# EXHIBIT 1

<u>**RECORDING AGREEMENT**</u>

AGREEMENT made and entered into by and between SKYYWALKER RECORDS, INC. 3050 BISCAYNE BLVD., SUITE 307, MIAMI, FL.  33137 (hereinafter referred to as "Company")LUTHER CAMPBELL, DAVID HOBBS, CHRIS WONG WON, MARQUIS ROSS p/k/a (2 LIVE CREW), 1550 N.E. 125TH TERRACE, MIAMI, FL.  33161 (hereinafter referred to as "Artist").

1.   <u>ENGAGEMENT</u>

Company hereby engages the exclusive services of Artist in connection with the production of phonograph records upon the terms and conditions herein contained; and Artist hereby accepts such engagement and agrees to render such services exclusively to Company for an initial period commencing on January 1, 1987 and ending December 31, 1987.  Company will have three (3) separate options to extend that term for additional Contract Periods ("Option Periods') on the same terms and conditions.  Company will have the right to exercise each of those options by seriding Artist a notice at any time before the expiration date of the Contract Period which is then in effect (the "Current Contract Period").  If Company exercises such an option, the Option Period concerned will begin immediately after the end of the current Contract Period.

2.   <u>RECORDING COMMITMENT</u>

(a)  During each Contract Period, Artist will perform for the recording of the number of Master Recordings indicated below (the "Minimum Recording Commitment"):

(1)  During the first Contract Period the Minimum Recording Commitment will be Master Recordings sufficient to constitute two (2) Sides (the "First Sides");

(2)  During each Option Period the Minimum Recording Commitment will be Master Recordings sufficient to constitute one(1) Album;

(i)  The Minimum Recording Commitment for each Contract Period will be fulfilled within the first three (3) months of the Period concerned.

(b)  During each Contract Period hereunder, Company will have the following options ("Over-call Options") to increase the Recording Commitment for the Period concerned by the number of Master Recordings set forth below ("Over-call Recordings").  Each Over-call Option may be exercised by Company by sending Artist a notice at any time before the end of the Contract Period concerned.

(1)  During the first Contract Period Company will have the following three (3) separate Over-call Options.

(i)  For Over-call Recordings sufficient to constitute two (2) additional Sides.

(ii) For Over-call Recordings, which together with the First Sides and two (2) additional Sides referred to in 2 (b) (1) (i) above, will be sufficient to constitute one (1) Album; and

(iii)  For Over-call Recordings sufficient to constitute one (1) additional Album.

(2)  During each Contract Period Company will have an Over-call Option to increase the Recording Commitment for that Period by Over-call Recordings sufficient to constitute one (1) additional Album.

-2-

(c)   Each time Company exercises any such Over-call Option hereunder:

(1)   The Over-call Recordings will be Delivered to company within three (3) months; and

(2)   The current Contract period will continue for nine (9) months after the date of Completion of the lacquer, copper, or equivalent masters to be used in manufacturing the disc Phonograph Record units derived from the Over-call Recordings concerned;

(d)   Company shall own all master recordings embodying the performance of Artist made hereunder and all derivatives of the same; and Company shall further own all of the performances of Artist embodied in said master recordings and derivatives thereof.  Without limiting the generality of the forgoing, Company's said rights of ownership shall include the sole and exclusive right to manufacture, advertise, sell, lease, license or otherwise use, deal in or dispose of records embodying the performances of Artist to be recorded hereunder in all fields of use perpetually and throughout the world and upon terms and conditions as Company may approve; and the sole and exclusive right publicly to perform Artists performances embodied in recordings hereunder by means of radio broadcasting or otherwise and to license and authorize others to do so perpetually and throughout the world upon such terms and conditions as Company may approve.  All master recordings recorded during the term here of and all derivatives manufactured therefrom, together with the performances embodied thereof shall from the inception of their creation, be entirely and forever the

-3-

property of the Company, or its designee free from any claims whatsoever by Artist or any person, firm or corporation deriving any rights or interests from Artist; and company shall have the right to assign and otherwise transfer such copyrights to any third party, free and clear of any claim by Artist or any person, firm or corporation, deriving any rights from Artist.

3.    GRANT OF RIGHTS

Artist hereby grants to Company the sole and exclusive right during the initial term of this Agreement and all renewals and extensions of the same to use, publish and permit others to use and publish, and licenses and authorize the use of Artists name, including any professional name, likeness, signature and biographical data about Artist on and in connection with the manufacture, advertising, sale, lease and other exploitation in all fields of use throughout the world, of records, as the same are now known or hereafter devised or improve, including audiovisual devices, record products and other products and services of Company and Company's licensees, upon such terms and conditions as Company may approve. However, the above mentioned grant of rights shall not include merchandising rights and said right shall be nonexclusive after the term of this agreement and shall continue thereafter in perpetuity.

4.    RECORDING PROCEDURE

(a)  Artist shall report to recording sessions at the same times and places that Company designates by Notice to Artist. Artist agrees to record such musical materials as Company

-4-

selects; and if requested to do so, Artist shall re-record any such "material" until a commercially satisfactory master recording thereof is accepted by the Company.  It is understood that Artist may submit

original material for consideration by Company on each Album recording project hereunder; however, Company's decision as to musical compositions used shall be final.

(b)  No "live" Recording or Recording not made in full compliance with the provisions of this Agreement will apply in fulfillment or your Recording Commitment, nor will Company be required to make any payments in connection with any such Recording, unless Company agrees in writing or such Recording is actually released by Company.  No Joint Recording will apply in fulfillment of your Recording Commitment, nor will Company be required to make any payments in connection with any such Joint Recording other than royalties due you hereunder, even if such Joint Recording is actually released by Company.  No Recordings shall be made by unauthorized dubbing.

(c)  Nothing in this Agreement shall obligate Company to continue or permit the continuation of any recording session or project, even if previously approved hereunder, if Company reasonably anticipates that the Recording Costs will exceed those specified in the approved budget or that the Recordings being produced will not be satisfactory.

(d)  Each Master Recording made hereunder shall be subject to our approval as commercially and technically satisfactory for the manufacture and sale of Phonograph Records by us or our

-5-

Licensees.  Upon Company's request, you shall re-record any Composition until a satisfactory Master Recording shall have been obtained.  We shall edit, sequence, and leader multi-tract master tapes for Master Records hereunder.  All work parts of whatever nature (including, without limitation, out-tapes or other tracks recorded during the Term) shall be delivered to Company promptly upon your completion.

(5)  COSTS

Company, or at its election for its Licensee, shall be responsible for, and shall pay when due, all Recording Costs with respect to the Master Recordings, including, without limitation, any and all fees payable at any time to any and all persons connected with the recording (including, without limitation, any and all instrumentalists, leaders contractors, arrangers, copyists, vocalists and producers), costs of transportation, accommodations and sustenance, tape costs, studio rentals, costs of cartage and instrument hire, pension and welfare payment, any editing and mastering costs, payroll taxes and any and all other costs and expenses customarily treated as recordings costs in the recording industry.  All such payments shall be in accordance with the requirements of any appropriate unions with which Company may at any time have an agreement lawfully conferring jurisdiction of the recording of such Master Recordings.  We shall also be solely responsible for and shall pay any and all sales, use or similar taxes which may be imposed by any taxing jurisdiction as a result of recording for us of any or all of the Master Recordings.  Said

-6-

recording costs shall be recoupable from royalties due and owing Artist according to Paragraph 6.

6. COMPENSATION, ROYALTIES

(a) As payment in full for Artists services hereunder, Company agrees to pay Artist within fourteen (14) days after services have been rendered, applicable minimum union scale for each Master Recording hereunder accepted by Company as commercially satisfactory for manufacture and sale. It is understood and agreed that Company shall determine in it sole business judgment and discretion whether any Master Recording hereunder is commercially acceptable or satisfactory. However, company shall not be unreasonable in it judgment and discretion.

(b) Notwithstanding anything to the contrary in this Agreement, the royalty rates herein shall be calculated upon the same basis and subject to the same royalty reductions and reserve policies as we are subject to pursuant to our Agreements with Licensees as we may from time to time be affiliated, including, but not limited to, tax and Container Charges and such royalty reductions as may be related to among others, foreign sales, promotional records, budget records, records combining Master recorded hereunder with those which are not, Masters licensed on a flat fee basis, records sold to governmental agencies or libraries. Company will adjust your royalty rate pro rata and compute our royalty or payment in the same manner as a licensee adjusts the royalty rate and computes the royalty or payment to Company for such tapes and records.

-7-

(c)   Conditioned upon the Artists full and faithful performance to the best of its ability of each and all of the terms hereof, Company shall pay to Artist in respect of the sale of Phonograph Records embodying, only the Master Recordings, the basic royalty computed at the applicable percentage indicated below, of the applicable Royalty Base Price in respect of Net Sales of Phonograph Records consisting entirely of Master Recordings:

(i)   In respect of any Records sold by us or our Licensees through Normal Retail Channels in the United States, a royalty of either:  (a) On Albums, 12% and (b) on "Single" records, 10% and (c) 8% on videograms, of the Whole Sale Price of records sold from time to time by companies distributors, except that in the event of sales by our Licensees in the United States of America of such records in the form of pre-recorded tapes, cartridges or other recorded devices of any kind (other than discs) the royalty shall be 75% of the aforementioned royalty rates based upon the (Wholesale Price) of the comparable disc device in the United States.

(ii) In the event of the sale of Records outside the United States, the royalty rate payable hereunder shall be (50%) of the rate times the Royalty Base Price provided in 6 b (i) and such Royalty Base Price shall be based upon the suggested retail price of such Records in the Country of sale.  Such royalties shall be computed in the national currency of the Country to which the price so selected applies and shall be credited to your royalty account hereunder at the same rate of exchange as Company is paid, and shall be proportionately subject to any and all taxes, charges or credits which may be imposed upon Company's receipts.

-8-

(c)   Notwithstanding any of the forgoing, the royalty on records sold in the United States through any Club Operation, shall:  be either at the rate of one-half (1/2) of the royalty provided for in (a) above, based upon the average net price to the Club members of purchases, of Fifty percent (50%) the net royalty which Company shall receive from its Licensee distributing such records, whichever shall be less, and the royalty rate on Records sold outside the United States through any Club Operation shall be one-half (1/2) of the royalty rate provided for in (b) above based upon the average net price to the Club members or purchasers.

(d)   Company or its Licensees shall have right to sell records under any sales or merchandising plan or team we or they may at any time deem desirable.  Notwithstanding anything to the contrary contained in this Agreement, no royalties shall be payable on Records furnished as free or bonus records to members, applicants or other participants in any Club Operation; on Records distributed for promotional or advertising purposes to disc jockeys of any kind, radio stations, television stations or networks, television production companies, motion picture companies, publishers, record reviewers, or other customary recipients of promotional records or as special audio products of any kind; on Records returned for credit by any buyer; on so-called "sampler" albums; on Records sold for scrap or as "cut-outs"); on Records distributed on a no-charge basis to distributors, sub-distributors, dealers or other (whether or not intended for resale or actually resold); and on Records given away gratis or sold to any party as

-9-

overstock or at less than of the regular wholesale price, whether for sales incentive purposes, in connection with special sales of merchandising sales plans, or otherwise. All records not sold to a third party by us or Company's Licensees, directly or indirectly, shall be presumed, for purposes of computing and paying royalties hereunder, to have been distributed on a no-charge basis. Without limiting the generality of the forgoing, it is hereby explicitly agreed that "free goods" shall be royalty free records regardless of whether such "free goods" are given by or to Company's Licensees as actual "free goods" or converted into an additional discount; and similarly, in the event Records are sold by or to such Licensee at a discount from the usual gross price for such Records instead of giving "free goods", the provisions of the following sentence shall apply, regardless of whether such additional discount is applied to sales or converted into "free goods".

(e)  The royalty rate on Records sold to the United States Government, it's subdivision, departments and agencies (including, without limitation, Records sold for resale through military facilities) shall be one-half (1/2) of the otherwise applicable royalty rate and shall be based upon the net amount actually received by Company in respect thereof. The royalty rate on Records sold as 'EP Records on a mid-priced label or for use as premiums, or promotional merchandise, or as special audiophile products of any kind, or sold as a Budget Record, Reissue Label or on a low-priced label shall be of the otherwise applicable royalty provided for above and shall be based upon the average applicable wholesale selling price charged from time to time to the Licensees in each Country which is selling each such record. Notwithstanding any provision to the contrary

-10-

herein contained, and without limiting any of Company's rights hereunder, Company shall have the right to license any Master Recording hereunder for use in any Country(ies) in compilation albums of any kind (including, without limitation, albums of the so-called "K-tel" type), and in the event of any such license, Company shall credit to your royalty account, in lieu of any royalty to which you might otherwise be entitled hereunder in respect of such use, 50% of any royalty actually received by Company from each Licensee with respect to each such licensed Master Recording.

(f)   Notwithstanding anything to the contrary contained in Article 6:

(i)   Records released by Company or its Licensees in the form of so-called "Giant Singles" or EPS" shall be treated for all purposes hereunder as if they were normal seven-inch 45 RPM single records and the royalty for each such record shall be the otherwise applicable royalty payable with respect to a seven inch 45 RPM single record of customary price actually charged for such single Records from time to time to Licensees selling each such Record in each Country where such Records are sold:

(ii) For purposes of computing royalties hereunder, there shall be deducted from any price upon which royalties are calculated hereunder (including, without limitation, the Wholesale Price and/or the suggested retail list price of any Phonograph Record hereunder) an amount equal to the aggregate of any payments pursuant to collective bargaining agreements of any kind and any excise, sales, value added or comparable or similar taxes;

(iii)     For purposes of computing royalties, there shall be deducted, a Container Charge, from any price upon which royalties are calculated hereunder (including, without limitation, the Wholesale Price and/or the suggested retail list price of any Phonograph Record hereunder.  Said container charge shall not exceed 10% on singles and single fold L.P.'S and shall not exceed 20% on Double Jacket L.P.'S and cassette tapes.

7.   <u>ACCOUNTING</u>

Accounting as to royalties payable hereunder shall be made by Company to Artist no less than semiannually together with payment of royalties, if any, earned by Artist during the preceding semiannual period.  Statements rendered by Company to Artist shall be binding upon Artist.  Artist shall have the right to appoint a certified public accountant or attorney to inspect the books and records of Company insofar as the same pertain to the subject matter of this Agreement; provided, however, that such inspection shall take place only upon reasonable notice, not more frequently than semiannual in any calendar year during which Artist received a statement, and at the sole expense of Artist.  You shall be deemed to have consented to all royalty statements and all other accounting rendered by us hereunder and each such royalty statement or other accounting shall be conclusive, final and binding, shall constitute an account stated, and shall not be subject to any objection for any reason whatsoever unless specific objection in writing, stating the basis thereof, is given by you to us within one (1) year after the date rendered.  No action, suit, or proceeding of

any nature in respect to any royalty statement or other accounting rendered by us hereunder may be maintained against us unless such action suit, or proceeding is commenced against us in a Court of competent jurisdiction within two (2) years after the date rendered.

8.  <u>LICENSES FOR COMPOSITIONS</u>

(a)  (1)  You will obtain at Company's expense and election, and for Company's benefit, when appropriate, at Company requests, mechanical licenses covering Controlled Compositions embodied on the Master Recording at a payment rate no greater than the royalty rate equal to the minimum compulsory license rate applicable under the copyright law of the country concerned at the time or release; or if there is no minimum compulsory license rate applicable in a particular country, at the lowest prevalent rate being paid to mechanical copyright owners at the time of release in the country concerned for Compositions of comparable length which are performed by other artists who have attained Records Sales comparable to sales by Artist in the country concerned.  You grant Company an irrevocable license, under copyright, to reproduce each Controlled Composition on Phonograph Records and distribute them in the Territory.

(2)  For that license, notwithstanding the forgoing, Company will pay mechanical Royalties of three-fourths of the minimum statutory rate then in effect per Composition which has not yet been recorded for Records sold in the United States and Canada, on the basis of Net Sales.  The Mechanical Royalty on any

-13-

Record sold through a Club Operation will be the amount fixed in the preceding sentence.  If the Composition is an arranged version of public domain work, the Mechanical Royalty on it will be half of the amount fixed in the first sentence.  No Mechanical Royalties will be payable for any Records described in Paragraph d.

(b)  The total Mechanical Royalty for all Compositions on any Album, including Controlled Compositions, will be limited to the number of Compositions on each album times the amount which would be payable on it under Section 8 (a) (2).  The total Mechanical Royalty on any "single" Record will be limited to twice that amount.

(c)  Company or its Licensees will compute Mechanical Royalties on Controlled Compositions as of the end of each calendar semiannual period for that calendar half.  By the next September 1, and March 1, Company or its Licensees in the United States and Canada will send a statement covering those royalties and will pay any net royalties which are due.  Company or its Licensees in the United States and Canada will not be required to send a statement for any period in which there are no sales or returns.  Mechanical Royalty reserves maintained by Company against anticipated returns and credits will not be held for an unreasonable period of time; retention of a reserve for two years after it is established will not be considered unreasonable in any case.  If the Record consisting of Master Recordings made under this Agreement (including Mechanical Royalties for Compositions which are not Controlled Compositions) is higher than the limit fixed for that

-14-

Record under Subparagraph 8(b), that excess amount will be considered as overpayment also and will be deducted from royalties.

(d)  If the copyright in any Controlled Composition is owned or controlled by anyone else, you will cause that Person to grant Company the same rights described in Paragraphs 8 (a) and 8 (d), on the same terms.  If the copyright in any Controlled Composition is transferred, the transfer will be made subject to this Agreement.

9.   WARRANTIES, REPRESENTATIONS; RESTRICTIONS; INDEMNITIES

(a)  You have the right and power to enter into and fully perform this Agreement.

(b)  To the best of your knowledge information and belief each Person who rendered any service in connection with, or who otherwise contributed in any way to the making of the Masters, or who granted to you your rights referred to in this Agreement, had the full right, power and authority to do so, and was not bound by any Agreement which would restrict such Person from rendering such services or granting such rights.

(c)  You are or will become and will remain to the extent necessary to enable the performance of this Agreement, a member in good standing of all labor unions or guilds, membership in which may be lawfully required for the performance of your services hereunder.

-15-

(d)  No Materials, as hereinafter defined, or any use thereof, will violate any law or infringe upon or violate the rights of any Person.  "Materials", as used in this Article, means:  (1) all Controlled Compositions, (2) each name legally and professionally used by you in connection with Recordings made hereunder or otherwise, and (3) all other musical, dramatic, artistic and literary materials, ideas, and other intellectual properties, furnished or selected by you and contained in or used in connection with any Recordings made hereunder or the packaging, sale, distribution, advertising, publicizing or other exploitation thereof.

(e)  You will and we will at all times indemnify and hold harmless the other and any Licensee from and against any and all claims, damages, liabilities, costs and expenses, including legal expenses and reasonable counsel fees, arising out of any breach by the other of any warranty or agreement made herein.  The breaching Party will reimburse the other and/or its Licensee on demand for any payment made at any time after the date hereof in respect of any liability or claim in respect or which the non-breaching Party or Licensees are entitled to be indemnified.

(f)  During the term of this Agreement, the Artist will not enter into any agreement which would interfere with the full and prompt performance of their obligations hereunder, and the Artist will, not perform or render any services for the purposes of making Phonograph Records of Master Recordings derived from the

-16-

Artists performances for any reason whatsoever, the Artist will not perform any Composition which shall have been Recorded hereinunder for any Person other than Company for the purpose of making Phonograph Recordings prior to following dates whichever shall be later:  (1) Within five (5) years following the termination of this agreement (2) Within five (5) years following the release of the last Master recorded hereunder.  The Artist shall not authorize or knowingly permit Artists performances to be Recorded without an express written agreement prohibiting the use of such Recording on Phonograph Records in violation of the forgoing restrictions.

(g)  If the Artist shall become aware of any unauthorized Recordings, manufacture, distribution or sale by any third party contrary to the forgoing re-recording restrictions, Artist shall notify Company thereof and shall cooperate with Company in the event that Company commences any action or proceedings against such third party.

(h)  The services of the Artist are unique and extraordinary, and the loss thereof cannot be adequately compensated in damages, and Company shall be entitled to injunctive relief to enforce the provisions of this Agreement.

(i)  Artist recognizes that the sale of Records is speculative and agrees that Company and Licensee's judgment with regard to any manner affecting the sale, distribution and/or exploitation of such records shall be binding and conclusive upon Artist.  Except as specifically provided to the contrary, nothing contained in this Agreement shall obligate Company or

-17-

Licensee to manufacture, release, distribute, sell and/or promote Records reproduced from Masters recorded hereunder. Furthermore, Company may discontinue or permit any Licensee to discontinue without any liability to Artist the manufacture and/or sale of any Records manufactured from Master Recordings recorded hereunder, when in Company's or Licensee's sole discretion they are no longer commercially satisfactory or their future sales and manufacture ceases to be profitable or advisable. Company shall have no liability for any failure to request or permit completion of Artist recording commitment hereunder unless the Artist has at all times been ready, willing and able to perform as and when provided herein.

10. BREACH OF CONTRACT

In the event Artist breaches any provision of this Agreement in addition to all other remedies available to Company, it is agreed that Company shall have the right to withhold all royalties or other monies otherwise payable to Artist hereunder or under any other Agreement between Artist and Company or any of Company's affiliated or subsidiary companies in an amount that will reasonably secure Company for all damages incurred and reasonably expected to be incurred by Company as a result of Artists breach.

11. ASSIGNMENT

Company shall have the right to assign this Agreement or any of its rights hereunder to any person, firm or corporation. Artist may not assign this Agreement or any of its rights or obligations hereunder without the prior written consent of Company.

-18-

12. <u>INDEMNITY OF ARTIST</u>

The Company hereby undertakes to save the Artist harmless from and to keep the Artist fully and effectively indemnified against all losses, claims, damages and demands (including without limitation to the generality of the forgoing costs and expenses which may be incurred by or awarded against the Artist in the institution or defense of any action or proceedings relating to the rights of the Artist in and to the Master) arising out of or as a consequence of any breach by the Company or by Producers engaged by the Company contained in any agreement between the Company, its Producers and any Third Party.

13. <u>UNIQUE SERVICES</u>

Company and Artist agree that Artists services hereunder are of a special and unique character, and that the use of the Artist performance, name and likeness in connection with the manufacture, advertising, and marketing or records is of a value that cannot readily be calculated in monetary terms.  Artist agrees that

-19-

in the event Artist breaches any of the provisions of this agreement, Company shall be entitled to seek injunctive relief against Artist in addition to any other remedies available to Company at law or in equity.

14. DEFINITIONS

For the purposes of this Agreement:

(a) "Side" means 7-inch, 45 rpm single sided recording embodying the recorded performance of Artist and intended for use in the manufacture and sale of phonograph records.

(b) "Single" means 7-inch, 45 rpm double sided phonograph record embodying therein two (2) sides

(c) "L.P." means a 12-inch 33-1/3 rpm double sided phonograph record embodying thereof the equivalent of not less than six (6) sides and not more than ten (10) sides.

(d) "Records" "phonograph records", "recordings", and "derivatives" means and include all forms of recording and reproductions, now known or which may hereafter become known, manufactured or sold primarily for home use and/or juke box use and/or use on or in means of transportation, including, without limiting the generality of the forgoing, magnetic recordings tape, film, electronic video records and an other medium or devise of the reproduction of artistic performances manufactures or solid primarily for home and/or juke box use, and/or use on or in means of transportation, whether embodying (i) sound alone; or (ii) sound synchronized with visual images, e.g. "sight and sound" devised.

-20-

(e)  "Wholesale Price" means the "wholesale) price or applicable list price, as Company is paid, by distributors in the country of sale (exclusive of all taxes, discounts, duties and packaging).

(f)  "Composition" means a musical composition or medley consisting of words and/or music, whether in the form of instrumental and/or vocal music, embodies in a Side.

(g)  "Union Scale" means the applicable minimum payment required to be made to Artist under the applicable collective bargaining agreement as may be in force from time to time and controlling with respect to this agreement.  If, at any time, there is no such collective bargaining agreement in force, then Union Scale shall mean the Union Scale in the collective bargaining agreement last in effect.

(h)  "Recording Cost" means all costs incurred for and with respect to the production of Sides embodying Artists performances.  Recording Cost include, without limitation, union scale, the costs of all instruments, musicians, vocalist, conductors, arranges, orchestrators, copyists, etc., payment to a trustee or fund based on wages to the extent required by any agreement between Company and any labor organization or trustee, all studio costs, tape, editing, and per diem for individuals involved in production of the Sides, rehearsal halls, costs of non-studio facilities and equipment, dubbing, transportation or instruments, producer's fees and other costs and expenses incurred in producing the Sides hereunder, from time to time, and which are customarily recognized as Recording Costs in the phonograph record industry.

16. <u>ENTIRE AGREEMENT</u>

This agreement sets forth the entire agreement between the parties hereto with respect to the subject matter hereof, and no modification, termination or discharge of this agreement or any provisions hereof shall be binding upon Company unless confirmed by a written instrument signed by an officer of Company. No waiver of any provision of or default under this agreement shall affect the right of Company thereafter to enforce such provisions or to exercise any right or remedy in the event of any default, whether similar or dissimilar. This agreement, it's validity, construction and effect shall be governed by the law of the State of Florida. The State of Florida is granted jurisdiction of all controversies arising out of this Recording Agreement between the parties hereto. In the event any part of this agreement is declared to be void or unenforceable, the remainder of this agreement shall continue in full force and effect with such void or unenforceable part thereof deleted therefrom.

WHEREFORE, THE PARTIES HERETO HAVE EXECUTED THIS AGREEMENT ON THE
YEAR AND DATE FIRST ABOVE WRITTEN.


COMPANY:

SKYYWALKER RECORDS, INC.

BY: _____

    LUTHER CAMPBELL

ARTIST:

_____

LUTHER CAMPBELL

_____

DAVID HOBBS

_____

CHRIS WONG WON

_____

MARQUIS ROSS