**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

LIL' JOE RECORDS, INC.,    )

    )

    Plaintiff,    )

    )

    v.    )    CASE NO. 1:21-CV-23727-DPG

    )

MARK ROSS; et al.,    )

    )

    Defendants.    )

    )

**DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY**
**JUDGMENT AND REQUEST FOR ORAL ARGUMENT**

i

## <u>TABLE OF CONTENTS</u>

I.      Introduction and statement of facts……………………………………………………..1

II.     Legal Standard……………………………………………………………………………2

III.    Argument…………………………………………………………………………………2

        A.  Lil' Joe has not proven that 2 Live Crew failed to exercise their Section 203
            rights………………………………………………………………………………2

        B.  Lil' Joe has not established that the notice was defective………………………..5

        C.  Lil' Joe cannot prove that 2 Live Crew lost their Section 203 rights through
            bankruptcy or via a settlement agreement………………………………………...7

        D.  The songs were not works-for-hire………………………………………………11

IV.     Request for additional time………………………………………………………………17

V.      Conclusion………………………………………………………………………………18

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Aymes v. Bonelli,*
   980 F.2d 857 (2d Cir. 1992) ................................................................................. 17

*Baldwin v. EMI Feist Catalog, Inc.,*
   805 F.3d 18 (2d Cir. 2015) ..................................................................................... 5

*Baldwin v. EMI Feist Catalog, Inc.,*
   2012 WL 13019195 (S.D. Fla. Dec. 11, 2012) ...................................................... 9

*Board of Trade of Chicago v. Johnson,*
   264 U. S. 1, 44 S.Ct. 232, 68 L.Ed. 533 (1924) .................................................. 10

*Brown-Thomas v. Hynie,*
   441 F. Supp. 3d 180 (D.S.C. 2019) ....................................................................... 9

*Carter v. Helmsley-Spear, Inc.,*
   71 F.3d 77 (2d Cir. 1995) ..................................................................................... 17

*Celotex Corp. v. Catrett,*
   477 U.S. 317 (1986) ............................................................................................... 2

*CENAPS Corp. v. Cmty. of Christ,*
   371 F. Supp. 3d 1024 (M.D. Fla. 2019) ................................................................ 2

*Champlin v. Music Sales Corp.,*
   2022 WL 1747932 (S.D.N.Y 2022) ....................................................................... 7

*Chanel, Inc. v. Italian Activewear, Inc.,*
   931 F.2d 1472 (11th Cir. 1991) ............................................................................. 2

*Chapman v. AI Transport,*
   229 F.3d 1012 (11th Cir. 2000) ............................................................................. 2

*Classic Media, Inc. v. Mewborn,*
   532 F.3d 978 (9th Cir. 2008) ................................................................................. 8

*Cmty. for Creative Non-Violence v. Reid,*
   490 U.S. 730 (1989) ....................................................................... 11, 12, 15, 17

*Eden Toys, Inc. v. Florelee Undergarment Co.,*
   697 F.2d 27 (2d Cir.1982) ..................................................................................... 4

*Eisenberg v. Advance Relocation & Storage, Inc.,*
   237 F.3d 111 (2d Cir. 2000) ................................................................................. 15

*Everly v. Everly,*
   958 F.3d 442 (6th Cir. 2020) ............................................................................... 17

*Everly v. Everly,*
   2020 WL 5642359 (M.D. Tenn. Sept. 22, 2020)................................................... 8

*F.T.C. v. Morton Salt Co.,*
   334 U.S. 37, 68 S.Ct. 822, 92 L.Ed. 1196 (1948).............................................. 11

*Fred Ahlert Music Corp. v. Warner/Chappell Music, Inc.,*
   155 F.3d 17 (2d Cir.1998) ..................................................................................... 9

*Gladwell Government Services, Inc. v. County of Marin,*
   265 F. App'x 624 (9th Cir. 2008) ........................................................................ 12

*Hall v. Burger King Corp.,*
   912 F.Supp. 1509 (S.D. Fla. 1995)........................................................................ 2

iii

*Horror Inc. v. Miller*,
  15 F.4th 232 (2d Cir. 2021) ................................................................................Passim

*Horror Inc.*,
  335 F. Supp. 3d 273 (D.Conn. 2018) .................................................................... 16

*I.A.E., Inc. v. Shaver*,
  74 F.3d 768 (7th Cir.1996) ...................................................................................... 4

*In re McKay*,
  143 F. 671 (W.D.N.Y. 1906) .................................................................................... 9

*In re Napster, Inc.* Copyright Litig.,
  191 F.Supp.2d 1087 (N.D. Cal. 2002) .................................................................... 8

*Irby v. Bittick*,
  44 F.3d 949 (11th Cir. 1995) ................................................................................... 2

*Korman v. HBC Fla., Inc.*,
  182 F.3d 1291 (11th Cir. 1999) ..................................................................... 2, 3, 11

*Langman Fabrics a div. of Blocks Fashion Fabrics, Inc. v. Graff Californiawear, Inc.*,
  160 F.3d 106 (2d Cir. 1998) .................................................................................. 13

*Marvel Characters, Inc., v. Simon*,
  310 F.3d 280 (2d Cir. 2002) .................................................................................... 6

*Mills Music, Inc. v. Snyder*,
  469 U.S. 153 (1985) ............................................................................................. 3, 8

*Mission Prod. Holdings, Inc. v. Tempnology, LLC*,
  203 L. Ed. 2d 876, 139 S. Ct. 1652 (2019) ........................................................... 10

*N.Y. Times Co. v. Tasini*,
  533 U.S. 483 (2001) ................................................................................................ 8

*Playboy Enterprises, Inc. v. Dumas*,
  53 F.3d 549 (2d Cir. 1995) .................................................................................... 13

*Rano v. Sipa Press, Inc.*,
  987 F.2d 580 (9th Cir. 1993) .................................................................................. 3

*Roberts & Schaefer Co. v. Hardaway Co.*,
  152 F.3d 1283 (11th Cir. 1998) ............................................................................... 5

*Rodrigue v. Rodrigue*,
  218 F.3d 432 (5th Cir. 2000) ................................................................................. 10

*Roger Miller Music v. Sony/ATV Publ'g*,
  477 F.3d 383 (6th Cir. 2007) ................................................................................. 17

*Schiller & Schmidt, Inc. v. Nordisco Corp.*,
  969 F.2d 410 (7th Cir. 1992) ................................................................................. 12

*Schubot v. McDonalds Corp.*,
  757 F.Supp. 1351 (S.D. Fla. 1990) ......................................................................... 2

*Siegel v. Warner Bros. Entm't Inc.*,
  690 F. Supp. 2d 1048 (C.D. Cal. 2009) .................................................................. 7

*Stewart v. Abend*,
  495 U.S. 207 (1990) ....................................................................................... 8, 9, 11

*Stillwater Ltd. v. Basilotta*,
  2017 WL 2906056 (C.D. Cal. Mar. 17, 2017) ....................................................... 8

*Van Cleef & Arpels Logistics, S.A. v. Jewelry*,
  547 F.Supp.2d 356 (S.D.N.Y.) ............................................................................. 14

*Waite v. UMG Recordings, Inc.*,
  450 F. Supp. 3d 430 (S.D.N.Y 2020) ........................................................................7
*Waite v. UMG Recordings, Inc.*,
  477 F. Supp. 3d 265 (S.D.N.Y. 2020) .......................................................................8
*Walthal v. Rusk*,
  172 F.3d 481 (7th Cir. 1999) .................................................................................2, 4
*Woods v. Bourne Co.*,
  60 F.3d 978 (2d Cir. 1995) ......................................................................................11
*Zuill v. Shanahan*,
  80 F.3d 1366 (9th Cir. 1996) ...................................................................................17

## Statutes

17 U.S.C. § 101 ..........................................................................................................6, 12
17 U.S.C. § 101(1) ...........................................................................................................15
17 U.S.C. § 203 ........................................................................................................Passim
17 U.S.C. § 203(3) .............................................................................................................7
17 U.S.C. § 203(a) .........................................................................................................5, 7
17 U.S.C. § 203(5) .........................................................................................................8, 9
17 U.S.C. § 203(a)(1) ........................................................................................................6
17 U.S.C. § 203(a)(1), (2) .................................................................................................6
17 U.S.C. § 203(a)(3) ................................................................................................2, 3, 6
17 U.S.C. § 203(a)(4) ........................................................................................................5
17 U.S.C. § 203(a)(4)(A) ..........................................................................................5, 6, 7
17 U.S.C. § 203(a)(5) ....................................................................................................3, 9
17 U.S.C. § 204(a) .............................................................................................................4
17 U.S.C. § 304(c)(6)(B) ...................................................................................................9
17 U.S.C. § 304(c)(6)(D) ...................................................................................................9
17 U.S.C. § 410(c) ...........................................................................................................13
17 U.S.C. § 101(2) ...........................................................................................................12
17 U.S.C. § 304 .................................................................................................................9

## Rules

Fed. R. Civ. P. 56(c) .........................................................................................................2
Fed. R. Civ. P. 56(d) .......................................................................................................18

## Regulations

37 C.F.R. § 201.10 ............................................................................................................7
37 C.F.R. § 201.10(b)(2)(iii) .............................................................................................7
37 C.F.R. § 201.10(e) ........................................................................................................7

## Other Authorities

H.R. Rep. No. 94-1476, at 124 (1976) ..............................................................................3

Renegotiating the Copyright Deal in the Shadow of the "Inalienable" Right to Terminate,
62 Fla. L. Rev. 1329 (2010)..........................................................................................................9

## MEMORANDUM OF FACTS AND LAW

### I.     Introduction and statement of facts

Plaintiff, Lil' Joe Records, Inc.'s ("Lil' Joe"), motion for summary judgment (the "Motion") must be denied. Defendants Mark Ross ("Ross"), Luther Campbell ("Campbell"), and Christopher Wong Won[1] ("Won") (collectively "2 Live Crew") properly terminated the transfers at issue pursuant to 17 U.S.C. § 203, which allows copyright holders to terminate grants of copyright 35 years after publication of the works at issue.

Lil' Joe challenges the termination on two grounds and both fail. First, it claims 2 Live Crew's rights to terminate were lost by virtue of bankruptcy proceedings and litigation settlements. But it is settled that the right to terminate is inalienable by law and non-transferable, and, in any event, does not vest until the effective date of termination, which has not yet occurred. Lil' Joe also argues that the works at issue are works-for-hire, despite the fact that the factors used in determining whether a work is "for hire" favor 2 Live Crew. Lil' Joe's motion must be denied.

From 1986 to 1989, five albums[2] ("Subject Albums") were written, recorded, and published by 2 Live Crew. Defendants Statement of Disputed Material Facts and Additional Material Facts ("Def. Statement"), at 11. In or around 1990, 2 Live Crew entered into a written agreement with Skyywalker Records, Inc. that memorialized a prior oral agreement between the parties. Def. Statement at 13. This is the only written agreement in the record under which the Subject Albums could have been recorded and transferred and is stated to have become effective as of January 1, 1987,[3] between the 2 Live Crew members and Skyywalker Records, Inc., the successor to Luke Skyywalker Records, Inc. ("1987 Agreement"). Def. Statement at 14. In addition, there are certain related publishing agreements with Pac Jam Publishing, Inc. ("Pac Jam Agreements"). Def. Statement, at 15. Ultimately, through a series of agreements, bankruptcy proceedings, and litigation settlements Lil' Joe came to own the copyrights in the Subject

---

[1] Defendants Anissa Wong Won, Christopher Wong Won, Jr., Roderick Wong Won, and Leterius Rey are the heirs of Christopher Wong Won and have terminated Christopher Wong Won's grant of rights on behalf of the Estate of Christopher Wong Won. Def. Statement at 12.
[2] *The 2 Live Crew is What We Are, Move Somethin', Move Somethin' (Clean), As Nasty As They Wanna Be,* and *As Clean As They Wanna be*
[3] Lil' Joe may challenge the veracity of this agreement but, tellingly, it has filed its copy of the agreement as Exhibit 1 to the Moskowitz Declaration. See Dkt. 33-1.

Albums. Def. Statement, at 16. On November 4, 2020, 2 Live Crew served a noticed termination of its original copyright grants under 17 U.S.C. § 203. Def. Statement, at 17. Beginning on the effective date of termination in November 2022, 2 Live Crew will start to reclaim ownership of the copyrights from Lil' Joe as successor-in-title from any prior grants. Lil' Joe received the termination notice and sued to deprive 2 Live Crew of their Section 203 rights.

## II.     Legal standard

Summary judgment may only be granted when there are 'no genuine issues as to any material fact and the moving party is entitled to a judgment as a matter of law.'" *Schubot v. McDonalds Corp.*, 757 F.Supp. 1351, 1355 (S.D. Fla. 1990); see also Fed. R. Civ. P. 56(c). If there exists a "factual dispute" relating to a material issue that "affects the outcome of the case," then the motion should be denied. *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000). It is incumbent upon the moving party to demonstrates that there is "an absence of evidence to support the non-moving party's case." *Hall v. Burger King Corp.*, 912 F.Supp. 1509, 1516 (S.D. Fla. 1995), citing *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)). The non-moving party can defeat the motion by proffering "significant, probative evidence demonstrating the existence of a triable issue of fact." *Hall*, 912 F.Supp. at 1516, quoting *Irby v. Bittick*, 44 F.3d 949, 953 (11th Cir. 1995); citing *Chanel, Inc. v. Italian Activewear, Inc.,*931 F.2d 1472, 1477 (11th Cir. 1991).

## III.     Argument

This motion must be denied. Lil' Joe has failed to establish that 2 Live Crew was unable to comply, or has not complied, with the necessary requirements of 17 U.S.C. § 203. Lil' Joe's bankruptcy and "work-for-hire" arguments are unsupported by fact or law and must be rejected.

### A.     Lil' Joe has not proven that 2 Live Crew failed to exercise their Section 203 rights

Under 17 U.S.C. § 203(a)(3), "a copyright owner can terminate an exclusive license of copyrighted material 'at any time during a period of five years beginning at the end of thirty-five years from the date of the grant' of the license." *CENAPS Corp. v. Cmty. of Christ*, 371 F. Supp. 3d 1024, 1028 (M.D. Fla. 2019); citing 17 U.S.C. § 203(a)(3). The "plain language of this provision gives the author of a work the right to terminate any copyright transfer or license still in effect after 35 years, provided she exercises that right after 35 and before 40 years have elapsed." *Korman v. HBC Fla., Inc.,* 182 F.3d 1291, 1295 (11th Cir. 1999), citing *Walthal v.*

- 2 -

*Rusk,* 172 F.3d 481, 484 (7th Cir. 1999); *Rano v. Sipa Press, Inc.,* 987 F.2d 580, 585 (9th Cir. 1993*); see also* 17 U.S.C. § 203(a)(5)("Termination of the grant may be effected notwithstanding any agreement to the contrary...."). If "the grant covers the right of publication of the work, the period begins at the end of thirty-five years from the date of publication of the work under the grant or at the end of forty years from the date of execution of the grant whichever term ends earlier." 17 U.S.C. § 203(a)(3).

The "manifest congressional intent" behind Section 203 is "the protection of authors[,]" and is "a provision safeguarding authors against unremunerative transfers[.]" *Korman v. HBC Fla., Inc*., 182 F.3d at 1296. As the House Report notes, "[a] provision of this sort is needed because of the unequal bargaining position of authors, resulting in part from the impossibility of determining a work's value until it has been exploited." *Id*., citing H.R.Rep. No. 94–1476, at 124 (1976), reprinted in 1976 U.S.C.C.A.N. 5659, 5740. The stated purpose of the law "is to help authors, not publishers or broadcasters or others who benefit from the work of authors*." Korman v. HBC Fla., Inc*., 182 F.3d at 1296, citing *Mills Music, Inc. v. Snyder*, 469 U.S. 153, 172–73 & n. 39, 105 S.Ct. 638, 649–50 & n. 39, 83 L.Ed.2d 556 (1985) (citing the House Report about section 203 as authority for the proposition that a "comparable termination provision" in a related section of the same legislation was intended "to relieve authors of the consequences of ill-advised and unremunerative grants that had been made before the author had a fair opportunity to appreciate the true value of his work"). Thus, we must apply Section 203 in a manner that benefits 2 Live Crew, the artists, as opposed to Lil' Joe, the company that owns the rights for the initial copyright period, .

Here, the congressional intent and statutory purpose of Section 203 is served by denying Lil' Joe's challenge to 2 Live Crew's exercise of their Section 203 rights. 2 Live Crew's members entered into a less than favorable grant in connection with the Subject Albums and are now, 35 years after those works were published, well in their rights to terminate the grant. Def. Statement at 18. The grant at issue covered the right of publication.[4] Def. Statement at 19. Thus,

---

[4] The 1987 Agreement specifically states, "Artist hereby grants to Company the sole and exclusive right during the initial term of this Agreement and all renewals and extensions of the same to use, **publish and permit other to use and publish**…" Def. Statement at 19. The Pac Jam Agreements cover the composition copyrights for certain compositions on the second and third Subject Album, and stated that "The writer(s) hereby sells, assigns, transfers and delivers to

2 Live Crew's noticed termination of the grants of copyright in the works at issue from their respective date of publication. Allowing them to now reap part of the vast success of their works is in line with the purpose of Section 203.

Lil' Joe argues that 2 Live Crew transferred to Luke Records, Inc. the rights to the Subject Albums pursuant to three 1991 Recording Agreements. But, it cites only to the 1987 Agreement, and any agreements in 1991 would have contemplated only *future* recordings and could not possibly cover the Subject Albums, each of which was written, recorded, released, and in some cases registered with the Copyright Office well before 1991.[5] Def. Statement, at 20.

The 1987 Agreement, which was executed in or around 1990, is the operative agreement and to the extent that said written agreement is somehow unenforceable or otherwise flawed the operative agreement would be the oral license that the 1987 agreement sought to memorialize. Def. Statement, at 21; Motion, Dkt. 33-1.

Transfers of ownership must be in writing. 17 U.S.C. § 204(a). But nonexclusive licenses may be granted orally and are similarly subject to termination. *Walthal*, 172 F.3d at 484, citing *I.A.E., Inc. v. Shaver*, 74 F.3d 768 (7th Cir.1996); see also 17 U.S.C. § 203 ("the exclusive or nonexclusive grant of a transfer **or license** of copyright or of any right under a copyright ... is subject to termination")(emphasis added). And an oral ownership transfer is enforceable when it is later affirmed by a memorandum of transfer executed by the copyright owner. *Eden Toys, Inc. v. Florelee Undergarment Co.*, 697 F.2d 27, 36 (2d Cir.1982).

As such, the 1987 Agreement, a 1990 memorialization of the earlier oral agreement, is effective. And, importantly, 2 Live Crew and Skyywalker Records, Inc. (and its predecessor) complied with and operated under the terms of the 1987 Agreement, as renewed. As the Eleventh Circuit has held, "where parties act as though a contract exists, there is a contract, even though no formal writing exists." *Roberts & Schaefer Co. v. Hardaway Co.*, 152 F.3d 1283, 1295 (11th

---

the Publisher, its successors and assigns, a certain heretofore **unpublished** original musical composition…[] and all rights, claims, and demands in any way relating thereto…" including the rights to secure, hold, and register the copyright in the identified composition. Def. Statement at 19. Encompassed within these rights was the right to publish the composition identified. Def. Statement at 19.

[5] Lil' Joe's own Affidavit of Joseph Weinberger cites, as Exhibit 1, to the 1987 Agreement, while claiming it is a 1991 agreement. Lil' Joe failed to submit with its moving papers any 1991 contracts.

Cir. 1998). So owing, either the written 1987 Agreement was terminated or the oral license that it memorialized was terminated. And, in either case, the publication date for the Subject Albums, and not the transfer date, would set the termination period.

Lil' Joe has not, and cannot, argue the existence of any relevant agreements other than the 1987 Agreement. Def. Statement, at 22. While there is evidence of the existence of the 1987 Agreement and certain later-executed Pac Jam Agreements, Lil' Joe does not argue that those were not terminated. Def. Statement, at 13. Thus, the 1987 Agreement (itself or the oral agreements that it memorializes) and those that flow from it, including the Pac Jam Agreements, must govern and are the operative grants to be terminated. At a minimum, this is a highly disputed fact which must not be resolved at the summary judgment stage, necessitating denial of Plaintiff's Motion.

**B.      Lil' Joe has not established that the notice was defective**

A "termination shall be effected by serving an advance notice in writing, signed by the number and proportion of owners of termination interests required under clauses (1) and (2) of this subsection, or by their duly authorized agents upon the grantee or the grantee's successor in title." 17 U.S.C. § 203(a)(4). "The notice shall state the effective date of the termination, which shall fall within the five-year period specified by clause (3) of this subsection, and the notice shall be served not less than two or more than ten years before that date." 17 U.S.C. § 203(a)(4)(A). 2 Live Crew sent their termination notice on November 4, 2020, making it timely. Def. Statement at 17.

Importantly, "the exclusive or nonexclusive grant of a transfer or license of copyright or of any right under a copyright" made "on or after" January 1, 1978 may be terminated by the "author." 17 U.S.C. § 203(a). If an author is deceased, his or her heirs hold the termination right[6]. *Baldwin v. EMI Feist Catalog, Inc.,* 805 F.3d 18, 32 (2d Cir. 2015)(when an author is deceased, "termination may be effected by individuals holding more than half of the author's termination interest as set forth in the statute."), citing 17 U.S.C. § 203(a)(1), (2). "In the case of a grant executed by two or more authors of a joint work, termination of the grant may be effected by a majority of the authors who executed it" 17 U.S.C. § 203(a)(1). Each of the Subject Albums

---

[6] Christopher Wong Won's heirs have exercised the Section 203 termination right on behalf of the Estate of Christopher Wong Won. Def. Statement at 12.

were authored by the four original members of 2 Live Crew. Def. Statement at 11. A majority three of the four original members joined in the termination, effectuating the termination. Def. Statement at 17.

2 Live Crew's notice of termination complied with all of the requisite formalities. First, it was served on November 4, 2020, upon all possible rights holders, including Lil' Joe, via first-class mail (return receipt requested) and when possible electronic mail. Def. Statement at 23. Second, 2 Live Crew's notice and effective termination dates fell within the requirements of Section 203. The notice was sent on November 4, 2020 over two years before the earliest date of effective termination (November 7, 2022) and less than 10 years from the last date of effective termination (May 1, 2024). 17 U.S.C. § 203(a)(4)(A); Def. Statement at 17. The date of publication[7] for the first Subject Album *The 2 Live Crew Is What We Are* was provided in the termination notice as December 1, 1986[8] and the notice listed a date of effective termination of November 7, 2022, which is over 35 years from the date of publication and within the 5-year window beginning on December 1, 2021. 17 U.S.C. § 203(a)(3); Def. Statement at 24. The date of publication of the second and third Subject Albums *Move Somethin'* and *Move Somethin' (Clean)* was provided in the termination notice as March 21, 1988[9] and the notice listed a date of effective termination of March 21, 2023, within the required timeframe. Def. Statement at 25. The date of publication of the fourth and fifth Subject Albums *As Nasty as They Wanna Be* and *As Clean as They Wanna Be* was provided in the termination notice as May 1, 1989[10] and the notice listed a date of effective termination of May 1, 2024, again within the required timeframe.

---

[7] As relevant here, the statute defines "publication" as "the distribution of copies or phonorecords of a work to the public by sale or other transfer of ownership, or by rental, lease, or lending." 17 U.S.C. § 101. As § 203 itself suggests, the publication of a work is a one-time event. See id. § 203(a)(3) (referring to "the date of publication"); see also *Marvel Characters, Inc., v. Simon*, 310 F.3d 280, 282–83 (2d Cir. 2002)(noting that under the 1909 Act, "an author was entitled to a copyright in his work for twenty-eight years from the date of its publication"); 1 Nimmer § 4.01[A] (listing the consequences that still attach to a work's publication date under the 1976 Act).

[8] The date listed of first publication on the earliest filed composition copyright registration for the songs on the identified Subject Album. Def. Statement at 24.

[9] The date listed of first publication on the February 26, 2001 sound recording copyright registrations for the identified Subject Albums. Def. Statement at 25.

[10] The date listed of first publication on the February 26, 2001 sound recording copyright registrations for the identified Subject Albums. Def. Statement at 26.

Def. Statement at 26. Third, pursuant to 17 U.S.C § 203(a)(4)(A) a copy of the Termination Notice was recorded in the Copyright Office before the effective date of termination. Def. Statement at 27.

The notice complied with all necessary formalities and any purported technical defects are excused by the "harmless error doctrine" set forth in 37 C.F.R. § 201.10(e). The notice will stand so long as it was adequate "to serve the purposes" of the termination provision. 37 C.F.R. § 201.10(e); *Siegel v. Warner Bros. Entm't Inc*., 690 F. Supp. 2d 1048 (C.D. Cal. 2009). Indeed, a notice with putative errors remains valid if the errors were made in good faith and 'without any intention to deceive, mislead or conceal relevant information' and if the errors are harmless and 'do not materially affect the adequacy of the information required to serve the purposes of [Section 203].'" *Champlin v. Music Sales Corp*., 2022 WL 1747932 (S.D.N.Y 2022), citing *Waite v. UMG Recordings, Inc.,* 450 F. Supp. 3d 430, 440 (S.D.N.Y 2020), quoting § 201.10(e).

Here, the notice more than adequately serves the purposes of the termination provision and provided all requisite information. Plaintiff's contention that the 1987 Agreement is "undated" or otherwise flawed and cannot support the exercise of a termination right is not supported by the law, because neither 17 U.S.C. § 203, nor 37 C.F.R. § 201.10 require a dated or written agreement.[11] Furthermore, the date of the grant is immaterial when the grant provided for the right of publication making the date of publication the governing date. 17 U.S.C. § 203(3); 37 C.F.R. § 201.10(b)(2)(iii). Lil' Joe proffers no evidence that the purpose of Section 203 will be hindered by any perceived defects or that such errors were made with intent to deceive, mislead, or conceal relevant information. Therefore, Lil' Joe's described "fatal" deficiencies are anything but and the termination notice is not defective.

**C.     Lil' Joe cannot prove that 2 Live Crew lost their Section 203 rights through bankruptcy or via a settlement agreement**

Section 203 could not be clearer that one cannot transfer or divest themselves of their right of termination.  "Termination of the grant may be effected **notwithstanding any agreement to the contrary**, including an agreement to make a will or to make any future grant." 17 U.S.C. § 203(5)(emphasis added). "This right is non-transferrable and can only be exercised

---

[11] Notably, the exclusive or nonexclusive grant of a transfer or license of copyright or of any right under a copyright, executed by the author on or after January 1, 1978" may be terminated. 17 U.S.C.A. § 203 (a). There is no requirement that the transfer or license be written or dated.

by the author or his/her heirs." *Stillwater Ltd. v. Basilotta*, No. CV 16-1895 FMO (SHX), 2017 WL 2906056, at *3 (C.D. Cal. Mar. 17, 2017), citing *In re Napster, Inc*. Copyright Litig., 191 F.Supp.2d 1087, 1097 (N.D. Cal. 2002). Indeed, "the termination rights created by §§ 203 and 304 have repeatedly been characterized as "inalienable." *Everly v. Everly*, No. 3:17-CV-01440, 2020 WL 5642359, at *6 (M.D. Tenn. Sept. 22, 2020), citing, e.g., *N.Y. Times Co. v. Tasini*, 533 U.S. 483, 497 (2001); *Stewart v. Abend*, 495 U.S. 207, 230 (1990).

This reflects the "the unequal bargaining position of authors, resulting in part from the impossibility of determining a work's value until it has been exploited. Section 203 reflects a practical compromise that will further the objectives of the copyright law while recognizing the problems and legitimate needs of all interests involved." *Stillwater Ltd.,* 2017 WL 2906056, at *3, quoting *Mills Music, Inc. v. Snyder*, 469 U.S. 153, 173 n. 39 (quoting congressional report); *Classic Media, Inc. v. Mewborn*, 532 F.3d 978, 984 (9th Cir. 2008).

Lil' Joe argues that Defendants lost their Section 203 rights because they entered into certain agreements as part of bankruptcy proceedings or settlement negotiations that somehow waived those rights. But, this ignores the "inalienable" nature of the right and the plain text of the statute, which states that termination may be effected "notwithstanding any agreement to the contrary[.]" 17 U.S.C. § 203(5). And even if the statute allowed such a waiver, Lil' Joe fails to point to any language in any settlement or bankruptcy agreement that specifically identifies the Section 203 right.

Its other contentions similarly lack merit. First, it contends that "Luke Records" must join in the Termination notice and is a required party by virtue of certain bankruptcy proceedings. See Motion pg. 8. But only an "author" or his or her "heirs" may terminate a copyright grant. And, by the statute's terms, "third parties to a contract and loan-out companies, which 'loan' out an artist's services to employers and enter into contracts on behalf of the artist, do not have a termination right under the statute." *Waite,* 477 F. Supp. 3d at 271 (citation omitted). Companies like Luke Records are unable to terminate under Section 203.

Even if a company had termination rights, Luke Records has never purported to be an author, is not listed as an author on any copyright registration other than three sound recording registrations registered by Lil' Joe in 2001, which are directly contradicted by the composition registrations for the same works. Def. Statement at 28. Despite arguably being a rights holder at one time, because Luke Records is not an author it has never and will never have the right to

terminate a grant of copyright pursuant to Section 203 for the Subject Albums. Therefore, Lil' Joe's argument that they in fact "must" join in the Termination Notice fails both factually and legally.

Second, Lil' Joe's contention Luther Campbell and Luke Records' termination rights remain the property of their bankruptcy estates likewise fails. See Motion pg. 8.  Even if there was an agreement establishing those inchoate rights as property of the estate, Section 203 would preserve those rights. 17 U.S.C. § 203(5). As noted, the termination of a grant "may be effected **notwithstanding any agreement to the contrary**, including an agreement to make a will or to make a future grant." *Brown-Thomas v. Hynie*, 441 F. Supp. 3d 180, 191–92 (D.S.C. 2019)(emphasis by court), citing § 203(a)(5). As such, the 1976 Copyright Act… provides an **inalienable** termination right. *Stewart,* 495 U.S. at 230; citing 17 U.S.C. § 203; see also *Fred Ahlert Music Corp. v. Warner/Chappell Music, Inc.*, 155 F.3d 17, 24 (2d Cir.1998) (inalienability is "consistent with the general thrust of § 304, which is designed to protect the interests of authors and their heirs and to maximize their ability to exploit the value of their [works] during the extended renewal term."). Termination rights remain inalienable until they are exercised by service of a notice of termination. 17 U.S.C. § 304(c)(6)(B);[12] see also, 17 U.S.C. § 304(c)(6)(D) (providing that "[a] further grant, or agreement to make a further grant, of any right covered by a terminated grant is valid only if it is made after the effective date of the termination ... [or] after the notice of termination has been served ...").

It is settled that "Congress created an inalienable right to terminate a prior grant of an interest in a copyright." *Baldwin v. EMI Feist Catalog, Inc.*, No. 11-81354-CIV, 2012 WL 13019195, at *2 (S.D. Fla. Dec. 11, 2012), citing generally Lydia Pallas Loren, Renegotiating the Copyright Deal in the Shadow of the "Inalienable" Right to Terminate, 62 Fla. L. Rev. 1329, 1333-42 (2010). Congress did so in two provisions; specifically, 17 U.S.C. §§ 203 and 304. And the Section 203 right, "being inalienable, did not pass to the trustee in bankruptcy." *In re McKay*, 143 F. 671, 673 (W.D.N.Y. 1906)(discussing inalienable trust). As the Section 203 right is inalienable, it cannot be transferred as Lil' Joe claims.

And no case has ever held that a copyright holder loses their Section 203 rights by filing bankruptcy. Lil' Joe certainly does not cite to any such authority. Depriving an author of the

---

[12] Section 304 tracks for the most part Section 203 but applies to pre-1978 works.

termination right via bankruptcy would violate the letter and intent of Section 203, the latter of which is to protect artist.

In any event, prior to the opening of the 35-year window, the Section 203 termination right simply does not exist as it has not "vested" and thus cannot be transferred. See BLACK'S LAW DICTIONARY 1563 (6th ed.1990)(the use of "vest" in statutes has a temporal connotation, indicating the time at which an interest in property accrues to its rightful holder). To be sure, to "vest" means to "give an immediate, fixed right of present or future enjoyment; to accrue to; to be fixed; to take effect. *Rodrigue v. Rodrigue*, 218 F.3d 432, 436 (5th Cir. 2000), citing BLACKS. And to "own" means to have a good legal title; to hold as property; to have a legal or rightful title to; to have; to possess." Id. Thus, there was no right to transfer via any bankruptcy agreement or proceeding.

Moreover, a bankruptcy "estate cannot possess anything more than the debtor itself did outside bankruptcy." *Mission Prod. Holdings, Inc. v. Tempnology*, *LLC*, 203 L. Ed. 2d 876, 139 S. Ct. 1652, 1663 (2019), citing *Board of Trade of Chicago v. Johnson*, 264 U. S. 1, 15, 44 S.Ct. 232, 68 L.Ed. 533 (1924) (establishing that principle); § 541(a)(1) (defining the estate to include the "interests of the debtor in property" (emphasis added). To be sure, a debtor's property "does not shrink by happenstance of bankruptcy, but it does not expand, either." *Id*., citing D. Baird, Elements of Bankruptcy 97 (6th ed. 2014). Here, no bankruptcy estate held the termination right because it had not yet vested and even if it had the right is inalienable. It would also go against the established congregation policy for establishing the termination right if an author can lose it during bankruptcy proceedings.

Despite the above, Lil' Joe spends a good deal of time explaining how assets of a bankruptcy debtor are placed and transferred to a bankruptcy estate, which is comprised of the equitable interests of the debtor in property as of the commencement of the case. Motion pgs. 8-9. However, Lil' Joe cites no case authority that this includes the inalienable right to terminate a copyright grant, particularly when that right has not vested at the commencement of the case. It is settled that the Section 203 right does not accrue until the effective date of the termination. Before that date, it is inchoate and nonexistent. Thus, Luther Campbell's termination right as an "author" of the Subject Albums could not and were not transferred into the bankruptcy estate because that right cannot be transferred, cannot be divested, and even if they could the right did not exist at the commencement of the bankruptcy proceeding because they had not yet "vested."

Luke Records was never an author and therefore, as discussed, never had termination rights to begin with. Therefore, any argument that Luther Campbell of no longer possesses the inalienable right to terminate due to his bankruptcy is not supported by the facts or the law and must fail.

Finally, Lil' Joe contends that through various settlement agreements Christopher Wong Won, Luther Campbell and Mark Ross released any interest they have in the copyrights for the Subject Albums so they cannot terminate any transfer of them. Motion pg. 10-11. Again, this ignores the plain language of Section 203, Supreme Court authority, and 11 Circuit case law, all of which clearly states that the right to terminate is inalienable and "[t]ermination of the grant may be effected notwithstanding any agreement to the contrary." *Stewart,* 495 U.S. at 230; *Korman,* 182 F.3d at 1995; 17 U.S.C § 203.

Even if the rights were alienable, none of the purported bankruptcy and settlement agreements relied upon by Lil' Joe even discuss termination rights, and their language addressing any royalties and/or profits, or acknowledging Lil' Joe's rights or interests in the master and/or publishing of any *2 Live Crew* related copyrights does not and cannot extinguish any of the original author's ability to terminate the original grant pursuant to Section 203, because Section 203 rights are inalienable and cannot be transferred or divested.

### D. The songs were not works-for-hire

Defendants did not create the songs as works-for-hire. The best evidence of this is that each entered into an agreement transferring their rights to the songs. An "author" is "the party who actually creates the work, that is, the person who translates an idea into a fixed, tangible expression entitled to copyright protection." *Cmty. for Creative Non-Violence v. Reid,* 490 U.S. 730, 737 (1989). That would be 2 Live Crew here – it licensed those rights orally and/or entered into the written 1987 Agreement.  In certain cases, that "author" can be an employer, but the employer has the burden of proof in establishing that works were works-for hire. *Horror Inc. v. Miller*, 15 F.4th 232, 242–43 (2d Cir. 2021), citing *Woods v. Bourne Co.,* 60 F.3d 978, 993-94 (2d Cir. 1995); *F.T.C. v. Morton Salt Co*., 334 U.S. 37, 44-45, 68 S.Ct. 822, 92 L.Ed. 1196 (1948) ("[The] general rule of statutory construction that the burden of proving justification or exemption under a special exception to ... a statute generally rests on one who claims its benefits ....").

Section 101 of the Act defines "two mutually exclusive categories of work for hire: the first provides that a work made by an employee within the scope of his employment is a work for

hire; and the second provides that a specially commissioned work that is subject to an express agreement that the work will be treated as one made for hire is such a work." *Horror Inc.,* 15 F.4th at 243, citing 17 U.S.C. § 101; see *Reid*, 490 U.S. at 738, 109 S.Ct. 2166. The second definition only applies to works created as "a motion picture or other audiovisual work, as a translation, as a supplementary work, as a compilation, as an instructional text, as a test, as answer material for a test, or as an atlas." 17 U.S.C.A. § 101(2). Music is not within these categories. Thus, only the first definition may apply here and it is clear that it does not.

2 Live Crew did not create the Subject Albums as works for hire for Skyywalker Records or its predecessor or successor. Def. Statement at 29.  And the members of 2 Live Crew did not create the Subject Albums within the scope of their employment with any record label. Def. Statement at 29. Lil' Joe again inappropriately references 1991 agreements that are not cited to in any declarations to support its argument that the Subject Albums were works-for-hire. But, those agreements, if made in 1991, could only have been prospective and must have been executed **after** the creation of the Subject Albums, which, as a matter of law is insufficient. Def. Statement at 20. Indeed, an agreement sufficient to establish a work as a "work for hire" must be executed **before** creation of the work. *Schiller & Schmidt, Inc. v. Nordisco Corp*., 969 F.2d 410, 412-13 (7th Cir. 1992); *Gladwell Government Services, Inc. v. County of Marin*, 265 F. App'x 624, 626 (9th Cir. 2008). The operative 1987 Agreement, entered into by *2 Live Crew* with Skyywalker Records, Inc., does not contain a work-for-hire clause and that grant language supports 2 Live Crew's position that the Subject Albums were **not** works for hire. Def. Statement at 30. And Campbell, who owned Skyywalker Records, confirms that the Subject Albums were not works for hire. Def. Statement at 30.

Moreover, Lil' Joe's reliance on supposed "work-for-hire" language in any 1991 agreement proves too much. Had the members of 2 Live Crew truly been employees of the record label, as Lil' Joe now claims, this language would be unnecessary as it is wholly inconsistent with an employee-employer relationship. And any royalty payments set forth in any contracts further proves that 2 Live Crew were not employees of the record label, as "where the creator of a work receives royalties as payment, that method of payment generally weighs **against** finding a work-for-hire relationship." *Playboy Enterprises, Inc. v. Dumas,* 53 F.3d 549, 555 (2d Cir. 1995)(citations omitted, emphasis added). 2 Live Crew's receipt of royalties at the outset makes clear that they were not employees of any record label. Def. Statement at 31.

- 12 -

Further, the registrations for the songs create a rebuttable presumption as to whether the songs were works for hire. *Horror Inc.*, 15 F.4th at 249 ("a copyright registration for the Screenplay that explicitly identified the Screenplay as a work for hire, a fact that entitles the Companies to a rebuttable statutory presumption that the Screenplay was a work for hire."), citing *Langman Fabrics a div. of Blocks Fashion Fabrics, Inc. v. Graff Californiawear, Inc.*, 160 F.3d 106, 111 (2d Cir. 1998), *amended,* 169 F.3d 782 (2d Cir. 1998); see also 17 U.S.C. § 410(c). The copyright registrations for the compositions of the works belie Lil' Joe's work-for-hire claim.

The composition PA registrations filed in September 1988 for the first Subject Album *The 2 Live Crew Is What We Are* all list the four original members of *2 Live Crew* as authors and specifically state that each author's contribution was **not** a "work made for hire." Def. Statement at 32. The composition PA registrations for the second Subject Album *Move Somethin'* all list the four original members of *2 Live Crew* as authors and specifically state that each author's contribution was **not** a "work made for hire." Def. Statement at 33. Notably, while the majority of these registrations were effective in April 1988, two of them for *Intro* and *Do Wah Diddy* were filed in 1998 and 1997 respectively by the entity Lil' Joe Wein Music, Inc.[13] which is an acknowledgement by Lil Joe that the works are not works-for-hire and that this claim is a post-hoc attempt to maintain control of 2 Live Crew's copyrights.  Def. Statement at 34.

The composition PA registrations for the third Subject Album *Move Somethin' (Clean)* all list the four original members of *2 Live Crew* as authors and specifically state that each author's contribution was **not** a "work made for hire." Def. Statement at 36. All but one[14] of these registrations have an effective date of May 22, 2001 and were registered by Lil' Joe Wein Music, Inc. again demonstrating that Lil' Joe was well aware that the Subject Albums have never been works made for hire. Def. Statement at 37.

The composition PA registrations filed on August 10, 1989 for the forth Subject Album *As Nasty as They Wanna Be* all list the four original members of *2 Live Crew* as authors and

---

[13] Lil' Joe Wein Music, Inc. is related to and has the same principles as Plaintiff Lil' Joe, who is listed as the entity listed in section 8 for "Correspondence" on the registrations filed by Lil' Joe Wein Music, Inc. Def. Statement at 35.

[14] The registration for *Do Wa Diddy (clean)* has an effective date of December 29, 1997 the same as the explicit version of *Do Wa Diddy* both of which were filed by Lil' Joe Wein Music, Inc. and stated the respective song was not a work made for hire. Def. Statement at 38.

specifically state that each author's contribution was **not** a "work made for hire." Def. Statement at 39.  The composition PA registrations for the final Subject Album *As Clean as They Wanna Be* all list the four original members of *2 Live Crew* as authors and specifically state that each author's contribution was **not** a "work made for hire." Def. Statement at 40. All but two[15] of these registrations have an effective date of March 12, 1998 and were registered by Lil' Joe Wein Music, Inc. again demonstrating that Lil' Joe was well aware that the Subject Albums have never been works made for hire. Def. Statement at 41.

The sound recording SR registrations for the Subject Albums have an effective date of February 26, 2001 registered by Lil' Joe Records and should be ignored. First, the registrations do **not** garner the presumption because they were not filed within the five-year deadline set by the statute. See *Van Cleef & Arpels Logistics, S.A. v. Jewelry*, 547 F.Supp.2d 356, 362 (S.D.N.Y.), *adhered to on reconsideration sub nom. Van Cleef & Arpels Logistics, S.A. v. Landau Jewelry*, 583 F.Supp.2d 461 (S.D.N.Y. 2008) ("a copyright registration issued more than five years after the first publication of a work is not entitled to the statutory presumption of validity[.]"). Second, these registrations falsely state that either Luke Records, Inc. or Lil' Joe are the authors of the sound recordings when these entities **did not exist** at the time of creation of the recordings, and Defendants are the actual authors. They also falsely state on four of the five registrations claim the works were works-for-hire, despite the composition registrations stating the opposite, this includes the majority of the *Move Somethin' (Clean)* PA registrations with effective dates in May 2001 three months after the SR registrations by Lil' Joe. Def. Statement at 45. Causing even greater confusion, two of the four SR registrations check both the work for hire and not work for hire boxes. Def. Statement at 46. As described in more detail below, none of the works whether the composition or sound recording were works for hire, but clearly, even Lil' Joe acknowledges that at a minimum the compositions were never considered works for hire as evidenced by the fact that there is no work-for-hire agreement and the registrations clearly identify the members of *2 Live Crew* as the authors whose contributions were not work-for-hire.

---

[15] The registrations for *You Got Larceny* and *City of Boom* have an effective date of August 10, 1989 on the same date as the *As Nasty as They Wanna Be* album and both were filed by Pac Jam Publishing stated the respective songs were not a work made for hire. Def. Statement at 42. registration for the song *Coolin'* was both registered by Pac Jam Publishing in 1989 and by Lil' Joe Wein Music, Inc. in 1998. Def. Statement at 43.

Even assuming *arguendo,* that the lack of a work-for-hire agreement and the registrations were not fatal to Lil' Joe's claim, Lil Joe **fails entirely** to even address or satisfy the Supreme Court's thirteen factor test for determining an employee relationship to meet the requirements of 17 U.S.C. § 101(1) for a work for hire, and thus fails to carry its burden. When considering is a work is "for hire" the court considers "[t]hirteen non-exhaustive factors: (1) the hiring party's right to control the manner and means by which the work is accomplished; (2) the skill required to create the work; (3) the source of the instrumentalities and tools; (4) the location of the work; (5) the duration of the relationship between the parties; (6) whether the hiring party has the right to assign additional projects to the hired party; (7) the extent of the hired party's discretion over when and how long to work; (8) the method of payment; (9) the hired party's role in hiring and paying assistants; (10) whether the work is part of the regular business of the hiring party; (11) whether the hiring party is in business; (12) the provision of employee benefits; (13) the tax treatment of the hired party. *Horror Inc.*, 15 F.4th at 243–44, citing *Reid* at 751-53, 109 S.Ct. 2166. "Other relevant factors may also be considered, so long as they are drawn from the common law of agency that Reid seeks to synthesize." *Id.* citing *Eisenberg v. Advance Relocation & Storage, Inc.*, 237 F.3d 111, 114 n.1 (2d Cir. 2000).

The sole evidence Lil' Joe proffers as evidence of an employer-employee relationship besides prospective 1991 agreements are paycheck stubs from Skyywalker Records, Inc. and Luke Records, Inc.[16] These checks do **not** identify what they were for, do not indicate that they were made in connection with the creation of the Subject Albums, and even if they were, that would not be dispositive under the thirteen *Reid* factors which are taken in aggregate. Def. Statement at 47. And, as explained by the owner of Skyywalker Records and Luke Records, 2 Live Crew received per diem checks at some point beginning in mid-1987, and while some of them were marked "payroll," those payments were not compensation for the creation of the Subject Albums. Campbell Decl. ¶40. The Subject Albums simply were not created by 2 Live Crew within the scope of any employment with Luke Skyywalker Records, Skyywalker Records, or any other company. Id. And Luke Skyywalker Records and Skyywalker Records, which released the Subject Albums, did not claim that the Subject Albums were works for hire. Id.

---

[16] These paychecks are identified in the Affidavit of Herman Moskowitz but were not attached as Exhibit 2 as stated.

Moreover, there is no employment agreement that states the existence of a salary, and what that salary would be for, for any member of 2 Live Crew. Def. Statement at 48. Mr. Moskowitz and Mr. Weinberg state these were payroll checks, and that there was an employment relationship, which 2 Live Crew disputes. Def. Statement at 3. At a minimum, this issue and the facts supporting Lil' Joe's position are disputed requiring denial of their Motion.

This is particularly true given the thirteen work-for-hire factors weigh in favor of 2 Live Crew, beginning with the first "right of control" factor.  None of the purported potential "employers" had the right to control the creative process for the Subject Albums and this factor favors 2 Live Crew. There is no evidence of "any right to control" cited in the Motion and, if anything, the supposed employers made "suggestions and contributions," which "do not necessarily evince the type of comprehensive control that characterizes a traditional employer-employee relationship. *Horror Inc.*, 15 F.4th at 250 (2d Cir. 2021), citing *Horror Inc.*, 335 F. Supp. 3d 273, 304 (D.Conn. 2018), aff'd, 15 F.4th 232 (2d Cir. 2021). While Skyywalker Records or its predecessor may have exercised some supervision over the Subject Albums, there is no evidence of that in the record.

The skill required to create, perform, and record the songs was high, favoring Defendants. "Courts adjudicating copyright cases involving professional creative artists have typically found the skill factor to weigh strongly in favor of independent contractor status." *Horror Inc.*, 15 F.4th at 251. Here, it is undisputed that 2 Live Crew had a high level of skill in writing and producing music and over the course of their career created multiple gold and one platinum album. Def. Statement at 49. The members of 2 Live Crew each contributed to the compositions and recording and Lil' Joe, Skyywalker Records, Inc., its predecessor,  Pac Jam Publishing, or any other contracting entity would not have been able to create and replicate the Subject Albums due to the high level of creativity and skill. Def. Statement at 50. Also, in favor of a finding against an employment situation is the fact that the Subject Albums were written and recorded in third-party studios not at the location of Skyywalker Records, Inc. or any other possible "employer." Def. Statement at 51.

Further, 2 Live Crew worked with Skyywalker Records, Inc. (and its predecessor) for a relatively short period of time. Def. Statement at 52. 2 Live Crew were not hired and paid on salary or an hourly basis but were paid a royalty on the delivered albums. Def. Statement at 53. While Skyywalker Records made certain payments to 2 Live Crew, those payments were for per

diems and were not related to compensation for the creation of the Subject Albums. Def. Statement at 54. Further, Skyywalker Records, Inc. did not have the ability to arbitrarily assign additional projects outside 2 Live Crew's obligation to create and deliver the required works. Def. Statement at 55.

2 Live Crew's "discretion over [their] day-to-day schedule weighs in favor of classifying [them] as an independent contractor." *Horror Inc.*, 15 F.4th at 255, citing *Reid*, 490 U.S. at 753, 109 S.Ct. 2166 ("Apart from the deadline for completing the sculpture, [sculptor] had absolute freedom to decide when and how long to work."). 2 Live Crew had the freedom to create their own schedule and did not have assigned times each day to work and simply had the deadline to deliver an album, but otherwise had absolute freedom to decide when to work. Def. Statement at 56.

Neither Skyywalker Records, Inc. nor its predecessor nor Luke Records, Inc., are still in business or have been in business since the mid-1990s. Def. Statement at 57. This further weights against finding a "work for hire."

The employee benefits factor favors also favors 2 Live Crew because Skyywalker Records and the others did not provide 2 Live Crew "with health insurance, paid vacation time, worker's compensation benefits, a pension plan, or other types of benefits that courts have traditionally found probative of employee status." *Horror Inc.*, 15 F.4th at 252, citing *Reid*, 490 U.S. at 753, (examining contributions to unemployment insurance or workers' compensation funds); *Aymes v. Bonelli*, 980 F.2d 857, 862 (2d Cir. 1992)(reviewing health insurance, unemployment, and life insurance); *Carter v. Helmsley-Spear, Inc.*, 71 F.3d 77, 86-87 (2d Cir. 1995) (considering life, health, liability insurance, and paid vacations); Def. Statement at 58. This makes clear that 2 Live Crew were not employees.

When taken in the aggregate the factors weigh in favor of 2 Live Crew who worked by themselves, controlled their schedule, worked at third-party locations, were paid on a royalty basis, and whose projects required highly skilled and unique musical talent of a manner only they could provide. Their relationship did not have the trappings of the typical employer and employee relationship, and thus, Plaintiff has not proven that the Subject Albums were works-for hire.

Finally, Plaintiff's argument that the works were "for hire" are barred by the statute of limitations. In copyright, a claim as to who initially created and owns the copyright for a work,

"accrues only once, and if an action is not brought within three years of accrual, it is forever barred." *Everly v. Everly*, 958 F.3d 442, 450 (6th Cir. 2020), citing *Roger Miller Music v. Sony/ATV Publ'g*, 477 F.3d 383, 390 (6th Cir. 2007), quoting *Zuill v. Shanahan*, 80 F.3d 1366, 1369 (9th Cir. 1996). Here, the 1987 Agreement and the copyright registrations established that 2 Live Crew created the Subject Albums as individual authors and granted ownership of or a license for the copyrights to those albums back in the 1980s. Def. Statement at 11, 30. Lil' Joe cannot claim now, 40 years later, that the works were for-hire.

## IV.    Request for additional time

Under Fed.R.Civ.P. 56(d), a party may show, "by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:(1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order. Here, Defendants filed this motion without a meet-and-confer and before making its full document production and while the parties were in the process of setting depositions, which dates are still being confirmed as of the date of this filing. Def. Statement at 59. The depositions of Joe Weinberger, the owner of Lil' Joe, and Herman Moscowitz, an accountant who was heavily involved in the business of Skyywalker Records and its successors and predecessors, are crucial to this opposition, as they provide substantive declarations that underpin this Motion. Id. Both depositions were timely noticed but not held upon objection by Plaintiff. Id. In addition, Plaintiff produced a large trove of documents at or around the time of its filing of this Motion that are still under review. Id. Finally, discovery in this matter does not close until November 3, 2022. Id. As such, if the Court is inclined to grant this Motion, it is respectfully requested that the Court allow additional time for Defendants to conduct depositions and discovery.

## V.    Conclusion

The motion should be denied. Defendants effectively terminated the transfers at issue. The spirit and letter of the Copyright Act both require that the termination be recognized. Defendants request oral argument on this Motion.

Dated: October 7, 2022                  Respectfully submitted,


                                        By: */s/ Scott Alan Burroughs*
                                        Scott Alan Burroughs
                                        (admitted *pro hac vice*)
                                        DONIGER / BURROUGHS
                                        237 Water Street, First Floor
                                        New York, New York 10038
                                        (310) 590 – 1820
                                        scott@donigerlawfirm.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on October 7, 2020, a true and authentic copy of the foregoing was submitted to the Clerk of Court using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

By:   */s/ Scott Alan Burroughs*

Scott Alan Burroughs