# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

| | | |
|---|---|---|
| LIL' JOE RECORDS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 1:21-CV-23727-DPG |
| | ) | |
| MARK ROSS; *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**DECLARATION OF LUTHER CAMPBELL IN OPPOSITION TO MOTION FOR PARTIAL SUMMARY JUDGMENT**

## DECLARATION OF LUTHER CAMPBELL

I, Luther Campbell, depose, attest, and say from my personal knowledge, the following:

1. I, Luther Campbell, performed in the group named "2 Live Crew" with Mark Ross, Christopher Wong Won, and David Hobbs.

2. I am a joint creator author, with the others in 2 Live Crew, of the albums entitled *The 2 Live Crew is What We Are, Move Somethin', Move Somethin' (Clean), As Nasty As They Wanna Be,* and *As Clean As They Wanna be* ("Subject Albums") which were written, recorded, and published from 1986 and 1989.

3. The 2 Live Crew's members entered into a less than favorable grant in connection with the Subject Albums and are now, 35 years after those works were published, we are well in our rights to terminate the grant.

4. On November 4, 2020, over two years before the earliest date of effective termination (November 7, 2022) and less than 10 years from the last date of effective termination (May 1, 2024), Mark Ross, the heirs of Christopher Wong Won, and I comprising and representing 3 of the 4 members of 2 Live Crew served a noticed termination of its original copyright grants under 17 U.S.C. § 203 (the "Termination Notice"). The grants terminated in the Termination Notice included the right of publication.

5. A true and correct copy of the Termination Notice executed by me and the other 2 Live Crew members and served on all possible rights holders is attached hereto as **Exhibit 66**.

6. The Termination Notice was served on November 4, 2020, upon all possible rights holders, including Lil' Joe, via first-class mail (return receipt requested) and when possible electronic mail.

7. The date of publication for the first Subject Album *The 2 Live Crew Is What We Are* was provided in the termination notice as December 1, 1986 and the notice listed a date of effective termination of November 7, 2022, which is over 35 years from the date of publication and within 5 year window beginning on December 1, 2021. The date listed of first publication on the earliest filed composition copyright registration for the songs on the identified Subject Album.

8. The date of publication of the second and third Subject Albums *Move Somethin'* and *Move Somethin' (Clean)* was provided in the termination notice as March 21, 1988 and the notice listed a date of effective termination of March 21, 2023, within the required timeframe.

2

The date listed of first publication on the February 26, 2001 sound recording copyright registrations for the album *Move Somethin'*.

9. The date of publication of the fourth and fifth Subject Albums *As Nasty as They Wanna Be* and *As Clean as They Wanna Be* was provided in the termination notice as May 1, 1989 and the notice listed a date of effective termination of May 1, 2024, again within the required timeframe. The date listed of first publication on the February 26, 2001 sound recording copyright registrations for the identified Subject Albums.

10. I was an owner of, and executive at, the companies named Luke Skyywalker Records, Inc., Skyywalker Records, Inc., Pac Jam Publishing, Inc., and Luke Records, Inc.

11. Neither Skyywalker Records, Inc. the contracting entity in the 1987 Agreement nor Luke Records, Inc. are still in business or have been in business since the mid-1990s.

12. In March 1988, the members of 2 Live Crew and Pac Jam Publishing entered into six publishing agreements for the songs on the Subject Album *Move Somethin' (Clean)* (the "Pac Jam Agreements). Other than the 1987 Agreement, these are the only contemporaneous agreements in the record which could serve as a transfer of rights in the Subject Albums. Attached hereto as **Exhibit 67** is a true and correct copy of those six agreements.

13. The Pac Jam Agreements cover the composition copyrights for certain compositions on the second and third Subject Album, and stated that "The writer(s) hereby sells, assigns, transfers and delivers to the Publisher, its successors and assigns, a certain heretofore **unpublished** original musical composition…[] and all rights, claims, and demands in any way relating thereto…" including the rights to secure, hold, and register the copyright in the identified composition. Encompassed within these rights was the right to publish the composition identified.

14. Luke Records has never purported to be an author of the Subject Albums, is not listed as an author on any copyright registration other than three sound recording registrations registered by Lil' Joe in 2001, which are directly contradicted by the composition registrations for the same works.

15. While I participated in various bankruptcy proceedings and agreements, none of those divested me of my rights under 17 U.S.C. § 203. Said rights had not vested at the time of those proceedings and were not part of any relevant bankruptcy estate.

16. I entered into various agreements related to my intellectual property rights, but

none of those divested me of my rights under 17 U.S.C. § 203. Said rights had not vested at the time of those agreements and were not part of any of those agreements.

17. Ultimately, through a series of agreements, bankruptcy proceedings, and litigation settlements Lil' Joe came to own the copyrights in the Subject Albums. None of the purported agreements provided by Plaintiff in this case even discuss termination rights, and any language relating to royalties and/or profits, or acknowledging Lil' Joe's rights or interests in the master and/or publishing of any *2 Live Crew* related copyrights does not and cannot extinguish my rights under 17 U.S.C. § 203.

18. When I created and authored the Subject Albums, I, like the others in 2 Live Crew, did so as independent contractors and not employees.

19. 2 Live Crew made all creative decisions in creating the Subject Albums.

20. The Subject Albums were not "works for hire."

21. Any 1991 agreements referenced by Plaintiff could not relate to the Subject Albums and were entered into after the Subject Albums were created. They would contemplate only *future* recordings and could not possibly cover the Subject Albums, each of which was written, recorded, released, and in some cases registered with the Copyright Office well before 1991.

22. Under the 1987 Agreement, the members of 2 Live Crew were paid a royalty for the recordings delivered under the terms of that agreement, and 2 Live Crew were never paid a salary.

23. The 1987 Agreement relates to the Subject Albums and to the extent that said agreement does not meet any technical requirements for an effective transfer the operative agreement would be the oral license that the 1987 Agreement sought to memorialize. The 1987 Agreement was executed in or around 1990 and reflects the oral agreement that the members of 2 Live Crew reached prior to its signing. The 1987 Agreement is the operative agreement for the Subject Albums and to the extent that said written agreement is unenforceable the operative agreement would be the oral license that the 1987 agreement sought to memorialize and under which the parties operated. In 1990, Skyywalker Records, Inc. was the name of my recording entity, and it operated out of the address 3050 Biscayne Blvd. Suite 307, Miami, Florida. The 1987 Agreement is accurate because it was executed in or around 1990 when Skyywalker Records, Inc. was in operation at that address. And, importantly, 2 Live Crew and Skyywalker

Records (as well as Skyywalker Records' predecessor, Luke Skyywalker Records) complied with and operated under the terms of the 1987 Agreeement, including as renewed, in the release of the Subject Albums and payments made thereunder. The record companies released the Subject Albums to the public and paid royalties to 2 Live Crew.

24. A true and correct copy of the 1987 Agreement that was signed by the members of 2 Live Crew and myself on behalf of Skyywalker Records is attached hereto as **Exhibit 1**.

25. The 1987 Agreement specifically states, "Artist hereby grants to Company the sole and exclusive right during the initial term of this Agreement and all renewals and extensions of the same to use, **publish and permit other to use and publish**…"

26. The operative 1987 Agreement does not contain a work-for-hire clause.

27. Under the 1987 Agreement the members of 2 Live Crew were paid a royalty for the recordings delivered under the terms of that agreement, and 2 Live Crew were never paid a salary.

28. Lil' Joe has not, and cannot, argue the existence of any agreements other than the clearly inapposite agreements from 1991.

29. The copyright registrations for the Subject Albums do not indicate that they were works for hire except in limited and often fraudulent cases.

30. The record company had no right to control the creative process for the songs. At most the record company made suggestions and contributions relating to the songs on the Subject Albums. 2 Live Crew made the artistic decisions. Further, Skyywalker Records, Inc. or any other record company did not have the ability to arbitrarily assign additional projects outside 2 Live Crew's obligation to create and deliver the required works.

31. 2 Live Crew had the freedom to create their own schedule and did not have assigned times each day to work and simply had the deadline to deliver an album, but otherwise had absolute freedom to decide when and how to work.

32. It took considerable skill required to create, perform, and record the songs on the Subject Albums. Each member of contributed to the compositions and recording and Lil' Joe, Skyywalker Records, Inc., Pac Jam Publishing, or any other contracting entity would not have been able to create and replicate the Subject Albums due to the high level of creativity and skill.

33. The Subject Albums were written and recorded in third-party studios not at the

location of Skyywalker Records, Inc. or any other possible "employer."

34. I never approved or was aware of my record labels providing me or members of 2 Live Crew's members with health insurance, paid vacation time, worker's compensation benefits, a pension plan, or other types of benefits.

35. The record label did not have the right to assign to 2 Live Crew additional projects.

36. 2 Live Crew had the right to receive royalties from, at the very least, BMI in connection with our creation of the Subject Albums, and received such royalties, which is inconsistent with "employee" status.

37. 2 Live Crew created the songs not at the offices of the music company but at their homes and off-site recording studios.

38. 2 Live Crew's relationship with Skyywalker Records was brief, as the company went out of business in the mid-1990s.

39. 2 Live Crew had discretion over our day-to-day schedule and decided when, where, and how long to work on the Subject Albums.

[Intentionally left Blank]

///

///

///

40. 2 Live Crew received per diem checks at some point beginning in mid-1987, and while some of them were marked "payroll," those payments were not compensation for the creation of the Subject Albums. The Subject Albums were not created by 2 Live Crew within the scope of any employment with Luke Skyywalker Records, Skyywalker Records, or any other company. Luke Skyywalker Records and Skyywalker Records, which released the Subject Albums, did not claim that the Subject Albums were works for hire.

I declare under perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on October 7, 2022 at __Miramar__, __Florida__.

By: _____ *Luther Campbell* (DocuSigned by: C0FE95D6F3F3421...)