EXHIBIT 69

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
CHAPTER 11

FILED BY
RECEIVED BY
95 FEB 16 PM 1:49
CLERK
U.S. BANKRUPTCY CT.
SD OF FLA.

IN RE:

LUKE RECORDS, INC.

Debtor,

CASE NO. 95-11447-BKC-RAM

LUTHER CAMPBELL,

Debtor.

CASE NO. 95-12795-BKC-RAM

## JOINT PLAN OF REORGANIZATION

Proponents: The OFFICIAL UNSECURED CREDITORS COMMITTEE OF LUKE

RECORDS, INC. ("Committee"); and Luke Records, Inc. ("Luke Records") and Luther

Campbell ("Campbell"), the Debtors herein, submit the following Joint Plan of Reorganization:

I.  DEFINITIONS

The following terms have the following meanings in this Plan of Reorganization:

1.      "Administrative Claim" or "Administrative Expense" has the same meaning

herein as it is used in Section 503(b) of the Code.

2.      "Allowed Claim" means a claim, (a) a proof of which is filed within the time

fixed by the Rules of Bankruptcy Procedure or by the Court, or if the Claim arose from the

rejection of an executory contract or unexpired lease, within such other time as may be fixed

by the Court, or (b) that has been, or hereafter is, scheduled by Debtor as liquidated in amount

and not disputed or contingent; as to which no objection to the allowance thereof has been filed

on or before February 14, 1996, or as to which any such objection has been determined by a

Final Order.

310

3.   "Luther R. Campbell" or "Campbell" means the Individual Debtor and Debtor-In-Possession or President, Sole Director and Shareholder of the Corporate Debtor.

4.   "Claim" means any

(a)   right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or

(b)   right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

5.   "Code" means Title 11 U.S.C. Sections 101, et seq.

6.   "Confirmation Date" means the date of the entry by the Court of the Order of Confirmation (hereinafter defined).

7.   "Corporate Debtor" or "Luke Records" means Luke Records, Inc., Debtor-In-Possession.

8.   "Corporate Case" means Luke Records, Inc., case number 95-11447 - BKC-RAM

9.   "Court" means the United States Bankruptcy Court for Southern District of Florida, including the Bankruptcy Judge presiding in the Debtor's Chapter 11 case, and any Court having competent jurisdiction to hear appeals therefrom.

10.   "Creditor" means any person that holds an Allowed Claim, including governmental units.

11.   "Effective Date" means within five (5) days after the Confirmation Date.

12. "Final" means, with respect to any order, decree or judgment of any Court, that such order, decree or judgment is no longer subject to appeal or rehearing and as to which no appeal, rehearing or motion for rehearing is then pending.

13. "H-Town" means the musical group comprised of Delando Connor (Dino), Solomon Connor (Shazam) and Darryl Jackson (GI)

14. "H-Town Buyer" means such buyer as is obtained pursuant to the provisions of the letter of intent hereinafter defined.

15. "H-Town Contract for Purchase and Sale" means that Agreement attached as **Exhibit "B"** hereto.

16. "H-Town Contract Rights" means these contract rights owned by the Corporate Debtor pursuant to the exclusive Recording Agreement of H-Town.

17. "H-Town Masters" means all Master Tapes, Mothers, Acetates, P.A.T.S. and copies of same, together with all performance copyrights to the recordings of H-Town, in all configurations, owned by Luke Records.

18. "H-Town Publishing Rights" means the publishing rights and underlying copyrights to the compositions, written in whole or in part by H-Town; owned by Pac Jam and encompassed on the H-Town Masters.

19. "INDI" means Independent National Distributors, Inc.

20. "Individual Case" means Luther Campbell case number 95-12795 - BKC-RAM.

21. "Individual Debtor" means Luther Campbell, Debtor and Debtor-In-Possession.

22. "Letter-Of-Intent" means the letter agreement as and between the respective Debtors, their Counsel, Counsel for the Official Unsecured Creditors' Committee of Luke

Records, Inc., Luther Campbell, as Debtor, Rockville Productions, Inc. by Luther Campbell, 2 L.C., Inc. by Luther Campbell, Luke Mortgage, Inc. by Luther Campbell, Luke Records' Fan Club, Inc. by Luther Campbell, Pac-Jam Publishing, Inc. by Luther Campbell, Joe Weinberger and Lil' Joe Records, Inc. by Joseph Weinberger, Peter Jones by Richard Wolfe, Esq. and Red Distribution, Inc. dated February 7, 1996, a copy of which, in its substantially completed format, is attached hereto as **Exhibit A.**

23. "Island Records Contract" means all proceeds and rights of Luther Campbell and/or Scandalous, Inc. pursuant to the agreement with Island Records, Inc. under the contract dated July 25, 1995.

24. "Liquidating Corporate Trustee" means Frank Terzo, Esq., or such other person as is appointed by the Court to fulfill the requirements of Articles V and VI of the Plan.

25. "Liquidating Individual Trustee" means Richard C. Wolfe, Esq., or such other person as is appointed by the Court to fulfill the requirements of Articles V and VI of the Plan.

26. "Luke Development" means Luke Development, Inc., a Florida corporation, which is wholly owned by Luther R. Campbell.

27. "Luke Mortgage" means Luke Mortgage, Inc., a Florida corporation, which is wholly owned by Luther R. Campbell.

28. "Luke Records" means the Corporate Debtor.

29. "Luke Records Fan Club" means Luke Records Fan Club, Inc., a Florida corporation, which is wholly owned by Luther R. Campbell.

30. "Luke Records Office Building" means that parcel of Real Estate, together with all building and fixtures owned by the Corporate Debtor located at: 8400 N.E. 2nd Avenue,

Miami, Florida 33138 and more particularly described as Lot 6 Less the S 10' and Less the E 2' hereof, Lot 7 and the S 10' of Lot 8 Less the E 2' thereof, also the N 40'of Lot 8 and Lot 9 Less the E 2' thereof, BK 1 Royal Palm Gardens, PB 7/71, Dade County, Florida.

31. "Luther Campbell Residence" shall mean that house located at 7180 Oakmont Drive, Miami Lakes, FL 33130, more particularly described as Lot 20, Block 24, COUNTRY CLUB OF MIAMI ESTATES, Section 5, according to the Plat thereof, as recorded in Plat Book 79, Page 80, of the Public Records of Dade County, Florida, owned by Luther Campbell.

32. "Order of Confirmation" means the Order entered by the Court confirming the Plan in accordance with the provisions of Chapter 11 of the Code.

33. "Pac-Jam" means Pac-Jam Publishing, Inc., a Florida corporation, which is wholly owned by Luther R. Campbell.

34. "Palm Beach Lot" means the parcel of vacant land owned by the Individual Debtor and described as Lot 33-42-41, N. 241.5 Ft. of S. 1296.5 Ft. of W. 209 Ft. of E. of 1922 Ft. of Section A/K/A F-3630. (Avocado Blvd., Palm Beach Gardens, Florida).

35. "Pensacola Gold Club" means Pensacola Gold Club, Inc., a Florida corporation, which is wholly owned by Luther R. Campbell.

36. "Peter Jones Judgment" means the judgment obtained by Peter Jones against Luther R. Campbell and Luke Records, Inc., in Case No. 90-32359 (CA) 27 and entered on October 28, 1994, and supplemented on March 24, 1995.

37. "Petition Date" means March 28, 1995, the date on which an involuntary Chapter 7 petition was filed by the Corporate Debtor's creditors, or June 12, 1995, the date on which a voluntary Chapter 11 petition was filed by Luther Campbell.

38. "Plan" means this Chapter 11 Plan, in its present form, or as may be amended or modified in accordance with the Code.

39. "Pro-rata" means, with respect to any distribution on account of any Allowed Claim, in the same proportion as the amount of such Allowed Claim bears to the aggregate amount of all Allowed Claims of its class.

40. "Publishing Rights" means the publishing rights and underlying copyrights to the compositions written by all the artists recorded by Luke Records and owned by either Pac Jam or Luke Records, Inc. and encompassed on the Masters.

41. "Records" means vinyl albums, compact discs, cassettes, P.A.T.S., on LP albums, together with any new technology created for the sale and distribution of Masters or H-Town Masters, whether or not now contemplated.

42. "Recording Studio" means that equipment, furniture, fixtures and recording equipment located at 67 N.W. 71st Street, Miami, Florida 33150.

43. "RED" means RED Distribution, Inc. f/k/a Relatively Entertainment Distribution, Inc., a New York corporation.

44. "Rockville Productions" means Rockville Productions, Inc. a Florida corporation, which is wholly owned by Luther R. Campbell.

45. "Secured Claim" means an Allowed Claim secured by a lien, security interest, judgment or other charge against an interest in property in which the Debtor has an interest, or which is subject to setoff under Section 553 of the Code, not voidable under any section of the Code to the extent of the value (determined in accordance with Section 506(a) of the Code) of

the interest of the holder of such Allowed Claim in the Debtor's interest in such property or to the extent of the amount subject to such setoff, as the case may be.

46.    "Stanley Campbell Home" means the fifty (50%) percent undivided interest in the house located at 8225 Mentient Terrace, Miami Lakes, Florida 33015, occupied by Stanley Campbell (Luther Campbell's father).

47.    "Trust" refers to the Liquidating Trusts, more specifically described in Article VI of the Plan.

48.    "Tax Liability" means the amount of money owed by Luther R. Campbell for personal income taxes for the years prior to 1995, if any.

49.    "2 L.C." means 2 L.C., Inc., a Florida corporation, which is wholly owned by Luther R. Campbell.

II.    ADMINISTRATIVE EXPENSES, FEES UNDER 28 U.S.C. SECTION 1930, AND UNSECURED CLAIMS OF GOVERNMENTAL UNITS (FOR THE LUKE RECORDS CASE AND THE LUTHER CAMPBELL CASE).

A.    Administrative Expenses.  All Allowed Administrative Claims shall be paid in full in cash shortly after the Effective Date in accordance with the Trust Agreements set forth herein, unless the holder of such claim has agreed to accept lesser treatment, or pro-rata to the extent that each of the Liquidating Trustees has funds available from liquidation of the property in the Luke Records Liquidating Trust and the Luther Campbell Liquidating Trust, respectively.  The Debtors, their counsel and the Committee agree subject to court approval that the total fee to Debtors' bankruptcy counsel, exclusive of the retainer received and not including costs in the Campbell bankruptcy estate, shall in no event exceed the sum of $150,000 and the total administrative costs for professional fees of the Luke Records bankruptcy estate, exclusive of

retainer received and not including costs, shall in no event exceed the sum of $180,000. Those Administrative Expenses which are not allowed before the Effective Date shall be paid in accordance with Class 5 (Luke Case) or Class 7 (Campbell Case), except to the extent that the holder of such a Claim agrees to different treatment.

B.    Fees.  All fees payable under 28 U.S.C. Section 1930 shall be paid in full on the Effective Date, if not previously paid.

C.    Claims of Governmental Units.  All allowed Claims of governmental units entitled to priority under Section 507(a)(8) of the Code shall be paid after full payment of the Claims referred to in Paragraphs IIA and B, above, on the Effective Date, except with regard to the Claim of the Internal Revenue Service for the Tax Liability of Luther Campbell which shall be paid by Luther Campbell from his post confirmation personal assets pursuant to 11 USC 1129(a)(9)(C) in equal monthly installments with interest at 8% per annum on a direct reduction basis commencing 30 days after the Effective Date and not exceeding six years after the date of assessment of such claim.  Luther Campbell does not believe that any amounts are due and owing to the Internal Revenue Service, although the Internal Revenue Service has filed a Claim in the amount of $1,241,981.41.

D.    UNCLASSIFIED CLAIMS - PURSUANT TO 11 U.S.C.§1123 EACH OF THE ALLOWED ADMINISTRATIVE CLAIMS AND CLAIMS OF GOVERNMENTAL UNITS UNDER §507(A)(8)ARE NOT REQUIRED TO BE CLASSIFIED AS CLAIMS OR INTERESTS IN THE BANKRUPTCY PROCEEDING.

### III.   CLASSIFICATION OF CLAIMS AND INTERESTS IN BOTH CASES

For the purposes of distribution under this Plan, Claims, Secured Claims, and Interests in the Luke Records case are divided into the following classes:

Class 1: Allowed Secured Claim of InterAmerican Bank (Luke Records Office Building)

Class 2: Allowed Secured Claim of RED

Class 3: Insider Claims against Luke Records

Class 4: Equity Interests of Luke Records

Class 5: Allowed Unsecured Claims against Luke Records

Class 6: Priority Claims - Salaries of Employees of Luke Records

For the purposes of distribution under this Plan, allowed secured claims and interests in the Campbell case are divided into the following classes:

Class 1: Allowed Secured Claim of Coral Gables Federal Bank (Mortgagee on Luther Campbell Residence).

Class 2: Allowed Secured Claim of Dime Savings Bank (Mortgagee on Stanley Campbell's home).

Class 3: Allowed Secured Claim of Ouida Belle Cooper Jennerman (Mortgagee on property located in Pensacola, Florida).

Class 4: Allowed Secured Claim of Casi, Inc. (Tax Certificate holder on real property located in Palm Beach Gardens, Florida.

Class 5: Allowed Secured Claim of Peter Jones.

Class 6: All Non-Priority Prepetition Allowed Unsecured Claims of $500.00 or less or which elect to be reduced to $500.00, pursuant to the ballot to be submitted hereunder.

CASE NO. 95-11447-BKC-RAM
CASE NO. 95-12795-BKC-RAM

Class 7: Allowed Unsecured Claims greater than $500.

IV.  TREATMENT OF CLAIMS AND INTERESTS IN THE LUKE RECORDS CASE.

Class 1: Allowed Secured Claim of InterAmerican Bank (Luke Records Office Building).

Description: Class 1 consists of the holder of an allowed secured claim of InterAmerican Bank as first mortgagee on the Luke Records Office Building located at 8400 N.E. 2nd Avenue, Miami, Florida 33138. InterAmerican Bank filed its Proof of Claim in the amount of $157,186.00.

Treatment: The Class 1 claim shall be paid pursuant to the Letter-of-Intent by Luther Campbell, either by assuming the obligations under the Note and Mortgage or, alternatively, by refinancing and paying off the claim; in either case, the obligation will involve a payment(s) outside the Plan of Reorganization.

Impairment: Class 1 is unimpaired.

Class 2: Allowed Secured Claim of RED.

Description: Class 2 consists of the secured claim of RED secured by security interests in and upon the master recordings, inventory and reserves of Luke Records.

Treatment: Treatment has been agreed to pursuant to the terms of letter of intent.

Impairment: Class 2 is impaired.

Class 3: Insider Claims Against Luke Records.

Description: Class 3 consists of any claims of Campbell or any of Campbell's affiliates, including Pac-Jam Publishing, Inc., as well as potentially those claims of Joseph Weinberger.

Treatment: All of the insider claims of Campbell and claims of Weinberger shall be waived pursuant to the Letter-of-Intent.

-10-

CASE NO. 95-11447-BKC-RAM
CASE NO. 95-12795-BKC-RAM

Impairment: Class 3 claims are impaired.

Class 4: Equity Interest in Luke Records.

Description: Class 4 consists of the equity interest of Luke Records, namely, the shareholders' interests of Campbell.

Treatment: Campbell shall retain his shares, but they will become worthless by reason of the liquidation of Luke Records. NO distribution shall be made to equity holder under the Plan on account of his equity interest.

Impairment: Class 4 is impaired.

Class 5: Allowed Unsecured Claims against Luke Records

Description: Class 5 consists of all allowed general unsecured creditors.

Treatment: Holders of Class 5 claims shall be paid pro rata an interim distribution within 15 days of the Effective Date from the proceeds of the sale of the Debtor's assets, if any funds remain after payment of administrative, secured and priority claims. Further payments to the Class 5 claims shall be paid in accordance with the Trust Agreement set forth herein. Pursuant to a settlement reached with Jones, Jones shall be entitled to a Class 5 general unsecured claim in the amount of $900,000.

Impairment: The Class 5 claims are impaired.

Class 6: Priority Claims - Salaries of employees of Luke Records.

Description: Class 6 consists of those allowed claims for wages to the extent that they are entitled to priority pursuant to 11 U.S.C. §507(a)(3) treatment. The Allowed Class 6 claim shall be paid in full in cash within 15 days of the Effective Date if, and only if, the Trustee has sufficient funds with which to do so after payment of all allowed administrative claims. If there

are insufficient funds, then Class 6 may receive no dividend or may receive a prorata dividend, depending upon the funds available. If, and in the event, funds become available after the Effective Date by reason of subsequent liquidation efforts by the Liquidating Trustee, Class 6 claims shall retain their priority over unsecured claims and shall be paid accordingly.

Impairment: Class 6 is believed to be unimpaired, but may be impaired depending upon the availability of sufficient funds to pay any class 6 claims within 15 days of the Effective Date.

## TREATMENT OF CLAIMS AND INTERESTS IN CAMPBELL CASE

Class 1: Allowed Secured Claim of Coral Gables Federal Bank (Mortgagee on Luther Campbell Residence).

Description: Class 1 consists the Allowed Secured Claim of Coral Gables Federal or First Union Mortgage Corporation, as its assignee against the homestead of Luther Campbell located at 7180 Oakmont Drive, Miami Lakes, FL 33130, more particularly described as Lot 20, Block 24, COUNTRY CLUB OF MIAMI ESTATES, Section 5, according to the Plat thereof, as recorded in Plat Book 79, Page 80, of the Public Records of Dade County, Florida.

Treatment: This is a first mortgage on Campbell's homestead and will be paid pursuant to the terms of the mortgage and paid outside of the Plan of Reorganization.

Impairment: Class 1 is unimpaired

Class 2: Allowed Secured Claim of Dime Savings Bank (Mortgagee on Stanley Campbell's home).

Description: Class 2 consists of the Allowed Secured Claim of Dime Savings Bank, the first mortgagee on a house located at 8225 Mentient Terrace, Miami Lakes, Dade County,

CASE NO. 95-11447-BKC-RAM
CASE NO. 95-12795-BKC-RAM

Florida 33015. The Debtor owns a one-half (1/2) interest in the property currently occupied by the Debtor's father, Stanley Campbell.

Treatment: The amount is fully secured and the mortgage will be paid pursuant to its terms and outside the Plan of Reorganization.

Impairment: Class 2 is unimpaired.

Class 3: Allowed Secured Claim of Ouida Belle Cooper Jennerman (Mortgagee on property located in Pensacola, Florida).

Description: Class 3 consists of the Allowed Secured Claim of Ouida Belle Jennerman on a first mortgage on property located at 2369 North Palafox Street, Pensacola, Escambia County, Florida.

Treatment: By agreement of parties, under the Plan of Reorganization, the Debtor shall Quit Claim the property back to the secured creditor, with the secured creditor receiving a $40,000.00 Class 7 unsecured claim on account of his deficiency, as the claim exceeds the present value of the property.

Impairment: Class 3 is impaired.

Class 4: Allowed Secured Claim of Casi, Inc. (Tax Certificate holder on real property located in Palm Beach Gardens, Florida.

Description: Class 4 consists of the Allowed Secured Claim of Casi, Inc., c/o FUNB as a tax certificate holder on real property located in Palm Beach Gardens, Florida with an outstanding tax certificate due and owing in the amount of $562.40.

Treatment: The holder of Class 4 claim shall retain their legal, equitable and contractual rights which will remain unaltered by the Plan and shall be deemed to be unimpaired.

-13-

Impairment: Class 4 is unimpaired.

Class 5: Allowed Secured Claim of Peter Jones.

Description: Class 5 consists of the Secured Claim of Peter Jones.

Treatment: By agreement of Secured Creditor and Debtor, Peter Jones will be treated as an unsecured creditor for purposes of this Plan of Reorganization and Disclosure Statement with an allowed unsecured claim in the amount of $1,400,000.00 and will be a claimant of Class 7.

Impairment: Class 5 is impaired.

Class 6: All Non-Priority Prepetition Allowed Unsecured Claims less than $500.00.

Description: Class 6 consists of all Non-Priority, Pre-Petition, Unsecured, Non-Contingent Allowed Claims in the amount of $500.00 or less or who voluntarily reduces their allowed claim to $500.00 pursuant to the Ballot to be provided hereunder.

Treatment: Holders of Class 6 claims will receive distribution in cash equal to one-hundred (100%) percent with fifty (50%) percent paid thirty (30) days after the Effective Date and fifty (50%) percent paid ninety (90) days thereafter.

Impairment: Class 6 is impaired.

Class 7: Allowed Unsecured Claims greater than $500.

Description: Class 7 consists of all Non-Priority, Pre-Petition, Unsecured, Non-Contingent Allowed Claims greater than $500.00.

Treatment: Holders of Class 7 claims will receive distribution in cash of their pro-rata share of the proceeds of assets being sold under the Plan of Reorganization after payment of the preceding classes, pursuant to the Trust Agreement described herein.

Impairment: Class 7 is impaired.

CASE NO. 95-11447-BKC-RAM
CASE NO. 95-12795-BKC-RAM

## V. MEANS FOR EXECUTION OF THE PLAN

The letter of intent annexed as **Exhibit "A"** will serve as the means for execution of the Plan.

CASE NO. 95-11447-BKC-RAM
CASE NO. 95-12795-BKC-RAM

## VI. CREATION OF THE LUKE RECORDS, INC. LIQUIDATING CORPORATE TRUST

A. The Liquidating Corporate Trust.

1. Creation of the Trust. A Trust is hereby declared and established on behalf of Luke Records and Frank P. Terzo is hereby designated as Liquidating Corporate Trustee who shall serve as the Liquidating Corporate Trustee without the necessity of posting a bond and for the purpose of receiving all of the Trust Property and Property of Luke Records and the bankruptcy Estate and any other consideration to be received by the Trust Creditors pursuant to the terms of the Plan, including, but not limited to the following Trust Property:

a. All causes of action, rights, claims, demands against third parties, investors, individuals or insiders that Luke Records and the bankruptcy Estate own, or have an interest in, or can assert in any fashion since its formation, including all causes of action belonging to Luke Records and the bankruptcy Estate, whether Pre-Petition, Post-Petition or Post-Confirmation and whether pending prior to Confirmation, including, but not limited to, actions under Sections 542, 543, 544, 545, 546, 547, 548, 550, and 553 of the Code to recover assets for the estate and the benefit of the Creditors, except for those expressly waived pursuant to the Letter-of-Intent; and any interest in properties or entities which Luke Records and the bankruptcy Estate own or control.

b. Any and all proceeds from the sale, disposition or liquidation of the assets of Luke Records.

c. Any and all causes or rights of action of Luke Records and the bankruptcy Estate against the stockholders, officers and directors of Debtor, except for those expressly waived pursuant to the Letter-of-Intent; .

-16-

    d.   Any and all other Property of Luke Records and the bankruptcy Estate.

    2.   <u>Authorization</u>. Pursuant to the terms of the Plan, the Liquidating Corporate Trustee shall have the power and authority to perform the following acts, in addition to any powers granted by law or conferred to him by any other provision of the Plan; <u>provided however</u>, that enumeration of the following powers shall not be considered in any way to limit or control the power of the Liquidating Corporate Trustee to act as specifically authorized by any other provision of this Plan and to act in such manner as the Liquidating Corporate Trustee may deem necessary or appropriate to discharge all obligations of or assumed by the Liquidating Trust or provided herein and to conserve and protect the Trust Estate or to confer on the Trust Creditors the benefits intended to be conferred upon them by this Plan:

    a.   Perfect and secure the Liquidating Corporate Trustee's right, title and interest to the properties comprising the Trust Property.

    b.   Reduce all of the Trust Property to the Liquidating Corporate Trustee's possession and hold same.

    c.   Sell and convert the Trust Property to cash, free and clear of liens, with liens to attach to the proceeds, and distribute the net proceeds as described herein.

    d.   Manage and protect the Trust Property and distribute the net proceeds as described herein.

    e.   Grant options to purchase, contracts to sell the Trust Property or any part or parts thereof where such purchase price is for cash and on such terms that the Court shall approve.

    f.   Release, convey or assign any right, title or interest in the Trust Property.

g.    Purchase insurance to protect the Liquidating Corporate Trustee and the Trust Property from liability.

h.    Deposit Trust funds, draw checks and make disbursements thereof.

i.    Employ and retain, and discharge and dismiss, appraisers, financial advisors, attorneys, accountants, auctioneers, agents and such other professionals as the Liquidating Corporate Trustee may deem necessary or appropriate to assist in fulfilling the purposes of the Plan, and to pay reasonable charges, commissions and compensation to all of the foregoing, subject to review, and approval by the Court.

j.    Exercise any and all powers granted to the Trustee by any agreements, by common law or any statute which serves to increase the extent of the powers granted to the Liquidating Corporate Trustee hereunder.

k.    Take such other action as the Liquidating Corporate Trustee may determine to be necessary or desirable to carry out the purpose of this Plan.

l.    Commence any lawsuit or other legal or equitable action, including filing objections to late filed Claims, in any court of competent jurisdiction which are necessary to carry out the terms and conditions of the Plan.

m.    Settle, compromise or adjust any disputes or controversies in favor of, or against, the Liquidating Corporate Trust, subject to review, and approval by the Court.

n.    Appoint, remove and act through agents, managers and employees and confer upon them such power and authority as may be necessary or advisable.

o.     Have instituted on behalf of the Liquidating Corporate Trust, all claims and causes of action which can be brought by a Trustee or Luke Records under the Code and prosecute or defend all appeals on behalf of Luke Records or the Liquidating Corporate Trust.

p.     Prepare and file tax returns on behalf of the Liquidating Corporate Trust and Luke Records as mandated by applicable state and federal law.

q.     In general, without in any manner limiting any of the foregoing, deal with the Trust Property or any part or parts thereof in all other ways as would be lawful for any person owning the same to deal therewith, whether similar to, or different from, the ways above specified at any time or times hereafter.

3.     Operations of the Trust.

a.     The Liquidating Corporate Trustee shall have full and complete authority to do and perform all acts and execute all documents and make all payments and disbursements of funds directed to be done, executed, performed, paid and disbursed by the provisions of the Plan.

b.     The Liquidating Corporate Trustee shall have the power to invest funds of the Liquidating Corporate Trust in demand and time deposits in any national bank which is an authorized depository for bankruptcy funds in the Southern District of Florida, or to make temporary investments such as short-term certificates of deposit in such banks or treasury instruments.

c.     In no case shall any party dealing with the Liquidating Corporate Trustee in any manner whatsoever in relation to the Trust Property or to any part or parts thereof, be obligated to see that the provisions of the Plan or the terms of this Liquidating Corporate Trust

-19-

CASE NO. 95-11447-BKC-RAM
CASE NO. 95-12795-BKC-RAM

or any direction from the Court have been complied with, or be obligated or privileged to inquire into the authority the Liquidating Corporate Trustee to act, or to inquire into any other limitation or restriction of the power and authority of the Liquidating Corporate Trustee, but as to any party dealing with the Liquidating Corporate Trustee in any manner whatsoever in relation to the Trust Property, the power of the Liquidating Corporate Trustee to act or otherwise deal with the Trust Property shall be absolute.

d.    The Liquidating Corporate Trustee shall be responsible for making distributions to Trust Creditors from the funds held in the Collected Cash Account and at the following times and in the following order of priority:

e.    Administrative. Each Creditor holding an Allowed Administrative shall be paid 100% of its Allowed Claim from the Collected Cash by the Liquidating Corporate Trustee on the later of the ten (10) days after the Effective Date, or ten (10) days after the Court determines that they hold an Allowed Claim, or ten (10) days after the funds become available.

f.    Class 6. Each Creditor holding an Allowed Priority shall be paid 100% of its Allowed Claim from the Collected Cash by the Liquidating Corporate Trustee on the later of the ten (10) days after the Effective Date, or ten (10) days after the Court determines that they hold an Allowed Claim, or ten (10) days after funds become available, provided that administrative claims have been satisfied.

g.    Class 5. The first distribution to the Creditors holding Allowed Class 5 Claims shall be paid within 15 days after the Effective Date the, or as soon thereafter as is practicable, ["Initial Distribution Date"] and subsequent to the distributions made by the Liquidating Corporate Trustee to holders of Allowed Administrative and Priority Claims of Class

6 as described herein as follows: the Liquidating Corporate Trustee shall distribute to Creditors holding Allowed Class 5 Claims, on a pro rata basis, all available funds in the Collected Cash Account. If there are insufficient funds in the Collected Cash Account to pay Creditors holding Allowed Class 5 Claims, in full, on the Initial Distribution Date, the Second Distribution, and all subsequent distributions, shall be made by the Liquidating Corporate Trustee once every six (6) months, or less, if the Liquidating Corporate Trustee determines it to be necessary.

h.    Additionally, pursuant to the Letter-of-Intent under §V(D)(2) and (3), the Liquidating Corporate Trustee shall pay over to the Liquidating Individual Trustee, the sum of $50,000 to hold such sums in trust pending an assignment for the benefit of creditors which will be commenced immediately thereafter upon receipt by the Liquidating Individual Trustee.

i.    The Liquidating Corporate Trustee shall keep an accounting of receipts and disbursements which shall be open to inspection and review by any creditors holding allowed claims with reasonable notice.

j.    All reasonable costs, expenses and obligations incurred by the Liquidating Corporate Trust or Liquidating Corporate Trustee in administering the Liquidating Corporate Trust or in any manner connected, incidental or related thereto, including but not limited to the fees and expenses of professionals retained by the Liquidating Corporate Trustee to assist in carrying out his duties pursuant to the Plan and the Liquidating Corporate Trust, shall be a charge against the Trust Property, and the Liquidating Corporate Trustee shall pay same, maintaining at all times adequate reserves for such payments prior to making distributions to the Trust Creditors.

k.   The Liquidating Corporate Trustee shall maintain an adequate reserve fund after payment of all fees, expenses, etc. in the Trust which shall be available to cover all anticipated expenses and costs associated with carrying out the provisions of the Liquidating Corporate Trust and the Plan. The balance of the reserve fund shall be included in the final disbursement to Trust Creditors prior to termination of the Trust, including any and all tax obligations.

l.   No recourse shall ever be had, directly or indirectly, against the Liquidating Corporate Trustee personally, or any employee of the Liquidating Corporate Trustee by legal or equitable proceedings or by virtue of any statute or otherwise, or any deed of trust, mortgage, pledge, note, nor upon any promise, contract, instrument, undertaking, obligation, covenant or agreement whatsoever executed by the Liquidating Corporate Trustee under the Plan or by reason of the creation of any indebtedness by the Liquidating Corporate Trustee under this Trust for any purpose authorized by the Trust, it being expressly understood and agreed that all such liabilities, covenants, and agreements of the Liquidating Corporate Trustee, whether in writing or otherwise, under this Liquidating Corporate Trust shall be enforceable only against, and be satisfied only out of, the Trust Property, or such part thereof as shall, under the terms of any such agreement, be liable therefor or shall be evidence only of a right of payment out of the income, proceeds and avails of the Trust Property, as the case may be; every undertaking, contract, covenant or agreement entered into in writing by the Liquidating Corporate Trustee shall provide expressly against the personal liability of the Liquidating Corporate Trustee.

m.   The Liquidating Corporate Trustee shall receive 3% of gross disbursements for his services as Liquidating Corporate Trustee.

-22-

n.  The Liquidating Corporate Trustee shall not be liable for any act he may do, or omit to do, as Liquidating Corporate Trustee hereunder or acting in good faith and in the exercise of his best judgment, and the fact that such act or omission was advised, directed or approved by an attorney acting as attorney for the Liquidating Corporate Trustee or this Liquidating Corporate Trust shall be conclusive evidence of such good faith and best judgment.

o.  In case of the resignation of the Liquidating Corporate Trustee, a successor shall be nominated by the retiring Liquidating Corporate Trustee or the largest allowed claimant and confirmed by majority vote in dollar amount of those beneficiaries voting on the election.

p.  This Liquidating Corporate Trust shall be effective as of the Effective Date and shall remain, and continue in full force and effect, until the earlier of the following: (1) the indebtedness of Luke Records to all Creditors has been paid or satisfied in accordance with the provision of the Plan, or (2) the Trust Property has been wholly converted to cash and all costs, expenses and obligations incurred in administering this Liquidating Corporate Trust have been fully paid and discharged and all remaining income, proceeds and avails of the Trust Property have been distributed to the Trust Creditors pursuant to the Plan.

4.  Collected Cash Account.  The Liquidating Corporate Trustee shall deposit all cash in his, her or its possession as of, and subsequent to, the Confirmation Date, plus the net cash proceeds received from liquidation of the Trust Property, into the Collected Cash Account. The cash in the Collected Cash Account shall be invested by the Liquidating Corporate Trustee pursuant to Section 345 of the Code.

5. <u>Plan Reserves</u>. Prior to making any distributions under the terms of the Plan, the Liquidating Corporate Trustee shall reserve amounts (i) sufficient to cover the estimated costs to fully and completely administer the Liquidating Corporate Trust including any and all tax liabilities; plus (ii) the sum of any Disputed Administrative Expenses and, if sufficient funds remain, the sum of any Disputed Priority Claims. Funds reserved pursuant to this paragraph shall be held by the Liquidating Corporate Trustee and shall be used to pay the cost of administrating the Liquidating Corporate Trust and satisfying all Disputed Administrative Expenses and Disputed Priority Claims when such claims become Allowed Claims. Any excess cash or other Trust Property held by the Liquidating Corporate Trustee for administering the Liquidating Corporate Trust, or held in respect of the disallowed portion of any Disputed Administrative Expense or Disputed Priority Claim, shall be considered Collected Cash (or shall be reduced to cash). For all Disputed Claims which are not Disputed Administrative or Disputed Priority Claims, the Liquidating Corporate Trustee shall reserve Collected Cash in an amount which the Liquidating Corporate Trustee believes will reasonably necessary to pay Luke Records' anticipated liability on the Disputed Claims. The Liquidating Corporate Trustee shall reserve said Collected Cash until such time as the Disputed Claim becomes an Ultimately Allowed Claim. Once a Claim becomes an Ultimately Allowed Claim in whole, or in part, the cash then due to the holder of the Ultimately Allowed Claim shall be distributed to the claimant in accordance with the provisions of the Plan. The distributions to be made to holders of Ultimately Allowed Claims shall be made as soon as practicable after the date that such Claim becomes an Ultimately Allowed Claim, unless the Liquidating Corporate Trustee determines that

any such distributions cannot be made until all Claims in a given Class are Ultimately Allowed Claims.

      6.   <u>Timing of Distribution Under the Liquidating Corporate Trust</u>.  Payments and distributions in respect of Allowed Claims under the Plan shall be made as mandated under the Plan and the Trust.  Ten (10) days after the Effective Date, or as soon thereafter as is practicable, the Liquidating Corporate Trustee shall distribute to all Allowed Administrative Claimants and all Allowed Priority Claimants, 100% of the amount of their Allowed Claims. On the Initial Distribution Date, or as soon thereafter as is practicable, and following the distribution to all Priority Tax Claims, the Liquidating Corporate Trustee shall distribute any remaining cash held in the Collected Cash Account in accordance with the provisions of the Plan and the Trust. Distributions shall thereafter be made by the Liquidating Corporate Trustee once, every three (3) months, unless the Liquidating Corporate Trustee deems it necessary to make more frequent distributions. The Liquidating Corporate Trustee shall continue to make distributions to Trust Creditors until the Final Distribution Date.

      7.   <u>Manner of Payments</u>.  Any payments to be made by the Liquidating Corporate Trustee pursuant to the Plan, shall be made by checks drawn on accounts maintained by the Liquidating Corporate Trustee.

      8.   <u>Reliance on Documents</u>.  The Liquidating Corporate Trustee may rely upon, and shall be protected in acting, or refraining from acting, upon any certificates, opinions, statements, instruments or reports believed by the Liquidating Corporate Trustee to be genuine and to have been signed or presented by the proper person or persons.

9.    <u>Requirement of Undertaking</u>.  The Liquidating Corporate Trustee may request any court to require, and any court may in its discretion require, in any suit for the enforcement of any right or remedy under the Liquidating Corporate Trust, or in any suit against the Liquidating Corporate Trustee for any action taken or omitted by the Liquidating Corporate Trustee, that the filing party litigant in such suit undertake to pay the costs of such suit, and such court may in its discretion assess reasonable costs, including reasonable attorneys' fees, against any party litigant in such suit, having due regard to the merits and good faith of the claims or defenses made by such party litigant.

10.    <u>Removal of Liquidating Corporate Trustee</u>. Upon a vote of the majority of claimants after two weeks written notice to all Claimants, the Liquidating Corporate Trustee may be removed and a successor voted in upon a majority vote.

11.    <u>Acceptance of Appointment By Successor Trustee</u>.  Any successor Liquidating Corporate Trustee shall execute and deliver an instrument accepting such appointment, and thereupon such Liquidating Corporate Trustee, without further act, shall become vested with all the rights, powers, and duties of the predecessor Liquidating Corporate Trustee, as if originally named as Liquidating Corporate Trustee herein.

12.    <u>Fee Requests</u>. The Liquidating Corporate Trustee shall provide a semi-annual accounting of receipts and disbursements. Fees shall be paid as earned and expenses reimbursed as incurred.

## VII. CREATION OF THE LUTHER CAMPBELL LIQUIDATING INDIVIDUAL TRUST

### A. The Liquidating Individual Trust.

1. <u>Creation of the Trust</u>. A Trust is hereby declared and established on behalf of Campbell and Richard Wolf, Esq. is hereby designated as Liquidating Individual Trustee who shall serve as the Liquidating Individual Trustee without the necessity of posting a bond and for the purpose of receiving all of the Trust Property and Property of Campbell and the bankruptcy Estate and any other consideration to be received by the Trust Creditors pursuant to the terms of the Plan, including, but not limited to the following Trust Property:

a. All causes of action, rights, claims, demands against third parties, investors, individuals or insiders that Campbell and the bankruptcy Estate own, or have an interest in, or can assert in any fashion since its formation, including all causes of action belonging to Campbell and the bankruptcy Estate, whether Pre-Petition, Post-Petition or Post-Confirmation and whether pending prior to Confirmation, including, but not limited to, actions under Sections 542, 543, 544, 545, 546, 547, 548, 550, and 553 of the Code to recover assets for the estate and the benefit of the Creditors, except for those expressly waived pursuant to the Letter-of-Intent; and any interest in properties or entities which Campbell and the bankruptcy Estate own or control.

b. Any and all proceeds from the sale, disposition or liquidation of the assets of Campbell.

c. Any and all causes or rights of action of Campbell and the bankruptcy Estate against the stockholders, officers and directors of Debtor, except for those expressly waived pursuant to the Letter-of-Intent; .

shall be paid by Luther Campbell from his post confirmation personal assets pursuant to 11 USC 1129(a)(9)(C) in equal monthly installments with interest at 8% per annum on a direct reduction basis commencing 30 days after the Effective Date and not exceeding six years after the date of assessment of such claim. Luther Campbell does not believe that any amounts are due and owing to the Internal Revenue Service, although the Internal Revenue Service has filed a Claim in the amount of $1,241,981.41. An objection to the IRS Claim is pending and will be heard on or before March 20, 1996.

E.    <u>UNCLASSIFIED CLAIMS - PURSUANT TO 11 U.S.C.§1123 EACH OF THE ALLOWED ADMINISTRATIVE CLAIMS AND CLAIMS OF GOVERNMENTAL UNITS UNDER §507(A)(8)ARE NOT REQUIRED TO BE CLASSIFIED AS CLAIMS OR INTERESTS IN THE BANKRUPTCY PROCEEDING.</u>

F.    <u>Treatment of All Claims and Interests.</u>

## TREATMENT OF CLAIMS AND INTERESTS IN LUKE RECORDS CASE

Class 1: Allowed Secured Claim of InterAmerican Bank (Luke Records Office Building).

<u>Description</u>: Class 1 consists of the holder of an allowed secured claim of InterAmerican Bank as first mortgagee on the Luke Records Office Building located at 8400 N.E. 2nd Avenue, Miami, Florida 33138. InterAmerican Bank filed its Proof of Claim in the amount of $157,186.00. This is a balloon mortgage which has matured.

<u>Treatment</u>: The Class 1 claim shall be paid pursuant to the Letter-of-Intent by Campbell, by refinancing or paying off the claim, both alternatives will involve a payment(s) outside the Plan of Reorganization. The holder of the Class 1 claim shall not have its legal, equitable or contractual rights altered.

<u>Impairment</u>: Class 1 is unimpaired.

**Class 2: Allowed Secured Claim of RED.**

Description: Class 2 consists of the secured claim of RED secured by security interests in and upon the master recordings, inventory and reserves of Luke Records.

Treatment: Provided that return record liability is assumed, pursuant to the terms and conditions set forth in the Letter-of-Intent, and further that any unrecouped balance that exists on the day of Confirmation is paid in full after reserves are liquidated, RED shall waive any and all distributions to any and all claims it has filed in the Luke Records case.

Impairment: Class 2 is impaired.

**Class 3: Insider Claims of Luke Records.**

Description: Class 3 consists of any claims of Campbell or any of Campbell's affiliates, including Pac-Jam Publishing, Inc., as well as potentially those claims of Joseph Weinberger.

Treatment: All of the insider claims of Campbell, Campbell's affiliates and claims of Weinberger shall be waived pursuant to the Letter-of-Intent.

Impairment: Class 3 claims are impaired.

**Class 4: Equity Interest in Luke Records.**

Description: Class 4 consists of the equity interest of Luke Records, namely, the shareholders' interests of Campbell.

Treatment: Pursuant to the Letter of Intent, Campbell shall retain his shares, but they will become worthless by reason of the liquidation of Luke Records. NO distribution shall be made to equity holder under the Plan on account of his equity interest.

Impairment: Class 4 is impaired.

**Class 5: Allowed Unsecured Claims of Luke Records**

-29-

Description: Class 5 consists of claims of all allowed general unsecured creditors. To date, in excess of $10,000,000 worth of general unsecured claims have been filed in the Luke Records case. Pursuant to the Letter-of-Intent, various claimants such as RED, Weinberger, Campbell, all of Campbell's affiliates (including Pac-Jam) will be eliminated. Various objections have been filed with the Court on the remaining Class 5 claimants. It is expected that through the objection process, the settlement of the Jones Claim described herein, and the Letter-of-Intent that the aggregate amount of Class 5 Claimants will be in an amount of approximately $3,000,000.

Treatment: Holders of Class 5 shall be paid pro rata beginning with a distribution within 15 days of the Effective Date from the proceeds of the sale of Luke Records' assets, if any funds remain after payment of administrative, secured and priority claims. Further payments to the Class 5 claims shall be paid in accordance with the Trust Agreement set forth herein. Pursuant to a settlement reached with Jones, Jones shall be entitled to a claim in the amount of $900,000.

The first distribution to the Creditors holding Allowed Class 5 Claims shall be paid within 15 days after the Effective Date the, or as soon thereafter as is practicable, ["Initial Distribution Date"] and subsequent to the distributions made by the Liquidating Corporate Trustee to holders of Allowed Administrative and Priority Claims of Class 6 as described herein as follows: the Liquidating Corporate Trustee shall distribute to Creditors holding Allowed Class 5 Claims, on a pro rata basis, all available funds in the Collected Cash Account ("Collected Cash Account" is a defined term in the Plan). If there are insufficient funds in the Collected Cash Account to pay Creditors holding Allowed Class 5 Claims, in full, on the Initial Distribution Date, the Second Distribution, and all subsequent distributions, shall be made by the Liquidating Corporate

-30-

Trustee once every six (6) months, or less, if the Liquidating Corporate Trustee determines it to be necessary.

Impairment: The Class 5 claims are impaired.

Class 6: Priority Claims - Salaries of employees of Luke Records.

Description: Class 6 consists of those allowed claims for wages to the extent that they are entitled to priority pursuant to 11 U.S.C. §507(a)(3) treatment. The allowed Class 6 claim shall be paid in full in cash within 30 days of the Effective Date if, and only if, the Trustee has sufficient funds with which to do so after payment of all allowed administrative claims. If there are insufficient funds, then Class 6 may receive no dividend or may receive a pro rata dividend, depending upon the funds available. If, and in the event, funds become available after the Effective Date by reason of subsequent liquidation efforts by the Liquidating Trustee, Class 6 claims shall retain their priority over other unsecured claims and shall be paid accordingly. The Proponents are not aware of any Class 6 Claimants but to the extent any exist, treatment is provided herein.

Impairment: Class 6 is believed to be unimpaired, but may be impaired depending upon the availability of sufficient funds to pay any class 6 claims within 30 days of the Effective Date.

## TREATMENT OF CLAIMS AND INTERESTS IN CAMPBELL CASE

Class 1: Allowed Secured Claim of Coral Gables Federal Bank (Mortgagee on Campbell Residence).

Description: Class 1 consists of holders of Allowed Secured Claim of Coral Gables Federal or First Union Mortgage Corporation, as its assignee against the homestead of Campbell located at 7180 Oakmont Drive, Miami Lakes, FL 33130, more particularly described as Lot 20, Block 24, COUNTRY CLUB OF MIAMI ESTATES, Section 5, according to the Plat thereof, as

recorded in Plat Book 79, Page 80, of the Public Records of Dade County, Florida. This is a first mortgage.

Treatment: The amount is fully secured and will be paid pursuant to the terms of the mortgage and paid outside of the Plan of Reorganization. The holder of the Class 1 claim shall not have its legal, equitable or contractual rights altered.

Impairment: Class 1 is unimpaired

Class 2: Allowed Secured Claim of Dime Savings Bank (Mortgagee on Stanley Campbell's home).

Description: Class 2 consists of the Allowed Secured Claim of Dime Savings Bank, the first mortgage on a house located at 8225 Mentient Terrace, Miami Lakes, Dade County, Florida 33015. Campbell owns a one-half (1/2) interest in the property currently occupied by Campbell's father, Stanley Campbell.

Treatment: The amount is fully secured and the mortgage will be paid pursuant to its terms and outside the Plan of Reorganization. The holder of the Class 2 claim shall not have its legal, equitable or contractual rights altered.

Impairment: Class 2 is unimpaired.

Class 3: Allowed Secured Claim of Ouida Belle Cooper Jennerman (Mortgagee on property located in Pensacola, Florida).

Description: Class 3 consists of the Allowed Secured Claim of Ouida Belle Jennerman on a first mortgage on property located at 2369 North Palafox Street, Pensacola, Escambia County, Florida. The mortgage amount is in excess of the fair market value of the property.

j.    All reasonable costs, expenses and obligations incurred by the Liquidating Individual Trust or Liquidating Individual Trustee in administering the Liquidating Individual Trust or in any manner connected, incidental or related thereto, including but not limited to the fees and expenses of professionals retained by the Liquidating Individual Trustee to assist in carrying out his duties pursuant to the Plan and the Liquidating Individual Trust, shall be a charge against the Trust Property, and the Liquidating Individual Trustee shall pay same, maintaining at all times adequate reserves for such payments prior to making distributions to the Trust Creditors.

k.    The Liquidating Individual Trustee shall maintain an adequate reserve fund after payment of all fees, expenses, etc. in the Trust which shall be available to cover all expenses and costs associated with carrying out the provisions of the Liquidating Individual Trust and the Plan. The balance of the reserve fund shall be included in the final disbursement to Trust Creditors prior to termination of the Trust.

l.    No recourse shall ever be had, directly or indirectly, against the Liquidating Individual Trustee personally, or any employee of the Liquidating Individual Trustee by legal or equitable proceedings or by virtue of any statute or otherwise, or any deed of trust, mortgage, pledge, note, nor upon any promise, contract, instrument, undertaking, obligation, covenant or agreement whatsoever executed by the Liquidating Individual Trustee under the Plan or by reason of the creation of any indebtedness by the Liquidating Individual Trustee under this Trust for any purpose authorized by the Trust, it being expressly understood and agreed that all such liabilities, covenants, and agreements of the Liquidating Individual Trustee, whether in writing or otherwise, under this Liquidating Individual Trust shall be enforceable only against,

CASE NO. 95-11447-BKC-RAM
CASE NO. 95-12795-BKC-RAM

and be satisfied only out of, the Trust Property, or such part thereof as shall, under the terms of any such agreement, be liable therefor or shall be evidence only of a right of payment out of the income, proceeds and avails of the Trust Property, as the case may be; every undertaking, contract, covenant or agreement entered into in writing by the Liquidating Individual Trustee shall provide expressly against the personal liability of the Liquidating Individual Trustee.

m. The Liquidating Individual Trustee shall receive a reasonable compensation for his services consistent with Trustees under similar circumstance, namely 3% of gross disbursements.

n. The Liquidating Individual Trustee shall not be liable for any act he may do, or omit to do, as Liquidating Individual Trustee hereunder or acting in good faith and in the exercise of his best judgment, and the fact that such act or omission was advised, directed or approved by an attorney acting as attorney for the Liquidating Individual Trustee or this Liquidating Individual Trust shall be conclusive evidence of such good faith and best judgment.

o. In case of the resignation of the Liquidating Corporate Trustee, a successor shall be nominated by the retiring Liquidating Corporate Trustee or the largest allowed claimant and confirmed by majority vote in dollar amount of those beneficiaries voting on the election.

p. This Liquidating Individual Trust shall be effective as of the Effective Date and shall remain, and continue in full force and effect, until the earlier of the following: (1) the indebtedness of Campbell to all Creditors has been paid or satisfied in accordance with the provision of the Plan, or (2) the Trust Property has been wholly converted to cash and all costs, expenses and obligations incurred in administering this Liquidating Individual Trust have

been fully paid and discharged and all remaining income, proceeds and avails of the Trust Property have been distributed to the Trust Creditors pursuant to the Plan.

4.      Collected Cash Account.  The Liquidating Individual Trustee shall deposit all cash in his, her or its possession as of, and subsequent to, the Confirmation Date, plus the net cash proceeds received from liquidation of the Trust Property, into the Collected Cash Account. The cash in the Collected Cash Account shall be invested by the Liquidating Individual Trustee pursuant to Section 345 of the Code.

5.      Plan Reserves.  Prior to making any distributions under the terms of the Plan, the Liquidating Individual Trustee shall reserve amounts (i) sufficient to cover the estimated costs to fully and completely administer the Liquidating Individual Trust including any and all tax liabilities; plus (ii) the sum of any Disputed Administrative Expenses and, if sufficient funds remain, the sum of any Disputed Priority Claims.  Funds reserved pursuant to this paragraph shall be held by the Liquidating Individual Trustee and shall be used to pay the cost of administrating the Liquidating Individual Trust and satisfying all Disputed Administrative Expenses and Disputed Priority Claims when such claims become Allowed Claims.  Any excess cash or other Trust Property held by the Liquidating Individual Trustee for administering the Liquidating Individual Trust, or held in respect of the disallowed portion of any Disputed Administrative Expense or Disputed Priority Claim, shall be considered Collected Cash (or shall be reduced to cash).  For all Disputed Claims which are not Disputed Administrative or Disputed Priority Claims, the Liquidating Individual Trustee shall reserve Collected Cash in an amount which the Liquidating Individual Trustee believes will reasonably necessary to pay Campbell's anticipated liability on the Disputed Claims.  The Liquidating Individual Trustee

shall reserve said Collected Cash until such time as the Disputed Claim becomes an Ultimately Allowed Claim. Once a Claim becomes an Ultimately Allowed Claim in whole, or in part, the cash then due to the holder of the Ultimately Allowed Claim shall be distributed to the claimant in accordance with the provisions of the Plan. The distributions to be made to holders of Ultimately Allowed Claims shall be made as soon as practicable after the date that such Claim becomes an Ultimately Allowed Claim, unless the Liquidating Individual Trustee determines that any such distributions cannot be made until all Claims in a given Class are Ultimately Allowed Claims.

      6.   <u>Timing of Distribution Under the Liquidating Individual Trust</u>. Payments and distributions in respect of Allowed Claims under the Plan shall be made as mandated under the Plan and the Trust. Ten (10) days after the Effective Date, or as soon thereafter as is practicable, the Liquidating Individual Trustee shall distribute to all Allowed Administrative Claimants and all Allowed Priority Claimants, 100% of the amount of their Allowed Claims. On the Initial Distribution Date, or as soon thereafter as is practicable, and following the distribution to all Priority Tax Claims, the Liquidating Individual Trustee shall distribute any remaining cash held in the Collected Cash Account in accordance with the provisions of the Plan and the Trust. Distributions shall thereafter be made by the Liquidating Individual Trustee once, every six (6) months, unless the Liquidating Individual Trustee deems it necessary to make more frequent distributions. The Liquidating Individual Trustee shall continue to make distributions to Trust Creditors until the Final Distribution Date.

7.     Manner of Payments.  Any payments to be made by the Liquidating Individual Trustee pursuant to the Plan, shall be made by checks drawn on accounts maintained by the Liquidating Individual Trustee.

8.     Reliance on Documents.  The Liquidating Individual Trustee may rely upon, and shall be protected in acting, or refraining from acting, upon any certificates, opinions, statements, instruments or reports believed by the Liquidating Individual Trustee to be genuine and to have been signed or presented by the proper person or persons.

9.     Requirement of Undertaking.  The Liquidating Individual Trustee may request any court to require, and any court may in its discretion require, in any suit for the enforcement of any right or remedy under the Liquidating Individual Trust, or in any suit against the Liquidating Individual Trustee for any action taken or omitted by the Liquidating Individual Trustee, that the filing party litigant in such suit undertake to pay the costs of such suit, and such court may in its discretion assess reasonable costs, including reasonable attorneys' fees, against any party litigant in such suit, having due regard to the merits and good faith of the claims or defenses made by such party litigant.

10.     Removal of Liquidating Individual Trustee. Upon a vote of the majority of claimants after two weeks written notice to all Claimants, the Liquidating Corporate Trustee may be removed and a successor voted in upon a majority vote.

11.     Acceptance of Appointment By Successor Trustee.  Any successor Liquidating Individual Trustee shall execute and deliver an instrument accepting such appointment, and thereupon such Liquidating Individual Trustee, without further act, shall become vested with all

the rights, powers, and duties of the predecessor Liquidating Individual Trustee, as if originally named as Liquidating Individual Trustee herein.

12. <u>Fee Requests</u>. The Liquidating Corporate Trustee shall provide a semi-annual accounting of receipts and disbursements. Fees shall be paid as earned and expenses reimbursed as incurred.

## VIII. DUTIES OF LUKE RECORDS, CAMPBELL AND JOSEPH WEINBERGER

Commencing on the Effective Date and continuing thereafter, Luke Records and Campbell shall cooperate as is necessary to carry out the provisions of the Plan and the Letter-of-Intent. Without limitation of the foregoing, Luke Records and Campbell shall cause to be delivered:

1. All documents under the Letter-of-Intent, all information necessary or appropriate to comply with the Letter-of-Intent and all executed documents evidencing the transfer of title to the Masters as contemplated by the Letter-of-Intent.

2. In connection with the distribution of the Trust Property or its proceeds and the implementation of the Plan, supply all information reasonably requested by the Liquidating Trustees in connection with the prompt and timely prosecution of objections to claims field against the Estates, the prompt and speedy defense of litigation against the Estates and the execution of all documents and the performance of all acts as may be necessary or desirable to promptly implement and effectuate the distribution to the creditors of the Estates and the overall implementation of the Plan. Luke Records and Campbell shall cooperate fully with the Liquidating Trustees and shall grant to the Liquidating Trustees access to and shall permit the Liquidating Trustees to copy all financial statements, tax returns, books and records of every kind as are within the possession, custody or control of Luke Records or Campbell.

3.     In connection with the sale, transfer or transfer of any and all of the assets of the Debtor's estates, the corporate Debtor and Luther Campbell shall endorse over to the respective Liquidating Trustees all drafts, negotiable instruments or any other consideration given to Campbell or Luke Records in conformity and pursuant with the Letter-of-Intent at the time of closing.

4.     Campbell to the best of his knowledge and belief shall provide to the Individual Liquidating Trustee a list of names and addresses of all potential claimants against Pac-Jam Publishing, Inc.

## IX.   EXECUTORY CONTRACTS

To the extent that any executory contracts exist and have not been assumed rejected, or are the subject of a pending motion to assume or reject, they are rejected.  The Agreement between RED and Luke Records, dated August 26, 1994 shall be assumed pursuant to Section 365 of the Code, and assigned to Lil' Joe Records, all in accordance with the terms of the Letter-of-Intent. Luther Campbell's Island Record Contract is specifically assumed.

## X.   EFFECT OF CONFIRMATION.

A.     Terms Binding.  Upon the Effective Date, all of the provisions of this Plan, including all appendices and other exhibits hereto, shall be binding on the Debtor, the Estate, all Creditors, and all other entities who are affected (or whose interests are affected) in any manner by the Plan.

B.     Automatic Stay Provisions.  The automatic stay provisions of §362 of the Bankruptcy Code shall remain in full force and effect until the Effective Date, provided, however, that such

automatic stay shall remain in force as to Disputed Claims until a Final Order has been entered in respect of such Disputed Claims.

## XI. MISCELLANEOUS.

**A.** <u>Modifications to Plan Prior to Confirmation</u>. At any time prior to the Confirmation Date, the Proponents may modify the Plan, but may not modify the Plan so that the Plan as modified fails to meet the requirements of §§ 1122 and 1123 of the Code. If the Proponents file a modification with the Court, the Plan as modified shall become the Plan.

**B.** <u>Modifications to Plan After Confirmation</u>. At any time after the Confirmation Date, and before Substantial Consummation, the Proponents may modify the Plan but may not modify the Plan so that the Plan as modified fails to meet the requirements of §§ 1122 and 1123 of the Code. The Plan as modified under this Section becomes the Plan only if the Court, after notice and a hearing, confirms such Plan, as modified, under §1129 of the Code.

**C.** <u>Remedy of Defects</u>. After the Effective Date, the Proponents may, with approval of the Court, and so long as it does not materially and adversely affect the interests of Creditors, remedy any defect or omission or reconcile any inconsistencies in the Plan or in the Confirmation Order in such manner as may be necessary to carry out the purposes and effect of the Plan.

**D.** <u>Jurisdiction of Bankruptcy Court</u>. Except as is otherwise provided in the Confirmation Order, the Bankruptcy Court shall retain jurisdiction for the following purposes:

1. Classification of any Claim, reexamination of any Claim which has been allowed for purposes of voting, and determination of any objection filed to any Claim. Failure

to object to any Claim for the purpose of voting shall not be deemed to be a waiver of the right to object to the Claim in whole or in part.

2.    Determination of all questions and disputes regarding the Plan, the Debtor or Property of the Estate and determination of all causes of action, controversies, disputes, or conflicts involving the Plan, any Creditor, the Debtor or Property of the Estate arising prior to or on the Effective Date whether or not subject to action pending as of the Confirmation Date including resolution of Disputed Claims.

3.    Determination of any issue, violation, injunction, contempt, relief, or other proceeding as contemplated under §362 of the Bankruptcy Code.

4.    Correction of any defect, curing of any omission of reconciliation of any inconsistency in the Plan or in the Confirmation Order as may be necessary or appropriate to carry out the purposes and intent of the Plan.

5.    Modification of the Plan after the Confirmation Date pursuant to the provisions of the Plan, the Code and the Rules.

6.    Interpretation of the Plan.

7.    Entry of any order, including a mandatory injunction or restraining order, required to facilitate consummation of the Plan or to enable the Effective Date to occur; and reconsideration or vacation of the Confirmation Order in the event Substantial Consummation is rendered impossible.

8.    Entry of a final decree closing the Case.

E.    <u>Savings Clause</u>.  Any minor defect or inconsistency in the Plan may be corrected or amended by the Confirmation Order.

## XII.  NOTICE OF INTENT TO REQUEST CRAMDOWN.

In the event that a sufficient number of holders of any impaired class of claims do not accept the Plan, the Proponents hereby give notice that it will request, and does hereby request, confirmation of the Plan pursuant to 11 U.S.C. § 1129(b), commonly referred to as the "cramdown" provision of the Bankruptcy Code.  The Debtor hereby reserves the right to modify or vary the treatment of the claims as to comply with 11 U.S.C. §1129(b).

C.  <u>Cramdown</u>.  The Plan provides for a possible "Cramdown".  Basically, this means that as long as one class which is adversely affected by the Plan votes in favor of it by the necessary majority, the Court may decide to confirm the Plan over the negative votes or objections of other classes.  Before it can do this certain criteria must be met, including a specific finding that the Plan is "fair and equitable" under the circumstances.  The Court may or may not grant a proposed cramdown.  The decision will be made at the Confirmation hearing.

D.  <u>Role of Creditors' Committee</u>. The Creditor's Committee has been extremely active in this case.  It had taken an active role in reorganizing Luke Records at times  with the cooperation of Campbell and at times opposing him.   Once it became evident that a reorganization of an operating company was not possible, the Committee played an integral role in insuring that a Plan could be developed for the systematic liquidation of both estates' assets.  Additionally, the Committee was charged with the responsibility of drafting the Disclosure Statement and Plan of Reorganization.

## VII. **BALLOT INFORMATION**

Creditors in the Luke Records estate will receive a separate ballot  as will creditors of the Campbell estate. Secured Creditors will receive a ballot for Secured Claimants; Unsecured Creditors will receive a ballot for Unsecured Claimants.  In the Campbell estate only unsecured creditors in Class 7 will have an opportunity to elect to reduce their claim to $500 and thereafter be treated as a Class 6 creditor.   The ballot in the Campbell estate  will afford  unsecured creditors this election.

The ballot for Unsecured Claimants is used to either  accept  or reject the Plan of Reorganization. Note that the amount to be filled in on the ballot does not determine the amount of the dividend which the Creditor will receive; rather,  the dividend will be based upon the

-43-

uncontested, liquidated amount listed in Luke Records' schedules, the Creditor's Proof of Claim, or the amount determined by a Court Order.

## VIII.  FINANCIAL INFORMATION PERTAINING TO THE PROPOSED PLAN.

A.    Introduction. The purpose of this section is to provide to creditors and interested parties an estimate of the value of Luke Records and CAMPBELL's assets, both in a systematic liquidation as set forth under the Plan, and in a forced liquidation under Chapter 7.  In doing so, the Proponents have made certain assumptions and the numbers provided may not be exact, but are good faith estimates.  It is the Committee's belief that little or nothing would be available to unsecured creditors in a forced sale of the assets from either estate in a conversion to Chapter 7.  Their belief stems from the competing claims to ownership of assets, the litigation these competing claims would engender, the non-waiver of insider claim absent confirmation of this Plan and the rejection claims of RED.

B.    Valuation of the Luke Records' Assets.

Office Building.

1.    The Office building located at 8400 N.E. 2nd Avenue, Miami, Florida  33138. The real property is encumbered with a first mortgage to InterAmerican Bank in the approximate amount of $175,000.  The property was listed on Luke Records' schedule for $500,000; however, based on certain offers to purchase the real estate the Committee believes that the value of the office building, while greater than the mortgage balance, is substantially less than the value stated in the Schedules.

Luke Records Profit Sharing Plan.

2.    As outlined in the joint Letter-of-Intent (attached to the Plan as **Exhibit "1"** of the Plan), Luke Records represented that the Luke Records profit sharing plan was not a

qualified retirement plan pursuant to ERISA or IRC§401, et seq. and that upon confirmation of the plan, Luke Records and Campbell will transfer to the Luke Records Liquidating Trustee the account balances that were initially set up as profit sharing plans in NationsBank and Capital Bank containing in the aggregate an approximate balance of $52,000. The Trustees must determine whether the employees of Luke Records (other than Campbell) or the creditors are entitled to these funds.

### Master Recordings and Inventory.

3.    The master recordings, as well as all of the inventory held by RED in their warehouses are fully encumbered by the RED security agreement and RED's potential claim in excess of $5,100,000 dollars. The amount of inventory that RED has in its possession is approximately $1,000,000. Additionally, Luke Records listed on its Schedules an additional $1,188,000 worth of inventory located in Dade County, not encumbered by RED's security interest. Upon further review and examination of the items listed in the inventory in Dade County, both the Committee and Luke Records believe that much of the Inventory is worthless, since many of the items listed on the Inventory have been "cutout" i.e. title and configurations that are no longer marketable. Hence, Luke Records believes that the value of the Inventory located in Dade County is not more than $350,000.

### Accounts Receivable (INDI).

4.    Luke Records had listed in excess of $1,800,000 in receivables purportedly owed to Luke Records from INDI for records distributed during the INDI Distribution period. The agreement with Weinberger specifies that if the H-Town hard assets are sold to another party other than Weinberger before confirmation, then these account receivables will remain as part of the residual assets being conveyed to the Liquidating Trustee of Luke Records, who shall

investigate the collectibility of these receivables and, if feasible, collect them for the benefit of the Creditors. On the other hand, if the hard assets of H-Town are not sold to a third party purchaser, other than Weinberger, before confirmation, Weinberger in consideration for assuming the return record liability for the H-Town masters will acquire any and all rights attendant to these receivables. In any event, INDI disputes it owes Luke Records anything and, in fact, claims Luke Records owes it $1,000,000.

<u>Accounts Receivable (Atlantic and M.S. Distributors)</u>.

5.      There are two account receivable balances owed by Atlantic Recording Corporation and M.S. Distributors in the approximate amount of $120,000 which Luke Records has represented are due and owing and that have not been pledged, hypothecated or collected.

C.      <u>Valuation of Campbell's Assets</u>.

## ASSETS

Cash in hand / checking account:

Contents of household goods and
furnishing:                                          25,000.00

Clothing:                                            5,000.00

Jewelry, collectibles & equipment:                   10,000.00

Luke Records Mortgage:                               242,000.00

Luke Records Development                             100,000.00

Exempt Assets:

     Homestead and adjacent lot:              900,000.00
     Annuity - Guardian company:              135,000.00
     Qualified Retirement Acct :               27,000.00
     Flexible life insurance   :               33,127.00

Automobiles:

| | |
|---|---|
| 1992 Truck | 15,000.00 |
| 1993 Ford Van | 6,000.00 |
| Palm Beach lot: | 90,000.00 |
| One-half (1/2) interest in father's home: | 17,000.00 |
| Luke, Inc.: | unknown |
| Pac Jam Publishing, Inc.: | unknown |
| Campbell - Charitable Foundation: | unknown |
| 2 LC, Inc.: | unknown |
| Luke Recording Studios, Inc.: | 75,000.00 |
| The 2 Live Crew, Inc.: | unknown |
| Luke Leasing, Inc.: | unknown |
| Luke Records Fan Club: | unknown |
| Luke Records, Inc.: | unknown |
| Pensacola Gold Club, Inc.: | unknown |
| Rockville Productions, Inc.: | unknown |
| Accounts Receivables from various royalties and salary payment: | unknown |
| Trademark rights to 2 Live Crew: | unknown |

## IX.  MISCELLANEOUS

A.  <u>Risk Analysis</u>. The Plan provides for an initial distribution to creditors, anticipated to be paid within 15 days of the Effective Date and ongoing distributions based upon collections by the Liquidating Trustees. There is substantial risk under this Plan.  A certain portion of distributions to the respective estates are to be made within six months and one year,

respectively, as set forth in the Letter-of-Intent, **Exhibit "1"** to this Plan and as Summarized on Exhibit "E" hereto. The Plan of Reorganization involves the systematic liquidation of all of the assets of the Debtors' bankruptcy estates. There is certain risk attendant to the liquidation process by virtue of not having the entire purchase price paid on the Effective Date.

Other risk factors are as follows:

1. The sale of assets to Weinberger are contingent upon approval of Weinberger by RED or approval of Weinberger by some other reputable record distribution company. As of the filing of this Disclosure Statement, Weinberger has not been approved although ongoing negotiations between him and RED are continuing.

2. The sale of H-Town hard and soft assets has not been agreed to as of the filing of the Disclosure Statement. Ongoing negotiations are continuing. However, H-Town is contesting the assignability of their contract and the amount due them to cure if the contract is assignable. While the Plan is not conditional upon the H-Town sale, a failure to sell this asset will have a significant impact on the amount of distribution to the unsecured creditors of Luke Records.

3. Further, there is additional risk in the Corporate Liquidating Trustee of Luke Records pursuing collection activities on those receivables that may be retained as residual assets by the Trustee. No representation is made at this time as to what percentage, if any, of the outstanding receivables can be collected by the Luke Records liquidating estate. With regards to the risk factors in the Campbell case, a significant portion of the distribution to be made to the unsecured creditors of Campbell will rest upon the collectibility of the promissory note that will be provided to the Liquidating Trustee of Campbell by Campbell, in return for purchasing certain assets of the Campbell estate. Campbell is executing a mortgage on three (3) pieces of real estate owned by him or more fully set forth as in the Letter-of-Intent.

4.   Both Weinberger and Campbell must execute certain promissory notes and in turn grant security interests in various collateral to insure that payment is made over the next six to twelve months.   No assurances are provided that these payments will ultimately be made and it is possible that the Liquidating Trustees of both estates may have to institute legal proceedings in order to collect on these promissory notes.

Assuming that the two Liquidating Trustees are successful in collecting all proceeds of the sale of the estates' assets and subject to claims objections, the unsecured creditors could anticipate a distribution in the amount of approximately 15% to 25% of their claims.

B.   <u>Post Confirmation Management</u>. The Masters and all assets of Luke Records will be sold under this Plan. The Publishing Rights owned by Pac-Jam Publishing will be sold. Further, the Liquidating Trustee in the Campbell case will execute an irrevocable exclusive license to Lil' Joe for all remaining compositions, to enable Lil' Joe to exploit the Masters he is buying, subject to Lil' Joe paying all writers Royalties directly to the owners of the writing portion of the publishing rights. Thus, one of the entities of Campbell (Pac-Jam) will remain in existence and may continue operations post confirmation until such time that the Liquidating Trustee of Campbell receives $100,000 from the respective estates and an assignment for the benefit of creditors is made for Pac-Jam Publishing.

C.   <u>Insider and Affiliate Claims</u>. Under the terms of the Plan, all insider and affiliate claims are extinguished.   That means that Campbell will waive all personal claims and claims on behalf of Pac-Jam Publishing in the Luke Records bankruptcy estate.   Moreover, Luke Records in turn shall waive any claim it may have in the Campbell bankruptcy estate and, finally, without any representations as to Weinberger's status as an insider or non-insider, Weinberger has agreed to waive any and all claims he may have against both the Luke Records

and Campbell bankruptcy estates and the two bankruptcy estates, in turn, shall waive any and all claims they may have against Weinberger. Mutual Releases shall be executed.

    D.    <u>Transactions with Insiders or Affiliates</u>. As previously described herein, Campbell post-petition was given court approval to contract his individual recording talents with Island Records. Shortly after, Campbell disclosed that he had reached an agreement with Island Records, the Committee for Luke Records moved for authority to sue Campbell on behalf of Luke Records for loss of corporate opportunity. Campbell had asserted prior to the agreement with Island Records that he had never signed an artist recording agreement with Luke Records and as such, was permitted to "market" his artistic talents to other record labels besides Luke Records. The Committee felt that any attempt by the principal of Luke Records to usurp a corporate opportunity was a breach of Campbell's fiduciary duties. The Court granted the Committee relief from stay to file the adversary against Campbell for signing a record deal with Island Records. No adversary was ever filed, since Campbell has now agreed to fund a portion of this liquidating plan through the proceeds of the advance received from Island Records to produce his first LP. The sale of the H-Town soft assets (that is the contract for performances going forward) for H-Town may involve a transaction in which Campbell is either directly or indirectly involved because of the need for his involvement pursuant to the terms and conditions governing the assignment of the relevant artist contracts.

    E.    <u>Preferential and Fraudulent Transfers</u>. The Committee is not aware of any transfers made by the Debtors outside of the ordinary course of business of any assets within the last year, except the liquidation of Luke Records' interest in Shopco Regional Malls, a Ltd. partnership and Luke Records' interest in the Pilgrim Fund, Franklin Fund and Securities of America, all

money market accounts, liquidated for the purposes of making payroll and paying other expenses of the business during the pendency of the Bankruptcy.

With regards to prepetition transfers, as previously set forth and described herein, the avoidance analysis made by the Examiner in June of 1995 indicates that the two significant transfers made by Luke Records to Jones and Weinberger may have been preferences. However, as further described in the Plan, the purchase of certain assets of the Debtor's estates by Weinberger and the reduction of Jones' claim and waiver of Jones' secured claim in Luke Records obviates any need for the Committee or the Liquidating Trustees to pursue any further investigation regarding these transfers.

F.    Disputed Claims. Both Luke Records and Campbell have filed objections to claims and the remaining disputes on claims are focused on the following:

1.    Those proofs of claim that were filed without adequate documentation to which the Debtors' books and records reflect a different balance owed;

2.    The proofs of claim of George Brown and Shelley Wilson for personal injury occurring on or about the premises owned by Luke Records to which the Debtors have objected on the basis that there was insurance coverage in effect regarding the unliquidated personal injury claims and, as such, there is no claim against the estate;

3.    The proofs of claim of certain professionals such as Mancini and Stevens, P.A., Williams and Klein, P.A., Williams and Associates, P.A., in which proofs of claim had been filed, but no adequate allocation of services performed as between the two bankruptcy estates.

4.   The proofs of claim of Akuff-Rose Music, Inc., which is now a claim that has been compromised and a settlement reached in which Akuff-Rose Music, Inc. shall have no allowed claim.

5.   Those proofs of claim that are treated pursuant to the agreed Letter-of-Intent regarding the systematic liquidation and purchase (i.e. claims of Campbell, Luke Records, Weinberger, Jones, RED, affiliated companies, Campbell, including Pac-Jam, Inc.); and

6.   Substantially all of the artists that have been contracted to record for Luke Records, to which Luke Records believes that in light of the significant advances provided to each of the artists, only a minimal amount of prepetition royalties are due.

## X.  ALTERNATIVES TO THE PLAN.

The Committee believes there is no viable alternative to the proposed Plan of Reorganization, but for a Chapter 7 liquidation. A Chapter 7 liquidation scenario would likely result in a rejection of the RED agreement. Several rejection damage models have been suggested, and depending on which one the court would consider, it is possible that the RED rejection damage claim could reach as high as $10,000,000. Thus, in that scenario, if RED were to have a claim in that amount, it is likely the Trustee would abandon its interest in the master recordings and the inventory held by RED.

The Chapter 7 Trustees could realize $100,000 in equity from the sale of the office building, take possession of the purported retirement account in the sum of approximately $52,000 and vigorously prosecute the Jones' preference claim and the §548 and/or §547 actions against Weinberger. Sale of any unencumbered inventory in Dade would yield a minimal amount and the recording studio about $75,000. The Chapter 7 Trustees would likely incur significant legal expense in prosecuting these actions and battling between themselves as to who

would get the net assets. The net recovery to the Luke Records estate might be as little as $300,000 to $400,000. If RED's unsecured rejection claim is approved by the Court, its claim could likely be far in excess of the total amount of unsecured claims filed to date. Moreover, all of the claimants who are now waiving or reducing their claims (i.e. Weinberger, Campbell, affiliated companies of Campbell, Jones, etc.) could significantly raise the total amount of unsecured claims to far in excess of $10,000,000. The distribution under a Chapter 7 liquidation could be only a few pennies on the dollar.

## XI. **CONCLUSION**.

For the foregoing reasons, the proponents herein respectfully submits that the most appropriate course of action open to the creditors is to approve the Debtors' Plan of Reorganization on the Ballot enclosed herewith.

