# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

_____

| | |
|---|---|
| LIL' JOE RECORDS, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   CASE NO. 1:21-CV-23727-DPG |
| | ) |
| MARK ROSS; et al., | ) |
| | ) |
| Defendants. | ) |

_____ )

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND REQUEST FOR ORAL ARGUMENT

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES…………………………………………………………………iii

MEMORANDUM OF FACTS AND LAW……………………………………………………1

I.      Introduction…………………………………………………………………………..1

II.     Statement of Facts……………………………………………………………………1

III.    Legal Standard……………………………………………………………………….3

IV.     Argument……………………………………………………………………………..3

      A.  2 Live Crew's notice meets all statutory requirements to be effective……………3

          1.   The Notice terminates the 1990 Agreement, which was a
              copyright transfer……………………………………………………..3

          2.   The Notice was in writing, timely, properly served, and joined
              by a majority of the authors' interests…………………………………..6

          3.   Policy favors validating the termination………………………………...8

      B.  Termination rights are inalienable and thus were not lost in bankruptcy
         or through old settlement agreements……………………………………………..9

      C.  The Subject Albums are not works-for-hire……………………………………..12

      D.  Plaintiff's copyright and trademark infringement claims fail…………………..18

          1.   The trademark (Counts II – IX) and copyright (Count 10) claims
              fail…………………………………………………………………...18

V.      Conclusion…………………………………………………………………………..20

VI.     Request for Hearing S.D. Fla. L.R. 7.1(b)(2)………………………………………..20

# **TABLE OF AUTHORITIES**

Page(s)

Cases

*Acuff-Rose Music, Inc. v. Campbell*,
  972 F.2d 1429 (6th Cir. 1992) ................................................................................. 5

*Allen v. Tyson Foods, Inc.*,
  121 F.3d 642 (11th Cir. 1997) ................................................................................. 3

*Ambrit [AmBrit], Inc. v. Kraft, Inc.*,
  812 F.2d 1531 (11th Cir.1986) ............................................................................... 20

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) ................................................................................................ 3

*Arthur Rutenberg Homes, Inc. v. Drew Homes, Inc.*,
  29 F.3d 1529 (11th Cir.1994) ................................................................................. 4

*Baldwin v. EMI Feist Catalog, Inc.*,
  805 F.3d 18 (2d Cir. 2015) ..................................................................................... 7

*Baldwin v. EMI Feist Catalog, Inc.*,
  2012 WL 13019195 (S.D. Fla. Dec. 11, 2012) ....................................................... 9

*Board of Trade of Chicago v. Johnson*,
  264 U.S. 1, 15 (1924) ............................................................................................. 11

*Business Trends Analysts, Inc. v. Freedonia Group, Inc.*,
  700 F. Supp. 1213 (S.D.N.Y. 1988) ....................................................................... 19

*CENAPS Corp. v. Cmty. of Christ*,
  371 F. Supp. 3d 1024 (M.D. Fla. 2019) .................................................................. 6

*Cmty. for Creative Non-Violence v. Reid*,
  490 U.S. 730 (1989) ...................................................................................... 12, 15, 17

*Commodores Ent. Corp. v. Thomas McClary*,
  2015 WL 12843872 (M.D. Fla. Mar. 10, 2015) ...................................................... 19

*Connecticut Nat'l Bank v. Germain*,
  503 U.S. 249 (1992) ................................................................................................ 9

*Dellacasa, LLC v. John Moriarty & Assocs. of Fla., Inc.*,
  2008 WL 299024 (S.D. Fla. Feb. 1, 2008) .............................................................. 4

*Eden Toys, Inc. v. Florelee Undergarment Co., Inc.*,
  697 F.2d 27 (2nd Cir.1982) ..................................................................................... 6

*Eisenberg v. Advance Relocation & Storage, Inc.*,
  237 F.3d 111 (2d Cir. 2000) ................................................................................... 16

*Ellis v. England*,
  432 F.3d 1321 (11th Cir. 2005) .............................................................................. 3

*EMI Catalogue P'ship v. Hill, Holliday, Connors, & Cosmopulos, Inc.*,
  228 F.3d 56 (2d Cir.2000) ...................................................................................... 19

*Everly v. Everly*,
  958 F.3d 442 (6th Cir. 2020) .................................................................................. 18

*Fred Ahlert Music Corp. v. Warner/Chappell Music, Inc.*,
  155 F.3d 17, 24 (2d Cir.1998) ................................................................................ 10

*Gift of Learning Foundation, Inc. v. TGC, Inc.*,
329 F.3d 792, 797 (11th Cir.2003) .................................................................. 18

*Great Southern Homes v. Johnson & Thompson*,
797 F.Supp. 609, 611-612 (M.D.Tenn.1992) .................................................. 4, 6

*Hardt v. Reliance Standard Life Ins. Co.*,
560 U.S. 242, 251 (2010) ................................................................................. 9

*Horror Inc. v. Miller*,
15 F.4th 232, 243 (2d Cir. 2021) .......................................... 12, 15, 16, 17

*Horror Inc. v. Miller*,
335 F. Supp. 3d 273, 304 (D.Conn. 2018).................................................... 16

*I.A.E., Inc. v. Shaver*,
74 F.3d 768 (7th Cir.1996) .............................................................................. 4

*Imperial Residential Design, Inc. v. Palms Dev. Grp., Inc.*,
70 F.3d 96, 99 (11th Cir. 1995) .................................................................... 4, 6

*In re McKay*,
143 F. 671, 673 (W.D.N.Y. 1906) ................................................................ 10

*In re Napster, Inc.* Copyright Litig.,
191 F.Supp.2d 1087, 1097 (N.D. Cal. 2002)................................................. 10

*Int'l Stamp Art, Inc. v. U.S. Postal Serv.*,
456 F.3d 1270, 1274 (11th Cir. 2006) .......................................................... 19

*Korman v. HBC Fla., Inc.*,
182 F.3d 1291, 1295 (11th Cir. 1999) ........................................................ 6, 8

*MGFB Properties, Inc. v. Viacom Inc*,
No. 21-13458, 2022 WL 17261122, at *8 (11th Cir. Nov. 29, 2022)…………………………20

*Mills Music, Inc. v. Snyder*,
469 U.S. 153, 172-173 ................................................................................. 8, 10

*Mission Prod. Holdings, Inc. v. T*empnology, LLC*,
203 L. Ed. 2d 876, 139 S. Ct. 1652, 1663 (2019)* ...................................... 11

*Radio Television Espanola, S.A. v. New World Entertainment, Ltd.*,
183 F.3d 922, 927 (9th Cir.1999) .................................................................... 4

*Roberts & Schaefer Co. v. Hardaway Co.*,
152 F.3d 1283, 1295 (11th Cir. 1998) ............................................................ 5

*Rodrigue v. Rodrigue*,
218 F.3d 432, 436 (5th Cir. 2000) ................................................................ 11

*Roger Miller Music v. Sony/ATV Publ'g*,
477 F.3d 383, 390 (6th Cir. 2007) ................................................................ 18

*Schiller & Schmidt, Inc. v. Nordisco Corp.*,
969 F.2d 410, 412-413 (7th Cir. 1992) ......................................................... 15

*SCO Grp., Inc. v. Novell, Inc.*,
578 F.3d 1201, 1212 (10th Cir. 2009) ............................................................ 4

*Soweco*,
617 F.2d 1185 ................................................................................................ 19

*Stewart v. Abend*,
495 U.S. 207, 230 (1990) ................................................................................ 9

*Stillwater Ltd. v. Basilotta*,
2017 WL 2906056 (C.D. Cal. Mar. 17, 2017)............................................... 10

*Unicolors, Inc. v. H&M Hennes & Mauritz, L. P.*,
  142 S. Ct. 941, 946 (2022) ............................................................................................ 9
*Van Cleef & Arpels Logistics, S.A. v. Jewelry*,
  547 F.Supp.2d 356, 362 (S.D.N.Y.) ............................................................................ 14
*Walthal*,
  172 F.3d ................................................................................................................... 4, 6
*Wornick v. Gaffney*,
  544 F.3d 486, 490 (2d Cir. 2008) .............................................................................. 11
*Zuill v. Shanahan*,
  80 F.3d 1366, 1369 (9th Cir. 1996) ........................................................................... 18

Statutes

11 U.S.C.A. § 541(a)(1) .................................................................................................. 11
15 U.S.C. § 1127 ............................................................................................................. 18
15 U.S.C § 1115(b)(4) .................................................................................................... 19
17 U.S.C. § 101 ........................................................................................................... 8, 12
17 U.S.C. § 101(1) .......................................................................................................... 15
17 U.S.C. § 203 ........................................................................................................ Passim
17 U.S.C. § 203(a) ...................................................................................................... 7, 11
17 U.S.C. § 203(a)(1) .................................................................................................... 7, 8
17 U.S.C. § 203(a)(1), (2) ................................................................................................. 7
17 U.S.C. § 203(a)(3) .................................................................................................... 6, 8
17 U.S.C. § 203(a)(4) ........................................................................................................ 7
17 U.S.C. § 203(a)(4)(A) ............................................................................................... 7, 8
17 U.S.C. § 203(a)(5) ........................................................................................................ 9
17 U.S.C. § 203(b)(2) ..................................................................................................... 10
17 U.S.C. § 204(a) ........................................................................................................ 4, 6
17 U.S.C.A. § 101(2) ................................................................................................. 12, 13

Other Authorities

1976 U.S.C.C.A.N. 5659 ................................................................................................... 8
H. R. Rep. No. 94–1476 .................................................................................................... 8
Renegotiating the Copyright Deal in the Shadow of the "Inalienable" Right to Terminate,
  62 Fla. L. Rev. 1329 (2010) ........................................................................................... 9

<u>**MEMORANDUM OF FACTS AND LAW**</u>

**I.      Introduction**

In ruling on this motion, the court need only address one material issue:

An artist may, 35 years after publication of a work, terminate the initial transfer of ownership for that work's copyrights and reclaim the copyrights. The band 2 Live Crew granted to Skyywalker Records copyright ownership of five albums from 1986 to 1990 and sent a notice to terminate said grant with an effective termination date 35 years after the publication of each album. Was 2 Live Crew's termination effective?

The answer to this question is "yes" and Defendants/Counterclaimant's first counterclaim for a declaratory judgment validating 2 Live Crew's termination should be adjudicated in Defendants' favor. Plaintiff's other claims – for copyright and trademark infringement – are meritless and should also be adjudicated in Defendants' favor, as set forth below.

**II.     Statement of facts**

Defendants Mark Ross ("Ross"), Luther Campbell ("Campbell"), and the deceased Christopher Wong Won[1] ("Won") (collectively "2 Live Crew") are three of the four original members of the band 2 Live Crew. Defendants Statement of Undisputed Material Facts ("SUF"), 1. From 1986 to 1989, 2 Live Crew wrote and recorded five albums[2] ("Subject Albums"). SUF 3. The members of 2 Live Crew, at the time they recorded each of the Subject Albums, had an oral agreement when they went into the studio about how the rights, including copyrights, for those albums would be treated. SUF 4. The parties performed under that oral agreement between 1986 and 1990. SUF 5. Specifically, they recorded the Subject Albums, Campbell's label Luke

---

[1] Appearing through his heirs, Defendants Anissa Wong Won, Christopher Wong Won, Jr., Roderick Wong Won, and Leterius Rey are the heirs of Christopher Wong Won (collectively "Won Heirs") terminated Won's grant of rights on behalf of the Estate of Christopher Wong Won. SUF 3.

[2] *The 2 Live Crew Is What We Are, Move Somethin', Move Somethin' (Clean), As Nasty As They Wanna Be,* and *As Clean As They Wanna Be*

Skyywalker Records, Inc. ("Skyywalker Records[3]") released them, and the label paid the group from the release of the Subject Albums. SUF 6. The Subject Albums bore the logo and company information for Skyywalker Records under the name the entity bore at the time of release. SUF 8. And when copyright and obscenity lawsuits relating to the Subject Albums were waged in court, Skyywalker Records was a party to those actions, which would only possible if it had ownership of the albums' copyrights. SUF 9. At no time between 1986 and 1990 did any of the members of 2 Live Crew, or anyone else for that matter, claim that any entity or individual other than Skyywalker Records held the Subject Album's copyrights. SUF 10.

In or around 1990, 2 Live Crew executed a written agreement with Skyywalker Records[4] memorializing the parties' oral agreement ("1990 Agreement"). SUF 11. The 1990 Agreement states an effective date of January 1, 1987 but was entered into in 1990 when the members of 2 Live Crew decided to memorialize their oral agreement in writing. SUF 13.  This is the only written agreement in the record under which the Subject Albums could have been recorded and transferred.[5] Lil' Joe Records, Inc., ("Lil' Joe") has had the 1990 Agreement in its files since the early 2000s and, before this litigation, never took any steps to challenge its validity or veracity. SUF 14.

Skyywalker Records held the copyrights for the Subject Albums per the 1990 Agreement at all relevant times until it, along with Campbell, declared bankruptcy in 1995. SUF 16.

---

[3] Luke Skyywalker Records was renamed Skyywalker Records (the entity that executed the 1990 Agreement), which was renamed Luke Records. SUF 7. For purposes of this motion, except where noted, "Skyywalker Records" will refer to all iterative names for the entity.
[4] The name of the contracting entity listed on the agreement is Skyywalker Records. SUF 12.
[5] There are certain publishing agreements with another entity, Pac Jam Publishing, Inc., that relate to the compositions for the Subject Albums. SUF 15. The majority of the composition copyright registrations state the members of 2 Live Crew are the authors of the Subject Albums and the Subject Albums were not works-for-hire. SUF 35-36.

Ultimately, through the bankruptcy process, Plaintiff, Lil' Joe, obtained the copyrights in the Subject Albums. SUF 17. On November 4, 2020, 2 Live Crew served a notice terminating ("Notice") its original copyright grants to Skyywalker Records under 17 U.S.C. § 203, which allows an artist to terminate a transfer and reclaim their copyrights from the current rightsholders after 35 years. SUF 18. Lil' Joe received the termination notice, and now challenges its validity.

### III.    Legal standard

Summary judgment "shall be granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Allen v. Tyson Foods, Inc*., 121 F.3d 642 (11th Cir. 1997) (internal quotation marks omitted). "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine issue of material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 – 48 (1986) (emphasis in original). "For factual issues to be considered genuine, they must have a real basis in the record ... mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (citations omitted).

### IV.    Argument

Defendants complied with the requirements of 17 U.S.C. § 203 and its Notice is thus effective in terminating the copyright transfers for the Subject Albums. The § 203 right is inalienable, and the albums were not works-for-hire. This motion should be granted.

### A.    2 Live Crew's notice meets all statutory requirements to be effective

### 1.    The Notice terminates the 1990 Agreement, which was a copyright transfer

Transfers of copyright ownership must be in writing. 17 U.S.C. § 204(a).[6] This "writing" requirement "can be satisfied by an oral assignment later ratified or confirmed by a written memorandum of the transfer*." Imperial Residential Design, Inc. v. Palms Dev. Grp., Inc.*, 70 F.3d 96, 99 (11th Cir. 1995), quoting *Arthur Rutenberg Homes, Inc. v. Drew Homes, Inc.*, 29 F.3d 1529, 1532–33 (11th Cir.1994). The Eleventh Circuit "has adopted the reasoning of those courts which have held that a copyright owner's later execution of a writing which confirms an earlier oral agreement validates the transfer *ab initio. Id.*, citing *Arthur Rutenberg Homes, Inc.* at 1533; *Great Southern Homes v. Johnson & Thompson*, 797 F.Supp. 609, 611–612 (M.D.Tenn.1992) (Wiseman, J.) (later writing signed by copyright owner and transferee memorializing oral agreement cured defects in standing, although signed after suit was filed).

Further, it is axiomatic that "[n]o magic words must be included in a document to satisfy § 204(a). Rather, the parties' intent as evidenced by the writing must demonstrate a transfer of the copyright." *Radio Television Espanola, S.A. v. New World Entertainment, Ltd*., 183 F.3d 922, 927 (9th Cir.1999), citing 3 Melville B. Nimmer & David Nimmer, Nimmer on Copyright, § 10.03[A][2] at 10-37); see also, *Dellacasa, LLC v. John Moriarty & Assocs. of Fla., Inc*., No. 07-21659-CIV, 2008 WL 299024, at *14–16 (S.D. Fla. Feb. 1, 2008). As such, the writing does not "have to be the Magna Carta; a one-line pro forma statement will do." *Id.* (citations omitted); see also *SCO Grp., Inc. v. Novell, Inc.*, 578 F.3d 1201, 1212 (10th Cir. 2009) ("Section 204(a), by its terms, imposes only the requirement that a copyright transfer be in writing and signed by the parties from whom the copyright is transferred; it does not on its face impose any heightened

---

[6] If the writing requirement is not met, a nonexclusive license may result, as nonexclusive licenses may be granted orally and are similarly subject to termination. *Walthal*, 172 F.3d at 484, citing *I.A.E., Inc. v. Shaver*, 74 F.3d 768 (7th Cir.1996); see also 17 U.S.C. § 203 ("the exclusive or nonexclusive grant of a transfer **or license** of copyright or of any right under a copyright ... is subject to termination")(emphasis added).

burden of clarity or particularity.").

Here, the 1990 Agreement evidences the group's intent to transfer the copyrights for the Subject Albums to Skyywalker Records and memorialized 2 Live Crew's prior oral agreement with the label. It states in paragraph 2(d) that:

> "All master recordings recorded during the term here of and all derivatives manufactured therefrom, **together with the performances embodied thereof** shall from the inception of their creation, be entirely and forever the property of the Company, or its designee free from any claims whatsoever by Artist or any person, firm or corporation deriving any rights or interests from Artist; and company shall have the right to assign and otherwise transfer such **copyrights** to any third party, free and clear of any claim by Artist or any person, firm or corporation, deriving any rights from Artist." SUF 19 (emphasis added).

This section indicates the parties intended to, and did, transfer the copyright in the Subject Albums to the label, as previously agreed. And all evidence supports such a transfer.

First, the parties' intent to transfer is evidenced by the fact that they performed under the 1990 Agreement, recording all of the Subject Albums for release by Skyywalker Records, and receiving payments under the terms of the agreement. SUF 6-8, 10-11, 20. To be sure, "where parties act as though a contract exists, there is a contract, even though no formal writing exists." *Roberts & Schaefer Co. v. Hardaway Co*., 152 F.3d 1283, 1295 (11th Cir. 1998). Second, the parties' conduct[7] before and after executing the 1990 Agreement establishes a transfer of copyrights in the Subject Albums pursuant to the 1990 Agreement and intent to affect a transfer. SUF 6-8, 10-11, 20. So owing, the written 1990 Agreement and the oral agreements it memorialized is the copyright transfer that was terminated by the Notice.

---

[7] Aside from tendering and receiving payment per the agreement, 2 Live Crew and Skyywalker Records' conduct in other litigation evidences the intent and effect of the 1990 Agreement. For example, the Sixth Circuit concluded that in "June 1989, Campbell's company, Luke Records (then doing business as Skyywalker Records), released 'Pretty Woman' as one of ten tracks on a collection entitled 'As Clean As They Wanna Be.'" *Acuff-Rose Music, Inc. v. Campbell*, 972 F.2d 1429, 1432 (6th Cir. 1992), rev'd, 510 U.S. 569, 114 S. Ct. 1164, 127 L. Ed. 2d 500 (1994). It is collaterally established that Skyywalker Records released that album, which is one of the Subject Albums.

Finally, Lil' Joe lacks standing to challenge the 1990 Agreement transfer: where there is "no dispute between the copyright owner and the transferee," it would be "unusual and unwarranted to permit a third-party" to challenge the transfer. See *Imperial Residential Design, Inc*., 70 F.3d at 99 (addressing infringement), citing *Eden Toys, Inc. v. Florelee Undergarment Co., Inc*., 697 F.2d 27, 36 (2nd Cir.1982). Thus, in cases where the parties to an agreement "agree that it effected a transfer, a challenger may not challenge a transfer by involving section 204(a)." *Id*., citing, *Great Southern Homes*, 797 F.Supp. at 611. As all parties to the 1990 Agreement concur that the agreement transferred the Subject Albums copyrights to Skyywalker Records, Lil' Joe cannot challenge that transfer.

**2.     The Notice was in writing, timely, properly served, and joined by a majority of the authors' interests**

Under § 203, "a copyright owner can terminate an exclusive license of copyrighted material 'at any time during a period of five years beginning at the end of thirty-five years from the date of the grant' of the license." *CENAPS Corp. v. Cmty. of Christ*, 371 F. Supp. 3d 1024, 1028 (M.D. Fla. 2019); citing 17 U.S.C. § 203(a)(3). This "provision gives the author of a work the right to terminate any copyright transfer or license still in effect after 35 years, provided she exercises that right after 35 and before 40 years have elapsed." *Korman v. HBC Fla., Inc.,* 182 F.3d 1291, 1295 (11th Cir. 1999), citing *Walthal v. Rusk*, 172 F.3d 481, 484 (7th Cir. 1999). If "the grant covers the right of publication of the work, the period begins at the end of thirty-five years from the date of publication of the work under the grant or at the end of forty years from the date of execution of the grant whichever term ends earlier." 17 U.S.C. § 203(a)(3).

A "termination shall be effected by serving an advance notice in writing, signed by the number and proportion of owners of termination interests required under clauses (1) and (2) of

this subsection, or by their duly authorized agents upon the grantee or the grantee's successor in title." 17 U.S.C. § 203(a)(4). "The notice shall state the effective date of the termination, which shall fall within the five-year period specified by clause (3) of this subsection, and the notice shall be served not less than two or more than ten years before that date." 17 U.S.C. § 203(a)(4)(A). Importantly, "the exclusive or nonexclusive grant of a transfer or license of copyright or of any right under a copyright" made "on or after" January 1, 1978 may be terminated by the "author." 17 U.S.C. § 203(a). If an author is deceased, his or her heirs hold the termination right[8]. *Baldwin v. EMI Feist Catalog, Inc.,* 805 F.3d 18, 32 (2d Cir. 2015), citing 17 U.S.C. § 203(a)(1), (2). "[A] grant executed by two or more authors of a joint work… may be [terminated] by a majority of the authors who executed it" 17 U.S.C. § 203(a)(1).

Defendants have satisfied the statutory requirements for terminating the 1990 Agreement and the oral agreements it memorializes. First, 2 Live Crew sent the written Notice to all possible rights holders, including Lil' Joe, via first-class mail (return receipt requested) and when possible electronic mail. SUF 21. Second, a majority three of the four original 2 Live Crew membership interests joined in the termination. SUF 22. Third, the Notice was sent on November 4, 2020 over two years before the earliest date of effective termination (November 7, 2022) and less than 10 years from the last date of effective termination (May 1, 2024). 17 U.S.C. § 203(a)(4)(A); SUF 23. Fourth, the grant at issue covered the right of publication,[9] and therefore, the notice of termination provides a date of effective termination for each of the Subject Albums which is over

---

[8] Christopher Wong Won's heirs have exercised the Section 203 termination right on behalf of the Estate of Christopher Wong Won. SUF 2.

[9] The 1990 Agreement specifically states, "Artist hereby grants to Company the sole and exclusive right during the initial term of this Agreement and all renewals and extensions of the same to use, **publish and permit other to use and publish**…" SUF 25 (emphasis added).

35 years from the date of publication[10] and within the 5-year window beginning on December 1, 2021. 17 U.S.C. § 203(a)(3); SUF 24. Finally, pursuant to 17 U.S.C § 203(a)(4)(A), a copy of the Notice was recorded in the Copyright Office before the effective date of termination. SUF 26. As such, Defendants' Notice effectively terminated the 1990 Agreement, a memorialization of the earlier oral agreement.

### 3. Policy favors validating the termination

Finding termination here achieves § 203's purpose. The "manifest congressional intent" behind § 203 is "the protection of authors[,]" and is "a provision safeguarding authors against unremunerative transfers[.]" *Korman*, 182 F.3d at 1296. As the House Report notes, "[a] provision of this sort is needed because of the unequal bargaining position of authors, resulting in part from the impossibility of determining a work's value until it has been exploited." *Id*., citing H.R.Rep. No. 94–1476, at 124 (1976), reprinted in 1976 U.S.C.C.A.N. 5659, 5740. The stated purpose of the law "is to help authors, not publishers or broadcasters or others who benefit from the work of authors*." Korman*, 182 F.3d at 1296, citing *Mills Music, Inc. v. Snyder*, 469 U.S. 153, 172–73 & n. 39 (1985) (noting that a "comparable termination provision" was intended "to relieve authors of the consequences of ill-advised and unremunerative grants that had been made before the author had a fair opportunity to appreciate the true value of his work").

Thus, § 203 must be applied to benefit 2 Live Crew, the artists, as opposed to Lil' Joe, the company that bought their rights for the initial copyright term in bankruptcy. The members of 2 Live Crew entered into an unfavorable grant of the Subject Albums' copyrights, and are now, 35

---

[10] As relevant here, the statute defines "publication" as "the distribution of copies or phonorecords of a work to the public by sale or other transfer of ownership, or by rental, lease, or lending." 17 U.S.C. § 101. As § 203 itself suggests, the publication of a work is a one-time event. See id. § 203(a)(3) (referring to "the date of publication"). The date of publication of the Subject Albums is also included in 2 Live Crew's Notice. SUF 27.

years later, well within their rights to terminate the grant and reclaim from Lil' Joe the rights. Allowing Defendants to enjoy part of the success of their works serves § 203's purpose.

> **B.**      **Termination rights are inalienable and thus were not lost in bankruptcy or through old settlement agreements**

Lil' Joe may argue that Defendants lost their termination rights in prior bankruptcy proceedings or through old settlement agreements (all of which occurred before the termination right vested). This argument, though, is foreclosed by the Copyright Act's text. When evaluating this Act, courts "follow the text of the statute." *Unicolors, Inc. v. H&M Hennes & Mauritz, L. P.*, 142 S. Ct. 941, 946 (2022), citing *Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242, 251 (2010). When the language of a statute is unambiguous, as it is here, the "judicial inquiry is complete." *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 254 (1992).

The Copyright Acts states that the "[t]ermination of the grant may be effected **notwithstanding any agreement to the contrary**, including an agreement to make a will or to make any future grant. 17 U.S.C. § 203(a)(5)(emphasis added). In enacting the Act, "Congress created an inalienable right to terminate a prior grant of an interest in a copyright. *Baldwin v. EMI Feist Catalog, Inc.*, No. 11-81354-CIV, 2012 WL 13019195, at *2 (S.D. Fla. Dec. 11, 2012), citing Lydia Pallas Loren, Renegotiating the Copyright Deal in the Shadow of the "Inalienable" Right to Terminate, 62 Fla. L. Rev. 1329, 1333-42 (2010). The plain language of the text forecloses any argument that bankruptcy filings or settlement agreements can divest an author of their termination right, as they are the type of "agreements to the contrary" that the Acts expressly states do not deprive an artist of their termination right.

Given that the Act "provides an **inalienable** termination right[,]" any argument that Defendants alienated that right must fail. *Stewart v. Abend*, 495 U.S. 207, 230 (1990); citing 17

U.S.C. § 203; see also *Fred Ahlert Music Corp. v. Warner/Chappell Music, Inc.*, 155 F.3d 17, 24 (2d Cir.1998) (termination right "is designed to protect the interests of authors and their heirs and to maximize their ability to exploit the value of their [works] during the extended renewal term."). This inalienability "reflects a practical compromise that will further the objectives of the copyright law while recognizing the problems and legitimate needs of all interests involved." *Stillwater Ltd. v. Basilotta*, No. CV 16-1895 FMO (SHX), 2017 WL 2906056, at *3 (C.D. Cal. Mar. 17, 2017), quoting *Mills Music, Inc.*, 469 U.S. at 173 n. 39 (remaining citations omitted).

Given the clear text, it is unsurprising that no court has ever found that an artist who declared bankruptcy or entered into a settlement agreement lost their termination right as a result. This is particularly true because a right, "being inalienable, d[oes] not pass to the trustee in bankruptcy." *In re McKay*, 143 F. 671, 673 (W.D.N.Y. 1906)(discussing inalienable trust). Moreover, as the right is "non-transferrable and can only be exercised by the author or his/her heirs" it cannot even be exercised by a bankruptcy trustee or court. *Stillwater Ltd.,* 2017 WL 2906056, at *3, citing *In re Napster, Inc*. Copyright Litig., 191 F.Supp.2d 1087, 1097 (N.D. Cal. 2002). As such, it would have no value for a bankruptcy estate in any event. Id.

Assuming, *arguendo,* that the termination right could be transferred in bankruptcy, Defendants' right was not vested at the time of any party's bankruptcy, and as an inchoate interest could not be part of the bankruptcy estate. The bankruptcies all occurred before service of the Notice, so the termination rights were not alienated, as they did not "become vested" until the "date the notice of termination has been served[.]" 17 U.S.C. § 203(b)(2). Before the 35-year window opened, the termination right did not exist and thus lacked any value as an inchoate right that had not "vested." It was thus incapable of transfer. See BLACK'S LAW DICTIONARY 1563 (6th ed.1990)( the use of "vest" in statutes has a temporal connotation, indicating the time

at which an interest in property accrues to its rightful holder). To "vest" means to "give an immediate, fixed right of present or future enjoyment; to accrue to; to be fixed; to take effect. *Rodrigue v. Rodrigue*, 218 F.3d 432, 436 (5th Cir. 2000). And to "own" means to have a good legal title; to hold as property; to have a legal or rightful title to; to have; to possess." *Id*.

   Here, Defendants did not own the termination right, which was inchoate and had not vested in any event, at the time of the relevant bankruptcy proceedings and settlement agreements. As a bankruptcy "estate cannot possess anything more than the debtor itself did outside bankruptcy[,]" it thus could not have transferred an interest that the debtor did not have. *Mission Prod. Holdings, Inc. v. Tempnology*, *LLC*, 203 L. Ed. 2d 876, 139 S. Ct. 1652, 1663 (2019), citing *Board of Trade of Chicago v. Johnson*, 264 U.S. 1, 15 (1924); 11 U.S.C.A. § 541(a)(1) (defining the estate to include the "interests of the debtor in property"). In other contexts, courts have found it "obvious" that an " inchoate interest" would not be "subject to administration by the beneficiary's trustee in bankruptcy." *Wornick v. Gaffney*, 544 F.3d 486, 490 (2d Cir. 2008)(addressing insurance).

   Here, the termination right was not lost through bankruptcy.[11] Nor was it lost through any of the various settlement agreements between the parties because it is inalienable. It is settled that the § 203 right does not accrue until the effective date of the termination. Before that date, it is inchoate and nonexistent. Thus, Defendants' termination right as "authors" of the Subject Albums could not and were not transferred into the bankruptcy estate or via settlement agreement because that right cannot be transferred, cannot be divested, and even if the law stated otherwise, the right was inchoate and did not exist during the bankruptcy proceeding or at the

---

[11] A bankruptcy estate didn't receive a ny termination right because it could never exercise such a right. "[T]he […] grant of a transfer or license of copyright or of any right under a copyright" may only be terminated by the "**author**." 17 U.S.C. § 203(a)(emphasis added).

time of the settlement agreements because they had not yet vested. The termination right was not transferred or lost and Defendants properly exercised that right to reclaim their copyrights in the Subject Albums from Lil' Joe and any other claimants.

### C. The Subject Albums are not works-for-hire

2 Live Crew did not create the Subject Albums as works-for-hire and thus had the right to terminate the transfer. There are "two mutually exclusive categories of work for hire: the first provides that a work made by an employee within the scope of his employment is a work for hire; and the second provides that a specially commissioned work that is subject to an express agreement that the work will be treated as one made for hire is such a work." *Horror Inc. v. Miller*, 15 F.4th 232, 243 (2d Cir. 2021), citing 17 U.S.C. § 101; see *Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 738 (1989). The second category only applies to works created as "a motion picture or other audiovisual work, as a translation, as a supplementary work, as a compilation, as an instructional text, as a test, as answer material for a test, or as an atlas." 17 U.S.C.A. § 101(2). Music is not listed. Thus, only the first category could apply and it does not.

2 Live Crew did not create the Subject Albums as works for hire for Skyywalker Records. SUF 28. The members of 2 Live Crew and Campbell, the owner of Skyywalker Records, agree that the members were not employees, which is dispositive. SUF 29.  Further evidence of this is that each member of 2 Live Crew entered into an agreement transferring their rights to the Subject Albums to Skyywalker Records. SUF 11. In addition, there is no employment agreement with any 2 Live Crew member let alone one that states the existence of a salary, what that salary would be for, and that the creation of musical works is within the scope of that employment. SUF 30.

 The sole evidence Lil' Joe proffers of an employer-employee relationship are purported

paycheck stubs from Skyywalker Records and Luke Records, Inc., the latter of which did not exist until after the Subject Albums were created, so those checks are irrelevant. The other checks do **not** identify what they were for, do not indicate that they were made in connection with the creation of the Subject Albums, and even if they were, do not establish a work-for-hire under the thirteen *Reid* factors. SUF 31. And, as explained by Campbell, the label's owner, 2 Live Crew received per diem checks at times and while some of them were marked "payroll," those payments were not compensation for the creation of the Subject Albums. SUF 32. The Subject Albums simply were not created by 2 Live Crew within the scope of any employment with Skyywalker Records, or any other company. Id. And Skyywalker Records, which released the Subject Albums, never claimed that the Subject Albums were works for hire. Id.

At the time of the Subject Albums' creation, Campbell was the owner of Skyywalker Records; however, the scope of his employment did not include the creation of the Subject Albums. SUF 33. His role as a member of 2 Live Crew was wholly independent of his Skyywalker Records role, as evidenced by the fact he is a signatory of the 1990 Agreement on behalf of both 2 Live Crew and Skyywalker Records. Id. The other members of 2 Live Crew were likewise not employed by Skyywalker Records. SUF 29-34. The operative 1990 Agreement, entered into by 2 Live Crew with Skyywalker Records, does not contain a work-for-hire clause and its grant language supports Defendants' position that the Subject Albums were **not** works for hire. SUF 34. And Campbell, who owned Skyywalker Records, confirmed that the Subject Albums were not works for hire. SUF 30.

The composition (PA) registrations filed for the first of the Subject Albums list the four original members of *2 Live Crew* as authors and specifically state that each author's contribution

was **not** a "work made for hire." SUF 35. Importantly, the majority[12] of these registrations were filed and registered by Lil' Joe Wein Music, Inc.,[13] an affiliate of Plaintiff. SUF 36. This establishes Lil' Joe and its owner knew that the Copyright Office was advised that the works were not works-for-hire. Plaintiff is estopped from now claiming otherwise.

The sound recording (SR) registrations for the Subject Albums were registered by Lil' Joe on February 26, 2001 – they should be ignored. SUF 40. First, the registrations do **not** garner any presumption because they were not filed within the five-year deadline set by the statute. See *Van Cleef & Arpels Logistics, S.A. v. Jewelry*, 547 F.Supp.2d 356, 362 (S.D.N.Y.), *adhered to on reconsideration sub nom. Van Cleef & Arpels Logistics, S.A. v. Landau Jewelry*, 583 F.Supp.2d 461 (S.D.N.Y. 2008) ("a copyright registration issued more than five years after the first publication of a work is not entitled to the statutory presumption of validity[.]"). Second, these registrations falsely state that either Luke Records, Inc. or Lil' Joe are the authors of the sound recordings when these entities **did not exist** at the time of creation of the recordings, and 2 Live Crew are the *actual* authors. SUF 40. They also falsely state on four of the five registrations the works were works-for-hire, despite the composition registrations stating the opposite. SUF 41. This includes the majority of the *Move Somethin' (Clean)* PA registrations, which were filed in May 2001, three months after the SR registrations were filed by Lil' Joe. SUF 42. Causing even greater confusion, two of the four SR registrations check both the work-for-hire and not work-

---

[12] The registrations for *You Got Larceny* and *City of Boom* have an effective date of August 10, 1989 filed on the same date as the *As Nasty as They Wanna Be* album and both were filed by Pac Jam Publishing stated the respective songs were not a work made for hire. SUF 37. The registration for the song *Coolin'* was registered by both Pac Jam Publishing in 1989 and by Lil' Joe Wein Music, Inc. in 1998. SUF 38.

[13] Lil' Joe Wein Music, Inc. is related to and has the same principle, Joseph Weinberger as Lil' Joe, who is listed as the entity listed in section 8 for "Correspondence" on the registrations filed by Lil' Joe Wein Music, Inc. SUF 39.

for-hire boxes. SUF 43. Further, Joe Weinberger on behalf of Lil' Joe admitted during its deposition to changing the sound recording registration for *Move Somethin'* which initially stated the work was not made for hire to stating it was a work-for-hire, in 2021 to gain an advantage in this litigation. SUF 44. Plaintiff's work-for-hire theory is a *post-hoc* reimagining of the facts. The Subject Albums were not works-for-hire and no one including Lil' Joe considered them to be so until Defendants sought to terminate the transfer.

Even assuming, *arguendo,* that the lack of a work-for-hire agreement[14] and the concessions in the registrations did not establish that the Subject Albums are not works for hire, the Supreme Court's thirteen factor test for determining an employee relationship to meet the requirements of 17 U.S.C. § 101(1) for a work-for-hire also supports this conclusion. When considering is a work is "for hire" the court considers "[t]hirteen non-exhaustive factors: (1) the hiring party's right to control the manner and means by which the work is accomplished; (2) the skill required to create the work; (3) the source of the instrumentalities and tools; (4) the location of the work; (5) the duration of the relationship between the parties; (6) whether the hiring party has the right to assign additional projects to the hired party; (7) the extent of the hired party's discretion over when and how long to work; (8) the method of payment; (9) the hired party's role in hiring and paying assistants; (10) whether the work is part of the regular business of the hiring party; (11) whether the hiring party is in business; (12) the provision of employee benefits; (13) the tax treatment of the hired party. *Horror Inc.*, 15 F.4th at 243–44, citing *Reid* at 751-53, 109

---

[14] Lil' Joe has raised an argument that the set of agreements signed in 1991 contain work-for-hire language and covers the Subject Album, but this contention is easily dispelled as it is black letter law an agreement sufficient to establish a work as a "work-for-hire" must be executed **before** creation of the work. *Schiller & Schmidt, Inc. v. Nordisco Corp.*, 969 F.2d 410, 412-13 (7th Cir. 1992). Therefore, the uncontested fact that those agreements are dated in 1991 and executed **after** the creation of the Subject Albums, is dispositive. SUF 45.

S.Ct. 2166. "Other relevant factors may also be considered, so long as they are drawn from the common law of agency that *Reid* seeks to synthesize." *Id*. citing *Eisenberg v. Advance Relocation & Storage, Inc.*, 237 F.3d 111, 114 n.1 (2d Cir. 2000).

The thirteen work-for-hire factors weigh in favor of 2 Live Crew, beginning with the first "right of control" factor.  None of the purported potential "employers" had the right to control the creative process for the Subject Albums and this factor favors 2 Live Crew. There is no evidence of "any right to control" by any purported employer, and, if anything, the supposed employers made "suggestions and contributions," which "do not necessarily evince the type of comprehensive control that characterizes a traditional employer-employee relationship. *Horror Inc.*, 15 F.4th at 250, citing *Horror Inc. v. Miller*, 335 F. Supp. 3d 273, 304 (D.Conn. 2018), aff'd, 15 F.4th 232 (2d Cir. 2021).

The skill required to create the Subject Albums was high, favoring Defendants. "Courts adjudicating copyright cases involving professional creative artists have typically found the skill factor to weigh strongly in favor of independent contractor status." *Horror Inc.*, 15 F.4th at 251. 2 Live Crew exercised a high level of skill in writing and producing music and over the course of their career created multiple gold and one platinum album. SUF 46. None of the contracting entities would not have been able to create and replicate the Subject Albums due to the high level of creativity and skill. SUF 47. The fact the Subject Albums were written and recorded in third-party studios also weighs against a work-for-hire finding. SUF 48.

Further, 2 Live Crew worked with Skyywalker Records for a relatively short period of time. SUF 49. 2 Live Crew were not hired as employees and paid on a salary or hourly basis but were paid a royalty on the delivered albums. SUF 30, 50. While Skyywalker Records made certain payments to 2 Live Crew, those payments were for per diems and were not related to

compensation for the creation of the Subject Albums. SUF 32. Skyywalker Records did not have

the ability to arbitrarily assign additional projects outside 2 Live Crew's obligation to create and

deliver the required works. SUF 51. Also, Skyywalker Records or any of its iterations are not

still in business and have not been in business since the mid-1990s. SUF 52.

    2 Live Crew's "discretion over [their] day-to-day schedule weighs in favor of classifying

[them] as an independent contractor." *Horror Inc.*, 15 F.4th at 255, citing *Reid*, 490 U.S. at 753,

("Apart from the deadline for completing the sculpture, [sculptor] had absolute freedom to

decide when and how long to work."). 2 Live Crew had the freedom to create their own schedule

and did not have assigned times each day to work and simply had the deadline to deliver an

album, but otherwise had absolute freedom to decide when to work. SUF 53.

    The employee benefits factor favors also favors 2 Live Crew because Skyywalker

Records did not provide 2 Live Crew "with health insurance, paid vacation time, worker's

compensation benefits, a pension plan, or other types of benefits that courts have traditionally

found probative of employee status." *Id.* at 252, citing *Reid*, 490 U.S. at 753, (examining

contributions to unemployment insurance or workers' compensation funds); SUF 54. This makes

clear that 2 Live Crew were not employees.

    When taken in the aggregate the factors weigh in favor of 2 Live Crew who worked by

themselves, controlled their schedule, worked at third-party locations, were paid on a royalty

basis, and whose projects required highly skilled and unique musical talent of a manner only they

could provide. Their relationship did not have the trappings of the typical employer and

employee relationship, and thus, the Subject Albums were not works-for hire.

    Finally, Plaintiff's argument that the works were "for hire" is barred by the statute of

limitations. In copyright, a claim as to who initially created and owns the copyright for a work,

"accrues only once, and if an action is not brought within three years of accrual, it is forever barred." *Everly v. Everly*, 958 F.3d 442, 450 (6th Cir. 2020), citing *Roger Miller Music v. Sony/ATV Publ'g*, 477 F.3d 383, 390 (6th Cir. 2007), quoting *Zuill v. Shanahan*, 80 F.3d 1366, 1369 (9th Cir. 1996). The 1990 Agreement and the copyright registrations establish 2 Live Crew created the Subject Albums and transferred their ownership of those albums' copyrights to Skyywalker Records. Lil' Joe cannot now claim, over 30 years later, that the works were for-hire and thus never owned by 2 Live Crew.

### D.     Plaintiff's copyright and trademark infringement claims fail

Plaintiff includes allegations of infringement in the complaint but failed entirely to prove up those claims during litigation. They should both be adjudicated in Defendants' favor.

### 1.     The trademark (Counts II – IX) and copyright (Count 10) claims fail

Plaintiff has produced no evidence that either Defendants Mark Ross or the Wong Won Heirs unlawfully used any of Plaintiff's trademarks, as alleged in the complaint. A trademark is "any word, name, symbol, or device, or any combination thereof [used] to identify and distinguish [one's] goods ... from those manufactured or sold by others and to indicate the source of the goods." *Gift of Learning Foundation, Inc. v. TGC, Inc.,* 329 F.3d 792, 797 (11th Cir.2003) (per curiam), quoting 15 U.S.C. § 1127. A plaintiff asserting a trademark infringement claim must show "1) that he had a valid trademark and 2) that the defendant had adopted an identical or similar mark such that consumers were likely to confuse the two." *Id.*

Plaintiff fails to show the Defendants "adopted an identical or similar mark" to one allegedly owned by Plaintiff, such as the 2 Live Crew mark. SUF 55. Instead, Plaintiff identifies only use by **third parties** of the 2 Live Crew mark to describe certain Defendants. SUF 56. Defendants are not liable for the acts of these third parties and no evidence exists of infringing

use by Defendants.

Even if Plaintiff had proven Defendants used Plaintiff's mark, such a use would undoubtedly be "fair use." A fair-use defense exists when the use is "(1) other than as a mark, (2) in a descriptive sense, and (3) in good faith." *Int'l Stamp Art, Inc. v. U.S. Postal Serv.*, 456 F.3d 1270, 1274 (11th Cir. 2006), quoting *EMI Catalogue P'ship v. Hill, Holliday, Connors, & Cosmopulos, Inc.*, 228 F.3d 56, 64 (2d Cir.2000), citing 15 U.S.C § 1115(b)(4). The "fair-use" defense, in essence, "forbids a trademark registrant to appropriate a descriptive term for [its] exclusive use and so prevent others from accurately describing a characteristic of their goods." Id., quoting *Soweco*, 617 F.2d at 1185. Indeed, a classic permissible use of a mark is to use it to explain that an artist is a "former founding member of the band." *Commodores Ent. Corp. v. Thomas McClary*, No. 614CV1335ORL37GJK, 2015 WL 12843872, at *5 (M.D. Fla. Mar. 10, 2015), citing *Business Trends Analysts, Inc. v. Freedonia Group, Inc.,* 700 F. Supp. 1213, 1233 (S.D.N.Y. 1988), aff'd in part and rev'd in part on other grounds by *Business Trends Analysts, Inc. v. Freedonia Group, Inc.*, 887 F.2d 399 (2d Cir. 2989) (the law does not prohibit use of a trademark "as a means of identifying either an individual working for a company or of describing the nature of goods or services being offered by that company").

Here, even the third-party uses with which Plaintiff takes issue are classic fair uses – they did not use the 2 Live Crew name as a mark but only in a descriptive sense to state that Ross, for example, was a member of 2 Live Crew. SUF 57. And the use is in good faith given there is no other way to state this historical fact. Plaintiff seeks to deprive the community of accurately describing Defendants as being members of 2 Live Crew. The uses complained of here were not made by Defendants and were classic descriptive fair uses. The complained-of use is also protected by the First Amendment because any use was not explicitly misleading and concerned

a creative performance. An "artistically expressive use of a trademark will not violate the Lanham Act unless the use of the mark has no artistic relevance to the underlying work whatsoever. *MGFB Properties, Inc. v. Viacom Inc*, No. 21-13458, 2022 WL 17261122, at *8 (11th Cir. Nov. 29, 2022)(citations omitted). Here, any use of the mark be non-infringing.

Finally, Plaintiff's claims come too late and are barred by laches. To establish a laches defense, Defendants must prove: (1) a delay in asserting a right or a claim, (2) that the delay was not excusable, and (3) that there was undue prejudice to the party against whom the claim is asserted. *Ambrit [AmBrit], Inc. v. Kraft, Inc*., 812 F.2d 1531, 1545 (11th Cir.1986), cert. denied, 481 U.S. 1041, 107 S.Ct. 1983, 95 L.Ed.2d 822 (1987). Here, Plaintiff knew of facts giving rise to the meritless trademark claims for years yet chose not to act until Defendants exercised their termination right. This evinces bad faith and it is not excusable. The claims should be barred.

And Ross did not violate Plaintiff's copyrights. Plaintiff asserted the claim with bare-bones allegations and no supporting evidence. Plaintiff cannot establish  that Ross used a registered copyrighted work owned by Plaintiff without consent. The claim thus fails.

## V.    Conclusion

Defendants effectively terminated their copyright grant to Skyywalker Records, exercising an inalienable right and observing all required formalities. Lil' Joe's owner was a lawyer for 2 Live Crew's record label before he bought up all of the group's rights in a bankruptcy proceeding. He and his label have greatly profited from 2 Live Crew's work for decades and the time has come for the artists and their heirs to reclaim those rights, as contemplated by § 203. It is respectfully submitted that the claims and counter-claims be adjudicated in Defendants' favor; that their Notice be found valid; and that Defendants be deemed the owner all copyrights in the Subject Albums as of the dates provided in the Notice.

## VI.      Request for Hearing S.D. Fla. L.R. 7.1(b)(2)

Defendants hereby request a hearing for oral argument on Defendants' Motion for

Summary Judgment. A hearing would be helpful to the Court in addressing the issue of whether

the Defendants exercised their termination right exists under 17 U.S.C. § 203, if that notice of

termination was effective, and what rights reverted, and will revert, to Defendants as a result.

Defendants estimate that one hour will be necessary for oral argument.

Dated: December 1, 2022                     Respectfully submitted,


                                            By: */s/ Scott Alan Burroughs*
                                            Scott Alan Burroughs
                                            (admitted *pro hac vice*)
                                            DONIGER / BURROUGHS
                                            237 Water Street, First Floor
                                            New York, New York 10038
                                            (310) 590 – 1820
                                            scott@donigerlawfirm.com

                                            *-with-*

                                            Joel B. Rothman, Esq.
                                            SRIP LAW
                                            21301 Powerline Road, Suite 100
                                            Boca Raton, Florida 3343
                                            (561) 404-4350
                                            joel.rothman@sriplaw.com

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on December 1, 2022, a true and authentic copy of the foregoing was submitted to the Clerk of Court using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

By:   */s/ Scott Alan Burroughs*

Scott Alan Burroughs