UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| LIL' JOE RECORDS, INC., | ) |
| Plaintiff, | ) ) ) |
| v. | ) CASE NO. 1:21-CV-23727-DPG |
| MARK ROSS; *et al.*, | ) ) ) |
| Defendants. | ) ) |

**DECLARATION OF LUTHER CAMPBELL IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT**

**DECLARATION OF LUTHER CAMPBELL**

I, Luther Campbell, depose, attest, and say from my personal knowledge, the following:

1. I, Luther Campbell, performed in the group named "2 Live Crew" with Mark Ross, Christopher Wong Won, and David Hobbs.

2. I am a joint creator author, with the others in 2 Live Crew, of the albums entitled *The 2 Live Crew is What We Are, Move Somethin', Move Somethin' (Clean), As Nasty As They Wanna Be,* and *As Clean As They Wanna be* ("Subject Albums") which were written, recorded, and published from 1986 and 1989.

3. I was an owner of, and executive at, the companies named Luke Skyywalker Records, Inc., Skyywalker Records, Inc., Pac Jam Publishing, Inc., and Luke Records, Inc. Luke Skyywalker Records, Inc., Skyywalker Records, Inc. and Luke Records, Inc. are different iterations of the same entity whose name changed over time beginning with Luke Skyywalker Records, Inc. then Skyywalker Records, Inc. and finally Luke Records, Inc. until the company dissolved. My ownership of all of these entities was separate from my role as the creator and author of music. Specifically, my work as a member of 2 Live Crew was separate and apart from my duties as owner of these entities. I contracted with the companies in my personal and individual artistic capacity. This is evidenced by my signature as both a member of 2 Live Crew and as executive for Skyywalker Records, Inc. on the 1990 Agreement (defined below).

4. None of the listed entities I owned are still in business nor have they been in business since the mid-1990s.

6. The members of 2 Live Crew including myself at the time we recorded each of the Subject Albums, had an oral agreement when we went into the studio about how the rights, including copyrights, for those albums would be treated. Under that agreement, the copyright for the albums would be transferred to the record label or publishers that I set up and that entity would release the albums and make payments to the group. I set up a record label Skyywalker Records, Inc. and the group transferred the copyrights for the Subject Albums to Skyywalker Records. 2 Live Crew and Skyywalker records performed under this oral agreement at all times from 1986 to 1990.

7. 2 Live Crew recorded the Subject Albums from 1986 to 1990.

8. I released the Subject Albums through my label Skyywalker Records or its other iterations. Attached hereto as **Exhibit 2** are true and correct copies of representative covers of the

Subject Albums listing Skyywalker Records as the label associated with their release further evidencing 2 Live Crew and Skyywalker Records' agreement at the time. The Subject Albums bore the logo and company information for Skyywalker Records under the name the entity bore at the time of release.

9. Skyywalker Records or its other iterations paid me and the other members of 2 Live Crew a royalty for the recordings delivered.

10. When 2 Live Crew was the subject of copyright and obscenity lawsuits relating to the Subject Albums, Skyywalker Records or its iterations were named parties to those actions because it was an owner of the copyrights.

11. In or around 1990, the members of 2 Live Crew including myself executed a written agreement with Skyywalker Records that memorialized the prior oral agreement between the parties (the "1990 Agreement"). The 1990 Agreement states it has an effective date of January 1, 1987 and is between 2 Live Crew and Skyywalker Records, Inc., the successor to Luke Skyywalker Records, Inc.

12. Skyywalker Records and its successors held the copyrights for the Subject Albums per the 1990 Agreement at all relevant times until its successor and I declared bankruptcy in 1995.

13. The 1990 Agreement relates to the Subject Albums and to the extent that said agreement does not meet any technical requirements for an effective transfer the operative agreement would be the oral license that the 1990 Agreement sought to memorialize.

14. In 1990, Skyywalker Records, Inc. was the name of my recording entity, and it operated out of the address 3050 Biscayne Blvd. Suite 307, Miami, Florida. The 1990 Agreement is accurate because it was executed in or around 1990 when Skyywalker Records, Inc. was in operation at that address. And, importantly, 2 Live Crew and Skyywalker Records (as well as Skyywalker Records' predecessor, Luke Skyywalker Records) complied with and operated under the terms of the 1990 Agreement, including as renewed, in the release of the Subject Albums and payments made thereunder. The record companies released the Subject Albums to the public and paid royalties to 2 Live Crew. And the record companies benefited from those releases.

15. A true and correct copy of the 1990 Agreement that was signed by the members of 2 Live Crew and myself on behalf of Skyywalker Records is attached hereto as **Exhibit 1**.

16. The 1990 Agreement specifically states in paragraph 3: "Artist hereby grants to

Company the sole and exclusive right during the initial term of this Agreement and all renewals and extensions of the same to **use, publish and permit other to use and publish**…" Thus, the agreement included a right to publish, also in line with the parties' oral agreement.

17. The 1990 Agreement also states in paragraph 2(d): "Company shall own all master recordings embodying the performance of Artist made hereunder and all derivatives of the same; and Company shall further own all of the performances of Artist embodied in said master recordings and derivatives thereof. Without limiting the generality of the forgoing, Company's said rights of ownership shall include the sole and exclusive right to manufacture, advertise, sell, lease, license or otherwise use, deal in or dispose of records embodying the performances of Artist to be recorded hereunder in all fields of use perpetually and throughout the world and upon terms and conditions as Company may approve; and the sole and exclusive right publicly to perform Artists performances embodied in recordings hereunder by means of radio broadcasting or otherwise and to license and authorize others to do so perpetually and throughout the world upon such terms and conditions as Company may approve. All master recordings recorded during the term here of and all derivatives manufactured therefrom, together with the performances embodied thereof shall from the inception of their creation, be entirely and forever the property of the Company, or its designee free from any claims whatsoever by Artist or any person, firm or corporation deriving any rights or interests from Artist; and company shall have the right to assign and otherwise transfer such copyrights to any third party, free and clear of any claim by Artist or any person, firm or corporation, deriving any rights from Artist." This evidences the parties' intent to transfer copyrights in the works to Skyywalker Records.

18. The operative 1990 Agreement does not contain a work-for-hire clause.

19. Lil' Joe has not, and cannot, argue the existence of any agreements other than the clearly inapposite agreements from 1991.

20. On November 4, 2020, over two years before the earliest date of effective termination (November 7, 2022) and less than 10 years from the last date of effective termination (May 1, 2024), Mark Ross, the heirs of Christopher Wong Won, and I comprising and representing 3 of the 4 members of 2 Live Crew served a noticed termination of its original copyright grants under 17 U.S.C. § 203 (the "Notice"). The grants terminated in the Termination Notice included the right of publication as noted in paragraph 16 above.

21. A true and correct copy of the Termination Notice executed by me and the other 2 Live Crew members and served on all possible rights holders is attached hereto as **Exhibit 3**.

22. The Termination Notice was served on November 4, 2020, upon all possible rights holders, including Lil' Joe, via first-class mail (return receipt requested) and when possible electronic mail.

23. The date of publication for the first Subject Album *The 2 Live Crew Is What We Are* was provided in the termination notice as December 1, 1986 and the notice listed a date of effective termination of November 7, 2022, which is over 35 years from the date of publication and within 5 year window beginning on December 1, 2021. The date listed of first publication on the earliest filed composition copyright registration for the songs on the identified Subject Album.

24. The date of publication of the second and third Subject Albums *Move Somethin'* and *Move Somethin' (Clean)* was provided in the termination notice as March 21, 1988 and the notice listed a date of effective termination of March 21, 2023, within the required timeframe. The date listed of first publication on the February 26, 2001 sound recording copyright registrations for the album *Move Somethin'*.

25. The date of publication of the fourth and fifth Subject Albums *As Nasty as They Wanna Be* and *As Clean as They Wanna Be* was provided in the termination notice as May 1, 1989 and the notice listed a date of effective termination of May 1, 2024, again within the required timeframe. The date listed of first publication on the February 26, 2001 sound recording copyright registrations for the identified Subject Albums.

26. In March 1988, the members of 2 Live Crew and Pac Jam Publishing entered into six publishing agreements for the songs on the Subject Album *Move Somethin' (Clean)* (the "Pac Jam Agreements). Other than the 1990 Agreement, these are the only contemporaneous agreements in the record which could serve as a transfer of rights in the Subject Albums. Attached hereto as **Exhibit 4** is a true and correct copy of those six agreements.

27. The Pac Jam Agreements cover the composition copyrights for certain compositions on the second and third Subject Album, and stated that "The writer(s) hereby sells, assigns, transfers and delivers to the Publisher, its successors and assigns, a certain heretofore **unpublished** original musical composition…[] and all rights, claims, and demands in any way relating thereto…" including the rights to secure, hold, and register the copyright in the identified

5

composition. Encompassed within these rights was the right to publish the composition identified.

28. Luke Records has never purported to be an author of the Subject Albums, is not listed as an author on any copyright registration other than three sound recording registrations registered by Lil' Joe in 2001, which are directly contradicted by the composition registrations for the same works.

29. While I participated in various bankruptcy proceedings and agreements, none of those divested me of my rights under 17 U.S.C. § 203. Said rights had not vested at the time of those proceedings and were not part of any relevant bankruptcy estate.

30. Ultimately, through bankruptcy proceedings involving myself and my entity Luke Records, Inc. (formerly Skyywalker Records and Luke Skyywalker Records, Inc.) Lil' Joe came to own the copyrights in the Subject Albums.

31. None of the purported agreements provided by Plaintiff in this case even discuss termination rights, and any language relating to royalties and/or profits, or acknowledging Lil' Joe's rights or interests in the master and/or publishing of any *2 Live Crew* related copyrights does not and cannot extinguish my rights under 17 U.S.C. § 203.

32. When I created and authored the Subject Albums, I, like the others in 2 Live Crew, did so as independent contractors and not employees.

33. 2 Live Crew made all creative decisions in creating the Subject Albums.

34. The Subject Albums were not "works for hire" and the members of 2 Live Crew were not employees of any of my labels.

35. Any 1991 agreements referenced by Plaintiff could not relate to the Subject Albums and were entered into after the Subject Albums were created. They contemplate only *future* recordings and could not possibly cover the Subject Albums, each of which was written, recorded, released, and in some cases registered with the Copyright Office well before 1991.

36. The copyright registrations for the Subject Albums do not indicate that they were works for hire except in limited and fraudulent cases.

37. The record company had no right to control the creative process for the songs. At most the record company made suggestions and contributions relating to the songs on the Subject Albums. 2 Live Crew made the artistic decisions. Further, Skyywalker Records, Inc. or any other record company did not have the ability to arbitrarily assign additional projects outside 2 Live

Crew's obligation to create and deliver the required works.

38. 2 Live Crew had the freedom to create their own schedule and did not have assigned times each day to work and simply had the deadline to deliver an album, but otherwise had absolute freedom to decide when and how to work.

39. It took considerable skill required to create, perform, and record the songs on the Subject Albums. Each member of contributed to the compositions and recording and Lil' Joe, Skyywalker Records, Inc., Pac Jam Publishing, or any other contracting entity would not have been able to create and replicate the Subject Albums due to the high level of creativity and skill. 2 Live Crew has over the course of our career written and produced several gold albums and one platinum album.

40. The Subject Albums were written and recorded in third-party studios not at the location of Skyywalker Records, Inc. or any other possible "employer."

41. I never approved or was aware of my record labels providing me or members of 2 Live Crew's members with health insurance, paid vacation time, worker's compensation benefits, a pension plan, or other types of benefits.

42. The record label did not have the right to assign to 2 Live Crew additional projects.

43. 2 Live Crew had the right to receive royalties from, at the very least, BMI in connection with our creation of the Subject Albums, and received such royalties, which is inconsistent with "employee" status. I received payment under the 1990 Agreement.

44. 2 Live Crew created the songs not at the offices of the music company but at their homes and off-site recording studios.

45. 2 Live Crew's relationship with Skyywalker Records was brief, as the company went out of business in the mid-1990s.

46. 2 Live Crew had discretion over our day-to-day schedule and decided when, where, and how long to work on the Subject Albums.

[Intentionally Left Blank]

47.     2 Live Crew received per diem checks at some point beginning in mid-1987, and while some of them were marked "payroll," those payments were not compensation for the creation of the Subject Albums. The Subject Albums were not created by 2 Live Crew within the scope of any employment with Luke Skyywalker Records, Skyywalker Records, or any other company. Luke Skyywalker Records and Skyywalker Records, which released the Subject Albums, did not claim that the Subject Albums were works for hire.

I declare under perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on December 1, 2022 at ____Miramar____, ____Florida____.

By: [signature]