UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 1:21-CV-23727-DPG

LIL' JOE RECORDS, INC.,

      Plaintiff,

v.

MARK ROSS, CHRISTOPHER WONG
WON, JR., RODERICK WONG WON,
LETERIUS RAY, ANISSA WONG WON
and LUTHER CAMPBELL,

      Defendants

_____/

## RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiff, Lil' Joe Records, Inc. ("Lil' Joe"), hereby responds to the Motion for Summary

Judgment [DE 53](the "Motion") filed by Defendants, Mark Ross ("Ross"), Christopher Wong

Won, Jr., Roderick Wong Won,  Leterius Ray ("Ray"), Anissa Wong Won and Luther Campbell

("Campbell"), as follows:

## TABLE OF CONTENTS

| Section | Description | Page |
|---------|-------------|------|
| I. | Overview | 3 |
| II. | Campbell and Ross' Bankruptcies Divested Them of the Right to Terminate the Transfer | 3 |
| III. | None of the Cases Cited by Defendants Support Their Position Regarding the Effect of the Bankruptcies | 8 |
| IV. | The 2 Live Crew Copyrights Were Each Works Made for Hire Whose Transfers Cannot be Terminated | 13 |

| V. | Defendants' Arguments That Section 203 Rights Cannot be Settled or Relinquished (Years after an Initial Transfer) is Unsupported as a Matter of Law | 17 |
|----|-----------------------------------------------------------------|----|
| VI. | The November 4, 2020 Notice of Exercise of the Termination Rights Was Defective on its Face | 18 |
| VII. | Oral Argument is Not Necessary | 21 |
| VIII. | Conclusion | 21 |

## I.  <u>Overview</u>

Lil' Joe has filed its own motion for summary judgment. [DE 30] The arguments and citations therein, which are reiterated here, rebut the assertions in the Defendants' Motion which demonstrate that: 1) the underlying notice of termination is defective, and ii) that for multiple reasons at least one of the three Defendants do not hold valid Section 203 termination rights because: 1) Campbell was an employee (and not an independent contractor) of his wholly owned and controlled company, Luke Records, Inc. ("Luke Records"), and therefore they were "works for hire"; or 2) both Campbell and Ross filed for bankruptcy where they gave up whatever termination rights they had; hence Defendants are not entitled to summary judgment in their favor.

"In the case of a grant executed by two or more authors of a joint work, *termination of the grant may be effected by a majority of the authors who executed it*…." 17 USC §203 (a)(1)(emphasis added). The sound recordings of *2 Live Crew* were each joint works. Defendants' Statement of Material Facts, etc. [DE 53-1]("Defendants' Statement") at ¶ 3. That means 3 of the 4 members of *2 Live Crew* must execute the termination notice and <u>each</u> must possess valid rights. It is undisputed that only 3 of *2 Live Crew*'s members signed the termination notice, so if any of them could not legally do so, the termination notice is ineffective.

## II.    **Campbell's and Ross' Bankruptcies Divested Them of Any Right to Terminate**

Campbell and Luke Records became the subject of bankruptcy proceedings which were jointly administered (the "Luke Bankruptcy"). Response to Statement of Material Facts, etc. ("Lil' Joe Statement") at p. 12, ¶ 4. Pursuant to the Joint Plan of Reorganization in the Luke Bankruptcy, the *2 Live Crew* copyrights at issue (the "2 Live Crew Copyrights") and trademark rights in *2 Live Crew*'s marks and cover designs were transferred to and assigned pursuant to court order to Lil' Joe and its owner, Joseph Weinberger ("Weinberger"), "free and clear of any and all liens, claims, encumbrances, charges, setoffs or recoupments of any kind", that "no royalties, whether as artist, producer, writer, publisher, or in any other capacity, on any of the masters or compositions" are due to Campbell, and Campbell separately released, among others, Lil' Joe and Weinberger, including "for royalties to be paid in the future" as a result of this transfer. **Lil' Joe Statement at p. 12, ¶ 5; Defendants Statement at ¶ 17**. At no time did any of the Defendants object to the transfer or file a claim in the Luke Bankruptcy asserting that they owned or were entitled to any Section 203 termination rights. **Lil' Joe Statement at pp. 12-13, ¶ 6.** The 2 Live Crew Copyrights were not abandoned back to Campbell and/or Luke Records. **Lil' Joe Statement at p. 13, ¶ 7.**

Ross also filed a bankruptcy (the "Ross Bankruptcy"). **Lil' Joe Statement at pp. 13-14, ¶ 9.** In the Ross Bankruptcy, an adversary proceeding was commenced by Lil' Joe against Ross and, in settling that claim, Ross acknowledged (just like Campbell did in the Luke Bankruptcy) that, other than writer's performance rights (which are not relevant to this proceeding), "he has no rights (master or publishing)" to any of *2 Live Crew*'s recordings, which he acknowledged was owned by Lil' Joe. The 2 Live Crew Copyrights were not abandoned back to Ross. **Lil' Joe Statement at pp. 13-14, ¶ 9.**

As a result of these bankruptcies, Campbell and Ross were divested of all rights they had at the time of their bankruptcy filings, which includes any termination rights. This occurs by operation of law. Defendants believe the termination rights remain their property despite their bankruptcies.

Defendants properly begin their analysis by evaluating the text of the termination provision of the Copyright Act and the provision of the Bankruptcy Code establishing what is an asset of a bankruptcy estate. The United States Supreme Court has directed that "in interpreting a statute a court should always turn first to one, cardinal cannon before all others. We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what is says there." *Connecticut National Bank v Germain,* 503 U.S. 249, 253-54, 112 S.Ct. 1146 (1992). Put another way, a Court is to "follow the text of the statute." *Unicolors, Inc. v H&M Hennes & Mauritz, L.P.,* 142 S.Ct. 941, 946 (2022). This is done by "examin[ing] the language of the provision itself." *Korman v HBC Florida, Inc.,* 182 F.3d 1291, 1295 (11th Cir. 1999). "When the words of a statute are unambiguous, then the first canon is also the last: 'judicial inquiry is complete.'" *Connecticut Nat'l.*, 503 U.S. at 254.

Defendants attempt to mislead this Court regarding this principal canon of statutory interpretation in evaluating both the termination provisions of the Copyright Act and the provision of the Bankruptcy Code that establishes what is an asset of a bankruptcy estate.

The Section 203 termination section of the Copyright Act says that "[t]ermination of the grant may be effected notwithstanding *any agreement* to the contrary, including an agreement to make a will or to make any future grant." 17 U.S.C. §203(a)(5)(emphasis added). As the plain text states, an author cannot give away his termination rights by "agreement." An agreement is a mutual understanding between two parties about their relative rights and duties involving the exchange of

consideration. Black's Law Dictionary, 8th Ed., 2004; Corbin on Contracts §1.9. Completely absent from Section 203 is any language whatsoever saying that a bankruptcy has no effect on Section 203 termination rights. As Defendants concede, that is the end of the "judicial inquiry." *Connecticut Nat'l.*, 503 U.S. at 254.

Against this clear backdrop, Defendants ask this Court to read into the language of Section 203, the words "bankruptcy", but "[i]t is not the business of courts to rewrite statutes…." *Korman,* 182 F.3d at 1296. "[I]nterpretation of section 203 requires no rewriting. We take the provisions as Congress wrote it, and neither add words to nor subtract them from it." *Id.* Accordingly, in *Korman* it was determined to be impermissible to "read[] into the language of the statute the word 'only,' a word that changes the meaning of the provision, and a word Congress did not put there." *Id.*

Despite the patently obvious fact that the word "bankruptcy" is completely absent from Section 203; Defendants take a tremendous leap and contend that "[t]he plain language of the text forecloses any argument that the bankruptcy filings … can divest an author of their termination right, as they are the type of 'agreement to the contrary' that the Acts expressly states do not deprive an artist of their termination right." Motion at p. 8. Defendants' contention is just wrong. The Copyright Act requires transfers to be in writing. 17 USC §204(a). That is the "agreement" which Section 203 mentions. The one exception is a transfer which occurs "by operation of law." *Id.* A transfer pursuant to a bankruptcy is a transfer "by operation of law." *Taylor Corp. v Four Seasons Greetings, LLC,* 403 F.3d 958, 963-64 (8th Cir. 2005). According to the Copyright Act itself, a transfer by "agreement" and "by operation of law" are distinct, and divestiture of Campbell's and Ross' termination rights in bankruptcy is not a transfer by "agreement" but "by operation of law."

"The commencement of a [bankruptcy] case ... creates an estate. Such estate is comprised of *all the following property*, wherever located and by whomever held: (1) Except as provided in subsections (b) and (c)(2) of this section, *all legal or equitable interests of the debtor in property as of the commencement of the case*...." 11 U.S.C. §541(a)(1)(emphasis added); *Mission Product Holdings, Inc. v Tempnology, LLC,* 139 S.Ct. 1652, 1658 (2019)("The filing of a petition creates a bankruptcy estate consisting of *all the debtor's assets and rights*.")(emphasis added); *Cardwell v Bankruptcy Estate of Joel Spivey (In re Douglas Asphalt Co.),* 483 BR 560, 571 (Bankr. S.D. Ga. 2012). Termination rights pursuant to 17 USC §203 are not among these "exceptions." 11 USC §541(b) & (c). Thus, Section 203 makes no mention of bankrupty and the Bankruptcy Code makes no mention of Section 203 rights. The creation of this bankruptcy estate and transfer of all of the debtor's assets to it occurs "upon commencement of a bankruptcy case...." *Schwab v Reilly,* 560 U.S. 770, 774 & 785 (2009). "As the Supreme Court has noted, 'Congress intended a broad range of property to be included in the estate." *Goldstone v. U.S. Bancorp.,* 811 F. 3d 1133, 1139 (9th Cir. 2015). "Indeed, the legislative history indicates that §541(a) would 'bring anything of value that the debtors have into the estate." *Id.* Bankruptcy Code "Section 541(a)(1) 'is all-encompassing, and Congress meant for it to be construed commensurately."" *Russ v. Jackson County School Board,* 530 F. Supp. 3d 1074, 1079 (N.D. Fla. 2021). "The Bankruptcy Code defines a bankrupt's estate broadly to encompass all kinds of property, including intangibles..." *Id.* at 1080. Put simply, all means all and includes Section 203 rights. Campbell's and Ross' termination rights pursuant to 17 USC §203, therefore, became part of their respective bankruptcy estates immediately upon the commencement of their respective bankruptcy case by operation of law.

"Once an asset becomes part of the bankruptcy estate, all rights held by the debtor in the asset are extinguished unless the asset is abandoned back to the debtor pursuant to § 554 of the Bankruptcy Code." *Russ,* 530 F.Supp 3d at 1082. The 2 Live Crew Copyrights were not abandoned back to the debtor. Lil' Joe Statement at pp. 13-14, ¶¶ 7 & 9. "After the bankruptcy case has been closed, 'property of the estate that is not administered in the bankruptcy proceedings remains the property of the estate.'" *Russ,* 530 F.Supp 3d at 1082. Consequently, as a result of their bankruptcies, whatever interest Campbell or Ross had in the 2 Live Crew Copyrights, including, but not limited to, any termination rights pursuant to 17 USC §203, are not theirs to exercise.

"Moreover, the bankruptcy code recognizes that only in limited circumstances (of which this is not one) are non-transferability restrictions to be respected in bankruptcy. 11 U.S.C.§541(c)." *Denadai v Preferred Capital Markets, Inc.,* 272 B.R. 21, 385 (D. Mass. 2001). To be considered for exclusion from becoming an asset of a bankruptcy estate, there must be evidence that Congress intended the statute at issue to serve as a general exemption from creditor process. *Id.* at 40. There is no such evidence here that Congress intended copyright termination in accordance with 17 USC §203 to serve as a general exemption from creditor process. An author's copyright termination rights may be his most valuable, or perhaps his only, asset. Defendants would have this Court believe an author could run up debts as termination approaches, declare bankruptcy just days before termination becomes effective, leaving his creditors high and dry, and then, days later, effect termination and reap the financial reward all for himself while his creditors get nothing. Naturally, no authority stands for that proposition.

Since it is the creation of these copyrights that form the basis of the termination rights, the termination rights existed when Campbell and Ross filed bankruptcy. As the United States

Supreme Court acknowledged, "[a] debtor's property does not shrink by happenstance of bankruptcy...." *Mission Product*, 139 S.Ct at 1663.

**III.    None of the Cases Cited by Defendants Support Their Position Regarding the Effect of the Bankruptcies**

*Wornick v Gaffney*, 544 F.3d 486 (2nd Cir. 2008), is cited by Defendants and it is well wide of the mark. "The only question this appeal presents is whether in a joint bankruptcy case of spouses who own reciprocal life insurance policies the bankruptcy estate of the beneficiary spouse is entitled to the case surrender value of an insurance policy taken out by and insuring the other spouse." *Id.* at 488. Nothing like that is raised here. A beneficiary of a life insurance policy may be removed at any time against its will. *Id.* at 490. Therefore, "the revocable beneficiary of a life insurance policy has 'a mere expectancy or an inchoate right in the policy depending entirely upon the will of the insured.'" *Id.* "As such, the beneficiary has no legal or equitable interest in the policy that could be made part of the property of the beneficiary's bankruptcy estate." *Id.* There is no mention of Section 203 copyright termination rights, nor mention of a transfer by operation of law, let alone an evaluation of them, in *Wornick*. Further, insurance policies, unlike copyrights, have certain state statutory protections from attachment by creditors. *See, e.g.*, Fla. Stat. §222.13.

While completely disregarding the Congressional intent of bankruptcy, Defendants take great pains to recognize that termination rights were given "because of the unequal bargaining position of authors, resulting in part from the impossibility of determining a work's value[1] until it has been exploited." *Korman*, 182 F.3d at 1296. As discussed in Section VI below, the actual

---

[1]    Defendants state, without any reference to any basis, that "[]he members of 2 Live Crew entered into an unfavorable grant of the Subject Albums' copyrights...." Motion at p. 8. The veracity of this statement is dubious at best. These rights were transferred by, among others, Campbell, to an entity solely owned by Campbell, Luke Records. Defendants' Statement at ¶ 29. How is this "unfavorable" to Campbell?

transfer of copyrights occurred in 1991 and $250,000 (see para. 7 of the 1991 contracts) of consideration was given, well after the value of the works were known. Further, each of Campbell, Wong Won and Ross acknowledged, in writing, that as a result of the Campbell/Luke Records/Ross bankruptcies, they no longer had Section 203 termination rights. They released any claim "for royalties to be paid in the future", Lil' Joe Statement at p. 12, ¶ 5 (Campbell), "[a]ll royalties, profits and other monies or payments at any time, directly or indirectly, due or to become due in connection with, relating to or in respect of" the 2 Live Crew Copyrights, Lil' Joe Statement at p. 13, ¶ 8 (Christopher Wong Won), and "no rights (master or publishing) to any previous recordings owned by Lil' Joe Records, Inc. [and] has no rights (master or publishing) in any other recordings owned by Lil' Joe Records, Inc", Lil' Joe Statement at pp. 13-14, ¶ 9 (Ross). Christopher Wong Won further released Lil Joe and Weinberger from, among other things, "[a]ll royalties, profits and other monies or payments at any time, directly or indirectly, due or to become due", "[a]ll rights to sue for infringements", and all rights to terminate. Lil' Joe Statement at p. 13, ¶ 8. Defendants, time and again, acknowledged that they had no rights in the 2 Live Crew Copyrights well after they knew its value.

To counter all of the foregoing, Defendants cite to *In re McKay,* 143 F. 671 (W.D. N.Y. 1906). However, *McKay* had absolutely nothing to do with copyrights or termination rights pursuant to 17 USC §203. It examined whether trust assets became property of a bankruptcy estate under the Bankruptcy Act of 1889. *Id.* at 672-73. "[T]he Bankruptcy Act of 1889… was abrogated by the adoption of the Bankruptcy Code in 1978." *Goldstone,* 811 F.3d at 1140. "The scope of §541(a) of the Bankruptcy Code is much greater than that of the prior Bankruptcy Act of 1889." *Id.* at 1139.

Next, Defendants attempt to scrabble an argument that the termination rights had not yet vested, and that somehow means they are not an asset of a bankruptcy estate. This argument is unavailing. First, even if the termination rights had not yet vested, they were still assets of Campbell's and Ross' bankruptcy estates. "Courts consistently have concluded that contingent interests should be included within the bankruptcy estate." *Denadai,* 272 B.R. at 29 n 5; *Russ,* 530 F.Supp 3d at 1079-80 (" Section 541 of the Bankruptcy Code provides that virtually all of a debtor's assets, both tangible and intangible, vest in the bankruptcy estate upon the filing of a bankruptcy petition."). Unvested and contingent options are assets of a bankruptcy estate. *Stoebner v Wick (In re Wick),* 276 F.3d 412, 415 (8th Cir 2001). *Denadai* considered whether "options that are unvested as of the petition date" are assets of a bankruptcy estate. 272 B.R. at 28. It was observed that "[a]lthough Debtor here did not become entitled to exercise all of the stock options until after filing his petition, he did possess at that time the contingent right to exercise the options in the future." *Id.* at 29. Likewise, here Campbell and Ross were not entitled to exercise their termination rights pursuant to 17 USC §203 until after filing their bankruptcies, but they possessed at the time of their bankruptcies the right to do so in the future. This is an asset of their bankruptcy estates.

*Rodriguez v Rodriguez,* 218 F.3d 432, 425 (5th Cir. 2000), belies Defendants' contention that the termination rights had not yet vested by acknowledging that a "copyright 'vests' in the author…." Defendants claim to be the author of the copyrights at issue from which the termination rights emanate, thus they had "vested." "'To vest' means to give an immediate, fixed right of present or future enjoyment…." *Id.* at 436. There is no dispute that the 2 Live Crew Copyrights at issue existed before Campbell's and Ross' bankruptcies**.** Lil' Joe Statement at pp. 11-14, ¶¶ 3, 4 & 9. Since it is the creation of these 2 Live Crew Copyrights that form the basis of the termination

rights, the termination rights exist at the time of the creation of the copyrights for future enjoyment. Either way you look at it, *Rodriguez* acknowledges the termination rights had already vested when Campbell and Ross filed bankruptcy.

The remaining cases cited by Defendants likewise do not help their cause, as none of them address the impact of an author's bankruptcy, nor transfers as a matter of law, hence they do not answer the question presented here -- Campbell's and Ross' loss of their copyright termination rights *in bankruptcy*. For example: *Stillwater Ltd. v Basilotta*, 2017 U.S. Dist LEXIS 170176 * 1-2, 2017 WL 2906056 (C.D. Cal. March 17, 2017), considered a motion to dismiss a complaint seeking a declaration that Basilotta did not validly terminate transfer of her copyright. In evaluating the allegations of the complaint, the court observed that "[t]his right is non-transferrable and can only be exercised by the author or his/her heirs." *Id.* at * 8. That is true in the context of a voluntary agreement, but it does not account for a transfer "by operation of law", which includes bankruptcy. 17 USC §204(a); *Taylor Corp.*, 403 F.3d at 963-64. Because no bankruptcy occurred there, *Stillwater* does not discuss the impact of bankruptcy on the ability to exercise a termination right – a pivotal issue here.

In *Stewart v Abend,* 495 U.S. 207, 211 (1990), "[t]he author of a pre-existing work agreed to assign his rights in the renewal copyright term to the owner of the derivative work, but dies before the commencement of the renewal period. The question presented is whether the owner of the derivative infringed the rights of the successor owner of the pre-existing work by continued distribution and publication of the derivative work during the renewal term of the pre-existing work." *Stewart* has nothing to do with the question presented here – whether copyright termination rights are assets of a bankruptcy estate. In a lengthy dissertation of a history of the copyrights, the *Stewart* court observed, like the *Everly* court, that the "1976 Copyright Act … provides an

inalienable termination right." *Id.* at 230. Like the other cases, *Stewart* and *Everly* did not consider the impact of bankruptcy on copyright termination rights.

*Fred Ahlert Music Corp. v Warner/Chappell Music, Inc.,* 155 F.3d 17, 18 (2nd Cir. 1998), "consider[ed] the scope of the 'Derivative Works Exception' of the Copyright Act of 1976." While no question was posed as to the effect of bankruptcy on Section 203 termination rights, the court did observe, contrary to Defendants' assertion here, that "*an author's termination rights are not unlimited.*" *Id.* at 19 (emphasis added). Lil' Joe does not dispute that termination rights are designed to protect an author's interest, but that does not mean that an author does not forfeit his termination rights when he files bankruptcy.

*Baldwin v EMI Feist Catalog, Inc.,* 2012 U.S. Dist LEXIS 201053 * 1-2; 2012 WL 13019195 (S.D. Fla. Dec. 11, 2012), evaluated a motion to dismiss a declaratory judgment action as to the validity of a copyright termination notice. The declaratory judgment was held to be ripe, but was dismissed for lack of personal jurisdiction. *Id.* at *3-13. The *Baldwin* court, like in *Stewart* and *Everly*, only generally discussed termination rights. *Baldwin* did not consider what happens to that termination right when the author files bankruptcy, nor when a transfer occurs by operation of law, nor when the author makes subsequent transfer after the value of the copyrights are known.

### IV.   **The 2 Live Crew Copyrights Were Each Works Made for Hire Whose Transfer Cannot Be Terminated**

The transfer of a copyright in a "work made for hire" is not subject to termination. 17 USC §203(a); *Ennio Morricone Music Inc. v Bixio Music Group Ltd.,* 936 F.3d 69, 73 (2nd Cir. 2019). "A 'work made for hire' is … a work prepared by an employee within the scope of his or her employment…." 17 USC §101. This requirement to qualify a work as a 'work made for hire' is straightforward and easy to apply. *Ennio,* 936 F.3d at 73.

Here, there is extensive evidence supporting Lil' Joe's claims that 3 of the *2 Live Crew* members were each artists for hire, but certainly Campbell, who was the sole-owner and CEO of Luke Records, Campbell Transcript at p. 9; Lil' Joe Statement at p. 15, ¶ 15; Defendants Statement at ¶¶ 29 & 33, acting within the scope of his employment, Lil' Joe Statement at pp. 14-15, ¶¶ 12-20. Again, if Campbell alone was an "artist for hire," then there is not a majority of the joint authors exercising the Section 203 rights.

First, Campbell, Christopher Wong Won, Ross and David Hobbs each agreed in the 1991 recording contracts at issue that the 2 Live Crew Copyrights were works "made for hire." Lil' Joe Statement at pp. 11-12, ¶ 3. Their acknowledgment is accurate, as each of them was an employee of Luke Records and the 2 Live Crew Copyrights were prepared within the scope of their employment. Lil' Joe Statement at pp. 14-15, ¶¶ 12-20. "In the case of a work made for hire, the employer or other person for whom the work was prepared is considered the author for purposes of this title, and, unless the parties have expressly agreed otherwise in a written instrument signed by them, owns all of the rights comprised in the copyright." 17 USC §201(b). It is of no consequence that this agreement was signed after the works were created. *Playboy Enterprises, Inc. v. Dumas,* 53 F.3d 549, 559 (2nd Cir. 1995)(the writing requirement of §101(2) can be met by a writing executed after a work is created if the writing confirms a prior agreement).

Although the 1991 contracts state that the members of *2 Live Crew* were "artists for hire", Lil' Joe acknowledges this does not end the inquiry. *Cmty For Creative Non Violence v Reid,* 490 US 730, 737 (1989). While there might be an issue of contested material facts as to Ross and Christopher Wong Won, there can be no such contested issue as to Campbell, who is clearly an employee acting within the scope of his employment as CEO and sole-owner of Luke Records.

*Horror Inc. v Miller,* 15 F.4th 232 (2nd Cir. 2021), cited by Defendants, explains the test for determining whether one is an employee for purposes of establishing artist for hire status. Thirteen non-exhaustive factors were identified in *Reid* to aid in this inquiry. *Id.* at 243-44. These factors are not to be applied "in a mechanistic fashion" there is "no direction concerning how the factors were to be weighed." *Id.* at 248. That analysis, as set forth below, shows an overwhelming majority of the factors favoring "employee" status, for Ross and Wong Won. Lil' Joe concedes that fact issues remain as to their status precluding summary judgment. Campbell, however, is a clearer question, for him 12 of the 13 factors favor the finding that Campbell was an employee:

| Factor | Test | Evidence |
|--------|------|----------|
| 1 | Luke Records Right to Control | The 1991 Contracts specifically gives Luke Records complete control over the recording process. Lil' Joe Statement at pp. 11-12, ¶ 3 (¶¶ 4,5,6,8,9 of the 1991 Contracts). In practice, Luke Records controlled the entire production process. Lil' Joe Statement at pp. 14-15, ¶¶ 12-16. |
| 2 | The Skill Required. | Both Luke Records and the members of 2 Live Crew were skillful in the recordings process. Lil' Joe Statement at p. 15, ¶ 16. |
| 3 | Source of Instrumentalization and Tools | Luke Records paid for and provided the studio, picked the times when the studio would be used, and paid for all costs of production including the producers, instruments and tapes. Two of the albums at issue were recorded in studios owned by Like Records. Lil' Joe Statement at pp. 14-15, ¶¶ 12-16. |
| 4 | Location of Work | Luke Records selected and paid for the studios, or owned the studios. Lil' Joe Statement at pp. 14-15, ¶¶ 12-16. |
| 5 | Duration of Relationship | The parties worked together on an exclusive basis from 1986 until 1995. Lil' Joe Statement at pp. 11-12 & 15, ¶¶ 3 (¶¶ 4-5 of the 1991 Contracts) & 13. |
| 6 | Right to Assign Additional Projects | Wong Won & Ross: Luke Records controlled the recording process. Lil' Joe Statement at pp. 11-12 |

| | | & 14-15, ¶¶ 3 (¶ 15 of the 1991 Contracts) & 12-16.<br>Campbell: Worked full time as CEO on a myriad of projects. Lil' Joe Statement at p. 15, ¶¶ 15-16. |
|---|---|---|
| 7 | Extent of Discretion Over When and How Long Work | Luke Records controlled access to the studio and therefore when and how long work would occur. Lil' Joe Statement at pp. 14-15, ¶¶ 12-16. |
| 8 | Method of Payment | Wong Won & Ross: Luke Records paid them by check deducting payroll taxes. Lil' Joe Statement at p. 14, ¶ 12.<br>Campbell: compensated as owner with taxes withheld. Lil' Joe Statement at p. 15, ¶ 20. |
| 9 | 2 Live Crew's Role | The group was deemed employees. Lil' Joe Statement at pp. 11-12 & 14-15, ¶¶ 3 (¶¶ 4-6 & 8-9 of the 1991 Contracts) & 12-20. |
| 10 | Whether the Work is Part of Luke Records' Regular Business | Luke Records was a record company. Hence its regular business was recordings. Lil' Joe Statement at p. 15, ¶ 16. |
| 11 | Whether Luke Records is in Business | Luke Records was in business at the time of the recordings. Lil' Joe Statement at pp. 14-15, ¶¶ 12-16. |
| 12 | Provisions of Employee Benefits | Wong Won & Ross: None<br>Campbell: Received employee benefits. Lil' Joe Statement at p. 15, ¶ 20. |
| 13 | Tax Treatment | Luke Records treated the members as employees for payroll and tax purposes. Lil' Joe Statement at pp. 14-15, ¶ 12 & 20. |

Of these 13 factors, five "should be given more weight in the analysis, because they will usually be highly probative of the true nature of the employment relationship." *Horror*, 15 F.4th at 249. Four of these factors indicate that Campbell was an employee of Luke Records and therefore the 2 Live Crew Copyrights were "works for hire." As to the first factor, the right to control, the 1991 Contracts explicitly give Luke Records complete control and Campbell, Luke Records' CEO, controlled the entire process. Lil' Joe Statement at pp. 11-12, ¶ 3. Campbell was

provided employee benefits and was treated as an employee for tax purposes, meeting the third and fourth factors. Lil' Joe Statement at pp. 14-15, ¶¶ 12-20. These two factors in particular, "the parties' tax treatment of their relationship is, along with employee benefits, 'highly indicative' of whether a worker should be treated as a conventional employee for copyright purposes." *Horror,* 15 F.4th at 253. As to the fifth factor, Campbell performed numerous functions for Luke Records, as its CEO, beyond performing for *2 Live Crew*, including overseeing other acts. Lil' Joe Statement at p. 15, ¶¶ 15-19. The one of these five factors not fully supporting Campbell's status as an employee, the skill required (second factor), is a push – the same person, Campbell, is both the employer and the employee. Lil' Joe is unaware of any authority holding the sole owner of a business to be an independent contractor, not an employee, just because he is a "skilled worker." (this proposition doesn't even make logical sense, as it would mean that a doctor or lawyer could never be an employee of his sole owned practice) The remaining seven of the 13 factors, which are "less significant in the copyright context", *Horror,* 15 F.4th at 255, also favor Campbell's status as an employee.

Cases support a finding that Campbell was acting within the scope of his employment. *See Sterpetti v. E-Brands Acquisition, LLC,* 2006 US Dist. LEXIS 21407 *20-22 (M.D. Fla. April 20, 2006)(an employee was an artist for hire who created a fresh pasta manual, within the scope of his employment even though there was no assignment nor contract; finding 3 elements must be present to show employee status if the work: a) is of the kind he is employed to perform; b) it occurs substantially with the authorized time and space limited; and c) it is activated at least in part by a purpose to serve the master.). Each of these three factors show that Campbell was acting within the scope of his employment with Luke Records. Lil Joe Statement at pp. 14-15, ¶¶ 12-19.

Finally, Defendants place great emphasis that some of the registrations of the sound recording copyrights state the recordings were not made by an "employee for hire." However, all of the registrations, with their supplements, reflect that they were "works for hire." Lil Joe Statement at p. 14, ¶¶ 12. This circuit has held that copyright registrations are insufficient to show if the underlying copyrights were created as works made for hire. See *Music v. ATL Recording Corp.,* 2021 US Dist. LEXIS 43980 (S.D. Fla. 2021).

**V.      Defendants' Arguments that Section 203 Rights Cannot be Settled or Relinquished (Years After an Initial Transfer) is Inconsistent With Section 203's Intent**

The legislative history of Section 203 shows that Congress did not intend to preclude authors from later transfers (after the value of the copyrights is known) and for further consideration to relinquish the Sec. 203 rights as part of a settlement. H.R. Rep. No 94-1476 (1976); also see *Walthal v Rusk,* 172 F. 3d 481 (7th Cir. 1999). Further, the 2nd Circuit holding in *Ahlert, Id.,* confirms the Section 203 rights are limited. Here, Defendants admit that years after the initial transfer of the copyrights (in 1991) there was subsequent litigation between Lil' Joe on one hand and Ross and Wong Won on the other, which resulted with settlement agreements in which Ross and Wong Won separately relinquished all rights to the copyrights and entered into subsequent assignment in favor of Lil' Joe. Lil' Joe Statement at pp. 13-14, ¶¶ 8-9. Based upon the legislative intent of protecting authors before the value of the copyrights are known and while also considering the rights of all who claim an interest in those copyrights, a balancing test must be employed rather than a simple finding that the 203 right continue on. No case has held that an author cannot relinquish his Section 203 rights years later, when the value of the copyrights are known and based upon further exchange of consideration. Most relevantly, Defendants have not issued a notice of termination as to these subsequent copyright assignments (1991, 1995 and later).

By Defendants' theory, no transfer or assignment of copyrights could ever settle a judgment against an artist and no assignee could ever settle (without consideration) a Section 203 claim or otherwise monetize their rights. Since the legislative history mandates that courts are to consider the legitimate needs of all interests involved, Lil' Joe's rights must likewise be considered. Further, the legislative intent of Sec. 203 could not grant Campbell rights because in addition to being one of the authors, he was also the sole owner of the grantee, Luke Records.

**VI.**    **The November 4, 2020 Notice of Exercise of Termination Rights Was Defective**

The notice of termination was defective on its face because it only references a contract effective in 1987 which is not the contracts by which Defendants transferred the copyrights to Luke Records. The notice of exercise of the termination rights (Defendant's Exhibit 66 [DE 39-66]) only asserts that the transfer of the alleged copyrights occurred in the "made effective 1987 contract."

No other transfer document is referenced, supporting the notice of exercise of the Sec. 203 rights. Defendants admit that a transfer of a copyright can only occur pursuant to a written agreement pursuant to Section 204 of the Copyright Act. However, the undated alleged "made effective 1987 contract" does not transfer any specific copyrights. Defendants Statement at ¶ 11. In response to Plaintiff's motion for summary judgment, Defendants claim that this 1987 agreement confirmed a prior oral agreement and was signed in 1990. This assertion makes no sense and it cannot support a summary judgment in favor of Defendants. First, the term of the 1987 contract (para. 1) is only for one year, Hence, come 1988, the term was over, and defendants contend that the copyrights at issue occurred afterwards. Defendants Statement at ¶ 3 Second, paragraph 2(d) of the 1987 contract provides that the transferee (Luke Records) owns all copyrights "free and clear of any claim by artist." The members of *2 Live Crew* entered into recording artist

18

agreements in 1991 (which contains "artists for hire" language) and that Lil Joe acquired ownership of all of the copyrights at issue pursuant to the orders of the United States Bankruptcy Court, which has been acknowledged by the written assignment by Campbell and the Luke Records bankruptcy trustee in 1995 and the subsequent settlement agreements with Wong Won and Ross. Lil' Joe Statement at pp. 12-14, ¶¶ 5, 8 & 9. Most relevantly, neither the 1991 contracts, 1995 order of the Bankruptcy Court, the 1995 assignments by the trustee and Campbell (each transferring the copyrights at issue) or the subsequent assignments in the Ross and Wong Won settlements are mentioned in the November 4, 2020, termination notice. 37 CFR §201.10(b) mandates that a termination notice must give a "brief statement reasonably identifying the grant to which the notice of termination applies." The notice in this case is defective on its face because no copyrights are identified anywhere in the purported 1987 contract and the notice fails to mention either the 1991, 1995 or subsequent grants.

## VII.   Defects in Defendants' Declarations

An affiant must explain how he has personal knowledge of the subjects discussed. *Kephart v Data Systems International, Inc.,* 243 F.Supp. 2d 1205, 1209 (D. Kansas 2003). An affidavit which offers conclusory allegations "is entitled to no consideration in determining the propriety of summary judgment." *Hanke v Global Van Lines Inc.,* 533 F.2d 396, 398 (8th Cir 1976). "Conclusory statements and statements not made on personal knowledge do not comply with the requirements of Fed.R. Civ. P. 56(e)." *Union Ins. Society of Canton, Ltd. v William Gluckin & Co.,* 353 F.2d 946, 952 (2nd Cir 1965). Campbell and Ross could not recall the terms of the purported oral contract, Lil' Joe Statement at pp. 1-2, ¶ 4, yet their declaration (¶¶6 & 3, respectively) makes various comments about this agreement. Their declarations also opine on who owns the copyrights (¶¶12 & 9, respectively), what is an oral license (¶¶13 & 10, respectively), what can be argued

19

(¶¶19 & 15, respectively), the impact of his bankruptcy and when rights vest (¶¶29 & 21, respectively), what extinguishes termination rights (¶¶31 & 22, respectively), who is an independent contractor or employee (¶¶32, 34 & 47 (Campbell) & 23, 34 & 38 (Ross)), whether the copyrights were "works for hire" (¶¶34 & 25, respectively), and what is consistent with employee status (¶¶43 & 34, respectively), but does not show how he has knowledge to render these opinions, and even if he had such knowledge they are impermissible legal argument. *Anhing Corp. v Thuan Phong Co. Ltd.,* 215 F.Supp. 3d 919, 928 (C.D. Cal. 2015).

Leterius Ray's knowledge is based upon what his father purportedly told him[2], which is hearsay and cannot be considered in deciding the Motion. *Macuba v Deboer*, 193 F.3d 1316, 1322 (11th Cir. 1999)("The general rule is that inadmissible hearsay 'cannot be considered on a motion for summary judgment.'").

For all of these reasons, the Defendants' declarations are defective and may not be used to support the Motion.

**VIII.   <u>Oral Argument is Not Necessary</u>**

Lil' Joe believes that the foregoing conclusively establishes that Campbell and Ross have been divested of any termination rights pursuant to 17 USC §203 by virtue of their bankruptcy, and that no factual issues remain as to whether the 2 Live Crew Copyrights were works for hire because Campbell operated within the scope of his employment as CEO of Luke Records. If,

---

[2]Q.       Okay. And I'm asking you. Other than what you spoke with your father, do you have any personal knowledge of anything else involving the 2 Live Crew copyrights or your father's relationship with Lil' Joe Records?
    A.       Just our conversations.
    Q.       With your father, correct?
    A.       Correct.

Transcript of November 4, 2022, deposition of Leterius Ray at p. 25.

however, the Court believes that oral argument would assist this Court, Lil' Joe is delighted to participate in those proceedings.

**IX.**    **Conclusion**

For the foregoing reasons, this Court should deny Mark Ross, Christopher Wong Won Jr., Roderick Wong Won, Leterius Ray, Anissa Wong Won and Luther Campbell's Motion for Summary Judgment.

WOLFE LAW MIAMI PA
175 SW 7th Street, Suite 2410
Miami, Florida 33130
P: 305.384.7370
F: 305.384.7371
Email: rwolfe@wolfelawmiami.com

By:    /s/ Richard C. Wolfe
        Richard C. Wolfe, Esq.
        Florida Bar No.: 355607

CERTIFICATE OF SERVICE

I hereby certify that on January 4, 2023, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record identified on the attached Service List in the manner specified, either via transmission of Notice of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notice of Electronic Filing.

Joel Rothman, Esq.
SRIP LAW PA
21301 Powerline Road, Ste 100
Boca Raton, Florida 33433
joel.rothman@sriplaw.com

Scott Burroughs, Esq.
Doniger/Burroughs

237 Water Street, First Floor
New York, NY 10038
scott@donigerlawfirm.com

/s/ Richard C. Wolfe
Richard C. Wolfe