# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 1:21-CV-23727-DPG

LIL' JOE RECORDS, INC., a
Florida corporation,

                    Plaintiffs,
V.

MARK ROSS, CHRISTOPHER WONG
WON, JR., RODERICK WONG WON,
LETERIUS RAY, ANISSA WONG WON
And LUTHER CAMPBELL,

                    Defendants.
_____/

VIDEOTAPED DEPOSITION OF
LUTHER CAMPBELL
Pages 1 through 97
A.M. SESSION

Tuesday, November 1, 2022
11:10 A.M.
VIA VIDEOCONFERENCE BY ALL PARTIES
VIA ZOOM

Stenographically Reported By:
Debra L. Stark,
Notary Public State of Florida

Luther Campbell
November 01, 2022

Page 2

1   APPEARANCES:
2   ON BEHALF OF THE PLAINTIFF: LIL' JOE
    RECORDS, INC., a Florida corporation
3
4       WOLFE LAW MIAMI, P.A.
        175 Southwest 7th Street
5       Penthouse 2410
        Miami Fl  33130
6       (305) 384-7370
        Rwolfe@wolfelawmiami.com
7       BY: RICHARD C. WOLFE, ESQ.
8
9   ON BEHALF OF THE DEFENDANTS:  MARK ROSS,
    CHRISTOPHER WONG WON, JR., RODERICK WONG
10  WON, LETERIUS RAY, ANISSA WONG WON
    And LUTHER CAMPBELL
11
12      DONIGER/BURROUGHS Building
        603 Rose Avenue,
13      Venice, California 90201
        (310) 590-1820
14      Scott@donigerlawfirm.com
        BY: SCOTT ALAN BURROUGHS, ESQ.
15
16
17
18
19
20
21
22
23
24
25

Page 3

1              INDEX OF PROCEEDINGS
2
3   WITNESS: LUTHER CAMPBELL          Page
4   DIRECT EXAMINATION                  4
5   BY MR. WOLFE
6   WITNESS NOTIFICATION LETTER        94
7   ERRATA SHEET                       95
8   CERTIFICATE OF OATH                96
9   C E R T I F I C A T E              97
10
11
12            E X H I B I T S
13
14  Exhibits                          Page
15  (Reporter's Note:  No new exhibits
16  marked or attached)
17
18
19
20
21
22
23
24
25      Deposition taken before DEBRA L. STARK,

Page 4

1   Florida Professional Reporter and Notary Public in
2   and for the State of Florida at Large.
3          (Witness presents government issued
4   identification and identity verified.)
5          COURT REPORTER:  Do you swear or affirm
6   the testimony you are about to give will be the
7   truth, the whole truth, and nothing but the
8   truth.
9          THE WITNESS:  Yes, I do.
10  THEREUPON:
11              LUTHER CAMPBELL
12          having been first duly sworn or affirmed,
13  was examined and testified under oath as follows:
14              DIRECT EXAMINATION
15  BY MR. WOLFE:
16      Q.   Good morning, Mr. Campbell.
17      A.   Good morning.
18      Q.   I presume you've had your deposition
19  taken before?
20      A.   Yes.
21      Q.   And you know the rules?
22      A.   Yes.
23      Q.   Let me just repeat a few of the basic
24  rules.
25          I'm going to ask you a series of

Page 5

1   questions.  I'm going to assume you understood
2   the question if you choose to answer the
3   question?
4          Do you understand that?
5      A.   Yes.
6      Q.   Do you understand you're under oath as
7   though you're testifying in a court of law?
8      A.   Yes.
9      Q.   And at any time you need to take a break,
10  just let us know and we'll be happy to take a break.
11          Okay?
12      A.   Yes.
13      Q.   And I think we should all shoot for
14  taking a lunch break around 1:00.  Is that
15  acceptable to everyone?
16      A.   Yes.
17      Q.   All right.  So can you tell me a little
18  bit about your background?  First let's start with
19  education.
20      A.   Education, I went to Miami Beach Senior
21  High.  I graduated in '78.
22      Q.   And no college after that?
23      A.   No.
24      Q.   And what do you currently do for a living?
25      A.   Currently do for a living, I run my

Luther Campbell
November 01, 2022

Page 6

1   record company and I coach high school football.
2      Q.   What's the name of your record company?
3      A.   Luke Records.
4      Q.   And how long have you operated this
5   version of Luke Records?
6      A.   I don't recall the time.  I would have to
7   go look at the documents.
8      Q.   Did you do anything to prepare for the
9   deposition today?
10     A.   Did I do anything to prepare?
11          MR. BURROUGHS:  Other than speak to your
12   counsel, of course.
13          THE WITNESS:  No.
14   BY MR. WOLFE:
15     Q.   Did you read any documents?
16     A.   No.
17     Q.   Did you speak with your counsel, without
18   telling me what was said?
19     A.   Yes, I spoke to my counsel.
20     Q.   And when did you do that?
21          MR. BURROUGHS:  Object and instruct the
22   witness not to answer anything about the
23   conversation, you can say yes or no, but
24   that's the extent of it.
25          MR. WOLFE:  I only asked him when, that's

Page 7

1   not privileged.
2          MR. BURROUGHS:  Same instruction.
3   BY MR. WOLFE:
4      Q.   How long did you speak with your counsel
5   for?
6          MR. BURROUGHS:  Again, I will instruct
7   the witness not to disclose anything about the
8   conversation with counsel.
9          MR. WOLFE:  I understand that.  I'm only
10   asking him how long you spoke for.
11          THE WITNESS:  I spoke to him pretty much
12   every day, 30 minutes, an hour sometimes.
13   Sometime I like to avoid him.
14   BY MR. WOLFE:
15     Q.   Okay.
16     A.   But every day I speak to my lawyer or one
17   of my lawyers.
18     Q.   Okay.  And do you have lawyers other than
19   Mr. Burroughs?
20     A.   Yes.
21     Q.   Who are those lawyers?
22     A.   Lawyer, my other lawyer is Matt Greenberg.
23   I speak to Bruce Rogow on a regular basis.
24          I speak to my other lawyer.  I just hired
25   her the other day.  I forget what her name is.  I

Page 8

1   can get that for you later on.
2      Q.   Are any of these three lawyers that you
3   just mentioned representing you in this
4   Section 203 case?
5      A.   No, sir.
6      Q.   All right.  What I would like to do is go
7   back to when you first started in the record
8   business.
9          Okay?  Do you know what year that was?
10     A.   What year it was?  When I started in the
11   record business?
12     Q.   Correct.
13     A.   Don't recall what year.
14     Q.   About 1985, '86; does that refresh your
15   memory?
16     A.   I started out as a DJ, so that would be
17   considered as in the record business.
18     Q.   Okay.  Well, I'm not interested in that.
19   I'm interested in the business in which you were
20   making and distributing recorded music.  So with
21   that understanding, approximately when did you
22   start in that business?
23     A.   I don't recall the exact date.
24     Q.   Does it refresh your recollection that
25   it would have been 1985 or 1986?

Page 9

1      A.   I don't recall the exact date.
2      Q.   Do you know what was the name of the
3   first business that you incorporated to be in the
4   record business?
5      A.   Luke Skyywalker Records.
6      Q.   Do you know when you incorporated Luke
7   Skyywalker Records?
8      A.   I don't recall that date.
9      Q.   And where did Luke Skyywalker's Records
10   operate from?
11     A.   I don't recall specifically where it
12   operated from.
13     Q.   And are you -- were you the sole owner of
14   Luke Skyywalker Records, Inc.?
15     A.   Yes.
16     Q.   And was Luke Skyywalker Records Inc. a
17   C corp. or an LLC or Sub S or some other kind of
18   corporation?
19     A.   I don't recall.
20     Q.   Now, did you eventually change the name
21   from Luke Skyywalker Records to Skyywalker
22   Records?
23     A.   Yes, I did.
24     Q.   When did you do that?
25     A.   I don't recall the date, the actual date.

Luther Campbell
November 01, 2022

**Page 10**

1    Q.   Why did you change the name?

2    A.   At one point I got sued by George Lucas

3  for using the Luke Skyywalker Records' name, but

4  I don't recall the date.

5    Q.   Did the Court in California enter an

6  injunction to prevent you from using the name Luke

7  Skyywalker Records, Inc.?

8    A.   Yes.

9    Q.   Is that what caused you to change the

10  name from Luke Skyywalker Records to Skyywalker

11  Records?

12    A.   I don't recall at that time whether that

13  was the reason why, but I know I had an injunction

14  to change the name.

15    Q.   Now, did the name change or did the

16  corporation entity change?

17    A.   I don't recall.

18    Q.   I'm sorry.

19    A.   I don't recall.

20    Q.   You don't recall.

21         Now, did eventually Skyywalker Records

22  become Luke Records?

23    A.   Did eventually Skyywalker Records become

24  Luke Records?  I would have to -- I don't recall.

25  I don't recall the date when it actually happened

**Page 11**

1  or at what period of time.

2         The name changes should be documented in

3  the Florida Sunbiz.

4    Q.   But you --

5    A.   Whatever the dates were, whatever the

6  names were and whatever the changes were, a lot

7  of changes.  I don't know the dates and the

8  names.  I know -- I know the names but I don't

9  know the exact dates.

10    Q.   But you agree with me, at some point,

11  Skyywalker Records, Inc. became known as Luke

12  Records, Inc.; correct?

13    A.   I don't -- I don't recall.

14    Q.   Okay.  Well, you just said you knew that

15  the name had changed; is that correct?

16    A.   I said that I don't recall what date or

17  when the name changed and I don't recall whether

18  it fell up under those names, they were separate.

19  There were other companies that had filled up, so

20  I don't recall.

21    Q.   Why did you change the name from

22  Skyywalker Records, Inc. to Luke Records?

23    A.   Just like I said, I don't recall.

24    Q.   And do you know when Skyywalker Records,

25  Inc. operated under that name?

**Page 12**

1    A.   I don't recall the exact date.

2    Q.   Do you know from which office Skyywalker

3  Records, Inc. operated from?

4    A.   No, I don't recall.

5    Q.   Did you at some point operate from 3050

6  Biscayne Boulevard?

7    A.   Yes, I did.

8    Q.   Do you know the years that you did that?

9    A.   No, I don't recall.

10    Q.   And eventually you moved to 2nd Avenue; is

11  that correct?

12    A.   Eventually I moved to 2nd Avenue?  At some

13  point, yes.

14    Q.   Do you know when your business moved from

15  3050 Biscayne to 2nd Avenue in North Miami?

16    A.   My business didn't move from -- it moved

17  from -- it moved from Biscayne Boulevard, if I --

18  if I can recall, it moved from -- did it move from

19  Biscayne to 54th Street, off 5th to Biscayne and

20  Biscayne?

21         At some point it moved to 2nd Avenue, but

22  I don't recall the exact dates.

23    Q.   Do you know the approximate date?

24    A.   No.

25    Q.   Do you know the approximate date that you

**Page 13**

1  operated from 3050 Biscayne Boulevard?

2    A.   No, I don't recall.

3    Q.   Are you familiar with Joseph Weinberger?

4    A.   Yes.

5    Q.   When did he first become a lawyer working

6  for one of your businesses?

7    A.   I don't recall the exact date.

8    Q.   Do you recall what he was originally hired

9  to do?

10    A.   Yes.

11    Q.   What was he hired to do?

12    A.   He -- he originally was hired as the tax

13  attorney, my tax attorney, and then he became my

14  general counsel -- for my records.

15    Q.   So let's first start as tax attorney.

16         When was he hired to be your tax lawyer?

17    A.   I don't recall the exact date.

18    Q.   Do you know when he became your general

19  counsel?

20    A.   I don't recall the exact date.

21    Q.   And is it fair to say that when he

22  became your general counsel, he was, in essence,

23  an employee of yours?

24    A.   Yes.

25         MR. BURROUGHS:  Objection.  Vague.  Calls

Luther Campbell
November 01, 2022

Page 14

1    for a legal conclusion, but if you know.
2    BY MR. WOLFE:
3        Q.    I will satisfy counsel.
4        When he became your general counsel, did
5    he work from your office?
6        A.    Yes.
7        Q.    So when he reported for work every day he
8    came to your office?
9        A.    Yes.
10       Q.    And he had an office within your building
11   in your company?
12       A.    Yes.
13       Q.    And he had the title of general counsel?
14       A.    I don't recall the exact title.  I don't
15   recall the exact title, but he worked from the
16   office.
17       Q.    And he was paid a salary as an employee?
18       A.    Yes.
19       Q.    And do you know the period of time when
20   he acted as your general counsel?
21       A.    I don't recall the exact dates.
22       Q.    Well, let me see if I can help refresh
23   your memory.  Do you recall that you filed for
24   bankruptcy in 1995?
25       A.    I don't recall the exact date.

Page 15

1        Q.    Would it refresh your memory if I
2    represented to you that you filed for bankruptcy
3    in 1995?
4        A.    If you showed me that filing document,
5    and I can look at it, the actual filing document
6    with my signature and my attorney's signature,
7    then I can -- if you reference that, then that
8    would be great.
9        Q.    Okay.  Who was the lawyer who filed
10   bankruptcy for you?
11       A.    I had a couple of lawyers.  I don't -- I
12   don't remember the exact name.
13       Q.    So accepting for the moment my
14   representation that the bankruptcy was in '95 or
15   '94, approximately how many years before then had
16   Joseph Weinberger been acting as your general
17   counsel?
18       A.    I don't recall the amount of years.
19       Q.    Did you have other entertainment lawyers
20   provide services to your companies prior to filing
21   for bankruptcy?
22       A.    Yes.
23       Q.    Do you remember their names?
24       A.    Before filing bankruptcy?  A couple of
25   names I remember.

Page 16

1        Q.    Who do you remember?
2        A.    Nick Mancini was a lawyer of mine in a
3    case, in a Peter Jones case.  I would consider
4    him probably.  He was a guy that Joe Weinberger
5    hired while working at the company.  Who else?
6    Allen Jacobi was a lawyer for a short period of
7    time before I sued him.
8        '90 -- yeah, I think it was maybe one
9    other, but I don't recall the actual name.
10       Q.    In the period of 1986, 1987, who was the
11   lawyer that was drafting contracts between Luke
12   Records or Skyywalker Records or Luke Skyywalker
13   Records and the artists that were signed to your
14   company?
15       A.    I don't -- I don't recall the exact
16   attorney name.  There was an engagement letter
17   that you have with my signature on there, if you
18   provide that with me, then I can verify that, that
19   --
20       Q.    I'm not asking you about an engagement
21   letter.  I'm asking you which attorney in that
22   time period was preparing contracts between your
23   company and your artists?
24       A.    I don't recall.
25       Q.    Did Nick Mancini ever prepare contracts

Page 17

1    between Luke Skyywalker, Skyywalker Records or
2    Luke Records and any of your artists?
3        A.    I don't recall.
4        Q.    Did Allen Jacobi prepare contracts
5    between Luke Skyywalker, Skyywalker Records or
6    Luke Records and any of your artists?
7        A.    I don't recall.
8        Q.    Have you seen an affidavit that Allen
9    Jacobi filed in this case stating that he had
10   prepared contracts for you?
11       A.    No.
12       Q.    Your lawyer didn't show you that
13   affidavit?
14       A.    I didn't see it.  Maybe he did.  Maybe he
15   did, maybe he didn't, but if you have a copy of
16   it, show it to me.
17       Q.    Are you aware of any other lawyer other
18   than Allen Jacobi who might have prepared
19   contracts between Luke Skyywalker, Skyywalker
20   Records and/or Luke Records and any of your
21   artists?
22       A.    I don't recall at this time.
23       Q.    And as we sit here today, is it fair to
24   say you're not aware of the name of any other
25   lawyer who could have possibly prepared those

Luther Campbell
November 01, 2022

Page 18

1  contracts?
2     A.   I don't recall.
3     Q.   That's not my question.  I said --
4     A.   I don't recall.
5     Q.   Do you know the name David Bercuson?
6     A.   Yes.
7     Q.   Was he a lawyer for Luke Skyywalker,
8  Skyywalker Records and/or Luke Records?
9     A.   I don't recall that.
10    Q.   Do you know what he did for any of those
11 entities?
12    A.   I don't recall.  I don't remember him
13 being a lawyer of mine, but I don't recall.
14    Q.   Are you familiar with a company called
15 Rockville Productions?
16    A.   Rockville Productions?  Rockville --
17 Rockville Productions?
18    Q.   Or Rockville, I'm not sure of the second
19 name.
20    A.   Rockville Productions?
21    Q.   I can double check.
22         Rockville Productions, Inc.?
23    A.   Rockville Productions, Inc.
24         Am I familiar with that company?
25         Rockville Production, Inc.  I'm familiar

Page 19

1  -- I think it was a Rockville Entertainment,
2  Rockville, Maryland.  I don't recall being
3  familiar with Rockville Productions.
4     Q.   Are you familiar with a company called
5  Luke Records Fan Club, Inc.?
6     A.   Yes.
7     Q.   What did that company do?
8     A.   Luke Records, it did a number -- numerous
9  amount of things, but I don't recall the specifics
10 of what it did.  I would need to look at the
11 documents to find out what it actually did at
12 that period of time.  That was a long time ago.
13    Q.   Are you familiar with a company called
14 Pac-Jam Publishing, Inc.?
15    A.   Yes.
16    Q.   P-A-C - J-A-M?
17    A.   Yes.
18    Q.   Is that a company that you owned?
19    A.   Yes.
20    Q.   Who was the lawyer that set that company
21 up for you?
22    A.   I don't recall.
23    Q.   Do you know when you established that
24 company?
25    A.   I don't recall.

Page 20

1     Q.   If I told you the records from Sunbiz
2  shows that it was filed in 1989, would that
3  refresh your recollection as to when it was
4  established?
5     A.   If you showed me the documents.
6     Q.   Okay.  What did that company do?
7     A.   Pac-Jam Publishing?
8     Q.   Yes.
9     A.   Pac-Jam -- records were published up
10 under that.  It was a publishing company.
11    Q.   Did Pac-Jam Publishing enter into any
12 contracts with any artists?
13    A.   I don't recall what artists it entered
14 into contracts with.
15    Q.   Specifically did Pac-Jam Publishing enter
16 into any contracts with the other members of
17 2 Live Crew?
18    A.   I would have to look at the documents.
19    Q.   Did Luke Records enter into any contracts
20 with the other members of 2 Live Crew?
21    A.   Did Luke Records, Luke Skyywalker
22 Records, all these different companies, I would
23 need to see the actual document to verify which
24 company entered into a contract with 2 Live Crew.
25    Q.   So you are aware that there is at least

Page 21

1  one contract between one of your companies,
2  Luke Skyywalker Records, Skyywalker Records or
3  Luke Records and the other members of 2 Live Crew;
4  is that correct?
5     A.   There is a contract -- there was a
6  contract with 2 Live Crew.
7     Q.   Okay.  Is it one contract or more than
8  one contract?
9     A.   I don't recall how many contracts it is.
10    Q.   Do you know when that contract was
11 prepared?
12    A.   I would have to actually see the
13 documents.  I don't recall what date it was
14 prepared or when it was prepared.
15    Q.   Do you know what lawyer prepared that
16 contract?
17    A.   No, I don't recall that.
18    Q.   Do you know whether or not that contract
19 was prepared before -- scratch that.  Let me
20 start over again.
21         You're familiar with the first three
22 records that were put out by your company for 2
23 Live Crew?
24    A.   Am I familiar with the records that were
25 put out?

Luther Campbell
November 01, 2022

Page 22

```
 1      Q.   Yes.
 2      A.   Yes.
 3      Q.   What was the first one?
 4      A.   The first record, the first record I think
 5   was 2 Live Is What We Are.
 6      Q.   And when was that record released to the
 7   public?
 8      A.   I want to say around '86.
 9      Q.   When that record was released to the
10   public, was there a contract between any one of
11   your three entities and the members of the group?
12      A.   It was a verbal contract.
13      Q.   What were the terms of the verbal
14   contract?
15      A.   I don't recall the specific verbal terms
16   of the contract, but you don't go in the studio
17   and do records without a verbal contract or a
18   contract, and at that time it was a verbal
19   contract.
20      Q.   And who was this verbal contract between?
21      A.   Me and the other members of the group.
22      Q.   You, personally?
23      A.   Me and the other members of the group.
24      Q.   And when was this verbal contract
25   formed?
```

Page 23

```
 1      A.   Before we went into the studio.
 2      Q.   So is it fair to say you had this verbal
 3   contract before 1986?
 4      A.   I don't recall the actual date we had a
 5   verbal contract.
 6      Q.   You had a verbal contract before 1987?
 7      A.   I don't recall -- I don't recall the
 8   date that I had a verbal contract.
 9      Q.   Is it fair to say you don't recall any
10   of the terms of the verbal contract between you
11   in one hand and the members of 2 Live Crew on the
12   other?
13      A.   There was a verbal contract with the
14   members before we went into the studio, as we
15   went in the studio, paid a royalty, the verbal
16   agreements as to how everybody get paid, whether
17   it was performing on a record and performing
18   live.
19      Q.   And what was the royalty that was agreed
20   to in this verbal agreement?
21      A.   I don't recall the royalties.  Whatever
22   they was being paid.
23      Q.   What was the term of the contract?
24      A.   The term of the contract?  The verbal
25   contract?
```

Page 24

```
 1      Q.   Yes.
 2      A.   I don't recall the terms of the verbal
 3   contract.
 4      Q.   How were they to be paid pursuant to
 5   this verbal contract?
 6      A.   I don't recall how they were being paid.
 7      Q.   Other than you, who else would know
 8   about this verbal contract?
 9      A.   Other than me, who else would know about
10   it?  The other members would know about it.
11      Q.   Would David Hobbs know about this verbal
12   contract?
13      A.   All of the members.
14      Q.   Was the verbal contract reached with all
15   three members at the same time or separately with
16   the three members?
17      A.   The verbal contract was made with all
18   three members at the same time, mainly with Chris
19   Wong Won.
20      Q.   Okay.  And where was this verbal contract
21   reached?
22      A.   I don't recall where it was reached.
23      Q.   Were you in the studio, in a restaurant,
24   were you somewhere?
25      A.   I don't recall where it was reached.
```

Page 25

```
 1      Q.   Is it correct to say that other than
 2   what you have just testified, you can't recall
 3   any of the other terms of this alleged verbal
 4   contract?
 5      A.   I don't recall at this time.
 6      Q.   Was any money paid by you to the other
 7   members of 2 Live Crew pursuant to the verbal
 8   contract?
 9      A.   I don't recall how the money was
10   disbursed, what was paid to them, based on the
11   verbal contract that we had of them recording
12   these records.
13      Q.   And I believe you said that the verbal
14   contract was done before you went in the studio
15   to record 2 Live Crew Is What We Are; is that
16   correct?
17      A.   There was a verbal contract before going
18   into the studio doing any records.
19      Q.   And so since the first record was 2 Live
20   Is What We Are, is it your testimony that the
21   verbal contract was reached before that record was
22   recorded?
23      A.   Yes, there was a verbal contract reached
24   before the record was recorded.
25      Q.   What studio was used to record 2 Live Crew
```

Luther Campbell
November 01, 2022

Page 26

1  Is What We Are?
2      A.   I don't recall what studio it was, but
3  it could have been several studios.
4          (A discussion was had off the record after
5      which the following proceedings were had:)
6  BY MR. WOLFE:
7      Q.   With any other producer who might have
8  worked on 2 Live Crew Is What We Are?
9      A.   Any other producer --
10     Q.   Other than David Hobbs?
11     A.   I don't recall what other producer
12 probably worked on it.
13     Q.   Who were the songwriters who wrote the
14 songs that are on 2 Live Crew Is What We Are?
15     A.   I would have to look at the documents of
16 writers, shares and all that, but I don't recall
17 right now, but I know the members wrote on the
18 songs and I wrote on the songs and Mr. Hobbs wrote
19 on the songs.  I think he did.  I don't recall the
20 exact writers.
21     Q.   Is there any written agreement between the
22 members of 2 Live Crew and any one of your
23 companies that transferred the copyrights to your
24 companies, with respect to 2 Live Crew Is What We
25 Are?

Page 27

1      A.   Is the -- rephrase the question.
2      Q.   Is there any written agreement between
3  the members of 2 Live Crew and your companies,
4  whether it is Luke Skyywalker, Skyywalker or Luke
5  Records, in which they transferred to your
6  companies, the copyrights to 2 Live Crew Is What
7  We Are?
8      A.   Yes.
9      Q.   What contract is that?
10     A.   That was a contract that we did, I think
11 in 1990.  I think in 1990 we did a contract that
12 covered all three of those albums.
13     Q.   Is that the contract that, quote, is made
14 effective as of 1987?
15     A.   I would have to look at the document.  I
16 don't recall the exact date.
17     Q.   Is it one contract with all of the members
18 of the group or are there separate contracts that
19 you're referring to?
20     A.   One contract with all the members of the
21 group.
22         MR. WOLFE:  One second, I need some help.
23 BY MR. WOLFE:
24     Q.   I am going to show you the -- one second.
25         MR. WOLFE:  I just want to screen share.

Page 28

1      Let me see if I can screen share.
2      (Technology recess.)
3  BY MR. WOLFE:
4      Q.   Can you see the document on your screen?
5      A.   Yes, it's kind of small.
6      Q.   Okay.  Let me see if I can make that
7  bigger.
8      Can you see it now?
9      A.   Yes.
10     Q.   And it says Recording Agreement?
11     A.   Yes.
12     Q.   I'll make it a little bigger.  Okay.
13     Now --
14         MR. BURROUGHS:  If you hit the arrow on
15 the right side, Richard, it will make the
16 screen bigger.  If you go down to the right.
17         MR. WOLFE:  Yeah.  I think that fills my
18 whole screen.
19         MR. BURROUGHS:  Yes, but you can get rid
20 of this export PDF, your free seven-day trial
21 button.  There's a little arrow that says
22 right here and it should -- yeah, to the
23 left.  To the left.  There we go.  If you hit
24 that.  Get rid of it.  There we go.
25         (Thereupon, the above-referred to document

Page 29

1  was previously marked as Exhibit No. 9,
2  contract for identification.)
3  BY MR. WOLFE:
4      Q.   Okay.  Mr. Campbell, are you familiar with
5  this contract?
6      A.   I just see the top of it.  I don't --
7         MR. BURROUGHS:  If you want to scroll
8  through it, so we can take a look at it.
9         MR. WOLFE:  Sure.  Let me just state for
10 the record.  This is the contract that we
11 marked as Exhibit 9 to the last deposition.
12 And I am going to use those 17 exhibits here.
13 So I'm happy to scroll through for you to be
14 able to see it.  Do you want me to go to the
15 last page first and then work back?
16         MR. BURROUGHS:  It's up to the witness.
17         THE WITNESS:  Yeah.
18 BY MR. WOLFE:
19     Q.   All right.  So there's the last page.
20     A.   Yes.
21     Q.   Now, you do you want me to -- is there
22 any particular paragraph you'd like to look at?
23     A.   You can scroll up.
24     Q.   Do you want me to scroll up or scroll
25 down?  What is better for you?

Luther Campbell
November 01, 2022

<!-- Page 30 -->

Page 30

1    A.  I thought you were at the end, so I am
2   assuming you're scrolling --
3    Q.  I'll scroll up.
4    A.  Hold up, hold up, hold up.  Little slower.
5   Can you go back a little bit?
6    Q.  Down?
7    A.  Yes, down.  Right there, right there,
8   right there.  Okay.  You can go up.  What
9   paragraph is that?  Eight.
10   Q.  That is --
11   A.  Yeah, that was eight.
12   Q.  Paragraph --
13   A.  Slow down, slow down, slow down.  Yep.
14  Yes, you can go up.  Hold up, hold up, hold up.
15  Can you go back down a little bit?  I just want
16  to read ten.  Right there, right there.
17       All right.  You can go back up.
18   Q.  Go up?
19   A.  Yeah, you can keep going.
20       MR. BURROUGHS:  It is, of course, up to
21  the witness, but it would seem easier to me to
22  start at the top and move down so we know the
23  -- we can see the captions and the paragraph
24  headings before we look at the language.
25       MR. WOLFE:  I am happy to do that if he

<!-- Page 31 -->

Page 31

1   prefers.
2        THE WITNESS:  Yes, if you can.
3   BY MR. WOLFE:
4    Q.  All right.  So looking at the top, do you
5   see that this agreement is undated?
6    A.  Excuse me?
7    Q.  Do you see that there is no date on this
8   agreement?
9    A.  Is that the very top of it?
10   Q.  Right there is the very top.
11   A.  Right.  I see no date there.
12   Q.  Do you know which lawyer prepared this
13  agreement?
14   A.  No, I don't.  I don't recall.
15       MR. BURROUGHS:  Can we scroll down to see
16  at least the entirety of page 1, if you're
17  going to ask questions on page 1?  I just want
18  to take a look at it.
19  BY MR. WOLFE:
20   Q.  Mr. Campbell, I am going to go slow on
21  page 1.
22       That is page 1.
23   A.  Okay.
24   Q.  So my question is:  This refers to the
25  Skyywalker Records, Inc., and I am going to ask

<!-- Page 32 -->

Page 32

1   you again:  When did Skyywalker Records
2   incorporate?
3    A.  I don't recall the date.  You have to
4   check --
5    Q.  Do you see that this has an address of
6   3050 Biscayne Boulevard, Suite 307?
7    A.  I see it.  I see two addresses, I see,
8   yes, I see the -- 3050 Biscayne Boulevard.
9    Q.  Again, my question is:  Do you know when
10  any one of your companies operated from that
11  suite?
12   A.  I don't recall the exact date.
13   Q.  Now, you see that there's an address for
14  the members of the group at 1550 Northeast 125th
15  Terrace?
16   A.  Yes.
17   Q.  Do you know whose address that is or
18  was?
19   A.  No, I don't.
20   Q.  Did you ever live or operate from that
21  address?
22   A.  I don't recall.  I don't think I did, but
23  I don't recall.  I don't recall.
24   Q.  Do you know if this contract was prepared
25  and signed before or after the release of 2 Live

<!-- Page 33 -->

Page 33

1   Crew Is What We Are?
2    A.  Rephrase that question again.
3    Q.  Do you know if this contract was prepared
4   and/or signed before or after the release of
5   2 Live Crew Is What We Are?
6    A.  I don't recall the exact date 2 Live Is
7   What We Are was released.
8    Q.  And you don't know when this was signed,
9   do you?
10   A.  This contract?
11   Q.  Yes.
12   A.  Whatever the date was, it was signed.
13   Q.  Well, there is no date on here.
14   A.  No date on here.  I don't recall the
15  exact date it was signed.
16   Q.  Do you have any idea where it was signed?
17   A.  Where it was signed?
18   Q.  Yes.
19   A.  No.
20   Q.  Do you have any idea who might have worked
21  on or prepared this agreement?
22   A.  No, I don't recall which lawyer worked on
23  it.
24   Q.  Do you know if Joe Weinberger worked on
25  this contract?

Luther Campbell
November 01, 2022

Page 34

1    A.   Definitely not.  I didn't know him at
2  the time.
3    Q.   So is it fair to say that this contract
4  was prepared before you met Mr. Weinberger?
5    A.   Yes.
6    Q.   Now, is there any mention in this
7  agreement of any copyrights being transferred
8  from the members of 2 Live Crew to your company?
9    A.   Can you rephrase that?
10   Q.   Is there any mention anywhere in this
11 agreement of any copyrights being transferred from
12 2 Live Crew to any of your companies?
13        MR. BURROUGHS:  I will just object, that
14    calls for a legal conclusion.  But if you
15    know.
16        THE WITNESS:  I don't -- I don't know.  I
17    don't...
18 BY MR. WOLFE:
19   Q.   You've been working in copyrights all your
20 career; correct?
21   A.   Have I been working in copyrights?  I
22 have been working in doing music in my career.
23   Q.   It's fair to say you know a little bit
24 about copyrights; correct?
25   A.   It's fair to say that I know about how to

Page 35

1  make music.
2    Q.   Okay.
3    A.   I'm not a copyright expert.  I'm a music
4  and marketing expert.
5    Q.   But you even went to the Supreme Court to
6  argue about copyrights, didn't you?
7    A.   Bruce Rogow argued.  I hired a lawyer to
8  do that argument.  I'm not a lawyer.  I never was
9  a lawyer.  As I stated earlier, I only went to
10 high school.
11   Q.   So I'm going to ask you again:  Do you
12 understand that in order to transfer a copyright,
13 there must be a written document?
14        MR. BURROUGHS:  Objection.  Calls for a
15    legal conclusion.  And to the extent it is
16    based on conversations with counsel, I am
17    going to instruct you not to disclose
18    attorney/client communications.  If you have
19    an independent basis, you can let him know.
20        THE WITNESS:  I don't know how copyrights
21    are transferred.
22 BY MR. WOLFE:
23   Q.   Do you have any document, anywhere, that
24 describes the album 2 Live Crew Is What We Are as
25 being transferred to any one of your companies?

Page 36

1    A.   Does this contract -- does -- this
2  contract should actually cover the three albums
3  that was recorded before this contract was
4  actually done.
5    Q.   Well, I'll represent to you that nowhere in
6  this contract is there any mention of any
7  specific copyrights being transferred?
8    A.   Oh, that's -- that's your opinion.
9    Q.   Okay.  Well, I'm asking you:  Other than
10 this contract that we have marked as Exhibit 9,
11 are you aware of any other contract that might
12 have transferred the copyrights to 2 Live Crew Is
13 What We Are to your companies?
14   A.   This contract covers -- this specific --
15 this contract right here, covers 2 Live Is What
16 We Are, Who Is Something and Nasty As They Want
17 To Be.
18   Q.   I understand that is your position --
19   A.   Yes.
20   Q.   I am only asking you is, if there is any
21 other contract, other than this one that we have
22 marked as Exhibit 9, that transferred those three
23 copyrights or the copyrights contained in those
24 albums, to your company?
25   A.   I don't recall.

Page 37

1    Q.   Now, do you recall what the term was
2  between Skyywalker Records, Inc. and the members
3  of 2 Live Crew as set forth in the contract that
4  we have marked as Exhibit 9?
5    A.   Do I recall what the terms were?
6    Q.   Term.
7    A.   Term.  The term?
8        MR. BURROUGHS:  Objection, vague and
9    ambiguous, and calls for legal conclusions.
10    But if you understand, you can respond.
11        THE WITNESS:  The term?  This contract,
12    this specific contract right here, covered
13    2 Live Is What We Are, Nasty As They Want To
14    Be, and the -- and the Move Somethin' album.
15 BY MR. WOLFE:
16   Q.   Did you pay in advance to any of the
17 members of 2 Live Crew pursuant to this contract
18 that we have marked as Exhibit 9?
19   A.   I don't recall whether I paid in advance
20 or not.
21   Q.   Do you recall contracting to give the
22 members of 2 Live Crew a $250,000 advance?
23   A.   Whatever the contract says, I am pretty
24 sure it was exercised.
25   Q.   That's not my question.  My question is:

Luther Campbell
November 01, 2022

Page 38

1   Do you recall the contractual terms in which you
2   agreed to pay the $250,000 advance to the members
3   of 2 Live Crew?
4        A.   Is it in this contract here?
5        Q.   That's not my question.  I am asking you
6   about your recollection.  If you don't know, then
7   just say, "I don't know."
8        A.   I don't recall.
9        Q.   And is it correct to say you don't have
10  any independent memory of ever giving the members
11  of 2 Live Crew an advance?
12       A.   I don't recall.
13       Q.   Do you know what royalty you agreed to
14  pay the members of 2 Live Crew with respect to
15  sales of those three records?
16       A.   I don't recall.
17       Q.   Do you know if it was 15 percent,
18  18 percent or something else?
19       A.   I don't recall.
20       Q.   Did you ever prepare a royalty statement
21  in which you paid members of 2 Live Crew a
22  royalty as a result of sale of those three
23  records?
24       A.   I don't recall.
25       Q.   I'm going to show you another version of

Page 39

1   this Recording Agreement that your lawyers
2   produced in this case, if you give me a second to
3   get to it.
4        Can you see this contract on the screen?
5        A.   Yes.
6        Q.   So --
7        MR. BURROUGHS:  I'll just state for the
8   record, that this is a contract that we tried
9   to cobble together and produce early on.  We
10  now understand that the pages were mixed up
11  or out of order.  And we are now using the
12  contract that --
13       MR. WOLFE:  I don't want you to tell the
14  witness how to answer the question.
15       MR. BURROUGHS:  -- that we looked at in
16  Exhibit 9.
17       MR. WOLFE:  Counsel you have to stop.
18  Speaking objections are not appropriate.
19       MR. BURROUGHS:  To the extent that --
20       MR. WOLFE:  Counsel, you have to stop.
21       MR. BURROUGHS:  -- the contents going to
22  be relied up --
23       MR. WOLFE:  Counsel, you have to stop.
24  You're telling the witness how to answer the
25  question.

Page 40

1        MR. BURROUGHS:  -- for the record that we
2   have -- we have identified that this was
3   produced in error and that we made a mistake
4   in collating it, so I want to get that on the
5   record.
6        MR. WOLFE:  Well, thank you for answering
7   the question for your client, but you know
8   that is not proper.  I would like to ask him
9   questions, not you.
10  BY MR. WOLFE:
11       Q.   So Mr. Campbell --
12       MR. BURROUGHS:  Okay.  We will also
13  represent that I don't believe that -- I
14  never discussed this with the client and the
15  client was not involved in the preparation of
16  this agreement.  This was prepared by my
17  office and it appears to have been collated
18  incorrectly and so we now are relying on the
19  incorrectly collated version of the contract,
20  but proceed.
21  BY MR. WOLFE:
22       Q.   Mr. Campbell, do you see down on the
23  bottom it says 2 Live Crew 0001?
24       A.   Yes.
25       Q.   Did you ever produce a copy of this

Page 41

1   contract to your lawyer?
2        MR. BURROUGHS:  I will just object.  We
3   have a copy of the correct version of this
4   that we were looking at in Exhibit 9.  This
5   particular version is one that we tried to put
6   together based on a couple of different
7   documents.  So I will object to the question
8   as vague.
9        MR. WOLFE:  I will accept your
10  representation that you tried to commit a
11  fraud on the Court, but I would like to move
12  on and ask him questions about it.
13  BY MR. WOLFE:
14       Q.   Mr. Campbell, I'm going to show you this
15  document and ask you if you recognize --
16  specifically, what I'm going to show you is page 3.
17       Do you see page 3, that's on the screen?
18       A.   The screen is kind of small so I don't
19  see what page it is.
20       Q.   Is that a little bigger?
21       A.   If you scroll down and let me see where
22  it actually says page 3.
23       Q.   You can see down on the bottom it says
24  page 3?
25       A.   No, I don't see that.

Luther Campbell
November 01, 2022

Page 42

1    Q.   Right here, right above --
2    A.   Oh, okay.  Yes, yes, yes.
3    Q.   You see where it says 2 Live Crew 003?
4    A.   Yes.
5    Q.   Do you recognize this as page 3 of the
6  document that you produced to your lawyer?
7    A.   I don't recall producing this to him.
8    Q.   And do you see that there is a code on
9  the bottom of the left side of page 3?
10    A.   No, I can't make that out.
11    Q.   Okay.  Do you know where page 3 came
12  from?
13    A.   I don't recall.
14    Q.   Do you know if this is a contract
15  between your company and the members of 2 Live
16  Crew?
17    A.   I don't recall.
18    Q.   Do you see in paragraph C, it provides
19  that the artist -- is the record company is an
20  employer for hire?
21    A.   The record company is employee  for --
22  say that again now.
23    Q.   I'm showing you paragraph C of page 3 of
24  the document that your lawyer produced as 003,
25  and I would like you to take a look at paragraph C

Page 43

1  and read it to yourself so I can ask you a couple
2  of questions about it.  It's very short.
3    A.   Yes, I read it.
4    Q.   Does this refresh your recollection that
5  there was a contract between your company and the
6  members of 2 Live Crew which included this
7  page 3?
8    A.   That there was a contract that included
9  this page 3, is that what you're saying?
10    Q.   Yes.
11    A.   I've never seen this page 3.
12    Q.   So how did your lawyer get this page 3 so
13  that it could be produced in this case pursuant
14  to our request for production of documents?
15         MR. BURROUGHS:  I will just object.  This
16    is misstating the record and the evidence.
17    Yeah, there is no representation that this
18    particular client produced this document.
19         MR. WOLFE:  Right, you did.
20         MR. BURROUGHS:  So there's no foundation
21    for the question.  Right.  These documents
22    were produced as they were produced by the
23    clients, not particularly Mr. Campbell.
24         MR. WOLFE:  Okay.
25         MR. BURROUGHS:  So asking him the question

Page 44

1    you're asking him, there is simply no
2    foundation for it.
3         MR. WOLFE:  Fair enough.
4  BY MR. WOLFE:
5    Q.   Mr. Campbell, does this page 3 appear to
6  be a portion of a contract between your company,
7  whether it's Luke Skyywalker, Skyywalker Records
8  or Luke Records, and the members of 2 Live Crew?
9    A.   No.  They were never on work for hire
10  basis.  A verbal agreement was them as artists.
11  They were never work for hire.
12    Q.   Now, I'm showing you page 4 of this
13  contract that you produced.  I am going to go down
14  to the bottom.
15    A.   I did not produce.
16         BY MR. BURROUGHS:  Again, yeah, I am going
17    to have to keep correcting the record.  This
18    witness did not produce this contract, and
19    this does not appear to me to be one contract,
20    it appears to be multiple contracts that have
21    been put together out of order.  I am going
22    to have to keep objecting if you keep referring
23    to this as one contract.
24         It appears to me, just by looking at the
25    pages and the appearance of the pages and the

Page 45

1    file markings, that these are two different
2    contracts that are combined.  So you are free
3    to ask questions but you -- you cannot
4    represent this to the witness as either, one,
5    one contract, or two, a contract that he
6    produced.
7         MR. WOLFE:  Counsel, with all due respect,
8    this is what you produced in response to our
9    request for production of documents, which is
10    2 Live Crew 0001 to 0023.
11         MR. BURROUGHS:  Yes, so this was produced
12    as -- these were produced to you as produced
13    to us by the client.  We have never made any
14    representation that the pages go in this order
15    or that it's one contract.
16         These were the pages produced to us by a
17    client, not Mr. Campbell, and then produced to
18    you.
19         We have never made any representations to
20    you or the Court that this is one contract.
21    This is, as we represented to the Court, two
22    different contracts.
23         There's the contract that's Exhibit 9,
24    that you questioned the witness on earlier,
25    and now there's these pages from our discovery

Luther Campbell
November 01, 2022

Page 46

1  responses that we have never represented to be
2  one contract.
3      You've now done that on the record
4  multiple times, but that appears, at least to
5  me to be a false representation, because
6  looking at these pages here, these appear to
7  be different contracts that were produced in
8  discovery.
9      MR. WOLFE:  Are you done?
10     MR. BURROUGHS:  I am going to have to keep
11 objecting if you keep referring to them as a
12 contract.
13     MR. WOLFE:  You can have a standing
14 objection, but I don't -- but you can't have
15 speaking objections.  And if you continue to
16 make speaking objections, I am going to have
17 to terminate the deposition, go to the Court,
18 and get an order of sanctions.  So your
19 speaking objections --
20     MR. BURROUGHS:  Well, I have to -- well,
21 listen to the questions and -- go ahead.
22     MR. WOLFE:  Excuse me, your speaking
23 objections tell the witness how to answer the
24 question, which is not proper.  You know
25 better than that.

Page 47

1      MR. BURROUGHS:  That is not true.  My
2  statements are correcting a false
3  representation to you on the record of a
4  particular series of a documents.
5      Proceed.
6  BY MR. WOLFE:
7      Q.  Mr. Campbell, I am showing you now,
8  page 0004 of a document that the defendants
9  produced, whether it was you or your
10 co-defendants, I am asking you if you recognize
11 this page?
12     A.  No, I don't.
13     Q.  Do you see that in paragraph C, it refers
14 to an LP entitled Luke featuring 2 Live Crew?
15     A.  I see LP, yes, I see that.
16     Q.  Does that refresh your recollection that,
17 in fact, this page came from a contract between
18 Luke Records and the members of 2 Live Crew?
19     A.  This contract is all over the place, it
20 has too many different parts of it.  So I don't
21 -- I don't recognize this as a -- regular
22 contract.
23     Q.  I am only asking you about this page 4.
24     A.  No, I don't -- I don't -- can you go down
25 to the bottom to see -- it's all over the place,

Page 48

1  it's like piecemeal pieces added into the
2  contract.
3      No, this -- this is not something that I
4  would ever produce as one -- you can give me the
5  entire contract to look at, other than it being
6  piecemeal and pages added in and pages added out,
7  then I can say that this is a part of an actual
8  contract in which I did with the group or I had
9  with the group or negotiated with the group.
10     MR. WOLFE:  Counsel --
11 BY MR. WOLFE:
12     Q.  I'm happy to email this to your lawyer,
13 so your lawyer can send it to you so you can take
14 the time to read it.
15     A.  If it's piecemeal like this, then I am
16 going to still have the same answer, because you
17 know how you guys do, y'all have a tendency of, in
18 my opinion, fraudulently putting documents into
19 documents and -- and into contracts and things
20 that are actually not factual.
21     Q.  So I am only asking --
22     A.  If it's not a full contract that you are
23 sending me, all this, with all these codes down to
24 the bottom and 2 Live Crew 004, and I don't recall
25 this document as a document that I prepared.

Page 49

1  That I -- that I used in a contractual deal with
2  the group.
3      Q.  Mr. Campbell, I am happy to send -- I am
4  happy to send you the totality of the documents
5  that the defendants produced in response to our
6  request for production, which are 2 Live Crew 001
7  through 26.
8      Would you like --
9      A.  I've never seen this document before.
10     Q.  You've never seen any portion of this
11 document before?
12     A.  Anything written on, anything written on
13 this document as it stands right here, I have not
14 seen this.  If you can provide me with a full
15 contract.
16     Q.  Well, I am happy to do that.
17     A.  Without -- without pages being slid in
18 and slid out, then I would appreciate that and
19 then I can look at that and see whether or not
20 that is something that I had one of my attorneys
21 prepare.
22     MR. BURROUGHS:  Yes.  So I will make that
23 same objection on the record that it is two
24 incomplete documents, and I'll object to
25 questions where you are asking the witness

Luther Campbell
November 01, 2022

Page 50

1  about two separate incomplete agreements and
2  positioning it as one agreement.
3       MR. WOLFE:  Well, Counsel, you're the one
4  who produced it as one agreement.
5       MR. BURROUGHS:  Again, I disagree.
6       MR. WOLFE:  So anyone doctored the
7  agreement, it's you, not us.
8       MR. BURROUGHS:  You have to let me finish.
9  We produced the documents as we received them
10  in the ordinary course.  There is no
11  representation to anyone at your office or the
12  Court, that these pages go in order.  As a
13  matter of fact, we filed the actual agreement
14  with the Court, as you know, with the correct
15  pages.
16      So it is still confusing to me as to why
17  you are attempting to ask this witness
18  questions on a document that you know is
19  incomplete and includes pages from two
20  agreements joined as one.
21      Apparently your basis is because that's
22  the Bates stamp order that they were produced
23  in discovery, but there's no representation
24  that those are the agreements.
25      There is no foundation for these

Page 51

1  questions.  You're presenting two incomplete
2  documents to the witness and we object on that
3  basis.
4  BY MR. WOLFE:
5       Q.  So Mr. Campbell, is it your testimony that
6  pages 3, 4, 5, 7, 8 and 9 are pages that were
7  taken from another contract between the group
8  2 Live Crew and one of your companies?
9       A.  I did not --
10      MR. BURROUGHS:  Let me object that it
11  calls for speculation.  But if you know or if
12  you can answer based on what the scrolling
13  just showed you.
14      THE WITNESS:  I did not prepare this
15  contract and I don't -- I'm not going to
16  answer questions off of contracts that you
17  guys piecemeal and put together and that is
18  just not the way it works.  So I --
19  BY MR. WOLFE:
20      Q.  Don't say "you guys," because it was your
21  lawyer who did this, not us.
22      A.  Wherever it came from, whoever provided
23  it, this is not a contract in which I provided to
24  my lawyer.
25      I would just leave it like that.

Page 52

1       Q.  So looking at those pages I just
2  referenced, do you recall ever having these
3  clauses included in a contract between your
4  company and the members of 2 Live Crew?
5       A.  This is not a contract in which I
6  provided to my attorney.  That is my answer and
7  it will keep being my answer.
8       Q.  I'm showing you the bottom of page 5,
9  which has the royalty rate.  Do you see that?
10      A.  This is not a contract in which I
11  provided to my attorney.
12      Q.  The only thing I asked you is if you see
13  that?
14      A.  This is not a contract in which I
15  provided to my attorney.
16      Q.  Please listen to my question.
17      I am only asking you, do you see that on
18  page 5, there is a royalty rate stated of 15
19  percent?
20      A.  Yes, I see that, but this is not a
21  contract I provided to my attorney.
22      Q.  Did you, in fact, reach an agreement with
23  the members of 2 Live Crew to pay them a royalty
24  of 15 percent?
25      A.  I don't recall.

Page 53

1       Q.  I am going up to the prior page.  Do you
2  see --
3       A.  If you referring to this contract, I
4  have not -- this is not a contract in which I
5  produced on behalf of my companies.
6       Q.  Is it your testimony that I will never
7  find your signature on a contract that has these
8  pages?
9       A.  These pages can go into a thousand
10  different contracts on a thousand different
11  occasions, if you -- if you have ran a record
12  company like myself, this type of language could
13  be in a contract if that is what you agreed on
14  with the artists, or if that is something that you
15  would negotiate.
16      So this type of language can go into any
17  artists of my company, with this specific group,
18  you have to provide me with a full contract.
19      Q.  That's not my question.
20      A.  You can try and trick up the words all
21  you want, but that's what you're going to get.
22      Q.  Mr. Campbell, you have to listen to my
23  question.
24      A.  I'm listening to your question.
25      Q.  My question is:  Is it your testimony

Luther Campbell
November 01, 2022

Page 54

1    that no contract exists that has your signature
2    on it between your company and the members of
3    2 Live Crew that has the exact same pages, 3, 4,
4    5, 7, 8 and 9, that I've just shown you?
5        A.   I don't recall.
6        Q.   You don't recall?
7             So you don't recall ever signing a
8    contract that has those pages?
9        A.   I don't recall.  Do you have a copy?
10       Q.   Of course, I do.  Would you like to see
11   it?
12       A.   Yes.  A full copy, not one that pages
13   were added in and added out.
14       Q.   I am happy to show you.
15            And we'll get there in a minute.  I just
16   want to continue to go through this and then I
17   will get to and show you the full contract that
18   you signed -- excuse me -- the three contracts
19   that you signed.
20            So, do you see that I am now showing you
21   on paragraph 7-B1, that there is an advance in the
22   amount of $250,000?  Right here.
23       A.   I don't know whose contract this is or
24   what contract that is.
25       Q.   My question is:  Isn't it true that you

Page 55

1    had an agreement on behalf of one of your
2    companies and the members of 2 Live Crew, to give
3    them an advance of $250,000?
4        A.   I don't recall.
5        Q.   Again, I am still showing you that this
6    specifically in paragraph 7(a), third line down,
7    refers too 2 Live Crew.
8             Do you see that?
9        A.   You're showing me one thing that I don't
10   recognize as a document in which I provided to
11   anybody, and you are asking me about whether or
12   not at some period of time, I agreed to pay
13   2 Live Crew $250,000.  That is two different
14   things.
15            So what you are trying to do is backdoor,
16   ask me a question about a document that I don't
17   -- that I don't recognize as a document of mine
18   with a number attached based on what the number
19   is showing on the screen.  I do not recognize this
20   document as a contract of mine, or as a contract
21   that I provided to anyone.
22       Q.   Mr. Campbell, I am now showing you a
23   document that we previously marked as Exhibit 3 to
24   a prior deposition.
25            MR. BURROUGHS:  I will just note for the

Page 56

1    record, this is not the exhibit from the prior
2    deposition, but this appears to be the exhibit
3    to the complaint and it is marked here on my
4    screen as Exhibit 2.
5             But go ahead, if you want to take some
6    time to scroll through it, you can take a
7    look.
8             MR. WOLFE:  I will be happy to show you
9    the email from Frank Trechsel attaching that
10   as Exhibits 1 through 17.
11            MR. BURROUGHS:  There is no -- well, go
12   ahead and scroll through it --
13            MR. WOLFE:  Do you want me to go back and
14   show you the transmittal?
15            MR. BURROUGHS:  No, but there is no --
16   that transcript has not been issued yet.  So
17   there is technically no -- it's been
18   previously marked as that exhibit number.  If
19   you want to mark it again with that exhibit
20   number, that's fine.
21            MR. WOLFE:  I am happy to show you to
22   satisfy you --
23            MR. BURROUGHS:  No, again, I think you're
24   miss --
25            MR. WOLFE:  Excuse me.  Please don't

Page 57

1    interrupt me.
2             MR. BURROUGHS:  You are misinterpreting
3    what I am saying.  You don't need to show
4    me --
5             MR. WOLFE:  I'm happy to show you --
6             MR. BURROUGHS:  I don't dispute that it's
7    the same document.  I am just saying that the
8    marking needs to be clear for the record.
9             MR. WOLFE:  Okay.
10   BY MR. WOLFE:
11       Q.   Mr. Campbell, do you see this exclusive
12   recording contract that I'm showing you?
13       A.   Yes, it says the exclusive recording
14   contract, yes.
15       Q.   And it is dated the blank day of April
16   1991 between Luke Records, Inc. at 8400 Northeast
17   2nd Avenue and Chris Wong Won?
18       A.   Chris Wong Won, yes.
19       Q.   Do you recognize this contract?
20       A.   If you scroll down I can look and see if
21   there's a signature of it, and --
22       Q.   I'm happy to accommodate you.
23            MR. BURROUGHS:  Yeah, a little bit slower.
24            MR. WOLFE:  I am just going down to the
25   bottom.  Okay.  I think I went too fast.

Luther Campbell
November 01, 2022

Page 58

1    MR. BURROUGHS:  And is it -- your
2  representation that this is one agreement or
3  is this a combination of agreements?
4    MR. WOLFE:  One second.
5  BY MR. WOLFE:
6    Q.   Here is the bottom, which is page 28.
7    A.   Okay.  That's the bottom?
8    MR. BURROUGHS:  Again, no, just for the
9  record.  This does not appear to me to be the
10  bottom, given that the slider is in the middle
11  of the page.
12    MR. WOLFE:  Please stop your speaking
13  objections.
14    MR. BURROUGHS:  Well, no, you're saying
15  this is the bottom of the page and it isn't.
16  It is not a speaking objection if it's
17  inaccurate.
18    MR. WOLFE:  Now, Counsel, let's go real
19  slow.
20    MR. BURROUGHS:  So the top of the page --
21  you stopped at page 28 of 85 and said it was
22  the bottom of the page, which is not true.
23  Can we scroll all the way through the end of
24  the document, please?
25    MR. WOLFE:  No.  Counsel, you have to stop

Page 59

1  with your speaking objections.
2    MR. BURROUGHS:  It's not a speaking
3  objection.  You told the witness you're at
4  the bottom of the document and --
5    MR. WOLFE:  Okay.  I am going go to the
6  Court --
7    MR. BURROUGHS:  -- you're on page 28 of
8  85.
9    MR. WOLFE:  I'm going to go to the Court.
10  I'm going to seek sanctions and I'm going to
11  have your pro hac vice revoked.
12    Counsel --
13    MR. BURROUGHS:  On what basis?  You're
14  misrepresenting a document --
15    (Simultaneous crosstalk.)
16    MR. WOLFE:  On the basis that you are
17  interrupting my deposition.  You're engaged
18  constantly in speaking objections that are
19  inappropriate.  You're telling the witness
20  how to answer the question.  I will seek
21  sanctions and seek to have your pro hoc vice
22  revoked.
23    MR. BURROUGHS:  If you are going to
24  ask --
25    MR. WOLFE:  You are here as a courtesy of

Page 60

1  the Court.  You are not a member of the
2  Florida Bar.  You are not a member of the
3  southern district.  And I will seek
4  sanctions, just like many other Courts have
5  sought sanctions against you, if you continue
6  with this behavior.
7    MR. BURROUGHS:  Yeah.  So if you are going
8  to ask the witness questions about an exhibit,
9  I am entitled to see the entire exhibit
10  before you ask questions.  I don't think that
11  is subject to dispute.  You are refusing to
12  show me the entire exhibit --
13    MR. WOLFE:  I'm happy to show you.  I
14  will accommodate you.
15    MR. BURROUGHS:  Hold on.  Let's not speak
16  over one another.
17    For the record, you are refusing to show
18  me the entire exhibit before questioning the
19  witness on it.  I believe that is
20  inappropriate and sanctionable and I reserve
21  all rights.
22    I will ask again, if you are going to
23  question the witness on any exhibit, that you
24  first publish the entire exhibit to me and the
25  witness.

Page 61

1    MR. WOLFE:  Happy to do so.
2  BY MR. WOLFE:
3    Q.   So Mr. Campbell, do you see that this is
4  an 86-page exhibit?
5    A.   Yes.
6    Q.   And do you see that I'm going to go to
7  the bottom of page 28, that there is a signature
8  line?
9    A.   Yes.
10    Q.   And page --
11    MR. BURROUGHS:  Well, can you scroll up
12  so I can see the entirety of 28?  Sorry, you
13  went a little bit fast.
14    MR. WOLFE:  Sure.  Sure.  Right there.
15    MR. BURROUGHS:  No, the entirety of page
16  28.
17    MR. WOLFE:  I'm sorry, it's page 27.
18  It's page 27 of the exhibits and it's list --
19  page 26 and here is page 27 and here is page
20  28.  Okay.
21    MR. BURROUGHS:  Can you scroll down so I
22  can see the full signature blocks?
23    MR. WOLFE:  Sure.
24    MR. BURROUGHS:  I will just state for the
25  record that I believe there's going to be

Luther Campbell
November 01, 2022

Page 62

1   some discrepancies in the record because we
2   have been referring to different contracts
3   with different pages as opposed to --
4   sometimes we're using the page number of the
5   document.  Sometimes we're using the page of
6   the exhibit.
7       So to the extent that there are issues in
8   that regard in the transcript, we'll reserve
9   rights.  Thank you.
10  BY MR. WOLFE:
11      Q.   Mr. Campbell, do you see that at the
12  bottom of page 28 there is a signature of you and
13  Chris Wong Won?
14      A.   Yes, I see that.
15      Q.   Is that your signature?
16      A.   You originally asked me is this one
17  exhibit?
18      Q.   It's the first --
19      A.   Or is it two separate?
20      Q.   I will clarify.  This exhibit has three
21  contracts.  I've shown you the first contract
22  that is pages 1 through 28.  And I will get to
23  the other two in a minute.
24      A.   Okay.  So -- I mean, I'm not a lawyer,
25  but why didn't y'all separate the exhibits, the

Page 63

1   contracts?
2       Why would they be put into one?  I don't
3   want to be answering questions based on what part
4   of one contract and give and then it be an answer
5   in reference to the entire exhibit which you just
6   said are three contracts.
7       Q.   I am only asking you, is this your
8   signature on page 28 of this exhibit?
9       A.   It's -- it's my signature -- it is my
10  signature of the contract up until page 28.  Not
11  for the entire three contracts that you have
12  attached to this specific exhibit.
13      Q.   I am only asking you a very simple
14  question.  Looking at page 28, is that your
15  signature on this contract?
16      A.   On page 28, that's my signature on this
17  particular contract.
18      Q.   Thank you.
19      A.   Not the entire exhibit.
20      Q.   And is that Chris Wong's Won's signature
21  on page 28?
22      A.   Yes, it is.  Yes, as I think it is, yes.
23      Q.   And do you recall that a lawyer named
24  Allen Jacobi prepared this contract?
25      A.   I don't recall what lawyer prepared the

Page 64

1   contract.
2       Q.   And I am happy to show you -- looking
3   for the notice clause.
4       MR. BURROUGHS:  I will just state for the
5   record, that we still haven't seen the
6   entirety of the 85-page exhibit -- my request.
7       MR. WOLFE:  And I'll get there.  I'm
8   happy to accommodate --
9       MR. BURROUGHS:  Well, generally, Mr.
10  Wolfe, you show the exhibit --
11      MR. WOLFE:  Okay.  Please stop.
12      MR. BURROUGHS:  -- to opposing counsel
13  before you ask questions about it.  I
14  understand you will get there, but I would
15  like to see it before you ask questions about
16  it.
17      MR. WOLFE:  I understand you would like
18  to see it, but I am sorry.  I am going to
19  start with this and I will get to the others
20  next.
21      MR. BURROUGHS:  All right.  We reserve all
22  rights.
23      MR. WOLFE:  You can reserve whatever you
24  would like.
25      Can you help me find the notice clause?

Page 65

1   What did we do with it?
2       MR. BURROUGHS:  We have been going for
3   over an hour, so while you're looking for
4   that, can we take a five-minute break so I
5   can use the restroom?
6       MR. WOLFE:  Of course.
7       MR. BURROUGHS:  Thanks.
8       MR. WOLFE:  Debbi, let's go off the
9   record.  It's 12:15, we will come back at
10  12:20.
11      THE TECHNICIAN:  Off the record, 2:14 --
12  12:14.
13      (A recess was had in the proceedings
14  after which the following proceedings were
15  had:)
16      THE TECHNICIAN:  On the record, 12:23.
17  BY MR. WOLFE:
18      Q.   Mr. Campbell, I'm showing you paragraph
19  13(a) and (b) of the first contract that we marked
20  as Exhibit 3.  Do you see that?
21      MR. BURROUGHS:  Just for the record, this
22  is page 12 of the exhibit.
23      MR. WOLFE:  It's paragraph 13.
24      MR. BURROUGHS:  Right.  On page 12 of the
25  exhibit.  I believe there are multiple

Luther Campbell
November 01, 2022

Page 66

1  paragraph 13s throughout this exhibit. So I
2  just want to make clear that we are talking
3  about page 12 of the exhibit.
4       MR. WOLFE: I only see one paragraph 13.
5       MR. BURROUGHS: I believe if you scroll
6  to the bottom of this exhibit, there are
7  going to be other paragraph 13s. I am not
8  trying to be contentious. I am just stating
9  what page you are looking at, which is page 12.
10 BY MR. WOLFE:
11      Q.  Okay.  Mr. Campbell, do you see
12 paragraph 13(a) and (b)?
13      A.  Which -- which contract is this, is this
14 the first contract?
15      Q.  This is the contract between your
16 company and Chris Wong Won and you just admitted
17 that it's your signature and his signature on
18 this contract.
19      A.  Is this the actual -- is this 13 of 1
20 through 28, the first contract you just showed
21 me?
22      Q.  That is correct.
23      A.  Okay.
24      Q.  So I am asking you to take a look at
25 paragraph 13(a).

Page 67

1       A.  Yes.
2       Q.  Does this refresh your recollection that
3  a lawyer named Mark Levinson of Los Angeles was
4  the lawyer for Chris Wong Won with respect to this
5  contract?
6       A.  I don't recall who his lawyer was.
7       Q.  Now, would you take a look at
8  paragraph 13(b)?
9           Have you read it?
10      A.  Yes.
11      Q.  Does this refresh your recollection that
12 Allen Jacobi was the lawyer who represented your
13 company with respect to this contract?
14      A.  I don't recall who represented me in
15 this contract.
16      Q.  But you recall that you had a lawyer
17 representing your company with respect to this
18 contract?
19      A.  I -- I don't recall whether I used a
20 lawyer or not.
21      Q.  Now, I am going to go now down to
22 paragraph 20(a).
23      Okay.  Would you take a minute and read
24 paragraph 20(a)?
25      A.  Yes.

Page 68

1       Q.  Do you recall signing this agreement that
2  had this paragraph in it?
3       A.  Can you go back down to the bottom of
4  this -- this actual contract?
5       Q.  To the bottom of the signature page?
6       A.  To the signature page of this -- of this
7  one contract?
8       Q.  Yes.
9           MR. BURROUGHS: I'd like -- and I'd like
10 to see that as well, including any -- I see a
11 reference Schedule A, so I would like to see
12 the Schedule A as well.
13          MR. WOLFE: Well, I'll get there.
14          MR. BURROUGHS: Okay.
15 BY MR. WOLFE:
16      Q.  Do you see the bottom?
17      A.  Yes.
18      Q.  Which is page 28.  Now --
19      A.  Can you go down a little more?
20      Q.  A little more, yes.  That's the end.
21      A.  Okay.  That's the end.
22      Q.  Now, I' am going back to
23 paragraph 20(a).
24          MR. BURROUGHS: Are you saying that is
25 the end and there is no Schedule A?

Page 69

1           MR. WOLFE: No.  I will get there, but
2  please stop coaching the witness.
3           MR. BURROUGHS: Again, if you're going
4  to --
5           MR. WOLFE: Please stop -- no.  Stop
6  coaching the witness.
7           MR. BURROUGHS: If you are going to ask
8  questions about a Schedule A, I need to see
9  the Schedule A.
10          MR. WOLFE: All right.  We are done.  We
11 are done.  I am going to the Judge right now.
12 You cannot continue to interrupt my deposition.
13          MR. BURROUGHS: Go ahead.  You are not
14 within your rights to question a witness about
15 a Schedule A without at least showing me the
16 Schedule A in the exhibit.
17          MR. WOLFE: I don't have the Schedule A
18 because your client hid it.  Just like you
19 doctored documents.  Your client doctored
20 this one.  How many frauds do you want to
21 commit on the Court?
22          MR. BURROUGHS: You have been questioning
23 this witness on this document for a long time
24 now.
25          You still haven't shown me or him the

Luther Campbell
November 01, 2022

Page 70

1 entire document. I've just stated that for
2 the record. It's 86 pages. You have only
3 showed us 28. You are controlling the
4 document. So I am not seeing what you're
5 asking him about. So we continue to reserve
6 all rights.
7        MR. WOLFE: You can reserve all rights
8 that you would like, but please stop
9 interrupting my deposition.
10        MR. BURROUGHS: Well, you said -- are you
11 going to the Judge right now so we can address
12 this? I thought you said you were calling the
13 Judge. I would like to be on that call.
14        MR. WOLFE: No, I am going to continue on
15 with my deposition --
16        MR. BURROUGHS: If I can get a ruling that
17 if you are going to ask the witness questions
18 about an exhibit, that you are required to
19 first show the entire exhibit to the witness
20 and his attorney.
21        MR. WOLFE: Are you done?
22        MR. BURROUGHS: Well, you told me you are
23 calling the Court. Was that not true?
24        MR. WOLFE: I am not going to call the
25 Court.

Page 71

1        I am going to continue on with my
2 deposition and I would ask you once again to
3 stop interrupting my deposition.
4 BY MR. WOLFE:
5    Q.   Mr. Campbell, I am going to now show you
6 paragraph 20(a).
7        Do you see paragraph 20(a)?
8    A.   Yes.
9    Q.   Do you know if a Schedule A was ever
10 produced and made part of this document?
11    A.   Rephrase that.
12    Q.   Do you see that paragraph 20(a) refers
13 to a Schedule A?
14    A.   It refers to a Schedule A; correct.
15    Q.   I am asking you: Do you know if there
16 ever was a Schedule A that was made part of this
17 document?
18    A.   I don't recall.
19    Q.   You recall that following the bankruptcy
20 Court, the bankruptcy Judge ordered you to
21 deliver all contracts to Mr. Weinberger, do you
22 recall that?
23    A.   I don't recall.
24    Q.   Do you know if, in fact, you delivered
25 this contract to Mr. Weinberger pursuant to Judge

Page 72

1 Mark's order?
2    A.   I don't recall.
3    Q.   Do you recall delivering any documents
4 to Mr. Weinberger pursuant to Judge Mark's order?
5    A.   I don't recall.
6    Q.   Do you remember Judge Marks?
7    A.   Judge Mark? What is his whole name?
8    Q.   Robert Mark.
9    A.   I -- I don't recall who my bankruptcy
10 judge was.
11        If there are some documents showing that
12 he was the Judge, then if you show it to me, then
13 I will -- I can confirm that, based on whatever
14 the documents are. From the Court, if he was, in
15 fact, my Judge.
16    Q.   I am going to specifically ask you, do
17 you recall hiring Allen Jacobi to prepare this
18 document which included a Schedule A that
19 transferred all of the copyrights at issue in this
20 case to Luke Records?
21    A.   I don't recall.
22    Q.   If Allen Jacobi gave that testimony,
23 could you refute -- could you refute him or rebut
24 him?
25        MR. BURROUGHS: Objection, vague.

Page 73

1        Objection, would violate the attorney-client
2 privilege.
3        But go ahead if you understand the
4 question.
5        THE WITNESS: I don't understand that
6 question, but I sued Allen Jacobi for
7 malpractice. And I don't even recall what I
8 sued him for malpractice for. So I am pretty
9 sure it probably was down the lines of
10 whatever malpractice he committed.
11 BY MR. WOLFE:
12    Q.   And whatever happened in that case?
13    A.   I don't recall.
14    Q.   Did he make any payment to you?
15    A.   I don't recall.
16        MR. BURROUGHS: Can you show me at least
17 the rest of this page, Mr. Wolfe?
18        MR. WOLFE: Happy to accommodate you.
19        MR. BURROUGHS: Slowly.
20        MR. WOLFE: Okay.
21        MR. BURROUGHS: Can we go down to the rest
22 of paragraph 20? Slowly. Can you go up. I
23 missed that subparagraph 2.
24        MR. WOLFE: Continue down?
25        MR. BURROUGHS: Give me a moment. Yep.

Luther Campbell
November 01, 2022

Page 74

```
 1        Continue down, please.
 2           MR. WOLFE:  Okay?
 3           MR. BURROUGHS:  Give me one moment.  Okay.
 4    Go back up.
 5           MR. WOLFE:  Where?  Where do you want me
 6    to go to?
 7           MR. BURROUGHS:  Hold, please.  Okay.
 8    Thank you.  Continue the questioning.
 9    BY MR. WOLFE:
10       Q.  Do you recall hiring Allen Jacobi to
11    prepare a contract between your company and the
12    members of 2 Live Crew which defined them as
13    artist for hire?
14       A.  Work for hire?  No.  I would never --
15    don't have a contract with them for work for hire.
16    I don't recall -- I don't recall what I hired
17    Allen Jacobi to do.  And I never -- I never did a
18    work for hire with them.  I just -- I never did
19    that.
20       Q.  And isn't it true that you wrote a book
21    called Book of Luke in which you praised Allen
22    Jacobi as an entertainment lawyer?
23       A.  I don't recall what is in the book,
24    there was a co-writer of the book, and you would
25    have to look that up in the book.
```

Page 75

```
 1           MR. BURROUGHS:  Praised him?
 2           THE WITNESS:  I sued him for malpractice.
 3    BY MR. WOLFE:
 4       Q.  Okay.  Now, let's go down to paragraph 27
 5    of this same contract.  I am going to show you
 6    the first half of paragraph 27 on page 24.
 7           Do you recall Allen Jacobi putting this
 8    in a contract between your company and Chris Wong
 9    Won?
10       A.  I don't recall what contracts Allen
11    Jacobi worked on on my behalf for my -- in any of
12    my companies.
13       Q.  So I have now shown you a contract
14    between Christopher Wong Won, I will go to the
15    top, and your company, Luke Records.  You have
16    admitted to me that it's your signature and his
17    signature, so I'm going to ask you directly.  Is
18    this a contract that exists between Luke Records
19    and Christopher Wong Won?
20       A.  Is this a contract that exists between
21    Luke Records and -- I -- I don't recall this being
22    a contract between me and him.
23           I know Chris Wong Won did a solo album
24    with Luke Records, and I don't know whether it's
25    this specific contract for that particular solo
```

Page 76

```
 1    album.
 2       Q.  Do you know if there's a similar
 3    contract between your company, Luke Records, and
 4    the other members of 2 Live Crew, Mark Ross and
 5    David Hobbs?
 6       A.  A similar contract?  I don't recall.  I
 7    would have to see if that is, in fact, a similar
 8    contract.  I also wanted to do solo albums.
 9       Q.  Still in that same exhibit, 3, and I am
10    going to go to page 29.
11           Okay.
12           Do you see page 29 is another contract?
13       A.  Yes.
14       Q.  And do you see that that is a contract
15    between -- that's dated blank day of April, 1991,
16    between Luke Records and Mark Ross and David
17    Hobbs?
18       A.  Yes.
19       Q.  Now, I'm going to go to the signature
20    page and then we'll work our way back.
21           Okay.  I am showing you what is page 56
22    of that exhibit, which is page 28 of that
23    contract, and I am asking you, is that your
24    signature?
25       A.  Yes.
```

Page 77

```
 1       Q.  And is that David Hobbs and Mark Ross'
 2    signature?
 3       A.  I -- I don't know, but -- I don't know
 4    if that's their signatures or not.
 5       Q.  Now, do you recall that your company
 6    entered into a contract with David Hobbs and Mark
 7    Ross?
 8       A.  At what period of time?
 9       Q.  In -- I'll go to the top.  April of 1991.
10       A.  In April of 1991, I don't recall.
11       Q.  And do you --
12       A.  I would have to see the entire document.
13       Q.  Well, I am happy to send it to you; would
14    you like to see it?
15       A.  If it's the entire document, yes, every
16    page should be -- have an initial on each one of
17    the pages.
18       Q.  Okay.
19       A.  Do every page have their initial on it?
20           MR. WOLFE:  I am happy to send you the
21    whole document.  Counsel, do you want me --
22           MR. BURROUGHS:  Can we just scroll
23    through and review?  If it is only 18 pages,
24    that should not take all that long.
25           MR. WOLFE:  It is 28 pages and I am happy
```

Luther Campbell
November 01, 2022

Page 78

1  to satisfy the witness and send him or you
2  the entire exhibit.
3       THE WITNESS:  The only thing I am
4  interested in if every page has an initial on
5  each page.
6  BY MR. WOLFE:
7    Q.   I can state for the record that the only
8  initials I see are on page 11.  Do you see
9  paragraph 11 on page 11?
10   A.   Yes.
11   Q.   Are those your initials?
12   A.   That's -- LC is my initial.
13   Q.   And do you recall initialing the change
14  in paragraph 11?
15   A.   Yes, I would have an issue that -- yes.
16       But I don't see the other member's
17  initial on here, so therefore, it appears to be
18  not a document in which it is a -- it is an
19  agreed upon document.
20   Q.   You don't see David Hobbs' initials?
21   A.   I see one -- I see one member initialing
22  that, I don't see the other one.
23   Q.   And do you see that what was changed is
24  the manner in which you were going to account to
25  the members, changing it from quarterly to

Page 79

1  semiannually?
2    A.   Correct.  But I do not see the other
3  members initial in this document.  So this
4  document can be a contract in which it was voided
5  because the members did not agree.  All of the
6  members initials should have been on this
7  particular document.  If they agreed on the
8  different language.  Not one person can agree for
9  other people.
10   Q.   Well, I'm going to go back to this
11  document that we previously marked as Exhibit 9,
12  the 1987 agreement, and I would like to show you
13  that.
14       So you can confirm that, in fact -- do
15  you recall this agreement that you testified to
16  earlier?
17   A.   Yes.
18   Q.   Is it your testimony that if there's no
19  initials on every page, it's not a valid contract?
20   A.   That's not my testimony.
21   Q.   So, why would there need to be initials
22  on Exhibit 3, but not on Exhibit 9?
23   A.   Because there were changes in the last
24  -- there were changes in the contract that you
25  just showed me.

Page 80

1       The second contract.  There were changes,
2  and the changes had initials of me and the other
3  members attached to those changes, and so if you
4  -- it wouldn't be, in my opinion, it would not be
5  a valid contract and I would not have -- it would
6  not have been agreed on, if all parties would not
7  initialed those changes.  There's only one person
8  initialed that, which was David Hobbs.
9    Q.   So looking at the contract with Mr. Hobbs
10  and Mr. Ross, does this refresh your recollection
11  that in April of 1991 your company entered into a
12  contract with them and that this is the contract?
13   A.   I don't recall.  If there's -- this
14  particular document that you showed me had changes
15  to the contract, and there were initials in the
16  changes and it's only my initial and Mr. Hobbs'
17  initial in this particular contract here.  You
18  have three -- two other members, and the other
19  member's initial is not on there agreeing to the
20  changes.
21       So this would not be a valid contract,
22  in my opinion, because the other member did not
23  initial the change of that particular line in the
24  contract.
25   Q.   So what memory of anything do you have

Page 81

1  regarding this April 1991 contract between Luke
2  Records and Mark Ross and David Hobbs?
3    A.   I don't recall.
4    Q.   So is it fair to say you don't know if
5  Allen Jacobi prepared it?
6    A.   I don't recall.
7    Q.   Is it fair to say that you don't know
8  where it was signed?
9    A.   I don't recall.
10   Q.   Now, I'm going to show you again, in this
11  contract, the -- paragraph 7(b), do you see that?
12       I am first going to show you 7(a).
13       Have you had a chance to refresh your
14  recollection as to what paragraph 7(a) says?
15   A.   Yes.
16   Q.   Does it refresh your recollection that
17  you entered into an agreement with David Hobbs
18  and Mark Ross to pay in advance of $250,000?
19   A.   I don't recall.  Based on this document,
20  this document in my opinion is not valid because
21  this particular document has changes in it, and
22  those changes are different paragraphs, there
23  were signatures -- not signatures but initials by
24  me and David Hobbs and not Mr. Ross.  So I would
25  probably say that this is not a valid contract.

Luther Campbell
November 01, 2022

Page 82

1 And then even after those signatures, those --
2 those initials, those initials that me and
3 David Hobbs added on, that language should have
4 been changed and there should have been a brand
5 new contract created based on the language change,
6 based on the -- the initials in which we initialed
7 those language changes.
8        I'm pretty sure if these beautiful
9 lawyers of Mr. Mark Levinson and Mr. Jacobi, if,
10 in fact, they were the lawyers at the time, they
11 would have created a brand new document with those
12 changes in there.
13        So I don't recognize this as a -- as a
14 valid contract between me and David Hobbs and
15 Mark Ross.
16    Q.   This contract mandates that David Hobbs
17 and Mark Ross are artists for hire, doesn't it?
18        MR. BURROUGHS:  Objection.  Vague.  Calls
19    for a legal conclusion.  Misstates the
20    evidence.  Go ahead.
21 BY MR. WOLFE:
22    Q.   You can answer the question.
23    A.   I don't know what this contract -- this
24 is not a contract that's between me and Mark Ross
25 and David Hobbs in which is it approved by me and

Page 83

1 Mark Ross and David Hobbs.
2    Q.   But it's got your signature and it's got
3 their signature on it, doesn't it?
4    A.   It has my signature on it and it has
5 changes with my initials on it and David Hobbs
6 initials and not Mark Ross initials.
7    Q.   Isn't it true -- I'm sorry, finish your
8 answer.
9    A.   No, go ahead.
10    Q.   Isn't it true that in 1991, you made
11 specific deals with each of the three members of
12 2 Live Crew with respect to their solo albums?
13    A.   I don't recall.
14    Q.   Let me go back and show you the first
15 contract with Mr. Wong Won and show you
16 paragraph 33.  Do you see paragraph 33?
17    A.   Yes.
18    Q.   Do you recall entering into an agreement
19 with Mr. Wong Won with respect to release and
20 distribution of an album on artists selected by
21 him?
22    A.   Is this particular, paragraph 33, what
23 contract is this?
24    Q.   I'll show you at the top.  It's the one
25 with -- get up to the top.  It's the one with

Page 84

1 Mr. Wong Won.
2        Do you see that?
3    A.   Yes, is this a point of the 28-page
4 contract?
5    Q.   Yes.
6    A.   With Mr. Wong Won?  Okay.
7    Q.   Okay.  So what I'm asking --
8    A.   It would have been a lot easier if you
9 all would have separated them, but, you know, I
10 would not be thinking as hard.
11    Q.   Okay.  I am only asking you:  Do you
12 recall entering into this contract that has this
13 specific paragraph 33, which calls for
14 distribution of an artist signed by Chris Wong Won
15 that your record company, Luke Records, is going
16 to release?
17    A.   An artist signed by Chris Wong Won.
18        Go back to the paragraph.
19    Q.   I'm happy to do so.  I'm showing you
20 paragraph 33.  Would you like to take a minute to
21 read it?
22    A.   Yes, please.
23    Q.   Okay.
24    Q.   Okay.
25    Q.   So now does it refresh your recollection

Page 85

1 that Luke Records entered into an agreement with
2 Mr. Wong Won to release an album of an artist
3 selected and signed by Mr. Wong Won?
4    A.   I don't recall.
5    Q.   Now, I am going to show you the next
6 contract that you entered into with Mr. Hobbs and
7 Ross and show you paragraph 33.
8        Do you see what it says?
9        It says intentionally deleted.  Do you
10 see that?
11    A.   I am reading paragraph 33.
12        What's the question?
13    Q.   Does it refresh your recollection that
14 you entered into a different deal with Mr. Wong
15 Won to release an album of an artist signed by
16 him which was paragraph 33 in the first contract,
17 that you do not have in the contract with Hobbs
18 and Ross?
19    A.   Rephrase that question.
20    Q.   Does it refresh your recollection that
21 you have a different clause in the contract with
22 Mr. Wong Won that does not exist in the contract
23 with Hobbs and Ross?
24    A.   If there's a -- there are different
25 things added in the different contracts with

Page 86

1  different artists.  If there was -- if that is,
2  in, fact, the contract that me and Mr. Wong Won
3  signed of the 28-page contract in which you
4  provided, with me -- with me, him and Ross
5  supposed to provide artists to be distributed by
6  me, and then now there's a separate contract with
7  me and Ross and Hobbs, that would be a totally
8  different deal.  That's why there are different
9  contracts.
10      So Mr. Ross explained it, Mr. Ross and
11  Mr. Wong Won, based on the first 28-page contract
12  with Mr. Wong Won, in the contract stated that
13  him and Mr. Ross would be going out and getting
14  artists and we would be distributing those
15  artists, paying those percentages.
16      Now, if this contract says me and  Mr.
17  Hobbs -- Mr. Hobbs and Mr. Ross, whatever it is,
18  I need to read the top of that, whatever this is,
19  would be actually totally different than the deal
20  that I had with Mr. Wong Won.  Giving all these
21  guys opportunities to be able to produce their
22  own artists and we would distribute it.
23   Q.   What I'm trying to reconcile is, your
24  earlier testimony where you said the only
25  contract with the members of 2 Live Crew was the

Page 87

1  document that we first showed you, that we marked
2  as Exhibit 9, when, in fact, I have now shown you
3  two additional contracts, one with Wong Won and
4  one with Hobbs and Ross and I am trying to
5  reconcile your testimony.
6      MR. BURROUGHS:  Objection.  Vague.
7   Misstates the testimony.  But go ahead, if
8   you understand the question.
9      THE WITNESS:  I understand the question.
10   Yes, you are misstating my testimony.
11   You asked me earlier about the contract in
12   which I entered into a contract with the
13   2 Live Crew, which means, in my opinion, means
14   all of the members of the group.  All early
15   on.
16      And now you are asking me about specific
17   contracts in which I entered into contractual
18   agreements with them as solo artists, as
19   record companies, as them going and finding
20   artists to distribute.
21      So if -- hopefully that clears up what
22   you are trying to -- what you are trying to
23   say, but you asked me a specific question did
24   I enter into a contract with the 2 Live Crew
25   early on.

Page 88

1      You did not say what did you not enter
2   into specific and solo and contracts with
3   individuals of the group.  These are not group
4   contracts.  These are separate contracts in
5   which they were going out and being
6   entrepreneurs.
7  BY MR. WOLFE:
8   Q.   So is it your testimony that the two
9  contracts I just showed you, does not cover their
10  services as members of 2 Live Crew?
11   A.   Based on -- if these contracts are the
12  actual contracts, this would not be contracts for
13  services as 2 Live Crew, no.
14   Q.   Let me show you the top of -- first I'm
15  going to show you the one --
16   A.   The first contract.
17   Q.   -- with David Hobbs.
18   A.   Go ahead.
19   Q.   Do you see what it says?  This is a
20  contract between Luke Records, Inc. and Mark Ross
21  and David Hobbs as performers in the group known
22  as 2 Live Crew.
23      So do you want to change your testimony
24  now?
25   A.   I don't -- I don't recall this document.

Page 89

1   Q.   And let me go back and show you the
2  first line of the contract with Mr. Wong Won.
3      MR. BURROUGHS:  And I will just while you
4   are doing that, object for the record that
5   the questions have been vague and I believe
6   there is going to be a bit of inconsistency
7   in the record because we are talking about
8   multiple contracts that have been compiled for
9   this one exhibit, referred to as sometimes as
10   contract, sometimes as contracts, and I'm a
11   bit confused as to what is being asked about
12   at times.
13      I believe that is going to be reflected
14   in the transcript.
15  BY MR. WOLFE:
16   Q.   Mr. Campbell, this is our last question
17   before we break.  I'm sorry, I'm going to have two
18   more questions.
19      MR. WOLFE:  Debbi, can I have five minutes
20   before we have to switch over?
21      THE REPORTER:  Yes.
22      MR. WOLFE:  Okay.
23  BY MR. WOLFE:
24   Q.   All right.  Mr. Campbell, I am now
25   showing you the first page of the contract with

Luther Campbell
November 01, 2022

Page 90

1   Mr. Wong Won, and do you see where it says that
2   the contract is between Luke Records and Chris
3   Wong Won as performer in the group known as 2 Live
4   Crew?
5      A.   Yes, I see that.
6      Q.   Now, I'm going to show you -- I am going
7   to ask you a question before I get there.  Did
8   you sign a contract with Luke Records as a member
9   of 2 Live Crew?
10     A.   I don't recall.  Can you go back to the
11  first contract you showed me earlier this
12  morning, in which all of us, it appeared to be
13  that all of us signed the contract?
14          MR. BURROUGHS:  I believe that was
15  Exhibit 9.
16  BY MR. WOLFE:
17     Q.   I can go back to Exhibit 9.
18          I am now showing you what we previously
19  marked as Exhibit 9.
20          MR. BURROUGHS:  Can we see the signature
21  page?
22          MR. WOLFE:  Of course.
23          THE WITNESS:  That right there shows that
24  I signed as an artist of the 2 Live Crew.
25  BY MR. WOLFE:

Page 91

1      Q.   Is this the only contract in which you
2   signed as an artist as a member of 2 Live Crew?
3      A.   I don't recall.
4      Q.   So now I'm going to go back to the last
5   contract in what we marked as Exhibit 2, which
6   for the contract starts at page 58, and do you see
7   that this is a contract dated February, 1991, by
8   and between Luke Records, Inc. and Mark Ross,
9   Chris Wong Won, David Hobbs and Luther Campbell,
10  PKA, the 2 Live Crew?
11     A.   Which document is this and what --
12     Q.   The one that -- the one that I am now
13  showing you that is on your screen.
14     A.   Which -- where --
15     Q.   Which for the record is page 58 of
16  page 86 of Exhibit 2, the third contract in that
17  set.
18     A.   Where is the other pages from 28 to 58?
19     Q.   Right up above.  You see?  I just went
20  down.
21     A.   Okay.  This page started at 28.  Go up,
22  go up, go up, go up.  Up, up, up.  You'll see 28,
23  28 and then you jumped to 58.
24     Q.   No.  You --
25     A.   Is there any other documents in between

Page 92

1   that?
2      Q.   No.  You will see that that is page 28,
3   which if you go up here it's page 56 of 85 of the
4   exhibit.  I am now going to the very next page.
5      A.   That starts off completely different
6   document.
7      Q.   Exactly.
8      A.   Page 86, correct?
9      Q.   Exactly.  I am asking if you recognize
10  this completely different contract as the third
11  contract between your company and the members of
12  2 Live Crew?
13     A.   I don't recognize -- I don't recall.
14          Because I am not looking at the complete
15  document, you are showing me only the top part of
16  a contract.
17     Q.   That's not my question.  My question is:
18  Do you recall entering into a third contract with
19  the other members of 2 Live Crew?
20     A.   I don't recall.
21     Q.   And do you recall that in all three of
22  these contracts, you designate the members of
23  2 Live Crew as artists for hire?
24     A.   Don't -- never, I never, never, never
25  did a contract with them, work for hires.

Page 93

1          (A discussion was had off the record
2   after which the following proceedings were had:)
3          MR. WOLFE:  Let's reconvene at 1:30.
4          THE TECHNICIAN:  Going off.
5          (Reading and signing were not waived for
6   a.m. session.)
7          (The above proceedings were continued at
8   1:02 P.M.)
9
10          ----------
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Luther Campbell
November 01, 2022

Page 94

```
 1
 2
 3                WITNESS NOTIFICATION LETTER
 4   November 9, 2022
 5   LUTHER CAMPBELL
     c/o SCOTT ALAN BURROUGHS, ESQ.
 6   Doniger / Burroughs Building
     603 Rose Avenue,
 7   Venice, California 902
 8
     In Re: LIL' JOE RECORDS, INC., a
 9   Florida corporation
     Deposition taken on November 1, 2022
10   Job No.  6258153
11
     The transcript of the above-referenced
12   proceeding has been prepared and is being
     provided to your office for review by the
13   witness.
14
     If you have not waived signature we
15   respectfully request that the witness
     complete their review within a reasonable
16   amount of time and return the errata sheet to
     our office.
17
18   Sincerely,
19
20
21
     Debra Stark, Court Reporter,
22   Notary Public
23
24
25
```

Page 95

```
 1               ERRATA SHEET
                 DO NOT WRITE ON THE TRANSCRIPT
 2               ENTER CHANGES ON THIS PAGE
                 IN RE: LIL' JOE RECORDS, INC., a
 3               Florida corporation
                 LUTHER CAMPBELL
 4
 5
 6
     Page |Line |Change          |Reason
 7
 8
 9   _____
10   _____
11   _____
12   _____
13   _____
14   _____
15
16
17          Under penalties of perjury, I
     declare that I have read the foregoing
18   document and that the facts stated in it are
     true.
19
20
21
22   _____
     LUTHER CAMPBELL
23
24
25
```

Page 96

```
 1               CERTIFICATE OF OATH
 2
 3   STATE OF FLORIDA:
 4   COUNTY OF BROWARD:
 5
 6         I, DEBRA L. STARK, Court Reporter and
 7   Notary Public, in and for the State of Florida
 8   at Large, do hereby certify that LUTHER CAMPBELL
 9   remotely appeared before me by audio and
10   visual means on November 1, 2022, and was duly
11   sworn.
12         Signed and sealed heretofore on this
13   day of November 9, 2022.
14
15
16
17
18
19   ------------------------------
20   DEBRA L. STARK, Court Reporter
         and Notary Public, State of
         Florida at Large
21
22
23   MY COMMISSION EXPIRES:
     March 28, 2025
24
25
```

Page 97

```
 1             C E R T I F I C A T E
 2   STATE OF FLORIDA:
 3   COUNTY OF BROWARD:
 4         I, DEBRA L. STARK, certify that I was
 5   authorized to and did stenographically remotely
 6   report by audio and visual means the deposition of
 7   LUTHER CAMPBELL; duly sworn by me;
 8   pages 1 to and including 97; and that the
 9   transcript is a true record of my stenographic
10   notes.
11         I further certify that I not a relative,
12   employee, attorney, or counsel of any of the
13   parties, nor am I a relative or employee of any of
14   the parties' attorneys or counsel connected with
15   the action, nor am I financially interested in the
16   action.
17         Signed and sealed on this date of
18   November 9, 2022.
19
20
21   ------------------------------
22   DEBRA L. STARK, Court Reporter
         and NOTARY PUBLIC, State of Florida
         at Large
23
24   MY COMMISSION EXPIRES:
     MARCH 28, 2025
25
```