# EXHIBIT C

Mark Ross
November 04, 2022

```
            UNITED STATES DISTRICT COURT
            SOUTHERN DISTRICT OF FLORIDA
             CASE NO. 1:21-CV-23727-DPG
```

LIL' JOE RECORDS, INC., a
Florida corporation,

             Plaintiffs,

V.

MARK ROSS, CHRISTOPHER WONG
WON, JR., RODERICK WONG WON,
LETERIUS RAY, ANISSA WONG WON
And LUTHER CAMPBELL,

             Defendants.
_____/


              VIDEOTAPED DEPOSITION OF
                      MARK ROSS
                 Pages 1 through 55


              Friday, November 4, 2022
                     3:13 P.M.
       VIA VIDEOCONFERENCE BY ALL PARTIES
                     VIA ZOOM


         U.S. Legal Support | www.uslegalsupport.com

          Stenographically Reported By:
                 Debra L. Stark,
           Notary Public State of Florida

## Page 2

```
 1   APPEARANCES:
 2   ON BEHALF OF THE PLAINTIFF: LIL' JOE
     RECORDS, INC., a Florida corporation
 3
 4      WOLFE LAW MIAMI, P.A.
        175 Southwest 7th Street
 5      Penthouse 2410
        Miami Fl  33130
 6      (305) 384-7370
        Rwolfe@wolfelawmiami.com
 7      BY: RICHARD C. WOLFE, ESQ.
 8
 9   ON BEHALF OF THE DEFENDANTS: MARK ROSS,
     CHRISTOPHER WONG WON, JR., RODERICK WONG
10   WON, LETERIUS RAY, ANISSA WONG WON
     And LUTHER CAMPBELL
11
12      DONIGER/BURROUGHS Building
        603 Rose Avenue,
13      Venice, California 90201
        (310) 590-1820
14      Scott@donigerlawfirm.com
        BY: SCOTT ALAN BURROUGHS, ESQ.
15
16
17
18
19
20
21
22
23
24
25
```

## Page 3

```
 1
 2              INDEX OF PROCEEDINGS
 3   WITNESS: MARK ROSS                       Page
 4   DIRECT EXAMINATION BY MR. WOLFE             6
 5   CROSS EXAMINATION BY MR. BURROUGHS         37
 6   REDIRECT EXAMINATION BY MR. WOLFE          46
 7   WITNESS NOTIFICATION LETTER                52
 8   ERRATA SHEET                               53
 9   CERTIFICATE OF OATH                        54
10   C E R T I F I C A T E                      55
11
12
13              E X H I B I T S
14   Exhibit No.                              Page
15
16   Plaintiff's Exhibit No. 23, contract       22
17   Exhibit No. 24, US Copyright Office        23
18   Exhibit No. 25, Lil' Joe's records         26
19   letter to Ross, January 12, 2018
20   Exhibit No. 26, flyer Sexy Ass Saturdays   27
21   Exhibit No. 27, contract                   36
22
23   Reporter's Note:  Exhibits retained by attorney)
24
25
```

## Page 4

```
 1               (Thereupon the following proceedings were
 2   had:)
 3        THE TECHNICIAN:  We are now on the record.
 4   Participants should be aware that this
 5   proceeding is being recorded and as such all
 6   conversations held will be recorded unless
 7   there is a request and agreement to go off the
 8   record.
 9        Private conversations and/or
10   attorney/client interactions should be held
11   outside the presence of the remote interface.
12        For the purpose of creating a witness
13   only video reporting, the witness is being
14   spotlighted or locked on all video screens
15   while on speaker view.  We ask that the
16   deponent not remove the spotlight setting
17   because it may cause other participants to
18   appear in the final video rather than just
19   the witness.  For anyone who does not want
20   the witness's video to take up a large part
21   of your screen, you may switch to gallery
22   view.
23        This is the remote video recorded
24   deposition of Mark Ross being taken by counsel
25   for the plaintiff.
```

## Page 5

```
 1        Today is Friday, November 4th, 2022.  The
 2   time is now 7:13 P.M. U.T.C.  Time is now
 3   3:13 P.M. Eastern Time.
 4        We are here in the matter of Lil Joe's
 5   Records V. Mark Ross, et al.  My name is
 6   Michael Hollander, remote technician.  I am
 7   not financially interested in the outcome.
 8   The court reporter is Debbi Stark on behalf
 9   of US Legal Support.  At this time will counsel
10   please state their appearance for the record
11   after which the court reporter will swear in
12   the witness.
13        MR WOLFE: Richard Wolfe for the plaintiff.
14        MR. BURROUGHS:  Scott Burroughs for the
15   defendants.
16        COURT REPORTER:  Raise your right hand,
17   please.
18        Do you solemnly swear or affirm the
19   testimony you are about to give will be the
20   truth, and nothing but the truth.
21        THE WITNESS:  Yes, I do.
22   THEREUPON:
23                MARK ROSS
24   was called as a witness, having been first duly
25   sworn to testify, testified as follows:
```

Mark Ross
November 04, 2022

Page 6

1      DIRECT EXAMINATION
2  BY MR. WOLFE:
3      Q.   Hi, Mark.  Remember me, I'm Richard Wolfe.
4           Nice to see you.
5      A.   Nice to see you too, Richard.
6      Q.   Would you state your name for the record?
7      A.   My name is Mark Ross.
8      Q.   And you understand why we are here today?
9      A.   Yes, I do.
10     Q.   You understand the rules of depositions?
11     A.   Yes, I do.
12     Q.   So I am just going to briefly say I am
13  going to ask you a series of questions.  I need
14  you to answer audibly, and if you answer the
15  question, I will assume you understood the
16  question, but if you need me to rephrase it, I'm
17  happy to do so.
18          Okay?
19     A.   Okay.
20     Q.   What I'd like to do is first discuss
21  with you the contracts that you signed with Luke
22  records.  Okay?  You were a member of 2 Live Crew;
23  correct?
24     A.   Correct.
25     Q.   When did you start with 2 Live Crew?

Page 7

1      A.   I started with 2 Live Crew in '95.
2      Q.   And what was the first record that you
3  put out?
4      A.   The first record I put out with 2 Live
5  Crew was 2 Live Is What We Are.
6      Q.   And at the time -- when was that put out?
7      A.   2 Live Is What We Are was put out in, I
8  believe, '86.
9      Q.   And at that time was there a contract
10  between you and the other members of 2 Live Crew
11  on one hand and Luther Campbell or Luke records on
12  the other?
13         MR. BURROUGHS:  Go ahead.
14         THE WITNESS:  We had a verbal contract.
15  BY MR. WOLFE:
16     Q.   When did you reach the verbal contract?
17     A.   When we made that record.
18     Q.   And what were the terms of the verbal
19  contract?
20     A.   The verbal contract was we were going to
21  make the records and we were going to give it to
22  Luke to put it out, make the record, put it out,
23  get some money
24     Q.   Do you remember any other terms of the
25  oral agreement?

Page 8

1      A.   No, I can't recall.
2      Q.   Do you recall if that oral agreement
3  discussed or involved who would own the
4  copyrights?
5      A.   I don't recall.
6      Q.   Do you remember anything else about the
7  verbal agreement?
8      A.   Yes, what I just stated.  The verbal
9  agreement was that we were going to put the record
10  out and give the record to Luke and he was going
11  to put the record out and we were going to get
12  paid from him.
13     Q.   How much were you were going to get paid
14  from the record?
15     A.   I can't recall.
16     Q.   And was there any money exchanged at the
17  time you reached the verbal agreement?
18     A.   No.
19     Q.   So the first record came out as
20  2 Live Crew Is What We Are, in '86.
21          What was the second record?
22     A.   The second record was Moved Somethin'.
23     Q.   And when Moved somethin' came out, when
24  was that?
25     A.   I think that was, I believe in '85, I

Page 9

1  believe, Moved Somethin' came out in '87.
2      Q.   When that record came out, did you have
3  a written agreement you or any members of
4  2 Live Crew and Luke Records?
5      A.   No, no, we didn't.
6      Q.   What was the third record, the third
7  album that you retired as a member of
8  2 Live Crew?
9      A.   Nasty As You Want To Be.
10     Q.   And when was that recorded and released?
11     A.   I think that was in, if I recall
12  correctly '86, '87 received probably, like early
13  '87 I believe.
14     Q.   And at that time did you have a written
15  agreement between the other members of
16  2 Live Crew and Luke Records?
17     A.   I think by that time, yes, there was a
18  written agreement that came up.
19     Q.   And was it signed when the third record
20  was recorded and released?
21         MR. BURROUGHS:  Objection.  Vague.  Go
22  ahead.
23         THE WITNESS:  I can't recall.
24  BY MR. WOLFE:
25     Q.   So let's try to go back and try to get

Page 10

1 the timeline.
2     The third record was --
3 A. Nasty As They Want to Be.
4 Q. Nasty as they want to be?
5 A. Yes.
6 Q. And I believe you said that was recorded
7 when?
8 A. I think it was recorded in '86, '87, I
9 believe.
10 Q. Do you know if it was '86 or '87?
11 A. I can't recall.
12 Q. If I tell you I have seen it was recorded
13 in '88, would that refresh your recollection?
14 A. Yes, somewhere around that. I can't
15 recall.
16 Q. Again, I'm trying to focus in on the
17 written contract between the members of
18 2 Live Crew with Luke Records and whether or not
19 that was signed before or after as Nasty As They
20 Want To Be was recorded and released?
21 A. I think it was after.
22 Q. What was after, the contract or the
23 release?
24 A. The contract.
25 Q. So just so we're clear, the three albums

Page 11

1 were all recorded and released before there was
2 any written agreement; correct?
3 A. Correct.
4 Q. So what was the first written agreement
5 that was signed between you or any of the other
6 members of 2 Live Crew and Luke Records?
7 A. I can't recall.
8 Q. I'm going to show you a contract so I'm
9 going to screen share.
10 Q. Can you see the contract on your screen?
11 A. Yes, I can.
12     (The above-referred to document was
13 previously marked as Exhibit No. 2 for
14 identification.)
15 BY MR. WOLFE:
16 Q. So I'm showing you a document we
17 previously marked as part of Exhibit 2. For the
18 record, it is a contract dated the blank day of
19 April, 1991, by and between Luke Records on one
20 hand and Mark Ross and David Hobbs on the other.
21     Do you see that?
22 A. Yes, I see it. I see something there on
23 your screen, yes, I do.
24 Q. Let me go down to the signature page.
25     I'm showing you page 28 of that contract.

Page 12

1 A. Yes, I see it.
2 Q. That's your signature and David Hobbs'
3 signature as well?
4 A. Yes, it is.
5 Q. And Luther Campbell's signature?
6 A. Yes, it is.
7 Q. Do you recall signing this contract?
8 A. Yes, I do.
9 Q. And I believe the contract is dated in
10 April of 1991?
11 A. Okay.
12 Q. Do you have any reason to believe that's
13 not the date approximately when you signed this
14 contract?
15     MR. BURROUGHS: Can we go off so we can
16     look at it. You're scrolling.
17     MR WOLFE: I'm going up.
18     I'm now showing you page 1, which shows
19     that it's entered into as of this blank day of
20     April, 1991.
21 BY MR. WOLFE:
22 Q. And my question for you is, do you have
23 any reason to believe that is not the approximate
24 date when you and David signed this contract with
25 Luke Records?

Page 13

1 A. Well, apparently if it's right here on the
2 contract, I guess so.
3 Q. Now, do you know if this is the first
4 contract that you signed with Luke Records?
5 A. I can't recall.
6 Q. So you don't know, as we sit here today,
7 if there is an earlier agreement between you and
8 Luke Records; correct?
9 A. I can't recall.
10 Q. Now, I want to go down a little bit and
11 show you paragraph 7(a). Do you see that it calls
12 for an advance of $250,000?
13 A. 7(a). Yes, I see that. Yes, I do.
14 Q. Does that refresh your recollection that
15 that was the agreement between you and David on
16 one hand and Luke Records on the other?
17 A. I can't recall.
18 Q. And do you know if, in fact, Luke Records
19 paid you guys an advance of $250,000?
20 A. I can't recall.
21 Q. Do you recall in 1992 you and David Hobbs
22 sued Luke Records for breach of this contract?
23     MR. BURROUGHS: Let me object. It calls
24     for legal conclusions. Go ahead.
25     THE WITNESS: Yes, yes, there was some

Page 14

1  kind of a discrepancy.  Yes, I remember.
2  BY MR. WOLFE:
3     Q.   And in fact, I represented you and David
4  against Luke Records for breach of this contract;
5  correct?
6     A.   Yes.  You represented me and David, so,
7  yes, yes, you did that.
8     Q.   And there was a settlement between Luke
9  Records on one hand and you and David on the
10 other?
11    A.   Yes, it was a settlement, I believe.
12    Q.   And is this the contract by which you
13 and David transferred to Luke Records the first
14 three albums?
15         MR. BURROUGHS:  Object to fom.
16         MR WOLFE:  For 2 Live Crew?
17         MR. BURROUGHS:  Objection.  Go ahead.
18         THE WITNESS:  I can't recall, and I don't
19    remember transferring anything.
20 BY MR. WOLFE:
21    Q.   You don't recall entering into an
22 agreement giving to Luke Records ownership of the
23 copyrights of the first three 2 Live Crew records?
24    A.   Yes, we made the records.  We gave them
25 to Luke to put out, so that we could get some

Page 15

1  money.
2     Q.   And what I'm asking you is, when you say
3  you gave them to Luke Records, does that mean you
4  transferred the copyrights to Luke Records?
5          MR. BURROUGHS:  Objection.  Vague.
6     Misstates the testimony.  Go ahead.
7          MR WOLFE:  These are improper objections.
8     I sent you an excerpt out of the Discovery
9     Guide in the Southern District, and I know
10    you're not a member of the Southern District,
11    but you need to read that, and the only thing
12    you are supposed to say is "Object to the
13    form."
14         MR. BURROUGHS:  I just want to state for
15    the record that there is a party to the case,
16    an individual named, Luke, and there's a
17    record label named Luke.
18         MR WOLFE:  There is no such thing as
19    speaking objections.  You have to stop.
20         MR. BURROUGHS:  I believe we are going to
21    have an unfair transcript, and I want to make
22    sure that when you are asking the questions
23    that we know what you are referring to.
24 BY MR. WOLFE:
25    Q.   Mr. Ross, is this the contract, this one

Page 16

1  I'm showing you on the screen, which we marked as
2  Exhibit 2, dated the blank day of April, 1991, by
3  which you and you and David Hobbs transferred to
4  Luke Records the copyrights to the first three
5  albums?
6          MR. BURROUGHS:  Objection.  Vague.
7          THE WITNESS:  Yes.  I see the contracts,
8     but I can't recall if there were any transfers.
9  BY MR. WOLFE:
10    Q.   Do you deny that you and David transferred
11 to Luke Records the copyrights to the first three
12 albums recorded by 2 Live Crew?
13    A.   Meaning if we recorded the albums, I can't
14 recall what was on in the contracts.
15    Q.   Do you know if there was any contract by
16 which you and David transferred -- let me rephrase
17 that.
18         Do you know if there was any contract by
19 which you and David transferred to Luke Records
20 the copyrights to the first three 2 Live Crew
21 records?
22    A.   I know that we made the first three
23 2 Live Crew records under the (audio distortion.)
24    Q.   That's not my question.  My question is
25 specifically about the transfer of the copyrights?

Page 17

1     A.   I can't recall.
2     Q.   So is it fair to say you don't know how
3  Luke Records obtained ownership of the copyrights
4  of the first three 2 Live Crew records?
5          MR. BURROUGHS:  Objection.  Calls for
6     legal conclusions.  Go ahead.
7          THE WITNESS:  I can't recall.
8  BY MR. WOLFE:
9     Q.   Now, you recall Luke Records filed for
10 bankruptcy in 1994, 1995?
11    A.   I remember some of it, but I don't know
12 everything about it.
13    Q.   Let's backup before then.  Let's talk
14 about Luke Records.  Luther Campbell was the owner
15 of Luke Records?
16    A.   Yes.
17    Q.   He was the CEO?
18    A.   Yes.
19    Q.   He ran the company?
20    A.   Yes.
21    Q.   He was an employee of Luke Records?
22         MR. BURROUGHS:  Objection.  Vague.  Calls
23    for legal conclusions.  Go ahead.
24         MR WOLFE:  Counsel.  You've got to stop.
25         MR. BURROUGHS:  Go ahead.

Page 18

```
 1      MR WOLFE:  Go ahead.
 2      THE WITNESS:  I am an employee of Luke
 3   Records?
 4   BY MR. WOLFE:
 5   Q.   No.  Was Luther Campbell an employee of
 6   Luke Records?
 7   A.   I guess he owned the record label.
 8   Q.   And that made him an employee; correct?
 9      MR. BURROUGHS:  Same objection.
10      MR. WOLFE:  You need to answer audibly.
11      THE WITNESS:  I mean, I can't recall.  I
12   just know he was the owner of the record label.
13   BY MR. WOLFE:
14   Q.   And he worked there full-time?
15   A.   Yes.
16      MR. BURROUGHS:  Same objection.
17      THE WITNESS:  I believe so.
18   BY MR. WOLFE:
19   Q.   And he bossed everybody around as the
20   boss?
21   A.   I guess he was the boss.
22   Q.   And everyone that worked at Luke Records
23   worked for him?
24      MR. BURROUGHS:  Objection.  Vague.  Form.
25      THE WITNESS:  I can't recall.
```

Page 19

```
 1   BY MR. WOLFE:
 2   Q.   Do you know the name Alan Jacobi?
 3   A.   Yes.
 4   Q.   How do you know that name?
 5   A.   I think he's an attorney.
 6   Q.   And was he an attorney hired before
 7   Luther Campbell to represent Luke Records?
 8   A.   I can't recall.
 9   Q.   Do you recall that Alan Jacobi prepared
10   a contract for you to sign with Luke Records?
11   A.   I can't recall.
12   Q.   Do you know the name Mark Levinson?
13   A.   I heard of it.
14   Q.   And is he an entertainment record?
15   A.   I believe so, some type of lawyer, yes.
16   Q.   And did he represent you with respect to
17   the contract that you had with Luke Records?
18   A.   I can't recall.
19   Q.   Now, do you recall filing for bankruptcy
20   in Alabama?
21   A.   Yes.
22   Q.   I'm going to show you a document which
23   we're going to mark, I believe we're up to
24   Exhibit 22 {sic}.
25
```

Page 20

```
 1      (Thereupon, the above-referred to document
 2   was marked as Exhibit No. 23, contract for
 3   identification.)
 4      MR. BURROUGHS:  I am showing you -- and
 5   I'll go slow.  It's a Settlement Agreement and
 6   it's date the 10th day of August of 2001, in a
 7   bankruptcy proceeding in the Northern District of
 8   Alabama.
 9      Do you see that?
10   A.   Yes, I see it.
11   Q.   Do you recall filing bankruptcy in
12   Alabama?
13   A.   Yes, I do.
14   Q.   I'm going to go down and flip through
15   this?
16      (A discussion was had off the record after
17   which the following proceedings were had:)
18   BY MR. WOLFE:
19   Q.   Well, for example, do you recognize your
20   initials at the bottom of page 5?
21   A.   Yes.
22   Q.   And those are your initials at the bottom
23   of page 6?
24   A.   Yes.
25   Q.   And your signature on the page 7?
```

Page 21

```
 1   A.   Yes.
 2   Q.   And do you recall entering into this
 3   Settlement Agreement with Joe Weinberger?
 4      MR. BURROUGHS:  If we are going to mark
 5   this exhibit, can we go all the way to the
 6   bottom?
 7      MR. WOLFE:  I'm at the bottom.
 8      MR. BURROUGHS:  You're on page 8 of 18.
 9      MR. WOLFE:  That's where I want to be.
10      MR. BURROUGHS:  We'll object to the
11   document for incompleteness.  Go ahead.
12      MR. WOLFE:  Okay.
13      THE WITNESS:  Yes.  I remember signing
14   that yes, I do.
15   BY MR. WOLFE:
16   Q.   I will now satisfy counsel and go down to
17   page 8.
18      Do you recognize this agreed final
19   judgment against you?
20   A.   Yes, there was a judgment.
21   Q.   And do you recognize the judgment that
22   starts at page 8 of this exhibit and continues
23   down, do you recognize that as being part of the
24   Settlement Agreement?
25   A.   Yes, I do.
```

Page 22

1  Q.  Now, I'm going to show you another part
2  of that, which is an Amended Final Judgment and
3  Permanent Injunction entered in your bankruptcy?
4  A.  Yes.
5  Q.  For the record it starts on page 13.
6  A.  Right.
7  Q.  Do you recognize that?
8  A.  Uh-huh.
9  Q.  You have to say yes.
10 A.  Yes.
11 Q.  Thank you.
12     And you recall a James Sledge is your
13 bankruptcy judge?
14 A.  I can't recall.  I can't recall.
15     MR. WOLFE:  I want to go back up and look
16 at one more thing.
17     MR. BURROUGHS:  While you're scrolling
18 up, I wanted to lodge an objection for the
19 record that this exhibit and the previous
20 exhibit witness was questioned on the exhibit
21 before the full exhibits were published to the
22 witness or counsel.
23 BY MR. WOLFE:
24 Q.  Mr. Ross, do you need to see any of this
25 exhibit, so you can verify that these are true

Page 23

1  and correct documents of the documents that are
2  in the bankruptcy court?
3  A.  No, I don't certainly.
4  Q.  I am now going to show you a document that
5  which I'm going to mark as Exhibit 24.
6     (Thereupon, the above-referred to document
7  was marked as Exhibit No. 24, US Copyright Office
8  for identification.)
9     MR. BURROUGHS:  Can you start at page one
10    and show us the document starting at page one?
11    MR. WOLFE:  Yes.  So this is a 119 page
12    document, and I'll represent to the witness
13    that this was taken from the US Copyright
14    Office.
15    MR. BURROUGHS:  Can you go to page one?
16    This is page two.
17    MR. WOLFE:  That's page one.
18    Here is page two.  Do you need me to make
19    this larger for you?
20    MR. WOLFE:  I'm going to go to page seven
21    of that document that is titled Transfer of
22    Document.
23 Do you see that?
24    THE WITNESS:  Yes, I see something -- yes,
25    I see it, yes.

Page 24

1
2  BY MR. WOLFE:
3  Q.  And is that your signature on the bottom
4  of that document?
5  A.  Yes, it is.
6  Q.  And do you see that that is a transfer of
7  the copyright by which you are acknowledging that
8  you transferred all of the contracts of
9  2 Live Crew to Luke Records?
10    MR. BURROUGHS:  Objection.  Vague.  Calls
11    for a legal conclusions.
12    MR. WOLFE:  Can't do it, Counsel.  Stop.
13    Object to form.
14    MR. BURROUGHS:  I can't read this.
15    THE WITNESS:  I don't recall.  I don't
16    recall.
17 BY MR. WOLFE:
18 Q.  But that is your signature, isn't it?
19 A.  Yes, that's my signature.
20    MR. BURROUGHS:  Before you scroll, I am
21    still trying to read this language.
22    MR. WOLFE:  Okay.
23    MR. BURROUGHS:  Give me a minute.
24    Unfortunately, I can't make out most of
25    the wording, but you can move on.

Page 25

1
2  BY MR. WOLFE:
3  Q.  Now, do you recall as a result of the
4  Luke Records bankruptcy, Joe Weinberger purchased
5  all of the contracts of 2 Live Crew?
6  A.  I can't recall.
7  Q.  You don't recall what happened in the
8  bankruptcy?
9  A.  No.
10 Q.  But do you recall that after 1995,
11 Joe Weinberger instead of Luke Records was the
12 owner of everything that was 2 Live Crew?
13    MR. BURROUGHS:  Object to the form.  Go
14    ahead.
15    THE WITNESS:  Well, I thought that was
16    something in the bankruptcy, but I can't
17    recall.
18 BY MR. WOLFE:
19 Q.  But do you recall eventually at some
20 point Joe Weinberger was the owner of all of the
21 copyrights and trademarks of 2 Live Crew?
22    MR. BURROUGHS:  Object to the form.  Calls
23    for speculation.  Go ahead.
24    THE WITNESS:  Yes, Joe owns it.
25 BY MR. WOLFE:

Page 26

1  Q.  Do you know how Joe became the owner of
2  all of the contracts of 2 Live Crew?
3  A.  No.
4  Q.  But do you deny that Joe Weinberger is the
5  owner of the contracts to the first three albums
6  reported by 2 Live Crew?
7       MR. BURROUGHS:  Object to the form.
8       THE WITNESS:  I know that Joe got the
9  company.
10      I have now put on the screen a document
11 that I am marking as Exhibit 25 which, for the
12 record, is a letter on the letterhead of Lil
13 Joe's records addressed to you dated
14 January 12, 2018.
15      Do you see that?
16      THE WITNESS:  Yes.
17      (The above referred to document was
18 marked as Exhibit No. 25, Lil' Joe's records
19 letter to Ross, January 12, 2018 for ID.)
20 BY MR. WOLFE:
21 Q.  Do you recall receiving this letter from
22 Joe Weinberger?
23 A.  No.
24 Q.  Do you recall that there was a decision
25 on your part, to stop working with Lil Joe's

Page 27

1  records?
2  A.  No.
3  Q.  Did there come a time when after 2017,
4  when you performed as 2 Live Crew?
5  A.  I can't recall.
6       (Thereupon, the above-referred to
7  document was marked as Exhibit No. 26, flyer.
8  Sexy Ass Saturdays for identification.)
9  BY MR. WOLFE:
10 Q.  I'm now showing you a document we are
11 going to mark as Exhibit 26, which is a flyer that
12 says Sexy Ass Saturdays.
13      Do you see that?
14 A.  Yes, I do.
15 Q.  Do you recognize this document?
16 A.  Yes, I recognize my photo, but probably
17 the promoter probably put that together.
18 Q.  And that's your photo; correct?
19 A.  Picture, yeah.
20 Q.  And this was promoting a performance by
21 as a member of 2 Live Crew?
22      MR. BURROUGHS:  Object to the form.  Can
23 you scroll and show us the entire exhibit.
24      I'm only seeing half of it.
25      MR. BURROUGHS:  Thank you.

Page 28

1
2  BY MR. WOLFE:
3  Q.  Which record occurred on March 13, 2018?
4  A.  Yes, I believe that was a hosting gig.
5  Q.  And did you have permission from Lil Joe's
6  to use the name 2 Live Crew in connection with
7  this performance?
8  A.  Like I said.
9       MR. BURROUGHS:  Object as to form, but go
10 ahead.
11      MR. WOLFE:  Go ahead.  You can answer now.
12      THE WITNESS:  Yes, the promoter put that
13 together.
14 BY MR. WOLFE:
15 Q.  That's not my question.
16      My question is, did you have permission
17 from Joe Weinberger to use the trademark,
18 2 Live Crew, in connection with this performance
19 on March 31, 2018?
20      MR. BURROUGHS:  Same objection.
21      THE WITNESS:  Yes.  I wasn't with
22 Mr. Weinberger.  The promotor put that
23 together.
24 BY MR. WOLFE:
25 Q.  I'm going to go back to Exhibit 2.

Page 29

1       Now, you may recall that I showed you a
2  contract which you identified -- and I will show
3  you again, so we can tee it up.  So there is the
4  one that I showed you before which is dated the
5  blank day of April 1991 with you and David Hobbs.
6       Do you recall that?
7  A.  Right.  Yes.
8  Q.  Did you know that, in fact, at the same
9  time a contract was also entered into between
10 Luke Records and Chris Wong Won?
11      MR. BURROUGHS:  Object as to form.
12      THE WITNESS:  I don't recall.
13 BY MR. WOLFE:
14 Q.  Let me show you that contract, so I'm
15 starting at page one of Exhibit 2.  Do you see
16 that which is a contract between Luke Records and
17 Chris Wong Won, also dated the blank day of April,
18 1991?
19 A.  Yes, I see something here on the screen.
20 Q.  Did you know that, in fact, Luke Records
21 entered into a contract with Chris Wong Won on the
22 ninth day of April of 1991?
23 A.  I can't recall.
24      (Thereupon, the above-referred to
25 document was previously marked as Exhibit No. 3

Page 30

1  for identification.)
2  BY MR. WOLFE:
3  Q. I am now going to show you a document
4  that we have marked as Exhibit 3, which, for the
5  record, is a Notice of Termination sent by your
6  lawyer, Mr. Burroughs, dated November 4th, 2020.
7     Do you recognize this letter?
8  A. Yes, I had it.
9  Q. And Mr. Burroughs is one of the lawyers
10 who represents you in this particular action?
11 A. Yes.
12 Q. And do you know what Section 203
13 termination is?
14 A. Yes.
15 Q. What do you know about it?
16    MR. BURROUGHS: To the extent that your
17    understanding is based on conversations with
18    your counsel, I instruct you not to answer.
19    But if you can answer on an independent basis
20    without disclosing attorney/client information,
21    you can respond.
22    THE WITNESS: Basically it just says what
23    it is, a termination letter.
24 BY MR. WOLFE:
25 Q. I'm going going to go down and show you

Page 31

1  -- See where it says termination number one on
2  page 4 of that exhibit?
3  A. Uh-huh.
4  Q. And that refers to the 2 Live Crew Is What
5  We Are. Do you see that? I have my arrow right
6  there.
7  A. Right, I see it.
8  Q. And that indicates that that album was
9  published December 1, 1986?
10 A. Yes.
11 Q. And there's a section here that says,
12 "The grant of rights was from from January 1,
13 1987."
14    So I'm going to ask you, did you, in fact,
15 sign a contract with Skyywalker Records on
16 January 1st, 1987, in which you granted the
17 copyrights to the 2 Live Crew Is What We Are, to
18 Skyywalker Records, Inc.?
19    MR. BURROUGHS: Object to the form.
20    MR. WOLFE: I'm sorry?
21    THE WITNESS: That was a verbal agreement.
22 BY MR. WOLFE:
23 Q. Has anyone ever told you that you can't
24 transfer a copyright except in writing?
25 A. I don't recall.

Page 32

1  Q. I'm going do go down continuing it on to
2  Termination No. 2, which is for the album, Move
3  Somethin'.
4     Do you see that?
5  A. Yes.
6  Q. Does it refresh your recollection that
7  that album was released on or about March 21,
8  1988?
9  A. I can't recall.
10 Q. And do you see that you indicate in this
11 Exhibit 2, that the grant of rights was made to
12 Luke Skyywalker on January 1st, 1987?
13    MR. BURROUGHS: Object to the form.
14    THE WITNESS: I can't recall.
15 BY MR. WOLFE:
16 Q. Does that refer to that same verbal
17 agreement that you previously testified to?
18 A. Yes, a verbal agreement.
19 Q. I am going to show you going down,
20 Termination No. 3. It's for as Happy As They
21 Want To Be.
22    Do you see that?
23 A. Yes, I see that.
24 Q. Does this refresh your recollection that
25 As Happy As They Want To Be was published on or

Page 33

1  about May 1, 1989?
2  A. I can't recall.
3  Q. And this refers to a grant of rights to
4  Skyywalker records on January 1, 1987. Again, is
5  that the same verbal agreement that you just
6  previously testified to?
7  A. I can't recall.
8  Q. So let's talk about this verbal agreement.
9  I already asked you about the terms.
10    Do you know about when the verbal
11 agreement was entered into?
12 A. The verbal agreement of our first album,
13 2 Live Is What We Are.
14 Q. So it was before 1986?
15 A. Yes.
16 Q. And who were the parties to the verbal
17 agreement?
18 A. The group.
19 Q. So that would be you, David, Chris, on
20 one hand and Luther on the other?
21    MR. BURROUGHS: Objection.
22    THE WITNESS: Yes.
23    MR. BURROUGHS: Objection. Calls for a
24    legal conclusion. Go ahead.
25 BY MR. WOLFE:

Page 34

1  Q.  And where was this verbal agreement
2  reached?
3  A.  I can't recall.
4  Q.  Do you recall if you were in the studio?
5  A.  I can't recall.
6  Q.  Was there ever anything in writing that
7  confirmed or ratified or set forth the terms of
8  the verbal agreement?
9       MR. BURROUGHS:  We have been going about
10 an hour.  Can we take a five-minute break
11 while you're finding whatever it is you're
12 looking for?
13      MR. WOLFE:  Yeah, why don't we take ten
14 minutes. I may be coming to the end anyway.
15      MR. BURROUGHS:  Thanks
16      MR. WOLFE: Let's come back at 4:00.
17      THE TECHNICIAN:  The time is 3:50 P.M.
18 Going off the record.
19      (A recess was had in the proceedings after
20 which the following proceedings were had:)
21      THE TECHNICIAN:  We're back on the record.
22 The time is 4:01 Eastern Time.
23 BY MR. WOLFE:
24 Q.  Mr. Ross, you received money from Luke
25 Records, didn't you, over the years?

Page 35

1  A.  Yes, I received some monies.
2  Q.  And when they paid you, they gave you a
3  check; didn't they?
4  A.  Yes.
5  Q.  And with they withheld taxes from that
6  check; didn't they?
7  A.  Earlier.
8  Q.  If I showed you the checks, would that
9  refresh your recollection they withheld tax money
10 from your paycheck?
11 A.  I can't recall.  If it says it on the
12 check.
13 Q.  Do you recall entering into a recording
14 agreement with Lil' Joe records?
15 A.  Yes.
16 Q.  Let me show you -- can you see a document
17 on your screen?
18 A.  Yes.
19 Q.  It says Exclusive Recording Agreement
20 dated the 16th day of March, 1995?
21 A.  Yes.
22 Q.  And that's with Lil' Joe Records, and
23 David Hobbs, Mark Ross and Chris Wong Won,
24 collectively known as 2 Live Crew?
25      MR. WOLFE:  I'd like to go ahead and mark

Page 36

1  that as Exhibit 27.  You recall entering into
2  this contract?
3       THE WITNESS:  Yes.
4       (Thereupon, the above-referred to
5  document was marked as Plaintiff's Exhibit
6  No. 27 contract for identification.)
7  BY MR. WOLFE:
8  Q.  Did you transfer copyrights to Lil' Joe
9  records pursuant to this contract?
10      MR. BURROUGHS:  Objection as to form and
11 calls for legal conclusion, and also, I hate
12 -- I only have seen the first couple of pages
13 of this 24 page exhibit as has the witness
14 only seen a couple of pages of this 24 page
15 exhibit.
16      MR. WOLFE:  Again, it's an improper
17 objection, and I am going to ask you for about
18 the 100th time to please stop it.
19      MR. BURROUGHS:  Again, you can't ask
20 questions to the witness without you publishing
21 the entire document.
22 BY MR. WOLFE:
23 Q.  Mr. Ross, do you recall transferring
24 copyrights to Lil' Joe Records?
25      MR. BURROUGHS:  Object to the form.

Page 37

1       THE WITNESS:  I can't recall.
2  BY MR. WOLFE:
3  Q.  At any time since the year 2000, do you
4  recall Chris Wong Won performing as 2 Live Crew?
5  A.  Yes.
6  Q.  How many times did he do so?
7  A.  I can't recall.
8  Q.  Do you know if he had the permission from
9  Joe Weinberger to do so?
10 A.  I can't recall.
11 Q.  How many times since 2000 did you perform
12 as 2 Live Crew?
13      MR. BURROUGHS:  Object to the form.  Go
14 ahead.
15      THE WITNESS:  I can't recall.
16 BY MR. WOLFE:
17 Q.  More than 20?
18 A.  No.
19 Q.  And did you have permission from Joe
20 Weinberger to do so?
21 A.  No.
22      MR. WOLFE:  Okay.  I have nothing further.
23      MR. BURROUGHS:  A couple of questions,
24 Mr. Ross.
25                CROSS EXAMINATION

Mark Ross
November 04, 2022

Page 38

1  BY MR. BURROUGHS:
2      Q.  Since 2000, have you ever performed under
3  the name 2 Live Crew?
4      A.  No, just Brother Marks, formerly of...
5      Q.  Can you say that last part again?
6      A.  Formerly of 2 Live Crew.
7      Q.  When you viewed -- strike that.
8          When you've seen references to 2 Live Crew
9  relevant to your performances, did those always
10 indicate that you were formerly of 2 Live Crew or
11 once associated with 2 Live Crew?
12         MR. WOLFE:  Object to the form.
13         THE WITNESS:  Yes, yes, formerly.
14 BY MR. BURROUGHS:
15     Q.  When you say you saw Mr. Wong Won
16 performing, quote, as 2 Live Crew, were you
17 referencing his use of 2 Live Crew to describe
18 his one-time participation in the group?
19     A.  Yes.
20     Q.  And, in fact, isn't it true that that
21 you're not aware of Mr. Wong Won ever performing
22 under the name 2 Live Crew in the years posted
23 2000; correct?
24         MR. WOLFE:  Object to the form.
25         THE WITNESS:  No.

Page 39

1          MR. WOLFE:  Object to the form.
2          THE WITNESS:  No.
3  BY MR. BURROUGHS:
4      Q.  Are you aware of him ever performing as
5  2 Live Crew since 2000?
6      A.  Well, no.
7      Q.  Now earlier you made reference to three
8  albums that earlier you indicated were covered by
9  a verbal agreement; is that correct?
10     A.  Correct.
11     Q.  And given to Luke?
12     A.  Yes, Luther Campbell.
13     Q.  When you said "Luke, "you were you
14 referring to Luke Records or Luke Campbell?
15     A.  Luke Campbell.
16     Q.  In fact, Luke Records didn't exist in
17 1986?
18         MR. WOLFE:  Object to the form.
19         THE WITNESS:  Correct.
20 BY MR. BURROUGHS:
21     Q.  And Luke Records did not exist in 1987?
22         MR. WOLFE:  Object to the form.
23         THE WITNESS:  Correct.
24 BY MR. BURROUGHS:
25     Q.  And did Luke Records exist in 1988?

Page 40

1          MR. WOLFE:  Objection to form.
2          THE WITNESS:  '88?  I can't recall.  I'm
3  kind of bad with the years.
4          MR. BURROUGHS:  Okay.
5          THE WITNESS:  I can't recall.  But
6  somewhere around there, I think he started
7  calling himself, Luke Records.
8          But the first were oral, the first three
9  were oral agreements.  It was just Luther
10 Campbell.
11 BY MR. BURROUGHS:
12     Q.  And did you confirm those oral agreements
13 in writing?
14     A.  No.
15     Q.  Did you ever enter into a written
16 agreement with Skyywalker Records confirming those
17 three oral agreements?
18         MR. WOLFE:  Object to the form.
19         THE WITNESS:  There was an agreement when
20 he signed -- when he came up with Skyywalker
21 Records.
22         Yes, there was an agreement, I think
23 somewhat after I think the third album.  After
24 the Nasty As You Want To Be.
25         MR. BURROUGHS:  Can we put up Exhibit 10?

Page 41

1          Wait for a moment and we're going to put
2  another exhibit up in front of you and tell me
3  if it refreshes your recollection.
4          Mr. Wolfe, are you able to do that?
5          MR. WOLFE:  Oh, you want me to do it?
6  I'm sorry, I can do it for you.
7          MR. BURROUGHS:  I'm sorry, Exhibit 9, the
8  earlier agreement there.
9          MR. WOLFE:  Do you see it?
10         THE WITNESS:  Yes, I see it.
11         MR. BURROUGHS:  Can you press that arrow
12 at the right so we can get the whole -- there
13 we go.  Perfect.
14         (Thereupon, the above-referred to document
15         was previously marked as Exhibit No. 9 for
16         identification.)
17 BY MR. BURROUGHS:
18     Q.  So I want you to scroll slowly through
19 this document that was previously marked as
20 Exhibit 9.
21         MR. WOLFE:  Okay.
22         MR. BURROUGHS:  Can we scroll up to the
23 page, page 23.
24         MR. WOLFE:  Top of this.
25         MR. BURROUGHS:  Start at the top and just

Page 42

```
 1     look at paragraph 1.  Okay.  Stop.
 2   BY MR. BURROUGHS:
 3     Q.    Does this refresh your recollection as
 4   to whether you entered into a written contract
 5   with Skyywalker Records confirming the oral
 6   agreements related to the first three albums?
 7     A.    Yes.
 8     Q.    Did you enter into a written agreement?
 9     A.    Yes.
10     Q.    And did that cover the first three
11   albums?
12     A.    Yes, it did.
13     Q.    And did that confirm the prior verbal
14   agreements that you reached with the other members
15   of 2 Live Crew and the label?
16           MR. WOLFE:  Object to the form.
17           THE WITNESS:  Yes, yes.
18   BY MR. BURROUGHS:
19     Q.    Thank you.  And we can we go to the final
20   page of this exhibit, Mr. Wolfe.  Okay.  And can
21   we make it smaller so we can see this whole page.
22           You see it says Skyywalker Records, Inc.
23   on the left?
24     A.    Uh-huh.
25     Q.    And if we scroll down a little bit,
```

Page 43

```
 1   Mr. Wolfe, so we can see all the signatures.  You
 2   see your name on the right?
 3     A.    Yes, I do.
 4     Q.    Does this refresh your recollection that
 5   you, Mr. Campbell, and Mr. Wong Won entered into
 6   an agreement with Skyywalker agreements in or
 7   around 1990?
 8           MR. WOLFE:  Object to the form.
 9           THE WITNESS:  Yes.
10   BY MR. BURROUGHS:
11     Q.    Okay.  So did you and the other members
12   of 2 Live Crew enter into a contract with
13   Skyywalker Records in 1990 that confirmed your
14   oral agreement relating to the first three
15   albums?
16     A.    Yes.
17           MR. WOLFE:  Object to form.
18   BY MR. BURROUGHS:
19     Q.    And what were those albums?
20     A.    Nasty As We Want To Be, Move Somethin',
21   and 2 Live Is What We Are.
22     Q.    And does this agreement confirm that the
23   members of the group are transferring the
24   contracts to Skyywalker the records?
25           MR. WOLFE:  Object to the form.
```

Page 44

```
 1           THE WITNESS:  Yes.
 2   BY MR. BURROUGHS:
 3     Q.    And was this the first written agreement
 4   that you entered into with any of Mr. Campbell's
 5   labels?
 6     A.    I can't recall.
 7     Q.    Do you have any reason to believe that
 8   this agreements is invalid?
 9     A.    Yes, it was a long time ago, yes.
10     Q.    Isn't it true that you believe that this
11   agreement is a valid agreement?
12           MR. WOLFE:  Object to form.
13           THE COURT:  Yes, yes.  Yes I think it was,
14      at the time we signed it, yes.
15   BY MR. BURROUGHS:
16     Q.    Let me pull this exhibit down and look at
17   Exhibit 21.
18           MR. WOLFE:  I'm not sure what that is.
19           MR. BURROUGHS:  I've got that one.
20           We're going to scroll through this nine
21      page exhibit.  Tell me if you want to scroll
22      faster or slower.
23     A.    Yes, I remember those, yeah.
24           Yes, I remember that, I remember that, I
25   remember those.
```

Page 45

```
 1     Q.    And what are those and how do you remember
 2   them?
 3     A.    A and B and inside single.
 4     Q.    And are those records related to the first
 5   three albums that you did as part of 2 Live Crew?
 6           MR. BURROUGHS:  Objection, form.
 7           THE WITNESS:  Yes, yes.  First three
 8      albums.  Yes.
 9   BY MR. BURROUGHS:
10     Q.    And do you recognize the Luke Skyywalker
11   logo on those albums?
12     A.    Yes.
13     Q.    We are going to put one more document in
14   front of you that has previously been marked as
15   Exhibit 22.
16           I want you to take a moment and look at
17   these.  Those are albums.  And how do you
18   recognize those albums?
19     A.    The pictures, the pictures, the artwork,
20   graphics, I see my face on them.
21     Q.    And do you recognize the Luke Skyywalker
22   logo on those albums?
23     A.    Yes, right in the lower right hand corner
24   of the album.
25           MR. BURROUGHS:  I have no further
```

Page 46

```
 1   questions.
 2          MR. WOLFE:  Mark, I'm going to go back to
 3   Exhibit 9.
 4          (Technology recess.)
 5              REDIRECT EXAMINATION
 6   BY MR. WOLFE:
 7      Q.   When your lawyer was asking you the
 8   leading questions.  He asked you if this was a
 9   transfer to the contracts of the last three
10   albums.
11          Do you recall that?
12      A.   Yes.
13      Q.   Can you tell me where in this contract it
14   makes any mention of any copyrights?
15          MR. BURROUGHS:  Object as to form.
16          MR. WOLFE:  I will be happy to scroll
17      through this as slow as you'd like me to do.
18      So you want me to go slowly?
19          MR. BURROUGHS:  Yes.
20   BY MR. WOLFE:
21      Q.   And if you see anything that looks like
22   a transfer to you of the three albums, please let
23   me know.  Okay?
24      A.   You are going kind of fast.
25          MR. BURROUGHS:  You can slow down.
```

Page 47

```
 1          MR. WOLFE:  Okay.
 2      A.   I mean I can't point it out, I can't point
 3   it out right now.
 4      Q.   Okay.
 5      A.   But we get the three albums.  We get the
 6   three albums so.
 7      Q.   Well, I can represent to you that there
 8   is nothing in here that makes any mention of any
 9   one of the first three albums.
10          Will you accept my representation?
11          MR. BURROUGHS:  Object as to form.
12          THE WITNESS:  I can't recall.
13   BY MR. WOLFE:
14      Q.   Do you understand that contracts have a
15   term for how long they last?
16          MR. BURROUGHS:  Object as to form.
17          THE WITNESS:  Well, I am aware it's some
18      length of time that you are under a contract,
19      yes.
20   BY MR. WOLFE:
21      Q.   I would like you to take a look at
22   paragraph 1.  And you see where the initial
23   period is January 1, 1987, and ending December 31,
24   1987.
25          Do you see that in paragraph 1?
```

Page 48

```
 1      A.   What was that again, Richard?
 2      Q.   Do you see the term of this contract is
 3   January 1st, 1987, and ending December 31st,
 4   1987?
 5      A.   I see December 31, 1987.  I see that part.
 6      Q.   Now, at any time did any of Luther's
 7   companies send you notice that they were extending
 8   the term?
 9          MR. BURROUGHS:  Object as to form.
10          THE WITNESS:  I can't recall.
11   BY MR. WOLFE:
12      Q.   So you don't recall ever receiving a
13   notice that the contract was being extending;
14   correct?
15          MR. BURROUGHS:  Object as to form.
16          THE WITNESS:  No.
17   BY MR. WOLFE:
18      Q.   Now, do you recall when I went over with
19   you the dates that the three albums were recorded
20   -- and I just want to refresh your recollection
21   that you testified that none of the three albums
22   at issue in this case were recorded during the
23   period of January 1, 1987, through December 31,
24   1987.
25          Do you recall that testimony?
```

Page 49

```
 1      A.   Some of those records were recorded before
 2   these --
 3      Q.   Exactly.  But none were recorded between
 4   January 1, 1987, and December 31, 1987?
 5      A.   I can't recall those dates, but I know
 6   there were some records made before '87.
 7      Q.   And as Nasty As They Want to Be was after
 8   1987; correct?
 9      A.   I can't remember.
10          Somewhere in there, '88, '87.
11      Q.   Now, do you recall that Luther Campbell
12   was sued by George Lucas for using the name Luke
13   Skyywalker?
14      A.   I remember somewhat appearing about that.
15      Q.   And he had to take the logo, Luke
16   Skyywalker, off every record and everything else.
17          Do you recall that?
18      A.   Yes, somewhat.
19      Q.   And so all the records that counsel showed
20   you that had the logo of Luke Skyywalker, were
21   taken out of circulation; correct?
22      A.   I can't recall it being taken out.  I
23   can't recall.  I remember the Lucas case.
24      Q.   And in the Lucas case there was an
25   injunction entered that prevented 2 Live Crew from
```

Page 50

1  ever using the logo, Luke Skyywalker; correct?
2      A.   I can't recall.
3           MR. WOLFE:  I have nothing further.
4           MR. BURROUGHS:  All right.  Can we have
5   the same stipulation that we had for the
6   previous deposition relating to the review of
7   the emailed copy.  I think we said 21 days,
8   does that work?
9           MR. WOLFE:  Yes.
10          THE TECHNICIAN:  I will take us off the
11  record.
12          The time is 4:20 P.M. Eastern Time, going
13  off the record.
14          (A discussion was had off the record after
15  which the following proceedings were had:)
16          THE TECHNICIAN:  Mr. Wolfe, do you want
17  to order the video?
18          MR. WOLFE:  Yes;
19          THE TECHNICIAN:  For both?
20          MR. WOLFE:  Yes.
21          THE TECHNICIAN:  Mr. Burroughs?
22          MR. BURROUGHS:  I don't need the video, but
23  I'll getting the transcript.
24          THE REPORTER:  Send any exhibits you
25  would like attached.

Page 51

2       (Reading and signing of the deposition
3   was not waived by the witness and all of the
4   parties.)
5
6       (Thereupon, the above proceedings were
7   concluded at 4:30 P.M.)
8
9       ----------

Page 52

1              WITNESS NOTIFICATION LETTER
2   November 15, 2022
3   MARK ROSS
    c/o SCOTT ALAN BURROUGHS, ESQ.
4
5   In Re: LIL' JOES RECORDS
    Deposition taken on November 4, 2022
6   Job No. 6258171
7
    The transcript of the above-referenced
8   proceeding has been prepared and is being
    provided to your office for review by the
9   witness.
10
    If you have not waived signature we
11  respectfully request that the witness
    complete their review within a reasonable
12  amount of time and return the errata sheet to
    our office.
13
14
    Sincerely,
15
16
17
    Debra Stark, Court Reporter,
18  Notary Public

Page 53

                    ERRATA SHEET
              DO NOT WRITE ON THE TRANSCRIPT
              ENTER CHANGES ON THIS PAGE
                IN RE: LIL' JOES RECORDS
                       MARK ROSS

Page  |Line |Change                        |Reason

_____

_____

_____

_____

_____

_____

_____

              Under penalties of perjury, I
17  declare that I have read the foregoing
    document and that the facts stated in it are
18  true.

                        _____
22  MARK ROSS

Page 54

CERTIFICATE OF OATH

STATE OF FLORIDA:
COUNTY OF BROWARD:

I, DEBRA L. STARK, Court Reporter and Notary Public, in and for the State of Florida at Large, do hereby certify that MARK ROSS, remotely appeared before me by audio and visual means on November 4, 2022, and was duly sworn.

Signed and sealed heretofore on this day of November 15, 2022.

Mark Ross
November 04, 2022

------------------------------
DEBRA L. STARK, Court Reporter
and Notary Public, State of
Florida at Large

MY COMMISSION EXPIRES:
March 28, 2025

Page 55

C E R T I F I C A T E

STATE OF FLORIDA:
COUNTY OF BROWARD:

I, DEBRA L. STARK, certify that I was authorized to and did stenographically remotely report by audio and visual means the deposition of MARK ROSS; duly sworn by me; pages 1 to and including 55; and that the transcript is a true record of my stenographic notes.

I further certify that I not a relative, employee, attorney, or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorneys or counsel connected with the action, nor am I financially interested in the action.

Signed and sealed on this date of November 15, 2022.

------------------------------
DEBRA L. STARK, Court Reporter
and NOTARY PUBLIC, State of Florida
at Large

MY COMMISSION EXPIRES:
MARCH 28, 2025