# EXHIBIT D

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 1:21-CV-23727-DPG

LIL' JOE RECORDS, INC., a
Florida corporation,

              Plaintiffs,

V.

MARK ROSS, CHRISTOPHER WONG
WON, JR., RODERICK WONG WON,
LETERIUS RAY, ANISSA WONG WON
and LUTHER CAMPBELL,

              Defendants.
_____/

VIDEOTAPED DEPOSITION OF
LETERIUS RAY
Pages 1 through 97

Friday, November 4, 2022
9:35 A.M.
VIA VIDEOCONFERENCE BY ALL PARTIES
VIA ZOOM

Stenographically Reported By:
Debra L. Stark,
Notary Public State of Florida

Leterius Ray
November 04, 2022

Page 2

1  APPEARANCES:
2  ON BEHALF OF THE PLAINTIFF: LIL' JOE RECORDS,
   INC., a Florida corporation
3
4     WOLFE LAW MIAMI, P.A.
      175 Southwest 7th Street
5     Penthouse 2410
      Miami Fl  33130
6     (305) 384-7370
      Rwolfe@wolfelawmiami.com
7  BY: RICHARD C. WOLFE, ESQ.
8
   ON BEHALF OF THE DEFENDANTS:  MARK ROSS,
9  CHRISTOPHER WONG WON, JR., RODERICK WONG WON,
   LETERIUS RAY, ANISSA WONG WON and LUTHER
10 CAMPELL
11
      DONIGER/BURROUGHS Building
12    603 Rose Avenue,
      Venice, California 90201
13    (310) 590-1820
      Scott@donigerlawfirm.com
14 BY: SCOTT ALAN BURROUGHS, ESQ.
15
16
17
18
19
20
21
22
23
24
25

Page 3

1        INDEX OF PROCEEDINGS
2  WITNESS: LETERIUS RAY
3  DIRECT EXAMINATION BY MR. WOLFE             4
4  CROSS EXAMINATION BY MR. BURROUGHS          96
5  REDIRECT EXAMINATION BY MR. WOLFE           98
6  WITNESS NOTIFICATION LETTER                 102
7  ERRATA SHEET                                103
8  CERTIFICATE OF OATH                         104
9  C E R T I F I C A T E                       105
10
11        E X H I B I T S
12 Exhibit                                PAGE
13 Exhibit No. 18, Order of Federal         67
14 Judge James Lawrence King of October 22,
15 2002
16 Exhibit No. 19, Notice of Assignment     70
17 Copyright office dated March 6th, 1997
18 Exhibit No. 20, recording agreement      90
19 Exhibit No. 21, Albums                   97
20 Exhibit No. 22, Four-Page Document       98
21
22      Reporter's Note:  Exhibits 18, 19, 20
23 retained by attorney)
24
25

Page 4

1        (Thereupon the following proceedings were
2  had:)
3        THE TECHNICIAN:  We are now on the record.
4  Participants should be aware that this
5  proceeding is being recorded and as such all
6  conversations held will be recorded unless
7  there is a request and agreement to go off the
8  record.
9        Private conversations and/or
10 attorney/client interactions should be held
11 outside the presence of the remote interface.
12 For the purpose of creating a witness only
13 video recording, the witness is being
14 spotlighted for locks on all video screens as
15 well as speaker view.
16       We ask that the witness not remove the
17 spotlight setting during the deposition as it
18 may cause other participants to appear on the
19 final video rather than just the witness.  For
20 anyone who does not want the witness's video
21 to take up a large part of your screen, you may
22 click the gallery view button in the upper
23 right corner of the remote interface.
24       This is the remote video recorded
25 deposition of Leterius Ray, being taken by the

Page 5

1  counsel for the plaintiff.  Today is Friday,
2  November 4th, 2022.  The time is now 1:34 P.M.
3  UTC Time, and 9:34 A.M. Eastern Time.
4        We are here in the matter of Lil' Joe
5  Records, Incorporated versus Mark Ross, et al.
6  My name is Michael Hollander, remote video
7  technician on behalf of US Legal Support.  I
8  am not related to any party in this action,
9  nor am I financially interested in the outcome.
10       The court reporter is Debbi Stark on
11 behalf of US Legal Support.  At this time will
12 counsel please state their appearances for the
13 record after which the court reporter will
14 swear in the witness.
15       MR. WOLFE:  Richard Wolfe for the
16 plaintiff, Lil' Joe.
17       MR. BURROUGHS:  And Scott Burroughs for
18 all defendants.
19       MR. WOLFE:  Okay.  Debbi, would you swear
20 in the witness, please.
21       COURT REPORTER:  Yes.  Mr. Ray, please
22 raise your right hand.  Do you solemnly swear
23 or affirm the testimony you are about to give
24 will be the truth, the whole truth, nothing
25 but the truth.

Leterius Ray
November 04, 2022

Page 6

1          THE WITNESS:  I do.
2
3  THEREUPON:
4              LETERIUS RAY,
   was called as a witness, having been first duly
   sworn testify, testified as follows:
6
7              DIRECT EXAMINATION
8  BY MR. WOLFE:
9      Q.   Good morning, Mr. Ray.  Would you state
10  your name for the record, please?
11     A.   Leterius Ray.
12     Q.   My name is Richard Wolfe.  I'm the lawyer
13  for Lil' Joe Records.  And have you ever had your
14  deposition taken before?
15     A.   No, sir.
16     Q.   So let me just give you a couple of
17  ground rules.  I'm going to ask you a series of
18  questions that I'm going to need you to answer
19  audibly.  So you can't shake your head or say
20  things like huh-huh or uh-huh.  I need a clear
21  yes or no if they are yes or no questions.
22          Do you understand that?
23     A.   I understand.
24     Q.   And you understand you are under oath,
25  and therefore, your testimony has the same import

Page 7

1  as though you were testifying in a Court of law
2  before a Judge?
3      A.   Yes, sir.
4      Q.   I'm going to ask you questions.  If you
5  don't understand a question, please ask me to
6  rephrase it or explain, which I'll be happy to do
7  so, but if you answer the question, I'll assume
8  you understood it.
9          Okay?
10     A.   Okay.
11     Q.   If you need a break, let us know.  And
12  with that, I would like to proceed.  But before I
13  do so, I want to just put on the record the
14  stipulation that I reached with Mr. Burroughs,
15  and that is Mr. Ray is hearing at -- is here
16  today as a representative of all of the so-called
17  Wong Won heirs, and your testimony is going to be
18  binding on all the Wong Won heirs, so that I need
19  not take the depositions of all the Wong Won
20  heirs.
21          MR. WOLFE: Is that correct, Mr. Burroughs?
22          MR. BURROUGHS: Yes, that's -- that's
23  correct.  In exchange for your waiver of the
24  right to depose the other heirs, we have
25  agreed that the deposition today will be

Page 8

1  binding on the heirs.
2          MR. WOLFE:  Okay.  Thank you.
3  BY MR. WOLFE:
4      Q.   Mr. Ray, did you do anything to prepare
5  for today's deposition?
6      A.   Such as?
7      Q.   Did you read any documents?
8      A.   Yes.
9      Q.   Which documents did you read?
10     A.   The contracts.
11     Q.   Which contracts did you read?
12     A.   The '90 agreement.  Several contracts.  I
13  mean, it's...
14     Q.   Several contracts?
15     A.   Uh-huh, yes.
16     Q.   And did you speak with anyone in order to
17  prepare for the depo?
18     A.   Just --
19          MR. BURROUGHS:  And it's okay.  I am going
20  to object.  Of course, don't disclose any
21  attorney/client information, but you can
22  indicate if you spoke to me, just yes or no.
23          THE WITNESS:  Oh, okay.  Yeah, I mean, I
24  spoke with my attorney.
25

Page 9

1  BY MR. WOLFE:
2      Q.   Okay.  Mr. Burroughs?
3      A.   Yes.
4      Q.   And when did you do so?
5      A.   Monday.
6      Q.   And how long did you talk for?
7          MR. BURROUGHS:  Objection.  I will instruct
8  the witness not to answer.  You know, he can
9  certainly testify as to the fact that we
10  spoke, but I don't want to provide any more
11  information relating to that conversation.
12          MR. WOLFE:  Well, how long you spoke is
13  not privileged.  What you spoke about is
14  privileged.  Okay?
15          MR. BURROUGHS:  I understand, but I am
16  going to stand by the instruction and let's
17  move on.
18          MR. WOLFE:  Okay.
19  BY MR. WOLFE:
20     Q.   You are one of the children of Christopher
21  Wong Won?
22     A.   Correct.
23     Q.   I'd like to ask you some questions about
24  your family and -- and your father.  Okay.  So
25  when I refer to Mr. Wong Won, I will be referring

Leterius Ray
November 04, 2022

Page 10

1  to Christopher Wong Won, who was one of the
2  members of 2 Live Crew.
3       Do you understand that?
4   A.  Yes.
5   Q.  And when did your father pass away?
6   A.  2018.
7   Q.  I'm sorry, I didn't hear that.  2013?
8   A.  No, no, I believe it was 2018.
9   Q.  2018.
10  A.  I lost track.
11  Q.  And where did he pass away?
12  A.  In Florida.
13  Q.  And was he a resident of Florida when he
14  passed away?
15  A.  Correct.
16  Q.  Which county was he a resident in?
17  A.  At the time Fort Lauderdale.
18  Q.  Okay.  Would that be Broward County,
19  Florida?
20  A.  Was it --
21  Q.  I can represent to you that
22  Fort Lauderdale is in Broward County, Florida.
23  A.  I'm not familiar with Florida counties,
24  I'm sorry.
25  Q.  Okay.  Where do you live?

Page 11

1   A.  I live in Kansas.
2   Q.  And when was the last time you saw your
3  father before his death?
4   A.  The day before.
5   Q.  When your father died, did he have a
6  spouse?
7   A.  He was not married, not at the time.
8   Q.  So when was the last time he had a spouse?
9   A.  By spouse, do you mean wife or --
10  Q.  Yes, wife.  Married to?
11  A.  Right.  It had to have been the early
12  2000s, to my recollection.
13  Q.  And can you tell me the names of each
14  person that your father was married to?
15  A.  To my knowledge, it was just Robbie.
16  Q.  Robbie?
17  A.  Yeah.
18  Q.  And Robbie's the name of a woman?
19  A.  Correct.
20  Q.  And when was your father married to
21  Robbie?
22  A.  You mean when did they get married?
23  Q.  Yes, when did they get married?
24  A.  Geez, to the best of my knowledge?  I
25  mean, I don't want to speculate.

Page 12

1   Q.  To the best of your knowledge.
2   A.  I mean, to the best of my knowledge, '88.
3   Q.  Do you know if they, in fact, got
4  divorced?
5   A.  That's what, to my knowledge, they were
6  divorced.
7   Q.  And where did they get divorced?
8   A.  In Florida.
9   Q.  Do you know which county?
10  A.  Not exactly.
11  Q.  Do you know where your father lived
12  together with Robbie at the time the marriage
13  ended?
14  A.  When the marriage ended they didn't live
15  together.
16  Q.  Do you know for sure that they got
17  divorced?
18  A.  Yes.
19  Q.  And do you know where Robbie lives now?
20  A.  Yes.
21  Q.  Where does she live?
22  A.  I don't know the address.
23  Q.  Approximately where?
24      Let's first start with the state.
25  A.  Florida.

Page 13

1   Q.  Let's start with the city.
2   A.  I believe it's -- I believe it's Liberty
3  City.
4   Q.  Is Robbie your mother?
5   A.  No.
6   Q.  What's the name of your mother?
7   A.  Loletta.
8   Q.  And did Chris ever -- Chris Wong Won ever
9  marry your -- Loletta?
10  A.  No.
11  Q.  Did Chris have other children other than
12  you?
13  A.  My siblings, yes.  Do you want me --
14  Q.  Yes.  What are the names of your siblings?
15  A.  Anissa, Roderick and Chris.
16  Q.  Where does Anissa live?
17  A.  In Florida.
18  Q.  And who was her mother, if you know?
19  A.  Robbie.
20  Q.  And Roderick, do you know where he lives?
21  A.  Florida.
22  Q.  And do you know who his mother is?
23  A.  Robbie, yes.
24  Q.  And Chris Jr., same questions?
25  A.  Florida.

Leterius Ray
November 04, 2022

Page 14

1    Q.   And who was Chris Jr.'s mother?
2    A.   Robbie.
3    Q.   Have you and your siblings discussed this
4 case?
5    A.   Yes.
6    Q.   And do you know what this case is about?
7    A.   Yes.
8    Q.   Tell me in your own words what you think
9 this case is about?
10    A.   Termination of rights.
11    Q.   And when was the first time you heard
12 about the "term" termination of rights?
13    A.   I have talked about it with my father.
14    Q.   When did you speak about it with your
15 father?
16    A.   On multiple occasions.
17    Q.   And tell me about your conversations with
18 your father, relative to Section 203 termination
19 of rights?
20    A.   I'm not an attorney, I don't know exactly
21 what you're referencing.
22    Q.   I'm only asking about, what did you and
23 your father talk about relative to termination of
24 rights?
25    A.   Basically that there is a law that after

Page 15

1 some time has passed he filed and terminated the
2 rights, the copyrights.
3    Q.   And did your father tell you that he
4 conveyed all of his copyrights to Luke Records?
5    A.   Repeat the question.
6    Q.   Did your father tell you that he had
7 transferred all of his copyright interests in the
8 recordings done by 2 Live Crew to Luke Records?
9    A.   He didn't use those words.
10    Q.   What words did he use?
11    A.   I mean, in our discussions it was,
12 you know, the -- based on the contracts that there
13 is a law that you can file and terminate the
14 copyrights after some time has passed.
15    Q.   Right. I'm not asking you about the
16 termination. I'm asking you, did your father
17 specifically tell you that he transferred all of
18 his copyright interests to Luke Records?
19    A.   He didn't use those words. I know he
20 signed contracts, an agreement for, you know,
21 recordings.
22    Q.   And that was with Luke Records?
23    A.   Yes, Luke Skyywalker Records, so, you
24 know, I have a general idea of that.
25    Q.   Did he also tell you that Joe Weinberger's

Page 16

1 company, Lil' Joe Records, purchased all of those
2 copyrights pursuant to a bankruptcy sale?
3    A.   I have knowledge of that.
4    Q.   Did he also tell you that he entered
5 into subsequent agreements with Lil' Joe Records?
6    A.   I have knowledge of recording contracts
7 with Lil' Joe Records.
8    Q.   And did he tell you that he transferred
9 all of his copyrights from to the 2 Live Crew
10 Records to Lil' Joe Records?
11    A.   I have knowledge that Lil' Joe Records
12 has -- had required the catalog and things of that
13 nature.
14    Q.   That's not my question.
15      My question is: Did your father
16 specifically tell you that he made conveyances or
17 transfers of the 2 Live Crew copyrights to
18 Lil' Joe Records?
19    A.   Well, he didn't specifically use language
20 like that.
21    Q.   What language did he use?
22    A.   I just know that we spoke about the
23 termination of rights and that based on the
24 agreements that he entered in, that we were
25 proceeding with his, so...

Page 17

1    Q.   So let me see if I understand your
2 testimony.
3      One, your father told you that he entered
4 into contracts with Luke Records and gave
5 Luke Records all the rights to the 2 Live Crew
6 copyrights; correct?
7      MR. BURROUGHS: Objection, that misstates
8 the testimony from earlier.
9      MR. WOLFE: Please don't tell the witness
10 -- just say I object to form. That is all you
11 can do legally under our rules. If you
12 continue to interrupt the witness and if you
13 continue to coach the witness, I am going to
14 go get an order of contempt.
15      MR. BURROUGHS: I disagree again, I stand
16 by -- stand by my objection. Go ahead.
17      MR. WOLFE: And your objection is not
18 proper under our local rules. And I
19 understand you are not licensed to practice
20 down here, and I understand the Court has
21 allowed you to participate pro hac vice, but
22 you need to learn the rules if you're going to
23 practice in our Courts down here, which you're
24 not licensed to do.
25      MR. BURROUGHS: Again, after all the

Leterius Ray
November 04, 2022

Page 18

```
1    objections, there's been no appropriate
2    conduct on the part of my office.
3         MR. WOLFE:  I object to form.
4         (Simultaneous crosstalk.)
5         MR. BURROUGHS:  -- addressing that with
6    the Court now.  But go ahead.
7         MR. WOLFE:  Just say I object to form.
8    That's all you can do.
9    BY MR. WOLFE:
10        Q.   Mr. Ray, I'm going to ask you again.
11             Isn't it true that your father told you
12   that he entered into a contract and conveyed all
13   of the 2 Live Crew copyrights to Luke Records,
14   Inc.?
15        MR. BURROUGHS:  Objection, misstates the
16   testimony.  Go ahead.
17        MR. WOLFE:  Again, Mr. Burroughs, you
18   can't do that.  It's not proper.
19        MR. BURROUGHS:  I disagree.  Go ahead.
20   BY MR. WOLFE:
21        Q.   Go ahead.  You can answer the question.
22        A.   Can you repeat the question?
23        Q.   Sure.  Isn't it true that your father
24   specifically told you that he entered in the
25   contracts and transferred all of the copyrights
```

Page 19

```
1    to 2 Live Crew, to Luke Records or Skyywalker
2    Records?
3         MR. BURROUGHS:  Hold on.  Objection.
4    Compound.  Vague.  Misstates the testimony.
5    Go ahead.  If you understand the question, you
6    can answer.
7         THE WITNESS:  I don't understand.
8    BY MR. WOLFE:
9         Q.   Okay.  Well, tell me what your father
10   told you about the initial conveyance of the
11   copyrights of 2 Live Crew to Mr. Campbell's
12   company?
13        MR. BURROUGHS:  Objection, asked and
14   answered.  But go ahead if you have something
15   to add.
16        THE WITNESS:  No.
17   BY MR. WOLFE:
18        Q.   You don't know anything about that?
19        MR. BURROUGHS:  Objection.  Hold on.
20   Objection, asked and answered.  But go ahead.
21   BY MR. WOLFE:
22        Q.   Can you answer my question?  Do you know
23   anything about your father transferring copyrights
24   to the company owned by Luther Campbell?
25        MR. BURROUGHS:  Objection, asked and
```

Page 20

```
1    answered.  But go ahead.
2    BY MR. WOLFE:
3         Q.   You can answer.
4         MR. BURROUGHS:  Go ahead.  If you
5    understand the question.
6         THE WITNESS:  I don't understand the
7    question.
8    BY MR. WOLFE:
9         Q.   Did you ever discuss with your father
10   that he entered into a contract with either Luke
11   Records or Skyywalker Records or Luke Skyywalker
12   Records?
13        A.   Correct.  He entered into a contract, yes.
14        Q.   What else did he tell you other than he
15   entered into a contract with one of those
16   entities?
17        A.   I just know that the first three works,
18   they were originally -- the contracts was to cover
19   those three works.
20        Q.   Did your father ever tell you that he had
21   an oral agreement with Mr. Campbell regarding the
22   2 Live Crew copyrights?
23        A.   They -- in the beginning they had an oral
24   agreement.
25        Q.   When did you have this conversation with
```

Page 21

```
1    your father?
2         A.   Multiple, multiple occasions.
3         Q.   Did he tell you what the terms were of
4    this oral agreement?
5         A.   In regards to?
6         Q.   Tell me what the terms were, as far as
7    you know, of this oral agreement with
8    Mr. Campbell?
9         A.   Just as a recording artist.
10        Q.   Other than that, when was this oral
11   agreement made?
12        A.   You mean like a year?
13        Q.   Yes.
14        A.   To my best knowledge, I don't want to
15   speculate, but to my best knowledge, probably '87,
16   '88.
17        Q.   Did your father tell you that he also
18   entered into contracts with Lil' Joe Records?
19        A.   I have that knowledge.
20        Q.   Tell me about the conversations you had
21   with your father about the contracts that he
22   entered into with Lil' Joe Records?
23        A.   I mean, as far as the contracts, I just
24   know that he requested them and I believe it was,
25   you know, he tried to get like an audit, but I
```

Leterius Ray
November 04, 2022

Page 22

1  mean he has receipts that the contracts were
2  delivered to him, to the best of my knowledge.
3  **Q.   Did you have a conversation with your**
4  **father about the bankruptcy that was filed in 1994**
5  **and in 1995 by Mr. Campbell and Luke Records?**
6  A.  We had spoken about it.
7  **Q.   What did you and your father speak about**
8  **concerning the bankruptcy?**
9  A.  In relation to what?
10 **Q.   Whatever you and your father discussed.**
11 A.  The bankruptcy, I mean really the extent
12 of that discussion was like how the artists didn't
13 really get paid, I mean, like at the end of all of
14 that, I mean, I think that's what I took away
15 mostly from that.
16 **Q.   Well, did he tell you, for example, that**
17 **Lil' Joe Records purchased all of the 2 Live Crew**
18 **copyrights pursuant to a bankruptcy sale?**
19 A.  I have knowledge of that.
20 **Q.   Did he tell you there was litigation**
21 **between Lil' Joe Records and your father?**
22 A.  In regards to what?
23 **Q.   Anything.  Did your father tell you that**
24 **he had a lawsuit with Lil' Joe Records?**
25 A.  I have knowledge about that.

Page 23

1  **Q.   What do you know about it?**
2  A.  I mean -- I mean there is, I believe
3  there was multiple -- I don't -- what -- I guess
4  what are you talking about?
5  **Q.   Well, there were multiple lawsuits**
6  **between your father and Lil' Joe Records; correct?**
7  A.  To my knowledge.
8  **Q.   And did your father specifically tell you**
9  **that he entered into subsequent agreements to**
10 **resolve those lawsuits with Lil' Joe Records?**
11 A.  I mean, I don't -- we didn't speak about
12 that, but I have like the -- I have the contracts.
13 **Q.   How old are you?**
14 A.  I am 34.
15 **Q.   34.  And how old are your siblings?**
16 A.  Oh, okay.  Let's go on.
17 Chris is 34.  I believe Rod just turned
18 33.  Anissa is the youngest.  I don't want to
19 speculate, but if I had to guess, I believe she
20 should would be about 28.
21 **Q.   Is it fair to say that other than the**
22 **conversations that you've had with your father,**
23 **neither you nor any of your siblings have any**
24 **personal knowledge of the business relationship**
25 **between your father and Lil' Joe Records?**

Page 24

1  MR. BURROUGHS:  Objection, vague.
2  But go ahead.  If you understand, you can
3  provide -- provide the answer.
4  THE WITNESS:  Can you repeat the
5  question?
6  BY MR. WOLFE:
7  **Q.   Is it correct to say that other than the**
8  **conversations that you or your siblings had with**
9  **your father, none of you have any personal**
10 **knowledge of the business relationship between**
11 **your father and Lil' Joe Records?**
12 A.  One more time, please.
13 **Q.   The only thing you know about the**
14 **copyrights is what your father told you; correct?**
15 A.  I mean, the -- is that the same question
16 you just asked me?
17 **Q.   Yes, and I am still waiting for an answer.**
18 MR. BURROUGHS:  Well, for the record, I'm
19 not sure if it is.  But if you understand it,
20 you can answer it.
21 THE WITNESS:  Can you repeat it, please?
22 BY MR. WOLFE:
23 **Q.   Is it correct to say the only thing you**
24 **know about the 2 Live Crew copyrights and the**
25 **relationship between your father and Lil' Joe, is**

Page 25

1  what your father told you?
2  A.  Did you just put the two questions
3  together?  I'm confused now.
4  **Q.   I'm going to say it again.**
5  **Do you have any personal knowledge,**
6  **other than what your father told you, about the**
7  **2 Live Crew copyrights or the relationship**
8  **between your father and Lil' Joe Records?**
9  A.  Personal knowledge?  Yeah, I mean, I
10 spoke with my father about that stuff, I mean...
11 **Q.   Okay.  And I'm asking you:  Other than**
12 **what you spoke with your father, do you have any**
13 **personal knowledge of anything else involving the**
14 **2 Live Crew copyrights or your father's**
15 **relationship with Lil' Joe Records?**
16 A.  Just our conversations.
17 **Q.   With your father; correct?**
18 A.  Correct.
19 **Q.   And is the same true for your siblings?**
20 MR. BURROUGHS:  Objection.  Calls for
21 speculation, but if you know.
22 THE WITNESS:  He mostly spoke with me.
23 BY MR. WOLFE:
24 **Q.   But that's not what my question is.**
25 **My question is:  Is it correct to say**

Leterius Ray
November 04, 2022

Page 26

1  that neither of your siblings or none of your
2  siblings, has any personal knowledge of anything
3  involving the 2 Live Crew copyrights or the
4  relationship with Lil' Joe other than what your
5  father told you?
6      A.   I don't know what they know.  I mean
7  outside of our conversations together.
8      MR. WOLFE:  So Scott, I need you to
9  either stipulate that they have no such
10  knowledge or I need to take their
11  depositions.
12      MR. BURROUGHS:  Well, I think we have a
13  stipulation already that this is binding on
14  everyone, so I don't see what -- what more you
15  need.
16      MR. WOLFE:  Well, I don't want one of the
17  siblings to come to Court and suddenly testify
18  that they have personal knowledge other than
19  things that they might have learned from their
20  father.
21      MR. BURROUGHS:  Right.  But that's why we
22  have the stipulation put on the record at the
23  outset.
24      MR. WOLFE:  Okay.  But if the stipulation
25  is, is that the witness has no personal

Page 27

1  knowledge and he does not know whether or not
2  the siblings do, I either need to take their
3  depositions or I need you to stipulate that
4  like this witness, they have no personal
5  knowledge of anything regarding the
6  2 Live Crew copyrights or the relationship
7  with Mr. Wong Won and his company.
8      MR. BURROUGHS:  Yeah, I mean, I can't --
9  I can't do that on the fly; right, without
10  conferring with them, but I think this
11  stipulation that says that this is the case
12  testimony if they have no personal knowledge,
13  and that testimony binds the other heirs, I
14  think that should be sufficient.
15      MR. WOLFE:  But I am not asking about his
16  knowledge, I am asking about their knowledge.
17  So I don't know -- so if he says he does not
18  know, if you are not willing to stipulate,
19  then I do need to take their deposition to
20  find out if they have any personal knowledge.
21      MR. BURROUGHS:  Well, then we need to
22  remove the stipulation that this is going to
23  bind the other heirs.
24      MR. WOLFE:  No.  What we need to do is --
25      MR. BURROUGHS:  We have -- you know, we

Page 28

1  can talk about it off the record, I suppose.
2  I can't on the fly without conferring with
3  those clients who entered in some stipulation
4  on their behalf.
5      MR. WOLFE:  Fair enough.  So here is what
6  I will do.
7      I'll give you the opportunity to confer
8  with them.  I then want you to put it in
9  writing, if you confer with them, that they
10  have no personal knowledge of any relationship
11  with Lil' Joe Records or the 2 Live Crew
12  copyrights, other than what their father told
13  them.  And if you confirm that, then I need
14  not take their depositions.
15      Fair enough?
16      MR. BURROUGHS:  Yeah, like I said, we can
17  discuss it.  It sounds to me like that is not
18  going to be accurate, just because, you know,
19  there are also these documents that the
20  witness referred to.  So I -- you know, for
21  that reason alone, I couldn't stipulate to the
22  request that you are asking me for, because,
23  of course, that knowledge could have come
24  with the documents.  But if you -- if you're
25  asking for a statement that they didn't

Page 29

1  witness, you know, any transactions or
2  anything between the parties, it seems like I
3  should be able to get that, but of course, I
4  can't do that until I confer with them.
5      MR. WOLFE:  Okay.  Fair enough.
6  BY MR. WOLFE:
7      Q.   Is it also correct to say that you have
8  no personal knowledge of any of your father's
9  dealings with Luke Records or Luther Campbell?
10      MR. BURROUGHS:  I will just object.  It's
11  vague as to personal knowledge.  But go ahead
12  if you understand the question.
13      THE WITNESS:  Repeat the question, please.
14  BY MR. WOLFE:
15      Q.   Is it correct to say that you have no
16  personal knowledge of your father's business
17  dealings with Luke Records or any of the other
18  versions of the company?
19      A.   I already stated that they had an
20  agreement and the -- the oral agreement and then
21  they memorialized that in the contracts.
22      Q.   And is this something your father told
23  you about or you heard from some other source?
24      A.   Well, we -- yes, I said that, yes.
25      Q.   You didn't answer my question.  You heard

Leterius Ray
November 04, 2022

Page 30

1 from your father and only your father; correct?

2    A.   My father said that and they -- the

3 members agreed on that.

4    Q.   How do you know that, did you speak with

5 anyone else about that subject?

6    A.   I mean, over, you know, over time.  I

7 mean...

8    Q.   Have you ever had a conversation with

9 Mark Ross?

10    A.   I have.

11    Q.   When?

12    A.   Multiple occasions.

13    Q.   Before this lawsuit or after this lawsuit?

14    A.   Yeah.

15    Q.   Before or after?

16    A.   Before.

17    Q.   In that conversation, did you discuss

18 this so-called oral agreement with Mr. Campbell?

19    A.   I have had multiple conversations with

20 Mark, yes.

21    Q.   And I'm asking you, again:  When you had

22 these conversations with Mark Ross, did you

23 discuss the so-called oral agreement between the

24 members of 2 Live Crew and Luther Campbell?

25    A.   We don't -- no.

Page 31

1         MR. WOLFE:  What I would like to do is

2 screen share now, if I can have a minute.

3         THE TECHNICIAN:  Mr. Ray, are you able to

4 tilt your camera up a little bit just so your

5 head stays in the same?

6         THE WITNESS:  I'm sorry.

7         THE TECHNICIAN:  No, it's all right, thank

8 you.

9 BY MR. WOLFE:

10    Q.   Mr. Ray, can you see the document I just

11 put on the screen?

12    A.   No.

13         THE TECHNICIAN:  I'm not seeing anything.

14         MR. WOLFE:  I'll try it again.  Now?

15         THE TECHNICIAN:  Try double clicking on

16 the document you're trying to share.  There

17 you go.  Looks like -- there we go.

18 BY MR. WOLFE:

19    Q.   Okay.  Mr. Ray, for the record, I'm

20 showing you a document that is an Exclusive

21 Recording Agreement entered into the blank day of

22 April 1991 by and between Luke Records and Chris

23 Wong Won.  Do you see that?

24    A.   I see the document.

25    Q.   Have you ever seen this document before?

Page 32

1    A.   Yes.

2    Q.   And when you refer to the agreements that

3 your father had with Luke Records, were you

4 referring to this document?

5    A.   The agreements for the first three were

6 the 1990.

7    Q.   So is it this document or something else?

8    A.   The agreements for the -- to memorialize

9 the first three is the 1990.

10    Q.   Who told you that?

11    A.   I have that, I have those documents.

12    Q.   And we'll get to that in a minute because

13 the 1990 agreement says nothing about any

14 particular copyright or album.  So what were the

15 first three albums released by 2 Live Crew?

16    A.   So it would be Nasty, it would be Move

17 Somethin', 2 Live Is What We Are.

18    Q.   Do you know when those albums were

19 recorded?

20    A.   Respect -- I mean, respectfully like they

21 were all prior to the 90 agreement.  Those were

22 all under the oral agreement, so...

23    Q.   And how do you know when it was recorded?

24    A.   Because they were -- I'm sorry --

25 distributed through the company before the

Page 33

1 agreement.

2    Q.   They were distributed by Luke Records;

3 correct?

4    A.   Uh-huh.

5    Q.   And those albums had a copyright notice

6 saying that Luke Records owned the copyrights;

7 correct?

8         MR. BURROUGHS:  Objection, vague.

9 BY MR. WOLFE:

10    Q.   You've seen those records, haven't you?

11    A.   I've seen the albums?

12    Q.   Yes.

13    A.   The albums?  Yes.

14    Q.   Did you see a CD?

15    A.   Have I seen a CD?

16         Sure, yes.

17    Q.   And when you looked at the CD, did you

18 see if there was a copyright notice?

19    A.   I wasn't looking for that.

20    Q.   That's not my question.

21         Do you know what a copyright notice is?

22    A.   No, I mean, I'm not a lawyer.  I mean,

23 what -- what are you referring?

24    Q.   So you have never seen a symbol with that

25 C in a circle; correct, or you don't know what

Leterius Ray
November 04, 2022

Page 34

1  that is?
2       A.   I believe I've seen that.
3       Q.   So you saw a C in a circle on each of
4  those first three records; correct?
5            MR. BURROUGHS:  Objection.  Misstates the
6  testimony.  Vague.  Go ahead.
7            MR. WOLFE:  I'll rephrase the question.
8  BY MR. WOLFE:
9       Q.   When you looked at those three records,
10 did you notice that there was a C in a circle on
11 each one of them?
12      A.   I wasn't looking for that.
13      Q.   That's not my question.  Did you see it?
14      A.   Did I notice it?
15      Q.   Yes.
16      A.   I wasn't looking for it.
17      Q.   That's not my question.
18           Did you see it?
19      A.   I did not notice it.
20      Q.   Do you know what a C in a circle means?
21           MR. BURROUGHS:  Objection, calls for legal
22 conclusions.
23           But go ahead, if you know.
24           THE WITNESS:  That's the copyright symbol.
25

Page 35

1  BY MR. WOLFE:
2       Q.   And did you ever see on any of those first
3  three records that it said C in a circle and then
4  either Luke Records or Lil' Joe Records?
5       A.   I did not notice.
6       Q.   I'm going to go back to the document that
7  we previously marked as Exhibit 3.
8            MR. BURROUGHS:  Before you start any
9  additional questions.  Let me do a quick
10 restroom break, five minutes.
11           MR. WOLFE:  Of course.
12           MR. BURROUGHS:  All right.  Thank you.
13           THE TECHNICIAN:  All right.  We're going
14 off the record, 10:14 A.M. Eastern Time.
15           (A recess was had in the proceedings after
16 which the following proceedings were had:)
17           THE TECHNICIAN:  We're back on the
18 record.  The time is 10:20 A.M. Eastern Time.
19 BY MR. WOLFE:
20      Q.   Mr. Ray, do you see the contract I have
21 on the screen?
22      A.   I can see it.
23           MR. WOLFE:  So just for the record, this
24 is page 28 of -- and I'll go up to the top,
25 of the contract between Luke Records and

Page 36

1  Chris Wong Won dated the blank day of April
2  1991.  So I'm now going to go back to the
3  signature page.
4  BY MR. WOLFE:
5       Q.   Do you recognize the signature on this
6  page?
7       A.   Yes, sir.
8       Q.   Is that your father's signature?
9       A.   Yes, sir.
10      Q.   Did your father tell you that he had
11 entered into this contract with Luke Records?
12      A.   I don't recall.
13      Q.   So you don't recall whether or not you
14 had a conversation with your father about his
15 contract dated April of 1991?
16      A.   I mean, I don't recall a specific
17 conversation about this contract.
18      Q.   Do you -- do you have any personal
19 knowledge -- scratch that.
20           Let me just represent to you that Luke
21 Records filed for bankruptcy in 1995.
22           At that point you were five, six or seven
23 years old?  Is that correct?
24      A.   What's the question?
25      Q.   In 1995, how old were you?

Page 37

1       A.   About seven.
2       Q.   Did you have any personal knowledge of
3  anything that went on in the Luke Records
4  bankruptcy that took place before you were seven
5  years old?
6       A.   At that time?
7       Q.   Or any time?
8       A.   Any time, yes.
9       Q.   So let's first start:  At that time did
10 you know anything about the Luke Records
11 bankruptcy?
12      A.   I don't recall.
13      Q.   And so what conversations did you have
14 with your father or anybody else about the Luke
15 Records bankruptcy that happened in 1995?
16      A.   What conversations?
17           Can you repeat the question?
18      Q.   Sure.  What conversations did you have
19 with anyone about the Luke Records bankruptcy
20 that happened in 1995?
21      A.   I mean I know -- I know it took place.
22      Q.   And how do you know that it took place?
23      A.   These documents.
24      Q.   What documents?
25      A.   I believe they've been entered.

Leterius Ray
November 04, 2022

Page 38

1      Q.   So have you seen the plan of
2  reorganization in the bankruptcy?
3      A.   I don't -- I mean, I don't recall
4  specifically.  I'm sure it's in the documents.
5      Q.   So let's now go back to Exhibit 3, the
6  contract that I showed you dated April of 1991.
7  Okay?  Do you have any knowledge of this document?
8           THE TECHNICIAN:  We're still seeing
9  Exhibit 2.
10          MR. WOLFE:  I'm sorry.  Exhibit, I'm sorry,
11  Exhibit 2.
12  BY MR. WOLFE:
13     Q.   Do you have any knowledge of this
14  contract?  Which for the record, is April, blank
15  day of April 1991, by and between Luke Records and
16  Chris Wong Won?
17     A.   '91?
18     Q.   Yes.
19     A.   To my knowledge, the '91 agreement was
20  Bayshore (ph) records.
21     Q.   How do you know that?
22     A.   I have that -- I have that in my
23  possession.
24     Q.   Who told you that?
25     A.   I have that in my possession.

Page 39

1      Q.   You have what in your possession?
2      A.   The contracts that were produced by the
3  label through the audit.
4      Q.   Which label, Luke Records or Lil' Joe
5  Records?
6      A.   My father, he audited -- I just know he
7  got those through the audit.
8      Q.   Did your father ever tell you how he was
9  paid money by Luke Records from the first three
10  albums?
11          MR. BURROUGHS:  Objection, vague.
12          But go ahead, if you understand the
13  question.
14          THE WITNESS:  To my understanding that
15  there was -- being my royalty.
16  BY MR. WOLFE:
17     Q.   Did your father ever tell you that Luke
18  Records paid in advance to the members of 2 Live
19  Crew?
20     A.   I don't recall.
21     Q.   So let me go up and show you
22  paragraph 7(a) of Exhibit 2, which is the contract
23  between Chris Wong Won and Luke Records.  Do you
24  see paragraph 7(a), it talks about an advance of
25  $250,000?

Page 40

1      A.   Okay.
2      Q.   Did you ever have a conversation with
3  your father about whether or not Luke Records paid
4  that advance?
5      A.   Not that I can recall.
6      Q.   I'm going to go down a little further and
7  show you paragraph 10(a).
8           Did you ever have a conversation with
9  your father about the royalty rate that Luke
10  Records was paying to him to be a member of
11  2 Live Crew?
12     A.   Not that I can recall.
13     Q.   Have you ever heard the name Allen Jacobi?
14     A.   Not that I can recall.
15     Q.   Do you know the name of any entertainment
16  lawyer who ever represented your father?
17     A.   Not that I can recall.
18     Q.   Did you ever hear the name Doug Stratton?
19     A.   Hmm, I've heard that name.
20     Q.   Tell me what you know about Doug Stratton?
21     A.   I remember the name, but I don't know a
22  whole lot.
23     Q.   Did you know that he was a lawyer who
24  represented your father in litigation with
25  Lil' Joe Records?

Page 41

1      A.   I don't recall that.  I remember the name.
2      Q.   I'm going to show you a document that your
3  lawyer produced yesterday.  Find it.  That's not
4  it.
5           (Technology recess.)
6           MR. WOLFE:  I am just trying to find --no,
7  I'll get them.  I'll find it.  It's not like
8  you can see any porn or anything.  That's not
9  it.  What did I do with it?  Scott, do you
10  have that, the documents you produced yesterday
11  handy?
12          MR. BURROUGHS:  I don't -- I didn't produce
13  anything --
14          MR. WOLFE:  There was like 20-some pages
15  of documents that were produced yesterday.
16          MR. BURROUGHS:  The email from Frank, yeah.
17          MR. WOLFE:  It came from Frank, didn't it?
18          MR. BURROUGHS:  It did, yeah.  Let me look
19  and see.
20          MR. WOLFE:  And actually I am not finding
21  it.  I thought it came from Frank.
22          MR. BURROUGHS:  Do you want me to try and
23  find the email -- here it is.  No, it's not,
24  that's not it.
25          MR. WOLFE:  No, that's not it.

Leterius Ray
November 04, 2022

Page 42

1   MR. BURROUGHS: Do you want to find it and
2   forward to you that email?
3   MR. WOLFE: Yes, that would be great.
4   All right, I'll move on while you're doing
5   that. Okay?
6   MR. BURROUGHS: Well, hold on. If I'm
7   going to be looking for something for you, I
8   am not going to be able to listen to the
9   questions.
10   MR. WOLFE: All right. Fair enough, I will
11   wait until you send it to me. I am
12   specifically looking for page number 220.
13   MR. BURROUGHS: Okay. I forwarded to you
14   the email that Frank sent to you last night
15   with the documents.
16   MR. WOLFE: Thank you. It hasn't come in
17   yet. Okay. I haven't seen it. I'll come
18   back to it, okay? I just want to go back to...
19   BY MR. WOLFE:
20   Q.   **Mr. Ray, I'm going to show you the**
21   **documents that we previously marked as Exhibit 9.**
22   **Do you see it on your screen?**
23   A.   Yes.
24   Q.   **Which, for the record, we have marked as**
25   **Exhibit 9. This is a recording agreement. It's**

Page 43

1   undated between Skyywalker Records, Inc. and
2   Luther Campbell Ross, David Hobbs, Chris Wong Won,
3   and Marquis Ross.
4   **Is this the contract that you were**
5   **referring to when you were talking about the**
6   **conveyance of rights between 2 Live Crew and Luke**
7   **Records?**
8   A.   I'm looking at the name, that would have
9   been the name at the time.
10   Q.   **Did you have a conversation with your**
11   **father about this contract?**
12   A.   Vaguely.
13   Q.   **What do you recall discussing with your**
14   **father about this particular contract?**
15   A.   I know the original agreement was the
16   focal point of the termination of rights, our
17   conversation.
18   Q.   **So I just showed you a -- before, a**
19   **document we marked as Exhibit 2, which was the**
20   **contract between Luke Records and your father,**
21   **and now I'm showing you this document that we**
22   **marked as Exhibit 9. Do you know which one was**
23   **signed first?**
24   MR. BURROUGHS: I'll object, and can we
25   the exhibits to be shown? All we are seeing

Page 44

1   is the first half of the first page. Can you
2   show us the -- what page it is so I can make
3   sure I know what I'm looking at?
4   MR. WOLFE: Sure.
5   BY MR. WOLFE:
6   Q.   **Mr. Ray, I will scroll down.**
7   MR. BURROUGHS: Is it possible to make it
8   bigger on the -- so we can see?
9   MR. WOLFE: Is that better?
10   MR. BURROUGHS: No. As I mentioned
11   yesterday, if you hit the arrow -- or the last
12   deposition, hit that arrow on the right, up
13   higher, up higher, up higher. The arrow on
14   the right, up higher. That will open it up.
15   There we go. That's better. And then if you
16   actually make the text smaller, then would be
17   able to read maybe a page at a time.
18   MR. WOLFE: How's that?
19   MR. BURROUGHS: That's -- is that -- is
20   that okay for the witness, are you able to --
21   if he goes back --
22   THE WITNESS: I think so.
23   MR. BURROUGHS: Okay.
24   MR. WOLFE: Okay. So now I'll --
25   MR. BURROUGHS: Well, can you please start

Page 45

1   it? I just want to make sure, I want to read
2   the first at least three pages to make sure I
3   know what I'm looking at.
4   MR. WOLFE: Okay.
5   MR. BURROUGHS: All right. Okay. And
6   just stop. Can you go back so I can just read
7   this engagement paragraph? Thank you. Just
8   give me 20 seconds.
9   MR. WOLFE: Continue down?
10   MR. BURROUGHS: The witness, do you need
11   more time? It's up to -- I want to make sure
12   the witness has a chance to read it as well.
13   So if he is ready, then I am ready to go to
14   the second paragraph.
15   THE WITNESS: Initial period January 1,
16   1987, and ending December 31st.
17   BY MR. WOLFE:
18   Q.   **Do you see that -- just focusing in on**
19   **that, did you have a specific conversation with**
20   **your father about the term of this contract?**
21   A.   If I am focusing on what now?
22   Q.   **Focusing in on paragraph 1 of the**
23   **document that we have marked as Exhibit 9, which**
24   **for the record, is a contract between Skyywalker**
25   **Records, Inc., Luther Campbell, David Hobbs,**

Leterius Ray
November 04, 2022

Page 46

1    Chris Wong Won and Marquis Ross. Okay. Looking
2    at paragraph 1. Do you see that this is a one-year
3    term?
4         MR. BURROUGHS: I will just object, calls
5    for legal conclusions. But if you understand
6    it, you can -- you can respond.
7         THE WITNESS: I mean, I'm not aware. The
8    contracts say what they say.
9    BY MR. WOLFE:
10        Q.  And does it clearly say to you that it's
11   a one-year contract commencing on January 1, 1997
12   and ending December 31, 1987?
13        MR. BURROUGHS: Object. Same objection.
14   Calls for legal conclusions and asked and
15   answered.
16   BY MR. WOLFE:
17        Q.  I just asked if he sees that, it says it
18   right there in the document?
19        THE REPORTER: I think you said January 1,
20   1997.
21        MR. WOLFE: No, 1987.
22        THE REPORTER: Yes, that's right.
23   BY MR. WOLFE:
24        Q.  Do you see that, Mr. Ray?
25        A.  I can see the contract.

Page 47

1        Q.  Are you aware if any of the 2 Live Crew
2    recordings were made between January 1, 1987 and
3    December 31, 1987?
4        A.  I don't -- I don't recall like specific.
5        Q.  Did you have a conversation with your
6    father about when the first three recordings --
7         I'm sorry, I'll start over.
8         Did you have a conversation with your
9    father about when the first three 2 Live Crew
10   albums were recorded?
11        A.  We have had conversations about nothing
12   specific. I mean we had conversations, I mean...
13        Q.  Did your father ever tell you that any
14   of the first three albums of 2 Live Crew were
15   recorded during the period of January 1, 1987
16   until December 31, 1987?
17        A.  I can't recall exactly.
18        Q.  Now I'm going to show you the -- can you
19   see the, a document on your screen now?
20        A.  I can see that.
21        Q.  Which, for the record, is 26 pages that
22   were produced by your lawyers yesterday.
23        Are you familiar with these documents?
24        MR. BURROUGHS: Well, just for the
25   record, these were actually produced in

Page 48

1    connection with the plaintiff's deposition a
2    week or so ago, but they were again produced
3    yesterday. But go ahead.
4         THE WITNESS: Can we go through them?
5    BY MR. WOLFE:
6        Q.  Sure. Let's take it page 1 at a time.
7         The first page appears to be an invoice
8    dated January 28, 2016 from Lil' Joe Records to
9    Christopher Wong Won?
10        Do you see that document?
11        A.  Yes, sir.
12        Q.  Where did that document come from, if
13   you know?
14        A.  Those are -- yes, he requested those from
15   Lil' Joe Records, I believe.
16        Q.  Okay. And did you have this document in
17   your possession?
18        A.  I do have those documents in my
19   possession.
20        Q.  How did you or your siblings get
21   possession of this document?
22        A.  My father requested those documents.
23        Q.  Okay. So did he tell you that?
24        A.  Yes.
25        Q.  So your father requested these documents

Page 49

1    from Lil' Joe, and did he tell you that Lil' Joe
2    gave him these documents?
3        A.  The documents were delivered.
4        Q.  Okay. And then what happened to them
5    after they were given to your father?
6        A.  He just kept -- I mean they were in his
7    possession.
8        Q.  So is it fair to say that upon his death
9    you or your siblings found these documents among
10   his possessions?
11        A.  Correct.
12        Q.  Did you have any other documents --
13   scratch that.
14        Did you find within your father's
15   possessions any other documents other than these
16   26 pages that were relative to 2 Live Crew, Luke
17   Records or Lil' Joe Records?
18        A.  Can you scroll through them?
19        Q.  Sure. Okay? So I'm going to repeat the
20   question.
21        Other than these 26 pages of documents,
22   did you find within your father's possessions,
23   any other documents that were relative to
24   2 Live Crew, Lil' Joe Records or Luke Records or
25   Skyywalker Records?

Page 50

1    MR. BURROUGHS: Objection, vague, compound.
2  But if you understand, please respond.
3    THE WITNESS: I don't -- what's the
4  question?
5  BY MR. WOLFE:
6    Q.   Other than these 26 pages of documents,
7  did you or your siblings, find any other documents
8  among your father's possessions that were related
9  to 2 Live Crew?
10   A.   I don't recall.
11   Q.   So how did you find these 26 pages?
12   A.   He had them with his personal possessions.
13   Q.   And where did he keep his personal
14  possessions?
15   A.   His residence.
16   Q.   And where was his residence?
17   A.   In Florida.
18   Q.   What was the address?
19   A.   I don't recall the address at the time.
20   Q.   Where within the residence were these
21  documents?
22   A.   He had a tote.
23   Q.   A tote?
24   A.   Uh-huh.
25   Q.   Like a little bag?

Page 51

1    A.   No.  Like a tub, like a --
2    Q.   A plastic tub of documents?
3        And were there documents in there other
4  than these 26 pages?
5    A.   Yes.
6    Q.   Is there any reason why you haven't
7  turned over those other documents?
8    A.   Have we not?  I mean, I don't know.
9        MR. BURROUGHS: Yeah, I believe that we
10  have turned over to you, Mr. Wolfe, what we
11  found and was responsive to the discovery
12  requests.
13  BY MR. WOLFE:
14   Q.   All right.  So let's back up.  Your father
15  died in 2018, and you said you were with them the
16  day before?
17   A.   Correct.
18   Q.   Were all the siblings there?
19   A.   Where?
20   Q.   When you found these documents?
21   A.   No, not all of us.
22   Q.   Who was there?
23   A.   I mean I don't recall.  It was a while
24  ago.
25   Q.   So I'm going to go up to document 220.

Page 52

1    Okay.  I am showing you a document.  Do
2  you see down on the bottom it says 2LiveCrew0220?
3    A.   Where are we at?  Show me.
4    Q.   Right here.
5    A.   Oh, okay.
6    Q.   Do you see that?
7    A.   Yes.
8    Q.   Do you know what this document is?
9    A.   That is the receipts.  That -- the
10  particular document there, yes.
11   Q.   Okay.  And do you see that among them,
12  No. 17, is the agreement, April, 1991, Luke
13  Records, Inc.
14       Do you see that?
15   A.   I see that line, yes.
16   Q.   Do you know if, in fact, Lil' Joe Records
17  gave to your father that April 1991 agreement that
18  we have previously marked as Exhibit 2?
19   A.   That's with these 26 documents?
20   Q.   No, that's not my question.  My question
21  is:  Does the reference as No. 17 on this page,
22  220, indicate that Lil' Joe Records gave your
23  father on February 2, 2016, the April 1991
24  contract?
25       MR. BURROUGHS:  Objection, calls for

Page 53

1  speculation.  But if you have an answer, go
2  ahead.
3        THE WITNESS:  Yes, that's the receipt for
4  the documents that were produced.
5  BY MR. WOLFE:
6    Q.   And did you find the April 1991 contract
7  with Luke Records among your father's possessions?
8    A.   All these documents were together.
9    Q.   And would that include the April 1991
10  contract?
11   A.   Yes.
12   Q.   How did you find Mr. Burroughs?
13       MR. BURROUGHS:  It's not relevant, but
14  you can -- yeah, tell him that.
15       MR. WOLFE:  Relevance is not an objection.
16       MR. BURROUGHS:  You can give me a short
17  answer.
18       MR. WOLFE:  I want a complete answer.
19       MR. BURROUGHS:  I will instruct the
20  witness not to answer based on privilege.
21       MR. WOLFE:  How he met you could not
22  possibly be privileged.
23       MR. BURROUGHS:  I absolutely disagree.
24       MR. WOLFE:  You weren't his lawyer yet.
25       MR. BURROUGHS:  As you know, the privilege

Page 54

1  covers communications made in advance of
2  retention.
3      MR. WOLFE:  I'm not asking about any
4  communications.  I'm asking him how we met.
5  BY MR. WOLFE:
6      Q.  Were you introduced to Mr. Burroughs by
7  someone else?
8      MR. BURROUGHS:  Go ahead.
9      THE WITNESS:  Yes.
10 BY MR. WOLFE:
11     Q.  Who was that person?
12     A.  A mutual friend.
13     Q.  What's the name of the mutual friend?
14     A.  Nicole.
15     Q.  What's Nicole's last name?
16     A.  I don't recall.
17     Q.  Where does Nicole live?
18     MR. BURROUGHS:  Objection.  Calls for
19 speculation.
20     THE WITNESS:  I'm not sure of her
21 whereabouts.
22 BY MR. WOLFE:
23     Q.  Is Nicole the manager of Mark Ross?
24     MR. BURROUGHS:  Objection.  Calls for
25 speculation.  But go ahead, if you know.

Page 55

1      THE WITNESS:  I'm not sure of their
2  current business standing.
3  BY MR. WOLFE:
4      Q.  What did Nicole say to you that led up
5  to the meeting with Mr. Burroughs?
6      MR. BURROUGHS:  Again, to the extent she
7  said anything during the meeting, I would, of
8  course, instruct you not to disclose that.
9      MR. WOLFE:  I said led up to the meeting.
10     MR. BURROUGHS:  Anything before we had a
11 conversation, then you can let him know.
12     THE WITNESS:  In regards to what?
13 BY MR. WOLFE:
14     Q.  Well, you said you met Mr. Burroughs
15 through Nicole.  So I'm asking you about your
16 conversations with Nicole.  What did she say?
17     A.  In regards to what, though?
18     Q.  Anything that led up to the conversation
19 or the meeting with Mr. Burroughs?
20     A.  I mean, she told me about his business,
21 you know, asking him that -- his -- just I mean
22 as a professional.
23     Q.  Okay.  And did she set up the meeting with
24 Mr. Burroughs?
25     A.  What do you mean, did she set up the

Page 56

1  meeting?
2      Q.  Well, how did the meeting with
3  Mr. Burroughs come about?
4      MR. BURROUGHS:  Objection.  Vague.  But if
5  you remember.
6      THE WITNESS:  I don't -- I don't recall.
7  BY MR. WOLFE:
8      Q.  So when was this meeting?
9      A.  It's been a while now.  I don't recall.
10     Q.  Was it by telephone or Zoom or some other
11 means?
12     A.  I don't recall.
13     Q.  Who was in the meeting?
14     MR. BURROUGHS:  Okay.  I am going to
15 instruct the witness not to disclose
16 attorney/client information and not answer.
17     MR. WOLFE:  Who was in the meeting could
18 not possibly be attorney/client communications.
19     MR. BURROUGHS:  I disagree.  I instruct
20 the witness not to answer.
21     MR. WOLFE:  Well, but maybe someone was
22 there who was not a client and therefore
23 there would be no privilege, so I am entitled
24 to ask the question and he has to answer the
25 question.

Page 57

1      MR. BURROUGHS:  I am going to instruct the
2  witness not to answer.
3      MR. WOLFE:  This deposition is over.  I
4  am going to the Court, you are interfering in
5  my deposition.  Therefore we are going to stop
6  now.  I will go to the Court and seek an order
7  of sanctions.  Okay?
8      MR. BURROUGHS:  You don't want to confer
9  off the record before going to the Court?
10     MR. WOLFE:  Yes, I am happy to confer
11 right now.  It is not possible as to who was
12 there that would be privileged.  Second of
13 all, if there was someone there who was not
14 one of the clients, there would be no
15 privilege.
16     MR. BURROUGHS:  I will make a proffer --
17     MR. WOLFE:  I don't want to hear -- I
18 don't want to hear it from you.  I want to
19 hear it from him.
20     MR. BURROUGHS:  Let me on break, I will
21 confer with the witness and see if he is
22 willing to waive that potentially privileged
23 information.  We will take a two-minute break
24 and be back.
25     MR. WOLFE:  Okay.

Page 58

```
 1          THE TECHNICIAN:  All right.  Going off
 2    the record, 10:54 A.M. Eastern Time.
 3          (A recess was had in the proceedings after
 4    which the following proceedings were had:)
 5          THE TECHNICIAN:  We are back on the video
 6    record.  The time is 11:03 A.M. Eastern Time.
 7          MR. BURROUGHS:  And as mentioned, Scott
 8    Burroughs speaking.  During the off-the-record
 9    colloquy between counsel, I conferred with
10    the witness and in order to avoid any sort of
11    dispute over this, it would appear to be a
12    non-issue, the witness will answer the prior
13    question if counsel wants to ask it again.
14          MR. WOLFE:  I will tee it up with a series
15    of questions.
16    BY MR. WOLFE:
17      Q.   I was asking you about a woman named
18    Nicole who you said introduced you to
19    Mr. Burroughs.  Do you recall that?
20      A.   Sure.
21      Q.   Nicole is not a lawyer, is she?
22      A.   Not to my knowledge.
23      Q.   And how do you know her?
24      A.   Through Mr. Ross.
25      Q.   And you said she was the one who set up
```

Page 59

```
 1    the meeting with Mr. Burroughs; correct?
 2          MR. BURROUGHS:  Objection.  Vague.
 3    Misstates the testimony.  Go ahead.
 4          MR. WOLFE:  It's not a proper objection.
 5    You have to stop doing that.  Just say, "I
 6    object to form."
 7          THE WITNESS:  She introduced us.
 8    BY MR. WOLFE:
 9      Q.   And what did she say when she set up the
10    meeting?
11          MR. BURROUGHS:  Objection, misstates the
12    testimony.
13          THE WITNESS:  Through her introduction she
14    filled me in on his professional record.
15    BY MR. WOLFE:
16      Q.   And did she say words to the effect --
17    scratch that.
18          Did she -- was there a discussion about
19    exercising a termination of the transfer of
20    copyrights?
21      A.   Yes.
22      Q.   And was Nicole the first person who
23    raised with you the subject of the termination of
24    the transfer of copyrights?
25      A.   No.
```

Page 60

```
 1      Q.   Who was the first one who raised it with
 2    you?
 3      A.   My dad.
 4      Q.   And when was that?
 5      A.   It was over the years.
 6      Q.   And did he say when those copyrights
 7    were transferred?
 8          MR. BURROUGHS:  Objection.  Calls for a
 9    legal conclusion.  Vague.  But you can answer,
10    if you understand it.
11          MR. WOLFE:  You have to stop doing that.
12          I mean, I don't know how many times I can
13    caution you.  I will be going to the Court for
14    sanctions because you are coaching the witness
15    and telling him how to answer.  The only thing
16    you are supposed to say is "I object to form,"
17    which preserves all objections.  Your
18    objection should not be speaking and should
19    not coach the witness as to how to answer the
20    question, as you are doing continuously.
21    BY MR. WOLFE:
22      Q.   Mr. Ray, would you like the court
23    reporter to read back the question?
24      A.   That's fine.
25          MR. WOLFE:  Debbi, would you please read
```

Page 61

```
 1    it back?
 2          (The requested portion of the transcript
 3    was read back by the reporter as was recorded
 4    above.)
 5          MR. BURROUGHS:  Same objections.
 6          THE WITNESS:  No.  Based on our
 7    conversations, it's that the Skyywalker
 8    agreement, and that's basically what I can
 9    recall.
10    BY MR. WOLFE:
11      Q.   Did your father tell you that, in fact,
12    the 1991 agreement transferred the copyrights to
13    Luke Records?
14      A.   We didn't speak about that.  We -- I mean,
15    from what I -- from our conversations, the
16    original recordings were off of the Skyywalker.
17      Q.   All right.  So let's go back to the
18    conversations with Nicole.  Did you call her or
19    did she call you?
20      A.   When?
21      Q.   When you first were discussing the subject
22    as a termination of the copyright transfers?
23      A.   She reached out.
24      Q.   What did she say?
25      A.   In relation to what?
```

Leterius Ray
November 04, 2022

Page 62

1    Q.    Termination of the transfers.
2    A.    We talked a lot about it.
3    Q.    I need to know what was said in those
4  conversations.
5    A.    Do you have a more specific question?
6    Q.    Yes.  What was said between you and her
7  in the conversations?
8    A.    I mean, like I said before, she talked
9  about Scott's record on the -- expertise on the
10  matter.
11    Q.    So is it fair to say that she is the one
12  who recommended that you hire Mr. Burroughs?
13    A.    She gave me the recommendation.
14    Q.    And was there then a meeting with
15  Mr. Burroughs or a phone call?
16    A.    Correct.
17    Q.    Was it a meeting or a phone call?
18    A.    We, you know, we -- phone call.
19    Q.    And who was on the phone call?
20    A.    I mean, it's been some time.  I don't
21  really recall what -- I know Mr. Burroughs and I
22  spoke.
23    Q.    Okay.
24    A.    And have spoken on occasion.
25    Q.    Okay.  Was anyone else on the phone call

Page 63

1  other than you and Mr. Burroughs?
2    A.    We have had numerous phone calls.
3    Q.    Was there ever a conversation where
4  Nicole was on the phone call, where the subject
5  of the termination of copyrights were discussed?
6    A.    I don't recall her being -- I don't
7  recall.
8    Q.    So you don't recall her ever being
9  present when you had a conversation with
10  Mr. Burroughs; is that your testimony?
11    A.    I can't recall.  It's been a while.  I
12  haven't spoken to her, I can't recall.
13    Q.    Is it fair to say that the conversations
14  with her were around the year 2020?
15    A.    I don't want to speculate.
16    Q.    You tell me, when did you have
17  conversations with Nicole about the termination of
18  copyrights?
19    A.    I can't recall.
20    Q.    Well, you're familiar with the notice of
21  termination that Mr. Burroughs sent on your
22  behalf?
23    A.    Yes.
24    Q.    And that happened in November 4th, 2020.
25       Do you recall that?

Page 64

1    A.    Can you show me a document?
2    Q.    Yes.  For the record, I'm showing you the
3  document we previously marked as Exhibit 3, which
4  is dated November 4th, 2020, which purports to be
5  a letter from Doniger / Burroughs to a number of
6  people, including Lil' Joe Records.
7       Do you see it on your screen?
8    A.    Uh-huh.
9    Q.    Does this refresh your recollection that
10  on November of 2020 is when Mr. Burroughs sent a
11  notice of termination on your behalf with respect
12  to the 2 Live Crew copyrights?
13    A.    That appears to be true.
14    Q.    So what I'm asking you about the
15  conversations that led up to this letter, when did
16  they happen?
17    A.    Prior to this.
18    Q.    How much prior to this?  Months?  Weeks?
19  Years?
20    A.    I mean, conversations, I mean there was
21  conversations with my father, but --
22    Q.    No, I'm asking about conversations with
23  Nicole?
24    A.    I honestly don't recall.  It's been a few
25  years, but prior to this.

Page 65

1    Q.    Well, here is what I'm asking you:  I am
2  showing you a letter that Mr. Burroughs sent on
3  your behalf from November 4th.  You told me that
4  Nicole introduced you to Mr. Burroughs.  So I'm
5  asking you:  How far before November 4th did she
6  make that recommendation?
7    A.    If I would have to put a number, I would
8  say months.
9    Q.    Okay.  One month, five months, how many
10  months?
11    A.    I honestly don't recall.
12    Q.    But just a number of months, not a matter
13  of years; correct?
14    A.    I don't know that for sure.  I honestly
15  don't recall.
16    Q.    And is it correct to say that you just
17  have no recollection of anything that was said in
18  the conversations between you and Nicole regarding
19  the 2 Live Crew copyrights that took place a
20  couple of months before November of 2020?
21    A.    Repeat the question.
22    Q.    Is it fair to say you have no
23  recollection of any of the conversations that took
24  place between you and Nicole in the months before
25  November 2020, regarding the 2 Live Crew

Leterius Ray
November 04, 2022

1   termination notice?
2       A.   I don't remember her telling me about
3   Scott's record on this and his expertise.
4       Q.   Anything else?
5       A.   That's what comes to mind.
6       Q.   Again, I'm going to ask you:  Was Nicole
7   ever present in any of the conversations that you
8   had with Mr. Burroughs?  And what I mean
9   "present," by phone or in person?
10      A.   I don't -- I just don't recall it.
11      Q.   Now, previously I had asked you about
12  the so-called oral agreement that your father had
13  with Luther Campbell regarding 2 Live Crew.
14  Okay?
15           Are you -- did he tell you or do you have
16  knowledge of any of the terms of that so-called
17  oral agreement?
18      A.   I don't recall.  I was -- I wasn't there.
19           I just -- I just know that the, you know,
20  the '87 agreement or the one entered with
21  Skyywalker was to cover it.
22      Q.   I'm showing you an order of Federal Judge
23  James Lawrence King of October 22, 2002.
24           Do you see that on your screen?
25      A.   I can see the document.

1       Q.   Which for the record is Exhibit C to the
2   complaint, in which I am going to go ahead and
3   mark that as Exhibit 18.
4
5           (The above referred to document was
6   marked as Exhibit No. 18, order of Federal Judge
7   James Lawrence King of October 22, 2002 for
8   identification.)
9   BY MR. WOLFE:
10      Q.   Have you ever seen this order before?
11      A.   Can you go back through it again?  That
12  was kind of fast.
13      Q.   Sure.  It's a seven-page order.
14           I'm going to specifically show you
15  paragraphs N -- oh, I'm sorry, I have the wrong
16  one.  Do you see paragraph N of this order?
17      A.   I can see.
18      Q.   Right there on the screen?  My question
19  is:  Are you aware of this order by James Lawrence
20  King, a Federal Judge?
21      A.   We have this in our possession.
22      Q.   You see that James Lawrence King found in
23  paragraph T of the order, that your father acted
24  wrongfully and fraudulently reassigned the
25  trademark to 2 Live Crew that was owned by

1   Lil' Joe Records?
2       A.   I would say that that is what that says.
3       Q.   Let me now show you -- now, I am going to
4   show you a document that we previously marked as
5   Exhibit 10, which, for the record, is a settlement
6   agreement in a lawsuit between Joseph Weinberger
7   and Christopher Wong Won dated June 24th, 2003.
8           Do you see that?
9       A.   I can see the document.
10      Q.   Do you recognize your father's signature
11  on this document?
12      A.   Yes.
13      Q.   Are you aware of this settlement
14  agreement?
15      A.   Can you scroll up?  What does it say here?
16      Q.   I am going to specifically show you
17  paragraph 3, which I'll read into the record.
18           "As between Wong Won" -- I'm sorry, I'm
19  going to start over.  I read it wrong.
20           "As between Weinberger and Christopher
21  Wong Won, Lil' Joe Records, Inc. and Lil' Joe Won
22  Music, Inc., these will exchange general release
23  of any and all claims whatsoever through this
24  date.  Wong won agrees that the Lil' Joe
25  companies own all right, title, and interest to

1   all copyrights and trademarks previously conveyed
2   to them in the bankruptcy of Luke Records and
3   Luther Campbell.
4           Christopher Wong Won releases any claims
5   whatsoever to these works and to any works created
6   for the Lil' Joe companies?"
7           Do you see that?
8       A.   Uh-huh, I can see that.
9       Q.   When did you -- I am asking you:  When
10  did you become aware of this settlement agreement
11  and order entered in 2003?
12      A.   A lot of the documents came into my
13  possession both postpartum, so...
14      Q.   Okay.  Were you aware of this agreement
15  before Mr. Burroughs sent the notice of
16  termination that we previously marked that was
17  dated November 4th, 2020?
18      A.   I mean, yes, but that had nothing to do
19  with the termination of rights.
20      Q.   I'm going to show you a document that I'm
21  now going to mark as Exhibit 19, which, for the
22  record, is a Notice of Assignment filed in the
23  copyright office dated March 6th, 1997.
24           Have you ever seen this document before?
25           (The above referred to document was

Leterius Ray
November 04, 2022

1  marked as Exhibit No. 19, Notice of Assignment,
2  for identification.)
3        THE WITNESS:  Can you scroll through it?
4  BY MR. WOLFE:
5     Q.   Sure.
6     A.   That particular one that was.
7     Q.   See, it says copyright assignment?
8        MR. BURROUGHS:  Can you make it bigger.  I
9  can't -- can you go back to that page?  I
10  can't read it, to be honest.
11       MR. WOLFE:  Is that better?
12       MR. BURROUGHS:  Can you go back to the
13  previous page where the small text was?
14       MR. WOLFE:  No, I can make it a little
15  bigger.
16       MR. BURROUGHS:  Okay.  Let me try to read
17  this.
18  BY MR. WOLFE:
19     Q.   Mr. Ray, have you seen this document
20  before?
21     A.   I believe so.  Can you scroll through?
22     Q.   Okay.
23     A.   Uh-huh.
24     Q.   So I'm asking you:  Have you seen this
25  document before?

1     A.   Yes.
2     Q.   And did you see this document before
3  Mr. Burroughs sent you the notice of termination dated
4  November 4th, 2020?
5     A.   Yes.  But it has nothing to do with the
6  termination of copyrights.
7     Q.   I am now going to show you an order
8  granting a permanent injunction signed by Judge
9  William Hoeveler on the 20th of it looks like
10  November, 2006.
11       Have you seen this document before?
12       MR. BURROUGHS:  What's the title?  Can you
13  scroll all the way to the top?
14       MR. WOLFE:  Yeah, I just did.
15       MR. BURROUGHS:  Can I look at the first
16  page?  I don't know if I have seen that first
17  page.
18       MR. WOLFE:  I will make it bigger.
19       MR. BURROUGHS:  This is page two, what is
20  page one?
21       MR. WOLFE:  Page one was the -- okay, that
22  is page one.
23       MR. BURROUGHS:  Now, are you marking this
24  as an exhibit.  You are going to include this
25  in the transcript?

1        MR. WOLFE:  Yes, I am.
2        MR. BURROUGHS:  Okay.
3  BY MR. WOLFE:
4     Q.   Do you see that this is an agreed order
5  granting Plaintiff's Motion for Permanent
6  Injunction?
7        Have you seen this document before?
8     A.   Can you scroll on through?
9     Q.   Sure.  Do you see in paragraph 2, Judge
10  Hoeveler found plaintiff, quote:
11       "Plaintiff, Lil' Joe Records is in the
12  recording business and is the owner of the sound
13  recordings and copyrights to the recordings made
14  by the group 2 Live Crew?"
15       Do you see that?
16     A.   I can see it.
17     Q.   And were you aware of this order by
18  Federal Judge William Hoeveler at the time
19  Mr. Burroughs sent a November 4th Notice of
20  Copyright Termination?
21     A.   Sure.  It has nothing to do with the
22  termination of rights.
23     Q.   How do you know that?
24     A.   The termination of copyrights?
25     Q.   Yes.

1        MR. BURROUGHS:  Yeah, I am instructing
2  you not to disclose any attorney/client
3  information or communications, but if you have
4  an independent legal basis, then let him know
5  or basis, let him know.
6        THE WITNESS:  Yeah, I mean just vaguely,
7  what I know is that it doesn't even get the
8  right until after the time has passed, so he
9  can't move something that you don't have
10  possession of.
11  BY MR. WOLFE:
12     Q.   Are you aware of your father exploiting
13  the mark 2 Live Crew after the orders that I have
14  just shown you?
15     A.   I'm not aware of that.
16     Q.   Did your father release a book?
17     A.   That's correct.
18     Q.   When did he do that?
19     A.   Roughly 2000 -- I don't want to speculate,
20  but my best assessment 2015, maybe.
21     Q.   I'm showing you a document which is part
22  of the documents we produced, which it appears to
23  be documents that your father -- which I'm just
24  going to state for the record, are Lil' Joe docs
25  00944 through 964.

Leterius Ray
November 04, 2022

Page 74

1       Do you see those?
2    A.   I can see the document.
3       MR. BURROUGHS:  Yes, it's hard to see, at
4    least the page that we're looking at, the
5    copy isn't very good.
6       It appears to may be a color copy that has
7    been copied in black and white or something,
8    but it's difficult for me to make out what I
9    am looking at.
10   BY MR. WOLFE:
11   Q.   Do you recognize that these are documents
12   --
13      MR. BURROUGHS:  -- individuals in this
14   particular exhibit, I can't read them.
15   BY MR. WOLFE:
16   Q.   Do you recognize that these are documents
17   that came from your father's book?
18   A.   Can you please scroll through them?
19   Q.   Sure.  We'll start at the beginning.
20      Okay.  So I'll specifically show you this
21   document.  This is Document 948.  Okay.
22      Do you recognize this document?
23   A.   I have seen that picture.  I mean lots of
24   people have seen that picture.
25   Q.   Do you recognize this came from your

Page 75

1    father's Instagram page?
2       MR. BURROUGHS:  Objection.  Calls for
3    speculation.
4       THE WITNESS:  I mean I see the handle.
5    BY MR. WOLFE:
6    Q.   Real Fresh Kid Ice, that was your father;
7    correct?
8    A.   Professionally known as Fresh Kid Ice,
9    yes.
10   Q.   So do you recognize Real Fresh Kid Ice as
11   your father's Instagram page?
12   A.   It's possible.
13   Q.   Do you see down at the bottom there's a
14   notation from Instagram?
15   A.   Uh-huh.
16   Q.   And do you see that your father posted
17   things about his book that's reflected in the
18   document that's 949?
19   A.   I can see the document.
20   Q.   And do you see that it is some time after
21   2016 because there's a copyright notice from 2016
22   on it?
23      MR. BURROUGHS:  Objection, vague.
24   BY MR. WOLFE:
25   Q.   Do you see that?

Page 76

1    A.   I see the -- I see the copyright at the
2    bottom.
3    Q.   So do you recognize this as something
4    that your father publicly distributed on
5    Instagram?
6       MR. BURROUGHS:  Objection.  Calls for
7    speculation.
8    BY MR. WOLFE:
9    Q.   Do you see that?
10   A.   I can see the document.
11   Q.   So let me show you.  Did you recognize
12   the document that is -- let me find the page
13   number.  954.
14      Do you see the document that is on the
15   screen now that is 954?
16   A.   Can you keep scrolling?  I can't see it
17   well.
18   Q.   That is your father; correct?
19   A.   Correct.
20   Q.   And this was the cover of his book?
21   A.   I don't believe so.
22   Q.   Was this distributed -- was this page
23   distributed by your father?
24      MR. BURROUGHS:  Objection.  Calls for
25   speculation.

Page 77

1    BY MR. WOLFE:
2    Q.   Waiting for your answer.
3    A.   Repeat the question, please.
4    Q.   Was the document, page 954, a document
5    that was distributed by your father?
6    A.   Distributed how?
7    Q.   On the internet?
8       MR. BURROUGHS:  Objection.  Calls for
9    speculation.  Go ahead.
10      THE WITNESS:  I think it was posted on his
11   account.
12   BY MR. WOLFE:
13   Q.   Okay.  Now I'm showing you the document
14   that is 955.  Do you see that?
15   A.   I can see the document.
16   Q.   And does this appear to you to be a flyer
17   of a performance that was going to take place on
18   October 15th, 2016, that would include a special
19   performance by your father?
20   A.   That looks like what is being advertised.
21   Q.   And do you see that your father is listed
22   as the co-founder of 2 Live Crew?
23   A.   That's what the flyer says.
24   Q.   So was your father continuing to perform
25   in 2015, 2016, even 2017 as formally a member of

Page 78

1  2 Live Crew?
2          MR. BURROUGHS:  Objection.  Vague.  Calls
3  for legal conclusions.  But go ahead.
4  BY MR. WOLFE:
5      Q.   **You can answer the question.**
6      A.   Can you repeat it, please?
7      Q.   **All right.  I'll back up.**
8           **Were you familiar with any of your**
9  **father's performances in the years after 2012**
10 **until his death in 2017 or 2018?**
11     A.   I know there was a big one on VH1.
12     Q.   **But your father regularly performed in**
13 **nightclubs, didn't he?**
14     A.   Throughout his career or --
15     Q.   **In those particular years, 2010 until**
16 **his death?**
17     A.   I mean there was a time where he couldn't,
18 because he had health issues, but I mean he was
19 an entertainer.
20     Q.   **As an entertainer, he performed in**
21 **nightclubs, didn't he?**
22     A.   Yes, sir.
23     Q.   **And when he performed in nightclubs, he**
24 **always performed as a member of 2 Live Crew;**
25 **correct?  That is how he advertised himself?**

Page 79

1          MR. BURROUGHS:  Objection.  Vague.
2  Compound.  Calls for legal conclusions.  Go
3  ahead.
4          THE WITNESS:  I mean, that's -- no, I
5  wouldn't say always.
6  BY MR. WOLFE:
7      Q.   **But he did it sometimes; didn't he?**
8      A.   It looks like the promoter probably -- I
9  don't -- that is what this looks like.
10     Q.   **So is it fair to say that your father,**
11 **when he performed, would advertise himself as a**
12 **member of 2 Live Crew?**
13         MR. BURROUGHS:  Objection.  Vague.
14 Ambiguous.
15         MR. WOLFE:  Stop, Counsel.  You have to
16 stop doing it.
17         MR. BURROUGHS:  Calls for legal
18 conclusions.
19         MR. WOLFE:  Stop doing it.  Just state an
20 objection.
21         MR. BURROUGHS:  Well, I have -- there
22 seems to be some sort of fundamental
23 misunderstanding.
24         MR. WOLFE:  You're right.  The fundamental
25 issue is you do not --

Page 80

1          (Simultaneous crosstalk.)
2          MR. BURROUGHS:  Strictly starts formally,
3  it may not be usable in Court.  You are
4  supposed to object and state the basis for in
5  a short and distinct fashion.  I have been
6  doing so and you have been objecting to my
7  objections.
8          I have to indicate to you that your
9  responses are improper, and, of course, we are
10 reserving all rights in that regard, but I
11 need to continue to make objections, they're
12 not speaking objections.
13         MR. WOLFE:  They are speaking objections.
14 You are constantly coaching the witness how
15 to answer the question.
16         (Simultaneous crosstalk.)
17         MR. BURROUGHS:  -- conditions before
18 interrupting, I let you speak.  Please let me
19 speak.
20         To the extent that I need to object on
21 behalf of my witness, I am going to do so.  I
22 am going to object and I am going to state
23 succinctly, as I have been doing, the basis
24 for that objection.  Now proceed.
25

Page 81

1  BY MR. WOLFE:
2      Q.   **Mr. Ray, when your father performed in**
3  **those years, he performed as a member of 2 Live**
4  **Crew, that's how he was known and that is how he**
5  **billed himself; correct?**
6          MR. BURROUGHS:  Objection.  Vague.
7  Compound.  Calls for legal conclusions.
8          Go ahead, if you understand the question.
9          THE WITNESS:  Can you repeat the question,
10 please?
11 BY MR. WOLFE:
12     Q.   **When your father performed in the years**
13 **2010 until his death, he would perform as a -- he**
14 **would perform as or he was advertised as a member**
15 **of 2 Live Crew, because that is how he wanted to**
16 **be known; correct?**
17         MR. BURROUGHS:  Same objections and
18 compound.  Go ahead.  And it also calls for
19 speculation as to the last clause.
20         THE WITNESS:  Yes, I mean, to my
21 knowledge, he was an entertainer and he would
22 be booked to entertain, and then, you know,
23 it is not on him to advertise at that point.
24 That is not the...
25

Leterius Ray
November 04, 2022

Page 82

1 BY MR. WOLFE:
2    Q.   So is your answer to my question, yes,
3 that he performed as a member of 2 Live Crew in
4 those years?
5        MR. BURROUGHS:  Objection.  Vague.
6 Misstates the testimony.
7 BY MR. WOLFE:
8    Q.   You can answer the question.
9    A.   I answered it.
10   Q.   Okay.  I am going to show you a document
11 that for the record is Document 956.  Do you see
12 this as a promotional advertisement for a club in
13 Charlotte, North Carolina?
14   A.   I can see it.
15   Q.   Is that a picture of your father?
16   A.   That is.
17   Q.   And it advertises it as 2 Live Crew after
18 party?
19   A.   That's what it says.
20   Q.   Now, looking at the picture of your
21 father, can you estimate approximately when this
22 was?
23       MR. BURROUGHS:  Objection.  Vague.  No
24 foundation.  Go ahead.
25       THE WITNESS:  No.

Page 83

1 BY MR. WOLFE:
2    Q.   Well, does this look like a picture of
3 your father towards the end of his life or early
4 in his career?
5    A.   In his latter years.
6        THE REPORTER:  Can you say that again?
7        MR. WOLFE:  He said in his latter years.
8        THE REPORTER:  Thank you.
9 BY MR. WOLFE:
10   Q.   I'm showing you a document we marked as
11 Exhibit 960.
12   A.   Okay.
13   Q.   Do you see that?
14   A.   I see it.
15   Q.   And do you know what this document is?
16   A.   No.
17   Q.   Are you aware of a film coming out called
18 2 Live Crew Banned in the U.S.A.?
19   A.   No.
20   Q.   So you don't know what this document is?
21   A.   Where did this come from?
22   Q.   My question is:  You don't know where
23 this came from, do you?
24   A.   No.
25   Q.   Now, I'm showing you a document marked

Page 84

1 961, and do you see, that is a document that your
2 father posted on the internet on January 8th
3 talking about the movie script entitled Banned in
4 the U.S.A.?
5        MR. BURROUGHS:  Objection.  Vague.  Calls
6 for speculation.
7 BY MR. WOLFE:
8    Q.   Do you recognize this document?
9    A.   I see the post.
10   Q.   And that was a post made by your father;
11 correct?
12       MR. BURROUGHS:  Objection.  Calls
13 for speculation.
14 BY MR. WOLFE:
15   Q.   Yes.
16   A.   There is an account with his name.
17   Q.   I will move on to Document 962.
18       Do you recognize this as a post made by
19 your father?
20       MR. BURROUGHS:  Objection.  Vague.  Calls
21 for speculation.
22 BY MR. WOLFE:
23   Q.   Do you recognize it?
24   A.   I can't -- I can't see that.  I can't see
25 that he posted this.

Page 85

1    Q.   Well, did your father work on a book
2 called My Rise 2 Fame?
3    A.   Yes.
4    Q.   Did he use the artwork from the album of
5 2 Live Crew in order to promote his book?
6        MR. BURROUGHS:  Objection --
7 BY MR. WOLFE:
8    Q.   That is depicted in Document 962?
9        MR. BURROUGHS:  Objection.  Vague.  Calls
10 for speculation.  No foundation.  Calls for a
11 legal conclusion.
12 BY MR. WOLFE:
13   Q.   Can you answer the question?
14   A.   I can't see that.  I can't see that it
15 even comes from an account with his name on it.
16 I mean, I see the document but I don't see
17 anything that says he posted it, or even an
18 account with his name on it posted it.
19       MR. BURROUGHS:  And just for the record,
20 I can't read it, so it's hard to make out
21 what the text is.
22 BY MR. WOLFE:
23   Q.   Did your father work on a book called My
24 Rise 2 Fame?
25   A.   Yes.

Leterius Ray
November 04, 2022

Page 86

1    Q.    When did he do that?
2    A.    I think I answered this already.
3    Q.    When?
4    A.    I don't know exactly, but roughly, I
5  would say roughly, if I had to guess, I don't
6  know, honestly, I don't recall honestly. It
7  happened.
8    Q.    Was an estate ever opened up for your
9  father?
10        MR. BURROUGHS: Objection. Calls for
11  legal conclusions and vague. Answer, if you
12  know.
13 BY MR. WOLFE:
14    Q.    Do you understand what I mean by an
15  estate?
16    A.    Can you explain?
17    Q.    Sure. Following your father's death,
18  did any of his children or anybody else go to the
19  probate Court and open a formal estate proceeding?
20    A.    Yes.
21    Q.    Where did that happen?
22    A.    I don't recall honestly.
23    Q.    Was anyone appointed as the personal
24  representative of his estate?
25    A.    I believe -- I mean I honestly -- I don't

Page 87

1  recall honestly what the specifics are.
2        MR. WOLFE: I may be done. Let's take a
3  break so I can confer with Steve and Joe. So
4  let's go off the record. It's 12:10, let's
5  reconvene at 12:00 o'clock. And if I have
6  anything more, it will be short and to the
7  point.
8        MR. BURROUGHS: I would like to say my
9  clock has it as 11:50, am I --
10        MR. WOLFE: Yes.
11        THE TECHNICIAN: Off the record, the time
12  is 11:50 A.M. Eastern Time. We're going off
13  the video record.
14        (A recess was had in the proceedings
15  after which the following proceedings were
16  had:)
17        THE TECHNICIAN: We are back on the video
18  record. The time is 12:04 P.M. Eastern Time.
19 BY MR. WOLFE:
20    Q.    Mr. Ray, we are coming to the end. Can
21  you see your screen, there's a document there?
22    A.    Uh-huh.
23    Q.    So I'm going to flip through this, this
24  is the recording agreement between Skyywalker
25  Records and Luther Campbell, David Hobbs,

Page 88

1  Chris Wong Won, the undated one. Do you recall
2  that?
3        MR. BURROUGHS: Can you scroll through the
4  --
5        MR. WOLFE: I will.
6 BY MR. WOLFE:
7    Q.    I am just asking if you recall that.
8  I'll get there.
9    A.    Okay.
10    Q.    So I'm now going to scroll through and
11  show you the markings down on the bottom that
12  this is what was produced to us by your counsel
13  in this case.
14        Do you see the marking down at the
15  bottom, 2LiveCrew001?
16    A.    I see that.
17    Q.    Okay. Now I am going to go through this
18  because I want you to look at certain pages. So
19  I'll go through the whole document and then I'll
20  come back.
21        Okay. So you see that goes through
22  2LiveCrew0023?
23    A.    I see that.
24    Q.    Now, what I'd like to do is go back to
25  -- did you notice that there is a couple of pages

Page 89

1  within this document that appear to be unmatched,
2  such as, for example, page 3, which I now am
3  showing you?
4    A.    Yeah. That's clearly mixed up. That's
5  clearly mixed -- it looks like separate contracts
6  mixed together.
7    Q.    What I'm asking you is: How did the --
8  this version of this document with these pages,
9  pages 3, 4, 5, 7, 8, and 9, how was this document
10  put together?
11        MR. BURROUGHS: Objection. Vague. Calls
12  for speculation. But if you know.
13        THE WITNESS: No.
14 BY MR. WOLFE:
15    Q.    Did you give this document to
16  Mr. Burroughs?
17    A.    Not composed like this.
18    Q.    Did any of the Wong Won kids give the
19  document composed like this to Mr. Burroughs?
20    A.    Negative.
21    Q.    Do you know why this document was
22  produced to us in the form that it is showing, in
23  this document that I am going to mark as
24  Exhibit 20?
25    A.    No, that is clearly mixed up.

Leterius Ray
November 04, 2022

Page 90

1   (The above referred to document was
2   marked as Exhibit No. 20, recording agreement for
3   ID.)
4   BY MR. WOLFE:
5   Q.   And do you know who mixed it up?
6   A.   No, not -- it was not submitted to me.
7   Q.   Do you know about a conversation between
8   your father and Joe Weinberger regarding which
9   was the contracts between 2 Live Crew and Luke
10  Records?
11  A.   Repeat the question, please.
12  Q.   Did your father ever tell you about a
13  conversation that he had with Joe Weinberger about
14  which was the contract regarding the first three
15  albums of 2 Live Crew?
16  A.   That sounds like a different question
17  that what you just asked me.  Sorry.
18  Q.   I will ask it again.  Okay?
19       Did your father ever tell you about a
20  conversation that he had with Joseph Weinberger
21  about the contract for the first three albums with
22  Luke Records?
23  A.   The conversation between my father and I
24  was just that the Skyywalker contract was the one
25  that covered the first three albums.

Page 91

1   Q.   But he didn't tell you that, in fact, he
2   admitted to Joe Weinberger that it was the 1991
3   contract and not the Skyywalker contract that
4   dealt with the first three albums?
5   A.   No.
6   Q.   Did your father ever tell you that
7   Luther Campbell was the owner of Luke Records?
8   A.   I mean, that is not public knowledge, I
9   mean I just know that he owns Skyywalker Records.
10  Q.   He was also the president -- and he was
11  also the president and CEO of the company?
12  A.   Yeah, we didn't talk about it, I mean...
13  Q.   Wasn't it in his book, that, in fact,
14  Luther Campbell was the owner, the CEO, and an
15  employee of Luke Records?
16  MR. BURROUGHS:  Objection.  Vague.  Are
17  you asking him if that's in a book?
18  MR. WOLFE:  Please, don't interrupt.  Just
19  say I object to form.
20  MR. BURROUGHS:  That is inappropriate
21  under 11 circuit law.  But can I have the
22  question read back, please?
23  (The requested portion of the transcript
24  was read back by the reporter as was recorded
25  above.)

Page 92

1   MR. BURROUGHS:  Objection.  Vague.  Calls
2   for speculation.
3   BY MR. WOLFE:
4   Q.   You can answer.
5   A.   Can we have that page on the screen?
6   Q.   I'm sorry?
7   A.   Do you have the page from the book on
8   hand?
9   Q.   No, do you have a copy of the book?
10  A.   Somewhere.
11  Q.   Okay.
12  MR. WOLFE:  Will you produce it to us,
13  Counsel.
14  MR. BURROUGHS:  We can have a discussion
15  about that off the record.  Because we do
16  have physical exhibits and I am assuming you
17  may as well that will we should talk about, to
18  arrange for a mutual inspection.
19  MR. WOLFE:  Well, I want a copy of the
20  book.
21  MR. BURROUGHS:  Well, I am open to a
22  conversation about that.
23  MR. WOLFE:  Okay.
24  BY MR. WOLFE:
25  Q.   Did you read that book?

Page 93

1   MR. BURROUGHS:  Are you asking me or the
2   witness?
3   BY MR. WOLFE:
4   Q.   I don't think you would be answering my
5   questions, I am asking the witness.
6   MR. BURROUGHS:  I just wanted to see if
7   you had anything further on that in response
8   to my statement.  Go ahead.
9   BY MR. WOLFE:
10  Q.   Mr. Ray, did you read the book?
11  A.   I've read it.
12  Q.   And are you aware that Luther Campbell
13  is the one who ran the day-to-day operations of
14  Luke Records before it went into bankruptcy?
15  MR. BURROUGHS:  Objection.  Vague.  Calls
16  for speculation.
17  BY MR. WOLFE:
18  Q.   You can answer the question.
19  A.   I wasn't there at the time.  I mean...
20  Q.   But you discussed it with your father;
21  right?
22  A.   Somewhat.
23  Q.   And didn't your father tell you that
24  Luther Records ran the day-to-day operations of
25  Luke Records before it went into bankruptcy?

Leterius Ray
November 04, 2022

Page 94

1        MR. BURROUGHS:  Objection.  Vague.  Asked
2   and answered.  Go ahead.
3   BY MR. WOLFE:
4        Q.   You can answer the question.
5        A.   Those words did not come out of his mouth.
6        THE REPORTER:  Sorry?
7        THE WITNESS:  Those -- he never said those
8   words to me.
9   BY MR. WOLFE:
10       Q.   Did he say anything to that effect?
11       MR. BURROUGHS:  Objection, vague.
12   BY MR. WOLFE:
13       Q.   Are you looking at something?  Is someone
14   sending you messages telling you how to answer
15   these questions?
16       A.   No.  I am just looking at the document,
17   page 9 in front of my screen.
18       Q.   That's not what I'm asking you.  You need
19   to listen to my question.
20       A.   I said no.
21       Q.   Your father never had a conversation with
22   you about who ran the day-to-day operation of
23   Luke Records?
24       MR. BURROUGHS:  Objection, asked and
25   answered.

Page 95

1   BY MR. WOLFE:
2        Q.   Is that your testimony?
3        MR. BURROUGHS:  Asked and answered. Vague.
4        Go ahead.
5   BY MR. WOLFE:
6        Q.   We are waiting.
7        A.   I don't recall that conversation.
8        MR. WOLFE:  I have nothing further.
9   Counsel, you want to explain to him he has
10   the right to review the transcript?
11       MR. BURROUGHS:  Well, I've got a couple
12   of questions.  But I need to screen share.  I
13   need to take that document down and can I be
14   given screen sharing privileges?
15       THE TECHNICIAN:  You are able to screen
16   share.
17       MR. BURROUGHS:  Fantastic.
18       MR. WOLFE:  Scott, before you do, can I
19   ask one more question?
20       MR. BURROUGHS:  Sure.  One question is
21   fine.
22       MR. WOLFE:  It might be two depending on
23   his answer.
24   BY MR. WOLFE:
25       Q.   Are you aware of your father ever selling

Page 96

1   physical records, CDs or digital downloads on
2   Apple using the 2 Live Crew name?
3        A.   I'm not aware of that.
4        MR. WOLFE:  Go ahead, Scott, I will
5   tender the witness.
6        MR. BURROUGHS:  Give me one second.  It's
7   not letting me screen share.  I'm going to try
8   something else.
9        THE TECHNICIAN:  When you hit share screen,
10   it doesn't bring up the dialogue.
11       MR. BURROUGHS:  No, it says that I'm
12   locked.  Can I send the exhibit to you and can
13   I have you put them on the screen?
14       THE TECHNICIAN:  Sure.  I just need -- do
15   you want to try it one more time?  I don't
16   think that there is anything --
17       MR. BURROUGHS:  Let me try again.  I'm
18   locked out for some reason.
19       THE TECHNICIAN:  If you want to just send
20   it in the chat.
21       THE REPORTER:  Yes, send it in the chat.
22       MR. BURROUGHS:  I'll post into the chat
23   and that way everyone will have access for
24   them.  Give me one second.  Madam court
25   reporter, we are on Exhibit 21; is that

Page 97

1   correct?
2        THE REPORTER:  Yes.
3        MR. WOLFE:  Yes.
4             CROSS EXAMINATION
5   BY MR. BURROUGHS:
6        Q.   Okay.  We are going to place a document
7   in front of you that we are going to mark as
8   Exhibit 21.
9        THE TECHNICIAN:  Just a moment.
10       MR. BURROUGHS:  It's nine pages so we
11   will scroll through the nine pages.
12       (The above referred to document was
13   marked as Exhibit No. 21, Albums, for
14   identification.)
15   BY MR. BURROUGHS:
16       Q.   Do you recognize this exhibit?
17       A.   Yes.
18       Q.   How do you recognize it and what is it?
19       A.   These are the albums from the group.  I
20   have seen them around and I think I actually have
21   a couple of these originals.
22       Q.   And do you recognize the logo on these
23   records?
24       A.   Yes, sir.
25       Q.   And what's the logo?

Leterius Ray
November 04, 2022

1   A.   The Luke Skyywalker.
2        MR. BURROUGHS:  I'm going to put one more
3   document in front of you that we are going to
4   mark as Exhibit 22.
5        (The above referred to document was
6   marked as Exhibit No. 22, Four-Page Document,
7   for identification.)
8   BY MR. BURROUGHS:
9        Q.   This is a four-page document, we will
10  scroll through it.  Let me know if you need more
11  or less time.
12       THE TECHNICIAN:  That's the last page.
13  BY MR. BURROUGHS:
14       Q.   Do you recognize this exhibit?
15       A.   Yes, sir.
16       Q.   What is it and how do you recognize it?
17       A.   Those are the albums and those are the
18  copies that I have in my possession.
19       Q.   So you own these physical albums?
20       A.   Yes, sir.
21       Q.   You recognize the Luke Skyywalker logo
22  on this exhibit?
23       A.   Yes, sir.
24       MR. BURROUGHS:  I don't believe I have any
25  further questions for the witness.

1        MR. WOLFE:  I have some follow-up.
2             REDIRECT EXAMINATION
3   BY MR. WOLFE:
4        Q.   Are you aware that Luther Campbell was
5   sued by George Lucas regarding the Luke Skyywalker
6   logo?
7        A.   Yes.
8        Q.   Are you aware that as a result of that
9   lawsuit, the Luke Skyywalker logo was taken off
10  and thereafter everything was put out under the
11  name Luke Records?
12       MR. BURROUGHS:  Objection.  Vague.  Calls
13  for speculation.  Compound.
14  BY MR. WOLFE:
15       Q.   You can answer.
16       A.   I mean my conversations with my dad were
17  just about the Skyywalker Records and the works
18  that were completed under that, so, I mean...
19       Q.   But you're aware at a point in time,
20  Luther Campbell stopped using the Luke Skyywalker
21  logo and mark and used Luke Records instead;
22  correct?
23       A.   Correct.
24       MR. WOLFE:  I have nothing further.
25       Scott, do you want to waive or read?

1        MR. BURROUGHS:  We stipulate that we will
2   be sent a certified copy by email that the
3   witness will have 21 days to review and read
4   and provide any corrections.
5        MR. WOLFE:  You have to pay for that.
6        Do you understand that?  You have to buy
7   the transcript in order to get it.
8        THE WITNESS:  Yes.
9        MR. BURROUGHS:  Yes, I am just asking --
10  okay, yes.  We have that stipulation.  We will
11  do that by email.
12       MR. WOLFE:  And then lastly, I think we
13  have five exhibits that we need to send.  So
14  I will send my three and you send your two,
15  and we will send them to Debbi at the email
16  she just put up on the screen.  Okay?
17       MR. BURROUGHS:  Well, I've got mine
18  already in the chat.  Is that sufficient,
19  Debbi, or do you  want me to also email them?
20       THE REPORTER:  They are marked 21 and 22.
21  I can download those.
22       MR. BURROUGHS:  Perfect.
23       MR. WOLFE:  All right.  So you have his
24  and I will send you mine.
25       THE REPORTER:  Yes.  One more question.

1   We are doing joint exhibits?  You don't want
2   plaintiff, defendant?
3        MR. WOLFE:  Yes.
4        THE REPORTER:  Okay.
5        MR. WOLFE:  In other words, the first 17
6   exhibits we marked at Mr. Weinberger's
7   deposition.
8        THE REPORTER:  Right, right.
9        THE TECHNICIAN:  All right.  I will take
10  us off the video record unless there is
11  anything else.
12       THE REPORTER:  Oh, yes.
13       THE TECHNICIAN:  We are going off the
14  record, 12:23 P.M. Eastern Time.  That
15  concludes our deposition.
16
17       (Reading and signing of the deposition
18  was not waived by the witness and all of the
19  parties.)
20
21       (Thereupon, the above proceedings were
22  concluded at 12:23 P.M.)
23
24       ----------
25

Leterius Ray
November 04, 2022

Page 102

WITNESS NOTIFICATION LETTER

November 15, 2022
LETERIUS RAY
c/o SCOTT BURROUGHS, ESQ.

In Re: LIL' JOE RECORDS, INC., a
Florida corporation
Deposition taken on November 4, 2022
Job No. 6258171

The transcript of the above-referenced
proceeding has been prepared and is being
provided to your office for review by the
witness.

If you have not waived signature we
respectfully request that the witness
complete their review within 30 days
and return the errata sheet to our office.

Sincerely,

Debra Stark, Court Reporter,
Notary Public
Dlstark1@gmail.com

Page 103

ERRATA SHEET
DO NOT WRITE ON THE TRANSCRIPT
ENTER CHANGES ON THIS PAGE
IN RE: LIL' JOE RECORDS
LETERIUS RAY

Page |Line |Change          |Reason

_____

_____

_____

_____

_____

_____

_____

_____

        Under penalties of perjury, I
declare that I have read the foregoing
document and that the facts stated in it are
true.

_____
LETERIUS RAY

Page 104

CERTIFICATE OF OATH

STATE OF FLORIDA:
COUNTY OF BROWARD:

        I, DEBRA L. STARK, Court Reporter and
Notary Public, in and for the State of Florida
at Large, do hereby certify that LETERIUS RAY
remotely appeared before me by audio and
visual means on November 4, 2022, and was duly
sworn.

        Signed and sealed heretofore on this
day of November 15, 2022.

------------------------------
DEBRA L. STARK, COURT Reporter
and Notary Public, State of
Florida at Large

MY COMMISSION EXPIRES:
March 28, 2025

Page 105

C E R T I F I C A T E

STATE OF FLORIDA:
COUNTY OF BROWARD:

        I, DEBRA L. STARK, certify that I was
authorized to and did stenographically remotely
report by audio and visual means the deposition of
LETERIUS RAY; duly sworn by me;
pages 1 to and including 105; and that the
transcript is a true record of my stenographic
notes.

        I further certify that I not a relative,
employee, attorney, or counsel of any of the
parties, nor am I a relative or employee of any of
the parties' attorneys or counsel connected with
the action, nor am I financially interested in the
action.

        Signed and sealed on this date of
November 15, 2022.

------------------------------
DEBRA L. STARK, Court Reporter
and NOTARY PUBLIC, State of Florida
at Large

MY COMMISSION EXPIRES:
MARCH 28, 2025