**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA**

| | | |
|---|---|---|
| LIL' JOE RECORDS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 1:21-CV-23727-DPG |
| | ) | |
| MARK ROSS; *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**DEFENDANTS MARK ROSS, CHRISTOPHER WONG WON, JR., RODERICK WONG WON, LETERIUS RAY, ANISSA WONG WON, AND LUTHER CAMPBELL's RESPONSE TO PLAINTIFF'S RESPONSE TO STATEMENT OF MATERIAL FACTS IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

## DEFENDANT'S STATEMENT OF FACTS

Defendants, Mark Ross, Christopher Wong Won, Jr., Roderick Wong Won, Leterius Ray, Anissa Wong Won, and Luther Campbell ("Defendants"), pursuant to S.D. Fla. L.R. 56.1 hereby provides this reply statement of material facts supporting its Motion for Summary Judgment as to Count 1 for Declaratory Judgment as to the Validity of the Copyright Termination Notice of Defendants' Counter Claim and Counts II-X of Plaintiff's Complaint and responding to Plaintiff's Response Statement of Material Facts as follows:

**Response to Plaintiff's Statement of Additional Material Facts**

1. Undisputed.

2. Undisputed, but dispute Weinberger's personal knowledge regarding the administration of Christopher Wong Won's testamentary estate.

3. Disputed. The 1991 Agreements could not have transferred the copyrights in the Subject Albums because they post-date their creation and are prospective looking only (Campbell Decl. [Dk. 53-2] ¶ 35; Ross Decl. [53-74] ¶ 26). This is clear from the plain language of the Agreements which states in part - "The term of this Agreement shall be for a period of one (1) year commencing on the date hereof." (Burroughs Supplemental Decl. ¶ 8, Ex. 78 Section 2). The members of 2 Live Crew, at the time they recorded each of the Subject Albums, had an oral agreement when they went into the studio about how the rights, including copyrights, for those albums would be treated. (Campbell Decl. [Dk. 53-2] ¶ 6; Ross Decl. [53-74] ¶ 3.) The parties performed under that oral agreement between 1986 and 1990. (Campbell Decl. [Dk. 53-2] ¶ 6-10; Ross Decl. [53-74] ¶ 3-7.). In or around 1990, 2 Live Crew executed a written agreement with Skyywalker Records memorializing the parties' oral agreement ("1990 Agreement"). (Campbell Decl. [Dk. 53-2] ¶ 11, 15, Ex. 1; Ross Decl. [53-74] ¶ 8; Ray Decl. [53-75] ¶ 7.) Further, Lil' Joe's proffered evidence is objectionable hearsay and privileged testimony and should be disregarded or stricken. (Defendants' Evidence Objections filed herewith Sections E and F.

4. Undisputed, and immaterial, the fact Luther Campbell and Luke Records became the subject of bankruptcy proceedings does not impact their ability to terminate previous grants of copyright pursuant to Section 203 when those rights have not yet vested.

5. Disputed. Disputed to the extent this fact implies that the Section 203 termination

right, that would eventually vest in Luther Campbell, was transferred to Lil' Joe Records, Inc. ("Lil' Joe") and Joseph Weinberger ("Weinberger") as part of the transfer which occurred as a result of the Joint Plan of Reorganization in Luke Bankruptcy. This right is not listed as an asset in the Joint Plan, nor could it have ever been transferred into the estate because the right of termination is inalienable and non-transferrable. (Burroughs Supplemental Decl. ¶ 5, Exh. 75 Joint Plan of Reorganization in Luke Bankruptcy.) Undisputed as to the other contents of the Joint Plan listed in Lil' Joe's Fact No. 5.

6. Undisputed, and immaterial, because whether Christopher Wong Won, Mark Ross or David Hobbs filed a claim in the Luke Bankruptcy as no impact on their ability to terminate the original copyright transfer to Luke Records or its predecessor under Section 203.

7. Disputed. This is a conclusion and finding of law and thus is impermissible argument as detailed in Defendants' Objection to Evidence filed herewith Section F. Further, Defendant's contend the termination right never entered the bankruptcy because it had not vested and was of no value to the estate. See Section E of Defendants' Reply. Assuming, *arguendo,* the termination right did enter the bankruptcy estate, the property of the estate not administered or otherwise detailed in the bankruptcy plan vests back in the debtor, so it is not true that the right was never "abandoned" by the estate. See Section F of Defendants' Reply.

8. Disputed. Defendants do not dispute that there was a 2002 lawsuit filed by Weinberger against Christopher Wong Won, or that a settlement was reached to resolve those claims, Defendant disputes that agreement could and did transfer or release Christopher Wong Won's right to terminate. The settlement agreement between Christopher Wong Won, on the one hand, and Weinberger and Lil' Joe, on the other hand, did **not** release or transfer "all rights to terminate" as stated in Lil' Joe's Fact No. 8. (Burroughs Supplemental Decl. at ¶ 6, Exh. 76 Wong Won Release filed with U.S. Copyright Office.) The agreements themselves do not mention or include the Wong Won's right to terminate, nor could they, because it is an inalienable and non-transferrable right under Section 203. (*Id.*)

9. Disputed. Defendants do no dispute that Mark Ross filed a bankruptcy action in November 2000, that Lil' Joe commenced an adversary proceeding against Mark Ross, or that the settlement agreement states what it states, but do dispute that the settlement agreement transferred, revoked, or otherwise divested Mark Ross of his Section 203 termination rights, which are non-transferrable, inalienable, and not mentioned anywhere in the settlement

agreement. (Burroughs Supplemental Decl. at ¶ 7, Exh. 77 Mark Ross Settlement Agreement)

10. Disputed. This is not a statement of fact but an argument. Further, there is ample evidence of an agreement predating the 1991 Agreements. Defendants have stated in both deposition and declarations that the members of 2 Live Crew, at the time they recorded each of the Subject Albums, had an oral agreement when they went into the studio about how the rights, including copyrights, for those albums would be treated. (Campbell Decl. [Dk. 53-2] ¶ 6; Ross Decl. [53-74] ¶ 3.) The parties performed under that oral agreement between 1986 and 1990. (Campbell Decl. [Dk. 53-2] ¶ 6-10; Ross Decl. [53-74] ¶ 3-7.). In or around 1990, 2 Live Crew executed a written agreement with Skyywalker Records memorializing the parties' oral agreement ("1990 Agreement"). (Campbell Decl. [Dk. 53-2] ¶ 11, 15, Ex. 1; Ross Decl. [53-74] ¶ 8; Ray Decl. [53-75] ¶ 7.) Further, Lil' Joe's proffered evidence of Weinberger's affidavit is objectionable hearsay and privileged testimony and should be disregarded or stricken. (Defendants' Evidence Objections filed herewith Sections and F). The following testimony also disputes this fact:

Campbell Deposition Transcript 23:9-18 attached to Supplemental Declaration of Scott Alan Burroughs as Exhibit 73:

> Q. Is it fair to say you don't recall any of the terms of the verbal contract between you in one hand and the members of 2 Live Crew on the other?
> A. There was a verbal contract with the members before we went into the studio, as we went in the studio, paid a royalty, the verbal agreements as to how everybody get paid, whether it was performing on a record and performing live.

Ross Deposition Transcript 7:9-23 attached to Supplemental Declaration of Scott Alan Burroughs as Exhibit 72:

> Q. And at that time was there a contract between you and the other members of 2 Live Crew on one hand and Luther Campbell or Luke records on the other?
> MR. BURROUGHS:· Go ahead.
> THE WITNESS: We had a verbal contract.
> BY MR. WOLFE: When did you reach the verbal contract?
> A. When we made that record.
> Q. And what were the terms of the verbal contract?
> A. The verbal contract was we were going to make the records and we were going to give it to Luke to put it out, make the record, put it out, get some money.

Ross Deposition Transcript 33:8-19 attached to Supplemental Declaration of Scott Alan

Burroughs as Exhibit 72:

> Q. So let's talk about this verbal agreement. I already asked you about the terms. Do you know about when the verbal agreement was entered into?
> A. The verbal agreement of our first album, 2 Live Is What We Are.
> Q. So it was before 1986?
> A. Yes.
> Q. And who were the parties to the verbal agreement?
> A. The group.

Ross Deposition Transcript 40:15-24 attached to Supplemental Declaration of Scott Alan Burroughs as Exhibit 72:

> Q. Did you ever enter into a written agreement with Skyywalker Records confirming those three oral agreements?
> MR. WOLFE: Object to the form.
> THE WITNESS: There was an agreement when he signed -- when he came up with Skyywalker Records. Yes, there was an agreement, I think somewhat after I think the third album. After the Nasty As You Want To Be.

Ross Deposition Transcript 42:3-19 attached to Supplemental Declaration of Scott Alan Burroughs as Exhibit 72:

> Q. Does this refresh your recollection as to whether you entered into a written contract with Skyywalker Records confirming the oral agreements related to the first three albums?
> A. Yes.
> Q. Did you enter into a written agreement?
> A. Yes.
> Q. And did that cover the first three albums?
> A. Yes, it did.
> Q. And did that confirm the prior verbal agreements that you reached with the other members of 2 Live Crew and the label?
> MR. WOLFE: Object to the form.
> THE WITNESS: Yes, yes.

Ross Deposition Transcript 43:4-17 attached to Supplemental Declaration of Scott Alan Burroughs as Exhibit 72:

> Q. Does this refresh your recollection that you, Mr. Campbell, and Mr. Wong Won entered into an agreement with Skyywalker agreements in or around 1990?
> MR. WOLFE: Object to the form.
> THE WITNESS: Yes.

>BY MR. BURROUGHS: Okay. So did you and the other members of 2 Live Crew enter into a contract with Skyywalker Records in 1990 that confirmed your oral agreement relating to the first three albums?
>A. Yes.

Campbell Deposition Transcript 27:2-12 attached to Supplemental Declaration of Scott Alan Burroughs as Exhibit 73:
>Q. Is there any written agreement between the members of 2 Live Crew and your companies, whether it is Luke Skyywalker, Skyywalker or Luke Records, in which they transferred to your companies, the copyrights to 2 Live Crew Is What We Are?
>A. Yes.
>Q. What contract is that?
>A. That was a contract that we did, I think in 1990. I think in 1990 we did a contract that covered all three of those albums.

    11.    Undisputed, but immaterial, Weinberger testified in deposition he received the 1990 Agreement in the 2000s. See Burroughs Supplemental Decl. ¶ 2, Exh. 71 Weinberger Transcript at 121:19-21 – "Q. Okay. When did you first see this agreement? A. In the 2000's."

    12.    Disputed. The statement "The members of *2 Live Crew* were each "artists for hire" is a legal conclusion and this "fact" is improper argument. Each of the stated "facts" is also disputed for the reason that Weinberger has no personal knowledge of any fact asserted for the relevant time period. (See, Evid. Obj. Section F). The 1990 Agreement and not the 1991 Agreements is operative, and it does not contain "work-for-hire" language. (See, *supra*, Evidence disputing Plaintiff's facts 3, 7, and 10; Campbell Decl. [Dk. 53-2] ¶ 18). Plaintiff has not provided any admissible facts to support the statement "Luke Records' tax and payroll records which show that Campbell was treated as an employee." (See, Objections to Evidence Section F). Further, Campbell's testified his work as a member of 2 Live Crew is outside the scope of his duties as CEO of the record label. (Campbell Decl. [Dk. 53-2] ¶ 3, 32, 43, 47). Lil Joe's statement that "Luke Records paid for and controlled all of their recording activities, including the selection of the producers, the studios and paying for all costs associated with same" is not based on personal knowledge. 2 Live Crew did not create the Subject Albums as works for hire for Skyywalker Records. (Campbell Decl. [Dk. 53-2] ¶ 32, 34, Ex.1; Ross Decl. [53-74] ¶ 23, 25.) The members of 2 Live Crew and Campbell, the owner of Skyywalker Records, agree that the members were not employees. (Campbell Decl. [Dk. 53-2] ¶ 32, 34, Ex.1; Ross Decl. [53-74]

¶ 23, 25.) There is no employment agreement with any 2 Live Crew member let alone one that states the existence of a salary, what that salary would be for, and that the creation of musical works is within the scope of that employment. (Campbell Decl. [Dk. 53-2] ¶ 15, 18, Ex.1; Ross Decl. [53-74] ¶ 14; Ray Decl. [53-75] ¶ 5-7.) The paychecks produced by Lil' Joe do not identify what they were for, do not indicate that they were made in connection with the creation of the Subject Albums. (Burroughs Decl. [53-7] ¶ 66.) 2 Live Crew received per diem checks at times and while some of them were marked "payroll," those payments were not compensation for the creation of the Subject Albums. (Campbell Decl. [Dk. 53-2] ¶ 43, 47; Ross Decl. [53-74] ¶ 34, 38.) At the time of the Subject Albums' creation, Campbell was the owner of Skyywalker Records; however, his role as a member of 2 Live Crew was wholly independent of his Skyywalker Records role, as evidenced by the fact he is a signatory of the 1990 Agreement on behalf of both 2 Live Crew and Skyywalker Records. (Campbell Decl. [Dk. 53-2] ¶ 3, 47.) The operative 1990 Agreement does not contain a work-for-hire clause. (Campbell Decl. [Dk. 53-2] ¶ 15, 18, Ex.1; Ross Decl. [53-74] ¶ 14; Ray Decl. [53-75] ¶ 6.) The Subject Albums were written and recorded in third-party studios. (Campbell Decl. [Dk. 53-2] ¶ 40, 44; Ross Decl. [53-74] ¶ 31, 35.) The composition (PA) registrations filed for the first of the Subject Albums list the four original members of *2 Live Crew* as authors and specifically state that each author's contribution was not a "work made for hire." (Campbell Decl. [Dk. 53-2] ¶ 36; Ross Decl. [53-74] ¶ 27; Burroughs Decl. [53-7] ¶ 2-60, Ex. 5-63.).

   13. Disputed. The Subject Albums were written and recorded in third-party studios. (Campbell Decl. [Dk. 53-2] ¶ 40, 44; Ross Decl. [53-74] ¶ 31, 35.) The members of 2 Live Crew and Campbell, the owner of Skyywalker Records, agree that the members were not employees. (Campbell Decl. [Dk. 53-2] ¶ 32, 34, Ex.1; Ross Decl. [53-74] ¶ 23, 25.) Further, Weinberger does not have personal knowledge of the facts asserted for the relevant time period. (See, Evid. Obj. Section F).

   14. Disputed. See, *supra,* evidence disputing Plaintiff's fact 13.

   15. Disputed. At the time of the Subject Albums' creation, Campbell was the owner of Skyywalker Records; however, his role as a member of 2 Live Crew was wholly independent of his Skyywalker Records role, as evidenced by the fact he is a signatory of the 1990 Agreement on behalf of both 2 Live Crew and Skyywalker Records. (Campbell Decl. [Dk. 53-2] ¶ 3, 47.) Further, neither Weinberger nor Moskowitz has personal knowledge of the employment situation

between Campbell and Skyywalker Records during the relevant time period. (See, Evidence Objections, Section F and G).

16. Disputed. See, *supra,* evidence disputing Plaintiff's fact 15.

17. Disputed. Campbell's benefits and compensation as CEO of Skyywalker records were separate and apart from his compensation as a member of 2 Live Crew. (Campbell Decl. [Dk. 53-2] ¶ 3, 32, 43, 47.)

18. Disputed. Undisputed to the extent Campbell performed tasks including signing checks and contracts as the CEO and sole owner of Luke records. Disputed to the extent this indicates that he could not separately be hired as an independent contractor in his role as a member of 2 Live Crew. (Campbell Decl. [Dk. 53-2] ¶ 3, 32, 43, 47) Further, Weinberger does not have personal knowledge of the facts asserted for the relevant time period. (See, Evid. Obj. Section F).

19. Disputed. Undisputed to the extent Campbell hired and fired Luke Records' employees, including Weinberger. Disputed to the extent this indicates that he could not separately be hired as an independent contractor in his role as a member of 2 Live Crew. (Campbell Decl. [Dk. 53-2] ¶ 3, 32, 43, 47.) Further, Weinberger does not have personal knowledge of the facts asserted for the relevant time period. (See, Evid. Obj. Section F).

20. Disputed. At the time of the Subject Albums' creation, Campbell was the owner of Skyywalker Records; however, his role as a member of 2 Live Crew was wholly independent of his Skyywalker Records role, as evidenced by the fact he is a signatory of the 1990 Agreement on behalf of both 2 Live Crew and Skyywalker Records. (Campbell Decl. [Dk. 53-2] ¶ 3, 32, 43, 47.) So too was his compensation. (Id. at 43). Further, neither Weinberger nor Moskowitz has personal knowledge of the employment situation between Campbell and Skyywalker Records during the relevant time period. (See Evidence Objections, Section F and G).

## Defendants' Additional Material Facts

58. The bankruptcy documentation establishes Skyywalker Records owned those copyrights until Lil' Joe purchased them in bankruptcy in 1995. (Supplemental Declaration of Scott Alan Burroughs ("Supp. Burroughs Decl.") ¶ 5, Ex. 75.)

59. The 1991 Agreements, the Wong Won Settlement Agreement, and the Ross

Bankruptcy Settlement Agreement do not and cannot transfer the copyrights in the Subject Albums which were owned by Skyywalker Records by oral agreement and then through the 1990 Agreement and then by Lil' Joe in 1995 through the Skyywalker Records Bankruptcy Plan. (Supp. Burroughs Decl. [53-7] ¶ 5-8, Ex. 75-78.)

60. Section 2 of the 1991 Agreements contains the following prospective language: "The term of this Agreement shall be for a period of one (1) year commencing on the date hereof." (Supp. Burroughs Decl. [53-7] ¶ 8, Ex. 78.)

61. The 1991 Agreements language is prospective only and does not purport to transfer copyrights in any previously created albums or include any retroactive clauses. (Supp. Burroughs Decl. [53-7] ¶ 8, Ex. 78.)

62. The Wong Won heirs have confirmed the 1990 Agreement memorialized a prior oral agreement based on their family's business records. (Ray Decl. [53-75] ¶ 6-7.)

63. Paragraph 2(b) of the 1990 Agreement states: "During each Contract Period hereunder, Company will have the following options ("Over-call Options") to increase the Recording Commitment for the Period concerned by the number of Master Recordings set forth below ("Over-call Recordings"). Each Over-call Option may be exercised by Company by sending Artist a notice at any time before the end of the Contract Period concerned."

64. Paragraph 2(b) of the 1990 Agreement state:

"(1) During the first Contract Period Company will have the following three (3) separate Over-call Options.

    (i) For Over-call Recordings sufficient to constitute two (2) additional Sides.

    (ii) For Over-call Recordings, which together with the First Sides and two (2) additional Sides referred to in 2(b)(1)(i) above, will be sufficient to constitute one

(1) Album; and

(iii) For Over-call Recordings sufficient to constitute one (1) additional Album.

(2) During each Contract Period Company will have an Over-call Option to increase the Recording Commitment for that Period by Over-call Recordings sufficient to constitute one (1) additional Album." (Campbell Decl. [Dk. 53-2] ¶ 15, Ex. 1.)

65. Notice was given under these paragraphs of the 1990 Agreement. (Supp. Burroughs Decl. ¶ 4(c), Ex. 74[1].)

66. Lil' Joe admits it possessed a copy of the 1990 Agreement since 2000 and never disputed its veracity until this litigation, and that it had access to the Subject Albums, each of which stated Skyywalker's copyright ownership for just as long. (Supp. Burroughs Decl. ¶ 2(f), Ex. 71[2].)

67. The Wong Won settlement only transfers rights he had not already transferred, as stated in the following section from the agreement "[Wong Won] *to the extent* [Wong Won] *had any such rights,*… hereby irrevocably transfers and assigns to Lil' Joe Records, Inc. … the copyrights in and to the musical compositions and master recordings listed on Schedule 'A.'" (emphasis added). (Supp. Burroughs Decl. ¶ 6, Ex. 76.)

68. The Ross settlement does not purport to transfer anything but is merely an

---

[1] Q. And just so we're clear, you have no independent recollection of Luke Records or Skywalker Records ever sending the artist a notice before the expiration date exercising any one of the three options, correct?
MR. BURROUGHS: Objection. Vague. Misstates the testimony. Go ahead.
A. We had a verbal -- we had a verbal agreement. If you want to consider that as a notice, you can. But we had a verbal agreement that these three albums fell under this contract. This is the reason why we did this contract. We had these three albums, 2 Live Is What We Are, Move Something, Nasty As They Wanna Be.
**[144:5-17]**

[2] Q. Okay. When did you first see this agreement?
A. In the 2000's.
**[121:19-21].**

acknowledgement of Lil' Joe Records, Inc.'s already existing ownership via the bankruptcy purchase, as stated in the following section from the agreement it merely "acknowledges that,… he has no rights (mater or publishing to any previous recordings owned by Lil' Joe Records, Inc." (Supp. Burroughs Decl. ¶ 7, Ex. 77.)

69. Campbell and Ross's bankruptcies are closed. (Supp. Burroughs Decl. ¶ 9, Exs. 79-80.)

70. Neither Campbell's joint plan nor the Ross settlement agreement have language regarding the right of termination. (Supp. Burroughs Decl. ¶¶ 5, 7, 9, Exs. 75, 77, 79-80.)

71. 2 Live Crew's contributions were even deemed "unique" in the 1990 Agreement, in Section 9(h) which states "The services of the Artist are unique and extraordinary, and the loss thereof cannot be adequately compensated in damages" and Section 13 "Company and Artist agree that Artists services hereunder are of a special and unique character." (Campbell Decl. [Dk. 53-2] ¶ 15, Ex. 1.)

72. Costs under the 1990 Agreement were recoupable from 2 Live Crew's royalties and thus paid for in the end by 2 Live Crew under Section 5 which states in part, "Said recording costs shall be recoupable from royalties due and owning Artist according to Paragraph 6." (Campbell Decl. [Dk. 53-2] ¶ 15, Ex. 1.)

Dated: January 25, 2023                                     Respectfully submitted,

By: /s/ Scott Alan Burroughs
Scott Alan Burroughs
(admitted pro hac vice)
DONIGER / BURROUGHS
237 Water Street, First Floor
New York, New York 10038
(310) 590 – 1820
scott@donigerlawfirm.com
December 1, 2022

## CERTIFICATE OF SERVICE

    I HEREBY CERTIFY that on January 25, 2023, a true and authentic copy of the foregoing was submitted to the Clerk of Court using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

                                                            By:   */s/ Scott Alan Burroughs*
                                                                               Scott Alan Burroughs