UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| LIL' JOE RECORDS, INC., )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>MARK ROSS; *et al.*, )<br>)<br>Defendants. )<br>) | CASE NO. 1:21-CV-23727-DPG |

**SUPPLEMENTAL DECLARATION OF SCOTT ALAN BURROUGHS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

### SUPPLEMENTAL DECLARATION OF SCOTT ALAN BURROUGHS

I, Scott Alan Burroughs, depose, attest, and say from my personal knowledge, the following:

1. I, Scott Alan Burroughs, am above eighteen (18) years of age and am competent to give the testimony set forth below. Said testimony is given from my own personal knowledge. I make this supplemental declaration in support of Defendants' Motion for Summary Judgment. If called as a witness, I could and would competently testify as set forth below.

2. On October 26, 2022, I took the deposition of Lil' Joe Records, Inc.'s principle Joe Weinberger ("Weinberger"). Attached hereto as **Exhibit 71** is a true and correct copy of portions of the transcript for that deposition, highlighted for the court's reference. During the deposition, Weinberger testified as follows, with citations to the transcript provided in brackets:

    a. Q. Okay. Now, do you want to go back to any pages or any sections of the agreement to take another look?
    MR. WOLFE: Same instruction. ·Don't answer the question. And, again, I'll repeat, I'm willing to print out all 86 pages and give him the opportunity to read it, not as you're flipping through, and -- and because any answer that he gives will only misconstrue his response, which would be inaccurate, unless he had the opportunity to review the document.
    BY MR. BURROUGHS: Have you ever seen this document before?
    MR. WOLFE:· Same instruction.
    BY MR. BURROUGHS: Okay.· And are you going to take your attorney's instruction and not answer questions about this contract?
    A. Yes.
    **[64:22– 65:16]**

    b. Q. So do you have a copy of this contract in your records?
    MR. WOLFE: Same instruction.
    BY MR. BURROUGHS: Have you ever seen a version of this contract with any exhibits or schedules?
    MR. WOLFE: Same instruction. 1
    BY MR. BURROUGHS: And do you know which songs or albums this exhibit covers?
    MR. WOLFE: Same instruction.
    BY MR. BURROUGHS: And do you believe that this contract relates in any way to the works at issue in this case?

2

|   |   |
|---|---|
|   | MR. WOLFE: Same instruction.<br>BY MR. BURROUGHS: And, again, you're going to take your attorney's instruction and not answer, correct?<br>A. Excuse me?<br>Q. You're taking your attorney's -- he can instruct you, but you have to say that, yes, you're taking the instruction --<br>A. Yes.<br>Q. -- in not answering, okay?<br>A. Yes.<br>Q. Okay.<br>**[67:3-68:4]** |
| c. | Q. How did the members of 2 Live Crew first transfer their copyrights in the subject albums?<br>A. I don't know.<br>**[91:1-3]** |
| d. | Q. Okay. We're going to put an exhibit in front of you we're going to mark as Exhibit 4.<br>(WHEREUPON, Defendants' Exhibit 4 was marked for identification.)<br>BY MR. BURROUGHS: I want you to take a look at it and tell me if you recognize it. I'll scroll through it.· If you want us to go faster or slower, let us know. Okay. Do you need to go back and see any specific pages or look at anything for a longer period of time?<br>MR. WOLFE:· I'm going to object. You've shown him about 40 pages of documents in a scroll-through fashion. He couldn't possibly take in, comprehend, remember any one of those pages.· It's impossible.<br>BY MR. BURROUGHS:  Do you need any more time to see any of the pages? We're happy to give you more time, as with all of the exhibits, to -- to review it so you feel comfortable.<br>MR. WOLFE: Sure. If you want me to print them out, I'll give him the time to do it.<br>BY MR. BURROUGHS: Do you want to look at any of these pages?<br>MR. WOLFE:· Same objection.<br>BY MR. BURROUGHS: Go ahead.<br>MR. WOLFE:· How would we know which page to look at when you've flipped through 50 pages of documents? |

>MR. BURROUGHS:· I think it's 32, but, again, if you --
>
>(Cross-talk.)
>
>MR. WOLFE:· That's my point. How would he be able to calculate?
>
>BY MR. BURROUGHS: Do you want to go to any particular page, or no?
>
>MR. WOLFE:· Same objection, and I'm going to instruct him not to answer until you give him the opportunity to read all 32 pages, which I'm happy to do if you want to send me the document, I'll print it out, and I'll give it to him.
>
>BY MR. BURROUGHS: Are you going to take your attorney's instruction?
>
>A. Yes.
>
>Q. All right. So I'll ask you -- so understanding that you are refusing to testify about the matters in Exhibit 4, which appear to me to be ·8· ·copyright registrations, we'll move on and we won't ask questions on those. But, of course, we reserve the right --
>
>MR. WOLFE: Object to form. Live statement.
>
>MR. BURROUGHS: -- to move in limine as mentioned before for the basis given on the record before.
>
>**[102:6-104:15]**

    e.    Q.    Okay. And were you doing that in connection with the termination letter and/or this lawsuit?

            A.    Yes.

            Q.    So it's fair to say that because of this lawsuit, you went back and amended this copyright registration in Exhibit 6?

            A.    Yes.

            Q.    Any other reason?

            A.    No.

**[117:2-11**, (Exhibit 6 to the deposition is copyright registration SR 305-983 for the album *Move Somethin'* and Exhibit 65 to this declaration)].

    f.    Q.    Okay. When did you first see this agreement[1]?

            A.    In the 2000's.

         **[121:19-21].**

    g.    Q.    Did you review it at the time?

---

[1] "Agreement" refers to the 1990 Agreement is defined in Defendants' Motion, it was designed Exhibit 9 during Weinberger's deposition, and attached to the Declaration of Luther Campbell in support of this motion as Exhibit 1.

      A.    Not really.

      Q.    Did you respond to Wong Won and dispute its·4· ·voracity or validity at the time?

      A.    The case settled when we went to a mediation.

      Q.    So before settling it, it was never challenged, is that accurate?

      A.    I don't recall. I don't -- I don't know.

**[122:1-9]**

h.    Q. Were you involved with them at all in 1998?
A. '98, yes.
Q. What about 1988?
A. Yes.
Q. When -- what was your first involvement with them in 1988?
A. I had met them.
Q. Okay. So other than just meeting them, you had no involvement with them or their careers, correct?
A. Like, I wasn't managing them. They weren't my clients.
Q. Okay. They were just people that you had met, correct?
A. Right.
Q. And the same in 1989?
A. Yes.
Q. And the same in 1990?
A. Yes.

**[132:1-19]**

3.    On November 4, 2022, I defended the deposition of Defendant Mark Ross. Attached hereto as **Exhibit 72** is a true and correct copy of portions of the transcript for that deposition, highlighted for the court's reference. During the deposition, Ross testified as follows, with citations to the transcript provided in brackets:

a.    Q. And at that time was there a contract between you and the other members of 2 Live Crew on one hand and Luther Campbell or Luke records on the other?
MR. BURROUGHS:· Go ahead.
THE WITNESS: We had a verbal contract.
BY MR. WOLFE: When did you reach the verbal contract?
A. When we made that record.

5

|   |   |
|---|---|
|   | Q. And what were the terms of the verbal contract?<br>A. The verbal contract was we were going to make the records and we were going to give it to Luke to put it out, make the record, put it out, get some money.<br>**[7:9-23]** |
| b. | Q. So let's talk about this verbal agreement. I already asked you about the terms. Do you know about when the verbal agreement was entered into?<br>A. The verbal agreement of our first album, 2 Live Is What We Are.<br>Q. So it was before 1986?<br>A. Yes.<br>Q. And who were the parties to the verbal agreement?<br>A. The group.<br>**[33:8-18]** |
| c. | Q. Did you ever enter into a written agreement with Skyywalker Records confirming those three oral agreements?<br>MR. WOLFE: Object to the form.<br>THE WITNESS: There was an agreement when he signed -- when he came up with Skyywalker Records. Yes, there was an agreement, I think somewhat after I think the third album. After the Nasty As You Want To Be.<br>**[40:15-24]** |
| d. | Q. Does this refresh your recollection as to whether you entered into a written contract with Skyywalker Records confirming the oral agreements related to the first three albums?<br>A. Yes.<br>Q. Did you enter into a written agreement?<br>A. Yes.<br>Q. And did that cover the first three albums?<br>A. Yes, it did.<br>Q. And did that confirm the prior verbal agreements that you reached with the other members of 2 Live Crew and the label?<br>MR. WOLFE: Object to the form.<br>THE WITNESS: Yes, yes.<br>**[42:3-17]** |
| e. | Q. Does this refresh your recollection that you, Mr. Campbell, and Mr. Wong Won entered into an agreement with Skyywalker agreements in or |

      around 1990?
MR. WOLFE: Object to the form.
THE WITNESS: Yes.
BY MR. BURROUGHS: Okay. So did you and the other members of 2 Live Crew enter into a contract with Skyywalker Records in 1990 that confirmed your oral agreement relating to the first three albums?
A. Yes.
**[43:4-16]**

4. On November 1, 2022, I defended the deposition of Defendant Luther Campbell. The deposition was broken up into a morning and afternoon session with separate transcripts. Attached hereto as **Exhibit 73** is a true and correct copy of portions of the morning transcript for that deposition, highlighted for the court's reference. Attached hereto as **Exhibit 74** is a true and correct copy of portions of the afternoon transcript for that deposition, highlighted for the court's reference. During the deposition, Campbell testified as follows, with citations to the transcript provided in brackets:

    a.    Q. Is there any written agreement between the members of 2 Live Crew and your companies, whether it is Luke Skyywalker, Skyywalker or Luke Records, in which they transferred to your companies, the copyrights to 2 Live Crew Is What We Are?
A. Yes.
Q. What contract is that?
A. That was a contract that we did, I think in 1990. I think in 1990 we did a contract that covered all three of those albums.
**[27:2-12]**

    b.    Q. Is it fair to say you don't recall any of the terms of the verbal contract between you in one hand and the members of 2 Live Crew on the other?
A. There was a verbal contract with the members before we went into the studio, as we went in the studio, paid a royalty, the verbal agreements as to how everybody get paid, whether it was performing on a record and performing live.
**[23:9-18]**

    c.    Q. And just so we're clear, you have no independent recollection of Luke Records or Skywalker Records ever sending the artist a notice before the expiration date exercising any one of the three options, correct?

> MR. BURROUGHS: Objection. Vague. Misstates the testimony. Go ahead.
>
> A. We had a verbal -- we had a verbal agreement. If you want to consider that as a notice, you can. But we had a verbal agreement that these three albums fell under this contract. This is the reason why we did this contract. We had these three albums, 2 Live Is What We Are, Move Something, Nasty As They Wanna Be.
>
> **[144:5-17]**

5. In this action Plaintiff produced a Joint Plan of Reorganization for the Luke Records, Inc. and Luther Campbell bankruptcy. This document does not mention copyright termination rights. This document also acknowledged Skyywalker Records owned the copyrights in the Subject Albums at the time of the bankruptcy in 1995. A true and correct copy of this document is attached hereto as **Exhibit 75**.

6. In this action Plaintiff produced a Settlement Agreement between Joseph Weinberger and Christopher Wong Won. The document states "[Wong Won] *to the extent* [Wong Won] *had any such rights,…* hereby irrevocably transfers and assigns to Lil' Joe Records, Inc. … the copyrights in and to the musical compositions and master recordings listed on Schedule 'A.'" (emphasis added). This document does not mention copyright termination rights. A true and correct copy of this document is attached hereto as **Exhibit 76.**

7. In this action Plaintiff produced a Settlement Agreement between Joseph Weinberger and Mark Ross resulting from Ross's bankruptcy. The document merely "acknowledges that,… he has no rights (mater or publishing to any previous recordings owned by Lil' Joe Records, Inc." This document does not mention copyright termination rights. A true and correct copy of this document is attached hereto as **Exhibit 77.**

8. Attached to Plaintiff's Complaint are the 1991 Agreements. The language of the 1991 Agreements is prospective only as demonstrated by the following quoted language from Section 2 of the Agreements - "The term of this Agreement shall be for a period of one (1) year commencing on the date hereof." The Agreements make no mention of transferring copyrights of already created works or retroactivity. A true and correct copy of the 1991 Agreements as attached to the Complaint is attached hereto as **Exhibit 78.**

9. On January 24, 2023, we downloaded the following docket sheets for Southern District of Florida Bankruptcy Petition Number 95-11447-RAM ("Campbell Bankruptcy") and Northern District of Alabama Bankruptcy Petition Number 00-43637-JJR7 ("Ross Bankruptcy"). True and correct copies of these dockets are attached hereto as **Exhibit 79** and **80** respectively.

These sheets show each bankruptcy was confirmed and closed.

I declare under perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on January 25, 2023 at New York, New York.

By: _____
Scott Alan Burroughs, Esq.