# EXHIBIT 78

## EXCLUSIVE RECORDING AGREEMENT

This Agreement made and entered into as of this _____ day of April, 1991 by and between Luke Records, Inc., 8400 N.E. 2nd Ave, Miami, Florida 33138 ("COMPANY") and Chris Wong Won as performer in the group known as The 2 Live Crew ("ARTIST").

In consideration of the mutual promises contained herein, it is hereby agreed as follows:

1.   (a)  COMPANY hereby engages ARTIST to record for COMPANY masters embodying the performances of ARTIST, and ARTIST hereby accepts such engagement and agrees to record masters embodying the performances of ARTIST exclusively for COMPANY during the term hereof and all extensions and renewals.

(b)  The rights herein granted to COMPANY and the obligations of ARTIST shall be for the world ("Territory").

2.   The term of this Agreement shall be for a period of one (1) year commencing on the date hereof ("Initial Period").  ARTIST hereby grants to COMPANY four (4) consecutive separate options to extend the term for further periods of one (1) year each ("Option Periods"), each upon the same terms and conditions applicable to the Initial Period, except as otherwise hereinafter set forth.  The Initial Period and every Option Period for which Company has exercised its option are hereinafter sometimes referred to together as the "Term".  Each option shall be automatically exercised, unless written notice to the contrary is sent to ARTIST at least fifteen (15) days prior to the date that the Term would otherwise expire.

3.   During the Initial Period, ARTIST shall record masters the equivalent in playing time of one Lp.  Said masters will be owned by COMPANY pursuant to all of the terms and conditions of this Agreement, particularly Paragraph 20 hereof and said masters shall be deemed recorded and delivered hereunder during the Initial term.

4.   (a)  During the Term, ARTIST shall not perform for the purpose of making records for anyone other than COMPANY for distribution in the Territory and ARTIST shall not authorize the use of ARTIST's name, likeness, or other indentification for the purpose of distributing, selling, advertising or exploiting records for anyone other than

-1-

individual members of ARTIST not to exceed two (2) may per-
form as instrumentalists, arrangers, producers or background
singers on other recordings for other artists in a "sideman"
capacity provided COMPANY receives credit, in the form of
"Courtesy of Luke Records". This paragraph will not apply
to any records distributed by Luke Records.

(b) ARTIST shall not perform any selection
recorded hereunder for the purpose of making records for
anyone other than COMPANY for distribution in the Territory
(i) for a period of five (5) years after the initial date of
release of the respective record containing such selection
or (ii) for a period of two (2) years after the expiration
or other termination of this Agreement, whichever is later
("Re-recording Restriction").

(c) Should ARTIST make any sound recording during
the Term for motion pictures, television, electrical
transcriptions or any other medium or should ARTIST after
the Term perform for any such purpose any selection recorded
hereunder to which the Re-recording Restriction then
applies, ARTIST will do so only pursuant to a written
agreement prohibiting the use of such recordings, directly
or indirectly, for record purposes in the Territory. ARTIST
shall furnish to COMPANY a copy of the provisions of any
such contract relating to the foregoing.

5. All masters recorded by ARTIST during the Term from
the inception of the recording thereof and all reproductions
derived therefrom, together with the performances embodied
thereon, shall be the property of COMPANY for the world free
from any claims whatsoever by ARTIST or any person deriving
any rights or interests from ARTIST. Without limiting the
generality of the foregoing, COMPANY and its designee(s)
shall have the exclusive and unlimited right to all the
results and proceeds of ARTIST's recording services rendered
during the Term, including, but not limited to, the exclu-
sive, unlimited and perpetual rights throughout the world:

(a) To manufacture, advertise, sell, lease,
license, distribute or otherwise use or dispose of, in any
or all fields of use by any method now or hereafter known,
records embodying the masters recorded by ARTIST during the
Term, all upon such terms and conditions as COMPANY may
elect, or at its discretion, to refrain therefrom;

-2-

Cl.55.91/2-28

Case 1:21-cv-23727-DPG Document 62-20 Entered on FLSD Docket 10/25/2023 Page 4 of 86

heretofore or hereafter adopted by ARTIST), photographs, likeness, and biographical material concerning ARTIST for advertising and trade purposes in connection with all masters recorded by ARTIST and all Pictures produced during the Term; ARTIST consent will be requested, such consent may not be unreasonably witheld. After the term of this agreement the rights conveyed in this paragraph shall be non-exclusive.

(c) To obtain copyrights and renewals thereof in sound recordings (as distinguished from the musical compositions embodied thereon) recorded by ARTIST during the Term, in COMPANY's name as owner and employer-for-hire of such sound recordings;

(d) To release records derived from masters recorded by ARTIST during the Term under any name, trademark or label which COMPANY or its subsidiaries, affiliates or licensees may from time to time elect. COMPANY agrees that the initial United States release during the Term hereof shall be on COMPANY's first line label. Masters recorded hereunder shall be distributed by a distributor or distributors selected by COMPANY in COMPANY's sole discretion.

(e) To perform such records publicly and to permit public performances thereof by means of radio broadcast, television or any other method now or hereafter known.

6. (a) ARTIST acknowledges that the sale of records is speculative and agrees that the judgment of COMPANY, reasonably exercised, with regard to any matter affecting the sale, distribution or exploitation of such records shall be binding and conclusive upon ARTIST. Except as otherwise specifically set forth in subparagraph 6(b) hereof, nothing contained in this Agreement shall obligate COMPANY to make, sell, license, or distribute records manufactured from masters delivered hereunder.

(b) Provided that ARTIST is not in breach of this Agreement, and if COMPANY is in receipt of completed, fully edited and mixed commercialy satistactory masters sufficient to comprise each newly-recorded required LP hereunder embodying ARTIST's newly-recorded required studio performances of material not previously recorded by ARTIST ready for COMPANY's manufacture of records therefrom, together with all materials therefor, COMPANY agrees to commercially release each LP recorded and delivered hereunder within one hundred and twenty (120) days following completion of Artists recording for COMPANY.

(c) It is understood and agreed that if COMPANY shall have failed to so release any such LP, ARTIST shall have the right to notify COMPANY in writing of COMPANY's such failure and of ARTIST's desire that the Term of this

-3-

C1.56.91/2-28

commercially release the applicable LP in the World. It is specifically understood and agreed that if COMPANY shall fails to fulfill any such release commitment, COMPANY shall have no liability whatsoever to ARTIST and ARTIST's only remedy shall be to terminate the Term of this Agreement by written notice to COMPANY within fifteen (15) days following the expiration of such sixty (60) day period.

7.   (a)   An advance in the sum of two hundred and fifty thousand ($250,000.00) dollars, to be divided equally by all members of that certain musical group known as 2 Live Crew, payable as follows; One third (1/3) upon signing of the agreement; one third (1/3) upon the start of the Lp; and the remaining one third (1/3) upon completion of the album, shall be the amount of the Recording Fund for the first Lp delivered during the initial Contract Period (the First Lp).

(b)   On all future Lp's the advance of two hundred and fifty thousand ($250,000) dollars, to be divided equally by all members of that certain musical group known as 2 Live Crew, shall be paid at one-half (1/2) on renewal of the Option Period and one-half (1/2) upon completion of the Lp.

|  | | Fund Amount |
|---|---|---|
| (i) | The Album Delivered during the first Contract Period (the "Second Album"): | $250,000 |
| (ii) | The Album Delivered during the second Option Period (the "Third Album") | $250,000 |
| (iii) | The Album Delivered during the third Option Period (the "Fourth Album") | $250,000 |
| (iv) | The Album Delivered during the fourth Option Period (the "Fifth Album") | $250,000 |

(c)   During each Contract Period COMPANY will have the option to increase the Recording Commitment for that Period by Master Recordings constituting one additional Lp ("Overcall Recordings").  COMPANY may exercise that option by sending you a notice at any time before the end of the Contract Period concerned.  The current Contract Period will continue for nine (9) months after delivery of the Overcall Recordings.  Any Lp entitled Luke Featuring 2 Live Crew shall count as an Overcall Lp. COMPANY however shall be limited to two (2) overcall albums over the entire length of the contract.

8.   (a)   (i)  Except as otherwise provided in sub-paragraph 8(a)(ii) hereof, COMPANY shall be solely respon-

-4-

C1.57.91/2-28

promotional costs incurred in the production and release of all masters subject to this Agreement. All such costs paid by COMPANY shall be deducted from any and all monies becoming payable to ARTIST under this agreement.

(ii) Notwithstanding the provisions of sub-paragraph 8(a)(i) hereof, in the event that COMPANY elects to require ARTIST to record and deliver the Additional Masters, or if COMPANY wishes to re-mix any of the masters delivered in connection with the First LP, all costs so paid by COMPANY shall be advances against and recoupable by COMPANY out of all royalties becoming payable to ARTIST pursuant to this or any other agreement between the parties hereto.

(b) COMPANY shall be solely responsible for and shall pay all monies becoming payable to ARTIST and all other parties rendering services or otherwise in respect of sales of recordings derived from masters subject to this Agreement.

9. (a) Each master recorded and delivered hereunder shall be produced by a producer selected by COMPANY. COMPANY shall be solely responsible for and shall pay all monies becoming payable to all producers. All such sums so paid by COMPANY shall be deducted from any and all monies otherwise payable to ARTIST under this or any other agreement between the parties hereto (excluding any publishing agreements with Companies affiliate Publishing Companies).

(b) As to any producers selected by COMPANY, COMPANY shall pay said producer or producers a royalty negotiated between COMPANY and said producer and shall not effect the royalty otherwise payable to ARTIST under this or any other agreement between the parties hereto.

10. Conditioned upon ARTIST's full and faithful performance of all the material terms hereof, COMPANY shall pay ARTIST the following royalties in respect of records subject to this Agreement:

(a) Company shall credit Artist's Royalty Account pursuant to and in accordance with the following royalty schedule for records manufactured and sold in the United States:

| RECORDING PERIODS | MINIMUM SIDES | ROYALTY RATES |
|---|---|---|
| Initial Period | One LP | 15% |
| 1st Option Period | One LP | 15% |
| 2nd Option Period | One LP | 15% |
| 3rd Option Period | One LP | 15% |
| 4th Option Period | One LP | 15% |

-5-

C1.58.91/2-28

<u>*Royalty Rate</u> = Percentage times ninety (90%) percent of net records sold and for which Company has been paid times the retail price of records manufactured in the United States. This rate shall not apply to 7" or 12" singles. (In the event Company's distributor pay on the basis of eighty-five (85%) percent of retail, then company shall pay on the same basis as distributor). The rate for 7" and 12" singles shall be thirteen (13%) percent.

(b)     (i)  With respect to retail sales outside the United States of all records derived from masters recorded and delivered during the Term, the royalty rate shall be based upon the U.S. rate and pro rated down at the percentage which COMPANY's royalty rate is reduced.

(ii) The royalty rate hereinabove set forth in subparagraph 10(b)(i) shall be hereinafter referred to as the "Basic Foreign Rate".

(iii) Notwithstanding anything to the contrary contained herein, with respect to records sold in Brazil, Greece, Portugal, India, Kenya, Zambia, Zimbabwe, Nigeria and any other territory in which governmental or other authorities place limits on the royalty rates permissible for remittances to the United States in respect of records sold in such territory(ies), the royalty rate payable to ARTIST hereunder in respect of sales of records in such territory(ies) shall equal the lesser of (A) the Basic Foreign Rate or (B) the effective royalty rate permitted by such governmental or other authority for remittances to the United States less a royalty equivalent to two (2%) percent of the retail list price and such monies as Company or its licensees shall be required to pay to all applicable union funds in respect of said sales.

(iv) Royalties in respect of sales of records outside the United States shall be computed in the same national currency as COMPANY is accounted to be its licensees and shall be paid to ARTIST at the same rate of exchange as COMPANY is paid. It is understood that such royalties will not be due and payable until payment thereof is received by or credited to COMPANY in the United States governmental regulations, royalties therefor shall not be credited to ARTIST's account during the continuance of such inability except that (I) if any accounting rendered to ARTIST hereunder during the continuance of such inability shows ARTIST's account to be in a credit position, COMPANY will, after ARTIST's request and at ARTIST's expense, if

-6-

C1.59.91/2-28

Case 1:21-cv-23727-DPG Document 62-20 Entered on FLSD Docket 07/25/2023 Page 8 of 86

account exceed the amount, if any, by which ARTIST's account is in a debit position, then COMPANY will, after ARTIST request and at ARTIST's expense, and if COMPANY is able to do so, deposit such excess royalties to ARTIST's credit in the applicable foreign currency in a foreign depository. Deposit as aforesaid shall fulfill COMPANY's obligations under this Agreement as to record sales to which such royalty payments are applicable.

(c) With respect to records sold (i) through any direct mail or mail order distribution method, including, without limitation, record club distribution, (ii) by distribution through retail outlets in conjunction with special advertisements on radio or television or (iii) by any combination of the methods set forth above, the royalty payble in connection therewith shall be one-half (1/2) of COMPANY's net earned royalty receipts in respect of reported sales through such channels after COMPANY shall have first deducted all third party payments for which COMPANY is responsible. No royalties shall be payable with respect to records given away as "bonus" or "free" records as a result of joining a record club or plan or of purchasing a required number of records or with respect to records received by members of any such club operation either in an introductory offer in connection with joining such club or upon recommending that another join such club operation.

(d) (i) With respect to mid-priced LPs, the royalty rate shall be two-thirds (2/3) of the Basic U.S. LP Rate or Basic Foreign Rate, as the case may be, provided that during the Term, COMPANY shall not release in the United States any such mid-priced LP comprised solely of masters delivered hereunder prior to nine (9) months following COMPANY's initial United States release of such LP as a full-priced record, unless ARTIST shall consent in writing.

(ii) With respect to budget LPs, the royalty rate shall be one-half (1/2) of the Basic U.S. LP Rate or Basic Foreign Rate, as the case may be, provided that during the Term, COMPANY shall not release in the United States any such budget LP comprised solely of masters delivered hereunder prior to eighteen (18) months following COMPANY's initial United States release of such LP as a full-priced record, unless ARTIST shall consent thereto.

(e) With respect to EPs, the royalty rate shall be three-fourths (3/4) of the Basic U.S. LP Rate or Basic Foreign Rate, as the case may be.

-7-

C1.60.91/2-28

tained in this Agreement, in the event that Company (or its licensee(s)) shall in any country(ies) of the Territory adopt a policy applicable to the majority of LPs in COMPANY's (or its licensee(s)') then current catalogue pursuant to which the retail list price of an LP is reduced subsequent to its initial release, then the royalty rates otherwise payable to ARTIST under this Agreement shall be reduced in the proportion that such reduced retail list price of the applicable LP bears to the retail list price of such LP as initially released in the applicable country.

(g)  With respect to "compact-disc" LPs, the royalty rate shall be the Basic U.S. LP Rate or Basic Foreign Rate, as the case may be.

(h)  In the event that COMPANY shall sell or license third parties to sell "records" via telephone, satellite, cable or other direct transmission to the consumer over wire or through the air, ARTIST shall be paid royalties with respect thereto at the Basic U.S. Singles Rate, Basic U.S. LP Rate or Basic Foreign Rate, as the case may be.  For the purposes of calculating royalties payable in connection with such sales, the retail list price of such "records" shall be deemed to be the then-current retail list price of tape copies of such records and in the case of records which have no tape equivalent, the corresponding price of the disc (but in the United States, eighty-five (85%) percent of the then current retail list price of such tape copies or corresponding disc), and the packaging deduction for such sales shall be made in accordance with subparagraph 10(s)(iii) of this Agreement.

(i)  The royalty rate payable for records sold to the United States government, its subdivisions, departments and agencies, and to educational institutions and libraries shall be one-half (1/2) of the otherwise applicable basic U.S. rate and shall be based upon the retail list price (Post Exchange list price where applicable) of such records.

(j)  The royalty rate payable for records sold as "premiums" shall be one-half (1/2) of the Basic U.S. Singles Rate, Basic U.S. LP Rate or Basic Foreign Rate, as the case may be, and the retail list price for such records shall be demed to be COMPANY's actual sales price.  It is understood that COMPANY shall not use ARTIST's name or likeness in connection with any such "premium" record as an endorsement of any product or service.  COMPANY agrees that there will be no premium records without the ARTISTS consent, which will not be unreasonably withheld.  ARTIST's consent or withholding of consent must be made in writing within seven (7) days of COMPANY's request, failure to respond will be deemed agreement with COMPANY's request.

(k)  Intentionally Deleted.

-8-

(1)   COMPANY shall have the right to license the masters to third parties for record use and/or all other types of use on a flat-fee basis.  COMPANY shall credit ARTIST's royalty account with fifty (50%) percent of the net amount received by COMPANY under each such license after COMPANY shall have first deducted all third party payments from the gross, for which COMPANY is responsible.

(m)   As to records not consisting entirely of masters recorded and delivered hereunder, the royalty rate otherwise payable to ARTIST hereunder with respect to sales of any such record shall be prorated by multiplying such royalty rate by a fraction, the numerator of which is the number of masters recorded and delivered hereunder embodied on such record and the denominator of which is the total number of masters embodied thereon.  This formula applies only to royalty bearing masters.

(n)   As to masters embodying performances of ARTIST together with the performances of another artist or artists, the royalty rate otherwise payable hereunder with respect to sales of any record derived from any such master and the recording costs and/or advances otherwise payable by COMPANY hereunder with respect to any such master shall be prorated by multiplying such royalty rate or recording costs and/or advances by a fraction, the numerator of which is one and the denominator of which is the total number of artists whose performances are embodied on such master, who receive royalties.

(o)   COMPANY shall have the right to include or to license others to include any one or more of the masters in promotional records on which such masters and other recordings are included, which promotional records are designed for sale at a substantially lower price than the regular price of COMPANY's LPs.  No royalties shall be payable on sales of such promotional records.

(p)   No royalties shall be payable in respect of: (i) records given away or furnished on a "no-charge" basis to "one-stops", rack jobbers, distributors or dealers, whether or not affiliated with COMPANY, provided that such records do not exceed 300 non-royalty bearing Singles out of every 1,000 Singles distributed and 200 non-royalty bearing LPs out of every 1,000 LPs distributed, and provided further that COMPANY shall have the right to exceed the aforesaid limitations for short term special promotions or marketing campaigns.  The number of records distributed on a no-charge

-9-

C1.62.91/2-28

paign exceed an additional ten (10%) percent of the total
number of records distributed.  COMPANY shall use reasonable
efforts to notify ARTIST of any such short term special pro-
motion or campaign, but COMPANY's failure to do so shall not
be a breach of this Agreement or in any manner affect
COMPANY's right to distribute records on a non-royalty basis
as aforesaid; (ii) records given away or sold at below
stated wholesale prices for promotional purposes to disc
jockeys, record reviewers, radio and television stations and
networks, motion pictures companies, music publishers,
COMPANY's employees, ARTIST, ARTIST or other customary reci-
pients of promotional records or for use on transportation
facilities; (iii) records sold as scrap, salvage, overstock
or "cut-outs"; (iv) records sold below cost.  No royalties
shall be payable on any sales by COMPANY's licensees until
payment has been received by or credited to COMPANY in the
United States.  This paragraph shall be governed by the
agreement between COMPANY and it's distributor.  In the
event that distributor adopts a different policy as to the
contents of this paragraph, then said distributor's policy
shall prevail as between COMPANY and ARTIST, <u>it is agreed
however, that said policy change may not materially change
the terms under this agreement.  Notices of said changes
shall be made to ARTIST pursuant to this Agreement.</u>

        (q)  As to records sold at a discount to
"one-stops", rack jobbers, distributors or dealers, whether
or not affiliated with COMPANY, in lieu of the records given
away or furnished on a "no-charge" basis as provided in sub-
paragraph 10(p)(i) above, the applicable royalty rate other-
wise payable hereunder with respect to such records shall be
reduced in the proportion that said discount wholesale price
bears to the usual stated wholesale price, provided that
said reduction in the applicable royalty rate does not
exceed the percentage limitations set forth in subparagraph
10(p)(i) above.

        (r)  The royalty rates provided for in this
Paragraph 10 shall be applied against the retail list price
(less COMPANY's container deductions, excise taxes, duties
and other applicable taxes) for ninety (90%) percent of
records sold which are paid for and not returned.  The term
for "retail list price" as used in this Agreement shall mean
(i) for records sold in the United States, the
manufacturer's suggested retail price in the United States
and (ii) for records sold outside the United States, the
manufacturer's suggested retail price in the country of
manufacture or sale, as COMPANY is paid.  In those countries
where a manufacturer's suggested retail price is not uti-
lized or permitted, the generally accepted retail price
shall be utilized.  Notwithstanding the foregoing, (A) the
retail list price for a "Disco-single" shall be deemed to be
the retail list price for a Single, except for Disco-Singles
sold in the United States the retail list price therefor
shall be deemed to be the lesser of one hundred fifty (150%)
percent of the retail list price of a Single or the actual

-10-

to "compact-disc" or other audible records in any con-
figuration manufactured, distributed and sold by Company's
normal retail channels in the United States a royalty equal
at the same penny rate as Company is paid on cassette tapes.
In computing sales, COMPANY shall have the right to deduct
all returns made at any time and for any reason.

(s)  COMPANY's container deductions shall be a sum
equal to (i) ten (10%) percent of the retail list price for
records in disc form (other than "compact-disc" records),
(ii) twelve and one-half (12-1/2%) percent of the retail
list price for records in disc form in "double-fold" jackets
or covers or in jackets which contain an insert or any other
special elements, and (iii) twenty-five (25%) percent of the
retail list price for pre-recorded tape, "compact-discs" and
cartridge boxes or containers, or any other form of package,
container or box other than as described herein.  In the
event that the deduction for packaging charged by COMPANY's
distributor is different then the amounts herein, then the
amount deducted by COMPANY's distributor shall prevail,
however, said policy may not materially alter the amount of
money received by ARTIST.  COMPANY shall not apply any
packaging deduction to 7" vinyl singles in standard sleeves.


11.  Statements as to royalties payable hereunder shall
be sent by COMPANY to ARTIST (each individually) within
sixty (60) days after the expiration of each calendar
quarter for the preceding quarterly period ending February
28, May 31, August 31 or November 30.  Concurrently with the
rendition of each statement, COMPANY shall pay ARTIST all
royalties shown to be due by such statement, after deducting
all recording costs paid by COMPANY, all payments made on
behalf of ARTIST, and all advances made to ARTIST prior to
the rendition of the statement.  No statements need be ren-
dered by COMPANY for any such quarterly period after the
expiration of the Term hereof for which there are no sales
of records derived from masters hereunder.  All payments
shall be made to the order of ARTIST and shall be sent to
ARTIST at ARTIST's address first above written.  COMPANY
shall be entitled to maintain a single account with
respect to all recordings subject to this or any other
agreement between the parties hereto.  COMPANY may maintain
reserves, however, COMPANY agrees that regarding such
reserves: (i) with respect to LPs in disc form, each base
reserve as initially established shall not exceed twenty
(20%) percent of records shipped during the applicable
accounting period and shall, at the end of two (2) years
from the date established, be reduced to five (5%)
percent; (ii) with respect to LPs in tape form, each base

-11-

C1.64.91/2-28

reserve as initially established shall not exceed twenty-five (25%) percent of tapes shipped during the applicable accounting period and shall, at the end of two (2) years from the date established, be reduced to ten (10%) percent; and (iii) with respect to Singles, each base reserve as initially established shall not exceed thirty-five (35%) percent of records shipped during the applicable accounting period and shall, at the end of two (2) years from the date established, be reduced to ten (10%) percent. COMPANY shall fully liquidate each base reserve within three (3) years from the date that such base reserve was established. At such time as a reserve is liquidated, it shall be deemed to be a sale in the period in which it was liquidated. ARTIST shall be deemed to have consented to all accountings rendered by COMPANY hereunder and said accountings shall be binding upon ARTIST and not subject to any objection by ARTIST for any reason unless specific objection, in writing, stating the basis thereof, is given to COMPANY within two (2) years after the date rendered, and after such written objection, unless suit is instituted within one (1) year after the date upon which COMPANY notifies ARTIST that it denies the validity of the objection. In the event COMPANY's distributor shall pay COMPANY on a semi-annual basis, then COMPANY shall pay ARTIST on the same basis as COMPANY is paid.

12. ARTIST shall have the right at ARTIST's sole cost and expense to appoint a Certified Public Accountant who is not then currently engaged in an outstanding audit of COMPANY to examine COMPANY's books and records as same pertain to sales of records subject hereto as to which royalties are payable hereunder, provided that any such examination shall be for a reasonable duration, shall take place at COMPANY's offices during normal business hours on reasonable prior written notice and shall not occur more than once in any calendar year.

13. (a) All notices to ARTIST may be served upon a principal or officer of ARTIST personally, by prepaid telegram, or by depositing the same, postage prepaid, in any mail box, chute, or other receptacle authorized by the United States Postal Service for mail, addressed to ARTIST at ARTIST' address first above written with a simultaneous copy sent in the same manner to: Mark L. Levinson, Sklar, Coben, Levinson & Dornstein, Inc., 2029 Century Park East, Los Angeles, CA 90067.

(b) All notices to COMPANY shall be in writing and shall be sent postage prepaid by registered or certified mail, return receipt requested, and addressed to COMPANY's address first above written with a simultaneous copy sent in the same manner to: Allen L. Jacobi, ESQ., Jacobi & Jacobi, P.A., 1313 N.E. 125th Street, North Miami, FL 33161.

14. (a) All musical compositions or material recorded pursuant to this Agreement which are written or composed, in whole or in part by ARTIST or any producer of the masters

-12-

C1.65.91/2-28

or indirectly, in whole or in part, by ARTIST and/or Artist
or any producer of the masters subject hereto (herein called
"Controlled Compositions") shall be and are hereby licensed
to COMPANY for the United States at a royalty per selection
equal to seventy-five (75%) percent of the minimum statutory
per selection rate (without regard to playing time) effec-
tive on the earlier of (i) the date such masters are
required to be delivered hereunder or (ii) the date such
masters are delivered to COMPANY hereunder. The aforesaid
seventy-five (75%) percent per selection rate shall
hereinafter sometimes be referred to as the "Per Selection
Rate." Notwithstanding the foregoing, the maximum aggregate
mechanical royalty rate which COMPANY shall be required to
pay in respect of any Single, Disco-single or LP hereunder,
regardless of the total number of all compositions contained
therein, shall not exceed two (2) times, and ten (10) times
the Per Selection Rate, respectively and in respect of any
EP hereunder, regardless of the total number of all com-
positions contained thereon, shall not exceed the per
Selection Rate times the total number of masters contained
therein. In this connection, it is specifically understood
that in the event that any Single, Disco-Single, EP or LP
contains other compositions in addition to the Controlled
Compositions and the aggregate mechanical royalty rate pro-
vided in this Paragraph 14, the aggregate rate for the
Controlled Compositions contained thereon shall be reduced
by the aforesaid excess over said applicable rate.
Additionally, COMPANY shall have the right with respect to
any Single, Disco-single, EP or LP, the aggregate mechanical
royalty rate for which exceeds the applicable rate provided
in this Paragraph 14 to deduct such excess payable thereon
from any and all monies payable to ARTIST pursuant to this
or any other agreement between the parties hereto. All
mechanical royalties payable hereunder shall be paid on the
basis of net records sold hereunder for which royalties are
payable to ARTIST pursuant to this Agreement.
Notwithstanding anything to the contrary contained herein,
mechanical royalties payable in respect of Controlled
Compositions for sales of records for any use other than as
described in subparagraphs 10(a), (e), (g) and (k) hereof
shall be seventy-five (75%) percent of the otherwise appli-
cable Per Selection Rate. Controlled Compositions which are
arranged versions of any musical compositions in the public
domain, when furnished by ARTIST for recording hereunder,
shall be free of administration of copyright in any
Controlled Composition shall be made subject to the provi-
sions hereof and any inconsistencies between the terms of
this Agreement and mechanical licenses issued to and
accepted by COMPANY shall be determined by the terms of this
Agreement. If any Single, Disco-Single, EP or LP contains
other compositions in addition to the Controlled
Compositions, ARTIST will obtain for COMPANY'S benefit
mechanical licenses covering such composition on the same

-13-

terms and conditions applicable to Controlled Compositions
pursuant to this Paragraph 14.

(b)  In respect of all Controlled Compositions per-
formed in Pictures, COMPANY is hereby granted an irrevocable
perpetual worldwide license to record and reproduce such
Compositions in such Pictures and to distribute and perform
such Pictures including, but not limited to, all Videoshows
thereof, and to authorize others to do so.  COMPANY will not
be required to make any payment in connection with those
uses, and that license shall apply whether or not COMPANY
receives any payment in connection with those Pictures.
Simultaneously with ARTIST'S submission to COMPANY of
the information required pursuant to subparagraph 21(c)(i)
hereof, ARTIST shall furnish COMPANY with a written
acknowledgment from the person(s) or entity(ies) controlling
the copyright in each non-Controlled Composition to be
embodied on any Picture confirming the terms upon which said
person(s) or entity(ies) to forthwith issue to COMPANY (and
its designees) licenses containing said terms and such other
terms and conditions as COMPANY (or its designees) may
require.  Royalties in connection with licenses for the use
of non-Controlled Compositions pertaining to Pictures and
Videoshows are included in the royalties set forth in sub-
paragraph 21(d) hereof, as described in subparagraph
21(d)(ii).  If the copyright in any Controlled Composition
is owned or controlled by anyone else, ARTIST will cause
that person, firm or corporation to grant COMPANY the same
rights described in this Paragraph 14, on the same terms.

15.  (a)  In the event that ARTIST for any reason fails
to timely fulfill any of its production and delivery commit-
ments hereunder in accordance with all of the terms and con-
ditions of this Agreement, then, in addition to any other
rights or remedies which COMPANY may have, COMPANY shall
have the right, upon written notice to ARTIST at any time
prior to the expiration of the then current Period, (i) to
terminate this Agreement without further obligation to
ARTIST as to unrecorded or undelivered masters, (ii) to
reduce the miniumum number of masters required to be
recorded and delivered during the then current Period to the
number which have been timely recorded and delivered during
such Period, or (iii) such default plus one hundred and
fifty (150) days with the times for the exercise by COMPANY
of its options to extend the Term and the dates of commen-
cement of subsequent Option Periods deemed extended accor-
dingly.  It is specifically understood that COMPANY may
exercise any of all of its rights pursuant to subparagraphs
15(a)(i), (ii) and (iii) hereof at any time(s) prior to the
date the Term would otherwise expire.  COMPANY's obligations
hereunder shall be suspended for the duration of any such
default.  The provisions of this subparagraph shall not
result in an extension of the Term for a period in excess of
the period permitted by applicable law, if any, for the
enforcement of personal services agreements.

-14-

C1.67.91/2-28

(b)   Intentionally Omitted.

(c)   COMPANY reserves the right, at its election, to suspend the operation of this Agreement for the duration of any of the following contingencies, if by reason of any such contingency, it is materially hampered in the performance of its obligations under this Agreement or its normal business operations are delayed or become impossible or commercially impraticable: Act of God, fire, catastrophe, labor disagreement, acts of government, its agencies or officers, any order, regulation, ruling or action of any labor union or association of artists, musicians, composers or employees affecting COMPANY or the industry in which it is engaged, delays in the delivery of materials and supplies, or any other cause beyond COMPANY's control.  Any such suspension due to a labor controversy which involves only COMPANY shall be limited to a period of six (6) months.

(d)   If ARTIST's voice or voices should be materially or permanently impaired, then in addition to any other rights or remedies which COMPANY may have, COMPANY shall have the right, upon written notice to ARTIST, to terminate this Agreement and shall thereby be relieved of any liability in connection with undelivered masters.

16.   ARTIST expressly acknowledges that ARTIST's services hereunder are of a special, unique and intellectual character which gives them peculiar value, and that in the event of a breach or threatened breach by ARTIST of any term, condition or covenant hereof, COMPANY will be caused immediate irreparable injury.  ARTIST expressly agrees that COMPANY shall be entitled to seek injunctive and other equitable relief, as permitted by law, to prevent a breach or threatened breach of this Agreement, or any portion thereof, by ARTIST which relief shall be in addition to any other rights or remedies, for damages or otherwise available to COMPANY.

17.   (a)   ARTIST warrants and represents that neither ARTIST is not under any disability, restriction or prohibition, whether contractual or otherwise, with respect to ARTIST's right to execute this Agreement or ARTIST's right to perform its terms and conditions.  Without limiting the foregoing, ARTIST specifically warrants and represents that no prior obligations, contracts or agreements of any kind undertaken or entered into by ARTIST, will interfere in any manner with the complete performance of this Agreement by COMPANY, ARTIST or with ARTIST's right to record any and all selections hereunder.  ARTIST warrants and represents that there are now in existence no prior unreleased masters embodying ARTIST's performances.

(b)   ARTIST warrants and represents that no materials, or any use thereof, will violate any law or infringe upon or violate the rights of any third party.

-15-

C1.68.91/2-28

include: (i) all musical compositions and other material contained on masters subject hereto, (ii) each name used by ARTIST, in connection with masters recorded hereunder, and (iii) all other materials, ideas, other intellectual properties, or elements furnished or selected by ARTIST and contained in or used in connection with any masters recorded hereunder or the packaging, sale, distribution, advertising, publicizing or other exploitation thereof.

(c) ARTIST agrees to and does hereby indemnify, save and hold COMPANY harmless from any and all loss and damage (including court costs and reasonable attorneys' fees) arising out of, connected with or as a result of any inconsistency with, failure or, or breach or threatened breach by ARTIST of any warranty, representation, agreement, undertaking or covenant contained in this Agreement including, without limitation, any claim by any third party in connection with the foregoing. In addition to any other rights or remedies COMPANY may have by reason of any such inconsistency, failure, breach, threatened breach or claim, ARTIST shall reimburse COMPANY, on demand, for any payment made by COMPANY at any time after the date hereof with respect to any loss, damage or liability resulting therefrom and in addition thereto COMPANY shall have the right to deduct from any and all monies otherwise payable to ARTIST under this or any other agreement between the parties hereto a sum(s) equal to such loss, and reasonable attorneys' fees). COMPANY shall give ARTIST notice of any third party claim to which the foregoing indemnity applies and ARTIST shall have the right to participate in the defense of any such claim through counsel of ARTIST's own choice and at ARTIST's expense. Pending the determination of any such claim, COMPANY may withhold payment of all monies under this or any other agreement between the parties hereto in any amount consistent with such claim.

18. Wherever in this Agreement ARTIST's approval or consent is required, such approval or consent shall not be unreasonably withheld. COMPANY may require ARTIST to formally give or withhold such approval or consent by giving ARTIST written notice requesting same and by furnishing ARTIST with the information or material in respect of which such approval or consent is sought. ARTIST shall give COMPANY written notice of approval or disapproval within five (5) days after such notice. ARTIST shall not hinder nor delay the scheduled release of any record hereunder. In the event of disapproval or no consent, the reasons therefor shall be stated. Failure to give such notice to COMPANY as aforesaid shall be deemed to be consent or approval.

19. During the Term, ARTIST warrants and represents that ARTIST shall become and remain a member in good standing of any labor unions with which the COMPANY may at

-16-

Cl.69.91/2-28

bership, including, but not limited to, the American
Federation of Musicians and the American Federation of
Television and Radio Artists. All masters subject hereto
shall be produced in accordance with the rules and regula-
tion of all unions having jurisdiction.

20. (a) ARTIST hereby sell, transfers and assigns to
COMPANY irrevocably all right, title and interest in and to
the masters embodying ARTISTS' performances the titles of
which are listed on Schedule "A" annexed hereto and made a
part hereof, from the inception of recordings thereof
(hereinafter in this Paragraph 20 referred to as the
"Masters"), including, without limitation, the COMPANY'S (or
its designee's) name as employer-for-hire such copyrights
and all renewals and extensions thereof, perpetually and
throughout the Territory.

(b) ARTIST will facilitate the Masters to
COMPANY at its offices in Miami, Florida not later
than simultaneously with the execution of this Agreement,
unless said masters are already in the possession of
COMPANY.

(c) The Masters will be deemed to have been
recorded under this Agreement during the Initial Period of
the Term of this Agreement.

(d) ARTIST hereby warrants and represents:

(i) Intentionally Deleted

(ii) No records have been manufactured from
the Masters by ARTIST or any other person, firm or cor-
poration for distribution in the Territory, and neither
ARTIST nor any other person, firm or corporation has or
shall have the right to distribute, market and/or sell any
records embodying the Masters in Territory, and none of the
musical compositions performed in the Masters have been per-
formed by ARTIST for the making of any other master
recordings, other than those records already pressed.

(iii) ARTIST has not, nor has any other
person, sold or assigned to any other party or otherwise
disposed of any right, title or interest in or to the
Masters.

(iv) (1) Each person who rendered any service
in connection with, or who otherwise contributed in any way
to the making of the Masters, or who granted to ARTIST any
of the rights referred to in this Agreement, had the full
right, power, and authority to do so, and was not bound by
any agreement which would restrict such person from ren-
dering such services or granting such rights.

-17-

C1.70.91/2-28

(2)   All recording costs and expenses with respect to the making of the Masters have been paid in full.

(3)   All necessary licenses for the recording of the compositions performed in the Masters have been obtained from the copyright owners, and all monies payable under such licenses or otherwise by reason of such recording have been paid.  The foregoing does not apply to any monies payable to such copyright owners in connection with the manufacture or sale or records derived from the Masters.

(4)   All the Masters were made in accordance with the rules and regulations of the American Federation of Musicians ("AFM"), the American Federation of Television and Radio Artists ("AFTRA") and all other unions having jurisdiction.

(v)   COMPANY shall have the sole and exclusive right to manufacture, advertise, distribute, sell and otherwise exploit and deal throughout the Territory in the Masters and records and other reproductions derived therefrom, free from any liability or obligation to make any payments therefor, except as expressly provided in this Agreement.

(vi) ARTIST will execute, acknowledge and deliver to COMPANY such further instruments and documents, and will otherwise cooperate with COMPANY as COMPANY shall request at any time, for the purpose of establishing or evidencing the rights granted to COMPANY herein, or otherwise to implement the intent of this Paragraph 20 COMPANY shall give ARTIST five day notice to sign such documentation and in the event that after said five days the documents are not signed then COMPANY may sign such documents in ARTIST'S name and make appropriate disposition of them.  It is agreed however, that prior to COMPANY's exercise of any power of attorney the documents in question should be sent to ARTIST's attorney, at least seven (7) days prior to said exercise.

(e)   It is understood and agreed that all of the provisions of this Paragraph 20 are of the essence of this Agreement.

21.   (a)   In addition to ARTIST's recording commitments as set forth in Paragraph 3 of this Agreement, ARTIST shall comply with requests, if any, made by COMPANY in connection with the production of Pictures. In this connection, ARTIST shall appear on dates and at places requested by COMPANY for the filming, taping or other fixation of audio-visual recordings.  ARTIST shall perform services with respect thereto as COMPANY deems desirable in a timely and first-class manner.  ARTIST acknowledges that the production of Pictures, involves matters of judgment with respect to art and taste, which judgment shall be exercised by COMPANY and COMPANY'S decisions with respect thereto shall be final. COMPANY will endeavor to consult with ARTIST as to the Production of pictures.

-18-

(b)  (i)  Each Picture produced during the Term of this Agreement shall be owned by COMPANY (including the worldwide copyrights therein and thereto and all extensions and renewals thereof) to the same extent as COMPANY's rights in master recordings made under this Agreement.

(ii) COMPANY will have the unlimited right to manufacture Videoshows of the Picture to rent, sell, distribute, transfer, sublicense or otherwise deal in such Videoshows under any trademarks, tradenames and labels; to exploit the Picture by any means now or hereafter known or developed; or to refrain from any such exploitation, throughout the world.

(c)  (i)  COMPANY agrees to advance all costs actually incurred in the production of Pictures made by COMPANY.  COMPANY shall submit to ARTIST for ARTIST's reasonable approval in writing, the following information: <u>(i)</u> the musical compositions and other material to be embodied thereon; <u>(ii)</u> the general concept therefor and <u>(iii)</u> the producer, director, and any other key personnel therefor. Following COMPANY's receipt of ARTIST's approval of said information, COMPANY shall commence production of the Picture. <u>(iv)</u> One-half of all sums paid by COMPANY in connection with each Picture shall be an advance against and recoupable by COMPANY out of all royalties becoming payable to ARTIST pursuant to this or any other agreement between the parties hereto.

(ii) Each of the following sums, if any, paid by COMPANY in connection with each Picture shall be an advance against and recoupable by COMPANY out of all royalties becoming payable to ARTIST pursuant to this or any other agreement between the parties hereto.

(A)  All expenses incurred by COMPANY in connection with the preparation and production of the Picture and the conversion of the Picture to Video Masters that are made to serve as prototypes for the duplication of the Videoshows of the Picture;

(B)  All of COMPANY's direct out-of-pocket costs (such as for rights, artists (including ARTIST), other personnel, facilities, materials, services, and the use of equipment) in connection with all steps in the production of the Picture and the process leading to and including the production of such Video Masters (including, but not limited to, packaging costs and the costs of making and delivering duplicate copies of such Video Masters); and

(C)  If in connection therewith COMPANY furnishes any of its own facilities, materials, services or equipment for which COMPANY has a standard rate, the amount of such standard rate or if there is no standard rate, the market value for the services or thing furnished.

-19-

C1.72.91/2-28

discretion deems necessary or advisable to pay in connection with the production of Pictures and the exploitation of COMPANY's rights therein in order to clear rights or to make any contractual payments that are due or may become due on the part of COMPANY, to ARTIST, ARTIST or any other person, firm or corporation by virtue of the exploitation of COMPANY's rights therein, in order to avoid, satisfy or make unnecessary any claims or demands by any person, firm or corporation claiming the right to payment therefor, including, but not limited to, any payment to an actual or alleged copyright owner, patent owner, union, union-related trust fund, pension plan or other entity, and any payment for an actual or alleged re-run fee, residual, royalty, license fee or otherwise shall constitute advances against and recoupable out of all royalties becoming payable to you pursuant to this or any other agreement between the parties hereto. No payment pursuant to this subparagraph 21(c)(iii) shall constitute a waiver of any of ARTIST's express or implied warranties and representations.

(d) (i) Conditioned upon ARTIST full and faithful performance of all of the terms and conditions of this Agreement, COMPANY shall pay ARTIST royalties equal to fifty (50%) percent of COMPANY's Video Net Receipts with respect to COMPANY's exploitation of Pictures subject to this Agreement. Monies earned and received by COMPANY from any licensee (rather than monies earned and received by the licensee) in respect of exploitation of Pictures shall be included in the computation of Video Net Receipts.

(ii) The royalties provided in subparagraph 21(d)(i) include any royalty obligations COMPANY may have to any other person, firm or corporation who supplied services or rights used in connection with Pictures, including, without limitation, producers, directors, extras, and music publishers, and any such royalties shall be deducted from the gross prior to the computation of royalties otherwise payable to ARTIST.

(iii) With respect to audiovisual material embodying Pictures made hereunder together with other audiovisual material, royalties payable to ARTIST shall be computed by multiplying the royalties otherwise applicable by a fraction, the numerator of which is the amount of playing time in such audiovisual material of Pictures made hereunder and the denominator of which is the total playing time of such audiovisual material.

(iv) As to Pictures embodying performances of ARTIST together with the performances of another artist or artists, the royalties otherwise payable hereunder shall be prorated by multiplying such royalties by a fraction, the numerator of which is one and the denominator of which is the total number of artists whose performances are embodied on such Pictures.

-20-

C1.73.91/2-28

(e)  COMPANY shall have the right to use and allow others to use each Picutre for advertising and promotional purposes with no payment to ARTIST.  As used herein, "advertising and promotional purposes" shall mean all uses for which COMPANY received no monetary consideration from licensees in excess of a reasonable amount as legal fees, administrative costs or similar type payments and as reim- bursement for transaction costs incurred by COMPANY in con- nection with such uses, such as tape, duplication costs, shipping, handling and insurance costs.

(f)  (i)  During the Term of this Agreement, no person, firm or corporation other than COMPANY will be authorized to make, sell, broadcast or otherwise exploit audio-visual materials unless: (A) ARTIST first notifies COMPANY of all of the material terms and conditions of the proposed agreement pursuant to which the audio-visual materials is to be made, sold, broadcast or otherwise exploited, including, but not limited to, the titles of the compositions covered by the proposed agreement, the format to be used, the manner of exploitation proposed and the indentities of all proposed parties to the agreement, and (B) ARTIST offers to enter into an agreement with COMPANY containing the same terms and conditions described in such notice and otherwise in the same form as this Agreement, but with payments to ARTIST that are ninety (90%) percent of the payments to ARTIST in such proposed agreement.  If COMPANY does not accept ARTIST's  offer within forty-five (45) days after COMPANY's receipt of same, ARTIST may then enter into that proposed agreement with the same parties mentioned in such notice, subject to subparagraph 21(f)(ii) hereof and provided that such agreement is consummated with those par- ties within thirty (30) days after the end of that sixty (60) day period upon the same financial terms and conditions set forth in ARTIST's notice and offer to COMPANY.  If that agreement is not consummated within the latter thirty (30) day period, no party except COMPANY will be authorized to make, sell, broadcast or otherwise exploit such audio- visual materials unless ARTIST first offers to enter into an agreement with COMPANY as provided in the first sen- tence of this subparagraph 21(f).  COMPANY will not be required, as a condition of accepting any offer made to COMPANY pursuant to this subparagraph 21(f), to agree to any terms or conditions which cannot be fulfilled by COMPANY as readily as by any other party (for example, but without limitation, the employment of a particular producer or director).

(ii) If COMPANY does not accept an offer made to it pursuant to this subparagraph 21(f), such non- acceptance shall not be considered a waiver of any of COMPANY's rights pursuant to this Agreement.  Such rights include, without limitation, the right to prevent authorizing any use of masters owned by or exclusively licensed to COMPANY unless COMPANY so agrees.  ARTIST shall not act in contravention of such rights.

-21-

(g)  In all other respects (e.g., the times for accountings to be rendered, and warranties and representations made by ARTIST) Pictures and Video Masters shall be governed by the same terms and conditions as are applicable to masters subject to this Agreement.

22.  Intentionally deleted.

23.  COMPANY shall prepare the artwork for the album covers used in connection with the releases hereunder in the United States, during the Term of this Agreement, of each newly-recorded LP required to be recorded and delivered hereunder (hereinafter, the "Artwork"), upon prior written notice to COMPANY and only upon all of the following conditions:

(a)  Before preparation and the incurring of any expenses in connection with the album artwork, ARTIST may discuss completely with a representative of COMPANY's art department, the proposed artwork to be produced by COMPANY, all of which shall be subject to the decision of COMPANY's art department.  COMPANY will endeavor to consult with ARTIST as to the album artwork.

(b)  (i)  COMPANY will deliver all such Artwork prepared by COMPANY to ARTIST for ARTIST's reasonable approval, prior to the printing of said album cover.

24.  All sums paid by COMPANY in connection with independant promotion, shall be an advance against and recoupable by COMPANY out of all royalties becoming payable to ARTIST pursuant to this or any other agreement between the parties.

25.  For the purposes of this Agreement, the following definitions shall apply:

(a)  "Master" - The equivalent of a seven (7") inch 45 rpm single-sided recording of not less than 3-1/2 minutes of playing time intended for use in the manufacture and sale of records.

(b)  "Single" - A seven (7") inch 45 rpm double-sided record embodying thereon two (2) masters.  A "Disco-single" is a twelve (12") inch double-sided record embodying thereon not more than four (4) masters.

(c)  "EP" - A double-sided record embodying thereon either five (5) masters or six (6) masters.

(d)  "LP" - A twelve (12") inche 33-1/3 rpm double-sided long-playing record of not less than 35 minutes of playing time. Multiple sets which consist of more than one

-22-

C1.75.91/2-28

intended to be released, packaged and sold together for a single overall price, shall be deemed to be the equivalent of one (1) LP for the purposes of this Agreement, but shall not be recorded or delivered hereunder without COMPANY's prior written consent.

(e) "Records", "phonograph records", "recordings" and "sound recording" - All forms of recording and reproduction by which sound may be recorded now known or which may hereafter become known, manufactured or sold primarily for home use, juke box use, or use on or in means of transportation, including, without limiting the foregoing, magnetic recording tape, film, electronic video recordings and any other medium or device for the production of artistic performances manufactured or sold primarily for home use, juke box use or use on or in means of transportation, whether embodying (i) sound alone or (ii) sound synchronized with visual images, e.g. "sight and sound" devices.

(f) "Delivery", "deliver" or "delivered" - The actual receipt by COMPANY of completed, fully mixed, leadered and edited masters comprising each LP, commercially satisfactory to COMPANY and ready for COMPANY's manufacture of records, together with all materials, consents, approvals, licenses and permissions.

(g) "Recording Costs" - Wages, fees, advances and payments of any nature to or in respect of all musicians, vocalists, conductors, arrangers, orchestrators, engineers, producers, copyists, etc.; payments to a trustee or fund based on wages to the extent required by any agreement between COMPANY and any labor organization or trustee; all studio, tape, editing, mixing, re-mixing, mastering and engineering costs; all costs of travel, per diems, rehearsal halls, non-studio facilities and equipment, dubdown, rental and transportation of instruments; all costs occasioned by the cancellation of any scheduled recording session; and all other costs and expenses incurred in producing the master recordings hereunder which are then customarily recognized as recording costs in the recording industry.

(h) "mid-priced LP" - an LP which bears a suggested retail list price in the applicable country of the Territory of at least sixty-seven (67%) percent but not more than eighty (80%) percent of the suggested retail list price of the majority of COMPANY's or COMPANY's licensee's as applicable, then-current newly-released LPs.

(i) "budget LP" - an LP which bears a suggested retail list price in the applicable country of the Territory or less than sixty-seven (67%) percent of the suggested retail list price of the majority of COMPANY's or COMPANY's licensee's, as applicable, then-current newly-released LPs.

C1.76.91/2-28

(j)  "Pictures" - motion pictures and other audiovisual works that have a soundtrack substantially featuring performances of ARTIST.

(k)  "Videoshows" - Videocassetts, Videodiscs or any other devces, now or hereafter known or developed, that enable the Picture to be perceived visually, with or without sound, when used in combination with or as part of a piece of electronic, mechanical or other apparatus.

(l)  "Videodisc" - a disc-type Videoshow that enable the Picture to be perceived visually, with or without sound, through a television-type playback system or device.

(m)  "Videocassette" - A Videoshow other than Videodisc (e.g., a Videoshow in the form of pre-recorded tape).

(n)  "Video Masters" - master Videoshows.

(o)  "Video Net Receipts" - monies earned and received by COMPANY from exploitation of Pictures less a twenty (20%) percent gross distribution fee, and less any out-of-pocket expenses, copyright, union and other third party payments, taxes and adjustments borne by COMPANY in connection with such exploitation and collection and receipt by COMPANY of such monies.

(p)  "any other agreement between the parties hereto" - any agreements between COMPANY on the one part, and ARTIST (or any other entity furnishing ARTIST's recordings or services) or ARTIST, on the other part, pertaining to ARTIST's recording services or recordings.

26.  COMPANY may assign its rights under this agreement in whole or in part to any subsidiary, affiliated or controlling corporation, to any person owning or acquiring a substantial portion of the stock or assets of COMPANY, or to any partnership or other venture in which COMPANY may participates.  COMPANY may also assign its rights to any of its licensees if advisable in COMPANY's sole discretion to implement the license granted.  ARTIST may assign its rights under this agreement to a corporation a majority of whose capital stock is owned and controlled by ARTIST. No such assignment shall affect COMPANY's rights hereunder nor relieve ARTIST of any obligations under this agreement.

27.  This Agreement sets forth the entire agreement between the parties with respect to the subject matter hereof. No modification, amendment, waiver, termination or discharge of this Agreement shall be binding upon COMPANY unless confirmed by a written instrument signed by an officer of COMPANY.  A waiver by COMPANY of any term or condition of this Agreement in any instance shall not be deemed or

-24-

construed as a waiver of the performance of any subsequent breach thereof. All of COMPANY's rights, options and remedies in this Agreement shall be cumulative and none of them shall be in limitation of any remedy, option or right available to COMPANY. Should any provision of this Agreement be adjudicated by a court of competent jurisdiction as void, invalid or inoperative, such decision shall not affect any other provision hereof, and the remainder of this Agreement shall be effective as though such void, invalid or inoperative provision had not been contained herein. It is agreed that all accountings and payments required herein, and all grants made herein, shall survive and continue beyond the expiration or earlier ter- mination of this Agreement. No breach of this Agreement by COMPANY shall be deemed material unless within thirty (30) days after ARTIST learns of such breach, ARTIST serves writ- ten notice thereof on COMPANY specifying the nature thereof and COMPANY fails to cure such breach, if any, within sixty (60) days ( except thirty (30) days if such alleged breach is the payment of monies hereunder) after receipt of such notice.

28. This Agreement shall be deemed to have been made in the State of Florida and its validity, construction, perfor- mance and breach shall be governed by the laws of the State of Florida applicable to agreements made and to be wholly performed therein. ARTIST agrees to submit itself to the jurisdiction of the Federal or State courts located in Miami in any action which may rise out of this agreement and said courts shall have exclusive jurisdiction over all disputes between COMPANY and ARTIST pertaining to this Agreement and all matters related thereto. In this regard, any process in any action or proceeding commenced in the courts of the State of Florida arising out of any claim, dispute or disagreement under this Agreement may, among other methods, be served upon ARTIST by delivering or mailing the same, via registered or certified mail, addressed to ARTIST at the address provided herein for notices to ARTIST; any such delivery or mail service shall be deemed to have the same force and effect as personal service within the State of Florida. Nothing contained herein shall constitute a waiver of any other remedies available to COMPANY. Nothing con- tained in this Paragraph 28 shall preclude COMPANY from joining ARTIST in an action brought by a third party against COMPANY in any jurisdiction, although COMPANY's failure to join ARTIST in any such action in one instance shall not consitute a waiver of any COMPANY's rights with respect thereto, or with respect to any subsequent action brought by a third party against COMPANY.

29. ARTIST hereby grants to COMPANY and its licenses the exclusive right, throughout the world, to use and authorize the use of ARTIST's name, portraits, pictures, likeness, and biographical material, either alone or in con- junction with other elements, in connection with the sale,

C1.78.91/2-28                    -25-

rights. For the rights granted by ARTIST to COMPANY in this paragraph, COMPANY shall pay ARTIST a royalty of twenty (20%) percent of COMPANY's net royalty receipts derived from the exploitation of such rights, after deducting all costs and third party payments relating thereto; and such royalty shall be accounted to ARTIST in the manner otherwise pro-vided herein. Relative to any and all activities conducted and contemplated by this paragraph, COMPANY agrees to regu-larly and reasonably inform ARTIST, in writing, of progress and current status of all such activities. COMPANY agrees to submit to ARTIST, within thirty (30) days of execution, copies of all contracts entered into by COMPANY relative to those activities provided for in this paragraph.

30. This Agreement shall not become effective until executed by all parties.

31. <u>Grant of Rights</u>

(a)     Assignment of Copyrights. Artist hereby sells, transfers, and assigns to COMPANY, its successors and assigns, and undivided one-hundred (100%) percent of the publishing interest in the Compositions, including without limitation, the copyrights therein and any and all renewals and/or extensions thereof throughout the world (the "Territory"), and all claims and causes of actions related to the Compositions accruing at any time and all other rights of whatsoever nature in the Composition, including without limitation, the titles, words and music of the Compositions and each every arrangement, adaptation and ver-sion thereof. COMPANY will pay to ARTIST twenty-five (25%) percent of the publishers share to ARTIST contemporaneously with record royalties. ARTIST will execute and deliver to COMPANY such instruments of transfer and other documents regarding the rights of COMPANY in the Compositions subject to this agreement as COMPANY may reasonably request to carry out the purposes of this agreement, (including, without limitation, the Exhibits annexed hereto), and COMPANY may sign such documents in your name or the name of any Controlled Songwriter and make appropriate disposition of them.

31.2     <u>Administration.</u>     COMPANY and its Licensees will have the sole, exclusive and perpetual right, throughout the Teritory, to:

(a)  License and cause others to license the exploitation of the Compositions, including, without limitation, the right to license broadcast and other public performances and the right to license the manufacture, distribution and sale of Phonograph Records embodying any one or more Compositions.

(b)  Administer and grant rights in the Compositions and the copyrights therein.

(c)  Print, publish and sell printed edi-tions of the Compositions.

-26-

(d)  Collect all monies payable during the term and Retention Period, with respect to the Compositions, in addition to all monies due prior to the date hereof, and all performance royalties payable to you with respect to the Compositions by the American Society of Composers, Authors and Publishers (ASCAP), Broadcast Music, Inc. (BMI), or any other applicable performing rights society (hereinafter collectively the "Societies"), but excluding any songwriter share of public performance income. If a Society in any territory does not license any particular public performance use of a Composition, it is understood COMPANY may license that use directly and all income received by COMPANY in connection with such licenses shall be deemed Gross Income and subject to accounting hereunder.

(e)  Make arrangements, or otherwise adapt or change any one or more Compositions in any manner.

(f)  Otherwise administer the Compositions and the copyrights therein and to act as the publisher thereof and exercise all of such rights as fully as if the copyrights were registered in COMPANY's name alone and COMPANY alone were the sole and exclusive owner thereof and of the Compositions.

31.3    Power of Attorney    ARTIST hereby irrevocably authorize, empower and appoints COMPANY, ARTISTS  true and lawful attorney, for the term of the copyrights in the respective Compositions and any renewals or extensions thereof, to secure any renewal periods for COMPANY's benefit, to initiate and compromise any claim or action with respect to the Compositions including any claim or action againt infringers of COMPANY or ARTISTS rights in the Compositions, and to execute in ARTISTS name, and the name of any Controlled Songwriter, any and all documents and/or instruments necessary or desirable to accomplish the foregoing and/or to evidence COMPANY's ownership of the copyrights during such periods and/or to effectuate COMPANY's rights hereunder.  The power granted herein is coupled with an interest and irrevocable.  COMPANY will cause the copyrights in the Compositions to be registered or re-registered jointly in the name of COMPANY and ARTIST and such additional parties as appropriate.  All documents which would be executed by a power of attorney will be delivered to the attorney for ARTIST prior to one (1) week before execution.

31.4    Name and Likenesses.  COMPANY and any Licensee of COMPANY each shall have the right and may grant to others the right to reproduce, print, publish, or disseminate in any medium your name, the names, portraits, pictures and likenesses in the exploitatin of musical compositions and the marketing of other merchandise of any kind.  During the term of this agreement neither you nor any Controlled Songwriter shall authorize any Party other than

-27-

C1.80.91/2-28

(or any professional, group, or other assumed or fictitious name used by Controlled Songwriters) in connection with the exploitation of musical compositions.

32.    <u>Liquidation of Existing Reserves</u> - COMPANY agrees to liquidate and pay to ARTIST fifty (50%) percent of the reserves now being held by COMPANY, on all 2 Live Crew Lp's to date.  This shall not include any reserves being held on the "Luke Album - Banned in the USA".

33.    <u>Record Label Distribution</u>  It is hereby agreed that COMPANY agrees to provide the distribution of phonograph records on artists selected and signed by ARTIST, Wongwon and Ross.  ARTIST, Wongwon shall be permitted to release up to three (3) artists (singles with an option for an Lp) per year, for which COMPANY will provide studio time, distribu- tion, and normal in-house promotion.  COMPANY shall pay to ARTIST a gross royalty of twelve (12%) percent out of which they will pay the artists for who they sign and produce. The label shall have a name selected by ARTIST which ARTIST will notify COMPANY of prior to the delivery of the first artists lp (or single).  COMPANY shall have first option on any of the artists selected and produced by ARTIST. A full and formal agreement pertaining to this record distribution agreement in accordance with the points contained herein shall be provided by COMPANY at the request of ARTIST.

YOU UNDERSTAND THAT THIS IS AN IMPORTANT LEGAL DOCUMENT PURSUANT TO WHICH YOU GRANT TO COMPANY CERTAIN EXCLUSIVE SERVICES FOR ALL OF THE WORLD FOR A PERIOD IN EXCESS OF THREE (3) YEARS. YOU HEREBY REPRESENT AND WARRANT THAT YOU HAVE BEEN ADVISED OF YOUR RIGHT TO RETAIN INDEPENDENT LEGAL COUNSEL IN CONNECTION WITH THE NEGOTIATION AND EXECUTION OF THIS AGREEMENT AND THAT YOU HAVE EITHER RETAINED AND HAVE BEEN REPRESENTED BY SUCH LEGAL COUNSEL OR HAVE KNOWINGLY AND VOLUNTARILY WAIVED YOUR RIGHT TO SUCH LEGAL COUNSEL AND DESIRE TO ENTER INTO THIS AGREEMENT WITHOUT THE BENEFIT OF LEGAL REPRESENTATION.

    IN WITNESS WHEREOF, the parties hereto have executed this Agreement on the day and year first above written.

                                    LUKE RECORDS

_____       BY: _____
                                    LUTHER CAMPBELL

_____           _____
                                    CHRIS WONG WON (Artist)

-28-

D1.Luke3



## EXCLUSIVE RECORDING AGREEMENT

This Agreement made and entered into as of this _____ day of April, 1991 by and between Luke Records, Inc., 8400 N.E. 2nd Ave, Miami, Florida 33138 ("COMPANY") and Mark Ross, and David Hobbs as performers in the group known as The 2 Live Crew ("ARTIST").

In consideration of the mutual promises contained herein, it is hereby agreed as follows:

1.    (a)  COMPANY hereby engages ARTIST to record for COMPANY masters embodying the performances of ARTIST, and ARTIST hereby accepts such engagement and agrees to record masters embodying the performances of ARTIST exclusively for COMPANY during the term hereof and all extensions and renewals.

(b)  The rights herein granted to COMPANY and the obligations of ARTIST shall be for the world ("Territory").

2.    The term of this Agreement shall be for a period of one (1) year commencing on the date hereof ("Initial Period").  ARTIST hereby grants to COMPANY four (4) consecutive separate options to extend the term for further periods of one (1) year each ("Option Periods"), each upon the same terms and conditions applicable to the Initial Period, except as otherwise hereinafter set forth.  The Initial Period and every Option Period for which Company has exercised its option are hereinafter sometimes referred to together as the "Term".  Each option shall be automatically exercised, unless written notice to the contrary is sent to ARTIST at least fifteen (15) days prior to the date that the Term would otherwise expire.

3.    During the Initial Period, ARTIST shall record masters the equivalent in playing time of one Lp.  Said masters will be owned by COMPANY pursuant to all of the terms and conditions of this Agreement, particularly Paragraph 20 hereof and said masters shall be deemed recorded and delivered hereunder during the Initial term.

4.    (a)  During the Term, ARTIST shall not perform for the purpose of making records for anyone other than COMPANY for distribution in the Territory and ARTIST shall not authorize the use of ARTIST's name, likeness, or other indentification for the purpose of distributing, selling, advertising or exploiting records for anyone other than

C1.54.91/2-28

-1-


EXHIBIT "A"

COMPANY in the Territory.  It is agreed however, that individual members of ARTIST not to exceed two (2) may perform as instrumentalists, arrangers, producers or background singers on other recordings for other artists in a "sideman" capacity provided COMPANY receives credit, in the form of "Courtesy of Luke Records".  This paragraph will not apply to any records distributed by Luke Records.

(b)  ARTIST shall not perform any selection recorded hereunder for the purpose of making records for anyone other than COMPANY for distribution in the Territory (i) for a period of five (5) years after the initial date of release of the respective record containing such selection or (ii) for a period of two (2) years after the expiration or other termination of this Agreement, whichever is later ("Re-recording Restriction").

(c)  Should ARTIST make any sound recording during the Term for motion pictures, television, electrical transcriptions or any other medium or should ARTIST after the Term perform for any such purpose any selection recorded hereunder to which the Re-recording Restriction then applies, ARTIST will do so only pursuant to a written agreement prohibiting the use of such recordings, directly or indirectly, for record purposes in the Territory.  ARTIST shall furnish to COMPANY a copy of the provisions of any such contract relating to the foregoing.

5.   All masters recorded by ARTIST during the Term from the inception of the recording thereof and all reproductions derived therefrom, together with the performances embodied thereon, shall be the property of COMPANY for the world free from any claims whatsoever by ARTIST or any person deriving any rights or interests from ARTIST.  Without limiting the generality of the foregoing, COMPANY and its designee(s) shall have the exclusive and unlimited right to all the results and proceeds of ARTIST's recording services rendered during the Term, including, but not limited to, the exclusive, unlimited and perpetual rights throughout the world:

(a)  To manufacture, advertise, sell, lease, license, distribute or otherwise use or dispose of, in any or all fields of use by any method now or hereafter known, records embodying the masters recorded by ARTIST during the Term, all upon such terms and conditions as COMPANY may elect, or at its discretion, to refrain therefrom;

-2-

(b)   To use and publish and to permit others to use and publish ARTIST's name (including any professional name heretofore or hereafter adopted by ARTIST), photographs, likeness, and biographical material concerning ARTIST for advertising and trade purposes in connection with all masters recorded by ARTIST and all Pictures produced during the Term; ARTIST consent will be requested, such consent may not be unreasonably witheld.  After the term of this agreement the rights conveyed in this paragraph shall be non-exclusive.

(c)   To obtain copyrights and renewals thereof in sound recordings (as distinguished from the musical compositions embodied thereon) recorded by ARTIST during the Term, in COMPANY's name as owner and employer-for-hire of such sound recordings;

(d)   To release records derived from masters recorded by ARTIST during the Term under any name, trademark or label which COMPANY or its subsidiaries, affiliates or licensees may from time to time elect.  COMPANY agrees that the initial United States release during the Term hereof shall be on COMPANY's first line label.  Masters recorded hereunder shall be distributed by a distributor or distributors selected by COMPANY in COMPANY's sole discretion.

(e)   To perform such records publicly and to permit public performances thereof by means of radio broadcast, television or any other method now or hereafter known.

6.   (a)   ARTIST acknowledges that the sale of records is speculative and agrees that the judgment of COMPANY, reasonably exercised, with regard to any matter affecting the sale, distribution or exploitation of such records shall be binding and conclusive upon ARTIST.  Except as otherwise specifically set forth in subparagraph 6(b) hereof, nothing contained in this Agreement shall obligate COMPANY to make, sell, license, or distribute records manufactured from masters delivered hereunder.

(b)   Provided that ARTIST is not in breach of this Agreement, and if COMPANY is in receipt of completed, fully edited and mixed commercialy satisfactory masters sufficient to comprise each newly-recorded required LP hereunder embodying ARTIST's newly-recorded required studio performances of material not previously recorded by ARTIST ready for COMPANY's manufacture of records therefrom, together with all materials therefor, COMPANY agrees to commercially release each LP recorded and delivered hereunder within one hundred and twenty (120) days following completion of Artists recording for COMPANY.

(c)   It is understood and agreed that if COMPANY shall have failed to so release any such LP, ARTIST shall have the right to notify COMPANY in writing of COMPANY's such failure and of ARTIST's desire that the Term of this

Agreement be terminated if COMPANY does not, within sixty (60) days after COMPANY receives such notice from ARTIST, commercially release the applicable LP in the World.  it is specifically understood and agreed that if COMPANY shall fails to fulfill any such release commitment, COMPANY shall have no liability whatsoever to ARTIST and ARTIST's only remedy shall be to terminate the Term of this Agreement by written notice to COMPANY within fifteen (15) days following the expiration of such sixty (60) day period.

7.   (a)  An advance in the sum of two hundred and fifty thousand ($250,000.00) dollars, to be divided equally by all members of that certain musical group known as 2 Live Crew, payable as follows; One third (1/3) upon signing of the agreement; one third (1/3) upon the start of the Lp; and the remaining one third (1/3) upon completion of the album, shall be the amount of the Recording Fund for the first Lp delivered during the initial Contract Period (the First Lp).

(b)  On all future Lp's the advance of two hundred and fifty thousand ($250,000) dollars, to be divided equally by all members of that certain musical group known as 2 Live Crew, shall be paid at one-half (1/2) on renewal of the Option Period and one-half (1/2) upon completion of the Lp.

|  | | Fund Amount |
|---|---|---|
| (i) | The Album Delivered during the first Contract Period (the "Second Album"): | $250,000 |
| (ii) | The Album Delivered during the second Option Period (the "Third Album") | $250,000 |
| (iii) | The Album Delivered during the third Option Period (the "Fourth Album") | $250,000 |
| (iv) | The Album Delivered during the fourth Option Period (the "Fifth Album") | $250,000 |

(c)  During each Contract Period COMPANY will have the option to increase the Recording Commitment for that Period by Master Recordings constituting one additional Lp ("Overcall Recordings").  COMPANY may exercise that option by sending you a notice at any time before the end of the Contract Period concerned.  The current Contract Period will continue for nine (9) months after delivery of the Overcall Recordings.  Any Lp entitled Luke Featuring 2 Live Crew shall count as an Overcall Lp. COMPANY however shall be limited to two (2) overcall albums over the entire length of the contract.

sible for and shall pay all recording costs, pressing and promotional costs incurred in the production and release of all masters subject to this Agreement. All such costs paid by COMPANY shall be deducted from any and all monies becoming payable to ARTIST under this agreement.

(ii) Notwithstanding the provisions of sub-paragraph 8(a)(i) hereof, in the event that COMPANY elects to require ARTIST to record and deliver the Additional Masters, or if COMPANY wishes to re-mix any of the masters delivered in connection with the First LP, all costs so paid by COMPANY shall be advances against and recoupable by COMPANY out of all royalties becoming payable to ARTIST pursuant to this or any other agreement between the parties hereto.

(b) COMPANY shall be solely responsible for and shall pay all monies becoming payable to ARTIST and all other parties rendering services or otherwise in respect of sales of recordings derived from masters subject to this Agreement.

9. (a) Each master recorded and delivered hereunder shall be produced by a producer selected by COMPANY. COMPANY shall be solely responsible for and shall pay all monies becoming payable to all producers. All such sums so paid by COMPANY shall be deducted from any and all monies otherwise payable to ARTIST under this or any other agreement between the parties hereto (excluding any publishing agreements with Companies affiliate Publishing Companies).

(b) As to any producers selected by COMPANY, COMPANY shall pay said producer or producers a royalty negotiated between COMPANY and said producer and shall not effect the royalty otherwise payable to ARTIST under this or any other agreement between the parties hereto.

10. Conditioned upon ARTIST's full and faithful performance of all the material terms hereof, COMPANY shall pay ARTIST the following royalties in respect of records subject to this Agreement:

(a) Company shall credit Artist's Royalty Account pursuant to and in accordance with the following royalty schedule for records manufactured and sold in the United States:

| RECORDING PERIODS | MINIMUM SIDES | ROYALTY RATES |
|---|---|---|
| Initial Period | One LP | 15% |
| 1st Option Period | One LP | 15% |
| 2nd Option Period | One LP | 15% |
| 3rd Option Period | One LP | 15% |
| 4th Option Period | One LP | 15% |

*Royalty Rate = Percentage times ninety (90%) percent
of net records sold and for which Company has been paid
times the retail price of records manufactured in the
United States.  This rate shall not apply to 7"
or 12" singles.  (In the event Company's distributor pay
on the basis of eighty-five (85%) percent of retail,
then company shall pay on the same basis as
distributor). The rate for 7" and 12" singles shall
be thirteen (13%) percent.

         (b)          (i)  With respect to retail sales outside
the United States of all records derived from masters
recorded and delivered during the Term, the royalty rate
shall be based upon the U.S. rate and pro rated down at the
percentage which COMPANY's royalty rate is reduced.

              (ii) The royalty rate hereinabove set
forth in subparagraph 10(b)(i) shall be hereinafter referred
to as the "Basic Foreign Rate".

              (iii) Notwithstanding anything to the
contrary contained herein, with respect to records sold in
Brazil, Greece, Portugal, India, Kenya, Zambia, Zimbabwe,
Nigeria and any other territory in which governmental or
other authorities place limits on the royalty rates per-
missible for remittances to the United States in respect of
records sold in such territory(ies), the royalty rate
payable to ARTIST hereunder in respect of sales of records
in such territory(ies) shall equal the lesser of (A) the
Basic Foreign Rate or (B) the effective royalty rate per-
mitted by such governmental or other authority for remittan-
ces to the United States less a royalty equivalent to two
(2%) percent of the retail list price and such monies as
Company or its licensees shall be required to pay to all
applicable union funds in respect of said sales.

              (iv) Royalties in respect of sales of
records outside the United States shall be computed in the
same national currency as COMPANY is accounted to be its
licensees and shall be paid to ARTIST at the same rate of
exchange as COMPANY is paid.  It is understood that such
royalties will not be due and payable until payment thereof
is received by or credited to COMPANY in the United States
governmental regulations, royalties therefor shall not be
credited to ARTIST's account during the continuance of such
inability except that (I) if any accounting rendered to
ARTIST hereunder during the continuance of such inability
shows ARTIST's account to be in a credit position, COMPANY
will, after ARTIST's request and at ARTIST's expense, if

COMPANY is able to do so, deposit such royalties to ARTIST's credit in the applicable foreign currency in a foreign depository, or (ii) if the royalties not credited to ARTIST's account exceed the amount, if any, by which ARTIST's account is in a debit position, then COMPANY will, after ARTIST request and at ARTIST's expense, and if COMPANY is able to do so, deposit such excess royalties to ARTIST's credit in the applicable foreign currency in a foreign depository. Deposit as aforesaid shall fulfill COMPANY's obligations under this Agreement as to record sales to which such royalty payments are applicable.

(c)  With respect to records sold (i) through any direct mail or mail order distribution method, including, without limitation, record club distribution, (ii) by distribution through retail outlets in conjunction with special advertisements on radio or television or (iii) by any combination of the methods set forth above, the royalty payble in connection therewith shall be one-half (1/2) of COMPANY's net earned royalty receipts in respect of reported sales through such channels after COMPANY shall have first deducted all third party payments for which COMPANY is responsible.  No royalties shall be payable with respect to records given away as "bonus" or "free" records as a result of joining a record club or plan or of purchasing a required number of records or with respect to records received by members of any such club operation either in an introductory offer in connection with joining such club or upon recommending that another join such club operation.

(d)  (i)  With respect to mid-priced LPs, the royalty rate shall be two-thirds (2/3) of the Basic U.S. LP Rate or Basic Foreign Rate, as the case may be, provided that during the Term, COMPANY shall not release in the United States any such mid-priced LP comprised solely of masters delivered hereunder prior to nine (9) months following COMPANY's initial United States release of such LP as a full-priced record, unless ARTIST shall consent in writing.

(ii) With respect to budget LPs, the royalty rate shall be one-half (1/2) of the Basic U.S. LP Rate or Basic Foreign Rate, as the case may be, provided that during the Term, COMPANY shall not release in the United States any such budget LP comprised solely of masters delivered hereunder prior to eighteen (18) months following COMPANY's initial United States release of such LP as a full-priced record, unless ARTIST shall consent thereto.

(e)  With respect to EPs, the royalty rate shall be three-fourths (3/4) of the Basic U.S. LP Rate or Basic Foreign Rate, as the case may be.

-7-

C1.60.91/2-28

(f)   Notwithstanding anything to the contrary contained in this Agreement, in the event that Company (or its licensee(s)) shall in any country(ies) of the Territory adopt a policy applicable to the majority of LPs in COMPANY's (or its licensee(s)') then current catalogue pursuant to which the retail list price of an LP is reduced subsequent to its initial release, then the royalty rates otherwise payable to ARTIST under this Agreement shall be reduced in the proportion that such reduced retail list price of the applicable LP bears to the retail list price of such LP as initially released in the applicable country.

(g)   With respect to "compact-disc" LPs, the royalty rate shall be the Basic U.S. LP Rate or Basic Foreign Rate, as the case may be.

(h)   In the event that COMPANY shall sell or license third parties to sell "records" via telephone, satellite, cable or other direct transmission to the consumer over wire or through the air, ARTIST shall be paid royalties with respect thereto at the Basic U.S. Singles Rate, Basic U.S. LP Rate or Basic Foreign Rate, as the case may be.  For the purposes of calculating royalties payable in connection with such sales, the retail list price of such "records" shall be deemed to be the then-current retail list price of tape copies of such records and in the case of records which have no tape equivalent, the corresponding price of the disc (but in the United States, eighty-five (85%) percent of the then current retail list price of such tape copies or corresponding disc), and the packaging deduction for such sales shall be made in accordance with subparagraph 10(s)(iii) of this Agreement.

(i)   The royalty rate payable for records sold to the United States government, its subdivisions, departments and agencies, and to educational institutions and libraries shall be one-half (1/2) of the otherwise applicable basic U.S. rate and shall be based upon the retail list price (Post Exchange list price where applicable) of such records.

(j)   The royalty rate payable for records sold as "premiums" shall be one-half (1/2) of the Basic U.S. Singles Rate, Basic U.S. LP Rate or Basic Foreign Rate, as the case may be, and the retail list price for such records shall be demed to be COMPANY's actual sales price.  It is understood that COMPANY shall not use ARTIST's name or likeness in connection with any such "premium" record as an endorsement of any product or service.  COMPANY agrees that there will be no premium records without the ARTISTS consent, which will not be unreasonably withheld.  ARTIST's consent or withholding of consent must be made in writing within seven (7) days of COMPANY's request, failure to respond will be deemed agreement with COMPANY's request.

(k)   Intentionally Deleted.

(1)  COMPANY shall have the right to license the masters to third parties for record use and/or all other types of use on a flat-fee basis. COMPANY shall credit ARTIST's royalty account with fifty (50%) percent of the net amount received by COMPANY under each such license after COMPANY shall have first deducted all third party payments from the gross, for which COMPANY is responsible.

(m)  As to records not consisting entirely of masters recorded and delivered hereunder, the royalty rate otherwise payable to ARTIST hereunder with respect to sales of any such record shall be prorated by multiplying such royalty rate by a fraction, the numerator of which is the number of masters recorded and delivered hereunder embodied on such record and the denominator of which is the total number of masters embodied thereon. This formula applies only to royalty bearing masters.

(n)  As to masters embodying performances of ARTIST together with the performances of another artist or artists, the royalty rate otherwise payable hereunder with respect to the sales of any record derived from any such master and the recording costs and/or advances otherwise payable by COMPANY hereunder with respect to any such master shall be prorated by multiplying such royalty rate or recording costs and/or advances by a fraction, the numerator of which is one and the denominator of which is the total number of artists whose performances are embodied on such master, who receive royalties.

(o)  COMPANY shall have the right to include or to license others to include any one or more of the masters in promotional records on which such masters and other recordings are included, which promotional records are designed for sale at a substantially lower price than the regular price of COMPANY's LPs. No royalties shall be payable on sales of such promotional records.

(p)  No royalties shall be payable in respect of: (i) records given away or furnished on a "no-charge" basis to "one-stops", rack jobbers, distributors or dealers, whether or not affiliated with COMPANY, provided that such records do not exceed 300 non-royalty bearing Singles out of every 1,000 Singles distributed and 200 non-royalty bearing LPs out of every 1,000 LPs distributed, and provided further that COMPANY shall have the right to exceed the aforesaid limitations for short term special promotions or marketing campaigns. The number of records distributed on a no-charge campaigns.

basis shall not, for any such short term promotion or cam-
paign exceed an additional ten (10%) percent of the total
number of records distributed.  COMPANY shall use reasonable
efforts to notify ARTIST of any such short term special pro-
motion or campaign, but COMPANY's failure to do so shall not
be a breach of this Agreement or in any manner affect
COMPANY's right to distribute records on a non-royalty basis
as aforesaid; (ii) records given away or sold at below
stated wholesale prices for promotional purposes to disc
jockeys, record reviewers, radio and television stations and
networks, motion pictures companies, music publishers,
COMPANY's employees, ARTIST, ARTIST or other customary reci-
pients of promotional records or for use on transportation
facilities; (iii) records sold as scrap, salvage, overstock
or "cut-outs"; (iv) records sold below cost.  No royalties
shall be payable on any sales by COMPANY's licensees until
payment has been received by or credited to COMPANY in the
United States.  This paragraph shall be governed by the
agreement between COMPANY and it's distributor.  In the
event that distributor adopts a different policy as to the
contents of this paragraph, then said distributor's policy
shall prevail as between COMPANY and ARTIST, it is agreed
however, that said policy change may not materially change
the terms under this agreement.  Notices of said changes
shall be made to ARTIST pursuant to this Agreement.

(q)  As to records sold at a discount to
"one-stops", rack jobbers, distributors or dealers, whether
or not affiliated with COMPANY, in lieu of the records given
away or furnished on a "no-charge" basis as provided in sub-
paragraph 10(p)(i) above, the applicable royalty rate other-
wise payable hereunder with respect to such records shall be
reduced in the proportion that said discount wholesale price
bears to the usual stated wholesale price, provided that
said reduction in the applicable royalty rate does not
exceed the percentage limitations set forth in subparagraph
10(p)(i) above.

(r)  The royalty rates provided for in this
Paragraph 10 shall be applied against the retail list price
(less COMPANY's container deductions, excise taxes, duties
and other applicable taxes) for ninety (90%) percent of
records sold which are paid for and not returned.  The term
for "retail list price" as used in this Agreement shall mean
(i) for records sold in the United States, the
manufacturer's suggested retail price in the United States
and (ii) for records sold outside the United States, the
manufacturer's suggested retail price in the country of
manufacture or sale, as COMPANY is paid.  In those countries
where a manufacturer's suggested retail price is not uti-
lized or permitted, the generally accepted retail price
shall be utilized.  Notwithstanding the foregoing, (A) the
retail list price for a "Disco-single" shall be deemed to be
the retail list price for a Single, except for Disco-Singles
sold in the United States the retail list price therefor
shall be deemed to be the lesser of one hundred fifty (150%)
percent of the retail list price of a Single or the actual

retail list price of such Disco-single and (B) with respect
to "compact-disc" or other audiofile records in any con-
figuration manufactured, distributed and sold by Company's
normal retail channels in the United States a royalty equal
at the same penny rate as Company is paid on cassette tapes.
In computing sales, COMPANY shall have the right to deduct
all returns made at any time and for any reason.

(s)  COMPANY's container deductions shall be a sum
equal to (i) ten (10%) percent of the retail list price for
records in disc form (other than "compact-disc" records),
(ii) twelve and one-half (12-1/2%) percent of the retail
list price for records in disc form in "double-fold" jackets
or covers or in jackets which contain an insert or any other
special elements, and (iii) twenty-five (25%) percent of the
retail list price for pre-recorded tape, "compact-discs" and
cartridge boxes or containers, or any other form of package,
container or box other than as described herein.  In the
event that the deduction for packaging charged by COMPANY's
distributor is different then the amounts herein, then the
amount deducted by COMPANY's distributor shall prevail,
however, said policy may not materially alter the amount of
money received by ARTIST.  COMPANY shall not apply any
packaging deduction to 7" vinyl singles in standard sleeves.

11.  Statements as to royalties payable hereunder shall
be sent by COMPANY to ARTIST (each individually) within
sixty (60) days after the expiration of each calendar
quarter for the preceding ~~quarterly~~ period ending ~~February-
28,~~ May 31, ~~August 31 or~~ November 30.  Concurrently with the
rendition of each statement, COMPANY shall pay ARTIST all
royalties shown to be due by such statement, after deducting
all recording costs paid by COMPANY, all payments made on
behalf of ARTIST, and all advances made to ARTIST prior to
the rendition of the statement.  No statements need be ren-
dered by COMPANY for any such ~~quarterly~~ period after the
expiration of the Term hereof for which there are no sales
of records derived from masters hereunder.  All payments
shall be made to the order of ARTIST and shall be sent to
ARTIST at ARTIST's address first above written.  COMPANY
shall be entitled to maintain a single account with
respect to all recordings subject to this or any other
agreement between the parties hereto.  COMPANY may maintain
reserves, however, COMPANY agrees that regarding such
reserves: (i) with respect to LPs in disc form, each base
reserve as initially established shall not exceed twenty
(20%) percent of records shipped during the applicable
accounting period and shall, at the end of two (2) years
from the date established, be reduced to five (5%)
percent; (ii) with respect to LPs in tape form, each base

reserve as initially established shall not exceed twenty-five (25%) percent of tapes shipped during the applicable accounting period and shall, at the end of two (2) years from the date established, be reduced to ten (10%) percent; and (iii) with respect to Singles, each base reserve as initially established shall not exceed thirty-five (35%) percent of records shipped during the applicable accounting period and shall, at the end of two (2) years from the date established, be reduced to ten (10%) percent. COMPANY shall fully liquidate each base reserve within three (3) years from the date that such base reserve was established. At such time as a reserve is liquidated, it shall be deemed to be a sale in the period in which it was liquidated. ARTIST shall be deemed to have consented to all accountings rendered by COMPANY hereunder and said accountings shall be binding upon ARTIST and not subject to any objection by ARTIST for any reason unless specific objection, in writing, stating the basis thereof, is given to COMPANY within two (2) years after the date rendered, and after such written objection, unless suit is instituted within one (1) year after the date upon which COMPANY notifies ARTIST that it denies the validity of the objection. In the event COMPANY's distributor shall pay COMPANY on a semi-annual basis, then COMPANY shall pay ARTIST on the same basis as COMPANY is paid.

12. ARTIST shall have the right at ARTIST's sole cost and expense to appoint a Certified Public Accountant who is not then currently engaged in an outstanding audit of COMPANY to examine COMPANY's books and records as same pertain to sales of records subject hereto as to which royalties are payable hereunder, provided that any such examination shall be for a reasonable duration, shall take place at COMPANY's offices during normal business hours on reasonable prior written notice and shall not occur more than once in any calendar year.

13. (a) All notices to ARTIST may be served upon a principal or officer of ARTIST personally, by prepaid telegram, or by depositing the same, postage prepaid, in any mail box, chute, or other receptacle authorized by the United States Postal Service for mail, addressed to ARTIST at ARTIST' address first above written with a simultaneous copy sent in the same manner to: Mark L. Levinson, Sklar, Coben, Levinson & Dornstein, Inc., 2029 Century Park East, Los Angeles, CA 90067.

(b) All notices to COMPANY shall be in writing and shall be sent postage prepaid by registered or certified mail, return receipt requested, and addressed to COMPANY's address first above written with a simultaneous copy sent in the same manner to: Allen L. Jacobi, ESQ., Jacobi & Jacobi, P.A., 1313 N.E. 125th Street, North Miami, FL 33161.

14. (a) All musical compositions or material recorded pursuant to this Agreement which are written or composed, in whole or in part by ARTIST or any producer of the masters

-12-

subject hereto, or which are owned or controlled, directly or indirectly, in whole or in part, by ARTIST and/or Artist or any producer of the masters subject hereto (herein called "Controlled Compositions") shall be and are hereby licensed to COMPANY for the United States at a royalty per selection equal to seventy-five (75%) percent of the minimum statutory per selection rate (without regard to playing time) effective on the earlier of (i) the date such masters are required to be delivered hereunder or (ii) the date such masters are delivered to COMPANY hereunder. The aforesaid seventy-five (75%) percent per selection rate shall hereinafter sometimes be referred to as the "Per Selection Rate." Notwithstanding the foregoing, the maximum aggregate mechanical royalty rate which COMPANY shall be required to pay in respect of any Single, Disco-single or LP hereunder, regardless of the total number of all compositions contained therein, shall not exceed two (2) times, and ten (10) times the Per Selection Rate, respectively and in respect of any EP hereunder, regardless of the total number of all compositions contained thereon, shall not exceed the per Selection Rate times the total number of masters contained therein. In this connection, it is specifically understood that in the event that any Single, Disco-Single, EP or LP contains other compositions in addition to the Controlled Compositions and the aggregate mechanical royalty rate provided in this Paragraph 14, the aggregate rate for the Controlled Compositions contained thereon shall be reduced by the aforesaid excess over said applicable rate. Additionally, COMPANY shall have the right with respect to any Single, Disco-single, EP or LP, the aggregate mechanical royalty rate for which exceeds the applicable rate provided in this Paragraph 14 to deduct such excess payable thereon from any and all monies payable to ARTIST pursuant to this or any other agreement between the parties hereto. All mechanical royalties payable hereunder shall be paid on the basis of net records sold hereunder for which royalties are payable to ARTIST pursuant to this Agreement. Notwithstanding anything to the contrary contained herein, mechanical royalties payable in respect of Controlled Compositions for sales of records for any use other than as described in subparagraphs 10(a), (e), (g) and (k) hereof shall be seventy-five (75%) percent of the otherwise applicable Per Selection Rate. Controlled Compositions which are arranged versions of any musical compositions in the public domain, when furnished by ARTIST for recording hereunder, shall be free of administration of copyright in any Controlled Composition shall be made subject to the provisions hereof and any inconsistencies between the terms of this Agreement and mechanical licenses issued to and accepted by COMPANY shall be determined by the terms of this Agreement. If any Single, Disco-Single, EP or LP contains other compositions in addition to the Controlled Compositions, ARTIST will obtain for COMPANY'S benefit mechanical licenses covering such composition on the same

terms and conditions applicable to Controlled Compositions
pursuant to this Paragraph 14.

(b)  In respect of all Controlled Compositions per-
formed in Pictures, COMPANY is hereby granted an irrevocable
perpetual worldwide license to record and reproduce such
Compositions in such Pictures and to distribute and perform
such Pictures including, but not limited to, all Videoshows
thereof, and to authorize others to do so.  COMPANY will not
be required to make any payment in connection with those
uses, and that license shall apply whether or not COMPANY
receives any payment in connection with those Pictures.
Simultaneously with ARTIST'S submission to COMPANY of
the information required pursuant to subparagraph 21(c)(i)
hereof, ARTIST shall furnish COMPANY with a written
acknowledgment from the person(s) or entity(ies) controlling
the copyright in each non-Controlled Compositions to be
embodied on any Picture confirming the terms upon which said
person(s) or entity(ies) to forthwith issue to COMPANY (and
its designees) licenses containing said terms and such other
terms and conditions as COMPANY (or its designees) may
require.  Royalties in connection with licenses for the use
of non-Controlled Compositions pertaining to Pictures and
Videoshows are included in the royalties set forth in sub-
paragraph 21(d) hereof, as described in subparagraph
21(d)(ii).  If the copyright in any Controlled Composition
is owned or controlled by anyone else, ARTIST will cause
that person, firm or corporation to grant COMPANY the same
rights described in this Paragraph 14, on the same terms.

15.  (a)  In the event that ARTIST for any reason fails
to timely fulfill any of its production and delivery commit-
ments hereunder in accordance with all of the terms and con-
ditions of this Agreement, then, in addition to any other
rights or remedies which COMPANY may have, COMPANY shall
have the right, upon written notice to ARTIST at any time
prior to the expiration of the then current Period, (i) to
terminate this Agreement without further obligation to
ARTIST as to unrecorded or undelivered masters, (ii) to
reduce the miniumum number of masters required to be
recorded and delivered during the then current Period to the
number which have been timely recorded and delivered during
such Period, or (iii) such default plus one hundred and
fifty (150) days with the times for the exercise by COMPANY
of its options to extend the Term and the dates of commen-
cement of subsequent Option Periods deemed extended accor-
dingly.  It is specifically understood that COMPANY may
exercise any of all of its rights pursuant to subparagraphs
15(a)(i), (ii) and (iii) hereof at any time(s) prior to the
date the Term would otherwise expire.  COMPANY's obligations
hereunder shall be suspended for the duration of any such
default.  The provisions of this subparagraph shall not
result in an extension of the Term for a period in excess of
the period permitted by applicable law, if any, for the
enforcement of personal services agreements.

"Materials", as used in this subparagraph 17(b) shall include: (i) all musical compositions and other material contained on masters subject hereto, (ii) each name used by ARTIST, in connection with masters recorded hereunder, and (iii) all other materials, ideas, other intellectual properties, or elements furnished or selected by ARTIST and contained in or used in connection with any masters recorded hereunder or the packaging, sale, distribution, advertising, publicizing or other exploitation thereof.

(c)   ARTIST agrees to and does hereby indemnify, save and hold COMPANY harmless from any and all loss and damage (including court costs and reasonable attorneys' fees) arising out of, connected with or as a result of any inconsistency with, failure or, or breach or threatened breach by ARTIST of any warranty, representation, agreement, undertaking or covenant contained in this Agreement including, without limitation, any claim by any third party in connection with the foregoing.  In addition to any other rights or remedies COMPANY may have by reason of any such inconsistency, failure, breach, threatened breach or claim, ARTIST shall reimburse COMPANY, on demand, for any payment made by COMPANY at any time after the date hereof with respect to any loss, damage or liability resulting therefrom and in addition thereto COMPANY shall have the right to deduct from any and all monies otherwise payable to ARTIST under this or any other agreement between the parties hereto a sum(s) equal to such loss, and reasonable attorneys' fees).  COMPANY shall give ARTIST notice of any third party claim to which the foregoing indemnity applies and ARTIST shall have the right to participate in the defense of any such claim through counsel of ARTIST's own choice and at ARTIST's expense.  Pending the determination of any such claim, COMPANY may withhold payment of all monies under this or any other agreement between the parties hereto in any amount consistent with such claim.

18.   Wherever in this Agreement ARTIST's approval or consent is required, such approval or consent shall not be unreasonably withheld.  COMPANY may require ARTIST to formally give or withhold such approval or consent by giving ARTIST written notice requesting same and by furnishing ARTIST with the information or material in respect of which such approval or consent is sought.  ARTIST shall give COMPANY written notice of approval or disapproval within five (5) days after such notice.  ARTIST shall not hinder nor delay the scheduled release of any record hereunder.  In the event of disapproval or no consent, the reasons therefor shall be stated.  Failure to give such notice to COMPANY as aforesaid shall be deemed to be consent or approval.

19.   During the Term, ARTIST warrants and represents that ARTIST shall become and remain a member in good standing of any labor unions with which the COMPANY may at

-16-

any time have agreements lawfully requiring such union membership, including, but not limited to, the American Federation of Musicians and the American Federation of Television and Radio Artists.  All masters subject hereto shall be produced in accordance with the rules and regulation of all unions having jurisdiction.

20.  (a)  ARTIST hereby sell, transfers and assigns to COMPANY irrevocably all right, title and interest in and to the masters embodying ARTISTS' performances the titles of which are listed on Schedule "A" annexed hereto and made a part hereof, from the inception of recordings thereof (hereinafter in this Paragraph 20 referred to as the "Masters"), including, without limitation, the COMPANY'S (or its designee's) name as employer-for-hire such copyrights and all renewals and extensions thereof, perpetually and throughout the Territory.

(b)  ARTIST will facilitate the Masters to COMPANY at its offices in Miami, Florida not later than simultaneously with the execution of this Agreement, unless said masters are already in the possession of COMPANY.

(c)  The Masters will be deemed to have been recorded under this Agreement during the Initial Period of the Term of this Agreement.

(d)  ARTIST hereby warrants and represents:

(i)  Intentionally Deleted

(ii) No records have been manufactured from the Masters by ARTIST or any other person, firm or corporation for distribution in the Territory, and neither ARTIST nor any other person, firm or corporation has or shall have the right to distribute, market and/or sell any records embodying the Masters in Territory, and none of the musical compositions performed in the Masters have been performed by ARTIST for the making of any other master recordings, other than those records already pressed.

(iii) ARTIST has not, nor has any other person, sold or assigned to any other party or otherwise disposed of any right, title or interest in or to the Masters.

(iv) (1)  Each person who rendered any service in connection with, or who otherwise contributed in any way to the making of the Masters, or who granted to ARTIST any of the rights referred to in this Agreement, had the full right, power, and authority to do so, and was not bound by any agreement which would restrict such person from rendering such services or granting such rights.

-17-

C1.70.91/2-28

(2)  All recording costs and expenses with respect to the making of the Masters have been paid in full.

(3)  All necessary licenses for the recording of the compositions performed in the Masters have been obtained from the copyright owners, and all monies payable under such licenses or otherwise by reason of such recording have been paid.  The foregoing does not apply to any monies payable to such copyright owners in connection with the manufacture or sale or records derived from the Masters.

(4)  All the Masters were made in accordance with the rules and regulations of the American Federation of Musicians ("AFM"), the American Federation of Television and Radio Artists ("AFTRA") and all other unions having jurisdiction.

(v)  COMPANY shall have the sole and exclusive right to manufacture, advertise, distribute, sell and otherwise exploit and deal throughout the Territory in the Masters and records and other reproductions derived therefrom, free from any liability or obligation to make any payments therefor, except as expressly provided in this Agreement.

(vi) ARTIST will execute, acknowledge and deliver to COMPANY such further instruments and documents, and will otherwise cooperate with COMPANY as COMPANY shall request at any time, for the purpose of establishing or evidencing the rights granted to COMPANY herein, or otherwise to implement the intent of this Paragraph 20 COMPANY shall give ARTIST five day notice to sign such documentation and in the event that after said five days the documents are not signed then COMPANY may sign such documents in ARTIST'S name and make appropriate disposition of them.  It is agreed however, that prior to COMPANY's exercise of any power of attorney the documents in question should be sent to ARTIST's attorney, at least seven (7) days prior to said exercise.

(e)  It is understood and agreed that all of the provisions of this Paragraph 20 are of the essence of this Agreement.

21.  (a)  In addition to ARTIST's recording commitments as set forth in Paragraph 3 of this Agreement, ARTIST shall comply with requests, if any, made by COMPANY in connection with the production of Pictures. In this connection, ARTIST shall appear on dates and at places requested by COMPANY for the filming, taping or other fixation of audio-visual recordings.  ARTIST shall perform services with respect thereto as COMPANY deems desirable in a timely and first-class manner.  ARTIST acknowledges that the production of Pictures, involves matters of judgment with respect to art and taste, which judgment shall be exercised by COMPANY and COMPANY'S decisions with respect thereto shall be final.  COMPANY will endeavor to consult with ARTIST as to the

(b)   Intentionally Omitted.

(c)   COMPANY reserves the right, at its election, to suspend the operation of this Agreement for the duration of any of the following contingencies, if by reason of any such contingency, it is materially hampered in the performance of its obligations under this Agreement or its normal business operations are delayed or become impossible or commercially impraticable: Act of God, fire, catastrophe, labor disagreement, acts of government, its agencies or officers, any order, regulation, ruling or action of any labor union or association of artists, musicians, composers or employees affecting COMPANY or the industry in which it is engaged, delays in the delivery of materials and supplies, or any other cause beyond COMPANY's control. Any such suspension due to a labor controversy which involves only COMPANY shall be limited to a period of six (6) months.

(d)   If ARTIST's voice or voices should be materially or permanently impaired, then in addition to any other rights or remedies which COMPANY may have, COMPANY shall have the right, upon written notice to ARTIST, to terminate this Agreement and shall thereby be relieved of any liability in connection with undelivered masters.

16.   ARTIST expressly acknowledges that ARTIST's services hereunder are of a special, unique and intellectual character which gives them peculiar value, and that in the event of a breach or threatened breach by ARTIST of any term, condition or covenant hereof, COMPANY will be caused immediate irreparable injury. ARTIST expressly agrees that COMPANY shall be entitled to seek injunctive and other equitable relief, as permitted by law, to prevent a breach or threatened breach of this Agreement, or any portion thereof, by ARTIST which relief shall be in addition to any other rights or remedies, for damages or otherwise available to COMPANY.

17.   (a)   ARTIST warrants and represents that neither ARTIST is not under any disability, restriction or prohibition, whether contractual or otherwise, with respect to ARTIST's right to execute this Agreement or ARTIST's right to perform its terms and conditions. Without limiting the foregoing, ARTIST specifically warrants and represents that no prior obligations, contracts or agreements of any kind undertaken or entered into by ARTIST, will interfere in any manner with the complete performance of this Agreement by COMPANY, ARTIST or with ARTIST's right to record any and all selections hereunder. ARTIST warrants and represents that there are now in existence no prior unreleased masters embodying ARTIST's performances.

(b)   ARTIST warrants and represents that no materials, or any use thereof, will violate any law or infringe upon or violate the rights of any third party.

(b)  (i)  Each Picture produced during the Term of this Agreement shall be owned by COMPANY (including the worldwide copyrights therein and thereto and all extensions and renewals thereof) to the same extent as COMPANY's rights in master recordings made under this Agreement.

(ii) COMPANY will have the unlimited right to manufacture Videoshows of the Picture to rent, sell, distribute, transfer, sublicense or otherwise deal in such Videoshows under any trademarks, tradenames and labels; to exploit the Picture by any means now or hereafter known or developed; or to refrain from any such exploitation, throughout the world.

(c)  (i)  COMPANY agrees to advance all costs actually incurred in the production of Pictures made by COMPANY.  COMPANY shall submit to ARTIST for ARTIST's reasonable approval in writing, the following information: (i) the musical compositions and other material to be embodied thereon; (ii) the general concept therefor and (iii) the producer, director, and any other key personnel therefor. Following COMPANY's receipt of ARTIST's approval of said information, COMPANY shall commence production of the Picture. (iv) One-half of all sums paid by COMPANY in connection with each Picture shall be an advance against and recoupable by COMPANY out of all royalties becoming payable to ARTIST pursuant to this or any other agreement between the parties hereto.

(ii) Each of the following sums, if any, paid by COMPANY in connection with each Picture shall be an advance against and recoupable by COMPANY out of all royalties becoming payable to ARTIST pursuant to this or any other agreement between the parties hereto.

(A)  All expenses incurred by COMPANY in connection with the preparation and production of the Picture and the conversion of the Picture to Video Masters that are made to serve as prototypes for the duplication of the Videoshows of the Picture;

(B)  All of COMPANY's direct out-of-pocket costs (such as for rights, artists (including ARTIST), other personnel, facilities, materials, services, and the use of equipment) in connection with all steps in the production of the Picture and the process leading to and including the production of such Video Masters (including, but not limited to, packaging costs and the costs of making and delivering duplicate copies of such Video Masters); and

(C)  If in connection therewith COMPANY furnishes any of its own facilities, materials, services or equipment for which COMPANY has a standard rate, the amount of such standard rate or if there is no standard rate, the market value for the services or thing furnished.

(iii) All sums that COMPANY in its sole discretion deems necessary or advisable to pay in connection with the production of Pictures and the exploitation of COMPANY's rights therein in order to clear rights or to make any contractural payments that are due or may become due on the part of COMPANY, to ARTIST, ARTIST or any other person, firm or corporation by virtue of the exploitation of COMPANY's rights therein, in order to avoid, satisfy or make unnecessary any claims or demands by any person, firm or corporation claiming the right to payment therefor, including, but not limited to, any payment to an actual or alleged copyright owner, patent owner, union, union-related trust fund, pension plan or other entity, and any payment for an actual or alleged re-run fee, residual, royalty, license fee or otherwise shall constitute advances against and recoupable out of all royalties becoming payable to you pursuant to this or any other agreement between the parties hereto. No payment pursuant to this subparagraph 21(c)(iii) shall constitute a waiver of any of ARTIST's express or implied warranties and representations.

(d) (i) Conditioned upon ARTIST full and faithful performance of all of the terms and conditions of this Agreement, COMPANY shall pay ARTIST royalties equal to fifty (50%) percent of COMPANY's Video Net Receipts with respect to COMPANY's exploitation of Pictures subject to this Agreement. Monies earned and received by COMPANY from any licensee (rather than monies earned and received by the licensee) in respect of exploitation of Pictures shall be included in the computation of Video Net Receipts.

(ii) The royalties provided in subparagraph 21(d)(i) include any royalty obligations COMPANY may have to any other person, firm or corporation who supplied services or rights used in connection with Pictures, including, without limitation, producers, directors, extras, and music publishers, and any such royalties shall be deducted from the gross prior to the computation of royalties otherwise payable to ARTIST.

(iii) With respect to audiovisual material embodying Pictures made hereunder together with other audiovisual material, royalties payable to ARTIST shall be computed by multiplying the royalties otherwise applicable by a fraction, the numerator of which is the amount of playing time in such audiovisual material of Pictures made hereunder and the denominator of which is the total playing time of such audiovisual material.

(iv) As to Pictures embodying performances of ARTIST together with the performances of another artist or artists, the royalties otherwise payable hereunder shall be prorated by multiplying such royalties by a fraction, the numerator of which is one and the denominator of which is the total number of artists whose performances are embodied on such Pictures.

(e)  COMPANY shall have the right to use and allow others to use each Picutre for advertising and promotional purposes with no payment to ARTIST.  As used herein, "advertising and promotional purposes" shall mean all uses for which COMPANY received no monetary consideration from licensees in excess of a reasonable amount as legal fees, administrative costs or similar type payments and as reimbursement for transaction costs incurred by COMPANY in connection with such uses, such as tape, duplication costs, shipping, handling and insurance costs.

(f)  (i)  During the Term of this Agreement, no person, firm or corporation other than COMPANY will be authorized to make, sell, broadcast or otherwise exploit audio-visual materials unless: (A) ARTIST first notifies COMPANY of all of the material terms and conditions of the proposed agreement pursuant to which the audio-visual materials is to be made, sold, broadcast or otherwise exploited, including, but not limited to, the titles of the compositions covered by the proposed agreement, the format to be used, the manner of exploitation proposed and the indentities of all proposed parties to the agreement, and (B) ARTIST offers to enter into an agreement with COMPANY containing the same terms and conditions described in such notice and otherwise in the same form as this Agreement, but with payments to ARTIST that are ninety (90%) percent of the payments to ARTIST in such proposed agreement.  If COMPANY does not accept ARTIST's  offer within forty-five (45) days after COMPANY's receipt of same, ARTIST may then enter into that proposed agreement with the same parties mentioned in such notice, subject to subparagraph 21(f)(ii) hereof and provided that such agreement is consummated with those parties within thirty (30) days after the end of that sixty (60) day period upon the same financial terms and conditions set forth in ARTIST's notice and offer to COMPANY.  If that agreement is not consummated within the latter thirty (30) day period, no party except COMPANY will be authorized to make, sell, broadcast or otherwise exploit such audio-visual materials unless ARTIST first offers to enter into an agreement with COMPANY as provided in the first sentence of this subparagraph 21(f).  COMPANY will not be required, as a condition of accepting any offer made to COMPANY pursuant to this subparagraph 21(f), to agree to any terms or conditions which cannot be fulfilled by COMPANY as readily as by any other party (for example, but without limitation, the employment of a particular producer or director).

(ii) If COMPANY does not accept an offer made to it pursuant to this subparagraph 21(f), such non-acceptance shall not be considered a waiver of any of COMPANY's rights pursuant to this Agreement.  Such rights include, without limitation, the right to prevent authorizing any use of masters owned by or exclusively licensed to COMPANY unless COMPANY so agrees.  ARTIST shall not act in contravention of such rights.

(g)  In all other respects (e.g., the times for accountings to be rendered, and warranties and representations made by ARTIST) Pictures and Video Masters shall be governed by the same terms and conditions as are applicable to masters subject to this Agreement.

22.  Intentionally deleted.

23.  COMPANY shall prepare the artwork for the album covers used in connection with the releases hereunder in the United States, during the Term of this Agreement, of each newly-recorded LP required to be recorded and delivered hereunder (hereinafter, the "Artwork"), upon prior written notice to COMPANY and only upon all of the following conditions:

(a)  Before preparation and the incurring of any expenses in connection with the album artwork, ARTIST may discuss completely with a representative of COMPANY's art department, the proposed artwork to be produced by COMPANY, all of which shall be subject to the decision of COMPANY's art department.  COMPANY will endeavor to consult with ARTIST as to the album artwork.

(b)  (i)  COMPANY will deliver all such Artwork prepared by COMPANY to ARTIST for ARTIST's reasonable approval, prior to the printing of said album cover.

24.  All sums paid by COMPANY in connection with independant promotion, shall be an advance against and recoupable by COMPANY out of all royalties becoming payable to ARTIST pursuant to this or any other agreement between the parties.

25.  For the purposes of this Agreement, the following definitions shall apply:

(a)  "Master" - The equivalent of a seven (7") inch 45 rpm single-sided recording of not less than 3-1/2 minutes of playing time intended for use in the manufacture and sale of records.

(b)  "Single" - A seven (7") inch 45 rpm double-sided record embodying thereon two (2) masters.  A "Disco-single" is a twelve (12") inch double-sided record embodying thereon not more than four (4) masters.

(c)  "EP" - A double-sided record embodying thereon either five (5) masters or six (6) masters.

(d)  "LP" - A twelve (12") inche 33-1/3 rpm double-sided long-playing record of not less than 35 minutes of playing time. Multiple sets which consist of more than one

(1) LP intended to be released, packaged and sold together for a single overall price, shall be deemed to be the equivalent of one (1) LP for the purposes of this Agreement, but shall not be recorded or delivered hereunder without COMPANY's prior written consent.

(e) "Records", "phonograph records", "recordings" and "sound recording" - All forms of recording and reproduction by which sound may be recorded now known or which may hereafter become known, manufactured or sold primarily for home use, juke box use, or use on or in means of transportation, including, without limiting the foregoing, magnetic recording tape, film, electronic video recordings and any other medium or device for the production of artistic performances manufactured or sold primarily for home use, juke box use or use on or in means of transportation, whether embodying (i) sound alone or (ii) sound synchronized with visual images, e.g. "sight and sound" devices.

(f) "Delivery", "deliver" or "delivered" - The actual receipt by COMPANY of completed, fully mixed, leadered and edited masters comprising each LP, commercially satisfactory to COMPANY and ready for COMPANY's manufacture of records, together with all materials, consents, approvals, licenses and permissions.

(g) "Recording Costs" - Wages, fees, advances and payments of any nature to or in respect of all musicians, vocalists, conductors, arrangers, orchestrators, engineers, producers, copyists, etc.; payments to a trustee or fund based on wages to the extent required by any agreement between COMPANY and any labor organization or trustee; all studio, tape, editing, mixing, re-mixing, mastering and engineering costs; all costs of travel, per diems, rehearsal halls, non-studio facilities and equipment, dubdown, rental and transportation of instruments; all costs occasioned by the cancellation of any scheduled recording session; and all other costs and expenses incurred in producing the master recordings hereunder which are then customarily recognized as recording costs in the recording industry.

(h) "mid-priced LP" - an LP which bears a suggested retail list price in the applicable country of the Territory of at least sixty-seven (67%) percent but not more than eighty (80%) percent of the suggested retail list price of the majority of COMPANY's or COMPANY's licensee's as applicable, then-current newly-released LPs.

(i) "budget LP" - an LP which bears a suggested retail list price in the applicable country of the Territory or less than sixty-seven (67%) percent of the suggested

(j)  "Pictures" - motion pictures and other audiovisual works that have a soundtrack substantially featuring performances of ARTIST.

(k)  "Videoshows" - Videocassetts, Videodiscs, or any other devces, now or hereafter known or developed, that enable the Picture to be perceived visually, with or without sound, when used in combination with or as part of a piece of electronic, mechanical or other apparatus.

(l)  "Videodisc" - a disc-type Videoshow that enable the Picture to be perceived visually, with or without sound, through a television-type playback system or device.

(m)  "Videocassette" - A Videoshow other than Videodisc (e.g., a Videoshow in the form of pre-recorded tape).

(n)  "Video Masters" - master Videoshows.

(o)  "Video Net Receipts" - monies earned and received by COMPANY from exploitation of Pictures less a twenty (20%) percent gross distribution fee, and less any out-of-pocket expenses, copyright, union and other third party payments, taxes and adjustments borne by COMPANY in connection with such exploitation and collection and receipt by COMPANY of such monies.

(p)  "any other agreement between the parties hereto" - any agreements between COMPANY on the one part, and ARTIST (or any other entity furnishing ARTIST's recordings or services) or ARTIST, on the other part, pertaining to ARTIST's recording services or recordings.

26.  COMPANY may assign its rights under this agreement in whole or in part to any subsidiary, affiliated or controlling corporation, to any person owning or acquiring a substantial portion of the stock or assets of COMPANY, or to any partnership or other venture in which COMPANY may participates.  COMPANY may also assign its rights to any of its licensees if advisable in COMPANY's sole discretion to implement the license granted.  ARTIST may assign its rights under this agreement to a corporation a majority of whose capital stock is owned and controlled by ARTIST. No such assignment shall affect COMPANY's rights hereunder nor relieve ARTIST of any obligations under this agreement.

27.  This Agreement sets forth the entire agreement between the parties with respect to the subject matter hereof. No modification, amendment, waiver, termination or discharge of this Agreement shall be binding upon COMPANY unless confirmed by a written instrument signed by an officer of COMPANY.  A waiver by COMPANY of any term or condition of this Agreement in any instance shall not be deemed or

construed as a waiver of such term or condition for the future, or of any subsequent breach thereof. All of COMPANY's rights, options and remedies in this Agreement shall be cumulative and none of them shall be in limitation of any remedy, option or right available to COMPANY. Should any provision of this Agreement be adjudicated by a court of competent jurisdiction as void, invalid or inoperative, such decision shall not affect any other provision hereof, and the remainder of this Agreement shall be effective as though such void, invalid or inoperative provision had not been contained herein. It is agreed that all accountings and payments required herein, and all grants made herein, shall survive and continue beyond the expiration or earlier termination of this Agreement. No breach of this Agreement by COMPANY shall be deemed material unless within thirty (30) days after ARTIST learns of such breach, ARTIST serves written notice thereof on COMPANY specifying the nature thereof and COMPANY fails to cure such breach, if any, within sixty (60) days ( except thirty (30) days if such alleged breach is the payment of monies hereunder) after receipt of such notice.

28.  This Agreement shall be deemed to have been made in the State of Florida and its validity, construction, performance and breach shall be governed by the laws of the State of Florida applicable to agreements made and to be wholly performed therein. ARTIST agrees to submit itself to the jurisdiction of the Federal or State courts located in Miami in any action which may rise out of this agreement and said courts shall have exclusive jurisdiction over all disputes between COMPANY and ARTIST pertaining to this Agreement and all matters related thereto. In this regard, any process in any action or proceeding commenced in the courts of the State of Florida arising out of any claim, dispute or disagreement under this Agreement may, among other methods, be served upon ARTIST by delivering or mailing the same, via registered or certified mail, addressed to ARTIST at the address provided herein for notices to ARTIST; any such delivery or mail service shall be deemed to have the same force and effect as personal service within the State of Florida. Nothing contained herein shall constitute a waiver of any other remedies available to COMPANY. Nothing contained in this Paragraph 28 shall preclude COMPANY from joining ARTIST in an action brought by a third party against COMPANY in any jurisdiction, although COMPANY's failure to join ARTIST in any such action in one instance shall not consitute a waiver of any COMPANY's rights with respect thereto, or with respect to any subsequent action brought by a third party against COMPANY.

29.  ARTIST hereby grants to COMPANY and its licenses the exclusive right, throughout the world, to use and authorize the use of ARTIST's name, portraits, pictures, likeness, and biographical material, either alone or in conjunction with other elements, in connection with the sale,

-25-

C1.76.91/2-28

lease, licensing or other disposition of merchandising rights. For the rights granted by ARTIST to COMPANY in this paragraph, COMPANY shall pay ARTIST a royalty of twenty (20%) percent of COMPANY's net royalty receipts derived from the exploitation of such rights, after deducting all costs and third party payments relating thereto; and such royalty shall be accounted to ARTIST in the manner otherwise provided herein. Relative to any and all activities conducted and contemplated by this paragraph, COMPANY agrees to regularly and reasonably inform ARTIST, in writing, of progress and current status of all such activities. COMPANY agrees to submit to ARTIST, within thirty (30) days of execution, copies of all contracts entered into by COMPANY relative to those activities provided for in this paragraph.

30. This Agreement shall not become effective until executed by all parties.

31. <u>Grant of Rights</u>

(a)       Assignment of Copyrights. Artist hereby sells, transfers, and assigns to COMPANY, its successors and assigns, and undivided one-hundred (100%) percent of the publishing interest in the Compositions, including without limitation, the copyrights therein and any and all renewals and/or extensions thereof throughout the world (the "Territory"), and all claims and causes of actions related to the Compositions accruing at any time and all other rights of whatsoever nature in the Composition, including without limitation, the titles, words and music of the Compositions and each every arrangement, adaptation and version thereof. COMPANY will pay to ARTIST twenty-five (25%) percent of the publishers share to ARTIST contemporaneously with record royalties. ARTIST will execute and deliver to COMPANY such instruments of transfer and other documents regarding the rights of COMPANY in the Compositions subject to this agreement as COMPANY may reasonably request to carry out the purposes of this agreement, (including, without limitation, the Exhibits annexed hereto), and COMPANY may sign such documents in your name or the name of any Controlled Songwriter and make appropriate disposition of them.

31.2       Administration.       COMPANY and its Licensees will have the sole, exclusive and perpetual right, throughout the Teritory, to:

(a)   License and cause others to license the exploitation of the Compositions, including, without limitation, the right to license broadcast and other public performances and the right to license the manufacture, distribution and sale of Phonograph Records embodying any one or more Compositions.

(b)   Administer and grant rights in the Compositions and the copyrights therein.

(c)   Print, publish and sell printed editions of the Compositions.

-26-

CL.79.91 '0-28

(d)  Collect all monies payable during the term and Retention Period, with respect to the Compositions, in addition to all monies due prior to the date hereof, and all performance royalties payable to you with respect to the Compositions by the American Society of Composers, Authors and Publishers (ASCAP), Broadcast Music, Inc. (BMI), or any other applicable performing rights society (hereinafter collectively the "Societies"), but excluding any songwriter share of public performance income. If a Society in any territory does not license any particular public performance use of a Composition, it is understood COMPANY may license that use directly and all income received by COMPANY in connection with such licenses shall be deemed Gross Income and subject to accounting hereunder.

(e)  Make arrangements, or otherwise adapt or change any one or more Compositions in any manner.

(f)  Otherwise administer the Compositions and the copyrights therein and to act as the publisher thereof and exercise all of such rights as fully as if the copyrights were registered in COMPANY's name alone and COMPANY alone were the sole and exclusive owner thereof and of the Compositions.

31.3    Power of Attorney   ARTIST hereby irrevocably authorize, empower and appoints COMPANY, ARTISTS true and lawful attorney, for the term of the copyrights in the respective Compositions and any renewals or extensions thereof, to secure any renewal periods for COMPANY's benefit, to initiate and compromise any claim or action with respect to the Compositions including any claim or action againt infringers of COMPANY or ARTISTS rights in the Compositions, and to execute in ARTISTS name, and the name of any Controlled Songwriter, any and all documents and/or instruments necessary or desirable to accomplish the foregoing and/or to evidence COMPANY's ownership of the copyrights during such periods and/or to effectuate COMPANY's rights hereunder.  The power granted herein is coupled with an interest and irrevocable.  COMPANY will cause the copyrights in the Compositions to be registered or re-registered jointly in the name of COMPANY and ARTIST and such additional parties as appropriate.  All documents which would be executed by a power of attorney will be delivered to the attorney for ARTIST prior to one (1) week before execution.

31.4    Name and Likenesses.  COMPANY and any Licensee of COMPANY each shall have the right and may grant to others the right to reproduce, print, publish, or disseminate in any medium your name, the names, portraits, pictures and likenesses in the exploitatin of musical compositions and the marketing of other merchandise of any kind.  During the term of this agreement neither you nor any Controlled Songwriter shall authorize any Party other than

-27-

COMPANY to use the name or likeness of Controlled Songwriter (or any professional, group, or other assumed or fictitious name used by Controlled Songwriters) in connection with the exploitation of musical compositions.

32.     Liquidation of Existing Reserves - COMPANY agrees to liquidate and pay to ARTIST fifty (50%) percent of the reserves now being held by COMPANY, on all 2 Live Crew Lp's to date.  This shall not include any reserves being held on the "Luke Album - Banned in the USA".

33.     Intentionally Deleted.

YOU UNDERSTAND THAT THIS IS AN IMPORTANT LEGAL DOCUMENT PURSUANT TO WHICH YOU GRANT TO COMPANY CERTAIN EXCLUSIVE SERVICES FOR ALL OF THE WORLD FOR A PERIOD IN EXCESS OF THREE (3) YEARS. YOU HEREBY REPRESENT AND WARRANT THAT YOU HAVE BEEN ADVISED OF YOUR RIGHT TO RETAIN INDEPENDENT LEGAL COUNSEL IN CONNECTION WITH THE NEGOTIATION AND EXECUTION OF THIS AGREEMENT AND THAT YOU HAVE EITHER RETAINED AND HAVE BEEN REPRESENTED BY SUCH LEGAL COUNSEL OR HAVE KNOWINGLY AND VOLUNTARILY WAIVED YOUR RIGHT TO SUCH LEGAL COUNSEL AND DESIRE TO ENTER INTO THIS AGREEMENT WITHOUT THE BENEFIT OF LEGAL REPRESENTATION.

    IN WITNESS WHEREOF, the parties hereto have executed this Agreement on the day and year first above written.

                                    LUKE RECORDS

_____        BY: _____
                                    LUTHER CAMPBELL

_____            _____
                                    DAVID HOBBS (Artist)

_____            _____
                                    MARK ROSS (Artist)

-28-

## EXCLUSIVE RECORDING AGREEMENT

This Agreement made and entered into as of this _____ day of February, 1991 by and between Luke Records, Inc., 8400 N.E. 2nd Ave, Miami, Florida 33138 ("COMPANY") and Mark Ross, Chris Wong Won and David Hobbs and Luther Campbell p/k/a The 2 Live Crew ("ARTIST").

In consideration of the mutual promises contained herein, it is hereby agreed as follows:

1. (a) COMPANY hereby engages ARTIST to record for COMPANY masters embodying the performances of ARTIST, and ARTIST hereby accepts such engagement and agrees to record masters embodying the performances of ARTIST exclusively for COMPANY during the term hereof and all extensions and renewals.

(b) The rights herein granted to COMPANY and the obligations of ARTIST shall be for the world ("Territory").

2. The term of this Agreement shall be for a period of one (1) year commencing on the date hereof ("Initial Period"). ARTIST hereby grants to COMPANY four (4) consecutive separate options to extend the term for further periods of one (1) year each ("Option Periods"), each upon the same terms and conditions applicable to the Initial Period, except as otherwise hereinafter set forth. The Initial Period and every Option Period for which Company has exercised its option are hereinafter sometimes referred to together as the "Term". Each option shall be automatically exercised, unless written notice to the contrary is sent to ARTIST at least fifteen (15) days prior to the date that the Term would otherwise expire.

3. During the Initial Period, ARTIST shall record masters the equivalent in playing time of one Lp. COMPANY and ARTIST hereby acknowledge that the masters listed on Schedule "A" annexed hereto and made a part hereof comprise the Lp required to be recorded during the Initial Period, (hereinafter sometimes referred to as the "First LP"), and have been heretofore recorded by ARTIST. Said masters are herein and hereby owned by COMPANY pursuant to all of the terms and conditions of this Agreement, particularly Paragraph 20 hereof and said masters shall be deemed recorded and delivered hereunder during the Initial term.

-1-

Cl.54.91/2-28

4.   (a)  During the Term, ARTIST shall not perform for the purpose of making records for anyone other than COMPANY for distribution in the Territory and ARTIST shall not authorize the use of ARTIST's name, likeness, or other indentification for the purpose of distributing, selling, advertising or exploiting records for anyone other than COMPANY in the Territory.  It is agreed however, that individual members of ARTIST not to exceed two (2) may perform as instrumentalists, arrangers, producers or background singers on other recordings for other artists in a "sideman" capacity provided COMPANY receives credit, in the form of "Courtesy of Luke Records".

(b)  ARTIST shall not perform any selection recorded hereunder for the purpose of making records for anyone other than COMPANY for distribution in the Territory (i) for a period of five (5) years after the initial date of release of the respective record containing such selection or (ii) for a period of two (2) years after the expiration or other termination of this Agreement, whichever is later ("Re-recording Restriction").

(c)  Should ARTIST make any sound recording during the Term for motion pictures, television, electrical transcriptions or any other medium or should ARTIST after the Term perform for any such purpose any selection recorded hereunder to which the Re-recording Restriction then applies, ARTIST will do so only pursuant to a written agreement prohibiting the use of such recordings, directly or indirectly, for record purposes in the Territory.  ARTIST shall furnish to COMPANY a copy of the provisions of any such contract relating to the foregoing.

5.   All masters recorded by ARTIST during the Term from the inception of the recording thereof and all reproductions derived therefrom, together with the performances embodied thereon, shall be the property of COMPANY for the world free from any claims whatsoever by ARTIST or any person deriving any rights or interests from ARTIST.  Without limiting the generality of the foregoing, COMPANY and its designee(s) shall have the exclusive and unlimited right to all the results and proceeds of ARTIST's recording services rendered during the Term, including, but not limited to, the exclusive, unlimited and perpetual rights throughout the world:

(a)  To manufacture, advertise, sell, lease, license, distribute or otherwise use or dispose of, in any or all fields of use by any method now or hereafter known, records embodying the masters recorded by ARTIST during the Term, all upon such terms and conditions as COMPANY may elect, or at its discretion, to refrain therefrom;

-2-

(b)   To use and publish and to permit others to use and publish ARTIST's name (including any professional name heretofore or hereafter adopted by ARTIST), photographs, likeness, and biographical material concerning ARTIST for advertising and trade purposes in connection with all masters recorded by ARTIST and all Pictures produced during the Term; ARTIST consent will be requested, such consent may not be unreasonably withheld.

(c)   To obtain copyrights and renewals thereof in sound recordings (as distinguished from the musical compositions embodied thereon) recorded by ARTIST during the Term, in COMPANY's name as owner and employer-for-hire of such sound recordings;

(d)   To release records derived from masters recorded by ARTIST during the Term under any name, trademark or label which COMPANY or its subsidiaries, affiliates or licensees may from time to time elect.  COMPANY agrees that the initial United States release during the Term hereof of records solely embodying masters recorded hereunder shall be by a distributor or distributors selected by COMPANY at COMPANY's sole discretion.

(e)   To perform such records publicly and to permit public performances thereof by means of radio broadcast, television or any other method now or hereafter known.

6.    (a)   ARTIST acknowledges that the sale of records is speculative and agrees that the judgment of COMPANY with regard to any matter affecting the sale, distribution or exploitation of such records shall be binding and conclusive upon ARTIST.  Except as otherwise specifically set forth in subparagraph 6(b) hereof, nothing contained in this Agreement shall obligate COMPANY to make, sell, license, or distribute records manufactured from masters delivered hereunder.

(b)   Provided that ARTIST is not in breach of this Agreement, and if COMPANY is in receipt of completed, fully edited and mixed commercialy satisfactory masters sufficient to comprise each newly-recorded required LP hereunder embodying ARTIST's newly-recorded required studio performances of material not previously recorded by ARTIST ready for COMPANY's manufacture of records therefrom, together with all materials therefor, COMPANY agrees to commercially release each LP recorded and delivered hereunder within one hundred and twenty (120) days following completion of Artists recording for COMPANY.

(c)   It is understood and agreed that if COMPANY shall have failed to so release any such LP, ARTIST shall have the right to notify COMPANY in writing of COMPANY's such failure and of ARTIST's desire that the Term of this

-3-

C1.56.91/2-28

Agreement be terminated if COMPANY does not, within sixty
(60) days after COMPANY receives such notice from ARTIST,
commercially release the applicable LP in the World.  it is
specifically understood and agreed that if COMPANY shall
fails to fulfill any such release commitment, COMPANY shall
have no liability whatsoever to ARTIST and ARTIST's only
remedy shall be to terminate the Term of this Agreement by
written notice to COMPANY within fifteen (15) days following
the expiration of such sixty (60) day period.

7.   (a) 4 An advance in the sum of two hundred and fifty
thousand ($250,000.00) dollars payable as follows; One third
(1/3) upon signing of the agreement; one third (1/3) upon
the start of the Lp; and the remaining one third (1/3) upon
completion of the album, shall be the amount of the
Recording Fund for the first Lp delivered during the initial
Contract Period (the First Lp).

(b)   On all future Lp's the advance of two hundred
and fifty thousand ($250,000) dollars shall be paid at
one-half (1/2) on renewal of the Option Period and one-half
(1/2) upon completion of the Lp.

|  |  | Fund Amount |
|---|---|---|
| (i) | The Album Delivered during the first Contract Period (the "Second Album"): | $250,000 |
| (ii) | The Album Delivered during the second Option Period (the "Third Album") | $250,000 |
| (iii) | The Album Delivered during the third Option Period (the "Fourth Album") | $250,000 |
| (iv) | The Album Delivered during the fourth Option Period (the "Fifth Album") | $250,000 |

(b)   During each Contract Period COMPANY will have
the option to increase the Recording Commitment for that
Period by Master Recordings constituting one additional Lp
("Overcall Recordings").  COMPANY may exercise that option
by sending you a notice at any time before the end of the
Contract Period concerned.  The current Contract Period will
continue for nine (9) months after delivery of the Overall
Recordings.  Any Lp entitled Luke Featuring 2 Live Crew
shall count as an Overcall Lp.

8.   (a)  (i)  Except as otherwise provided in sub-
paragraph 8(a)(ii) hereof, COMPANY shall be solely respon-

-4-

C1.57.91/2-28

sible for and shall pay all recording costs, pressing and promotional costs incurred in the production and release of all masters subject to this Agreement. All such costs paid by COMPANY shall be deducted from any and all monies becoming payable to ARTIST under this or any other agreement between the parties hereto.

(ii) Notwithstanding the provisions of sub-paragraph 8(a)(i) hereof, in the event that COMPANY elects to require ARTIST to record and deliver the Additional Masters, or if COMPANY wishes to re-mix any of the masters delivered in connection with the First LP, all costs so paid by COMPANY shall be advances against and recoupable by COMPANY out of all royalties becoming payable to ARTIST pur-suant to this or any other agreement between the parties hereto.

(b)  COMPANY shall be solely responsible for and shall pay all monies becoming payable to ARTIST and all other parties rendering services or otherwise in respect of sales of recordings derived from masters subject to this Agreement.

9.  (a)  Each master recorded and delivered hereunder shall be produced by a producer selected by COMPANY. COMPANY shall be solely responsible for and shall pay all monies becoming payable to all producers. All such sums so paid by COMPANY shall be deducted from any and all monies otherwise payable to ARTIST under this or any other agreement between the parties hereto (excluding any publishing agreements with Companies affiliate Publishing Companies).

(b)  As to any producers selected by COMPANY, COMPANY shall pay said producer or producers a royalty nego-tiated between COMPANY and said producer and shall not effect the royalty otherwise payable to ARTIST under this or any other agreement between the parties hereto.

10.  Conditioned upon ARTIST's full and faithful perfor-mance of all the material terms hereof, COMPANY shall pay ARTIST the following royalties in respect of records subject to this Agreement:

(a)  Company shall credit Artist's Royalty Account pursuant to and in accordance with the following royalty schedule for records manufactured and sold in the United States:

-5-

| RECORDING PERIODS | MINIMUM SIDES | ROYALTY RATES |
|---|---|---|
| Initial Period | One LP | 15% |
| 1st Option Period | One LP | 15% |
| 2nd Option Period | One LP | 15% |
| 3rd Option Period | One LP | 15% |
| 4th Option Period | One LP | 15% |

*Royalty Rate = Percentage times one-hundred (100%) percent of net records sold and for which Company has been paid times the retail price of records manufactured in the United States. This rate shall not apply to 7" or 12" singles. (In the event Company's distributor pay on the basis of eighty-five (85%) or ninety (90%) percent of retail, then company shall pay on the same basis as distributor). The rate for 7" and 12" singles shall be thirteen (13%) percent.

(b)    (i) With respect to retail sales outside the United States of all records derived from masters recorded and delivered during the Term, the royalty rate shall be based upon the U.S. rate and pro rated down at the percentage which COMPANY's royalty rate is reduced.

(ii) The royalty rate hereinabove set forth in subparagraph 10(b)(i) shall be hereinafter referred to as the "Basic Foreign Rate".

(iii) Notwithstanding anything to the contrary contained herein, with respect to records sold in Brazil, Greece, Portugal, India, Kenya, Zambia, Zimbabwe, Nigeria and any other territory in which governmental or other authorities place limits on the royalty rates permissible for remittances to the United States in respect of records sold in such territory(ies), the royalty rate payable to ARTIST hereunder in respect of sales of records in such territory(ies) shall equal the lesser of (A) the Basic Foreign Rate or (B) the effective royalty rate permitted by such governmental or other authority for remittances to the United States less a royalty equivalent to two (2%) percent of the retail list price and such monies as Company or its licensees shall be required to pay to all applicable union funds in respect of said sales.

(iv) Royalties in respect of sales of records outside the United States shall be computed in the same national currency as COMPANY is accounted to be its licensees and shall be paid to ARTIST at the same rate of exchange as COMPANY is paid. It is understood that such royalties will not be due and payable until payment thereof is received by or credited to COMPANY in the United States governmental regulations, royalties therefor shall not be

-6-

credited to ARTIST's account during the continuance of such
inability except that (I) if any accounting rendered to
ARTIST hereunder during the continuance of such inability
shows ARTIST's account to be in a credit position, COMPANY
will, after ARTIST's request and at ARTIST's expense, if
COMPANY is able to do so, deposit such royalties to ARTIST's
credit in the applicable foreign currency in a foreign depo-
sitory, or (ii) if the royalties not credited to ARTIST's
account exceed the amount, if any, by which ARTIST's account
is in a debit position, then COMPANY will, after ARTIST
request and at ARTIST's expense, and if COMPANY is able to
do so, deposit such excess royalties to ARTIST's credit in
the applicable foreign currency in a foreign depository.
Deposit as aforesaid shall fulfill COMPANY's obligations
under this Agreement as to record sales to which such
royalty payments are applicable.

     (c)  With respect to records sold (i) through any
direct mail or mail order distribution method, including,
without limitation, record club distribution, (ii) by
distribution through retail outlets in conjunction with spe-
cial advertisements on radio or television or (iii) by any
combination of the methods set forth above, the royalty
payble in connection therewith shall be one-half (1/2) of
COMPANY's net earned royalty receipts in respect of reported
sales through such channels after COMPANY shall have first
deducted all third party payments for which COMPANY is
responsible.  No royalties shall be payable with respect to
records given away as "bonus" or "free" records as a result
of joining a record club or plan or of purchasing a required
number of records or with respect to records received by
members of any such club operation either in an introductory
offer in connection with joining such club or upon recom-
mending that another join such club operation.

     (d)  (i)  With respect to mid-priced LPs, the
royalty rate shall be two-thirds (2/3) of the Basic U.S. LP
Rate or Basic Foreign Rate, as the case may be, provided
that during the Term, COMPANY shall not release in the
United States any such mid-priced LP comprised solely of
masters delivered hereunder prior to nine (9) months
following COMPANY's initial United States release of such LP
as a full-priced record, unless ARTIST shall consent in writing.

          (ii) With respect to budget LPs, the royalty
rate shall be one-half (1/2) of the Basic U.S. LP Rate or
Basic Foreign Rate, as the case may be, provided that during
the Term, COMPANY shall not release in the United States any
such budget LP comprised solely of masters delivered
hereunder prior to eighteen (18) months following COMPANY's
initial United States release of such LP as a full-priced
record, unless ARTIST shall consent thereto.

     (e)  With respect to EPs, the royalty rate shall be
three-fourths (3/4) of the Basic U.S. LP Rate or Basic
Foreign Rate, as the case may be.

-7-

C1.60.91/2-28

(f)  Notwithstanding anything to the contrary con-
tained in this Agreement, in the event that Company (or its
licensee(s)) shall in any country(ies) of the Territory
adopt a policy applicable to the majority of LPs in
COMPANY's (or its licensee(s)') then current catalogue pur-
suant to which the retail list price of an LP is reduced
subsequent to its initial release, then the royalty rates
otherwise payable to ARTIST under this Agreement shall be
reduced in the proportion that such reduced retail list
price of the applicable LP bears to the retail list price of
such LP as initially released in the applicable country.

(g)  With respect to "compact-disc" LPs, the
royalty rate shall be the Basic U.S. LP Rate or Basic
Foreign Rate, as the case may be.

(h)  In the event that COMPANY shall sell or
license third parties to sell "records" via telephone,
satellite, cable or other direct transmission to the con-
sumer over wire or through the air, ARTIST shall be paid
royalties with respect thereto at the Basic U.S. Singles
Rate, Basic U.S. LP Rate or Basic Foreign Rate, as the case
may be.  For the purposes of calculating royalties payable
in connection with such sales, the retail list price of such
"records" shall be deemed to be the then-current retail list
price of tape copies of such records and in the case of
records which have no tape equivalent, the corresponding
price of the disc (but in the United States, eighty-five
(85%) percent of the then current retail list price of such
tape copies or corresponding disc), and the packaging deduc-
tion for such sales shall be made in accordance with sub-
paragraph 10(s)(iii) of this Agreement.

(i)  The royalty rate payable for records sold to
the United States government, its subdivisions, departments
and agencies, and to educational institutions and libraries
shall be one-half (1/2) of the otherwise applicable basic
U.S. rate and shall be based upon the retail list price
(Post Exchange list price where applicable) of such records.

(j)  The royalty rate payable for records sold as
"premiums" shall be one-half (1/2) of the Basic U.S. Singles
Rate, Basic U.S. LP Rate or Basic Foreign Rate, as the case
may be, and the retail list price for such records shall be
demed to be COMPANY's actual sales price.  It is understood
that COMPANY shall not use ARTIST's name or likeness in con-
nection with any such "premium" record as an endorsement of
any product or service.

(k)  The royalty rate payable for records sold in
the form of pre-recorded tape (whether reel-to-reel or
cartridge) or any other form (other than disc), shall be the
applicable royalty rate otherwise payable, provided that if
the retail list price of any record sold in pre-recorded

-8-

C1.61.91/2-28

tape form or any form other than disc) shall be less than
the retail list price of the corresponding record in disc
form, the royalty rate otherwise payable shall be reduced in
the proportion that the retail list price of the applicable
record in pre-recorded tape form (or such form other than
disc) bears to the retail list price of such record in disc
form.

(1)  COMPANY shall have the right to license the
masters to third parties for record use and/or all other
types of use on a flat-fee basis.  COMPANY shall credit
ARTIST's royalty account with fifty (50%) percent of the net
amount received by COMPANY under each such license after
COMPANY shall have first deducted all third party payments
for which COMPANY is responsible.

(m)  As to records not consisting entirely of
masters recorded and delivered hereunder, the royalty rate
otherwise payable to ARTIST hereunder with respect to sales
of any such record shall be prorated by multiplying such
royalty rate by a fraction, the numerator of which is the
number of masters recorded and delivered hereunder embodied
on such record and the denominator of which is the total
number of masters embodied thereon.

(n)  As to masters embodying performances of ARTIST
together with the performances of another artist or artists,
the royalty rate otherwise payable hereunder with respect to
sales of any record derived from any such master and the
recording costs and/or advances otherwise payable by COMPANY
hereunder with respect to any such master shall be prorated
by multiplying such royalty rate or recording costs and/or
advances by a fraction, the numerator of which is one and
the denominator of which is the total number of artists
whose performances are embodied on such master.

(o)  COMPANY shall have the right to include or to
license others to include any one or more of the masters in
promotional records on which such masters and other record-
dings are included, which promotional records are designed
for sale at a substantially lower price than the regular
price of COMPANY's LPs.  No royalties shall be payable on
sales of such promotional records.

(p)  No royalties shall be payable in respect of:
(i) records given away or furnished on a "no-charge" basis
to "one-stops", rack jobbers, distributors or dealers,
whether or not affiliated with COMPANY, provided that such
records do not exceed 300 non-royalty bearing Singles out of
every 1,000 Singles distributed and 200 non-royalty bearing
LPs out of every 1,000 LPs distributed, and provided further
that COMPANY shall have the right to exceed the aforesaid
limitations for short term special promotions or marketing
campaigns.  The number of records distributed on a no-charge

-9-

basis shall not, for any such short term promotion or campaign exceed an additional ten (10%) percent of the total number of records distributed. COMPANY shall use reasonable efforts to notify ARTIST of any such short term special promotion or campaign, but COMPANY's failure to do so shall not be a breach of this Agreement or in any manner affect COMPANY's right to distribute records on a non-royalty basis as aforesaid; (ii) records given away or sold at below stated wholesale prices for promotional purposes to disc jockeys, record reviewers, radio and television stations and networks, motion pictures companies, music publishers, COMPANY's employees, ARTIST, ARTIST or other customary recipients of promotional records or for use on transportation facilities; (iii) records sold as scrap, salvage, overstock or "cut-outs"; (iv) records sold below cost. No royalties shall be payable on any sales by COMPANY's licensees until payment has been received by or credited to COMPANY in the United States. This paragraph shall be governed by the agreement between COMPANY and it's distributor. In the event that distributor adopts a different policy as to the contents of this paragraph, then said distributor's policy shall prevail as between COMPANY and ARTIST.

(q) As to records sold at a discount to "one-stops", rack jobbers, distributors or dealers, whether or not affiliated with COMPANY, in lieu of the records given away or furnished on a "no-charge" basis as provided in subparagraph 10(p)(i) above, the applicable royalty rate otherwise payable hereunder with respect to such records shall be reduced in the proportion that said discount wholesale price bears to the usual stated wholesale price, provided that said reduction in the applicable royalty rate does not exceed the percentage limitations set forth in subparagraph 10(p)(i) above.

(r) The royalty rates provided for in this Paragraph 10 shall be applied against the retail list price (less COMPANY's container deductions, excise taxes, duties and other applicable taxes) for ninety (90%) percent of records sold which are paid for and not returned. The term for "retail list price" as used in this Agreement shall mean (i) for records sold in the United States, the manufacturer's suggested retail price in the United States and (ii) for records sold outside the United States, the manufacturer's suggested retail price in the country of manufacture or sale, as COMPANY is paid. In those countries where a manufacturer's suggested retail price is not utilized or permitted, the generally accepted retail price shall be utilized. Notwithstanding the foregoing, (A) the retail list price for a "Disco-single" shall be deemed to be the retail list price for a Single, except for Disco-Singles sold in the United States the retail list price therefor shall be deemed to be the lesser of one hundred fifty (150%) percent of the retail list price of a Single or the actual

retail list price of such Disc-single and (B) with respect to "compact-disc" or other audiofile records in any configuration manufactured, distributed and sold by Company's normal retail channels in the United States a royalty equal at the same penny rate as Company is paid on cassette tapes. In computing sales, COMPANY shall have the right to deduct all returns made at any time and for any reason.

(s) COMPANY's container deductions shall be a sum equal to (i) ten (10%) percent of the retail list price for records in disc form (other than "compact-disc" records), (ii) twelve and one-half (12-1/2%) percent of the retail list price for records in disc form in "double-fold" jackets or covers or in jackets which contain an insert or any other special elements, and (iii) twenty-five (25%) percent of the retail list price for pre-recorded tape, "compact-discs" and cartridge boxes or containers, or any other form of package, container or box other than as described herein. In the event that the deduction for packaging charged by COMPANY's distributor is different then the amounts herein, then the amount deducted by COMPANY's distributor shall prevail.

11. Statements as to royalties payable hereunder shall be sent by COMPANY to ARTIST within sixty (60) days after the expiration of each calendar quarter for the preceding quarterly period ending February 28, May 31, August 31 or November 30. Concurrently with the rendition of each statement, COMPANY shall pay ARTIST all royalties shown to be due by such statement, after deducting all recording costs paid by COMPANY, all payments made on behalf of ARTIST, and all advances made to ARTIST prior to the rendition of the statement. No statements need be rendered by COMPANY for any such quarterly period after the expiration of the Term hereof for which there are no sales of records derived from masters hereunder. All payments shall be made to the order of ARTIST and shall be sent to ARTIST at ARTIST's address first above written. COMPANY shall be entitled to maintain a single account with respect to all recordings subject to this or any other agreement between the parties hereto. COMPANY may maintain reserves, however, COMPANY agrees that regarding such reserves: (i) with respect to LPs in disc form, each base reserve as initially established shall not exceed twenty (20%) percent of records shipped during the applicable accounting period and shall, at the end of two (2) years from the date established, be reduced to five (5%) percent; (ii) with respect to LPs in tape form, each base

C1.64.91/2-28

reserve as initially established shall not exceed twenty-
five (25%) percent of tapes shipped during the applicable
accounting period and shall, at the end of two (2) years
from the date established, be reduced to ten (10%) percent;
and (iii) with respect to Singles, each base reserve as ini-
tially established shall not exceed thirty-five (35%) per-
cent of records shipped during the applicable accounting
period and shall, at the end of two (2) years from the date
established, be reduced to ten (10%) percent. COMPANY shall
fully liquidate each base reserve within four (4) years from
the date that such base reserve was established. At such
time as a reserve is liquidated, it shall be deemed to be a
sale in the period in which it was liquidated. ARTIST shall
be deemed to have consented to all accountings rendered by
COMPANY hereunder and said accountings shall be binding upon
ARTIST and not subject to any objection by ARTIST for any
reason unless specific objection, in writing, stating the
basis thereof, is given to COMPANY within one (1) year after
the date rendered, and after such written objection, unless
suit is instituted within one (1) year after the date upon
which COMPANY notifies ARTIST that it denies the validity of
the objection. In the event COMPANY's distributor shall pay
COMPANY on a semi-annual basis, then COMPANY shall pay
ARTIST on the same basis as COMPANY is paid.

12. ARTIST shall have the right at ARTIST's sole cost
and expense to appoint a Certified Public Accountant who is
not then currently engaged in an outstanding audit of
COMPANY to examine COMPANY's books and records as same per-
tain to sales of records subject hereto as to which
royalties are payable hereunder, provided that any such exa-
mination shall be for a reasonable duration, shall take
place at COMPANY's offices during normal business hours on
reasonable prior written notice and shall not occur more
than once in any calendar year.

13. (a) All notices to ARTIST may be served upon a
principal or officer of ARTIST personally, by prepaid
telegram, or by depositing the same, postage prepaid, in any
mail box, chute, or other receptacle authorized by the
United States Postal Service for mail, addressed to ARTIST
at ARTIST' address first above written.

(b) All notices to COMPANY shall be in writing and
shall be sent postage prepaid by registered or certified
mail, return receipt requested, and addressed to COMPANY's
address first above written with a simultaneous copy sent in
the same manner to:
                ALLEN L. JACOBI, ESQ.
                1313 N.E. 125th Street
                North Miami, FL 33161

14. (a) All musical compositions or material recorded
pursuant to this Agreement which are written or composed, in
whole or in part by ARTIST or any producer of the masters

-12-

C1.65.91/2-28

subject hereto, or which are owned or controlled, directly
or indirectly, in whole or in part, by ARTIST and/or Artist
or any producer of the masters subject hereto (herein called
"Controlled Compositions") shall be and are hereby licensed
to COMPANY for the United States at a royalty per selection
equal to seventy-five (75%) percent of the minimum statutory
per selection rate (without regard to playing time) effec-
tive on the earlier of (i) the date such masters are
required to be delivered hereunder or (ii) the date such
masters are delivered to COMPANY hereunder.  The aforesaid
seventy-five (75%) percent per selection rate shall
hereinafter sometimes be referred to as the "Per Selection
Rate."  Notwithstanding the foregoing, the maximum aggregate
mechanical royalty rate which COMPANY shall be required to
pay in respect of any Single, Disco-single or LP hereunder,
regardless of the total number of all compositions contained
therein, shall not exceed two (2) times, and  ten (10) times
the Per Selection Rate, respectively and in respect of any
EP hereunder, regardless of the total number of all com-
positions contained thereon, shall not exceed the per
Selection Rate times the total number of masters contained
therein.  In this connection, it is specifically understood
that in the event that any Single, Disco-Single, EP or LP
contains other compositions in addition to the Controlled
Compositions and the aggregate mechanical royalty rate pro-
vided in this Paragraph 14, the aggregate rate for the
Controlled Compositions contained thereon shall be reduced
by the aforesaid excess over said applicable rate.
Additionally, COMPANY shall have the right with respect to
any Single, Disco-single, EP or LP, the aggregate mechanical
royalty rate for which exceeds the applicable rate provided
in this Paragraph 14 to deduct such excess payable thereon
from any and all monies payable to ARTIST pursuant to this
or any other agreement between the parties hereto.  All
mechanical royalties payable hereunder shall be paid on the
basis of net records sold hereunder for which royalties are
payable to ARTIST pursuant to this Agreement.
Notwithstanding anything to the contrary contained herein,
mechanical royalties payable in respect of Controlled
Compositions for sales of records for any use other than as
described in subparagraphs 10(a), (e), (g) and (k) hereof
shall be seventy-five (75%) percent of the otherwise appli-
cable Per Selection Rate.  Controlled Compositions which are
arranged versions of any musical compositions in the public
domain, when furnished by ARTIST for recording hereunder,
shall be free of administration of copyright in any
Controlled Composition shall be made subject to the provi-
sions hereof and any inconsistencies between the terms of
this Agreement and mechanical licenses issued to and
accepted by COMPANY shall be determined by the terms of this
Agreement.  If any Single, Disco-Single, EP or LP contains
other compositions in addition to the Controlled
Compositions, ARTIST will obtain for COMPANY'S benefit
mechanical licenses covering such composition on the same

-13-

terms and conditions applicable to Controlled Compositions pursuant to this Paragraph 14.

(b) In respect of all Controlled Compositions per-formed in Pictures, COMPANY is hereby granted an irrevocable perpetual worldwide license to record and reproduce such Compositions in such Pictures and to distribute and perform such Pictures including, but not limited to, all Videoshows thereof, and to authorize others to do so. COMPANY will not be required to make any payment in connection with those uses, and that license shall apply whether or not COMPANY receives any payment in connection with those Pictures. Simultaneously with ARTIST'S submission to COMPANY of the information required pursuant to subparagraph 21(c)(i) hereof, ARTIST shall furnish COMPANY with a written acknowledgment from the person(s) or entity(ies) controlling the copyright in each non-Controlled Compositions to be embodied on any Picture confirming the terms upon which said person(s) or entity(ies) to forthwith issue to COMPANY (and its designees) licenses containing said terms and such other terms and conditions as COMPANY (or its designees) may require. Royalties in connection with licenses for the use of non-Controlled Compositions pertaining to Pictures and Videoshows are included in the royalties set forth in sub-paragraph 21(d) hereof, as described in subparagraph 21(d)(ii). If the copyright in any Controlled Composition is owned or controlled by anyone else, ARTIST will cause that person, firm or corporation to grant COMPANY the same rights described in this Paragraph 14, on the same terms.

15. (a) In the event that ARTIST for any reason fails to timely fulfill any of its production and delivery commit-ments hereunder in accordance with all of the terms and con-ditions of this Agreement, then, in addition to any other rights or remedies which COMPANY may have, COMPANY shall have the right, upon written notice to ARTIST at any time prior to the expiration of the then current Period, (i) to terminate this Agreement without further obligation to ARTIST as to unrecorded or undelivered masters, (ii) to reduce the miniumum number of masters required to be recorded and delivered during the then current Period to the number which have been timely recorded and delivered during such Period, or (iii) such default plus one hundred and fifty (150) days with the times for the exercise by COMPANY of its options to extend the Term and the dates of commen-cement of subsequent Option Periods deemed extended accor-dingly. It is specifically understood that COMPANY may exercise any of all of its rights pursuant to subparagraphs 15(a)(i), (ii) and (iii) hereof at any time(s) prior to the date the Term would otherwise expire. COMPANY's obligations hereunder shall be suspended for the duration of any such default. The provisions of this subparagraph shall not result in an extension of the Term for a period in excess of the period permitted by applicable law, if any, for the enforcement of personal services agreements.

-14-

(b)   Intentionally Omitted.

(c)   COMPANY reserves the right, at its election, to suspend the operation of this Agreement for the duration of any of the following contingencies, if by reason of any such contingency, it is materially hampered in the performance of its obligations under this Agreement or its normal business operations are delayed or become impossible or commercially impraticable:  Act of God, fire, catastrophe, labor disagreement, acts of government, its agencies or officers, any order, regulation, ruling or action of any labor union or association of artists, musicians, composers or employees affecting COMPANY or the industry in which it is engaged, delays in the delivery of materials and supplies, or any other cause beyond COMPANY's control.  Any such suspension due to a labor controversy which involves only COMPANY shall be limited to a period of six (6) months.

(d)   If ARTIST's voice or voices should be materially or permanently impaired, then in addition to any other rights or remedies which COMPANY may have, COMPANY shall have the right, upon written notice to ARTIST, to terminate this Agreement and shall thereby be relieved of any liability in connection with undelivered masters.

16.   ARTIST expressly acknowledges that ARTIST's services hereunder are of a special, unique and intellectual character which gives them peculiar value, and that in the event of a breach or threatened breach by ARTIST of any term, condition or covenant hereof, COMPANY will be caused immediate irreparable injury.  ARTIST expressly agrees that COMPANY shall be entitled to seek injunctive and other equitable relief, as permitted by law, to prevent a breach or threatened breach of this Agreement, or any portion thereof, by ARTIST which relief shall be in addition to any other rights or remedies, for damages or otherwise available to COMPANY.

17.   (a)   ARTIST warrants and represents that neither ARTIST is not under any disability, restriction or prohibition, whether contractual or otherwise, with respect to ARTIST's right to execute this Agreement or ARTIST's right to perform its terms and conditions.  Without limiting the foregoing, ARTIST specifically warrants and represents that no prior obligations, contracts or agreements of any kind undertaken or entered into by ARTIST, will interfere in any manner with the complete performance of this Agreement by COMPANY, ARTIST or with ARTIST's right to record any and all selections hereunder.  ARTIST warrants and represents that there are now in existence no prior unreleased masters embodying ARTIST's performances.

(b)   ARTIST warrants and represents that no materials, or any use thereof, will violate any law or infringe upon or violate the rights of any third party.

-15-

C1.68.91/2-28

"Materials", as used in this subparagraph 17(b) shall include: (i) all musical compositions and other material contained on masters subject hereto, (ii) each name used by ARTIST, in connection with masters recorded hereunder, and (iii) all other materials, ideas, other intellectual properties, or elements furnished or selected by ARTIST and contained in or used in connection with any masters recorded hereunder or the packaging, sale, distribution, advertising, publicizing or other exploitation thereof.

(c)  ARTIST agrees to and does hereby indemnify, save and hold COMPANY harmless from any and all loss and damage (including court costs and reasonable attorneys' fees) arising out of, connected with or as a result of any inconsistency with, failure or, or breach or threatened breach by ARTIST of any warranty, representation, agreement, undertaking or covenant contained in this Agreement including, without limitation, any claim by any third party in connection with the foregoing.  In addition to any other rights or remedies COMPANY may have by reason of any such inconsistency, failure, breach, threatened breach or claim, ARTIST shall reimburse COMPANY, on demand, for any payment made by COMPANY at any time after the date hereof with respect to any loss, damage or liability resulting therefrom and in addition thereto COMPANY shall have the right to deduct from any and all monies otherwise payable to ARTIST under this or any other agreement between the parties hereto a sum(s) equal to such loss, and reasonable attorneys' fees).  COMPANY shall give ARTIST notice of any third party claim to which the foregoing indemnity applies and ARTIST shall have the right to participate in the defense of any such claim through counsel of ARTIST's own choice and at ARTIST's expense.  Pending the determination of any such claim, COMPANY may withhold payment of all monies under this or any other agreement between the parties hereto in any amount consistent with such claim.

18.  Wherever in this Agreement ARTIST's approval or consent is required, such approval or consent shall not be unreasonably witheld.  COMPANY may require ARTIST to formally give or withhold such approval or consent by giving ARTIST written notice requesting same and by furnishing ARTIST with the information or material in respect of which such approval or consent is sought.  ARTIST shall give COMPANY written notice of approval or disapproval within five (5) days after such notice.  ARTIST shall not hinder nor delay the scheduled release of any record hereunder.  In the event of disapproval or no consent, the reasons therefor shall be stated.  Failure to give such notice to COMPANY as aforesaid shall be deemed to be consent or approval.

19.  During the Term, ARTIST warrants and represents that ARTIST shall become and remain a member in good standing of any labor unions with which the COMPANY may at

-16-

Cl.69.91/2-28

any time have agreements lawfully requiring such union membership, including, but not limited to, the American Federation of Musicians and the American Federation of Television and Radio Artists.  All masters subject hereto shall be produced in accordance with the rules and regulation of all unions having jurisdiction.

20.  (a)  ARTIST hereby sell, transfers and assigns to COMPANY irrevocably all right, title and interest in and to the masters embodying ARTISTS' performances the titles of which are listed on Schedule "A" annexed hereto and made a part hereof, from the inception of recordings thereof (hereinafter in this Paragraph 20 referred to as the "Masters"), including, without limitation, the COMPANY'S (or its designee's) name as employer-for-hire such copyrights and all renewals and extensions thereof, perpetually and throughout the Territory.

(b)  ARTIST will facilitate the Masters to COMPANY at its offices in Miami, Florida not later than simultaneously with the execution of this Agreement, unless said masters are already in the possession of COMPANY.

(c)  The Masters will be deemed to have been recorded under this Agreement during the Initial Period of the Term of this Agreement.

(d)  ARTIST hereby warrants and represents:

(i)  Intentionally Deleted

(ii) No records have been manufactured from the Masters by ARTIST or any other person, firm or corporation for distribution in the Territory, and neither ARTIST nor any other person, firm or corporation has or shall have the right to distribute, market and/or sell any records embodying the Masters in Territory, and none of the musical compositions performed in the Masters have been performed by ARTIST for the making of any other master recordings, other than those records already pressed.

(iii) ARTIST has not, nor has any other person, sold or assigned to any other party or otherwise disposed of any right, title or interest in or to the Masters.

(iv) (1)  Each person who rendered any service in connection with, or who otherwise contributed in any way to the making of the Masters, or who granted to ARTIST any of the rights referred to in this Agreement, had the full right, power, and authority to do so, and was not bound by any agreement which would restrict such person from rendering such services or granting such rights.

-17-

C1.70.91/2-28

(2)   All recording costs and expenses with respect to the making of the Masters have been paid in full.

(3)   All necessary licenses for the recording of the compositions performed in the Masters have been obtained from the copyright owners, and all monies payable under such licenses or otherwise by reason of such recording have been paid.  The foregoing does not apply to any monies payable to such copyright owners in connection with the manufacture or sale or records derived from the Masters.

(4)   All the Masters were made in accordance with the rules and regulations of the American Federation of Musicians ("AFM"), the American Federation of Television and Radio Artists ("AFTRA") and all other unions having jurisdiction.

(v)   COMPANY shall have the sole and exclusive right to manufacture, advertise, distribute, sell and otherwise exploit and deal throughout the Territory in the Masters and records and other reproductions derived therefrom, free from any liability or obligation to make any payments therefor, except as expressly provided in this Agreement.

(vi) ARTIST will execute, acknowledge and deliver to COMPANY such further instruments and documents, and will otherwise cooperate with COMPANY as COMPANY shall request at any time, for the purpose of establishing or evidencing the rights granted to COMPANY herein, or otherwise to implement the intent of this Paragraph 20 COMPANY shall give ARTIST five day notice to sign such documentation and in the event that after said five days the documents are not signed then COMPANY may sign such documents in ARTIST'S name and make appropriate disposition of them.

(e)   It is understood and agreed that all of the provisions of this Paragraph 20 are of the essence of this Agreement.

21.  (a)  In addition to ARTIST's recording commitments as set forth in Paragraph 3 of this Agreement, ARTIST shall comply with requests, if any, made by COMPANY in connection with the production of Pictures. In this connection, ARTIST shall appear on dates and at places requested by COMPANY for the filming, taping or other fixation of audio-visual recordings.  ARTIST shall perform services with respect thereto as COMPANY deems desirable in a timely and first-class manner.  ARTIST acknowledges that the production of Pictures, involves matters of judgment with respect to art and taste, which judgment shall be exercised by COMPANY and COMPANY'S decisions with respect thereto shall be final. COMPANY will endeavor to consult with ARTIST as to the Production of pictures.

-18-

(b)   (i)   Each Picture produced during the Term of this Agreement shall be owned by COMPANY (including the worldwide copyrights therein and thereto and all extensions and renewals thereof) to the same extent as COMPANY's rights in master recordings made under this Agreement.

(ii) COMPANY will have the unlimited right to manufacture Videoshows of the Picture to rent, sell, distribute, transfer, sublicense or otherwise deal in such Videoshows under any trademarks, tradenames and labels; to exploit the Picture by any means now or hereafter known or developed; or to refrain from any such exploitation, throughout the world.

(c)   (i)   COMPANY agrees to advance all costs actually incurred in the production of Pictures made by COMPANY.   COMPANY shall submit to ARTIST for ARTIST's reasonable approval in writing, the following information:  <u>(i)</u> the musical compositions and other material to be embodied thereon; <u>(ii)</u> the general concept therefor and <u>(iii)</u> the producer, director, and any other key personnel therefor. Following COMPANY's receipt of ARTIST's approval of said information, COMPANY shall commence production of the Picture. <u>(iv)</u> All sums paid by COMPANY in connection with each Picture shall be an advance against and recoupable by COMPANY out of all royalties becoming payable to ARTIST pursuant to this or any other agreement between the parties hereto.

(ii) Each of the following sums, if any, paid by COMPANY in connection with each Picture shall be an advance against and recoupable by COMPANY out of all royalties becoming payable to ARTIST pursuant to this or any other agreement between the parties hereto.

(A)   All expenses incurred by COMPANY in connection with the preparation and production of the Picture and the conversion of the Picture to Video Masters that are made to serve as prototypes for the duplication of the Videoshows of the Picture;

(B)   All of COMPANY's direct out-of-pocket costs (such as for rights, artists (including ARTIST), other personnel, facilities, materials, services, and the use of equipment) in connection with all steps in the production of the Picture and the process leading to and including the production of such Video Masters (including, but not limited to, packaging costs and the costs of making and delivering duplicate copies of such Video Masters); and

(C)   If in connection therewith COMPANY furnishes any of its own facilities, materials, services or equipment for which COMPANY has a standard rate, the amount of such standard rate or if there is no standard rate, the market value for the services or thing furnished.

-19-

(iii) All sums that COMPANY in its sole
discretion deems necessary or advisable to pay in connection
with the production of Pictures and the exploitation of
COMPANY's rights therein in order to clear rights or to make
any contractual payments that are due or may become due on
the part of COMPANY, to ARTIST, ARTIST or any other person,
firm or corporation by virtue of the exploitation of
COMPANY's rights therein, in order to avoid, satisfy or make
unnecessary any claims or demands by any person, firm or
corporation claiming the right to payment therefor,
including, but not limited to, any payment to an actual or
alleged copyright owner, patent owner, union, union-related
trust fund, pension plan or other entity, and any payment
for an actual or alleged re-run fee, residual, royalty,
license fee or otherwise shall constitute advances against
and recoupable out of all royalties becoming payable to you
pursuant to this or any other agreement between the parties
hereto. No payment pursuant to this subparagraph 21(c)(iii)
shall constitute a waiver of any of ARTIST's express or
implied warranties and representations.

(d) (i) Conditioned upon ARTIST full and faithful
performance of all of the terms and conditions of this
Agreement, COMPANY shall pay ARTIST royalties equal to fifty
(50%) percent of COMPANY's Video Net Receipts with respect
to COMPANY's exploitation of Pictures subject to this
Agreement. Monies earned and received by COMPANY from any
licensee (rather than monies earned and received by the
licensee) in respect of exploitation of Pictures shall be
included in the computation of Video Net Receipts.

(ii) The royalties provided in subparagraph
21(d)(i) include any royalty obligations COMPANY may have to
any other person, firm or corporation who supplied services
or rights used in connection with Pictures, including,
without limitation, producers, directors, extras, and music
publishers, and any such royalties shall be deducted from
the royalties otherwise payable to ARTIST.

(iii) With respect to audiovisual material
embodying Pictures made hereunder together with other
audiovisual material, royalties payable to ARTIST shall be
computed by multiplying the royalties otherwise applicable
by a fraction, the numerator of which is the amount of
playing time in such audiovisual material of Pictures made
hereunder and the denominator of which is the total playing
time of such audiovisual material.

(iv) As to Pictures embodying performances of
ARTIST together with the performances of another artist or
artists, the royalties otherwise payable hereunder shall be
prorated by multiplying such royalties by a fraction, the
numerator of which is one and the denominator of which is
the total number of artists whose performances are embodied
on such Pictures.

-20-

C1.73.91/2-28

(e)  COMPANY shall have the right to use and allow others to use each Picutre for advertising and promotional purposes with no payment to ARTIST.  As used herein, "advertising and promotional purposes" shall mean all uses for which COMPANY received no monetary consideration from licensees in excess of a reasonable amount as legal fees, administrative costs or similar type payments and as reimbursement for transaction costs incurred by COMPANY in connection with such uses, such as tape, duplication costs, shipping, handling and insurance costs.

(f)  (i)  During the Term of this Agreement, no person, firm or corporation other than COMPANY will be authorized to make, sell, broadcast or otherwise exploit audio-visual materials unless: (A) ARTIST first notifies COMPANY of all of the material terms and conditions of the proposed agreement pursuant to which the audio-visual materials is to be made, sold, broadcast or otherwise exploited, including, but not limited to, the titles of the compositions covered by the proposed agreement, the format to be used, the manner of exploitation proposed and the indentities of all proposed parties to the agreement, and (B) ARTIST offers to enter into an agreement with COMPANY containing the same terms and conditions described in such notice and otherwise in the same form as this Agreement, but with payments to ARTIST that are ninety (90%) percent of the payments to ARTIST in such proposed agreement.  If COMPANY does not accept ARTIST's  offer within fourty-five (45) days after COMPANY's receipt of same, ARTIST may then enter into that proposed agreement with the same parties mentioned in such notice, subject to subparagraph 21(f)(ii) hereof and provided that such agreement is consummated with those parties within thirty (30) days after the end of that sixty (60) day period upon the same financial terms and conditions set forth in ARTIST's notice and offer to COMPANY.  If that agreement is not consummated within the latter thirty (30) day period, no party except COMPANY will be authorized to make, sell, broadcast or otherwise exploit such audio-visual materials unless ARTIST first offers to enter into an agreement with COMPANY as provided in the first sentence of this subparagraph 21(f).  COMPANY will not be required, as a condition of accepting any offer made to COMPANY pursuant to this subparagraph 21(f), to agree to any terms or conditions which cannot be fulfilled by COMPANY as readily as by any other party (for example, but without limitation, the employment of a particular producer or director).

(ii) If COMPANY does not accept an offer made to it pursuant to this subparagraph 21(f), such non-acceptance shall not be considered a waiver of any of COMPANY's rights pursuant to this Agreement.  Such rights include, without limitation, the right to prevent authorizing any use of masters owned by or exclusively licensed to COMPANY unless COMPANY so agrees.  ARTIST shall not act in contravention of such rights.

-21-

(g) In all other respects (e.g., the times for accountings to be rendered, and warranties and representations made by ARTIST) Pictures and Video Masters shall be governed by the same terms and conditions as are applicable to masters subject to this Agreement.

22. Intentionally deleted.

23. COMPANY shall prepare the artwork for the album covers used in connection with the releases hereunder in the United States, during the Term of this Agreement, of each newly-recorded LP required to be recorded and delivered hereunder (hereinafter, the "Artwork"), upon prior written notice to COMPANY and only upon all of the following conditions:

(a) Before preparation and the incurring of any expenses in connection with the album artwork, ARTIST may discuss completely with a representative of COMPANY's art department, the proposed artwork to be produced by COMPANY, all of which shall be subject to the decision of COMPANY's art department. COMPANY will endeavor to consult with ARTIST as to the album artwork.

(b) (i) COMPANY will deliver all such Artwork prepared by COMPANY to ARTIST for ARTIST's reasonable approval, prior to the printing of said album cover.

24. All sums paid by COMPANY in connection with independant promotion, shall be an advance against and recoupable by COMPANY out of all royalties becoming payable to ARTIST pursuant to this or any other agreement between the parties.

25. For the purposes of this Agreement, the following definitions shall apply:

(a) "Master" - The equivalent of a seven (7") inch 45 rpm single-sided recording of not less than 3-1/2 minutes of playing time intended for use in the manufacture and sale of records.

(b) "Single" - A seven (7") inch 45 rpm double-sided record embodying thereon two (2) masters. A "Disco-single" is a twelve (12") inch double-sided record embodying thereon not more than four (4) masters.

(c) "EP" - A double-sided record embodying thereon either five (5) masters or six (6) masters.

(d) "LP" - A twelve (12") inche 33-1/3 rpm double-sided long-playing record of not less than 35 minutes of playing time. Multiple sets which consist of more than one

-22-

C1.75.91/2-28

(1) LP intended to be released, packaged and sold together for a single overall price, shall be deemed to be the equivalent of one (1) LP for the purposes of this Agreement, but shall not be recorded or delivered hereunder without COMPANY's prior written consent.

(e)  "Records", "phonograph records", "recordings" and "sound recording" - All forms of recording and reproduction by which sound may be recorded now known or which may hereafter become known, manufactured or sold primarily for home use, juke box use, or use on or in means of transportation, including, without limiting the foregoing, magnetic recording tape, film, electronic video recordings and any other medium or device for the production of artistic performances manufactured or sold primarily for home use, juke box use or use on or in means of transportation, whether embodying (i) sound alone or (ii) sound synchronized with visual images, e.g. "sight and sound" devices.

(f)  "Delivery", "deliver" or "delivered" - The actual receipt by COMPANY of completed, fully mixed, leadered and edited masters comprising each LP, commercially satisfactory to COMPANY and ready for COMPANY's manufacture of records, together with all materials, consents, approvals, licenses and permissions.

(g)  "Recording Costs" - Wages, fees, advances and payments of any nature to or in respect of all musicians, vocalists, conductors, arrangers, orchestrators, engineers, producers, copyists, etc.; payments to a trustee or fund based on wages to the extent required by any agreement between COMPANY and any labor organization or trustee; all studio, tape, editing, mixing, re-mixing, mastering and engineering costs; all costs of travel, per diems, rehearsal halls, non-studio facilities and equipment, dubdown, rental and transportation of instruments; all costs occasioned by the cancellation of any scheduled recording session; and all other costs and expenses incurred in producing the master recordings hereunder which are then customarily recognized as recording costs in the recording industry.

(h)  "mid-priced LP" - an LP which bears a suggested retail list price in the applicable country of the Territory of at least sixty-seven (67%) percent but not more than eighty (80%) percent of the suggested retail list price of the majority of COMPANY's or COMPANY's licensee's as applicable, then-current newly-released LPs.

(i)  "budget LP" - an LP which bears a suggested retail list price in the applicable country of the Territory or less than sixty-seven (67%) percent of the suggested retail list price of the majority of COMPANY's or COMPANY's licensee's, as applicable, then-current newly-released LPs.

-23-

C1.76.91/2-28

(j)  "Pictures" - motion pictures and other audiovisual works that have a soundtrack substantially featuring performances of ARTIST.

(k)  "Videoshows" - Videocassetts, Videodiscs or any other devces, now or hereafter known or developed, that enable the Picture to be perceived visually, with or without sound, when used in combination with or as part of a piece of electronic, mechanical or other apparatus.

(l)  "Videodisc" - a disc-type Videoshow that enable the Picture to be perceived visually, with or without sound, through a television-type playback system or device.

(m)  "Videocassette" - A Videoshow other than Videodisc (e.g., a Videoshow in the form of pre-recorded tape).

(n)  "Video Masters" - master Videoshows.

(o)  "Video Net Receipts" - monies earned and received by COMPANY from exploitation of Pictures less a twenty (20%) percent gross distribution fee, and less any out-of-pocket expenses, copyright, union and other third party payments, taxes and adjustments borne by COMPANY in connection with such exploitation and collection and receipt by COMPANY of such monies.

(p)  "any other agreement between the parties hereto" - any agreements between COMPANY on the one part, and ARTIST (or any other entity furnishing ARTIST's recordings or services) or ARTIST, on the other part, pertaining to ARTIST's recording services or recordings.

26.  COMPANY may assign its rights under this agreement in whole or in part to any subsidiary, affiliated or controlling corporation, to any person owning or acquiring a substantial portion of the stock or assets of COMPANY, or to any partnership or other venture in which COMPANY may participates.  COMPANY may also assign its rights to any of its licensees if advisable in COMPANY's sole discretion to implement the license granted.  ARTIST may assign its rights under this agreement to a corporation a majority of whose capital stock is owned and controlled by ARTIST. No such assignment shall affect COMPANY's rights hereunder nor relieve ARTIST of any obligations under this agreement.

27.  This Agreement sets forth the entire agreement between the parties with respect to the subject matter hereof. No modification, amendment, waiver, termination or discharge of this Agreement shall be binding upon COMPANY unless confirmed by a written instrument signed by an officer of COMPANY.  A waiver by COMPANY of any term or condition of this Agreement in any instance shall not be deemed or

-24-

C1.77.91/2-28

construed as a waiver of such term or condition for the future, or of any subsequent breach thereof. All of COMPANY's rights, options and remedies in this Agreement shall be cumulative and none of them shall be in limitation of any remedy, option or right available to COMPANY. Should any provision of this Agreement be adjudicated by a court of competent jurisdiction as void, invalid or inoperative, such decision shall not affect any other provision hereof, and the remainder of this Agreement shall be effective as though such void, invalid or inoperative provision had not been contained herein. It is agreed that all accountings and payments required herein, and all grants made herein, shall survive and continue beyond the expiration or earlier termination of this Agreement. No breach of this Agreement by COMPANY shall be deemed material unless within thirty (30) days after ARTIST learns of such breach, ARTIST serves written notice thereof on COMPANY specifying the nature thereof and COMPANY fails to cure such breach, if any, within sixty (60) days ( except thirty (30) days if such alleged breach is the payment of monies hereunder) after receipt of such notice.

28.  This Agreement shall be deemed to have been made in the State of Florida and its validity, construction, performance and breach shall be governed by the laws of the State of Florida applicable to agreements made and to be wholly performed therein. ARTIST agrees to submit itself to the jurisdiction of the Federal or State courts located in Miami in any action which may rise out of this agreement and said courts shall have exclusive jurisdiction over all disputes between COMPANY and ARTIST pertaining to this Agreement and all matters related thereto. In this regard, any process in any action or proceeding commenced in the courts of the State of Florida arising out of any claim, dispute or disagreement under this Agreement may, among other methods, be served upon ARTIST by delivering or mailing the same, via registered or certified mail, addressed to ARTIST at the address provided herein for notices to ARTIST; any such delivery or mail service shall be deemed to have the same force and effect as personal service within the State of Florida. Nothing contained herein shall constitute a waiver of any other remedies available to COMPANY. Nothing contained in this Paragraph 28 shall preclude COMPANY from joining ARTIST in an action brought by a third party against COMPANY in any jurisdiction, although COMPANY's failure to join ARTIST in any such action in one instance shall not consitute a waiver of any COMPANY's rights with respect thereto, or with respect to any subsequent action brought by a third party against COMPANY.

29.  ARTIST hereby grants to COMPANY and its licenses the exclusive right, throughout the world, to use and authorize the use of ARTIST's name, portraits, pictures, likeness, and biographical material, either alone or in conjunction with other elements, in connection with the sale,

-25-

C1.78.91/2-28

lease, licensing or other disposition of merchandising
rights. For the rights granted by ARTIST to COMPANY in this
paragraph, COMPANY shall pay ARTIST a royalty of twenty (20%)
percent of COMPANY's net royalty receipts derived from the
exploitation of such rights, after deducting all costs and
third party payments relating thereto; and such royalty
shall be accounted to ARTIST in the manner otherwise pro-
vided herein. Relative to any and all activities conducted
and contemplated by this paragraph, COMPANY agrees to regu-
larly and reasonably inform ARTIST, in writing, of progress
and current status of all such activities. COMPANY agrees
to submit to ARTIST, within thirty (30) days of execution,
copies of all contracts entered into by COMPANY relative to
those activities provided for in this paragraph.

30.  This Agreement shall not become effective until
executed by all parties.

31.  <u>Grant of Rights</u>

    (a)         Assignment of Copyrights. Artist hereby
sells, transfers, and assigns to COMPANY, its successors and
assigns, and undivided one-hundred (100%) percent of the
publishing interest in the Compositions, including without
limitation, the copyrights therein and any and all renewals
and/or extensions thereof throughout the world (the
"Territory"), and all claims and causes of actions related
to the Compositions accruing at any time and all other
rights of whatsoever nature in the Composition, including
without limitation, the titles, words and music of the
Compositions and each every arrangement, adaptation and ver-
sion thereof. COMPANY will pay to ARTIST twenty-five (25%)
percent of the publishers share to ARTIST contemporaneously
with record royalties. ARTIST will execute and deliver to
COMPANY such instruments of transfer and other documents
regarding the rights of COMPANY in the Compositions subject
to this agreement as COMPANY may reasonably request to carry
out the purposes of this agreement, (including, without
limitation, the Exhibits annexed hereto), and COMPANY may
sign such documents in your name or the name of any
Controlled Songwriter and make appropriate disposition of
them.

    31.2    <u>Administration.</u>    COMPANY and its
Licensees will have the sole, exclusive and perpetual right,
throughout the Teritory, to:

        (a)  License and cause others to license
the exploitation of the Compositions, including, without
limitation, the right to license broadcast and other public
performances and the right to license the manufacture,
distribution and sale of Phonograph Records embodying any
one or more Compositions.

        (b)  Administer and grant rights in the
Compositions and the copyrights therein.

        (c)  Print, publish and sell printed edi-
tions of the Compositions.

-26-

(d)   Collect all monies payable during the term and Retention Period, with respect to the Compositions, in addition to all monies due prior to the date hereof, and all performance royalties payable to you with respect to the Compositions by the American Society of Composers, Authors and Publishers (ASCAP), Broadcast Music, Inc. (BMI), or any other applicable performing rights society (hereinafter collectively the "Societies"), but excluding any songwriter share of public performance income. If a Society in any territory does not license any particular public performance use of a Composition, it is understood COMPANY may license that use directly and all income received by COMPANY in connection with such licenses shall be deemed Gross Income and subject to accounting hereunder.

(e)   Make arrangements, or otherwise adapt or change any one or more Compositions in any manner.

(f)   Otherwise administer the Compositions and the copyrights therein and to act as the publisher thereof and exercise all of such rights as fully as if the copyrights were registered in COMPANY's name alone and COMPANY alone were the sole and exclusive owner thereof and of the Compositions.

31.3   <u>Power of Attorney</u>   ARTIST hereby irrevocably authorize, empower and appoints COMPANY, ARTISTS true and lawful attorney, for the term of the copyrights in the respective Compositions and any renewals or extensions thereof, to secure any renewal periods for COMPANY's benefit, to initiate and compromise any claim or action with respect to the Compositions including any claim or action againt infringers of COMPANY or ARTISTS rights in the Compositions, and to execute in ARTISTS name, and the name of any Controlled Songwriter, any and all documents and/or instruments necessary or desirable to accomplish the foregoing and/or to evidence COMPANY's ownership of the copyrights during such periods and/or to effectuate COMPANY's rights hereunder.  The power granted herein is coupled with an interest and irrevocable.  COMPANY will cause the copyrights in the Compositions to be registered or re-registered jointly in the name of COMPANY and ARTIST and such additional parties as appropriate.

31.4   <u>Name and Likenesses</u>.  COMPANY and any Licensee of COMPANY each shall have the right and may grant to others the right to reproduce, print, publish, or disseminate in any medium your name, the names, portraits, pictures and likenesses in the exploitatin of musical compositions and the marketing of other merchandise of any kind.  During the term of this agreement neither you nor any Controlled Songwriter shall authorize any Party other than

-27-

COMPANY to use the name or likeness of Controlled Songwriter (or any professional, group, or other assumed or fictitious name used by Controlled Songwriters) in connection with the exploitation of musical compositions.

32.     <u>Liquidation of Existing Reserves</u> - COMPANY agrees to liquidate and pay to ARTIST fifty (50%) percent of the reserves now being held by COMPANY, on all 2 Live Crew Lp's to date.  This shall not include any reserves being held on the "Luke Album - Banned in the USA".

33.     <u>Record Label Distribution-Wongwon & Ross</u> - It is hereby agreed that COMPANY agrees to provide the distribution of phonograph records on artists selected and signed by ARTISTS, Wongwon and Ross.  ARTISTS, Wongwon and Ross shall be permitted to release up to three (3) artists (singles with an option for an Lp) per year, for which COMPANY will provide studio time, distribution, and normal in-house promotion.  COMPANY shall pay to ARTIST a gross royalty of twelve (12%) percent out of which they will pay the artists for who they sign and produce.  The label shall have a name selected by ARTIST which ARTIST will notify COMPANY of prior to the delivery of the first artists lp (or single). COMPANY shall have first option on any of the artists selected and produced by ARTIST. A full and formal agreement pertaining to this record distribution agreement in accordance with the points contained herein shall be provided by COMPANY at the request of ARTIST.

34.     <u>Record Label Distribution-Hobbs</u> - It is hereby agreed that COMPANY agrees to provide the distribution of phonograph records on artists selected and signed by ARTISTS, Hobbs.  ARTISTS, Hobbs shall be permitted to release up to three (3) artists (singles with an option for an Lp) per year, for which COMPANY will provide studio time, distribution, and normal in-house promotion.  COMPANY shall pay to ARTIST a gross royalty of twelve (12%) percent out of which they will pay the artists for who they sign and produce.  The label shall have a name selected by ARTIST which ARTIST will notify COMPANY of prior to the delivery of the first artists lp (or single).  COMPANY shall have first option on any of the artists selected and produced by ARTIST. A full and formal agreement pertaining to this record distribution agreement in accordance with the points contained herein shall be provided by COMPANY at the request of ARTIST.

YOU UNDERSTAND THAT THIS IS AN IMPORTANT LEGAL DOCUMENT PURSUANT TO WHICH YOU GRANT TO COMPANY CERTAIN EXCLUSIVE SERVICES FOR ALL OF THE WORLD FOR A PERIOD IN EXCESS OF THREE (3) YEARS. YOU HEREBY REPRESENT AND WARRANT THAT YOU HAVE BEEN ADVISED OF YOUR RIGHT TO RETAIN INDEPENDENT LEGAL COUNSEL IN CONNECTION WITH THE NEGOTIATION AND EXECUTION OF THIS AGREEMENT AND THAT YOU HAVE EITHER RETAINED AND HAVE

D1.Luke3.91/2-28

BEEN REPRESENTED BY SUCH LEGAL COUNSEL OR HAVE KNOWINGLY AND
VOLUNTARILY WAIVED YOUR RIGHT TO SUCH LEGAL COUNSEL AND
DESIRE TO ENTER INTO THIS AGREEMENT WITHOUT THE BENEFIT OF
LEGAL REPRESENTATION.

    IN WITNESS WHEREOF, the parties hereto have executed
this Agreement on the day and year first above written.

                              LUKE RECORDS

                              BY:
_____         _____
                              LUTHER CAMPBELL

_____         _____
                              CHRIS WONG WON (Artist)

_____         _____
                              MARK ROSS (Artist)

_____         _____
                              DAVID HOBBS (Artist)

_____         _____
                              LUTHER CAMPBELL (Artist)

-29-