**LIL' JOE RECORDS, INC. vs MARK ROSS, ET AL.**
**Joseph Weinberger on 10/26/2022**

```
 1                UNITED STATES DISTRICT COURT
                  SOUTHERN DISTRICT OF FLORIDA
 2

 3                 CASE NO. 1:21-CV-23727-DPG

 4
     LIL' JOE RECORDS, INC., a Florida
 5   corporation,

 6          Plaintiffs,

 7   v.

 8   MARK ROSS, CHRISTOPHER WONG
     WON, JR., RODERICK WONG WON,
 9   LETERIUS RAY, ANISSA WONG WON
     and LUTHER CAMPBELL,
10
            Defendants.
11

12   _____/

13
     DEPOSITION OF:     JOSEPH WEINBERGER
14                      (LIL' JOE RECORDS, INC.)

15   TAKEN BY:          DEFENDANTS

16   DATE:              OCTOBER 26, 2022

17   TIME:              10:57 A.M. - 3:46 P.M.

18   PLACE:             ZOOM VIDEOCONFERENCE

19   STENOGRAPHICALLY
     REPORTED BY:       KRISTINA ESSIG, RPR
20                      NOTARY PUBLIC, STATE OF FLORIDA

21

22

23

24

25
```

**LIL' JOE RECORDS, INC. vs MARK ROSS, ET AL.**
**Joseph Weinberger on 10/26/2022**                    Pages 2..5

Page 2

```
1   A P P E A R A N C E S :
2
3   WOLFE LAW MIAMI, P.A.
    Richard C. Wolfe, Esquire
4   175 SW 7 Street
    Suite 2410
5   Miami, FL 33130
    Tel: 305-384-7370
6   Fax: 305-384-7371
    Email: rwolfe@wolfelawmiami.com
7
    Counsel for the Plaintiff
8
9
10  DONIGER BURROUGHS
    Scott Alan Burroughs, Esquire
11  Frank Trechsel, Esquire
    603 Rose Avenue
12  Venice, CA 90291
    (310) 590-182
13  Email: scott@donigerlawfirm.com
    Email: ftrechsel@donigerlawfirm.com
14
    Counsel for the Defendants
15
16
17  OTHER ZOOM PARTICIPANTS:
18  NIKKY KANCEY
19  LUTHER CAMPBELL
20
21
22
23
24
25
```

Page 3

```
1            C O N T E N T S
2   TESTIMONY OF JOSEPH WEINBERGER
3     Direct Examination by Mr. Burroughs.............7
4   CERTIFICATE OF OATH..........................186
5   CERTIFICATE OF REPORTER......................187
6   ERRATA SHEET.................................188
7              * * * * * *
8            EXHIBITS
9   DEFENDANTS' EXHIBIT 1...........................15
    (Lil' Joe Depo Notice_100522)
10
    DEFENDANTS' EXHIBIT 2...........................60
11  (Complaint Composite Exhibit A)
12  DEFENDANTS' EXHIBIT 3...........................85
    (2 Live Crew Copyright Termination)
13
    DEFENDANTS' EXHIBIT 4..........................102
14  (Compilation PA registrations for 2 Live Crew
    Is What We Are)
15
    DEFENDANTS' EXHIBIT 5..........................106
16  (2 Live Is What We Are (Album) - SR 360-735)
17  DEFENDANTS' EXHIBIT 6..........................115
    (Move Somethin' (Album) - SR 305-983)
18
    DEFENDANTS' EXHIBIT 7..........................117
19  (Move Somethin' Clean (Album) - SR 359 017)
20  DEFENDANTS' EXHIBIT 8..........................118
    (Compilation of PA registrations for Move Somethin'
21  and Move Something - clean)
22  DEFENDANTS' EXHIBIT 9..........................121
    (1987 Agreement)
23
    DEFENDANTS' EXHIBIT 10.........................140
24  (Wong Won Settlement Agreement)
25          EXHIBITS (CONTINUED)
```

Page 4

```
1   DEFENDANTS' EXHIBIT 11.........................144
2   (Ross Settlement Agreement)
3   DEFENDANTS' EXHIBIT 12.........................152
    (1987 Folder)
4
    DEFENDANTS' EXHIBIT 13.........................154
5   (1991 Folders)
6   DEFENDANTS' EXHIBIT 14.........................157
    (1995 Folder)
7
    DEFENDANTS' EXHIBIT 15.........................159
8   (Compilation of PA registrations for Nasty as they
    Wanna Be and Clean as They Wanna Be - 12 pages)
9
    DEFENDANTS' EXHIBIT 16.........................161
10  (Decl_Weinberger - 4)
11  DEFENDANTS' EXHIBIT 17.........................166
    (Invoice of Joe Records to Wong Won)
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

```
1              * * * * * *
2          S T I P U L A T I O N S
3      It is hereby stipulated and agreed by and
4   between counsel present for the respective parties,
5   and the deponent, that the reading and signing of the
6   deposition are hereby RESERVED.
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**LIL' JOE RECORDS, INC. vs MARK ROSS, ET AL.**
Joseph Weinberger on 10/26/2022                              Pages 6..9

Page 6

```
1          P R O C E E D I N G S
2            * * * * * * * *
3       THE COURT REPORTER:  I am not present
4  with the witness and I will be reporting the
5  proceeding and administering the oath remotely.
6       Counsel, beginning with the setting
7  attorney, please indicate your agreement and
8  consent by stating your name and your agreement
9  on the record.
10      MR. BURROUGHS:  Scott Burroughs from
11 Doniger Burroughs for the defendants, and
12 agreed.
13      MR. WOLFE:  Richard Wolfe for the
14 plaintiff, we agree.
15      THE COURT REPORTER:  Okay.  And now for
16 the witness, what city and state are you located
17 in?
18      THE WITNESS:  Miami, Florida.
19      THE COURT REPORTER:  Thank you.
20      And do you consent to being placed under
21 oath remotely?
22      THE WITNESS:  Yes.
23      THE COURT REPORTER:  Okay.  Please raise
24 your hand to be sworn.
25      Do you swear or affirm to tell the truth
```

Page 7

```
1  and nothing but the truth?
2       THE WITNESS:  Yes.
3       THE COURT REPORTER:  Thank you.
4  Whereupon,
5            JOSEPH WEINBERGER,
6  after having been first duly sworn, testified as
7  follows:
8       MR. BURROUGHS:  And before we get
9  started, I just want to note an objection for
10 the record.  The witness's attorney, Richard
11 Wolfe, is in the room with the witness, and
12 we've asked him to sit next to the witness on
13 camera.  He declined.
14      We've asked him to turn his camera on so
15 we can see him, and he's declined.
16      Do I have that correct, Mr. Wolfe?
17      MR. WOLFE:  It's not my deposition.
18      MR. BURROUGHS:  Okay.  So we've asked him
19 to turn his camera on.  He's not doing it.  So
20 we, of course, make the objection for the record
21 and we reserve all rights in that regard.
22            DIRECT EXAMINATION
23 BY MR. BURROUGHS:
24   Q.   Now, Mr. Weinberger, will you spell and
25 state your name for the record?
```

Page 8

```
1   A.   J-O-S-E-P-H, W-E-I-N-B-E-R-G-E-R.
2   Q.   Okay.  And are currently employed?
3   A.   Yes.
4   Q.   Okay.  And where are you employed?
5   A.   I have several different businesses.
6   Q.   And can you name them for us?
7   A.   Lil' Joe Records, Inc.
8   Q.   Okay.  Any others?
9   A.   Joseph Weinberger, PA.
10  Q.   Any others?
11  A.   Joseph Weinberger Investment, LLC.
12       Lil' Joe Wein Music, Inc.
13       MR. BURROUGHS:  Were you able to get
14 that, Ms. Essig?
15       THE COURT REPORTER:  Yes.
16 BY MR. BURROUGHS:
17  Q.   Any others currently?
18  A.   Boyz With Da Bass, Inc.
19  Q.   Any others?
20  A.   I think that's everything.
21  Q.   Okay.  And have you given a deposition in
22 the last three years?
23  A.   No.
24  Q.   Okay.  Have you ever given a deposition in
25 a case involving copyright issues?
```

Page 9

```
1   A.   I think so.
2   Q.   Okay.  What case was that, if you can
3  recall?
4   A.   I don't remember.
5   Q.   Okay.  Did it in involve 2 Live Crew or any
6  of its members?
7   A.   I don't recall.  It's like a long time ago.
8   Q.   Did it involve 50 Cent, or the individual
9  known as 50 Cent?
10  A.   I believe so.
11  Q.   And can you estimate for me about when that
12 deposition took place?
13  A.   Probably like over 20 years ago.
14  Q.   All right.  Since it's been a while, I'll
15 go over the admonitions briefly, but do I understand
16 correctly you're an attorney?
17  A.   Yes.
18  Q.   Are you an active attorney with any state
19 bar?
20  A.   Yes.
21  Q.   Which state or states?
22  A.   Florida.
23  Q.   Okay.  So you may be more familiar with
24 these admonitions than most folks that we do
25 depositions with, but I'm going to go over them
```

**LIL' JOE RECORDS, INC. vs MARK ROSS, ET AL.**
Joseph Weinberger on 10/26/2022                              Pages 10..13

---

Page 10

1  briefly.

2          The oath you were given by Ms. Essig is the
3  same oath that you'd be given in a court of law and
4  carries with it the same obligation to tell the
5  truth.  Do you understand that?

6      A.    Yes.

7      Q.    Okay.  Your answers need to be audible,
8  yes's or no's as opposed to uh-huhs or uh-uhs or head
9  shakes or nods.  Do you understand that?

10     A.    Yes.

11     Q.    Okay.  And it's a, you know, we may be
12  asking questions today about things that go back a
13  while, and we understand that some of these events
14  did take place in the '90's or thereabouts, so you
15  may not have specific recollections that you'll be
16  able to share in response to my questions, but I am
17  entitled to your best estimates as to dates, times,
18  and things of that nature.  Do you understand that?

19     A.    Yes.

20     Q.    And your attorney as we proceed today may
21  make objections.  You know, those are for the record.

22          To the extent that he makes objections, you
23  should still answer if you understand the question,
24  okay?

25     A.    Yes.

---

Page 11

1      Q.    Okay.  And other than this screen that
2  we're looking at, is there anything on your computer
3  right now?

4      A.    I see there's, like, someone else in the
5  computer.

6      Q.    Are you looking at the Zoom window?

7      A.    Yeah, there's a Frank Trechsel.

8      Q.    Okay.  That's an associate from my office.

9      A.    Okay.

10     Q.    Other than the Zoom window, is there
11  anything else on your computer screen?

12     A.    No.

13     Q.    Okay.  Is Mr. Wolfe in your eye line?

14     A.    Yes.

15     Q.    Okay.  And to the extent that he makes any
16  indication to you or mouths any words to you, you'll
17  let me know that that takes place, okay?

18     A.    Yes.

19     Q.    To the extent that he engages in any
20  physical content, a kick under the table, for
21  example, you'll let me know if that happens, right?

22     A.    He wouldn't be able to kick me under the
23  table.

24     Q.    Okay.

25     A.    There's like a -- his desk goes down to the

---

Page 12

1  floor.

2          MR. WOLFE:  And, Scott, I wouldn't do so
3  anyway.  I certainly know the rules.

4  BY MR. BURROUGHS:

5      Q.    Okay.  But if that, you know, if that does
6  happen in some way, you'll tell me, right?

7      A.    It would be impossible for him to kick me.

8      Q.    Okay.  The transcript --

9      A.    The desk -- I'm sorry.

10          I said the desk would move if he kicked me.

11     Q.    Understood.

12     A.    The desk would, like, probably, like, go
13  into me.

14     Q.    Okay.  Once we're finished today, you're
15  going to get a transcript prepared by Ms. Essig
16  that's going to have everything that you say and that
17  I say and that anyone else says on the record today.

18          You'll have an opportunity to revise that
19  transcript, but to the extent that you make
20  substantial revisions, or substantive revisions, such
21  as a yes to a no, or a blue to a red, I'll be able to
22  comment on that at time of trial and it may impact
23  your credibility before the jury, so it's important
24  that you only answer my questions if you understood
25  them.  Okay?

---

Page 13

1      A.    Yes.

2      Q.    Have you had any drugs or alcohol or
3  engaged in anything in the last 24 hours that may
4  impact your testimony today?

5      A.    No.

6      Q.    Okay.  Is there any reason why you wouldn't
7  be able to give me your best testimony today?

8          No.

9      Q.    Okay.  Other than speaking with your
10  attorney, did you discuss today's deposition with
11  anyone?

12     A.    No.

13     Q.    Other than your attorney, have you
14  discussed this case with anyone?

15     A.    No.

16     Q.    Have you ever discussed this case, for
17  example, with an Allen Jacobi?

18     A.    I may have.

19     Q.    What's your best estimate as to when that
20  conversation may have taken place?

21     A.    It would be a while ago.

22     Q.    Can you give me your best estimate?

23     A.    Couple of years.

24     Q.    Other than Mr. Jacobi, have you discussed
25  this case with anyone, other than your attorney?

---

**LIL' JOE RECORDS, INC. vs MARK ROSS, ET AL.**
Joseph Weinberger on 10/26/2022

Pages 14..17

Page 14

1    A.    Maybe, like, the attorney I used in New
2  York, Stuart Silfen.
3        Q.    Can you spell that for us?
4    A.    S-I-L-F-E-N.
5        Q.    Anyone else?
6    A.    I don't think so.
7        Q.    Is it your understanding that Mr. Jacobi
8  once represented Luther Campbell?
9    A.    Yes.
10       Q.    Do you understand that he represented him
11 as an individual?
12   A.    I think he represented him as an
13 individual, yeah, and as a corporation.
14       Q.    Can you estimate for me when that
15 representation began?
16   A.    Maybe 1990. I'm not sure.
17       Q.    Do you have any understanding, or can you
18 provide me with an estimate as to when that
19 representation ended?
20   A.    I'm not aware that it ended.
21       Q.    Have you prepared any documents or material
22 to prepare for today's session?
23   A.    No.
24       Q.    Did you bring any documents with you today?
25   A.    No. Just, like, a pair of reading glasses.

Page 15

1        Q.    In thinking about today's deposition, did
2  you prepare any notes?
3    A.    No.
4        Q.    Do you recall seeing a deposition notice
5  relevant to this case?
6    A.    I'm not sure.
7        Q.    Do you recall ever seeing such a notice?
8    A.    I don't remember.
9        Q.    Do you recall ever seeing discovery
10 requests --
11   A.    Yes.
12       Q.    -- to this case?
13   A.    Yes.
14       Q.    And did you participate in preparing the
15 responses to those requests and collecting evidence
16 responsive to those requests?
17   A.    Yes.
18       Q.    I'm going to put a document in front of you
19 we're going to mark as Exhibit 1.
20            Mr. Trechsel will put that on the screen.
21   A.    I have to change my glasses.
22            All right.
23            (WHEREUPON, Defendant's Exhibit 1 was
24            marked for identification.)
25

Page 16

1  BY MR. BURROUGHS:
2        Q.    And we'll scroll through it.
3            Let us know if you want us to scroll more
4  quickly, or less quickly, but I want you to review
5  this and tell me if you've seen it before.
6    A.    I think so.
7        Q.    When do you recall seeing this?
8    A.    A while ago. Like, several months maybe.
9        Q.    And do you recall reviewing the topics --
10   A.    Yes.
11       Q.    -- on Pages 2 and 3?
12   A.    Yes.
13       Q.    Okay. And are you the person at your
14 company who has been designated to testify on these
15 topics?
16   A.    Yes.
17       Q.    Okay. So let's go back up to topic No. 1.
18       Q.    Okay. And I want you to read that
19 paragraph and tell me if you have knowledge in regard
20 to that subject matter.
21   A.    Yes.
22       Q.    And so --
23            MR. WOLFE:  Scott, I'll help you out
24       here.  We'll stipulate he's the person who has
25       the most knowledge of all of the topics listed

Page 17

1        in the subpoena...
2  BY MR. BURROUGHS:
3        Q.    Does Lil' Joe Records, Inc. have any other
4  employees currently?
5    A.    Yes.
6        Q.    How many?
7    A.    One.
8        Q.    And what's that person's name?
9    A.    Detrius Dawson.
10       Q.    Can you spell that, please?
11   A.    D-E-T-R-I-U-S, Dawson, D-A-W-S-O-N.
12       Q.    Okay. And what's Mr. or Mrs. Dawson's job
13 title?
14   A.    He goes -- he's, like, a road manager for
15 the 2 Live Crew and performs in the group
16 Performance.
17       Q.    Okay. So, as road manager, what are his or
18 her day-to-day obligations?
19   A.    He deals with the booking agent regarding
20 shows.
21       Q.    Anything else?
22   A.    He deals with Mr. Mix of the 2 Live Crew
23 and the various dancers.
24       Q.    And in connection with those duties, is he
25 paid as a W-2 employee?

**LIL' JOE RECORDS, INC. vs MARK ROSS, ET AL.**
**Joseph Weinberger on 10/26/2022**                    Pages 18..21

Page 18

1    A.    Yeah, Lil' Joe Records pays him a salary.
2    Q.    Is that as a W-2 employee?
3    A.    Yes.
4    Q.    And he also performs as part of the new 2
5  Live Crew, is that your testimony?
6    A.    It's not the new 2 Live Crew, it's the 2
7  Live Crew.
8    Q.    And he also performs as part of that group?
9    A.    Yes.
10   Q.    Is he paid as a W-2 employee to do that?
11   A.    I think he's paid as a 1099, but from a
12  different company.
13   Q.    And which company is that?
14   A.    Boyz With Da Bass.
15   Q.    Is that an LLC or a corporation?
16   A.    I-N-C.
17   Q.    Okay.  So is it fair to say that Mr. Dawson
18  is paid as a W-2 employee for the work that he does
19  for Lil' Joe Records and as a 1099 employee for his
20  performance in 2 Live Crew by another entity?
21   A.    Yes.
22   Q.    Does Lil' Joe Records have any 1099
23  independent contractors currently?
24   A.    Yes.
25   Q.    How many?

Page 19

1    A.    One.
2    Q.    What is his or her name?
3    A.    Actually, two.
4          Robert MacDonald and Alamundo Cooper.
5    Q.    Would you spell those for us?
6    A.    M-A-C-D-O-N-A-L-D.
7          Cooper, C-O-O-P-E-R.
8    Q.    Cooper's first name, will you spell that
9  for us?
10   A.    A-L-A-M-U-N-D-O.
11   Q.    And what does MacDonald do for Lil' Joe
12  Records?
13   A.    He's a bookkeeper, controller.
14   Q.    And what does Cooper do for the company?
15   A.    He's -- he does various things.
16   Q.    Can you identify for us the things that he
17  does?
18   A.    He could send, like, like, WAV files and
19  things like that to people that want to license songs
20  for TV shows or movies.  Things like that.
21   Q.    And I understand -- well, do you know who
22  you're suing in this case?
23   A.    Do I know who I'm suing?
24   Q.    Correct.
25   A.    Yes.

Page 20

1    Q.    Who are you suing?
2    A.    Mark Ross, Luther Campbell, and the Wong
3  Won children.
4    Q.    Okay.  And why are you suing them?
5    A.    There are variations reasons.
6    Q.    Can you explain those to me, please.
7    A.    They're listed in the complaint.
8    Q.    And what's your understanding as to what
9  those allegations are?
10   A.    Whatever is listed in the complaint.
11   Q.    Okay.  Do you have an independent basis for
12  your response?
13   A.    Yes.
14   Q.    And what's that?
15   A.    Things that I observed.
16   Q.    What did you observe?
17         MR. WOLFE:  Objection to form.
18  BY MR. BURROUGHS:
19   Q.    Go ahead.
20   A.    Do I answer that?
21         MR. WOLFE:  You can --
22  BY MR. BURROUGHS:
23   Q.    Yes, as I mentioned at the outset,
24  Mr. Wolfe may make objections for the record.  Those
25  are just for the record.

Page 21

1          So as long as you understand the question,
2  you should still respond.
3    A.    All right.  What was your question, please?
4    Q.    So you indicated that your complaint is
5  based on things you observed; and I'm asking, what
6  are those things?
7    A.    Things that Mark Ross did.
8    Q.    And what are those things?
9    A.    Used various copyrights that I own, or that
10  my company owns.
11   Q.    And how did Mr. Ross use those copyrights?
12   A.    It's listed in the complaint.
13         Like, various shows, video clips, things
14  like that.
15   Q.    And what copyrights?
16   A.    It's listed in the complaint.
17         I don't -- I don't have them memorized.
18   Q.    Okay.  So as you sit here today, you have
19  no knowledge as to what copyrights are at issue in
20  the case, correct?
21         MR. WOLFE:  Objection to form.
22         THE WITNESS:  It's what's listed in the
23   case.
24  BY MR. BURROUGHS:
25   Q.    Understood.

**LIL' JOE RECORDS, INC. vs MARK ROSS, ET AL.**
Joseph Weinberger on 10/26/2022                    Pages 22..25

Page 22

1        But do you have understanding personally,
2  sitting here today, which copyrights are at issue in
3  the case?
4      A.    I'd have to look at the complaint to
5  refresh my memory.
6      Q.    So as we sit here today, you can't recall
7  any, is that correct?
8        MR. WOLFE:  Objection to form.
9        THE WITNESS:  I can recall some.  I
10  couldn't give you like a -- like a complete list
11  without looking at the complaint.
12  BY MR. BURROUGHS:
13     Q.    Can you identify them for me?
14     A.    The album copyrights.
15        The visual copyrights for As Nasty as They
16  Wanna Be, Shake a Lil' Somethin', Banned in the USA,
17  Move Somethin'.
18     Q.    And how did Mr. Ross use those?
19     A.    In video clips and shows that he did as --
20  as the 2 Live Crew, which he doesn't have a right to
21  use.
22     Q.    And it's your understanding that that
23  violates your copyrights?
24     A.    Copyrights and trademarks.
25     Q.    Other than the allegations against

Page 23

1  Mr. Ross, do you have any understanding as to what
2  you're claiming in violation of your copyrights and
3  trademarks in this case?
4      A.    The Wong Wons used the 2 Live Crew on
5  physical product and digital product.
6      Q.    What type of product?
7      A.    Songs that are on Apple iTunes and 12-inch
8  vinyl records.  CDs.
9      Q.    Okay.  Anything else?
10     A.    CDs meaning compact disks.
11     Q.    Anything else?
12     A.    I don't recall anything else.
13     Q.    Okay.  Do you allege that Campbell is
14  violating your copyrights or trademarks?
15     A.    No.
16     Q.    Are you also claiming that Campbell, Hobbs,
17  and Wong Won heirs don't have the right to terminate
18  the copyright transfer for certain of their albums?
19     A.    Yes.
20     Q.    And why do you believe that?
21     A.    The items are listed in the complaint and
22  the responsive pleadings.
23     Q.    Do you have any independent understanding,
24  or is that based solely from what your lawyer put in
25  the complaint?

Page 24

1        MR. WOLFE:  Objection to form.
2        THE WITNESS:  It's based on, I guess,
3    discussions with my lawyer.
4  BY MR. BURROUGHS:
5      Q.    So as you sit here, are you aware of any
6  factual basis for the claims relating to the
7  termination issue?
8      A.    Yes.
9      Q.    And what are those?
10     A.    That Campbell and Ross don't have a right
11  to terminate because they had filed bankruptcies.
12  And those rights remain with the bankruptcy trustees.
13     Q.    Any other basis?
14     A.    The intention of the termination statute
15  doesn't apply to Campbell because he was the record
16  company owner that the rights were transferred to
17  initially.
18     Q.    Okay.  Any other basis?
19     A.    The termination notice was defective
20  because it didn't list all the transfers that took
21  place.
22     Q.    Anything else?
23     A.    The termination notice didn't list all of
24  the documents for -- that transferred the rights, I
25  guess.

Page 25

1        MR. WOLFE:  One second, Scott, my plug
2    just came out.
3        How's that?
4  BY MR. BURROUGHS:
5      Q.    Anything else?
6      A.    I'm trying to think.
7        I don't recall anything right now.
8      Q.    And looking at your educational history,
9  did you go to law school?
10     A.    Yes.
11     Q.    Where?
12     A.    University of Miami and NYU.
13     Q.    At Miami, were you classmates with
14  Mr. Wolfe?
15     A.    Yes.
16     Q.    And at NYU, was that for an LLM?
17     A.    Yes.
18     Q.    In what?
19     A.    Taxation.
20     Q.    Did you ever take any copyright courses in
21  Miami?
22     A.    No.
23     Q.    Did you ever take any trademark courses?
24     A.    No.
25     Q.    Have you ever had done independent research

Page 26

1  other than on-the-job experience to learn about
2  trademarks or copyrights?
3      A.   I don't understand your question.
4      Q.   Outside of working in the industry, have
5  you done any training or undertaken any research to
6  learn about copyright or trademark law?
7      A.   No.
8      Q.   When did you begin working in the music
9  industry?
10     A.   19 -- I think 1988 or '89.
11     Q.   In what capacity?
12     A.   I did some legal work for Luther Campbell
13 and Luke Records, or the Skyywalker Records that his
14 company was known at the time.
15     Q.   And were you doing work relating to
16 accounting and taxes at that time?
17     A.   No.
18     Q.   What were you doing?
19     A.   Corp -- corporate work.
20          Like formation of corporations, minutes,
21 change of corporate names.
22     Q.   At the time, did you have your own law
23 firm?
24     A.   No.
25     Q.   Where were you working at the time?

Page 27

1      A.   I think the firm name was Bailey, Hunt,
2  Jones & Busto.
3      Q.   And so Mr. Campbell worked -- I'm sorry.
4          Go ahead.
5      A.   What were you saying?
6      Q.   So Mr. Campbell -- Mr. Campbell or his
7  label hired that firm to do corporate work, is that
8  correct?
9      A.   Hired me at that firm.
10     Q.   Were you retained directly, or was the firm
11 retained?
12     A.   I don't remember.
13     Q.   Was it the firm's practice at that time to
14 have clients directly engage with attorneys at the
15 firm?
16     A.   I don't remember.
17     Q.   Were you an associate at the firm at the
18 time?
19     A.   Senior associate.
20     Q.   So you didn't have any equity stake,
21 correct?
22     A.   No.
23     Q.   Well, did you have an equity stake?
24     A.   I said, no.
25     Q.   At some point, did you take on a larger

Page 28

1  role in connection with Mr. Campbell's businesses?
2      A.   I don't understand what you mean by a
3  larger role.
4      Q.   Did you eventually leave the law firm --
5      A.   Yes.
6      Q.   -- to work for Luther Campbell?
7      A.   Yes.
8      Q.   When did that happen?
9      A.   I think in -- I'm not sure exactly.
10          1990, 1991.
11     Q.   And at that time, what was your role in
12 connection with his companies?
13     A.   My role, once I left the law firm?
14          Campbell hired me to work for him and his
15 companies.
16     Q.   Did you have a title?
17     A.   I'm not sure.  I don't think so.
18     Q.   And in 1990 or '91, when you first started
19 at the company, what were your obligations?
20     A.   Obligations for what?
21     Q.   What did you do?
22     A.   I interacted with the other attorneys that
23 Mr. Campbell had.
24          Allen Jacobi, and I guess Milton Rothman.
25          David Bergeson (phonetic).

Page 29

1          Nicolas Manzini.
2          There were other attorneys.
3          Bruce Rogow.
4      Q.   And who was paying you at that time?
5      A.   I think Luke Records was paying me.
6      Q.   Were you a W-2 employee --
7      A.   Yes.
8      Q.   -- at that time?
9      A.   Yes.
10     Q.   Was that the role that you discharged your
11 obligations under for the entire time that you worked
12 with Luke Records?
13     A.   There were various other assignments that
14 Mr. Campbell gave me to do.
15     Q.   And what were those?
16     A.   To interact with the distributors.
17     Q.   Anything else?
18     A.   To interact with his brother running
19 several nightclubs.
20     Q.   Anything else?
21     A.   Deal, I guess, with other employees he had
22 with his management company.
23     Q.   Anything else?
24     A.   I think that covers most of it.
25     Q.   Did you ever work with Luke Skyywalker

**LIL' JOE RECORDS, INC. vs MARK ROSS, ET AL.**
Joseph Weinberger on 10/26/2022                                    Pages 30..33

Page 30

1  Records, Inc.?
2     A.   Yes.
3     Q.   Okay.  When did you work with them?
4     A.   1988.
5     Q.   And what did you do in connection with Luke
6  Skyywalker Records, Inc.?
7     A.   Me, personally, or when I was at a law
8  firm?
9     Q.   You personally.
10    A.   Well, I wasn't employed as a person with
11 Campbell at the time.  I think I was employed through
12 the law firm that I was with.
13    Q.   Okay.  So Luke Skyywalker Records, Inc.
14 retained your law firm at some point?
15    A.   Yes.
16    Q.   And while you were at that law firm -- law
17 firm, you did legal work for Luke Skyywalker Records,
18 Inc., is that correct?
19    A.   Yes.
20    Q.   What legal work did you do?
21    A.   Like, corporate minutes.  Like, reviewed
22 contracts.  Change of corporate names for various
23 entities that -- corporate annual reports, articles
24 and bylaws of new corporation's operations.
25    Q.   Did you form Luke Skyywalker Record, Inc.?

Page 31

1     A.   No.
2     Q.   Do you know who did?
3     A.   I have no idea.
4          I don't -- I don't remember.
5     Q.   So did you --
6          MR. WOLFE:  Scott, I just want to
7  interrupt so we can discuss what we want to do
8  about lunch because if we're gonna -- you know,
9  we're happy to eat it at our desk and continue
10 through, but I just wanted to know if you wanted
11 to go ahead and order food.
12         MR. BURROUGHS:  Do we want to do a lunch
13 break at 1:00?
14         MR. WOLFE:  Well, that's fine.
15         How much time do you need today for the
16 whole depo?  And I'm not holding you to it.
17         MR. BURROUGHS:  Yeah, it's just depends
18 on -- it's going -- you know, it's not
19 necessarily going as fast as a normal depo, so
20 it may take a little bit longer, so I anticipate
21 going the whole day.
22         MR. WOLFE:  Well, I'm reserved until
23 4:30, so that's why I'm suggest -- and if you
24 need as much time as that, then maybe we can
25 just order sandwiches and break for ten minutes

Page 32

1  and eat the sandwiches at our desk.
2          Is that okay?
3          MR. BURROUGHS:  If the court reporter is
4  okay with that, yeah, a 15, 20-minute lunch
5  break is fine.
6          MR. WOLFE:  Okay.  And we'll just figure
7  we'll break at -- at 1:00.
8          So, Joe, what do you want?
9          What kind of sandwich do you want?
10         THE WITNESS:  Just like a plain sandwich.
11         Like, from where?
12         MR. WOLFE:  We'll order it from somewhere
13 down here.  You want to just order a pizza?
14         THE WITNESS:  I'll eat, like, a slice or
15 two --
16         MR. BURROUGHS:  All right.  So we are
17 still on the record, so if you guys want to talk
18 about pizza, we can do it at a break.
19 BY MR. BURROUGHS:
20    Q.   Going back to your law firm's work with
21 Luke Skyywalker Records, Inc., you also were never
22 engaged directly by that company, right?
23    A.   I was engaged by the suc -- I guess the
24 successor company, like when I went to work for Luke
25 Records, Inc.

Page 33

1     Q.   Right.  But for Luke Skyywalker Records,
2  Inc., you were not engaged directly?
3     A.   I don't think so.
4          MR. WOLFE:  Joe, change of plans.  We're
5  going with Roberto's.  Do you want a
6  cheeseburger or a hamburger?
7          MR. BURROUGHS:  Well, let's go off.
8          If you guys are going to talk about
9  lunch, let's go off the record for five minutes
10 and use the restroom and you guys can talk
11 about your burgers, okay?
12         Let's go off the record for five
13 minutes.
14         THE COURT REPORTER:  And just before I go
15 off the record, who's Clarity?  Who is Clarity?
16 Someone named Clarity on there?
17         MR. WOLFE:  I don't know.
18         THE COURT REPORTER:  No one knows?
19         MR. WOLFE:  No, I don't -- I don't know
20 who Clarity is.
21         MR. BURROUGHS:  Yeah, that is the manager
22 of one of our clients.
23         THE COURT REPORTER:  Oh, okay.
24         All right.  If I could, just before we
25 end, get the full name of that person for the

**LIL' JOE RECORDS, INC. vs MARK ROSS, ET AL.**
Joseph Weinberger on 10/26/2022                    Pages 34..37

Page 34

1  appearance page, please.
2      MR. BURROUGHS:  Yeah, I'll email or I'll
3  send you a DM with the spelling.
4      THE COURT REPORTER:  Okay.  Thank you.
5      (Recess.)
6  BY MR. BURROUGHS:
7      Q.  All right.  You understand you're still
8  under oath?
9      A.  Yes.
10     Q.  Okay.  Were you involved, as a lawyer, in
11 changing the name of the entity, Luke Skyywalker
12 Records, Inc., to Skyywalker Records Inc.?
13     A.  Yes.
14     Q.  Okay.  And when you were working with Luke
15 Skyywalker Records, Inc., were you involved at all in
16 their employment or employment legal issues?
17     A.  I don't remember.
18     Q.  Do you recall ever doing any employment law
19 while at that law firm?
20     A.  No.
21     Q.  Okay.  You recall why --
22     A.  Excuse me.
23         What do you mean by employment law?
24     Q.  Anything under the employment law rubric,
25 such as deciding whether someone is an employer or an

Page 35

1  independent contractor, setting guidelines, writing
2  employee handbooks, anything of that nature.
3      A.  Maybe a profit sharing plan.
4      Q.  Okay.  Anything else?
5      A.  I don't recall anything else.
6      Q.  Do you recall drafting a profit sharing
7  plan for Luke Skyywalker Records, Inc.?
8      A.  I think so.
9      Q.  Okay.  Do you recall drafting such a plan
10 for Skyywalker Records, Inc.?
11     A.  There may have been, like, a name change.
12 I don't -- I don't recall specifically.  This is a
13 long time ago.
14     Q.  Were you involved at all with payroll at
15 Luke Skyywalker Records, Inc.?
16     A.  At Luke Skyywalker Records, Inc.?
17         I believe Herman Moskowitz was.  He was --
18     Q.  Were you?
19     A.  I may have been.  I don't recall.
20     Q.  Do you recall any involvement with payroll
21 at Luke Skyywalker Records, Inc.?
22     A.  I -- I don't recall.
23     Q.  Do you recall any involvement with payroll
24 at Skyywalker Records, Inc.?
25     A.  I don't recall.

Page 36

1      Q.  Do you recall why the name Luke Skyywalker
2  Records, Inc. changed to Skyywalker Records, Inc.?
3      MR. WOLFE:  Scott, I just got a 911
4  message from my wife.  Can we have a break for
5  one minute?  And I never get them.
6      MR. BURROUGHS:  That's fine.  Let's go
7  off the record for five minutes.
8      (Recess.)
9  BY MR. BURROUGHS:
10     Q.  All right.  You understand you're still
11 under oath?
12     A.  Yes.
13     Q.  Okay.  Were you involved in the name change
14 of Skyywalker Records, Inc. --
15     A.  Yes.
16     Q.  -- to a new name?
17     A.  Yes.
18     Q.  What was that new name?
19     A.  Luke Records, Inc.
20     Q.  Okay.  At the time of the name change, did
21 you have any ownership interest in Luke Records,
22 Inc.?
23     A.  No.
24     Q.  At the time of the name change, what was
25 your role in connection with Luke Records, Inc.?

Page 37

1      A.  When it changed from Skyywalker Records to
2  Luke Records, I was working at a law firm.
3      Q.  And Luke Records, Inc. retained that law
4  firm?
5      A.  I believe so.
6      Q.  And you performed work for Luke Records,
7  Inc. as an associate at that law firm?
8      A.  Senior associate.
9      Q.  Is that correct?
10     A.  Yes.
11     Q.  Were you involved with payroll for Luke
12 Records?
13     A.  Yes.
14     Q.  What was your involvement?
15     A.  I think I was a signatory on the -- on the
16 checking account.
17     Q.  And did that happen at the time of the name
18 change or later?
19     A.  I think it would be later.
20     Q.  When did you become a signatory on that
21 account?
22     A.  Probably sometime in 1991.
23     Q.  Do you recall how many employees Luke
24 Skyywalker, Inc. had?
25     A.  Are you talking about before it changed the

**LIL' JOE RECORDS, INC. vs MARK ROSS, ET AL.**
Joseph Weinberger on 10/26/2022                      Pages 38..41

Page 38

1  name?  I would say more than ten...
2      Q.     Okay.  Can you recall any of their names?
3      A.     Ricky Norris, Jerry Parker Gabird
4  (phonetic), Linda Fine, Debbie Bennett, Felicia
5  Bivins (phonetic), Luther Campbell, Bernard Campbell.
6  Dwayne Kemp (phonetic).  I think Cormilus Lattimore.
7          Manny Abueg.
8          THE COURT REPORTER:  I'm sorry, what was
9  that last name?
10         THE WITNESS:  Manny Abueg, A-B-U-E-G.
11         THE COURT REPORTER:  Thank you.
12         THE WITNESS:  Monika Hopkins (phonetic).
13  BY MR. BURROUGHS:
14     Q.     Can you recall any others?
15     A.     I think Jerome Taylor, Cedric Walker,
16  Gloria Moseley (all phonetic).
17         Bernard Veargis, Cheryl Randall, Joe
18  Kolsky.  Burt Goldin.  Dickey Hazely.
19         Brian Tobino (phonetic).
20         Ricky Norris (phonetic); I don't if I said
21  it before.
22         I can't think of anyone else right now.
23     Q.     Did Robert MacDonald work at that company?
24     A.     At Luke Skyywalker Records.
25     Q.     When the name changed to Skyywalker

Page 39

1  Records, were any employees added?
2      A.     There were a lot of employees coming and
3  going.
4      Q.     Can you recall any at Skyywalker Records
5  that you didn't already tell me, their names?
6      A.     I don't remember.  I've done -- I'm giving
7  you -- I gave you, like, the names of people I
8  remember.  There were other people, too.
9      Q.     Okay.  So, as you sit here now, you don't
10  recall any other employees, correct?
11     A.     Not right now.
12     Q.     And can you estimate for me how long
13  Skyywalker Records, Inc. was in existence?
14     A.     A few months.
15     Q.     And then the name was changed to Luke
16  Records, Inc.?
17     A.     Yes.
18     Q.     And you did that name change?
19     A.     Yes.
20     Q.     Do you recall if any employees were added
21  when the name was changed to Luke Records, Inc.?
22     A.     Like I said before, there were people
23  coming and going all the time.
24     Q.     Okay.  But as of now, you've told me the
25  names of the employees that you recall for Luke

Page 40

1  Skyywalker Records, Inc., Skyywalker Records, Inc.,
2  and Luke Records, Inc., correct?
3      A.     Yes.
4          A guy named David, I don't remember his
5  last name, that was a bookkeeper at one time.
6      Q.     Anyone else?
7      A.     Robert MacDonald was an employee towards
8  the end of 1994.
9      Q.     Okay.
10     A.     When David -- David was the bookkeeper, I
11  forget what his last name was -- he walked off the
12  job when Luke insulted him when his father died.
13     Q.     What was Mr. Campbell's title at Luke
14  Skyywalker Records, Inc.?
15     A.     President.
16     Q.     Okay.  Was he also president of Skyywalker
17  Records, Inc.?
18     A.     Yes.
19     Q.     Was he also president of Luke Records,
20  Inc.?
21     A.     Yes.
22     Q.     Did you ever obtain an ownership interest
23  in Luke Records, Inc.?
24     A.     No.
25     Q.     Okay.  Did you ever obtain an ownership

Page 41

1  record in Luke Skyywalker Records, Inc.?
2      A.     No.
3      Q.     Did you ever obtain an ownership interest
4  in Skyywalker Records, Inc.?
5      A.     No.
6      Q.     Did you ever have any decision-making power
7  at Luke Skyywalker Records, Inc.?
8      A.     I don't recall.
9      Q.     Okay.  Do you recall ever hiring or firing
10  anyone?
11     A.     Oh, and there was a woman by the name of
12  Glenn Daniels (phonetic), was an employee, also.
13     Q.     Do you recall ever hiring or firing anyone
14  at Luke Skyywalker Records, Inc.?
15     A.     Sometimes Campbell had me fire people.
16     Q.     And you recall doing so at Luke Skyywalker
17  Records, Inc.?
18     A.     I believe so.
19     Q.     Okay.  Who did you fire?
20     A.     Glenn Daniels (phonetic) and Joe Kolsky
21  (phonetic), like several times.
22     Q.     And was it Mr. Campbell's decision to fire
23  those individuals?
24     A.     Yes.
25     Q.     Okay.  And you carried out his

**LIL' JOE RECORDS, INC. vs MARK ROSS, ET AL.**
Joseph Weinberger on 10/26/2022                    Pages 42..45

Page 42

1  instructions?
2      A.    Whatever he told me to do, I did.
3      Q.    Did you have any decision-making power at
4  Skyywalker Records, Inc.?
5      A.    In conjunction with what he told me to do.
6      Q.    Okay.  So he would make the decisions and
7  give you directions, and you would carry those out?
8      A.    Right.
9      Q.    Did you have --
10     A.    Go ahead.  Go ahead.  I'm sorry.
11     Q.    Did you have anything to add?
12     A.    No.
13     Q.    Did you have decision-making power at Luke
14  Records, Inc.?
15     A.    Ah, yes.
16     Q.    Okay.  And did that power exist at the time
17  the name change happened, or sometime thereafter?
18     A.    I would think afterwards.
19     Q.    When were you given decision-making power
20  at Luke Records, and how?
21     A.    When I was employed full time.
22     Q.    Okay.  When did that take place?
23     A.    I think in the spring of 1991.
24           Spring, summer.
25     Q.    And was it Mr. Campbell that hired you?

Page 43

1      A.    I believe he hired me and a Darryl Sharpton
2  (phonetic).
3      Q.    What was Sharpton's role?
4      A.    He was an accountant.
5      Q.    And what was your role or title?
6      A.    I don't recall if I had a title.
7      Q.    Was it something along the lines of general
8  counsel or legal, something in that area?
9      A.    It's possible.
10     Q.    When hired, what were your primary job
11  obligations, legal duties?
12     A.    It was a broad range of duties.
13     Q.    And what were they?
14     A.    To interact with the accountant's attorneys
15  and employees and distributors.
16     Q.    Anything else?
17     A.    I guess in -- in Campbell's family and
18  things like that.
19     Q.    Anything else?
20     A.    I don't think so.
21     Q.    And in that role, did you report to
22  Mr. Campbell?
23     A.    Yes.
24     Q.    And did you take instructions from Mr.
25  Campbell?

Page 44

1      A.    Yes.
2      Q.    And did Mr. Campbell have the last word on
3  all company decisions?
4      A.    I wouldn't say on everything.
5      Q.    What didn't he have the final say on?
6      A.    I guess buying different things, you know,
7  like supplies, his night clubs, and...
8      Q.    Anything else?
9      A.    Paying bills and things like that.
10     Q.    So it's your testimony that if Mr. Campbell
11  disputed a bill, he didn't have the final say on
12  whether a bill was paid?
13     A.    There would be a discussion as to whether
14  his dispute was, like, legitimate.
15     Q.    Okay.  And then who would have the final
16  say?
17     A.    I guess I would discuss it with him with
18  the other attorneys, like on the various matters that
19  he had.
20     Q.    Okay.  And then who would have the final
21  say?
22     A.    I guess it was a consensus.
23     Q.    Do you recall any situation in which
24  Mr. Campbell provided a directive and you or another
25  attorney or accountant refused to follow it?

Page 45

1      A.    There were several times when he wanted me
2  to fire people that I refused to do it because I
3  didn't think he was justified in firing them.
4      Q.    And were those folks not fired?
5      A.    No.  He fired them.
6      Q.    Okay.  So it's fair to say he had the final
7  say on that?
8      A.    I -- I would think so.
9      Q.    So can you think of any time where he
10  didn't have the final say on something?
11           Not at this time.
12     Q.    Okay.  Was there ever any other owner of
13  Luke Records other than Mr. Campbell?
14     A.    No.
15     Q.    And at least as of the spring of 1991, were
16  you the primary lawyer overlooking the Luke Records'
17  business interests?
18           MR. WOLFE:  Objection to form.
19           THE WITNESS:  No.
20  BY MR. BURROUGHS:
21     Q.    Okay.  What other lawyer had that role?
22     A.    Allen Jacobi was in charge of all the
23  entertainment matters.  Like, he's -- he was
24  specialized in entertainment law.
25     Q.    Did he report to you, Mr. Campbell, or

**LIL' JOE RECORDS, INC. vs MARK ROSS, ET AL.**
Joseph Weinberger on 10/26/2022                                   Pages 46..49

Page 46

1  someone else?
2      A.    He would make me aware of what he was
3  doing.
4      Q.    So he would report to you?
5      A.    When he would come into the office, most of
6  the time I would be present for the meetings.
7            Same thing like with Bruce Rogow and things
8  like that.
9      Q.    So other than you and Mr. Jacobi, what
10 attorneys were overseeing the Luke Records' legal
11 issues.
12     A.    Bruce Rogow, Nicolas Manzini, David
13 Bergeson (phonetic), Milton Rothman.
14            I think there was a woman attorney, Heath,
15 I think Heath Heath Lewis or Heath Lewis Mack
16 (phonetic) that was doing work.
17     Q.    What was Manzini's area?
18     A.    He did some litigation.
19     Q.    Was Luke Records, Inc., pleased with the
20 way he handled the litigation that he handled for the
21 company?
22     A.    At what time?
23     Q.    At any time.
24     A.    Initially, he -- Campbell was pleased with
25 it.

Page 47

1      Q.    And at the end?
2      A.    He became displeased.
3      Q.    Why?  If you know.
4      A.    Well, there was a case that was lost.
5      Q.    Which case?
6      A.    The Peter Jones case.
7      Q.    Okay.  Do you recall generally the
8  allegations in that case?
9      A.    I guess.
10     Q.    And what were they?
11     A.    Fraud and royalty dispute.
12     Q.    Is it your understanding that that case was
13 decided adversely to Luke Records?
14     A.    Yes.
15     Q.    And was that ruling a contributor to Luke
16 Records -- well, actually, let me withdraw that part
17 of the question.
18            What became of Luke Records?
19     A.    Luke Records went bankrupt.
20     Q.    Okay.  Was the litigation you just
21 referenced a contributor to that bankruptcy?
22     A.    Eventually.
23     Q.    Why did Luke Records declare bankruptcy?
24     A.    You would have to ask Luther Campbell
25 because I don't -- I don't know.

Page 48

1      Q.    Do you have any understanding as to why it
2  happened?
3      A.    I wasn't employed at the time.
4      Q.    And so is it your testimony that you have
5  no understanding as to why that happened?
6      A.    I wasn't an employee at the time that Luke
7  Records went bankrupt.
8      Q.    No, I under -- I understand.
9            My question, though, is, do you have an
10 understanding as to why it happened?  I don't think
11 that requires employment.
12     A.    Do I understand why Luke Records went
13 bankrupt?  From what I understood is that Campbell
14 was trying to sign a contract with Island Records and
15 he had to disentangle himself from the personal
16 liability that he had from the Peter Jones case.
17     Q.    Okay.  And did you understand at the time
18 that Campbell had asserted, prior to the agreement
19 with Island Records, that he never signed any artist
20 recording agreement with Luke Records?
21     A.    He -- he had said that in the past, yes.
22     Q.    Okay.  And you were aware of that
23 assertion?
24     A.    Yes and no.
25            Like Allen Jacobi had told me that he had

Page 49

1  prepared contracts I think in 1991 that Campbell was
2  under contract.  That Campbell asked him to get
3  everyone under the contract because there had been no
4  contract prior to that time.
5      Q.    And is it your understanding that that
6  agreement was with Luke Records as opposed to another
7  entity?
8      A.    What agreement?
9      Q.    The agreement that you just referenced that
10 Mr. Jacobi mentioned to you.
11     A.    I believe the '91 agreement was with Luke
12 Records, Inc.
13     Q.    And it's your understanding that Mr. Jacobi
14 prepared that agreement?
15     A.    Yes.  There was --
16     Q.    Go ahead.
17     A.    There were a series of agreements.  They
18 were, like, signed, I think, in counterpart.
19     Q.    And have you seen that signed agreement?
20     A.    There were plural agreements.  There were
21 three -- three different agreements.
22     Q.    And have you seen them?
23     A.    Yes.
24     Q.    Did the versions that you've seen include
25 any attachments or schedules?

**LIL' JOE RECORDS, INC. vs MARK ROSS, ET AL.**
Joseph Weinberger on 10/26/2022                                Pages 50..53

Page 50

1    A.    I don't recall.
2    Q.    And based on your review of those
3  agreements, did you dispute Mr. Campbell's assertion
4  that he did not have an artist recording agreement
5  with Luke Records?
6         MR. WOLFE:  Objection to form.
7         THE WITNESS:  Did I dispute it?
8         I don't think it became relevant because
9  I purchased the assets that -- that he sold to
10 me in the bankruptcy.
11 BY MR. BURROUGHS:
12   Q.    Okay.  So you participated in the Luke
13 Records bankruptcy proceedings?
14   A.    Yeah, I purchased assets from Luther
15 Campbell and Luke Records.
16   Q.    Okay.
17   A.    From their bankruptcy estates.
18   Q.    Okay.  And have you said in the past that
19 you bought those assets for cents on the dollar, or
20 something to that effect?
21   A.    I think I -- it said that if everything had
22 been clean, it wouldn't be cents on the dollar, but
23 the -- the assets had, like, return liabilities on
24 them that I had to assume, like substantial return
25 liabilities.

Page 51

1    Q.    Did you believe you were buying the assets
2  at below market value?
3    A.    No.
4    Q.    Okay.  Do you recall ever giving an
5  interview where you claim to have bought the assets
6  at below market value?
7    A.    I'm aware of someone writing something, but
8  that's not what I said.
9    Q.    Which journalist are you referring to?
10   A.    The newspaper that Luther Campbell writes
11 for, The New Times.
12   Q.    And how do you believe you were misquoted?
13   A.    It didn't have the full quote.
14   Q.    What was omitted?
15   A.    What I just told you, that the assets had
16 substantial return liabilities.
17   Q.    Do you recall being misquoted in any other
18 interview?
19   A.    I haven't given very many interviews
20 because of that.
21   Q.    Okay.  Do you recall ever being misquoted
22 in any other interview?
23   A.    I'm not aware of any other interviews.
24   Q.    When you bought the Luke Records assets out
25 of bankruptcy, what did you do with them?

Page 52

1    A.    What do mean, what did I do with them?
2    Q.    Did you start a company to exploit them?
3    A.    I had a company that I started to exploit
4  them, yes.
5    Q.    And what's the name of that company?
6    A.    Lil' Joe Records, Inc.
7    Q.    And that's the plaintiff in this case?
8    A.    Yes.
9    Q.    Okay.  Did you start that company before
10 you bought the Luke Records assets or after?
11   A.    During the time period that I was
12 negotiating.
13   Q.    And at the time that you bought the Luke
14 Records assets, did Lil' Joe Records have any other
15 assets?
16   A.    I was recording some material with the 2
17 Live Crew members and with JT Money and The Poison.
18   Q.    Which 2 Live Crew members?
19   A.    Wong Won, Hobbs, and Ross.
20   Q.    Had any songs been completed at the time
21 you bought the Luke Records assets?
22   A.    I don't -- I'm not -- I don't remember.
23   Q.    Okay.  When did you begin at Lil' Joe
24 Records to work with Wong Won, Hobbs, and/or Ross?
25   A.    '95.

Page 53

1    Q.    And you had met them while working at
2  Luke -- or working with Luke Skyywalker Records or
3  Skyywalker Records?
4    A.    Yes.
5    Q.    How did you approach them about reporting
6  for a Lil' Joe Records?
7    A.    They approached me.
8    Q.    Do you recall when that happened?
9    A.    In 1995.
10   Q.    And did you eventually sign them to
11 agreements with Lil' Joe Records in or around 1995?
12   A.    I think so.
13   Q.    Have you seen those contracts?
14   A.    Not recently.
15   Q.    Did those 1995 agreements pertain to future
16 recordings of projects, or past, or both?
17   A.    I don't remember.
18   Q.    Do you recall if they referenced at all
19 past recordings created by any of those artists?
20   A.    I -- I don't remember.
21   Q.    Did you enter into any written agreements
22 with any of those artists after 1995?
23   A.    Which artists?
24   Q.    Wong Won, Hobbs, and Ross.
25   A.    Yes.

**LIL' JOE RECORDS, INC. vs MARK ROSS, ET AL.**
Joseph Weinberger on 10/26/2022                                      Pages 54..57

1     Q.    What other agreements did you enter into
2  with Wong Won relating to Wong Won's recording
3  services?
4     A.    I think there were some agreements in 2008
5  or 2010.
6     Q.    Did those pertain to the recording of new
7  material?
8     A.    Yes.
9     Q.    What agreements, if any, were entered into
10 with Ross after 1995 between Ross and Lil' Joe
11 Records?
12    A.    The same thing.
13    Q.    Was that also in 2008?
14    A.    Or '10, or both years.
15          I don't know.  I'm not sure.
16    Q.    Did you eventually start a company, Lil'
17 Joe Wein Music, Inc.?
18    A.    Yes.
19    Q.    Okay.  And that was founded when?
20    A.    1995.
21    Q.    And what did that company do?
22    A.    It eventually owned some of the copyrights.
23    Q.    Other than owning copyrights, did it do
24 anything else?
25    A.    I don't -- I don't think so.

1     Q.    Did the entirety of the Lil' Joe Wein
2  copyrights consist of material transferred to it by
3  Lil' Joe Records?
4     A.    I don't think so.
5     Q.    Well, from what other sources did it obtain
6  copyrights?
7     A.    There was some artists that were doing work
8  at Lil' Joe Records.
9     Q.    Why did Lil' Joe Records, Inc. transfer
10 certain of its copyrights to Lil' Joe Wein Music,
11 Inc.?
12    A.    I think BMI recorded them.
13    Q.    Any other reason?
14    A.    I -- I don't recall.
15    Q.    Did Lil' Joe Wein have an agreement with
16 BMI?
17    A.    Yes.
18    Q.    Had Lil' Joe Wein ever had an agreement of
19 BMI?
20    A.    Yes.
21    Q.    Okay.  What did the agreement between Lil'
22 Joe Records and BMI entail?
23    A.    I don't -- I don't know.
24    Q.    Do you recall any of the specifics about
25 that agreement?

1     A.    No.
2     Q.    Do you recall anything about the agreement
3  between BMI and Lil' Joe Wein?
4     A.    No.
5     Q.    Is Lil' Joe Wein music still in existence
6  today?
7     A.    Yes.
8     Q.    Does it have any employees?
9     A.    No.
10    Q.    Are you the sole owner?
11    A.    Yes.
12    Q.    Does it collect royalties?
13    A.    Not very much.
14    Q.    Other than collect royalties, does it
15 receive any other revenues?
16    A.    During what time period?
17    Q.    Currently.
18    A.    I don't think so.
19    Q.    At any time since 1995, is it receiving
20 revenues other than royalty payments?
21    A.    I don't remember.
22    Q.    Are you the sole owner of Lil' Joe Wein?
23    A.    Yes.
24    Q.    Have there ever been any other owners?
25    A.    No.

1     Q.    Are you familiar with a company Pac Jam
2  Publishing, Inc?
3     A.    Yes.
4     Q.    Have you ever had any connection to that
5  company?
6     A.    Connection, can you define the word
7  "connection"?
8     Q.    Have you ever worked with that company?
9     A.    Yes.
10    Q.    In what capacity?
11    A.    I think while I was working at -- for
12 Luther Campbell.
13    Q.    And what's your understanding of what Pac
14 Jam Publishing does?
15    A.    What it did?  It owned certain copyrights
16 of Luke Records.
17    Q.    And did it collect royalties for those
18 works?
19    A.    I don't know.
20    Q.    Do you recall any legal work that you did
21 in connection with that company?
22    A.    There was work.  I don't specifically
23 recall the work.
24    Q.    Did you ever have any ownership interest in
25 that company?

**LIL' JOE RECORDS, INC. vs MARK ROSS, ET AL.**
Joseph Weinberger on 10/26/2022

Pages 58..61

Page 58

1    A.    No.
2    Q.    Relating to Lil' Joe Records, how does it
3  maintain its business files and records?
4    A.    I don't understand your question.
5    Q.    Does it have paper files?  Does it have a
6  filing system?  Does it maintain a Cloud server?
7          Where are its records kept?
8    A.    I guess there are paper records and
9  computerized records.
10   Q.    What was the second thing you mentioned?
11   A.    Computerized records, like QuickBooks.
12   Q.    Okay.  And where are the paper records
13 maintained?
14   A.    At the office.
15   Q.    Okay.  Can you give us the address for the
16 office?
17   A.    6157 Northwest 167th Street.
18   Q.    And how long has Lil' Joe Records been at
19 that address?
20   A.    I think since 1995.
21   Q.    Okay.  Does Lil' Joe Wein also operate out
22 of that address?
23   A.    Yes.
24   Q.    Does Lil' Joe Wein maintain separate
25 records from the Lil' Joe Records?

Page 59

1    A.    Yes.
2    Q.    Does Lil' Joe Records currently have any
3  interest in BMI royalties from the 2 Live Crew works?
4    A.    Yes.
5    Q.    Does Lil' Joe Wein also have such an
6  interest?
7    A.    I don't think so.
8    Q.    Do you recall looking for and producing any
9  of those BMI records relating to royalty payments for
10 the 2 Live Crew works?
11   A.    Yes.
12   Q.    Is there a document retention policy in
13 place at Lil' Joe Records?
14   A.    I don't -- I'm not aware of a specific
15 policy.
16   Q.    Is there a general or oral policy that's
17 employed?
18   A.    I -- I would think so.
19   Q.    And what is that?
20   A.    We would keep copies of, like, the royalty
21 statements.
22   Q.    Do you recall ever destroying or throwing
23 away records in a -- to a substantial degree at any
24 time in the last ten years?
25   A.    What kind of records?

Page 60

1    Q.    Business records.
2    A.    I may have shredded some, like, old
3  receipts and things like that.
4    Q.    Anything else?
5    A.    No.
6    Q.    Okay.  And in terms of the chain of title
7  documents for the copyrights that are at issue in
8  your case, do you recall looking for those and
9  producing all of those to your attorney?
10   A.    Yes.
11   Q.    Are you aware of any that are -- that are
12 missing for any of the works at issue?
13   A.    I'm not aware one way or the other.
14   Q.    I'm going to put a document in front of you
15 that we're going to mark as Exhibit 2.
16         (WHEREUPON, Defendant's Exhibit 2 was
17         marked for identification.)
18 BY MR. BURROUGHS:
19   Q.    I want you to take a moment to scroll
20 through it and tell me if you recognize it.
21   A.    I don't see anything.
22         MR. WOLFE:  Joe, do you need this to go
23   slower?
24 BY MR. BURROUGHS:
25   Q.    Yeah, if you need us to go slower, faster,

Page 61

1  let us know and Mr. Trechsel will do so.
2    A.    Go ahead.  Go ahead.
3          Yeah, I don't think this is an accurate
4  document.  I think it's two documents that are pieced
5  together.
6    Q.    Okay.  And why do you believe that?
7    A.    This contract is with Wong Won, and then it
8  mentions in the notice section, Mark Levinson.
9          Mark Levinson represented David Hobbs.
10   Q.    Okay.  Any other reason?
11   A.    I don't -- I wouldn't know unless I looked
12 at the thing a lot -- a lot closer.
13         But I did notice that when you scrolled by
14 and I saw Mark Levinson's name.
15   Q.    Okay.
16         MR. WOLFE:  Can you go to the signature
17   page, please.  And then one back.
18         MR. BURROUGHS:  You want us to keep going
19   down?
20         THE WITNESS:  Go ahead.
21         MR. WOLFE:  It looks as though you're
22   going into another contract now.
23         THE WITNESS:  It looks like it's a
24   contract with David Hobbs and Mark Ross.
25         MR. BURROUGHS:  We can keep going.

**LIL' JOE RECORDS, INC. vs MARK ROSS, ET AL.**
Joseph Weinberger on 10/26/2022

Pages 62..65

**Page 62**

1    I want you to see the whole exhibit and
2   tell me if you see any other discrepancies or
3   issues with the agreement.
4        MR. WOLFE:  No.  Here's my objection.
5   I would like him to read the whole
6   document, not as to being scrolled.
7        If you'd like, I could print the
8   document, show it to him, and give him an
9   opportunity to read it.
10       MR. BURROUGHS:  We're going to do that on
11  the record.  If you -- again, you can take as
12  much time as you need.
13       MR. WOLFE:  Let me print out the document
14  and give it to him.  If you -- the first one you
15  showed him was a 28-page document that you
16  scrolled through and didn't give him an
17  opportunity to really read.
18       THE WITNESS:  Also, it seems like these
19  contracts are not -- don't have specific dates
20  on them.
21       MR. BURROUGHS:  Uh-huh, okay.
22       We'll keep scrolling here.
23       Keep going all the way to the end so you
24  can see the entire exhibit.
25       THE WITNESS:  Well, it seems like on some

**Page 63**

1   of the pages, there's no page numbers; seems to
2   be cut off.
3        MR. WOLFE:  Scott, here's my suggestion.
4        As you're going by, it appears as though
5   these are exhibits to our complaint.
6        MR. BURROUGHS:  Well, I'm going to just
7   -- there's a situation pending here.  I don't
8   need to -- unless you want to make an objection,
9   I wouldn't like any speaking on the record.
10       MR. WOLFE:  Then I'm going to instruct
11  him not to answer a thing about these documents
12  as you're flipping by them and not giving him an
13  opportunity to read them.
14       So with that, I'm instructing him not to
15  answer any questions, unless you give a full
16  and complete opportunity to read what appears
17  to be 86 pages of documents.
18       MR. BURROUGHS:  Yeah, please take all the
19  time you need.
20       MR. WOLFE:  He can't.
21       You're flipping through it.
22       MR. BURROUGHS:  I hear you saying that,
23  but I don't -- you know, please, if you need
24  more time on any of these pages.  I know it's 86
25  pages, but they appear to be the, you know --

**Page 64**

1        MR. WOLFE:  He's not going to answer any
2   more questions --
3        MR. BURROUGHS:  -- multiple copies of the
4   same agreement to me.  But if you need more
5   time, please let us know, we're not trying to
6   rush you.
7        MR. WOLFE:  But it's not your deposition.
8   It's his deposition.
9        You're showing him 86 pages of three
10  different contracts that you're flipping
11  through at a speed that no one can possibly
12  read them and comprehend them.
13       So, therefore, I am instructing him not
14  to answer any questions until he's had the
15  opportunity to review all 86 pages, which I'm
16  willing to print out and give him that
17  opportunity to do so, but you've refused that
18  request, so I am instructing him not to answer
19  any questions at this time under these
20  circumstances.
21  BY MR. BURROUGHS:
22       Q.   Okay.  Now, do you want to go back to any
23  pages or any sections of the agreement to take
24  another look?
25       MR. WOLFE:  Same instruction.

**Page 65**

1        Don't answer the question.
2        And, again, I'll repeat, I'm willing to
3   print out all 86 pages and give him the
4   opportunity to read it, not as you're flipping
5   through, and -- and because any answer that he
6   gives will only misconstrue his response, which
7   would be inaccurate, unless he had the
8   opportunity to review the document.
9   BY MR. BURROUGHS:
10       Q.   Have you ever seen this document before?
11       MR. WOLFE:  Same instruction.
12  BY MR. BURROUGHS:
13       Q.   Okay.  And are you going to take your
14  attorney's instruction and not answer questions about
15  this contract?
16       A.   Yes.
17       Q.   Okay.  Now, earlier you had indicated that
18  one issue with the contract that you did see was that
19  it was missing dates.  What do you mean by that?
20       A.   On the first page of the document, it says
21  blank day of, and the month.  It didn't have the date
22  filled in.
23       Q.   Okay.  And you mentioned that some of the
24  pages appeared to be cut off because they were
25  missing page numbers; is that accurate?

**LIL' JOE RECORDS, INC. vs MARK ROSS, ET AL.**
Joseph Weinberger on 10/26/2022

Pages 66..69

Page 66

1   A.   Yes.
2        MR. WOLFE:  Again, you're flipping
3   through the pages.  He doesn't have an
4   opportunity to review every page of a moving
5   document.
6        MR. BURROUGHS:  Listen, you've made your
7   objection and instructed him not to answer on
8   this contract, so you've taken that position.
9        We, of course, reserve all rights to
10  move to exclude it because of that instruction,
11  but I'll move on to some -- some other
12  questions.
13       MR. WOLFE:  You can't show him a document
14  that is moving and expect him to be able to read
15  it.  It's unreasonable --
16       MR. BURROUGHS:  He can take as long as he
17  wants, but you've taken your position.
18  That's -- that is, you know, I can't force him to
19  answer, so, like I said, we reserve our rights
20  to move in limine to exclude this particular
21  agreement.
22       MR. WOLFE:  And just so we're clear, I've
23  proffered that I'll print out the document and
24  give him the opportunity to review it so he can
25  then answer whatever question you'd like to

Page 67

1   give.  If you find that --
2   BY MR. BURROUGHS:
3       Q.   So do you have a copy of this contract in
4   your records?
5        MR. WOLFE:  Same instruction.
6   BY MR. BURROUGHS:
7       Q.   Have you ever seen a version of this
8   contract with any exhibits or schedules?
9        MR. WOLFE:  Same instruction.
10  BY MR. BURROUGHS:
11      Q.   And do you know which songs or albums this
12  exhibit covers?
13       MR. WOLFE:  Same instruction.
14  BY MR. BURROUGHS:
15      Q.   And do you believe that this contract
16  relates in any way to the works at issue in this
17  case?
18       MR. WOLFE:  Same instruction.
19  BY MR. BURROUGHS:
20      Q.   And, again, you're going to take your
21  attorney's instruction and not answer, correct?
22      A.   Excuse me?
23      Q.   You're taking your attorney's -- he can
24  instruct you, but you have to say that, yes, you're
25  taking the instruction --

Page 68

1   A.   Yes.
2       Q.   -- in not answering, okay?
3       A.   Yes.
4       Q.   Okay.
5        MR. WOLFE:  And, again, if you want to
6   give him an opportunity to read the document, a
7   reasonable opportunity, he'll answer whatever
8   you'd like put before him.
9   BY MR. BURROUGHS:
10      Q.   Did you provide any contracts to your
11  attorney in connection with this case?
12      A.   Did I provide?  Just copies that I may have
13  had in my files.
14      Q.   How many contracts did you provide to your
15  attorney?
16      A.   I don't know.
17      Q.   One?
18      A.   I would say there's more than one contract.
19      Q.   What's your best estimate as to how many
20  contracts you provided to your attorney?
21      A.   Recording contracts, or what kind of
22  contracts?
23      Q.   Contracts.
24      A.   A bunch.
25      Q.   Between five and ten?

Page 69

1   A.   Could be.
2       Q.   Is that your best estimate?
3       A.   It could be more than ten.  I don't know.
4   I'd have to go back and look.
5       Q.   How many recording contracts did you
6   provide to your attorney in connection with this
7   action?
8       A.   I don't remember.
9       Q.   What would be your best estimate?
10      A.   I don't remember.
11       That's all I could tell you.
12      Q.   So as you sit here today, you don't recall
13  how many recording contracts you provided to your
14  counsel, correct?
15      A.   I -- it was a while ago.  I don't remember.
16      Q.   Do you recall providing any recording
17  contracts to your attorney in connection with this
18  case?
19      A.   Yes.
20      Q.   Do you recall who they were between?
21      A.   No.
22      Q.   Do you recall who hired Nicolas Manzini to
23  handle matters for Luke Records?
24      A.   Luther Campbell.
25      Q.   And were you involved in that decision at

**LIL' JOE RECORDS, INC. vs MARK ROSS, ET AL.**
Joseph Weinberger on 10/26/2022                                    Pages 70..73

1   all?
2       A.   Was I involved?  No.
3       Q.   Did any of the contracts you provided to
4   your attorney in connection with this case have any
5   exhibits or schedules attached to them?
6       A.   I don't recall.
7       Q.   Do you recall any exhibits or schedules
8   being attached to any of the recording agreements
9   that you had with the artist or the defendants in
10  this case, or their predecessors?
11      A.   I don't recall.
12      Q.   So, as you sit here today, is it accurate
13  to say that you don't recall ever seeing an
14  attachment or an exhibit or schedule to any of the
15  recording contracts that you've seen that were
16  entered into by the defendants in this case or their
17  predecessors?
18      A.   I'd have to see the specific contract
19  you're talking about.
20      Q.   But do you recall ever seeing such
21  documents?
22      A.   I think I just answered your question.
23           I would have to see the specific contract.
24      Q.   Understood.
25           So, sitting here -- I just want to confirm,

1   that sitting here right now, is it accurate to say
2   that you don't recall seeing any such schedules or
3   exhibits?  Is that accurate?
4       A.   At one -- at time, these contracts did have
5   exhibits.  The copies I have in my files are not
6   complete copies.
7       Q.   So is it fair to say that the contracts
8   that you produced in this case are incomplete copies?
9            MR. WOLFE:  Objection to form.
10           THE WITNESS:  They're the best copy I --
11  I have.  Anything I produced would be the best
12  copy I have.
13  BY MR. BURROUGHS:
14      Q.   And to the extent that they are incomplete,
15  is it accurate to say that they're incomplete because
16  you were unable to locate a complete copy of the
17  relevant agreement?
18      A.   Yes.
19      Q.   When you looked for the agreements, where
20  did you look?
21      A.   In the files that were given to me by
22  Luther Campbell.
23      Q.   Where were those kept?
24      A.   In my office.
25      Q.   And that's at the address you gave us

1   previously?
2       A.   Yes.
3       Q.   Are those kept in a filing cabinet, in
4   bankers boxes, or in some other way?
5       A.   He gave me a bunch of documents that were
6   just thrown together.  I had to go through the
7   thrown-together documents to try to organize them the
8   best that I could.
9       Q.   And now how are they organized?
10      A.   In files.
11      Q.   Are they organized chronologically?
12      A.   In files by -- by name.
13      Q.   Is that alphabetically?
14      A.   I -- I don't know if it's alphabetical.
15      Q.   Did you organize those yourself, or did you
16  have someone assist you in doing that?
17      A.   I had other people assist me.
18      Q.   And when did you do that organization with
19  those folks?
20      A.   1996, '97, '98.
21      Q.   And do you know if at that time any of the
22  recording contracts had any exhibits or schedules?
23      A.   Some did and some didn't.
24      Q.   And how do you know that?
25      A.   Because some contracts had the titles

1   attached to them, and some -- some didn't.
2       Q.   Do you recall seeing any at that time?
3       A.   What contracts?
4       Q.   Any recording contracts with exhibits or
5   schedules.
6       A.   It was a long time ago.
7            I couldn't tell you in particular.
8       Q.   Okay.  So, as you sit here today, do you
9   recall or no?
10      A.   I don't specifically recall.
11      Q.   Do you recall anything in that regard?
12      A.   Just what I told you.  I was given
13  everything that was -- I was given documents by
14  Luther Campbell that were mixed in with broken glass
15  and things like that.  It took me a long time to go
16  through the documents without cutting my hands, and
17  the employees I had, without cutting their hands, and
18  things like that.
19      Q.   Did you leave Luke Records in the time
20  period leading up to the bankruptcy?
21      A.   No, I was fired.
22           I was locked out of the business.
23      Q.   And can you estimate for me, how many
24  months was that before the bankruptcy was filed?
25      A.   I don't recall.  Maybe -- I don't

**LIL' JOE RECORDS, INC. vs MARK ROSS, ET AL.**
Joseph Weinberger on 10/26/2022                                         Pages 74..77

Page 74

1  specifically recall.
2      Q.    What's your best estimate?
3      A.    I don't specifically recall.
4            It was a short time period.
5      Q.    So, less than three months?
6      A.    I don't recall.
7      Q.    Less than a month?
8      A.    I don't recall.
9      Q.    All you recall is that it was a short
10 period of time before the bankruptcy --
11     A.    Right.
12     Q.    -- filing, correct?
13     A.    Right.
14     Q.    While at Luke Records, did you have any
15 participation in preparing for the bankruptcy filing
16 or the chapter -- the Chapter 7 proceedings?
17     A.    Did I?  No.
18     Q.    Okay.  When you separated from Luke
19 Records, did you take any business records with you?
20     A.    No.
21     Q.    Did you take any documents with you?
22     A.    I was locked out of the company.
23     Q.    Did you take anything with you?
24     A.    I was locked out of the company.
25     Q.    I understand.

Page 75

1            But before you were locked out, did you
2  take anything with you?
3      A.    No.
4      Q.    Other than through --
5      A.    I wasn't --
6      Q.    Go ahead.
7      A.    I said I wasn't aware I was going to be
8  locked out.
9      Q.    Other than through the bankruptcy
10 proceedings, have you ever had the occasion to take
11 possession of Luke Records intellectual property or
12 physical assets?
13     A.    I don't understand your question.
14     Q.    Well, you testified that you bought the
15 Luke Records assets in bankruptcy, correct?
16     A.    Yes.
17     Q.    Did you obtain rights -- well, let's break
18 it up.
19            Did you obtain any intellectual property
20 rights --
21     A.    Yes.
22     Q.    -- that were owned by Luke Records in any
23 other way?
24     A.    I received physical product.
25     Q.    And how did that happen?

Page 76

1      A.    I had a truck pick up the product from Luke
2  Records' warehouse.
3      Q.    Was that part of the bankruptcy purchase,
4  or was that something else?
5      A.    Part of the bankruptcy purchase.
6      Q.    Has there ever been any agreements outside
7  of the bankruptcy proceedings through which your
8  companies obtained ownership of any Luke Records
9  physical products or intellectual property?
10     A.    With who?
11     Q.    With anyone.
12     A.    Yes.
13     Q.    And who's that?
14     A.    There was various lawsuits.
15     Q.    Did one lawsuit involve Mr. Ross?
16     A.    Yes.
17     Q.    And what was obtained by you through that
18 lawsuit?
19     A.    Whatever the documents say was obtained,
20 was obtained.
21     Q.    And do you have any understanding as to
22 what that was or is?
23     A.    No.
24     Q.    Okay.
25     A.    I'd have to look at the specific document

Page 77

1  to tell you.  It happened a while ago.
2            I don't have everything memorized.
3      Q.    When you were employed at Luke Records, did
4  you ever attend private meetings with the 2 Live Crew
5  members?
6      A.    Private meetings, meaning what?
7      Q.    The members and you.
8      A.    No.
9      Q.    Did you ever have any conversations with
10 them about creating music?
11     A.    I saw them create music, like, in the
12 studio and in office settings, and things like that.
13            MR. WOLFE:  Scott, we've been going a
14 little more than an hour and a half.
15            Maybe now is a good time to break for
16 lunch.
17            MR. BURROUGHS:  Yeah, just let me finish.
18            I got a couple more questions on this
19 and then we can break.
20            MR. WOLFE:  No problem.
21 BY MR. BURROUGHS:
22     Q.    Were you -- other than an observer, were
23 you ever involved in 2 Live Crew's -- 2 Live Crew's
24 music creation process?
25            MR. WOLFE:  That's just a scary thought.

**Page 78**

1      THE WITNESS:  During what period of time?
2  BY MR. BURROUGHS:
3      Q.    At any time.
4      A.    I'm not really sure about that.
5      Q.    Do you recall ever giving musical direction
6  or feedback about the music itself to 2 Live Crew?
7      A.    Later on, yes.
8      Q.    Okay.  Well, when you say later on, when?
9      A.    Like, when they were working for me?
10      Q.    What years?
11      A.    Maybe 1995 onward.
12      Q.    Okay.  And generally speaking, what sort of
13  guidance or feedback did you give them?
14      A.    About the structure of the songs, as to --
15  should it be, like, the topics of the songs should be
16  changed.
17      Q.    Do you know if they incorporated your
18  feedback?
19      A.    Yes.
20      Q.    Okay.  Do you recall any feedback other
21  than what you've told me so far?
22      A.    I don't specifically recall.
23            I know that there may have been, like,
24  songs about, like, things that were not a good idea
25  to be recording about.

**Page 79**

1      Q.    Okay.  So when you were at Luke Records,
2  were you responsible for maintaining the documents
3  and business records?
4      A.    No.
5      Q.    Do you know who was?
6      A.    I would say Allen Jacobi, when Allen Jacobi
7  was the lawyer, and whatever Luther Campbell had that
8  was doing his contracts.
9      Q.    Okay.
10            MR. BURROUGHS:  All right.  So we can go
11  off the record now for -- how long do we need?
12            Is a 5-minute break okay for everybody?
13            MR. WOLFE:  No, let's take 15.
14            MR. BURROUGHS:  For a break or for lunch?
15            MR. WOLFE:  Yeah, we have our food here.
16            MR. BURROUGHS:  All right.  So we'll do a
17  lunch break of 15 minutes and come back and --
18            MR. WOLFE:  Come back at about five
19  minutes of.
20            THE COURT REPORTER:  Okay.
21            MR. BURROUGHS:  Yeah, we'll come back at
22  12:55.  Let's go off the record.
23            (Lunch recess.)
24  BY MR. BURROUGHS:
25      Q.    You understand you're still under oath?

**Page 80**

1      A.    Yes.
2      Q.    Okay.  Did you get a chance during the
3  break to review Exhibit 2, the 1991 contract?
4      A.    No.
5      Q.    Okay.  Did -- to your knowledge, did
6  Richard Wolfe ever represent Luther Campbell?
7      A.    I have no idea.
8      Q.    Do you recall ever introducing them?
9      A.    Did I recall introducing Richard Wolfe to
10  Luther Campbell?  No.
11      Q.    Okay.  No, going back to the bankruptcy
12  proceedings, do you recall if that was initially an
13  involuntary or a voluntary matter?
14      A.    I don't recall.
15      Q.    Okay.  Do you recall ever reaching out to
16  any creditors of the label to advise them of
17  potential financial issues?
18      A.    I don't understand what you mean by advise
19  them of financial issues.
20      Q.    Let them know that they may not be paid, or
21  there's a chance that they wouldn't be paid?
22      A.    No.
23      Q.    Okay.  Do you recall ever communicating
24  with Mr. Armada (phonetic) about potential financial
25  issues?

**Page 81**

1      A.    I had told them when I was fired.
2      Q.    And what did you tell them?
3      A.    That I was fired.
4      Q.    Did you tell them anything else?
5      A.    I don't recall specifically what I told
6  them.
7      Q.    Did you make any statements about Luke
8  Records' ability to pay its bills?
9      A.    I don't believe so.
10      Q.    Do you recall communicating with Mr. Stein
11  at that time about Luke Records?
12      A.    Stein?  No.
13      Q.    Do you recall ever reaching out to any
14  creditor of Luke Records to advise them anything
15  about the Luke Records' financial situation?
16      A.    Just that I had been fired.
17      Q.    Are you aware that Campbell, Ross, and the
18  Wong Won heirs sent a termination letter relating to
19  certain albums and a certain series of contracts?
20      A.    Whatever the termination letter says, it
21  says.
22      Q.    Okay.  Do you know what albums that
23  termination letter references?
24      A.    2 Live Is What We Are, Move Somethin', and
25  Nasty as They Wanna Be.

**LIL' JOE RECORDS, INC. vs MARK ROSS, ET AL.**
Joseph Weinberger on 10/26/2022                                   Pages 82..85

Page 82

1    Q.    Okay.  And you recall receiving that
2  termination letter?
3    A.    Yes.
4    Q.    And other than talking to your lawyers, did
5  you do anything in connection with investigating the
6  claims in that letter?
7    A.    I spoke with my wife.
8    Q.    Did you do anything else?
9    A.    Like, whatever my lawyer told me to do.
10   Q.    Who currently owns the copyrights for the
11 sound recordings for those albums?
12   A.    Lil' Joe Records.
13   Q.    And who currently owns the copyright for
14 the compositions for those albums?
15   A.    I believe BMG Rights Management, which is,
16 I believe, that's their correct name.
17   Q.    And how did Lil' Joe Records obtain the
18 copyrights for those three albums?
19   A.    In the bankruptcy and through the various
20 litigation.
21   Q.    And when you say the bankruptcy, you're
22 referring to the Luke Records bankruptcy?
23   A.    The Luther Campbell, Luke Records
24 bankruptcy.
25   Q.    And when you referred to the litigation,

Page 83

1  you earlier referenced the Ross litigation.
2        What other litigation was there?
3    A.    Hobbs litigation and the Wong Won
4  litigation.
5    Q.    And what did your company obtain in the
6  Wong Won litigation?
7    A.    Whatever the documents say, they say.
8    Q.    Do you have any other understanding?
9    A.    Whatever the documents say.
10   Q.    Did it obtain ownership of any copyrights?
11   A.    Whatever the documents --
12   Q.    Can you identify any copyrights that it
13 obtained in the litigation?
14   A.    Whatever the documents say.
15   Q.    So, as you sit here today, is it fair to
16 say that you don't recall any of the copyrights that
17 were obtained in the Wong Won litigation?
18   A.    Whatever the documents say.
19   Q.    But aside from what's in the documents, do
20 you have personal --
21   A.    I'd -- I'd have to look at the documents to
22 refresh my memory.  I don't have everything.
23   Q.    Okay.  What documents would you look at?
24   A.    The settlement agreements and the copyright
25 transfers.

Page 84

1    Q.    And for the Wong Won litigation, what
2  copyright transfers are you referring to?
3    A.    I -- I don't know off the top of my head.
4        I'd have to look and see.
5    Q.    So is it fair to say for all of the
6  litigation, at least as you sit here today, you have
7  no independent recollection of what was obtained in
8  connection with 2 Live Crew copyrights?
9    A.    Whatever was obtained was obtained through
10 the bankruptcy transfers and the various sets of
11 litigation and affirmation of things and other
12 agreements later on.
13   Q.    And then, other than referring to the
14 documentation, can you distinguish what was obtained
15 through Lil' Joe Records through the bankruptcy as
16 opposed to the litigation?
17   A.    I'd have to specifically look.
18        I don't want to guess.
19   Q.    Do you have any general understanding?
20   A.    As I said, I would have to look.
21        I don't want to guess.
22   Q.    Okay.  So if you have any understanding at
23 all, let me know.
24   A.    I told you I would have to look at the
25 documents.

Page 85

1    Q.    Okay.
2    A.    To -- to be specific.
3    Q.    Okay.  So given that you weren't able to
4  tell me anything, I'm going to understand that as you
5  sit here, you don't recall, you'll need to look at
6  the records to obtain an understanding.  Okay.
7        Do you recall receiving the termination for
8  those three albums in or around November 4th, 2020?
9    A.    I don't know if it was November 4th.
10   Q.    Okay.  We're going to put a document in
11 front of you we're going to mark as Exhibit 3.
12        (WHEREUPON, Defendants' Exhibit 3 was
13        marked for identification.)
14 BY MR. BURROUGHS:
15   Q.    Take a moment to review this.  If you want
16 us to go faster or slower, let us know and we will.
17        And after you review it, tell me if you
18 recognize it.
19   Q.    Okay.  Do you recognize this document?
20   A.    It looks familiar.
21   Q.    Okay.  How do you recognize it, and what is
22 it?
23   A.    It says that it's like a notice of
24 termination.
25   Q.    And do you understand it to be a letter

**LIL' JOE RECORDS, INC. vs MARK ROSS, ET AL.**
Joseph Weinberger on 10/26/2022                     Pages 86..89

Page 86
1 purporting to terminate transfers relating to the
2 three -- three albums that we mentioned earlier, 2
3 Live Crew Is What We Are, Move Somethin', and Nasty
4 as They Wanna Be, as well the alternates of those
5 albums?
6     A.    Yes.
7     Q.    And if I call those the subject albums
8 while we discuss them, will you understand that to
9 mean the albums I just identified?
10    A.    Yes.
11    Q.    Okay.  And do you dispute that the
12 termination set forth in Exhibit 3 is a valid
13 termination?
14    A.    Yes.
15    Q.    Why?
16    A.    My lawyers listed it out as to why.
17    Q.    Do you have any understanding as to why?
18    A.    What my lawyer has told me.
19    Q.    Anything else?
20    A.    What my lawyer has told me.
21    Q.    Anything outside of what your lawyer has
22 told you?
23    A.    Basically what --
24          MR. WOLFE:  I'm going to object and call
25 for a legal conclusion and I would bar him to

Page 87
1 disclose attorney-client privileged
2 communications.
3 BY MR. BURROUGHS:
4     Q.    Go ahead.
5          MR. WOLFE:  No.  I'm instructing him not
6 to answer.
7          THE WITNESS:  Yeah, I'm not going to
8 answer.
9          MR. BURROUGHS:  Okay.  We reserve the
10 right to move on that as well on the similar
11 basis as before.
12 BY MR. BURROUGHS:
13    Q.    Did you sign and return this letter where
14 indicated?  And we can scroll down to where the
15 signature block is.  I believe it's on Page 3.
16    A.    No.
17    Q.    Okay.
18    A.    I don't know what that is.
19    Q.    Did you sign -- have you signed that
20 signature block at any time?
21    A.    I don't believe so.
22    Q.    And why is that?
23    A.    I didn't see a necessity to sign that in
24 return.
25    Q.    Do you contend that any of the factual

Page 88
1 allegations in the termination are inaccurate?
2     A.    Yes.  Like, my lawyers listed them out.
3     Q.    Which ones?
4     A.    My lawyers listed them out.
5     Q.    Do you have any other response to the
6 question, do you dispute that any of the factual
7 allegations in the letter are false?
8     A.    My lawyer has listed them out, the reasons.
9     Q.    And I'm not asking now for the legal
10 reasons.  I'm asking for factual allegations.
11          Do you dispute any of the factual
12 allegations in Exhibit 3?
13    A.    My lawyers listed them out.
14    Q.    You have any response other than your
15 lawyers listed them out?
16    A.    No.
17    Q.    And where did your lawyers list them out?
18    A.    In the responsiveness pleadings.
19          In the -- in the complaint and in the
20 responsive pleadings.
21    Q.    Anywhere else?
22    A.    It's like what I told you.
23    Q.    Anywhere else?
24    A.    I have told you.  I think you keep on
25 asking the same question.

Page 89
1     Q.    Yeah.  So just yes or no.  So --
2     A.    I still --
3     Q.    -- other than what you've told me --
4     A.    I still --
5     Q.    -- anywhere else?
6     A.    I still have the same answer.  So you can
7 ask me ten times, 15 times; still the same answer I'm
8 going to stick with, my lawyers told me.
9     Q.    Okay.  Anywhere else?
10          It's just yes or no.
11          If it's only where your lawyers put it in
12 the responsive pleading, that's fine, but I just need
13 an answer yes or no.
14    A.    There's no other place other than what I've
15 told you.
16    Q.    Thank you.
17          Can you identify any evidence that disputes
18 the allegations in Exhibit 3?
19    A.    My lawyer has the evidence.
20    Q.    What evidence?
21    A.    My lawyer has the evidence.
22    Q.    What is that evidence?
23    A.    You have to ask him.
24          He's listed it out for you.
25    Q.    Are you aware of any evidence?

Page 90

1    A.   It's what my lawyers listed, that's what
2  I'm aware of.
3      Q.   Okay.  Where is that listed?
4      A.   In the -- in the documents that I told you
5  about.  In the complaint and in the responsive
6  pleadings.
7      Q.   Okay.  Are they listed anywhere else?
8      A.   Like, we keep on going through the same
9  thing.  Like, I don't -- I don't know why you keep
10 asking the same question.
11     Q.   Just yes or no.
12     A.   It's in the complaint and in the responsive
13 pleadings.
14     Q.   Okay.  And now, is it anywhere else?
15     A.   It's in the complaint and the responsive
16 pleadings.
17     Q.   If it's anywhere other than those two
18 places, let me know now.
19     A.   Do you want to go on, or are you going to
20 keep asking the same question?
21     Q.   Well, I'm just giving you an opportunity to
22 identify anywhere else, and you haven't, so I can
23 move on for the record.
24     A.   I'm -- I'm not aware of any -- anywhere
25 else.

Page 91

1      Q.   How did the members of 2 Live Crew first
2  transfer their copyrights in the subject albums?
3      A.   I don't know.
4      Q.   Do you know who they transferred them to?
5      A.   I don't know.
6      Q.   Do you have any understanding as to how any
7  record company came to own the copyrights for the
8  sound recordings to the subject albums?
9      A.   It was sold to me in the bankruptcy.
10     Q.   By whom?
11     A.   Luke Records and Luther Campbell.
12     Q.   Who sold you the copyrights for the sound
13 recordings for the subject albums?
14     A.   I just told you.  Luther Campbell and Luke
15 Records.
16     Q.   Was it both of them?
17     A.   I believe so.
18     Q.   Do you know which of them owned which
19 rights?
20     A.   I don't know.
21     Q.   Which rights did Luke Records sell you?
22     A.   I don't know.  I -- I don't have the
23 documents in front of me, so I can't tell you.
24     Q.   Which rights did Luther Campbell sell you?
25     A.   I just told you.  I don't have the

Page 92

1  documents in front of me, so I can't tell you.
2      Q.   How did Luke Records obtain those
3  copyrights?
4      A.   I'm not sure.
5      Q.   How did Luther Campbell obtain those
6  copyrights?
7      A.   I'm not sure.
8      Q.   Do you have any understanding as to how
9  they obtained any copyrights that they then
10 transferred to you?
11     A.   They're in the documents.
12     Q.   Other than that, do you have any
13 understanding?
14     A.   They transferred documents in the
15 litigation, so this stuff got transferred.
16     Q.   Understood.
17     And that's how it got transferred to Luke
18 Records, is that your testimony?
19     A.   The litigation.  The litigation was
20 after -- afterwards.
21     Q.   Right.  And so my question is, how did Luke
22 Records obtain those copyrights?
23     A.   I don't know.  I told you that.
24     I don't know.
25     Q.   And how did Luther Campbell obtain those

Page 93

1  copyrights?
2      A.   I'm not specifically sure.
3      Q.   Do you know anything about how he obtained
4  those copyrights?
5      A.   Other than what Allen Jacobi told me, that
6  there was a contract that he drafted, I believe those
7  contracts in 1991, I -- I believe were the only
8  contracts.
9      Q.   Okay.
10     A.   Based on what Allen Jacobi told me.
11     Q.   Do you have any other basis for that
12 understanding?
13     A.   Other than, you know, like the bankruptcy,
14 the bankruptcy transferred documents, and the
15 subsequent litigation with the individual members
16 where they raised the issues as to whether I owned
17 this thing, where it was resolved in that litigation.
18     Q.   Okay.  But those were transfers to Lil'
19 Joe, right, not Luke?
20     A.   I think that there's agreements in 2008 or
21 2010 with Ross and Wong Won where they acknowledge
22 that all of the stuff that was transferred from Luke
23 Records to me was -- everything that was transferred
24 back then.
25     Q.   Any other basis?

**LIL' JOE RECORDS, INC. vs MARK ROSS, ET AL.**
Joseph Weinberger on 10/26/2022                              Pages 94..97

Page 94

1    A.   No.
2    Q.   Okay.  Had the subject albums been recorded
3 in 1991?  Let me withdraw the question and ask it
4 more cleanly.
5         Were the subject albums recorded before
6 1991?
7    A.   I -- I don't know.
8    Q.   Were at least one -- or was at least one of
9 the subject albums recorded before 1991?
10    A.   I think so.
11    Q.   Isn't it true that 2 Live Crew Is What We
12 Are was recorded before 1991?
13    A.   I believe so.
14    Q.   And isn't true that Move Somethin' was
15 recorded before 1991?
16    A.   I believe so.
17    Q.   And isn't true that As Nasty as They Wanna
18 Be was recorded before 1991?
19    A.   I believe so.
20    Q.   Okay.  So as a 1991, those three albums had
21 been recorded, correct?
22    A.   I believe so.
23    Q.   What was your involvement, if any, in the
24 drafting of the 1991 agreement that you referenced?
25    A.   Very little.

Page 95

1         Allen Jacobi was the entertainment lawyer
2 for Luther Campbell and Luke Records.
3    Q.   What involvement, if any, did you have?
4    A.   I don't recall that much involvement.
5    Q.   Do you recall having any involvement?
6    A.   I don't recall much involvement.
7    Q.   Do you recall any?
8    A.   I don't recall much involvement.
9    Q.   Okay.  What if anything do you recall doing
10 in connection with that agreement?
11    A.   I don't recall.
12    Q.   Other than Mr. Jacobi, did anyone have a
13 hand in drafting it, to your knowledge?
14    A.   Mark Levinson.
15    Q.   And who did Mr. Levinson represent?
16    A.   I believe he represented David Hobbs.
17         He may have represented the other members,
18 as well, but I'm not sure.
19         So, like my statement earlier where Mark
20 Levinson was listed, it may be because the contracts
21 were executed in counterpart, and he did, I guess,
22 work on the contract on behalf of at least David
23 Hobbs.  I don't know about the other -- the other
24 members.
25    Q.   And is your understanding that that 1991

Page 96

1 agreement was for the recording of future projects by
2 the 2 Live Crew members?
3    A.   No.
4    Q.   And why?
5    A.   Because I was told by Allen Jacobi that it
6 wasn't.
7    Q.   Any other basis?
8    A.   I believe the documents on that basis deal
9 with prior recordings.
10    Q.   Any other basis?
11    A.   No.
12    Q.   Okay.  And what did he tell you that led
13 you to believe that it wasn't just for perspect --
14 perspective recordings?
15    A.   That Luther Campbell had told him that he
16 needed to get, quote-unquote, the guys on the
17 contract because they were not under contract for
18 anything.
19    Q.   Did he tell you anything else?
20    A.   I believe that's it.
21    Q.   Okay.  Did he tell you about the 1987
22 contract that he drafted?
23    A.   He didn't --
24         MR. WOLFE:  Objection to form.
25         THE WITNESS:  He didn't -- he wasn't

Page 97

1 Luke's attorney in 1987.
2 BY MR. BURROUGHS:
3    Q.   Do you know when he became Luke's attorney?
4    A.   I think in 1990.
5    Q.   Did he tell you of a contract that he
6 drafted in 1990 relevant to 2 Live Crew?
7    A.   No.  He told me that there was -- the '91
8 contract was the only contract.  But he specifically
9 told me that.
10    Q.   And as far as you know, Mr. Jacobi was not
11 involved in drafting any other recording agreement
12 between a record label and the members of 2 Live
13 Crew, correct?
14    A.   He said that that was the only agreement
15 that existed -- well, I think the only recording
16 contract that existed.
17    Q.   And that's in reference to the '91
18 agreement, correct?
19    A.   The '91 counterpart agreements, I'll call
20 them, like, had --
21    Q.   Have you --
22    A.   -- three contracts.
23    Q.   Have you ever seen any other agreements
24 between the members of 2 Live Crew and any record
25 label?

**LIL' JOE RECORDS, INC. vs MARK ROSS, ET AL.**
Joseph Weinberger on 10/26/2022                      Pages 98..101

Page 98

1    A.    Wong Won had given me a copy of the undated
2  contract in a litigation that I had with him.
3    Q.    Okay.  And what's your understanding as to
4  that agreement?
5    A.    That it's a phony contract.
6    Q.    And why is that?
7    A.    That it was made with Skyywalker Records.
8          Skyywalker Records didn't exist in 1987.
9          That the contract only had, like, a
10 one-year contract without an option that had to be
11 renewed for each subsequent year.
12   Q.    Any other reason?
13   A.    I think that -- and also I think the
14 address of Luke Skyywalker Records in '87 wasn't at
15 3050 Biscayne Boulevard.
16   Q.    Any other reason?
17   A.    I think that's it.  Unless my attorneys
18 listed something else.
19   Q.    Okay.  Did any of the signatories to the
20 agreement ever tell you it was phony?
21   A.    Yes.
22   Q.    Who?
23   A.    All of them.
24   Q.    What did they tell you in that regard?
25   A.    They said that there was no contract that

Page 99

1  existed until after the Nasty as They Wanna Be album.
2    Q.    Okay.  Did they tell you anything else?
3    A.    They each independently told me that.
4    Q.    Okay.  So it's your testimony that, at the
5  very least, Ross, Wong Won, and Campbell told you
6  that the agreement with the 1987 date is phony?
7    A.    Well, Campbell told me that there was never
8  a contract at all, which I don't believe is correct
9  because there's the '91 agreements.
10         And Hobbs also told me that there was no
11 contract that was done until after the Nasty as They
12 Wanna Be album.
13   Q.    Okay.  So Hobbs did tell you that he signed
14 that contract, is that accurate?
15   A.    No.  He didn't tell me he signed the
16 contract.  He said there was never a contract done
17 until after the Nasty as They Wanna Be album.
18         He didn't say he signed that contract.
19   Q.    Was he referring to the agreement with the
20 1987 date?
21   A.    He was referring to the '91 agreements.
22   Q.    And how do you know that?
23   A.    Because he told me.  He said there was no
24 contracts.  The only contract that existed was the
25 one that was done after the Nasty as They Wanna Be

Page 100

1  album.
2    Q.    Okay.
3    A.    Which would be the '91 -- the '91
4  contracts.
5    Q.    Are you aware as to whether the agreement
6  with the '87 date was done after the Nasty album?
7    A.    I have no idea.
8    Q.    Would it surprise you to learn that?
9    A.    Yes.
10   Q.    Why?
11   A.    Because Allen Jacobi told me that there was
12 no contract, and he was Luke's entertainment lawyer,
13 and Luke told him that he had no contracts with him.
14   Q.    Okay.
15   A.    So it would surprise me that that contract
16 was -- was -- was in contract because it'd contradict
17 what Luke said and what Allen Jacobi were saying.
18   Q.    Okay.  For any other reason other than what
19 you've told me already?
20   A.    That seems to be it.
21   Q.    Okay.
22   A.    Like -- and the various reasons I listed.
23   Q.    In your experience in the industry, have
24 you ever had an oral agreement that you later
25 memorialized in writing?

Page 101

1    A.    Well, I don't think you can transfer
2  copyrights pursuant to an oral agreement.  I think
3  you need a written agreement.  But I don't want to
4  speculate.  Like, I'm not, like, an expert witness as
5  to any of this stuff.
6    Q.    All right.  So we'll ask about your
7  personal experience in the industry.
8          Have you ever had an oral agreement that
9  you later memorialized in writing?
10   A.    No.
11   Q.    Never?
12   A.    No.
13   Q.    Are you aware of such agreements being
14 legally binding?
15   A.    No.
16   Q.    And in your experience, you've never seen a
17 copyright transfer that was oral and later
18 memorialized in writing, correct?
19         Right.
20   Q.    Looking back at Exhibit 3.
21         Mr. Trechsel will put that up on your
22 screen for you.
23         We're going to look at the dates in the
24 matrix here in the letter.
25         All right.  So looking there at -- it's

**LIL' JOE RECORDS, INC. vs MARK ROSS, ET AL.**
**Joseph Weinberger on 10/26/2022**                    Pages 102..105

Page 102

1  Page No. 4 of the letter, 2 Live Crew IS What We Are
2  is the title, publication date is December 1, 1986.
3          Does that reconcile with your recollection
4  when that album was published?
5      A.   I'm not sure.
6      Q.   Okay.  We're going to put an exhibit in
7  front of you we're going to mark as Exhibit 4.
8          (WHEREUPON, Defendants' Exhibit 4 was
9          marked for identification.)
10 BY MR. BURROUGHS:
11     Q.   I want you to take a look at it and tell me
12 if you recognize it.
13          I'll scroll through it.  If you want us to
14 go faster or slower, let us know.
15          Okay.  Do you need to go back and see any
16 specific pages or look at anything for a longer
17 period of time?
18          MR. WOLFE:  I'm going to object.
19          You've shown him about 40 pages of
20     documents in a scroll-through fashion.  He
21     couldn't possibly take in, comprehend, remember
22     any one of those pages.  It's impossible.
23 BY MR. BURROUGHS:
24     Q.   Do you need any more time to see any of the
25 pages?  We're happy to give you more time, as with

Page 103

1  all of the exhibits, to -- to review it so you feel
2  comfortable.
3          MR. WOLFE:  Sure.  If you want me to
4     print them out, I'll give him the time to do it.
5  BY MR. BURROUGHS:
6      Q.   Do you want to look at any of these pages?
7          MR. WOLFE:  Same objection.
8  BY MR. BURROUGHS:
9      Q.   Go ahead.
10          MR. WOLFE:  How would we know which page
11     to look at when you've flipped through 50 pages
12     of documents?
13          MR. BURROUGHS:  I think it's 32, but,
14     again, if you --
15          (Cross-talk.)
16          MR. WOLFE:  That's my point.
17          How would he be able to calculate?
18 BY MR. BURROUGHS:
19     Q.   Do you want to go to any particular page,
20 or no?
21          MR. WOLFE:  Same objection, and I'm going
22     to instruct him not to answer until you give him
23     the opportunity to read all 32 pages, which I'm
24     happy to do if you want to send me the document,
25     I'll print it out, and I'll give it to him.

Page 104

1  BY MR. BURROUGHS:
2      Q.   Are you going to take your attorney's
3  instruction?
4      A.   Yes.
5      Q.   All right.  So I'll ask you -- so
6  understanding that you are refusing to testify about
7  the matters in Exhibit 4, which appear to me to be
8  copyright registrations, we'll move on and we won't
9  ask questions on those.
10          But, of course, we reserve the right --
11          MR. WOLFE:  Object to form.  Live
12     statement.
13          MR. BURROUGHS:  -- to move in limine as
14     mentioned before for the basis given on the
15     record before.
16 BY MR. BURROUGHS:
17     Q.   Were you involved in preparing any
18 copyright registrations at any of the record labels
19 that Mr. Campbell owned?
20     A.   No.
21     Q.   Okay.  Have you received any copy --
22     A.   I don't -- I don't believe so.
23     Q.   Okay.  Have you ever seen any of those
24 copyright registrations?
25     A.   I believe Mr. Black got me copies of them

Page 105

1  because I was never given any copies of the
2  documents.
3      Q.   Okay.  Do you recall ever reviewing those
4  registrations?
5      A.   No.
6      Q.   Did Luke Skyywalker Records, Skyywalker
7  Records, or Luke Records ever claim that any of the
8  subject albums were works for hire?
9      A.   I don't -- I don't know.
10     Q.   Are you aware of them ever making such a
11 claim?
12     A.   I'm not sure.  I don't know.
13     Q.   Okay.  And isn't it true that the
14 registrations that were filed for the subject works
15 did not indicate that the subject works were works
16 for hire?
17     A.   I -- whatever the documents say they say,
18 they say.
19     Q.   Okay.  And you certainly don't recall ever
20 seeing a registration that stated that they were
21 works for hire, correct?
22     A.   I believe the sound recordings state that.
23     Q.   Okay.  Any others?
24     A.   I'm not sure.
25     Q.   Let's pull down Exhibit 4 and we'll put up

**LIL' JOE RECORDS, INC. vs MARK ROSS, ET AL.**
Joseph Weinberger on 10/26/2022                    Pages 106..109

Page 106

1  Exhibit 5 for you to take a look at.
2          (WHEREUPON, Defendants' Exhibit 5 was
3          marked for identification.)
4  BY MR. BURROUGHS:
5      Q.    And we'll scroll through this.
6          Again, let us know if you want us to go
7  faster or slower, and take all the time you need.
8          MR. WOLFE:  And the same objection as
9  before.  If you want me to print them out, I'll
10  show it to him, but he can't possibly read a
11  document as you scroll through it.
12  BY MR. BURROUGHS:
13     Q.    Are you able to read the document?
14         I see it's only three pages.
15         MR. WOLFE:  Yes, for the first time you
16  stopped rather than scroll.
17         MR. BURROUGHS:  I don't think that's
18  true, but...
19  BY MR. BURROUGHS:
20     Q.    Are you able to read the document?
21     A.    The part that you have on there, yes.
22     Q.    Okay.  Would you like us to go back to the
23  top?
24     A.    What -- what was your question?
25     Q.    Would you like us to go back to the top?

Page 107

1      A.    You can if you want.
2      Q.    Okay.  I just want to make sure that you're
3  comfortable and you've had an opportunity to review
4  this exhibit like the others.
5          Have you seen this document before?
6      A.    Yes.
7      Q.    When did you see this document and what is
8  it?
9      A.    It's a Form SR.
10     Q.    Okay.  And what's your understanding of
11  what a Form SR is?
12     A.    It's a copyright registration for sound
13  recordings.
14     Q.    Okay.  Is this a copyright registration for
15  a sound recording submitted by your company?
16     A.    Yes.
17     Q.    And is this a sound recording that was
18  submitted at least five years after the sound
19  recording was created?
20     A.    I believe so.
21     Q.    Okay.  Why did you submit this
22  registration?
23     A.    I think I was told I needed to have
24  registrations in order to borrow against the
25  copyrights or to sell them.

Page 108

1      Q.    Okay.
2      A.    Even though -- even though I acquired them
3  in a bankruptcy.
4      Q.    Any other reason?
5      A.    No.
6      Q.    Okay.  Is everything in this registration
7  accurate?
8      A.    I believe so.
9      Q.    Okay.  You see there's a section there that
10  asked the question, "Was this contribution to the
11  work a 'work made for hire'"?
12         Do you see that?
13     A.    Yes.
14     Q.    Okay.  What is your answer there?
15     A.    Yes.
16     Q.    Okay.  Is it fair to say that -- that the
17  "No" box also has some sort of indication on top of
18  it?
19     A.    No, because there's a comment on the next
20  page where a person from the copyright office spoke
21  with Joe Stewart and the document was corrected or
22  clarified.
23     Q.    And how was it clarified?
24     A.    The box says "yes," and the no thing is
25  lined out.

Page 109

1      Q.    Okay.  So is it fair to say that when Lil'
2  Joe Records first submitted its registration, the box
3  "No" was checked in the work-made-for-hire section?
4      A.    I'm not sure.  I didn't do the -- I didn't
5  do the filing.  It was -- Joe Stewart did.
6      Q.    Is this a Lil' Joe Wein business record?
7      A.    I believe so.
8      Q.    Okay.  So is it fair to say that after
9  speaking with the copyright office, Lil' Joe Records
10  changed the answer to the work-for-hire question from
11  no to yes?
12     A.    I guess there was a clarification.  I
13  wasn't involved, obviously not.  Joe Stewart.
14     Q.    Did it change it from no to yes, or from
15  yes to no?
16     A.    I don't know how that document originally
17  existed, so I wouldn't be able to answer the
18  question.
19     Q.    Okay.  So, as sit here today, is it fair to
20  say that you're unaware as to whether the work for --
21  work-made-for-hire question is a yes or a no?
22     A.    It's a yes.
23     Q.    Okay.  And was that changed from a no?
24     A.    I have no idea.
25     Q.    And why do you believe it was a yes?

**LIL' JOE RECORDS, INC. vs MARK ROSS, ET AL.**
Joseph Weinberger on 10/26/2022                    Pages 110..113

1    A.   Because it's obviously a yes and there's a

2  comment stating that it's a yes.

3    Q.   Okay.  Let's look at that.

4        Will you point out what page that comment

5  is on?

6    A.   Page 2.

7    Q.   All right.  Stop.

8    A.   It says, "Amended by CO, authority

9  telephone conversation" -- conversation is spelled

10  wrong, "with Joe Stewart, authorized agent, on

11  2/20/02.

12    Q.   Okay.  And does that state that it was

13  changed from a yes to a no, or a no to a yes, or

14  anything in regard to the work-for-hire?

15    A.   I would believe it says it's a yes because

16  it's got an asterisk, but I'm just guessing.

17    Q.   Okay.  So is it fair to say that you're

18  guessing in response to these questions about the

19  work-made-for-hire section?

20    A.   It appears that it's a yes.

21    Q.   But is that a guess?

22    A.   It appears on the face of the document that

23  it says yes.

24    Q.   Do you have any other basis for that

25  response other than what's seen here on Page 2 after

1  the asterisk?

2    A.   On Page 1, the box has a asterisk at the

3  yes.

4    Q.   Okay.  Did you consult with any of the

5  members of 2 Live Crew before filing this

6  registration?

7    A.   No.

8    Q.   Have you ever made any of them aware of

9  this registration?

10    A.   They were -- everyone was aware of that.

11    Q.   Of this registration?

12    A.   Yep.

13    Q.   How were they made aware of it?

14    A.   Because there was a prior litigation where

15  this stuff was given to them in discovery.

16    Q.   Okay.  Which case was that?

17    A.   There's various cases.  You have copies of

18  the cases.  There's 2000 litigation, or 2002

19  litigation, things like that.

20    Q.   Okay.  And other litigation?

21    A.   There's litigation with David Hobbs I think

22  in 2010 and 2015, approximately.

23    Q.   Okay.  And it's your testimony that you

24  provided this registration to them in all of those

25  cases?

1    A.   I think all of the registrations were

2  provided.

3    Q.   And why do you believe that?

4    A.   Because they were.

5    Q.   Okay.  Do you have a specific recollection

6  of that happening?

7    A.   It was the subjective of the litigation.

8    Q.   Do you have a specific recollection of them

9  being provided?

10    A.   It was the subject of the litigation.

11    Q.   Do you have any other basis for your --

12    A.   The -- the litigation involved whether I

13  properly owned the copyrights, and whether I properly

14  owned the trademark.

15    Q.   Any other basis for that belief?

16    A.   The original litigation.

17        I'd have to look it up.

18    Q.   Any other basis?

19    A.   We keep on -- I'm giving you the same

20  answer.  You keep on asking the same question.

21    Q.   Yeah, just closing the loop.

22        Is there any other basis other than what

23  you've told me?

24    A.   No.

25    Q.   Going up to the publication date on Page 1.

1        What publication date did you include for

2  this registration?

3    A.   I didn't include it.  Joe Stewart put, I

4  guess, January 1 of 1986.

5    Q.   Okay.  And you understand, as established

6  in looking at Exhibit 1, that you're here testifying

7  on behalf of Lil' Joe Records today?

8    A.   Right.

9    Q.   And that your testimony is on behalf of and

10  binds Lil' Joe Records, right?

11    A.   Right.

12    Q.   So when I say you, I'm referring to Lil'

13  Joe Records.

14    A.   Right.

15    Q.   Okay.  So why did Lil' Joe Records include

16  that date as the date of first publication?

17        I don't know.

18    Q.   Did you do any due diligence before

19  including that date?

20    A.   I told you I didn't do -- I didn't do the

21  registration.  Joseph Stewart and/or Jonathan Black

22  assisted, so I don't know.

23    Q.   Are you aware of Lil' Joe Records doing any

24  due diligence in that regard?

25    A.   Other than through them, I wouldn't -- I

**LIL' JOE RECORDS, INC. vs MARK ROSS, ET AL.**
Joseph Weinberger on 10/26/2022                    Pages 114..117

Page 114

1  wouldn't know.
2      Q.    And you didn't speak to any of them before
3  today's deposition, correct?
4      A.    Well, Joe Stewart's dead, so I wouldn't be
5  able to have a séance with him to find out, so I
6  don't know.
7      Q.    Okay.  And the other individual?
8      A.    I haven't spoken to Jonathan Black in a
9  while.
10     Q.    Okay.  And you didn't review any other
11 documents relating to the information on this
12 document, correct?
13     A.    Right.  It would be inconsistent with what
14 Allen Jacobi had told me.
15     Q.    Was Allen Jacobi involved in the
16 registration process for Lil' Joe Records?
17     A.    No.
18     Q.    Okay.  Are either of the folks that filed
19 these applications on behalf of Lil' Joe Records'
20 lawyers?
21     A.    No.
22           MR. WOLFE:  You need to clarify, lawyers
23    in Florida or lawyers elsewhere.
24 BY MR. BURROUGHS:
25     Q.    I'm going to put a document in front of you

Page 115

1  we're going to mark as Exhibit 6.
2           (WHEREUPON, Defendants' Exhibit 6 was
3           marked for identification.)
4  BY MR. BURROUGHS:
5      Q.    Take a moment to review this document.
6    Tell me if you recognize it.
7           It's two pages.  We'll scroll through it.
8    Tell us if you want us to go slower or faster.
9           MR. WOLFE:  Can you go back to Page 1,
10   please.
11          MR. BURROUGHS:  That's fine.
12          THE WITNESS:  Yeah, this SR was changed.
13 BY MR. BURROUGHS:
14     Q.    And why was that?
15     A.    There was a subsequent filing where it was
16 changed.
17     Q.    Okay.  And why?
18     A.    Because there's a mistake in the box.
19     Q.    Okay.  So you registered this same work a
20 second time?
21     A.    No, I amended the work.
22     Q.    Okay.  And do you believe this form is the
23 form through which you amend a copyright application
24 or registration?
25     A.    This was not the form.  There was a

Page 116

1  subsequent form that was used.
2      Q.    Which form?
3      A.    Whatever the form is, there's a exist --
4  there's a form that changes it.
5      Q.    Okay.  Do you indicate anywhere in this
6  form that there was a previous registration?
7      A.    No.
8      Q.    Do you believe you're required to do that?
9      A.    This is not the final form.
10     Q.    And why do you say that?
11     A.    Because I specifically recall amending it.
12     Q.    Okay.  How do you recall amending it?
13     A.    I specifically amended it in two thousand,
14 I think '21 or...
15     Q.    Was that after receiving the termination
16 letter?
17     A.    Yes.
18     Q.    Okay.  And why did you modify it at that
19 time?
20     A.    Because I noticed that there was a mistake
21 on the form.
22     Q.    What gave you cause to review the form?
23     A.    I looked at the form.
24     Q.    Did anything precipitate that?
25     A.    I just looked at the form when I was

Page 117

1  copying the forms I had to give to Richard Wolfe.
2      Q.    Okay.  And were you doing that in
3  connection with the termination letter and/or this
4  lawsuit?
5      A.    Yes.
6      Q.    So it's fair to say that because of this
7  lawsuit, you went back and amended this copyright
8  registration in Exhibit 6?
9      A.    Yes.
10     Q.    Any other reason?
11     A.    No.
12     Q.    Okay.  I'm going to put another document in
13 front of you I'm going to mark as Exhibit 7.
14           (WHEREUPON, Defendants' Exhibit 7 was
15           marked for identification.)
16 BY MR. BURROUGHS:
17     Q.    Do you recognize this document?
18     A.    Yes.
19     Q.    Okay.  And what's this document?
20     A.    It's a Form SR.
21     Q.    And stopping at Section 5, do you see that
22 section?  "Previous registration:  Has registration
23 for this work or an earlier version of this work
24 already been made in the copyright office?"
25           Do you see that?

**LIL' JOE RECORDS, INC. vs MARK ROSS, ET AL.**
Joseph Weinberger on 10/26/2022                    Pages 118..121

Page 118

1    A.    Yes.
2    Q.    And you checked "No," correct?
3    A.    I didn't check it.  Joe Stewart checked it.
4    Q.    And that was on behalf of Lil' Joe Records,
5    correct?
6    A.    Right.
7    Q.    Okay.  I'm going to put another document in
8    front of you we're going to mark as Exhibit 8.
9          MR. WOLFE:  If you can go back to Page 1
10   of this document, please.
11         MR. BURROUGHS:  Sure.  Happy to.
12         Mr. Trechsel, if you don't mind going up
13   to Page 1.
14         MR. WOLFE:  Stop right there.
15         Okay.  We can go to Exhibit 8 now,
16   please.
17         MR. BURROUGHS:  All right.
18         Mr. Trechsel, let's go to Exhibit 8.
19         (WHEREUPON, Defendants' Exhibit 8 was
20         marked for identification.)
21   BY MR. BURROUGHS:
22   Q.    And this one's 58 pages, so we can go
23   slowly.
24         All right.  Do you need us to scroll up to
25   a particular page?  Did you have a moment to review

Page 119

1    this exhibit?
2          MR. WOLFE:  Same objection.  Same
3    instruction.  If you'd like, I'm happy to print
4    out this 58-page document and let the witness
5    have the opportunity to review it, rather than
6    show it to him as you're scrolling --
7          MR. BURROUGHS:  Okay.  Since -- so we're
8    about an hour anyways, if you want to print this
9    out and show it to him, that's fine.
10         Let's take a -- what, a ten-minute
11   break?
12         MR. WOLFE:  Yeah.  Why don't you email it
13   to me so I know I'm looking at the right --
14         MR. BURROUGHS:  And while you're on that
15   break, we're going to be looking at the 1991
16   agreement and the 1987 agreement and the Pac Jam
17   agreements, as well, so maybe you guys can spend
18   some time reviewing those on the break.
19         MR. WOLFE:  Well, those are long
20   documents.  It's going to be hard to review all
21   of them in a 15-minute break, but if you email
22   me whatever documents you'd like him to look at,
23   happy to show him, and we'll take whatever time
24   we need for him to review it.  Okay?
25         MR. BURROUGHS:  If you need more time,

Page 120

1    just hop on and tell us you need more time.
2          All right.  Frank will do so.
3          Let's go off the record.
4          (Recess.)
5    BY MR. BURROUGHS:
6    Q.    All right.  We're going to put another
7    document in front of you that we're going to mark as
8    Exhibit 9.  It's what -- what we've been discussing
9    as the agreement with the 1987 reference.
10         Mr. Trechsel will pull that up for you.
11         Hopefully you had an opportunity to review
12   it during the break.  And we'll try to point to
13   the --
14         MR. WOLFE:  We have not had that
15   opportunity.
16         MR. BURROUGHS:  -- sections of the
17   document.
18         MR. WOLFE:  He has not had that
19   opportunity, but he can look at it now.
20         Although, Scott, what I -- what Frank
21   sent me as Exhibit 9 is 105-page compilation of
22   registrations.
23         MR. BURROUGHS:  We're scan -- yeah, we're
24   going to be marking Exhibit -- the one that you
25   probably have as 10 is Exhibit 9.

Page 121

1          We're going to marking as Exhibit 9 the
2    agreement reflecting the '87 arrangement.
3          (WHEREUPON, Defendants' Exhibit 9 was
4          marked for identification.)
5          MR. WOLFE:  Give me one second.
6          Okay.  What you sent to me as Exhibit
7    10, we're now marking Exhibit 9, and for the
8    record, it's an undated document that says
9    Recording Agreement and Skywalker Records,
10   Inc., correct?
11   BY MR. BURROUGHS:
12   Q.    Are you familiar with this document?
13         MR. WOLFE:  Hold on.
14         Do you have it handy?
15         THE WITNESS:  This one here?
16         MR. WOLFE:  Yes, that's it.
17         THE WITNESS:  Yeah, I see it.
18   BY MR. BURROUGHS:
19   Q.    Okay.  When did you first see this
20   agreement?
21   A.    In the 2000's.
22   Q.    In what context did you first see this
23   agreement?
24   A.    Wong Won produced it in litigation I had
25   with him.

**LIL' JOE RECORDS, INC. vs MARK ROSS, ET AL.**
Joseph Weinberger on 10/26/2022                          Pages 122..125

Page 122

1   Q.   Did you review it at the time?
2   A.   Not really.
3   Q.   Did you respond to Wong Won and dispute its
4   voracity or validity at the time?
5   A.   The case settled when we went to a
6   mediation.
7   Q.   So before settling it, it was never
8   challenged, is that accurate?
9   A.   I don't recall.  I don't -- I don't know.
10  Q.   As you sit here today, do you have reason
11  to challenge this agreement?
12  A.   Yeah, I told you earlier the different --
13  the different things that I thought were peculiar
14  with it.
15  Q.   Okay.  But other than some of the
16  peculiarities that you mentioned, do you challenge
17  the fact that the individuals transferred their
18  copyrights to the label via this agreement?
19  A.   Well, I don't know if this agreement is a
20  valid agreement because Luther Campbell said that
21  there was never an agreement.
22  Q.   Understood.
23       But do you dispute that the members of
24  2 Live Crew transferred the copyrights of the subject
25  albums to the label?

Page 123

1       MR. WOLFE:  Objection to form.
2       What copyrights?  None are described in
3   this agreement.
4   BY MR. BURROUGHS:
5   Q.   Go ahead.  Do you understand the question?
6   A.   I'm not -- like, I -- I would just be
7   guessing.  I don't want to guess.
8   Q.   Okay.  Earlier we established what the
9   subject albums are, right, the albums --
10  A.   Right.
11  Q.   -- at issue in this case?
12  A.   Right.
13  Q.   Okay.  Do you dispute that the individual
14  members transferred copyrights for the subject albums
15  to Campbell's record label?
16  A.   No.
17  Q.   And how do you believe that that took
18  place?
19  A.   The 1991 agreements that Jacobi told me
20  about.
21  Q.   Okay.  Any other agreement?
22  A.   The litigation I had with them.
23  Q.   Did Jacobi also draft the agreement that's
24  in Exhibit 9?
25  A.   I don't believe.

Page 124

1   Q.   And why is that?
2   A.   Because he told me the only agreements that
3   he drafted were the '91 agreements.
4   Q.   Any other reason?
5   A.   That -- that is enough for me to believe.
6   Q.   Okay.  Let's scroll down to the signature
7   page.
8       Do you recognize these signatures?
9   A.   It's hard to read the signatures.
10  Q.   Okay.  Do you recognize them?
11  A.   Vaguely.
12  Q.   Did Mr. Campbell ever tell you that his
13  signature was forged on this document?
14  A.   He told me he'd never had signed -- he
15  never had a recording agreement, so...
16  Q.   Did he ever tell you that his signature was
17  forged on this document?
18  A.   He said he never had a recording agreement,
19  so it would mean that this agreement didn't exist.
20  Q.   I understand, but I'm asking a slightly
21  different question.
22       Did he ever tell you that his signature was
23  forged on this -- on this agreement?
24  A.   No.
25  Q.   Did Mr. Hobbs ever tell you that his

Page 125

1   signature was forged on this agreement?
2   A.   I don't know if this is an agreement.
3   Q.   Did Mr. Hobbs ever tell you that his
4   signature was forged on this document?
5   A.   As I told you, I don't know if this is an
6   agreement.
7   Q.   Did he ever tell you that his signature was
8   forged on what you're seeing on Exhibit 9?
9   A.   You keep on asking the same question, I
10  keep on answering, and it's the same answer.
11      Like, I don't know if this is a valid
12  agreement or not.
13  Q.   Did he ever tell you that his signature had
14  been forged on a contract relating to the label?
15  A.   He told me that the -- there was no
16  agreement, so it would not lead me to believe that
17  this is a valid agreement.
18  Q.   I understand that, but I'm asking a
19  slightly different question.
20      Did he ever tell you that his signature had
21  been forged on any agreement with the label?
22  A.   I told you what he told me.
23      So, like, he didn't specifically state
24  that.
25  Q.   Okay.  So it's fair to say that Mr. Hobbs

**LIL' JOE RECORDS, INC. vs MARK ROSS, ET AL.**
Joseph Weinberger on 10/26/2022                    Pages 126..129

1  never told you that his agreement was forged on one
2  of the label agreements, correct?
3      A.    He told me that there was never an
4  agreement.
5      Q.    Understood.
6            But did he tell you that his signature had
7  been forged?
8      A.    We keep on going back and forth.
9            I'm going to stay with what I told you.
10     Q.    Yeah, I'm just trying to get an answer to
11 my actual question, which is, you know, did Mr. Hobbs
12 ever tell you that his signature had been forged on
13 one of the label's agreements?
14     A.    He never told me it was or it wasn't.
15     Q.    Okay.  Did Mr. Wong Won ever tell you that
16 his signature have been forged on one of the label's
17 agreements?
18     A.    Same -- same thing.
19     Q.    So he never told you one way or the other,
20 correct?
21     A.    Right.
22     Q.    Did Mr. Ross ever tell you that his
23 signature had been forged on one of the label's
24 agreements?
25     A.    Other than, like, what I told you, that all

1  of them had told me that there was no agreement until
2  after the Nasty as They Wanna Be album.
3      Q.    Okay.  So none of the signatories to
4  Exhibit 9 ever told you that their signature had been
5  forged on any of the label agreements, correct?
6      A.    As I said, not one way or the other.
7      Q.    Okay.  Are you aware of any of the artist's
8  agreements ever being forged on any of the agreements
9  with your company or its predecessors?
10     A.    I know in the Peter Jones case, the
11 agreements were forged.
12     Q.    Okay.  And whose signatures were forged in
13 those cases, in that case?
14     A.    I'd have to look at the judgment against
15 Luther Campbell and Luke Records to tell you.
16     Q.    Okay.  Other than that, are you aware of
17 any claims of forgery?
18     A.    Well, I believe in the case with Hobbs and
19 Ross, they may have alleged that the agreements were
20 forged.  There was -- there was an -- I think there
21 was litigation in 1992 between Hobbs and Ross and
22 Luke Records, and I believe that that was an
23 allegation in case.
24     Q.    Okay.  Any other basis?
25     A.    No.

1      Q.    And other than what you've told me so far,
2  have you ever heard of any of the artists challenging
3  the fact that they signed this particular agreement?
4      A.    Luke Campbell said he never signed any
5  agreements, and then the other three told me that
6  they had not signed any agreement until after the
7  Nasty as They Wanna Be album was done.
8      Q.    Okay.  Do you -- assuming that this
9  agreement was signed, do you know when it was signed?
10     A.    I have no idea.
11     Q.    Okay.  Do you know if it was signed in
12 1990?
13     A.    I have no idea.
14     Q.    Okay.  If it was signed in 1990, would that
15 be after the recording of Nasty?
16     A.    Yes.
17     Q.    Since two thousand and -- hold on.
18           Let me withdraw that.
19           Since the early 2000's, have you had a copy
20 of this agreement in your business records?
21     A.    Yes.
22     Q.    Okay.  Have you, in fact, produced copies
23 of it to the heirs of Wong Won?
24     A.    I don't think so.
25     Q.    So Lil' Joe Records never produced a copy

1  of that agreement to the heirs of Wong Won; is that
2  your testimony?
3      A.    I don't believe so.  I don't think that
4  gave the heirs of Wong Won anything.
5      Q.    Okay.  Were you made aware of any oral
6  agreements between the members of 2 Live Crew and any
7  record label?
8      A.    No.
9      Q.    Were you ever privy to the conversations
10 between the members of 2 Live Crew during the
11 recording of the subject albums?
12     A.    No.
13     Q.    In fact, you didn't even know that members
14 of 2 Live Crew at the time these subject albums were
15 awarded, correct?
16     A.    No, I knew who they were.
17     Q.    Did you know them personally?
18     A.    I've met -- I had met them, yes.
19     Q.    Okay.  Had you had any conversations with
20 them about their agreements with labels?
21     A.    They had told me that they had no agreement
22 until the Nasty as They Wanna Be album.
23     Q.    When did they tell you that?
24     A.    Repeatedly.
25     Q.    Starting when?

**LIL' JOE RECORDS, INC. vs MARK ROSS, ET AL.**
Joseph Weinberger on 10/26/2022                    Pages 130..133

Page 130

1     A.    Probably, like, 1991.
2     Q.    Okay.  They certainly didn't tell you that
3  contemporaneous with the recording of the subject
4  albums, correct?
5     A.    Right.
6     Q.    In fact, you have no knowledge about any
7  agreements that were reached by the members of 2 Live
8  Crew related to copyright ownership contemporaneous
9  with the creation of the subject albums, correct?
10     A.    The '91 agreements and the subsequent
11  agreements.
12     Q.    All of which were executed afterward,
13  correct?
14     A.    Executed after what?
15     Q.    The creation of the subject albums.
16     A.    They were created -- I think they were
17  executed, the ones with my company were before this
18  stuff was created.
19     Q.    When you say "this stuff," you're referring
20  to the subject albums?
21     A.    Yes.
22     Q.    Isn't it true that your company was founded
23  in 1991?
24     A.    No.
25     Q.    When was your company founded?

Page 131

1     A.    '95.
2     Q.    Okay.  And weren't the subject albums
3  created in the late '80's?
4     A.    No, I'm not talking about these original
5  albums.  You asked me if I had, um, the albums that I
6  did with them were done after the fact.  Like, the
7  agreements were done after the fact.
8     Q.    There must have been a miscommunication.
9         Let me rephrase and attempt to clarify.
10         Isn't it true that -- that you had no
11  conversations with any -- well, actually, let me
12  withdraw that so I can try to mirror the prior
13  question.
14         Isn't it true that you have no
15  understanding of any agreements between the members
16  of 2 Live Crew relating to copyright ownership for
17  the subject albums that are contemporaneous with the
18  creation of those albums?
19     A.    Other than they all told me that there were
20  no agreements.
21     Q.    And that was afterward, correct?
22     A.    Yes.
23     Q.    In fact, in 1987, you weren't involved with
24  the members of 2 Live Crew at all, were you?
25     A.    No.

Page 132

1     Q.    Were you involved with them at all in 1998?
2     A.    '98, yes.
3     Q.    What about 1988?
4     A.    Yes.
5     Q.    When -- what was your first involvement
6  with them in 1988?
7     A.    I had met them.
8     Q.    Okay.  So other than just meeting them, you
9  had no involvement with them or their careers,
10  correct?
11     A.    Like, I wasn't managing them.
12         They weren't my clients.
13     Q.    Okay.  They were just people that you had
14  met, correct?
15     A.    Right.
16     Q.    And the same in 1989?
17         Yes.
18     Q.    And the same in 1990?
19     A.    Yes.
20     Q.    Do you contend that the agreement in
21  Exhibit 9 is falsified or altered in any way?
22     A.    I don't believe it's a valid agreement.
23     Q.    Understood.
24         But do you believe that it's been falsified
25  or altered in any way?

Page 133

1     A.    There was a prior agreement that you
2  produced that was altered that's different than this.
3     Q.    Now, remember to try to answer the question
4  that I'm asking, okay?
5         I'm asking about Exhibit 9.
6         Do you have any reason to believe that it's
7  been altered or modified in any way?
8     A.    I don't believe it's a valid agreement.
9     Q.    I understand that, but do you believe that
10  it's been altered or modified in any way?
11     A.    Other than it's not a valid agreement, it
12  seems that it was created after the fact with a set
13  of facts that don't make any sense, which I've gone
14  over repeatedly with you.
15     Q.    Okay.
16     A.    And I'm not going to keep on, you know,
17  answering the same -- same thing over and over.
18     Q.    So is it fair to say that other than that,
19  you don't have any reason to believe that this
20  exhibit has been falsified or edited in any way,
21  correct?
22     A.    I'm not going to answer the questions
23  anymore.
24     Q.    If you have any reason to believe so, I'll
25  give you a moment now to tell me.

**LIL' JOE RECORDS, INC. vs MARK ROSS, ET AL.**
Joseph Weinberger on 10/26/2022                    Pages 134..137

Page 134

1     If not, we'll move on.
2          MR. WOLFE:  Objection.  Asked and
3     answered multiple times.
4     BY MR. BURROUGHS:
5          Q.   Have you ever heard of any party being in
6     breach of the agreement in Exhibit 9?
7          MR. WOLFE:  Objection to form.
8          THE WITNESS:  I'm -- I'm not aware.
9          I have no recollection.
10    BY MR. BURROUGHS:
11         Q.   Are you aware of the parties ever
12    performing under this agreement?
13         A.   I have no recollection.
14         Q.   Before 1991, were the members of 2 Live
15    Crew receiving payment in connection with the subject
16    albums?
17         A.   I -- I don't know.
18         Q.   Before 1991, are you aware of the
19    performers in 2 Live Crew not being paid in
20    connection with the subject albums?
21         A.   I -- I don't know.  I think there was a
22    lawsuit filed in '92 that they hadn't received -- or
23    at least Hobbs and Ross had not received royalties.
24         Q.   Have you heard anything else?
25         A.   Other than what I've told you, no.

Page 135

1          Q.   Okay.  Have you ever done any investigation
2     into whether or not the document in Exhibit 9 is a
3     valid agreement?
4          A.   Yeah, I discussed that with you numerous
5     times already.  You keep on asking me that.
6          I specifically told you I asked Allen
7     Jacobi, and Allen Jacobi said that that is not a
8     valid agreement.  The only agreement that existed
9     were the set of three agreements that he did.
10         Q.   Did you ask him if he drafted this
11    agreement?
12         A.   That wouldn't make any sense.
13         Q.   Why is that?
14         A.   Because if the only agreement that he
15    drafted were the '91 agreements, how could he have
16    drafted this agreement?
17         Q.   So it would surprise you to learn that he
18    drafted this agreement if you were to learn that,
19    correct?
20         A.   I'd be shocked that -- that he drafted
21    this.  He told me the only ones that were drafted
22    were the '91 agreements.
23         Q.   Okay.  Other than who you've identified so
24    far, was Luke or his label working with any lawyers
25    in 1990?

Page 136

1          A.   I believe Allen Jacobi.
2          Q.   Anyone other than who you've told me so
3     far?
4          A.   Milton -- Milton Rothman.
5          Q.   Have you spoken to any of those attorneys
6     in regard to this agreement, or this purported
7     agreement?
8          A.   I told you I spoke with Allen Jacobi.
9          Milton Rothman's dead.  He's been dead for
10    a period of time.
11         Q.   Have you spoken with any other attorneys
12    related to this document?
13         A.   No.
14         Q.   Was the answer no?
15         A.   I said no.
16         Q.   Apologies.  I missed that.
17         Did Mr. Campbell or his labels ever work
18    with an attorney named Paul Schindler?
19         A.   In 1994.
20         Q.   Whose decision was it to retain
21    Mr. Schindler?
22         A.   Campbell.
23         Q.   Is it Lil' Joe's contention that Luke
24    Skyywalker Records, Inc. ever held the copyrights for
25    the subject albums?

Page 137

1          A.   Yes.
2          Q.   And is it Lil' Joe Records' position that
3     Skyywalker Records, Inc. held the copyrights for the
4     subject albums?
5          A.   Yes.
6          Q.   And is it your contention that Luke Records
7     held the copyrights for the subject albums?
8          A.   Yes.
9          Q.   When Lil' Joe Records bought the assets of
10    Luke Records out of bankruptcy, did it buy all of the
11    copyrights for all of the subject albums?
12         A.   Yes.
13         Q.   You mentioned that it also obtained certain
14    copyrights via other vehicles, settlement agreements,
15    and so forth.  If it purchased all of the copyrights
16    through the bankruptcy, what did it obtain via those
17    other agreements?
18         A.   The other people in the litigation claimed
19    that the copyrights were not valid, so there was an
20    affirmation in the agreements that -- that the
21    copyrights were valid.
22         Q.   When you say copyrights, what are you
23    referring to?
24         A.   The subject matter.
25         Q.   So there's a dispute over whether the

**LIL' JOE RECORDS, INC. vs MARK ROSS, ET AL.**
Joseph Weinberger on 10/26/2022                     Pages 138..141

Page 138

1  subject albums were valid; is that your position?
2      A.    At one -- at one time, the various artists
3  in the group other than Campbell contested the
4  validity of the copyrights and the trademarks.
5      Q.    Were they contesting the validity of the
6  1991 agreement?
7      A.    I don't recall.  I know that there was --
8  the items were in dispute.
9      Q.    Were they contesting the validity of any
10 agreement, to your knowledge?
11     A.    I believe they were.  There was a dispute.
12     Q.    Which agreement were they contesting?
13     A.    They were contesting the copyrights as to
14 whether I owned them or not.
15     Q.    Did they challenge any particular transfer
16 agreement?
17     A.    I don't recall.  I don't know if they -- I
18 don't know.
19     Q.    And do you allege that you also obtained
20 the 2 Live Crew trademark rights through the Luke
21 bankruptcy?
22     A.    Through the bankruptcy and through
23 subsequent litigation and settlement with the Wong
24 Wons.  And it was confirmed in the agreement in 2015
25 when three of the members did a reunion tour where

Page 139

1  they acknowledged I own the name.
2      Q.    Now, do you allege that you own the name
3  through the bankruptcy proceedings, or through these
4  subsequent -- subsequent agreements?
5      A.    Both.
6      Q.    At any time, did you do anything to perfect
7  your interest in the trademark?
8      A.    Yes.
9      Q.    Okay.  What did you do?
10     A.    Filed litigation.
11     Q.    Anything else?
12     A.    Filed renewals.
13     Q.    Did you make any filings with the United
14 States Patent and Trademark Office or any other
15 government agency?
16     A.    Yes.
17     Q.    Which filings?
18     A.    They are what they are.
19           You'd have to look in the filings.
20     Q.    Do you recall any of them?
21     A.    There were renewals, and also orders that
22 were recorded in the trademark office.
23           One of your clients actually stolen the
24 trademark out of the trademark office, and I had to
25 file a lawsuit against him and his brother, and it

Page 140

1  was resolved in litigation.
2      Q.    How did they do that?  How did they steal
3  it out of the trademark office?
4      A.    They filed a document saying that the
5  trademark was assigned to me.
6      Q.    I'm going to put a document in front of you
7  that we'll mark as Exhibit 10.
8           I believe it's the Wong Won settlement
9  agreement.  If you can tell me what it is after
10 you've looked at it.
11           (WHEREUPON, Defendants' Exhibit 10 was
12           marked for identification.)
13 BY MR. BURROUGHS:
14     Q.    And while we're putting that exhibit up,
15 has Lil' Joe ever done any business with a company
16 named Pac Jam?
17     A.    I don't think so.
18     Q.    All right.  So I want you to take a look at
19 Exhibit 10 and tell me if you recognize it.
20           MR. WOLFE:  Go a little slower, please.
21           MR. BURROUGHS:  Absolutely.  And we can
22     go as slowly or as quickly as you want, just let
23     us know.
24 BY MR. BURROUGHS:
25     Q.    Okay.  Have you seen this document before?

Page 141

1      A.    Yes.
2      Q.    Do you recognize it?
3      A.    Yes.
4      Q.    What is it?
5      A.    It's a settlement agreement.
6      Q.    Okay.  And is this the agreement through
7  which the Wong Wons transferred to you certain
8  intellectual property rights?
9      A.    I think there's another agreement that is
10 recorded in the register of copyrights, as well.
11     Q.    Okay.  Is this one of the agreements?
12     A.    I believe so.
13     Q.    Okay.  Let's go down to the next page.
14     A.    Yes, all right.
15     Q.    So does this agreement predate or post-date
16 the other settlement agreement that you entered into
17 with the Wong Wons?
18     A.    Oh, I don't know.
19           I'd have to look at the agreement.
20     Q.    Okay.  And what dispute is this agreement
21 settling?
22     A.    There are a bunch of issues that existed
23 with Wong Won.  One of which was I had a mortgage on
24 a house that he had that was in foreclosure, and then
25 I think there was federal litigation in -- for -- in

**LIL' JOE RECORDS, INC. vs MARK ROSS, ET AL.**
**Joseph Weinberger on 10/26/2022**                     Pages 142..145

Page 142

1  the Southern District of Florida, the United States
2  District Court for the Southern District of Florida
3  with Judge King.
4        And then, there were subsequent litigation
5  with Judge Hoeveler I think two different times down
6  here in 2005 and 2006 with the Wong Wons.
7     Q.   Did each of those result in a settlement
8  agreement?
9     A.   Yes.  Or a judgment from the judge.
10    Q.   And --
11    A.   Or -- or --
12    Q.   Go ahead.
13    A.   Or an injunction.
14    Q.   And in connection with any of those
15  settlement agreements, were copyrights being
16  transferred, or was their language confirming a prior
17  transfer, or both?
18    A.   I believe that both.  I think this -- this
19  agreement maybe has language, and then there's other
20  agreements where the specific copyrights were listed.
21    Q.   Were any of those copyrights for the
22  subject albums?
23    A.   Yes.
24    Q.   And can you estimate for me when those
25  agreements were entered into?

Page 143

1     A.   I don't know.  Let's say from, like,
2  2000 -- approximately 2000 through 2006.
3        And then there was also an affirmation in
4  the 2008 and 2010 agreements with Wong Won
5  acknowledging that he has no rights in the name or
6  the copyrights from Luke Records or from my company.
7     Q.   Okay.  So if Lil' Joe had bought all the
8  copyrights out of bankruptcy, why did it require a
9  transfer of copyrights from Wong Won at that time,
10  period?
11        MR. WOLFE:  Objection to form.
12        THE WITNESS:  It's because he raised the
13     issue, so my lawyer said to have him resign it
14     again to -- to -- to reinforce it.
15  BY MR. BURROUGHS:
16    Q.   Any other reason?
17    A.   That's -- that's my recollection.
18    Q.   And did you transfer all of these -- or did
19  you produce all these agreements to your attorney in
20  this case?
21    A.   I believe.
22    Q.   Okay.  I'm going to put another document in
23  front of you we're going to mark as Exhibit 11.
24        This is an agreement with Mr. Ross.
25

Page 144

1        (WHEREUPON, Defendants' Exhibit 11 was
2        marked for identification.)
3  BY MR. BURROUGHS:
4     Q.   As we go through this, tell us if you want
5  us to speed up or slow down.
6        MR. WOLFE:  Can you go back to the first
7     page, please.
8        Okay.  Thank you.
9        You're going a little too fast.
10        MR. BURROUGHS:  All right.  We'll slow
11     down.  Let us know if you need us to go back.
12        MR. WOLFE:  Go back to Page 4, please.
13        Okay.
14        MR. TRECHSEL:  That's the end.  Let me
15     know if you want me to go to a particular page.
16  BY MR. BURROUGHS:
17    Q.   Do you recognize the document?
18    A.   Yes.
19    Q.   What is this document, and how do you
20  recognize it?
21    A.   It's a settlement of an adversarial
22  proceeding in Mark Ross's bankruptcy in Alabama.
23    Q.   And was the dispute resolved via this
24  agreement?
25    A.   It confirmed that I owned various rights.

Page 145

1     Q.   Intellectual property rights?
2     A.   Yes.  There was a -- there was -- if you go
3  back to Page 4.
4     Q.   Okay.  Let's go back to Page 4.
5     A.   If you look in Subparagraph G, there's a
6  confirm -- a reaffirmation that Ross doesn't own any
7  of the -- I guess the subject albums.
8     Q.   Okay.
9     A.   He sold the rights in -- as part of a
10  settlement in litigation in 1992 as referenced.
11        And I'm pretty sure that copyright
12  assignment was recorded in the copyright office in
13  the '92, '93, or I -- I think in '93 or ninety --
14  around -- around that time period.
15    Q.   Okay.  Now, at the time of this agreement,
16  was it Lil' Joe's understanding that it owned the
17  copyrights for the subject albums?
18    A.   Yes.
19    Q.   And is it your position that in this
20  proceeding, Mr. Ross was challenging that ownership?
21    A.   There was a question that came up in the
22  bankruptcy, and the lawyer wanted to make sure that
23  there was no -- no question later on, so he put that
24  language in there.
25    Q.   Any other reason?

**LIL' JOE RECORDS, INC. vs MARK ROSS, ET AL.**
Joseph Weinberger on 10/26/2022                      Pages 146..149

Page 146

1    A.    I think in that bankruptcy, subsequent to
2    this initial settlement, there was a violation of the
3    agreement because Ross put out a 2 Live Crew album.
4    And there was a subsequent, I think, judgment.
5        Q.    Okay.
6        A.    Raising the judgment from 75,000 -- I don't
7    know if it was 600,000 or 750.
8            I don't remember the amount.
9        Q.    Other than the documents relevant to the
10   bankruptcy proceedings, did you ever enter into any
11   agreement, settlement, or otherwise with Mr. Campbell
12   relating to the transfer of his intellectual property
13   rights?
14       A.    He challenged the rights, like, when I had
15   BMI recognize the writer performance rights.
16       Q.    And was that resolved?
17       A.    Yes.
18       Q.    Was that resolved via written agreement?
19       A.    It was resolved with BMI recognizing that I
20   owned the rights.
21       Q.    Okay.  So is it accurate to say that the
22   only documents reflecting your obtainment of Luke
23   Records or Mr. Campbell's copyrights would be those
24   documents relevant to the bankruptcy proceedings?
25       A.    And the BMI documents that were produced.

Page 147

1        Q.    Okay.  Any other documents?
2        A.    I -- I don't know.  I don't have any
3    recollection other than I think there's a 2015
4    agreement that I mentioned earlier, as well as some
5    emails that Campbell sent me saying that I only own
6    the name in name only or something.
7            He was, like, trying to play head games
8    with me or something, so I put in a tour agreement,
9    and the three people that were participating in the
10   tour acknowledged that I owned the 2 Live Crew
11   tradename.
12           MR. WOLFE:  Scott, can we --
13   BY MR. BURROUGHS:
14       Q.    Anything else?
15           MR. WOLFE:  Scott, can we take a comfort
16   break?
17           MR. BURROUGHS:  Yes.  That's fine.
18           Is five minutes all right?
19           MR. WOLFE:  Yeah, five minutes is all I
20   need.  Thanks.
21           MR. BURROUGHS:  All right.  Let's go off
22   the record.
23           (Recess.)
24   BY MR. BURROUGHS:
25       Q.    Do any of the various agreements that you

Page 148

1    have with the members of 2 Live Crew reference
2    Section 203, your termination rights, in any way?
3        A.    I think the agreements with Hobbs does.
4        Q.    Okay.  And how does it reference those?
5        A.    You'd have to get the agreement and look at
6    it.
7        Q.    Do any of your agreements with Campbell,
8    Ross, or Wong Won, or the Wong Won heirs, reference
9    Section 203, your termination rights, in any way?
10       A.    I don't -- I don't recall.
11       Q.    Do you recall ever discussing any of those
12   rights with those parties at any time?
13       A.    I don't believe that they have the rights
14   because of the Campbell and Ross bankruptcies.
15       Q.    And why is that?
16       A.    Because they were an asset of the
17   bankruptcy estates, and they weren't --
18       Q.    Any other reasons?
19       A.    And the agreement in the bankruptcy with
20   Campbell references that he would never ever receive
21   any royalties from it.
22           So if he was going to get the rights back,
23   it wouldn't -- it wouldn't reference it.
24       Q.    And why are those in an agreement that you
25   have with Hobbs?

Page 149

1        A.    Because I had litigation with Hobbs.
2        Q.    Any other reason?
3        A.    I've had litigation with Hobbs several
4    times.
5        Q.    And you've had litigation with Ross and the
6    Won -- and Wong Won, as well, correct?
7        A.    At various times, yes.
8        Q.    Okay.  And the Section 203, your
9    termination rights, were never discussed in
10   connection with those litigations, correct?
11       A.    Ross went bankrupt, so I don't think it was
12   necessary to discuss it.
13       Q.    So they weren't discussed, correct?
14       A.    He didn't have the rights.
15       Q.    In fact, it's accurate to say that you've
16   never discussed the termination or Section 203 rights
17   with Ross, Campbell, or Wong Won, or the Wong Won
18   heirs, correct?
19           MR. WOLFE:  Objection to form.
20           THE WITNESS:  Wong Won, Junior came in to
21   try to get money off of me.  He told me that
22   there were people trying to get him to -- him
23   and his brother, Roderick, to join in on
24   terminating the copyrights.
25           And I went through with them why I felt

**LIL' JOE RECORDS, INC. vs MARK ROSS, ET AL.**
Joseph Weinberger on 10/26/2022 — Pages 150..153

1  that they had no right to do it.
2          And he said that I didn't need to worry
3  about it and I was kind of, like, shocked when
4  I got a notice from your office --
5      Q.   Any other reasons?
6      A.   -- where they signed it.
7          Like, he had attempted to borrow money from
8  me a couple of times, either five of $15,000 a clip.
9      Q.   Any other reason?
10     A.   Any other reason with what?
11     Q.   Why you may have discussed the -- or I
12  should say any other occasion on which you had
13  discussed the Section 203 rights with anyone else
14  other than Hobbs?
15     A.   I told you, Wong Won, Junior.
16     Q.   And -- correct.
17          Anything -- any other occasion than that?
18     A.   I don't recall with Ross.
19     Q.   And is it your position that you didn't
20  have to discuss the Section 203 right, or the
21  transfer of it, because it was part of the Luke
22  bankruptcy estate?
23     A.   As part of the Luther Campbell bankruptcy
24  estate and the Mark Ross bankruptcy estate.
25          And it would have been part of the David

1  Hobbs bankruptcy estate, as well.  Because David
2  Hobbs had also filed bankruptcy.
3      Q.   And did you purchase the termination right
4  in any of those bankruptcies?
5      A.   No.  It was with the bankruptcy trustee, as
6  part of the bankruptcy trustee owned the rights.
7      Q.   And other than the 1991 agreement that we
8  discussed and the agreement relating to '87, which
9  you dispute, but which we discussed, are you aware of
10  any other recording agreement between all members of
11  2 Live Crew and a record label owned by Mr. Campbell
12  or you?
13     A.   All members meaning all four members --
14     Q.   All four members.
15     A.   -- or all the members at one particular
16  time?
17     Q.   All four members.
18     A.   No.
19     Q.   I'm going to put a document in front of --
20  well, let me ask you this.
21          At your offices, do you keep agreements and
22  paperwork in manila folders or binders or in some
23  other way?
24     A.   In various ways.
25     Q.   Okay.  Is -- do you keep some documents in

1  folders?
2      A.   I would think so, yeah.
3      Q.   Okay.  Let me put an exhibit in front of
4  you we're going to mark as Exhibit 12.
5          (WHEREUPON, Defendants' Exhibit 12 was
6          marked for identification.)
7  BY MR. BURROUGHS:
8      Q.   I want you to take a look at this and tell
9  me if you recognize it.
10          Do you recognize that folder?
11     A.   No.
12     Q.   Have you ever seen it before?
13     A.   I don't -- I don't know where that came
14  from.
15     Q.   Okay.  Do you recognize the form of the
16  label on that folder?
17          MR. WOLFE:  Scott, it was inadvertently
18  produced to you.  We'd appreciate it if you
19  dispose it.
20  BY MR. BURROUGHS:
21     Q.   Go ahead.
22          Are you still thinking or...
23          MR. WOLFE:  No, no.  You -- no, it was
24  inadvertently produced, so he's not going to ask
25  any questions about it.

1          MR. BURROUGHS:  How was it inadvertently
2  produced?  It's Bates stamped and it looks --
3  appears to reference this disputed -- the heart
4  of this dispute.
5          MR. WOLFE:  I just explained to you, it
6  was inadvertently produced.  It was sent
7  together with a stack of documents to be copied.
8  It should have been pulled out.
9  BY MR. BURROUGHS:
10     Q.   Okay.  Are you going to take you attorney's
11  instruction?
12          MR. WOLFE:  No.  I assume you're going to
13  take my instructions and do the ethical thing
14  and not ask him questions about a document that
15  was inadvertently produced.
16          MR. BURROUGHS:  I need some sort of
17  proffer, so sort of information about why.
18          To me, from looking at it, it appears to
19  be extremely relevant.
20          MR. WOLFE:  It was produced to my office.
21  When my office sent out a stack of
22  documents, it should have been but was not
23  removed.
24          MR. BURROUGHS:  Are you saying your
25  office generated this particular document?

**LIL' JOE RECORDS, INC. vs MARK ROSS, ET AL.**
Joseph Weinberger on 10/26/2022                    Pages 154..157

Page 154

1      MR. WOLFE: I'm not going to go any
2  further. And he's not going to answer any
3  questions about.
4  BY MR. BURROUGHS:
5      Q.   All right. And you're going to take your
6  attorney's instruction?
7      A.   Yes.
8      Q.   All right. I'm going to put another
9  document in front of you we're going to mark as
10  Exhibit 13.
11      (WHEREUPON, Defendants' Exhibit 13 was
12      marked for identification.)
13  BY MR. BURROUGHS:
14      Q.   Do you recognize this?
15      MR. WOLFE: Same thing. It was
16  inadvertently produced.
17      MR. BURROUGHS: So are you saying your
18  office created this document?
19      MR. WOLFE: No. I just explained to you,
20  my office sent a stack of documents to be copied
21  and Bates stamped. It should have been removed.
22      MR. BURROUGHS: So I -- so did this or
23  did this not come from the business records of
24  the plaintiff?
25      MR. WOLFE: It did not come from the

Page 155

1  business records. It was inadvertently produced
2  by my client to me. It should be destroyed.
3      MR. BURROUGHS: So it was provided by
4  your client to your office, but you allege that
5  it is not responsive to the discovery requests?
6      MR. WOLFE: I'm not going to repeat
7  myself again.
8      And he's not going to answer any
9  questions about it.
10  BY MR. BURROUGHS:
11      Q.   All right. Are going to take your
12  attorney's instruction?
13      MR. WOLFE: It's not an instruction.
14      It's an instruction to you.
15      MR. BURROUGHS: Well, I'd like -- to me,
16  you know, of course if something is subject
17  to --
18      MR. WOLFE: You're going to need to go to
19  court.
20      MR. BURROUGHS: -- privilege or there's
21  some basis not to explore it, I'd be happy to
22  work through that with you, but --
23      MR. WOLFE: I just explained it to you --
24      MR. BURROUGHS: -- to me, you know,
25  you're telling me your client gave this to

Page 156

1  you --
2      MR. WOLFE: -- you can go to the court.
3      MR. BURROUGHS: -- and you gave it to us.
4  It's not in any privilege log. It's not in any
5  redaction log.
6      To me, it looks -- you know, it looks
7  relevant, so I'd like to ask questions.
8      But if you're instructing him not to
9  answer, I'll, of course, respect that --
10      MR. WOLFE: I'm instructing you not to
11  answer --
12      (Cross-talk.)
13      MR. BURROUGHS: -- reservation of
14  rights --
15      MR. WOLFE: -- that.
16      I'm not going to go any further.
17      MR. BURROUGHS: So are you instructing
18  him not to -- I mean, I'd like to ask questions.
19      Are you instructing him not to answer
20  those questions? If so, we can move to the
21  next exhibit.
22      MR. WOLFE: He's not going to answer any
23  questions.
24      And if you ask questions, it would be
25  inappropriate and unethical for you to do so.

Page 157

1  BY MR. BURROUGHS:
2      Q.   And are you going to take your attorney's
3  instruction?
4      A.   (No audible response.)
5      Q.   And I also can't see -- you're a little bit
6  silhouetted now. I don't know if you can -- there
7  you go.
8      Are you going to take your attorney's
9  instruction.
10      A.   Yes.
11      Q.   Okay. We'll put another document in front
12  of you we're going to mark as Exhibit 14.
13      (WHEREUPON, Defendants' Exhibit 14 was
14      marked for identification.)
15  BY MR. BURROUGHS:
16      Q.   And your attorney can tell me if he has the
17  same instruction and direction on this.
18      MR. WOLFE: Same instruction. Same
19  direction.
20  BY MR. BURROUGHS:
21      Q.   And you're going to take your attorney's
22  instruction?
23      A.   Yes.
24      Q.   All right.
25      Okay. We can take that down.

**LIL' JOE RECORDS, INC. vs MARK ROSS, ET AL.**
Joseph Weinberger on 10/26/2022          Pages 158..161

Page 158

1    THE WITNESS: Can we go off the record
2  for a second? I want to ask you something.
3    MR. WOLFE: Sure.
4    MR. BURROUGHS: I have a few more
5  questions, but there's nothing pending, so if
6  you're going to take a --
7    MR. WOLFE: Tw-minute break.
8    MR. BURROUGHS: -- take a break, we can
9  do that.
10    THE COURT REPORTER: Okay. Off the
11  record?
12    MR. BURROUGHS: Yeah, we didn't agree to
13  go off the record, but they went off the record,
14  so...
15    MR. WOLFE: Yeah, let me just check the
16  battery while I'm at it.
17    (Recess.)
18  BY MR. BURROUGHS:
19    Q.  Did you get a chance to consult with
20  Counsel during the break?
21    A.  Yes.
22    Q.  Okay. Do you wish to change any of your
23  prior answers or answer questions that you previously
24  were not inclined to respond to?
25    A.  No.

Page 159

1    Q.  Are you the current custodian of records at
2  Lil' Joe?
3    A.  Yes.
4    Q.  And you're responsible for interacting with
5  Lil Joe's files on a day-to-day basis?
6    A.  Yes.
7    Q.  And you are the one that collected and
8  collated the documents that you produced in this
9  case?
10    A.  Yes.
11    Q.  I'm going to put up an exhibit that appears
12  to be registrations, but I'll let you to take a look.
13    I want you to review these documents in
14  Exhibit 15 and tell me if you recognize them.
15    (WHEREUPON, Defendants' Exhibit 15 was
16    marked for identification.)
17    MR. WOLFE: A little slower, please.
18    MR. BURROUGHS: Actually, I'm going to
19  move things along. Let's -- we'll go through
20  the first ten pages, unless you have an
21  objection, we'll look at the first ten pages of
22  this, and we'll -- Mr. Trechsel will shorten it
23  before sending it to the court reporter.
24    MR. WOLFE: Okay.
25

Page 160

1  BY MR. BURROUGHS:
2    Q.  All right. So that's the first ten pages.
3    Let's go back to the top.
4    MR. TRECHSEL: I'm going to go one more
5  just so it's the end of --
6    MR. BURROUGHS: Oh, yeah, okay.
7    So we'll go through Page 11 just so we
8  have that complete document.
9    MR. TRECHSEL: It should be 12.
10    MR. BURROUGHS: Or 12. I apologize.
11    One through 12.
12    MR. TRECHSEL: Yeah.
13    MR. BURROUGHS: Okay. Let's go back to
14  the top. And for the record, we'll only attach
15  Page 1 through 12 to the transcript.
16  BY MR. BURROUGHS:
17    Q.  Do you recognize this document?
18    A.  Yes.
19    Q.  What is this document, and how do you
20  recognize it?
21    A.  They were copies, I think Jonathan Black
22  obtained for me, for the copyright records.
23    Q.  Okay. And these were registrations that
24  were applied for before you were involved with --
25    A.  Yes.

Page 161

1    Q.  -- Lil' Joe Records, correct?
2    A.  Yes.
3    Q.  Okay. And you had no involvement in filing
4  any of the Form PA registrations for the subject
5  albums at the time or contemporaneous with their
6  creation, correct?
7    A.  Right.
8    Q.  Okay. We can pull those -- pull that down.
9    We're going to put in front of you a
10  document we're going to mark as Exhibit 16.
11    (WHEREUPON, Defendants' Exhibit 16 was
12    marked for identification.)
13  BY MR. BURROUGHS:
14    Q.  A declaration, I believe.
15    I want you to take look at it and tell me
16  if you've seen it before.
17    Okay. We'll go through it slowly so you
18  can review.
19    Okay. Do you recall this agreement?
20    A.  Yes.
21    Q.  And did you sign it?
22    A.  Yes.
23    Q.  Did you attach certain exhibits to it?
24    A.  I believe so.
25    Q.  Okay. Did you write this, or did your

**LIL' JOE RECORDS, INC. vs MARK ROSS, ET AL.**
Joseph Weinberger on 10/26/2022                    Pages 162..165

Page 162

1  attorney write this and you signed it?
2      A.    We dis -- we discussed it.
3            MR. WOLFE:  Don't go any further.
4  BY MR. BURROUGHS:
5      Q.    Yeah, I don't want to -- I don't need to
6  know what you discussed.
7            But, okay, so he -- he wrote it and you
8  signed it, is that accurate?
9      A.    I didn't say that.
10     Q.    Oh.
11     A.    I said we discussed it.
12     Q.    Did you type any of this out?
13     A.    I think so.
14     Q.    Okay.  And before signing it, did you read
15  it to make sure it was accurate?
16     A.    Yes.
17     Q.    Let's go up to Paragraph 2.
18           Okay.  And you indicate here that Lil' Joe,
19  meaningful Lil' Joe Records, is a successor in
20  interest to Luke Records.  Do you see that?
21     A.    Yes.
22     Q.    Is that accurate?
23     A.    It's successor in interest to Luke Records'
24  assets.
25     Q.    So is it accurate, is it inaccurate?

Page 163

1            What is it?
2      A.    It's what I just told you.
3      Q.    Okay.
4      A.    I bought what I bought from the bankruptcy
5  court.
6      Q.    Okay.  So you stand by the statement that
7  Lil' Joe is the successor in interest to Luke
8  Records, Inc., correct?
9      A.    To -- to the assets.
10     Q.    Does it say to the assets in Paragraph 2?
11     A.    That's what was meant.
12     Q.    Okay.  If you had the chance to rewrite it,
13  would you add "to the assets"?
14     A.    Most likely.
15     Q.    Okay.  Let's look down at the last sentence
16  of that paragraph.  "I was previously in-house
17  counsel to Luke Records -- Luke Records."
18           Do you see that?
19     A.    Yes.
20     Q.    Okay.  Let's scroll down.
21           All right.  Let's look at Paragraph 5.
22           Take a -- take a moment to read that.
23           Let me know when you're done.
24     A.    Yes.  Go ahead.
25     Q.    And did you attach that, the relevant

Page 164

1  agreement as Exhibit 1 to this declaration?
2      A.    I'm not sure what was attached.
3      Q.    Okay.  Let's go down and look at Exhibit 1.
4            Well, let me just -- well, before we go
5  down.  So did you not look at what was attached
6  before signing?
7      A.    I signed the document without the exhibits
8  attached.
9      Q.    Okay.  Let's go down to Exhibit 1 that you
10  reference in Paragraph 5.  And let's stop.
11           Is this the agreement that you're
12  referencing in Exhibit 5 -- I'm sorry -- in Paragraph
13  5 of this exhibit?
14     A.    No.
15     Q.    Okay.  Was this attached erroneously?
16     A.    I believe so.
17     Q.    Okay.  And did you not review the
18  attachments before referencing the attachments in
19  your sworn statement?
20     A.    Yes.
21     Q.    Okay.  Let's go back up.
22           In Paragraph 6 and 7, you reference certain
23  bankruptcy proceedings, right?
24     A.    Yes.
25     Q.    Are those the proceedings that we've

Page 165

1  discussed previously?
2      A.    As to the Luther Campbell and Luke Records
3  bankruptcy, yes.
4      Q.    Okay.  And I believe you testified that
5  there are no other relevant bankruptcy proceedings
6  relating to those two individuals, correct?
7      A.    Right.
8      Q.    Okay.  Let's scroll down.
9            All right.  Let's keep scrolling.
10           Okay.  Just stop there.
11           This is your signature?
12     A.    Yes.
13     Q.    Okay.  You can pull that exhibit down.
14           And I believe we're close to done.
15           Let's take a quick five-minute break for me
16  to go over my notes and then we'll reconvene.
17           Let's go off the record.
18           (Recess.)
19  BY MR. BURROUGHS:
20     Q.    All right.  So earlier you testified that
21  at some point you became a signatory to the Luke
22  Records bank account, is that accurate?
23     A.    I -- I believe so, yes.
24     Q.    Okay.  Do you recall ever signing any
25  checks from that account to any of the members of

**LIL' JOE RECORDS, INC. vs MARK ROSS, ET AL.**
Joseph Weinberger on 10/26/2022                    Pages 166..169

Page 166

1  2 Live Crew?
2      A.    No.
3      Q.    Okay.  And earlier you testified in regard
4  to a certain litigation with the Wong Won heirs,
5  correct?
6      A.    I don't believe I had any litigation with
7  the Wong Won heirs.
8      Q.    Okay.  I'm going to put a document in front
9  of you we're going to mark as Exhibit 17.
10           (WHEREUPON, Defendants' Exhibit 17 was
11           marked for identification.)
12  BY MR. BURROUGHS:
13     Q.    We'll going to scroll through this.  It's
14  three pages.  Let me know if you recognize this.
15           You recognize that document?
16     A.    No.
17     Q.    Let's go to page -- while we're on Page 3,
18  is that Lil' Joe Records' address?
19     A.    Yes.
20     Q.    Okay.  Let's go to Page 2.
21           Is that the Lil' Joe Records' letterhead?
22     A.    It appears to be.
23     Q.    Are you aware of anyone other than Lil' Joe
24  Records' personnel ever using Lil' Joe Records
25  letterhead for any reason?

Page 167

1      A.    No.
2      Q.    And do you see in the list of documents a
3  document titled, quote, "Agreement Effective 1/1/87
4  Luke Records, Inc?
5      A.    Yes.
6      Q.    Okay.  And that's No. 16?
7      A.    Yes.
8      Q.    Did you provide a copy of that agreement to
9  Christopher Wong Won?
10     A.    Yeah, that was the agreement that I told
11  you that he had provided to me in 2000.
12     Q.    Okay.  And so is it -- would it appear from
13  this document that Lil' Joe was giving back to him
14  a -- an agreement that he had previously provided?
15     A.    Yes.
16     Q.    Okay.  And let's go to the top.
17           Now, you testified you didn't recognize
18  this document, correct?
19     A.    Yeah, I don't recognize that.
20     Q.    Okay.  Do you use this form for invoices at
21  Lil' Joe?
22     A.    Like, the amount of the copies wouldn't
23  correspond with what's on the next page.  That's why
24  I said I don't recognize it.
25     Q.    Okay.  Did you use this form in 2016?

Page 168

1      A.    It's possible.
2      Q.    Okay.  Did you use any other invoice form
3  in 2016?
4      A.    It's possible.  I don't -- I don't know.
5      Q.    Okay.  But as you sit here today, you don't
6  recognize this particular document, is that correct?
7      A.    It doesn't seem to coordinate with the
8  other document.
9      Q.    Okay.  Let's look at Page 2.
10           And, also, there's, like, a green
11  background.  I don't -- I don't know where the green
12  background comes from.
13     Q.    Okay.  Disregarding the green background
14  and the date on that secondary card, do you -- do you
15  recognize the document with the Lil' Joe Records'
16  letterhead that's Page 2 of Exhibit 17?
17     A.    Yeah, but it's not signed, so I don't -- I
18  don't know what that is.
19     Q.    Okay.  So you recognize the letterhead, but
20  you don't recognize the remainder because it's not
21  signed, is that your testimony?
22     A.    Right.
23     Q.    Okay.
24     A.    Like, there's the signature line for
25  Christopher Wong Won to sign, and there's no

Page 169

1  signature.
2      Q.    And you yourself have never seen this
3  document before, correct?
4      A.    I don't recall seeing that.
5      Q.    In 2016, who else at Lil' Joe Records could
6  have issued this document on this letterhead?
7      A.    Anyone that was there could have used the
8  letterhead.
9           MR. WOLFE:  Do you know where this
10  document comes from?
11  BY MR. BURROUGHS:
12     Q.    And who was there in February of 2016?
13     A.    Including Christopher Wong Won taking a
14  copy of it and typing it up, so I don't know.
15           MR. WOLFE:  Scott, do you know where this
16  document came from?
17           Is it something you produced?
18  BY MR. BURROUGHS:
19     Q.    So is it your testimony that Mr. Wong Won
20  typed this up himself on your letterhead?
21           MR. WOLFE:  Scott, is this something you
22  produced?
23           MR. BURROUGHS:  Uh-huh.
24           MR. WOLFE:  Yes?
25           MR. BURROUGHS:  Yes, this is something

**LIL' JOE RECORDS, INC. vs MARK ROSS, ET AL.**
Joseph Weinberger on 10/26/2022        Pages 170..173

Page 170

1  we're -- yes, that we're producing.
2      MR. WOLFE:  That you're producing now for
3  the first time, is that what you're saying?
4      MR. BURROUGHS:  I'm not certain if it was
5  in our prior production, but yes, this is
6  something that we're certainly supplementing
7  with if it wasn't already produced.
8      THE WITNESS:  What was your question,
9  Scott?
10 BY MR. BURROUGHS:
11     Q.   Well, I'm trying to clarify your testimony.
12     I believe you testified that you think that
13 Mr. Wong Won typed this up on your letterhead.
14     A.   It's possible.
15     Q.   Okay.  And why do you believe that's
16 possible?
17     A.   Because he's done some, I don't know, like,
18 dishonest stuff in the past.
19     Q.   Okay.  Was he ever doing office work for
20 Lil' Joe Records?
21     A.   He was in the office frequently.
22     Q.   Was he doing office work there?
23     A.   Was he doing office work?  No.
24     Q.   Okay.
25     A.   He would come into the office and sit

Page 171

1  there, like, all day long.
2      And I didn't supervise him all day long.
3      Q.   So you think he may have typed up this list
4  and then billed himself for copies at Lil' Joe
5  Company Records?
6      MR. WOLFE:  Objection to form.
7      THE WITNESS:  It doesn't -- the copies
8  don't correspond with the amount of the
9  documents that are on Page 1.
10 BY MR. BURROUGHS:
11     Q.   Okay.  Do you think maybe he gave himself a
12 deal on the -- on the document.
13     A.   I can't tell you what he did or what he
14 didn't do.
15     Q.   Do you recognize the handwriting on the
16 document?
17     A.   It says 18 and a half, 12/24/98 trademark,
18 et cetera.
19     That's not my handwriting.
20     Q.   Do you recognize it?
21     A.   I have no idea whose handwriting that is.
22     Q.   Okay.  How many employees did Lil' Joe
23 Records have in 2016?
24     A.   Maybe seven or eight.
25     Q.   Okay.  Was there someone that was in charge

Page 172

1  of the records at that time?
2      A.   It would have been me.
3      Q.   Okay.  So if Christopher Wong Won came in
4  looking for copies of all Lil' Joe Records relating
5  to 2 Live Crew, he would ask you for the records?
6      A.   These aren't documents related to 2 Live
7  Crew.  Like, some of them are, some of them are
8  different documents.
9      Q.   Okay.  Fair enough.
10     If he came in and asked you for documents
11 relating to, you know, his agreements, would he ask
12 you that?
13     A.   Ah, yes.
14     Q.   Okay.  But you don't remember him doing it
15 in 2016, correct?
16     A.   No.
17     Q.   So that's not correct.
18     So you -- so what do you remember about him
19 asking for this in 2016?
20     A.   I don't recall.  I don't recall this.
21     Q.   Okay.  Where were the documents in
22 Paragraphs 1 through 22 kept in 2016?
23     MR. WOLFE:  Objection to form.
24     THE WITNESS:  Like, I don't know what the
25 18 and a half and the 19 and a half is.

Page 173

1  BY MR. BURROUGHS:
2      Q.   Okay.  Well, I'm not asking about those.
3      I'm asking about 1 through 22.
4      A.   I know that he would have copies of the
5  documents.
6      Q.   Were those kept at Lil' Joe offices?
7      A.   He had copies.  I had copies.
8      Q.   Okay.  Where were they kept in your office?
9      A.   In various places in the office.
10     Q.   Okay.  Where were you keeping your copy of
11 the 1/1/87 Luke Records agreement referenced in
12 Paragraph 16?
13     A.   In my office.
14     Q.   Was it kept with the other agreements
15 between the members of 2 Live Crew and a record
16 label?
17     A.   Yes.
18     Q.   And is it your testimony that you did not
19 give Chris Wong Won a copy of that agreement in
20 February of 2016, or that you don't recall doing so?
21     A.   I don't recall, and I think I had told you
22 before that Allen Jacobi told me that there was no
23 agreement.  That's why I knew it was, like, a bogus
24 agreement.
25     Q.   Did you ever indicate anywhere in your

**LIL' JOE RECORDS, INC. vs MARK ROSS, ET AL.**
**Joseph Weinberger on 10/26/2022**                    Pages 174..177

---

Page 174

1  files that your copy of this '87 agreement was bogus?
2      A.   I may have.
3      Q.   Where?
4      A.   I may have, like, written on the back of
5  it, like, a question mark.
6      Q.   And if you didn't do that, is it safe to
7  assume that you never indicated anywhere in any of
8  your files that this '87 agreement was supposedly
9  phony?
10     A.   This is, like, what Allen Jacobi had told
11 me.  He told me that there was no agreement.
12     Q.   So it's fair to say as you sit here today,
13 you don't recall ever making any indication in your
14 records that there was an issue with the '87
15 agreement --
16     A.   No.
17     Q.   -- correct?
18     A.   No.  I had told you that there's a question
19 mark on the back of the agreement.
20     Q.   On which page?
21     A.   The last page.
22     Q.   Okay.  I don't believe I've seen that, so
23 if that exists, it hasn't been produced; of course,
24 it should be produced.
25          When did you add that question mark?

---

Page 175

1      A.   Like, when Wong Won had given me the thing.
2      Q.   When was that?
3      A.   It's -- I think I told you in the -- early
4  in the 2000's.
5      Q.   Okay.  So it's your testimony that when
6  Wong Won provided to you the contract, you put a
7  question mark on the back of it at that time?
8      A.   Oh, no.
9           No, when Allen Jacobi told me it was a bad
10 contract.
11     Q.   Okay.  Now, did he tell you it was a bad
12 contract?
13     A.   He said it was not a -- not a valid
14 contract was his words.
15          He said the only agreements that existed
16 with 2 Live Crew were the ones that he drafted in
17 1991.
18     Q.   Okay.
19     A.   And they're not all listed in this -- in
20 this document.
21     Q.   Yes.  That's -- I was going to ask you
22 about that.
23          So you don't see that '91 agreement in
24 here, or do you?
25     A.   I see one of the three agreements.

---

Page 176

1      I don't see all three of them.
2      That's why I'm telling you I don't think
3  this is -- this is something I would have generated.
4      Q.   So after putting the question mark on this
5  agreement that your lawyer told you was a fraud, did
6  you take any other steps to challenge it or reach out
7  to anyone and provide them notice that you believe
8  that this was fraudulent or anything else?
9          MR. WOLFE:  Objection.
10         THE WITNESS:  I believe Richard Wolfe did
11 with you.
12 BY MR. BURROUGHS:
13     Q.   Twenty-two years later?
14     A.   I didn't know it was fraudulent until,
15 like, recently.
16     Q.   Well, you just testified you put a question
17 mark on it in the early 2000's, didn't you?
18     A.   No, I told you that Allen Jacobi told me
19 that it was a questionable agreement because he
20 didn't -- he was not -- he said that the only
21 agreements he had were the ones he drafted in 1991.
22     Q.   Well, I understand that may be the only
23 agreement that he's told you he had, right --
24     A.   No, he -- he --
25     Q.   -- does that indicate to you that just

---

Page 177

1  because he didn't have a copy, that the agreement was
2  phony or --
3      A.   No.
4      Q.   -- invalid?
5      A.   He said that those were the only agreements
6  that existed with 2 Live Crew.
7      Q.   (Unintelligible.)
8      A.   He was the lawyer for Luke -- Luther
9  Campbell, and he told me specifically, and he told
10 Richard, that Luther Campbell told him that the guys
11 in the group were not under contract and that he
12 needed to draft up contracts for them.
13     Q.   Isn't it true that he was only one of a
14 number of attorneys for Mr. Campbell and Luke Records
15 at the time?
16         MR. WOLFE:  Objection.
17         We've been over this three times.
18         THE WITNESS:  That's what --
19 BY MR. BURROUGHS:
20     Q.   Go ahead.
21     A.   That's what -- that's what he told me, he
22 was the attorney in 1991.
23     Q.   Okay.  So when did you add the question
24 mark to the 1987 agreement?
25     A.   Recently.  Like, within the last year.

---

**LIL' JOE RECORDS, INC. vs MARK ROSS, ET AL.**
Joseph Weinberger on 10/26/2022                    Pages 178..181

Page 178

1    Q.   So is it fair to say that between at least
2  2002 and last year, you had never expressed any
3  problem with that 1987 agreement to any third party?
4    A.   I didn't know to -- to raise an issue with
5  the agreement.  I just thought it was strange that
6  Wong Won gave me the agreement and I didn't have a
7  copy in my files.  So I always thought it was
8  peculiar.
9    Q.   And it's fair to say that you never reached
10  out to Mr. Campbell or any lawyer or anyone regarding
11  the supposed invalidity of this contract until this
12  present case, correct?
13    A.   There was no reason to.
14    Q.   Correct?
15    A.   There was no reason to.
16    Q.   But isn't that correct?
17    A.   Yes, that is correct.
18    Q.   Okay.  And isn't it true that you made no
19  indication in your records in or around 2002 when you
20  first allegedly received a copy of this contract to
21  indicate that there was some problem with it,
22  correct?
23    A.   Just mentally, you know, that I was aware
24  that there was, like, a weirdness about it.
25    Q.   Okay.  And there was nothing in your

Page 179

1  business records relating to this contract having any
2  sort of problem at any time until the present lawsuit
3  came about, correct?
4    A.   I didn't realize it was relevant until the
5  present lawsuit?
6    Q.   So is that correct?
7    A.   I didn't realize it was relevant until the
8  present lawsuit.
9    Q.   I understood.
10       So based on that understanding of
11  relevancy, is that correct?
12    A.   I didn't understand the relevancy of the
13  correctness of the contract or not.
14       I think that all of the rights with Wong
15  Won was resolved through the various releases and
16  things like that.
17    Q.   All right.  So if at any time between 2002
18  and this lawsuit you made any indication in your
19  business records or reached out to the copyright office or any
20  or filed anything with the copyright office or any
21  government entity relating to the supposed issues
22  with this contract, I'll let you tell me those now.
23       MR. WOLFE:  Objection to form.
24       THE WITNESS:  I had told you, like, once
25    Allen Jacobi told me that it was a bogus

Page 180

1  contract, I marked the back of the contract with
2  a question mark, and Richard --
3  BY MR. BURROUGHS:
4    Q.   And that was --
5    A.   -- and Richard advised to as a phony
6  contract.
7    Q.   And that was in or around 2021?
8    A.   I don't know when Richard told me.
9       I would think 2021.
10    Q.   So if you did anything between 2002 and
11  2021, please tell me now.
12    A.   I didn't realize that --
13       MR. WOLFE:  Objection to form.
14       THE WITNESS:  I didn't realize there was
15  an issue regarding it until -- until you filed a
16  termination notice.
17  BY MR. BURROUGHS:
18    Q.   Okay.  I'm going to give you another moment
19  to let me know what if anything was done in that
20  time.
21       MR. WOLFE:  He just did.
22       He's not going to answer it a fourth
23  time.
24       THE WITNESS:  I'm not going to answer
25  your questions ten times.  You keep on asking me

Page 181

1  questions ten times.
2    Q.   Okay.  I've given you some time.
3       Do you have anything to add?
4    A.   Do you have any other questions?
5    Q.   Do you have anything to add?
6       It's a yes or no.
7       MR. WOLFE:  Add to what?
8       MR. BURROUGHS:  To his prior response.
9       MR. WOLFE:  He's already said he's
10  answered the question.
11  BY MR. BURROUGHS:
12    Q.   So I'll take that as you do not have
13  anything to add.  If that's incorrect, let me know.
14       MR. WOLFE:  That's fair enough.
15  BY MR. BURROUGHS:
16    Q.   And let's go down to the third page of this
17  document.
18       Do you see this text?
19    A.   Do I see what?
20    Q.   The text on Page 3 of this exhibit.
21    A.   Text, I don't see any --
22       MR. WOLFE:  No, the -- what --
23       THE WITNESS:  Oh, what's typed on it,
24  yes.
25

**LIL' JOE RECORDS, INC. vs MARK ROSS, ET AL.**
Joseph Weinberger on 10/26/2022                     Pages 182..185

Page 182

1  BY MR. BURROUGHS:
2      Q.    Yeah, I refer to letters as text.
3            If you have another way to describe it...
4            What -- well, what do you see on this page?
5      A.    The typeset is different than the prior
6  page.
7      Q.    Okay.  Do those calculations mean anything
8  to you?
9      A.    It was money that was owed to me by Chris
10 Wong Won.
11     Q.    Okay.  Were these calculations from your
12 records?
13     A.    Yes.
14     Q.    Did you type this?
15     A.    It doesn't look like something I would have
16 typed.
17     Q.    Did Lil' Joe Records type this?
18     A.    No.
19     Q.    Yes or no?
20     A.    No.  It may be something that Wong Won
21 typed while he was in the office.
22     Q.    From where would he have pulled the
23 numerical values that you see there on Page 3?
24     A.    Probably he would have asked what was --
25 what he owed.

Page 183

1      Q.    Who would he have asked?
2      A.    Myself and/or Robert MacDonald.
3      Q.    Okay.  Do you recall him asking either of
4  you?
5      A.    He asked pretty much on a regular basis
6  what he owed.
7      Q.    And do you recall providing that
8  information to him?
9      A.    Yes.
10     Q.    And do you recall doing that in or around
11 February of 2016?
12     A.    I have no reason to believe that I didn't.
13     MR. BURROUGHS:  Okay.
14           All right.  I believe that I am
15 finished.
16           Mr. Wolfe, do you have any questions?
17     MR. WOLFE:  I have no questions.
18           He would like to read.
19           And Scott, if we can just go off the
20 record and ask you a few things.
21     MR. BURROUGHS:  Well, before we go off
22 the record, we will relieve the court reporter
23 of her duties under the code.
24           And agree that we can use a certified
25 copy in place of the original for any purpose,

Page 184

1  and that your client will have the opportunity
2  to read.
3            Is 21 days sufficient to read it and
4  respond?
5      MR. WOLFE:  That's fine.
6      MR. BURROUGHS:  All right.  Then, that's
7  fine.  Anything else to stipulate to on the
8  record?  Richard?
9            All right.  And so, do you agree to that
10 procedure?
11     THE COURT REPORTER:  Okay.
12     MR. WOLFE:  Is the mediation -- we're --
13 we've been unable --
14     MR. BURROUGHS:  Well, before we get into
15 that, do you agree to the stipulation, so we can
16 go off the record?
17     MR. WOLFE:  Yes.
18     MR. BURROUGHS:  All right.
19           So let's go off the record.
20     THE COURT REPORTER:  Okay.  One moment.
21           Would you like that transcribed, Mr.
22 Burroughs?
23     MR. BURROUGHS:  Yes, we would like our
24 copy.
25     THE COURT REPORTER:  Okay.

Page 185

1            And, Mr. Wolfe, would you like a copy?
2      MR. WOLFE:  Yeah, regular turnaround is
3  fine.
4      THE COURT REPORTER:  Okay.  Thank you.
5            And then, the exhibits, I will confirm
6  that I receive 1 through 17, Mr. --
7      MR. WOLFE:  And then attach it so we have
8  a set with them attached.
9      THE COURT REPORTER:  I will, of course.
10 Thank you, gentlemen.
11     MR. BURROUGHS:  Thank you.
12     MR. WOLFE:  Thank you.
13     MR. BURROUGHS:  Thank you so much.
14 Take care.
15     (The deposition concluded at 3:46 p.m.)
16           * * * * * *
17
18
19
20
21
22
23
24
25

**LIL' JOE RECORDS, INC. vs MARK ROSS, ET AL.**
**Joseph Weinberger on 10/26/2022**                    **Pages 186..188**

Page 186

```
 1              CERTIFICATE OF OATH
 2
 3   STATE OF FLORIDA
 4   COUNTY OF BROWARD
 5
 6        I, KRISTINA ESSIG, RPR, Registered
 7   Professional Reporter, and Notary Public, State of
 8   Florida, certify that JOSEPH WEINBERGER, appeared
 9   before me via videoconference and was duly
10   sworn/affirmed remotely pursuant to the Florida
11   Supreme Court Administrative Order.
12
13        WITNESS my hand and official seal this
14   26th day of October, 2022.
15
16
17
18
19        Kristina Essig, Court Reporter
          Notary Public, State of Florida
20        Commission No.: HH064474
          Expires: January 5, 2025
21
22
23
24
25
```

Page 187

```
 1              CERTIFICATE OF REPORTER
 2
 3   STATE OF FLORIDA
 4   COUNTY OF BROWARD
 5
 6        I, KRISTINA ESSIG, RPR, Registered
 7   Professional Reporter, and Notary Public, State of
 8   Florida, do hereby certify that I was authorized to
 9   and did stenographically report the deposition of
10   JOSEPH WEINBERGER; that a review of the transcript
11   was requested; and the foregoing transcript is a true
12   and accurate record of my stenographic notes.
13        I FURTHER CERTIFY that I am not a relative,
14   employee, attorney, or counsel of any of the parties,
15   nor am I a relative or employee of any of the
16   parties' attorney or counsel connected with the
17   action, nor am I financially interested in the
18   action.
19
20        Dated this 4th day of November, 2022.
21
22
23        Kristina Essig, Court Reporter
          Notary Public, State of Florida
24
25
```

Page 188

```
Re: Lil' Joe Records, Inc. v. Mark Ross, et al.
Case No. 1:21-CV-23727-DPG
Deposition of Joseph Weinberger, taken 10/26/2022
              E R R A T A   S H E E T
PAGE_____ LINE_____ CHANGE_____
_____
REASON_____
PAGE_____ LINE_____ CHANGE_____
_____
REASON_____
PAGE_____ LINE_____ CHANGE_____
_____
REASON_____
PAGE_____ LINE_____ CHANGE_____
_____
REASON_____
PAGE_____ LINE_____ CHANGE_____
_____
REASON_____
Under penalty of perjury, I declare that I have read
the entire transcript taken in the above-captioned
matter, or the same has been read to me, and the same
is true and accurate except for changes and/or
corrections, if any, as indicated by me on the ERRATA
SHEET, with the understanding that I offer these
changes as if still under oath.
_____       _____
     DATE                       JOSEPH WEINBERGER
```

**LIL' JOE RECORDS, INC. vs MARK ROSS, ET AL.**
Joseph Weinberger on 10/26/2022                    Index: $15,000..19

_____
   **Exhibits**
_____

**WeinbergerJ 1**
  3:9 15:19,
  23 113:6
  164:1,3,9

**WeinbergerJ 2**
  3:10
  60:15,16
  80:3

**WeinbergerJ 3**
  3:12
  85:11,12
  86:12
  88:12
  89:18
  101:20

**WeinbergerJ 4**
  3:13
  102:7,8
  104:7
  105:25

**WeinbergerJ 5**
  3:15
  106:1,2
  164:12

**WeinbergerJ 6**
  3:17
  115:1,2
  117:8

**WeinbergerJ 7**
  3:18
  117:13,14

**WeinbergerJ 8**
  3:20

118:8,15,
18,19

**WeinbergerJ 9**
  3:22
  120:8,21,
  25 121:1,
  3,7 123:24
  125:8
  127:4
  132:21
  133:5
  134:6
  135:2

**WeinbergerJ 10**
  3:23
  121:6,7
  140:7,11,
  19

**WeinbergerJ 11**
  4:1 143:23
  144:1

**WeinbergerJ 12**
  4:3 152:4,
  5

**WeinbergerJ 13**
  4:4
  154:10,11

**WeinbergerJ 14**
  4:6
  157:12,13

**WeinbergerJ 15**
  4:7
  159:14,15

**WeinbergerJ 16**
  4:9

161:10,11

**WeinbergerJ 17**
  4:11
  166:9,10
  168:16

_____
       **$**
_____

**$15,000**
  150:8

_____
       **1**
_____

**1**  15:19,23
  16:17
  102:2
  111:2
  112:25
  113:4,6
  115:9
  118:9,13
  160:15
  164:1,3,9
  171:9
  172:22
  173:3
  185:6

**1/1/87**  167:3
  173:11

**10**  54:14
  120:25
  121:7
  140:7,11,
  19

**105-page**
  120:21

**1099**  18:11,
  19,22

**11**  143:23
  144:1
  160:7

**12**  152:4,5
  160:9,10,
  11,15

**12-inch**  23:7

**12/24/98**
  171:17

**12:55**  79:22

**13**  154:10,
  11

**14**  157:12,
  13

**15**  32:4
  79:13,17
  89:7
  159:14,15

**15-minute**
  119:21

**16**  161:10,
  11 167:6
  173:12

**167th**  58:17

**17**  166:9,10
  168:16
  185:6

**18**  171:17
  172:25

**19**  26:10
  172:25

**LIL' JOE RECORDS, INC. vs MARK ROSS, ET AL.**
Joseph Weinberger on 10/26/2022          Index: 1986..28-page

**1986**  102:2
  113:4

**1987**  96:21
  97:1 98:8
  99:6,20
  119:16
  120:9
  131:23
  177:24
  178:3

**1988**  26:10
  30:4
  132:3,6

**1989**  132:16

**1990**  14:16
  28:10,18
  97:4,6
  128:12,14
  132:18
  135:25

**1991**  28:10
  37:22
  42:23
  45:15 49:1
  80:3 93:7
  94:3,6,9,
  12,15,18,
  20,24
  95:25
  119:15
  123:19
  130:1,23
  134:14,18
  138:6
  151:7
  175:17

176:21
177:22

**1992**  127:21
  145:10

**1994**  40:8
  136:19

**1995**  53:9,
  11,15,22
  54:10,20
  56:19
  58:20
  78:11

**1996**  72:20

**1998**  132:1

**1:00**  31:13
  32:7

───────────
        **2**
───────────

**2**  9:5 16:11
  17:15,22
  18:4,6,20
  22:20 23:4
  52:16,18
  59:3,10
  60:15,16
  77:4,23
  78:6 80:3
  81:24 84:8
  86:2 91:1
  94:11 96:2
  97:6,12,24
  102:1
  110:6,25
  111:5
  122:24

**129:6,10,
  14 130:7
  131:16,24
  134:14,19
  138:20
  146:3
  147:10
  148:1
  151:11
  162:17
  163:10
  166:1,20
  168:9,16
  172:5,6
  173:15
  175:16
  177:6

**2/20/02**
  110:11

**20**  9:13

**20-minute**
  32:4

**2000**  111:18
  143:2
  167:11

**2000's**
  121:21
  128:19
  175:4
  176:17

**2002**  111:18
  178:2,19
  179:17
  180:10

**2005**  142:6

**2006**  142:6
  143:2

**2008**  54:4,
  13 93:20
  143:4

**2010**  54:5
  93:21
  111:22
  143:4

**2015**  111:22
  138:24
  147:3

**2016**  167:25
  168:3
  169:5,12
  171:23
  172:15,19,
  22 173:20
  183:11

**2020**  85:8

**2021**  180:7,
  9,11

**203**  148:2,9
  149:8,16
  150:13,20

**21**  116:14
  184:3

**22**  172:22
  173:3

**24**  13:3

**28-page**
  62:15

**LIL' JOE RECORDS, INC. vs MARK ROSS, ET AL.**
Joseph Weinberger on 10/26/2022                    Index: 3..acknowledge

**3**

3  16:11
  85:11,12
  86:12
  87:15
  88:12
  89:18
  101:20
  166:17
  181:20
  182:23

3050  98:15

32  103:13,
  23

3:46  185:15

**4**

4  102:1,7,8
  104:7
  105:25
  144:12
  145:3,4

40  102:19

4:30  31:23

4th  85:8,9

**5**

5  106:1,2
  117:21
  163:21
  164:10,12,
  13

5-minute
  79:12

50  9:8,9
  103:11

58  118:22

58-page
  119:4

**6**

6  115:1,2
  117:8
  164:22

600,000
  146:7

6157  58:17

**7**

7  74:16
  117:13,14
  164:22

75,000  146:6

750  146:7

**8**

8  118:8,15,
  18,19

80's  131:3

86  63:17,24
  64:9,15
  65:3

87  98:14
  100:6

121:2
  151:8
  174:1,8,14

89  26:10

**9**

9  120:8,21,
  25  121:1,
  3,7  123:24
  125:8
  127:4
  132:21
  133:5
  134:6
  135:2

90's  10:14

91  28:18
  49:11
  97:7,17,19
  99:9,21
  100:3
  124:3
  130:10
  135:15,22
  175:23

911  36:3

92  134:22
  145:13

93  145:13

95  52:25
  131:1

97  72:20

98  72:20
  132:2

**A**

A-B-U-E-G
  38:10

A-L-A-M-U-N-D-
O  19:10

ability  81:8

Absolutely
  140:21

Abueg  38:7,
  10

account
  37:16,21
  165:22,25

accountant
  43:4  44:25

accountant's
  43:14

accounting
  26:16

accurate
  61:3  65:25
  70:12
  71:1,3,15
  99:14
  108:7
  122:8
  146:21
  149:15
  162:8,15,
  22,25
  165:22

acknowledge
  93:21

acknowledged
139:1
147:10

acknowledging
143:5

acquired
108:2

action  69:7

active  9:18

actual
126:11

add  42:11
163:13
174:25
177:23
181:3,5,7,
13

added  39:1,
20

address
58:15,19,
22 71:25
98:14
166:18

administering
6:5

admonitions
9:15,24

adversarial
144:21

adversely
47:13

advise

80:16,18
81:14

advised
180:5

affirm  6:25

affirmation
84:11
137:20
143:3

afterward
130:12
131:21

agency
139:15

agent  17:19
110:10

agree  6:14
158:12
183:24
184:9,15

agreed  5:3
6:12

agreement
6:7,8
48:18,20
49:6,8,9,
11,14,19
50:4
55:15,18,
21,25 56:2
62:3 64:4,
23 66:21
71:17
94:24
95:10 96:1

97:11,14,
18 98:4,20
99:6,19
100:5,24
101:2,3,8
119:16
120:9
121:2,9,
20,23
122:11,18,
19,20,21
123:3,21,
23 124:15,
18,19,23
125:1,2,6,
12,16,17,
21 126:1,4
127:1
128:3,6,9,
20 129:1,
21 132:20,
22 133:1,
8,11
134:6,12
135:3,8,
11,14,16,
18 136:6,7
138:6,10,
12,16,24
140:9
141:5,6,9,
15,16,19,
20 142:8,
19 143:24
144:24
145:15
146:3,11,
18 147:4,8

148:5,19,
24 151:7,
8,10
161:19
164:1,11
167:3,8,
10,14
173:11,19,
23,24
174:1,8,
11,15,19
175:23
176:5,19,
23 177:1,
24 178:3,
5,6

agreements
49:17,20,
21 50:3
53:11,15,
21 54:1,4,
9 70:8
71:19 76:6
83:24
84:12
93:20
97:19,23
99:9,21
101:13
119:17
123:19
124:2,3
126:2,13,
17,24
127:5,8,
11,19
128:5
129:6,20

LIL' JOE RECORDS, INC. vs MARK ROSS, ET AL.
Joseph Weinberger on 10/26/2022          Index: ahead..appears

130:7,10,
11 131:7,
15,20
135:9,15,
22 137:14,
17,20
139:4
141:11
142:15,20,
25 143:4,
19 147:25
148:3,7
151:21
172:11
173:14
175:15,25
176:21
177:5

ahead  20:19
27:4 31:11
42:10
49:16
61:2,20
75:6 87:4
103:9
123:5
142:12
152:21
163:24
177:20

Alabama
144:22

Alamundo
19:4

album  22:14
99:1,12,17
100:1,6

102:4
127:2
128:7
129:22
146:3

albums  23:18
67:11
81:19,22
82:11,14,
18 85:8
86:2,5,7,9
91:2,8,13
94:2,5,9,
20 105:8
122:25
123:9,14
129:11,14
130:4,9,
15,20
131:2,5,
17,18
134:16,20
136:25
137:4,7,11
138:1
142:22
145:7,17
161:5

alcohol  13:2

allegation
127:23

allegations
20:9 22:25
47:8 88:1,
7,10,12
89:18

allege  23:13
138:19
139:2
155:4

alleged
127:19

allegedly
178:20

Allen  13:17
28:24
45:22
48:25 79:6
93:5,10
95:1 96:5
100:11,17
114:14,15
135:6,7
136:1,8
173:22
174:10
175:9
176:18
179:25

alphabetical
72:14

alphabetically
72:13

altered
132:21,25
133:2,7,10

alternates
86:4

amend  115:23

amended
110:8

115:21
116:13
117:7

amending
116:11,12

amount  146:8
167:22
171:8

and/or  52:24
113:21
117:3
183:2

annual  30:23

answering
68:2
125:10
133:17

answers  10:7
158:23

anticipate
31:20

anymore
133:23

Apologies
136:16

apologize
160:10

appearance
34:1

appeared
65:24

appears
63:4,16

110:20,22
153:3,18
159:11
166:22

Apple  23:7

application
115:23

applications
114:19

applied
160:24

apply  24:15

approach
53:5

approached
53:7

approximately
111:22
143:2

area  43:8
46:17

Armada  80:24

arrangement
121:2

articles
30:23

artist  48:19
50:4 70:9

artist's
127:7

artists
53:19,22,
23 55:7

128:2
138:2

asserted
48:18

assertion
48:23 50:3

asset  148:16

assets  50:9,
14,19,23
51:1,5,15,
24 52:10,
14,15,21
75:12,15
137:9
162:24
163:9,10,
13

assigned
140:5

assignment
145:12

assignments
29:13

assist
72:16,17

assisted
113:22

associate
11:8
27:17,19
37:7,8

assume  50:24
153:12
174:7

assuming
128:8

asterisk
110:16
111:1,2

attach
160:14
161:23
163:25
185:7

attached
70:5,8
73:1
164:2,5,8,
15 185:8

attachment
70:14

attachments
49:25
164:18

attempt
131:9

attempted
150:7

attend  77:4

attorney  6:7
7:10 9:16,
18 10:20
13:10,13,
25 14:1
44:25
46:14 60:9
68:11,15,
20 69:6,17
70:4 97:1,

3 136:18
143:19
157:16
162:1
177:22

attorney's
65:14
67:21,23
104:2
153:10
154:6
155:12
157:2,8,21

attorney-
client  87:1

attorneys
27:14
28:22 29:2
43:14
44:18
46:10
98:17
136:5,11
177:14

audible  10:7
157:4

authority
110:8

authorized
110:10

awarded
129:15

aware  14:20
24:5 46:2
48:22

51:7,23
59:14
60:11,13
75:7 81:17
89:25
90:2,24
100:5
101:13
105:10
111:8,10,
13 113:23
127:7,16
129:5
134:8,11,
18 151:9
166:23
178:23

_____
B
_____

back  10:12
16:17
32:20
61:17
64:22 69:4
79:17,18,
21 80:11
93:24
101:20
102:15
106:22,25
115:9
117:7
118:9
126:8
144:6,11,
12 145:3,4
148:22

160:3,13
164:21
167:13
174:4,19
175:7
180:1

background
168:11,12,
13

bad  175:9,
11

Bailey  27:1

bank  165:22

bankers  72:4

bankrupt
47:19
48:7,13
149:11

bankruptcies
24:11
148:14
151:4

bankruptcy
24:12
47:21,23
50:10,13,
17 51:25
73:20,24
74:10,15
75:9,15
76:3,5,7
80:11
82:19,21,
22,24
84:10,15

91:9
93:13,14
108:3
137:10,16
138:21,22
139:3
143:8
144:22
145:22
146:1,10,
24 148:17,
19 150:22,
23,24
151:1,2,5,
6 163:4
164:23
165:3,5

Banned  22:16

bar  9:19
86:25

based  21:5
23:24 24:2
50:2 93:10
179:10

Basically
86:23

basis  20:11
24:6,13,18
87:11
93:11,25
96:7,8,10
104:14
110:24
112:11,15,
18,22
127:24

155:21
159:5
183:5

Bass  8:18
18:14

Bates  153:2
154:21

battery
158:16

began  14:15

begin  26:8
52:23

beginning
6:6

behalf  95:22
113:7,9
114:19
118:4

belief
112:15

Bennett  38:4

Bergeson
28:25
46:13

Bernard
38:5,17

bill  44:11,
12

billed  171:4

bills  44:9
81:8

binders
151:22

LIL' JOE RECORDS, INC. vs MARK ROSS, ET AL.
Joseph Weinberger on 10/26/2022      Index: binding..Burroughs

binding
  101:14

binds   113:10

Biscayne
  98:15

bit   31:20
  157:5

Bivins   38:5

Black   104:25
  113:21
  114:8
  160:21

blank   65:21

block   87:15,
  20

blue   12:21

BMG   82:15

BMI   55:12,
  16,19,22
  56:3 59:3,
  9 146:15,
  19,25

bogus   173:23
  174:1
  179:25

booking
  17:19

bookkeeper
  19:13
  40:5,10

borrow
  107:24
  150:7

bought   50:19
  51:5,24
  52:10,13,
  21 75:14
  137:9
  143:7
  163:4

Boulevard
  98:15

box   108:17,
  24 109:2
  111:2
  115:18

boxes   72:4

Boyz   8:18
  18:14

breach   134:6

break   31:13,
  25 32:5,7,
  18 36:4
  75:17
  77:15,19
  79:12,14,
  17 80:3
  119:11,15,
  18,21
  120:12
  147:16
  158:7,8,20
  165:15

Brian   38:19

briefly   9:15
  10:1

bring   14:24

broad   43:12

broken   73:14

brother
  29:18
  139:25
  149:23

Bruce   29:3
  46:7,12

bunch   68:24
  72:5
  141:22

burgers
  33:11

Burroughs
  6:10,11
  7:8,18,23
  8:13,16
  12:4 16:1
  17:2
  20:18,22
  21:24
  22:12 24:4
  25:4
  31:12,17
  32:3,16,19
  33:7,21
  34:2,6
  36:6,9
  38:13
  45:20
  50:11
  60:18,24
  61:18,25
  62:10,21
  63:6,18,22
  64:3,21

65:9,12
  66:6,16
  67:2,6,10,
  14,19 68:9
  71:13
  77:17,21
  78:2
  79:10,14,
  16,21,24
  85:14
  87:3,9,12
  97:2
  102:10,23
  103:5,8,
  13,18
  104:1,13,
  16 106:4,
  12,17,19
  114:24
  115:4,11,
  13 117:16
  118:11,17,
  21 119:7,
  14,25
  120:5,16,
  23 121:11,
  18 123:4
  134:4,10
  140:13,21,
  24 143:15
  144:3,10,
  16 147:13,
  17,21,24
  152:7,20
  153:1,9,
  16,24
  154:4,13,
  17,22

155:3,10,
15,20,24
156:3,13,
17 157:1,
15,20
158:4,8,
12,18
159:18
160:1,6,
10,13,16
161:13
162:4
165:19
166:12
169:11,18,
23,25
170:4,10
171:10
173:1
176:12
177:19
180:3,17
181:8,11,
15 182:1
183:13,21
184:6,14,
18,22,23
185:11,13

**Burt**  38:18

**business**
45:17 58:3
60:1 73:22
74:19 79:3
109:6
128:20
140:15
154:23

155:1
179:1,19

**businesses**
8:5 28:1

**Busto**  27:2

**buy**  137:10

**buying**  44:6
51:1

**bylaws**  30:24

─────────────

**C**

─────────────

**C-O-O-P-E-R**
19:7

**cabinet**  72:3

**calculate**
103:17

**calculations**
182:7,11

**call**  86:7,
24 97:19

**camera**  7:13,
14,19

**Campbell**
14:8 20:2
23:13,16
24:10,15
26:12
27:3,6
28:6,14,23
29:14
30:11 38:5
41:15
42:25

43:22,25
44:2,10,24
45:13,25
46:24
47:24
48:13,18
49:1,2
50:15
51:10
57:12
69:24
71:22
73:14 79:7
80:6,10
81:17
82:23
91:11,14,
24 92:5,25
95:2 96:15
99:5,7
104:19
122:20
124:12
127:15
128:4
136:17,22
138:3
146:11
147:5
148:7,14,
20 149:17
150:23
151:11
165:2
177:9,10,
14 178:10

**Campbell's**
28:1 40:13

41:22
43:17 50:3
123:15
146:23

**capacity**
26:11
57:10

**card**  168:14

**care**  185:14

**careers**
132:9

**carried**
41:25

**carries**  10:4

**carry**  42:7

**case**  8:25
9:2 13:14,
16,25
15:5,12
19:22
21:20,23
22:3 23:3
47:4,5,6,
8,12 48:16
52:7 60:8
67:17
68:11
69:18
70:4,10,16
71:8
111:16
122:5
123:11
127:10,13,
18,23

143:20
159:9
178:12

cases
  111:17,18,
  25 127:13

CDS  23:8,10

Cedric  38:15

Cent  9:8,9

cents  50:19,
  22

certified
  183:24

cetera
  171:18

chain  60:6

challenge
  122:11,16
  138:15
  176:6

challenged
  122:8
  146:14

challenging
  128:2
  145:20

chance  80:2,
  21 158:19
  163:12

change  15:21
  26:21
  30:22 33:4
  35:11

36:13,20,
24 37:18
39:18
42:17
109:14
158:22

changed  36:2
37:1,25
38:25
39:15,21
78:16
109:10,23
110:13
115:12,16

changing
  34:11

chapter
  74:16

charge  45:22
171:25

check  118:3
158:15

checked
  109:3
  118:2,3

checking
  37:16

checks
  165:25

cheeseburger
  33:6

Cheryl  38:17

children
  20:3

Chris  173:19
182:9

Christopher
  167:9
  168:25
  169:13
  172:3

chronological
ly  72:11

circumstances
  64:20

city  6:16

claim  51:5
105:7,11

claimed
  137:18

claiming
  23:2,16

claims  24:6
82:6
127:17

clarification
  109:12

clarified
  108:22,23

clarify
  114:22
  131:9
  170:11

Clarity
  33:15,16,
  20

classmates

25:13

clean  50:22

cleanly  94:4

clear  66:22

client
  155:2,4,25
  184:1

clients
  27:14
  33:22
  132:12
  139:23

clip  150:8

clips  21:13
22:19

close  165:14

closer  61:12

closing
  112:21

Cloud  58:6

clubs  44:7

code  183:23

collated
  159:8

collect
  56:12,14
  57:17

collected
  159:7

collecting
  15:15

LIL' JOE RECORDS, INC. vs MARK ROSS, ET AL.
Joseph Weinberger on 10/26/2022          Index: comfort..contract

comfort
  147:15

comfortable
  103:2
  107:3

comment
  12:22
  108:19
  110:2,4

communicating
  80:23
  81:10

communications
  87:2

compact
  23:10

companies
  28:12,15
  76:8

company
  16:14
  18:12,13
  19:14
  21:10
  24:16
  26:14
  28:19
  29:22
  32:22,24
  38:23 44:3
  46:21
  52:2,3,5,9
  54:16,21
  57:1,5,8,
  21,25

74:22,24
83:5 91:7
107:15
127:9
130:17,22,
25 140:15
143:6
171:5

compilation
  120:21

complaint
  20:7,10
  21:4,12,16
  22:4,11
  23:21,25
  63:5 88:19
  90:5,12,15

complete
  22:10
  63:16
  71:6,16
  160:8

completed
  52:20

compositions
  82:14

comprehend
  64:12
  102:21

computer
  11:2,5,11

computerized
  58:9,11

concluded
  185:15

conclusion
  86:25

confirm
  70:1
  145:6
  185:5

confirmed
  138:24
  144:25

confirming
  142:16

conjunction
  42:5

connection
  17:24
  28:1,12
  30:5 36:25
  57:4,6,7,
  21 68:11
  69:6,17
  70:4 82:5
  84:8 95:10
  117:3
  134:15,20
  142:14
  149:10

consensus
  44:22

consent   6:8,
  20

consist   55:2

consult
  111:4
  158:19

contemporaneou
s   130:3,8
  131:17
  161:5

contend
  87:25
  132:20

content
  11:20

contention
  136:23
  137:6

contested
  138:3

contesting
  138:5,9,
  12,13

context
  121:22

continue
  31:9

contract
  48:14
  49:2,3,4
  61:7,22,24
  65:15,18
  66:8 67:3,
  8,15 68:18
  70:18,23
  80:3 93:6
  95:22
  96:17,22
  97:5,8,16
  98:2,5,9,
  10,25

LIL' JOE RECORDS, INC. vs MARK ROSS, ET AL.
Joseph Weinberger on 10/26/2022   Index: contractor..corporation

99:8,11,
14,16,18,
24 100:12,
15,16
125:14
175:6,10,
12,14
177:11
178:11,20
179:1,13,
22 180:1,6

contractor
35:1

contractors
18:23

contracts
30:22 49:1
53:13
62:19
64:10
68:10,14,
20,21,22,
23 69:5,
13,17
70:3,15
71:4,7
72:22,25
73:3,4
79:8 81:19
93:7,8
95:20
97:22
99:24
100:4,13
177:12

contradict
100:16

contribution
108:10

contributor
47:15,21

controller
19:13

conversation
13:20
110:9

conversations
77:9
129:9,19
131:11

Cooper   19:4,
7,14

Cooper's
19:8

coordinate
168:7

copied   153:7
154:20

copies   59:20
64:3 68:12
71:5,6,8
104:25
105:1
111:17
128:22
160:21
167:22
171:4,7
172:4
173:4,7

copy   67:3

71:10,12,
16 98:1
104:21
128:19,25
167:8
169:14
173:10,19
174:1
177:1
178:7,20
183:25
184:24
185:1

copying
117:1

copyright
8:25 23:18
25:20 26:6
82:13
83:24 84:2
101:17
104:8,18,
24 107:12,
14 108:20
109:9
115:23
117:7,24
130:8
131:16
145:11,12
160:22
179:20

copyrights
21:9,11,
15,19
22:2,14,
15,23,24

23:2,14
26:2
54:22,23
55:2,6,10
57:15 60:7
82:10,18
83:10,12,
16 84:8
91:2,7,12
92:3,6,9,
22 93:1,4
101:2
107:25
112:13
122:18,24
123:2,14
136:24
137:3,7,
11,14,15,
19,21,22
138:4,13
141:10
142:15,20,
21 143:6,
8,9 145:17
146:23
149:24

Cormilus
38:6

Corp   26:19

corporate
26:19,21
27:7
30:21,22,
23

corporation
14:13

18:15

**corporation's**
30:24

**corporations**
26:20

**correct**  7:16
19:24
21:20 22:7
27:8,21
30:18 37:9
39:10 40:2
67:21
69:14
74:12
75:15
82:16
94:21
97:13,18
99:8
101:18
105:21
114:3,12
118:2,5
121:10
126:2,20
127:5
129:15
130:4,9,13
131:21
132:10,14
133:21
135:19
149:6,10,
13,18
150:16
161:1,6
163:8

165:6
166:5
167:18
168:6
169:3
172:15,17
174:17
178:12,14,
16,17,22
179:3,6,11

**corrected**
108:21

**correctly**
9:16

**correctness**
179:13

**correspond**
167:23
171:8

**counsel**  5:4
6:6 43:8
69:14
158:20
163:17

**counterpart**
49:18
95:21
97:19

**couple**  13:23
77:18
150:8

**courses**
25:20,23

**court**  6:3,
15,19,23

7:3 8:15
10:3 32:3
33:14,18,
23 34:4
38:8,11
79:20
142:2
155:19
156:2
158:10
159:23
163:5
183:22
184:11,20,
25 185:4,9

**covers**  29:24
67:12

**create**  77:11

**created**
53:19
107:19
130:16,18
131:3
133:12
154:18

**creating**
77:10

**creation**
77:24
130:9,15
131:18
161:6

**credibility**
12:23

**creditor**
81:14

**creditors**
80:16

**Crew**  9:5
17:15,22
18:5,6,7,
20 22:20
23:4
52:17,18
59:3,10
77:4 78:6
84:8 86:3
91:1 94:11
96:2 97:6,
13,24
102:1
111:5
122:24
129:6,10,
14 130:8
131:16,24
134:15,19
138:20
146:3
147:10
148:1
151:11
166:1
172:5,7
173:15
175:16
177:6

**Crew's**  77:23

**Cross-talk**
103:15
156:12

**current**
159:1

custodian
  159:1

cut   63:2
  65:24

cutting
  73:16,17

—————————
          D
—————————

D-A-W-S-O-N
  17:11

D-E-T-R-I-U-S
  17:11

Da   8:18
  18:14

dancers
  17:23

Daniels
  41:12,20

Darryl   43:1

date   65:21
  99:6,20
  100:6
  102:2
  112:25
  113:1,16,
  19 168:14

dates   10:17
  62:19
  65:19
  101:23

David   28:25
  40:4,10
  46:12
  61:9,24

95:16,22
111:21
150:25
151:1

Dawson   17:9,
  11 18:17

Dawson's
  17:12

day   31:21
  65:21
  171:1,2

day-to-day
  17:18
  159:5

days   184:3

dead   114:4
  136:9

deal   29:21
  96:8
  171:12

deals   17:19,
  22

Debbie   38:4

December
  102:2

decided
  47:13

deciding
  34:25

decision
  41:22
  69:25
  136:20

decision-
making   41:6
  42:3,13,19

decisions
  42:6 44:3

declaration
  161:14
  164:1

declare
  47:23

declined
  7:13,15

defective
  24:19

Defendant's
  15:23
  60:16

defendants
  6:11 70:9,
  16

Defendants'
  85:12
  102:8
  106:2
  115:2
  117:14
  118:19
  121:3
  140:11
  144:1
  152:5
  154:11
  157:13
  159:15
  161:11

166:10

define   57:6

degree   59:23

depends
  31:17

depo   31:16,
  19

deponent   5:5

deposition
  5:6 7:17
  8:21,24
  9:12 13:10
  15:1,4
  64:7,8
  114:3
  185:15

depositions
  9:25

describe
  182:3

designated
  16:14

desk   11:25
  12:9,10,12
  31:9 32:1

destroyed
  155:2

destroying
  59:22

Detrius   17:9

Dickey   38:18

died   40:12

digital   23:5

diligence
  113:18,24

DIRECT   7:22

direction
  78:5
  157:17,19

directions
  42:7

directive
  44:24

directly
  27:10,14
  32:22 33:2

dis   162:2

discharged
  29:10

disclose
  87:1

discovery
  15:9
  111:15
  155:5

discrepancies
  62:2

discuss
  13:10 31:7
  44:17 86:8
  149:12
  150:20

discussed
  13:14,16,
  24 135:4

149:9,13,
16 150:11,
13 151:8,9
162:2,6,11
165:1

discussing
  120:8
  148:11

discussion
  44:13

discussions
  24:3

disentangle
  48:15

dishonest
  170:18

disks   23:10

displeased
  47:2

dispose
  152:19

dispute
  44:14
  47:11
  50:3,7
  86:11
  88:6,11
  122:3,23
  123:13
  137:25
  138:8,11
  141:20
  144:23
  151:9
  153:4

disputed
  44:11
  153:3

disputes
  89:17

Disregarding
  168:13

distinguish
  84:14

distributors
  29:16
  43:15

District
  142:1,2

DM   34:3

document
  15:18
  59:12
  60:14 61:4
  62:6,8,13,
  15 65:8,
  10,20
  66:5,13,23
  68:6 76:25
  85:10,19
  103:24
  106:11,13,
  20 107:5,7
  108:21
  109:16
  110:22
  114:12,25
  115:5
  117:12,17,
  19 118:7,

10 119:4
120:7,17
121:8,12
124:13,17
125:4
135:2
136:12
140:4,6,25
143:22
144:17,19
151:19
153:14,25
154:9,18
157:11
160:8,17,
19 161:10
164:7
166:8,15
167:3,13,
18 168:6,
8,15
169:3,6,
10,16
171:12,16
175:20
181:17

documentation
84:14

documents
  14:21,24
  24:24 60:7
  61:4
  63:11,17
  70:21
  72:5,7
  73:13,16
  74:21

76:19 79:2
83:7,9,11,
14,18,19,
21,23
84:25 90:4
91:23
92:1,11,14
93:14 96:8
102:20
103:12
105:2,17
114:11
119:20,22
146:9,22,
24,25
147:1
151:25
153:7,22
154:20
159:8,13
167:2
171:9
172:6,8,
10,21
173:5

**dollar**
50:19,22

**Doniger**  6:11

**draft**  123:23
177:12

**drafted**  93:6
96:22 97:6
124:3
135:10,15,
16,18,20,
21 175:16
176:21

**drafting**
35:6,9
94:24
95:13
97:11

**drugs**  13:2

**due**  113:18,
24

**duly**  7:6

**duties**  17:24
43:11,12
183:23

**Dwayne**  38:6

———————

**E**

———————

**earlier**
65:17 83:1
86:2 95:19
117:23
122:12
123:8
147:4
165:20
166:3

**early**  128:19
175:3
176:17

**eat**  31:9
32:1,14

**edited**
133:20

**educational**
25:8

**effect**  50:20

**Effective**
167:3

**email**  34:2
119:12,21

**emails**  147:5

**employed**
8:2,4
30:10,11
42:21 48:3
59:17 77:3

**employee**
17:25
18:2,10,
18,19 29:6
35:2 40:7
41:12 48:6

**employees**
17:4 29:21
37:23
39:1,2,10,
20,25
43:15 56:8
73:17
171:22

**employer**
34:25

**employment**
34:16,18,
23,24
48:11

**end**  33:25
40:8 47:1
62:23
144:14

160:5

**ended**  14:19,
20

**engage**  27:14

**engaged**  13:3
32:22,23
33:2

**engages**
11:19

**entail**  55:22

**enter**  53:21
54:1
146:10

**entered**  54:9
70:16
141:16
142:25

**entertainment**
45:23,24
95:1
100:12

**entire**  29:11
62:24

**entirety**
55:1

**entities**
30:23

**entitled**
10:17

**entity**  18:20
34:11 49:7
179:21

**equity**

LIL' JOE RECORDS, INC. vs MARK ROSS, ET AL.
Joseph Weinberger on 10/26/2022     Index: erroneously..extent

27:20,23

**erroneously**
164:15

**Essig** 8:14
10:2 12:15

**established**
113:5
123:8

**estate**
150:22,24
151:1

**estates**
50:17
148:17

**estimate**
9:11
13:19,22
14:14,18
39:12
68:19
69:2,9
73:23 74:2
142:24

**estimates**
10:17

**ethical**
153:13

**events** 10:13

**eventually**
28:4 47:22
53:10
54:16,22

**evidence**
15:15

89:17,19,
20,21,22,
25

**EXAMINATION**
7:22

**exclude**
66:10,20

**Excuse** 34:22
67:22

**executed**
95:21
130:12,14,
17

**exhibit**
15:19,23
60:15,16
62:1,24
67:12
70:14 80:3
85:11,12
86:12
88:12
89:18
101:20
102:6,7,8
104:7
105:25
106:1,2
107:4
113:6
115:1,2
117:8,13,
14 118:8,
15,18,19
119:1
120:8,21,

24,25
121:1,3,6,
7 123:24
125:8
127:4
132:21
133:5,20
134:6
135:2
140:7,11,
14,19
143:23
144:1
152:3,4,5
154:10,11
156:21
157:12,13
159:11,14,
15 161:10,
11 164:1,
3,9,12,13
165:13
166:9,10
168:16
181:20

**exhibits**
63:5 67:8
70:5,7
71:3,5
72:22 73:4
103:1
161:23
164:7
185:5

**exist** 42:16
98:8 116:3
124:19

**existed**
97:15,16
99:1,24
109:17
135:8
141:22
175:15
177:6

**existence**
39:13 56:5

**exists**
174:23

**expect** 66:14

**experience**
26:1
100:23
101:7,16

**expert** 101:4

**explain** 20:6

**explained**
153:5
154:19
155:23

**exploit**
52:2,3

**explore**
155:21

**expressed**
178:2

**extent** 10:22
11:15,19
12:19
71:14

LIL' JOE RECORDS, INC. vs MARK ROSS, ET AL.
Joseph Weinberger on 10/26/2022        Index: extremely..flipping

extremely
  153:19

eye   11:13

_____
        F
_____

face  110:22

fact  122:17
  128:3,22
  129:13
  130:6
  131:6,7,23
  133:12
  149:15

facts  133:13

factual  24:6
  87:25
  88:6,10,11

fair  18:17
  45:6 71:7
  83:15 84:5
  108:16
  109:1,8,19
  110:17
  117:6
  125:25
  133:18
  172:9
  174:12
  178:1,9
  181:14

false  88:7

falsified
  132:21,24
  133:20

familiar
  9:23 57:1
  85:20
  121:12

family  43:17

fashion
  102:20

fast  31:19
  144:9

faster  60:25
  85:16
  102:14
  106:7
  115:8

father  40:12

February
  169:12
  173:20
  183:11

federal
  141:25

feedback
  78:6,13,
  18,20

feel  103:1

Felicia  38:4

felt  149:25

figure  32:6

file  139:25

filed  24:11
  73:24
  105:14
  114:18

134:22
139:10,12
140:4
151:2
179:20
180:15

files  19:18
  58:3,5
  68:13
  71:5,21
  72:10,12
  159:5
  174:1,8
  178:7

filing  58:6
  72:3
  74:12,15
  109:5
  111:5
  115:15
  161:3

filings
  139:13,17,
  19

filled  65:22

final  44:5,
  11,15,20
  45:6,10
  116:9

financial
  80:17,19,
  24 81:15

find  67:1
  114:5

fine  31:14

32:5 36:6
38:4 89:12
115:11
119:9
147:17
184:5,7
185:3

finish  77:17

finished
  12:14
  183:15

fire  41:15,
  19,22 45:2

fired  45:4,5
  73:21
  81:1,3,16

firing  41:9,
  13 45:3

firm  26:23
  27:1,7,9,
  10,15,17
  28:4,13
  30:8,12,
  14,16,17
  34:19
  37:2,4,7

firm's  27:13
  32:20

five-minute
  165:15

flipped
  103:11

flipping
  63:12,21

64:10 65:4
66:2

floor   12:1

Florida   6:18
9:22
114:23
142:1,2

folder
152:10,16

folders
151:22
152:1

folks   9:24
45:4 72:19
114:18

follow   44:25

food   31:11
79:15

force   66:18

foreclosure
141:24

forged
124:13,17,
23 125:1,
4,8,14,21
126:1,7,
12,16,23
127:5,8,
11,12,20

forgery
127:17

forget   40:11

form   20:17

21:21 22:8
24:1 30:25
45:18 50:6
71:9 96:24
104:11
107:9,11
115:22,23,
25 116:1,
2,3,4,6,9,
21,22,23,
25 117:20
123:1
134:7
143:11
149:19
152:15
161:4
167:20,25
168:2
171:6
172:23
179:23
180:13

formation
26:20

forms   117:1

founded
54:19
130:22,25

fourth
180:22

Frank   11:7
120:2,20

fraud   47:11
176:5

fraudulent
176:8,14

frequently
170:21

front   15:18
60:14
85:11
91:23 92:1
102:7
114:25
117:13
118:8
120:7
140:6
143:23
151:19
152:3
154:9
157:11
161:9
166:8

full   33:25
42:21
51:13
63:15

future   53:15
96:1

———————————

——————————
G
——————————

Gabird   38:3

games   147:7

gave   29:14
39:7 71:25
72:5
116:22

129:4
155:25
156:3
171:11
178:6

general   43:7
59:16
84:19

generally
47:7 78:12

generated
153:25
176:3

gentlemen
185:10

give   13:7,
22 22:10
42:7 58:15
62:8,14,16
63:15
64:16 65:3
66:24 67:1
68:6 78:13
102:25
103:4,22,
25 117:1
121:5
133:25
173:19
180:18

giving   39:6
51:4 63:12
78:5 90:21
112:19
167:13

glass  73:14

glasses
  14:25
  15:21

Glenn  41:12,
  20

Gloria  38:16

Goldin  38:18

good  77:15
  78:24

government
  139:15
  179:21

green
  168:10,11,
  13

group  17:15
  18:8 138:3
  177:11

guess  24:2,
  25 28:24
  29:21
  32:23
  43:17
  44:6,17,22
  47:9 58:8
  84:18,21
  95:21
  109:12
  110:21
  113:4
  123:7
  145:7

guessing

110:16,18
  123:7

guidance
  78:13

guidelines
  35:1

guy  40:4

guys  32:17
  33:8,10
  96:16
  119:17
  177:10

_____

H

half  77:14
  171:17
  172:25

hamburger
  33:6

hand  6:24
  95:13

handbooks
  35:2

handle  69:23

handled
  46:20

hands  73:16,
  17

handwriting
  171:15,19,
  21

handy  121:14

happen  12:6
  28:8 37:17
  75:25

happened
  42:17
  48:2,5,10
  53:8 77:1

happening
  112:6

happy  31:9
  102:25
  103:24
  118:11
  119:3,23
  155:21

hard  119:20
  124:9

Hazely  38:18

he'll  68:7

head  10:8
  84:3 147:7

hear  63:22

heard  128:2
  134:5,24

heart  153:3

Heath  46:14,
  15

heirs  23:17
  81:18
  128:23
  129:1,4
  148:8
  149:18
  166:4,7

held  136:24
  137:3,7

Herman  35:17

hire  105:8,
  16,21

hire'  108:11

hired  27:7,9
  28:14
  42:25
  43:1,10
  69:22

hiring  41:9,
  13

history  25:8

Hobbs  23:16
  52:19,24
  53:24
  61:9,24
  83:3
  95:16,23
  99:10,13
  111:21
  124:25
  125:3,25
  126:11
  127:18,21
  134:23
  148:3,25
  149:1,3
  150:14
  151:1,2

Hoeveler
  142:5

hold  121:13
  128:17

holding
  31:16

hop   120:1

Hopkins
  38:12

hour   77:14
  119:8

hours   13:3

house   141:24

How's   25:3

Hunt   27:1

_____

        I

I-N-C   18:16

idea   31:3
  78:24 80:7
  100:7
  109:24
  128:10,13
  171:21

identification
  15:24
  60:17
  85:13
  102:9
  106:3
  115:3
  117:15
  118:20
  121:4
  140:12
  144:2
  152:6
  154:12

157:14
159:16
161:12
166:11

identified
86:9
135:23

identify
19:16
22:13
83:12
89:17
90:22

impact   12:22
13:4

important
12:23

impossible
12:7
102:22

in-house
163:16

inaccurate
65:7 88:1
162:25

inadvertently
152:17,24
153:1,6,15
154:16
155:1

inappropriate
156:25

inclined
158:24

include
49:24
113:1,3,15

including
113:19
169:13

incomplete
71:8,14,15

inconsistent
114:13

incorporated
78:17

incorrect
181:13

independent
18:23
20:11
23:23
25:25 35:1
84:7

independently
99:3

indication
11:16
108:17
174:13
178:19
179:18

individual
9:8 14:11,
13 93:15
114:7
123:13

individuals

41:23
122:17
165:6

industry
26:4,9
100:23
101:7

information
114:11
153:17
183:8

initial
146:2

initially
24:17
46:24
80:12

injunction
142:13

instruct
63:10
67:24
103:22

instructed
66:7

instructing
63:14
64:13,18
87:5
156:8,10,
17,19

instruction
64:25
65:11,14
66:10

67:5,9,13,
18,21,25
104:3
119:3
153:11
154:6
155:12,13,
14  157:3,
9,17,18,22

**instructions**
42:1  43:24
153:13

**insulted**
40:12

**intellectual**
75:11,19
76:9  141:8
145:1
146:12

**intention**
24:14

**interact**
29:16,18
43:14

**interacted**
28:22

**interacting**
159:4

**interest**
36:21
40:22  41:3
57:24
59:3,6
139:7
162:20,23

163:7

**interests**
45:17

**interrupt**
31:7

**interview**
51:5,18,22

**interviews**
51:19,23

**introducing**
80:8,9

**invalid**
177:4

**invalidity**
178:11

**investigating**
82:5

**investigation**
135:1

**Investment**
8:11

**invoice**
168:2

**invoices**
167:20

**involuntary**
80:13

**involve**  9:5,
8  76:15

**involved**
34:10,15
35:14
36:13

37:11
69:25  70:2
77:23
97:11
104:17
109:13
112:12
114:15
131:23
132:1
160:24

**involvement**
35:20,23
37:14
94:23
95:3,4,5,
6,8  132:5,
9  161:3

**involving**
8:25

**Island**
48:14,19

**issue**  21:19
22:2  24:7
60:7,12
65:18
67:16
123:11
143:13
174:14
178:4
180:15

**issued**  169:6

**issues**  8:25
34:16
46:11  62:3

80:17,19,
25  93:16
141:22
179:21

**items**  23:21
138:8

**itunes**  23:7

---

**J**

---

**J-O-S-E-P-H**
8:1

**Jacobi**
13:17,24
14:7  28:24
45:22  46:9
48:25
49:10,13
79:6  93:5,
10  95:1,12
96:5  97:10
100:11,17
114:14,15
123:19,23
135:7
136:1,8
173:22
174:10
175:9
176:18
179:25

**Jam**  57:1,14
119:16
140:16

**January**
113:4

**LIL' JOE RECORDS, INC. vs MARK ROSS, ET AL.**
**Joseph Weinberger on 10/26/2022**                    Index: Jerome..law

Jerome   38:15

Jerry   38:3

job   17:12
  40:12
  43:10

Joe   8:7,12
  17:3 18:1,
  19,22
  19:11 32:8
  33:4 38:17
  41:20
  52:6,14,23
  53:6,11
  54:10,17
  55:1,3,8,
  9,10,15,
  18,22
  56:3,5,22
  58:2,18,
  21,24,25
  59:2,5,13
  60:22
  82:12,17
  84:15
  93:19
  108:21
  109:2,5,6,
  9,13
  110:10
  113:3,7,
  10,13,15,
  23 114:4,
  16,19
  118:3,4
  128:25
  137:2,9
  140:15

143:7
159:2
161:1
162:18,19
163:7
166:18,21,
23,24
167:13,21
168:15
169:5
170:20
171:4,22
172:4
173:6
182:17

Joe's   136:23
  145:16
  159:5

join   149:23

Jonathan
  113:21
  114:8
  160:21

Jones   27:2
  47:6 48:16
  127:10

Joseph   7:5
  8:9,11
  113:21

journalist
  51:9

JT   52:17

judge   142:3,
  5,9

judgment

127:14
142:9
146:4,6

Junior
  149:20
  150:15

jury   12:23

justified
  45:3

_____

K
_____

keeping
  173:10

Kemp   38:6

kick   11:20,
  22 12:7

kicked   12:10

kind   32:9
  59:25
  68:21
  150:3

King   142:3

knew   129:16
  173:23

knowledge
  16:19,25
  21:19 80:5
  95:13
  130:6
  138:10

Kolsky   38:18
  41:20

_____

L
_____

label   27:7
  80:16
  97:12,25
  122:18,25
  123:15
  125:14,21
  126:2
  127:5
  129:7
  135:24
  151:11
  152:16
  173:16

label's
  126:13,16,
  23

labels
  104:18
  129:20
  136:17

language
  142:16,19
  145:24

larger   27:25
  28:3

late   131:3

Lattimore
  38:6

law   10:3
  25:9 26:6,
  22 28:4,13
  30:7,12,
  14,16

LIL' JOE RECORDS, INC. vs MARK ROSS, ET AL.
Joseph Weinberger on 10/26/2022                    Index: lawsuit..list

32:20
34:18,19,
23,24
37:2,3,7
45:24

lawsuit
76:15,18
117:4,7
134:22
139:25
179:2,5,8,
18

lawsuits
76:14

lawyer   23:24
24:3 34:10
45:16,21
79:7 82:9
86:18,20,
21 88:8
89:19,21
95:1
100:12
143:13
145:22
176:5
177:8
178:10

lawyers   82:4
86:16
88:2,4,13,
15,17
89:8,11
90:1
114:20,22,
23 135:24

lead   125:16

leading
73:20

learn   26:1,6
100:8
135:17,18

leave   28:4
73:19

led   96:12

left   28:13

legal   26:12
30:17,20
34:16
43:8,11
46:10
57:20
86:25 88:9

legally
101:14

legitimate
44:14

letter
81:18,20,
23 82:2,6
85:25
87:13 88:7
101:24
102:1
116:16
117:3

letterhead
166:21,25
168:16,19
169:6,8,20

170:13

letters
182:2

Levinson
61:8,9
95:14,15,
20

Levinson's
61:14

Lewis   46:15

liabilities
50:23,25
51:16

liability
48:16

license
19:19

Lil   159:5

Lil'   8:7,12
17:3 18:1,
19,22
19:11
22:16
52:6,14,23
53:6,11
54:10,16
55:1,3,8,
9,10,15,
18,21
56:3,5,22
58:2,18,
21,24,25
59:2,5,13
82:12,17
84:15

93:18
109:1,6,9
113:7,10,
12,15,23
114:16,19
118:4
128:25
136:23
137:2,9
140:15
143:7
145:16
159:2
161:1
162:18,19
163:7
166:18,21,
23,24
167:13,21
168:15
169:5
170:20
171:4,22
172:4
173:6
182:17

limine   66:20
104:13

Linda   38:4

lined   108:25

lines   43:7

list   22:10
24:20,23
88:17
167:2
171:3

listed  16:25
 20:7,10
 21:12,16,
 22 23:21
 86:16
 88:2,4,8,
 13,15
 89:24
 90:1,3,7
 95:20
 98:18
 100:22
 142:20
 175:19

Listen  66:6

litigation
 46:18,20
 47:20
 82:20,25
 83:1,2,3,
 4,6,13,17
 84:1,6,11,
 16 92:15,
 19 93:15,
 17 98:2
 111:14,18,
 19,20,21
 112:7,10,
 12,16
 121:24
 123:22
 127:21
 137:18
 138:23
 139:10
 140:1
 141:25

142:4
145:10
149:1,3,5
166:4,6

litigations
 149:10

Live  9:5
 17:15,22
 18:5,6,7,
 20 22:20
 23:4
 52:17,18
 59:3,10
 77:4,23
 78:6 81:24
 84:8 86:3
 91:1 94:11
 96:2 97:6,
 12,24
 102:1
 104:11
 111:5
 122:24
 129:6,10,
 14 130:7
 131:16,24
 134:14,19
 138:20
 146:3
 147:10
 148:1
 151:11
 166:1
 172:5,6
 173:15
 175:16
 177:6

LLC  8:11
 18:15

LLM  25:16

locate  71:16

located  6:16

locked  73:22
 74:22,24
 75:1,8

log  156:4,5

long  9:7
 21:1 35:13
 39:12
 58:18
 66:16
 73:6,15
 79:11
 119:19
 171:1,2

longer  31:20
 102:16

looked  61:11
 71:19
 116:23,25
 140:10

loop  112:21

lost  47:4

lot  39:2
 61:12

Luke  26:13
 29:5,12,25
 30:5,13,
 17,25
 32:21,24
 33:1

34:11,14
35:7,15,
16,21
36:1,19,
21,25
37:2,3,6,
11,23
38:24
39:15,21,
25 40:2,
12,13,19,
23 41:1,7,
14,16
42:13,20
45:13,16
46:10,19
47:13,15,
18,19,23
48:6,12,20
49:6,11
50:5,12,15
51:24
52:10,13,
21 53:2
57:16
69:23
73:19
74:14,18
75:11,15,
22 76:1,8
77:3 79:1
81:7,11,
14,15
82:22,23
91:11,14,
21 92:2,
17,21
93:19,22

LIL' JOE RECORDS, INC. vs MARK ROSS, ET AL.
Joseph Weinberger on 10/26/2022                    Index: Luke's..marked

95:2 98:14
100:13,17
105:6,7
127:15,22
128:4
135:24
136:23
137:6,10
138:20
143:6
146:22
150:21
162:20,23
163:7,17
165:2,21
167:4
173:11
177:8,14

**Luke's** 97:1,
3 100:12

**lunch** 31:8,
12 32:4
33:9 77:16
79:14,17,
23

**Luther** 14:8
20:2 26:12
28:6 38:5
47:24
50:14
51:10
57:12
69:24
71:22
73:14 79:7
80:6,10
82:23

91:11,14,
24 92:5,25
95:2 96:15
122:20
127:15
150:23
165:2
177:8,10

—————————
**M**
—————————

**M-A-C-D-O-N-A-
L-D** 19:6

**Macdonald**
19:4,11
38:23 40:7
183:2

**Mack** 46:15

**made** 66:6
98:7
108:11
111:8,13
117:24
129:5
178:18
179:18

**maintain**
58:3,6,24

**maintained**
58:13

**maintaining**
79:2

**make** 7:20
10:21
12:19
20:24 42:6

46:2 63:8
81:7 107:2
133:13
135:12
139:13
145:22
162:15

**makes** 10:22
11:15

**making**
105:10
174:13

**management**
29:22
82:15

**manager**
17:14,17
33:21

**managing**
132:11

**manila**
151:22

**Manny** 38:7,
10

**Manzini** 29:1
46:12
69:22

**Manzini's**
46:17

**mark** 15:19
20:2 21:7
60:15
61:8,9,14,
24 85:11

95:14,19
102:7
115:1
117:13
118:8
120:7
140:7
143:23
144:22
150:24
152:4
154:9
157:12
161:10
166:9
174:5,19,
25 175:7
176:4,17
177:24
180:2

**marked** 15:24
60:17
85:13
102:9
106:3
115:3
117:15
118:20
121:4
140:12
144:2
152:6
154:12
157:14
159:16
161:12
166:11
180:1

market  51:2,
  6

marking
  120:24
  121:1,7

material
  14:21
  52:16 54:7
  55:2

matrix
  101:24

matter  16:20
  80:13
  137:24

matters
  44:18
  45:23
  69:23
  104:7

meaning
  23:10 77:6
  151:13

meaningful
  162:19

meant  163:11

mediation
  122:6
  184:12

meeting
  132:8

meetings
  46:6 77:4,
  6

members  9:6
  52:17,18
  77:5,7
  91:1 93:15
  95:17,24
  96:2
  97:12,24
  111:5
  122:23
  123:14
  129:6,10,
  13 130:7
  131:15,24
  134:14
  138:25
  148:1
  151:10,13,
  14,15,17
  165:25
  173:15

memorialized
  100:25
  101:9,18

memorized
  21:17 77:2

memory  22:5
  83:22

mentally
  178:23

mentioned
  20:23
  49:10
  58:10
  65:23 86:2
  104:14
  122:16

137:13
  147:4

mentions
  61:8

message  36:4

met  53:1
  129:18
  132:7,14

Miami  6:18
  25:12,13,
  21

Milton  28:24
  46:13
  136:4,9

mind  118:12

minute  36:5

minutes
  26:20
  30:21
  31:25
  33:9,13
  36:7
  79:17,19
  147:18,19

mirror
  131:12

miscommunicati
on  131:8

misconstrue
  65:6

misquoted
  51:12,17,
  21

missed
  136:16

missing
  60:12
  65:19,25

mistake
  115:18
  116:20

Mix  17:22

mixed  73:14

modified
  133:7,10

modify
  116:18

moment  60:19
  85:15
  115:5
  118:25
  133:25
  163:22
  180:18
  184:20

money  52:17
  149:21
  150:7
  182:9

Monika  38:12

month  65:21
  74:7

months  16:8
  39:14
  73:24 74:5

mortgage
  141:23

LIL' JOE RECORDS, INC. vs MARK ROSS, ET AL.
Joseph Weinberger on 10/26/2022     Index: Moseley..obligation

Moseley
   38:16

Moskowitz
   35:17

mouths   11:16

move   12:10
   22:17
   66:10,11,
   20  81:24
   86:3  87:10
   90:23
   94:14
   104:8,13
   134:1
   156:20
   159:19

movies   19:20

moving   66:4,
   14

multiple
   64:3  134:3

music   8:12
   26:8  54:17
   55:10  56:5
   77:10,11,
   24  78:6

musical   78:5

―――――― N ――――――

named   33:16
   40:4
   136:18
   140:16

names   26:21

30:22 38:2
39:5,7,25

Nasty   22:15
   81:25 86:3
   94:17
   99:1,11,
   17,25
   100:6
   127:2
   128:7,15
   129:22

nature   10:18
   35:2

necessarily
   31:19

necessity
   87:23

needed   96:16
   107:23
   177:12

negotiating
   52:12

newspaper
   51:10

Nicolas   29:1
   46:12
   69:22

night   44:7

nightclubs
   29:19

ninety
   145:13

no's   10:8

nods   10:9

normal   31:19

Norris   38:3,
   20

Northwest
   58:17

note   7:9

notes   15:2
   165:16

notice   15:4,
   7  24:19,23
   61:8,13
   85:23
   150:4
   176:7
   180:16

noticed
   116:20

November
   85:8,9

number
   177:14

numbers   63:1
   65:25

numerical
   182:23

numerous
   135:4

NYU   25:12,
   16

―――――― O ――――――

oath   6:5,21
   10:2,3
   34:8 36:11
   79:25

object   86:24
   102:18
   104:11

objection
   7:9,20
   20:17
   21:21 22:8
   24:1 45:18
   50:6 62:4
   63:8 66:7
   71:9 96:24
   103:7,21
   106:8
   119:2
   123:1
   134:2,7
   143:11
   149:19
   159:21
   171:6
   172:23
   176:9
   177:16
   179:23
   180:13

objections
   10:21,22
   20:24

obligation
   10:4

LIL' JOE RECORDS, INC. vs MARK ROSS, ET AL.
Joseph Weinberger on 10/26/2022     Index: obligations..owning

**obligations**
 17:18
 28:19,20
 29:11
 43:11

**observe**
 20:16

**observed**
 20:15 21:5

**observer**
 77:22

**obtain**
 40:22,25
 41:3 55:5
 75:17,19
 82:17
 83:5,10
 85:6 92:2,
 5,22,25
 137:16

**obtained**
 76:8,17,
 19,20
 83:13,17
 84:7,9,14
 92:9 93:3
 137:13
 138:19
 160:22

**obtainment**
 146:22

**occasion**
 75:10
 150:12,17

**office**  11:8

46:5
58:14,16
71:24
77:12
108:20
109:9
117:24
139:14,22,
24 140:3
145:12
150:4
153:20,21,
25 154:18,
20 155:4
170:19,21,
22,23,25
173:8,9,13
179:20
182:21

**offices**
 151:21
 173:6

**omitted**
 51:14

**on-the-job**
 26:1

**one's**  118:22

**one-year**
 98:10

**onward**  78:11

**operate**
 58:21

**operations**
 30:24

**opportunity**

12:18
62:9,17
63:13,16
64:15,17
65:4,8
66:4,24
68:6,7
90:21
103:23
107:3
119:5
120:11,15,
19 184:1

**opposed**  10:8
 49:6 84:16

**option**  98:10

**oral**  59:16
 100:24
 101:2,8,17
 129:5

**order**  31:11,
 25 32:12,
 13 107:24

**orders**
 139:21

**organization**
 72:18

**organize**
 72:7,15

**organized**
 72:9,11

**original**
 112:16
 131:4
 183:25

**originally**
 109:16

**outset**  20:23

**overlooking**
 45:16

**overseeing**
 46:10

**owed**  182:9,
 25 183:6

**owned**  54:22
 57:15
 75:22
 91:18
 93:16
 104:19
 112:13,14
 138:14
 144:25
 145:16
 146:20
 147:10
 151:6,11

**owner**  24:16
 45:12
 56:10,22

**owners**  56:24

**ownership**
 36:21
 40:22,25
 41:3 57:24
 76:8 83:10
 130:8
 131:16
 145:20

**owning**  54:23

owns   21:10
  82:10,13

———————
      P
———————

p.m.  185:15

PA  8:9
  161:4

Pac  57:1,13
  119:16
  140:16

pages  16:11
  63:1,17,
  24,25
  64:9,15,23
  65:3,24
  66:3
  102:16,19,
  22,25
  103:6,11,
  23  106:14
  115:7
  118:22
  159:20,21
  160:2
  166:14

paid  17:25
  18:10,11,
  18  44:12
  80:20,21
  134:19

pair  14:25

paper  58:5,
  8,12

paperwork
  151:22

paragraph
  16:19
  162:17
  163:10,16,
  21  164:10,
  12,22
  173:12

Paragraphs
  172:22

Parker  38:3

part  18:4,8
  47:16
  76:3,5
  106:21
  145:9
  150:21,23,
  25  151:6

participate
  15:14

participated
  50:12

participating
  147:9

participation
  74:15

parties  5:4
  134:11
  148:12
  179:19

party  134:5
  178:3

past  48:21
  50:18
  53:16,19

170:18

Patent
  139:14

Paul  136:18

pay  81:8

paying  29:4,
  5  44:9

payment
  134:15

payments
  56:20 59:9

payroll
  35:14,20,
  23  37:11

pays  18:1

peculiar
  122:13
  178:8

peculiarities
  122:16

pending  63:7
  158:5

people  19:19
  39:7,8,22
  41:15 45:2
  72:17
  132:13
  137:18
  147:9
  149:22

perfect
  139:6

performance

17:16
18:20
146:15

performed
  37:6

performers
  134:19

performing
  134:12

performs
  17:15
  18:4,8

period  52:11
  56:16
  73:20
  74:4,10
  78:1
  102:17
  136:10
  143:10
  145:14

person
  16:13,24
  30:10
  33:25
  108:20

person's
  17:8

personal
  48:15
  83:20
  101:7

personally
  22:1 30:7,
  9  129:17

LIL' JOE RECORDS, INC. vs MARK ROSS, ET AL.
Joseph Weinberger on 10/26/2022          Index: personnel..print

personnel
  166:24

perspect
  96:13

perspective
  96:14

pertain
  53:15 54:6

Peter  47:6
  48:16
  127:10

phonetic
  28:25
  38:4,5,6,
  12,16,19,
  20 41:12,
  20,21 43:2
  46:13,16
  80:24

phony  98:5,
  20 99:6
  174:9
  177:2
  180:5

physical
  11:20 23:5
  75:12,24
  76:9

pick  76:1

pieced  61:4

pizza  32:13,
  18

place  9:12
  10:14

11:17
13:20
24:21
42:22
59:13
89:14
123:18
183:25

places  90:18
  173:9

plain  32:10

plaintiff
  6:14 52:7
  154:24

plan  35:3,
  7,9

plans  33:4

play  147:7

pleading
  89:12

pleadings
  23:22
  88:18,20
  90:6,13,16

pleased
  46:19,24

plug  25:1

plural  49:20

point  27:25
  30:14
  103:16
  110:4
  120:12
  165:21

Poison  52:17

policy
  59:12,15,
  16

position
  66:8,17
  137:2
  138:1
  145:19
  150:19

possession
  75:11

possibly
  64:11
  102:21
  106:10

post-date
  141:15

potential
  80:17,24

power  41:6
  42:3,13,
  16,19

practice
  27:13

precipitate
  116:24

predate
  141:15

predecessors
  70:10,17
  127:9

prepare
  14:22 15:2

prepared
  12:15
  14:21
  49:1,14

preparing
  15:14
  74:15
  104:17

present  5:4
  6:3 46:6
  178:12
  179:2,5,8

president
  40:15,16,
  19

pretty
  145:11
  183:5

previous
  116:6
  117:22

previously
  72:1
  158:23
  163:16
  165:1
  167:14

primary
  43:10
  45:16

print  62:7,
  13 64:16
  65:3 66:23
  103:4,25
  106:9

119:3,8

prior  48:18
49:4 96:9
111:14
131:12
133:1
142:16
158:23
170:5
181:8
182:5

private
77:4,6

privilege
155:20
156:4

privileged
87:1

privy  129:9

problem
77:20
178:3,21
179:2

procedure
184:10

proceed
10:20

proceeding
6:5 144:22
145:20

proceedings
50:13
74:16
75:10 76:7

80:12
139:3
146:10,24
164:23,25
165:5

process
77:24
114:16

produce
143:19

produced
71:8,11
121:24
128:22,25
133:2
146:25
152:18,24
153:2,6,
15,20
154:16
155:1
159:8
169:17,22
170:7
174:23,24

producing
59:8 60:9
170:1,2

product
23:5,6
75:24 76:1

production
170:5

products
76:9

proffer
153:17

proffered
66:23

profit  35:3,
6

projects
53:16 96:1

properly
112:13

property
75:11,19
76:9 141:8
145:1
146:12

provide
14:18
68:10,12,
14 69:6
167:8
176:7

provided
44:24
68:20
69:13 70:3
111:24
112:2,9
155:3
167:11,14
175:6

providing
69:16
183:7

publication
102:2

112:25
113:1,16

published
102:4

Publishing
57:2,14

pull  105:25
120:10
161:8
165:13

pulled  153:8
182:22

purchase
76:3,5
151:3

purchased
50:9,14
137:15

purported
136:6

purporting
86:1

purpose
183:25

pursuant
101:2

put  15:18,
20 23:24
60:14 68:8
85:10
89:11
101:21
102:6
105:25

113:3
114:25
117:12
118:7
120:6
140:6
143:22
145:23
146:3
147:8
151:19
152:3
154:8
157:11
159:11
161:9
166:8
175:6
176:16

**putting**
140:14
176:4

_____

**Q**

_____

**question**
10:23
21:1,3
26:3 47:17
48:9 58:4
65:1 66:25
70:22
75:13
88:6,25
90:10,20
92:21 94:3
106:24
108:10

109:10,18,
21 112:20
123:5
124:21
125:9,19
126:11
131:13
133:3
145:21,23
170:8
174:5,18,
25 175:7
176:4,16
177:23
180:2
181:10

**questionable**
176:19

**questions**
10:12,16
12:24
63:15
64:2,14,19
65:14
66:12
77:18
104:9
110:18
133:22
152:25
153:14
154:3
155:9
156:7,18,
20,23,24
158:5,23
180:25

181:1,4
183:16,17

**quick**  165:15

**Quickbooks**
58:11

**quickly**  16:4
140:22

**quote**  51:13
167:3

**quote-unquote**
96:16

_____

**R**

_____

**raise**  6:23
178:4

**raised**  93:16
143:12

**Raising**
146:6

**Randall**
38:17

**range**  43:12

**reach**  176:6

**reached**
130:7
178:9
179:19

**reaching**
80:15
81:13

**read**  16:18
62:5,9,17

63:13,16
64:12 65:4
66:14 68:6
103:23
106:10,13,
20 124:9
162:14
163:22
183:18
184:2,3

**reading**  5:5
14:25

**reaffirmation**
145:6

**realize**
179:4,7
180:12,14

**reason**  13:6
55:13
61:10
98:12,16
100:18
108:4
117:10
122:10
124:4
133:6,19,
24 143:16
145:25
149:2
150:9,10
166:25
178:13,15
183:12

**reasonable**
68:7

LIL' JOE RECORDS, INC. vs MARK ROSS, ET AL.
Joseph Weinberger on 10/26/2022          Index: reasons..record

reasons  20:5
 88:8,10
 100:22
 148:18
 150:5

recall  9:3,7
 15:4,7,9
 16:7,9
 22:6,9
 23:12 25:7
 34:18,21
 35:5,6,9,
 12,19,20,
 22,23,25
 36:1 37:23
 38:2,14
 39:4,10,
 20,25
 41:8,9,13,
 16 43:6
 44:23 47:7
 50:1 51:4,
 17,21
 53:8,18
 55:14,24
 56:2
 57:20,23
 59:8,22
 60:8
 69:12,16,
 20,22
 70:6,7,11,
 13,20 71:2
 73:2,9,10,
 11,25
 74:1,3,6,
 8,9 78:5,
 20,22

 80:8,9,12,
 14,15,23
 81:5,10,13
 82:1 83:16
 85:5,7
 95:4,5,6,
 7,8,9,11
 105:3,19
 116:11,12
 122:9
 138:7,17
 139:20
 148:10,11
 150:18
 161:19
 165:24
 169:4
 172:20
 173:20,21
 174:13
 183:3,7,10

receipts
 60:3

receive
 56:15
 148:20
 185:6

received
 75:24
 104:21
 134:22,23
 178:20

receiving
 56:19 82:1
 85:7
 116:15
 134:15

recently
 53:14
 176:15
 177:25

recess  34:5
 36:8 79:23
 120:4
 147:23
 158:17
 165:18

recognize
 60:20
 85:18,19,
 21 102:12
 115:6
 117:17
 124:8,10
 140:19
 141:2
 144:17,20
 146:15
 152:9,10,
 15 154:14
 159:14
 160:17,20
 166:14,15
 167:17,19,
 24 168:6,
 15,19,20
 171:15,20

recognizing
 146:19

recollection
 84:7 102:3
 112:5,8
 134:9,13
 143:17

147:3

recollections
 10:15

reconcile
 102:3

reconvene
 165:16

record  6:9
 7:10,20,25
 10:21
 12:17
 20:24,25
 24:15
 30:25
 32:17
 33:9,12,15
 36:7 41:1
 62:11 63:9
 79:11,22
 90:23 91:7
 97:12,24
 104:15,18
 109:6
 120:3
 121:8
 123:15
 129:7
 147:22
 151:11
 158:1,11,
 13 160:14
 165:17
 173:15
 183:20,22
 184:8,16,
 19

**LIL' JOE RECORDS, INC. vs MARK ROSS, ET AL.**
Joseph Weinberger on 10/26/2022    Index: recorded..referenced

**recorded**
 55:12
 94:2,5,9,
 12,15,18,
 21 139:22
 141:10
 145:12

**recording**
 48:20 50:4
 52:16
 54:2,6
 68:21
 69:5,13,16
 70:8,15
 72:22 73:4
 78:25 96:1
 97:11,15
 107:15,17,
 19 121:9
 124:15,18
 128:15
 129:11
 130:3
 151:10

**recordings**
 53:16,19
 82:11
 91:8,13
 96:9,14
 105:22
 107:13

**records**  8:7
 17:3 18:1,
 19,22
 19:12 23:8
 26:13
 29:5,12

30:1,6,13,
17 32:21,
25 33:1
34:12,15
35:7,10,
15,16,21,
24 36:2,
14,19,21,
25 37:1,2,
3,6,12
38:24
39:1,4,13,
16,21
40:1,2,14,
17,19,23
41:1,4,7,
14,17
42:4,14,20
45:13
46:19
47:13,16,
18,19,23
48:7,12,
14,19,20
49:6,12
50:5,13,15
51:24
52:6,10,
14,21,24
53:2,3,6,
11 54:11
55:3,8,9,
22 57:16
58:2,3,7,
8,9,11,12,
18,25
59:2,9,13,
23,25 60:1

67:4 69:23
73:19
74:14,19
75:11,15,
22 76:8
77:3 79:1,
3 81:11,14
82:12,17,
22,23
84:15 85:6
91:11,15,
21 92:2,
18,22
93:23 95:2
98:7,8,14
105:6,7
109:2,9
113:7,10,
13,15,23
114:16
118:4
121:9
127:15,22
128:20,25
136:24
137:3,6,9,
10 143:6
146:23
154:23
155:1
159:1
160:22
161:1
162:19,20
163:8,17
165:2,22
166:24
167:4

169:5
170:20
171:5,23
172:1,4,5
173:11
174:14
177:14
178:19
179:1,19
182:12,17

**Records'**
 45:16
 46:10 76:2
 81:8,15
 114:19
 137:2
 162:23
 166:18,21,
 24 168:15

**red**  12:21

**redaction**
 156:5

**refer**  182:2

**reference**
 97:17
 120:9
 148:1,4,8,
 23 153:3
 164:10,22

**referenced**
 47:21 49:9
 53:18 83:1
 94:24
 145:10
 173:11

references
 81:23
 148:20

referencing
 164:12,18

referred
 82:25

referring
 51:9 82:22
 84:2,13
 99:19,21
 113:12
 130:19
 137:23

reflecting
 121:2
 146:22

refresh  22:5
 83:22

refused
 44:25 45:2
 64:17

refusing
 104:6

regard  7:21
 16:19
 73:11
 98:24
 110:14
 113:24
 136:6
 166:3

register
 141:10

registered
 115:19

registration
 105:20
 107:12,14,
 22 108:6
 109:2
 111:6,9,
 11,24
 113:2,21
 114:16
 115:24
 116:6
 117:8,22

registrations
 104:8,18,
 24 105:4,
 14 107:24
 112:1
 120:22
 159:12
 160:23
 161:4

regular
 183:5
 185:2

reinforce
 143:14

related
 130:8
 136:12
 172:6

relates
 67:16

relating
 24:6 26:15

54:2 58:2
59:9 81:18
86:1
114:11
125:14
131:16
146:12
151:8
165:6
172:4,11
179:1,21

releases
 179:15

relevancy
 179:11,12

relevant
 15:5 50:8
 71:17 97:6
 146:9,24
 153:19
 156:7
 163:25
 165:5
 179:4,7

relieve
 183:22

remain  24:12

remainder
 168:20

remember  9:4
 15:8
 27:12,16
 31:4 34:17
 39:6,8
 40:4 52:22
 53:17,20

56:21
69:8,10,15
102:21
133:3
146:8
172:14,18

remotely
 6:5,21

removed
 153:23
 154:21

renewals
 139:12,21

renewed
 98:11

repeat  65:2
 155:6

repeatedly
 129:24
 133:14

rephrase
 131:9

report  43:21
 45:25 46:4

reporter
 6:3,15,19,
 23 7:3
 8:15 32:3
 33:14,18,
 23 34:4
 38:8,11
 79:20
 158:10
 159:23
 183:22

184:11,20,
25 185:4,9

reporting
6:4 53:5

reports
30:23

represent
80:6 95:15

representation
14:15,19

represented
14:8,10,12
61:9
95:16,17

request
64:18

requests
15:10,15,
16 155:5

require
143:8

required
116:8

requires
48:11

research
25:25 26:5

reservation
156:13

reserve  7:21
66:9,19
87:9
104:10

reserved  5:6
31:22

resign
143:13

resolved
93:17
140:1
144:23
146:16,18,
19 179:15

respect
156:9

respective
5:4

respond  21:2
122:3
158:24
184:4

response
10:16
20:12 65:6
88:5,14
110:18,25
157:4
181:8

responses
15:15

responsible
79:2 159:4

responsive
15:16
23:22
88:20
89:12
90:5,12,15

155:5

responsiveness
88:18

restroom
33:10

result  142:7

retain
136:20

retained
27:10,11
30:14 37:3

retention
59:12

return
50:23,24
51:16
87:13,24

reunion
138:25

revenues
56:15,20

review  16:4
50:2 64:15
65:8 66:4,
24 80:3
85:15,17
103:1
107:3
114:10
115:5
116:22
118:25
119:5,20,
24 120:11

122:1
159:13
161:18
164:17

reviewed
30:21

reviewing
16:9 105:3
119:18

revise  12:18

revisions
12:20

rewrite
163:12

Richard  6:13
7:10 80:6,
9 117:1
176:10
177:10
180:2,5,8
184:8

Ricky  38:3,
20

rights  7:21
24:12,16,
24 66:9,19
75:17,20
82:15
91:19,21,
24 138:20
141:8
143:5
144:25
145:1,9
146:13,14,

15,20
148:2,9,
12,13,22
149:9,14,
16 150:13
151:6
156:14
179:14

road  17:14,
17

Robert  19:4
38:23 40:7
183:2

Roberto's
33:5

Roderick
149:23

Rogow  29:3
46:7,12

role  28:1,
3,11,13
29:10
36:25
43:3,5,21
45:21

room  7:11

Ross  20:2
21:7,11
22:18 23:1
24:10
52:19,24
53:24
54:10
61:24
76:15

81:17 83:1
93:21 99:5
126:22
127:19,21
134:23
143:24
145:6,20
146:3
148:8,14
149:5,11,
17 150:18,
24

Ross's
144:22

Rothman
28:24
46:13
136:4

Rothman's
136:9

royalties
56:12,14
57:17 59:3
134:23
148:21

royalty
47:11
56:20
59:9,20

rubric  34:24

rules  12:3

ruling  47:15

running
29:18

rush  64:6

_____

S

_____

S-I-L-F-E-N
14:4

safe  174:6

salary  18:1

sandwich
32:9,10

sandwiches
31:25 32:1

scan  120:23

scary  77:25

schedule
70:14

schedules
49:25 67:8
70:5,7
71:2 72:22
73:5

Schindler
136:18,21

school  25:9

Scott  6:10
12:2 16:23
25:1 31:6
36:3 63:3
77:13
120:20
147:12,15
152:17
169:15,21
170:9

183:19

screen  11:1,
11 15:20
101:22

scroll  16:2,
3 60:19
87:14
102:13
106:5,11,
16 115:7
118:24
124:6
163:20
165:8
166:13

scroll-through
102:20

scrolled
61:13
62:6,16

scrolling
62:22
119:6
165:9

secondary
168:14

section  61:8
108:9
109:3
110:19
117:21,22
148:2,9
149:8,16
150:13,20

sections

64:23
120:16

sell  91:21,
24 107:25

send  19:18
34:3
103:24

sending
159:23

Senior  27:19
37:8

sense  133:13
135:12

sentence
163:15

separate
58:24

separated
74:18

series  49:17
81:19

server  58:6

services
54:3

session
14:22

set  86:12
133:12
135:9
185:8

sets  84:10

setting  6:6
35:1

settings
77:12

settled
122:5

settlement
83:24
137:14
138:23
140:8
141:5,16
142:7,15
144:21
145:10
146:2,11

settling
122:7
141:21

Shake  22:16

shakes  10:9

share  10:16

sharing
35:3,6

Sharpton
43:1

Sharpton's
43:3

shocked
135:20
150:3

short  74:4,9

shorten
159:22

show  62:8

66:13
106:10
119:6,9,23

showed  62:15

showing  64:9

shown  102:19

shows  17:20
19:20
21:13
22:19

shredded
60:2

sign  48:14
53:10
87:13,19,
23 161:21
168:25

signatories
98:19
127:3

signatory
37:15,20
165:21

signature
61:16
87:15,20
124:6,13,
16,22
125:1,4,7,
13,20
126:6,12,
16,23
127:4
165:11
168:24

169:1

signatures
124:8,9
127:12

signed  48:19
49:18,19
87:19
99:13,15,
18 124:14
128:3,4,6,
9,11,14
150:6
162:1,8
164:7
168:17,21

signing  5:5
162:14
164:6
165:24

Silfen  14:2

silhouetted
157:6

similar
87:10

sit  7:12
21:18 22:6
24:5 39:9
69:12
70:12 73:8
83:15 84:6
85:5
109:19
122:10
168:5
170:25

LIL' JOE RECORDS, INC. vs MARK ROSS, ET AL.
Joseph Weinberger on 10/26/2022                    Index: sitting..start

174:12

**sitting** 22:2
70:25 71:1

**situation**
44:23 63:7
81:15

**Skyywalker**
26:13
29:25
30:6,13,
17,25
32:21 33:1
34:11,12,
15 35:7,
10,15,16,
21,24
36:1,2,14
37:1,24
38:24,25
39:4,13
40:1,14,16
41:1,4,7,
14,16 42:4
53:2,3
98:7,8,14
105:6
121:9
136:24
137:3

**slice** 32:14

**slightly**
124:20
125:19

**slow** 144:5,
10

**slower**
60:23,25
85:16
102:14
106:7
115:8
140:20
159:17

**slowly**
118:23
140:22
161:17

**sold** 50:9
91:9,12
145:9

**sole** 56:10,
22

**solely** 23:24

**Somethin'**
22:16,17
81:24 86:3
94:14

**songs** 19:19
23:7 52:20
67:11
78:14,15,
24

**sort** 78:12
108:17
153:16,17
179:2

**sound** 82:11
91:8,12
105:22
107:12,15,

17,18

**sources** 55:5

**Southern**
142:1,2

**speak** 114:2

**speaking**
13:9 63:9
78:12
109:9

**specialized**
45:24

**specific**
10:15
59:14
62:19
70:18,23
76:25 85:2
102:16
112:5,8
142:20

**specifically**
35:12
57:22
73:10
74:1,3
78:22 81:5
84:17 93:2
97:8
116:11,13
125:23
135:6
177:9

**specifics**
55:24

**speculate**

101:4

**speed** 64:11
144:5

**spell** 7:24
14:3 17:10
19:5,8

**spelled**
110:9

**spelling**
34:3

**spend** 119:17

**spoke** 82:7
108:20
136:8

**spoken** 114:8
136:5,11

**spring**
42:23,24
45:15

**SR** 107:9,11
115:12
117:20

**stack** 153:7,
21 154:20

**stake** 27:20,
23

**stamped**
153:2
154:21

**stand** 163:6

**start** 52:2,9
54:16

LIL' JOE RECORDS, INC. vs MARK ROSS, ET AL.
Joseph Weinberger on 10/26/2022   Index: started..supplementing

started 7:9
 28:18 52:3

Starting
 129:25

state 6:16
 7:25 9:18,
 21 105:22
 110:12
 125:23

stated
 105:20

statement
 95:19
 104:12
 163:6
 164:19

statements
 59:21 81:7

states 9:21
 139:14
 142:1

stating 6:8
 110:2

statute
 24:14

stay 126:9

steal 140:2

Stein 81:10,
 12

steps 176:6

Stewart
 108:21
 109:5,13

110:10
113:3,21
118:3

Stewart's
 114:4

stick 89:8

stipulate
 16:24
 184:7

stipulated
 5:3

stipulation
 184:15

stolen
 139:23

stop 110:7
 118:14
 164:10
 165:10

stopped
 106:16

stopping
 117:21

strange
 178:5

Street 58:17

structure
 78:14

Stuart 14:2

studio 77:12

stuff 92:15
 93:22
 101:5

111:15
130:18,19
170:18

subject
 16:20 86:7
 91:2,8,13
 94:2,5,9
 105:8,14,
 15 112:10
 122:24
 123:9,14
 129:11,14
 130:3,9,
 15,20
 131:2,17
 134:15,20
 136:25
 137:4,7,
 11,24
 138:1
 142:22
 145:7,17
 155:16
 161:4

subjective
 112:7

submit
 107:21

submitted
 107:15,18
 109:2

Subparagraph
 145:5

subpoena
 17:1

subsequent
 93:15
 98:11
 115:15
 116:1
 130:10
 138:23
 139:4
 142:4
 146:1,4

substantial
 12:20
 50:24
 51:16
 59:23

substantive
 12:20

suc 32:23

successor
 32:24
 162:19,23
 163:7

sufficient
 184:3

suggest
 31:23

suggestion
 63:3

suing 19:22,
 23 20:1,4

summer 42:24

supervise
 171:2

supplementing

170:6

**supplies**
44:7

**supposed**
178:11
179:21

**supposedly**
174:8

**surprise**
100:8,15
135:17

**swear** 6:25

**sworn** 6:24
7:6 164:19

**system** 58:6

**séance** 114:5

————————

**T**

————————

**table** 11:20,
23

**takes** 11:17

**taking**
67:23,25
169:13

**talk** 32:17
33:8,10

**talking**
37:25
70:19 82:4
131:4

**Taxation**
25:19

**taxes** 26:16

**Taylor** 38:15

**telephone**
110:9

**telling**
155:25
176:2

**ten** 31:25
38:1 59:24
68:25 69:3
89:7
159:20,21
160:2
180:25
181:1

**ten-minute**
119:10

**terminate**
23:17
24:11 86:1

**terminating**
149:24

**termination**
24:7,14,
19,23
81:18,20,
23 82:2
85:7,24
86:12,13
88:1
116:15
117:3
148:2,9
149:9,16
151:3

180:16

**terms** 60:6

**testified**
7:6 75:14
165:4,20
166:3
167:17
170:12
176:16

**testify**
16:14
104:6

**testifying**
113:6

**testimony**
13:4,7
18:5 44:10
48:4 92:18
99:4
111:23
113:9
129:2
168:21
169:19
170:11
173:18
175:5

**text**
181:18,20,
21 182:2

**thereabouts**
10:14

**thing** 46:7
54:12
58:10

61:12
63:11 90:9
93:17
108:24
126:18
133:17
153:13
154:15
175:1

**things**
10:12,18
19:15,16,
19,20
20:15
21:5,6,7,
8,13 43:18
44:6,9
46:7 60:3
73:15,18
77:12
78:24
84:11
111:19
122:13
159:19
179:16
183:20

**thinking**
15:1
152:22

**thought**
77:25
122:13
178:5,7

**thousand**
116:13
128:17

throwing
 59:22

thrown  72:6

thrown-
together
 72:7

time  9:7
 12:22
 26:14,16,
 22,25
 27:13,18
 28:11
 29:4,8,11
 30:11
 31:15,24
 35:13
 36:20,24
 37:17
 39:23 40:5
 42:16,21
 45:9,11
 46:6,22,23
 48:3,6,17
 49:4
 52:11,13,
 20 56:16,
 19 59:24
 62:12
 63:19,24
 64:5,19
 71:4 72:21
 73:2,6,15,
 19 74:4,10
 77:15
 78:1,3
 81:11
 87:20

102:17,24,
25 103:4
106:7,15
115:20
116:19
119:18,23,
25 120:1
122:1,4
129:14
136:10
138:2
139:6
143:9
145:14,15
148:12
151:16
161:5
170:3
172:1
175:7
177:15
179:2,17
180:20,23
181:2

times  10:17
 41:21 45:1
 51:11 89:7
 134:3
 135:5
 142:5
 149:4,7
 150:8
 177:17
 180:25
 181:1

title  17:13
 28:16

40:13
43:5,6
60:6 102:2

titled  167:3

titles  72:25

Tobino  38:19

today  10:12,
 20 12:14,
 17 13:4,7
 14:24
 21:18
 22:2,6
 31:15 56:6
 69:12
 70:12 73:8
 83:15 84:6
 109:19
 113:7
 122:10
 168:5
 174:12

today's
 13:10
 14:22 15:1
 114:3

told  39:24
 42:2,5
 48:25
 51:15
 73:12
 78:21
 81:1,5
 82:9 84:24
 86:18,20,
 22 88:22,
 24 89:3,8,

15 90:4
91:14,25
92:23
93:5,10
96:5,15
97:7,9
99:3,5,7,
10,23
100:11,13,
19 107:23
112:23
113:20
114:14
122:12
123:19
124:2,14
125:5,15,
22 126:1,
3,9,14,19,
25 127:1,4
128:1,5
129:21
131:19
134:25
135:6,21
136:2,8
149:21
150:15
163:2
167:10
173:21,22
174:10,11,
18 175:3,9
176:5,18,
23 177:9,
10,21
179:24,25
180:8

top  84:3
  106:23,25
  108:17
  160:3,14
  167:16

topic  16:17

topics  16:9,
  15,25
  78:15

tour  138:25
  147:8,10

trademark
  25:23 26:6
  112:14
  138:20
  139:7,14,
  22,24
  140:3,5
  171:17

trademarks
  22:24
  23:3,14
  26:2 138:4

tradename
  147:11

training
  26:5

transcribed
  184:21

transcript
  12:8,15,19
  160:15

transfer
  23:18 55:9

91:2
101:1,17
138:15
142:17
143:9,18
146:12
150:21

transferred
  24:16,24
  55:2 91:4
  92:10,14,
  15,17
  93:14,22,
  23 122:17,
  24 123:14
  141:7
  142:16

transfers
  24:20
  83:25
  84:2,10
  86:1 93:18

Trechsel
  11:7 15:20
  61:1
  101:21
  118:12,18
  120:10
  144:14
  159:22
  160:4,9,12

trial  12:22

truck  76:1

true  94:11,
  14,17
  105:13

106:18
130:22
131:10,14
177:13
178:18

trustee
  151:5,6

trustees
  24:12

truth  6:25
  7:1 10:5

turn  7:14,
  19

turnaround
  185:2

TV  19:20

Tw-minute
  158:7

Twenty-two
  176:13

type  23:6
  162:12
  182:14,17

typed  169:20
  170:13
  171:3
  181:23
  182:16,21

typeset
  182:5

typing
  169:14

U

Uh-huh  62:21
  169:23

uh-huhs  10:8

uh-uhs  10:8

unable  71:16
  184:13

unaware
  109:20

undated  98:1
  121:8

understand
  9:15 10:5,
  9,13,18,23
  14:10
  19:21 21:1
  26:3 28:2
  34:7 36:10
  48:8,12,17
  58:4 74:25
  75:13
  79:25
  80:18
  85:4,25
  86:8 113:5
  123:5
  124:20
  125:18
  133:9
  176:22
  179:12

understanding
  14:7,17
  20:8 22:1,

22 23:1,23
47:12
48:1,5,10
49:5,13
57:13
76:21 83:8
84:19,22
85:6 86:17
91:6 92:8,
13 93:12
95:25 98:3
104:6
107:10
131:15
145:16
179:10

**understood**
12:11,24
21:25
48:13
70:24
92:16
122:22
126:5
132:23
179:9

**undertaken**
26:5

**unethical**
156:25

**Unintelligible**
177:7

**United**
139:13
142:1

**University**

25:12

**unreasonable**
66:15

**USA** 22:16

————————
————————
**V**
————————

**Vaguely**
124:11

**valid** 86:12
122:20
125:11,17
132:22
133:8,11
135:3,8
137:19,21
138:1
175:13

**validity**
122:4
138:4,5,9

**values**
182:23

**variations**
20:5

**Veargis**
38:17

**vehicles**
137:14

**version** 67:7
117:23

**versions**
49:24

**video** 21:13

22:19

**vinyl** 23:8

**violates**
22:23

**violating**
23:14

**violation**
23:2 146:2

**visual** 22:15

**voluntary**
80:13

**voracity**
122:4

————————
————————
**W**
————————

**W-2** 17:25
18:2,10,18
29:6

**W-E-I-N-B-E-R-
G-E-R** 8:1

**walked** 40:11

**Walker** 38:15

**Wanna** 22:16
81:25 86:4
94:17
99:1,12,
17,25
127:2
128:7
129:22

**wanted** 31:10
45:1
145:22

**warehouse**
76:2

**WAV** 19:18

**ways** 151:24

**Wein** 8:12
54:17
55:1,10,
15,18
56:3,5,22
58:21,24
59:5 109:6

**Weinberger**
7:5,24
8:9,11

**weirdness**
178:24

**wife** 36:4
82:7

**window** 11:6,
10

**withdraw**
47:16 94:3
128:18
131:12

**witness's**
7:10

**Wolfe** 6:13
7:11,16,17
11:13 12:2
16:23
20:17,21,
24 21:21
22:8 24:1
25:1,14

**LIL' JOE RECORDS, INC. vs MARK ROSS, ET AL.**
Joseph Weinberger on 10/26/2022          Index: woman..work

31:6,14,22
32:6,12
33:4,17,19
36:3 45:18
50:6 60:22
61:16,21
62:4,13
63:3,10,20
64:1,7,25
65:11
66:2,13,22
67:5,9,13,
18 68:5
71:9
77:13,20,
25 79:13,
15,18
80:6,9
86:24 87:5
96:24
102:18
103:3,7,
10,16,21
104:11
106:8,15
114:22
115:9
117:1
118:9,14
119:2,12,
19 120:14,
18 121:5,
13,16
123:1
134:2,7
140:20
143:11
144:6,12

147:12,15,
19 149:19
152:17,23
153:5,12,
20 154:1,
15,19,25
155:6,13,
18,23
156:2,10,
15,22
157:18
158:3,7,15
159:17,24
162:3
169:9,15,
21,24
170:2
171:6
172:23
176:9,10
177:16
179:23
180:13,21
181:7,9,
14,22
183:16,17
184:5,12,
17 185:1,
2,7,12

**woman** 41:11
46:14

**Won** 20:3
23:17
52:19,24
53:24 54:2
61:7 81:18
83:3,6,17

84:1 93:21
98:1 99:5
121:24
122:3
126:15
128:23
129:1,4
140:8
141:23
143:4,9
148:8
149:6,17,
20 150:15
166:4,7
167:9
168:25
169:13,19
170:13
172:3
173:19
175:1,6
178:6
179:15
182:10,20

**Won's** 54:2

**Wong** 20:2
23:4,17
52:19,24
53:24 54:2
61:7 81:18
83:3,6,17
84:1 93:21
98:1 99:5
121:24
122:3
126:15
128:23

129:1,4
138:23
140:8
141:7,17,
23 142:6
143:4,9
148:8
149:6,17,
20 150:15
166:4,7
167:9
168:25
169:13,19
170:13
172:3
173:19
175:1,6
178:6
179:14
182:10,20

**Wons** 23:4
138:24
141:7,17
142:6

**word** 44:2
57:6

**words** 11:16
175:14

**work** 18:18
26:12,15,
19 27:7
28:6,14
29:25
30:3,17,20
32:20,24
37:6 38:23
46:16

52:24 55:7
57:20,22,
23 95:22
108:11
109:20
115:19,21
117:23
136:17
155:22
170:19,22,
23

**work-for-hire**
109:10
110:14

**work-made-for-
hire** 109:3,
21 110:19

**worked** 27:3
29:11 57:8

**working**
26:4,8,25
34:14 37:2
53:1,2
57:11 78:9
135:24

**works** 57:18
59:3,10
60:12
67:16
105:8,14,
15,21

**worry** 150:2

**write** 161:25
162:1

**writer**

146:15

**writes** 51:10

**writing** 35:1
51:7
100:25
101:9,18

**written**
53:21
101:3
146:18
174:4

**wrong** 110:10

**wrote** 162:7

─────────
**Y**
─────────

**year** 98:11
177:25
178:2

**years** 8:22
9:13 13:23
54:14
59:24
78:10
107:18
176:13

**yes's** 10:8

**York** 14:2

─────────
**Z**
─────────

**Zoom** 11:6,
10