# EXHIBIT A

Luther Campbell
November 01, 2022

Page 2

1  APPEARANCES:

2  ON BEHALF OF THE PLAINTIFF: LIL' JOE
   RECORDS, INC., a Florida corporation

4      WOLFE LAW MIAMI, P.A.
       175 Southwest 7th Street
5      Penthouse 2410
       Miami Fl  33130
6      (305) 384-7370
       Rwolfe@wolfelawmiami.com
7      BY: RICHARD C. WOLFE, ESQ.

9  ON BEHALF OF THE DEFENDANTS:  MARK ROSS,
   CHRISTOPHER WONG WON, JR., RODERICK WONG
10 WON, LETERIUS RAY, ANISSA WONG WON
   And LUTHER CAMPBELL
11
12     DONIGER/BURROUGHS Building
       603 Rose Avenue,
13     Venice, California 90201
       (310) 590-1820
14     Scott@donigerlawfirm.com
       BY: SCOTT ALAN BURROUGHS, ESQ.
15
16
17
18
19
20
21
22
23
24
25

Page 3

1          INDEX OF PROCEEDINGS

2

3  WITNESS: LUTHER CAMPBELL          Page

4  DIRECT EXAMINATION                  4

5  BY MR. WOLFE

6  WITNESS NOTIFICATION LETTER        94

7  ERRATA SHEET                       95

8  CERTIFICATE OF OATH                96

9  C E R T I F I C A T E              97

10

11

12          E X H I B I T S

13

14 Exhibits                         Page

15 (Reporter's Note:  No new exhibits

16 marked or attached)

17

18

19

20

21

22

23

24

25      Deposition taken before DEBRA L. STARK,

Page 4

1  Florida Professional Reporter and Notary Public in

2  and for the State of Florida at Large.

3          (Witness presents government issued

4  identification and identity verified.)

5          COURT REPORTER:  Do you swear or affirm

6  the testimony you are about to give will be the

7  truth, the whole truth, and nothing but the

8  truth.

9          THE WITNESS:  Yes, I do.

10 THEREUPON:

11              LUTHER CAMPBELL

12          having been first duly sworn or affirmed,

13 was examined and testified under oath as follows:

14              DIRECT EXAMINATION

15 BY MR. WOLFE:

16     Q.   Good morning, Mr. Campbell.

17     A.   Good morning.

18     Q.   I presume you've had your deposition

19 taken before?

20     A.   Yes.

21     Q.   And you know the rules?

22     A.   Yes.

23     Q.   Let me just repeat a few of the basic

24 rules.

25          I'm going to ask you a series of

Page 5

1  questions.  I'm going to assume you understood

2  the question if you choose to answer the

3  question?

4          Do you understand that?

5     A.   Yes.

6     Q.   Do you understand you're under oath as

7  though you're testifying in a court of law?

8     A.   Yes.

9     Q.   And at any time you need to take a break,

10 just let me know and we'll be happy to take a break.

11          Okay?

12     A.   Yes.

13     Q.   And I think we should all shoot for

14 taking a lunch break around 1:00.  Is that

15 acceptable to everyone?

16     A.   Yes.

17     Q.   All right.  So can you tell me a little

18 bit about your background?  First let's start with

19 education.

20     A.   Education, I went to Miami Beach Senior

21 High.  I graduated in '78.

22     Q.   And no college after that?

23     A.   No.

24     Q.   And what do you currently do for a living?

25     A.   Currently do for a living, I run my

Luther Campbell
November 01, 2022

**Page 6**

1   record company and I coach high school football.
2       Q.   What's the name of your record company?
3       A.   Luke Records.
4       Q.   And how long have you operated this
5   version of Luke Records?
6       A.   I don't recall the time.  I would have to
7   go look at the documents.
8       Q.   Did you do anything to prepare for the
9   deposition today?
10      A.   Did I do anything to prepare?
11      MR. BURROUGHS:  Other than speak to your
12   counsel, of course.
13      THE WITNESS:  No.
14   BY MR. WOLFE:
15      Q.   Did you read any documents?
16      A.   No.
17      Q.   Did you speak with your counsel, without
18   telling me what was said?
19      A.   Yes, I spoke to my counsel.
20      Q.   And when did you do that?
21      MR. BURROUGHS:  Object and instruct the
22   witness not to answer anything about the
23   conversation, ,you can say yes or no, but
24   that's the extent of it.
25      MR. WOLFE:  I only asked him when, that's

**Page 7**

1   not privileged.
2       MR. BURROUGHS:  Same instruction.
3   BY MR. WOLFE:
4       Q.   How long did you speak with your counsel
5   for?
6       MR. BURROUGHS:  Again, I will instruct
7   the witness not to disclose anything about the
8   conversation with counsel.
9       MR. WOLFE:  I understand that.  I'm only
10   asking him how long you spoke for.
11      THE WITNESS:  I spoke to him pretty much
12   every day, 30 minutes, an hour sometimes.
13   Sometime I like to avoid him.
14   BY MR. WOLFE:
15      Q.   Okay.
16      A.   But every day I speak to my lawyer or one
17   of my lawyers.
18      Q.   Okay.  And do you have lawyers other than
19   Mr. Burroughs?
20      A.   Yes.
21      Q.   Who are those lawyers?
22      A.   Lawyer, my other lawyer is Matt Greenberg.
23   I speak to Bruce Rogow on a regular basis.
24      I speak to my other lawyer.  I just hired
25   her the other day.  I forget what her name is.  I

**Page 8**

1   can get that for you later on.
2       Q.   Are any of these three lawyers that you
3   just mentioned representing you in this
4   Section 203 case?
5       A.   No, sir.
6       Q.   All right.  What I would like to do is go
7   back to when you first started in the record
8   business.
9       Okay?  Do you know what year that was?
10      A.   What year it was?  When I started in the
11   record business?
12      Q.   Correct.
13      A.   Don't recall what year.
14      Q.   About 1985, '86; does that refresh your
15   memory?
16      A.   I started out as a DJ, so that would be
17   considered as in the record business.
18      Q.   Okay.  Well, I'm not interested in that.
19   I'm interested in the business in which you were
20   making and distributing recorded music.  So with
21   that understanding, approximately when did you
22   start in that business?
23      A.   I don't recall the exact date.
24      Q.   Does it refresh your recollection that
25   it would have been 1985 or 1986?

**Page 9**

1       A.   I don't recall the exact date.
2       Q.   Do you know what was the name of the
3   first business that you incorporated to be in the
4   record business?
5       A.   Luke Skyywalker Records.
6       Q.   Do you know when you incorporated Luke
7   Skyywalker Records?
8       A.   I don't recall that date.
9       Q.   And where did Luke Skyywalker's Records
10   operate from?
11      A.   I don't recall specifically where it
12   operated from.
13      Q.   And are you -- were you the sole owner of
14   Luke Skyywalker Records, Inc.?
15      A.   Yes.
16      Q.   And was Luke Skyywalker Records Inc. a
17   C corp. or an LLC or Sub S or some other kind of
18   corporation?
19      A.   I don't recall.
20      Q.   Now, did you eventually change the name
21   from Luke Skyywalker Records to Skyywalker
22   Records?
23      A.   Yes, I did.
24      Q.   When did you do that?
25      A.   I don't recall the date, the actual date.

Luther Campbell
November 01, 2022

Page 10

1    Q.   Why did you change the name?

2    A.   At one point I got sued by George Lucas

3    for using the Luke Skywalker Records' name, but

4    I don't recall the date.

5    Q.   Did the Court in California enter an

6    injunction to prevent you from using the name Luke

7    Skywalker Records, Inc.?

8    A.   Yes.

9    Q.   Is that what caused you to change the

10   name from Luke Skyywalker Records to Skyywalker

11   Records?

12   A.   I don't recall at that time whether that

13   was the reason why, but I know I had an injunction

14   to change the name.

15   Q.   Now, did the name change or did the

16   corporation entity change?

17   A.   I don't recall.

18   A.   I'm sorry.

19   A.   I don't recall.

20   Q.   You don't recall.

21   Now, did eventually Skyywalker Records

22   become Luke Records?

23   A.   Did eventually Skyywalker Records become

24   Luke Records?  I would have to -- I don't recall.

25   I don't recall the date when it actually happened

Page 11

1    or at what period of time.

2    The name changes should be documented in

3    the Florida Sunbiz.

4    Q.   But you --

5    A.   Whatever the dates were, whatever the

6    names were and whatever the changes were, a lot

7    of changes.  I don't know the dates and the

8    names.  I know -- I know the names but I don't

9    know the exact dates.

10   Q.   But you agree with me, at some point,

11   Skyywalker Records, Inc. became known as Luke

12   Records, Inc.; correct?

13   A.   I don't -- I don't recall.

14   Q.   Okay.  Well, you just said you knew that

15   the name had changed; is that correct?

16   A.   I said that I don't recall what date or

17   when the name changed and I don't recall whether

18   it fell up under those names, they were separate.

19   There were other companies that had filled up, so

20   I don't recall.

21   Q.   Why did you change the name from

22   Skyywalker Records, Inc. to Luke Records?

23   A.   Just like I said, I don't recall.

24   Q.   And do you know when Skyywalker Records,

25   Inc. operated under that name?

Page 12

1    A.   I don't recall the exact date.

2    Q.   Do you know from which office Skyywalker

3    Records, Inc. operated from?

4    A.   No, I don't recall.

5    Q.   Did you at some point operate from 3050

6    Biscayne Boulevard?

7    A.   Yes, I did.

8    Q.   Do you know the years that you did that?

9    A.   No, I don't recall.

10   Q.   And eventually you moved to 2nd Avenue; is

11   that correct?

12   A.   Eventually I moved to 2nd Avenue?  At some

13   point, yes.

14   Q.   Do you know when your business moved from

15   3050 Biscayne to 2nd Avenue in North Miami?

16   A.   My business didn't move from -- it moved

17   from -- it moved from Biscayne Boulevard, if I --

18   if I can recall, it moved from -- did it move from

19   Biscayne to 54th Street, off 5th to Biscayne and

20   Biscayne?

21   At some point it moved to 2nd Avenue, but

22   I don't recall the exact dates.

23   Q.   Do you know the approximate date?

24   A.   No.

25   Q.   Do you know the approximate date that you

Page 13

1    operated from 3050 Biscayne Boulevard?

2    A.   No, I don't recall.

3    Q.   Are you familiar with Joseph Weinberger?

4    A.   Yes.

5    Q.   When did he first become a lawyer working

6    for one of your businesses?

7    A.   I don't recall the exact date.

8    Q.   Do you recall what he was originally hired

9    to do?

10   A.   Yes.

11   Q.   What was he hired to do?

12   A.   He -- he originally was hired as the tax

13   attorney, my tax attorney, and then he became my

14   general counsel -- for my records.

15   Q.   So let's first start as tax attorney.

16   When was he hired to be your tax lawyer?

17   A.   I don't recall the exact date.

18   Q.   Do you know when he became your general

19   counsel?

20   A.   I don't recall the exact date.

21   Q.   And is it fair to say that when he

22   became your general counsel, he was, in essence,

23   an employee of yours?

24   A.   Yes.

25   MR. BURROUGHS:  Objection.  Vague.  Calls

Luther Campbell
November 01, 2022

Page 14

1   for a legal conclusion, but if you know.
2   BY MR. WOLFE:
3      Q.   I will satisfy counsel.
4           When he became your general counsel, did
5   he work from your office?
6      A.   Yes.
7      Q.   So when he reported for work every day he
8   came to your office?
9      A.   Yes.
10     Q.   And he had an office within your building
11  in your company?
12     A.   Yes.
13     Q.   And he had the title of general counsel?
14     A.   I don't recall the exact title.  I don't
15  recall the exact title, but he worked from the
16  office.
17     Q.   And he was paid a salary as an employee?
18     A.   Yes.
19     Q.   And do you know the period of time when
20  he acted as your general counsel?
21     A.   I don't recall the exact dates.
22     Q.   Well, let me see if I can help refresh
23  your memory.  Do you recall that you filed for
24  bankruptcy in 1995?
25     A.   I don't recall the exact date.

Page 15

1      Q.   Would it refresh your memory if I
2   represented to you that you filed for bankruptcy
3   in 1995?
4      A.   If you showed me that filing document,
5   and I can look at it, the actual filing document
6   with my signature and my attorney's signature,
7   then I can -- if you reference that, then that
8   would be great.
9      Q.   Okay.  Who was the lawyer who filed
10  bankruptcy for you?
11     A.   I had a couple of lawyers.  I don't -- I
12  don't remember the exact name.
13     Q.   So accepting for the moment my
14  representation that the bankruptcy was in '95 or
15  '94, approximately how many years before then had
16  Joseph Weinberger been acting as your general
17  counsel?
18     A.   I don't recall the amount of years.
19     Q.   Did you have other entertainment lawyers
20  provide services to your companies prior to filing
21  for bankruptcy?
22     A.   Yes.
23     Q.   Do you remember their names?
24     A.   Before filing bankruptcy?  A couple of
25  names I remember.

Page 16

1      Q.   Who do you remember?
2      A.   Nick Mancini was a lawyer of mine in a
3   case, in a Peter Jones case.  I would consider
4   him probably.  He was a guy that Joe Weinberger
5   hired while working at the company.  Who else?
6   Allen Jacobi was a lawyer for a short period of
7   time before I sued him.
8           '90 -- yeah, I think it was maybe one
9   other, but I don't recall the actual name.
10     Q.   In the period of 1986, 1987, who was the
11  lawyer that was drafting contracts between Luke
12  Records or Skyywalker Records or Luke Skyywalker
13  Records and the artists that were signed to your
14  company?
15     A.   I don't -- I don't recall the exact
16  attorney name.  There was an engagement letter
17  that you have with my signature on there, if you
18  provide that with me, then I can verify that, that
19  --
20     Q.   I'm not asking you about an engagement
21  letter.  I'm asking you which attorney in that
22  time period was preparing contracts between your
23  company and your artists?
24     A.   I don't recall.
25     Q.   Did Nick Mancini ever prepare contracts

Page 17

1   between Luke Skyywalker, Skyywalker Records or
2   Luke Records and any of your artists?
3      A.   I don't recall.
4      Q.   Did Allen Jacobi prepare contracts
5   between Luke Skyywalker, Skyywalker Records or
6   Luke Records and any of your artists?
7      A.   I don't recall.
8      Q.   Have you seen an affidavit that Allen
9   Jacobi filed in this case stating that he had
10  prepared contracts for you?
11     A.   No.
12     Q.   Your lawyer didn't show you that
13  affidavit?
14     A.   I didn't see it.  Maybe he did.  Maybe he
15  did, maybe he didn't, but if you have a copy of
16  it, show it to me.
17     Q.   Are you aware of any other lawyer other
18  than Allen Jacobi who might have prepared
19  contracts between Luke Skyywalker, Skyywalker
20  Records and/or Luke Records and any of your
21  artists?
22     A.   I don't recall at this time.
23     Q.   And as we sit here today, is it fair to
24  say you're not aware of the name of any other
25  lawyer who could have possibly prepared those

Luther Campbell
November 01, 2022

---

**Page 18**

1  contracts?

2  A.  I don't recall.

3  Q.  That's not my question.  I said --

4  A.  I don't recall.

5  Q.  Do you know the name David Bercuson?

6  A.  Yes.

7  Q.  Was he a lawyer for Luke Skyywalker,

8  Skyywalker Records and/or Luke Records?

9  A.  I don't recall that.

10  Q.  Do you know what he did for any of those

11  entities?

12  A.  I don't recall.  I don't remember him

13  being a lawyer of mine, but I don't recall.

14  Q.  Are you familiar with a company called

15  Rockville Productions?

16  A.  Rockville Productions?  Rockville --

17  Rockville Productions?

18  Q.  Or Rockville, I'm not sure of the second

19  name.

20  A.  Rockville Productions?

21  Q.  I can double check.

22      Rockville Productions, Inc.?

23  A.  Rockville Productions, Inc.

24      Am I familiar with that company?

25      Rockville Production, Inc.  I'm familiar

---

**Page 19**

1  -- I think it was a Rockville Entertainment,

2  Rockville, Maryland.  I don't recall being

3  familiar with Rockville Productions.

4  Q.  Are you familiar with a company called

5  Luke Records Fan Club, Inc.?

6  A.  Yes.

7  Q.  What did that company do?

8  A.  Luke Records, it did a number -- numerous

9  amount of things, but I don't recall the specifics

10  of what it did.  I would need to look at the

11  documents to find out what it actually did at

12  that period of time.  That was a long time ago.

13  Q.  Are you familiar with a company called

14  Pac-Jam Publishing, Inc.?

15  A.  Yes.

16  Q.  P-A-C - J-A-M?

17  A.  Yes.

18  Q.  Is that a company that you owned?

19  A.  Yes.

20  Q.  Who was the lawyer that set that company

21  up for you?

22  A.  I don't recall.

23  Q.  Do you know when you established that

24  company?

25  A.  I don't recall.

---

**Page 20**

1  Q.  If I told you the records from Sunbiz

2  shows that it was filed in 1989, would that

3  refresh your recollection as to when it was

4  established?

5  A.  If you showed me the documents.

6  Q.  Okay.  What did that company do?

7  A.  Pac-Jam Publishing?

8  Q.  Yes.

9  A.  Pac-Jam -- records were published up

10  under that.  It was a publishing company.

11  Q.  Did Pac-Jam Publishing enter into any

12  contracts with any artists?

13  A.  I don't recall what artists it entered

14  into contracts with.

15  Q.  Specifically did Pac-Jam Publishing enter

16  into any contracts with the other members of

17  2 Live Crew?

18  A.  I would have to look at the documents.

19  Q.  Did Luke Records enter into any contracts

20  with the other members of 2 Live Crew?

21  A.  Did Luke Records, Luke Skyywalker

22  Records, all these different companies, I would

23  need to see the actual document to verify which

24  company entered into a contract with 2 Live Crew.

25  Q.  So you are aware that there is at least

---

**Page 21**

1  one contract between one of your companies,

2  Luke Skyywalker Records, Skyywalker Records or

3  Luke Records and the other members of 2 Live Crew;

4  is that correct?

5  A.  There is a contract -- there was a

6  contract with 2 Live Crew.

7  Q.  Okay.  Is it one contract or more than

8  one contract?

9  A.  I don't recall how many contracts it is.

10  Q.  Do you know when that contract was

11  prepared?

12  A.  I would have to actually see the

13  documents.  I don't recall what date it was

14  prepared or when it was prepared.

15  Q.  Do you know what lawyer prepared that

16  contract?

17  A.  No, I don't recall that.

18  Q.  Do you know whether or not that contract

19  was prepared before -- scratch that.  Let me

20  start over again.

21      You're familiar with the first three

22  records that were put out by your company for 2

23  Live Crew?

24  A.  Am I familiar with the records that were

25  put out?

---

Luther Campbell
November 01, 2022

Page 22

```
 1    Q.    Yes.
 2    A.    Yes.
 3    Q.    What was the first one?
 4    A.    The first record, the first record I think
 5  was 2 Live Is What We Are.
 6    Q.    And when was that record released to the
 7  public?
 8    A.    I want to say around '86.
 9    Q.    When that record was released to the
10  public, was there a contract between any one of
11  your three entities and the members of the group?
12    A.    It was a verbal contract.
13    Q.    What were the terms of the verbal
14  contract?
15    A.    I don't recall the specific verbal terms
16  of the contract, but you don't go in the studio
17  and do records without a verbal contract or a
18  contract, and at that time it was a verbal
19  contract.
20    Q.    And who was this verbal contract between?
21    A.    Me and the other members of the group.
22    Q.    You, personally?
23    A.    Me and the other members of the group.
24    Q.    And when was this verbal contract
25  formed?
```

Page 23

```
 1    A.    Before we went into the studio.
 2    Q.    So is it fair to say you had this verbal
 3  contract before 1986?
 4    A.    I don't recall the actual date we had a
 5  verbal contract.
 6    Q.    You had a verbal contract before 1987?
 7    A.    I don't recall -- I don't recall the
 8  date that I had a verbal contract.
 9    Q.    Is it fair to say you don't recall any
10  of the terms of the verbal contract between you
11  in one hand and the members of 2 Live Crew on the
12  other?
13    A.    There was a verbal contract with the
14  members before we went into the studio, as we
15  went in the studio, paid a royalty, the verbal
16  agreements as to how everybody get paid, whether
17  it was performing on a record and performing
18  live.
19    Q.    And what was the royalty that was agreed
20  to in this verbal agreement?
21    A.    I don't recall the royalties.  Whatever
22  they was being paid.
23    Q.    What was the term of the contract?
24    A.    The term of the contract?  The verbal
25  contract?
```

Page 24

```
 1    Q.    Yes.
 2    A.    I don't recall the terms of the verbal
 3  contract.
 4    Q.    How were they to be paid pursuant to
 5  this verbal contract?
 6    A.    I don't recall how they were being paid.
 7    Q.    Other than you, who else would know
 8  about this verbal contract?
 9    A.    Other than me, who else would know about
10  it?  The other members would know about it.
11    Q.    Would David Hobbs know about this verbal
12  contract?
13    A.    All of the members.
14    Q.    Was the verbal contract reached with all
15  three members at the same time or separately with
16  the three members?
17    A.    The verbal contract was made with all
18  three members at the same time, mainly with Chris
19  Wong Won.
20    Q.    Okay.  And where was this verbal contract
21  reached?
22    A.    I don't recall where it was reached.
23    Q.    Were you in the studio, in a restaurant,
24  were you somewhere?
25    A.    I don't recall where it was reached.
```

Page 25

```
 1    Q.    Is it correct to say that other than
 2  what you have just testified, you can't recall
 3  any of the other terms of this alleged verbal
 4  contract?
 5    A.    I don't recall at this time.
 6    Q.    Was any money paid by you to the other
 7  members of 2 Live Crew pursuant to the verbal
 8  contract?
 9    A.    I don't recall how the money was
10  disbursed, what was paid to them, based on the
11  verbal contract that we had of them recording
12  these records.
13    Q.    And I believe you said that the verbal
14  contract was done before you went in the studio
15  to record 2 Live Crew Is What We Are; is that
16  correct?
17    A.    There was a verbal contract before going
18  into the studio doing any records.
19    Q.    And so since the first record was 2 Live
20  Is What We Are, is it your testimony that the
21  verbal contract was reached before that record was
22  recorded?
23    A.    Yes, there was a verbal contract reached
24  before the record was recorded.
25    Q.    What studio was used to record 2 Live Crew
```

Luther Campbell
November 01, 2022

Page 26

1  Is What We Are?
2      A.   I don't recall what studio it was, but
3  it could have been several studios.
4           (A discussion was had off the record after
5      which the following proceedings were had:)
6  BY MR. WOLFE:
7      Q.   With any other producer who might have
8  worked on 2 Live Crew Is What We Are?
9      A.   Any other producer --
10      Q.   Other than David Hobbs?
11      A.   I don't recall what other producer
12  probably worked on it.
13      Q.   Who were the songwriters who wrote the
14  songs that are on 2 Live Crew Is What We Are?
15      A.   I would have to look at the documents of
16  writers, shares and all that, but I don't recall
17  right now, but I know the members wrote on the
18  songs and I wrote on the songs and Mr. Hobbs wrote
19  on the songs.  I think he did.  I don't recall the
20  exact writers.
21      Q.   Is there any written agreement between the
22  members of 2 Live Crew and any one of your
23  companies that transferred the copyrights to your
24  companies, with respect to 2 Live Crew Is What We
25  Are?

Page 27

1      A.   Is the -- rephrase the question.
2      Q.   Is there any written agreement between
3  the members of 2 Live Crew and your companies,
4  whether it is Luke Skyywalker, Skyywalker or Luke
5  Records, in which they transferred to your
6  companies, the copyrights to 2 Live Crew Is What
7  We Are?
8      A.   Yes.
9      Q.   What contract is that?
10      A.   That was a contract that we did, I think
11  in 1990.  I think in 1990 we did a contract that
12  covered all three of those albums.
13      Q.   Is that the contract that, quote, is made
14  effective as of 1987?
15      A.   I would have to look at the document.  I
16  don't recall the exact date.
17      Q.   Is it one contract with all of the members
18  of the group or are there separate contracts that
19  you're referring to?
20      A.   One contract with all the members of the
21  group.
22           MR. WOLFE:  One second, I need some help.
23  BY MR. WOLFE:
24      Q.   I am going to show you the -- one second.
25           MR. WOLFE:  I just want to screen share.

Page 28

1           Let me see if I can screen share.
2           (Technology recess.)
3  BY MR. WOLFE:
4      Q.   Can you see the document on your screen?
5      A.   Yes, it's kind of small.
6      Q.   Okay.  Let me see if I can make that
7  bigger.
8           Can you see it now?
9      A.   Yes.
10      Q.   And it says Recording Agreement?
11      A.   Yes.
12      Q.   I'll make it a little bigger.  Okay.
13      Now --
14           MR. BURROUGHS:  If you hit the arrow on
15      the right side, Richard, it will make the
16      screen bigger.  If you go down to the right.
17           MR. WOLFE:  Yeah.  I think that fills my
18      whole screen.
19           MR. BURROUGHS:  Yes, but you can get rid
20      of this export PDF, your free seven-day trial
21      button.  There's a little arrow that says
22      right here and it should -- yeah, to the
23      left.  To the left.  There we go.  If you hit
24      that.  Get rid of it.  There we go.
25           (Thereupon, the above-referred to document

Page 29

1      was previously marked as Exhibit No. 9,
2      contract for identification.)
3  BY MR. WOLFE:
4      Q.   Okay.  Mr. Campbell, are you familiar with
5  this contract?
6      A.   I just see the top of it.  I don't --
7           MR. BURROUGHS:  If you want to scroll
8      through it, so we can take a look at it.
9           MR. WOLFE:  Sure.  Let me just state for
10      the record.  This is the contract that we
11      marked as Exhibit 9 to the last deposition.
12      And I am going to use those 17 exhibits here.
13      So I'm happy to scroll through for you to be
14      able to see it.  Do you want me to go to the
15      last page first and then work back?
16           MR. BURROUGHS:  It's up to the witness.
17           THE WITNESS:  Yeah.
18  BY MR. WOLFE:
19      Q.   All right.  So there's the last page.
20      A.   Yes.
21      Q.   Now, do you want me to -- is there
22  any particular paragraph you'd like to look at?
23      A.   You can scroll up.
24      Q.   Do you want me to scroll up or scroll
25  down?  What is better for you?

Luther Campbell
November 01, 2022

Page 30

1    A.   I thought you were at the end, so I am
2  assuming you're scrolling --
3    Q.   I'll scroll up.
4    A.   Hold up, hold up, hold up.  Little slower.
5  Can you go back a little bit?
6    Q.   Down?
7    A.   Yes, down.  Right there, right there,
8  right there.  Okay.  You can go up.  What
9  paragraph is that?  Eight.
10   Q.   That is --
11   A.   Yeah, that was eight.
12   Q.   Paragraph --
13   A.   Slow down, slow down, slow down.  Yep.
14 Yes, you can go up.  Hold up, hold up, hold up.
15 Can you go back down a little bit?  I just want
16 to read ten.  Right there, right there.
17        All right.  You can go back up.
18   Q.   Go up?
19   A.   Yeah, you can keep going.
20        MR. BURROUGHS:  It is, of course, up to
21 the witness, but it would seem easier to me to
22 start at the top and move down so we know the
23 -- we can see the captions and the paragraph
24 headings before we look at the language.
25        MR. WOLFE:  I am happy to do that if he

Page 31

1  prefers.
2        THE WITNESS:  Yes, if you can.
3  BY MR. WOLFE:
4    Q.   All right.  So looking at the top, do you
5  see that this agreement is undated?
6    A.   Excuse me?
7    Q.   Do you see that there is no date on this
8  agreement?
9    A.   Is that the very top of it?
10   Q.   Right there is the very top.
11   A.   Right.  I see no date there.
12   Q.   Do you know which lawyer prepared this
13 agreement?
14   A.   No, I don't.  I don't recall.
15        MR. BURROUGHS:  Can we scroll down to see
16 at least the entirety of page 1, if you're
17 going to ask questions on page 1?  I just want
18 to take a look at it.
19 BY MR. WOLFE:
20   Q.   Mr. Campbell, I am going to go slow on
21 page 1.
22        That is page 1.
23   A.   Okay.
24   Q.   So my question is:  This refers to the
25 Skyywalker Records, Inc., and I am going to ask

Page 32

1  you again:  When did Skyywalker Records
2  incorporate?
3    A.   I don't recall the date.  You have to
4  check --
5    Q.   Do you see that this has an address of
6  3050 Biscayne Boulevard, Suite 307?
7    A.   I see it.  I see two addresses, I see,
8  yes, I see the -- 3050 Biscayne Boulevard.
9    Q.   Again, my question is:  Do you know when
10 any one of your companies operated from that
11 suite?
12   A.   I don't recall the exact date.
13   Q.   Now, you see that there's an address for
14 the members of the group at 1550 Northeast 125th
15 Terrace?
16   A.   Yes.
17   Q.   Do you know whose address that is or
18 was?
19   A.   No, I don't.
20   Q.   Did you ever live or operate from that
21 address?
22   A.   I don't recall.  I don't think I did, but
23 I don't recall.  I don't recall.
24   Q.   Do you know if this contract was prepared
25 and signed before or after the release of 2 Live

Page 33

1  Crew Is What We Are?
2    A.   Rephrase that question again.
3    Q.   Do you know if this contract was prepared
4  and/or signed before or after the release of
5  2 Live Crew Is What We Are?
6    A.   I don't recall the exact date 2 Live Is
7  What We Are was released.
8    Q.   And you don't know when this was signed,
9  do you?
10   A.   This contract?
11   Q.   Yes.
12   A.   Whatever the date was, it was signed.
13   Q.   Well, there is no date on here.
14   A.   No date on here.  I don't recall the
15 exact date it was signed.
16   Q.   Do you have any idea where it was signed?
17   A.   Where it was signed?
18   Q.   Yes.
19   A.   No.
20   Q.   Do you have any idea who might have worked
21 on or prepared this agreement?
22   A.   No, I don't recall which lawyer worked on
23 it.
24   Q.   Do you know if Joe Weinberger worked on
25 this contract?

Luther Campbell
November 01, 2022

Page 34

```
 1      A.   Definitely not.  I didn't know him at
 2  the time.
 3      Q.   So is it fair to say that this contract
 4  was prepared before you met Mr. Weinberger?
 5      A.   Yes.
 6      Q.   Now, is there any mention in this
 7  agreement of any copyrights being transferred
 8  from the members of 2 Live Crew to your company?
 9      A.   Can you rephrase that?
10      Q.   Is there any mention anywhere in this
11  agreement of any copyrights being transferred from
12  2 Live Crew to any of your companies?
13           MR. BURROUGHS:  I will just object, that
14      calls for a legal conclusion.  But if you
15      know.
16           THE WITNESS:  I don't -- I don't know.  I
17      don't...
18  BY MR. WOLFE:
19      Q.   You've been working in copyrights all your
20  career; correct?
21      A.   Have I been working in copyrights?  I
22  have been working in doing music in my career.
23      Q.   It's fair to say you know a little bit
24  about copyrights; correct?
25      A.   It's fair to say that I know about how to
```

Page 35

```
 1  make music.
 2      Q.   Okay.
 3      A.   I'm not a copyright expert.  I'm a music
 4  and marketing expert.
 5      Q.   But you even went to the Supreme Court to
 6  argue about copyrights, didn't you?
 7      A.   Bruce Rogow argued.  I hired a lawyer to
 8  do that argument.  I'm not a lawyer.  I never was
 9  a lawyer.  As I stated earlier, I only went to
10  high school.
11      Q.   So I'm going to ask you again:  Do you
12  understand that in order to transfer a copyright,
13  there must be a written document?
14           MR. BURROUGHS:  Objection.  Calls for a
15      legal conclusion.  And to the extent it is
16      based on conversations with counsel, I am
17      going to instruct you not to disclose
18      attorney/client communications.  If you have
19      an independent basis, you can let him know.
20           THE WITNESS:  I don't know how copyrights
21      are transferred.
22  BY MR. WOLFE:
23      Q.   Do you have any document, anywhere, that
24  describes the album 2 Live Crew Is What We Are as
25  being transferred to any one of your companies?
```

Page 36

```
 1      A.   Does this contract -- does -- this
 2  contract should actually cover the three albums
 3  that was recorded before this contract was
 4  actually done.
 5      Q.   Well, I'll represent to you that nowhere in
 6  this contract is there any mention of any
 7  specific copyrights being transferred?
 8      A.   Oh, that's -- that's your opinion.
 9      Q.   Okay.  Well, I'm asking you:  Other than
10  this contract that we have marked as Exhibit 9,
11  are you aware of any other contract that might
12  have transferred the copyrights to 2 Live Crew Is
13  What We Are to your companies?
14      A.   This contract covers -- this specific --
15  this contract right here, covers 2 Live Is What
16  We Are, Who Is Something and Nasty As They Want
17  To Be.
18      Q.   I understand that is your position --
19      A.   Yes.
20      Q.   I am only asking you is, if there is any
21  other contract, other than this one that we have
22  marked as Exhibit 9, that transferred those three
23  copyrights or the copyrights contained in those
24  albums, to your company?
25      A.   I don't recall.
```

Page 37

```
 1      Q.   Now, do you recall what the term was
 2  between Skywalker Records, Inc. and the members
 3  of 2 Live Crew as set forth in the contract that
 4  we have marked as Exhibit 9?
 5      A.   Do I recall what the terms were?
 6      Q.   Term.
 7      A.   Term.  The term?
 8           MR. BURROUGHS:  Objection, vague and
 9      ambiguous, and calls for legal conclusions.
10      But if you understand, you can respond.
11           THE WITNESS:  The term?  This contract,
12      this specific contract right here, covered
13      2 Live Is What We Are, Nasty As They Want To
14      Be, and the -- and the Move Somethin' album.
15  BY MR. WOLFE:
16      Q.   Did you pay in advance to any of the
17  members of 2 Live Crew pursuant to this contract
18  that we have marked as Exhibit 9?
19      A.   I don't recall whether I paid in advance
20  or not.
21      Q.   Do you recall contracting to give the
22  members of 2 Live Crew a $250,000 advance?
23      A.   Whatever the contract says, I am pretty
24  sure it was exercised.
25      Q.   That's not my question.  My question is:
```

Luther Campbell
November 01, 2022

Page 38

1  Do you recall the contractual terms in which you
2  agreed to pay the $250,000 advance to the members
3  of 2 Live Crew?
4      A.   Is it in this contract here?
5      Q.   That's not my question.  I am asking you
6  about your recollection.  If you don't know, then
7  just say, "I don't know."
8      A.   I don't recall.
9      Q.   And is it correct to say you don't have
10  any independent memory of ever giving the members
11  of 2 Live Crew an advance?
12      A.   I don't recall.
13      Q.   Do you know what royalty you agreed to
14  pay the members of 2 Live Crew with respect to
15  sales of those three records?
16      A.   I don't recall.
17      Q.   Do you know if it was 15 percent,
18  18 percent or something else?
19      A.   I don't recall.
20      Q.   Did you ever prepare a royalty statement
21  in which you paid members of 2 Live Crew a
22  royalty as a result of sale of those three
23  records?
24      A.   I don't recall.
25      Q.   I'm going to show you another version of

Page 39

1  this Recording Agreement that your lawyers
2  produced in this case, if you give me a second to
3  get to it.
4           Can you see this contract on the screen?
5      A.   Yes.
6      Q.   So --
7           MR. BURROUGHS:  I'll just state for the
8      record, that this is a contract that we tried
9      to cobble together and produce early on.  We
10      now understand that the pages were mixed up
11      or out of order.  And we are now using the
12      contract that --
13           MR. WOLFE:  I don't want you to tell the
14      witness how to answer the question.
15           MR. BURROUGHS:  -- that we looked at in
16      Exhibit 9.
17           MR. WOLFE:  Counsel you have to stop.
18      Speaking objections are not appropriate.
19           MR. BURROUGHS:  To the extent that --
20           MR. WOLFE:  Counsel, you have to stop.
21           MR. BURROUGHS:  -- the contents going to
22      be relied up --
23           MR. WOLFE:  Counsel, you have to stop.
24      You're telling the witness how to answer the
25      question.

Page 40

1           MR. BURROUGHS:  -- for the record that we
2      have -- we have identified that this was
3      produced in error and that we made a mistake
4      in collating it, so I want to get that on the
5      record.
6           MR. WOLFE:  Well, thank you for answering
7      the question for your client, but you know
8      that is not proper.  I would like to ask him
9      questions, not you.
10  BY MR. WOLFE:
11      Q.   So Mr. Campbell --
12           MR. BURROUGHS:  Okay.  We will also
13      represent that I don't believe that -- I
14      never discussed this with the client and the
15      client was not involved in the preparation of
16      this agreement.  This was prepared by my
17      office and it appears to have been collated
18      incorrectly and so we now are relying on the
19      incorrectly collated version of the contract,
20      but proceed.
21  BY MR. WOLFE:
22      Q.   Mr. Campbell, do you see down on the
23  bottom it says 2 Live Crew 0001?
24      A.   Yes.
25      Q.   Did you ever produce a copy of this

Page 41

1  contract to your lawyer?
2           MR. BURROUGHS:  I will just object.  We
3      have a copy of the correct version of this
4      that we were looking at in Exhibit 9.  This
5      particular version is one that we tried to put
6      together based on a couple of different
7      documents.  So I will object to the question
8      as vague.
9           MR. WOLFE:  I will accept your
10      representation that you tried to commit a
11      fraud on the Court, but I would like to move
12      on and ask him questions about it.
13  BY MR. WOLFE:
14      Q.   Mr. Campbell, I'm going to show you this
15  document and ask you if you recognize --
16  specifically, what I'm going to show you is page 3.
17           Do you see page 3, that's on the screen?
18      A.   The screen is kind of small so I don't
19  see what page it is.
20      Q.   Is that a little bigger?
21      A.   If you scroll down and let me see where
22  it actually says page 3.
23      Q.   You can see down on the bottom it says
24  page 3?
25      A.   No, I don't see that.

Luther Campbell
November 01, 2022

Page 42

```
1    Q.   Right here, right above --
2    A.   Oh, okay.  Yes, yes, yes.
3    Q.   You see where it says 2 Live Crew 003?
4    A.   Yes.
5    Q.   Do you recognize this as page 3 of the
6  document that you produced to your lawyer?
7    A.   I don't recall producing this to him.
8    Q.   And do you see that there is a code on
9  the bottom of the left side of page 3?
10   A.   No, I can't make that out.
11   Q.   Okay.  Do you know where page 3 came
12 from?
13   A.   I don't recall.
14   Q.   Do you know if this is a contract
15 between your company and the members of 2 Live
16 Crew?
17   A.   I don't recall.
18   Q.   Do you see in paragraph C, it provides
19 that the artist -- is the record company is an
20 employer for hire?
21   A.   The record company is employee  for --
22 say that again now.
23   Q.   I'm showing you paragraph C of page 3 of
24 the document that your lawyer produced as 003,
25 and I would like you to take a look at paragraph C
```

Page 43

```
1  and read it to yourself so I can ask you a couple
2  of questions about it.  It's very short.
3    A.   Yes, I read it.
4    Q.   Does this refresh your recollection that
5  there was a contract between your company and the
6  members of 2 Live Crew which included this
7  page 3?
8    A.   That there was a contract that included
9  this page 3, is that what you're saying?
10   Q.   Yes.
11   A.   I've never seen this page 3.
12   Q.   So how did your lawyer get this page 3 so
13 that it could be produced in this case pursuant
14 to our request for production of documents?
15       MR. BURROUGHS:  I will just object.  This
16 is misstating the record and the evidence.
17 Yeah, there is no representation that this
18 particular client produced this document.
19       MR. WOLFE:  Right, you did.
20       MR. BURROUGHS:  So there's no foundation
21 for the question.  Right.  These documents
22 were produced as they were produced by the
23 clients, not particularly Mr. Campbell.
24       MR. WOLFE:  Okay.
25       MR. BURROUGHS:  So asking him the question
```

Page 44

```
1  you're asking him, there is simply no
2  foundation for it.
3        MR. WOLFE:  Fair enough.
4  BY MR. WOLFE:
5    Q.   Mr. Campbell, does this page 3 appear to
6  be a portion of a contract between your company,
7  whether it's Luke Skyywalker, Skyywalker Records
8  or Luke Records, and the members of 2 Live Crew?
9    A.   No.  They were never on work for hire
10 basis.  A verbal agreement was them as artists.
11 They were never work for hire.
12   Q.   Now, I'm showing you page 4 of this
13 contract that you produced.  I am going to go down
14 to the bottom.
15   A.   I did not produce.
16       BY MR. BURROUGHS:  Again, yeah, I am going
17 to have to keep correcting the record.  This
18 witness did not produce this contract, and
19 this does not appear to me to be one contract,
20 it appears to be multiple contracts that have
21 been put together out of order.  I am going
22 to have to keep objecting if you keep referring
23 to this as one contract.
24       It appears to me, just by looking at the
25 pages and the appearance of the pages and the
```

Page 45

```
1  file markings, that these are two different
2  contracts that are combined.  So you are free
3  to ask questions but you -- you cannot
4  represent this to the witness as either, one,
5  one contract, or two, a contract that he
6  produced.
7        MR. WOLFE:  Counsel, with all due respect,
8  this is what you produced in response to our
9  request for production of documents, which is
10 2 Live Crew 0001 to 0023.
11       MR. BURROUGHS:  Yes, so this was produced
12 as -- these were produced to you as produced
13 to us by the client.  We have never made any
14 representation that the pages go in this order
15 or that it's one contract.
16       These were the pages produced to us by a
17 client, not Mr. Campbell, and then produced to
18 you.
19       We have never made any representations to
20 you or the Court that this is one contract.
21 This is, as we represented to the Court, two
22 different contracts.
23       There's the contract that's Exhibit 9,
24 that you questioned the witness on earlier,
25 and now there's these pages from our discovery
```

Luther Campbell
November 01, 2022

Page 46

1  responses that we have never represented to be
2  one contract.
3       You've now done that on the record
4  multiple times, but that appears, at least to
5  me to be a false representation, because
6  looking at these pages here, these appear to
7  be different contracts that were produced in
8  discovery.
9       MR. WOLFE:  Are you done?
10      MR. BURROUGHS:  I am going to have to keep
11  objecting if you keep referring to them as a
12  contract.
13      MR. WOLFE:  You can have a standing
14  objection, but I don't -- but you can't have
15  speaking objections.  And if you continue to
16  make speaking objections, I am going to have
17  to terminate the deposition, go to the Court,
18  and get an order of sanctions.  So your
19  speaking objections --
20      MR. BURROUGHS:  Well, I have to -- well,
21  listen to the questions and -- go ahead.
22      MR. WOLFE:  Excuse me, your speaking
23  objections tell the witness how to answer the
24  question, which is not proper.  You know
25  better than that.

Page 47

1       MR. BURROUGHS:  That is not true.  My
2  statements are correcting a false
3  representation to you on the record of a
4  particular series of a documents.
5       Proceed.
6  BY MR. WOLFE:
7       Q.  Mr. Campbell, I am showing you now,
8  page 0004 of a document that the defendants
9  produced, whether it was you or your
10  co-defendants, I am asking you if you recognize
11  this page?
12      A.  No, I don't.
13      Q.  Do you see that in paragraph C, it refers
14  to an LP entitled Luke featuring 2 Live Crew?
15      A.  I see LP, yes, I see that.
16      Q.  Does that refresh your recollection that,
17  in fact, this page came from a contract between
18  Luke Records and the members of 2 Live Crew?
19      A.  This contract is all over the place, it
20  has too many different parts of it.  So I don't
21  -- I don't recognize this as a -- a regular
22  contract.
23      Q.  I am only asking you about this page 4.
24      A.  No, I don't -- I don't -- can you go down
25  to the bottom to see -- it's all over the place,

Page 48

1  it's like piecemeal pieces added into the
2  contract.
3       No, this -- this is not something that I
4  would ever produce as one -- you can give me the
5  entire contract to look at, other than it being
6  piecemeal and pages added in and pages added out,
7  then I can say that this is a part of an actual
8  contract in which I did with the group or I had
9  with the group or negotiated with the group.
10      MR. WOLFE:  Counsel --
11  BY MR. WOLFE:
12      Q.  I'm happy to email this to your lawyer,
13  so your lawyer can send it to you so you can take
14  the time to read it.
15      A.  If it's piecemeal like this, then I am
16  going to still have the same answer, because you
17  know how you guys do, y'all have a tendency of, in
18  my opinion, fraudulently putting documents into
19  documents and -- and into contracts and things
20  that are actually not factual.
21      Q.  So I am only asking --
22      A.  If it's not a full contract that you are
23  sending me, all this, with all these codes down to
24  the bottom and 2 Live Crew 004, and I don't recall
25  this document as a document that I prepared.

Page 49

1  That I -- that I used in a contractual deal with
2  the group.
3       Q.  Mr. Campbell, I am happy to send -- I am
4  happy to send you the totality of the documents
5  that the defendants produced in response to our
6  request for production, which are 2 Live Crew 001
7  through 26.
8       Would you like --
9       A.  I've never seen this document before.
10      Q.  You've never seen any portion of this
11  document before?
12      A.  Anything written on, anything written on
13  this document as it stands right here, I have not
14  seen this.  If you can provide me with a full
15  contract.
16      Q.  Well, I am happy to do that.
17      A.  Without -- without pages being slid in
18  and slid out, then I would appreciate that and
19  then I can look at that and see whether or not
20  that is something that I had one of my attorneys
21  prepare.
22      MR. BURROUGHS:  Yes.  So I will make that
23  same objection on the record that it is two
24  incomplete documents, and I'll object to
25  questions where you are asking the witness

Luther Campbell
November 01, 2022

Page 50

1  about two separate incomplete agreements and
2  positioning it as one agreement.
3      MR. WOLFE:  Well, Counsel, you're the one
4  who produced it as one agreement.
5      MR. BURROUGHS:  Again, I disagree.
6      MR. WOLFE:  So anyone doctored the
7  agreement, it's you, not us.
8      MR. BURROUGHS:  You have to let me finish.
9  We produced the documents as we received them
10  in the ordinary course.  There is no
11  representation to anyone at your office or the
12  Court, that these pages go in order.  As a
13  matter of fact, we filed the actual agreement
14  with the Court, as you know, with the correct
15  pages.
16      So it is still confusing to me as to why
17  you are attempting to ask this witness
18  questions on a document that you know is
19  incomplete and includes pages from two
20  agreements joined as one.
21      Apparently your basis is because that's
22  the Bates stamp order that they were produced
23  in discovery, but there's no representation
24  that those are the agreements.
25      There is no foundation for these

Page 51

1  questions.  You're presenting two incomplete
2  documents to the witness and we object on that
3  basis.
4  BY MR. WOLFE:
5      Q.  So Mr. Campbell, is it your testimony that
6  pages 3, 4, 5, 7, 8 and 9 are pages that were
7  taken from another contract between the group
8  2 Live Crew and one of your companies?
9      A.  I did not --
10      MR. BURROUGHS:  Let me object -- that it
11  calls for speculation.  But if you know or if
12  you can answer based on what the scrolling
13  just showed you.
14      THE WITNESS:  I did not prepare this
15  contract and I don't -- I'm not going to
16  answer questions off of contracts that you
17  guys piecemeal and put together and that is
18  just not the way it works.  So I --
19  BY MR. WOLFE:
20      Q.  Don't say "you guys," because it was your
21  lawyer who did this, not us.
22      A.  Wherever it came from, whoever provided
23  it, this is not a contract in which I provided to
24  my lawyer.
25      I would just leave it like that.

Page 52

1      Q.  So looking at those pages I just
2  referenced, do you recall ever having these
3  clauses included in a contract between your
4  company and the members of 2 Live Crew?
5      A.  This is not a contract in which I
6  provided to my attorney.  That is my answer and
7  it will keep being my answer.
8      Q.  I'm showing you the bottom of page 5,
9  which has the royalty rate.  Do you see that?
10      A.  This is not a contract in which I
11  provided to my attorney.
12      Q.  The only thing I asked you is if you see
13  that?
14      A.  This is not a contract in which I
15  provided to my attorney.
16      Q.  Please listen to my question.
17      I am only asking you, do you see that on
18  page 5, there is a royalty rate stated of 15
19  percent?
20      A.  Yes, I see that, but this is not a
21  contract I provided to my attorney.
22      Q.  Did you, in fact, reach an agreement with
23  the members of 2 Live Crew to pay them a royalty
24  of 15 percent?
25      A.  I don't recall.

Page 53

1      Q.  I am going up to the prior page.  Do you
2  see --
3      A.  If you referring to this contract, I
4  have not -- this is not a contract in which I
5  produced on behalf of my companies.
6      Q.  Is it your testimony that I will never
7  find your signature on a contract that has these
8  pages?
9      A.  These pages can go into a thousand
10  different contracts on a thousand different
11  occasions, if you -- if you have ran a record
12  company like myself, this type of language could
13  be in a contract if that is what you agreed on
14  with the artists, or if that is something that you
15  would negotiate.
16      So this type of language can go into any
17  artists of my company, with this specific group,
18  you have to provide me with a full contract.
19      Q.  That's not my question.
20      A.  You can try and trick up the words all
21  you want, but that's what you're going to get.
22      Q.  Mr. Campbell, you have to listen to my
23  question.
24      A.  I'm listening to your question.
25      Q.  My question is:  Is it your testimony

Luther Campbell
November 01, 2022

Page 54

1  that no contract exists that has your signature
2  on it between your company and the members of
3  2 Live Crew that has the exact same pages, 3, 4,
4  5, 7, 8 and 9, that I've just shown you?
5      A.  I don't recall.
6      Q.  You don't recall?
7          So you don't recall ever signing a
8  contract that has those pages?
9      A.  I don't recall.  Do you have a copy?
10     Q.  Of course, I do.  Would you like to see
11 it?
12     A.  Yes.  A full copy, not one that pages
13 were added in and added out.
14     Q.  I am happy to show you.
15         And we'll get there in a minute.  I just
16 want to continue to go through this and then I
17 will get to and show you the full contract that
18 you signed -- excuse me -- the three contracts
19 that you signed.
20         So, do you see that I am now showing you
21 on paragraph 7-B1, that there is an advance in the
22 amount of $250,000?  Right here.
23     A.  I don't know whose contract this is or
24 what contract that is.
25     Q.  My question is:  Isn't it true that you

Page 55

1  had an agreement on behalf of one of your
2  companies and the members of 2 Live Crew, to give
3  them an advance of $250,000?
4      A.  I don't recall.
5      Q.  Again, I am still showing you that this
6  specifically in paragraph 7(a), third line down,
7  refers too 2 Live Crew.
8          Do you see that?
9      A.  You're showing me one thing that I don't
10 recognize as a document in which I provided to
11 anybody, and you are asking me about whether or
12 not at some period of time, I agreed to pay
13 2 Live Crew $250,000.  That is two different
14 things.
15         So what you are trying to do is backdoor,
16 ask me a question about a document that I don't
17 -- that I don't recognize as a document of mine
18 with a number attached based on what the number
19 is showing on the screen.  I do not recognize this
20 document as a contract of mine, or as a contract
21 that I provided to anyone.
22     Q.  Mr. Campbell, I am now showing you a
23 document that we previously marked as Exhibit 3 to
24 a prior deposition.
25         MR. BURROUGHS:  I will just note for the

Page 56

1  record, this is not the exhibit from the prior
2  deposition, but this appears to be the exhibit
3  to the complaint and it is marked here on my
4  screen as Exhibit 2.
5          But go ahead, if you want to take some
6  time to scroll through it, you can take a
7  look.
8          MR. WOLFE:  I will be happy to show you
9  the email from Frank Trechsel attaching that
10 as Exhibits 1 through 17.
11         MR. BURROUGHS:  There is no -- well, go
12 ahead and scroll through it --
13         MR. WOLFE:  Do you want me to go back and
14 show you the transmittal?
15         MR. BURROUGHS:  No, but there is no --
16 that transcript has not been issued yet.  So
17 there is technically no -- it's been
18 previously marked as that exhibit number.  If
19 you want to mark it again with that exhibit
20 number, that's fine.
21         MR. WOLFE:  I am happy to show you to
22 satisfy you --
23         MR. BURROUGHS:  No, again, I think you're
24 miss --
25         MR. WOLFE:  Excuse me.  Please don't

Page 57

1  interrupt me.
2          MR. BURROUGHS:  You are misinterpreting
3  what I am saying.  You don't need to show
4  me --
5          MR. WOLFE:  I'm happy to show you --
6          MR. BURROUGHS:  I don't dispute that it's
7  the same document.  I am just saying that the
8  marking needs to be clear for the record.
9          MR. WOLFE:  Okay.
10 BY MR. WOLFE:
11     Q.  Mr. Campbell, do you see this exclusive
12 recording contract that I'm showing you?
13     A.  Yes, it says the exclusive recording
14 contract, yes.
15     Q.  And it is dated the blank day of April
16 1991 between Luke Records, Inc. at 8400 Northeast
17 2nd Avenue and Chris Wong Won?
18     A.  Chris Wong Won, yes.
19     Q.  Do you recognize this contract?
20     A.  If you scroll down I can look and see if
21 there's a signature of it, and --
22     Q.  I'm happy to accommodate you.
23         MR. BURROUGHS:  Yeah, a little bit slower.
24         MR. WOLFE:  I am just going down to the
25 bottom.  Okay.  I think I went too fast.

Luther Campbell
November 01, 2022

Page 58

1      MR. BURROUGHS:  And is it -- your
2  representation that this is one agreement or
3  is this a combination of agreements?
4      MR. WOLFE:  One second.
5  BY MR. WOLFE:
6      Q.   Here is the bottom, which is page 28.
7      A.   Okay.  That's the bottom?
8      MR. BURROUGHS:  Again, no, just for the
9  record.  This does not appear to me to be the
10  bottom, given that the slider is in the middle
11  of the page.
12      MR. WOLFE:  Please stop your speaking
13  objections.
14      MR. BURROUGHS:  Well, no, you're saying
15  this is the bottom of the page and it isn't.
16  It is not a speaking objection if it's
17  inaccurate.
18      MR. WOLFE:  Now, Counsel, let's go real
19  slow.
20      MR. BURROUGHS:  So the top of the page --
21  you stopped at page 28 of 85 and said it was
22  the bottom of the page, which is not true.
23  Can we scroll all the way through the end of
24  the document, please?
25      MR. WOLFE:  No.  Counsel, you have to stop

Page 59

1  with your speaking objections.
2      MR. BURROUGHS:  It's not a speaking
3  objection.  You told the witness you're at
4  the bottom of the document and --
5      MR. WOLFE:  Okay.  I am going to go to the
6  Court --
7      MR. BURROUGHS:  -- you're on page 28 of
8  85.
9      MR. WOLFE:  I'm going to go to the Court.
10  I'm going to seek sanctions and I'm going to
11  have your pro hac vice revoked.
12      Counsel --
13      MR. BURROUGHS:  On what basis?  You're
14  misrepresenting a document --
15      (Simultaneous crosstalk.)
16      MR. WOLFE:  On the basis that you are
17  interrupting my deposition.  You're engaged
18  constantly in speaking objections that are
19  inappropriate.  You're telling the witness
20  how to answer the question.  I will seek
21  sanctions and seek to have your pro hoc vice
22  revoked.
23      MR. BURROUGHS:  If you are going to
24  ask --
25      MR. WOLFE:  You are here as a courtesy of

Page 60

1  the Court.  You are not a member of the
2  Florida Bar.  You are not a member of the
3  southern district.  And I will seek
4  sanctions, just like many other Courts have
5  sought sanctions against you, if you continue
6  with this behavior.
7      MR. BURROUGHS:  Yeah.  So if you are going
8  to ask the witness questions about an exhibit,
9  I am entitled to see the entire exhibit
10  before you ask questions.  I don't think that
11  is subject to dispute.  You are refusing to
12  show me the entire exhibit --
13      MR. WOLFE:  I'm happy to show you.  I
14  will accommodate you.
15      MR. BURROUGHS:  Hold on.  Let's not speak
16  over one another.
17      For the record, you are refusing to show
18  me the entire exhibit before questioning the
19  witness on it.  I believe that is
20  inappropriate and sanctionable and I reserve
21  all rights.
22      I will ask again, if you are going to
23  question the witness on any exhibit, that you
24  first publish the entire exhibit to me and the
25  witness.

Page 61

1      MR. WOLFE:  Happy to do so.
2  BY MR. WOLFE:
3      Q.   So Mr. Campbell, do you see that this is
4  an 86-page exhibit?
5      A.   Yes.
6      Q.   And do you see that I'm going to go to
7  the bottom of page 28, that there is a signature
8  line?
9      A.   Yes.
10      Q.   And page --
11      MR. BURROUGHS:  Well, can you scroll up
12  so I can see the entirety of 28?  Sorry, you
13  went a little bit fast.
14      MR. WOLFE:  Sure.  Sure.  Right there.
15      MR. BURROUGHS:  No, the entirety of page
16  28.
17      MR. WOLFE:  I'm sorry, it's page 27.
18  It's page 27 of the exhibits and it's list --
19  page 26 and here is page 27 and here is page
20  28.  Okay.
21      MR. BURROUGHS:  Can you scroll down so I
22  can see the full signature blocks?
23      MR. WOLFE:  Sure.
24      MR. BURROUGHS:  I will just state for the
25  record that I believe there's going to be

Luther Campbell
November 01, 2022

Page 62

```
1    some discrepancies in the record because we
2    have been referring to different contracts
3    with different pages as opposed to --
4    sometimes we're using the page number of the
5    document.  Sometimes we're using the page of
6    the exhibit.
7         So to the extent that there are issues in
8    that regard in the transcript, we'll reserve
9    rights.  Thank you.
10 BY MR. WOLFE:
11    Q.   Mr. Campbell, do you see that at the
12 bottom of page 28 there is a signature of you and
13 Chris Wong Won?
14    A.   Yes, I see that.
15    Q.   Is that your signature?
16    A.   You originally asked me is this one
17 exhibit?
18    Q.   It's the first --
19    A.   Or is it two separate?
20    Q.   I will clarify.  This exhibit has three
21 contracts.  I've shown you the first contract
22 that is pages 1 through 28.  And I will get to
23 the other two in a minute.
24    A.   Okay.  So -- I mean, I'm not a lawyer,
25 but why didn't y'all separate the exhibits, the
```

Page 63

```
1    contracts?
2         Why would they be put into one?  I don't
3    want to be answering questions based on what part
4    of one contract and give and then it be an answer
5    in reference to the entire exhibit which you just
6    said are three contracts.
7    Q.   I am only asking you, is this your
8    signature on page 28 of this exhibit?
9    A.   It's -- it's my signature -- it is my
10 signature of the contract up until page 28.  Not
11 for the entire three contracts that you have
12 attached to this specific exhibit.
13    Q.   I am only asking you a very simple
14 question.  Looking at page 28, is that your
15 signature on this contract?
16    A.   On page 28, that's my signature on this
17 particular contract.
18    Q.   Thank you.
19    A.   Not the entire exhibit.
20    Q.   And is that Chris Wong's Won's signature
21 on page 28?
22    A.   Yes, it is.  Yes, as I think it is, yes.
23    Q.   And do you recall that a lawyer named
24 Allen Jacobi prepared this contract?
25    A.   I don't recall what lawyer prepared the
```

Page 64

```
1    contract.
2    Q.   And I am happy to show you -- looking
3    for the notice clause.
4         MR. BURROUGHS:  I will just state for the
5    record, that we still haven't seen the
6    entirety of the 85-page exhibit -- my request.
7         MR. WOLFE:  And I'll get there.  I'm
8    happy to accommodate --
9         MR. BURROUGHS:  Well, generally, Mr.
10 Wolfe, you show the exhibit --
11       MR. WOLFE:  Okay.  Please stop.
12       MR. BURROUGHS:  -- to opposing counsel
13 before you ask questions about it.  I
14 understand you will get there, but I would
15 like to see it before you ask questions about
16 it.
17       MR. WOLFE:  I understand you would like
18 to see it, but I am sorry.  I am going to
19 start with this and I will get to the others
20 next.
21       MR. BURROUGHS:  All right.  We reserve all
22 rights.
23       MR. WOLFE:  You can reserve whatever you
24 would like.
25       Can you help me find the notice clause?
```

Page 65

```
1    What did we do with it?
2         MR. BURROUGHS:  We have been going for
3    over an hour, so while you're looking for
4    that, can we take a five-minute break so I
5    can use the restroom?
6         MR. WOLFE:  Of course.
7         MR. BURROUGHS:  Thanks.
8         MR. WOLFE:  Debbi, let's go off the
9    record.  It's 12:15, we will come back at
10 12:20.
11       THE TECHNICIAN:  Off the record, 2:14 --
12 12:14.
13       (A recess was had in the proceedings
14 after which the following proceedings were
15 had:)
16       THE TECHNICIAN:  On the record, 12:23.
17 BY MR. WOLFE:
18    Q.   Mr. Campbell, I'm showing you paragraph
19 13(a) and (b) of the first contract that we marked
20 as Exhibit 3.  Do you see that?
21    A.   Just for the record, this
22 is page 12 of the exhibit.
23       MR. WOLFE:  It's paragraph 13.
24       MR. BURROUGHS:  Right.  On page 12 of the
25 exhibit.  I believe there are multiple
```

Luther Campbell
November 01, 2022

Page 66

1  paragraph 13s throughout this exhibit.  So I
2  just want to make clear that we are talking
3  about page 12 of the exhibit.
4       MR. WOLFE:  I only see one paragraph 13.
5       MR. BURROUGHS:  I believe if you scroll
6  to the bottom of this exhibit, there are
7  going to be other paragraph 13s.  I am not
8  trying to be contentious.  I am just stating
9  what page you are looking at, which is page 12.
10 BY MR. WOLFE:
11      Q.   Okay.  Mr. Campbell, do you see
12 paragraph 13(a) and (b)?
13      A.   Which -- which contract is this, is this
14 the first contract?
15      Q.   This is the contract between your
16 company and Chris Wong Won and you just admitted
17 that it's your signature and his signature on
18 this contract.
19      Is this the actual -- is this 13 of 1
20 through 28, the first contract you just showed
21 me?
22      Q.   That is correct.
23      A.   Okay.
24      Q.   So I am asking you to take a look at
25 paragraph 13(a).

Page 67

1       A.   Yes.
2       Q.   Does this refresh your recollection that
3  a lawyer named Mark Levinson of Los Angeles was
4  the lawyer for Chris Wong Won with respect to this
5  contract?
6       A.   I don't recall who his lawyer was.
7       Q.   Now, would you take a look at
8  paragraph 13(b)?
9       Have you read it?
10      A.   Yes.
11      Q.   Does this refresh your recollection that
12 Allen Jacobi was the lawyer who represented your
13 company with respect to this contract?
14      A.   I don't recall who represented me in
15 this contract.
16      Q.   But you recall that you had a lawyer
17 representing your company with respect to this
18 contract?
19      A.   I -- I don't recall whether I used a
20 lawyer or not.
21      Q.   Now, I am going to go now down to
22 paragraph 20(a).
23      Okay.  Would you take a minute and read
24 paragraph 20(a)?
25      A.   Yes.

Page 68

1       Q.   Do you recall signing this agreement that
2  had this paragraph in it?
3       A.   Can you go back down to the bottom of
4  this -- this actual contract?
5       Q.   To the bottom of the signature page?
6       A.   To the signature page of this -- of this
7  one contract?
8       Q.   Yes.
9       MR. BURROUGHS:  I'd like -- and I'd like
10 to see that as well, including any -- I see a
11 reference Schedule A, so I would like to see
12 the Schedule A as well.
13      MR. WOLFE:  Well, I'll get there.
14      MR. BURROUGHS:  Okay.
15 BY MR. WOLFE:
16      Q.   Do you see the bottom?
17      A.   Yes.
18      Q.   Which is page 28.  Now --
19      A.   Can you go down a little more?
20      Q.   A little more, yes.  That's the end.
21      A.   Okay.  That's the end.
22      Q.   Now, I' am going back to
23 paragraph 20(a).
24      MR. BURROUGHS:  Are you saying that is
25 the end and there is no Schedule A?

Page 69

1       MR. WOLFE:  No.  I will get there, but
2  please stop coaching the witness.
3       MR. BURROUGHS:  Again, if you're going
4  to --
5       MR. WOLFE:  Please stop -- no.  Stop
6  coaching the witness.
7       MR. BURROUGHS:  If you are going to ask
8  questions about a Schedule A, I need to see
9  the Schedule A.
10      MR. WOLFE:  All right.  We are done.  We
11 are done.  I am going to the Judge right now.
12 You cannot continue to interrupt my deposition.
13      MR. BURROUGHS:  Go ahead.  You are not
14 within your rights to question a witness about
15 a Schedule A without at least showing me the
16 Schedule A in the exhibit.
17      MR. WOLFE:  I don't have the Schedule A
18 because your client hid it.  Just like you
19 doctored documents.  Your client doctored
20 this one.  How many frauds do you want to
21 commit on the Court?
22      MR. BURROUGHS:  You have been questioning
23 this witness on this document for a long time
24 now.
25      You still haven't shown me or him the

Luther Campbell
November 01, 2022

Page 70

1  entire document.  I've just stated that for
2  the record.  It's 86 pages.  You have only
3  showed us 28.  You are controlling the
4  document.  So I am not seeing what you're
5  asking him about.  So we continue to reserve
6  all rights.
7        MR. WOLFE:  You can reserve all rights
8  that you would like, but please stop
9  interrupting my deposition.
10       MR. BURROUGHS:  Well, you said -- are you
11  going to the Judge right now so we can address
12  this?  I thought you said you were calling the
13  Judge.  I would like to be on that call.
14       MR. WOLFE:  No, I am going to continue on
15  with my deposition --
16       MR. BURROUGHS:  If I can get a ruling that
17  if you are going to ask the witness questions
18  about an exhibit, that you are required to
19  first show the entire exhibit to the witness
20  and his attorney.
21       MR. WOLFE:  Are you done?
22       MR. BURROUGHS:  Well, you told me you are
23  calling the Court.  Was that not true?
24       MR. WOLFE:  I am not going to call the
25  Court.

Page 71

1        I am going to continue on with my
2     deposition and I would ask you once again to
3     stop interrupting my deposition.
4  BY MR. WOLFE:
5     Q.   Mr. Campbell, I am going to now show you
6  paragraph 20(a).
7        Do you see paragraph 20(a)?
8     A.   Yes.
9     Q.   Do you know if a Schedule A was ever
10  produced and made part of this document?
11    A.   Rephrase that.
12    Q.   Do you see that paragraph 20(a) refers
13  to a Schedule A?
14    A.   It refers to a Schedule A; correct.
15    Q.   I am asking you:  Do you know if there
16  ever was a Schedule A that was made part of this
17  document?
18    A.   I don't recall.
19    Q.   You recall that following the bankruptcy
20  Court, the bankruptcy Judge ordered you to
21  deliver all contracts to Mr. Weinberger, do you
22  recall that?
23    A.   I don't recall.
24    Q.   Do you know if, in fact, you delivered
25  this contract to Mr. Weinberger pursuant to Judge

Page 72

1  Mark's order?
2     A.   I don't recall.
3     Q.   Do you recall delivering any documents
4  to Mr. Weinberger pursuant to Judge Mark's order?
5     A.   I don't recall.
6     Q.   Do you remember Judge Marks?
7     A.   Judge Mark?  What is his whole name?
8     Q.   Robert Mark.
9     A.   I -- I don't recall who my bankruptcy
10  judge was --
11       If there are some documents showing that
12  he was the Judge, then if you show it to me, then
13  I will -- I can confirm that, based on whatever
14  the documents are.  From the Court, if he was, in
15  fact, my Judge.
16    Q.   I am going to specifically ask you, do
17  you recall hiring Allen Jacobi to prepare this
18  document which included a Schedule A that
19  transferred all of the copyrights at issue in this
20  case to Luke Records?
21    A.   I don't recall.
22    Q.   If Allen Jacobi gave that testimony,
23  could you refute -- could you refute him or rebut
24  him?
25       MR. BURROUGHS:  Objection, vague.

Page 73

1  Objection, would violate the attorney-client
2  privilege.
3        But go ahead if you understand the
4  question.
5        THE WITNESS:  I don't understand that
6  question, but I sued Allen Jacobi for
7  malpractice.  And I don't even recall what I
8  sued him for malpractice for.  So I am pretty
9  sure it probably was down the lines of
10  whatever malpractice he committed.
11  BY MR. WOLFE:
12    Q.   And whatever happened in that case?
13    A.   I don't recall.
14    Q.   Did he make any payment to you?
15    A.   I don't recall.
16       MR. BURROUGHS:  Can you show me at least
17  the rest of this page, Mr. Wolfe?
18       MR. WOLFE:  Happy to accommodate you.
19       MR. BURROUGHS:  Slowly.
20       MR. WOLFE:  Okay.
21       MR. BURROUGHS:  Can we go down to the rest
22  of paragraph 20?  Slowly.  Can you go up.  I
23  missed that subparagraph 2.
24       MR. WOLFE:  Continue down?
25       MR. BURROUGHS:  Give me a moment.  Yep.

Luther Campbell
November 01, 2022

Page 74

1    Continue down, please.
2        MR. WOLFE:  Okay?
3        MR. BURROUGHS:  Give me one moment.  Okay.
4    Go back up.
5        MR. WOLFE:  Where?  Where do you want me
6    to go to?
7        MR. BURROUGHS:  Hold, please.  Okay.
8    Thank you.  Continue the questioning.
9    BY MR. WOLFE:
10       Q.   Do you recall hiring Allen Jacobi to
11   prepare a contract between your company and the
12   members of 2 Live Crew which defined them as
13   artist for hire?
14       A.   Work for hire?  No.  I would never -- I
15   don't have a contract with them for work for hire.
16   I don't recall -- I don't recall what I hired
17   Allen Jacobi to do.  And I never -- I never did a
18   work for hire with them.  I just -- I never did
19   that.
20       Q.   And isn't it true that you wrote a book
21   called Book of Luke in which you praised Allen
22   Jacobi as an entertainment lawyer?
23       A.   I don't recall what is in the book,
24   there was a co-writer of the book, and you would
25   have to look that up in the book.

Page 75

1        MR. BURROUGHS:  Praised him?
2        THE WITNESS:  I sued him for malpractice.
3    BY MR. WOLFE:
4        Q.   Okay.  Now, let's go down to paragraph 27
5    of this same contract.  I am going to show you
6    the first half of paragraph 27 on page 24.
7        Do you recall Allen Jacobi putting this
8    in a contract between your company and Chris Wong
9    Won?
10       A.   I don't recall what contracts Allen
11   Jacobi worked on on my behalf for my -- in any of
12   my companies.
13       Q.   So I have now shown you a contract
14   between Christopher Wong Won, I will go to the
15   top, and your company, Luke Records.  You have
16   admitted to me that it's your signature and his
17   signature, so I'm going to ask you directly.  Is
18   this a contract that exists between Luke Records
19   and Christopher Wong Won?
20       A.   Is this a contract that exists between
21   Luke Records and -- I -- I don't recall this being
22   a contract between me and him.
23       I know Chris Wong Won did a solo album
24   with Luke Records, and I don't know whether it's
25   this specific contract for that particular solo

Page 76

1    album.
2        Q.   Do you know if there's a similar
3    contract between your company, Luke Records, and
4    the other members of 2 Live Crew, Mark Ross and
5    David Hobbs?
6        A.   A similar contract?  I don't recall.  I
7    would have to see if that is, in fact, a similar
8    contract.  I also wanted to do solo albums.
9        Q.   Still in that same exhibit, 3, and I am
10   going to go to page 29.
11       Okay.
12       Do you see page 29 is another contract?
13       A.   Yes.
14       Q.   And do you see that that is a contract
15   between -- that's dated blank day of April, 1991,
16   between Luke Records and Mark Ross and David
17   Hobbs?
18       A.   Yes.
19       Q.   Now, I'm going to go to the signature
20   page and then we'll work our way back.
21       Okay.  I am showing you what is page 56
22   of that exhibit, which is page 28 of that
23   contract, and I am asking you, is that your
24   signature?
25       A.   Yes.

Page 77

1        Q.   And is that David Hobbs and Mark Ross'
2    signature?
3        A.   I -- I don't know, but -- I don't know
4    if that's their signatures or not.
5        Q.   Now, do you recall that your company
6    entered into a contract with David Hobbs and Mark
7    Ross?
8        A.   At what period of time?
9        Q.   In -- I'll go to the top.  April of 1991.
10       A.   In April of 1991, I don't recall.
11       Q.   And do you --
12       A.   I would have to see the entire document.
13       Q.   Well, I am happy to send it to you; would
14   you like to see it?
15       A.   If it's the entire document, yes, every
16   page should be -- have an initial on each one of
17   the pages.
18       Q.   Okay.
19       A.   Do every page have their initial on it?
20       MR. WOLFE:  I am happy to send you the
21   whole document.  Counsel, do you want me --
22       MR. BURROUGHS:  Can we just scroll
23   through and review?  If it is only 18 pages,
24   that should not take all that long.
25       MR. WOLFE:  It is 28 pages and I am happy

Page 78

```
1    to satisfy the witness and send him or you
2    the entire exhibit.
3         THE WITNESS:  The only thing I am
4    interested in if every page has an initial on
5    each page.
6    BY MR. WOLFE:
7    Q.   I can state for the record that the only
8    initials I see are on page 11.  Do you see
9    paragraph 11 on page 11?
10   A.   Yes.
11   Q.   Are those your initials?
12   A.   That's -- LC is my initial.
13   Q.   And do you recall initialing the change
14   in paragraph 11?
15   A.   Yes, I would have an issue that -- yes.
16        But I don't see the other member's
17   initial on here, so therefore, it appears to be
18   not a document in which it is a -- it is an
19   agreed upon document.
20   Q.   You don't see David Hobbs' initials?
21   A.   I see one -- I see one member initialing
22   that, I don't see the other one.
23   Q.   And do you see that what was changed is
24   the manner in which you were going to account to
25   the members, changing it from quarterly to
```

Page 79

```
1    semiannually?
2    A.   Correct.  But I do not see the other
3    members initial in this document.  So this
4    document can be a contract in which it was voided
5    because the members did not agree.  All of the
6    members initials should have been on this
7    particular document.  If they agreed on the
8    different language.  Not one person can agree for
9    other people.
10   Q.   Well, I'm going to go back to the
11   document that we previously marked as Exhibit 9,
12   the 1987 agreement, and I would like to show you
13   that.
14        So you can confirm that, in fact -- do
15   you recall this agreement that you testified to
16   earlier?
17   A.   Yes.
18   Q.   Is it your testimony that if there's no
19   initials on every page, it's not a valid contract?
20   A.   That's not my testimony.
21   Q.   So, why would there need to be initials
22   on Exhibit 3, but not on Exhibit 9?
23   A.   Because there were changes in the last
24   -- there were changes in the contract that you
25   just showed me.
```

Page 80

```
1         The second contract.  There were changes,
2    and the changes had initials of me and the other
3    members attached to those changes, and so if you
4    -- it wouldn't be, in my opinion, it would not be
5    a valid contract and I would not have -- it would
6    not have been agreed on, if all parties would not
7    initialed those changes.  There's only one person
8    initialed that, which was David Hobbs.
9    Q.   So looking at the contract with Mr. Hobbs
10   and Mr. Ross, does this refresh your recollection
11   that in April of 1991 your company entered into a
12   contract with them and that this is the contract?
13   A.   I don't recall.  If there's -- this
14   particular document that you showed me had changes
15   to the contract, and there were initials in the
16   changes and it's only my initial and Mr. Hobbs'
17   initial in this particular contract here.  You
18   have three -- two other members, and the other
19   member's initial is not on there agreeing to the
20   changes.
21        So this would not be a valid contract,
22   in my opinion, because the other member did not
23   initial the change of that particular line in the
24   contract.
25   Q.   So what memory of anything do you have
```

Page 81

```
1    regarding this April 1991 contract between Luke
2    Records and Mark Ross and David Hobbs?
3    A.   I don't recall.
4    Q.   So is it fair to say you don't know if
5    Allen Jacobi prepared it?
6    A.   I don't recall.
7    Q.   Is it fair to say that you don't know
8    where it was signed?
9    A.   I don't recall.
10   Q.   Now, I'm going to show you again, in this
11   contract, the -- paragraph 7(b), do you see that?
12        I am first going to show you 7(a).
13        Have you had a chance to refresh your
14   recollection as to what paragraph 7(a) says?
15   A.   Yes.
16   Q.   Does it refresh your recollection that
17   you entered into an agreement with David Hobbs
18   and Mark Ross to pay in advance of $250,000?
19   A.   I don't recall.  Based on this document,
20   this document in my opinion is not valid because
21   this particular document has changes in it, and
22   those changes are different paragraphs, there
23   were signatures -- not signatures but initials by
24   me and David Hobbs and not Mr. Ross.  So I would
25   probably say that this is not a valid contract.
```

Luther Campbell
November 01, 2022

1  And then even after those signatures, those --
2  those initials, those initials that me and
3  David Hobbs added on, that language should have
4  been changed and there should have been a brand
5  new contract created based on the language change,
6  based on the -- the initials in which we initialed
7  those language changes.
8        I'm pretty sure if these beautiful
9  lawyers of Mr. Mark Levinson and Mr. Jacobi, if,
10 in fact, they were the lawyers at the time, they
11 would have created a brand new document with those
12 changes in there.
13       So I don't recognize this as a -- as a
14 valid contract between me and David Hobbs and
15 Mark Ross.
16    Q.   This contract mandates that David Hobbs
17 and Mark Ross are artists for hire, doesn't it?
18       MR. BURROUGHS:  Objection.  Vague.  Calls
19    for a legal conclusion.  Misstates the
20    evidence.  Go ahead.
21 BY MR. WOLFE:
22    Q.   You can answer the question.
23    A.   I don't know what this contract -- this
24 is not a contract that's between me and Mark Ross
25 and David Hobbs in which is it approved by me and

1  Mark Ross and David Hobbs.
2    Q.   But it's got your signature and it's got
3  their signature on it, doesn't it?
4    A.   It has my signature on it and it has
5  changes with my initials on it and David Hobbs
6  initials and not Mark Ross initials.
7    Q.   Isn't it true -- I'm sorry, finish your
8  answer.
9    A.   No, go ahead.
10   Q.   Isn't it true that in 1991, you made
11 specific deals with each of the three members of
12 2 Live Crew with respect to their solo albums?
13   A.   I don't recall.
14   Q.   Let me go back and show you the first
15 contract with Mr. Wong Won and show you
16 paragraph 33.  Do you see paragraph 33?
17   A.   Yes.
18   Q.   Do you recall entering into an agreement
19 with Mr. Wong Won with respect to release and
20 distribution of an album on artists selected by
21 him?
22   A.   Is this particular, paragraph 33, what
23 contract is this?
24   Q.   I'll show you at the top.  It's the one
25 with -- get up to the top.  It's the one with

1  Mr. Wong Won.
2    Q.   Do you see that?
3    A.   Yes, is this a point of the 28-page
4  contract?
5    Q.   Yes.
6    A.   With Mr. Wong Won?  Okay.
7    Q.   Okay.  So what I'm asking --
8    A.   It would have been a lot easier if you
9  all would have separated them, but, you know, I
10 would not be thinking as hard.
11   Q.   Okay.  I am only asking you:  Do you
12 recall entering into this contract that has this
13 specific paragraph 33, which calls for
14 distribution of an artist signed by Chris Wong Won
15 that your record company, Luke Records, is going
16 to release?
17   A.   An artist signed by Chris Wong Won.
18 Go back to the paragraph.
19   Q.   I'm happy to do so.  I'm showing you
20 paragraph 33.  Would you like to take a minute to
21 read it?
22   A.   Yes, please.
23   Q.   Okay.
24   A.   Okay.
25   Q.   So now does it refresh your recollection

1  that Luke Records entered into an agreement with
2  Mr. Wong Won to release an album of an artist
3  selected and signed by Mr. Wong Won?
4    A.   I don't recall.
5    Q.   Now, I am going to show you the next
6  contract that you entered into with Mr. Hobbs and
7  Ross and show you paragraph 33.
8        Do you see what it says?
9        It says intentionally deleted.  Do you
10 see that?
11   A.   I am reading paragraph 33.
12        What's the question?
13   Q.   Does it refresh your recollection that
14 you entered into a different deal with Mr. Wong
15 Won to release an album of an artist signed by
16 him which was paragraph 33 in the first contract,
17 that you do not have in the contract with Hobbs
18 and Ross?
19   A.   Rephrase that question.
20   Q.   Does it refresh your recollection that
21 you have a different clause in the contract with
22 Mr. Wong Won that does not exist in the contract
23 with Hobbs and Ross?
24   A.   If there's a -- there are different
25 things added in the different contracts with

Luther Campbell
November 01, 2022

Page 86

1  different artists.  If there was -- if that is,
2  in fact, the contract that me and Mr. Wong Won
3  signed of the 28-page contract in which you
4  provided, with me -- with me, him and Ross
5  supposed to provide artists to be distributed by
6  me, and then now there's a separate contract with
7  me and Ross and Hobbs, that would be a totally
8  different deal.  That's why there are different
9  contracts.
10       So Mr. Ross explained it, Mr. Ross and
11  Mr. Wong Won, based on the first 28-page contract
12  with Mr. Wong Won, in the contract stated that
13  him and Mr. Ross would be going out and getting
14  artists and we would be distributing those
15  artists, paying those percentages.
16       Now, if this contract says me and  Mr.
17  Hobbs -- Mr. Hobbs and Mr. Ross, whatever it is,
18  I need to read the top of that, whatever this is,
19  would be actually totally different than the deal
20  that I had with Mr. Wong Won.  Giving all these
21  guys opportunities to be able to produce their
22  own artists and we would distribute it.
23       Q.  What I'm trying to reconcile is, your
24  earlier testimony where you said the only
25  contract with the members of 2 Live Crew was the

Page 87

1  document that we first showed you, that we marked
2  as Exhibit 9, when, in fact, I have now shown you
3  two additional contracts, one with Wong Won and
4  one with Hobbs and Ross and I am trying to
5  reconcile your testimony.
6       MR. BURROUGHS:  Objection.  Vague.
7  Misstates the testimony.  But go ahead, if
8  you understand the question.
9       THE WITNESS:  I understand the question.
10  Yes, you are misstating my testimony.
11  You asked me earlier about the contract in
12  which I entered into a contract with the
13  2 Live Crew, which means, in my opinion, means
14  all of the members of the group.  All early
15  on.
16       And now you are asking me about specific
17  contracts in which I entered into contractual
18  agreements with them as solo artists, as
19  record companies, as them going and finding
20  artists to distribute.
21       So if -- hopefully that clears up what
22  you are trying to -- what you are trying to
23  say, but you asked me a specific question did
24  I enter into a contract with the 2 Live Crew
25  early on.

Page 88

1       You did not say what did you not enter
2  into specific and solo and contracts with
3  individuals of the group.  These are not group
4  contracts.  These are separate contracts in
5  which they were going out and being
6  entrepreneurs.
7  BY MR. WOLFE:
8       Q.  So is it your testimony that the two
9  contracts I just showed you, does not cover their
10  services as members of 2 Live Crew?
11       A.  Based on -- if these contracts are the
12  actual contracts, this would not be contracts for
13  services as 2 Live Crew, no.
14       Q.  Let me show you the top of -- first I'm
15  going to show you the one --
16       A.  The first contract.
17       Q.  -- with David Hobbs.
18       A.  Go ahead.
19       Q.  Do you see what it says?  This is a
20  contract between Luke Records, Inc. and Mark Ross
21  and David Hobbs as performers in the group known
22  as 2 Live Crew.
23       So do you want to change your testimony
24  now?
25       A.  I don't -- I don't recall this document.

Page 89

1       Q.  And let me go back and show you the
2  first line of the contract with Mr. Wong Won.
3       MR. BURROUGHS:  And I will just while you
4  are doing that, object for the record that
5  the questions have been vague and I believe
6  there is going to be a bit of inconsistency
7  in the record because we are talking about
8  multiple contracts that have been compiled for
9  this one exhibit, referred to as sometimes as
10  contract, sometimes as contracts, and I'm a
11  bit confused as to what is being asked about
12  at times.
13       I believe that is going to be reflected
14  in the transcript.
15  BY MR. WOLFE:
16       Q.  Mr. Campbell, this is our last question
17  before we break.  I'm sorry, I'm going to have two
18  more questions.
19       MR. WOLFE:  Debbi, can I have five minutes
20  before we have to switch over?
21       THE REPORTER:  Yes.
22       MR. WOLFE:  Okay.
23  BY MR. WOLFE:
24       Q.  All right.  Mr. Campbell, I am now
25  showing you the first page of the contract with

Luther Campbell
November 01, 2022

Page 90

1    Mr. Wong Won, and do you see where it says that
2    the contract is between Luke Records and Chris
3    Wong Won as performer in the group known as 2 Live
4    Crew?
5        A.   Yes, I see that.
6        Q.   Now, I'm going to show you -- I am going
7    to ask you a question before I get there.  Did
8    you sign a contract with Luke Records as a member
9    of 2 Live Crew?
10       A.   I don't recall.  Can you go back to the
11   first contract you showed me earlier this
12   morning, in which all of us, it appeared to be
13   that all of us signed the contract?
14            MR. BURROUGHS:  I believe that was
15   Exhibit 9.
16   BY MR. WOLFE:
17       Q.   I can go back to Exhibit 9.
18            I am now showing you what we previously
19   marked as Exhibit 9.
20            MR. BURROUGHS:  Can we see the signature
21   page?
22            MR. WOLFE:  Of course.
23            THE WITNESS:  That right there shows that
24   I signed as an artist of the 2 Live Crew.
25   BY MR. WOLFE:

Page 91

1        Q.   Is this the only contract in which you
2    signed as an artist as a member of 2 Live Crew?
3        A.   I don't recall.
4        Q.   So now I'm going to go back to the last
5    contract in what we marked as Exhibit 2, which
6    for the record starts at page 58, and do you see
7    that this is a contract dated February, 1991, by
8    and between Luke Records, Inc. and Mark Ross,
9    Chris Wong Won, David Hobbs and Luther Campbell,
10   PKA, the 2 Live Crew?
11       A.   Which document is this and what --
12       Q.   The one that -- the one that I am now
13   showing you that is on your screen.
14       A.   Which -- where --
15       Q.   Which for the record is page 58 of
16   page 86 of Exhibit 2, the third contract in that
17   set.
18       A.   Where is the other pages from 28 to 58?
19       Q.   Right up above.  You see?  I just went
20   down.
21       A.   Okay.  This page started at 28.  Go up,
22   go up, go up, go up.  Up, up, up.  You'll see 28,
23   28 and then you jumped to 58.
24       Q.   No.  You --
25       A.   Is there any other documents in between

Page 92

1    that?
2        Q.   No.  You will see that that is page 28,
3    which if you go up here it's page 56 of 85 of the
4    exhibit.  I am now going to the very next page.
5        A.   That starts off completely different
6    document.
7        Q.   Exactly.
8        A.   Page 86, correct?
9        Q.   Exactly.  I am asking if you recognize
10   this completely different contract as the third
11   contract between your company and the members of
12   2 Live Crew?
13       A.   I don't recognize -- I don't recall.
14            Because I am not looking at the complete
15   document, you are showing me only the top part of
16   a contract.
17       Q.   That's not my question.  My question is:
18   Do you recall entering into a third contract with
19   the other members of 2 Live Crew?
20       A.   I don't recall.
21       Q.   And do you recall that in all three of
22   these contracts, you designate the members of
23   2 Live Crew as artists for hire?
24       A.   Don't -- never, I never, never, never
25   did a contract with them, work for hires.

Page 93

1            (A discussion was had off the record
2    after which the following proceedings were had:)
3            MR. WOLFE:  Let's reconvene at 1:30.
4            THE TECHNICIAN:  Going off.
5            (Reading and signing were not waived for
6    a.m. session.)
7            (The above proceedings were continued at
8    1:02 P.M.)
9
10            ----------
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Luther Campbell
November 01, 2022

---

**Page 94**

```
 1
 2
 3                WITNESS NOTIFICATION LETTER
 4   November 9, 2022
 5   LUTHER CAMPBELL
     c/o SCOTT ALAN BURROUGHS, ESQ.
 6   Doniger / Burroughs Building
     603 Rose Avenue,
 7   Venice, California 902

     In Re: LIL' JOE RECORDS, INC., a
 9   Florida corporation
     Deposition taken on November 1, 2022
10   Job No.  6258153

11
     The transcript of the above-referenced
12   proceeding has been prepared and is being
     provided to your office for review by the
13   witness.

14
     If you have not waived signature we
15   respectfully request that the witness
     complete their review within a reasonable
16   amount of time and return the errata sheet to
     our office.
17
18
     Sincerely,
19
20
21
     Debra Stark, Court Reporter,
22   Notary Public
23
24
25
```

**Page 95**

```
 1
              ERRATA SHEET
 2        DO NOT WRITE ON THE TRANSCRIPT
          ENTER CHANGES ON THIS PAGE
 3     IN RE: LIL' JOE RECORDS, INC., a
            Florida corporation
 4          LUTHER CAMPBELL
 5
 6
     Page |Line |Change          |Reason
 7
 8   _____
 9   _____
10   _____
11   _____
12   _____
13   _____
14   _____
15
16
17        Under penalties of perjury, I
     declare that I have read the foregoing
18   document and that the facts stated in it are
     true.
19
20
21
22   _____
     LUTHER CAMPBELL
23
24
25
```

**Page 96**

```
 1                CERTIFICATE OF OATH
 2
 3   STATE OF FLORIDA:
 4   COUNTY OF BROWARD:
 5
 6        I, DEBRA L. STARK, Court Reporter and
 7   Notary Public, in and for the State of Florida
 8   at Large, do hereby certify that LUTHER CAMPBELL
 9   remotely appeared before me by audio and
10   visual means on November 1, 2022, and was duly
11   sworn.
12        Signed and sealed heretofore on this
13   day of November 9, 2022.
14
15
16
17
18
19   ------------------------------
     DEBRA L. STARK, Court Reporter
20   and Notary Public, State of
     Florida at Large
21
22
23   MY COMMISSION EXPIRES:
     March 28, 2025
24
25
```

**Page 97**

```
 1         C E R T I F I C A T E
 2   STATE OF  FLORIDA:
 3   COUNTY OF BROWARD:
 4        I, DEBRA L. STARK, certify that I was
 5   authorized to and did stenographically remotely
 6   report by audio and visual means the deposition of
 7   LUTHER CAMPBELL; duly sworn by me;
 8   pages 1 to and including 97; and that the
 9   transcript is a true record of my stenographic
10   notes.
11        I further certify that I not a relative,
12   employee, attorney, or counsel of any of the
13   parties, nor am I a relative or employee of any of
14   the parties' attorneys or counsel connected with
15   the action, nor am I financially interested in the
16   action.
17        Signed and sealed on this date of
18   November 9, 2022.
19
20
21   ------------------------------
     DEBRA L. STARK, Court Reporter
22   and NOTARY PUBLIC, State of Florida
     at Large
23
24   MY COMMISSION EXPIRES:
     MARCH 28, 2025
25
```

Luther Campbell
November 01, 2022

**$**

**$250,000**
37:22 38:2
54:22 55:3,
13 81:18

**(**

**(b)**
65:19 66:12

**0**

**0001**
40:23 45:10
**0004**
47:8
**001**
49:6
**0023**
45:10
**003**
42:3,24
**004**
48:24

**1**

**1**
31:16,17,21,
22 56:10
62:22 66:19
**11**
78:8,9,14
**12**
65:22,24
66:3,9
**125th**
32:14
**12:14**
65:12
**12:15**
65:9

**12:20**
65:10
**12:23**
65:16
**13**
65:23 66:4,
19
**13(a)**
65:19 66:12,
25
**13(b)**
67:8
**13s**
66:1,7
**15**
38:17 52:18,
24
**1550**
32:14
**17**
29:12 56:10
**18**
38:18 77:23
**1987**
27:14 79:12
**1990**
27:11
**1991**
57:16 76:15
77:9,10
80:11 81:1
83:10 91:7
**1:02**
93:8
**1:30**
93:3

**2**
26:8,14,22,
24 27:3,6
32:25 33:5,6
34:8,12
35:24 36:12,
15 37:3,13,
17,22 38:3,

11,14,21
40:23 42:3,
15 43:6 44:8
45:10 47:14,
18 48:24
49:6 51:8
52:4,23 54:3
55:2,7,13
56:4 73:23
74:12 76:4
83:12 86:25
87:13,24
88:10,13,22
90:3,9,24
91:2,5,10,16
92:12,19,23
**20**
73:22
**20(a)**
67:22,24
68:23 71:6,
7,12
**24**
75:6
**26**
49:7 61:19
**27**
61:17,18,19
75:4,6
**28**
58:6,21 59:7
61:7,12,16,
20 62:12,22
63:8,10,14,
16,21 66:20
68:18 70:3
76:22 77:25
91:18,21,22,
23 92:2
**28-page**
84:3 86:3,11
**29**
76:10,12
**2:14**
65:11
**2nd**
57:17

**3**

**3**
41:16,17,22,
24 42:5,9,
11,23 43:7,
9,11,12 44:5
51:6 54:3
55:23 65:20
76:9 79:22
**3050**
32:6,8
**307**
32:6
**33**
83:16,22
84:13,20
85:7,11,16

**4**

**4**
44:12 47:23
51:6 54:3

**5**

**5**
51:6 52:8,18
54:4
**56**
76:21 92:3
**58**
91:6,15,18,
23

**7**

**7**
51:6 54:4
**7(a)**
55:6 81:12,
14
**7(b)**
81:11

Luther Campbell
November 01, 2022

**7-B1**
54:21

**8**

**8**
51:6 54:4
**8400**
57:16
**85**
58:21 59:8
92:3
**85-page**
64:6
**86**
70:2 91:16
92:8
**86-page**
61:4

**9**

**9**
29:1,11
36:10,22
37:4,18
39:16 41:4
45:23 51:6
54:4 79:11,
22 87:2
90:15,17,19

**A**

**a.m.**
93:6
**able**
29:14 86:21
**above**
42:1 91:19
93:7
**above-
referred**
28:25
**accept**
41:9

**accommodate**
57:22 60:14
64:8 73:18
**account**
78:24
**actual**
48:7 50:13
66:19 68:4
88:12
**added**
48:1,6 54:13
82:3 85:25
**additional**
87:3
**address**
32:5,13,17,
21 70:11
**addresses**
32:7
**admitted**
66:16 75:16
**advance**
37:16,19,22
38:2,11
54:21 55:3
81:18
**agree**
79:5,8
**agreed**
38:2,13
53:13 55:12
78:19 79:7
80:6
**agreeing**
80:19
**agreement**
26:21 27:2
28:10 31:5,
8 33:21
34:7,11 39:1
40:16 44:10
50:2,4,7,13
52:22 55:1
58:2 68:1
79:12,15
81:17 83:18
85:1

**agreements**
50:1,20,24
58:3 87:18
**ahead**
46:21 56:5,
12 69:13
73:3 82:20
83:9 87:7
88:18
**album**
35:24 37:14
75:23 76:1
83:20 85:2,
15
**albums**
27:12 36:2,
24 76:8
83:12
**Allen**
63:24 67:12
72:17,22
73:6 74:10,
17,21 75:7,
10 81:5
**ambiguous**
37:9
**amount**
54:22
**and/or**
33:4
**Angeles**
67:3
**answer**
39:14,24
46:23 48:16
51:12,16
52:6,7 59:20
63:4 82:22
83:8
**answering**
40:6 63:3
**anybody**
55:11
**anyone**
50:6,11
55:21

**Apparently**
50:21
**appearance**
44:25
**appeared**
90:12
**appears**
40:17 44:20,
24 46:4 56:2
78:17
**appreciate**
49:18
**appropriate**
39:18
**approved**
82:25
**April**
57:15 76:15
77:9,10
80:11 81:1
**argue**
35:6
**argued**
35:7
**argument**
35:8
**arrow**
28:14,21
**artist**
42:19 74:13
84:14,17
85:2,15
90:24 91:2
**artists**
44:10 53:14,
17 82:17
83:20 86:1,
5,14,15,22
87:18,20
92:23
**asked**
52:12 62:16
87:11,23
89:11
**asking**
36:9,20 38:5
43:25 44:1

Luther Campbell
November 01, 2022

47:10,23
48:21 49:25
52:17 55:11
63:7,13
66:24 70:5
71:15 76:23
84:7,11
87:16 92:9
**assuming**
30:2
**attached**
55:18 63:12
80:3
**attaching**
56:9
**attempting**
50:17
**attorney**
52:6,11,15,
21 70:20
**attorney-
client**
73:1
**attorney/
client**
35:18
**attorneys**
49:20
**Avenue**
57:17
**aware**
36:11

---

**B**

---

**back**
29:15 30:5,
15,17 56:13
65:9 68:3,22
74:4 76:20
79:10 83:14
84:18 89:1
90:10,17
91:4
**backdoor**
55:15

**bankruptcy**
71:19,20
72:9
**Bar**
60:2
**based**
35:16 41:6
51:12 55:18
63:3 72:13
81:19 82:10
86:11 88:11
**basis**
35:19 44:10
50:21 51:3
59:13,16
**Bates**
50:22
**beautiful**
82:8
**behalf**
53:5 55:1
75:11
**behavior**
60:6
**believe**
40:13 60:19
61:25 65:25
66:5 89:5,13
90:14
**better**
29:25 46:25
**bigger**
28:7,12,16
41:20
**Biscayne**
32:6,8
**bit**
30:5,15
34:25 57:23
61:13 89:6,
11
**blank**
57:15 76:15
**blocks**
61:22
**book**
74:20,21,23,

24,25
**bottom**
40:23 41:23
42:9 44:14
47:25 48:24
52:8 57:25
58:6,7,10,
15,22 59:4
61:7 62:12
66:6 68:3,5,
16
**Boulevard**
32:6,8
**brand**
82:4,11
**break**
65:4 89:17
**Bruce**
35:7
**BURROUGHS**
28:14,19
29:7,16
30:20 31:15
34:13 35:14
37:8 39:7,
15,19,21
40:1,12 41:2
43:15,20,25
44:16 45:11
46:10,20
47:1 49:22
50:5,8 51:10
55:25 56:11,
15,23 57:2,
6,23 58:1,8,
14,20 59:2,
7,13,23
60:7,15
61:11,15,21,
24 64:4,9,
12,21 65:2,
7,21,24 66:5
68:9,14,24
69:3,7,13,22
70:10,16,22
72:25 73:16,
19,21,25
74:3,7 75:1

77:22 82:18
87:6 89:3
90:14,20
**button**
28:21

---

**C**

---

**call**
70:13,24
**called**
74:21
**calling**
70:12,23
**calls**
34:14 35:14
37:9 51:11
82:18 84:13
**Campbell**
29:4 31:20
40:11,22
41:14 43:23
44:5 45:17
47:7 49:3
51:5 53:22
55:22 57:11
61:3 62:11
65:18 66:11
71:5 89:16,
24 91:9
**captions**
30:23
**career**
34:20,22
**case**
39:2 43:13
72:20 73:12
**chance**
81:13
**change**
78:13 80:23
82:5 88:23
**changed**
78:23 82:4
**changes**
79:23,24
80:1,2,3,7,

Luther Campbell
November 01, 2022

14,16,20
81:21,22
82:7,12 83:5
**changing**
78:25
**check**
32:4
**Chris**
57:17,18
62:13 63:20
66:16 67:4
75:8,23
84:14,17
90:2 91:9
**Christopher**
75:14,19
**clarify**
62:20
**clause**
64:3,25
85:21
**clauses**
52:3
**clear**
57:8 66:2
**clears**
87:21
**client**
40:7,14,15
43:18 45:13,
17 69:18,19
**clients**
43:23
**co-defendants**
47:10
**co-writer**
74:24
**coaching**
69:2,6
**cobble**
39:9
**code**
42:8
**codes**
48:23
**collated**
40:17,19

**collating**
40:4
**combination**
58:3
**combined**
45:2
**come**
65:9
**commit**
41:10 69:21
**committed**
73:10
**communication**
**s**
35:18
**companies**
26:23,24
27:3,6 32:10
34:12 35:25
36:13 51:8
53:5 55:2
75:12 87:19
**company**
34:8 36:24
42:15,19,21
43:5 44:6
52:4 53:12,
17 54:2
66:16 67:13,
17 74:11
75:8,15 76:3
77:5 80:11
84:15 92:11
**compiled**
89:8
**complaint**
56:3
**complete**
92:14
**completely**
92:5,10
**conclusion**
34:14 35:15
82:19
**conclusions**
37:9

**confirm**
72:13 79:14
**confused**
89:11
**confusing**
50:16
**constantly**
59:18
**contained**
36:23
**contentious**
66:8
**contents**
39:21
**continue**
46:15 54:16
60:5 69:12
70:5,14 71:1
73:24 74:1,8
**continued**
93:7
**contract**
27:9,10,11,
13,17,20
29:2,5,10
32:24 33:3,
10,25 34:3
36:1,2,3,6,
10,11,14,15,
21 37:3,11,
12,17,23
38:4 39:4,8,
12 40:19
41:1 42:14
43:5,8 44:6,
13,18,19,23
45:5,15,20,
23 46:2,12
47:1,19,22
48:2,5,8,22
49:15 51:7,
15,23 52:3,
5,10,14,21
53:3,4,7,13,
18 54:1,8,
17,23,24
55:20 57:12,
14,19 62:21

63:4,10,15,
17,24 64:1
65:19 66:13,
14,15,18,20
67:5,13,15,
18 68:4,7
71:25 74:11,
15 75:5,8,
13,18,20,22,
25 76:3,6,8,
12,14,23
77:6 79:4,
19,24 80:1,
5,9,12,15,
17,21,24
81:1,11,25
82:5,14,16,
23,24 83:15,
23 84:4,12
85:6,16,17,
21,22 86:2,
3,6,11,12,
16,25 87:11,
12,24 88:16,
20 89:2,10,
25 90:2,8,
11,13 91:1,
5,7,16
92:10,11,16,
18,25
**contracting**
37:21
**contracts**
27:18 44:20
45:2,22 46:7
48:19 51:16
53:10 54:18
62:2,21
63:1,6,11
71:21 75:10
85:25 86:9
87:3,17
88:2,4,9,11,
12 89:8,10
92:22
**contractual**
38:1 49:1
87:17

Luther Campbell
November 01, 2022

controlling
70:3
conversations
35:16
copy
40:25 41:3
54:9,12
copyright
35:3,12
copyrights
26:23 27:6
34:7,11,19,
21,24 35:6,
20 36:7,12,
23 72:19
correct
34:20,24
38:9 41:3
50:14 66:22
71:14 79:2
92:8
correcting
44:17 47:2
counsel
35:16 39:17,
20,23 45:7
48:10 50:3
58:18,25
59:12 64:12
77:21
couple
41:6 43:1
course
30:20 50:10
54:10 65:6
90:22
Court
35:5 41:11
45:20,21
46:17 50:12,
14 59:6,9
60:1 69:21
70:23,25
71:20 72:14
courtesy
59:25

Courts
60:4
cover
36:2 88:9
covered
27:12 37:12
covers
36:14,15
created
82:5,11
Crew
26:8,14,22,
24 27:3,6
33:1,5 34:8,
12 35:24
36:12 37:3,
17,22 38:3,
11,14,21
40:23 42:3,
16 43:6 44:8
45:10 47:14,
18 48:24
49:6 51:8
52:4,23 54:3
55:2,7,13
74:12 76:4
83:12 86:25
87:13,24
88:10,13,22
90:4,9,24
91:2,10
92:12,19,23
crosstalk
59:15

─────────────

D

date
27:16 31:7,
11 32:3,12
33:6,12,13,
14,15
dated
57:15 76:15
91:7
David
26:10 76:5,

16 77:1,6
78:20 80:8
81:2,17,24
82:3,14,16,
25 83:1,5
88:17,21
91:9
day
57:15 76:15
deal
49:1 85:14
86:8,19
deals
83:11
Debbi
65:8 89:19
defendants
47:8 49:5
defined
74:12
Definitely
34:1
deleted
85:9
deliver
71:21
delivered
71:24
delivering
72:3
deposition
29:11 46:17
55:24 56:2
59:17 69:12
70:9,15
71:2,3
describes
35:24
designate
92:22
different
41:6 45:1,22
46:7 47:20
53:10 55:13
62:2,3 79:8
81:22 85:14,
21,24,25

86:1,8,19
92:5,10
directly
75:17
disagree
50:5
disclose
35:17
discovery
45:25 46:8
50:23
discrepancies
62:1
discussed
40:14
discussion
26:4 93:1
dispute
57:6 60:11
distribute
86:22 87:20
distributed
86:5
distributing
86:14
distribution
83:20 84:14
district
60:3
doctored
50:6 69:19
document
27:15 28:4,
25 35:13,23
41:15 42:6,
24 43:18
47:8 48:25
49:9,11,13
50:18 55:10,
16,17,20,23
57:7 58:24
59:4,14 62:5
69:23 70:1,4
71:10,17
72:18 77:12,
15,21 78:18,
19 79:3,4,7,

Luther Campbell
November 01, 2022

11 80:14
81:19,20,21
82:11 87:1
88:25 91:11
92:6,15
**documents**
26:15 41:7
43:14,21
45:9 47:4
48:18,19
49:4,24 50:9
51:2 69:19
72:3,11,14
91:25
**doing**
34:22 89:4
**due**
45:7

**E**

**earlier**
35:9 45:24
79:16 86:24
87:11 90:11
**early**
39:9 87:14,
25
**easier**
30:21 84:8
**effective**
27:14
**eight**
30:9,11
**either**
45:4
**email**
48:12 56:9
**employee**
42:21
**employer**
42:20
**end**
30:1 58:23
68:20,21,25
**engaged**
59:17

**enter**
87:24 88:1
**entered**
77:6 80:11
81:17 85:1,
6,14 87:12,
17
**entering**
83:18 84:12
92:18
**entertainment**
74:22
**entire**
48:5 60:9,
12,18,24
63:5,11,19
70:1,19
77:12,15
78:2
**entirety**
31:16 61:12,
15 64:6
**entitled**
47:14 60:9
**entrepreneurs**
88:6
**error**
40:3
**evidence**
43:16 82:20
**exact**
26:20 27:16
32:12 33:6,
15 54:3
**Exactly**
92:7,9
**exclusive**
57:11,13
**excuse**
31:6 46:22
54:18 56:25
**exercised**
37:24
**exhibit**
29:1,11
36:10,22
37:4,18

39:16 41:4
45:23 55:23
56:1,2,4,18,
19 60:8,9,
12,18,23,24
61:4 62:6,
17,20 63:5,
8,12,19
64:6,10
65:20,22,25
66:1,3,6
69:16 70:18,
19 76:9,22
78:2 79:11,
22 87:2 89:9
90:15,17,19
91:5,16 92:4
**exhibits**
29:12 56:10
61:18 62:25
**exist**
85:22
**exists**
54:1 75:18,
20
**expert**
35:3,4
**explained**
86:10
**export**
28:20
**extent**
35:15 39:19
62:7

**F**

**fact**
47:7 50:13
52:22 71:24
72:15 76:7
79:14 82:10
86:2 87:2
**factual**
48:20
**fair**
34:3,23,25

44:3 81:4,7
**false**
46:5 47:2
**familiar**
29:4
**fast**
57:25 61:13
**featuring**
47:14
**February**
91:7
**file**
45:1
**filed**
50:13
**fills**
28:17
**find**
53:7 64:25
**finding**
87:19
**fine**
56:20
**finish**
50:8 83:7
**first**
29:15 60:24
62:18,21
65:19 66:14,
20 70:19
75:6 81:12
83:14 85:16
86:11 87:1
88:14,16
89:2,25
90:11
**five**
89:19
**five-minute**
65:4
**Florida**
60:2
**following**
26:5 65:14
71:19 93:2
**forth**
37:3

Luther Campbell
November 01, 2022

---

foundation
  43:20 44:2
  50:25
Frank
  56:9
fraud
  41:11
frauds
  69:20
fraudulently
  48:18
free
  28:20 45:2
full
  48:22 49:14
  53:18 54:12,
  17 61:22

---

G

gave
  72:22
generally
  64:9
getting
  86:13
give
  37:21 39:2
  48:4 55:2
  63:4 73:25
  74:3
given
  58:10
giving
  38:10 86:20
going
  27:24 29:12
  30:19 31:17,
  20,25 35:11,
  17 38:25
  39:21 41:14,
  16 44:13,16,
  21 46:10,16
  48:16 51:15
  53:1,21
  57:24 59:5,
  9,10,23

---

60:7,22
61:6,25
64:18 65:2
66:7 67:21
68:22 69:3,
7,11 70:11,
14,17,24
71:1,5 72:16
75:5,17
76:10,19
78:24 79:10
81:10,12
84:15 85:5
86:13 87:19
88:5,15
89:6,13,17
90:6 91:4
92:4 93:4
group
  27:18,21
  32:14 48:8,9
  49:2 51:7
  53:17 87:14
  88:3,21 90:3
guys
  48:17 51:17,
  20 86:21

---

H

hac
  59:11
half
  75:6
happened
  73:12
happy
  29:13 30:25
  48:12 49:3,
  4,16 54:14
  56:8,21
  57:5,22
  60:13 61:1
  64:2,8 73:18
  77:13,20,25
  84:19
hard
  84:10

---

headings
  30:24
help
  27:22 64:25
hid
  69:18
high
  35:10
hire
  42:20 44:9,
  11 74:13,14,
  15,18 82:17
  92:23
hired
  35:7 74:16
hires
  92:25
hiring
  72:17 74:10
hit
  28:14,23
Hobbs
  26:10,18
  76:5,17
  77:1,6 80:8,
  9 81:2,17,24
  82:3,14,16,
  25 83:1,5
  85:6,17,23
  86:7,17 87:4
  88:17,21
  91:9
Hobbs'
  78:20 80:16
hoc
  59:21
hold
  30:4,14
  60:15 74:7
hour
  65:3

---

I

I'
  68:22

---

idea
  33:16,20
identificatio
n
  29:2
identified
  40:2
inaccurate
  58:17
inappropriate
  59:19 60:20
included
  43:6,8 52:3
  72:18
includes
  50:19
including
  68:10
incomplete
  49:24 50:1,
  19 51:1
inconsistency
  89:6
incorporate
  32:2
incorrectly
  40:18,19
independent
  35:19 38:10
individuals
  88:3
initial
  77:16,19
  78:4,12,17
  79:3 80:16,
  17,19,23
initialed
  80:7,8 82:6
initialing
  78:13,21
initials
  78:8,11,20
  79:6,19,21
  80:2,15
  81:23 82:2,6
  83:5,6

---

Luther Campbell
November 01, 2022

**instruct**
  35:17
**intentionally**
  85:9
**interested**
  78:4
**interrupt**
  57:1 69:12
**interrupting**
  59:17 70:9
  71:3
**involved**
  40:15
**issue**
  72:19 78:15
**issued**
  56:16
**issues**
  62:7

―――――――――
            J

**Jacobi**
  63:24 67:12
  72:17,22
  73:6 74:10,
  17,22 75:7,
  11 81:5 82:9
**Joe**
  33:24
**joined**
  50:20
**judge**
  69:11 70:11,
  13 71:20,25
  72:4,6,7,10,
  12,15
**jumped**
  91:23

―――――――――
            K

**keep**
  30:19 44:17,
  22 46:10,11
  52:7

**kind**
  28:5 41:18
**know**
  26:17 30:22
  31:12 32:9,
  17,24 33:3,
  8,24 34:1,
  15,16,23,25
  35:19,20
  38:6,7,13
  40:7 42:11,
  14 46:24
  48:17 50:14,
  18 51:11
  54:23 71:9,
  15,24 75:23,
  24 76:2 77:3
  81:4,7 82:23
  84:9
**known**
  88:21 90:3

―――――――――
            L

**language**
  30:24 53:12,
  16 79:8
  82:3,5,7
**lawyer**
  31:12 33:22
  35:7,8,9
  41:1 42:6,24
  43:12 48:12,
  13 51:21,24
  62:24 63:23,
  25 67:3,4,6,
  12,16,20
  74:22
**lawyers**
  39:1 82:9,10
**LC**
  78:12
**leave**
  51:25
**left**
  28:23 42:9

**legal**
  34:14 35:15
  37:9 82:19
**Levinson**
  67:3 82:9
**line**
  55:6 61:8
  80:23 89:2
**lines**
  73:9
**list**
  61:18
**listen**
  46:21 52:16
  53:22
**listening**
  53:24
**little**
  28:12,21
  30:4,5,15
  34:23 41:20
  57:23 61:13
  68:19,20
**live**
  26:8,14,22,
  24 27:3,6
  32:20,25
  33:5,6 34:8,
  12 35:24
  36:12,15
  37:3,13,17,
  22 38:3,11,
  14,21 40:23
  42:3,15 43:6
  44:8 45:10
  47:14,18
  48:24 49:6
  51:8 52:4,23
  54:3 55:2,7,
  13 74:12
  76:4 83:12
  86:25 87:13,
  24 88:10,13,
  22 90:3,9,24
  91:2,10
  92:12,19,23
**long**
  69:23 77:24

**look**
  26:15 27:15
  29:8,22
  30:24 31:18
  42:25 48:5
  49:19 56:7
  57:20 66:24
  67:7 74:25
**looked**
  39:15
**looking**
  31:4 41:4
  44:24 46:6
  52:1 63:14
  64:2 65:3
  66:9 80:9
  92:14
**Los**
  67:3
**lot**
  84:8
**LP**
  47:14,15
**Luke**
  27:4 44:7,8
  47:14,18
  57:16 72:20
  74:21 75:15,
  18,21,24
  76:3,16 81:1
  84:15 85:1
  88:20 90:2,8
  91:8
**Luther**
  91:9

―――――――――
            M

**made**
  27:13 40:3
  45:13,19
  71:10,16
  83:10
**make**
  28:6,12,15
  35:1 42:10
  46:16 49:22

Luther Campbell
November 01, 2022

66:2 73:14
**malpractice**
73:7,8,10
75:2
**mandates**
82:16
**manner**
78:24
**mark**
56:19 67:3
72:7,8 76:4,
16 77:1,6
81:2,18
82:9,15,17,
24 83:1,6
88:20 91:8
**Mark's**
72:1,4
**marked**
29:1,11
36:10,22
37:4,18
55:23 56:3,
18 65:19
79:11 87:1
90:19 91:5
**marketing**
35:4
**marking**
57:8
**markings**
45:1
**Marks**
72:6
**matter**
50:13
**mean**
62:24
**means**
87:13
**member**
60:1,2 78:21
80:22 90:8
91:2
**member's**
78:16 80:19

**members**
26:17,22
27:3,17,20
32:14 34:8
37:2,17,22
38:2,10,14,
21 42:15
43:6 44:8
47:18 52:4,
23 54:2
74:12 76:4
78:25 79:3,
5,6 80:3,18
83:11 86:25
87:14 88:10
92:11,19,22
**memory**
38:10 80:25
**mention**
34:6,10 36:6
**met**
34:4
**middle**
58:10
**mine**
55:17,20
**minute**
54:15 62:23
67:23 84:20
**minutes**
89:19
**misinterpreting**
57:2
**misrepresenting**
59:14
**missed**
73:23
**Misstates**
82:19 87:7
**misstating**
43:16 87:10
**mistake**
40:3
**mixed**
39:10

**moment**
73:25 74:3
**morning**
90:12
**move**
30:22 37:14
41:11
**multiple**
44:20 46:4
65:25 89:8
**music**
34:22 35:1,3

---

### N

**name**
72:7
**named**
63:23 67:3
**Nasty**
36:16 37:13
**need**
27:22 57:3
69:8 79:21
86:18
**needs**
57:8
**negotiate**
53:15
**negotiated**
48:9
**never**
35:8 40:14
43:11 44:9,
11 45:13,19
46:1 49:9,10
53:6 74:14,
17,18 92:24
**Northeast**
32:14 57:16
**note**
55:25
**notice**
64:3,25
**number**
55:18 56:18,
20 62:4

---

### O

**object**
34:13 41:2,7
43:15 49:24
51:2,10 89:4
**objecting**
44:22 46:11
**objection**
35:14 37:8
46:14 49:23
58:16 59:3
72:25 73:1
82:18 87:6
**objections**
39:18 46:15,
16,19,23
58:13 59:1,
18
**occasions**
53:11
**office**
40:17 50:11
**okay**
28:6,12 29:4
30:8 31:23
35:2 36:9
40:12 42:2,
11 43:24
57:9,25 58:7
59:5 61:20
62:24 64:11
66:11,23
67:23 68:14,
21 73:20
74:2,3,7
75:4 76:11,
21 77:18
84:6,7,11,
23,24 89:22
91:21
**once**
71:2
**one**
26:22 27:17,
20,22,24

Luther Campbell
November 01, 2022

32:10 35:25
36:21 41:5
44:19,23
45:4,5,15,20
46:2 48:4
49:20 50:2,
3,4,20 51:8
54:12 55:1,9
58:2,4 60:16
62:16 63:2,4
66:4 68:7
69:20 74:3
77:16 78:21,
22 79:8 80:7
83:24,25
87:3,4 88:15
89:9 91:12

**operate**
32:20

**operated**
32:10

**opinion**
36:8 48:18
80:4,22
81:20 87:13

**opportunities**
86:21

**opposed**
62:3

**opposing**
64:12

**order**
35:12 39:11
44:21 45:14
46:18 50:12,
22 72:1,4

**ordered**
71:20

**ordinary**
50:10

**originally**
62:16

—————————

**P**

—————————

**P.M.**
93:8

**page**
29:15,19
31:16,17,21,
22 41:16,17,
19,22,24
42:5,9,11,23
43:7,9,11,12
44:5,12
47:8,11,17,
23 52:8,10
53:1 58:6,
11,15,20,21,
22 59:7
61:7,10,15,
17,18,19
62:4,5,12
63:8,10,14,
16,21 65:22,
24 66:3,9
68:5,6,18
73:17 75:6
76:10,12,20,
21,22 77:16,
19 78:4,5,8,
9 79:19
89:25 90:21
91:6,15,16,
21 92:2,3,4,
8

**pages**
39:10 44:25
45:14,16,25
46:6 48:6
49:17 50:12,
15,19 51:6
52:1 53:8,9
54:3,8,12
62:3,22 70:2
77:17,23,25
91:18

**paid**
37:19 38:21

**paragraph**
29:22 30:9,
12,23 42:18,
23,25 47:13
54:21 55:6
65:18,23

66:1,4,7,12,
25 67:8,22,
24 68:2,23
71:6,7,12
73:22 75:4,6
78:9,14
81:11,14
83:16,22
84:13,18,20
85:7,11,16

**paragraphs**
81:22

**part**
48:7 63:3
71:10,16
92:15

**particular**
29:22 41:5
43:18 47:4
63:17 75:25
79:7 80:14,
17,23 81:21
83:22

**parties**
80:6

**parts**
47:20

**pay**
37:16 38:2,
14 52:23
55:12 81:18

**paying**
86:15

**payment**
73:14

**PDF**
28:20

**people**
17:8 46:10

**percent**
38:17,18
52:19,24

**percentages**
86:15

**performer**
90:3

**performers**
88:21

**period**
55:12 77:8

**person**
79:8 80:7

**piecemeal**
48:1,6,15
51:17

**pieces**
48:1

**PKA**
91:10

**place**
47:19,25

**please**
52:16 56:25
58:12,24
64:11 69:2,5
70:8 74:1,7
84:22

**point**
84:3

**portion**
44:6 49:10

**position**
36:18

**positioning**
50:2

**praised**
74:21 75:1

**prefers**
31:1

**preparation**
40:15

**prepare**
38:20 49:21
51:14 72:17
74:11

**prepared**
31:12 32:24
33:3,21 34:4
40:16 48:25
63:24,25
81:5

**presenting**
51:1

Luther Campbell
November 01, 2022

**pretty**
37:23 73:8
82:8
**previously**
29:1 55:23
56:18 79:11
90:18
**prior**
53:1 55:24
56:1
**privilege**
73:2
**pro**
59:11,21
**probably**
26:12 73:9
81:25
**proceed**
40:20 47:5
**proceedings**
26:5 65:13,
14 93:2,7
**produce**
39:9 40:25
44:15,18
48:4 86:21
**produced**
39:2 40:3
42:6,24
43:13,18,22
44:13 45:6,
8,11,12,16,
17 46:7 47:9
49:5 50:4,9,
22 53:5
71:10
**producer**
26:7,9,11
**producing**
42:7
**production**
43:14 45:9
49:6
**proper**
40:8 46:24
**provide**
49:14 53:18

86:5
**provided**
51:22,23
52:6,11,15,
21 55:10,21
86:4
**provides**
42:18
**publish**
60:24
**pursuant**
37:17 43:13
71:25 72:4
**put**
41:5 44:21
51:17 63:2
**putting**
48:18 75:7

---

**Q**

**quarterly**
78:25
**question**
27:1 31:24
32:9 33:2
37:25 38:5
39:14,25
40:7 41:7
43:21,25
46:24 52:16
53:19,23,24,
25 54:25
55:16 59:20
60:23 63:14
69:14 73:4,6
82:22 85:12,
19 87:8,9,23
89:5,16 90:7
92:17
**questioned**
45:24
**questioning**
60:18 69:22
74:8
**questions**
31:17 40:9

41:12 43:2
45:3 46:21
49:25 50:18
51:1,16
60:8,10 63:3
64:13,15
69:8 70:17
89:5,18
**quote**
82:17:13

---

**R**

**ran**
53:11
**rate**
52:9,18
**reach**
52:22
**read**
30:16 43:1,3
48:14 67:9,
23 84:21
86:18
**reading**
85:11 93:5
**real**
58:18
**rebut**
72:23
**recall**
26:2,11,16,
19 27:16
31:14 32:3,
12,22,23
33:6,14,22
36:25 37:1,
5,19,21
38:11,12,
16,19,24
42:7,13,17
48:24 52:2,
25 54:5,6,7,
9 55:4
63:23,25
67:6,14,16,
19 68:1

71:18,19,22,
23 72:2,3,5,
9,17,21
73:7,13,15
74:10,16,23
75:7,10,21
76:6 77:5,10
78:13 79:15
80:13 81:3,
6,9,19
83:13,18
84:12 85:4
88:25 90:10
91:3 92:13,
18,20,21
**received**
50:9
**recess**
28:2 65:13
**recognize**
41:15 42:5
47:10,21
55:10,17,19
57:19 82:13
92:9,13
**recollection**
38:6 43:4
47:16 67:2,
11 80:10
81:14,16
84:25 85:13,
20
**reconcile**
86:23 87:5
**reconvene**
93:3
**record**
26:4 29:10
39:8 40:1,5
42:19,21
43:16 44:17
46:3 47:3
49:23 53:11
56:1 57:8
58:9 60:17
61:25 62:1
64:5 65:9,
11,16,21

Luther Campbell
November 01, 2022

| | | | |
|---|---|---|---|
| 70:2 78:7<br>84:15 87:19<br>89:4,7 91:6,<br>15 93:1 | regard<br>62:8<br>regarding<br>81:1 | reserve<br>60:20 62:8<br>64:21,23<br>70:5,7 | Robert<br>72:8<br>Rogow<br>35:7 |
| recorded<br>36:3 | regular<br>47:21 | respect<br>26:24 38:14 | Ross<br>76:4,16 77:7 |
| recording<br>28:10 39:1<br>57:12,13 | release<br>32:25 33:4<br>83:19 84:16<br>85:2,15 | 45:7 67:4,<br>13,17 83:12,<br>19 | 80:10 81:2,<br>18,24 82:15,<br>17,24 83:1,6<br>85:7,18,23 |
| records<br>27:5 31:25<br>32:1 37:2<br>38:15,23<br>44:7,8 47:18<br>57:16 72:20<br>75:15,18,21,<br>24 76:3,16<br>81:2 84:15<br>85:1 88:20<br>90:2,8 91:8 | released<br>33:7<br>relied<br>39:22<br>relying<br>40:18<br>remember<br>72:6<br>rephrase<br>27:1 33:2<br>34:9 71:11<br>85:19 | respond<br>37:10<br>response<br>45:8 49:5<br>responses<br>46:1<br>rest<br>73:17,21<br>restroom<br>65:5<br>result<br>38:22<br>review<br>77:23 | 86:4,7,10,<br>13,17 87:4<br>88:20 91:8<br>Ross'<br>77:1<br>royalty<br>38:13,20,22<br>52:9,18,23<br>ruling<br>70:16 |
| reference<br>63:5 68:11 | REPORTER<br>89:21 | revoked<br>59:11,22 | S |
| referenced<br>52:2 | represent<br>36:5 40:13<br>45:4 | Richard<br>28:15 | sale<br>38:22 |
| referred<br>89:9 | representatio<br>n | rid<br>28:19,24 | sales<br>38:15 |
| referring<br>27:19 44:22<br>46:11 53:3<br>62:2 | 41:10 43:17<br>45:14 46:5<br>47:3 50:11,<br>23 58:2 | right<br>26:17 28:15,<br>16,22 29:19<br>30:7,8,16,17 | sanctionable<br>60:20<br>sanctions<br>46:18 59:10, |
| refers<br>31:24 47:13<br>55:7 71:12,<br>14 | representatio<br>ns<br>45:19 | 31:4,10,11<br>36:15 37:12<br>42:1 43:19,<br>21 49:13 | 21 60:4,5<br>satisfy<br>56:22 78:1 |
| reflected<br>89:13 | represented<br>45:21 46:1 | 54:22 61:14<br>64:21 65:24 | saying<br>43:9 57:3,7<br>58:14 68:24 |
| refresh<br>43:4 47:16<br>67:2,11<br>80:10 81:13,<br>16 84:25<br>85:13,20 | 67:12,14<br>representing<br>67:17<br>request<br>43:14 45:9 | 69:10,11<br>70:11 89:24<br>90:23 91:19<br>rights<br>60:21 62:9 | says<br>28:10,21<br>37:23 40:23<br>41:22,23<br>42:3 57:13<br>81:14 85:8,9 |
| refusing<br>60:11,17 | 49:6 64:6 | 64:22 69:14<br>70:6,7 | 86:16 88:19<br>90:1 |
| refute<br>72:23 | required<br>70:18 | | Schedule<br>68:11,12,25 |

69:8,9,15,
16,17 71:9,
13,14,16
72:18
**school**
35:10
**screen**
27:25 28:1,
4,16,18 39:4
41:17,18
55:19 56:4
91:13
**scroll**
29:7,13,23,
24 30:3
31:15 41:21
56:6,12
57:20 58:23
61:11,21
66:5 77:22
**scrolling**
30:2 51:12
**second**
27:22,24
39:2 58:4
80:1
**see**
28:1,4,6,8
29:6,14
30:23 31:5,
7,11,15
32:5,7,8,13
39:4 40:22
41:17,19,21,
23,25 42:3,
8,18 47:13,
15,25 49:19
52:9,12,17,
20 53:2
54:10,20
55:8 57:11,
20 60:9
61:3,6,12,22
62:11,14
64:15,18
65:20 66:4,
11 68:10,11,
16 69:8

71:7,12
76:7,12,14
77:12,14
78:8,16,20,
21,22,23
79:2 81:11
83:16 84:2
85:8,10
88:19 90:1,
5,20 91:17,
19,22 92:2
**seeing**
70:4
**seek**
59:10,20,21
60:3
**selected**
83:20 85:3
**semiannually**
79:1
**send**
48:13 49:3,4
77:13,20
78:1
**sending**
48:23
**separate**
27:18 50:1
62:19,25
86:6 88:4
**separated**
84:9
**series**
47:4
**services**
88:10,13
**session**
93:6
**set**
37:3 91:17
**seven-day**
28:20
**several**
26:3
**share**
27:25 28:1

**shares**
26:16
**short**
43:2
**show**
27:24 38:25
41:14,16
54:14,17
56:8,14,21
57:3,5
60:12,13,17
64:2,10
70:19 71:5
72:12 73:16
75:5 79:12
81:10,12
83:14,15,24
85:5,7
88:14,15
89:1 90:6
**showed**
51:13 66:20
70:3 79:25
80:14 87:1
88:9 90:11
**showing**
42:23 44:12
47:7 52:8
54:20 55:5,
9,19,22
57:12 65:18
69:15 72:11
76:21 84:19
89:25 90:18
91:13 92:15
**shown**
54:4 62:21
69:25 75:13
87:2
**shows**
90:23
**side**
28:15 42:9
**sign**
90:8
**signature**
53:7 54:1
57:21 61:7,

22 62:12,15
63:8,9,10,
15,16,20
66:17 68:5,6
75:16,17
76:19,24
77:2 83:2,3,
4 90:20
**signatures**
77:4 81:23
82:1
**signed**
32:25 33:4,
8,12,15,16,
17 54:18,19
81:8 84:14,
17 85:3,15
86:3 90:13,
24 91:2
**signing**
54:7 68:1
93:5
**similar**
76:2,6,7
**simple**
63:13
**simply**
44:1
**simultaneous**
59:15
**Skyywalker**
27:4 31:25
32:1 37:2
44:7
**slid**
49:17,18
**slider**
58:10
**slow**
30:13 31:20
58:19
**slower**
30:4 57:23
**Slowly**
73:19,22
**small**
28:5 41:18

Luther Campbell
November 01, 2022

**solo**
75:23,25
76:8 83:12
87:18 88:2
**Somethin'**
37:14
**songs**
26:14,18,19
**songwriters**
26:13
**sought**
60:5
**southern**
60:3
**speak**
60:15
**speaking**
39:18 46:15,
16,19,22
58:12,16
59:1,2,18
**specific**
36:7,14
37:12 53:17
63:12 75:25
83:11 84:13
87:16,23
88:2
**specifically**
41:16 55:6
72:16
**speculation**
51:11
**stamp**
50:22
**standing**
46:13
**stands**
49:13
**start**
30:22 64:19
**started**
91:21
**starts**
91:6 92:5
**state**
29:9 39:7

**stated**
35:9 52:18
70:1 86:12
**statement**
38:20
**statements**
47:2
**stating**
66:8
**stop**
39:17,20,23
58:12,25
64:11 69:2,5
70:8 71:3
**stopped**
58:21
**studio**
26:2
**studios**
26:3
**subject**
60:11
**subparagraph**
73:23
**sued**
73:6,8 75:2
**suite**
32:6,11
**supposed**
86:5
**Supreme**
35:5
**sure**
29:9 37:24
61:14,23
73:9 82:8
**switch**
89:20

**T**

**take**
29:8 31:18
42:25 48:13
56:5,6 65:4

**taken**
51:7
**talking**
66:2 89:7
**technically**
56:17
**TECHNICIAN**
65:11,16
93:4
**technology**
28:2
**tell**
39:13 46:23
**telling**
39:24 59:19
**ten**
30:16
**tendency**
48:17
**term**
37:1,6,7,11
**terminate**
46:17
**terms**
37:5 38:1
**Terrace**
32:15
**testified**
79:15
**testimony**
51:5 53:6,25
72:22 79:18,
20 86:24
87:5,7,10
88:8,23
**thank**
40:6 62:9
63:18 74:8
**Thanks**
65:7
**thing**
52:12 55:9
78:3

**things**
48:19 55:14
85:25
**think**
26:19 27:10,
11 28:17
32:22 56:23
57:25 60:10
63:22
**thinking**
84:10
**third**
55:6 91:16
92:10,18
**thought**
30:1 70:12
**thousand**
53:9,10
**three**
27:12 36:2,
22 38:15,22
54:18 62:20
63:6,11
80:18 83:11
92:21
**time**
34:2 48:14
55:12 56:6
69:23 77:8
82:10
**times**
46:4 89:12
**told**
59:3 70:22
**top**
29:6 30:22
31:4,9,10
58:20 75:15
77:9 83:24,
25 86:18
88:14 92:15
**totality**
49:4
**totally**
86:7,19
**transcript**
56:16 62:8

66:24 67:7,
23 77:24
84:20

Luther Campbell
November 01, 2022

89:14

**transfer**
35:12

**transferred**
26:23 27:5
34:7,11
35:21,25
36:7,12,22
72:19

**transmittal**
56:14

**Trechsel**
56:9

**trial**
28:20

**trick**
53:20

**true**
47:1 54:25
58:22 70:23
74:20 83:7,
10

**try**
53:20

**trying**
55:15 66:8
86:23 87:4,
22

**two**
32:7 45:1,5,
21 49:23
50:1,19 51:1
55:13 62:19,
23 80:18
87:3 88:8
89:17

**type**
53:12,16

---

**U**

---

**undated**
31:5

**understand**
35:12 36:18
37:10 39:10
64:14,17

73:3,5 87:8,
9

---

**V**

---

**vague**
37:8 41:8
72:25 82:18
87:6 89:5

**valid**
79:19 80:5,
21 81:20,25
82:14

**verbal**
44:10

**version**
38:25 40:19
41:3,5

**vice**
59:11,21

**violate**
73:1

**voided**
79:4

---

**W**

---

**waived**
93:5

**want**
27:25 29:7,
14,21,24
30:15 31:17
36:16 37:13
39:13 40:4
53:21 54:16
56:5,13,19
63:3 66:2
69:20 74:5
77:21 88:23

**wanted**
76:8

**way**
51:18 58:23
76:20

**Weinberger**
33:24 34:4

71:21,25
72:4

**went**
35:5,9 57:25
61:13 91:19

**witness**
29:16,17
30:21 31:2
34:16 35:20
37:11 39:14,
24 44:18
45:4,24
46:23 49:25
50:17 51:2,
14 59:3,19
60:8,19,23,
25 69:2,6,
14,23 70:17,
19 73:5 75:2
78:1,3 87:9
90:23

**Wolfe**
26:6 27:22,
23,25 28:3,
17 29:3,9,18
30:25 31:3,
19 34:18
35:22 37:15
39:13,17,20,
23 40:6,10,
21 41:9,13
43:19,24
44:3,4 45:7
46:9,13,22
47:6 48:10,
11 50:3,6
51:4,19
56:8,13,21,
25 57:5,9,
10,24 58:4,
5,12,18,25
59:5,9,16,25
60:13 61:1,
2,14,17,23
62:10 64:7,
10,11,17,23
65:6,8,17,23
66:4,10

68:13,15
69:1,5,10,17
70:7,14,21,
24 71:4
73:11,17,18,
20,24 74:2,
5,9 75:3
77:20,25
78:6 82:21
88:7 89:15,
19,22,23
90:16,22,25
93:3

**Won**
57:17,18
62:13 66:16
67:4 75:9,
14,19,23
83:15,19
84:1,6,14,17
85:2,3,15,22
86:2,11,12,
20 87:3 89:2
90:1,3 91:9

**Won's**
63:20

**Wong**
57:17,18
62:13 66:16
67:4 75:8,
14,19,23
83:15,19
84:1,6,14,17
85:2,3,14,22
86:2,11,12,
20 87:3 89:2
90:1,3 91:9

**Wong's**
63:20

**words**
53:20

**work**
29:15 44:9,
11 74:14,15,
18 76:20
92:25

**worked**
26:8,12

Luther Campbell
November 01, 2022

 33:20,22,24
 75:11
**working**
 34:19,21,22
**works**
 51:18
**writers**
 26:16,20
**written**
 26:21 27:2
 35:13 49:12
**wrote**
 26:13,17,18
 74:20

---

**Y**

---

**y'all**
 48:17 62:25
**yeah**
 28:17,22
 29:17 30:11,
 19 43:17
 44:16 57:23
 60:7

Luther Campbell
November 01, 2022

U.S. Legal Support | www.uslegalsupport.com