# EXHIBIT D

LUTHER CAMPBELL

THE BOOK OF *Luke*

MY FIGHT FOR TRUTH, JUSTICE, ★ *and* ★ LIBERTY ★ *City* ★

the thick glasses. I thought, This is the kind of guy I need watching the farm, just a straight numbers guy to dot the i's and cross the t's. And Bailey & Hunt was one of the most reputable firms in Miami. I asked Weinberger to join Luke Records as my in-house counsel and chief financial officer, and he came over and joined the company.

For a while everything went great. I was a rock star on top of the world. The money was coming in, and the legal issues were being handled. The only major issue I had at the time was the breakup of 2 Live Crew. Since Weinberger was a tax attorney, he said we should bring in a litigator to handle the settlement. He recommended a guy he knew, a Cuban lawyer named Nicolas Manzini. Manzini didn't have a background in entertainment law, but he was a skilled negotiator, which is what Weinberger said we needed. I trusted his opinion and brought Manzini on for a $10,000-a-month retainer.

Manzini did a great job with the case. All the issues with Mr. Mixx and Marquis and Fresh Kid Ice, they were all settled pretty quickly. It was amicable, too. Marquis went and said some shit about me in the press, but that was just trying to stir up beef to promote this solo project he was trying to do. The truth is that we all walked away from the table on good terms. We just agreed that the ride was over and it was time for each of us to do his own thing.

The 2 Live Crew catalog was a huge piece of my business, and if that settlement had gone badly I might have had problems, but Manzini had done such a good job with it I agreed with Weinberger that he should handle another problem I had: MC Shy D. MC Shy D, also known as Peter Jones, was one of the first acts I'd signed to Luke Records. His albums sold okay in Florida and in the Atlanta area, but he was not a huge success. I dropped him after his first two albums, *Got to Be Tough* and *Comin' Correct*,

Case 1:21-cv-23727-DPG Document 70-4 Entered on FLSD Docket 02/09/2023 Page 4 of 15

and had paid him $95,645 in royalties on the two rec... was exactly what my records showed I owed him. But s... Mixx and Marquis, Jones felt he was entitled to more... and hired an entertainment lawyer, this guy Richard W... June of 1990 they sued me, saying I owed an additional...

The whole thing was a nuisance. This was coming... middle of the Broward trial and I had much bigger co... not going to jail for obscenity. I felt like, even with the... ous interpretation of the contract, Jones was owed maybe... fifty grand, and I was willing to settle for something in the... figures just to make it go away. That case had been l... months when Manzini and Weinberger came on board... Manzini on Wolfe to try and settle it.

Those guys were going back and forth when Jones... did some typical thug-rapper bullshit: he got in an ar... the parking lot of a club in Atlanta and shot a guy in the... ended up getting sentenced to a year in jail, and Wolfe re... leverage was slipping away. He offered to come down... and settle for $150,000. I'd have taken that deal in a he... but I'd never told Manzini I was willing to go that high... never brought me the offer. He rejected it out of hand... told him, ideally, I wanted to pay about fifty grand. But... have at least *told* me about the offer. It was a costly mista... meantime, Manzini was taking home $10,000 a mon... me almost as much as it would have taken to settle an... whole thing off my plate.

Was I paying as much attention to this as I should'... No. I was bunkered down with Bruce Rogow, worried... ing Acuff-Rose to the Supreme Court. I was putting al... tal energy over there, going to circuit court in Nashv... appeals court in Atlanta. It was costing me hundreds of... just to fight that case, and if I'd lost it would have cos...

Case 1:21-cv-23727-DPG Document 70-4 Entered on FLSD Docket 02/09/2023 Page 5 of 15

e two records, which
im. But same as with
ed to more. He went
ichard Wolfe, and in
additional $180,000.
s coming right in the
bigger concerns, like
with the most gener-
owed maybe another
thing in the mid-five
d been lingering for
on board, and I put

hen Jones went and
in an argument in
guy in the leg. Jones
d Wolfe realized his
e down thirty grand
eal in a heartbeat—
o that high, and he
of hand because I'd
grand. But he could
ostly mistake. In the
0 a month, costing
settle and take the

I should've been?
worried about tak-
utting all my men-
n Nashville, to the
dreds of thousands
have cost me hun-

dreds of thousands more. That was a big fucking deal. Compared to that, the MC Shy D case was nothing. It was nickel-and-dime shit, just some minor piece of business that I'd delegated to Manzini. I figured at some point he'd come back with a settlement for eighty, ninety grand or something and that would be the end of it.

Manzini rejected four other offers from Wolfe, and by the time Jones was out of prison, Wolfe refused to lower his offer and decided to go to trial in December of 1992. The only thing at issue was the accounting practices of Luke Records, whether or not they accurately reflected what Jones should be paid. Wolfe's contention was that the records were wrong. My contention was always that the records were spot-on. I wasn't running my shit out of a shit house. I wasn't hustling records out of my mamma's utility shed anymore. I'd hired professional CPAs, the best tax attorneys in town. As far as I knew, we had a record of every sale. We have catalog numbers. You go to the manufacturer and say, "How many copies of XR-102 did you press?" Then you go to the distributor, "How many XR-102 did you purchase?" Then you add and subtract. It's not difficult. I had all that information because that's how I kept track of what I was owed. You don't just lose stuff like that.

But Manzini made what turned out to be a crucial mistake. He tried to make a counterargument against Jones by saying that Luke Records had overestimated the number of records sold, so Jones had actually been *over*paid, that he owed money back to the label. But in making that argument, Manzini had agreed in principle that the records were not accurate, that my company had not been keeping its own books properly. Since Manzini wasn't an entertainment lawyer, he didn't know about a key legal precedent in the history of the record industry. It's the case of *Thomas v. Gusto Records*, which came out of Nashville in 1991, right around the time Jones first sued me. It's now considered a land-

Case 1:21-cv-23727-DPG Document 70-4 Entered on FLSD Docket 02/09/2023 Page 6 of 15

mark case in the business, but Manzini wasn't an entertainment lawyer, he was a Florida litigator, so he wasn't familiar with it.

B. J. Thomas, who wrote "Raindrops Keep Fallin' on My Head," sued his label and the court decided that whenever there is doubt about a record company's accounting of its sales, the artist is allowed to present expert testimony to determine the real sales figures. With his counterargument, Manzini had opened that door. Wolfe and Jones were able to bring in their own accountants to plow through my files and present the court with their estimate of what they thought the sales were, as well as what Jones's royalties ought to be based on that estimate. In October of 1994, after nearly four years of depositions and hearings and filings, the judge ruled that Luke Records owed this guy $1.6 million. By the time they added legal fees and punitive damages, it was $2.3 million.

When I heard that, I was shocked, floored. I said, "This is the craziest shit in the world." $1.6 million in royalties? You have to be doing 2 Live Crew–level sales to make that kind of money. MC Shy D never even came close to that. I knew Wolfe and his team had to be doing creative accounting of their own. First thing I did was call Weinberger and Manzini and say, "Let's fucking appeal." Manzini wanted to. He said we'd win. But Weinberger said we didn't have enough cash on hand to do it. To appeal a civil case in the state of Florida, you have to post a bond of 124 percent of the judgment just to start the process. I'd have to take $3 million in cash and set it aside to post the bond. Then there'd be years of legal expenses on top of that. I didn't care. I'd never shied away from a fight when I knew I was right. I said, "Fuck it. Put up the $3 million."

But I couldn't. I didn't have it.

While all this MC Shy D stuff was going on, 2 Live Crew had come back. They weren't gone but a year or two when they

realized shit
jumping aro
hire-type shi
a group witl
album that I
Horrible. Pr
It didn't l
careers, but
music from
soundtrack c
be a fun thin
decided to pu
label. I asked
what he cam
it was loaded
conditions th
any sense to
At the san
deal with So
tic, but now I
needed a big
hip-hop. Rath
tributors, I w
and consolida
firm handling
& Goldstein,
There was
codes. Switch
been beneficia
inventory, so t
old distributor
coming from

the money we'd be owed from Sony. We were insisting that Sony change the bar codes, and Sony didn't want to.

It was a Friday morning, maybe a week or so before Christmas. The MC Shy D decision had just come down six weeks before, and I was wrestling with how to resolve that. I was on my way to Canada to do a show that night. The way I recall it happening was that Weinberger came to me and told me that the lawyer from Grubman had called to say the contract was ready to sign. So I said, "Great. I'll stop off in New York on my way to Canada and sign the deal." And that's what I did. I swung by Sony's offices and signed the contract, but I should have reviewed it, or at least double-checked the bar code language, and I never should have signed it since it didn't come to me straight from my law firm. Monday morning I called Grubman to talk to my lawyer and tell him the contract was done. First thing out of his mouth was, "You did *what*? I didn't say the contract was ready to sign." The problem with the bar codes was still in the language of the deal, and I wasn't able to back out once I'd signed. What the hell had Weinberger done, telling me Grubman had okayed the contract to sign? Did he have some miscommunication with them? Did he deliberately have me sign a bad deal? Whatever was going on, between that and the contract he'd drawn up for 2 Live Crew, I started to get a bad feeling. I fired Weinberger. But I was too late.

A few days later, right around New Year's, my assistant Nikki got a call from Jose Armado, who ran Caribbean Cassettes, one of the local pressing plants I used to make my records. Armado was one of my best and oldest vendors; he'd built his business on the work that I brought him. He called that day looking for me, but I was out. He told Nikki that he'd received a disturbing phone call from Weinberger. He said that Weinberger had called him and told him that Luke Records was broke, that I was never going to pay him on the invoices that were outstanding from the past few

Case 1:21-cv-23727-DPG Document 70-4 Entered on FLSD Docket 02/09/2023 Page 8 of 15

months, and that he should join Weinberger in forcing me into bankruptcy. In Florida, if you have unpaid creditors, all it takes is three of them to band together and they can force you into what's called a Chapter 7, an involuntary bankruptcy, in an attempt to recover their debt. Armado said he told Weinberger, "No way." He never liked Weinberger. He called him a snake on the the phone call with Nikki. That's how he phrased it, "Tell Luther this snake just called me . . ."

The next couple of days, we started to piece together what was happening. We started reaching out to clients and vendors. A lot of them hadn't been paid properly, and they were getting calls from Weinberger trying to band them together to put me in Chapter 7. Why would my former CFO and in-house counsel be trying to force me into bankruptcy? It turned out that Weinberger had put himself in a position where he could say that Luke Records owed *him* money, too. A lot of money. I'd never asked Joe Weinberger for money in my life, as a loan or anything else, but he'd gone and put a few hundred thousand dollars of his own money into the company account, calling it a loan to help cover expenses. He insisted later that Luke Records had needed the cash. It didn't make any sense to me. You're the CFO and you see a cash flow problem, but you give the company a secret loan and you don't actually tell the head of the company that there's an issue? Whatever his motivation, this "loan" meant that Weinberger was now a creditor to the company, and since he was no longer an executive employee owing the company any kind of fiduciary duty, the door was open for him to come back around, find some willing partners, and drive me into bankruptcy.

Now don't that sound like some devious shit?

I sued Weinberger for tortious interference. On January 11, 1995, the court held a hearing on my request for an injunction to stop him from contacting anyone doing business with me. The

court found that Luke Records' reputation and ability to do business had suffered "irreparable harm" due to Weinberger's actions, and that there was "a substantial likelihood of success on the merits for a claim for interference." In plain English: the facts of the case were in my favor and I had a good chance of winning if I took him to trial.

The injunction was granted. But, again, I was already too late. One week before I filed for the injunction, on January 4, Weinberger had gone and filed incorporation papers for a new company: Lil' Joe Records. He was starting his own record label? Dude was a tax attorney. He didn't know the first thing about music. What acts was he planning to sign? How was he going to make money? All those questions would eventually be answered.

Despite the injunction, Weinberger had already made enough phone calls to convince a handful of my creditors to file for Luke Records to go into involuntary bankruptcy. As I recall, it was one of my distributors, a sound engineer who was owed about a thousand dollars, and one other guy. They filed the petition on March 28. At the same time, I was still trying to figure out what had happened with the Sony/Relativity deal. The new H-Town album, *Beggin' After Dark*, had just dropped. It was blowing up, already well on its way to being certified gold, and the money from that could have helped me take care of a lot of my problems. But Sony/Relativity wouldn't release any of the money from the album. They said there were too many losses being reported from previous distributors—the bar code issue.

Once the Chapter 7 petition was filed, I had to go and find a new lawyer to clean up the mess. She told me if I filed for Chapter 11, a voluntary bankruptcy and reorganization, I could preempt the involuntary bankruptcy, renegotiate the bad contract with Sony, and have at least some control over what was happening. So that's what I did. On June 12, 1995, Luke Records filed for Chapter 11.

When you file for
is send in an account
what's what: every as
ing debt that you owe
my accounts were in t
like Poison Clan and
statements. They were
money was. The press
they hadn't been getti
behind, 90 days in a
been notified about it,
oversee this kind of st
launching H-Town an
the person I hired to h

This accountant al
Weinberger had writt
Weinberger was allow
up to $3,000. The sa
had to be countersign
Bennett, but there was
write in a given period.
out to himself, sometin
and taking them to De
them. She said Weinber
bursement on the "loa
him for.

I don't recall exact
confronted Debbie abo
was going on. She put it
too much authority an
busy that whenever lega
in the habit of saying "A

Case 1:21-cv-23727-DPG Document 70-4 Entered on FLSD Docket 02/09/2023 Page 10 of 15

and ability to do busi-
› Weinberger's actions,
of success on the mer-
ıglish: the facts of the
ce of winning if I took

I was already too late.
on January 4, Wein-
ers for a new company:
ecord label? Dude was
ıg about music. What
;oing to make money?
wered.
already made enough
ditors to file for Luke
s I recall, it was one of
wed about a thousand
ition on March 28. At
t what had happened
Town album, *Beggin'*
g up, already well on
from that could have
. But Sony/Relativity
bum. They said there
evious distributors—

had to go and find a
if I filed for Chapter
ı, I could preempt the
ntract with Sony, and
ening. So that's what
ır Chapter 11.

When you file for bankruptcy, the first thing the court does is send in an accountant to go through your books and establish what's what: every asset and receivable you own, every outstanding debt that you owe. What this accountant uncovered was that my accounts were in terrible shape. The artists on my label, groups like Poison Clan and H-Town—they'd stopped receiving royalty statements. They were getting angry, wanting to know where their money was. The pressing plants and other vendors I worked with, they hadn't been getting paid, either. Their accounts were falling behind, 90 days in arrears, 120 days in arrears. I'd never even been notified about it, and I had brought Weinberger in as CFO to oversee this kind of stuff. This whole time my focus had been on launching H-Town and fighting the Acuff-Rose case. I trusted that the person I hired to handle it was handling it.

This accountant also uncovered a paper trail of checks that Weinberger had written to himself from the company. As CFO, Weinberger was allowed to write checks on the company account up to $3,000. The safeguard I had in place was that all checks had to be countersigned by myself or my office manager, Debbie Bennett, but there was no limit on the number of checks he could write in a given period. Weinberger had been making these checks out to himself, sometimes a stack of them in the space of a month, and taking them to Debbie—and she'd countersigned them. All of them. She said Weinberger had told her these checks were for reimbursement on the "loan" he'd given me—the loan I never asked him for.

I don't recall exactly the number of checks, but it was a lot. I confronted Debbie about it. I thought she had to be in on whatever was going on. She put it back on me. She said I'd given Weinberger too much authority and too much say in the company. I'd been so busy that whenever legal or financial issues had come up I'd gotten in the habit of saying "Ask Weinberger. Talk to Weinberger. Check

with Weinberger." She'd grown accustomed to taking Weinberger's word as mine. If he said it, she assumed it was either coming from me or it was something I knew about. So she'd deferred to him without question.

She wasn't wrong about the blame being on me. I trace it back to one terrible, regrettable decision on my part. Back before I hired Weinberger, my accountant was this guy Sharpton, from one of the top black accounting firms in Miami. After Weinberger came in, he was always coming to me with complaints about Sharpton: Sharpton didn't use the right bookkeeping system, this and that. Weinberger kept saying he couldn't work with the guy and he wanted to bring in a new accountant he had a good working relationship with.

I never went to business school. All my decisions on how to run Luke Records came from instinct. My approach to the label came from my background in sports. I thought of that company like a team. I was the coach, and my management team was my coaching staff. When you're a head coach and you bring in a new offensive coordinator, you usually let him bring in his own guys, the people he works best with, his own quarterback coach, his own running back coach. So when Weinberger said he'd work better with someone else instead of Sharpton, I said, "Okay. You're handling the money. That's your crew. You staff it however you think is best."

Because I was thinking of my company like a team, I wasn't thinking about checks and balances, having competing forces to keep tabs on each other. I still believe if I'd kept Sharpton, he would have served as that needed counterbalance and notified me of all the financial trouble spots that were later revealed in the bankruptcy court. By the time I was stuck in the middle of the bankruptcy, it was too late. I'd spent thousands on lawyers. My money was tied up in mortgages, recording studios, all the things I used to run the business. I couldn't believe it, but it was true: Luke Records was broke.

I spent the next y
picked over and divvi
tors. My yacht, gone.
The property I owned
parents' house, gone. I
mortgage company to
They took that, too.

Then came the final
lect on his so-called "
that Weinberger and R
to law school together.
going on there, or was
to me at the time. Beca
my biggest single credi
serve as a liquidating tr
of the company's assets
most of the Luke Recor
my masters, to his old fr
that's maybe a tenth of
table with a better offer
catalog was now the pr
Weinberger had conveni
ing me into Chapter 7.
H-Town and taking that.
name, some of the publis

The bankruptcy judg
22, 1996. As part of t
$800,000 paid to the ba
Crew and the Luke Reco
ment directly to me to cl
paid me $10. The largest
in America, the biggest p

·d to taking Weinberger's
was either coming from
o she'd deferred to him

ıg on me. I trace it back
part. Back before I hired
ıarpton, from one of the
Weinberger came in, he
about Sharpton: Sharp-
m, this and that. Wein-
ıe guy and he wanted to
ırking relationship with.
lecisions on how to run
:oach to the label came
of that company like a
team was my coaching
ring in a new offensive
s own guys, the people
ɔach, his own running
vork better with some-
y. You're handling the
'er you think is best."
like a team, I wasn't
ing competing forces
I'd kept Sharpton, he
lance and notified me
later revealed in the
in the middle of the
ands on lawyers. My
:udios, all the things I
but it was true: Luke

I spent the next year in bankruptcy court, my assets being picked over and divvied up by lawyers from all my major creditors. My yacht, gone. The nightclub I'd bought in Pensacola, gone. The property I owned, with the exception of my house and my parents' house, gone. I'd also started a real-estate development and mortgage company to develop housing in black neighborhoods. They took that, too.

Then came the final twist. Weinberger did more than just collect on his so-called "loan" to Luke Records. I came to find out that Weinberger and Richard Wolfe, MC Shy D's lawyer, had gone to law school together. They were friends. Was another conspiracy going on there, or was I just paranoid? I know what it looked like to me at the time. Because of the court judgment, MC Shy D was my biggest single creditor. Wolfe was appointed by the court to serve as a liquidating trustee; his job was to oversee the dissolution of the company's assets. As part of that, he approved the sale of most of the Luke Records catalog, including 2 Live Crew and all my masters, to his old friend Joe Weinberger for $800,000. I'd say that's maybe a tenth of what it was worth, but no one came to the table with a better offer and the court signed off on the sale. My catalog was now the property of Lil' Joe Records—the new label Weinberger had conveniently thought to incorporate while forcing me into Chapter 7. Sony ended up breaking off the rights to H-Town and taking that. I got to keep my office, the Luke Records name, some of the publishing rights, but my business was gutted.

The bankruptcy judge approved the final settlement on March 22, 1996. As part of the final settlement, in addition to the $800,000 paid to the bankruptcy trustees for the rights to 2 Live Crew and the Luke Records catalog, Weinberger did make a payment directly to me to close the transaction. Per the agreement, he paid me $10. The largest independent, black-owned record label in America, the biggest piece of black-owned intellectual property

Case 1:21-cv-23727-DPG Document 70-4 Entered on FLSD Docket 02/09/2023 Page 13 of 15

in the history of hip-hop up to that point, and all I got for it was ten lousy bucks.

But when Weinberger bought the rights to my catalog, he didn't buy the rights to me. I wasn't signed as an artist to my own label. Luther Campbell never had a contract with Luke Records, because why would I need a contract with myself? If Weinberger thought he could own me he was dead wrong. I'll never let anybody own me. While the bankruptcy was being settled, I couldn't use the Luke Records name for anything, so I formed a separate company, Luther Campbell Music, and made a one-off distribution deal with PolyGram. I wanted to put out an album right away so the world would know: Luke ain't dead.

I went into the studio angry and came out with my biggest album yet: *Uncle Luke*. I brought in the best talent in the country: Ice Cube, Trick Daddy, Verb, the Notorious B.I.G. The single from the album, "Scarred," blew the fuck up. Hottest record in the damn country. Some new Luke shit. You couldn't walk into a club anywhere in America without hearing it. *Uncle Luke* hit No. 8 on the R&B/Hip-Hop Albums chart. "Scarred" went to No. 64 on the *Billboard* Hot 100 Singles and to No. 7 on the Hot Hip-Hop Singles. Even with everything they threw at me, I could still make a hit record as good as anyone in the business. It was a testament to the fact that even though I was hurt, I was gonna get better because I was tough.

The producers and rappers who worked with me on that album, they stood by me in a tough time. When you go through something like what I went through, you find out who your friends really are. You lose your money, people are out trashing your reputation, and you see who stays and who runs for the exit. H-Town left and went with Sony. A year later they were on BET, talking about how Luke put chains on their legs and now they were free. But I bet they never got the love over there that they'd had with Luke Records.

Within a coup
nowhere.

I've never t
about Joe Wei
earth, after he
Records and h
Miami in a pin
ing around Mi
wearing all thi
crusted Rolex

The other
Mixx and Ma
and it must h
ended up suing
never come clo
perform togeth
Weinberger's s

After it was
mad at mys
go broke, they
and hookers. I
differently, but
could with the

To this day
if he never brok
At a minimum,
advantage of t
against the rac
DJs, against the
against the slea

t, and all I got for it was

s to my catalog, he didn't
n artist to my own label.
h Luke Records, because
? If Weinberger thought
I never let anybody own
ttled, I couldn't use the
ned a separate company,
off distribution deal with
right away so the world

ne out with my biggest
best talent in the coun-
orious B.I.G. The single
ıp. Hottest record in the
ouldn't walk into a club
*Uncle Luke* hit No. 8 on
ed" went to No. 64 on
7 on the Hot Hip-Hop
t me, I could still make
ıess. It was a testament
I was gonna get better

with me on that album,
ı go through something
your friends really are.
ıg your reputation, and
H-Town left and went
ılking about how Luke
re free. But I bet they
d with Luke Records.

Within a couple years, H-Town's career dried up and they went nowhere.

I've never been more wrong about a human being than I was about Joe Weinberger. This guy I'd pegged as the nerdiest nerd on earth, after he bought out my catalog he went and took Lil' Joe Records and he started signing up groups. He was driving around Miami in a pimped-out Jaguar. This little Jewish tax attorney, riding around Miami with a baseball hat turned around backward, wearing all this jewelry, big gold chains, a blinged-out, diamond-crusted Rolex watch, all these fat gold rings. It was crazy.

The other guys from 2 Live Crew, they didn't stick around. Mixx and Marquis and Fresh Kid Ice, they signed with Lil' Joe, and it must have been pretty terrible for them because they all ended up suing each other to try and get out of the deal. They've never come close to the level of success we once had, and they can't perform together or even use the name 2 Live Crew without Joe Weinberger's say-so. He owns them.

After it was all over I did a lot of soul-searching. Should I be mad at myself? Should I kick myself? No. Most musicians who go broke, they don't pay their taxes, they blow it all on cocaine and hookers. I made an error in judgment. I wish I'd done things differently, but I sleep easy knowing I made the best decisions I could with the information and experience I had at the time.

To this day Weinberger insists he did nothing illegal. But even if he never broke the law that doesn't mean he didn't do me wrong. At a minimum, when I was in a bad spot he turned on me and took advantage of the situation. My whole career I'd been fighting—against the racist cops who tried to shut down the Ghetto Style DJs, against the moral majority wing-nuts who tried to censor me, against the sleazy record executives who wanted to screw me. I'd

Case 1:21-cv-23727-DPG Document 70-4 Entered on FLSD Docket 02/09/2023 Page 15 of 15

been so busy looking for sharks in the water I hadn't kept an eye out for snakes in the grass in my own backyard.

At the time all the shit came down, I was seeing red. I felt the same as I did after Handsome Harry was killed and I shot up that car. Weinberger, Wolfe, Manzini, all of them, I wanted to blow their fucking heads off. I wanted to go chop them up into little pieces. I still had that thug voice going in the back of my mind, but I had to think about my kids, what a stupid waste it would be for me to spend my life in jail because of anger over what somebody else did.

I did feel like I had a claim to pursue in court. As the judge in my tortious interference case said, I had a "substantial likelihood of success" based on the facts. Between the $3,000 checks, the calls to my creditors, what if anything had gone on with the signing of the Sony/Relativity deal, I believed if I pressed it I could prove what I believed then and still believe to this day: that there was a deliberate attempt to sabotage my business and drive me into bankruptcy, a hostile takeover from start to finish. I'll never know for sure because I decided to let it go. By that point I'd been dragged down in court proceedings for five years, ever since Broward. I'd thrown good money after bad, easily a million dollars, paying lawyers for this, that, and the other. My resources were already strapped. Did I want to pour those last remaining resources into another lawsuit and spend another five years in court with a whole bunch of other lawyers, or did I want to take what I had left and get on with the things that are important to me in life?

It wasn't a difficult choice. As part of the bankruptcy settlement, I signed a General Release and Hold Harmless Agreement, releasing Joe Weinberger and Lil' Joe Records from any and all future claims, damages, or demands. The same with Sony and everybody else. I washed my hands of the whole thing. I paid my creditors what the court said I had to pay, I took my $10 check

from Joe Weir
with it. I reall
it, and he has
live in an etern
because he's a
from exploiting
out there sellin
shit. Knowing
for me.