# EXHIBIT E

LIL' JOE RECORDS, INC. vs MARK ROSS, ET AL.
Joseph Weinberger on 10/26/2022

```
 1              UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF FLORIDA
 2

 3              CASE NO. 1:21-CV-23727-DPG

 4
    LIL' JOE RECORDS, INC., a Florida
 5  corporation,

 6       Plaintiffs,

 7  v.

 8  MARK ROSS, CHRISTOPHER WONG
    WON, JR., RODERICK WONG WON,
 9  LETERIUS RAY, ANISSA WONG WON
    and LUTHER CAMPBELL,
10
         Defendants.
11

12  _____/

13
    DEPOSITION OF:    JOSEPH WEINBERGER
14                    (LIL' JOE RECORDS, INC.)

15  TAKEN BY:         DEFENDANTS

16  DATE:             OCTOBER 26, 2022

17  TIME:             10:57 A.M. - 3:46 P.M.

18  PLACE:            ZOOM VIDEOCONFERENCE

19  STENOGRAPHICALLY
    REPORTED BY:      KRISTINA ESSIG, RPR
20                    NOTARY PUBLIC, STATE OF FLORIDA

21

22

23

24

25
```

**Page 62**

1  I want you to see the whole exhibit and
2  tell me if you see any other discrepancies or
3  issues with the agreement.
4       MR. WOLFE: No. Here's my objection.
5       I would like him to read the whole
6  document, not as to being scrolled.
7       If you'd like, I could print the
8  document, show it to him, and give him an
9  opportunity to read it.
10      MR. BURROUGHS: We're going to do that on
11 the record. If you -- again, you can take as
12 much time as you need.
13      MR. WOLFE: Let me print out the document
14 and give it to him. If you -- the first one you
15 showed him was a 28-page document that you
16 scrolled through and didn't give him an
17 opportunity to really read.
18      THE WITNESS: Also, it seems like these
19 contracts are not -- don't have specific dates
20 on them.
21      MR. BURROUGHS: Uh-huh, okay.
22      We'll keep scrolling here.
23      Keep going all the way to the end so you
24 can see the entire exhibit.
25      THE WITNESS: Well, it seems like on some

**Page 63**

1  of the pages, there's no page numbers; seems to
2  be cut off.
3       MR. WOLFE: Scott, here's my suggestion.
4       As you're going by, it appears as though
5  these are exhibits to our complaint.
6       MR. BURROUGHS: Well, I'm going to just
7  -- there's a situation pending here. I don't
8  need to -- unless you want to make an objection,
9  I wouldn't like any speaking on the record.
10      MR. WOLFE: Then I'm going to instruct
11 him not to answer a thing about these documents
12 as you're flipping by them and not giving him an
13 opportunity to read them.
14      So with that, I'm instructing him not to
15 answer any questions, unless you give a full
16 and complete opportunity to read what appears
17 to be 86 pages of documents.
18      MR. BURROUGHS: Yeah, please take all the
19 time you need.
20      MR. WOLFE: He can't.
21      You're flipping through it.
22      MR. BURROUGHS: I hear you saying that,
23 but I don't -- you know, please, if you need
24 more time on any of these pages. I know it's 86
25 pages, but they appear to be the, you know --

**Page 64**

1       MR. WOLFE: He's not going to answer any
2  more questions --
3       MR. BURROUGHS: -- multiple copies of the
4  same agreement to me. But if you need more
5  time, please let us know, we're not trying to
6  rush you.
7       MR. WOLFE: But it's not your deposition.
8       It's his deposition.
9       You're showing him 86 pages of three
10 different contracts that you're flipping
11 through at a speed that no one can possibly
12 read them and comprehend them.
13      So, therefore, I am instructing him not
14 to answer any questions until he's had the
15 opportunity to review all 86 pages, which I'm
16 willing to print out and give him that
17 opportunity to do so, but you've refused that
18 request, so I am instructing him not to answer
19 any questions at this time under these
20 circumstances.
21 BY MR. BURROUGHS:
22      Q.   Okay. Now, do you want to go back to any
23 pages or any sections of the agreement to take
24 another look?
25      MR. WOLFE: Same instruction.

**Page 65**

1       Don't answer the question.
2       And, again, I'll repeat, I'm willing to
3  print out all 86 pages and give him the
4  opportunity to read it, not as you're flipping
5  through, and -- and because any answer that he
6  gives will only misconstrue his response, which
7  would be inaccurate, unless he had the
8  opportunity to review the document.
9  BY MR. BURROUGHS:
10      Q.   Have you ever seen this document before?
11      MR. WOLFE: Same instruction.
12 BY MR. BURROUGHS:
13      Q.   Okay. And are you going to take your
14 attorney's instruction and not answer questions about
15 this contract?
16      A.   Yes.
17      Q.   Okay. Now, earlier you had indicated that
18 one issue with the contract that you did see was that
19 it was missing dates. What do you mean by that?
20      A.   On the first page of the document, it says
21 blank day of, and the month. It didn't have the date
22 filled in.
23      Q.   Okay. And you mentioned that some of the
24 pages appeared to be cut off because they were
25 missing page numbers; is that accurate?

**Page 66**

1  A.  Yes.
2      MR. WOLFE:  Again, you're flipping
3  through the pages.  He doesn't have an
4  opportunity to review every page of a moving
5  document.
6      MR. BURROUGHS:  Listen, you've made your
7  objection and instructed him not to answer on
8  this contract, so you've taken that position.
9      We, of course, reserve all rights to
10 move to exclude it because of that instruction,
11 but I'll move on to some -- some other
12 questions.
13     MR. WOLFE:  You can't show him a document
14 that is moving and expect him to be able to read
15 it.  It's unreasonable --
16     MR. BURROUGHS:  He can take as long as he
17 wants, but you've taken your position.
18 That's -- that's, you know, I can't force him to
19 answer, so, like I said, we reserve our rights
20 to move in limine to exclude this particular
21 agreement.
22     MR. WOLFE:  And just so we're clear, I've
23 proffered that I'll print out the document and
24 give him the opportunity to review it so he can
25 then answer whatever question you'd like to

**Page 67**

1  give.  If you find that --
2  BY MR. BURROUGHS:
3      Q.   So do you have a copy of this contract in
4  your records?
5           MR. WOLFE:  Same instruction.
6  BY MR. BURROUGHS:
7      Q.   Have you ever seen a version of this
8  contract with any exhibits or schedules?
9           MR. WOLFE:  Same instruction.
10 BY MR. BURROUGHS:
11     Q.   And do you know which songs or albums this
12 exhibit covers?
13          MR. WOLFE:  Same instruction.
14 BY MR. BURROUGHS:
15     Q.   And do you believe that this contract
16 relates in any way to the works at issue in this
17 case?
18          MR. WOLFE:  Same instruction.
19 BY MR. BURROUGHS:
20     Q.   And, again, you're going to take your
21 attorney's instruction and not answer, correct?
22     A.   Excuse me?
23     Q.   You're taking your attorney's -- he can
24 instruct you, but you have to say that, yes, you're
25 taking the instruction --

**Page 68**

1  A.  Yes.
2  Q.  -- in not answering, okay?
3  A.  Yes.
4  Q.  Okay.
5      MR. WOLFE:  And, again, if you want to
6  give him an opportunity to read the document, a
7  reasonable opportunity, he'll answer whatever
8  you'd like put before him.
9  BY MR. BURROUGHS:
10     Q.   Did you provide any contracts to your
11 attorney in connection with this case?
12     A.   Did I provide?  Just copies that I may have
13 had in my files.
14     Q.   How many contracts did you provide to your
15 attorney?
16     A.   I don't know.
17     Q.   One?
18     A.   I would say there's more than one contract.
19     Q.   What's your best estimate as to how many
20 contracts you provided to your attorney?
21     A.   Recording contracts, or what kind of
22 contracts?
23     Q.   Contracts.
24     A.   A bunch.
25     Q.   Between five and ten?

**Page 69**

1  A.   Could be.
2  Q.   Is that your best estimate?
3  A.   It could be more than ten.  I don't know.
4  I'd have to go back and look.
5  Q.   How many recording contracts did you
6  provide to your attorney in connection with this
7  action?
8  A.   I don't remember.
9  Q.   What would be your best estimate?
10 A.   I don't remember.
11      That's all I could tell you.
12 Q.   So as you sit here today, you don't recall
13 how many recording contracts you provided to your
14 counsel, correct?
15 A.   I -- it was a while ago.  I don't remember.
16 Q.   Do you recall providing any recording
17 contracts to your attorney in connection with this
18 case?
19 A.   Yes.
20 Q.   Do you recall who they were between?
21 A.   No.
22 Q.   Do you recall who hired Nicolas Manzini to
23 handle matters for Luke Records?
24 A.   Luther Campbell.
25 Q.   And were you involved in that decision at

Page 90

1  A. It's what my lawyers listed, that's what
2  I'm aware of.
3  Q. Okay. Where is that listed?
4  A. In the -- in the documents that I told you
5  about. In the complaint and in the responsive
6  pleadings.
7  Q. Okay. Are they listed anywhere else?
8  A. Like, we keep on going through the same
9  thing. Like, I don't -- I don't know why you keep
10 asking the same question.
11 Q. Just yes or no.
12 A. It's in the complaint and in the responsive
13 pleadings.
14 Q. Okay. And now, is it anywhere else?
15 A. It's in the complaint and the responsive
16 pleadings.
17 Q. If it's anywhere other than those two
18 places, let me know now.
19 A. Do you want to go on, or are you going to
20 keep asking the same question?
21 Q. Well, I'm just giving you an opportunity to
22 identify anywhere else, and you haven't, so I can
23 move on for the record.
24 A. I'm -- I'm not aware of any -- anywhere
25 else.

Page 91

1  Q. **How did the members of 2 Live Crew first**
2  **transfer their copyrights in the subject albums?**
3  A. **I don't know.**
4  Q. Do you know who they transferred them to?
5  A. I don't know.
6  Q. Do you have any understanding as to how any
7  record company came to own the copyrights for the
8  sound recordings to the subject albums?
9  A. It was sold to me in the bankruptcy.
10 Q. By whom?
11 A. Luke Records and Luther Campbell.
12 Q. Who sold you the copyrights for the sound
13 recordings for the subject albums?
14 A. I just told you. Luther Campbell and Luke
15 Records.
16 Q. Was it both of them?
17 A. I believe so.
18 Q. Do you know which of them owned which
19 rights?
20 A. I don't know.
21 Q. Which rights did Luke Records sell you?
22 A. I don't know. I -- I don't have the
23 documents in front of me, so I can't tell you.
24 Q. Which rights did Luther Campbell sell you?
25 A. I just told you. I don't have the

Page 92

1  documents in front of me, so I can't tell you.
2  Q. How did Luke Records obtain those
3  copyrights?
4  A. I'm not sure.
5  Q. How did Luther Campbell obtain those
6  copyrights?
7  A. I'm not sure.
8  Q. Do you have any understanding as to how
9  they obtained any copyrights that they then
10 transferred to you?
11    They're in the documents.
12 Q. Other than that, do you have any
13 understanding?
14 A. They transferred documents in the
15 litigation, so this stuff got transferred.
16 Q. Understood.
17    And that's how it got transferred to Luke
18 Records, is that your testimony?
19 A. The litigation. The litigation was
20 after -- afterwards.
21 Q. Right. And so my question is, how did Luke
22 Records obtain those copyrights?
23 A. I don't know. I told you that.
24    I don't know.
25 Q. And how did Luther Campbell obtain those

Page 93

1  copyrights?
2  A. I'm not specifically sure.
3  Q. Do you know anything about how he obtained
4  those copyrights?
5  A. Other than what Allen Jacobi told me, that
6  there was a contract that he drafted, I believe those
7  contracts in 1991, I -- I believe were the only
8  contracts.
9  Q. Okay.
10 A. Based on what Allen Jacobi told me.
11 Q. Do you have any other basis for that
12 understanding?
13 A. Other than, you know, like the bankruptcy,
14 the bankruptcy transferred documents, and the
15 subsequent litigation with the individual members
16 where they raised the issues as to whether I owned
17 this thing, where it was resolved in that litigation.
18 Q. Okay. But those were transfers to Lil'
19 Joe, right, not Luke?
20 A. I think that there's agreements in 2008 or
21 2010 with Ross and Wong Won where they acknowledge
22 that all of the stuff that was transferred from Luke
23 Records to me was -- everything that was transferred
24 back then.
25 Q. Any other basis?

Page 102

1  Page No. 4 of the letter, 2 Live Crew IS What We Are
2  is the title, publication date is December 1, 1986.
3         Does that reconcile with your recollection
4  when that album was published?
5     A.    I'm not sure.
6     Q.    Okay.  We're going to put an exhibit in
7  front of you we're going to mark as Exhibit 4.
8         (WHEREUPON, Defendants' Exhibit 4 was
9         marked for identification.)
10 BY MR. BURROUGHS:
11    Q.    I want you to take a look at it and tell me
12 if you recognize it.
13         I'll scroll through it.  If you want us to
14 go faster or slower, let us know.
15         Okay.  Do you need to go back and see any
16 specific pages or look at anything for a longer
17 period of time?
18         MR. WOLFE:  I'm going to object.
19         You've shown him about 40 pages of
20    documents in a scroll-through fashion.  He
21    couldn't possibly take in, comprehend, remember
22    any one of those pages.  It's impossible.
23 BY MR. BURROUGHS:
24    Q.    Do you need any more time to see any of the
25 pages?  We're happy to give you more time, as with

Page 103

1  all of the exhibits, to -- to review it so you feel
2  comfortable.
3         MR. WOLFE:  Sure.  If you want me to
4     print them out, I'll give him the time to do it.
5  BY MR. BURROUGHS:
6     Q.    Do you want to look at any of these pages?
7         MR. WOLFE:  Same objection.
8  BY MR. BURROUGHS:
9     Q.    Go ahead.
10         MR. WOLFE:  How would we know which page
11    to look at when you've flipped through 50 pages
12    of documents?
13         MR. BURROUGHS:  I think it's 32, but,
14    again, if you --
15         (Cross-talk.)
16         MR. WOLFE:  That's my point.
17         How would he be able to calculate?
18 BY MR. BURROUGHS:
19    Q.    Do you want to go to any particular page,
20 or no?
21         MR. WOLFE:  Same objection, and I'm going
22    to instruct him not to answer until you give him
23    the opportunity to read all 32 pages, which I'm
24    happy to do if you want to send me the document,
25    I'll print it out, and I'll give it to him.

Page 104

1  BY MR. BURROUGHS:
2     Q.    Are you going to take your attorney's
3  instruction?
4     A.    Yes.
5     Q.    All right.  So I'll ask you -- so
6  understanding that you are refusing to testify about
7  the matters in Exhibit 4, which appear to me to be
8  copyright registrations, we'll move on and we won't
9  ask questions on those.
10         But, of course, we reserve the right --
11         MR. WOLFE:  Object to form.  Live
12    statement.
13         MR. BURROUGHS:  -- to move in limine as
14    mentioned before for the basis given on the
15    record before.
16 BY MR. BURROUGHS:
17    Q.    Were you involved in preparing any
18 copyright registrations at any of the record labels
19 that Mr. Campbell owned?
20    A.    No.
21    Q.    Okay.  Have you received any copy --
22    A.    I don't -- I don't believe so.
23    Q.    Okay.  Have you ever seen any of those
24 copyright registrations?
25    A.    I believe Mr. Black got me copies of them

Page 105

1  because I was never given any copies of the
2  documents.
3     Q.    Okay.  Do you recall ever reviewing those
4  registrations?
5     A.    No.
6     Q.    Did Luke Skyywalker Records, Skyywalker
7  Records, or Luke Records ever claim that any of the
8  subject albums were works for hire?
9     A.    I don't -- I don't know.
10    Q.    Are you aware of them ever making such a
11 claim?
12    A.    I'm not sure.  I don't know.
13    Q.    Okay.  And isn't it true that the
14 registrations that were filed for the subject works
15 did not indicate that the subject works were works
16 for hire?
17    A.    I -- whatever the documents say they say,
18 they say.
19    Q.    Okay.  And you certainly don't recall ever
20 seeing a registration that stated that they were
21 works for hire, correct?
22    A.    I believe the sound recordings state that.
23    Q.    Okay.  Any others?
24    A.    I'm not sure.
25    Q.    Let's pull down Exhibit 4 and we'll put up

**LIL' JOE RECORDS, INC. vs MARK ROSS, ET AL.**
Joseph Weinberger on 10/26/2022                                Pages 130..133

Page 130

```
 1   A.   Probably, like, 1991.
 2   Q.   Okay.  They certainly didn't tell you that
 3   contemporaneous with the recording of the subject
 4   albums, correct?
 5   A.   Right.
 6   Q.   In fact, you have no knowledge about any
 7   agreements that were reached by the members of 2 Live
 8   Crew related to copyright ownership contemporaneous
 9   with the creation of the subject albums, correct?
10   A.   The '91 agreements and the subsequent
11   agreements.
12   Q.   All of which were executed afterward,
13   correct?
14   A.   Executed after what?
15   Q.   The creation of the subject albums.
16   A.   They were created -- I think they were
17   executed, the ones with my company were before this
18   stuff was created.
19   Q.   When you say "this stuff," you're referring
20   to the subject albums?
21   A.   Yes.
22   Q.   Isn't it true that your company was founded
23   in 1991?
24   A.   No.
25   Q.   When was your company founded?
```

Page 131

```
 1   A.   '95.
 2   Q.   Okay.  And weren't the subject albums
 3   created in the late '80's?
 4   A.   No, I'm not talking about these original
 5   albums.  You asked me if I had, um, the albums that I
 6   did with them were done after the fact.  Like, the
 7   agreements were done after the fact.
 8   Q.   There must have been a miscommunication.
 9        Let me rephrase and attempt to clarify.
10        Isn't it true that -- that you had no
11   conversations with any -- well, actually, let me
12   withdraw that so I can try to mirror the prior
13   question.
14        Isn't it true that you have no
15   understanding of any agreements between the members
16   of 2 Live Crew relating to copyright ownership for
17   the subject albums that are contemporaneous with the
18   creation of those albums?
19   A.   Other than they all told me that there were
20   no agreements.
21   Q.   And that was afterward, correct?
22   A.   Yes.
23   Q.   In fact, in 1987, you weren't involved with
24   the members of 2 Live Crew at all, were you?
25   A.   No.
```

Page 132

```
 1   Q.   Were you involved with them at all in 1998?
 2   A.   '98, yes.
 3   Q.   What about 1988?
 4   A.   Yes.
 5   Q.   When -- what was your first involvement
 6   with them in 1988?
 7   A.   I had met them.
 8   Q.   Okay.  So other than just meeting them, you
 9   had no involvement with them or their careers,
10   correct?
11   A.   Like, I wasn't managing them.
12        They weren't my clients.
13   Q.   Okay.  They were just people that you had
14   met, correct?
15   A.   Right.
16   Q.   And the same in 1989?
17        Yes.
18   Q.   And the same in 1990?
19   A.   Yes.
20   Q.   Do you contend that the agreement in
21   Exhibit 9 is falsified or altered in any way?
22   A.   I don't believe it's a valid agreement.
23   Q.   Understood.
24        But do you believe that it's been falsified
25   or altered in any way?
```

Page 133

```
 1   A.   There was a prior agreement that you
 2   produced that was altered that's different than this.
 3   Q.   Now, remember to try to answer the question
 4   that I'm asking, okay?
 5        I'm asking about Exhibit 9.
 6        Do you have any reason to believe that it's
 7   been altered or modified in any way?
 8   A.   I don't believe it's a valid agreement.
 9   Q.   I understand that, but do you believe that
10   it's been altered or modified in any way?
11   A.   Other than it's not a valid agreement, it
12   seems that it was created after the fact with a set
13   of facts that don't make any sense, which I've gone
14   over repeatedly with you.
15   Q.   Okay.
16   A.   And I'm not going to keep on, you know,
17   answering the same -- same thing over and over.
18   Q.   So is it fair to say that other than that,
19   you don't have any reason to believe that this
20   exhibit has been falsified or edited in any way,
21   correct?
22   A.   I'm not going to answer the questions
23   anymore.
24   Q.   If you have any reason to believe so, I'll
25   give you a moment now to tell me.
```

**Page 150**

1   that they had no right to do it.
2           And he said that I didn't need to worry
3   about it and I was kind of, like, shocked when
4   I got a notice from your office --
5       Q.   Any other reasons?
6       A.   -- where they signed it.
7           Like, he had attempted to borrow money from
8   me a couple of times, either five of $15,000 a clip.
9       Q.   Any other reason?
10      A.   Any other reason with what?
11      Q.   Why you may have discussed the -- or I
12  should say any other occasion on which you had
13  discussed the Section 203 rights with anyone else
14  other than Hobbs?
15      A.   I told you, Wong Won, Junior.
16      Q.   And -- correct.
17           Anything -- any other occasion than that?
18      A.   I don't recall with Ross.
19      Q.   And is it your position that you didn't
20  have to discuss the Section 203 right, or the
21  transfer of it, because it was part of the Luke
22  bankruptcy estate?
23      A.   As part of the Luther Campbell bankruptcy
24  estate and the Mark Ross bankruptcy estate.
25           And it would have been part of the David

**Page 151**

1   Hobbs bankruptcy estate, as well.  Because David
2   Hobbs had also filed bankruptcy.
3       Q.   And did you purchase the termination right
4   in any of those bankruptcies?
5       A.   No.  It was with the bankruptcy trustee, as
6   part of the bankruptcy trustee owned the rights.
7       Q.   And other than the 1991 agreement that we
8   discussed and the agreement relating to '87, which
9   you dispute, but which we discussed, are you aware of
10  any other recording agreement between all members of
11  2 Live Crew and a record label owned by Mr. Campbell
12  or you?
13      A.   All members meaning all four members --
14      Q.   All four members.
15      A.   -- or all the members at one particular
16  time?
17      Q.   All four members.
18      A.   No.
19      Q.   I'm going to put a document in front of --
20  well, let me ask you this.
21           At your offices, do you keep agreements and
22  paperwork in manila folders or binders or in some
23  other way?
24      A.   In various ways.
25      Q.   Okay.  Is -- do you keep some documents in

**Page 152**

1   folders?
2       A.   I would think so, yeah.
3       Q.   Okay.  Let me put an exhibit in front of
4   you we're going to mark as Exhibit 12.
5           (WHEREUPON, Defendants' Exhibit 12 was
6           marked for identification.)
7   BY MR. BURROUGHS:
8       Q.   I want you to take a look at this and tell
9   me if you recognize it.
10          Do you recognize that folder?
11      A.   No.
12      Q.   Have you ever seen it before?
13      A.   I don't -- I don't know where that came
14  from.
15      Q.   Okay.  Do you recognize the form of the
16  label on that folder?
17          MR. WOLFE:  Scott, it was inadvertently
18  produced to you.  We'd appreciate it if you
19  dispose it.
20  BY MR. BURROUGHS:
21      Q.   Go ahead.
22          Are you still thinking or...
23          MR. WOLFE:  No, no.  You -- no, it was
24  inadvertently produced, so he's not going to ask
25  any questions about it.

**Page 153**

1           MR. BURROUGHS:  How was it inadvertently
2   produced?  It's Bates stamped and it looks --
3   appears to reference this disputed -- the heart
4   of this dispute.
5           MR. WOLFE:  I just explained to you, it
6   was inadvertently produced.  It was sent
7   together with a stack of documents to be copied.
8   It should have been pulled out.
9   BY MR. BURROUGHS:
10      Q.   Okay.  Are you going to take you attorney's
11  instruction?
12          MR. WOLFE:  No.  I assume you're going to
13  take my instructions and do the ethical thing
14  and not ask him questions about a document that
15  was inadvertently produced.
16          MR. BURROUGHS:  I need some sort of
17  proffer, so sort of information about why.
18          To me, from looking at it, it appears to
19  be extremely relevant.
20          MR. WOLFE:  It was produced to my office.
21          When my office sent out a stack of
22  documents, it should have been but was not
23  removed.
24          MR. BURROUGHS:  Are you saying your
25  office generated this particular document?

**LIL' JOE RECORDS, INC. vs MARK ROSS, ET AL.**
Joseph Weinberger on 10/26/2022
Pages 154..157

**Page 154**

```
1        MR. WOLFE:  I'm not going to go any
2   further.  And he's not going to answer any
3   questions about.
4   BY MR. BURROUGHS:
5        Q.   All right.  And you're going to take your
6   attorney's instruction?
7        A.   Yes.
8        Q.   All right.  I'm going to put another
9   document in front of you we're going to mark as
10  Exhibit 13.
11           (WHEREUPON, Defendants' Exhibit 13 was
12           marked for identification.)
13  BY MR. BURROUGHS:
14       Q.   Do you recognize this?
15           MR. WOLFE:  Same thing.  It was
16  inadvertently produced.
17           MR. BURROUGHS:  So are you saying your
18  office created this document?
19           MR. WOLFE:  No.  I just explained to you,
20  my office sent a stack of documents to be copied
21  and Bates stamped.  It should have been removed.
22           MR. BURROUGHS:  So I -- so did this or
23  did this not come from the business records of
24  the plaintiff?
25           MR. WOLFE:  It did not come from the
```

**Page 155**

```
1   business records.  It was inadvertently produced
2   by my client to me.  It should be destroyed.
3            MR. BURROUGHS:  So it was provided by
4   your client to your office, but you allege that
5   it is not responsive to the discovery requests?
6            MR. WOLFE:  I'm not going to repeat
7   myself again.
8            And he's not going to answer any
9   questions about it.
10  BY MR. BURROUGHS:
11       Q.   All right.  Are going to take your
12  attorney's instruction?
13           MR. WOLFE:  It's not an instruction.
14           It's an instruction to you.
15           MR. BURROUGHS:  Well, I'd like -- to me,
16  you know, of course if something is subject
17  to --
18           MR. WOLFE:  You're going to need to go to
19  court.
20           MR. BURROUGHS:  -- privilege or there's
21  some basis not to explore it, I'd be happy to
22  work through that with you, but --
23           MR. WOLFE:  I just explained it to you --
24           MR. BURROUGHS:  -- to me, you know,
25  you're telling me your client gave this to
```

**Page 156**

```
1   you --
2            MR. WOLFE:  -- you can go to the court.
3            MR. BURROUGHS:  -- and you gave it to us.
4   It's not in any privilege log.  It's not in any
5   redaction log.
6            To me, it looks -- you know, it looks
7   relevant, so I'd like to ask questions.
8            But if you're instructing him not to
9   answer, I'll, of course, respect that --
10           MR. WOLFE:  I'm instructing you not to
11  answer --
12           (Cross-talk.)
13           MR. BURROUGHS:  -- reservation of
14  rights --
15           MR. WOLFE:  -- that.
16           I'm not going to go any further.
17           MR. BURROUGHS:  So are you instructing
18  him not to -- I mean, I'd like to ask questions.
19           Are you instructing him not to answer
20  those questions?  If so, we can move to the
21  next exhibit.
22           MR. WOLFE:  He's not going to answer any
23  questions.
24           And if you ask questions, it would be
25  inappropriate and unethical for you to do so.
```

**Page 157**

```
1   BY MR. BURROUGHS:
2        Q.   And are you going to take your attorney's
3   instruction?
4        A.   (No audible response.)
5        Q.   And I also can't see -- you're a little bit
6   silhouetted now.  I don't know if you can -- there
7   you go.
8            Are you going to take your attorney's
9   instruction.
10       A.   Yes.
11       Q.   Okay.  We'll put another document in front
12  of you we're going to mark as Exhibit 14.
13           (WHEREUPON, Defendants' Exhibit 14 was
14           marked for identification.)
15  BY MR. BURROUGHS:
16       Q.   And your attorney can tell me if he has the
17  same instruction and direction on this.
18           MR. WOLFE:  Same instruction.  Same
19  direction.
20  BY MR. BURROUGHS:
21       Q.   And you're going to take your attorney's
22  instruction?
23       A.   Yes.
24       Q.   All right.
25           Okay.  We can take that down.
```

**Page 186**

```
 1              CERTIFICATE OF OATH
 2
 3   STATE OF FLORIDA
 4   COUNTY OF BROWARD
 5
 6        I, KRISTINA ESSIG, RPR, Registered
 7   Professional Reporter, and Notary Public, State of
 8   Florida, certify that JOSEPH WEINBERGER, appeared
 9   before me via videoconference and was duly
10   sworn/affirmed remotely pursuant to the Florida
11   Supreme Court Administrative Order.
12
13        WITNESS my hand and official seal this
14   26th day of October, 2022.
15
16
17
18   _____
19        Kristina Essig, Court Reporter
          Notary Public, State of Florida
20        Commission No.: HH064474
          Expires: January 5, 2025
21
22
23
24
25
```

**Page 187**

```
 1              CERTIFICATE OF REPORTER
 2
 3   STATE OF FLORIDA
 4   COUNTY OF BROWARD
 5
 6        I, KRISTINA ESSIG, RPR, Registered
 7   Professional Reporter, and Notary Public, State of
 8   Florida, do hereby certify that I was authorized to
 9   and did stenographically report the deposition of
10   JOSEPH WEINBERGER; that a review of the transcript
11   was requested; and the foregoing transcript is a true
12   and accurate record of my stenographic notes.
13        I FURTHER CERTIFY that I am not a relative,
14   employee, attorney, or counsel of any of the parties,
15   nor am I a relative or employee of any of the
16   parties' attorney or counsel connected with the
17   action, nor am I financially interested in the
18   action.
19
20        Dated this 4th day of November, 2022.
21
22
23   _____
          Kristina Essig, Court Reporter
          Notary Public, State of Florida
24
25
```

**Page 188**

```
Re: Lil' Joe Records, Inc. v. Mark Ross, et al.
Case No. 1:21-CV-23727-DPG
Deposition of Joseph Weinberger, taken 10/26/2022
             E R R A T A  S H E E T
PAGE_____ LINE_____ CHANGE_____
_____
REASON_____
PAGE_____ LINE_____ CHANGE_____
_____
REASON_____
PAGE_____ LINE_____ CHANGE_____
_____
REASON_____
PAGE_____ LINE_____ CHANGE_____
_____
REASON_____
PAGE_____ LINE_____ CHANGE_____
_____
REASON_____

Under penalty of perjury, I declare that I have read
the entire transcript taken in the above-captioned
matter, or the same has been read to me, and the same
is true and accurate except for changes and/or
corrections, if any, as indicated by me on the ERRATA
SHEET, with the understanding that I offer these
changes as if still under oath.

_____     _____
        DATE                   JOSEPH WEINBERGER
```