UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 1:21-CV-23727-DPG

LIL' JOE RECORDS, INC.,

        Plaintiff,

v.

MARK ROSS, CHRISTOPHER WONG
WON, JR., RODERICK WONG WON,
LETERIUS RAY, ANISSA WONG WON
and LUTHER CAMPBELL,

        Defendants.

_____/

## PLAINTIFF'S TRIAL BRIEF

    Plaintiff, Lil Joe Records, Inc. ("Lil Joe"), by and through undersigned counsel, hereby submits

its Trial Brief, as follows:

    **I.**      **List of Pending Motions**

- Defendants' Motion to Realign (DE 183)
- Plaintiff's Motion to Strike Stanley Cobble as a Rebuttal Witness (DE 169/176/177)
- Defendants' Motion in Limine (DE 171/172/178)
- Plaintiff's Motion in Limine (DE 70/88/90)
- Plaintiff's Request for Judicial Notice (DE 113)
- Plaintiff's Motion for Partial Summary Judgment (DE 30) & Defendants' Motion for Summary Judgment (DE 53) – This Court has announced its ruling, but has not issued the detailed written order necessary for appellate review. (DE 166/167).

    **II.**      **The Competing Equitable Claims for Declaratory Relief**

    The Court is to determine the equitable issues raised in the competing requests for declaratory

relief and can (if it chooses to) rely on a jury for an advisory opinion.

    **III.**      **Issues to be tried:**

1

1. Did Defendants properly exercise a valid notice of copyright termination under section 203 of the Copyright Act?
2. Were these sound recordings works for-hire?
3. Were the copyrights transferred retroactively by a document that Defendants call a 1990 Agreement or by the contracts the Plaintiffs refer to as the 1991 Agreements?
4. Can copyrights be transferred retroactively to memorialize an earlier claimed oral agreement?
5. Were the copyrights to sound recordings copyrights transferred in subsequent, independent transactions which are not subject to the copyright termination notice at issue?
6. Does 17 USC §203(b)(5) prohibit the Termination?

## A. Factual Background

The 4 members of *2 Live Crew:* Luther Campbell ("Campbell"), Christopher Wong Won, Mark Ross, and David Hobbs, transferred whatever sound recording copyright rights[1] they had to *2 Live Crew's* music (the "*2 Live Crew* Copyrights") to Luke Records, Inc. f/k/a Skyywalker Records, Inc. ("Luke Records"). Campbell and Luke Records subsequently filed bankruptcy where all of their sound recording copyright rights to *2 Live Crew's* music, including the *2 Live Crew* Copyrights, transferred in bankruptcy and sold to Lil' Joe "free and clear of any and all liens, claims, encumbrances, charges, setoffs or recoupments of any kind", thereafter "no royalties, whether as artist, producer, writer, publisher, or in any other capacity, on any of the masters" are due to Luther Campbell. Exs. P4 (¶1A), P43 (Order Confirming the Joint Plan of Organization), P45 (1996 Assignment by Campbell and Luke Records) and P46 (recorded Luke Records' assignment). Defendants seek to terminate the transfer of the *2 Live Crew* Copyrights pursuant to 17 USC §203 (the "Termination Notice"; Ex. P 13).

Lil Joe acquired the 2 Live Crew copyrights pursuant to an order of Judge Robert Mark, dated March 22, 1996, transferring the rights pursuant to 11 USC §363. (EX 43) ("Judge Mark's Order").

In 2003 Christopher Wong Won, in settling certain claims with Lil' Joe, agreed that Lil' Joe "owned all right, title and interest to all copyrights and trademarks previously conveyed to them in the

---

[1] The transfer of composition copyrights are not at issue in this case.

bankruptcy of Luke Records and Luther Campbell", and he "releases any claims whatsoever to those works", and further agreed that "he has no further claims to any royalties to any of the works owned by" Lil' Joe. Ex. P7.

In 2001 Mark Ross settled certain claims with Lil Joe acknowledging that, other than writer's performance rights which are not relevant to this proceeding, "he has no rights (master or publishing) to any previous recordings owned by Lil' Joe Records, and he had no rights in any recordings owned by Lil' Joe Records, Inc." Exs. P8, P10, P11 and P12.

At issue is whether the Termination Notice sent by 3 of the 4 members of *2 Live Crew* is effective to terminate the transfer of the sound recording copyrights as to 5 albums that were recorded in 1986-1989. The Termination Notice is defective and cannot terminate Lil' Joe's interest in the *2 Live Crew* Copyrights, for several reasons, ANY ONE of which defeats defendants' position.

First, pursuant to 17 USC § 203(b)(5), the grant of rights to Lil Joe pursuant to Judge Mark's Order cannot be terminated.

Second, this Court must determine whether the members of *2 Live Crew* created the works subject of the *2 Live Crew* Copyrights as works-for-hire. If these were works-for-hire, then the members of *2 Live Crew* never had any rights in the *2 Live Crew* Copyrights to terminate.

Next, if the works subject of the *2 Live Crew* Copyrights are not works-for-hire, then this Court must consider whether the Termination Notice is effective. The Termination Notice purports to terminate a transfer which allegedly occurred <u>only</u> pursuant to a contract entered into in 1990 which purports to memorialize an earlier oral agreement (the "1990 Agreement"). The correct transfer of the sound recordings copyrights to Luke Records occurred in 1991 pursuant to[2]:

- Exclusive Recording Agreement dated April 1991, between Luke Records, Inc. and Chris Wong Won; (Ex. P2)

---

[2] The regulations under Section 203 mandate that the grant to be terminated must be identified in the notice.

- Exclusive Recording Agreement dated April 1991, between Luke Records, Inc. and Mark Ross and David Hobbs;  (Ex P3)
- Exclusive Recording Agreement dated February 1991, between Luke Records, Inc. and Luther Campbell. (Ex P1)

(collectively, the "1991 Agreements"). Because the Termination Notice does not seek to terminate these transfers pursuant to the 1991 Agreements or the subsequent grants in 1993, 1996, 2000 and 2003, but solely references the 1990 Agreement, it is fatally defective.

Finally, the Termination Notice cannot terminate the grant of rights occurring in 1993, 1996, 2000 or 2003, which are not mentioned in the Termination Notice.

### B.  Overview of Termination of Rights under 17 USC §203

Section 203 allows for termination of rights to be effective anytime during a five-year period beginning at the end of thirty-five years from the date of execution of the grant or date of publication. That means there is a five-year window of opportunity from the thirty-fifth year to forty years after a grant or publication.

**17 U.S. Code § 203 - Termination of Transfers and Licenses Granted by the author (Relevant Part)**

(a) **Conditions for Termination.—**In the case of any work **other than a work made for hire**, the exclusive or nonexclusive grant of a transfer or license of copyright or of any right under a copyright, executed by the author on or after January 1, 1978, otherwise than by will, is subject to termination under the following conditions:

(1) In the case of a grant executed by one author, termination of the grant may be effected by that author or, if the author is dead, by the person or persons who, under clause (2) of this subsection, own and are entitled to exercise a total of more than one-half of that author's termination interest. **In the case of a grant executed by two or more authors of a joint work, termination of the grant may be effected by a majority of the authors who executed it**; if any of such authors is dead, the termination interest of any such author may be exercised as a unit by the person or persons who, under clause (2) of this subsection, own and are entitled to exercise a total of more than one-half of that author's interest.

(3) **Termination of the grant may be effected at any time during a period of five years beginning at the end of thirty-five years from the date of execution of the grant**; or, if the grant covers the right of publication of the work, the period begins at the end of thirty-five years

4

from the date of publication of the work under the grant or at the end of forty years from the date of execution of the grant, whichever term ends earlier.

**(4) The termination shall be effected by serving an advance notice in writing, signed by the number and proportion of owners of termination interests required under clauses (1) and (2) of this subsection, or by their duly authorized agents, upon the grantee or the grantee's successor in title**.

> **(A)** The notice shall state the effective date of the termination, which shall fall within the five-year period specified by clause (3) of this subsection, and the notice shall be served not less than two or more than ten years before that date. A copy of the notice shall be recorded in the Copyright Office before the effective date of termination, as a condition to its taking effect.
>
> **(B)** The notice shall comply, in form, content, and manner of service, with requirements that the Register of Copyrights shall prescribe by regulation.

> **(5)** <u>**Termination of a grant under this section affects only those rights covered by the grants**</u> that arise under this title, and in no way affects rights arising under any other Federal, State, or foreign laws.
>
> **(6)** Unless and until termination is effected under this section, the grant, if it does not provide otherwise, continues in effect for the term of copyright provided by this title.

The sound recordings of *2 Live Crew* were each joint works. That means (a) 3 of the 4 members of *2 Live Crew's members* (or their heirs) must execute the termination notice and (b) each of the 3 members must possess valid rights at the time of the Termination Notice. It is undisputed that only 3 of 4 *Live Crew*'s members signed the Termination Notice, so if any 1 of 3 could not legally do so, e.g. did not possess valid rights at the time of the Termination Notice, the Termination Notice is ineffective.

### C. Defendants Did Not Comply with the Requirements for a Termination Notice under 17 USC § 203 Because the Termination Notice Failed to Mention the 1991 Agreements or the Subsequent Transfers

The requirements for a Notice of Exercise of Copyright Termination Rights are specified under the U.S. Copyright Act, particularly in 17 U.S.C. §§ 203 and 304(c), (d), 37 CFR § 201.10. Here are the key requirements for the notice:

### 1. Timing of the Notice

5

- **When to Serve**: The notice must be served no earlier than 10 years and no later than 2 years before the effective date of termination.

- **Effective Date**: The effective date of termination must fall within a five-year window beginning 35 years after the date of execution of the grant or publication.

**2. Content of the Notice**

- **Statement of Termination**: A clear statement that the termination is being exercised under the relevant section of the Copyright Act (e.g., 17 U.S.C. § 203).

- **Name of the Author(s)**: The name(s) of the author(s) who are exercising the termination right.

- **Title of the Work**: The title of the work to which the termination applies.

- **Original Copyright registration number**, if possible and practicable.

- **Date of Execution of the Grant**: The date when the original grant or transfer of rights was executed.

- **Identification of the Grant**: A brief statement reasonably identifying the grant to which the notice of termination applies.

- **Effective Date of Termination**: The specific date on which the termination will take effect.

- **Identification of the Grantee**: The name of the person or entity to whom the rights were originally granted or transferred.

- **Signature**: The notice must be signed by the author(s) or their heirs, or by an authorized agent.

Notably, 37 CFR § 201.10(b)(2) requires that there be a "clear identification" of each of the above required information. That includes the date of the execution of the grant being terminated and a brief statement reasonably identifying the grant to which the notice of termination applies. 37 CFR § 201.10(b)(2)(iii), (v). Plaintiff's position focuses on the failure to identify the proper grant to be terminated.

6

1. **The Termination Notice Does Not Terminate Any Grant Pursuant to the 1991 Agreements**

The Termination Notice claims the grant to be terminated is pursuant to the undated "1990 Agreement". Lil' Joe claims the grant was pursuant to the 1991 Agreements, which are not mentioned in the Termination Notice.

The following evidence supports that the 1991 Agreements are the correct grant of rights, and the only agreement transferring copyright rights from *2 Live Crew*'s members to Luke Records:

- The term of the 1990 Agreement is January 1-December 31, 1987, but none of the recordings at issue occurred during that time frame
- Allen Jacobi was the lawyer who prepared the 1991 Agreements . He will testify that he had no knowledge of the 1990 Agreement and there would be no reason to prepare the 1991 Agreements if the 1990 Agreement existed.
- Joe Weinberger was the in-house lawyer for Luke Records. He will testify that there was not aware of the 1990 Agreement, but used the 1991 Agreements to calculate and pay royalties.
- Both Chris Wong Won and his lawyer, Doug Stratton, sent letters to Luke Records threatening to sue for breach of the 1991 Agreements and do not mention the 1990 Agreement.
- The 1990 Agreement contains no grant of or transfer of any copyright rights.
- Luke Records and 2 Live Crew operated under the terms of the 1991 Agreements and made no reference to the 1990 Agreement.
- Luther Campbell testified there was only one agreement and the 1990 agreement, which term ended before all of the albums at issue were recorded, does not transfer any copyrights
- A lawsuit was filed vs Luke Records in 1992 by David Hobbs and Mark Ross for breach of the 1991 Agreements, because no royalties were calculated and paid consistent with same and a settlement was reached.

Neither Campbell nor Ross who has since died, have any specific knowledge about the alleged 1990 Agreement or the alleged prior oral agreement. Christopher Wong Won who died before the Termination Notice and this action, has no testimony to offer about this subject, such as the date, the terms and/or circumstances. The purported oral copyright transfer is of no consequence, as a copyright cannot be transferred via an oral agreement. *Latimer v. Roaring Toyz, Inc*., 601 F.3d 1224, 1235 (11th Cir. 2010); *Francois v. Jack Ruch Quality Homes, Inc*., 2006 U.S. Dist. LEXIS 57062 *22 (C.D. Ill.

7

Aug. 14, 2006)("the Copyright Act invalidates any such transfer, sale or assignment of copyright ownership that is not in writing signed by the copyright owner. 17 U.S.C. § 204(a).") Nor can a copyright be transferred retroactively back to an oral agreement. *Davis v. Blige*, 505 F.3d 90 (2d Cir. 2007). "[A]ssignments ... are prospective ....", *id.* at 104, "a license or assignment in copyright can only act prospectively.", *id.* at 104. "There is little from a policy perspective to recommend a rule that allows retroactive licenses or assignments, and there are two strong reasons disfavoring them ...." *Id.* at 105-06.; *Spinelli v. Nat'l Football League*, 903 F.3d 185, 198 (2d Cir. 2018) (applied *Davis*'s holding to bar Associated Press from granting a retroactive license to the NFL).

Defendants created the sound recording copyrights at issue from 1986 to 1989, when they recorded the five albums at issue. By 1990 or 1991 the value of the copyrights was well known, as the records were international hits and in 1990, Luke Records received a distribution deal from Atlantic Records, with a 5 million dollar advance. Since the value of the *2 Live Crew* Copyrights were known by 1990 or 1991, Section 203 protection is not warranted. *Waite v UMG Recordings, Inc.,* 2023 U.S. Dist. LEXIS 14465 * 4-5 (SD NY Jan. 27, 2023)(section 203 implemented to protect artists who give up their copyrights before they know it is a hit); *Champlin v. Music Sales Corp.*, 604 F. Supp. 3d 224, 236 (S.D. N.Y. 2022)("the Act seeks to 'counterbalance the unequal bargaining position of artists seeking to reclaim their copyrights, resulting in part from the 'impossibility of determining a work's value until it has been exploited.'")(quoting H.R. Rep. No. 94-1476, at 124 (1976)).

### 2. **2 Live Crew Cannot Claim Harmless Error by Failing to mention the 1991 Agreement or the Subsequent Transfers**

Under 37 CFR § 201.10(e)(2), errors in identifying the date of the execution of the grant will not affect the validity of the notice, provided the errors were "made in good faith and without any intention to deceive, mislead, or conceal relevant information." Here, the failure to mention the 1991 Agreement was intentional, because those contracts contain "artist for hire" language and deceptively

to make it appear as though the transfers were made before the true value of the works was known.

As a general rule, an error is harmless if it "do[es] not materially affect the adequacy of the information required" under section 203. 37 CFR § 201.10(e)(1).

Thus, if the date of execution specified in the notice of termination is not the actual date of execution of the grant, the error may be considered harmless "if it is as accurate as the terminating party is able to ascertain, and if the date is provided in good faith and without any intention to deceive, mislead, or conceal relevant information." Compendium of U.S. Copyright Practices, §2310.12 (3d ed. 2021) (citing 37 CFR § 201.10(e)(2)). But here, the error is not of just the date, but the grant itself, and was completely done to conceal the work for hire language and deceptively to make it appear as though the transfers were made before the true value of the works was known. In addition, by the time of the 1990 Agreement or 1991 Agreements, the value of the works were well known by virtue of the 5 million dollar offer from Atlantic Records.

"Providing an erroneous date of execution . . . may not be considered harmless if, for example, the grant would have properly been subject to termination under section 203, rather than section 304 (or vice versa). Compendium of U.S. Copyright Practices, § 2310.12 (citing 17 CFR 201.10(e)(1).

"An error's 'materiality,' and hence its 'harmlessness,' is to be viewed through the prism of the information needed to adequately advance the purpose sought by the statutory termination provisions themselves." *Champlin v. Music Sales Corp.*, 604 F. Supp. 3d 224, 236 (S.D.N.Y. 2022). On the other, section 203 strives 'for the existing assignee to receive reasonable notice of what rights of theirs are being affected' in the artist's exercise of his or her termination right." *Champlin*, 604 F. Supp. 3d at 236 (quoting *Siegel*, 690 F. Supp. 2d at 1055–56). "The resulting inquiry into harmless error is, unsurprisingly, 'fact-intensive,' and 'case-specific.'" *Champlin*, 604 F. Supp. 3d at 236 (internal citations omitted). "This inquiry is 'broad,' and not limited to mere 'scrivener's errors,' but it 'will not

forgive every error in a notice or render section 203's notice requirements a nullity.'" *Champlin*, 604 F. Supp. 3d at 236 (quoting *Yoakam v. Warner Music Grp. Corp.* , 21 Civ. 1165 (SVW) (MAA) (C.D. Cal. July 12, 2021)). Alleged errors in dates provided in a termination notice raise factual issues. *Mtume v. Sony Music Entm't*, 408 F. Supp. 3d 471, 476 (S.D.N.Y. 2019).

The Copyright Office has described the inquiry framed by these objectives as "attempt[ing] to avoid the imposition of costly or burdensome [termination] requirements" while "giving the grantee and the public a reasonable opportunity to identify the affected grant and work from the information given in the notice." Termination of Transfers and Licenses Covering Extended Renewal Term, 42 Fed. Reg. 45916, 45918 (Sept. 13, 1977). Here, the notice failed to mention the 1991, 1993,  1996, 2000 and/or 2003 grant of rights.

"That language distinguishes errors [with]in a notice, i.e., the document communicating to grantee an intent to terminate, from errors in complying with the statutory requirements for termination". *Yoakam v. Warner Music Grp. Corp.* , 21 Civ. 1165 (SVW) (MAA), 2021 WL 3774225 (C.D. Cal. July 12, 2021) (citing *Nimmer on Copyright* § 11.06 ("Because the harmless error doctrine applies only to information regarding the adequacy of notice, it cannot be invoked to excuse timing errors.").  Here, the deficiencies in the notice show that Defendants' failed to comply with the statutory requirements for termination.

Importantly, "if the wrong date [of execution] is recited in the notice and a court subsequently determines that the actual date of execution was at a time that places the effective date of termination or the date of service of the notice of termination outside of the statutory windows, the harmless error doctrine will be of no assistance." *Final Rule*, *Gap in Termination Provisions*, 76 FR 32319 (2011).

Similar to this case, in *Waite v. UMG Recordings, Inc.*, 450 F. Supp. 3d 430, 440 (S.D.N.Y. 2020), the creation dates for sound recordings were omitted. The correct creation date for one of the

records was 1977 and thus the notice fell outside that five-year window.  Plaintiff thus dismissed its claims as to that recording. As to the other two recordings, there was evidence they were created in 1980. The court found the error harmless because there was no indication of an intent to deceive or conceal or that the omission was done in bad faith. Plus, the defendants had the information it needed to identify the grant before class certification and trial.   Here, Defendants   knew about the 1991 Agreements(which contains work for hire provisions)  and that the value of the works was well known by the time of the written grant, and they ignored them in the notice in order to deceive.

Similar to this case, *Burroughs v. Metro-Goldwyn-Mayer, Inc.*, 491 F. Supp. 1320 (S.D.N.Y. 1980), involved a premature notice of termination under 17 USC §304 (similar to section 203). That notice was found to be a nullity because it was served before the effective date of the relevant section of the law and before the commencement of the five-year period in which termination could be effected. Here too, the notice of termination references a single grant made "January 1, 1987 undated and executed by clients." Defendants contend that grant was signed sometime in 1990 but "made effective in 1987" to ignore that the value of the works was well known at the time of the grant.  But the only relevant grant was the written one in  the 1991 Agreements, which renders the Notice of Termination materially deceitful, rendering the Notice errors both harmful, not harmless, and void.  Moreover, the defective Notice cannot be remedied because of the bankruptcies and prior transfers.

3.  **Transfer of a copyright must be in writing, so Defendants' claim of a purported oral agreement fails as a matter of law. Thus, no rights were transferred pursuant to the 1990 agreement.**

Since the 1990 Agreement does not contain any grant or transfer of any copyright rights, Defendants claim there was a prior oral agreement. However, a grant of copyright "must be in writing". *Karlson v. Red Door Homes, LLC*, 611 F. App'x 566, 569 (11th Cir. 2015) ("A copyright owner can transfer copyright ownership through the grant of an exclusive license, but the grant must be

in writing."). 17 U.S.C. §204(a) expressly requires that:

> "(a) A transfer of copyright ownership, other than by operation of law, is not valid unless an instrument of conveyance, or a note or memorandum of the transfer, is in writing and signed by the owner of the rights conveyed or such owner's duly authorized agent."

Federal courts have applied the statute of frauds, and the decisions interpreting it, to this section of the Copyright Act. *See Pamfiloff v. Giant Records, Inc.*, 794 F.Supp. 933 (N.D. Cal. 1992). Thus, the law is that Defendants cannot rely on their purported oral agreements to render the Termination Notice applicable to the sound recording copyrights at issue. *Francois*, 2006 U.S. Dist. LEXIS 57062 at *22 (" the Copyright Act invalidates any such transfer, sale or assignment of copyright ownership that is not in writing signed by the copyright owner.").

Allowing for a retroactive memorialization of a purported oral agreement would entirely circumvent Congress mandate that assignments be in writing. Accordingly, the Second Circuit in *Davis v. Blige* held "a license or assignment in copyright can only act prospectively." *Davis v. Blige*, 505 F.3d 90, 104 (2d Cir. 2007).

The issue in *Davis* was whether "a copyright co-owner ... can convey his copyright interest to a third party retroactively, thereby defeating a claim of infringement asserted against that third party by another co-owner." 505 F.3d at 101. The pertinent facts in *Davis* were that the plaintiff Sharice Davis claimed that she and a third party, Bruce Chambliss, were co-authors of compositions used in two songs recorded by Mary J. Blige. 505 F.3d at 94. Davis sued Mary J. Blige, Bruce Miller, who co-wrote the two allegedly infringing songs, and others involved in the songs' production. *Id.* While litigation was ongoing, Chambliss transferred his ownership interest in the disputed compositions to Miller retroactively "effective as of the date" that the compositions were created. *Id.* at 96. The defendants then moved for summary judgment on the ground that the "written transfer agreements conveyed the copyrights [to Miller] retroactively," and because a copyright holder cannot sue a co-

12

owner for infringement, Davis's suit was "barred against [the new owner Miller] and those to whom [he] had licensed the disputed compositions (including Blige and the other defendants)." *Id.* at 96–97. Based on those arguments in *Davis*, the Second Circuit held: "**a license or assignment in copyright can only act prospectively**." *Davis v. Blige*, 505 F.3d 90, 104 (2d Cir. 2007).

The Second Circuit distinguished copyright transfers from other contracts or settlements because licenses and assignments are prospective—they permit future use. 505 F.3d at 103. **But "[a] retroactive license or assignment purports to authorize a past use that was originally unauthorized.**" *Id.* **And when there are co-owners, the co-owners rights (such as the right to sue for infringement) could impermissibly be extinguished by another co-owner's retroactive transfer**. *Id.* **"A rule permitting retroactive assignments and transfers would inject uncertainty and unpredictability into copyright ownership, contrary to the intent of Congress in enacting the Copyright Act of 1976.**" *Id.* at 105.

Ten years later, in *Spinelli v. Nat'l Football League*, 903 F.3d 185, 198 (2d Cir. 2018), the Second Circuit applied *Davis*'s holding to bar the Associated Press from granting a retroactive license to the NFL. A district court in *Palmer/Kane LLC v. Rosen Book Works LLC*, 204 F. Supp. 3d 565, 576 (S.D.N.Y. 2016), also rejected any argument that *Davis* is limited to its facts, noting that the Second Circuit casted its holding in broad terms, not limited to any one particular set of facts. *See Davis* , 505 F.3d at 103 ("Licenses ... are prospective ....") ; *see id.* at 104 ("[W]e hold that a license or assignment in copyright can only act prospectively."); *see id.* at 104 ("Licenses in patent and copyright function similarly ... and thus it is appropriate to consider copyright licensing, like patent licensing, prospective in nature."); *see id.* at 104–05 ("There is little from a policy perspective to recommend a rule that allows retroactive licenses or assignments, and there are two strong reasons disfavoring them ....").

### 4. The Termination Notice Cannot as a Matter of 17 USC § 203(b)(5) Affect the Grant of Rights to Lil Joe Pursuant to Bankruptcy Law and the Bankruptcy Order

**of Judge Robert Mark**

17 USC §203(b)(5) states:

> Termination of a grant under this section affects only those rights covered by the grants that arise under this title, and in no way affects rights arising under any other federal, state or foreign law.

It is unrebutted that Lil Joe first obtained the rights to the 2 Live Crew copyrights pursuant to an order of bankruptcy Judge Robert Mark, dated March 22, 1996 (Plaintiff's EX 43):

i) <u>Making Lil Joe a good faith purchaser of the 2 Live Crew copyrights pursuant to 11 USC §363(b)1. See para. 24.</u>
ii) Adopting the plan pursuant to 11 USC §1129.

Thus, the Termination Notice cannot terminate Lil Joe's rights as the owner of the copyrights under 11 USC §363.

**5.** **<u>Even if the 203 Termination Notice is valid (respectfully, it is not), there are, nevertheless, additional grants not mentioned in the Termination Notice that are not terminated</u>**

There is no mention in the Termination Notice of the Campbell's grants in 1996 (to Lil Joe), the Ross grants in 1993 (to Luke Records) or in 2001 (to Lil Joe) and the Wong Won grant in 2003. Therefore, the Termination Notice does not affect these grants. See *Penguin Books v Steinbeck*, 537 F. 3d 193 (2d Cir.2008). (Section 203 does not terminate grants replaced by subsequent grants).

**6.** **<u>The *2 Live Crew* Copyrights Were Works Made for Hire, which does not have 203 rights</u>**

The transfer of a copyright in a "work made for hire" is not subject to termination. 17 USC §203(a); *Ennio Morricone Music Inc. v Bixio Music Group Ltd.*, 936 F.3d 69, 73 (2nd Cir. 2019). "A 'work made for hire' is … a work prepared by an employee within the scope of his or her employment…." 17 USC §101. This requirement to qualify a work as a 'work made for hire' is straightforward and easy to apply. *Ennio,* 936 F.3d at 73.

14

Here, there is extensive evidence supporting Lil' Joe's claims that the three *2 Live Crew* members were each artists for hire, but certainly Campbell was as the CEO of Luke Records..  See the sound recording copyright registrations (Plaintiffs EX 27-32), and the copyright notices on the albums (Defendants' EX D133), each of which shows Luke Records as the owner of the copyrights, as the members are artists for hire. If Campbell, 1 of the 3 artists purporting to terminate under 203, was an "artist for hire," then there is not the required majority (3 of the 4) of the joint authors exercising the Section 203 rights. Each of the 5 albums at issue in this case have a sound recording copyright notice indicating that the owner of the copyrights is Luke Records. Ex D133. Since these albums were released before any transfer, the copyright notice is only accurate if the members of *2 Live Crew* were "artists for hire." But there is further evidence supporting same as the copyright registration by Lil Joe shows the sound recordings were acquired from Luke Records, and Luke Records inc. could only be the author if the members of 2 Live Crew were artists for hire.

First, Campbell, Wong Won, Ross and David Hobbs <u>each</u> expressly agreed in the 1991 Agreements that the *2 Live Crew* Copyrights were works "made for hire." Ex P1-3 at para. 20. Their acknowledgment is accurate, as each of them was an employee of Luke Records and the *2 Live Crew* Copyrights were prepared within the scope of their employment. "In the case of a work made for hire, the employer or other person for whom the work was prepared is considered the author for purposes of this title, and, unless the parties have expressly agreed otherwise in a written instrument signed by them, owns all of the rights comprised in the copyright." 17 USC §201(b). This is consistent with the copyright notices contained on the 5 albums at issue, which were released before either the 1990 Agreement or the 1991 Agreements when the copyright transfers supposedly occurred. Those copyright notices could only be truthful and accurate if the members of *2 Live Crew* were artists for hire.

That the 1991 Agreements were signed after the works were created is legally insignificant. *Playboy Enterprises, Inc. v. Dumas,* 53 F.3d 549, 559 (2d Cir. 1995)(the writing requirement of §101(2) can be met by a writing executed after a work is created if the writing confirms a prior agreement), which the 1991 Agreement does here.

Although paragraph 20 of the 1991 Agreements expressly states that the members of *2 Live Crew* were "artists for hire" (like the copyright notices on the albums), Lil' Joe acknowledges that while this is persuasive upon a court, it does not end the inquiry. See *Cmty For Creative Non Violence v Reid,* 490 U.S. 730, 737 (1989).

*Horror Inc. v Miller,* 15 F.4th 232 (2d Cir. 2021), explains the test for determining whether one is an employee for purposes of establishing artist for hire status. Thirteen non-exhaustive factors were identified in *Reid* to aid in this inquiry. *Id.* at 243-44. These factors are not to be applied "in a mechanistic fashion" there is "no direction concerning how the factors were to be weighed." *Id.* at 248. That analysis, as set forth below, shows an overwhelming majority of the factors favoring "employee" status as to Mark Ross and Christopher Wong Won, but clearly as to Campbell, which is a clearer question**:**

| Factor | Test | Evidence |
|---|---|---|
| 1 | Luke Records Right to Control | The 1991 Agreements specifically gives Luke Records complete control over the recording process. (¶¶ 4,5,6,8,9 of the 1991 Agreements). In practice, Luke Records controlled the entire production process. |
| 2 | The Skill Required. | Both Luke Records and the members of 2 Live Crew were skillful in the recordings process. |
| 3 | Source of Instrumentalization and Tools | Luke Records paid for and provided the studio, picked the times when the studio would be used, and paid for all costs of production including the |

|  |  | producers, instruments and tapes. Two of the albums at issue were recorded in studios owned by Luke Records. |
|---|---|---|
| 4 | Location of Work | Luke Records selected and paid for the studios, or owned the studios. |
| 5 | Duration of Relationship | The parties worked together on an exclusive basis from 1986 until 1995. |
| 6 | Right to Assign Additional Projects | Luke Records controlled the recording process. (¶ 15 of the 1991 Agreements) Campbell additionally worked full time as CEO on a myriad of projects |
| 7 | Extent of Discretion Over When and How Long Work | Luke Records controlled access to the studio and therefore when and how long work would occur. |
| 8 | Method of Payment | Luke Records paid them by check deducting payroll taxes. |
| 9 | 2 Live Crew's Role | The group was deemed employees. (¶¶ 4-6 & 8-9 of the 1991 Agreements) |
| 10 | Whether the Work is Part of Luke Records' Regular Business | Luke Records was a record company. Hence its regular business was recordings. |
| 11 | Whether Luke Records is in Business | Luke Records was in business at the time of the recordings. |
| 12 | Provisions of Employee Benefits | Received benefits only allowed to employees. |
| 13 | Tax Treatment | Luke Records treated the members as employees for payroll and tax purposes. |

Of these 13 factors, five "should be given more weight in the analysis, because they will usually be highly probative of the true nature of the employment relationship." *Horror,* 15 F.4th at 249. Four of these factors support the finding that Campbell was an employee of Luke Records and therefore the *2 Live Crew* Copyrights were "works for hire." As to the first factor, the right to control, the 1991

Agreements explicitly give Luke Records complete control and Campbell, Luke Records' CEO, controlled the entire process. Campbell was provided employee benefits and was treated as an employee for tax purposes, meeting the third and fourth factors. These two factors in particular, "the parties' tax treatment of their relationship is, along with employee benefits, 'highly indicative' of whether a worker should be treated as a conventional employee for copyright purposes." *Horror,* 15 F.4th at 253. As to the fifth factor, Campbell performed numerous functions for Luke Records, as its CEO, beyond performing for *2 Live Crew*, including overseeing other acts. The one factor, out of these five factors, that does not fully support Campbell's status as an employee, the skill required (second factor), is a push – the same person, Campbell, is both the employer and the employee. Lil' Joe is unaware of any authority holding the sole owner of a business to be an independent contractor, not an employee, just because he is a "skilled worker." (this proposition doesn't even make logical sense, as it would mean that a doctor or lawyer could never be an employee of his sole owned practice) The remaining seven of the 13 factors, which are "less significant in the copyright context", *Horror,* 15 F.4th at 255, also favor Campbell's status as an employee. Testimony that Campbell was an employee of Luke Records will be provided by Joe Weinberger, (the in house lawyer for Luke Records), Herman Moskowitz (the CPA for Luke Records) and Allen Jacobi (the outside attorney for Luke Records).

There are numerous cases that support a finding that Campbell (as the CEO and owner of Luke Records) was acting within the scope of his employment. *See Sterpetti v. E-Brands Acquisition, LLC,* 2006 US Dist. LEXIS 21407 *20-22 (M.D. Fla. April 20, 2006)(an employee was an artist for hire who created a fresh pasta manual, within the scope of his employment even though there was no assignment nor contract; finding 3 elements must be present to show employee status if the work: a) is of the kind he is employed to perform; b) it occurs substantially with the authorized time and space limited; and c) it is activated at least in part by a purpose to serve the master.). Each of these three factors show that

Campbell was acting within the scope of his employment with Luke Records. At a minimum, therefore, Campbell, undoubtedly, as well as Mark Ross and Christopher Wong Won, were Luke Records employees so the *2 Live Crew* Copyrights are of works made for hire.

### 7.   Campbell's and Ross' Bankruptcies Divested Them of Any Right to Terminate[3]

To ensure full preservation and that the Court is fully informed, Campbell and Luke Records became the subject of bankruptcy proceedings which were jointly administered (the "Luke Bankruptcy"). Pursuant to the Joint Plan of Reorganization in the Luke Bankruptcy, the *2 Live Crew* Copyrights were transferred to and assigned pursuant to court order to Lil' Joe and its owner, Joseph Weinberger ("Weinberger"), "free and clear of any and all liens, claims, encumbrances, charges, setoffs or recoupments of any kind", that "no royalties, whether as artist, producer, writer, publisher, or in any other capacity, on any of the masters" are due to Campbell, and Campbell separately released, among others, Lil' Joe and Weinberger, including "for royalties to be paid in the future" as a result of this transfer. At no time did any of the Defendants object to the transfer or file a claim in the Luke Bankruptcy asserting that they owned or were entitled to any Section 203 termination rights. The *2 Live Crew* Copyrights were not abandoned back to Campbell and/or Luke Records. Ex. P 67.

Mark Ross also filed a bankruptcy (the "Ross Bankruptcy"). In the Ross Bankruptcy, an adversary proceeding was commenced by Lil' Joe against Mark Ross and, in settling that claim, Mark Ross acknowledged (just like Campbell did in the Luke Bankruptcy) that (other than writer's performance rights which are not relevant to this proceeding), "he has no rights (master or publishing)" to any of *2 Live Crew*'s recordings, which he acknowledged was owned by Lil'

---

[3] Although this Court has orally announced its findings in opposite to this argument, this Court has not yet issued its detailed written order [DE 166/167] that the Court announced it would issue, so Lil' Joe addresses this contention for this Court's further consideration and reconsideration, within the Court's power and authority, and for appellate preservation.

Joe. The *2 Live Crew* Copyrights were not abandoned back to Mark Ross. Ex. P 68.

As a result of these bankruptcies, Campbell and Mark Ross were divested of all rights they had at the time of their bankruptcy filings, which includes any termination rights. This occurs by operation of law. Defendants have asserted the termination rights remain their property despite their bankruptcies.

The Supreme Court has directed that "in interpreting a statute a court should always turn first to one, cardinal cannon before all others. We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what is says there." *Connecticut National Bank v Germain,* 503 U.S. 249, 253-54 (1992). Put another way, a Court is to "follow the text of the statute." *Unicolors, Inc. v H&M Hennes & Mauritz, L.P.,* 142 S.Ct. 941, 946 (2022). This is done by "examin[ing] the language of the provision itself." *Korman v HBC Florida, Inc.,* 182 F.3d 1291, 1295 (11th Cir. 1999). "When the words of a statute are unambiguous, then the first canon is also the last: 'judicial inquiry is complete.'" *Connecticut Nat'l.,* 503 U.S. at 254.

To further ensure the Court is fully informed and that this issue is fully preserved,_by bankruptcy law and the plain language of the Copyright Act, even termination rights not yet vested were still assets of Campbell's and Ross' bankruptcy estates. That is because "Courts consistently have concluded that contingent interests" are "included within the bankruptcy estate." *Denadai v Preferred Capital Markets, Inc*., 272 B.R. 21, 29 n 5 (D. Mass. 2001); *Russ v Jackson County School Board,* 530 F.Supp. 3d 1074, 1079-80 (N.D. Fla. 2021) ("When a debtor files a [bankruptcy] petition, his assets, with specified exemptions, are immediately transferred to a bankruptcy estate."); at 1079-80 ("Section 541 of the Bankruptcy Code provides that virtually all of a debtor's assets, both tangible and intangible, vest in the bankruptcy estate upon the filing of a bankruptcy petition."); 11 USC §541(a)(1).

Unvested and contingent options are bankruptcy estate assets as a matter of law. *Stoebner v Wick* (In re Wick), 276 F.3d 412, 415 (8th Cir 2001). *Denadai v Preferred Capital Markets, Inc*., 272

B.R. 21, 29 n 5 (D. Mass. 2001), specifically considered whether "options that are unvested as of the petition date" are assets of a bankruptcy estate. 272 B.R. at 28. It was observed that "[a]lthough Debtor here did not become entitled to exercise all of the stock options until after filing his petition, he did possess at that time the contingent right to exercise the options in the future." *Id*. at 29. Whether the termination rights had been exercised or vested or unvested, they remain assets of a bankruptcy estate.

Defendants argue that the inalienable nature of the termination right under 17 U.S.C. § 203(5), means that they retained their termination right notwithstanding the bankruptcies. Defendants rely on section 203(5), which provides that "Termination of the grant may be effected notwithstanding any agreement to the contrary, including an agreement to make a will or to make any future grant." This "agreements to the contrary" limitation requires that there be an "agreement." Unilateral acts, then, would arguably fall outside of the agreement limitation. Bankruptcy is a unilateral act in which the debtor voluntarily engages to discharge his debts.

This makes sense because section 203(5) addresses the "the unequal bargaining position of authors, resulting in part from the impossibility of determining a work's value until it has been exploited. Section 203 reflects a practical compromise that will further the objectives of the copyright law while recognizing the problems and legitimate needs of all interests involved." *Mills Music, Inc. v. Snyder*, 469 U.S. 153, 173 n. 39 (quoting congressional report H.R. Rep. No. 94-1476, at 124.); *Classic Media, Inc. v. Mewborn*, 532 F.3d 978, 984 (9th Cir. 2008).

Bankruptcy is not an "agreement" but a voluntary, unilateral process in which the debtor voluntarily obtains the quid pro quo of a "fresh start" in exchange for turning over all of his non-exempt property for the benefit of his creditors. *In re: Bilzerian,* 264 B.R. 726, 733-34 (Bankr. M.D. Fla. 2001). It does not carry the same unequal bargaining power between artist and publisher against which Congress meant to protect. Accordingly, the Copyright Act expressly contemplates transfers by

operation of law that are undertaken by the power of the bankruptcy court:

> (e)Involuntary Transfer.—
>> When an individual author's ownership of a copyright, or of any of the exclusive rights under a copyright, has not previously been transferred voluntarily by that individual author, no action by any governmental body or other official or organization purporting to seize, expropriate, transfer, or exercise rights of ownership with respect to the copyright, or any of the exclusive rights under a copyright, shall be given effect under this title, **except as provided under title 11** [the bankruptcy code].

17 U.S.C. §201(e). Consistently,  House Report No. 94-1476, expressly provides that bankruptcy proceedings are not prohibited by subsection (e), because a debtor has voluntarily entered into it:

> Traditional legal actions that may involve transfer of ownership, such as bankruptcy proceedings and mortgage foreclosures, are not within the scope of this subsection; the authors in such cases have voluntarily consented to these legal processes by their overt actions-for example, by filing in bankruptcy or by hypothecating a copyright.

### Defendants' Termination Notice Cannot Be Remedied Because the Termination Rights Extinguished in Bankruptcy

Any legal or equitable interest that Campbell or Mark Ross had in the *2 Live Crew* Copyrights, by operation of law became, and remain, property of their bankruptcy estates. "A debtor's bankruptcy petition creates a legal fiction known as a 'bankruptcy estate' into which the debtor … places all of his assets.' … 'All the 'legal or equitable interests' the debtor had in his property pre-petition become property of the bankruptcy estate….'" *Cardwell v Bankruptcy Estate of Joel Spivey (In re Douglas Asphalt Co.)*, 483 BR 560, 571 (Bankr. S.D. Ga. 2012); *Russ v Jackson County School Board*, 530 F.Supp. 3d 1074, 1079 (N.D. Fla. 2021) ("When a debtor files a [bankruptcy] petition, his assets, with specified exemptions, are immediately transferred to a bankruptcy estate."); 11 USC §541(a)(1).

 Under section 541(a)(1), the debtor's bankruptcy estate is comprised of 'all legal or equitable interests of the debtor in property as of the commencement of the case.'" 11 USC §541(a)(1). Bankruptcy Code § 541 provides that virtually all of a debtor's assets, both tangible and intangible, vest in the bankruptcy estate upon the filing of a bankruptcy petition." *Russ*, 530 F. Supp 3d at 1079-80.

Under the Bankruptcy Code, the term "claim" includes the "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured...." 11 U.S.C. § 101(5)(A). Congress intended "claim" to "adopt the broadest available definition" of the word and that is how it is applied. *See Johnson v. Home State Bank*, 501 U.S. 78, 83, 111 S.Ct. 2150, 115 L.Ed.2d 66 (1991); see also *Russ*, at 1080.

That Campbell or Mark Ross neglected to specifically list their respective section 203 termination rights in their respective bankruptcy is not a "gotcha" escape hatch.. "A debtor seeking shelter under the bankruptcy laws must disclose *all assets, or potential assets*, to the bankruptcy court. The duty to disclose is a continuing one that does not end once the forms are submitted to the bankruptcy court; rather, a debtor must amend his financial statements if circumstances change. Full and honest disclosure in a bankruptcy case is crucial to the effective functioning of the federal bankruptcy system." *Copeland v Birmingham Nursing & Rehabilitation Center East, LLC,* 2015 U.S. Dist. LEXIS 85297 *10 (N.D. Ala. July 1, 2015). "All assets, or potential assets" means all, not some. What these Defendants are advancing is that copyright authors who voluntarily go into bankruptcy can simply avoid the express and explicit carve out of the Copyright Act in § 201(e) for the Bankruptcy Code and later exercise termination rights under § 203 by simply not disclosing all their assets, actual and potential, that is directly at odds with the Copyright Act and the Bankruptcy Code,

It is Black Letter bankruptcy law that unlisted assets do not stay with the debtor. "[W]here...a party fails to disclose an asset to a bankruptcy court, but then pursues a claim in a separate tribunal based on that undisclosed asset", "[j]udicial estoppel is particularly appropriate." *Reed v. City of Arlington*, 650 F.3d 571, 574 (5th Cir. 2011) (citing and quoting *Jethroe v. Omnova Solutions, Inc.*, 412 F.3d 598, 600 (5th Cir. 2005)). "A debtor's failure to list a claim or cause of action 'on a bankruptcy

schedule leaves that interest in the bankruptcy estate.'" *Russ*, at 1082. "Once an asset becomes part of the bankruptcy estate, all rights held by the debtor in the asset are extinguished unless the asset is abandoned back to the debtor pursuant to § 554 of the Bankruptcy Code." *Id.* The *2 Live Crew* Copyrights were never abandoned back to Campbell or Mark Ross. Again, as a matter of Bankruptcy law, those rights were transferred to Lil' Joe. "After the bankruptcy case has been closed, 'property of the estate that is not administered in the bankruptcy proceedings remains the property of the estate'", not the debtor. *Russ*, 530 F.Supp 3d at 1082; *see also Reed,* 650 F.3d at 574-75. Directly at odds with Defendants' novel theory, whatever interest Campbell, Mark Ross and Luke Records had in the 2 Live Crew Copyrights, including, but not limited to, any termination rights, ceased being theirs to exercise.

Defendants have argued, and the Court relied upon the ruling in *Mills Music, Inc v Snyder*, 469 U.S. 153 (1985), for the proposition that Section 203 termination rights are not extinguished in bankruptcy, because they had not yet vested. With great respect, this is error.

One of the questions raised in this case is whether an author's bankruptcy, in this case two authors, Campbell and Mark Ross, divests the author of his copyright termination rights under 17 USC §203. The answer to that is yes, and it's expressly addressed in § 201 read with § 203. *Mills Music Inc. v Snyder*, 469 U.S. 153 (1985), does not support Defendants' position; it neither addresses nor does it clarify this question.

At issue in *Mills Music* was the "derivative works exception" to termination. In the event of termination and recapture under sections 203 or 304, a derivative work—or a work based on a work, or a recording of a song or a film based on a book, for example—licensed under the terminated, original grant may continue to be utilized under the terms of the original agreement, even after its termination.

In *Mills Music*, the song writer, Snyder, assigned his copyright in a song to a publisher, who, in turn, issued voluntary mechanical licenses to record companies to create derivative works – recordings

of the song. 469 U.S. at 156. That original copyright to the song was registered in 1923 by a publishing company that Snyder partly owned. *Id*. That publishing company went into bankruptcy in 1929 and in 1932 the bankruptcy trustee assigned the copyright to Mills Music, Inc. *Id*. at 156-57. In 1940 Snyder, who did not go through any bankruptcy proceeding, assigned his own, personal interest in the renewal of the copyright to Mills, and Mills registered the renewal copyright. *Id*. at 157-58. Mills issued over 400 licenses authorizing use of the song from which derivative works were made. *Id*. at 158.

Years later, when the songwriter's heirs terminated the publisher's original grant [not bankruptcy transfer] of the US copyright, the heirs claimed they were entitled to royalties generated by the record companies from the continuing sale of new copies of the recordings after termination. However, the Supreme Court held that the original publisher – not the songwriter's heirs – was entitled to continued receipt of the royalties. According to the Court, the publisher had originally issued a voluntary mechanical license and the Copyright Act should be read "to preserve the total contractual relationship," including the record companies' duty to pay the publisher any royalties, and the publisher's duty to pay the songwriter or his or her heirs or successors any due royalties."

*Mills Music* is oft cited, including by Defendants, for its recitation of the purpose of the termination provisions:

> "A provision of this sort is needed because of the unequal bargaining position of authors, resulting in part from the impossibility of determining a work's value until it has been exploited. Section 203 reflects a practical compromise that will further the objectives of the copyright law while recognizing the problems and legitimate needs of all interests involved." H.R. Rep. No. 94-1476, at 124.

*Mills Music*, 469 U.S. at 172, n.39. In other words, it is to prevent publishers from exploiting creators. This interest, however, is not implicated here. There is no agreement between two parties transferring the copyright interests; it was done by the bankruptcy court after Luther Campbell and Luke Records voluntarily entered into bankruptcy. Nor is there any agreement between any party that affects

termination rights. Only Luther Campbell and Luke Records' voluntary decision to enter bankruptcy and the bankruptcy court's transfer.

Moreover, *Mills* was decided under the renewal right provisions of the 1909 Copyright Act— not the termination provisions of current law. Under the Copyright Act of 1909, 35 Stat. 1075, the copyright in a musical composition lasted for 28 years from the date of its first publication, and the author could renew the copyright for an additional term of 28 years. 469 U.S. at 157. Defendants have quoted in their Response to Reconsideration: "Although Mills had acquired ownership of the original copyright from the trustee in bankruptcy, it needed the cooperation of Snyder in order to acquire an interest in the 28-year renewal term." Defendants omit, however that the Snyder *did enter a written agreement to exercise the renewal*: "Accordingly, in 1940 Mills and Snyder entered into a written agreement defining their respective rights in the renewal of the copyright. In essence, Snyder assigned his entire interest in all renewals of the copyright to Mills in exchange for an advance royalty and Mills' commitment to pay a cash royalty on sheet music and 50 percent of all net royalties that Mills received for mechanical reproductions." 469 U.S. at 157.

*Mills Music* did not address the question posed here, and does not support the proposition that copyright termination rights, irrespective of whether those are effectuated under 17 USC §203 or 304, are not an asset which becomes part of an author's bankruptcy. *Mills Music* does not address this question, explicitly or implicitly, because the author, Snyder, never filed bankruptcy. While Snyder's publishing company (the equivalent of Luke Records here) filed bankruptcy, the author, Snyder (the equivalent of Campbell and Mark Ross, who did file for bankruptcy), did not file for bankruptcy. *Mills Music* is of no consequence whatsoever in evaluating the impact of an author's bankruptcy and the orders of the bankruptcy courts on the author's termination rights – it is simply not addressed at all.

*Mills Music* only uses the word "vest" in reciting Snyder's agreement with Mills, *Mills Music*,

469 U.S. at 642 n.10, and in stating a position that the Snyders advanced that *Mills Music* rejected as unpersuasive, under the 1909 Copyright Act, *id.* at 651 n 45. *Mills Music* does not discuss or decide when termination rights vested or whether they became an asset of a bankruptcy estate, whether vested or unvested.

Even termination rights not yet vested were still assets of Campbell's and Mark Ross' bankruptcy estates. "Courts consistently have concluded that contingent interests" are "included within the bankruptcy estate." *Denadai v Preferred Capital Markets, Inc*., 272 B.R. 21, 29 n 5 (D. Mass. 2001); Russ, at 1079-80 ("Section 541 of the Bankruptcy Code provides that virtually all of a debtor's assets, both tangible and intangible, vest in the bankruptcy estate upon the filing of a bankruptcy petition."). Unvested and contingent options most certainly are bankruptcy estate assets. *Stoebner v Wick* (In re Wick), 276 F.3d 412, 415 (8th Cir 2001). *Denadai* specifically considered whether "options that are unvested as of the petition date" are assets of a bankruptcy estate. 272 B.R. at 28. It was observed that "[a]lthough Debtor here did not become entitled to exercise all of the stock options until after filing his petition, he did possess at that time the contingent right to exercise the options in the future." Id. at 29. Whether the termination rights had been exercised or vested or unvested, they remain assets of a bankruptcy estate.

Finally, and most relevantly, the Court has not addressed the 1996 Order of Judge Robert Mark, granting Lil Joe complete ownership of the sound copyrights "free and clear of any and all liens, claims, encumbrances, charges, set off or recoupments of any kind." At no time did Campbell, Luke Records, any of the other Defendants or *2 Live Crew*'s other member seek relief from this final (literally decades ago) and no longer appealable order. It should be noted that Campbell was (in the bankruptcy court) the proponent of this plan, which included this Order, and Mark Ross and Christopher Wong Won participated in the bankruptcy proceedings but did not object to entry of the

Order. See Ex. P 67.

Thus, the 1996 Order precludes any challenge to Lil Joe's ownership of the sound copyrights "free and clear of any and all liens, claims, encumbrances, charges, set off or recoupments of any kind." Where a court of competent, which a bankruptcy court is, jurisdiction renders a prior final judgment on the merits, as did Judge Grant here, that order is to be given preclusive effect through res judicata and collateral estop. *See Wallis v. Justice Oaks II, Ltd.*, 898 F.2d 1544, 1550–52 (11th Cir. 1990); *CSX Transp., Inc. v. Bhd. of Maint. of Way Emps.*, 327 F.3d 1309, 1317 (11th Cir. 2003).

<u>**CONCLUSION**</u>

For any one of the 6 reasons listed above, the Termination Notice is not effective to terminate the grant of rights made in the 1991 Agreements or the subsequent grants. Thus, Lil Joe continues to own the sound recording copyrights that it acquired pursuant to the 1996 Order of Judge Robert Mark. Judgment granting Lil Joe's request for declaratory relief should be entered and Defendants' request for declaratory relief should be denied. Further, Plaintiff should be awarded fees and costs pursuant to 17 USC §505.

**WOLFE LAW MIAMI PA**
Counsel for Lil Joe Records Inc.
175 SW 7th Street, Suite 2410
Miami, Florida 33130
Phone: 305-384-7370

s/ Richard C. Wolfe_____
   Richard C. Wolfe, Esq.
   Florida Bar No.: 355607

28

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 27, 2024, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record identified on the attached Service List in the manner specified, either via transmission of Notice of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notice of Electronic Filing.

Joel Rothman, Esq.
SRIP LAW PA
21301 Powerline Road, Ste 100
Boca Raton, Florida 33433
joel.rothman@sriplaw.com

Scott Burroughs, Esq.
Doniger/Burroughs
237 Water Street, First Floor
New York, NY 10038
scott@donigerlawfirm.com

/s/ Richard C. Wolfe
Richard C. Wolfe
