UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 1:21-cv-23727-GAYLES/TORRES

LIL' JOE RECORDS, INC.,

      Plaintiff,

v.

RAVEN ROSS, CHRISTOPHER WONG WON, JR.,
RODERICK WONG WON, LETERIUS RAY,
ANISSA WONG WON, and LUTHER CAMPBELL,

      Defendants.

_____/

## ORDER

    **THIS CAUSE** comes before the Court on the Plaintiff's Motion for Partial Summary Judgment, [ECF No. 30], and the Defendants' Motion for Summary Judgment, [ECF No. 53] (collectively, the "Motions"). The Court has reviewed the Motions and the record and is otherwise fully advised. For the reasons stated below, the Plaintiff's Motion is **DENIED**, and the Defendants' Motion is **GRANTED in part and DENIED in part**.

## I.    BACKGROUND[1]

    This is a music copyright ownership dispute between Plaintiff Lil' Joe Records, Inc. ("Lil' Joe") and the Defendants. Defendant Luther Campbell ("Campbell") is a former member of the musical group 2 Live Crew. Defendants Raven Ross ("Raven"), Anissa Wong Won ("Anissa"), Christopher Wong Won, Jr. ("Christopher"), Roderick Wong Won ("Roderick"), and Leterius Ray

---

[1] The undisputed facts, unless otherwise noted, are taken from the Plaintiff's Statement of Material Facts, [ECF No. 31]; the Defendants' Response to Plaintiff's Statement of Material Facts and Additional Facts, [ECF No. 37]; the Defendants' Statement of Material Facts in Support of its Motion for Summary Judgment, [ECF No. 53-1]; the Plaintiff's Response to Defendants' Statement of Material Facts and Additional Facts, [ECF No. 59]; the Defendants' Reply to Statement of Material Facts, [ECF No. 62-1]; and the corresponding record citations and exhibits.

("Leterius") are the children and heirs of former 2 Live Crew members Mark Ross ("Ross") and Christopher Wong Won ("Wong Won"), who have unfortunately passed away. The fourth member of 2 Live Crew, David Hobbs, is not a party in this litigation.

The parties seek a determination as to whether the Defendants lost their right to terminate the transfer of copyrights in 2 Live Crew's music and reclaim those copyrights from the current owner, Lil' Joe. The Court begins by recounting the limited undisputed facts.

### A.    Undisputed Facts

Miami-based 2 Live Crew gained notoriety in the 1980s and 1990s for its music, which became the center of public and legal controversy due to its explicit content. Between 1986 and 1989, 2 Live Crew recorded five albums: *The 2 Live Crew Is What We Are* (1986), *Move Somethin'* (1988), *Move Somethin' (Clean)* (1988), *As Nasty As They Wanna Be* (1989), and *As Clean As They Wanna Be* (1989) (collectively, the "Subject Albums"). The Subject Albums were released under various iterations of the record label Luke Skyywalker Records, Inc., which was owned by Campbell and subsequently renamed Skyywalker Records, Inc., and finally Luke Records, Inc. ("Luke Records").[2]

### 1)    The Bankruptcies and Settlement Agreements

On March 28, 1995, Luke Records became the subject of an involuntary Chapter 7 bankruptcy petition filed by its creditors in the U.S. Bankruptcy Court for the Southern District of Florida. [ECF No. 32 ¶ 6]. On June 12, 1995, Campbell individually filed a voluntary Chapter 11 bankruptcy petition. *Id.* On March 22, 1996, the Bankruptcy Court entered an Order Confirming Joint Plan of Reorganization (the "Confirmation Order"), [ECF No. 32-3], jointly administering

---

[2] For the sake of clarity, in this Order, the Court will refer to all iterations of the record label as "Luke Records."

the Luke Records and Campbell bankruptcies under Chapter 11.[3] The Confirmation Order adopted the parties' letter of intent regarding the terms of reorganization (the "Letter of Intent"), [ECF No. 1-3], and the Joint Plan of Reorganization (the "Reorganization Plan"), [ECF No. 32-2], (collectively, the "Bankruptcy Filings"). [ECF No. 32-3 ¶ 20].

The Letter of Intent states that all copyright rights to 2 Live Crew's music and compositions and all trademark rights in 2 Live Crew's marks and cover designs were transferred to Lil' Joe and Lil' Joe's President, Joseph Weinberger ("Weinberger"), "free and clear of any and all liens, claims, encumbrances, charges, setoffs or recoupments of any kind." [ECF No. 1-3 at 3]. Luke Records and Campbell agreed to receive "no royalties, whether as artist, producer, writer, publisher, or in any other capacity, on any of the masters or compositions." *Id.* Lil' Joe and Weinberger were released from "claim[s] for royalties to be paid in the future, as a result of this transfer." *Id.* at 16. The Reorganization Plan did not mention future termination rights. Importantly, in the Luke Records and Campbell bankruptcies, Wong Won, Ross, and Hobbs did not file claims asserting that they owned or were entitled to any rights appurtenant to any of the 2 Live Crew copyrights transferred to Lil' Joe and Weinberger. [ECF No. 31 ¶ 6].

On November 22, 2000, Ross filed for bankruptcy in the U.S. Bankruptcy Court for the Northern District of Alabama. [ECF No. 32 ¶ 11]. During the bankruptcy, Ross settled a claim brought by Lil' Joe (the "Ross Settlement Agreement"). *Id.* The Ross Settlement Agreement acknowledged that other than writer's performance rights, Ross "has no rights (master or publishing) to any previous recordings owned by Lil' Joe Records, Inc. and Lil['] Joe Wein Music, Inc. and The 2 Live Crew name which were previously owned by Luther Campbell and Luke

---

[3] Although the Bankruptcy Court administered the two cases jointly, they were maintained as separate cases: *In re Luke Records, Inc.*, No. 95-11447 (Bankr. S.D. Fla. 1995), and *In re Luther Campbell*, 185 B.R. 628 (Bankr. S.D. Fla. 1995).

Records" and "has no rights (master or publishing) in any other recordings owned by Lil' Joe Records, Inc." [ECF No. 32-6 at 4].[4] The Ross Settlement Agreement did not mention future copyright transfer termination rights.

In 2002, Weinberger sued Wong Won. In settling the claims against him, Wong Won agreed that Lil' Joe and Lil' Joe Wein Music, Inc. "own all right, title and interest to all copyrights and trademarks previously conveyed to them in the bankruptcy of Luke Records and Luther Campbell"; released "any claims whatsoever to those works"; and agreed that Wong Won "has no further claims to any royalties to any of the works owned by" Lil' Joe (the "Wong Won Settlement Agreement"). [ECF No. 32-4]. Separately, Wong Won released Lil' Joe and Weinberger from, among other things, "[a]ll royalties, profits and other monies or payments at any time, directly or indirectly, due or to become due," and "[a]ll rights to sue for infringements." [ECF No. 32-5 at 2]. Like the Bankruptcy Filings and the Ross Settlement Agreement, the Wong Won Settlement Agreement did not mention future copyright transfer termination rights.

2)     The Termination Notice

Pursuant to the Copyright Act of 1976 (the "Copyright Act"), authors or their heirs can "terminate the rights of a grantee to whom the author had transferred rights in the original work." *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 284 (2d Cir. 2002) (citations omitted). The Copyright Act contains two provisions regarding the termination of copyright grants: 17 U.S.C. §§ 203, 304(c). Both provisions were designed to "safeguard[ ] authors against unremunerative transfers" and are "needed because of the unequal bargaining position of authors, resulting in part from the impossibility of determining a work's value until it has been exploited." H.R. Rep. No. 94-1476, at 124 (1976), *reprinted in* 1976 U.S.C.C.A.N. 5659, 5740. For copyrights transferred

---

[4] Lil' Joe Wein Music, Inc. is related to, and has the same principal as, Lil' Joe.

on or after January 1, 1978, the author (or his successors, as defined by the statute) could terminate the transfer between thirty-five and forty years after the date the copyright was assigned to a third party. 17 U.S.C. § 203(a)(3).

It is undisputed that the transfer of the copyrights to the Subject Albums occurred after January 1, 1978. Therefore, the Court looks to § 203, which states:

(a) Conditions for Termination. - In the case of any work other than a work made for hire, the exclusive or nonexclusive grant of a transfer or license of copyright or of any right under a copyright, executed by the author on or after January 1, 1978, otherwise than by will, is subject to termination under the following conditions:

(1) In the case of a grant executed by one author, termination of the grant may be effected by that author or, if the author is dead, by the person or persons who, under clause (2) of this subsection, own and are entitled to exercise a total of more than one-half of that author's termination interest. In the case of a grant executed by two or more authors of a joint work, termination of the grant may be effected by a majority of the authors who executed it; if any of such authors is dead, the termination interest of any such author may be exercised as a unit by the person or persons who, under clause (2) of this subsection, own and are entitled to exercise a total of more than one-half of that author's interest.

(2) Where an author is dead, his or her termination interest is owned, and may be exercised, as follows:

(A) The widow or widower owns the author's entire termination interest unless there are any surviving children or grandchildren of the author, in which case the widow or widower owns one-half of the author's interest.

(B) The author's surviving children, and the surviving children of any dead child of the author, own the author's entire termination interest unless there is a widow or widower, in which case the ownership of one-half of the author's interest is divided among them.
. . .

(3) Termination of the grant may be effected at any time during a period of five years beginning at the end of thirty-five years from the date of execution of the grant; or, if the grant covers the right of publication of the work, the period begins at the end of thirty-five years from the date of publication of the work under the grant or at the end of forty years from the date of execution of the grant, whichever term ends earlier.

(4) The termination shall be effected by serving an advance notice in writing, signed by the number and proportion of owners of termination interests required under

5

clauses (1) and (2) of this subsection, or by their duly authorized agents, upon the grantee or the grantee's successor in title.

> (A) The notice shall state the effective date of the termination, which shall fall within the five-year period specified by clause (3) of this subsection, and the notice shall be served not less than two or more than ten years before that date. A copy of the notice shall be recorded in the Copyright Office before the effective date of termination, as a condition to its taking effect.

> (B) The notice shall comply, in form, content, and manner of service, with requirements that the Register of Copyrights shall prescribe by regulation.

> **(5) Termination of the grant may be effected notwithstanding any agreement to the contrary, including an agreement to make a will or to make any future grant.**

17 U.S.C. § 203 (emphasis added). Under this statute, termination of a copyright grant may be effected at any time during a five-year period, starting thirty-five years after the execution of the grant. *Id.* § 203(a)(3).

On November 4, 2020, the Defendants served all possible rights-holders, including the Plaintiff, via first-class mail and e-mail with a notice to terminate a 1990 Agreement transferring copyright ownership of the Subject Albums to Luke Records (the "Termination Notice"). [ECF No. 53-5 at 2]. The Termination Notice states:

> We hereby provide formal notice that our Clients are terminating their copyright grants, as detailed hereinbelow, pursuant to 17 U.S.C. §203. Our investigation has revealed that the recipients of this correspondence and the parties identified herein are or were grantees and/or successors-in-title that received a transfer of copyrights related to works created and/or owned by our Clients. Section 203 allows authors and their heirs to terminate copyright transfers within a five-year window[] running from thirty-five to forty years after the execution of such transfers or publication of the work(s) transferred. Notably, the "[t]ermination of the grant may be effected notwithstanding any agreement to the contrary, including an agreement to make a will or to make any future grant." 17 U.S.C. § 203 (a)(5).

[ECF No. 53-5 at 3]. Campbell, Christopher, and Ross signed the Termination Notice and timely recorded it with the U.S. Copyright Office. [ECF No. 53-1 ¶¶ 21–23, 26]. The Termination Notice contains the date of publication of the Subject Albums and describes the grant being terminated as

the "[g]rant to [Luke] Records, Inc. titled 'Recording Agreement,' granted January 1, 1987, undated, and executed by Clients." [ECF No. 53-5 at 6–7].

**B.**     **Disputed Facts**

As explained below, many of the material facts in this case are disputed and, therefore, preclude summary judgment. The parties dispute when the copyrights of the Subject Albums were transferred, how they were transferred, and what rights were specifically transferred.

1)     The Copyright Transfer Agreements

The Defendants claim that between 1986 and 1989, the 2 Live Crew members entered into an oral agreement about how the rights to the Subject Albums, including copyrights, would be treated (the "Oral Agreement"). [ECF No. 53-1 ¶ 4]. The Defendants contend that, in or around 1990, 2 Live Crew's members entered into a written agreement with Luke Records to memorialize the Oral Agreement and transfer the copyrights for the Subject Albums (the "1990 Agreement"). *Id.* ¶ 11. The 1990 Agreement does not indicate when the parties signed it. [ECF No. 53-3]. However, the 1990 Agreement states that it was effective between January 1, 1987, and December 31, 1987, with options to extend it for additional contract periods. *Id.* The 1990 Agreement states, in part:

2. RECORDING COMMITMENT

. . .

(d) . . . All master recordings recorded during the term here of and all derivatives manufactured therefrom, together with the performances embodied thereof shall from the inception of their creation, be entirely and forever the property of [Luke Records], or its designee free from any claims whatsoever by Artist or any person, firm or corporation deriving any rights or interests from Artist; and company shall have the right to assign and otherwise transfer such copyrights to any third party, free and clear of any claim by Artist or any person, firm or corporation, deriving any rights from Artist.

. . .

7

3. <u>GRANT OF RIGHTS</u>

Artist hereby grants to [Luke Records] the sole and exclusive right during the initial term of this Agreement and all renewals and extensions of the same to use, publish and permit others to use and publish, and licenses [sic] and authorize the use of Artists [sic] name, including any professional name, likeness, signature and biographical data about Artist on and in connection with the manufacture, advertising, sale, lease and other exploitation in all fields of use throughout the world, of records, as the same are now known or hereafter devised or improve, including audiovisual devices, record products and other products and services of [Luke Records] and [Luke Records'] licensees, upon such terms and conditions as [Luke Records] may approve. However, the above[-]mentioned grant of rights shall not include merchandising rights and said right shall be nonexclusive after the term of this agreement and shall continue thereafter in perpetuity.

[ECF No. 53-3 at 5].

The Plaintiff claims that the 1990 Agreement is not valid because the Oral Agreement did not occur. [ECF No. 59 ¶¶ 4–5]. The Plaintiff also contends that the 1990 Agreement is not enforceable because Campbell, Ross, and Leterius could not recall terms or details of the Oral Agreement. *Id.* The Plaintiff cites to Campbell's deposition testimony that he did not "recall the specific verbal terms of the contract" or "recall the date that [he] had a verbal contract." *Id.* ¶ 4 nn.1-2; [ECF No. 59-1 at 8]. Similarly, the Plaintiff notes that Ross and Leterius attested to their lack of knowledge regarding the terms and circumstances of the Oral Agreement. [ECF No. 59 ¶ 4 nn.3-5]. Moreover, the Plaintiff contends that the 1990 Agreement could not have transferred the copyrights for the Subject Albums because the agreement did not occur until after the Subject Albums were recorded and released and "did not transfer the copyrights at issue." *Id.* at ¶ 20.

In 1991, Luke Records and the 2 Live Crew members entered into multiple recording agreements (collectively, the "1991 Agreements").[5] The Plaintiff contends that, through the 1991

---

[5] The 1991 Agreements included the following: Exclusive Recording Agreement dated April 1991, between Luke Records, Inc. and Wong Won; Exclusive Recording Agreement dated April 1991, between Luke Records, Inc., Ross, and Hobbs; and Exclusive Recording Agreement dated February 1991, between Luke Records, Inc. and Ross, Wong Won, Hobbs, and Campbell. [ECF No. 1-2].

Agreements, the Defendants transferred all copyright rights in 2 Live Crew's music (including the Subject Albums) and all trademark rights in 2 Live Crew's marks and cover designs to Luke Records. [ECF No. 31 ¶ 3]. However, the Defendants assert that the 1991 Agreements could not have transferred those rights because they post-date creation of the Subject Albums and are, therefore, prospective looking only. [ECF No. 62-1 ¶ 3]. For support, the Defendants cite to the 1991 Agreements, which state, "[t]he term of this Agreement shall be for a period of one (1) year commencing on the date hereof." *Id.*

### 2)   The Validity of the Termination Notice

The Defendants claim that the Descriptions in the Termination Notice reference the Oral Agreements memorialized in the written 1990 Agreement. [ECF No. 53-5 at 5–8]. However, the parties dispute the existence of the Oral Agreements and whether the 1990 Agreement or the 1991 Agreements transferred copyright ownership of the Subject Albums to Campbell and Luke Records. The Defendants argue that the 1990 Agreement is the operative grant and that it covered the right of publication because it states, "Artist hereby grants to [Luke Records] the sole and exclusive right during the initial term of this Agreement and all renewals and extensions of the same to use, publish and permit other to use and publish . . . ." [ECF No. 53-1 ¶¶ 24-25]. The Plaintiff contends that the 1991 Agreements, not the 1990 Agreement, transferred ownership of the copyrights to the Subject Albums. [ECF No. 59 at 11 ¶ 3]. Due to this underlying factual dispute as to which agreement is the operative grant of the copyright ownership, there is also a dispute as to whether the Termination Notice is valid.

### 3)   Work Made for Hire Designations

Additionally, the parties dispute whether the Subject Albums constitute works made for hire under § 203. As set forth in more detail below, the author of a work is the initial owner of the copyright for that work. 17 U.S.C. § 201(a). But when a work is "made for hire," the employer,

rather than the employee, is deemed the author for the purposes of the statute. 17 U.S.C. § 201(b).

Here, there are factual disagreements about whether the 2 Live Crew members created the Subject Albums within the scope of their employment with Luke Records, including the nature of parties' business relationships and how the 2 Live Crew members were paid. [ECF No. 53-1 ¶¶ 29–33, 50]; [ECF No. 59 ¶¶ 20, 29–33]; [ECF No. 33]. The parties further dispute where the Subject Albums were recorded and whether Luke Records paid for the studio sessions to record them, [ECF No. 59 at 10 ¶ 53]; whether Luke Records could assign additional projects outside 2 Live Crew's obligation to create the Subject Albums, *id.* ¶ 51; the length of the parties' working relationship, *id.* ¶ 49; and whether 2 Live Crew members had the freedom to create their own work and personal schedule, *id.* ¶ 53. The parties also dispute whether Campbell, as CEO of Luke Records, was also an employee of Luke Records based on his activities, which included signing checks on behalf of Luke Records, receiving employee benefits from Luke Records, and hiring and firing Luke Records employees. *Id.* at 15 ¶¶ 15–20.

The parties also note contradictions within the performing arts copyright ("PA") registrations, which were filed with the U.S. Copyright Office for each song comprising the Subject Albums. *Id.* at 8 ¶¶ 35, 37. Some PA registrations, including those for the first Subject Album, list Ross, Campbell, Won Wong, and Hobbs as authors and state that each author's contribution was not a "work made for hire." [ECF No. 53-1 ¶ 35]. The Plaintiff separately filed sound recording copyright ("SR") registrations with the U.S. Copyright Office for each of the Subject Albums and listed either Luke Records or Lil' Joe as the author. *Id.* at ¶ 40. The SR forms for *As Nasty As They Wanna Be (XR-107)* and *As Clean As They Wanna Be (XR-108)* check the "yes" box, indicating that Luke Records' contribution was a work made for hire. [ECF No. 39-64]; [ECF No. 39-65]. The SR forms for *2 Live Is What We Are (XR-100)* and *Move Somethin' (XR-102)* check both the "yes" and "no" boxes to indicate whether they were works made for hire.

[ECF No. 39-61]; [ECF No. 39-63]. On the other hand, the SR form for *Move Somethin' (XR-101)* checks the "no" box, indicating that its contribution was not a work made for hire. [ECF No. 39-62].

### C.   Procedural Background

On October 21, 2021, the Plaintiff filed a ten-count Complaint against the Defendants seeking declaratory judgment as to the validity of the Termination Notice (Count I) and alleging federal trademark infringement against the Wong Won heirs (Count II); false designation of origin against the Wong Won heirs (Count III); Florida trademark infringement against the Wong Won heirs (Count IV); common law trademark infringement against the Wong Won heirs (Count V); federal trademark infringement against Mark Ross[6] (Count VI); false designation of origin against Mark Ross (Count VII); Florida trademark infringement against Mark Ross (Count VIII); common law trademark infringement against Mark Ross (Count IX); and copyright infringement against Mark Ross (Count X). On February 18, 2022, the Defendants filed an Answer and Counterclaim, asserting twenty-one affirmative defenses and a counterclaim seeking a declaration that the Defendants own certain rights, had the ability to terminate the relevant transfers, and effectively served the Termination Notice. [ECF No. 12].

On September 23, 2022, the Plaintiff filed its Motion for Partial Summary Judgment as to Count I. [ECF No. 30]. On December 1, 2022, the Defendants filed their cross Motion for Summary Judgment on all Counts. [ECF No. 53]. At the July 7, 2023 hearing on the Motions, the parties presented arguments on the Plaintiff's claim for declaratory relief.[7]

---

[6] On August 13, 2024, the Defendants filed a Motion for Substitution of a Party seeking the substitution of Raven Ross in the place of Mark Ross as a defendant in this action, which the Court subsequently granted. [ECF No. 179]; [ECF No. 182].

[7] Prior to the hearing, the Court rejected the Plaintiff's attempts to voluntarily dismiss its infringement and false designation of origin claims (Counts II–X). [ECF No. 139]; [ECF No. 141]. At the hearing, the Plaintiff conceded that Counts II–X are no longer at issue. However, the parties have not sought partial final judgment or leave to amend.

## II.     LEGAL STANDARD

Under Federal Rule of Civil Procedure 56(a), summary judgment "is appropriate only if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." *Tolan v. Cotton*, 572 U.S. 650, 656–57 (2014) (per curiam) (quoting Fed. R. Civ. P. 56(a)) (internal quotation marks omitted). "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). An issue is "genuine" when a reasonable trier of fact, viewing all the record evidence, could rationally find in favor of the nonmoving party in light of its burden of proof. *Harrison v. Culliver*, 746 F.3d 1288, 1298 (11th Cir. 2014). And a fact is "material" if, "under the applicable substantive law, it might affect the outcome of the case." *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259–60 (11th Cir. 2004).

The Court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *SEC v. Monterosso*, 756 F.3d 1326, 1333 (11th Cir. 2014). However, to prevail on a motion for summary judgment, "the nonmoving party must offer more than a mere scintilla of evidence for its position; indeed, the nonmoving party must make a showing sufficient to permit the jury to reasonably find on its behalf." *Urquilla-Diaz v. Kaplan Univ.*, 780 F.3d 1039, 1050 (11th Cir. 2015) (citation omitted). Furthermore, conclusory allegations will not create an issue of fact for trial sufficient to defeat a well-supported motion for summary judgment. *See, e.g.*, *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1081 (11th Cir. 1990) (citations omitted). "A district court's disposition of cross-motions for summary judgment

---

Therefore, this Court "still must address or otherwise dispose of" Counts II–X. *Rosell v. VMSB, LLC*, 67 F.4th 1141, 1144 (11th Cir. 2023) (quoting *In re Esteva*, 60 F.4th 664, 677–78 (11th Cir. 2023)).

employs the same legal standards applied when only one party files a motion." *Certain Underwriters at Lloyds, London Subscribing to Policy No. SA 10092-11581 v. Waveblast Watersports, Inc.*, 80 F. Supp. 3d 1311, 1316 (S.D. Fla. 2015) (citation omitted).

## III.   DISCUSSION[8]

The Plaintiff argues that summary judgment should be granted in its favor on Count I and seeks a declaration that (1) Campbell and Ross lost any termination rights through bankruptcy; (2) Ross and Wong Won relinquished their termination rights in their settlement agreements (collectively, "Settlement Agreements") with Lil' Joe; (3) the 2 Live Crew members were artists for hire and, therefore, hold no termination rights; and (4) the Termination Notice was ineffective as a matter of law. The Defendants contend that summary judgment is warranted in their favor on Counts I–X of the Complaint and as to their counterclaim for declaratory judgment because (1) the Termination Notice was effective; (2) § 203 termination rights are inalienable; (3) the Subject Albums were not works made for hire because the 2 Live Crew members were not artists for hire; and (4) the infringement claims are meritless.[9]

The Court notes that whether the members of 2 Live Crew were artists for hire; whether the Termination Notice was ineffective; and which agreement is the operative agreement for the purposes of termination are all threshold issues. If the Court were to find that the 2 Live Crew members were artists for hire or that the Termination Notice was ineffective, it would not need to reach the issue of whether the Defendants' termination rights were forfeited in bankruptcy or via the Settlement Agreements. However, because the Court finds that disputed issues of material fact preclude summary judgment on these threshold issues, its analysis will be limited primarily to

---

[8] At the hearing and in their pleadings, the parties briefly referenced the Defendants' statute of limitations, estoppel, and laches defenses. Because no party moved for summary judgment on those defenses, the Court does not address them in this Order.

[9] Following the hearing on the cross-motions for summary judgment, the parties filed notices disputing case law and seeking relief from this Court, [ECF Nos. 147, 149–151], which the Court has considered.

whether the Defendants renounced their termination rights through bankruptcies and settlement agreements. Lastly, the Court will take up the Plaintiff's Trademark and Copyright Infringement Claims.

### A.   Threshold Issues

1)   <u>Works Made for Hire</u>

Under the Copyright Act, the author of a work is the initial owner of the copyright for that work. 17 U.S.C. § 201(a). When a work is "made for hire," the employer, rather than the employee, is deemed the author. *Id*. § 201(b). Section 101 of the Copyright Act provides that a work is "for hire" under two sets of circumstances:

> (1) a work prepared by an employee within the scope of his or her employment; or
>
> (2) a work specially ordered or commissioned for use as a contribution to a collective work . . . if the parties expressly agree in a written instrument signed by them that the work shall be considered a work made for hire.

17 U.S.C. § 101. Only § 101(1) is relevant here.[10] Therefore, the parties must demonstrate that there is no genuine issue of material fact as to whether the 2 Live Crew members were employees of Luke Records when they created the Subject Albums. Said otherwise, the "for hire" determination depends on whether the Defendants completed the Subject Albums within the scope of their employment. The Defendants argue that the lack of a work-for-hire agreement and the concessions in the copyright registrations establish that the Subject Albums are not works for hire. [ECF No. 53 at 12–15]. However, as the Defendants correctly note, this determination under § 101(1) also requires the Court to go through "thirteen non-exhaustive [agency] factors." *Horror Inc. v. Miller*, 15 F.4th 232, 242–43 (2d Cir. 2021).

---

[10] Section 101(2) is not applicable because the parties do not argue that any of the Subject Albums were "specially ordered or commissioned." Moreover, the Subject Albums do not fall into the listed works.

In *Reid*, the Supreme Court set forth a multi-factor test to determine whether an author was an employee and produced the work at issue while acting within the scope of his or her employment. *Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 747 (1989). To determine whether a party qualifies as a hired employee or an independent contractor, courts should apply common law agency principles and consider the following factors:

> (1) the hiring party's right to control the manner and means by which the work is accomplished; (2) the skill required to create the work; (3) the source of the instrumentalities and tools; (4) the location of the work; (5) the duration of the relationship between the parties; (6) whether the hiring party has the right to assign additional projects to the hired party; (7) the extent of the hired party's discretion over when and how long to work; (8) the method of payment; (9) the hired party's role in hiring and paying assistants; (10) whether the work is part of the regular business of the hiring party; (11) whether the hiring party is in business; (12) the provision of employee benefits; [and] (13) the tax treatment of the hired party.

*Horror Inc.*, 15 F.4th at 244 (citing *Reid*, 490 U.S. at 751–53). "This inquiry is highly fact specific." *Roberts v. Gordy*, 359 F. Supp. 3d 1231, 1244 (S.D. Fla. 2019).

In their Response, while applying the *Reid* factors, the Defendants recognize that at least two disputed issues of material fact exist: (1) whether the 1991 Agreements and the paycheck stubs from Luke Records covered the Subject Albums; and (2) whether Luke Records may have exercised some supervision over the Subject Albums. [ECF No. 36 at 21]. In its Reply, the Plaintiff concedes "that Defendants have raised genuine issues of contested fact whether Defendants were artists for hire." [ECF No. 47 at 1].

Despite noting the existence of these factual disputes in their Response, the Defendants argue in their own Motion that the *Reid* factors support their argument that the 2 Live Crew members were not employees. The Court disagrees. At the very least there are disputed material facts as to whether Campbell "exercised complete control of [Luke Records]" and whether "[t]here simply was no supervision of [Campbell's] work other than his own." *M & A Assocs., Inc. v. VCX, Inc.*, 657 F. Supp. 454, 459 (E.D. Mich. 1987), *aff'd*, 856 F.2d 195 (6th Cir. 1988); *see also Clancy*

*v. Jack Ryan Enterprises, Ltd.*, No. CV ELH-17-3371, 2021 WL 488683, at *26 (D. Md. Feb. 10, 2021) (finding that the evidence demonstrated that neither of the entities asserting ownership made any attempt to control the manner and means by which the subject works (books) were written); *Heimerdinger v. Collins*, No. 07-00844-CIV, 2009 WL 1743764, at *4 (D. Utah June 18, 2009) (finding that partner A's allegation that he and co-partner B were "employees and partners" of the partnership "is conclusory and without supporting facts" to show that partner B created the subject works as an employee of the partnership). "Accordingly, because the work for hire inquiry is highly fact specific, and because there is conflicting evidence, the issue is inappropriate for resolution on summary judgment[ ] and must be determined by a jury." *Roberts*, 359 F. Supp. 3d at 1245.

2)     The Operative Agreement

Genuine issues of material fact also exist as to which of the agreements granted the transfer of ownership of the subject copyrights. Indeed, the parties dispute the facts and events precipitating the Oral, 1990, and 1991 Agreements. The Defendants contend that the 1990 Agreement memorialized the Oral Agreement. However, the Plaintiff claims that there was no Oral Agreement and, if it did exist, it is not enforceable because the 2 Live Crew members cannot recall the terms or dates that it occurred. The Plaintiff specifically cites to Campbell's testimony that he "didn't recall the specific verbal terms of the contract," and that he "[didn't] recall the date that [he] had a verbal contract." [ECF No. 59 ¶ 4 nn.1-2]; [ECF No. 59-1 at 8]. Similarly, the Plaintiff notes that Ross and Leterius attested to their lack of knowledge regarding the terms and circumstances of the Oral Agreement. [ECF No. 59 ¶ 4 nn.3-5].

The validity of the 1990 Agreement is also the subject of numerous factual disputes, which require credibility determinations. Notably, the 1990 Agreement is undated. However, it states that "THE PARTIES HERETO HAVE EXECUTED THIS AGREEMENT ON THE YEAR AND

DATE FIRST ABOVE WRITTEN." [ECF No. 53-3 at 24]. As the first written date is January 1, 1987, *id.* at 2, a reasonable jury could find that the 1990 Agreement was not actually signed in 1990. The parties also dispute whether the Subject Albums fall under the terms of the 1990 Agreement or the later 1991 Agreements.

The record is replete with additional material factual disputes related to the agreements at issue, including the dates of pertinent events, conversations between the parties, actions taken by the parties, and responsibilities of the parties. With these facts in dispute, the Court cannot determine when the parties assumed ownership of the copyrights at issue. Granting summary judgment in either party's favor on Count I of the Complaint or the Defendants' counterclaim would require the trier of fact to make credibility determinations and weigh the conflicting evidence. The Court may not do so at summary judgment. *See Hairston v. Gainesville Sun Publ'g Co.*, 9 F.3d 913, 919 (11th Cir. 1993).[11]

3)      The Termination Notice

The Plaintiff does not dispute that the Termination Notice complies with the technical requirements of § 203. Instead, the Plaintiff argues that the Termination Notice is defective because it incorrectly asserts that the Oral Agreement is the operative agreement that first transferred the subject copyrights. As noted above, determining the operative agreement raises a genuine issue of material fact that cannot be addressed at this stage of the case. Moreover, the Plaintiff does not cite any authority to support its contention that stating the incorrect grant in a notice of termination invalidates the Termination Notice. Indeed, the regulations promulgated under § 203 suggest that a notice of termination with incorrect information may still be valid if the errors are harmless and do not "materially affect the adequacy of the information required to serve the purposes of 17

---

[11] The Defendants argue that the Plaintiff lacks standing to challenge the 1990 Agreement. However, the Defendants' argument assumes that the 1990 Agreement governs, which is disputed.

U.S.C. § 203." 37 C.F.R. § 201.10(e)(1); *see Stillwater Ltd. v. Basilotta*, 2017 WL 2906056, at *4 (C.D. Cal. Mar. 17, 2017). Therefore, summary judgment cannot be granted on this issue.

### B.    The Effect of Bankruptcies and Settlement Agreements

The Plaintiff argues that even if the threshold issues discussed above are resolved in the Defendants' favor, the Defendants lost their termination rights through the bankruptcies and the Settlement Agreements. Resolving this dispute raises issues of first impression in this Circuit, including whether copyright termination rights are divested or become part of a bankruptcy estate when a debtor files for bankruptcy and whether a bankruptcy court's confirmation order or a settlement agreement are considered "agreement[s] to the contrary." 17 U.S.C. § 203(a)(5). Each is taken in turn.

#### 1)    Termination Rights and Bankruptcy

As previously noted, authors or their heirs may terminate the rights of a grantee. *Marvel Characters, Inc.*, 310 F.3d at 284. The right to terminate is "inalienable" for both authors and heirs. *Stewart v. Abend*, 495 U.S. 207, 230 (1990) (citing 17 U.S.C. §§ 203, 304). Indeed, "[termination rights] cannot be contracted away." *Baldwin v. EMI Feist Catalog, Inc.*, 805 F.3d 18, 32 (2d Cir. 2015). Despite the designation of termination rights as "inalienable," the Plaintiff argues that termination rights can be divested through bankruptcy.

Courts in this Circuit have not considered whether termination rights under § 203 are a debtor's property that becomes part of his bankruptcy estate. Under 11 U.S.C. § 541(a)(1), property of the bankruptcy estate is defined as "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). "The plain language of that provision is clear, and it makes the commencement of the bankruptcy case the key date for property definition purposes." *In re Bracewell*, 454 F.3d 1234, 1237 (11th Cir. 2006). "[W]hether a debtor's interest constitutes 'property of the estate' is a federal question." *In re Builders Transp., Inc.*, 471

F.3d 1178, 1185 (11th Cir. 2006) (internal quotation marks and citations omitted). While the "nature and existence of the [debtor's] right to property is determined by looking at state law," *id.*, this is true only "unless some federal interest requires a different result," *Butner v. United States*, 440 U.S. 48, 55 (1979).

Here, the federal interest is manifest because termination rights under § 203 are granted under federal law. Congress amended the Copyright Act in 1976 to create a "termination right"; that is, it authorized the author of a work (or his successors) "to undo a prior transfer of his copyright and recapture all interests in the copyright for himself." *Brumley v. Albert E. Brumley & Sons, Inc.*, 822 F.3d 926, 928 (6th Cir. 2016). By enacting this provision, Congress expressed a federal interest in protecting the personal rights of authors to terminate a transfer or license under § 203. Characterizing § 203 as "a provision safeguarding authors against unremunerative transfers," the House Report accompanying the Copyright Act states that "[a] provision of this sort is needed because of the unequal bargaining position of authors, resulting in part from the impossibility of determining a work's value until it has been exploited." H.R. Rep. No. 94-1476, at 124 (1976); *see also Korman v. HBC Fla., Inc.*, 182 F.3d 1291, 1296 (11th Cir. 1999) ("Our reading of section 203 furthers, instead of defeats, the manifest congressional intent behind that section—the protection of authors."). The House Report states, "the right to take this action [*i.e.*, terminate a transfer] *cannot be waived in advance or contracted away.*" *Id.* at 125 (emphasis added).

In *Mills Music, Inc. v. Snyder*, 469 U.S. 153, 173 (1985), a music publisher and the heirs of an author of a song sought to determine the rights to royalties for the song following the heirs' termination of the author's grant of the copyright to the publisher. The original copyright was registered in 1923 to a publishing company partially owned by the author. In 1929, the company went into bankruptcy; and in 1932, the bankruptcy trustee assigned the copyright to the publisher, Mills Music. In 1978, the author's heirs exercised their termination rights under 17 U.S.C. § 304(c)

and terminated Mills Music's ownership of the copyrighted musical composition. While *Mills* did not specifically address the question before this Court, the Supreme Court recognized that the author's heirs successfully exercised their termination right and "caused the ownership of the copyright to revert" *after the copyright was assigned to Mills during bankruptcy proceedings*. *Mills*, 469 U.S. at 167. At no point did the Supreme Court or the lower courts find or take issue with the heirs exercising their post-bankruptcy termination rights.

In *Korman*, the Eleventh Circuit recognized that the "manifest congressional intent behind" § 203 is "the protection of authors" and that the purpose of § 203 "is to help authors, not publishers or broadcasters or others who benefit from the work of authors." 182 F.3d at 1296 (citing *Mills*, 469 U.S. at 172–73 n.39 (1985)). The preeminent treatises on copyright law agree. *See 3 Nimmer on Copyright* § 11.01[B], at 11–6 (1995) ("Section 203 is designed to protect authors and to confer on them an additional opportunity to profit from their works, notwithstanding an antecedent grant to the contrary."); 1 Neil Boorstyn, *Boorstyn on Copyright* § 8.14, at 8–28 (1999) ("[T]he federal termination provisions were intended to facilitate, not restrict, authors' rights of termination and copyright recapture.").

After *Mills* and *Korman*, the Supreme Court has repeatedly described an author's termination rights as "inalienable." *Stewart*, 495 U.S. at 230; *see also New York Times Co. v. Tasini*, 533 U.S. 483, 497 (2001). This understanding has been subsequently adopted by this Court and others. *See Baldwin v. EMI Feist Catalog, Inc.*, No. 11-81354-CIV, 2012 WL 13019195, at *2 (S.D. Fla. Dec. 11, 2012) ("To protect authors from permanently losing the rights to their works before they are able to determine the work's value, Congress created an inalienable right to terminate a prior grant of an interest in a copyright."); *Garza v. Everly*, 59 F.4th 876, 880 (6th Cir. 2023) ("Termination rights cannot be transferred."); *Livingston v. Jay Livingston Music, Inc.*, No. 3:22-CV-00532, 2024 WL 713780, at *4 (M.D. Tenn. Feb. 21, 2024) ("Based on this language,

the termination right created by § 203 has repeatedly been characterized as 'inalienable.'"); *Brown-Thomas v. Hynie*, 441 F. Supp. 3d 180, 191 (D.S.C. 2019) ("As to the special nature of these provisions, the United States Supreme Court has noted that the Copyright Act of 1976 'provides an inalienable termination right' for both authors and his or her statutory heirs" (quoting *Stewart*, 495 U.S. at 230)); *Stillwater Ltd.*, 2017 WL 2906056, at *3 ("This right is non-transferrable and can only be exercised by the author or his/her heirs." (quoting *In re Napster, Inc. Copyright Litig.*, 191 F. Supp. 2d 1087, 1097 (N.D. Cal. 2002))); *Archie Comic Publications, Inc. v. DeCarlo*, No. 00 CIV 5686 (LAK), 2001 WL 1543526, at *3 (S.D.N.Y. Dec. 3, 2001) ("Section 203 of the Copyright Act gives copyright owners an inalienable right to terminate grants or licenses after appropriate periods of time.").

Neither side has offered any authority regarding the effect of a bankruptcy on this inalienable termination right. The Defendants draw parallels between a debtor's termination rights and a debtor's right to take an elective share in a decedent's estate to provide for the debtor's needs as a surviving spouse. *See In re Brand*, 251 B.R. 912, 914 (Bankr. S.D. Fla. 2000).  As only the surviving spouse can exercise this right to an elective share under Florida law, courts have recognized this as a personal right. *Id.* (finding that an elective share is a personal right because it "is for the purpose of providing for the needs of the surviving spouse" and "only the surviving spouse or those who represent the surviving spouse's best interest may exercise the right of election"). In *In re Brand*, the bankruptcy court distinguished between an "elective share interest and the right of election," noting that "[e]ven though electing to take an elective share interest results in the creation of a property interest of the debtor, the right of election, itself, is not a property interest of the debtor, and thus, not property of the estate." *Id.* at 915.

While the Plaintiff argues the inaccuracy of the Defendants' elective share comparison, it provides no legal or factual support to show why termination rights should become part of a

bankruptcy estate in direct contravention of Congress' intent. The Court finds merit in the argument that termination rights can be viewed as personal rights, separate and apart from underlying copyrights, because they exist for the specific purpose of "allow[ing] **an author**, if he is living, or his widow and children, if he is not, to recapture . . . the rights that had previously been transferred to third parties." *Classic Media, Inc. v. Mewborn*, 532 F.3d 978, 983 (9th Cir. 2008) (emphasis added).

For example, the Tenth Circuit held that "a personal [statutory] right to future maintenance" is not part of a bankruptcy estate because, as a "personal statutory right," it was "not a property right." *In re Wise*, 346 F.3d 1239, 1242 (10th Cir. 2003). In *In re Wise*, the court held that a spouse's right to future maintenance was a personal right to be excluded from the bankruptcy estate because "the right to receive alimony or maintenance, as well as the duty to pay it, are personal." *Id.* In support of its holding, the court cited to *United States v. Davis*, 370 U.S. 65, 70 (1962), noting that in *Davis*, the Supreme Court recognized the obligation of post-divorce support "is more [of a] personal liability of husband than [a] property interest of [the] wife." *Id.*

The Court finds the reasoning behind *Brand* and *Wise* instructive here. Copyright termination rights are personal to the author, as no other party may exercise them. *Stillwater Ltd.*, 2017 WL 2906056, at \*3. Moreover, at least one district court has held that a determination regarding a party's termination rights does not implicate the *probate* estate of an individual because termination rights "[do] not implicate any 'disposal of property in the custody of a state probate court,' but rather involve[] the 'personal rights and obligations of the parties.'" *Brown-Thomas*, 441 F. Supp. 3d at 214 (quoting *Lee Graham Shopping Ctr., LLC v. Estate of Kirsch*, 777 F.3d 678, 681 (4th Cir. 2015).[12] Therefore, the Court finds that copyright termination rights do not

---

[12] Florida Courts' treatment of homestead status in bankruptcy proceedings is also useful in analyzing this issue. In *In re Reinhard*, the District Court held that because homestead status was a "limitation on alienation . . . [t]he acquisition

become a part of the bankruptcy estate because they are personal rights specifically created for the author, not property rights that can be transferred.

Even assuming copyright termination rights could become a part of a bankruptcy estate and be divested, they were not expressly discussed in the Letter of Intent, the Reorganization Plan, the Confirmation Order, or other record evidence. Without some clear indication that Campbell or Ross' termination rights were a part of their bankruptcy estates, the Court cannot find that those rights were terminated in bankruptcy.

2.      "Agreement to the Contrary"

At the hearing on the parties' motions for summary judgment, the parties also disputed whether the Settlement Agreements and Bankruptcy Filings constitute "agreement[s] to the contrary" under § 203 such that they divested the Defendants of their termination rights. Section § 203 provides:

> (a) Conditions for Termination. - In the case of any work other than a work made for hire, the exclusive or nonexclusive grant of a transfer or license of copyright or of any right under a copyright, executed by the author on or after January 1, 1978, otherwise than by will, is subject to termination under the following conditions:
> . . .
>
> (5) Termination of the grant may be effected notwithstanding any agreement to the contrary, including an agreement to make a will or to make any future grant.

17 U.S.C. § 203(a)(5). Based on this clear language, the Defendants retain their termination rights even if the Bankruptcy Filings and Settlement Agreements are construed as "agreement[s] to the contrary." However, the phrase "agreement to the contrary" is undefined in the statute, and courts in this Circuit have not yet examined it.

---

of homestead status does not confer any additional property interest or rights in property." *In re Reinhard*, 377 B.R. 315, 319 (Bankr. N.D. Fla. 2007). The Court noted that because "[h]omestead is simply a status" that limits a property's alienability, "[i]t is not a property interest." *Id.* Like homestead rights, termination rights do not provide an owner (or author) with "any of the rights traditionally associated with property interests: the right to possession, the right to use, the right to transfer—the owner already holds whatever of these he has." *Id.* Rather than "conceptualized as a stick in the bundle[,] [termination rights are] a protective safe in which the bundle is put." *Id.*

The Plaintiff contends that the Bankruptcy Filings divested and transferred the Defendants' termination rights by "operation of law," and that a transfer by operation of law (as opposed to a transfer by writing), does not constitute an "agreement to the contrary."[13] [ECF No. 58 at 5]. However, § 203 does not define "agreements to the contrary" as only being transfers by written agreements to the exclusion of transfers by operation of law. The Plaintiff's argument requires the Court to find that § 203 makes a distinction as to what constitutes an "agreement to the contrary" based on the method of transfer of copyrights despite the lack of any language supporting that proposition. "It is not the business of courts to rewrite statutes, and . . . section 203 requires no rewriting." *Korman*, 182 F.3d at 1296. Even if the Plaintiff's interpretation is correct, it would not change the result here; the Court has already determined that termination rights cannot be transferred by operation of law in bankruptcy.

This Court does not find that an author (or his heirs) may never relinquish his copyright termination rights. For guidance, this Court looks to the few courts that have examined the phrase "agreement to the contrary." Although the phrase may seem, as the Defendants argue, to encompass any agreement preventing an individual from exercising his or her right to terminate a grant, the Second and Ninth Circuits have held that authors and their heirs may renegotiate a copyright grant. The Second Circuit stated that it did not "read the phrase 'agreement to the contrary' so broadly that it would include any agreement that has the effect of eliminating a termination right." *Penguin Group (USA), Inc. v. Steinbeck*, 537 F.3d 193, 202 (2d Cir. 2008)

---

[13] The Plaintiff bases this argument on § 204(a) of the Copyright Act which notes that "[a] transfer of copyright ownership, other than by operation of law, is not valid unless an instrument of conveyance . . . is in writing." It is true that § 204(a) allows for the transfer of copyrights by different methods. However, the Plaintiff assumes that because § 204(a) contemplates both a transfer "by operation of law" and a transfer "in writing," there is a mutually exclusive distinction between the two. The Plaintiff then infers, without any support, that "the agreement" referenced in Section 203 is the same as the "writing" referenced in § 204. As such, the Plaintiff concludes that only a transfer by a "writing" can constitute an agreement to the contrary under § 203. The Plaintiff's position is not supported by case law or § 203's plain language. "We take the provision as Congress wrote it, and neither add words to nor subtract them from it." *Korman*, 182 F.3d at 1296.

(noting heirs holding termination rights can threaten or make good on a threat to exercise termination rights and extract more favorable terms from early grants of an author's copyright, but they do not have "more than one opportunity, between them, to use termination rights to enhance their bargaining power or to exercise them"). Similarly, the Ninth Circuit has "rejected the argument . . . that Congress intended to preclude parties from alienating their statutory termination rights by contract." *Larson v. Warner Bros Ent.*, *Inc.*, 640 F. App'x 630 (9th Cir. 2016) (citing *Milne ex rel. Coyne v. Stephen Slesinger, Inc*., 430 F.3d 1036 (9th Cir. 2005)).

"[T]he courts in both *Milne* and *Steinbeck* ardently emphasized the fact that the heirs had vindicated Congress's intent by wielding their termination rights to extract more lucrative deals." *Larson v. Warner Bros. Ent. Inc.*, No. 4-08400-CIV, 2013 WL 1694448, at *4 (C.D. Cal. Apr. 18, 2013). This is because when an author (or heir) "[chooses] to use the leverage of imminent vesting to revoke the pre-1978 grant and enter into a highly remunerative new grant of the same rights, it [is] tantamount to following the statutory formalities, and achieve[s] the exact policy objectives for which [termination statutes] [were] enacted." *Mewborn*, 532 F.3d at 987.

In *Mewborn*, the Ninth Circuit held "that an agreement to re-grant the rights to Lassie works was one 'to the contrary' under § 304(c)(5) where the heir, unaware of her future termination rights, 'had nothing in hand with which to bargain' and received a meager $3,000 in compensation as a result." *Larson*, 640 F. App'x at 633 (quoting *Mewborn*, 532 F.3d at 987). In *Mewborn*, the court further clarified that a known termination right can only be relinquished by an agreement that "expressly or impliedly" contemplates the author's termination right, by providing additional consideration therefor. *See Mewborn*, 532 F.3d at 989. An agreement without consideration for the relinquishment of an author's termination right is an "agreement to the contrary" because it attempts to "subvert[ ] the termination rights and the congressional purpose underlying them." *Id.*

at 988 (comparing facts before it with those in *Milne*, 430 F.3d at 1045, where the agreement "fully honored" the author's right of termination).

There is no evidence that, during their bankruptcy proceedings, Campbell, Luke Records, or Ross renegotiated copyright grants while leveraging their rights to terminate.[14] Indeed, there is no record evidence that the parties even contemplated termination rights during the bankruptcy proceedings. Moreover, Campbell, Luke Records, and Ross could not exercise their termination rights in 1995 and 2000, respectively, and "had nothing in hand with which to bargain." *Mewborn*, 532 F.3d at 989.

Similarly, there is no evidence that Wong Won and Ross leveraged their termination rights while negotiating their Settlement Agreements. As part of his agreement to settle the lawsuit brought against him by the Plaintiff and Weinberger, Wong Won released all interests to 2 Live Crew's copyrights transferred during the Luke Records and Campbell bankruptcies. Even so, Wong Won could not have exercised his termination rights at that time. And when Ross released his rights to 2 Live Crew's recordings to settle the Plaintiff's claim, he could not have exercised his termination rights at that time. While the Plaintiff argues that the Bankruptcy Filings and Settlement Agreements divested the Defendants' termination rights, those agreements would constitute agreements to the contrary under Second and Ninth Circuit precedent.

---

[14] The Plaintiff argues, without legal support, that the Confirmation Order is "much more than an agreement" or contract because it is an order of a federal judge. [ECF No. 149]. According to the Plaintiff, the Confirmation Order transferred the copyrights at issue from Campbell and Luke Records to Lil' Joe "free and clear of any and all liens, claims, encumbrances, charges, setoffs or recoupments of any kind." [ECF No. 58 at 3]; [ECF No. 1-3 at 3]. Orders confirming plans of reorganization are creatures of the Bankruptcy Code that become "res judicata to the parties and those in privity with them." *In re FFS Data, Inc.*, 776 F.3d 1299, 1304 (11th Cir. 2015). Although a confirmed reorganization plan is a judgment rendered by a federal court, the plan "is essentially a contract between a debtor and the creditors of the bankruptcy estate." *In re Westport Holdings Tampa, Ltd. P'ship*, 614 B.R. 918, 921 (Bankr. M.D. Fla. 2020). Therefore, the Eleventh Circuit "follows principles of contract interpretation" when interpreting confirmed plans of reorganization. *In re FFS Data, Inc.*, 776 F.3d 1299, 1304 (11th Cir. 2015); *see also In re 8 Mile Ranch, LLC*, No. 12-10227-CIV, 2015 WL 5307389, at *4 (Bankr. M.D. Fla. Sept. 10, 2015) (holding that "a confirmation order should be interpreted together with the chapter 11 [reorganization] plan so that the goal of the plan is not subverted by arbitrary enforcement of a confirmation order." (internal quotation marks and citations omitted)).

Ultimately, there is no evidence in the record to support a finding that the Defendants relinquished their termination rights to the Plaintiff during the subject bankruptcies or Settlement Agreements. Neither the Bankruptcy Filings nor the Settlement Agreements mention a transfer of the Defendants' termination rights; and there is no indication that the Defendants used their termination rights as leverage during negotiations. In fact, there is no evidence that the Defendants were even aware of their termination rights during the bankruptcy and settlement proceedings. So, even if copyright termination rights can be divested, it was not done properly here.

### C.    The Plaintiff's Trademark and Copyright Infringement Claims

The Defendants move for summary judgment on the Plaintiff's trademark infringement claims against the Wong Won heirs (Counts II, IV, V) and Raven (Ross's heir) (Counts VI, VIII, IX). The Defendants also move for summary judgment on the Plaintiff's false designation of origin claims against the Wong Won heirs (Count III) and Raven (Count VII). Finally, the Defendants move for summary judgment on the Plaintiff's copyright infringement claim against Raven (Count X). The Plaintiff's response to the Defendants' Motion does not address the Defendants' arguments on Counts II–X. At the hearing, The Plaintiff conceded that Counts II–X were not at issue. However, the Plaintiff has not sought leave to amend the Complaint.

To prevail on a claim of federal trademark infringement, a plaintiff must show that (1) its trademark has priority and (2) a defendant's mark is likely to cause consumer confusion. *Frehling Enterprises, Inc. v. Int'l Select Grp., Inc.*, 192 F.3d 1330, 1335 (11th Cir. 1999). "The analysis under the Lanham Act for trademark infringement also applies to claims of trademark infringement under Florida common law." *Carnival Corp. v. SeaEscape Casino Cruises, Inc.*, 74 F. Supp. 2d 1261, 1264 n.2 (S.D. Fla. 1999); *see also Colonial Van Lines, Inc. v. Colonial Moving & Storage, LLC*, No. 20-61255-CIV, 2020 WL 6700449, at *2 (S.D. Fla. Oct. 20, 2020) ("[T]he Florida common law trademark infringement and unfair competition analysis is essentially the same as the

federal trademark infringement analysis."). The elements of a claim for trademark infringement under Florida law are as follows: (1) the plaintiff has a valid trademark registered under Florida law; (2) the defendant used an identical or similar mark in commerce without the plaintiff's consent; (3) defendant's use postdates plaintiff's use; and (4) defendant's use is likely to cause confusion. Fla. Stat. § 495.131; *Canon U.S.A., Inc. v. Morrison*, No. 13-1574-CIV, 2014 WL 12872726, at *3 (M.D. Fla. May 1, 2014) (citing § 495.131).

The only record evidence supporting the Plaintiff's trademark infringement claims consists of Ross and Leterius' testimony regarding performances "as 2 Live Crew" without permission from Weinberger. [ECF No. 11 ¶ 55–57]. However, the Plaintiff has abandoned its claims by not responding to the Defendant's Motion as to the trademark infringement claims. *McIntyre v. Eckerd Corp.*, 251 F. App'x 621, 626 (11th Cir. 2007) (holding "the district court did not err in concluding that because [the plaintiff] made no argument on [her] claim, she abandoned it."). Moreover, the Plaintiff failed to put forth evidence to rebut the Defendants' arguments or evidence. Therefore, the Defendants' Motion for Summary Judgment is granted as to Counts II, IV, V, VI, VIII, IX.

To prevail on a claim for false designation of origin under 15 U.S.C. § 1125(a), a party must show "(1) that it has trademark rights in the mark or name at issue" and "(2) that the defendant adopted a mark or name that was the same, or confusingly similar to the plaintiff's mark, such that there was a likelihood of confusion for consumers as to the proper origin of the goods created by the defendant's use of the [plaintiff's] name in his trade." *See Conagra, Inc. v. Singleton*, 743 F.2d 1508, 1512 (11th Cir. 1984). Like its trademark infringement claims, the Plaintiff has abandoned its false designation of origin claims by not responding to the Defendant's Motion for Summary Judgment or presenting argument at the hearing. *McIntyre*, 251 F. App'x at 626. Moreover, the Plaintiff failed to put forth evidence to show any likelihood of confusion or to rebut the

Defendants' arguments. Therefore, the Defendants' Motion for Summary Judgment as to Counts III and VII is granted.

Summary judgment is also warranted in the Defendants' favor on the Plaintiff's copyright infringement claim against Raven (Ross's heir). Copyright infringement has two elements: "(1) ownership of a valid copyright, and (2) copying of [protectable] elements." *Miller's Ale House, Inc. v. Boynton Carolina Ale House, LLC*, 702 F.3d 1312, 1325 (11th Cir. 2012) (alteration in original) (quoting *Oravec v. Sunny Isles Luxury Ventures*, *LC.*, 527 F.3d 1218, 1223 (11th Cir. 2008)). Here, the Plaintiff provides no evidence to support its claim that Ross infringed any of the alleged copyrights. Like its trademark infringement and false designation of origin claims, the Plaintiff abandoned its copyright infringement claims by failing to respond to the Defendants' Motion for Summary Judgment on the papers or at the hearing. *McIntyre*, 251 F. App'x at 626. Accordingly, the Defendants' Motion for Summary Judgment is also granted as to Count X.

## IV.  CONCLUSION

Accordingly, it is **ORDERED AND ADJUDGED** that:

1.  The Plaintiff's Motion for Partial Summary Judgement, [ECF No. 30], is **DENIED**.

2.  The Defendants' Motion for Summary Judgment, [ECF No. 53], is **GRANTED** as to Counts II–X. The Motion is otherwise **DENIED**.

3.  This matter shall proceed to trial before a jury.

**DONE AND ORDERED** in Miami, Florida, this 30th day of September, 2024.

_____
DARRIN P. GAYLES
UNITED STATES DISTRICT JUDGE

cc:    All Counsel of Record