DFE/aa

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 1:21-CV-23727-DPG

LIL' JOE RECORDS, INC.,

      Plaintiff,

v.

RAVEN ROSS, CHRISTOPHER WONG WON, JR.,
RODERICK WONG WON, LETERIUS RAY,
ANISSA WONG WON AND LUTHER
CAMPBELL,

      Defendants.

_____/

### PLAINTIFF'S MOTION FOR RECONSIDERATION
### AND ALTERNATIVE REQUEST FOR RULE 54 (B) CERTIFICATION

      Plaintiff, LIL' JOE RECORDS, INC. ("Lil' Joe"), through undersigned counsel, brings this Motion for Reconsideration/Alternative Motion for Rule 54(b) Certification, under Fed. R. Civ. P. 54(b), 59(e), 60(b), and S.D. Fla. Local Rule 7.1, and respectfully seeks reconsideration, alternatively certification under Rule 54(b), of the September 30, 2024, Summary Judgment Order [ECF210], and as good grounds states:

#### A. LEGAL STANDARDS

      While there is no specific rule for reconsideration of a nonfinal [interlocutory] order in federal courts, "[a] motion for reconsideration may be brought pursuant to Rule 59(e) or Rule 60(b)." *Williams v. Cruise Ships Catering Service International*, 320 F. Supp. 2d 1347, 1357 (S.D. Fla. 2004); *see Sussman v. Salem, Saxon Nielsen, P.A.,* 153 F.R.D. 689, 694 (M.D. Fla. 1994); *see also Peterson v. Travelers Indem. Co.*, 867 F.3d 992, 997 (8th Cir. 2017); *Shepherd v. International Paper Co.*, 372 F.3d 326, 328 n.1 (5th Cir. 2004).

**B. THRESHOLD ISSUES: THE OPERATIVE AGREEMENT AND THE TERMINATION NOTICE**

**1. The Order overlooks or misapprehends [ECF 210 at 16–17] that the oral and 1990 "Agreements", if there really were any, are null and not enforceable.**

First, the Order overlooks that the 1990 Agreement does not contain *any grant or transfer of any copyright rights*. To circumvent that fatal defect, Defendants claim there was a prior oral agreement. The legal problem with that is this: Copyright cannot be transferred via an oral agreement and must be in writing. 17 U.S.C. §204(a) (expressly requiring "transfer of copyright ownership, other than by operation of law," be "in writing and signed by the owner of the rights conveyed or such owner's duly authorized agent" or else it is not valid); *Karlson v. Red Door Homes, LLC*, 611 F. App'x 566, 569 (11th Cir. 2015) ("A copyright owner can transfer copyright ownership through the grant of an exclusive license, but the grant must be in writing."). *Latimer v. Roaring Toyz, Inc.*, 601 F.3d 1224, 1235 (11th Cir. 2010); *Francois v. Jack Ruch Quality Homes, Inc.*, 2006 U.S. Dist. LEXIS 57062 *22 (C.D. Ill. Aug. 14, 2006) ("the Copyright Act invalidates any such transfer, sale or assignment of copyright ownership that is not in writing signed by the copyright owner. 17 U.S.C. § 204(a).")

The other legal problem that Defendants cannot remedy is that a copyright cannot be transferred retroactively back to an oral agreement. *Davis v. Blige*, 505 F.3d 90 (2d Cir. 2007). "[A]ssignments ... are prospective ....". *Id.* at 104. "[A] license or assignment in copyright can only act prospectively." *Id.* at 104. The reasons for those rules are because "[t]here is little from a policy perspective to recommend a rule that allows retroactive licenses or assignments, and there are two strong reasons disfavoring them ...." *Id.* at 105-06.; *Spinelli v. Nat'l Football League*, 903 F.3d 185, 198 (2d Cir. 2018) (applying *Davis* to bar Associated Press from granting a retroactive license to the NFL).

The 1990 "Agreement" referenced in the Termination Notice does not grant any rights. ***See Attached Composite Exhibit "A", 1990 Agreement.*** Reconsideration of this Order is, thus, merited because the law renders the Defendants' claimed oral and 1990 "Agreements", if there really were any,

null and not enforceable.

**2.  *The Order [ECF 210 at 17–18] also overlooks or misapprehends that the Termination Notice is defective.***

In addition to overlooking that the 1990 agreement referenced in the Termination Notice does not grant any rights, and that Defendants' claimed oral and retroactive transfers are invalid, the Order also overlooks or misapprehends that there's no mention in the Termination Notice of the Campbell grants in 1991 (to Luke Records) or 1996 (to Lil Joe), the Ross grants in 1993 (to Luke Records) or 2001 (to Lil Joe) and the Wong Won grant in 2003. Therefore, the Termination Notice has no affect on these grants as a matter of law. *See Penguin Books v. Steinbeck*, 537 F. 3d 193 (2d Cir. 2008) (Section 203 does not terminate grants replaced by subsequent grants).

**C.  ISSUES: EFFECT OF BANKRUPTCIES AND SETTLEMENT AGREEMENTS, TERMINATION RIGHTS VIA BANKRUPTCY AND "AGREEMENTS TO THE CONTRARY"**

The Order begins its analysis with the proposition that the termination right in "inalienable." ECF No. 210 at 19. In so doing, the Order overlooks or misapprehends that the statute—the starting point of the legal analysis here—never uses the word "inalienable." *See* 17 U.S.C. § 203. "Inalienable" is within a general description of copyright law within *dicta* in *Stewart v. Abend*, 495 U.S. 207 (1990), which involved the status of an assignment of renewal rights if the author died before exercised and never decided or provided guidance on the issue decided in this Order. In *Stewart*, the Supreme Court confirmed that under the renewal provisions of the 1909 and 1976 Copyright Acts, 7 U.S.C. § 24 (1976 ed.), the assignment of renewal rights by an author before the renewal time arrived couldn't defeat the right of the author's statutory successors to the renewal rights if the author dies before the right to renewal accrues. *Id.* at 219–20. In other words, if the author dies before the right to renewal accrues, then the author's statutory successor is entitled to renew the copyright free and clear from any assignment previously made by the author. *Id*. *Stewart* did not interpret the "agreement to the contrary" language of section 203(a)(5) or its counterpart under  section 304(c)(5).

3

The Order continues from "inalienable" in the unique context of successors with: Courts in this Circuit have not considered whether termination rights are a debtor's property that become part of his bankruptcy estate. ECF 210 at 18. With great respect, the Order overlooks the Bankruptcy Code's expansive definition of property in the bankruptcy estate and the substantial body of case law holding that intellectual property rights are property of the debtor that become part of his Bankruptcy Estate as a matter of law.

The "property" in the Bankruptcy Estate is defined in 11 U.S.C. § 101 and it includes "intellectual property" expressly includes U.S. copyrights (foreign copyrights are excluded):

> 11 U.S.C. § 101 - Definitions
> In this title the following definitions *shall* apply:
>> (35A) The term "intellectual property" *means*—
>>> (A)  trade secret;
>>> (B)  invention, process, design, or plant protected under title 35;
>>> (C) patent application;
>>> (D) plant variety;
>>> **(E) work of authorship protected under title 17** [the Copyright Act]; **or**
>>> (F) mask work protected under chapter 9 of title 17; to the extent protected by applicable nonbankruptcy law.

"It is undisputed that the property of the debtor's estate includes the debtor's intellectual property, such as interest in patents, trademarks, and copyrights." *Chesapeake Fiber Pkg. v. Sebro Packaging Corp.*, 143 B.R. 360 (D.Md. 1992) (citing *United States v. Inslaw Inc.*, 932 F.2d 1467, 1471 (D.C. Cir. 1991)); *see also* 11 U.S.C. §101(35A)(E) (stating the term "intellectual property" means "work of authorship protected under title 17");  *see also generally*, U.S. Copyright Office, *Chapter 2-Copryright Ownership and Transfer*, website url: https://www.copyright.gov/title17/92chap2.html (last visited Oct. 2, 2024); J.T. Westermeier & Philip S. Warden, *Bankruptcy Issues in Copyright*, PLI Intellectual Property Institute 1 (2010); David Gurnick & Tal Grinblat, *Nine Ways to Avoid Copyright Termination Part 2*, Vol. 37, No. 2, New Matter 5 (2012); Bruce Buechler, Esq., *A General Overview of the Treatment of Intellectual Property Licenses in Bankruptcy*, Credit Research Foundation, 16 (2017).

The Order overlooks or misapprehends that, upon commencement of a bankruptcy case a bankruptcy estate is created and by Bankruptcy Code is comprised of "all" of the Debtor's "legal or equitable interests" in property as of the commencement of the bankruptcy case. 11 U.S.C. § 541(a)(1). Section 541 of the Bankruptcy Code already includes, by law,  property of the estate that comprises "all legal or equitable interests of the debtor in property as of the commencement of the case"  Section 541(c) sweeps it **all** into the Bankruptcy Estate and does so to maximize value to the highest bidding creditors:

> (1) notwithstanding any provision in an agreement, transfer instrument, or applicable non-bankruptcy law –
> (A) that restricts or conditions transfer of such interest by the debtor; or
> (B) that is conditioned on the insolvency or financial condition of the debtor, on the commencement of a case under this title, or on the appointment of or taking possession by a trustee in a case under this title or a custodian before such commencement, and that effects or gives an option to effect a forfeiture, modification, or termination of the debtor's interest in property.

11 U.S.C. § 541(c)(1).  Section 541(c)(1) operates to ensure that all property and rights in that property interest becomes property of the Bankruptcy Estate.

The Bankruptcy Code intentionally "defines a bankrupt's estate broadly to encompass all kinds of property, including intangibles," causes of action, and all sorts of claims. *Integrated Sols., Inc. v. Serv. Support Specialties, Inc.*, 124 F.3d 487, 490 (3d Cir. 1997). And under the Bankruptcy Code, "claim" includes the "***right to payment***, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, ***contingent, matured, unmatured,*** disputed, undisputed, legal, equitable, secured, or unsecured . . . ." 11 U.S.C. § 101(5)(A). In so defining "claim" so broadly, Congress intended to "adopt the broadest available definition" of the word imaginable. *Johnson v. Home State Bank*, 501 U.S. 78, 83 (1991). Any ***thing or right*** having conceivable value, whether yet vested, or mature, or not, goes into the Estate.

And section 541's reach is extensive. It encompasses by operation of law "every conceivable

interest of the debtor, future, non-possessory, contingent, speculative, and derivative." *Koch Refining v. Farmers Union Central Exchange, Inc.,* 831 F.2d 1339, 1343 (7th Cir. 1987); *In re Yonikus,* 996 F.2d 866, 869 (7th Cir. 1993), *disapproved on other grounds in Law v. Siegel*, 571 U.S. 415 (2014); *see generally In re Plunkett,* 23 B.R. 392, 393–94 (Bankr. E.D. Wis. 1982) (explaining the broad reach of section 541 and Congress' reasons for expansively defining the bankruptcy estate of a debtor).

The broad language of the statute reflects Congress' intent to expand the scope of "property of the estate" ***to eliminate substantial litigation*** which arose under § 70 of the Bankruptcy Act of 1898:

> The bill makes significant changes in what constitutes property of the estate. Current law is a complicated melange of references to State law, and does little to further the bankruptcy policy of distribution of the debtor's property to his creditor in satisfaction of his debts. . . .
> The bill determines what is property of the estate by a simple reference to what interests in property the debtor has at the commencement of the case. This includes all interests, such as interests in real or personal property, tangible and intangible property, choses in action, causes of action, rights such as copyrights, trade-marks, patents and processes, contingent interests and future interests, whether or not transferable by the debtor. . . .
> These changes will bring anything of value that the debtors have into the estate. The exemption section will permit an individual debtor to take out of the estate that property that is necessary for a fresh start and for the support of himself and his dependents. Certain restrictions on the transferability of property will prevent the trustee from realizing on some items of property of the estate. But on the whole, the trustee will be able to bring all property together for a coherent evaluation of its value and transferability, and then to dispose of it for the benefit of the debtor's creditors.

H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 175-176 (September 8, 1977), U.S. Code Cong. Admin.News 1978, pp. 5787, 6136." *In re Plunkett,* 23 B.R. 392, 394 (Bankr. E.D. Wis. 1982). As such, again with great respect, the Order's suggestion that all present and future Copyrights rights are not transferred by operation of law in Bankruptcy unless the Bankruptcy Court details every possible asset that is the subject of that transfer misapprehends the Bankruptcy Code and the Order is premised on legally erroneous principles recklessly advanced by Defendants that would turn bankruptcies of other intellectual property debtors into complete disarray and irreparably harm the intellectual property marketplace. Reconsideration is warranted for these reasons as well.

Reconsideration is also merited because, in likening the termination right to *alimony*, the Order overlooks the unique character of alimony in Bankruptcy and that "[o]n its face and by its plain language, § 541(a)(5)(B) does not reach alimony awards." *In re Jeter,* 257 B.R. 907, 910 (8th Cir. 2001). Section 541(a)(5)(B) explicitly provides that a debtor's bankruptcy estate only includes property or any interest in property a debtor receives from a property settlement agreement or a final divorce decree within a certain time frame. 11 U.S.C. § 541(a)(5)(B). Alimony is not property that comes to the debtor as part of property settlement agreement or final divorce decree because "property division is the equitable distribution of marital assets, while alimony represents spousal support and maintenance." *Jeter*, at 911.

The Order misapprehends that courts hold that post-petition alimony should be excluded from the debtor's bankruptcy estate because it is "most often rehabilitative and temporary in nature and designed to help a spouse bounce back financially from a divorce." *Jeter*, at 912. "Making such support payments property of the estate upon the petition filing would jeopardize the debtor spouse's fresh start and substantially interfere with, perhaps even undermine, the debtor spouse's ability to support himself or herself in the future." *Id.*; *see also In re Wise*, 346 F.3d 1239, 1242–43 (10th Cir. 2003); *In re Peterson,* 280 B.R. 886, 892 (Bankr. S.D. Ala. 2001). Alimony is, thus, very different from intellectual property rights, and instead akin to post-petition earnings. As such, the Order's reliance upon and application of the law on alimony to intellectual property rights is legally erroneous.

What is legally correct is that the termination right within the Copyright right exists and (if not a work for hire) is part of the Copyright right as a matter of law, akin to contingent and maturing-in-the-future rights, which are included in the bankruptcy estate. "Courts consistently have concluded that contingent interests should be included within the bankruptcy estate." *Denadai v. Preferred Capital Markets, Inc.*, 272 B.R. 21, 28-30 (Bankr. D. Mass. 2001) (citing, *e.g., Rau v. Ryerson* (*In re Ryerson*), 739 F.2d 1423 (9th Cir. 1984) (**holding post-petition termination payments were property of**

*the estate*); *Booth v. Vaughan* (*In re Booth*), 260 B.R. 281, 285-87 (6th Cir. BAP 2001) (collecting cases holding that various contingent interests are property of the estate); *see also* H.R. Rep. No. 95-595, at 175-76 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6136 ("The bill determines what is property of the estate by a simple reference to what interests in property the debtor has at the commencement of the case. This includes **all *interests***, such as interests in real or personal property, tangible and intangible property, choses in action, causes of action, rights such as copyrights, trade-marks, patents, and processes, contingent interests and future interests, whether or not transferable by the debtor." (footnotes omitted)).).

The Order misapprehends that courts have also concluded that debtors have a contingent contractual interest in ***options that are unvested as of the petition date***, and that the contingent interest is property of the estate subject to the contingency. *Denadai*, 272 B.R. at 28 (discussing *Allen v. Levey* ( *In re Allen*), 226 B.R. 857 (Bankr. N.D. Ill. 1998)). We can analogize to a stock option. If a debtor who holds a stock option meets the conditions precedent to the exercisability of the option, then, upon the exercising of his option, the company is under a binding obligation to sell him the stock at the option price. *See Allen*, 226 B.R. at 862–65. If a debtor who has a termination right meets the conditions precedent to the exercisability of the termination, then, upon exercising his right to termination, the grantee is under a binding obligation to return the rights to the copyright. And options that have not vested are not excluded from the estate either. *Denadai*, 272 B.R. at 32–33 ("The case law does not support DeNadai's attempt to distinguish between "vesting" and "exercisability." Whether unvested options are conceived of as contract rights or equity interests, they represent interests subject to a contingency that are properly understood as property of the estate.").

"[T]he array of circumstances in which the cases have held that a contingent interest is property of the estate is extensive." *In re Booth*, 260 B.R. 281, 287 (6th Cir. BAP 2001) (citing cases). "[T]he term 'property' has been construed most generously and an interest is not outside its reach because it is

novel or contingent or because enjoyment must be postponed." *Segal v. Rochelle,* 382 U.S. 375, 379 (1966).

Overlooking the above well-established bankruptcy law, the Order relies on Defendants' advanced *Mills Music, Inc. v. Snyder*, 469 U.S. 153, 173 (1985), to reason that an individual's voluntary bankruptcy has no affect on one's termination right. The Order misapprehends that in *Mills Music **the individual holding the renewal right never entered bankruptcy***, unlike here, and the *Mills Music **issue*** was not termination rights or bankruptcy, but whether a grantee was entitled to the royalties from derivative works even after the original copyright holder exercised his renewal right, to which question the Supreme Court answered yes.

A publisher, Mills Music, Inc., had a dispute with the heirs of Ted Snyder, the author of the 1923 copyrighted song "Who's Sorry Now", over the division of royalty income that the sound recordings of the song have generated. 469 U.S. at 154–55, 157. The original copyright for "Who's Sorry Now" was registered in 1923 in the name of a publishing company that Snyder partly owned, Waterson, Berlin Snyder Co. ***That company only***—not Ted Snyder, individually—went into bankruptcy in 1929, and in 1932 the trustee in bankruptcy assigned the copyright to Mills Music. *Id.* at 156–57.

At issue was the Copyright Act of 1909, 35 Stat. 1075, by which the copyright in a musical composition lasted for 28 years from the date of its first publication, and the author could renew the copyright for an additional term of 28 years. *Id.* at 157. The Supreme Court noted that, although Mills had acquired copyright ownership from the trustee in the bankruptcy of the publishing company, it needed Snyder's cooperation to acquire an interest in the 28-year renewal term. *Id.* at 157. In 1940, Mills Music and Snyder entered into a written agreement wherein "Snyder assigned his entire interest in all renewals of the copyright to Mills in exchange for an advance royalty and Mills Music's commitment to pay a cash royalty on sheet music and 50 percent of all net royalties that Mills received

for mechanical reproductions." *Id.* at 157–58.

We stop here for emphasis: ***Only the publishing company went into bankruptcy***, not Snyder individually. ***Thus, Snyder still retained*** his personal renewal right and his right passed to his heirs. That's why he assigned his interest in the renewals to Mills Music during his renewal period. But here, ***both*** the Luke Records publishing company ***and*** Luther Campbell individually (and voluntarily) went through bankruptcy and Lil' Joe as the highest bidder paid considerable money and acquired all rights from ***both*** the Luke Records publishing company and Luther Campbell. The Order overlooks or misapprehends that critical, critical difference in the facts and law driving the *Mills Music* decision that do not support this decision. As such, the Order misreads, upon Defendants' urging, *Mills Music* to preclude any and all agreements or transfers of termination rights via bankruptcy because Court did not consider such a question, as those facts were not before it.

Continuing on, in 1951, Mills Music obtained and registered the renewal copyright. 469 U.S. at 158. Mills Music then directly or through its agent, Harry Fox Agency, Inc., issued over 400 licenses to record companies authorizing the use of the song in specific reproductions on phonograph records. *Id.* These record companies used various artists and musical arrangements to create "derivative works," each of which was *independently* copyrightable. *Id.* These derivative works were "mechanical reproductions" of "Who's Sorry Now" so under Snyder and Mills Music's 1940 agreement, Mills Music had to pay 50 percent of the royalties it's agent collected from the record companies to Snyder. *Id.* After Snyder's death, his heirs succeeded to his interest in *the arrangement* with Mills Music. *Id.* at 158–59.

Years after *Mills Music*, the 1976 Copyright Act was enacted and section 304(c)(2) gave Snyder's heirs a statutory right to terminate Snyder's 1940 grant of the renewal rights to Mills Music. *Id.* at 155, 161–62. Belaboring, because Snyder individually never went through bankruptcy, his right was never transferred in bankruptcy.

Under § 304(c)(6), a termination caused all rights "covered by the terminated grant" to revert to the heirs, except that under § 304(c)(6)(A) a "derivative work prepared under the authority of the grant before its termination may continue to be utilized under the terms of the grant after its termination." *Id.* at 162.  So, on January 3, 1978, tracking § 304(c)(2) of the Copyright Act, as revised in 1976, Snyder's heirs terminated the Snyder's grant to Mills Music of rights in the renewal copyright effective January 3, 1980. *Id.* at 162. On August 11, 1980, Snyder's heirs advised Mills Music's agent that Mills Music's interest in the copyright had been terminated and demanded that all royalties on the derivative words be remitted to them. *Id.* at 162. *Mills Music* is a case about whether a grantee's interest in derivative works survives the exercise of a renewal right. Not a case about whether the transfer of copyrights in bankruptcy leave behind with the debtor the debtor's copyright termination rights (and it doesn't by operation of Bankruptcy law).

On those facts and procedural posture, the Supreme Court held Mills Music was entitled pursuant to § 304(c)(6)(A) to a share of the royalty income in dispute under the terms of the Snyder's grant to Mills Music in 1940. The Court looked to the language of the applicable subparagraph — § 304(c)(6)(A) — carving out an exception from the reversion of rights that takes place when an author exercises his right to termination:

> "A derivative work prepared under authority of the ***grant*** before its termination may continue to be utilized under the terms of the *grant* after its termination, but this privilege does not extend to the preparation after the termination of other derivative works based upon the copyrighted work covered by the ***terminated grant***." 17 U.S.C. § 304(c)(6)(A).

The Court concluded that a consistent reading of the word "grant" in the text of § 304(c)(6)(A) encompassed Snyder's grant to Mills Music in 1940. Nothing in the legislative history or the language of the statute indicates that Congress intended to draw a distinction between authorizations to prepare derivative works that are based on a single direct grant and those that are based on successive grants.

With great respect, *Mills Music* does not, and cannot, stand for the proposition that an

individual voluntarily entering into bankruptcy retains his termination right given those facts were never the facts and this issue was never the issue in Mills Music. That's because the Eleventh Circuit recognizes that "[t]he holding of a case comprises both the result of the case and those portions of the opinion necessary to that result." *United States v. Caraballo-Martinez*, 866 F.3d 1233, 1244 (11th Cir. 2017) (internal quotation marks omitted). And as for Defendants' reliance upon dicta, "regardless of what a court says in its opinion, ***the decision can hold nothing beyond the facts of that case***", *Edwards v. Prime, Inc.*, 602 F.3d 1276, 1298 (11th Cir. 2010) (collecting cases), and which are very different from the facts here. Reconsideration is warranted for these reasons as well.

The Order's reliance on the "inalienable" language in *Stewart* and cases citing *Stewart* do not interpret the "agreement to the contrary" language of section 203(a)(5). The Order's cited *Garza v. Everly*, 59 F.4th 876 (6th Cir. 2023), is a case in which the Sixth Circuit Court of Appeals held Phil Everly's heirs and successors were barred from claiming or exercising rights related to authorship of the song *Cathy's Clown* because Don Every repudiated Phil's authorship of the song and Phil did not respond by asserting his authorship rights within the applicable statutory period. The Sixth Circuit only stated in *dicta*, and never held, that termination rights cannot be transferred. 59 F.4th at 880. Importantly, the Sixth Circuit rejected Phil's heir's claim that the inalienable nature of termination rights means that a holding that Phil is not a co-author violates the Copyright Act by alienating his termination rights. *Id.* at 881.

Similarly, the district court in *Livingston v. Jay Livingston Music, Inc.*, 3:22-cv-00532, at *9 (M.D. Tenn. Feb. 21, 2024), only noted in *dicta* that courts have characterized termination rights as "inalienable," citing *Stewart,* which *Stewart*, *supra,* did not hold. And the actual issue in *Livingston* was whether the complaint adequately alleged that notices of termination were invalid or defective. The issue in *Brown-Thomas v. Hynie*, 441 F. Supp. 3d 180 (D.S.C. 2019), was subject-matter jurisdiction, not bankruptcy transfer of termination rights. In *Archie Comic Publications v. Decarlo*, 00 Civ. 5686

(LAK), at *1 (S.D.N.Y. Dec. 3, 2001), the issue was the termination notice timing, not bankruptcy transfer of termination rights. In *Stillwater Ltd. v. Basilotta,* No. 16 Civ. 1895 FMO (SHx), (C.D. Cal. Mar. 17, 2017), the issue was whether errors in publication dates raised factual issues, again, not bankruptcy transfer of termination rights.

Thus, reconsideration is warranted because the Order is premised on *dicta* within *dicta* within in cases that never decided bankruptcy transfer of termination rights to advance a Congressional intent that was never expressed. And the stated Congressional intent—to protect authors from opportunistic publishers at the point of creation of a work—is not implicated by bankruptcy transfers under the *supervision, scrutiny, and subject to the final approval of the Bankruptcy Courts*, and Congress expressly contemplated, and memorialized that in the Copyright Act under Sections 201 and 203, that transfers by virtue of Bankruptcy would ***not*** be included for these very reasons.

The Order's reasoning that the "manifest" intent is the "protection of authors" [ECF No. 210 at 20] overlooks or misapprehends that Section 203 seeks to protect authors from **opportunistic publishers** who benefit from the work of the authors, not *carte blanch* absolute protection in perpetuity. H.R. Rep. No. 94-1476, at 124 (1976). Publishers routinely required authors to assign renewal rights in advance making renewal rights illusory, and ***that*** is what Congress meant to protect against. H.R. REP. No. 60-2222, at 14–15 (1909) ("It not infrequently happens that the author sells his copyright outright to a publisher for a comparatively small sum. If the work proves to be a great success and lives beyond the term of twenty-eight years, your committee felt that it should be the exclusive right of the author to take the renewal term, and the law should be framed as is existing law, so that he could not be deprived of that right.").

The Order also overlooks or misapprehends that Section 203 seeks to protect authors when they are unable to determine a work's value *before it's been exploited*. ECF No. 210 at 20; but see *Waite v. UMG Recordings, Inc.*, 2023 U.S. Dist. LEXIS 14465 * 4-5 (SD NY Jan. 27, 2023) (section 203

implemented to protect artists who give up their copyrights before they know it is a hit); *Champlin v. Music Sales Corp.*, 604 F. Supp. 3d 224, 236 (S.D. N.Y. 2022) ("the Act seeks to 'counterbalance the unequal bargaining position of artists seeking to reclaim their copyrights, resulting in part from the 'impossibility of determining a work's value until it has been exploited.'") (quoting H.R. Rep. No. 94-1476, at 124 (1976).  Here, the value of the works *were **known*** in 1991; they had been published for several years, the records were international hits, and in 1990, Luke Records received a distribution deal from Atlantic Records, with a $5 million advance. They were also known in 1995 when Luke Records and Luther Campbell entered into bankruptcy proceedings, for which Lil' Joe paid considerable sums, and in 2000 when Ross filed for bankruptcy and settled claims brought by Lil' Joe, for which Lil' Joe further paid considerable sums. ECF No. 32 ¶ 6, 11; ECF No. 32-3.

To further aid the Court's review of this Motion, the Ninth Circuit Court of Appeals expressly rejected a broad reading of *Stewart* that Congress intended to make the termination right inalienable for authors and their families. *Milne ex Rel. Coyne v. Stephen Slesinger*, 430 F.3d 1036, 1043 (9th Cir. 2005). More correctly, Congress via section 203 precludes alienation of one's termination right only through an "agreement to the contrary." 17 U.S.C. §203(a)(5).  The Order overlooks or misapprehends that an agreement, whether in writing or not, is "a mutual understanding between ***two or more persons*** about their relative rights and duties regarding past or future performances; a ***manifestation of mutual assent by two or more persons***." *Agreement*, Black's Law Dictionary (12th ed. 2024). Bankruptcy, by contrast, is a unilateral act in which the debtor voluntarily engages to receive the benefit of discharge his debts and the federal Bankruptcy Court follows its obligations via the Bankruptcy to distribute the debtor's property consisting of anything of value to secure the property's highest value and use. A contrary conclusion would yield a massive sea change in intellectual property bankruptcies, throwing them into complete disarray, protracted post-bankruptcy litigation, as here, and a lack of finality around which the courts, creditors, and debtors function.

The Order misapprehends or overlooks the courts' interpretations of the "agreements to the contrary" language in section 203 that is premised on legislative history. In *Milne ex rel. Coyne v. Stephen Slesinger*, Inc., 430 F.3d 1036 (9th Cir. 2005), the Ninth Circuit found the "agreement to the contrary" language ambiguous; looking to the legislative history it found that:

> Congress specifically stated that it did not intend for the statute to 'prevent the parties to a transfer or license from voluntarily agreeing at any time to terminate an existing grant and negotiating a new one[.]" H.R. REP. NO. 94-1476 at 127, 1976 U.S.C.C.A.N. at 5743. Congress further stated that "nothing in this section or legislation is intended to change the existing state of the law of contracts concerning the circumstances in which an author may terminate a license, transfer or assignment." H.R. REP. NO. 94-1476 at 142, 1976 U.S.C.C.A.N. at 5758. Congress therefore anticipated that parties may contract, as an alternative to statutory termination, to revoke a prior grant by replacing it with a new one. Indeed, Congress explicitly endorsed the continued right of "parties to a transfer or license" to "voluntarily agree at any time to terminate an existing grant and negotiat[e] a new one." H.R. REP. NO. 94-1476 at 127, 1976 U.S.C.C.A.N. at 5743.

430 at 1045–46. Thus, the express cancellation of an original grant and simultaneous regrant were not "agreements to the contrary" and the heirs held no termination rights under the cancelled original grant. *Id.* at 1046. The court then determined that because the Milnes received a better deal through the 1983 Agreement, the rationale behind the termination of transfer rule—safeguarding authors against unremunerative transfers—was not applicable. *Id.* at 1046. And in *Penguin Group (USA), Inc. v. Steinbeck*, 537 F.3d 193, 202 (2d Cir., the 2008), the Second Circuit concluded that neither the plain language nor the legislative intent of the Copyright Act precluded authors and their hers from losing the right to terminate a grant by renegotiating it. 537 F.3d at 202.

The Order overlooks or misapprehends that it was not the fact that the parties were able to renegotiate per se, but the issue of whether the purpose of the statute was applicable—i.e, safeguarding authors against unremunerative transfers. As in *Milne* and *Steinbeck*, this purpose of Section 203 not implicated in an individual's voluntary bankruptcy.

The Order misreads *Milne* and *Steinbeck*, and *Classic Media, Inc. v. Mewborn*, 532 F.3d 978, 983 (9th Cir. 2008), to stand for a rule that the parties must have expressly bargained with their

termination rights. ECF No. 210 at 24–36. Those courts looked to the language and the purpose of the statute. As in *Milne* and *Steinbeck,* where Congress explicitly stated it did not affect the existing state of the law of contracts concerning the circumstances in which an author may terminate a license, transfer or assignment and no one was being exploited by an opportunistic publisher, *see supra*, **the Copyright Act expressly contemplates transfers undertaken by the authority, scrutiny, and supervision of Bankruptcy Courts** and bankruptcy does not implicate the concerns expressed by Congress. Recognizing that authority, the Order overlooks or misapprehends that Congress enacted within the Copyright Act a carve-out for transfers by law that are undertaken by the power of the bankruptcy court in 17 U.S.C. §201(e):

> (e)Involuntary Transfer.—
> When an individual author's ownership of a copyright, or of any of the exclusive rights under a copyright, has not previously been transferred voluntarily by that individual author, no action by any governmental body or other official or organization purporting to seize, expropriate, transfer, or exercise rights of ownership with respect to the copyright, or any of the exclusive rights under a copyright, shall be given effect under this title, **except as provided under title 11** [the bankruptcy code].

The carve-out from the Act's termination provisions for Bankruptcy was intentional, not poor wordsmithing. House Report No. 94-1476, expressly provides that bankruptcy transfers are not prohibited by subsection 201(e), because a debtor has voluntarily entered into it:

> Traditional legal actions that may involve transfer of ownership, such as bankruptcy proceedings and mortgage foreclosures, are not within the scope of this subsection; the authors in such cases have voluntarily consented to these legal processes by their overt actions—for example, by filing in bankruptcy or by hypothecating a copyright.

The Copyright Act also carved out transfers made by will—another unilateral act—from the Act's termination provisions. 17 U.S.C. §§ 203(a) and 304(c); *Broadcast Music, Inc. v. Roger Miller Music, Inc.*, 396 F.3d 762, 775*; Venegas-Hernandez v. Peer*, 283 F. Supp. 2d 491, 504 (D.P.R. 2003) ("If there has been a will, the copyright renewal transfers by testament, and the statutory class does not receive the termination rights.").

Finally, reconsideration is warranted because the Order overlooks 17 U.S.C. 203(b)(5), which provides that a termination of a grant under this Section affects only those rights covered by the grants that arise under this title, and in no way affects rights arising under any other Federal, State, or foreign laws. The grants of rights to Lil' Joe arose under Chapters 7 and 11 of federal bankruptcy law, and thus are not affected by at termination right under subsection 203(b)(5)'s plain language. The Bankruptcy Court Order specifically states: Joseph Weinberger is a "good faith purchaser as that term is used in 11 U.S.C. § 363(m) and is entitled to all of the protection of good faith purchasers pursuant thereto." *See* **attached Exhibit C** at 3, 14 (1996 Bankruptcy Court Order confirming Luke Records and Campbell Joint Plan of Reorganization and Order).

Further, the Luke Records and Campbell Bankruptcy Orders, **Attached Exhibits C and D,** transferring ownership of the sound recordings copyrights "free and clear of any and all liens claims, encumbrances, charges, setoffs or recoupments of any kind," and Mark Ross Bankruptcy Settlement Agreement and Agreed Nondischargeable Final Judgment, **Attached Composite Exhibit E,** stating that he has "no rights" to the recordings, foreclose any challenge to Lil Joe's ownership of the sound recordings copyrights. *See also,* 11 U.S.C. § 363. Under binding precedent, this issue has been settled for some time: a bankruptcy court's order confirming a plan of reorganization is given the same effect as any district court's final judgment on the merits. *See Stoll v. Gottlieb,* 305 U.S. 165, 170–71 (1938); *Miller v. Meinhard-Commercial Corp.,* 462 F.2d 358, 360 (5th Cir. 1972).

Under further binding precedent, "[w]hen all of the requirements of claim preclusion are satisfied, 'the judgment or decree upon the merits in the first case is an absolute bar to the subsequent action or suit between the same parties . . . not only in respect of every matter which was actually offered and received to sustain the demand, but also as to every [claim] which might have been presented.'" *Wallis v. Justice Oaks II, Ltd.*, 898 F.2d 1544, 1552 (11th Cir. 1990) (quoting *Baltimore S.S. Corp. v. Phillips*, 274 U.S.316, 319 (1927)). Where a court of competent, which a bankruptcy court

is, jurisdiction renders a prior final judgment on the merits, as did the Bankruptcy Court Judge here, that order is to be given preclusive effect through res judicata and collateral estop. *See Wallis*, 898 F.2d at 1550–52 (11th Cir. 1990); *CSX Transp., Inc. v. Bhd. of Maint. of Way Emps.*, 327 F.3d 1309, 1317 (11th Cir. 2003).

In sum, reconsideration is warranted because the Order overlooks or misapprehends:

a) Section 203 of the Copyright Act mandates that the party seeking termination must properly describe the prior grant that it is seeking to terminate. In this case, the Defendants only cited to a 1990 contract reportedly between them and Luke Records. However, from the face of that contract, no copyrights were transferred and section 203 of the Copyright Act mandates that all transfers of copyrights must be in writing, signed by the transferor and <u>describing</u> the particular grant of copyrights.

b) Whether vested or not, the Section 203 termination *rights* existed at the time Campbell and Ross filed for bankruptcy, and became assets of their respective bankruptcy estates under the Bankruptcy Code and which Bankruptcy Code is expressly excluded under Section 201 from the reach of Section 203 of the Copyright Act;

c) Full faith and effect must be accorded Bankruptcy Judge Mark's 1996 Order confirming the Campbell/Luke Records plan of reorganization which granted Lil' Joe the ownership of the copyrights at issue, free and clear of "all claims, liens and encumbrances", when there has been, and at this time there can be no, relief from that order; and

Lil' Joe respectfully requests reconsideration to ensure the Court is not led into error.

## D.   RULE 54(B) CERTIFICATION

If the Court declines reconsideration, Lil' Joe Records respectfully requests the Court certify its summary judgments so they can be immediately appealed to afford the US Court of Appeals for the Eleventh Circuit to speak on these critical issues.

When multiple claims or parties are involved in an action Rule 54(b), Fed. R. Civ. P., permits entry of a final judgment as to some but not all of all of the claims or parties. A certification under Rule 54(b) to enter a final judgment of fewer than all of the claims in an action requires: First, a district court must determine that the order to be certified would be final were it not for the presence of other claims or other parties. In other words, the order to be certified must be "a 'judgment' in the sense that it is a

decision upon a cognizable claim for relief, and it must be 'final' in the sense that it is '**an ultimate disposition of an individual claim entered in the course of a multiple claims action**.'" *Curtiss-Wright Corp. v. Gen. Elec. Co.*, 446 U.S. 1, 7 (1980) (quoting *Sears, Roebuck & Co. v. Mackey*, 351 U.S. 427, 436 (1956)).

Second, a district court must determine, "tak[ing] into account judicial administrative interests as well as the equities involved," that there is no just reason to delay entry of final judgment pertaining to that party or claim. *Id.* at 8.

The issue regarding whether the termination rights were transferred in bankruptcy is separate because it does not overlap or depend on the other claims—it can be and was decided independent of other claims. And, as the Court has noted, it is highly significant to and could be dispositive of the other claims and this issue may ultimately be decided by the Supreme Court. As termination rights under section 203 are increasingly vesting, there will be numerous questions about the unintended impacts of those rights and how to interpret the language in Sections 201 and 203 of the Copyright Act within the confines of Bankruptcy proceedings that already transferred copyright rights (and other classes of intellectual property rights like trademarks and patents defined in the bankruptcy code as "property" of the Bankruptcy Estate), discharged bankruptcy debtors decades before upon the transfer of entire Copyright rights, including termination rights, often an intellectual property debtor's most valuable asset.

Certifying this issue now, before trial, so that the U.S. Court of Appeals for the Eleventh Circuit can speak and give direction on this issue would impact the disposition of this case with the benefit of an appellate opinion before the resources are exhausted on trial after which judgment might be reversed on appeal and remanded with further instruction.

WHEREFORE for the reasons and legal authorities set forth herein, Plaintiff, LIL' JOE RECORDS, INC., respectfully asks this Court to reconsider its Summary Judgment Order [ECF210] or,

alternatively, to certify this for appellate review under Fed. R. Civ. P. 54(b).

Respectfully submitted,

*And*

WOLFE LAW MIAMI, P.A.
*Counsel for Plaintiff*
Latitude One Building
175 SW 7th Street, Ste. 2410
Miami, Florida 33131
T: 305-384-7370
E: rwolfe@wolfelawmiami.com


/s/ Richard Wolfe
RICHARD WOLFE, ESQ.
FLA. BAR NO. 355607

EASLEY APPELLATE PRACTICE PLLC
*Appellate Counsel for Plaintiff*
1200 Brickell Avenue, Ste. 1950
Miami, Florida 33131
T: (305) 444-1599; 800-216-6185
FLORIDA BAR DESIGNATED E-MAILS:
administration@easleyappellate.com
admin2@easleyappellate.com


/s/ Dorothy F. Easley
DOROTHY F. EASLEY, MS, JD, BCS APPEALS
FLA. BAR NO. 0015891

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on the 3d  day of October, 2024, I electronically filed the foregoing document, with the Clerk of the Court, by using the CM/ECF system, which will send a Notice of Electronic Filing to all counsel of record, listed on the attached service list. I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

By:      s/ Dorothy F. Easley
DOROTHY F. EASLEY, ESQ.

## SERVICE LIST
*Lil' Joe Records v. Mark Ross et al.*
CASE NO. 1:21-CV-23727-DPG
U.S. District Court, Southern District of Florida

RICHARD WOLFE, ESQ.
WOLFE LAW MIAMI, P.A.
Latitude One Building
175 SW 7th Street, Ste. 2410
Miami, Florida 33131
T: 305-384-7370
E: rwolfe@wolfelawmiami.com
*Counsel for Plaintiff*

JOEL B. ROTHMAN, ESQ.
SRIP LAW P.A.
21301 Powerline Road, Ste. 100
Boca Raton, Florida 33343
T: 561-404-4350
E: joel.rothman@sriplaw.com
*Counsel for Defendants*

DOROTHY F. EASLEY, MS, JD, BCS APPEALS
EASLEY APPELLATE PRACTICE PLLC
1200 Brickell Avenue, Ste. 1950
Miami, Florida  33131
T: (305) 444-1599; 800-216-6185
FLORIDA BAR DESIGNATED E-MAILS:
administration@easleyappellate.com
admin2@easleyappellate.com
Upload URL for secure e-service:
https://www.hightail.com/u/Easley-Appellate-Practice-PLLC
** *Appellate Counsel for Plaintiff*

SCOTT A. BURROUGHS, ESQ. (*pro hac vice*)
David Michael Stuart Jenkins, Esq. (*pro hac vice*)
DONIGER / BURROUGHS
247 Water Street, First Floor
New York, New York 10038
T: 310-590-1820
E: scott@donigerlawfirm.com
djenkins@donigerlawfirm.com
*Counsel for Defendants*