DFE/aa

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 1:21-CV-23727-DPG

LIL' JOE RECORDS, INC.,

      Plaintiff,

v.

RAVEN ROSS, CHRISTOPHER WONG WON, JR.,
RODERICK WONG WON, LETERIUS RAY,
ANISSA WONG WON AND LUTHER
CAMPBELL,

      Defendants.

_____/

### PLAINTIFF'S NOTICE OF SUPPLEMENTAL AUTHORITIES TO AID COURT'S REVIEW AND FOR APPELLATE PRESERVATION ON ISSUE OF COPYRIGHT TRANSFERS VIA BANKRUPTCY AND ON ISSUE OF STATUTORY CONSTRUCTION OF 17 U.S.C. §§ 201, 203, AND 204

Plaintiff, LIL' JOE RECORDS, INC., through counsel and under the Federal Rules of Civil Procedure, hereby give Notice of the following Supplemental Authorities to Aid the Court's Review and for Appellate Preservation on Issues of Copyright Transfers via Bankruptcy and Statutory Construction of 17 U.S.C. §§ 201, 203, and 204, such that accepting these Defendants' interpretation of those sections completely renders 17 USC § 201(e)'s language—"except as provided under title 11"—superfluous and eviscerates intellectual property transfers, including termination rights, by operation of law in bankruptcy proceedings under the authority and supervision of the bankruptcy court, wherein the highest bidders are led to believe they are paying for one thing—full copyright rights—vested, not yet vested, present claims, and future claims—only to have those rights challenged in subsequent litigation by a debtor years after bankruptcy discharge:

1. *Taylor Corp. v. Four Seasons Greetings, LLC*, 403 F.3d 958, 961 n.2, 962-63, 963-64 (8th Cir. 2005) ("Copyright ownership "vests initially in the author or authors of the

work." 17 U.S.C. § 201(a). An employer is the author when an item is considered a work made for hire. *See* 17 U.S.C. § 201(b); *Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 737 [] (1989); *see also* 17 U.S.C. § 101 (defining a work made for hire as 'a work prepared by an employee within the scope of his or her employment')." . . ."AP P later filed for bankruptcy. In April 2000, AP P and Taylor entered into an Asset Purchase Agreement (Agreement), in which AP P agreed to sell certain assets to Taylor, including AP P's assets 'used in the operation of [AP P's] Business.'" "AP P also agreed to transfer to Taylor '[a]ll intellectual property of the Business, including . . . copyrights, . . . artwork, designs and other intangible property of the Business, . . . including without limitation the Intellectual Property listed in Schedule 1.1(d).' Schedule 1.1(d) identifies hundreds of greeting card designs, including the six card designs authored by Creative Card. On April 28, 2000, the United States Bankruptcy Court for the District of Delaware approved the sale of AP P's assets to Taylor. ". . . . "Taylor contends the bankruptcy court's order effected the transfer of Creative Card's copyrights to Taylor. Accordingly, the question is whether Taylor proved a transfer of copyright ownership 'by operation of law.' Section 204(a) of the Copyright Act does not define the phrase 'by operation of law," and sparse case law addresses the transfer of copyright 'by operation of law.' *Brooks v. Bates,* 781 F.Supp. 202, 205 (S.D.N.Y. 1991). In *Brooks,* one of the few cases to address the meaning of 'by operation of law,' the court relied on the late Professor Melville B. Nimmer's renowned copyright treatise to interpret 'by operation of law' to mean transfers by bequest, bankruptcy, mortgage foreclosures, and the like. *Id.* at 205 (citing Melville B. Nimmer David Nimmer, 3 *Nimmer on Copyright* § 10.03[A] at 10-42 (1991)). The court then concluded, '[t]he lessons to be drawn from Professor Nimmer are that transfers of copyrights by operation of law are limited in number, and depend upon circumstances which establish the author's express or implied consent.' *Id.* One example of a transfer 'by operation of law' is a 'transfer of ownership pursuant to proceedings in bankruptcy . . ., since in such cases the author, by his overt conduct in filing in bankruptcy, . . . has consented to such a transfer.' *Id.* (quoting *supra,* § 10.06[A], 10-42)."...."We conclude the bankruptcy court's order approving AP P's and Taylor's Agreement constituted a transfer of the copyrights 'by operation of law.' The Agreement explicitly states AP P sold to Taylor 'the business of designing and publishing greeting cards, . . . as currently conducted by the Creative Card division.' The Agreement further transferred from AP P to Taylor '[a]ll intellectual property of the Business,' and Schedule 1.1(d) identifies the card designs at issue in this case. We agree with the district court that the bankruptcy court's April 28, 2000 order approving AP P's and Taylor's Agreement vested Taylor with ownership in the copyrights in Creative Card's card designs".) **attached**;

2. *The Evolutionary Level Above Human, Inc. v. Havel*, 3:22-CV-395-MGG, at *1-3, 18 (N.D. Ind. Feb. 27, 2024) ("Throughout the 1980s and 1990s, a religious group known as Total Overcomers Anonymous or Heaven's Gate [ ("the Group")] created numerous works to disseminate its teachings. These works consisted of hundreds of audio tapes and video tapes, several literary works, and other visual works." Involved members of the Heaven's Gate committed suicide, their estates were consolidated and administered through Summary Probate Proceedings, and Plaintiff intervened and acquired rights to the Group's intellectual property through a settlement agreement. Plaintiff then sued,

among others, Steven Havel for infringement. The defendants argued that Plaintiff did not own the copyright. District court disagreed and found Plaintiff did own the copyright through the settlement agreement approved by the California Court: "Thus, despite what Defendants contend, evidence presented by both parties demonstrates that the Group's intellectual property rights were transferred to Plaintiff by operation of law, through the Public Administrator's voluntary transfer of intellectual property rights to Plaintiff as part of a settlement agreement approved by the California Court. *See Taylor Corp.*[ *v. Four Seasons Greetings, LLC*, 403 F.3d 958, 964 (8th Cir. 2005)] (holding that a bankruptcy court order approving an asset purchase agreement transferring intellectual property rights constituted transfer by operation of law".) **attached**;

3. *Brooks v. Bates*, 781 F. Supp. 202, 205-06 (S.D.N.Y. 1991) (The "operation of law" clause of § 204(a) has generally been limited to well-defined circumstances, including transfers of ownership pursuant to proceedings in bankruptcy and mortgage foreclosures; transfer of ownership rights from employee to employer in a "for hire" situation; or by transfer of assets from a dissolving corporation to its shareholders pursuant to the laws of the state of incorporation.) **attached**;

4. *U.S. Home Corp. v. R.A. Kot Homes Inc.*, 563 F. Supp. 2d 971, 976 (D. Minn. 2008) ("Under 17 U.S.C. § 204(a), a copyright may be transferred by 'operation of law.' Courts have interpreted a transfer by 'operation of law' to include mergers and any other transaction that 'establish[es] the author's express or implied consent' to transfer the copyright. *Taylor Corp. v. Four Seasons Greetings, LLC,* 403 F.3d 958, 963 (8th Cir. 2005) (quoting *Brooks v. Bates,* 781 F.Supp. 202, 205 (S.D.N.Y. 1991)). The two copyrights were issued to Lundgren Brothers on June 21, 2004. (Axtell Aff. Ex. B.) On June 4, 2005, the Minnesota Secretary of State issued a certificate of merger between Lundgren Brothers Construction, Inc. and U.S. Home Corporation. (Axtell Aff. Ex. A.) The certificate indicates that the surviving entity after the effective date of merger, June 4, 2005, was U.S. Home Corporation. (Axtell Decl. Ex A.) According to Minnesota Statute § 302A.641, subdivision 2(d), the copyrights in suit vested in U.S. Home Corporation on June 4, 2005, the effective date of the merger, without any 'further act or deed' on the part the surviving company. That is, U.S. Home was not required under the statute to have the copyright certificates re-issued under its name. By way of the merger, the copyrights were transferred to U.S. Home by operation of law.") **attached**;

5. *Design Basics, LLC v. Forrester Wehrle Homes, Inc.*, No. 3:15CV00666, at *14-15 (N.D. Ohio Mar. 30, 2018) ("'Such cases . . . focus on whether the author of the transfer provided express or implied consent to such change of ownership.' *Soc'y of the Holy Transfiguration*, 689 F.3d at 41. If it did, the transfer is considered effective, meaning that 'a transfer by operation of law is a voluntary transfer done on the part of the copyright owner to another.' *Id.*" "Indeed, the transfer of copyright ownership 'by operation of law' is an express exception to the requirement that such transfers must ordinarily be in writing. *See* 17 U.S.C. § 204(a) ('A transfer of ownership, other than by operation of law, is not valid unless an instrument of conveyance or a note or memorandum of the transfer, is in writing and signed by the owner of the rights conveyed or such owner's duly authorized agent.'). 'Only disputes over facts that might affect the

outcome of the suit . . . will properly preclude entry of summary judgment,' *Anderson*, 477 U.S. at 248, and in view of plaintiff's corporate history, a failure to record the transfer of ownership is not one of them. *See Lone Ranger Television*, 740 F.3d at 721 (rejecting a similar argument). DB has carried its burden to demonstrate that it owns copyrights in the allegedly-infringed designs. I therefore grant plaintiff's motion for summary judgment on the issue of ownership. ") **attached**;

6. *Time, Inc. v. Kastner*, 972 F. Supp. 236, 238 (S.D.N.Y. 1997) ("According to the Copyright Act, a transfer of copyright ownership is not valid 'other than by operation of law . . . unless an instrument of conveyance, or a note or memorandum of the transfer, is in writing and signed by the author of the rights conveyed or such owner's duly authorized agent.' 17 U.S.C. § 204(a) (1996). The Copyright Act defines transfer of copyright ownership as 'an assignment, . . . exclusive license, or any other conveyance . . . of a copyright or of any of the exclusive rights comprised in a copyright . . . but not including a nonexclusive license.' 17 U.S.C. § 101 (1996)." "The Copyright Act, then, carves out two exceptions to the writing requirement: nonexclusive licenses and transfers of ownership by operation of law. While the Copyright Act does not define transfer by 'operation of law,' courts in this Circuit have noted that transfers due to bankruptcy or mortgage foreclosure, where there is evidence of the author's express or implied consent of transfer ( *e.g.* his overt conduct in filing for bankruptcy), are transfers by 'operation of law'. *Brooks v. Bates,* 781 F. Supp. 202, 205 (S.D.N.Y. 1991). ") **attached**;

7. *Advance Magazine Publishers Inc. v. Leach*, 466 F. Supp. 2d 628, 635-36 (D. Md. 2006) ("Defendant attempts to circumvent the federal preemption issue by maneuvering within the Copyright Act to argue that there has been a transfer of Plaintiff's copyrights to him by 'operation of law' through the doctrine of adverse possession. (Paper 5, Ex. 1). Thus, he is. . .asking the court to construe 'operation of law' to encompass the principles of adverse possession. This argument is also misguided.". . ."[T]ransfers by operation of law are expressly limited to voluntary transfers, except in bankruptcy proceedings.". . ."[A]dverse possession cannot constitute a transfer 'by operation of law' under the Copyright Act because it is not a voluntary act.") **attached**;

8. *TRW Inc.* v. *Andrews*, 534 U. S. 19, 31 (2001) ("It is `a cardinal principle of statutory construction' that `a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.'") (quoting *Duncan* v. *Walker*, 533 U. S. 167, 174 (2001)) **attached**;

9. *Dubov v. Read (In re Read)*, 692 F.3d 1185, 1191 (11th Cir. 2012) ("'It is a cardinal principle of statutory construction that a statute, ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.' *TRW Inc. v. Andrews,* 534 U.S. 19, 31 [] (2001) (quoting *Duncan v. Walker,* 533 U.S. 167, 174 [ ](2001) (internal quotation marks omitted in original)). 'It is our duty, "to give effect, if possible, to every clause and word of a statute." ' *United States v. Menasche,* 348 U.S. 528, 539 [] (1955) (quoting *Montclair v. Ramsdell,* 107 U.S. 147, 152 [] (1883)). 'General language of a statutory provision, although broad enough to include it, will not be held to apply to a matter specifically dealt with in

another part of the same enactment. Specific terms prevail over the general in the same or another statute which otherwise might be controlling.' *D. Ginsberg & Sons, Inc. v. Popkin,* 285 U.S. 204, 208 [] (1932) (internal citations omitted in original). The intent of Congress in enacting § 505(a)(2)(C) was to prevent bankruptcy abuse by debtors and ensure that debtors pay the amount they owe as soon as possible. We are persuaded that in enacting § 505(a)(2)(C), Congress intended that the specific provisions of that statute must prevail over the more general provisions of § 108(a).") **attached**;

10. *Brotherhood of Locomotive Engineers & Trainmen General Committee of Adjustment CSX Transportation Northern Lines v. CSX Transportation, Inc.*, 522 F.3d 1190, 1194-95 (11th Cir. 2008) ("The primary principle of statutory construction requires courts to give effect to the plain meaning of the words used 'in their ordinary and usual sense.' *Caminetti v. United States*, 242 U.S. 470, 485-86 [] (1917). To the extent possible, the rules of statutory construction require courts to give meaning to every word and clause in a statute. *United States v. Menasche*, 348 U.S. 528, 538-39 [] (1955); *TRW Inc. v. Andrews*, 534 U.S. 19, 31   [] (2001). Additionally, courts must reject statutory interpretations that would render portions of a statute surplusage. *TRW*, 534 U.S. at 31 []. ") **attached**;

11. *Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1348 (11th Cir. 2014) ("Such an interpretation, however, would functionally eviscerate the meaning of the phrase "any program" in the 90 Day Provision", just as Defendants' interpretation, in this case, of 17 U.S.C. § 203 in conjunction with 17 U.S.C. § 201, eviscerates the provision within §201(e) that expressly carves out an exception to alienability of termination rights in the case of transfers by operation of law under the Bankruptcy Code) **attached**.

Respectfully submitted,

*And*

WOLFE LAW MIAMI, P.A.
*Counsel for Plaintiff*
Latitude One Building
175 SW 7th Street, Ste. 2410
Miami, Florida 33131
T: 305-384-7370
E: rwolfe@wolfelawmiami.com

 /s/ Richard Wolfe
RICHARD WOLFE, ESQ.
FLA. BAR NO. 355607

EASLEY APPELLATE PRACTICE PLLC
*Appellate Counsel for Plaintiff*
1200 Brickell Avenue, Ste. 1950
Miami, Florida 33131
T: (305) 444-1599; 800-216-6185
FLORIDA BAR DESIGNATED E-MAILS:
administration@easleyappellate.com
admin2@easleyappellate.com

 /s/ Dorothy F. Easley
DOROTHY F. EASLEY, MS, JD, BCS APPEALS
FLA. BAR NO. 0015891

## CERTIFICATE OF SERVICE

 **I HEREBY CERTIFY** that on the 11th  day of October, 2024, I electronically filed the foregoing

document, with the Clerk of the Court, by using the CM/ECF system, which will send a Notice of

Electronic Filing to all counsel of record, listed on the attached service list. I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

By:    s/ Dorothy F. Easley
        DOROTHY F. EASLEY, ESQ.

### SERVICE LIST

*Lil' Joe Records v. Mark Ross et al.*
CASE NO. 1:21-CV-23727-DPG
U.S. District Court, Southern District of Florida

RICHARD WOLFE, ESQ.
WOLFE LAW MIAMI, P.A.
Latitude One Building
175 SW 7th Street, Ste. 2410
Miami, Florida 33131
T: 305-384-7370
E: rwolfe@wolfelawmiami.com
*Counsel for Plaintiff*

DOROTHY F. EASLEY, MS, JD, BCS APPEALS
EASLEY APPELLATE PRACTICE PLLC
1200 Brickell Avenue, Ste. 1950
Miami, Florida  33131
T: (305) 444-1599; 800-216-6185
FLORIDA BAR DESIGNATED E-MAILS:
administration@easleyappellate.com
admin2@easleyappellate.com
Upload URL for secure e-service:
https://www.hightail.com/u/Easley-Appellate-Practice-PLLC
** *Appellate Counsel for Plaintiff*

JOEL B. ROTHMAN, ESQ.
SRIP LAW P.A.
21301 Powerline Road, Ste. 100
Boca Raton, Florida 33343
T: 561-404-4350
E: joel.rothman@sriplaw.com
*Counsel for Defendants*

SCOTT A. BURROUGHS, ESQ. (*pro hac vice*)
David Michael Stuart Jenkins, Esq., (*pro hac vice*)
DONIGER / BURROUGHS
247 Water Street, First Floor
New York, New York 10038
T: 310-590-1820
E: scott@donigerlawfirm.com
djenkins@donigerlawfirm.com
*Counsel for Defendants*

No. 04-1088

United States Court of Appeals, Eighth Circuit

# Taylor Corp. v. Four Seasons Greetings, LLC

403 F.3d 958 (8th Cir. 2005)

Decided Apr 11, 2005

No. 04-1088.

Submitted: December 17, 2004.

Filed: April 11, 2005.

Appeal from the United States District Court for

959 the District of Minnesota, David S. Doty, J. *959

Robert Mark Halligan, argued, Chicago, IL (James Brian Sheehy, Minneapolis, MN, on the brief), for appellant.

Laura J. Hein, Minneapolis, MN (Dean C. Eyler, on the brief), for appellee.

Before LOKEN, Chief Judge, MORRIS SHEPPARD ARNOLD and RILEY, Circuit Judges.

---

960 *960

RILEY, Circuit Judge.

This appeal is primarily governed by the standard of review. We directly address a challenge to the appropriate standard for reviewing a district court's findings of substantial similarity in copyright law cases. We adopt the standard from the majority of other circuits and review the

961 district *961 court's fact findings concerning substantial similarity for clear error.

In this copyright infringement action, Taylor Corporation (Taylor), a greeting card manufacturer, claims Four Seasons Greetings, LLC (Four Seasons), a competing greeting card company, infringed Taylor's copyrights in six greeting card designs. Following a bifurcated trial,

the district court[1] concluded Taylor owns the copyrights in the six greeting card designs at issue, and Four Seasons's card designs infringe Taylor's copyrights. The district court issued a permanent injunction against Four Seasons, directing Four Seasons to stop copying, selling, or distributing the six greeting card designs. Four Seasons appeals, arguing the district court erred: (1) in holding Four Seasons liable for copyright infringement, and (2) in issuing a permanent injunction. We affirm.

[1] The Honorable David S. Doty, United States District Judge for the District of Minnesota.

## I. BACKGROUND

This case involves claims of illegal copying of six holiday greeting card designs. Creative Card Company (Creative Card) employed Frank Stockmal (Stockmal), Bernard Granger (Granger), Michael Shelton (Shelton), and Aleta Brunettin (Brunettin) to design greeting cards. While working for Creative Card, these artists created the six card designs disputed in this case: Colored Presents, Ribbon of Flags Around Globe, Three Worlds of Thanks Globe Ornament, Pencil Sketch Farm, Thanksgiving Cart, and Wreath with Verse. Because the artists were employed by Creative Card when the artists created the card designs, Creative Card is considered the author and the original copyright owner of the six designs.[2] At the time Creative Card authored the six card designs, Creative Card was a wholly owned subsidiary of AP P Manufacturing, Inc. (AP P).



Taylor Corp. v. Four Seasons Greetings, LLC   403 F.3d 958 (8th Cir. 2005)

2 Copyright ownership "vests initially in the author or authors of the work." 17 U.S.C. § 201(a). An employer is the author when an item is considered a work made for hire. *See* 17 U.S.C. § 201(b); *Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 737, 109 S.Ct. 2166, 104 L.Ed.2d 811 (1989); *see also* 17 U.S.C. § 101 (defining a work made for hire as "a work prepared by an employee within the scope of his or her employment").

In 1999, Creative Card's president left Creative Card and formed Four Seasons. Three of Creative Card's artists-Stockmal, Shelton, and Brunettin-resigned from Creative Card and went to work for Four Seasons. While employed by Four Seasons, Stockmal, Shelton, and Brunettin created six card designs Taylor contends are similar to six card designs the artists and Granger previously created for Creative Card.

AP P later filed for bankruptcy. In April 2000, AP P and Taylor entered into an Asset Purchase Agreement (Agreement), in which AP P agreed to sell certain assets to Taylor, including AP P's assets "used in the operation of [AP P's] Business." The Agreement defines "business" as "the business of designing and publishing greeting cards, . . . as currently conducted by the Creative Card division of [AP P]." AP P also agreed to transfer to Taylor "[a]ll intellectual property of the Business, including . . . copyrights, . . . artwork, designs and other intangible property of the Business, . . . including without limitation the Intellectual Property listed in Schedule 1.1(d)." Schedule 1.1(d) identifies hundreds of greeting card designs, including the six card designs authored by Creative Card. On April 28, 2000, the United States Bankruptcy Court for the District of Delaware approved the sale of AP P's assets to Taylor. *962 *962

In June and August 2001, Taylor registered the six card designs at issue in this case with the United States Copyright Office. The original copyright registrations misidentified Taylor as the author of

each card design. In August 2003, Taylor filed supplementary registrations correctly identifying Creative Card as the author of each work. The supplementary registrations listed Taylor as the copyright claimant. The registration form requires the copyright claimant, if different from the author, to give a brief explanation as to how the claimant obtained ownership of the copyright. In response to that direction, each supplementary registration contains the statement "Bill of Sale and Assignment from [AP P] to Taylor . . . dated May 9, 2000."

Taylor sued Four Seasons for copyright infringement under the 1976 Copyright Act, 17 U.S.C. §§ 101- 1332, for "copying, manufacturing, producing, publishing, selling, promoting and/or advertising . . . greeting cards bearing designs . . . substantially similar to [Taylor's] Works." The district court preliminarily enjoined Four Seasons from further sale or distribution of the six cards in question. This court affirmed the preliminary injunction. *Taylor Corp. v. Four Seasons Greetings, LLC*, 315 F.3d 1039, 1041 (8th Cir. 2003) ( *Taylor I*).

Before trial, Four Seasons stipulated it earned a profit of $45,976.95 from sales of the six card designs. Despite Four Seasons's stipulation of damages, Taylor filed a "Notice of Election of Remedies and Withdrawal of Jury Demand," wherein Taylor sought only injunctive relief at trial. The district court bifurcated Taylor's action into two separate trials. First, the parties tried Taylor's infringement claim to the court and to an advisory jury. The advisory jury unanimously found Four Seasons's cards infringed Taylor's copyrights. Second, the parties tried Taylor's claim that it owns the copyrights at issue to the district court, which concluded "[Taylor] is the legal owner of the copyrights pertaining to the [six card designs]." After deciding Four Seasons infringed Taylor's copyrights, the district court entered judgment in favor of Taylor and issued a permanent injunction against Four Seasons, prohibiting Four Seasons "from any further

copying, manufacture, production, reproduction, publication, display, distribution, promotion, sale or offering for sale of the six Four Seasons designs."

Four Seasons challenges the district court's judgment, contending the district court erred: (1) in concluding Taylor owns the copyrights in the six card designs; (2) in "failing to identify what constituent elements of the Taylor cards were original, protectable expression that was copied by Four Seasons"; (3) in failing to find Four Seasons's cards were independently created; (4) in granting injunctive relief after Taylor elected not to accept monetary damages; and (5) in depriving Four Seasons of its right to a jury in the ownership phase of the trial.

## II.   DISCUSSION   A.   Copyright Infringement

Copyright law grants the copyright owner a limited monopoly to exploit his creation. This limited monopoly "is intended to motivate the creative activity of authors and inventors by the provision of a special reward, and to allow the public access to the products of their genius after the limited period of exclusive control has expired." *Sony Corp. of Am. v. Universal City Studios, Inc.,* 464 U.S. 417, 429, 104 S.Ct. 774, 78 L.Ed.2d 574 (1984). To prevail on its copyright infringement claim, Taylor must prove "ownership of a valid copyright and copying of original elements *963 of the work." *Mulcahy v. Cheetah Learning, LLC,* 386 F.3d 849, 852 (8th Cir. 2004).

On appeal, Four Seasons claims Taylor failed to prove copyright infringement. First, Four Seasons argues Taylor failed to prove it owns the copyrights in the six card designs. Second, Four Seasons contends Taylor failed to prove Four Seasons copied any original, protectable elements of Taylor's card designs. Finally, Four Seasons maintains it independently created its card designs.

### 1. Ownership

Copyrights, like other property rights, may be transferred from the owner to another entity. *See* 17 U.S.C. § 201(d). The Copyright Act sets forth the requirements of a transfer: "A transfer of copyright ownership, other than by operation of law, is not valid unless an instrument of conveyance, or a note or memorandum of the transfer, is in writing and signed by the owner of the rights conveyed or such owner's duly authorized agent." 17 U.S.C. § 204(a).

It is uncontested Creative Card, the author of the card designs, originally owned the copyrights. The parties further agree Creative Card did not execute a writing expressly transferring or assigning its copyrights to AP P or to Taylor. However, Taylor contends the bankruptcy court's order effected the transfer of Creative Card's copyrights to Taylor. Accordingly, the question is whether Taylor proved a transfer of copyright ownership "by operation of law."

Section 204(a) of the Copyright Act does not define the phrase "by operation of law," and sparse case law addresses the transfer of copyright "by operation of law." *Brooks v. Bates,* 781 F.Supp. 202, 205 (S.D.N.Y. 1991). In *Brooks,* one of the few cases to address the meaning of "by operation of law," the court relied on the late Professor Melville B. Nimmer's renowned copyright treatise to interpret "by operation of law" to mean transfers by bequest, bankruptcy, mortgage foreclosures, and the like. *Id.* at 205 (citing Melville B. Nimmer David Nimmer, 3 *Nimmer on Copyright* § 10.03[A] at 10-42 (1991)). The court then concluded, "[t]he lessons to be drawn from Professor Nimmer are that transfers of copyrights by operation of law are limited in number, and depend upon circumstances which establish the author's express or implied consent." *Id.* One example of a transfer "by operation of law" is a "transfer of ownership pursuant to proceedings in bankruptcy . . ., since in such cases the author, by his overt conduct in filing in bankruptcy, . . . has consented to such a transfer." *Id.* (quoting *supra,* § 10.06[A], 10-42). Although the *Brooks* court

Taylor Corp. v. Four Seasons Greetings, LLC   403 F.3d 958 (8th Cir. 2005)

found the copyrights in that case had not been transferred by operation of law, the court noted, "[t]his is not a case of a corporate owner of a copyright merging with another or dissolving, so that its copyrights passed to the shareholders by operation of law." *Id.* at 206.

Other courts similarly have held corporate mergers and dissolutions transfer copyright ownership "by operation of law." *See Lone Ranger Television, Inc. v. Program Radio Corp.,* 740 F.2d 718, 721 (9th Cir. 1984) (holding where copyright was transferred to corporation, corporation merged into another corporation, and surviving corporation then transferred copyright to subsidiary, subsidiary could maintain infringement action, because with every change in ownership parties recorded transfers); *Fantasy, Inc. v. Fogerty,* 664 F.Supp. 1345, 1356 (N.D.Cal. 1987) (holding where assets were transferred from dissolving corporation to its sole shareholder, sole shareholder succeeded to ownership of copyright by operation of law), *aff'd,* 984 F.2d 1524 (9th Cir. 1993), *rev'd on other* 964 *grounds,* *964

510 U.S. 517, 114 S.Ct. 1023, 127 L.Ed.2d 455 (1994).

We conclude the bankruptcy court's order approving AP P's and Taylor's Agreement constituted a transfer of the copyrights "by operation of law." The Agreement explicitly states AP P sold to Taylor "the business of designing and publishing greeting cards, . . . as currently conducted by the Creative Card division." The Agreement further transferred from AP P to Taylor "[a]ll intellectual property of the Business," and Schedule 1.1(d) identifies the card designs at issue in this case. We agree with the district court that the bankruptcy court's April 28, 2000 order approving AP P's and Taylor's Agreement vested Taylor with ownership in the copyrights in Creative Card's card designs.[3] **2. Copying**

[3] Indeed, if we were to conclude otherwise, no entity could pursue this infringement action. Creative Card cannot be named as a plaintiff here, and can no longer transfer the copyrights to Taylor, because in 2001, Creative Card was liquidated and ceased to exist as a corporate entity.

The second element required to show copyright infringement is copying. Taylor presented no direct evidence of copying. In the absence of direct evidence, Taylor may establish copying by proving: (1) Four Seasons had access to the copyrighted card designs; and (2) substantial similarity between the card designs. *Hartman v. Hallmark Cards, Inc.,* 833 F.2d 117, 120 (8th Cir. 1987). Four Seasons does not contest it had access to Taylor's designs. However, Four Seasons vigorously maintains any similarities between its and Taylor's card designs are not sufficiently substantial to trigger liability.

## a. Standard of Review

Four Seasons's "substantial similarity" argument raises a threshold, and potentially controlling, issue regarding our standard of review. In *Taylor I,* we assumed the district court's findings of substantial similarity were subject to review for clear error. *Taylor I,* 315 F.3d at 1043 ("The District Court's findings of substantial similarity between all six original cards and their allegedly infringing counterparts were not clearly erroneous."). We now address Four Season's challenge to the appropriate standard for reviewing a district court's determination of substantial similarity in copyright law cases.

Four Seasons cites a line of cases from the Second Circuit for the proposition that appellate review of "substantial similarity" determinations in copyright law cases is de novo. In *Boisson* and *Folio Impressions,* the Second Circuit rejected a clearly erroneous standard of review in favor of a de novo standard of review. *Boisson v. Banian, Ltd.,* 273 F.3d 262, 272 (2d Cir. 2001); *Folio Impressions, Inc. v. Byer Cal.,* 937 F.2d 759, 766 (2d Cir. 1991). The Second Circuit reasoned it could review de novo a district court's finding of substantial similarity, "because what is required is

*Taylor Corp. v. Four Seasons Greetings, LLC   403 F.3d 958 (8th Cir. 2005)*

only a visual comparison of the works, rather than credibility, which we are in as good a position to decide as was the district court." *Folio Impressions,* 937 F.2d at 766; *see Boisson,* 273 F.3d at 272 (applying de novo review, "because credibility is not at stake and all that is required is a visual comparison of the products-a task we may perform as well as the district court"). However, in *Yurman Design, Inc. v. PAJ, Inc.,* 262 F.3d 101, 110 (2d Cir. 2001), the Second Circuit recognized it has "never decided the standard of review applicable to *jury* findings of substantial similarity where credibility is not at issue." The Second Circuit thus concluded, "[a]lthough a jury's factual findings are subject to `independent review' where

965 such review *965 is constitutionally required, we think that in copyright cases the Constitution dictates a more deferential standard." *Id.* at 111 (citation omitted).

We are unpersuaded by the Second Circuit's reasoning supporting de novo review of findings of substantial similarity in copyright law cases. Federal Rule of Civil Procedure 52(a) specifically states "[i]n all actions tried upon the facts without a jury *or with an advisory jury,* the court shall find the facts." (emphasis added). Rule 52(a) then describes our appellate review: "Findings of fact, whether based on oral *or documentary evidence,* shall not be set aside unless clearly erroneous." (emphasis added). Thus, neither an advisory jury nor findings of fact resting solely on documentary evidence changes this rule of deference to the district court's fact findings. *See Anderson v. Bessemer City,* 470 U.S. 564, 574-75, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985). Rule 52(a) requires "even greater deference to the trial court's findings" when those findings are based on witness credibility determinations. *Id.* at 575, 105 S.Ct. 1504. The function of appellate courts is not to decide fact issues de novo, and as a reviewing court, we may not reverse the district court's fact findings "simply because [we are] convinced [we] would have decided the case differently." *Id.* at 573, 105 S.Ct. 1504.

The majority of circuit courts adhere to a clearly erroneous review of findings of "substantial similarity" in copyright law cases. *See, e.g., Hennon v. Kirkland's, Inc.,* No. 94-2595, 1995 WL 490266, at *3 (4th Cir. Aug.17, 1995) (unpublished) (per curiam) (stating "[t]he district court's determination of similarity of expression depended on its factual analysis of the figurines, and we review for clear error the district court's factual findings for substantial similarity"); *Wildlife Express Corp. v. Carol Wright Sales, Inc.,* 18 F.3d 502, 506-07 n. 1 (7th Cir. 1994) (saying, "[i]n this circuit, when reviewing the products in issue for substantial similarity, we permit `side-by-side' comparison, and an `ocular comparison,' of the works being analyzed for similarity, but follow the clearly erroneous standard in reviewing the district court's conclusions." (citations omitted); *Kepner-Tregoe, Inc. v. Leadership Software, Inc.,* 12 F.3d 527, 532-33 (5th Cir. 1994) (holding issue of substantial similarity is a finding of fact and "consequently [is] reviewed under the clearly erroneous standard"); *Data East USA, Inc. v. Epyx, Inc.,* 862 F.2d 204, 206 (9th Cir. 1988) (holding issue of substantial similarity is "finding of fact reviewable for clear error"); *Whelan Assocs., Inc. v. Jaslow Dental Lab., Inc.,* 797 F.2d 1222, 1233 n. 25 (3d Cir. 1986) (applying clearly erroneous standard of review to question of substantial similarity); *Original Appalachian Artworks, Inc. v. Toy Loft, Inc.,* 684 F.2d 821, 825 n. 4 (11th Cir. 1982) (same).

We find additional support for our conclusion in case law construing substantial similarity in actions involving alleged patent infringement. *See Sony Corp. of Am.,* 464 U.S. at 439, 104 S.Ct. 774 (stating "it is appropriate to refer" to patent law in copyright law cases, "because of the historic kinship between patent law and copyright law"). In *Horton Manufacturing Co. v. Tol-O-Matic, Inc.,* 973 F.2d 649 (8th Cir. 1992), a patent holder filed suit against an alleged infringer, asserting breach of a settlement agreement. According to the settlement agreement, the alleged infringer agreed

to cease producing any products "with a configuration that includes any of [a number] of identifiers listed . . . on Attachment 1 hereto." *Id.* at 650 (alterations in original). The district court found the alleged infringer had violated the settlement agreement by manufacturing products that were substantially similar to those made by the patent holder. *Id.* On *966 appeal, we reviewed the district court's finding of substantial similarity "under the clearly erroneous standard[,]" because a "district court's determination of substantial similarity is a finding of fact." *Id.* at 651.

966

Having determined the appropriate standard of review, we next consider whether the district court clearly erred in finding Taylor's and Four Seasons's card designs are substantially similar.

## b. Substantial Similarity

The Eighth Circuit applies a two-step analysis-an extrinsic test and an intrinsic test-to determine substantial similarity:

> First, similarity of ideas is analyzed extrinsically, focusing on objective similarities in the details of the works. Second, if there is substantial similarity in ideas, similarity of expression is evaluated using an intrinsic test depending on the response of the ordinary, reasonable person to the forms of expression.

*Hartman,* 833 F.2d at 120 (citations omitted); *see also Taylor I,* 315 F.3d at 1043. The district court determined both steps of the substantial similarity test are satisfied in this case. First, the district court concluded the extrinsic test is satisfied because the card designs share similar ideas. Second, the district court determined the intrinsic test is satisfied because the card designs share similarities of expression.

Four Seasons does not challenge the district court's application of the "extrinsic" step of the substantial similarity analysis. Four Seasons generally admits the cards share the same "general thematic and technical levels-e.g., similar holiday themes, paper stock and printing techniques." Four Seasons does, however, challenge the district court's application of the "intrinsic" step of the substantial similarity analysis.

Four Seasons first argues the district court failed to distinguish between protectable and unprotectable elements of Taylor's card designs. Four Seasons advanced this same argument in *Taylor I,* and our previous panel rejected Four Seasons's argument. *See Taylor I,* 315 F.3d at 1043 (declining to require district court to filter out "unprotectable elements" of the card designs). We continue to reject Four Seasons's argument, because it is improper to perform analytic dissection, or "filtering," when conducting the "intrinsic" step. *See Dr. Seuss Enters. v. Penguin Books USA, Inc.,* 109 F.3d 1394, 1399 (9th Cir. 1997) (holding "analytic dissection is not appropriate when conducting the subjective or `intrinsic test'" to determine whether works are substantially similar in copyright infringement cases). In applying the "intrinsic" step, the district court correctly asked whether the ordinary, reasonable observer would find the works, taken as a whole, to be substantially similar. *See Hartman,* 833 F.2d at 120 (stating "similarity of expression is evaluated using an intrinsic test depending on the response of the ordinary, reasonable person to the forms of expression"); *see also Taylor I,* 315 F.3d at 1043.

Next, Four Seasons contends any similarities between the card designs "are both qualitatively and quantitatively insubstantial." Although Four Seasons points to various differences in detail in each of the card designs, "a finding of substantial similarity is not precluded where differences in detail do little to lessen a viewer's overwhelming impression that the defendant's products are appropriations." *Yurman Design,* 262 F.3d at 111 (citation omitted). The district court engaged in lengthy side-by-side comparisons of Taylor's and Four Seasons's card designs, and noted numerous similarities of expression, including the objects depicted, *967 design, proportions used, colors,

967

*Taylor Corp. v. Four Seasons Greetings, LLC    403 F.3d 958 (8th Cir. 2005)*

and use of lettering. We do not dispute those similarities on appeal. The record bears support for the district court's findings that Four Seasons's card designs share a similarity of expression with the corresponding Taylor card designs, which findings are consistent with the advisory jury's unanimous findings. Therefore, we hold the district court's findings of substantial similarity are not clearly erroneous.

## c. Independent Creation

"By establishing reasonable access and substantial similarity, a copyright plaintiff creates a presumption of copying." *Three Boys Music Corp. v. Bolton,* 212 F.3d 477, 486 (9th Cir. 2000). Then, "[t]he burden shifts to the defendant to rebut that presumption through proof of independent creation." *Id.* Four Seasons presented testimony from each artist explaining how they created the card designs. The artists also identified the source material they used in creating the card designs while employed by Four Seasons. The district court and the advisory jury evaluated all of this evidence, including the credibility of the witnesses, and found Four Seasons copied Taylor's card designs. Relying in significant measure on credibility determinations, which we are ill-disposed to disturb on appeal, the district court and the advisory jury found insufficient proof of "independent creation." *See Triton Corp. v. Hardrives, Inc.,* 85 F.3d 343, 345 (8th Cir. 1996) (stating an appellate court does "not weigh, evaluate, or consider the credibility of the evidence"). These findings are supported by the record and are not clearly erroneous.

## B. Permanent Injunction

"We review a district court's issuance of a permanent injunction for an abuse of discretion." *Wigg v. Sioux Falls Sch. Dist. 49-5,* 382 F.3d 807, 812 (8th Cir. 2004). An abuse of discretion occurs when the district court bases its decision on an erroneous application of the law or a clearly erroneous finding of fact. *Id.*

The Copyright Act specifically authorizes a federal court to "grant temporary and final injunctions on such terms as it may deem reasonable to prevent or restrain infringement of a copyright." 17 U.S.C. § 502(a). To determine whether permanent injunctive relief is warranted, we balance three factors: (1) the threat of irreparable harm to the moving party; (2) the balance of harm between this harm and the harm suffered by the nonmoving party if the injunction is granted; and (3) the public interest. *See Bank One v. Guttau,* 190 F.3d 844, 847 (8th Cir. 1999) (adapting generally the preliminary injunction factors announced in *Dataphase Sys., Inc. v. C.L. Sys., Inc.,* 640 F.2d 109, 113 (8th Cir. 1981), to review a permanent injunction).

Four Seasons contends injunctive relief is not warranted in this case, because "[b]y having `elected' not to take damages in an uncontested amount, Taylor has conceded that it has suffered no damage and that its legal claim is a nullity." We find this argument to be wholly without merit. Taylor never conceded it suffered no damage. Rather, "Taylor chose to streamline its case." Therefore, we conclude a valid legal remedy remained available to Taylor.

Because Taylor had a legal remedy available to it, i.e., uncontested damages in the amount of $45,976.95, the question then becomes whether Taylor was entitled to seek purely equitable relief in the form of a permanent injunction. It is well-established that a party is entitled to equitable relief only if there is no adequate remedy at law. *Morales v. Trans World Airlines, Inc.,* 504 U.S. 374, 381, 112 S.Ct. 2031, 119 L.Ed.2d 157 (1992). However, in copyright infringement actions, the denial *968 of a request for injunctive relief could otherwise "amount to a forced license to use the creative work of another." *Silverstein v. Penguin Putnam, Inc.,* 368 F.3d 77, 84 (2d Cir. 2004); *see also Nat'l Football League v. Primetime 24 Joint Venture,* No. 98 Civ. 3778, 1999 WL 760130, at *4 (S.D.N.Y. Sept.27, 1999) (where an infringer is likely to continue to infringe, "the failure to issue

968

a final injunction will ordinarily be tantamount to the creation of a compulsory license[, which] is not . . . a desirable practice or consistent with the objectives of the Copyright Act"). Taylor certainly has the right to control the use of its copyrighted materials, and irreparable harm inescapably flows from the denial of that right. We therefore hold Taylor was entitled to seek only injunctive relief, despite the availability of uncontested damages.

Four Seasons next argues the permanent injunction disserves the public interest, because the injunction harms Four Seasons's "interest in pursuing its business" and makes it "impossible for these artists to continue in the greeting card business." The harm to Four Seasons and the artists is minimal, because Four Seasons may continue to sell other card designs in its portfolio, and the artists are free to create innovative card designs. Injunctions regularly are issued pursuant to the mandate of section 502, because the "public interest is the interest in upholding copyright protections." *Autoskill, Inc. v. Nat'l Educ. Support Sys., Inc.,* 994 F.2d 1476, 1499 (10th Cir. 1993). "Since Congress has elected to grant certain exclusive rights to the owner of a copyright in a protected work, it is virtually axiomatic that the public interest can only be served by upholding copyright protections and, correspondingly, preventing the misappropriation of the skills, creative energies, and resources which are invested in the protected work." *Apple Computer, Inc. v. Franklin Computer Corp.,* 714 F.2d 1240, 1254-55 (3d Cir. 1983) (quoting *Klitzner Indus., Inc. v. H.K. James Co.,* 535 F.Supp. 1249, 1259-60 (E.D.Pa. 1982)). We believe the permanent injunction in this case will not harm the public interest, but rather, serve it.

## C. Jury Trial

Finally, Four Seasons contends the district court violated Four Seasons's Seventh Amendment right to a jury trial by erroneously "depriv[ing] Four Seasons of its constitutional right to have the jury decide disputed factual issues in both the liability

and ownership phase of this case." "Whether a party has a right to trial by jury in federal court is a question of law subject to de novo review." *Ind. Lumbermens Mut. Ins. Co. v. Timberland Pallet Lumber Co.,* 195 F.3d 368, 374 (8th Cir. 1999).

The Seventh Amendment preserves, "[i]n Suits at common law, . . . the right of trial by jury." U.S. Const. amend. VII. The Supreme Court has established a two-prong test for determining whether a party enforcing a statutory right is entitled to a jury trial under the Seventh Amendment. *Tull v. United States,* 481 U.S. 412, 417-18, 107 S.Ct. 1831, 95 L.Ed.2d 365 (1987). First, we must "compare the statutory action to 18th-century actions brought in the courts of England prior to the merger of the courts of law and equity. Second, we examine the remedy sought and determine whether it is legal or equitable in nature." *Id.* (citations omitted). The Supreme Court has stressed the second inquiry of this test is the more important of the two. *See Chauffeurs, Teamsters Helpers, Local No. 391 v. Terry,* 494 U.S. 558, 565, 110 S.Ct. 1339, 108 L.Ed.2d 519 (1990).

In *Cass County Music Co. v. C.H.L.R., Inc.,* 88 F.3d 635, 642-44 (8th Cir. 1996), we applied the *Tull* two-prong test and held *969 (1) copyright infringement is a legal action; (2) statutory damages for copyright infringement are a legal remedy; and (3) "either party in a copyright infringement suit is entitled under the Seventh Amendment to a jury trial on demand." However, *Cass County Music* involved a claim for statutory damages under the Copyright Act. *Id.* at 644. In the instant case, Taylor forfeited its claim for damages and instead sought only injunctive relief. Therefore, we conclude the holding in *Cass County Music* does not control the instant case.

We find the Federal Circuit's decision in *Tegal Corp. v. Tokyo Electron America, Inc.,* 257 F.3d 1331 (Fed. Cir. 2001) persuasive. In *Tegal,* the patent holder sued the defendant for patent infringement, seeking injunctive relief and

*Taylor Corp. v. Four Seasons Greetings, LLC     403 F.3d 958 (8th Cir. 2005)*

damages, and requested a jury trial. *Id.* at 1338. The defendant asserted affirmative defenses, including invalidity, but the defendant did not file a counterclaim. *Id.* Six days before trial, the plaintiff dropped its claim for damages, believing it would lose its right to a jury trial. *Id.* The case proceeded to trial without a jury, and the district court issued a permanent injunction against the defendant. *Id.*

On appeal, the Federal Circuit framed the jury trial issue as whether a defendant has a right to a jury trial where the plaintiff seeks only an injunction, and the defendant asserts only affirmative defenses and no counterclaims. *Id.* at 1339. In reaching its decision that the defendant has no right to a jury trial under such circumstances, the Federal Circuit applied the *Tull* two-prong jury trial test. Analyzing the first prong, the Federal Circuit explained:

> "[i]n eighteenth-century England, allegations of patent infringement could be raised in both actions at law and suits in equity," and . . . the choice was the patentee's and depended on the type of remedy sought. If the patentee sought an injunction and an accounting, the patentee went to a court of equity. If, however, the patentee sought only damages, a court of law was used.

*Tegal*, 257 F.3d at 1340 (quoting *In re Lockwood*, 50 F.3d 966, 976 (Fed. Cir. 1995), vacated and remanded, *Am. Airlines, Inc. v. Lockwood*, 515 U.S. 1182, 116 S.Ct. 29, 132 L.Ed.2d 911 (1995)). Addressing the second prong of the *Tull* test, the Federal Circuit recognized, "Tegal sought only an injunction, a purely equitable remedy." *Id.* at 1341.

The Federal Circuit concluded neither party had a right to a jury, holding "a defendant, asserting only affirmative defenses and no counterclaims, does not have a right to a jury trial in a patent infringement suit if the only remedy sought by the plaintiff-patentee is an injunction." *Id.* We agree with the Federal Circuit's holding in *Tegal*. Recognizing the "historic kinship between patent law and copyright law," *Sony Corp. of Am.*, 464 U.S. at 439, 104 S.Ct. 774, we apply the Federal Circuit's holding in *Tegal* to this copyright action. Therefore, Four Seasons was not entitled to a jury trial on Taylor's action seeking only a permanent injunction.

## III. CONCLUSION

For the foregoing reasons, we affirm the district court's decision in all respects.

970   *970

casetext
Part of Thomson Reuters

3:22-CV-395-MGG

United States District Court, Northern District of Indiana

# The Evolutionary Level Above Human, Inc. v. Havel

Decided Feb 27, 2024

3:22-CV-395-MGG

02-27-2024

THE EVOLUTIONARY LEVEL ABOVE HUMAN FOUNDATION, INC., Plaintiff, v. STEPHEN ROBERT HAVEL, et al., Defendants.

Michael G. Gotsch, Sr. United States Magistrate Judge

**OPINION AND ORDER**

Michael G. Gotsch, Sr. United States Magistrate Judge

Ripe before the Court are two discovery motions filed by *pro se* defendant Steven Havel: (1) his Motion to Order Plaintiffs to Produce Havel's First Request for Production of Documents, filed on September 15, 2023; and (2) his Motion to Compel Plaintiffs to Produce Havel's Second Requests for Production of Documents, filed on October 30, 2023. [DE 151, DE 172.] As explained below, the Court must deny both motions. Mr. Havel is instead ordered to meet and confer with Plaintiff's counsel should he wish to pursue his discovery requests further.

**I. Relevant Background**

Plaintiff filed this case on May 18, 2022, alleging that Defendants infringed on its registered copyrights and trademarks. Following a zoom status conference with the parties on June 14, 2023, the Court entered its Rule 16(b) Scheduling Order to control the progress of this litigation. [DE 117 at 5-10]. The Scheduling Order set December 14, 2023, as the deadline to complete discovery in

2 this case. Moreover, to facilitate the *2 parties' completion of discovery before this deadline, the Court also set October 16, 2023, as the deadline to file all discovery-related nondispositive motions. Regarding this nondispositive motion deadline, the Court's order advised as follows:

> For a motion filed before this deadline, no extension of discovery will be granted without good cause and the court's consent under Fed.R.Civ.P. 16(b)(4). To facilitate a pretrial status conference and a prompt trial date, no motion to extend discovery or to continue other pretrial deadlines will be approved after this nondispositive motion deadline, except for excusable neglect or other extraordinary reasons. Accordingly, after this deadline, good cause alone will *not* be sufficient to constitute such a reason. The parties are thus advised to complete timely discovery and, if necessary, file any motion to continue pretrial deadlines, motion to compel, or such motions that may impact the schedule well enough in advance of this deadline to permit any necessary briefing and time for the court to rule.

[DE 117 at 6]. The Court issued this Scheduling Order after already addressing the parties' numerous motions disputing how the case should proceed. The *pro se* defendants filed most of these motions-many did not comply with the Rules of Civil Procedure or the Court's local rules, and many used a vituperative tone that impugned the motivation or litigation tactics used by Plaintiff.



Accordingly, the Scheduling Order concluded with the following advisements to all parties:

> The parties and attorneys are **ADMONISHED** to cooperate in good faith and comply with all applicable rules during the discovery process. Failure to litigate this action consistent with the procedures set forth in the Federal Rules of Civil Procedure could result in sanctions up to and including dismissal of all claims.
>
> To that end, the Court reminds the parties and attorneys to take reasonable steps to preserve all electronically stored information (ESI) that is relevant to any claim or defense. This requirement relates back to the point in time when the party reasonably anticipated litigation about these matters. The parties are encouraged to negotiate a stipulated protective order regarding the confidentiality of discovery materials while this action

3    *3

> is pending (if deemed necessary). A protective order template, consistent with Seventh Circuit authority, is available at https://www.innd.uscourts.gov/judges-info/MGG.

[DE 117 at 7-8].

Mr. Havel filed his First Request for Production of Documents approximately two months later, on August 9, 2023, seeking twenty-six categories of documents from Plaintiff. Among his requests were copies of documents Plaintiff submitted to the Copyright Office; correspondence between Plaintiff's directors and other members of the religious group Heaven's Gate; records from other litigation involving Plaintiff; correspondence between the parties; and correspondence between Plaintiff and third parties. [DE 135]. Plaintiff timely filed its responses to these requests on September 7, 2023. [DE 142]. Plaintiff objected to many of these requests as overbroad and not relevant to any claim or defense in this case, or

otherwise seeking documents that are not in its custody or control. Plaintiff's responses further indicated that it had responsive documents to produce, but these documents contained confidential or proprietary information such that a protective order would need to be entered first. [*See* DE 142 at 5, 6, 7, 8, 9, 10, 11, 12, 13, 15, 16, and 20].

Upon receiving this response from Plaintiff, Mr. Havel filed his Motion to Order Plaintiffs to Produce Havel's First Request for Production of Documents about a week later, on September 15, 2023. Mr. Havel challenges all of Plaintiff's objections and wholly rejects Plaintiff's request for a protective order, contending that Plaintiff has not shown that it will be required to reveal confidential or sensitive information. Plaintiff responded to Mr. Havel's motion on September 29, 4    2023. Plaintiff contends that Mr.   *4   Havel's motion should be denied for his failure to meet and confer with Plaintiff's counsel. Like its response to his requests, Plaintiff maintains that the scope of Mr. Havel's requests should be limited and that a protective order should be entered before Plaintiff discloses certain documents. Plaintiff also submitted a proposed protective order as part of its response.

The same day Mr. Havel filed this motion, he also filed his Second Request for Production of Documents. In this second request, he seeks sixty categories of documents-primarily filings and exhibits submitted in another case involving Plaintiff. Plaintiff timely filed its response to this second request on October 11, 2023. [DE 169]. Plaintiff's responses prompted Mr. Havel to file another Motion to Compel on October 30, 2023, where he primarily disputes Plaintiff's request that a protective order be entered before it discloses discovery. Plaintiff responded to Mr. Havel's second motion on November 13, 2023. Plaintiff reports that this second document request was primarily to authenticate documents already in Mr. Havel's possession and that Mr. Havel has again refused to consider a protective order despite

several of his newer requests seeking documents filed under seal in another case. Plaintiff also disputes the timing of the second motion, contending that Mr. Havel filed it two weeks after the discovery-related nondispositive motion deadline.

The time for Mr. Havel to file any reply in support of his motions has now passed. *See* N.D. Ind. L.R. 7-1(d)(3). The motions are ripe for ruling. *5

## II. Discussion

Information is discoverable if it is nonprivileged, relevant to any claim or defense in the case, and proportional to the needs of the case. Fed.R.Civ.P. 26(b)(1). When a responding party withholds discoverable information responsive to a party's discovery requests, a motion to compel discovery is allowed. Fed.R.Civ.P. 37(a)(3)-(4). But before a motion to compel is filed, the parties must first try to work it out among themselves. As explained in Federal Rule of Civil Procedure, all motions to compel discovery must "include a certification that the movant has in good faith conferred or attempted to confer with the person or party failing to make disclosure or discovery in an effort to obtain it without court action." Fed.R.Civ.P. 37(a)(1). This is not a technical formality. Informal resolution plays an important part in the mandate to achieve a "just, speedy, and inexpensive resolution" of an action. Fed.R.Civ.P. 1. By meeting and conferring, parties are often able to "narrow the outstanding discovery issues and assist[] the Court in crafting more specifically-tailored relief." *Doaks v. Safeco Ins. Co. of Am.*, No. 309-CV-367JTM, 2010 WL 3940907, at *1 (N.D. Ind. July 20, 2010), *report and recommendation adopted sub nom.Dorothy Doaks v. Safeco Ins. Co. of Am.,* No. 3:09 CV 367, 2010 WL 3940891 (N.D. Ind. Oct. 5, 2010).

Here, it is undisputed that Mr. Havel filed his discovery motions without first making any attempt to informally resolve the dispute with Plaintiff's counsel. [*See* DE 152, DE 172 at 1-2]. This Court's local rules state that a *pro se* party's

failure to file the certification is not a basis to deny a discovery motion. N.D. Ind. L.R. 37-1(b). Even so, courts in this circuit often require informal attempts at resolution even in cases *6 involving *pro se* parties. *See, e.g.,Southall v. AVI Food Sys., Inc.*, No. 121CV00039HABSLC, 2022 WL 1015001, at *2 (N.D. Ind. Apr. 5, 2022) (discussing the defendant's attempts to confer with the *pro se* plaintiff); *Sanders v. Univ. of Notre Dame,* No. 3:21-CV-404-RLM-JEM, 2021 WL 5358575, at *1 (N.D. Ind. Nov. 17, 2021) (explaining that the *pro se* plaintiff must attempt to work out disputes directly with the defendant's counsel first)*;Alerding Castor Hewitt LLP v. Fletcher*, No. 1:16-cv-2453-JPH-MJD, 2019 WL 1746284, at *2 (S.D. Ind. April 18, 2019) (observing that Rule 37 "does not have an exemption for pro s[e] litigants").

Moreover, this Court specifically ordered the parties to cooperate in good faith as this case progresses, making Mr. Havel's failure to do so here particularly problematic. [DE 117 at 7, DE 125 at 4]. Mr. Havel's whirlwind motions do not suggest good faith cooperation. Noncompliance with the Court's order warrants denial. *See, e.g., Sanders,* 2021 WL 5358575, at *1; *Ostrowski v. Lake Cnty. Bd. of Commissioners*, No. 2:16-CV-166-JEM, 2016 WL 8668496, at *2 (N.D. Ind. Oct. 21, 2016) (denying a *pro se* motion to compel for failure to comply with Rule 37 after the court ordered the *pro se* party to follow its requirements); *Mattar v. Cmty. Mem'l Hosp.*, No. 1:04-CV-095, 2005 WL 8169389, at *1 (N.D. Ind. Sept. 23, 2005).

The need for a narrowing of issues is even more necessary here, as the parties have reached a total impasse on several of Mr. Havel's requests, and Mr. Havel's blanket refusal to a protective order makes it difficult for the Court to provide tailored relief. This is exacerbated by the timing of these motions, as Mr. Havel filed his second motion filed on October 30, 2023-nearly two weeks after this Court's discovery-related *7 nondispositive motion deadline of October 16, 2023. Per this

Court's Scheduling Order, no discovery motions filed after this deadline will be approved absent excusable neglect or other extraordinary reasons. Mr. Havel acknowledges this language in the Court's scheduling order, but rather than explaining his own untimeliness, he accuses Plaintiff of "seek[ing] to delay discovery" by objecting to his discovery requests and seeking a protective order prior to production of documents. [DE 172 at 2]. Without more, the Court cannot find any excusable neglect or extraordinary reasons here.

Although these deficiencies warrant denial of Mr. Havel's motions, this Court is still mindful of the mandate to ensure a "just, speedy, and inexpensive resolution" of this case. Fed.R.Civ.P. 1. Denying Mr. Havel's motions without further order does not meet this mandate. This Court has broad discretion in deciding discovery matters and must "independently determine the proper course of discovery based upon the arguments of the parties.". Fed.R.Civ.P. 26(c); *Sattar v. Motorola, Inc.*, 138 F.3d 1164, 1171 (7th Cir. 1998); *Gile v. United Airlines*, Inc., 95 F.3d 492, 495-96 (7th Cir. 1996). Plaintiff's response indicates that many of Mr. Havel's concerns "could have easily been resolved through communication with [its] counsel." [DE 161 at 1]. Based on this, consistent with the Court's order that the parties cooperate in good faith, Mr. Havel must meet and confer with Plaintiff on the issues raised in these motions if he wishes to pursue his discovery requests further.

To facilitate such a conference, the Court now addresses certain concerns raised by the parties. First, it appears that Mr. Havel requested numerous documents that he already has in his possession and that he did so "to authenticate them for trial." [DE 173 at 1]. *8 It is true that "producing a paper in discovery is an implicit act of authentication." *Jones v. DuPage Cnty. Sheriff's Off.*, 529 F.Supp.3d 867, 872 n.1 (N.D. Ill. 2021). But the purpose of a request for production of documents is to obtain items in the *responding* party's possession-not items the *requesting* party

already possesses. Mr. Havel cannot oblige Plaintiff to do something not contemplated by the federal rules. Although his request as propounded was procedurally improper, there are other ways that Mr. Havel can authenticate his documents. As suggested by Plaintiff, Mr. Havel can propound requests for admission under Federal Rule of Civil Procedure 36. These requests for admission can ask Plaintiff to admit that certain documents Mr. Havel possesses are authentic copies. Moreover, the parties can also stipulate to the authenticity of certain documents without filing formal discovery requests. Thus, this issue is particularly apt for informal resolution, and the Court encourages the parties to discuss this concern at any discovery conference.

Next, the parties dispute the relevance of several of Mr. Havel's requests, and Plaintiff reports that it will not produce documents responsive to certain requests because they are beyond the scope permitted by the rules. [DE 161 at 2]. Although the scope of discovery is liberal, "the proponent of a motion to compel discovery still bears the initial burden of proving that the information sought is relevant." *United States v.Lake County Bd. of Comm'rs*, No. 2:04 CV 415, 2006 WL 978882, at *1 (N.D. Ind. Apr. 7, 2006) (internal quotation omitted). Mr. Havel's explanations for the relevance of certain requests are either wholly conclusory or lack sufficient detail to show how they are connected to the claims or defenses in this case. For instance, his reason for *9 propounding request no. 21 is that it "is important for Defendant's Defense." [DE 135 at 12]. Likewise, his request no. 18 requests emails between Plaintiff's directors and another individual who worked with them through "some arrangement" and that they "might" have discussed their copyright registrations with him. [DE 135 at 11]. "A party moving to compel production carries the initial burden of establishing, with specificity, that the requested documents are relevant." *Greenbank v. Great Am. Assurance Co.*, No. 3:18-cv-00239-SEB-MPB 2019 WL 6522885, at *3 (S.D. Ind.

Dec. 4, 2019). It is possible that Mr. Havel can demonstrate the relevance of requests to which Plaintiff has fully objected. But the Court cannot find that he has done so yet. As such, the Court cannot compel Plaintiff to respond these requests at this stage. Accordingly, these requests are also suitable for continued discussion, and the Court encourages the parties to discuss these requests during an informal conference.

Finally, Plaintiff has indicated that it would provide certain responsive documents in its possession once a protective order was entered. Mr. Havel has outright rejected this, making sweeping statements that "Plaintiffs have not proven that by providing Defendant['s] Requested Documents [it] would reveal confidential or proprietary information" [DE 152 at 3] and that "Plaintiffs have no 'trade' regarding any of the Heaven's Gate Intellectual Property they possess." [DE 173 at 5]. Mr. Havel's blanket objections do not assist the Court in crafting any kind of tailored relief. Plaintiff, however, did present a proposed protective order for the Court's review. So the Court will use that as the basis for its discussion.

10    *10

When determining whether a protective order should issue, the Court must independently determine whether "good cause" exists to seal the requested information from the public record. Fed.R.Civ.P. 26(c); *Citizens First Nat'l Bank of Princeton v. Cincinnati Ins. Co.*, 178 F.3d 943, 944 (7th Cir. 1999). "Good cause ... generally signifies a sound basis or legitimate need to take judicial action." *Hobley v. Chicago Police Commander Burge*, 225 F.R.D. 221, 224 (N.D. Ill. 2004). Thus, with good cause shown, parties can "keep their trade secrets (or some other properly demarcated category of legitimately confidential information) out of the public record, provided the judge . . . satisfies himself that the parties know what a trade secret is and are acting in good faith in deciding which parts of the record are trade secrets." *Citizens*, 178 F.3d at 946. Protective orders are commonly used in federal practice

when sensitive information is sought in discovery. *Bonds v. Hollywood Casino & Hotel*, No. 122CV02279JPHTAB, 2023 WL 4493158, at *2 (S.D. Ind. June 28, 2023). They are often used when a party discloses documents or information created or received as part of its business operations. Indeed, as a general matter, this Court encourages parties to use protective orders when it is deemed necessary and has facilitated this process with a protective order template. What's more, the Court also specifically encouraged the parties to negotiate an agreed protective order in this case. Thus, the Court is not surprised by Plaintiff's desire for a protective order here. Given this, and Mr. Havel's statements that he has no desire to share Plaintiff's documents online or elsewhere, his outright refusal to discuss a protective order with Plaintiff is perplexing and unreasonable. [*See* DE 117 at 8]. It also suggests that Mr. Havel is not cooperating in good faith as ordered. *11

11

That said, Plaintiff's protective order, as proposed, cannot be approved because it is overbroad. The Court must not grant parties *carte blanche* to seal or protect whatever they desire. *Citizens,* 178 F.3d at 945; *see also Pierson v. Indianapolis Power &Light Co.*, 205 F.R.D. 646, 647 (S.D. Ind. 2002) ("Independent and careful evaluations of protective orders are especially important because '[t]he judge is the primary representative of the public interest in the judicial process ....'") (quoting *Citizens,* 178 F.3d at 945). In other words, this Court must not "rubber stamp" parties' requests to seal public records but must review all requests to seal documents in light of the public interest in the judicial process. *Citizens,* 178 F.3d at 945 (citing *Matter of Krynicki*, 983 F.2d 74 (7th Cir. 1992). The court's evaluation of proposed protective orders need not be made on a document-by-document basis. *Citizens,* 178 F.3d at 946 ("In a case with thousands of documents, such a requirement might impose an excessive burden on the district judge or magistrate judge."). Using qualifiers such as "private," "confidential,"

or "proprietary" to describe the protected information, without more description, fails to assure the Court that the parties know what information will be sealed, "whether and under what circumstances it may be sealed, or whether the parties will be making good faith and accurate designations of information." *Pierson*, 205 F.R.D. at 647.

When reviewing a proposed protective order seeking to seal documents produced in discovery, this Court must ensure that "(1) the information sought to be protected falls within a legitimate category of confidential information, (2) the information or category sought to be protected is properly described or demarcated, (3) the parties know the defining elements of the applicable category of confidentiality and *12 will act in good faith in deciding which information qualifies thereunder, and (4) the protective order explicitly allows any party and any interested member of the public to challenge the sealing of particular documents." *Pierson*, 205 F.R.D. at 647 (citing *Citizens,* 178 F.3d at 946).

The protective order proposed by Plaintiff cannot be granted because it fails the second prong of the above standard. Plaintiff's proposed Protective Order demonstrates a general understanding of the *Citizens* requirements as it defines a category of information to be protected as confidential and provides four examples. Plaintiff generally defines confidential information as "[n]on-public business records, the disclosure of which could result in competitive or economic harm to Plaintiff[.]" [DE 161-1 at 3]. Plaintiff follows this definition with the four examples of what it considers to be non-public business records subject to disclosure:

a. Non-public internal Telah Foundation communications;

b. Non-public communications received by Mark and Sarah King from The Heaven's Gate Members;

c. Non-public court documents pertaining to Plaintiff that were sealed and have remained sealed;

d. Non-public lists summarizing contents of copyrighted works not being asserted in this case.

[DE 161-1 at 3]. But this definition and these examples are not sufficient. First, Plaintiff's overall definition for Confidential Information uses the overbroad category of "business records" defined by the general qualifier "non-public." The term "non-public," without additional information, is insufficient. *SeePurvis v. Wal-Mart Stores E., LP,* No. 117CV00102TLSSLC, 2017 WL 2391193, at *1 (N.D. Ind. June 2, 2017) (stating that if nonpublic "means only that the information is not available to the general public, it is *13 insufficient because the information must be kept secret from and not be readily ascertainable by potential competitors"). Although "business records" is overbroad, Plaintiff does list specific examples of protectable information. But Plaintiff continues to use "non-public" to describe these examples. The third example listed-sealed court documents-is sufficiently discrete enough despite the use of the general qualifier "non-public." However, the other categories, without more information, remain overbroad. Finally, Plaintiff's use of expansive, non-inclusive language before listing these examples ("including the following") fails to limit the scope to the examples provided in the proposed protective order. Therefore, the proposed protective order fails to assure the Court that the parties would be able to accurately designate protected information within the confines of the Order. *See Pierson*, 205 F.R.D. at 647 . To satisfy the Seventh Circuit's requirements for protective orders, discrete closed categories of protected information must be explicitly delineated for every designation of protectable information.



The Evolutionary Level Above Human, Inc. v. Havel  3:22-CV-395-MGG (N.D. Ind. Feb. 27, 2024)

In sum, while the Court cannot approve Plaintiff's protective order as proposed, the Court again encourages the parties to negotiate an agreed protective order that complies with the requirements outlined in this order.

### III. Conclusion

Based on the foregoing, Mr. Havel's motions must be **DENIED**. [DE 151, DE 172]. The Court again encourages the parties to resolve these disputes so that the case can proceed. To facilitate resolution of these disputes and Plaintiff's production of responsive documents, Mr. Havel is **ORDERED** to meet and confer with Plaintiff's *14 counsel if he wishes to pursue his discovery requests further. Any attempts at an informal resolution must occur before March 31, 2024. The parties must then **FILE** a joint status report no later than **April 5, 2024**, indicating the following:

(1) whether any informal resolution conferences were held;

(2) if the parties did meet and confer, whether the parties

(a) were able to stipulate to the authentication of documents;

(b) were able to stipulate to a protective order, and if so, an anticipated disclosure timeframe after a stipulated protective order is approved; and

(c) were able to resolve other disputes raised in these filings. Any disputes that remain unresolved must be clearly delineated on the parties' status report.

Any proposed protective order-whether agreed by the parties or proposed only by Plaintiff-must also be filed for the Court's consideration no later than **April 5, 2024**.

The deadlines in this matter remain tolled pending receipt of these filings. The toll will be lifted, as appropriate, upon receipt of a joint status report and/or a proposed protective order. Any remaining issues will be resolved through a hearing, which will be set as appropriate upon receipt of these filings.

**SO ORDERED.**





No. 89 Civ. 4478 (CSH)

United States District Court, S.D. New York

# Brooks v. Bates

781 F. Supp. 202 (S.D.N.Y. 1991)

Decided Nov 27, 1991

No. 89 Civ. 4478 (CSH).

203   November 27, 1991. *203

Chapman, Moran, Hubbard tumann (John Haven Chapman, of counsel), New York City, for Brooks.

Jonathan D. Wallace, New York City, for Bates.

## MEMORANDUM OPINION AND ORDER

HAIGHT, District Judge:

This is a private shareholder derivative suit, brought by plaintiff Frank C. Brooks, Jr. pursuant to Rule 23.1, Fed.R.Civ.P. alleging violations of federal and common law copyright and trademark laws, misappropriation of trade secrets, unfair competition, conversion, and other state law claims, including recently asserted claims for breach of contract and unjust enrichment. Subject matter jurisdiction is said to be founded upon the Copyright Act of 1976, 17 U.S.C. § 101 *et seq.,* and § 43(a) of the Lanham Trademark Act, 15 U.S.C. § 1125(a); and with respect to the state law claims, upon principles of pendent jurisdiction and diversity of citizenship.

Defendant William E. Bates moves under Rules 12 and 56 to dismiss the first cause of action alleged in the complaint, the first through fifth affirmative defenses to defendant's counterclaims, and the counterclaims asserted by plaintiff in his reply to defendant's counterclaims.

## BACKGROUND

According to the complaint, in April 1988 Brooks and Bates formed a computer software company, Knowledge Engineering Incorporated ("KEI"), the nominal defendant. The stated purpose of KEI was to develop, market and service computer software and hardware for the Apple computer. Brooks became the president, treasurer, and a director of KEI, owning 49% of the common shares of the company. Bates became a director and secretary of KEI, and the owner of 51%, of the shares. Brooks is a resident of Connecticut. Bates is a resident of New York. KEI is a Connecticut corporation, formally incorporated in that state on December 27, 1988. The complaint alleges at ¶ 7 that KEI's principal product currently in development is a color separation system or software package under the copyrighted name of ColorSystem I. KEI is also alleged to market copyrighted software systems under the trade name Just-Text.

Plaintiff attached to his complaint copies of five certificates of copyright registration. Each certificate refers to a computer program. The titles of the registered programs are: JustText; Document Manager; The Lithographer; Lithographer II; and Mac II Rip. The complaint alleges that the Document Manager program is used in conjunction with JustText; and that the Lithographer, Lithographer II and Mac II *204 Rip programs are included in the ColorSystem I program marketed by KEI.

204

Each of the five copyright registrations lists William Bates as the author of the work, and KEI as the copyright claimant. The registration form requires the copyright claimant, if different from

the author, to give a brief statement as to how the claimant obtained ownership of the copyright. In response to that direction, each registration contains the phrase "transfer of all rights by author." Brooks signed each of the five copyright applications on behalf of KEI on June 5 or 7, 1989. He commenced this action on June 27, 1989.

Brooks alleges in his complaint that prior to April 1988, Bates had been doing business on his own under the name "Knowledge Engineering," but had never incorporated under that name. Brooks alleges that in April 1988, Bates needed money, from a business standpoint and personally as well. Without money Bates was unable to develop the ColorSystem I computer software package. Brooks alleges in substance that he and Bates formed KEI, Brooks contributing the funds and Bates the computer expertise. Subsequently, Brooks alleges, he discovered that Bates, in violation of KEI's corporate existence and in violation of his fiduciary obligation to the company, set himself up in a separate business as "Knowledge Engineering" and began to deal directly with customers of KEI.

Accordingly Brooks commenced this action. The first cause of action, which lies at the heart of the present motion, alleges that KEI is the owner of the five copyrighted programs and that Bates is infringing those copyrights.

Bates interposed an answer consisting of a general denial, several affirmative defenses, and five counterclaims. Bates' second affirmative defense alleges that the Court lacks subject matter jurisdiction under the Copyright Act. The first counterclaim alleges fraud on the Copyright Office and prays for an order cancelling the certificates of registration in KEI's name. The other four counterclaims seek a declaration that plaintiff and the nominal corporate plaintiff have no interest in the propriety material; injunctive relief and compensatory damages; damages for abuse of process; and an accounting.

Plaintiff's reply to the counterclaims alleges, *inter alia,* that KEI is the registered owner of the copyrights (first affirmative defense); that Bates' rights to the programs were transferred to KEI by operation of law (second affirmative defense); that Bates' claim to trade secrets in the programs were transferred to KEI by operation of law; that Bates as author of the program transferred his copyrights to KEI "by his notice of copyright placed by him on copies of said computer programs" (fourth affirmative defense); and that Bates as author of the programs transferred his copyrights to KEI "by parol agreement . . . prior to the registration of said copyrights" (fifth affirmative defense).

Brooks also appended to his reply to Bates' counterclaims a self-styled "first counterclaim" for breach of contract and a "second counterclaim" for unjust enrichment.

Bates moves for an order of dismissal or summary judgment on Brooks' first cause of action. Because the parties have submitted material falling outside the pleadings which the Court has considered, I treat the motion as one for summary judgment under Rule 56. Bates also moves for summary judgment on Brooks' first five affirmative defenses, and to dismiss the two counterclaims referred in Brooks' reply to Bates' counterclaims.

## DISCUSSION

Copyright protection "subsists . . . in original works of authorship fixed in any tangible medium of expression." 17 U.S.C. § 102(a). The limited monopoly granted to an author by the Copyright Act "is a means by which an important public purpose may be achieved. It is intended to motivate the creative activity of authors and inventors by the provision of a special award, and to allow the public access to the products of their genius after the limited period of exclusive control has expired." *Sony Corp. v. Universal Studios,* 205 *Inc.,* *205 464 U.S. 417, 429, 104 S.Ct. 774, 782, 78 L.Ed.2d 574* (1984). In the case at bar, plaintiff concedes that Bates is the author of the computer programs at issue.

Brooks v. Bates    781 F. Supp. 202 (S.D.N.Y. 1991)

The Copyright Act of 1976 provides at 17 U.S.C. § 204(a):

> A transfer of copyright ownership, other than by operation of law, is not valid unless an instrument of conveyance, or a note or memorandum of the transfer, is in writing and signed by the owner of the rights conveyed or such owner's duly authorized agent.

It is common ground that Bates never executed a written transfer of his copyright ownership in the computer programs to KEI, to plaintiff Brooks, or to anyone else. Accordingly the question is whether the record establishes a transfer of copyright ownership "by operation of law." If such a transfer took place, it need not be in writing.

§ 204(a) does not define the phrase "operation of law." In *3 Nimmer on Copyright* (1991 ed.) at § 10.03[a], p. 10-34, the author's discussion of § 204(a) accompanies the phrase "operation of law" with a footnoted reference to 17 U.S.C. § 201(d)(1). § 201(d) refers to "Transfer of Ownership" of copyrights. Subsection (d)(1) provides:

> The ownership of a copyright may be transferred in whole or in part by any means of conveyance or by operation of law, and may be bequeathed by will or pass as personal property by the applicable laws of intestate succession.

§ 201(e), captioned "Involuntary Transfer," provides as follows:

> When an individual author's ownership of a copyright, or of any of the exclusive rights under a copyright, has not previously been transferred voluntarily by the individual author, no action by any governmental body or other official or organization purporting to seize, expropriate, transfer, or exercise rights of ownership with respect to the copyright, or any of the exclusive rights under a copyright, shall be given effect under this title.

Nimmer's Treatise refers to § 201(e)'s "curious provision invalidating involuntary transfers." *Op. cit. supra,* at § 10.04, p. 10-41. Since the statute contains the broad word "organization," Nimmer "raises the question of its possible impact on domestic transactions such as attachments pursuant to judicial proceedings, the rights of unpaid sellers to reclaim property, etc." *Id.* at p. 10-42. The House Report, Nimmer continues, makes it plain that § 201(e) "would not inhibit transfers of ownership pursuant to proceedings in bankruptcy and mortgage foreclosures, since in such cases the author, by his overt conduct in filing in bankruptcy, or hypothecating a copyright, has consented to such a transfer." *Ibid.* (footnotes omitted). These may be taken as examples of transfers of copyright "by operation of law." In like fashion, Nimmer observes, "it may be concluded that the transfer of rights from employee to employer in a for hire relationship is not precluded since this is based upon a rebuttable presumption of consent from the employee." *Ibid.* (footnote omitted). Nimmer had previously observed, at § 10.03[a], p. 10-36 n. 16, that the automatic vesting in an employee's copyright interest in the absence of a contrary agreement "constitutes a transfer `by operation of law' within the meaning of 17 U.S.C. § 204(a). Concluding his discussion of § 201(e), Nimmer says:



This appears to mean, however, that although Section 201(d)(1) provides that a transfer of ownership of copyright may be effectuated by "operation of law" rather than by "conveyance," such operation of law must be triggered by the express or implied consent of the author. *Id.* at p. 10-42.

The lessons to be drawn from Professor Nimmer are that transfers of copyrights by operation of law are limited in number, and depend upon circumstances which establish the author's express or implied consent.

Case law on transfer of copyright by operation of law is sparse. In *Fantasy, Inc. v. Fogerty,* 664 F. Supp. 1345 (N.D.Cal. 1987), a case governed by § 28 of the now superseded 1909 Copyright Act, the district court held that the transfer of assets from a dissolving corporation to its shareholders pursuant to the laws of the state of incorporation *206 constitute a transfer by operation of law of a copyright owned by the corporation. The court concluded that "copyright transfers by operation of law were valid under the 1909 Copyright Act, citing *Brecht v. Bentley,* 185 F. Supp. 890, 892 n. 1 (S.D.N.Y. 1960), in which Judge Bryan said that the 1909 Act's provision "that a copyright may be bequeathed by will must be read to include intestate succession." In a case comparable to *Fantasy,* the Ninth Circuit, construing the 1909 Act, held without discussion of the point that where the copyright in radio play scripts was transferred from one corporation to another, that corporation was merged into a third corporation, and the surviving corporation then transferred the copyrights to a subsidiary, the subsidiary could enforce the copyrights. Judge Owen reached a contrary conclusion on the facts in *H.K., Inc. v. Mori Lee Associates, Inc.,* No. 85 Civ. 9929, 1989 U.S.Dist. LEXIS 7104 at * 5 n. 3 (S.D.N.Y. June 23, 1989) ("While H.K. may have succeeded to Lafayette's assets upon Lafayette's merger into H.K., it did not succeed to Lace Art's assets (including the copyright in question) as a result of

the merger. Although Lace Art became a wholly owned subsidiary of Lafayette, it apparently retained its assets following reorganization and had not divested itself of them by the time its charter was revoked in 1983. Therefore, title to the lace copyright was not transferred to H.K. `by operation of law,' 17 U.S.C. § 201(d)(1), or otherwise.")

In *Pamfiloff v. Giant Records, Inc.,* No. C-91-1708, ( 1991 U.S.Dist. LEXIS 15887, N.D.Cal. October 28, 1991), construing the 1976 Copyright Act, the district court rejected a contention that an oral agreement can give rise to a transfer of copyright by operation of law, thereby satisfying § 204(a). The district court observed that an allegation in the complaint "that Danville acquired the rights to the compositions by oral contract forecloses an argument that they were transferred by operation of law." U.S.Dist. LEXIS 15887 at 887 at * 7. I think that correctly states the law under 1976 Act, and to the extent that *Jerry Vogel Music v. Warner Bros. Inc.,* 535 F. Supp. 172, 175 (S.D.N.Y. 1982), relied upon by plaintiff at bar, suggests a contrary conclusion, I decline to follow it. *See also Mellencamp v. Riva Music Ltd.,* 698 F. Supp. 1154, 1161-62 (S.D.N.Y. 1988) (Conboy, J.) (holding oral agreement to transfer a copyright as invalid under § 204(a), the "Copyright Statute of Frauds"); *Library Publications, Inc. v. Medical Economics Co.,* 548 F. Supp. 1231, 1234 (E.D.Pa. 1982), *aff'd,* 714 F.2d 123 (3d Cir. 1983) (same holding with respect to alleged oral exclusive license of copyright interests).

There is no basis in the present record for finding that Bates transferred his copyrights to plaintiff or to KEI by operation of law. Brooks and Bates conducted negotiations with each other and entered into a relationship which began in harmony and ended in mutual recrimination. Whoever may properly regard himself as aggrieved, there is no writing evidencing a transfer of Bates' copyrights sufficient to satisfy § 204(a), and the case does not fall within any of the limited circumstances recognized by the courts as

Brooks v. Bates    781 F. Supp. 202 (S.D.N.Y. 1991)

constituting a transfer by operation of law. Bates' conduct in placing copyright notices on his softwear in the name of his own sole proprietorship, "Knowledge Engineering," does not suffice. It is undisputed that Bates used that name prior to his negotiations with Brooks. The adoption by the parties of the corporate name "Knowledge Engineering, Inc." and that company's incorporation in Connecticut (which I will assume was perfected although Bates appears to question it) fall well short of constituting a transfer of Bates' copyrights to the corporation. This is not a case of a corporate owner of a copyright merging with another or dissolving, so that its copyrights passed to the shareholders by operation of law. It is rather a case of two individuals negotiating with each other, agreeing, and then disagreeing, in circumstances which cannot be said to give rise to a transfer of copyrights by operation of law. Bates retained his 207 copyrights at all times. *207

It follows that defendant is entitled to summary judgment dismissing plaintiff's first cause of action alleging copyright infringement, and to summary judgment dismissing plaintiff's first five affirmative defenses to defendant's counterclaims, all of which assert ownership in KEI of the copyrights, and which fall as a consequence of the conclusions reached in this Opinion. Defendant is also entitled to a direction to the Registrar of Copyrights that the copyright registrations in KEI's name be cancelled.

Plaintiff's remaining causes of action are not addressed by defendant's present motion. They assert claims as to which diversity of citizenship affords an alternative basis for subject matter jurisdiction in this Court.

Lastly, plaintiff asserts in its answer to defendant's counterclaims two self-styled "counterclaims," for breach of contract and unjust enrichment. Defendant correctly observes that the Federal Rules of Civil Procedure do not contemplate a counterclaim to a counterclaim. However, Rule 15(a) permits a party to amend its pleadings by leave of court, "and leave shall be freely given when justice so requires." Construing plaintiff's most recent submission as a motion to amend his complaint to assert these two additional claims, I grant the motion and direct plaintiff to file and serve an amended complaint within thirty (30) days of the date of this Opinion and Order. Defendant is directed to answer the amended pleading within the time specified by the rules.

Counsel for defendant are directed to settle a Judgment consistent with this Opinion on seven (7) days' notice not later than December 21, 1991.

The parties are directed to attend a status conference on January 17, 1992 at 2:30 p.m. in Room 307.

It is SO ORDERED.

casetext
Part of Thomson Reuters

Civil No. 07-1274 (JRT/FLN)
United States District Court, D. Minnesota

# U.S. Home Corp. v. R.A. Kot Homes Inc.

563 F. Supp. 2d 971 (D. Minn. 2008)
Decided May 23, 2008

Civil No. 07-1274 (JRT/FLN).

972 May 23, 2008 *972

Keith S. Moheban, David D. Axtell, and Erin C. Skold, Leonard Street And Deinard, PA, Minneapolis, MN, for plaintiff.

David A. Davenport and Brent A. Lor-entz, Winthrop Weinstine, PA, Minne-apolis, MNfor defendant R.A. Kot Homes Inc.

David K. Snyder, Eckberg Lammers Briggs Wolff Vierling, PLLP, Stillwater, MN, Craig W. Baumann, Craig W. Bau-mann, PA, Woodbury, MN, for defendants Milan Daoheuang and Bea Daoheuang.

## ORDER ADOPTING REPORT AND RECOMMENDATION

JOHN TUNHEIM, District Judge

U.S. Home Corporation filed this action against R.A. Kot Homes Inc. ("R.A.Kot"), Milan Daoheuang, and Bea Daoheuang, al-leging copyright infringement. R.A. Kot filed a motion for summary judgment. In a Report and Recommendation dated March 27, 2008, United States Magistrate Judge Franklin L. Noel recommended that this Court deny R.A. Kot's motion. *See* 28 U.S.C. § 636(b)(1)(B). R.A. Kot now ob-jects to that recommendation. After re-viewing the Report and Recommendation *de novo, see* 28 U.S.C. § 636(b)(1)(C); D. Minn. LR

72.2(b), the Court overrules R.A. Kot's objection and adopts the Report and Recommendation of the Magistrate Judge.

## BACKGROUND [1]

[1] R.A. Kot indicates that it does not object to the facts set forth by the Magistrate Judge. Those facts are repeated below only to the extent necessary to rule on defendant's objection.

U.S. Home Corporation owns copyrights for a residential home design named the "Remington." The copyrights were specif-ically for the Remington technical draw-ings and for the architectural structure built from the drawings. On April 4, 2005, Milan and Bea Daoheuang entered into a purchase agreement with U.S. Home Corporation to build them a Remington. The Daoheuangs cancelled this agreement on April 23, 2005 "because of a survey issue." The Daoheuangs entered into a second purchase agreement with U.S. Home Cor-poration on September 9, 2005, again to build a Remington. The Daoheuangs worked with U.S. Home Corporation's sales associate Cindy Miller on both agree-ments.

After the second purchase agreement was signed, the Daoheuangs worked with Cindy Miller to customize their home. The relationship between Miller and the Daoheuangs became strained and, on one occasion, Miller cursed at Bea Daoheuang. The Daoheuangs terminated the second purchase agreement shortly after this en-counter. In his deposition, Milan Dao-heuang gave a number of



reasons for why he and his wife terminated the second purchase agreement. He said that U.S. Home Corporation could not build the house they wanted, that Miller swore at his wife, that there was a drainage prob-lem with the lot, and that Miller told them to go to a custom builder. With respect to the drainage issue, Milan Daoheuang add-ed that: "If [Miller] can build me the house, I could have picked another lot." When Bea Daoheuang was asked whether, after the second purchase agreement was terminated, she was still interested in having U.S. Home Corporation build a house for her family, she testified that she did not remember "the exact thoughts at the time."

Eventually, defendant R.A. Kot built a home for the Daoheuangs. U.S. Home Corporation then filed this action alleging that the home built by R.A. Kot violates its *973 Remington copyrights. U.S. Home Corporation alleges that R.A. Kot is one of its direct competitors, and that the home was built within three miles of where plaintiff had agreed to build for the Daoheuangs.

## ANALYSIS
## I. STANDARD OF REVIEW

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party can demonstrate that it is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). A fact is material if it might affect the outcome of the suit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for either party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A court considering a motion for summary judgment must view the facts in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences that can be drawn from those facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

## II.   COPYRIGHT INFRINGEMENT

"To prevail on a copyright infringement claim, [plaintiff] must prove ownership of a valid copyright and copying of original elements of the work." *Taylor Corp. v. Four Seasons Greetings, LLC,* 403 F.3d 958, 962-63 (8th Cir. 2005) (quotation omitted). A prevailing plaintiff "is entitled to recover the actual damages suffered by him or her as a result of the infringement[.]" 17 U.S.C. § 504(b). In a case involving infringement of a home design among competitors in the same housing market, the Sixth Circuit has approved the use of lost sales as a measure of actual damages, on the theory that any sale made by the defendant in those circumstances would have been a sale for the plaintiff. *Robert R. Jones Assocs., Inc. v. Nino Homes,* 858 F.2d 274, 280-81 (6th Cir. 1988). " [0]nce a copyright holder establishes with a reasonable probability the existence of a causal connection between the infringement and a loss of revenue, the burden properly shifts to the infringer to show that this damage would have occurred had there been no taking of copyrighted expression." *Harper Row Publishers, Inc. v. Nation Enterprises,* 471 U.S. 539, 567, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985).

R.A. Kot moves for summary argument on U.S. Home Corporation's claim for lost profits. R.A. Kot's sole argument is that there is insufficient evidence that the Daoheuangs would have returned to U.S. Home Corporation to purchase a Remington, in light of the contentious manner in which they parted ways.[2] R.A. Kot argues that plaintiff is therefore unable to "establish[] with a reasonable probability the existence of a causal connection between the infringement and a loss of revenue." *Id.* U.S. Home Corporation responds that a jury could reasonably find that the Daoheuangs would have purchased a home from U.S. Home Corporation if not for their decision to infringe. This Court agrees. As plaintiff points out, the Daoheuangs and U.S. Home Corporation entered into two separate purchase agreements for

U.S. Home Corp. v. R.A. Kot Homes Inc.    563 F. Supp. 2d 971 (D. Minn. 2008)

a Remington. The Daoheuangs then allegedly hired R.A. Kot to *974 build such a home, just miles from where they had planned to build with U.S. Home Corporation. In those circumstances, a jury could reasonably conclude that the Daoheuangs had great affection for both the copyrighted design and the area where they eventually built, and would have returned to negotiations with U.S. Home Corporation if that was the only way to acquire a Remington. Accordingly, the Court overrules R.A. Kot's objection, and adopts the Report and Recommendation of the Magistrate Judge. R.A. Kot's motion for summary judgment on plaintiff's lost profits claim is denied.

> 2 In R.A. Kot's initial motion, it also argued that it was entitled to summary judgment because plaintiff did not own the Remington copyrights. The Magistrate Judge disagreed, concluding that plaintiff does own these copyrights. Defendant has not objected to that determination. Accordingly, the Court adopts that conclusion of the Magistrate Judge without further discussion.

This case will be placed on the Court's next available trial calendar.

## ORDER

Based on the foregoing records, files, and proceedings herein, **IT IS HEREBY ORDERED** that defendant R.A. Kot Homes Inc.'s Objection to the Report and Recommendation of the Magistrate Judge [Docket No. 53] is **OVERRULED.** The Magistrate Judge's Report and Recommendation dated March 27, 2008 [Docket No. 50] is **ADOPTED.** Accordingly, defendant R.A. Kot Homes Inc.'s Motion for Summary Judgment [Docket No. 33] is **DENIED.**

## REPORT AND RECOMMENDATION

FRANKLIN L. NOEL, United States Magistrate Judge.

**THIS MATTER** came before the undersigned United States Magistrate Judge on March 11, 2003 on Defendant R.A. Kot Homes, Inc.'s Motion for Summary Judgment [# 33]. The matter was referred to the undersigned for Report and Recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.1. For the reasons which follow, this Court recommends Defendant's motion be denied.

## I. FINDINGS OF FACT

On June 4, 2006, Lundgren Brothers Construction, Inc. ("Lundgren") obtained copyright registrations for a residential home design named the Remington. (Axtell Decl. Ex. B.) The copyrights were specifically for the Remington technical drawings and for the architectural structure built from the drawings. *(Id.)* On June 4, 2005, Lundgren merged with U.S. Home Corporation ("U.S.Home") pursuant to Articles of Merger filed with the Minnesota Secretary of State on that day. (Axtell Decl. Ex. A.) Under the Articles, U.S. Home was the surviving entity from the merger. *(Id.)* U.S. Home continued however to do business under Lundgren name after the merger. (Davenport Aff. Ex A (St. Amant Dep.) 37:3-11.)

On April 4, 2005, Meilan and Bea Daoheuang entered into a purchase agreement with Lundgren to build a Remington home. (Axtell Decl. Ex. J.) The Daoheuangs cancelled this purchase agreement on April 23, 2005 "because of a survey issue." (Axtell Decl. Ex J (Miller Dep.) 72:2.) The Daoheuangs entered into a second purchase agreement with Lundgren to build a Remington home on September 9, 2005. (Axtell Decl. Ex. K.) The Daoheuangs worked with Lundgren sales associate Cindy Miller both times that they signed a purchase agreement. (Axtell Decl. Ex J (Miller Dep.) 53:8-13; 54:8-11.)

After the second purchase agreement was signed, the Daoheuangs worked with Cindy Miller on customizing their home. The relationship between Miller and the Daoheuangs became strained and, on one occasion, Ms. Miller swore at Ms.



Daoheuang. (Davenport Aff. Ex. I (Miller Dep.) 94:11-95:2.) The Daoheuangs terminated the second purchase agreement shortly after this **975** encounter. *(Id.* at 95:1-2.) *\*975* In his deposition, Mr. Daoheuang gave a number of reasons for why he and his wife terminated the second purchase agreement; he said that Lundgren could not build the house they wanted, that Cindy Miller swore at his wife, that there was a drainage problem with the lot and that Miller told them to go to a custom builder. (Axtell Decl. Ex. H (Bea Daoheuang Dep.) 10:1-4.) With respect to the drainage issue, he also testified that: "If she can build me the house, I could have picked another lot." *(Id.* at 68:8-10.) When Mrs. Daoheuang was asked whether, after the second purchase agreement was terminated, she was still interested in having Lundgren build a house for her family, she testified that she did not remember "the exact thoughts at the time". (Axtell Decl. Ex. G (Meilan Daoheuang Dep.) at 176:15.)

R.A. Kot Homes, Inc. eventually built a home for the Daoheuangs. The Daoheuangs had no contact with R.A. Kot until after they cancelled the second purchase agreement with Lundgren. (Davenport Aff. Ex. B (Bea Daoheuang Dep.) at 59:1013.)

## II. STANDARD OF REVIEW

According to Federal Rule of Civil Procedure Rule 56, summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). In order to determine whether a certain fact is material, "it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Summary judgment will not be granted "if the dispute about a material fact is `genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* "The inquiry performed is the threshold inquiry of determining whether . . . there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250, 106 S.Ct. 2505.

When determining whether to grant a motion for summary judgment, a court must view all of the facts in the light most favorable to the non-moving party and give the non-moving party the benefit of all reasonable inferences that can be drawn from those facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586-87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). When the moving party brings forth a proper summary judgment motion, the "adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) ("Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c).")

## III. LEGAL ANALYSIS

### A. U.S. Home Corporation Owns the Copyrights in Suit.

Defendant R.A. Kot claims that Plaintiff U.S. Home does not own the copyrights in suit because they are owned by Lundgren.

Minnesota Statute § 302A.641, subdivision 2(d), provides that when two companies merge, "[a]ll property, real, personal, and mixed, and all **976** debts due on any account, including subscriptions *\*976* to shares, and all other choses in action, and every other interest of or belonging to or due to each of the constituent organizations vests in the surviving organization without any further act or deed." Under 17 U.S.C. § 204(a), a copyright may be

U.S. Home Corp. v. R.A. Kot Homes Inc.     563 F. Supp. 2d 971 (D. Minn. 2008)

transferred by "operation of law." Courts have interpreted a transfer by "operation of law" to include mergers and any other transaction that "establish[es] the author's express or implied consent" to transfer the copyright. *Taylor Corp. v. Four Seasons Greetings, LLC,* 403 F.3d 958, 963 (8th Cir. 2005) (quoting *Brooks v. Bates,* 781 F.Supp. 202, 205 (S.D.N.Y. 1991)).

The two copyrights were issued to Lundgren Brothers on June 21, 2004. (Axtell Aff. Ex. B.) On June 4, 2005, the Minnesota Secretary of State issued a certificate of merger between Lundgren Brothers Construction, Inc. and U.S. Home Corporation. (Axtell Aff. Ex. A.) The certificate indicates that the surviving entity after the effective date of merger, June 4, 2005, was U.S. Home Corporation. (Axtell Decl. Ex A.) According to Minnesota Statute § 302A.641, subdivision 2(d), the copyrights in suit vested in U.S. Home Corporation on June 4, 2005, the effective date of the merger, without any "further act or deed" on the part the surviving company. That is, U.S. Home was not required under the statute to have the copyright certificates re-issued under its name. By way of the merger, the copyrights were transferred to U.S. Home by operation of law.

## B. There is a genuine issue of material fact with respect to whether or not U.S. Home should recover lost profits.

R.A. Kot contends that summary judgment should be granted with respect to Plaintiff's claim for lost profits. R.A. Kot claims that the Daoheuangs would not have contracted with Lundgren to build them a home even if they could not have built an allegedly infringing home with R.A. Kot.

17 U.S.C. § 504(b) provides that a copyright owner may recover "the actual damages suffered by him or her as a result of the infringement" in addition to "any profits of the infringer that are attributable to the infringement and are not taken

into account in computing the actual damages." Actual damages may include, among other things, lost profits. *Mary Ellen Enterprises v. Camex, Inc.,* 68 F.3d 1065, 1070 (8th Cir. 1995) (unholding a jury verdict awarding actual damages that included lost profits for copyright infringement).

In proving lost profits, "once a copyright holder establishes with reasonable probability the existence of a causal connection between the infringement and a loss of revenue, the burden properly shifts to the infringer to show that this damage would have occurred had there been no taking of copyrighted expression." *Harper Row Publishers, Inc. v. Nation Enterprises,* 471 U.S. 539, 567-568, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985).

Assuming but without deciding that the Plaintiff in this case has established with reasonable probability the existence of a causal connection between the infringement and a loss of revenue, the Court concludes that there is a genuine issue of material fact as to whether U.S. Homes would have lost the sale but for R.A. Kot's alleged infringing use of the copyrights. R.A. Kot contends that the Daohuangs would never have returned to Lundgren to build a house because the sales agent, Cindy Miller, swore at Ms. Daoheuang. After Miller swore at Ms. Daoheuang, the Daoheuangs promptly cancelled the purchase 977 *977 agreement and were refunded their deposit.

In response to this argument, the Plaintiff contends that these facts do not establish that the Daoheuangs would not have returned to Lundgren a third time to build a Remington home. The Daoheuangs had cancelled a purchase agreement with Lundgren in April 2005 (because of "a survey issue") and subsequently entered into another purchase agreement with them in September 2005. (Eyer Dep. at 72:2.) Both purchase agreements were for a Remington design home. The Defendants further contend that no party testified that the Daoheuangs and Lundgren refused to work with one another.

U.S. Home Corp. v. R.A. Kot Homes Inc.     563 F. Supp. 2d 971 (D. Minn. 2008)

Defendant R.A. Kot essentially asks this Court to conclude as a matter of law that when a home buyer cancels a contract after failed, contentious negotiations, it will never contract with the seller again. A jury could find that the Daoheuangs loved the Remington home design and would have returned to Lundgren to build such a home had R.A. Kot not built an allegedly infringing design. On the other hand, a jury might conclude that, based on the Daoheuang's dealings with Lundgren and their belief that Lundgren could not build them the home they wanted, the Daoheuangs would not have returned to Lundgren. Given these circumstances, there is a genuine issue of material fact as to whether or not the Daoheuangs would have contracted with Lundgren to build a Remington home but for R.A. Kot's infringement.

## IV. RECOMMENDATION

Based upon all the files, records and proceedings herein, **IT IS HEREBY RECOMMENDED** that Defendant R.A. Kot Homes, Inc.'s Motion for Summary Judgment [# 33] be **DENIED.** March 27, 2007.





Part of Thomson Reuters

Case No. 3:15CV00666

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO WESTERN DIVISION

# Design Basics, LLC v. Forrester Wehrle Homes, Inc.

*Decided Mar 30, 2018*

Case No. 3:15CV00666

03-30-2018

Design Basics, LLC, Plaintiff, v. Forrester Wehrle Homes, Inc., et al. Defendants.

---

James G. Carr Sr. U.S. District Judge

ORDER

This is a copyright-infringement case.

Plaintiff Design Basics LLC, (DB), creates and licenses architectural plans for single-family homes. It accuses defendants, the home building companies Forrester Wehrle Homes, Inc., and Wehrle Development, Ltd. (collectively, FWH) of copying, manufacturing and selling "three-dimensional infringing copies (houses)" of its copyright-protected designs. (Doc. 89, ID 3488).

Three motions are pending.

First is plaintiff's motion for summary judgment regarding: the validity of the copyrights at issue; its ownership of the copyrights; and defendants' alleged access to the protected works. (Doc. 83). Second is plaintiff's motion to exclude defense expert John Gugliotta's report, which FWH cites in response to DB's summary-judgment arguments. (Doc. 84). Defendants oppose both motions. (Docs. 87, 88).

Third is defendants' objection to an affidavit submitted by plaintiff's counsel, James Rogers, "the materials attached thereto," combined with a motion to strike "Plaintiff's argument based thereon." (Doc. 100, ID 4103). Plaintiff opposes the motion. (Doc. 104). *2

For the reasons below, I grant plaintiff's motion to exclude Gugliotta's report in part, and deny it in part, overrule defendants' objection to Rogers' affidavit and deny their motion to strike plaintiff's "argument based thereon" in its entirety, and grant plaintiff's motion for summary judgment in part, and deny it in part.

## Number of Designs

Before reaching the substance of DB's copyright claims, I resolve a threshold matter: determining exactly how many copyrighted design plans are at issue. DB's conflicting positions make this task harder than it should be.

Relying on the second amended complaint (*see* Doc. 58), I noted in previous orders that DB accused FWH of infringing its copyrights in twenty-three architectural design plans. *See Design Basics*, *LLC v. Forrester Wehrle Homes*, *Inc.*, (*Design Basics I*), 2017 WL 5467152 (N.D. Ohio); *Design Basics*, *Inc. v. Forrester Wehrle Homes*, *Inc.*, (*Design Basics II*), 2017 WL 5444569 (N.D. Ohio). They are: the "Kaiser," the "Kendall," the "Shannon," the "Sherburne," the "Newlin," the "Bermier," the "Tollefson," the "Monte Vista," the "Lancaster," the "Franklin," the "Harrisburg," the "Chandler," the "Galvin," the "Carrington," the "Paisley," the "Ambrose," the "Kincaid," the "Gabriel Bay," the "Tilmer's Run," the "Crimson Creek," the "Kirby Farms," the "Ashton" and the "Albany." (Doc. 58, ID 1222).

DB clarified that Counts I through VIII of its second amended complaint, alleging traditional copyright infringement claims, did not apply to

2

and Albany plans, which DB had licensed to FWH in 2014. (Doc. 58, ID 1226; Doc. 83-25, ID 3248).

Plaintiff did not, however, explicitly exclude the Ashton or the Albany from Count IX of the complaint, alleging a violation of the Digital Millennium Copyright Act (DMCA), 17 U.S.C. § 1201 *3 *et seq*., and claiming that defendants "intentionally removed and omitted DB's copyright . . . information from copies of DB's works"-an act that could violate the DMCA notwithstanding a valid license. *See* 17 U.S.C. § 1202(b)(1). I therefore inferred that Count IX included a claim related to these two designs-a supposition plaintiff later confirmed in its brief opposing defendants' motion for summary judgment on substantial similarity. (*See* Doc.118).

To succeed on a DMCA claim, however, a copyright holder still bears the burden of proving two of the elements essential to a traditional copyright infringement claim: (1) that it owns the copyright; and (2) that the defendant had access to it. *See* 17 U.S.C. § 1202(b)(1) ("No person shall, *without the authority of the copyright owner* or the law . . . intentionally remove or alter any copyright management information" (emphasis added)); *see also Granger v. Dethlefs*, 2014 WL 2475979, *6-7 (E.D. Pa.) (Plaintiff "cannot prove that Defendants violated the DMCA because if there is not enough evidence to show copyright ownership, it cannot be proved that any copyrighted material was altered or removed."); *Design Basics, LLC v. Lexington Homes, Inc*., 2016 WL 8116897, *5 (E.D. Wis.) ("Without evidence of access to the copyrighted works, there is no genuine dispute of material fact as to whether Defendants intentionally removed copyright management information from the same copyrights as required for Plaintiffs to prove their claim under the [DMCA].").

And at present, DB does not move for summary judgment on its ownership of a copyright in, or defendants' access to, the Ashton or the Albany.

DB "moves for summary judgment on . . . Plaintiff's ownership of the valid copyrights in the 21 works at issue," rather than the twenty-three works it named in the second amended complaint. (Doc. 83-1, ID 2861 (emphasis omitted)). Plaintiff [4] did not submit certificates of copyright *4 registration or deposit materials for the Ashton or the Albany as exhibits to its motion,[1] and did not include them among its list of the twenty-one designs "at issue." (*Id*. at 2860). Thus, to the extent DB had intended to raise any arguments concerning its ownership of, and FWH's access to, the Ashton or the Albany, plaintiff waived them by failing to discuss them in its principal summary-judgment brief. *See Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 553 (6th Cir. 2008).

> [1] This is not to imply that DB had to register the Ashton or the Albany with the United States Copyright Office in order pursue a DMCA claim-a plaintiff's "failure to register its copyrighted work is not a bar to a DMCA action." *Gattoni v. Tibi, LLC*, 254 F. Supp.3d 659, 664 (S.D. N.Y. 2017) (citation omitted). I note only that, for the reasons explained *infra*, certificates of registration would have been sufficient to establish that DB owned copyrights in these designs.

DB's counsel evidently caught this mistake when drafting plaintiff's reply. There, plaintiff asserts that it owns "valid copyrights in the *twenty-three* (23) architectural works at issue," and contends defendants had access to all of them, bringing the Ashton and the Albany back into the mix. (Doc. 98, ID 3751, 3768 (emphasis added)). That it cannot do.

A reply is a not a vehicle for DB to correct the omissions in its initial brief. *Hunt v. Big Lots, Inc*., 244 F.R.D. 394, 397 (N.D. Ohio 2007). "[R]eply briefs *reply* to arguments made in the response brief-they do not provide the moving party with a new opportunity to present yet another issue for the court's consideration." *Scottsdale*, 513 F.3d at 553 (quoting *NovoSteel SA v. Untied States*, 284

1274 (Fed. Cir. 2002)). "As a matter of litigation fairness and procedure, then," I treat issues raised for the first time on reply "as waived." *Id.* (quoting *NovoSteel*, 248 F.3d at 1274); *see also* Hunt, 244 F.R.D. at 397.

Accordingly, because plaintiff waived its arguments concerning the Ashton and the Albany, I deny DB's motion for summary judgment on ownership and access insofar as it relates to these designs. *5

Further, because I have already dismissed DB's claims concerning defendants' alleged infringement of plaintiff's Kincaid, Bermier, and Paisley designs (Doc. 129, ID 4950), my analysis herein concerns only the eighteen remaining designs still at issue.

## Gugliotta's Report

A second threshold matter is whether, and to what extent, I may consider certain expert testimony in resolving plaintiff's arguments concerning validity, ownership, and access.

In an earlier order, I granted plaintiff's motion to exclude defense expert Richard Kraly's initial report insofar as it expressed legal opinions characterizing DB's designs as too unoriginal to warrant copyright protection. Defendants evidently assumed first, that I required witness advice on matters of copyright law, and second, that Kraly, an architect with no legal education or training, was somehow qualified to provide it. *See Design Basics I*, 2017 WL 5467152 at *4 (citation omitted).

This time, they rely on an actual attorney.

Specifically, in opposing DB's summary judgment motion, FWH offers an expert report penned by John Gugliotta, Esq., a lawyer defendants bill as "an expert in . . .copyright law." (Doc. 88-1, ID 3438).

"Admittedly," at the summary judgment stage, the "parties are not required to submit evidence . . . in a 'form that would be admissible at trial.'" *Shazor*

*v. Prof. Transit Mgmt., Ltd.*, 744 F.3d 948, 960 (6th Cir. 2014) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)). But their materials "must still comport with the rules of evidence"- including those governing expert testimony. *Id.*; *see also* Fed. R. Civ. P. 56(c)(2) ("A party may object that the material cited to . . . cannot be presented in a form that would be admissible in evidence.").

I have already explained that "I have an independent 'gatekeeping' duty to ensure that expert *6 testimony is admissible under Fed. R. Evid. 702." *Design Basics I*, 2017 WL 5467152 at *4 (citing *Kuhmo Tire v. Carmichael*, 526 U.S. 137, 147 (1999)). "That duty includes maintaining 'vigilant' guard against expert testimony that 'embraces actual legal conclusions.'" *Id.* (citation, brackets, and ellipsis omitted). "Generally, an expert may not state his or her opinion as to legal standards nor may he or she state legal conclusions drawn by applying the law to the facts." *United States v. Gordon*, 493 F. App'x 617, 626-27 (6th Cir. 2012) (citation omitted).

Gugliotta goes out of his way to do both.

First, Gugliotta opines that five of DB's designs are "ineligible for copyright protection as a matter of law" based on their dates of creation. As for the others, he explains that "Plaintiff does not have any claim of infringement for an architectural work" and "Plaintiff's allegations of copyright infringement . . . fail[] to sufficiently plead the nature of the copyrighted material." (Doc. 88-1, ID 3459-3465, 3468).

Gugliotta also repeats Kraly's assertion that DB's "works are not copyrightable because there are no original design elements present." (*Id.* at 3468 (citing Kraly report)). I previously excluded this portion of Kraly's report because Kraly's "belief that DB's designs do not merit copyright protection is a legal conclusion-and a subject on which I 'do not need the judgment of witnesses.'"*Design Basics I*, 2017 WL 5467152 at

(quoting *Gordon*, *supra*, 493 F. App'x at 626). I now exclude this portion of Gugliotta's report for the same reason.[2]

> [2] In a declaration defending the report, Gugilotta insists that he "used headings in the report that reference the results of [his] legal analysis" merely as a "stylistic choice," and not to "set[] forth legal conclusions." (Doc. 88-1, ID 3435). Gugliotta's explanation underscores the very problem; his report should not include "legal analysis."

"However," as I said with respect to Kraly's report, "the inclusion of such opinions does not *7 render [Gugliotta's] entire report and/or testimony inadmissible." *Id.* (citation and ellipsis omitted).

An individual with specialized knowledge may offer testimony or opinion as a lay witness so long as he has personal knowledge of the facts he discusses. *Harris v. J.B. Robinson Jewelers*, 627 F.3d 235, 239-41 (6th Cir. 2010); *United States v. Wells*, 211 F.3d 988, 998 (6th Cir. 2000); *see also* Fed. R. Evid.701(a) (testimony "rationally based on the witness's perception" is lay testimony). Here, apart from his legal advocacy, Gugliotta recounts personally observable facts relevant to FWH's defenses, such as his claim that he "review[ed] the records" at the United States Copyright Office and "was unable to find any" proof that Design Basics, Inc. (plaintiff's predecessor in interest and the original copyright registrant) transferred ownership of its copyrights to DB. (Doc. 88-1, ID 3440).

Though Gugliotta cannot render a legal conclusion based on this fact, defense counsel can rely on it to dispute DB's assertion that it owns the copyrights originally registered to Design Basics, Inc. "The distinction, though subtle, is nonetheless important." *See Berry v. City of Detroit*, 25 F.3d 1342, 1353 (6th Cir. 1994).

Accordingly, I disregard Gugliotta's legal conclusions, but consider the facts he relays to the extent that they bear on FWH's arguments regarding ownership, validity, and access.

## Rogers' Affidavit

The final preliminary issue is FWH's objection to the affidavit of plaintiff's counsel, James Rogers, "the materials attached thereto," and its motion to strike "Plaintiff's argument based thereon." (Doc. 100, ID 4103).

In his affidavit, Rogers attests that in the course of discovery, defense counsel, Robert Stoffers, sent him the "original Design Basics plan books" in his "clients' possession" as of June 22, *8 2016. (Doc. 98-10, ID 3847). The affidavit and its exhibits do not state whether these "original Design Basics plan books" were in defendants' "possession" because FWH specifically ordered them, or received them through a more passive means, such as unsolicited advertisement. Other evidence in the record, however, shows that one of the defendant entities-Forrester Wehrle Homes, Inc.-ordered "Design Basics plan books" directly from Design Basics, Inc. in 1993, 1996, 2002 and 2003. (Doc. 83-25).[3]

> [3] DB's customer records are less than specific in identifying the precise number of DB plan books Forrester Wehrle Homes, Inc. purchased. Plaintiff alleges, however, that "Defendants have had access to at least 15 plan catalogues from DB since January 15, 1993, and FWH has licensed the 'Ashton' and 'Albany' plans from DB." (Doc. 58, ID 1226).

Rogers attests that he "personally reviewed each page" of the plan books and "made a note of every page that had handwriting, paper clips, dog ear pages [i.e., folds at the upper corner], and any other physical alterations." (Doc. 98-10, ID 3848). He copied these pages and "drafted a document summarizing" their alterations. (*Id.*).

The "materials attached thereto" Rogers' affidavit include: (1) the letter from Stoffers stating that the "original Design Basics plan books" were in FWH's "possession"; (2) Rogers' copies of the

casetext
referred pages; and (3) Rogers' notes summarizing the alterations; and (4) a letter indicating that Rogers returned the plan books to Stoffers following his review. (Docs. 98-11, 98-12, 98-13, 98-14).

DB relies on Rogers' affidavit and these exhibits to demonstrate access-i.e., that one or more defendants saw or "ha[d] a reasonable opportunity" to see plaintiff's copyrighted designs "and thus ha[d] the opportunity to copy" them. *Jones v. Blige*, 558 F.3d 485, 491 (6th Cir. 2009) (citation omitted). This is the "argument based thereon" defendants move to strike as part of their evidentiary objection. *9

To that end, FWH contends that Rogers' affidavit is insufficient to authenticate his copies of the "original Design Basics plan book" pages. This is so, it argues, because Rogers lacks personal knowledge of "the DB books," including "their source, their creation, their retention, their content, or that they are what they purport to be." (Doc. 100, ID 4107). And although Stoffers signed the letter representing that the documents he produced were indeed "original Design Basics plan books . . . [then] in [his] clients' possession," (Doc. 98-11, ID 3849-50), he now insists that his representation is also insufficient to authenticate them, because he can "express nothing more than [his] belief that the papers are those described" in Rogers' discovery request. *Fisher v. United States*, 425 U.S. 391, 413 (1976).

But DB need not resort to Rogers' (or Stoffers') personal knowledge "to produce evidence sufficient to support a finding" that the plan book pages are what DB claims they are. *See* Fed. R. Evid. 901(a). Rather, as promotional materials "that contain a company logo," the Design Basics plan book pages are self-authenticating documents pursuant to Fed. R. Evid. 902(7). *Alexander v. CareSource*, 576 F.3d 551, 561 (6th Cir. 2009) (citing *Pass & Seymour, Inc. v. Hubbell, Inc.*, 532 F. Supp.2d 418, 438 (N.D. N.Y. 2007)).

For example, many of the plan book pages feature illustrations of homes in close proximity to a "Design Basics, Inc." logo, copyright symbol, or web address. Several plan book cover pages also declare that they are "published by Design Basics, Inc." (Doc. 98-15, ID 3883; Doc. 98-16, ID 3931; Doc. 98-18, ID 3935), or are "a Design Basics, Inc. Publication." (Doc. 98-14, ID 3860; Docs. 98-19, 98-20). One, in fact, identifies itself as a booklet of "Design Basics Home Plans." (Doc. 98-19, ID 3935). On top of that, a number of the plan book titles-"Gold Seal Home Plans," "Nostalgia Home Plans Volume II," and "Neighborhood in a Box"-are similar, if not identical, to the names of *10 the DB plan books Forrester Wehrle Homes, Inc., ordered from Design Basics, Inc. in years past. (*Compare* Docs. 98-15, 98-18, 98-20, *with* Doc. 83-25, ID 3245-46).

Because these documents bear "[a]n inscription, sign, tag, or label purporting to have been affixed in the course of business and indicating origin, ownership, or control," they require "no extrinsic evidence of authenticity in order to be admitted." Fed. R. Evid. 902(7); *see also Alexander*, *supra*, 576 F.3d at 561.

Defendants alternatively contend that even if the plan book pages are admissible, the handwritten notations on the pages are not, because the "source(s)" of the marks, paper clips and dog ear folds "are not known,"(Doc. 106, ID 4348), and neither Rogers' affidavit, nor Stoffers' letter "demonstrates that the markings . . . were made by Defendants." (Doc. 100, ID 4110).

True enough. "But the fact that the author of the 'handwritten notes remains unknown' does not extinguish the document[s'] authenticity." *Hardin v. Dadlani*, 221 F. Supp.3d 87, 102 (D. D.C 2016) (quoting *Lexington Ins. Co. v. W. Pa. Hosp.*, 423 F.3d 318, 329 (3d Cir. 2005)).

"Rule 901(a) does not require the document to be probative of a particular fact." *Lexington Ins.*, 423 F.3d at 329-330. Nor does it require the proponent to "rule out all possibilities inconsistent with

casetext

authentic, or to prove beyond any doubt that the evidence is what it purports to be." *United States v. Dhinsa*, 243 F.3d 635, 658 (2d Cir.2001). All DB must do is introduce evidence sufficient "for a jury to conclude that the document 'is what its proponent claims it to be.'" *Lexington Ins.*, 423 F.3d at 330 (citation omitted). DB has done at least that.

11    Based on the foregoing evidence, a reasonable juror could conclude that one or more employees at Forrester Wehrle Homes, Inc., are responsible for the handwritten marks and alterations on the Design Basics plan books Forrester Wehrle Homes, Inc. ordered and admittedly kept in its *11 "possession." *See e.g.*, *Hardin*, 221 F. Supp.3d at 102 (employment application with the handwritten note, "blond girl" admissible against employer despite plaintiff's failure to "show who made the 'blond girl' notation," where the "application was in the defendants' possession . . . and there was ample evidence that [the defendant supervisor] said he wanted to hire blond girls").

Defendants' insistence that there are "other conceivable explanations" for the handwritten marks (Doc. 106, ID 4350), goes to the weight of this evidence, not its admissibility. *See United States v. Crosgrove*, 637 F.3d 646, 658 (6th Cir. 2011) (defendant's claim that his cohort "may have hidden (or even written)" a disputed letter "go to the weight the jury should afford the evidence," not authentication).[4]

---

[4] I note, in any event, that defendants fail to suggest, much less show, any reason to doubt the authenticity of the DB plan books. They likewise suggest no reason to believe anyone, other than someone associated with FWH, is responsible for the writings and alterations (paper clips, folded pages, etc.) on the plan book pages. The absence of a plausible alternative source for either the books, or the alterations, lends further support for overruling defendants' objection and denying their motion to strike.

I overrule defendants' objection and deny their motion to strike DB's access argument.

## Standard of Review

Summary judgment is appropriate under Fed. R. Civ. P. 56 where the opposing party fails to show the existence of an essential element for which that party bears the burden of proof. *Celotex*, *supra*, 477 U.S. at 322.

The movant must initially show the absence of a genuine issue of material fact. *Id.* at 323. Once the movant meets that burden, the "burden shifts to the nonmoving party [to] set forth specific facts showing there is a genuine issue for trial." *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 250 (1986). Rule 56 "requires the nonmoving party to go beyond the [unverified] pleadings" and
12    submit *12 admissible evidence supporting its position. *Celotex*, *supra*, 477 U.S. at 324.

I accept the non-movant's evidence as true and construe all evidence in its favor. *Eastman Kodak Co. v. Image Tech. Servs.*, *Inc.*, 504 U.S. 451, 456 (1992).

## Discussion

To prove copyright infringement, DB must demonstrate that it owns valid copyrights in the designs allegedly infringed, and that FWH copied them. *Feist Publications*, *Inc. v. Rural Telephone Serv. Co.*, 499 U.S. 340, 361 (1991).

Direct evidence of copying is rare. Most plaintiffs instead "establish an inference of copying" by demonstrating: (1) that the defendant had access to the plaintiff's copyrighted works; and (2) that the defendant's works are substantially similar to the copyrighted works. *Tiseo Architects*, *Inc. v. B & B Pools Serv. and Supply Co.*, 495 F.3d 344, 347 (6th Cir. 2007). I have already addressed similarity between the parties' designs in a previous order. (Doc. 129).

Here, I consider the preliminary questions: whether DB owns the copyrights in question; whether those copyrights are valid; and whether

*Transfiguration Monastery v. Gregory*, 689 F.3d 29, 41 (1st Cir. 2012)); *see also e.g., Lone Ranger Television, Inc. v. Program Radio Corp.*, 740 F.2d 718, 719, 721 (9th Cir. 1984) (copyright transfers from one corporation to another through a merger was a valid transfer of ownership).

"Such cases . . . focus on whether the author of the transfer provided express or implied consent to such change of ownership." *Soc'y of the Holy Transfiguration*, 689 F.3d at 41. If it did, the transfer is considered effective, meaning that "a transfer by operation of law is a voluntary transfer done on the part of the copyright owner to another." *Id*. \*14

In affidavits attached to its motion for summary judgment, plaintiff explains that Design Basics, Inc. did, in fact, "voluntarily transfer" its copyrights to Design Basics, LLC.

Business partners Myles Sherman and Patrick Carmichael purchased Design Basics, Inc. in 2009, and in the process, created DBI Holdings, a Nebraska limited liability company. The partners merged the companies and transferred the corporation's assets-including "*all* . . . copyrighted works in which Design Basics, Inc. had an ownership interest"-to the surviving LLC. Following the merger, they renamed DBI Holdings "Design Basics, LLC," "the plaintiff entity in the above-captioned case." (Doc. 83-2, ID 2876-77).

DB may not be the presumptive owner of copyrights registered in the name of Design Basics, Inc., but "there is no genuine dispute" that it inherited the corporation's assets through merger.[5] *See* Fed. R. Civ. P. 56(a). And under Nebraska law, "[a]ll property . . . and every other interest belonging to . . . any . . . business entities, as merged or consolidated" are "deemed to be transferred to and vested in the surviving or new limited partnership without further act and deed." Neb. Rev. Stat. § 67-248.02(d)(5). This means the "merger transferred the copyrights owned by

---

of this made access to DB's home plan designs.

I note at the outset that copyrights registered within five years of publication "constitute prima facie evidence of the copyright and the facts stated within the certificate." 17 U.S.C. § 410(c). "A certificate of registration, if timely obtained," therefore creates a rebuttable presumption "both that the copyright is valid and that the registrant owns the copyright." *Gen. Universal Sys., Inc. v. Lee*, 379 F.3d 131, 141 (5th Cir. 2004); *see also Monogram Models, Inc. v. Industro Motive Corp.*, 448 F.2d 284, 286 (6th Cir. 1971).

## A. Ownership

First, although DB produced certificates of copyright registration for all eighteen of the \*13 allegedly-infringed plans, FWH notes that plaintiff does not enjoy a presumption of ownership because the copyrights are registered in the name of Design Basics, Inc., not Design Basics, LLC. Moreover, according to Gugliotta's research, Design Basics, Inc. never recorded a transfer of its ownership interests to Design Basics, LLC at the United States Copyright Office. *See* 17 U.S.C. § 205(a).

Neither defect is fatal.

"Copyrights, like other property rights, may be transferred from the owner to another entity." *Taylor Corp. v. Four Seasons Greetings, LLC*, 403 F.3d 958, 963 (8th Cir. 2005) (citing 17 U.S.C. § 201(d)). DB argues it became the owner of the former company's copyrights not by "instrument of conveyance" recorded at the Copyright Office, but by "operation of law," as permitted under 17 U.S.C. § 204(a).

"Cases dealing with copyright transfers by operation of law are scarce." *Design Basics, LLC v. DeShano Companies, Inc.*, 2012 WL 4321313, \*4 (E.D. Mich.); *see also Taylor*, *supra*, 403 F.3d at 963 (collecting cases). Those that address the issue "generally concern transfer by operation of state law, often arising from corporate mergers or dissolutions." *Id*. (citing *Soc'y of the Holy*

casetext

Basics, Inc. to Design Basics, LLC." *DeShano*, *supra*, 2012 WL 4321313 at *5 (reaching the same conclusion).

> 5 I note an inconsistency between FWH's claim that Sherman and Carmichael acquired Design Basics, Inc. to go trolling with its copyrights (in which they had, presumably, a lawful interest) and its argument here, disclaiming that DB had such an interest.

Gugliotta did not find a record of the transaction at the United States Copyright Office because Design Basics, Inc. did not have to file one. *See* 17 U.S.C. § 205(a) ("Any transfer of copyright ownership . . . *may* be recorded at the Copyright Office" (emphasis added)). Indeed, the transfer of copyright ownership "by operation of law" is an express exception to the requirement that such transfers must ordinarily be in writing. *See* 17 U.S.C. § 204(a) ("A transfer of ownership, other than by operation of law, is not valid unless an instrument of conveyance or a note or memorandum of the transfer, is in writing and signed by the owner of the rights conveyed or such owner's duly authorized agent."). "Only disputes over facts that might affect the outcome of the suit . . . will properly preclude entry of summary judgment," *Anderson*, 477 U.S. at 248, and in view of plaintiff's corporate history, a failure to record the transfer of ownership is not one of them. *See Lone Ranger Television*, 740 F.3d at 721 (rejecting a similar argument).

DB has carried its burden to demonstrate that it owns copyrights in the allegedly-infringed designs. I therefore grant plaintiff's motion for summary judgment on the issue of ownership.

## B. Validity

"The test for copyright validity is whether a work is the result of 'independent creation,' which, 'in turn means that a work must not consist of actual copying,'" *In Design v. Lynch Knitting Mills, Inc.*, 689 F. Supp. 176, 178 (S.D. N.Y. 1988) (quoting *Durham Indus., Inc. v. Tomy Corp.*, 630 F.2d 905,

910 (2d Cir. 1980)), and must "possess[] at least some minimal degree of creativity." *Feist*, 499 U.S. at 345. Works "in which the creative spark is utterly lacking or so trivial as to be virtually nonexistent . . . are incapable of sustaining a valid copyright." *Id.* at 359.

Defendants must have missed this point, because the arguments they characterize as going to the "validity" of DB's copyrights have more to do with copyright registration and scope than they do with originality-the "*sine qua non* of copyright" validity. *Id.* at 348.

Nevertheless, I address each in turn.

## 1. Deposit Materials

FWH first contends DB is "not entitled to a presumption of validity arising from its copyright registrations because . . . DB failed to submit a copy of the deposit materials for each work." (Doc. *16 87, ID 3349). This argument stems from the registration requirement in § 411(a).

A plaintiff cannot enforce his rights under the Copyright Act "until preregistration or registration of the copyright has been made in accordance with this title." 17 U.S.C. § 411(a). Registration or preregistration under § 411(a) is a non-jurisdictional "threshold requirement[] that claimants must complete . . . before filing a lawsuit." *Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154, 166 (2010). Those who neglect to register or preregister their copyrighted works before filing suit fail state an infringement claim as a matter of law. *Cruz v. RCA Record Label*, 2015 WL 5023121, *3 (M.D. Tenn.)

To register a copyright "in accordance with this title," one must deliver to the Copyright Office a deposit (i.e., a copy) of the work, "together with the application and fee specified by sections 409 and 708." 17 U.S.C. § 408(a). FWH posits that DB must not have filed the requisite copies of its designs because, again, according to Gugliotta "the deposit materials in many instances are no longer on file" at the United

casetext

Copyright Office. (Doc. 88-1, ID 3439; Doc. 87, ID 3352). Defendants therefore reason that DB pursued this action without proper registration and that its copyrights are, as a result, invalid.

Defendants are mistaken.

First, the factual premise for their argument is suspect.

The Copyright Office generally retains deposit copies "for the longest period considered practicable and desirable by the Register of Copyrights and the Librarian of Congress," 17 U.S.C. § 704(d), which in Gugliotta's experience is "at least five years." (Doc. 88-1, ID 3439 n.5). "After that period," the Register of Copyrights and the Librarian of Congress have "joint discretion . . . to order their destruction or other disposition." 17 U.S.C. § 704(d). *17

Most of DB's copyrights are twenty to thirty years old-well past the estimated five-year retention period. And I can presume that the original registrant (Design Basics, Inc.) filed all necessary application materials because the Copyright Office ultimately issued certificates of registration for these designs approximately twenty to thirty years ago. *See* 17 U.S.C. §§ 408(a), 410(c). Taking these facts as true, the most likely reason the deposit copies are, in "many instances . . . no longer on file" is not because the original registrant never filed them, but because "the Register and the Librarian . . . order[ed] their destruction or other disposition" following the minimum five-year retention period. 17 U.S.C. § 704(d).

Second, the conclusion defendants' draw from their unlikely premise is incorrect; errors in copyright registration do not render a copyright invalid.

By focusing on the deposit requirements, defendants "conflate the statutory formality of registration with the burden of proving the content

of the allegedly-infringed work." *Enter. Mgmt. Ltd. v. Warrick*, 717 F.3d 1112, 1119 (10th Cir. 2013). "The two are separate issues." *Id.*

"Copyright registration is not a prerequisite for copyright protection"-that is, for the existence of an underlying copyright. *Id.* (citing 17 U.S.C. §§ 102, 408(a)). An author holds a valid copyright in his work from "the moment an original idea leaves the mind and finds expression in a tangible medium, be it words on a page, images on a screen, or paint on a canvas." *Kernel Records Oy v. Mosley*, 694 F.3d 1294, 1301 (11th Cir. 2012) (citation and brackets omitted); *see also* 17 U.S.C. § 102(a). And the validity of such copyright does not turn on whether the author has also completed the "threshold requirement[]" for filing suit in federal court.[6] *Reed Elsevier*, 559 U.S. at *18 166.

> [6] The Sixth Circuit has likewise embraced "the unremarkable proposition that although an action for infringement cannot be enforced until § 411's filing requirements have been satisfied, copyright protection extends retroactively to the time the artist creates the work." *Dice Corp. v. Bold Techs.*, 556 F. App'x 378, 386 n.3 (6th Cir. 2014) (citing *Coles v. Wonder*, 283 F.3d 798, 801 (6th Cir. 2002)).

On the contrary, "Congress made sure . . .that the registration system did not extinguish the automatic creation and recognition of copyrights" by explicitly declaring that "registration is not a condition of copyright protection." *La Resolana Architects, PA v. Clay Realtors Fire Angel*, 416 F.3d 1195, 1199 (10th Cir. 2005) (quoting in part 17 U.S.C. § 408(a)), *abrogated on other grounds by Reed Elsevier*, *supra*, 559 U.S. at 159 n.2. Registration is therefore "necessary only as a prerequisite to suing for infringement," not to demonstrate copyright validity. *Warrick*, 717 F.3d at 1119.

And DB has, in any event, satisfied the registration requirement. Its predecessor Design Basics, Inc. applied for and received certificates of

copyright registration for all eighteen designs either as "pictorial, graphic, and sculptural works," 17 U.S.C § 102(a)(5), "architectural works," 17 U.S.C. § 101, or both. Plaintiff is therefore within its rights to sue FWH in federal court. *See* 17 U.S.C. § 411(a).

DB also submitted copies of all relevant deposit materials in support of its motion for summary judgment, leaving no question that "the underlying [designs] are in fact the [designs] for which the certificates of registration are issued." *Cf. Alaska Stock, LLC v. Pearson Educ., Inc.*, 975 F. Supp.2d 1027, 1039 (D. Alaska 2013). This is simply not a case in which "it is impossible for the Defendants (or the Court) to compare whatever works may have been registered by the Copyright Office to the allegedly infringing products." *Lanard Toys, Ltd. v. Novelty, Inc.*, 2007 WL 2439505, *6-7 (C.D. Cal. 2006).

Gugliotta's claim that the deposit materials are, "in many instances . . . no longer on file" *19 at the Copyright Office amounts to no more than a "scintilla of evidence" undermining DB's right to pursue an infringement action. *Anderson*, 477 U.S. at 252. It is not "evidence on which the jury could reasonably find for" defendants *id.*, and does not create a genuine issue of fact as to the validity of DB's copyrights.[7]

> [7] FWH also insists that "DB has an obligation to ensure that the Copyright Office maintains copies of its deposit material." (Doc. 87, ID 3350). As far as I can tell, it doesn't. Defendants cite no authority for this proposition, which is an unlikely one given that the Act expressly grants the Copyright Office discretion to destroy and dispose of deposit materials. *See* 17 U.S.C. § 704(d). The sole authority I have found on point also suggests just the opposite: "neither the Copyright Office nor the Library of Congress wants to keep every copy of every work submitted to it. Moreover, it is not necessary for the institution of an infringement action for the deposit material to be retained by either the Copyright Office or the Library of Congress." Howard B. Abrams, 1 The law of Copyright §10:66 Retention of Deposits (Oct. 2017 Update) (footnote omitted).

## 2.  Designs Not Registered as "Architectural Works"

Taking up Gugliotta's point, FWH next contends that five of DB's designs are ineligible for protection under the Architectural Works Copyright Protection Act (AWCPA) because they were created before the AWCPA's effective date. This claim requires some unpacking.

Copyright law protects "original works of authorship fixed in any tangible medium of expression." 17 U.S.C. § 102(a). Works of authorship include "pictorial, graphic, and sculptural works," also referred to as PGS works. *Id.* at § 102(a)(5). "Until 1990, architectural works could be registered only as 'technical drawings' under the category" of PGS works. *Nat'l Med. Care, Inc. v. Espiritu*, 284 F. Supp.2d 424, 434 (S.D. W. Va. 2003).

Once awarded, a "copyright . . . gives its owner . . . the exclusive right 'to reproduce the copyrighted work' and 'to prepare derivative works based upon the copyrighted work.'" *Robert R. Jones & Assocs., Inc. v. Nino Homes*, 858 F.2d 274, 277 (6th Cir. 1988) (quoting 17 U.S.C. § 106). *20 "Anyone who violates this exclusive right infringes on the owner's copyright." *Espiritu*, 284 F. Supp.2d at 433.

But at the same time, the "power to prohibit unauthorized reproduction is inherently limited." *Nino Homes*, 858 F.2d at 277. It does not "extend to any idea, procedure, process, system, method of operation, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work." 17 U.S.C. § 102(b). "Only the original expression of an idea embodied within a copyrighted work is protected by copyright law," the idea itself is not. *Espiritu*, 284 F. Supp.2d at 433; *see also Wickham*

*Int'l Energy Exposition, Inc.*, 739 F.2d 1094, 1097 (6th Cir. 1984) ("The 'idea' of a tower structure certainly is not copyrightable.").

Architectural plans are also "subject to certain qualifications peculiar to this form of work" based on the useful article doctrine. *Nino Homes*, 858 F.2d at 278 (citation omitted).

Section 113(b) of the Act "provides that a PGS copyright of a 'useful article,' such as a building, does not extend to the manufacture of the article itself." *Oravec v. Sunny Isles Luxury Ventures, L.C.*, 469 F. Supp.2d 1148, 1162 (S.D. Fla. 2006) *aff'd* 572 F.3d 1218 (11th Cir. 2008). Accordingly, "[u]nder the 1976 Copyright Act, an architect had *no exclusive right* to build structures depicted in his or her technical writings." Stuart E. Jones, *Copyright Protection of Architectural Works: My House is My Castle, but can I Protect it from Infringement?* 8 Intell. Prop. L. Bull. 1, 4 (2003). A "PGS copyright protected the underlying design from being copied, but it did not prevent the construction of a building based on those plans." *Oravec*, 469 F. Supp.2d at 1162.

This left architects little recourse against homebuilders who "cop[ied] a structure depicted in the plans, without copying the plans themselves." *Espiritu*, 284 F. Supp.2d at 435. "[A] building is not a 'copy' of the underlying plans, with the result that construction of the structure does not *21 constitute infringement." *Oravec*, 469 F. Supp.2d at 1162 (quoting 1 M. Nimmer & D. Nimmer, Copyright, § 2.08 (1990)).[8]

[8] Likewise, "there was no protection for the copying of the building itself." Jones, *supra*, at 4. "For example . . . a person could go to a building, take measurements, make sketches, or otherwise record the building and replicate without obtaining permission from the original designer of the building." *Guillot-Vogt Assocs., Inc. v. Holly & Smith*, 848 F. Supp. 682, 686 (E.D. La. 1994).

Things changed in 1990 with the enactment of the AWCPA, which extended copyright protection to "architectural works"-the "design of a building as embodied in any tangible medium of expression, including the building, architectural plans, or drawings." 17 U.S.C. § 101; *see also* 17 U.S.C. § 102(a)(8). Thanks to the 1990 amendment, the "holder of a copyright in an architectural plan" can now avail himself of two distinct protections: "one under the provision for an 'architectural work' under 17 U.S.C. § 102(a)(8), and another under the provision for a 'pictorial, graphical, or sculptural work' under 17 U.S.C. §102(a)(5)." *T-Peg, Inc. v. Vermont Timber Works, Inc.*, 495 F.3d 97, 109-110 (1st Cir. 2006).

Defendants argue that five of DB's designs (the Kendall, the Sherburne, the Lancaster, the Carrington, and the Galvin) are ineligible for protection as architectural works because they were created before December 1, 1990-the effective date of the AWCPA. *See* AWCPA § 706, Pub. L. No. 101-650, 104 Stat. 5089, 5134 (1990). They therefore reason that "DB cannot prove it owns valid copyrights" in these designs. (Doc. 87, ID 3352).

I disagree.

DB concedes that predecessor Design Basics, Inc. created four of the plans (the Kendall, the Sherburne, the Lancaster, and the Carrington) before December 1, 1990. But plaintiff holds *22 copyrights in those designs as PGS works, not as architectural works. And "[t]he enactment of the AWCPA did not affect the scope of copyright protection afforded to architectural works registered only as technical drawings." *Espiritu*, 284 F. Supp.2d at 434; *see also Guillot-Vogt*, 848 F. Supp. at 686.

Moreover, plaintiff's claims are not limited to the alleged manufacture and sale of infringing homes. DB also accuses FWH of "publicly displaying," "scanning, copying, and/or reproducing

casetext

unauthorized copies" of DB's designs, acts that violate the exclusive rights of a PGS copyright holder. (Doc. 58, ID 1227-29).[9]

[9] In addition to damages for unauthorized copying, DB claims damages from the sale of homes that infringe on its PGS works copyrights, despite the "long line of case law supporting [the] position that a PGS copyright . . . did not prevent the construction of a building based on [the copyrighted] plans." *Oravec*, 469 F. Supp.2d at 1162. Plaintiff relies on the Sixth Circuit's decision in *Nino Homes*, a pre-AWCPA case holding that "where someone makes infringing copies of another's copyrighted architectural plans, the damages recoverable by the copyright owner include the losses suffered as a result of the infringer's subsequent use of the infringing copies," i.e., lost profits for the sale of infringing homes. 858 F.2d at 280. But *Nino Homes* does not necessarily guarantee DB lost-profits damages in the instant case. For one, *Nino Homes* aimed to fix a problem that now no longer exists. A modern-day PGS works copyright holder can prevent the construction of a building based on her designs by separately registering them as architectural works. Unlike the *Nino Homes* plaintiff, who could register his design only as a PGS work, DB had the option to seek architectural-works protection, but, for a number of its designs, failed to do so. For another, the *Nino Homes* court expressly "limited" its holding to the facts presented there: "our decision rests in large part on the convincing evidence that [defendants] directly copied the Aspen plans themselves and did not merely duplicate the house." *Id.* at 280 n.5. "The same result would not necessarily obtain if the alleged infringer merely made houses which were substantially similar to those depicted in the copyrighted plans." *Id.* If FWH's homes are "merely . . . substantially similar" to DB's designs, and there is no evidence that

defendants "directly copied" them, *Nino Homes* may be inapposite. I leave this question for the damages stage, assuming we reach it.

As for the Galvin, DB first published that design on December 1, 1990, making it eligible *23 for registration as both an architectural work and a PGS work, *see* 37 C.F.R. § 202.11(d)(3) (excluding designs published *before* December 1, 1990, from AWCPA protection), although plaintiff apparently only registered the design as the latter, and not the former. (*See* Doc. 83-19).

The same goes for Shannon, the Monte Vista, the Harrisburg, the Chandler and the Ambrose. Regardless of eligibility, DB submitted certificates of registration demonstrating that it registered these designs as PGS works, but offered nothing to prove that it also registered them as architectural works. (*See* Docs. 83-6, 83-13, 83-16, 83-17, 83-20, 83-21).[10]

[10] "An author seeking to register a work under both categories must submit separate registrations." *Attia v. Soc'y of New York Hosp.*, 201 F.3d 50, 53 n.3 (2d Cir. 1999); *see also* 37 C.F.R.§ 202.11(c)(4) ("Where dual copyright claims exist in technical drawings and the architectural work depicted in the drawings, any claims with respect to the technical drawings and architectural work must be registered separately."). To identify the copyrighted work as either a PGS or architectural work, I consult the "nature of authorship" section of the certificates of registration. *See Axelrod & Chervney Architects, P.C. v. Winmar Homes*, 2007 WL 708798,*3-5 (E.D. N.Y.) (explaining that "the [Copyright] Office's practice has always been to look to the 'nature of authorship' statement" in the registration application to determine "the general character or the type or category of the work being registered" (citation omitted)).

casetext

Design Basics, LLC v. Forrester Wehrle Homes, Inc.    Case No. 3:15CV00666 (N.D. Ohio Mar. 30, 2018)

whether the nature of the . . . drawings is architectural, technical, or otherwise, they can be the subject of copyright protection as [PGS] works under 17 U.S.C. § 102(a)(5) if the other requirements of the Act are satisfied." *Guillot-Vogt*, 848 F. Supp. at 687. And as I understand plaintiff's complaint, DB is pursuing infringement claims based on defendants' alleged misuse of the Kendall, the Sherburne, the Lancaster, the Carrington, the Galvin, the Shannon, the Monte Vista, the Harrisburg, the Chandler, and the Ambrose exclusively as PGS works. "Consequently, defendants' argument that the drawings are not within the scope of copyright because they are not architectural [works] is without merit." *Guillot-Vogt*, 848 F. Supp. at 687.

DB is not at fault for failing to satisfy the "threshold requirement" of registering these designs *24 as architectural works "before filing a lawsuit." *Reed Elsevier*, 559 U.S. at 166.

## 3. Originality

Lastly, FWH urges me to deny DB summary judgment on validity because "none of DB's plans are original or creative." (Doc. 87, ID 3352-53). I disagree.

"To garner copyright protection, a particular work must be original, meaning 'that it possess at least some minimal level of creativity.'" *Design Basics I*, 2017 WL 5467152 at *4 (quoting *Feist*, 499 U.S. at 345). "Because DB holds certificates of copyright registration" in the allegedly-infringed works, "I presume its designs satisfy the 'extremely low' creativity threshold for originality." *Id.* (quoting *Feist*, 449 U.S. at 345). Here too then, "the burden shifts to the defendants to rebut this presumption of validity." *Architects Collective v. Pucciano & English, Inc.*, 247 F. Supp.3d 1322, 1337 (N.D. Ga. 2017) (citation omitted).

I spoke at length about the nature of original expression in architectural works in my earlier order requesting supplemental briefing:

> Copyright protection can extend to the 'overall form as well as the arrangement and composition of spaces and elements in the design, but does not include individual standard features.' Nor does protection extend to the 'standard configurations of spaces as well as common windows, doors, and other stable building components.'

*Design Basics II*, 2017 WL 5444569 at *3 (quoting 17 U.S.C. §101; also quoting *Lennar Homes of Texas Sales and Marketing, Ltd. v. Perry Homes*, LLC, 117 F. Supp.3d 913, 934 (S.D. Tex. 2015)).

"Where the defendant challenges the originality of copyrighted material, the presumption of validity will not be overcome unless the defendant offers either (1) proof that the product was copied from other works or (2) 'similarly probative evidence as to originality.'" *Lennar Homes*, 117 F. *25 Supp. 3d at 930 (quoting *Masquerade Novelty, Inc. v. Unique Indus.*, 912 F.2d 663, 668-69 (3d Cir. 1990)). FWH offers neither.

Defendants' argument on originality, in its entirety, states:

> Design Basics['] residential designs do not contain protected original individual features nor are the total composition/plan/exterior appearances of each design protected unique expressions that would comply with the required component of 'original expression.' This is because the models 'are standard and customary residences composed of standard features/materials/assemblies in existence and available to designers/builders/homeowners for several decades but incorporate current technology that comply with industry standards, building codes, manufacturer recommendations and expectations as well as satisfy desired function and efficiency construction plus cost containment for builders.'

ID 3353 (alterations and record citations omitted)).

Setting aside that this assertion is premised on portions of an expert report I previously excluded as inadmissible,[11] the bigger problem with FWH's argument is that it says both everything and nothing: None of DB's designs are copyrightable because all are "standard and customary residences," consisting of "standard features/materials/assemblies" generally "available to designers/builders/homeowners" and dictated by "industry standards, building codes, manufacturer recommendations and expectations as well as . . . efficiency" and "cost containment." (*Id.*).

> [11] FWH quotes the portions of Kraly's report that I excluded because Kraly's belief that plaintiff's designs "do not merit copyright protection is a legal conclusion." *Design Basics I*, 2017 WL 5467152 at *4 (citation omitted). Unlike Kraly, defense counsel is well-positioned to advocate for specific legal conclusions in defendants' brief opposing summary judgment. I therefore consider counsel's legal arguments without resorting to Kraly's report.

This conclusory, run-on claim does not engage with any of the eighteen "standard and customary residen[tial]" designs in dispute, specifically identify any of their "standard features/materials/assemblies," or explain how those "features/materials/assemblies" are in fact dictated by "industry standards, building codes, manufacturer recommendations . . . efficiency" or *26 "cost containment," as opposed to creative thoughtful design.

The same goes for defendants' claim that "DB's plans are merely derivative works and do not qualify for copyright protection." (Doc. 87, ID 3355).

A derivative work is a design plan based on a preexisting plan for which copyright protection extends "only to the material contributed by the author of such work, as distinguished from the preexisting material employed in the work." 17 U.S.C. § 103(b). FWH identifies only one such derivative work, the Crimson Creek plan, which it characterizes as "virtually identical to joining two" units of the Kirby Farms plan, provided that the viewer ignore "a few exterior aesthetic differences." (*Id.*).

Defendants do not explain what these "few exterior aesthetic differences"are, how they fail to qualify the Crimson Creek for protection as a derivative work, or how this point is relevant, given that DB holds copyrights in both the original, and derivative designs, and accuses FWH of copying both. *See Dorchen/Martin Assoc., Inc. v. Brook of Cheboygan, Inc.*, 2012 WL 4867608, *27 *5-6 (E.D. Mich.).[12] *27

> [12] DB interprets defendants' derivative-works complaint as one about its failure to properly register the Crimson Creek plan, rather than one about lack of originality. Because this is a better argument than the one defendants actually made, I address it: Section 409 of the Copyright Act requires applicants seeking to register derivative works to "identif[y] . . . any preexisting work or works that it is based on or incorporates" and provide "a brief, general statement of the additional material covered by the copyright claim being registered." 17 U.S.C. § 409(9). FWH concedes it failed to name the Kirby Farms plan as source material when it applied to register the Crimson Creek plan. Still, this does not invalidate the Crimson Creek registration because "[t]he issue raised by § 409(9) is whether and to what extent the derivative design incorporates elements designed by someone else." *See Dorchen/Martin.*, 2012 WL 4867608 at *5 (quoting *Frank Betz Assoc., Inc. v. O.J. Clark Const., LLC*, 2010 WL 2253541, *11 (M.D. Tenn.)). "Where the . . . Plaintiff created derivative designs based on its own original designs, 'the concerns that § 409(9) raises are not implicated.'" *Id.* (quoting

14

*Dirk Betz, supra,* 2010 WL 2253541 at *11)). Because DB utilized its own Kirby Farms plan to create the Crimson Creek plan, "[i]ts failure to inform the Copyright Office of this information did not deprive [the Office] from fully evaluating its application," and plaintiff is entitled to enforce its rights in both works in federal court. *Id*. at *6.

"Of course [as] the party seeking summary judgment," DB "bears the initial responsibility of informing the district court of the basis for its motion, and identifying" the evidence that "it believes demonstrate the absence of a genuine issue of material fact." *Celotex, 477 U.S. at 323.* But DB has done that. Plaintiff's certificates of copyright registration are presumptive proof of originality, which defendants may rebut only by going "beyond the pleadings" and designating "specific facts showing there is a genuine issue for trial." *Id*. (citation omitted).

Rule 56 requires me to "'resolve any factual issues of controversy in favor of the non-moving party' only in the sense that, where the facts specifically averred by that party contradict facts specifically averred by the movant, the motion must be denied." *Lujan v. Nat'l Wildlife Federation, 497 U.S. 871, 888* (1990) (citation omitted). FWH has not averred to any such facts.

Beyond that, the suggestion that a presumptively original architectural or PGS work is in fact, not original because its elements are entirely "dictated by functional demands" finds little support in the case law. *Lennar Homes, 117 F. Supp.3d at 931.* Defendants do not "cite a single case finding a copyright invalid on these grounds" and, evidently, neither could at least one other district court examining the same issue. *See id*.

The only precedent FWH directs me to is *Sari v. America's Home Place, Inc., 129 F. Supp.3d 317* (E.D. Va. 2015), wherein the court found originality lacking because the plaintiff in that case paid the designer "$500 to copy an existing,

apparently quite common, floor plan." *Id.* at 326. *Sari* is inapposite here, where defendants have not proffered evidence that DB copied its plans from *28  *28 "existing . . . common" sources. *Id*.[13]

> [13] The *Sari* court also invalidated the plaintiff's copyright in a derivative architectural work, but only after the *Sari* defendants explained why the ten unique elements in the derivative plan were "either unoriginal," because the designer "got the idea from someone or something else," or "not protectable under the AWCPA" due to their functional purpose. *Sari, supra, 129 F. Supp.3d at 327.* Defendants in this case simply have not gone to the trouble to do the same.

"Conclusory allegations, speculation, and unsubstantiated assertions are not evidence, and, are not enough to defeat a well-supported motion for summary judgment." *Pearce v. Faurecia Exhaust Sys., Inc., 529 F. App'x 454, 458* (6th Cir. 2013). Because defendants offer nothing more than that, I grant DB's motion for summary judgment with respect to its ownership of valid copyrights in the eighteen designs at issue, including the Kendall, Sherburne, Lancaster, Carrington, Galvin, Shannon, Monte Vista, Harrisburg, Chandler, and the Ambrose exclusively as PGS works.

## C. Access

Finally, the remaining issue: FWH's alleged access to the protected works.

"Access is essentially hearing or having a reasonable opportunity to hear" or in this case, to see, "the plaintiff's work and thus having the opportunity to copy." *Murray Hill Publications, Inc., v. Twentieth Century Fox Film Corp., 361 F.3d 312, 316* (6th Cir. 2004) (brackets and citation omitted). "Access may not be inferred through mere speculation or conjecture. There must be a reasonable possibility of viewing the

plaintiff's work-not a bare possibility." *King Records v. Bennett*, 438 F. Supp.2d 812, 846 (M.D. Tenn. 2006) (citation omitted).

As I noted earlier, defendant Forrester Wehrle Homes, Inc., (FWHI) ordered a series of DB plan books from plaintiff's predecessor in interest, Design Basics, Inc., between 1993 and 2003-compelling evidence that FWHI had more than "a bare possibility"of viewing, and copying, the designs featured in those books. *29

However, DB offers no similar evidence demonstrating that FWHI had access to the designs that did not appear in the DB plan books it ordered, or that defendant Wehrle Development, Ltd. (WDL) had access to any of plaintiff's protected works.

## 1. FWHI Had Access to Sixteen Protected Works

To explain, I begin with a brief word about defendants' background.

Richard Wehrle founded the original home building company Forrester & Wehrle, Inc., in the 1960's and operated the business through the early 2000's. His sons, Jeffrey and Joseph Wehrle "carr[ied] on the family legacy" by establishing their own home-building companies. Jeffery incorporated FWHI in 1999, and Joseph formed WDL in 1997. (Doc. 87-2, ID 3365; Doc. 87-3, ID 3368). DB named each of these parties (with the exception of Richard's business) as defendants in the instant suit: Richard, Jeffrey and Joseph Wehrle as individual defendants, and FWHI and WDL as entity defendants.

According to DB's records, FWHI is the entity that purchased of all the Design Basics, Inc., plan books (including those ordered in 1993 and 1996, before Jeffery's business was incorporated), and licensed the Ashton and the Albany plans. Plaintiff's records also list Jeffery Wehrle as the customer contact for the business. (Doc. 83-25).

Just as important, these same records also show that sixteen of the eighteen designs at issue (with the exception of the Tollefson and Kirby Farms plans) appeared in the DB plan books FWHI ordered. (*See* Doc. 83-26).[14] Again, defense counsel acknowledged his "clients" still had portions *30 of these plan books in their "possession" as of June 2016-years after FWHI ordered them.

[14] I note this is not at all plain on the face of exhibit 23 to plaintiff's motion for summary judgment-a chart identifying the plan books FWHI ordered from Design Basics, Inc. and listing the plans that appeared in each of the books. (*See* Doc. 83-26). Instead of identifying the designs on the chart by name (i.e., the "Newlin" or the "Kirby Farms") plaintiff identifies them with four-digit numbers, which the reviewer must then match with the four-digit number appearing on a particular design's certificate of registration. For example, the Newlin corresponds to 2951, and 2951 also appears as the "Plan No." on the Newlin's certificate of registration. (*Compare* Docs. 83-26, 83-10). This system is not intuitive. And plaintiff did not explain it to me-I discerned it myself after a careful review of the record. DB admits the Tollefson did not appear in the plan books FWHI purchased, but says nothing about the Kirby Farms plan. There is, however, a four-digit number on the chart (8053) which is one digit off from a match with the four-digit "Plan No."on the Kriby Farms' certificate of registration (8093). No matter. I am not obligated to assume this is a typographical error, nor am I obligated to interpret ambiguous evidence in plaintiff's favor, particularly given that plaintiff is the moving party. Plaintiff has not established the Kriby Farms design appeared in the DB plan books, and thus has not established that FWHI had access to this design. --------

Design Basics, LLC v. Forrester Wehrle Homes, Inc.    Case No. 3:15CV00666 (N.D. Ohio Mar. 30, 2018)

counsel's reference to his "clients" is arguably ambiguous (as he represents all named defendants), evidence elsewhere in the record confirms that those unidentified "clients" likely included FWHI, not only because the company ordered the DB plan books directly from Design Basics, Inc., but because a former FWHI employee recognized them. Specifically, Thomas Flowers, who designed for FWHI between 1998 and 2006, and worked for the company as an independent contractor thereafter, testified that he recalled seeing at least one of the DB-brand plan books Jeffrey allegedly ordered "in the library . . . [or] like a conference room" at the firm's office. (Doc. 99-1, ID 4027-30).

Taken together, this evidence "clearly shows" that FWHI had a reasonable opportunity to view, and therefore to copy, the sixteen home designs featured in the DB plan books. *See Nino Homes*, 858 F.2d at 277 ("The photocopy found in the firm's files clearly shows that the architects had an opportunity to view [the plaintiff's] design."). DB thus carried its burden to demonstrate FWHI had access to these protected works.

Defendants' arguments to the contrary are unpersuasive.

First, they point to Jeffery Wehrle's affidavit, which disputes plaintiff's business records. *31 Wehrle attests that he "never purchased anything from DB," and does not know "who may have ordered" the DB plan books. (Doc. 87-2). He acknowledges "[c]ertain copies of DB's plan books have been present" in FWHI's office, (*id.* at 3366), but posits that this is only because Design Basics, Inc. sent FWHI unsolicited mail advertisements. Jeffery maintans, further, that he never "receive[d]," "review[ed]," or "utilize[d]" the plan books, and "[n]one of [FWHI's] designers have ever utilized a DB plan book within the scope of their employment." (*Id.*).

But his affidavit proves too much, to no end. "Access merely means an opportunity to view the protected material"; it does not require proof that a particular individual reviewed or utilized the plaintiff's protected works. *Nino Homes*, 858 F.2d at 277. "[T]he copyright holder need not necessarily prove access on the part of the alleged infringer, so long as there is proof that the person who composed the allegedly-infringing work had access to the copyrighted material." *Id.*

If FWHI's designers had a "reasonable *opportunity*" to view DB's plan books, *Murray Hill*, *supra*, 361 F.3d at 316 (emphasis added), then DB has established access. Plaintiff need not prove that they actually used the plan books to draft FWHI's designs. Thus, Wehrle's "testimony that [he] never heard of Plaintiff or reviewed the plan books is not conclusive." *DeShano*, *supra*, 2012 WL 4321313 at *15 ; *see also e.g.*, *Ronald Mayotte & Assoc. v. MCG Bldg. Co.*, 885 F. Supp. 148, 152 (E.D. Mich. 1994) ("Plaintiffs . . . established the likely existence of access" based on their distribution of brochures in the area and because their model home was two miles away from the allegedly-infringing home, "despite the [defendant business owner's] affidavit . . . stating that he never viewed Plaintiffs' plans.").

Relatedly, defendants also maintain that FWHI's mere "corporate receipt" of DB's plan books is insufficient to prove "possession by another [unknown] corporate employee who allegedly *32 infringed the work[s]." *Blige*, 558 F.3d at 492-93. Several Circuit Courts, including the Sixth, "have rejected 'bare corporate receipt' as sufficient proof of access, requiring plaintiffs to introduce some evidence that it was 'reasonably possible that the paths of the infringer and the infringed work crossed.'" *Id.* at 493 (citations omitted, collecting cases).

Yet here, DB's evidence does show a reasonable possibility "that the paths of the infringer and the infringed work crossed" at FWHI. Even if Jeffery Wehrle did not order the DB plan books, he agrees "[c]ertain copies of DB's plan books have been present" in FWHI's office-the same plan book materials Flowers recognized from the "library" or

conference room," and the same that defense counsel confirmed have been in his "clients' possession" though the start of this litigation.

What is more, the DB plan book pages still in FWHI's "possession" featured handwritten notes, marks, paperclips and corner folds-convincing proof that someone, at some point, consulted them. For example, a notation on the page featuring DB's "Bennett" design (which is not among the eighteen plans in dispute), remarks, "Great plan like Freeport." (Doc. 98-13, ID 3856). And a post-it note paced at the center of the "Bristol" plan page (also not at issue) declares, "nice plan, open kitchen area, good master." (*Id*. at 3857). These remarks corroborate Flowers' claim that FWHI design employees had ready access to the DB plan books.

In sum, DB has shown FWHI's access to the sixteen protected works went beyond "bare corporate receipt." *Cf. Blige*, *supra*, 558 F.3d at 492-93. I therefore grant plaintiff's motion for summary judgment on the issue of FWHI's access to these sixteen plans.

## 2. FWHI Did Not Have Access to the

## Tollefson or Kriby Farms Plans

Of course, that still leaves the two designs not featured in the plan books FWHI ordered: the Tollefson and the Kriby Farms plans. *33

Plaintiff argues defendants had access to these designs nonetheless because DB "has maintained a huge website since 1996, which display[s] elevations and floor plans for each of the [designs] at issue," including the Tollefson and the Kirby Farms. (Doc. 83, ID 2869). But standing alone, the fact that plaintiff posted its protected works online demonstrates "nothing more than the bare possibility that Defendants might have seen the plans," *DeShano*, *supra*, 2012 WL 4321313 at *13, not proof that they had the opportunity to copy them.

Among the courts that have considered whether "an Internet presence may satisfy the access requirement for an infringement claim," the "weight of authority, and . . . the more persuasive analysis, rejects this argument." *Design Basics, LLC v. Lexington Homes, Inc.*, 858 F.3d 1093, 1107 (7th Cir. 2017) (footnote omitted, collecting cases). "[E]stablishing a bare possibility of access is not enough, and a plaintiff must prove that a defendant had a reasonable possibility of viewing the work. Applying this doctrine, courts have consistently refused to treat internet publication alone as sufficient to engender this requisite possibility." *Id*. (quoting *Cain v. Hallmark Cards, Inc.*, 2016 WL 3189231, * 5 (M.D. La.) (ellipsis omitted)). In this case, I join them.

Because DB has not shown that FWHI had a reasonable opportunity to view the Tollefson and Kirby Farms plans, I deny its motion for summary judgment on the issue of FWHI's access to these designs.

## 3. WDL Did Not Have Access to the Protected Works

DB's access argument fails against Joseph Wehrle's business, WDL, for much the same reason. Plaintiff points to nothing more than its internet presence as proof that WDL had a "reasonable opportunity" to see, "and thus . . . to copy" plaintiff's designs. *Murray Hill*, 361 F.3d at 316 (citation omitted). *34

Unlike FWHI, WDL did not have a history of ordering products from plaintiff, or from plaintiff's predecessor in interest, Design Basics, Inc. And unlike Jeffrey, Joseph attests that "copies of DB plan books," even unsolicited copies, "have never been . . . present" in WDL's office. (Doc. 87-3). DB offers no testimony from WDL employees to contradict him.

Instead, plaintiff falls back on the admission from defense counsel Stoffers-that the DB plan book remnants were in his "clients' possession," up until June 2016, and implies that the plural "clients"

included WDL. But plaintiff never clarified this point in discovery, and proffers no evidence that Jeffery's business shared the plan books, or any resources, such as employees or office space, with Joseph's business. *See Blige*, 558 F.3d at 491 ("Although evidence that a third party with whom both the plaintiff and defendant were dealing had possession of plaintiff's work is sufficient to establish access by the defendant, access may not be inferred through mere speculation or conjecture."(citation omitted)).

Speculation and conjecture do not support an inference of access. Accordingly, I deny DB's motion for summary judgment on the issue of access with respect to WDL.

## Conclusion

It is, therefore,

ORDERED THAT:

1. DB's motion to exclude defense expert Gugliotta's report (Doc. 84), be, and the same hereby is, granted in part and denied in part, as provided herein;

2. FWH's objection to the affidavit of James Rogers and the exhibits attached thereto, and its motion to strike plaintiff's argument based thereon (Doc. 100), be, and the same hereby is, overruled and denied;

3. DB's motion for summary judgment with respect to its ownership of copyrights in, and defendants' access to, the Ashton and Albany designs (Docs. 83, 98) be, and the same hereby is, denied;

4. DB's motion for summary judgment with respect to its ownership of valid copyrights in the eighteen designs at issue (Doc. 83), be, and the same hereby is, granted as provided herein, including the Kendall, Sherburne, Lancaster, Carrington, Galvin, Shannon, Monte Vista, Harrisburg, Chandler, and the Ambrose exclusively as PGS works;

5. DB's motion for summary judgment with respect to FWHI's access to the copyrighted works (Doc. 83) be, and the same hereby is, granted as to the Kaiser, Kendall, Shannon, Sherburne, Newlin, Monte Vista, Lancaster, Franklin, Harrisburg, Chandler, Glavin, Carrington, Ambrose, Gabriel Bay, Tilmer's Run, and the Crimson Creek plans;

6. DB's motion for summary judgment with respect to FWHI's access to the copyrighted works (Doc. 83) be, and the same hereby is, denied as to the Tollefson and Kirby Farms plans; and

7. DB's motion for summary judgment with respect to WDL's access to the copyrighted works (Doc. 83) be, and the same hereby is, denied in full.

So ordered.

/s/ James G. Carr

Sr. U.S. District Judge

Design Basics, LLC v. Forrester Wehrle Homes, Inc.    Case No. 3:15CV00666 (N.D. Ohio Mar. 30, 2018)



No. 96 Civ. 5791(HB)

United States District Court, S.D. New York

# Time, Inc. v. Kastner

972 F. Supp. 236 (S.D.N.Y. 1997)

Decided Jul 31, 1997

No. 96 Civ. 5791(HB).

237  July 31, 1997. *237

David B. Wolf, Time Inc., New York City, for Plaintiffs.

Raymond J. Dowd, New York City, for Defendants.

## OPINION AND ORDER

BAER, District Judge.

Plaintiffs brought this cause of action seeking a declaratory judgment that defendants failed to acquire any of the copyright interest in an article entitled "The Predator" published by Time Inc.'s *Fortune* magazine, and claiming interference with prospective contractual relations. Defendants counterclaimed and alleged a cause of action for breach of contract, quantum meruit and fraud. Plaintiffs moved for partial summary judgment on its first cause of action and summary judgment dismissing defendants' counterclaims. At oral argument on July 14, 1997, I granted plaintiffs' motion for summary judgment declaring that defendants have no copyright interest in the article "The Predator" and dismissing defendants' counterclaim for fraud. I denied plaintiffs' motion for summary judgment with respect to defendants' counterclaim for quantum meruit, and reserved judgment on plaintiffs' motion with respect to defendants' counterclaims for breach of contract. I write to address this remaining issue. For the reasons stated below, plaintiffs' motion for summary judgment with respect to defendants' counterclaims for breach of contract is granted.

## I. *Background*

David McClintock, an author of such books as *Indecent Exposure,* and Elliott Kastner, an independent movie producer, have known each other for almost fifteen years. In June 1995, McClintock called Kastner and told Kastner he was in dire financial straits and would appreciate any money Kastner could give him. Kastner sent him $5,000. Kastner alleges that the two agreed that in exchange, McClintock "pledged" his next project to Kastner (the "June 1995 agreement"). However, McClintock sent Kastner a letter on June 27, 1995 that stated that the $5,000 was a loan, repayable upon Kastner's demand at whatever interest rate he considered fair. Kastner alleges he never received this letter.

On November 14, 1995, *Fortune* magazine and McClintock entered into an agreement commissioning McClintock to write the article at issue here, *The Predator,* [1] and the agreement included a provision that it was to be a work for hire with *Fortune* owning all rights (including copyright) in and to the article. In early 1996, McClintock began work on the article. Kastner alleges that he collaborated with McClintock on the article, believing he owned the film rights. His belief, he contends, stemmed from his understanding of the alleged June 1995 agreement.

238  On *238 February 24, 1996, Kastner and McClintock had lunch at Cipriani's in New York and they discussed the prospect of McClintock

writing a screenplay based on the article. Kastner says it was at this meeting that he learned for the first time of McClintick's agreement with *Fortune i.e.,* that the story was a work for hire, and the fact that McClintick did not own any rights in the article. Despite this, Kastner alleges he offered McClintick $75,000 to write the screenplay and that McClintick would use his best efforts to help Kastner buy the film rights to the article from *Fortune* (the "February 1996 agreement").

> [1] The article tells the story of a Hollywood scandal involving Giancarlo Paretti who allegedly bribed the management at the bank Credit Lyonnais to fund his takeover of the MGM movie studio.

On June 6, 1996, Kastner spoke by telephone with John Huey, the Managing Editor of *Fortune,* and the two discussed the film rights to the article. Huey stated that *Fortune* might sell the rights for half of the costs they had incurred on the project. Kastner agreed that that amount sounded reasonable and asked that Huey call him back with the exact figure (the "June 1996 Agreement"). Huey never called Kastner back. Huey then hired Amanda Urban, a literary agent, to handle the negotiations for the sale of the motion picture rights. At Ms. Urban's request, Kastner made a bid for the motion picture rights, maintaining that he already had an agreement with plaintiffs for such rights. Kastner was informed by letter on June 28, 1996 that *Fortune* sold the film rights to Hallmark Entertainment and that McClintick subsequently accepted an offer from Hallmark to write a screenplay based on the article. This lawsuit ensued.[2]

> [2] After this lawsuit was initiated, McClintick sent Kastner a check for $5,000 in repayment of the June, 1995 loan.

## II. *Discussion*

Plaintiffs argue that defendants' contract counterclaims must be dismissed because they are premised on breach of oral contracts that allegedly transferred copyright ownership in the article and consequently are barred by § 204 of the Copyright Act. Plaintiffs argue, alternatively, that these alleged oral contracts are unenforceable because they are vague and indefinite. Defendant argues that the contracts fit within an exception to the rule and are not subject to § 204 and are not vague and indefinite.

### A. June 1995 and June 1996 Agreements

According to the Copyright Act, a transfer of copyright ownership is not valid "other than by operation of law . . . unless an instrument of conveyance, or a note or memorandum of the transfer, is in writing and signed by the author of the rights conveyed or such owner's duly authorized agent." 17 U.S.C. § 204(a) (1996). The Copyright Act defines transfer of copyright ownership as "an assignment, . . . exclusive license, or any other conveyance . . . of a copyright or of any of the exclusive rights comprised in a copyright . . . but not including a nonexclusive license." 17 U.S.C. § 101 (1996). Section 204 also bars breach of contract claims based on oral agreements that violate that section. *Valente-Kritzer Video v. Pinckney,* 881 F.2d 772, 774 (9th Cir. 1989); *Library Publications, Inc. v. Medical Economics Company,* 548 F. Supp. 1231, 1233-34 (E.D.Pa. 1982), *aff'd* 714 F.2d 123 (3d Cir. 1983).

The Copyright Act, then, carves out two exceptions to the writing requirement: nonexclusive licenses and transfers of ownership by operation of law. While the Copyright Act does not define transfer by "operation of law," courts in this Circuit have noted that transfers due to bankruptcy or mortgage foreclosure, where there is evidence of the author's express or implied consent of transfer ( *e.g.* his overt conduct in filing for bankruptcy), are transfers by "operation of law". *Brooks v. Bates,* 781 F. Supp. 202, 205 (S.D.N.Y. 1991).

Kastner claims that the June 1995 oral agreement with McClintick transferred ownership in the film rights to "The Predator." Similarly, Kastner claims

that during his conversation with Huey in June 1996 he "ma[de] a deal . . . for the motion picture and allied rights" of the article. Def.'s Memorandum at 12. Kastner concedes that both of these alleged agreements are based on oral statements and that there are no contemporaneous writings signed by the copyright owner to support his contentions. Indeed, *239 the only writing by the copyright owner, *Fortune,* is a letter dated June 27, 1996 that denies the existence of any agreement transferring the film rights in "The Predator." *See* Wolf Reply Aff. Ex. B. Kastner suggests that he and McClintick had a joint venture to create a film of "The Predator" and that therefore, ownership in the film rights to the article were transferred to Kastner by operation of law and thus no writing was required. Aside from the fact that not a scintilla of evidence save Kastner's allegations support this contention, the Ninth Circuit has observed in a well reasoned decision that due to "the ease with which joint ventures may be alleged and proved under the law in many states, acceptance of this argument would fatally undermine the Copyright Act's written instrument requirement ." *Konigsberg Int'l, Inc. v. Rice,* 16 F.3d 355, 357 (9th Cir. 1994). Since § 204 requires a writing for the valid transfer of copyright interests and because here no such writings existed, Kastner's contract claims with respect to the June 1995 and the June 1996 oral agreements must fail.

*B. February 1996 Alleged Agreement*

With respect to this alleged agreement, defendants contend that McClintick's promise to use his best efforts to arrange with *Fortune* the sale of the film rights to "The Predator" was an agreement that granted to Kastner the right of first refusal in the film rights. Plaintiffs argue that this alleged agreement is an unenforceable agreement to agree and therefore defendants' claim must be dismissed.

In New York, a "right of first refusal" requires the *"owner,* when and if he decides to sell, to offer the property first to the party holding the preemptive

right so that he may meet a third-party offer or buy the property at some other price ." *LIN v. Metromedia, Inc.,* 74 N.Y.2d 54, 56, 544 N.Y.S.2d 316, 542 N.E.2d 629 (1989) (emphasis added). Here, all parties concede that McClintick did not own any rights in "The Predator," and therefore, he could not have agreed to give Kastner a right of first refusal in the film rights. Consequently, this contract counterclaim must fail.

Even if McClintick were the owner of the rights to the article, Kastner's contract claim would fail on vagueness grounds alone. It is well settled that for a contract to be valid the salient terms must be set forth in sufficient detail so that the parties' intention may be ascertained with a reasonable degree of certainty. *Candid Productions, Inc. v. Int'l Skating Union,* 530 F. Supp. 1330, 1333-34 (S.D.N.Y. 1982). Even where the parties "believe that they are bound, if the terms of the agreement are so vague and indefinite that there is . . . no means by which such terms may be made certain, then there is no enforceable contract." *Deligiannis v. Pepsi-Co, Inc.,* 757 F. Supp. 241, 256 (S.D.N.Y. 1991) (citing *Candid Productions,* 530 F. Supp. at 1333-34). Therefore, where a contract does not have such essential terms as the time or manner of performance or price to be paid, the contract is unenforceable. *Id.*

In the instant case, deposition testimony establishes that the February 1996 agreement consisted of McClintick stating that "he had a good relationship with the senior editor [at *Fortune*] and that he was confident that [McClintick and Kastner] could work the movie project out." Wolf Aff. Ex. 1 at 88-89. Furthermore, McClintick's deposition testimony reflects his belief that after this conversation he had obligated himself to giving Kastner the "pole position" *i.e.,* if someone bid on the film rights to the article, Kastner would have the opportunity to top that offer.[3] Material terms, however, such as the timing or manner by which McClintick would secure Kastner's right of first refusal from *Fortune* are missing, to say nothing of the fact that he did

not have any rights to negotiate away. *See Pinnacle Books, Inc. v. Harlequin Enterprises, Ltd.,* 519 F. Supp. 118, 122 (S.D.N.Y. 1981) (contract held unenforceable where parties agreed to use "best efforts" but failed to establish express standards to measure that performance); *cf: De Lanrentiis v. Cinematoyrafica De Las Americas, S.A.,* 9 N.Y.2d 503, 215 N.Y.S.2d 60, 174 N.E.2d 240 736 (1961) *240 (enforcing a written contract where the parties agreed to make a good faith effort to create a story outline "acceptable to both"). Indeed, McClintick's promise appears to be little more than a promise to "take care of [Kastner]" or perhaps putting in a good word when dealing with *Fortune* executives. *See Deligiannis,* 757 F. Supp. at 257. While there may be more here than meets the eye, the law seems clear that such a promise is insufficient to create an enforceable contract. *Id.* at 256-57. Consequently, because the February 1996 agreement is unenforceable, Kastner's cause of action for breach of that agreement must fail.

³ Kastner refers to this as the "right of first refusal."

III. *Conclusion*

For the reasons stated above, plaintiffs' motion for summary judgment with respect to defendants' first and second counterclaim for breach of contract is GRANTED. The parties should be prepared to try the remainder of the claims⁴ on August 25, 1997 at 9:30 a.m. in Courtroom 23B.

⁴ The claims that remain are as follows: plaintiffs' claim for interference with prospective contractual relations and defendants' counterclaim for quantum meruit.

SO ORDERED.



Civil Action No. DKC 2006-0522
United States District Court, D. Maryland

# Advance Magazine Publishers Inc. v. Leach

466 F. Supp. 2d 628 (D. Md. 2006)
Decided Nov 30, 2006

Civil Action No. DKC 2006-0522.

629 November 30, 2006. *629

David Edward Mills, Dow Lohnes and Albertson PLLC, Washington, DC, for Advance Magazine Publishers Inc.

David Leach, T/A Disruptive Publishing, Rockville, MD, pro se.

631 *631

## MEMORANDUM OPINION

CHASANOW, District Judge.

Presently pending and ready for resolution in this copyright and trademark infringement case are (1) Plaintiff's motion for partial summary judgment on count I, (2) Defendant's motion for partial summary judgment on counts III, IV, and V, (3) Defendant's motion to extend time for discovery and to extend time to file, (4) Defendant's motion to dismiss, and (5) Defendant's motion for a writ of mandamus. The issues are fully briefed and the court now rules pursuant to Local Rule 105.6, no hearing being deemed necessary. For the reasons that follow, Plaintiff's motion for partial summary judgment will be granted. Defendant's motion to extend time to file will be denied as moot. Defendant's motions for partial summary 632 judgment, to *632 extend time for discovery, to dismiss, and for a writ of mandamus will be denied.

## I. Factual Background

All facts are uncontroverted. Plaintiff Advance Magazine Publishers, Inc., is the owner on record with the United States Copyright Office of more than 500 book-length stories, published in the 1930s and 1940s, in the pulp fiction serial 2 magazines, *The* *2 *Shadow, Doc Savage,* and *The Avenger,* as well as in similarly titled magazines ("publications").[1] (Paper 1, Exs. A, D, F; paper 8, Birenz Decl. ¶¶ 4, 5).

[1] The number of works at issue is unclear. The parties have described the publications as numbering "more than 500," "506," and "546" in various documents. Any and all references to *"The Shadow"* include the publications *The Shadow: A Detective Magazine, The Shadow: A Detective Monthly, The Shadow Detective Monthly, The Shadow Magazine,* and *The Shadow Mystery;* and any and all references to *"Doc Savage"* include *Doc Savage Magazine.* (Paper 1 at 4, 7).

Defendant David Leach, d/b/a David Moynihan, d/b/a Disruptive Publishing, operates two websites, Blackmask.com and Smartset.net, through which he displays or offers for distribution electronic copies and reprints of Plaintiff's publications. (Paper 8, Birenz Decl. ¶ 13). Defendant operates his business by scanning literary works into electronic form and making them available to the public in a variety of formats, including MS-Reader, Adobe Acrobat, and Rocket eBook. (Paper 5 at 4). Defendant's customers may download advertiser-supported electronic copies of works directly from his websites, purchase by mail CD-ROMs and DVD-

casetext
Part of Thomson Reuters

ROMs containing compilations of works, or purchase through online booksellers such as Amazon.com and Barnesandnoble.com, reprints of literary works made by Defendant. Defendant began selling copies of Plaintiff's publications in 2000. (Paper 5 at 5; paper 8 at 5-6).

Plaintiff submitted extensive exhibits documenting its chain of title to the publications, which will be summarized briefly. Between 1931 and 1949, Street Smith published *The Shadow, Doc* *3 *Savage,* and *The Avenger* as works for hire written by Walter Gibson (pen name Maxwell Grant), Lester Dent, and Paul Ernst (pen name Kenneth Robeson), respectively. (Paper 1 at ¶¶ 15, 26, 35; paper 8, Birenz Decl. ¶ 4). On December 19, 1961, Street Smith merged into Condé Nast, transferring all "estate, property, rights, privileges and Franchises." (Paper 1 at ¶ 44; paper 8, Birenz Decl. ¶ 8). The merger document was filed with the United States Patent and Trademark Office. On September 22, 1988, Condé Nast merged into Plaintiff. At the time of the merger, Plaintiff acquired all rights previously owned by Condé Nast. (Paper 8, Birenz Decl. ¶¶ 8, 9). Plaintiff has registered additional copyrighted materials and trademarks related to the publications and has properly renewed all its registrations. (Paper 1, Exs. J, K, L).

## II. Procedural Background

On February 28, 2006, Plaintiff filed a six count complaint against Defendant alleging: count I, copyright infringement under the Copyright Act of 1976, 17 U.S.C. §§ 106, 501, *et seq.,* ("Copyright Act"); count II, copyright infringement under the Digital Millennium Copyright Act, 17 U.S.C. § 1202, ("DMCA"); count III, trademark infringement under the Lanham Act, 15 U.S.C. § 1114; count IV, trademark infringement and unfair competition under the Lanham Act, 15 U.S.C. § 1125(a); count V, trademark dilution under *4 the Lanham Act, 15 U.S.C. § 1125(c); and count VI, trademark infringement under Maryland common law. (Paper 1). *633

On March 22, 2006, Defendant filed an answer defending his actions by alleging that Plaintiff is not the true owner of the copyrights at issue because Defendant had acquired the rights through adverse possession.[2] (Paper 5 at 1). The answer also included a copy of a letter Defendant wrote to the United States Copyright Office, requesting a recordation of transfer of ownership of 506 of Plaintiff's publications based on the doctrine of adverse possession. (Paper 5, Ex. 1). The copyright office rejected Defendant's petition because he did not pay the proper fee.

> [2] In the alternative, Defendant initially contended that Plaintiff's rights to *Doc Savage* had been acquired by unclean hands, and were therefore void. (Paper 5 at 1). However, in deposition testimony Defendant testified that he had "dropped" the defense of unclean hands. (Paper 20, Ex. 2).

On May 3, 2006, pursuant to the DMCA, Plaintiff sent a notice to the Internet service provider hosting Defendant's websites, PEER 1 Network, informing PEER 1 that Defendant's websites contained infringing copies of Plaintiff's publications. The following day, PEER 1 disabled access to Defendant's websites.

On May 4, 2006, Defendant resubmitted his letter to the copyright office claiming a transfer of rights through adverse possession. On June 28, 2006, the copyright office responded to Defendant's letter, indicating that the copyright office does not *5 consider the doctrine of adverse possession applicable to intellectual property. (Paper 20, Ex. 1).

Plaintiff seeks partial summary judgment on its copyright infringement claim (count I). (Paper 8). Defendant seeks partial summary judgment on counts III, IV, and V. (Paper 28). Defendant also filed an untitled motion, (paper 34). While it is not clear precisely what relief is sought by Paper 34, the court will construe it as a request to extend the period for discovery and to extend the time for

Defendant to file a motion to dismiss. Defendant additionally filed a separate motion to dismiss (paper 38) and a motion requesting a writ of mandamus ordering PEER 1 to restore access to the server hosting Defendant's websites for a limited period to allow Defendant to remove the content (paper 39).

## III. Motions for Summary Judgment

### A. Standard of Review

It is well established that a motion for summary judgment will be granted only if there exists no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). In other words, if there clearly exist factual issues "that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party," then summary judgment is inappropriate. *Anderson,* 477 U.S. at 250; *see* *6 *also Pulliam Inv. Co. v. Cameo Props.,* 810 F.2d 1282, 1286 (4th Cir. 1987); *Morrison v. Nissan Motor Co.,* 601 F.2d 139, 141 (4th Cir. 1979). The moving party bears the burden of showing that there is no genuine issue as to any material fact and that he is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Catawba Indian Tribe of S.C. v. South Carolina,* 978 F.2d 1334, 1339 (4th Cir. 1992), *cert. denied,* 507 U.S. 972, 113 S.Ct. 1415, 122 L.Ed.2d 785 (1993).

When ruling on a motion for summary judgment, the court must construe the facts alleged in the light most favorable to *634 the party opposing the motion. *See United States v. Diebold,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); *Gill v. Rollins Protective Servs. Co.,* 773 F.2d 592, 595 (4th Cir. 1985). A party who bears the burden of proof on a particular claim must factually support each element of his or her claim. "[A] complete failure of proof concerning an essential element . . . necessarily renders all other facts immaterial."

*Celotex Corp.,* 477 U.S. at 323. Thus, on those issues on which the nonmoving party will have the burden of proof, it is his or her responsibility to confront the motion for summary judgment with an affidavit or other similar evidence in order to show the existence of a genuine issue for trial. *See Anderson,* 477 U.S. at 256; *Celotex Corp.,* 477 U.S. at 324. However, "[a] mere scintilla of evidence in support of the nonmovant's position will not defeat a motion for summary judgment." *Detrick v. Panalpina, Inc.,* 108 F.3d 529, 536 (4th Cir.), *cert. denied,* 522 U.S. 810 (1997). There *7 must *7 be "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson,* 477 U.S. at 249-50 (citations omitted).

### B. Copyright Claim (count I)

In its motion for partial summary judgment on count I, Plaintiff requests that the court enter a judgment of liability against Defendant for copyright infringement, with the amount of damages, costs, and attorney's fees to be determined separately. Plaintiff seeks to enjoin Defendant immediately and permanently from reproducing, displaying, or distributing any copies of Plaintiff's publications. Plaintiff further requests that the court order Defendant to provide to Plaintiff's attorney all infringing copies of its publications in his possession, custody, or control, and all publications used to make the infringing copies that are in his possession, custody, or control. (Paper 8 at 3-4).

Plaintiff contends that by scanning into electronic form, displaying, and selling or otherwise making available to the public, more than 500 of Plaintiff's publications, Defendant has infringed its copyrights in those publications under 17 U.S.C. § 501(a).

"[T]he Copyright Act grants the copyright holder `exclusive' rights to use and to authorize the use of his work in five qualified ways," namely, (1) to

Advance Magazine Publishers Inc. v. Leach   466 F. Supp. 2d 628 (D. Md. 2006)

8   reproduce the work, (2) to prepare *8 derivative works, (3) to distribute copies of the work to the public, (4) to perform the work publicly, and (5) to display the work publicly. *Sony Corp. v. Universal City Studios, Inc.,* 464 U.S. 417, 432-33 (1984); 17 U.S.C. § 106. The Copyright Act provides that "[a]nyone who violates any of the exclusive rights of the copyright owner . . . is an infringer of the copyright." 17 U.S.C. § 501. Stated at a general level, "[t]o establish infringement, two elements must be proven: (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.,* 499 U.S. 340, 361 (1991). "A direct infringer has thus been characterized as one who trespasses into the copyright owner's exclusive domain established in § 106, subject to the limitations of §§ 107 through 118." *CoStar Group, Inc. v. LoopNet, Inc.,* 373 F.3d 544, 549 (4th Cir. 2004) (quoting *Sony,* 464 U.S. at 433, 104 S.Ct. 774) (internal quotations omitted).

## 1. Adverse Possession

Defendant asserts that his actions cannot constitute 635 infringing activity because *635 he has acquired the copyrights to Plaintiff's publications through the doctrine of adverse possession. Defendant alleges that he has maintained a publicly available website for nearly 8 years, which is open and notorious, hostile to the interests of the copyright 9   owner, continuous, and under claim of right. *9

Defendant makes a rather novel argument. No court has decided whether the doctrine of adverse possession applies to intellectual property since the revision of the Copyright Act in 1976. Plaintiff offers two legal arguments for why this court should hold that the doctrine of adverse possession does not apply to copyright: (1) adverse possession is a common law doctrine and as such is preempted by the federal Copyright Act, and (2) adverse possession cannot constitute a transfer "by operation of law" under the Copyright Act because it is not a voluntary act. (Paper 8 at 14-26).

### a. Federal Preemption

Under the Supremacy Clause, a state law that interferes with or is contrary to federal law is invalid. U.S. CONST. Art. 6, cl. 2. Even in its traditional application to realty, the doctrine of adverse possession is strictly a state law defense and does not apply to rights created by federal law, such as Native American title to lands. *See Catawba Indian Tribe of S.C. v. South Carolina,* 865 F.2d 1444, 1448 (4th Cir. 1989) ("[e]xcept where Congress provides otherwise, claims based on Indian title are not subject to state law defenses such as . . . adverse possession").

Defendant seeks to extend the state law doctrine of adverse possession to federal copyrights. The United States Constitution vests Congress with the exclusive authority to regulate copyrights and patents. U.S. CONST. Art. I, § 8, cl. 8. Congress 10   amended the *10 Copyright Act in 1976 to clarify the relationship between the Act and state law:

> On and after January 1, 1978, all legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106 in works of authorship that are fixed in a tangible medium of expression and come within the subject matter of copyright as specified by sections 102 and 103, whether created before or after that date and whether published or unpublished, are governed exclusively by this title. Thereafter, no person is entitled to any such right or equivalent right in any such work under the common law or statutes of any State.

17 U.S.C. § 301(a). "Thus, § 301(a) preempts state law claims if the rights granted under state law are equivalent to any exclusive rights within the scope of federal copyright as set out in 17 U.S.C. § 106." *Rosciszewski v. Arete Assocs., Inc.,* 1 F.3d 225, 229 (4th Cir. 1993). Application of the doctrine of adverse possession would transfer all of the original owner's rights to the adverse possessor.

Advance Magazine Publishers Inc. v. Leach   466 F. Supp. 2d 628 (D. Md. 2006)

Therefore, the rights that would be acquired by adverse possession of a copyright would be equivalent to the rights set out in § 106 of the Copyright Act. Section 301(a) expressly preempts any state law granting equivalent rights. Thus, the state common law doctrine of adverse possession is preempted by the Copyright Act and cannot divest Plaintiff of its federal copyrights in *The Shadow, Doc Savage,* and *The Avenger.* *11

### b. Adverse Possession as Transfer by Operation of Law

In the alternative, Defendant attempts to circumvent the federal preemption issue by maneuvering within the Copyright Act to argue that there has *636 been a transfer of Plaintiff's copyrights to him by "operation of law" through the doctrine of adverse possession. (Paper 5, Ex. 1). Thus, he is not asserting adverse possession as a state law doctrine, but rather asking the court to construe "operation of law" to encompass the principles of adverse possession. This argument is also misguided.

The Copyright Act does allow the transfer of copyrights by "operation of law" as Defendant suggests. *See* 17 U.S.C. § 201(d)(1). However, transfers by operation of law are expressly limited to voluntary transfers, except in bankruptcy proceedings.

> When an individual author's ownership of a copyright, or of any of the exclusive rights under a copyright, *has not previously been transferred voluntarily* by that individual author, no action by any governmental body or other official or organization purporting to seize, expropriate, transfer, or exercise rights of ownership with respect to the copyright, or any of the exclusive rights under a copyright, shall be given effect under this title, except as provided under title 11.

*Id.* § 201(e) (emphasis added). By its nature, adverse possession requires involuntariness, or

lack of consent, on the part of the original owner.[3] Defendant's claim to have effected the transfer *12 by operation of law through adverse possession amounts to a claim for an involuntary transfer of rights, which is barred by 17 U.S.C. § 201(e).

> [3] Because no federal law of adverse possession exists, the court must look to state law to interpret the elements of adverse possession. Defendant is a citizen of and operates his business from Maryland, so the court will look to Maryland law. The familiar elements of adverse possession are that, to be adverse, possession must be actual, open, notorious, exclusive, hostile, under claim of title or ownership, and continuous or uninterrupted for the statutory period of twenty years. *Banks v. Pusey,* 393 Md. 688, 709 (2006). "It has long been held by [the Court of Appeals of Maryland] that where the original entry and subsequent occupancy of land was under a contract, or *with the consent or permission of the owner,* the possession would not be hostile or adverse," and thus cannot meet the requirements for adverse possession. *Banks,* 393 Md. at 710 (emphasis added). In short, if a would-be adverse possessor has "the consent or permission of the owner" he cannot meet the hostility and adversity requirements of adverse possession.

Defendant essentially contends that his conduct over time somehow estops Plaintiff from complaining about copyright infringement. Any argument that Plaintiff's claim is time-barred must be rejected. The limitations period for bringing a copyright infringement claim is three years after the claim accrues. 17 U.S.C. § 507(b). A claim accrues when "one has knowledge of a violation or is chargeable with such knowledge." *Hotaling v. Church of Jesus Christ of Latter-Day Saints,* 118 F.3d 199, 202 (4th Cir. 1997) (internal quotation marks and citations omitted). Because each sale or copy of a work is a separate act of

Advance Magazine Publishers Inc. v. Leach   466 F. Supp. 2d 628 (D. Md. 2006)

infringement, a "party does not waive the right to sue for [copyright] infringements that accrue within three years of filing *13 by not asserting related claims that accrued beyond three years." *Id.* Defendant was displaying infringing copies of Plaintiff's work until PEER 1 disabled access to his websites, thus, the last act of infringement occurred as recently as May, 2006. Plaintiff's complaint was brought within the three year statute of limitations. Furthermore, a court may not apply the doctrine of laches to shorten the statutory limitations period established by Congress for claims brought under the Copyright Act, 17 U.S.C. § 507(b). *Lyons Partnership, L.P. v. Morris Costumes, Inc.,* 243 F.3d 789, 798 (4th Cir. 2001). *637

Thus, Defendant's argument that he has acquired the copyrights to *The Shadow, Doc Savage,* and *The Avenger* through adverse possession fails as a matter of law. Plaintiff has produced uncontroverted evidence that it owns the copyrights to the publications.

## 2. Infringing Activity

"Section 106 of the Copyright Act confers a bundle of exclusive rights to the owner of the copyright," including the rights to reproduce, create derivative works, distribute, perform, and display the copyrighted work. *Harper Row, Publishers, Inc. v. Nation Enter.,* 471 U.S. 539, 546 (1985); 17 U.S.C. § 106. Plaintiff alleges that Defendant has violated its exclusive rights of reproduction, distribution, and display in the publications Defendant makes available on his websites. *14

Plaintiff contends that Defendant violated its exclusive right to reproduce the publications by scanning into electronic form the text, original illustrations, and cover art of its publications. (Paper 8 at 13). It is well-established that photocopying a copyrighted work without the owner's permission infringes the owner's right of reproduction. *See Princeton Univ. v. Michigan Document Svcs.,* 99 F.3d 1381 (6th Cir. 1996),

*cert. denied,* 520 U.S. 1156 (1997). Although Defendant used a scanner to create a digital copy of a work, rather than a photocopier to print a physical copy, the methods of copying are equivalent and they are both infringing.[4] A digital copy made without the owner's permission is copyright infringement. *See, e.g., Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.,* 545 U.S. 913 (2005) (holding companies contributorily liable for copyright infringement for facilitating users' transmissions of unauthorized digital copies of copyrighted works). Thus, Defendant has infringed Plaintiff's exclusive right to reproduce its publications.

> [4] Although Defendant does, in fact, print and sell paper copies of Plaintiff's work, Plaintiff asserts that this violates its right to distribution rather than its right to reproduction.

Furthermore, Plaintiff alleges that Defendant violated its exclusive right to display its publications by making them available for the public to view as HTML pages on his websites. (Paper 8 at 13). To infringe an owner's right to display, a person *15 must (1) display a copy of the work (2) to the public. 17 U.S.C. § 106(5). "Display" covers any showing of a copy of the work, "either directly or by means of a film, slide, television image or any other device or process." 17 U.S.C. § 101. To display publicly means "to transmit or otherwise communicate a . . . display of the work . . . to the public, by means of any device or process, whether the members of the public capable of receiving the performance or display receive it in the same place or in separate places and at the same time or at different times." 17 U.S.C. § 101. Displaying a copy of a work on the Internet, especially on a commercial site, falls squarely within the definition of "public display." Defendant's posting of Plaintiff's publications on his websites infringe Plaintiff's right of display.

Finally, Plaintiff claims that Defendant violated its exclusive right to distribute its publications by making them available online as "advertiser-supported downloads . . . as well as by selling his reproductions on CD-ROM compilations, DVD-ROM compilations and print books or `reprints.'" (Paper 8 at 13). In a case that bears directly on this issue, the Supreme Court held that two online database companies violated six freelance authors'

638  *638 rights of distribution by making copies of their articles available to the databases' users without the authors' consent. *New York Times Co., Inc. v. Tasini,* 533 U.S. 483, 488, 121 S.Ct. 2381, 150 L.Ed.2d 500 (2001). Defendant operates what is essentially an online database of literary works,

16  *16 and by making available unauthorized copies of Plaintiff's publications, he has infringed its right to distribution.

## 3. Requested Relief

Accordingly, Plaintiff has established as a matter of law that Defendant has infringed Plaintiff's copyrights, specifically its rights of reproduction, display, and distribution. Plaintiff requests immediate relief in the form of a permanent injunction against Defendant and mandamus ordering Defendant to surrender all of Plaintiff's publications and infringing copies of Plaintiff's publications within his possession, custody, or control. (Paper 8 at 3-4).

At this stage of litigation, the court finds it appropriate to issue a preliminary injunction against Defendant, barring him from reproducing, displaying, or distributing any copies of Plaintiff's publications, in any form or format, pending a final determination of all issues. The scope and form of a permanent injunction will be resolved at that time.

Under 17 U.S.C. § 502(a), a court may "grant temporary and final injunctions on such terms as it may deem reasonable to prevent or restrain infringement of a copyright." The United States Court of Appeals for the Fourth Circuit has set out a balancing test to be considered by the court in

deciding on a motion for preliminary injunction: (1) the plaintiff's likelihood of success on the

17  merits of the underlying dispute; (2) the  *17 possibility of irreparable harm to the plaintiff if preliminary relief is denied; (3) the harm to the defendant if an injunction is issued; and (4) the public interest. *See Blackwelder Furniture Co. v. Seilig Mfg. Co.,* 550 F.2d 189, 196 (4th Cir. 1977). The decision to grant or deny a preliminary injunction depends upon a "flexible interplay" among all the factors considered. *Id.* The irreparable harm to the plaintiff and the harm to the defendant are the two most important factors. *In re Microsoft Corp. Antitrust Litigation,* 333 F.3d 517, 526 (4th Cir. 2003) (internal quotation marks omitted).

If a plaintiff establishes a prima facie claim of copyright infringement, the district court may presume that it could show both probable likelihood of success on the merits and irreparable harm, for purposes of granting a preliminary injunction. *Serv. Training, Inc. v. Data Gen. Corp.,* 963 F.2d 680, 690 (4th Cir. 1992). Here, Plaintiff has gone beyond establishing a prima facie case of copyright infringement and shown actual infringement, satisfying the first two factors of the balancing test. The third factor in the balancing test is to weigh the harm to Defendant if the injunction is issued. Defendant cannot claim a cognizable harm in being prevented from making a profit through infringing activity, thus this factor weighs in favor of Plaintiff. Finally, the "public interest is the interest in upholding copyright protections." *Autoskill, Inc. v. Nat'l Educ. Support

18  Sys., Inc.,*  *18 994 F.2d 1476, 1499 (10th Cir. 1993). "Since Congress has elected to grant certain exclusive rights to the owner of a copyright in a protected work, it is virtually axiomatic that the public interest can only be served by upholding copyright protections and, correspondingly, preventing the misappropriation of the skills, creative energies, and resources which are invested in the protected work." *Apple Computer, Inc. v. Franklin Computer Corp.,* 714

F.2d 1240, 1254-55 (3rd Cir. 1983). The balancing
639 *639 test tips decidedly in Plaintiff's favor and the
court will grant a preliminary injunction against
Defendant that he is not to reproduce, display or
distribute any copies of Plaintiff's publications in
any way.

In later determining the terms of any permanent
injunction, the court will consider the four factors
laid out by the Supreme Court:

> According to well-established principles of
> equity, a plaintiff seeking a permanent
> injunction must satisfy a four-factor test
> before a court may grant such relief. A
> plaintiff must demonstrate: (1) that it has
> suffered an irreparable injury; (2) that
> remedies available at law, such as
> monetary damages, are inadequate to
> compensate for that injury; (3) that,
> considering the balance of hardships
> between the plaintiff and defendant, a
> remedy in equity is warranted; and (4) that
> the public interest would not be disserved
> by a permanent injunction.

*eBay, Inc. v. MercExchange, LLC,* ___ U.S. ___,
___, 126 S.Ct. 1837, 1839, 164 L.Ed.2d 641
19 (2006). *19

Additionally, Plaintiff requests that the court
impound all of Defendant's infringing copies of
Plaintiff's publications, as well as the original
publications used to make those infringing copies.

> (a) At any time while an action under this
> title is pending, the court may order the
> impounding, on such terms as it may deem
> reasonable, of all copies . . . claimed to
> have been made or used in violation of the
> copyright owner's exclusive rights, and of
> all plates, molds, matrices, masters, tapes,
> film negatives, or other articles by means
> of which such copies . . . may be
> reproduced.

17 U.S.C. § 503. This is a reasonable request and
the court will order Defendant to provide to

Plaintiff's attorney all of Plaintiff's publications,
and infringing reproductions of those publications,
that are in his possession, custody, or control.
These items will be held by Plaintiff's attorney
until a final judgment is issued in this case.

## C. Trademark Claims

Defendant moves for summary judgment on all
trademark infringement claims relating to *The
Shadow* and *Doc Savage.* [5] Defendant argues that
because Plaintiff has abandoned the marks, it no
longer has rights to the marks, and thus cannot
assert a cause of action for trademark
20 infringement. *20

> [5] Plaintiff did not file a formal response to
> the motion. Instead, it objected to the filing
> of the motion as being out of time.
> Defendant's motion was filed well after the
> deadline set, and he has not been granted
> an extension. For that reason, as well as
> those set forth in the body of this
> Memorandum, the motion will be denied.

Under the Lanham Act, a trademark is abandoned
when "its use has been discontinued with intent
not to resume such use." 15 U.S.C. § 1127.
Abandonment is an affirmative defense. *See
United States v. Farmer,* 370 F.3d 435, 441 n. 2
(4th Cir. 2004). Thus, a party claiming that a mark
has been abandoned must show "non-use of the
name by the legal owner and no intent by that
person or entity to resume use in the reasonably
foreseeable future." *Emergency One, Inc. v. Am.
FireEagle, Ltd.,* 228 F.3d 531, 535 (4th Cir. 2000)
(quoting *Stetson v. Howard D. Wolf Assocs.,* 955
F.2d 847, 850 (2nd Cir. 1992)). Non-use for three
consecutive years alone constitutes prima facie
evidence of abandonment. *See* 15 U.S.C. § 1127.
Proof of three consecutive years of non-use thus
creates a presumption of intent not to resume use.
*See Cerveceria Centroamericana, S.A. v.
640 Cerveceria India,* *640 *Inc.,* 892 F.2d 1021, 1025-
26 (Fed. Cir. 1989). "Once the presumption is
triggered, the legal owner of the mark has the
burden of producing evidence of either actual use

Advance Magazine Publishers Inc. v. Leach   466 F. Supp. 2d 628 (D. Md. 2006)

during the relevant period or intent to resume use." *Emergency One,* 228 F.3d at 536; *see also Cerveceria Centroamericana,* 892 F.2d at 1026. The ultimate burden of proof, by a preponderance of the evidence, remains always on the party asserting abandonment. *Emergency One,* 228 F.3d at 536; *Rivard v. Linville,* 133 F.3d 1446, 1449 (Fed. Cir. 1998).

Defendant submits no evidence for his claim that Plaintiff has abandoned its marks. His one page motion merely states "[p]er Mr. *21 Ney's statement, the Court may safely conclude that Doc Savage was last printed by Advance in 1990, while The Shadow was last used in 1994. . . ." (Paper 28 at 1). Defendant does not make clear which statement by Plaintiff he refers to, and the court cannot find any support for his assertion on the record. The moving party in a summary judgment motion bears the burden of proving that no genuine dispute as to any material fact exists. *See* Fed.R.Civ.P. 56(c). Because Defendant has submitted no evidence that Plaintiff has abandoned the *Doc Savage* and *The Shadow* marks, his motion for partial summary judgment on counts III, IV, and V (paper 28) will be denied.

## IV. Other Motions

### A. Untitled Motion

Defendant filed a "request to file motion" asking the court's permission to "A, contact the Estate of Walter Gibson with information about rights said estate might not know it holds, and B, file a motion . . . to dismiss a portion of the complaint against the Defense relating to digital reproductions." (Paper 34 at 4). Defendant asserts that the delay in filing a motion to dismiss was due to Plaintiff's fraudulent misrepresentation of its ownership. ( *Id.*)

As to Part A, Defendant is free to contact whomever he wishes without leave of the court. To the extent that Defendant is asking the court to extend the period of discovery, that request will be *22 denied. The scheduling order set the close of

discovery for August 7, 2006. (Paper 6). A scheduling order "shall not be modified except upon a showing of good cause and by leave of the district judge[.]" Fed.R.Civ.P. 16(b). Defendant has not shown good cause demonstrating why the court should extend the period for discovery.

Part B, the request to file a motion to dismiss, was rendered moot when Defendant subsequently filed a motion to dismiss (paper 38).

## B. Motion to Dismiss

Defendant filed a motion pursuant to Fed.R.Civ.P. 41(b) seeking an involuntary dismissal of all of Plaintiff's claims for Plaintiff's failure to comply with court-ordered discovery. In a paperless order on October 6, 2006, Magistrate Judge Connelly directed Plaintiff to (1) produce documents from the last six years from Plaintiff, Michael Uslan, and the Sony Corporation regarding *The Shadow,* and (2) to submit an affidavit detailing its search for all contracts between Street Smith and Gibson from 1930-1932. (Paper 33). Defendant's motion, filed on October 23, 2006, contends that Plaintiff has failed to comply with the order. The motion is premature and will be denied. Plaintiff has not yet had time to complete its compliance.

## C. Motion for Miscellaneous Relief

Defendant asks this court to issue a writ of mandamus compelling PEER 1 to make *641 the servers on which Defendant's files *23 are stored accessible to him for 72 hours. (Paper 39). Access to those servers has been disabled since Plaintiff filed a DMCA notice with PEER 1 in May, 2006.

The court may issue a writ of mandamus "if the petitioner has no other adequate means to obtain relief to which there is a 'clear and indisputable' right. *Media Gen. Operations, Inc. v. Buchanan,* 417 F.3d 424, 433 (4th Cir. 2005). "Mandamus is a drastic remedy to be invoked only in extraordinary situations." *United States v. Moussaoui,* 333 F.3d 509, 516 (4th Cir. 2003) (internal quotation marks and citation omitted). A party seeking a writ of

mandamus must demonstrate that: (1) he has a clear and indisputable right to the relief sought; (2) the responding party has a clear duty to do the specific act requested; (3) the act requested is an official act or duty; (4) there are no other adequate means to attain the relief he desires; and (5) the issuance of the writ will effect right and justice in the circumstances. *In re Braxton,* 258 F.3d 250, 261 (4th Cir. 2001); 28 U.S.C. § 1651.

First, PEER 1 is not a party to this action. Second, while Defendant clearly has a strong interest in accessing the materials which have provided the foundation of his business for several years, he does not have an indisputable right to access them. The files he wishes to access include infringing copies of Plaintiff's publications. A more proper relief would be to allow Defendant to access only those publications which are in the public domain or *24 for which he has express consent from the copyright owner to duplicate. Third, PEER 1 does not have a clear duty to provide Defendant access to its servers. Defendant states "Peer 1 Networks, has by policy removed the Defense's server. . . ." This suggests that PEER 1 has a policy, known to its clients, that it may remove the client's server at its discretion.

Defendant has not demonstrated that this is an extraordinary situation justifying a writ of mandamus, even were PEER 1 a party. His request will be denied.

## V. Conclusion

For the foregoing reasons, Plaintiff's motion for partial summary judgment will be granted. Defendant's motion to extend time to file a motion to dismiss will be denied as moot. Defendant's motions for summary judgment, to extend time for discovery, to dismiss, and for a writ of mandamus will be denied. A separate Order will follow.

casetext
Part of Thomson Reuters

No. 00-1045

U.S.

# TRW Inc. v. Andrews

534 U.S. 19 (2001) · 122 S. Ct. 441

Decided Nov 13, 2001

CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

No. 00-1045.

Argued October 9, 2001 Decided November 13, 2001

The Fair Credit Reporting Act (FCRA or Act) requires credit reporting agencies, *inter alia*, to maintain "reasonable procedures" to avoid improper disclosures of consumer credit information. 15 U.S.C. § 1681e(a). The Act's limitations provision prescribes that an action to enforce any liability created under the Act must be brought "within two years from the date on which the liability arises, except that where a defendant has . . . willfully misrepresented any information required under [the Act] to be disclosed to [the plaintiff] and the information . . . is material to [a claim under the Act], the action may be brought at any time within two years after [the plaintiff's] discovery of the misrepresentation." § 1681p.

Plaintiff-respondent Adelaide Andrews visited a doctor's office in Santa Monica, California, and there filled out a form listing her name, Social Security number, and other basic information. An office receptionist named Andrea Andrews (the Impostor) copied the data and moved to Las Vegas, where she attempted to open credit accounts using Andrews' Social Security number and her own last name and address.

On July 25, September 27, and October 28, 1994, and on January 3, 1995, defendant-petitioner TRW Inc. furnished copies of Andrews' credit report to

companies from which the Impostor sought credit. Andrews did not learn of these disclosures until May 31, 1995, when she sought to refinance her home and in the process received a copy of her credit report reflecting the Impostor's activity. She sued TRW for injunctive and monetary relief on October 21, 1996, alleging that TRW had violated the Act by failing to verify, predisclosure of her credit report to third parties, that Adelaide Andrews of Santa Monica initiated the credit applications or was otherwise involved in the underlying transactions. TRW moved for partial summary judgment, arguing, *inter alia*, that the FCRA's statute of limitations had expired on Andrews' claims stemming from TRW's first two disclosures because both occurred more than two years before she brought suit. Andrews countered that the limitations period on those claims did not commence until she discovered the disclosures. The District Court held the two claims time barred, reasoning that § 1681p's explicit exception, which covers only misrepresentation claims, precludes judicial attribution of a broader *20 discovery rule *20 to the FCRA. The Ninth Circuit reversed, applying what it considered to be the "general federal rule" that a statute of limitations starts running when a party knows or has reason to know she was injured, unless Congress expressly legislates otherwise.

*Held:* 1. A general discovery rule does not govern § 1681p. That section explicitly delineates the exceptional case in which discovery triggers the two-year limitation, and Andrews' case does not fall within the exceptional category. Pp. 27-33.



casetext
Part of Thomson Reuters

(a) Even if the Ninth Circuit correctly identified a general presumption in favor of a discovery rule, an issue this case does not oblige this Court to decide, the Appeals Court significantly overstated the scope and force of such a presumption. That court placed undue weight on *Holmberg* v. *Armbrecht*, 327 U.S. 392, 397, which stands for the proposition that equity tolls the statute of limitations in cases of fraud or concealment, but does not establish a general presumption across all contexts. The only other cases in which the Court has recognized a prevailing discovery rule, moreover, were decided in two contexts, latent disease and medical malpractice, "where the cry for [such a] rule is loudest," *Rotella* v. *Wood*, 528 U.S. 549, 555. See *United States* v. *Kubrick*, 444 U.S. 111; *Urie* v. *Thompson*, 337 U.S. 163. The Court has also observed that lower federal courts generally apply a discovery rule when a statute is silent on the issue, but has not adopted that rule as its own. Further, and beyond doubt, the Court has never endorsed the Ninth Circuit's view that Congress can convey its refusal to adopt a discovery rule only by explicit command, rather than by implication from the particular statute's structure or text. Thus, even if the presumption identified by the Ninth Circuit exists, it would not apply to the FCRA, for that Act does not govern an area of the law that cries out for application of a discovery rule and is not silent on the issue of when the statute of limitations begins to run. Pp. 27-28.

21

(b) Section 1681p's text and structure evince Congress' intent to preclude judicial implication of a discovery rule. Where Congress explicitly enumerates certain exceptions to a general prohibition, additional exceptions are not to be implied, in the absence of evidence of a contrary legislative intent. *Andrus* v. *Glover Constr. Co.*, 446 U.S. 608, 616-617. Section 1681p provides that the limitation period generally runs from the date "liability arises," subject to a single exception for cases involving a defendant's willful misrepresentation of material information. It would distort § 1681p's text to convert the exception into the rule. See *Leatherman* v. *Tarrant County Narcotics Intelligence and Coordination Unit*, 507 U.S. 163, 168. Pp. 28-29.

*21



TRW Inc. v. Andrews   534 U.S. 19 (2001)

(c) At least equally telling, reading a general discovery rule into § 1681p would in practical effect render the express exception superfluous in all but the most unusual circumstances. In the paradigmatic setting in which a plaintiff requests a credit report and the reporting agency responds by concealing its wrongdoing, the express exception would do no work other than that performed by a general discovery rule. The Court rejects Andrews' and the Government's attempt to give some independent scope to the exception by characterizing it as a codification of the doctrine of equitable estoppel. The scenario constructed by Andrews and the Government to support this characterization is unlikely to occur in reality. In any event, Andrews and the Government concede that the independent function one could attribute to the express exception under their theory would arise only in rare and egregious cases. Adopting their position would therefore render the express exception insignificant, if not wholly superfluous, contrary to a cardinal principle of statutory construction. Pp. 29-31.

(d) Andrews' two additional arguments in defense of the decision below are unconvincing. First, her contention that a discovery rule is expressed in the words framing § 1681p's general rule — "date on which the liability arises" — is not compelled by the dictionary definition of "arise" and is unsupported by this Court's precedent. Second, Andrews' reliance on § 1681p's legislative history fails to convince the Court that Congress intended *sub silentio* to adopt a general discovery rule in addition to the limited one it expressly provided. Pp. 32-33.

2. Because the issue was not raised or briefed below, this Court does not reach Andrews' alternative argument that, even if § 1681p does not incorporate a general discovery rule, "liability" does not "arise" under the FCRA when a violation occurs, but only on a sometimes later date when "actual damages" materialize. The Court notes that the Ninth Circuit has not adopted Andrews' argument and the Government does not join her in advancing it here. In any event, it is doubtful that the argument, even if valid, would aid Andrews in this case. Pp. 33-35.

225 F.3d 1063, reversed and remanded.

Glen D. Nager argued the cause for petitioner. With him on the briefs was Daniel H. Bromberg.

22   *22

Andrew Ryan Henderson argued the cause for respondent. With him on the brief were Carlyle W. Hall, Jr., and Gerald L. Sauer.

Kent L. Jones argued the cause for the United States et al. as amici curiae urging affirmance. On the brief were Acting Solicitor General Underwood, Deputy Solicitor General Wallace, Edward C. DuMont, John D. Graubert, John F. Daly, and Lawrence DeMille-Wagman.–

– Richard J. Rubin, Joanne S. Faulkner, Willard P. Ogburn, Deborah M. Zuckerman, Stacy J. Canan, and Michael R. Schuster filed a brief for the National Association of Consumer Advocates et al. as amici curiae urging affirmance.

**Ginsburg, J.**, delivered the opinion of the Court, in which **Rehnquist, C. J.**, and **Stevens, O'Connor, Kennedy, Souter**, and **Breyer, JJ.**, joined. **Scalia, J.**, filed an opinion concurring in the judgment, in which **Thomas**, J., joined, post, p. 35.

Justice Ginsburg delivered the opinion of the Court.

This case concerns the running of the two-year statute of limitations governing suits based on the Fair Credit Reporting Act (FCRA or Act), as added, 84 Stat. 1127, and amended, 15 U.S.C. § 1681 et seq. (1994 ed. and Supp. V).[1] The time prescription appears in § 1681p, which sets out a general rule and an exception. Generally, an action to enforce any liability created by the Act may be brought "within two years from the date on which the liability arises." The exception covers willful misrepresentation of "any information required under [the Act] to be disclosed to [the plaintiff]": When such a representation is material to a claim under the Act, suit may be brought "within two years after [the plaintiff's] discovery . . . of the misrepresentation."

> [1] Congress has revised the FCRA extensively since the events at issue, but has not altered the provisions material to this case.

Section 1681p's exception is not involved in this case; the complaint does not allege misrepresentation of information that the FCRA "require[s] . . . to be disclosed to [the plaintiff]." Plaintiff-respondent Adelaide Andrews nevertheless contends, and the Ninth Circuit held, that § 1681p's generally applicable two-year 23 limitation commenced to run on *23 Andrews' claims only upon her discovery of defendant-petitioner TRW Inc.'s alleged violations of the Act.

We hold that a discovery rule does not govern § 1681p. That section explicitly delineates the exceptional case in which discovery triggers the two-year limitation. We are not at liberty to make Congress' explicit exception the general rule as well.

## I A

Congress enacted the FCRA in 1970 to promote efficiency in the Nation's banking system and to protect consumer privacy. See 15 U.S.C. § 1681(a) (1994 ed.). As relevant here, the Act seeks to accomplish those goals by requiring credit reporting agencies to maintain "reasonable procedures" designed "to assure maximum possible accuracy of the information" contained in credit reports, § 1681e(b), and to "limit the furnishing of [such reports] to" certain statutorily enumerated purposes, § 1681e(a); 15 U.S.C. § 1681b (1994 ed. and Supp. V). The Act creates a private right of action allowing injured consumers to recover "any actual damages" caused by negligent violations and both actual and punitive damages for willful noncompliance. See 15 U.S.C. § 1681n, 1681 o (1994 ed.).[2]

> [2] Under 1996 amendments to § 1681n, a plaintiff may also recover statutory damages of between $100 and $1,000 for willful violations. See 15 U.S.C. § 1681n(a)(1)(A) (1994 ed., Supp. V).

## B

The facts of this case are for the most part undisputed. On June 17, 1993, Adelaide Andrews visited a radiologist's office in Santa Monica, California. She filled out a new patient form listing certain basic information, including her name, birth date, and Social Security number. Andrews handed the form to the office receptionist, one Andrea Andrews (the Impostor), who copied the information and thereafter moved to Las Vegas, Nevada. Once there, the Impostor 24 *24 attempted on numerous occasions to open credit accounts using Andrews' Social Security number and her own last name and address.

On four of those occasions, the company from which the Impostor sought credit requested a report from TRW. Each time, TRW's computers registered a match between Andrews' Social Security number, last name, and first initial and therefore responded by furnishing her file. TRW thus disclosed Andrews' credit history at the

Impostor's request to a bank on July 25, 1994; to a cable television company on September 27, 1994; to a department store on October 28, 1994; and to another credit provider on January 3, 1995. All recipients but the cable company rejected the Impostor's applications for credit.

Andrews did not learn of these disclosures until May 31, 1995, when she sought to refinance her home mortgage and in the process received a copy of her credit report reflecting the Impostor's activity. Andrews concedes that TRW promptly corrected her file upon learning of its mistake. She alleges, however, that the blemishes on her report not only caused her inconvenience and emotional distress, they also forced her to abandon her refinancing efforts and settle for an alternative line of credit on less favorable terms.

On October 21, 1996, almost 17 months after she discovered the Impostor's fraudulent conduct and more than two years after TRW's first two disclosures, Andrews filed suit in the United States District Court for the Central District of California. Her complaint stated two categories of FCRA claims against TRW, only the first of which is relevant here.[3] See App. 15-17. Those claims 25 alleged that TRW's *25 four disclosures of her information in response to the Impostor's credit applications were improper because TRW failed to verify, predisclosure, that Adelaide Andrews of Santa Monica initiated the requests or was otherwise involved in the underlying transactions. Andrews asserted that by processing requests that matched her profile on Social Security number, last name, and first initial but did not correspond on other key identifiers, notably birth date, address, and first name, TRW had facilitated the Impostor's identity theft. According to Andrews, TRW's verification failure constituted a willful violation of § 1681e(a), which requires credit reporting agencies to maintain "reasonable procedures" to avoid improper disclosures. She sought injunctive relief, punitive damages, and compensation for the "expenditure of time and money, commercial impairment, inconvenience,

embarrassment, humiliation and emotional distress" that TRW had allegedly inflicted upon her. App. 15-16.

> [3] The second alleged that TRW had collected information about the Impostor's activities and inaccurately attributed that activity to Andrews, in violation of its obligation under § 1681e(b) to "follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom [a] report relates." A jury resolved this claim in favor of TRW. The complaint also stated FCRA claims against Trans Union Corporation, another credit reporting agency involved in the Impostor's conduct. In addition, Andrews brought a state-law claim against each defendant. The resolution of these claims is not at issue here.

TRW moved for partial summary judgment, arguing, *inter alia*, that the FCRA's statute of limitations had expired on Andrews' claims based on the July 25 and September 27, 1994, disclosures because both occurred more than two years before she brought suit. Andrews countered that her claims as to all four disclosures were timely because the limitations period did not commence until May 31, 1995, the date she learned of TRW's alleged wrongdoing. The District Court, agreeing with TRW that § 1681p does not incorporate a general discovery rule, held that relief stemming from the July and September 1994 disclosures was time barred. *Andrews* *26 v. *Trans Union Corp.*, 7 F. Supp.2d 1056, 1066-1067 (C.D.Cal. 1998).[4]

> [4] The District Court also granted summary judgment to TRW on the two remaining improper disclosure claims, reasoning that TRW maintained adequate procedures and that the disputed disclosures had been made for a permissible purpose as defined by § 1681b. See *Andrews* v. *Trans Union Corp.*, 7 F. Supp.2d, at 1068-1071. The Ninth Circuit reversed that ruling. 225 F.3d 1063, 1067-1068 (2000). Such questions,

the Appeals Court held, "needed determination by a jury not a judge." *Id.*, at 1068.

The Court of Appeals for the Ninth Circuit reversed this ruling, applying what it considered to be the "general federal rule . . . that a federal statute of limitations begins to run when a party knows or has reason to know that she was injured." 225 F.3d 1063, 1066 (2000). The court rejected the District Court's conclusion that the text of § 1681p, and in particular the limited exception set forth in that section, precluded judicial attribution of such a rule to the FCRA. "[U]nless Congress has expressly legislated otherwise," the Ninth Circuit declared, "the equitable doctrine of discovery is read into every federal statute of limitations." *Id.*, at 1067 (internal quotation marks omitted). Finding no such express directive, the Court of Appeals held that "none of [Andrews'] injuries were stale when suit was brought." *Id.*, at 1066. Accordingly, the court reinstated Andrews' improper disclosure claims and remanded them for trial.

In holding that § 1681p incorporates a general discovery rule, the Ninth Circuit parted company with four other Circuits; those courts have concluded that a discovery exception other than the one Congress expressed may not be read into the Act. See *Clark* v. *State Farm Fire Casualty Ins. Co.*, 54 F.3d 669 (CA10 1995); *Rylewicz* v. *Beaton Servs., Ltd.*, 888 F.2d 1175 (CA7 1989); *Houghton* v. *Insurance Crime Prevention Institute*, 795 F.2d 322 (CA3 1986); *Clay* v. *Equifax, Inc.*, 762 F.2d 952 (CA11 1985). We granted certiorari to resolve this conflict, 532 U.S. 902 (2001), and now reverse. *27

27

## II

The Court of Appeals rested its decision on the premise that all federal statutes of limitations, regardless of context, incorporate a general discovery rule "unless Congress has expressly legislated otherwise." 225 F.3d, at 1067. To the extent such a presumption exists, a matter this

case does not oblige us to decide, the Ninth Circuit conspicuously overstated its scope and force.

The Appeals Court principally relied on our decision in *Holmberg* v. *Armbrecht*, 327 U.S. 392 (1946). See 225 F.3d, at 1067. In that case, we instructed with particularity that "where a plaintiff has been injured by fraud and remains in ignorance of it without any fault or want of diligence or care on his part, the bar of the statute does not begin to run until the fraud is discovered." *Holmberg*, 327 U.S., at 397 (internal quotation marks omitted). *Holmberg* thus stands for the proposition that equity tolls the statute of limitations in cases of fraud or concealment; it does not establish a general presumption applicable across all contexts. The only other cases in which we have recognized a prevailing discovery rule, moreover, were decided in two contexts, latent disease and medical malpractice, "where the cry for [such a] rule is loudest," *Rotella* v. *Wood*, 528 U.S. 549, 555 (2000). See *United States* v. *Kubrick*, 444 U.S. 111 (1979); *Urie* v. *Thompson*, 337 U.S. 163 (1949).

We have also observed that lower federal courts "generally apply a discovery accrual rule when a statute is silent on the issue." *Rotella*, 528 U.S., at 555; see also *Klehr* v. *A. O. Smith Corp.*, 521 U.S. 179, 191 (1997) (citing *Connors* v. *Hallmark Son Coal Co.*, 935 F.2d 336, 342 (CADC 1991), for the proposition that "federal courts generally apply [a] discovery accrual rule when [the] statute does not call for a different rule"). But we have not adopted that position as our own. And, beyond doubt, we have never endorsed the Ninth Circuit's view that Congress can convey its refusal to adopt a discovery rule only by explicit command, rather than *28 by implication from the structure or text of the particular statute.

28

The Ninth Circuit thus erred in holding that a generally applied discovery rule controls this case. The FCRA does not govern an area of the law that cries out for application of a discovery rule, nor is

the statute "silent on the issue" of when the statute of limitations begins to run. Section 1681p addresses that precise question; the provision reads:

> "An action to enforce any liability created under [the Act] may be brought . . . within two years from the date on which the liability arises, except that where a defendant has materially and willfully misrepresented any information required under [the Act] to be disclosed to an individual and the information so misrepresented is material to the establishment of the defendant's liability to that individual under [the Act], the action may be brought at any time within two years after discovery by the individual of the misrepresentation."

We conclude that the text and structure of § 1681p evince Congress' intent to preclude judicial implication of a discovery rule.

"Where Congress explicitly enumerates certain exceptions to a general prohibition, additional exceptions are not to be implied, in the absence of evidence of a contrary legislative intent." *Andrus* v. *Glover Constr. Co.*, 446 U.S. 608, 616-617 (1980). Congress provided in the FCRA that the two-year statute of limitations runs from "the date on which the liability arises," subject to a single exception for cases involving a defendant's willful misrepresentation of material information. § 1681p. The most natural reading of § 1681p is that Congress implicitly excluded a general discovery rule by explicitly including a more limited one. See *Leatherman* v. *Tarrant County Narcotics Intelligence and Coordination Unit*, 507 U.S. 163, 168 (1993) (" *Expressio unius est exclusio alterius*."). We would distort § 1681p's text by converting *29 the exception into the rule. Cf. *United States* v. *Brockamp*, 519 U.S. 347, 352 (1997) ("explicit listing of exceptions" to running of limitations period considered indicative of

29

Congress' intent to preclude "courts [from] read[ing] other unmentioned, open-ended, `equitable' exceptions into the statute").

At least equally telling, incorporating a general discovery rule into § 1681p would not merely supplement the explicit exception contrary to Congress' apparent intent; it would in practical effect render that exception entirely superfluous in all but the most unusual circumstances. A consumer will generally not discover the tortious conduct alleged here — the improper disclosure of her credit history to a potential user — until she requests her file from a credit reporting agency. If the agency responds by concealing the offending disclosure, both a generally applicable discovery rule and the misrepresentation exception would operate to toll the statute of limitations until the concealment is revealed. Once triggered, the statute of limitations would run under either for two years from the discovery date. In this paradigmatic setting, then, the misrepresentation exception would have no work to do.

Both Andrews and the Government, appearing as *amicus* in her support, attempt to generate some role for the express exception independent of that filled by a general discovery rule. They conceive of the exception as a codification of the judge-made doctrine of equitable estoppel, which, they argue, operates only *after* the discovery rule has triggered the limitations period, preventing a defendant from benefiting from its misrepresentation by tolling that period until the concealment is uncovered.

To illustrate this supposed separate application, Andrews and the Government frame the following scenario: A credit reporting agency injures a consumer by disclosing her file for an improper purpose. The consumer has no reason to suspect the violation until a year later, when she applies for *30 and is denied credit as a result of the agency's wrongdoing. At that point, the Government asserts, "the consumer would presumably be put on inquiry notice of the

30

TRW Inc. v. Andrews    534 U.S. 19 (2001)

violation, and the discovery rule would start the running of the normal limitation period." Brief for United States et al. as *Amici Curiae* 22 (emphasis); see Tr. of Oral Arg. 35-36 (argument in accord by Andrews' counsel). Some days or months later, the consumer follows up on her suspicions by requesting a copy of her credit report, to which the agency responds by concealing the initial improper disclosure. According to Andrews and the Government, the misrepresentation exception would then operate to toll the already-commenced limitations period until the agency reveals its wrongdoing.

We reject this argument for several reasons. As an initial matter, we are not persuaded by this effort to distinguish the practical function of a discovery rule and the express exception, because we doubt that the supporting scenario is likely to occur outside the realm of theory. The fatal weakness in the narrative is its assumption that a consumer would be charged with constructive notice of an improper disclosure upon denial of a credit application. If the consumer habitually paid her bills on time, the denial might well lead her to suspect a prior credit agency error. But the credit denial would place her on "inquiry notice," and the discovery rule would trigger the limitations period at that point, only if a reasonable person in her position would have learned of the injury in the exercise of due diligence. See *Stone* v. *Williams*, 970 F.2d 1043, 1049 (CA2 1992) ("The duty of inquiry having arisen, plaintiff is charged with whatever knowledge an inquiry would have revealed."); 2 C. Corman, Limitation of Actions § 11.1.6, p. 164 (1991) ("It is obviously unreasonable to charge the plaintiff with failure to search for the missing element of the cause of action if such element would not have been revealed by such search.").

In the usual circumstance, the plaintiff will gain knowledge of her injury from the credit reporting agency. The *31 scenario put forth by Andrews and the Government, however, requires the assumption that, even if the consumer exercised

reasonable diligence by requesting her credit report without delay, she would not in fact learn of the disclosure because the credit reporting agency would conceal it. The uncovering of that concealment would remain the triggering event for both the discovery rule and the express exception. In this scenario, as in the paradigmatic one, the misrepresentation exception would be superfluous.

In any event, both Andrews and the Government concede that the independent function one could attribute to the express exception would arise only in "rare and egregious case[s]." Brief for Respondent 32-33; see Brief for United States et al. as *Amici Curiae* 24 (implied discovery rule would apply in "vast majority" of cases). The result is that a rule nowhere contained in the text of § 1681p would do the bulk of that provision's work, while a proviso accounting for more than half of that text would lie dormant in all but the most unlikely situations.

It is "a cardinal principle of statutory construction" that "a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant." *Duncan* v. *Walker*, 533 U.S. 167, 174 (2001) (internal quotation marks omitted); see *United States* v. *Menasche*, 348 U.S. 528, 538-539 (1955) ("It is our duty `to give effect, if possible, to every clause and word of a statute.' " (quoting *Montclair* v. *Ramsdell*, 107 U.S. 147, 152 (1883))). "[W]ere we to adopt [Andrews'] construction of the statute," the express exception would be rendered "insignificant, if not wholly superfluous." *Duncan*, 533 U.S., at 174. We are "reluctant to treat statutory terms as surplusage in any setting," *ibid.*, (internal alteration and quotation marks omitted), and we decline to do so here.[5] *32

> [5] Similarly, even if we agreed that the discovery and equitable estoppel doctrines could comfortably coexist in this setting, we would reject the contention that we are therefore free to incorporate both into the FCRA. As we have explained, see *supra*, at

7-8, we read Congress' codification of one judge-made doctrine not as a license to imply others, but rather as an intentional rejection of those it did not codify.

Andrews advances two additional arguments in defense of the decision below, neither of which we find convincing. She contends, first, that the words "date on which the liability arises" — the phrase Congress used to frame the general rule in § 1681p — "literally expres[s]" a discovery rule because liability does not "arise" until it "present[s] itself" or comes to the attention of the potential plaintiff. Brief for Respondent 13. The dictionary definition of the word "arise" does not compel such a reading; to the contrary, it can be used to support either party's position. See Webster's Third New International Dictionary 117 (1966) (arise defined as "to come into being"; "to come about"; or "to become apparent in such a way as to demand attention"); Black's Law Dictionary 138 (rev. 4th ed. 1968) ("to come into being or notice"). And TRW offers a strong argument that we have in fact construed that word to imply the result Andrews seeks to avoid. See Brief for Petitioner 16-20 (citing, *inter alia*, *McMahon* v. *United States*, 342 U.S. 25 (1951) (statute of limitations triggered on date "cause of action arises" incorporates injury-occurrence rule)). On balance, we conclude, the phrase "liability arises" is not particularly instructive, much less dispositive of this case.

Similarly unhelpful, in our view, is Andrews' reliance on the legislative history of § 1681p. She observes that early versions of that provision, introduced in both the House and Senate, keyed the start of the limitations period to "the date of the occurrence of the violation." S. 823, 91st Cong., 1st Sess., § 618 (1969); H.R. 16340, 91st Cong., 2d Sess., § 27 (1970); H.R. 14765, 91st Cong., 1st Sess., § 617 (1969). From the disappearance of that language in the final version of § 1681p, Andrews infers a congressional intent to reject the rule that the deleted words would have plainly established. *33

As TRW notes, however, Congress also heard testimony urging it to enact a statute of limitations that runs from "the date on which the violation is discovered" but declined to do so. Hearings before the Subcommittee on Consumer Affairs of the House Committee on Banking and Currency, 91st Cong., 2d Sess., 188 (1970). In addition, the very change to § 1681p's language on which Andrews relies could be read to refute her position. The misrepresentation exception was added at the same time Congress changed the language "date of the occurrence of the violation" to "liability arises." Compare S. 823, 91st Cong., 1st Sess., § 618 (1969); H.R. 16340, 91st Cong., 2d Sess., § 27 (1970); H.R. 14765, 91st Cong., 1st Sess., § 617 (1969), with H.R. Rep. No. 91-1587, p. 22 (1970). We doubt that Congress, when it inserted a carefully worded exception to the main rule, intended simultaneously to create a general discovery rule that would render that exception superfluous. In sum, the evidence of the early incarnations of § 1681p, like the "liability arises" language on which Congress ultimately settled, fails to convince us that Congress intended *sub silentio* to adopt a general discovery rule in addition to the limited one it expressly provided.

## III

In this Court, Andrews for the first time presents an alternative argument based on the "liability arises" language of § 1681p. Brief for Respondent 22-25. She contends that even if § 1681p does not incorporate a discovery rule, "liability" under the FCRA does not necessarily "arise" when a violation of the Act occurs. Noting that the FCRA's substantive provisions tie "liability" to the presence of "actual damages," §§ 1681n, 1681o, and that "arise" means at least "to come into existence," Andrews concludes that "liability arises" only when actual damages materialize. Not until then, she maintains, will all the essential elements of a claim coalesce: "duty, breach, causation, and *injury*." Brief for Respondent 23; see *Hyde* v. *Hibernia Nat. Bank*, 861 F.2d 446, *34 449 (CA5 1988) ("The requirement that a

consumer sustain some injury in order to establish a cause of action suggests that the statute should be triggered when the agency issues an erroneous report to an institution with which the consumer is dealing.").

Accordingly, Andrews asserts, her claims are timely: The disputed "liability" for actual damages did not "arise" until May 1995, when she suffered the emotional distress, missed opportunities, and inconvenience cataloged in her complaint; prior to that time, "she had no FCRA claim to bring," Brief for Respondent 24 (emphasis). Cf. *Bay Area Laundry and Dry Cleaning Pension Trust Fund* v. *Ferbar Corp. of Cal.*, 522 U.S. 192, 200-201 (1997) (rejecting construction of statute under which limitations period would begin running before cause of action existed in favor of "standard rule" that the period does not commence earlier than the date "the plaintiff can file suit and obtain relief ").[6]

> [6] The opinion concurring in the judgment rips *Bay Area Laundry and Dry Cleaning Pension Trust Fund* v. *Ferbar Corp. of Cal.*, 522 U.S. 192, 201 (1997), from its berth, see *post*, at 1, 3; we here set the record straight. The question presented in *Bay Area Laundry* was whether a statute of limitations could commence to run on one day while the right to sue ripened on a later day. We answered that question, and only that question, "no," unless the statute indicates otherwise. See 522 U.S., at 200-201. Continuing on beyond the place where the concurrence in the judgment leaves off, we clarified:

> > "Unless Congress has told us otherwise in the legislation at issue, a cause of action does not become `complete and present' for limitations purposes until the plaintiff can file suit and obtain relief. See *Reiter* v. *Cooper*, 507 U.S. 258, 267 (1993) ("While it is theoretically possible for a statute to create a cause of action that accrues at one time for the purpose of calculating when the statute of limitations begins to run, but at another time for the purpose of bringing suit, we will not infer such an odd result in the absence of any such indication in the statute.")."

> *Id.*, at 201.

We do not reach this issue because it was not raised or briefed below. See Reply Brief for Petitioner 18-19. We note, however, that the Ninth Circuit has not embraced Andrews' alternative argument, see 225 F.3d, at 1066 ("Liability *35 under the [Act] arises when a consumer reporting agency fails to comply with § 1681e."), and the Government does not join her in advancing it here.

Further, we doubt that the argument, even if valid, would aid Andrews in this case. Her claims alleged *willful* violations of § 1681e(a) and are thus governed by § 1681n. At the time of the events in question, that provision stated: "Any consumer reporting agency . . . which willfully fails to comply with any requirement imposed under [the Act] with respect to any consumer is liable to that consumer in an amount equal to the sum of . . . any actual damages" and "such amount of punitive damages as the court may allow." 15 U.S.C. § 1681n (1994 ed.). Punitive damages, which Andrews sought in this case, could presumably be awarded at the moment of TRW's alleged wrongdoing, even if "actual damages" did not accrue at that time. On Andrews' theory, then,

TRW Inc. v. Andrews   534 U.S. 19 (2001)

at least some of the liability she sought to enforce arose when the violations occurred, and the limitations period therefore began to run at that point.

\* \* \*

For the reasons stated, the judgment of the Court of Appeals for the Ninth Circuit is reversed, and the case is remanded for further proceedings consistent with this opinion.

It is so ordered.

---

Justice Scalia, with whom Justice Thomas joins, concurring in the judgment.

As the Court notes, *ante*, at 5, 6, the Court of Appeals based its decision on what it called the "general federal rule . . . that a federal statute of limitations begins to run when a party knows or has reason to know that she was injured," 225 F.3d 1063, 1066 (CA9 2000). The Court declines to say whether that expression of the governing general rule is correct. See *ante*, at 27 ("To the extent such a *36 presumption exists, a matter this case does not oblige us to decide . . ."). There is in my view little doubt that it is not, and our reluctance to say so today is inexplicable, given that we held, a mere four years ago, that a statute of limitations which says the period runs from "the date on which the cause of action arose," 29 U.S.C. § 1451(f)(1) (1994 ed.), "incorporates *the standard rule* that the limitations period commences when the plaintiff has a complete and present cause of action," *Bay Area Laundry and Dry Cleaning Pension Trust Fund* v. *Ferbar Corp. of Cal.*, 522 U.S. 192, 201 (1997) (emphasis added and internal quotation marks omitted).[1] *37 Bay Area Laundry* quoted approvingly our statement in *Clark* v. *Iowa City*, 20 Wall. 583, 589 (1875), that "[a]ll statutes of limitation begin to run when the right of action is complete . . . ." This is unquestionably the traditional rule: absent other indication, a statute of limitations begins to run at the time the plaintiff "has the right to apply to the

court for relief . . . ." 1 H. Wood, Limitation of Actions § 122a, p. 684 (4th ed. 1916). "That a person entitled to an action has no knowledge of his right to sue, or of the facts out of which his right arises, does not postpone the period of limitation." 2 Id. § 276c(1), at 1411.

[1] This analysis does not, as the Court asserts, *ante*, at 14, n. 6, "ri[p] *Bay Area Laundry* . . . from its berth." The question presented on which certiorari was granted in the case was not, as the Court now recharacterizes it, the generalized inquiry "whether a statute of limitations could commence to run on one day while the right to sue ripened on a later day," *ibid.*, but rather (as set forth in somewhat abbreviated form in petitioner Bay Area Laundry's merits brief) the much more precise question, "When does the statute of limitations begin to run on an action under the Multiemployer Pension Plan Amendments Act, 29 U.S.C. § 1381 *et seq.*, to collect overdue employer withdrawal liability payments? " Brief for Petitioner in O.T. 1997, No. 96-370, p. i. (Framing of the question in respondent Ferbar Corporation's merits brief was virtually identical.) The Court's *Bay Area Laundry* opinion introduced its discussion of the merits as follows:

"[T]he Ninth Circuit's decision conflicts with an earlier decision of the District of Columbia Circuit [which] held that the statute of limitations . . . runs from the date the employer misses a scheduled payment, not from the date of complete withdrawal. . . . The Third and Seventh Circuits have also held that the statute of limitations runs from the failure to make a payment. . . . We granted certiorari . . . to resolve these conflicts." 522 U.S., at 200.

The Court's assertion that we did not

TRW Inc. v. Andrews   534 U.S. 19 (2001)

answer the question presented, and did not resolve the conflicts — held only that the Ninth Circuit was wrong to say that the limitations period commenced before there was a right of action, and not that the other Circuits were right to say that the period commenced upon the failure to make a payment — is as erroneous as it is implausible. *Bay Area Laundry* held that the cause of action arose when "the employer violated an obligation owed the plan," *id.*, at 202, *because* "the standard rule" is that the period begins to run when the plaintiff has a "complete and present cause of action," *id.*, at 201 (internal quotation marks omitted).

The injury-discovery rule applied by the Court of Appeals is bad wine of recent vintage. Other than our recognition of the historical exception for suits based on fraud, *e.g.*, *Bailey* v. *Glover*, 21 Wall. 342, 347-350 (1875), we have deviated from the traditional rule and imputed an injury-discovery rule to Congress on only one occasion. *Urie* v. *Thompson*, 337 U.S. 163, 169-171 (1949).[2] We did so there because we could not imagine that legislation as "humane" as the Federal Employers' Liability Act would bar recovery for latent medical injuries. *Id.*, at 170. We repeated this sentiment in *Rotella* v. *Wood*, 528 U.S. 549, 555 (2000), saying that the "cry for a discovery rule is loudest" in the context of medical-malpractice suits; and we repeat it again today with the assertion that the present case does *not* involve "an area *38 of the law that cries out for application of a discovery rule," *ante*, at 28. These cries, however, are properly directed not to us, but to Congress, whose job it is to decide how "humane" legislation should be — or (to put the point less tendentiously) to strike the balance between remediation of all injuries and a policy of repose. See *Amy* v. *Watertown (No. 2)*, 130 U.S. 320, 323-324 (1889) ("[T]he cases in which [the statute of limitations may be suspended by causes not mentioned in the statute itself] are very limited in

character, and are to be admitted with great caution; otherwise the court would make the law instead of administering it").

[2] As the Court accurately notes, *ante*, at 6-7, in one other case we simply observed (without endorsement) that several Courts of Appeals had substituted injury-discovery for the traditional rule in medical-malpractice actions under the Federal Tort Claims Act, see *United States* v. *Kubrick*, 444 U.S. 111, 120, and n. 7 (1979), and in two other cases observed (without endorsement) that lower federal courts "generally apply" an injury-discovery rule, see *Rotella* v. *Wood*, 528 U.S. 549, 555 (2000); *Klehr* v. *A. O. Smith Corp.*, 521 U.S. 179, 191 (1997).

Congress has been operating against the background rule recognized in *Bay Area Laundry* for a very long time. When it has wanted us to apply a different rule, such as the injury-discovery rule, it has said so. See, *e.g.*, 18 U.S.C. § 1030(g) (1994 ed., Supp. V).[3] See also, *e.g.*, 15 U.S.C. § 77m (1994 ed., Supp. V);[4] 42 U.S.C. § 9612(d)(2) (1994 ed.).[5] To apply a new background rule to previously enacted legislation would reverse prior congressional judgments; and to display uncertainty regarding the current background rule makes all unspecifying new legislation a roll of the dice. Today's opinion, in clarifying the meaning of 15 U.S.C. § 1681p, casts the meaning of innumerable other limitation periods in doubt. *39 *39

[3] "No action may be brought under this subsection unless such action is begun within 2 years of the date of the act complained of or the date of the discovery of the damage."

[4] "No action shall be maintained to enforce any liability created under section 77k or 77l(a)(2) of this title unless brought within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the

TRW Inc. v. Andrews    534 U.S. 19 (2001)

exercise of reasonable diligence, or, if the action is to enforce a liability created under section 77l(a)(1) of this title, unless brought within one year after the violation upon which it is based."

5  "No claim may be presented under this section . . . unless the claim is presented within 3 years after . . . [t]he date of the discovery of the loss and its connection with the release in question."

Because there is nothing in this statute to contradict the rule that a statute of limitations begins to run when the cause of action is complete, I concur in the judgment of the Court.

40    *40



No. 11-14994

United States Court of Appeals, Eleventh Circuit.

# Dubov v. Read (In re Read)

692 F.3d 1185 (11th Cir. 2012)   ·   23 Fla. L. Weekly Fed. C 1490   ·   56 Bankr. Ct. Dec. 258
Decided Aug 30, 2012

No. 11–14994.

2012-08-30

In re Sandra Ann READ, Debtor. Pam Dubov, Pinellas County Property Appraiser; Diane Nelson, Pinellas County Tax Collector, Plaintiffs–Appellants, v. Sandra Ann Read, Defendant–Appellee.

Christina Marie LeBlanc, David S. Crowell, Sarah Richardson, Pinellas County Attorney's Office, Clearwater, FL, for Plaintiffs–Appellants. Herbert R. Donica, Donica Law Firm, PA, Tampa, FL, for Defendant–Appellee.

ALARCÓN

1187 *1187

Christina Marie LeBlanc, David S. Crowell, Sarah Richardson, Pinellas County Attorney's Office, Clearwater, FL, for Plaintiffs–Appellants. Herbert R. Donica, Donica Law Firm, PA, Tampa, FL, for Defendant–Appellee.

Appeal from the United States District Court for the Middle District of Florida.

**Before DUBINA, Chief Judge, and JORDAN and ALARCÓN,** * **Circuit Judges.**

**ALARCÓN, Circuit Judge:**

> * Honorable Arthur L. Alarcón, United States Circuit Judge for the Ninth Circuit, sitting by designation.

Pam Dubov, Pinellas County Property Appraiser ("Property Appraiser") and Diane Nelson, Pinellas County Tax Collector ("Tax Collector") appeal

from an order of the District Court of the Middle District of Florida affirming the final order of the Tampa Division of the United States Bankruptcy Court. The bankruptcy court held that Sandra Ann Read's ("the Debtor") request for the bankruptcy court to redetermine her *ad valorem* tax liability for the year 2009 was timely filed under 11 U.S.C. §§ 108(a) and 505. The Property Appraiser and Tax Collector appealed to the district court, which issued an order affirming the decision of the bankruptcy court.

The Property Appraiser and Tax Collector contend that the specific provisions of § 505(a)(2)(C) preclude a bankruptcy court from redetermining the amount or legality of any *ad valorem* tax liability on real property of a debtor's estate, if the allowable period for contesting such a claim under state law expired prior to the filing of an objection in the bankruptcy court, notwithstanding the general extension of time periods for filing set forth in § 108(a). We reverse the district court's affirmance of the bankruptcy court's decision in this matter because we conclude that, when Congress amended § 505(a) by adding § 505(a)(2)(C), it intended to create an exception to the general time limits for contesting a tax assessment set forth in § 108(a).

The bankruptcy court had jurisdiction pursuant to 28 U.S.C. § 158(a). "Section [ ] 158(d) grants jurisdiction to courts of appeals for all final judgments and orders made by the district courts on appeals taken from the bankruptcy courts." 1188 *1188 *In re Briglevich,* 847 F.2d 759, 760 (11th Cir.1988).



## I

In this matter, the Property Appraiser certified the 2009 Tax Rolls to the Tax Collector for collection on October 12, 2009. The Debtor filed a voluntary petition under Chapter 11 of the Bankruptcy Code twenty-nine days later on November 10, 2009. The Tax Collector filed a proof of claim on December 15, 2009 ("Tax Claims"), for unpaid real property *ad valorem* taxes, based on the appraised value of approximately twenty investment properties owned by the Debtor. The Debtor did not file a judicial challenge to the value of her property in a Florida state court within 60 days of the October 12, 2009 certification of the 2009 tax rolls by the Property Appraiser pursuant to Fla. Stat. § 194.171(2) (2009).[1] The Debtor filed an objection to the Tax Claims in the bankruptcy court on April 21, 2010, on the ground that the assessed value exceeded the actual value of the property. Under Florida law, the failure to file a challenge to a tax assessment within the prescribed time limit deprives Florida courts of the jurisdiction to consider a claim.[2] The Debtor's initial objection to the Tax Collector's claim was not filed in the bankruptcy court until 131 days after the 60–day deadline to file a challenge to the tax assessment in a Florida state court.

> [1] .Section 194.171(2), Fla. Stat. (2009), provides as follows:
>
> No action shall be brought to contest a tax assessment after 60 days from the date the assessment being contested is certified for collection under s. 193.122(2), or after 60 days from the date a decision is rendered concerning such assessment by the value adjustment board if a petition contesting the assessment had not received final action by the value adjustment board prior to extension of the roll under s. 197.323.
>
> The Debtor did not file an appeal with the value adjustment board within the prescribed time.

> [2] .Section 194.171(6), Fla. Stat. (2009), states:
>
> The requirements of subsections (2), (3), and (5) are jurisdictional. No court shall have jurisdiction in such cases until after the requirements of both subsections (2) and (3) have been met. A court shall lose jurisdiction of a case when the taxpayer has failed to comply with the requirements of subsection (5).

## II

We must decide whether the bankruptcy court erred in holding that the time period for the filing of the Debtor's request for a redetermination of the amount of the *ad valorem* taxes was timely, notwithstanding the fact that the time to contest the tax assessment had expired under state law. The Tax Collector and Property Appraiser contend that § 505(a)(2)(C) of the Bankruptcy Code creates an exception to the general time provisions of § 108(a) to file a claim for a tax refund and expressly precludes a bankruptcy court from redetermining a debtor's *ad valorem* tax liability if the applicable period for doing so has expired under relevant nonbankruptcy law. It is undisputed that the Debtor's objection to the *ad valorem* tax claim did not occur until after the time to do so under Florida law had expired. The Debtor contends that her objection was timely pursuant to § 108(a) because her petition for bankruptcy relief was filed before the period to commence an action under Florida law to challenge the amount of the *ad valorem* tax had expired. Because this appeal challenges the district court's decision affirming the bankruptcy court's order, our review is *de novo. See In re Globe Mfg. Corp.,* 567 F.3d 1291, 1296 (11th Cir.2009) ("We review the district court's decision to affirm the bankruptcy court *de novo,* which allows us to assess the bankruptcy 1189 court's judgment anew, *1189 employing the same standard of review as the district court itself used.").

The issue raised in this appeal has not been reviewed by any United States Court of Appeals. It has been addressed by three other bankruptcy courts. Each has held that a bankruptcy court loses the right to determine tax liability where, as here, the debtor does not seek redetermination prior to the expiration of time for the bringing of an action under state law. *See In re Breakwater Shores Partners, L.P.,* 2012 WL 1155773, at *3, 2012 Bankr.LEXIS 1454, at *11 (Bankr.E.D.Tex. Apr. 5, 2012) (holding that § 505(a)(2)(c) "is properly construed as requiring that a determination request must be prior to the expiration of the deadline established for review under state law without possibility of extension under Bankruptcy Code § 108."); *In re Village at Oakwell Farms, Ltd.,* 428 B.R. 372, 376–80 (Bankr.W.D.Tex.2010) (holding that where a debtor does not seek redemption of *ad valorem* taxes under § 505(a) prior to the expiration for bringing an action under state law, the bankruptcy court loses the right to determine the tax liability); *In re ATA Airlines, Inc.,* 2010 WL 3955574, at *2, 2010 Bankr.LEXIS 3571, at *6–7 (Bankr.S.D.Ind. Oct. 4, 2010) ("§ 505(a)(2) (C) bars a bankruptcy court from redetermining tax liability for an ad valorem tax if the applicable period for contesting or redetermining the amount of the tax under nonbankruptcy law has expired *before the motion to determine tax liability is brought before the bankruptcy court....*") (emphasis added). The bankruptcy court in the matter *sub judice* stands alone in concluding that, where the applicable period for contesting *ad valorem* tax liability has not expired as of the date of the bankruptcy filing, § 108(a) should be read as extending the time to seek redetermination under § 505 for an additional two years, even where the § 505 motion is filed *after* the expiration of the applicable period for contesting the amount under applicable nonbankruptcy law.

## III

This dispute is before us because of the lack of clarity in the relationship between the time limits set forth in § 108(a) and § 505(a)(2)(C) for

challenging an *ad valorem* tax, if the time to do so has expired under state law before the *ad valorem* tax is asserted in a bankruptcy court. Section 108(a) provides:

(a) *If applicable nonbankruptcy law,* an order entered in a nonbankruptcy proceeding, or an agreement

*fixes a period within which the debtor may commence an action, and such period has not expired before the date of the filing of the petition, the trustee may commence such action only before the later of*

(1) the end of such period, including any suspension of such period occurring on or after the commencement of the case; or

(2) *two years after the order for relief.*
11 U.S.C. § 108(a) (emphases added).

In 2005, Congress amended the Bankruptcy Code by adding § 505(a)(2)(C). Section 505(a), as amended, provides:

(a)(1) Except as provided in paragraph (2) of this subsection, the court may determine the amount or legality of any tax, any fine or penalty relating to a tax, or any addition to tax, whether or not previously assessed, whether or not paid, and whether or not contested before and adjudicated by a judicial or administrative tribunal of competent jurisdiction.

(2)

*The court may not so determine*

(A) the amount or legality of a tax, fine, penalty, or addition to tax if such amount or legality was contested before *1190 and adjudicated by a judicial or administrative tribunal of competent jurisdiction before the commencement of the case under this title;

(B) any right of the estate to a tax refund, before the earlier of

(i) 120 days after the trustee properly requests such refund from the governmental unit from which such refund is claimed; or

(ii) a determination by such governmental unit of such request; or

(C) *the amount or legality of any amount arising in connection with an ad valorem tax on real or personal property of the estate, if the applicable period for contesting or redetermining that amount under applicable nonbankruptcy law has expired*.

11 U.S.C. § 505(a) (emphases added).

Under Florida law, absent the application of 11 U.S.C. § 108(a), the time for Debtor to challenge the 2009 *ad valorem* tax valuations would have expired on December 13, 2009 (i.e., 60 days after the certification of the tax rolls). Applying § 108(a) alone, without regard to any of the provisions in § 505, would have extended to April 21, 2010, the time allowed for the trustee, on behalf of Debtor's estate, to file objections to the valuations. But a plain reading of § 108(a) and § 505 does not permit us to apply § 108(a) alone. Rather, § 108(a) must be considered together with § 505.

Subsection (a)(2)(C) of § 505 does not permit a bankruptcy court to determine the amount or legality of an *ad valorem* tax on real estate "if the applicable period for contesting or redetermining that amount under applicable nonbankruptcy law has expired." § 505(a)(2)(C). Under Florida law, which is the relevant nonbankruptcy law, the period for contesting the valuations expired on December 13, 2009. Because we cannot read § 108(a) alone, the Debtor (or the trustee on behalf of the Debtor) was not entitled to wait until April 21, 2010, to file a challenge to the *ad valorem* tax valuation. In other words, because § 108(a) is *not* a nonbankruptcy law, its extension of the time period is irrelevant for purposes of § 505(a)(2)(C). We cannot look to § 108(a) because it is a bankruptcy law.

This plain reading of § 505(a)(2)( C) is supported by the policy underlying § 505, which "is to protect creditors and ensure the finality of determinations of tax liability reached prior to bankruptcy." *In re Galvano,* 116 B.R. 367, 372 (Bankr.E.D.N.Y.1990). "In enacting § 505, Congress was concerned with protecting creditors from the dissipation of an estate's assets which could result if creditors were bound by a tax judgment which a debtor, due to its ailing financial condition, failed to contest." *Id.* (citing *In re Century Vault Co.,* 416 F.2d 1035, 1041 (3d Cir.1969)) (discussing the rationale for § 2a (2A) of the Bankruptcy Code, the precursor to § 505, and concluding that it was intended to protect creditors who "should not be bound by omissions of the bankrupt" where the debtor has little or no interest in contesting a tax assessment and permits an adjudication to be taken against him or her prior to bankruptcy).

Section 505(a)(2)(C) was added in 2005 as part of the Bankruptcy Abuse Prevention and Consumer Protection Act ("BAPCPA"). This Court has held that "[t]he heart of [BAPCPA's] consumer bankruptcy reforms ... is intended to ensure that debtors repay creditors the maximum they can afford." *Whaley v. Tennyson* ( *In re Tennyson*), 611 F.3d 873, 879 (11th Cir.2010) (second and third alterations in original) (quoting H.R. Rep. 109–31(I), p. 2, 2005 U.S.C.C.A.N. 88, 89); *see also* Elizabeth Weller, *Does the Bankruptcy Court* *1191Really Have Unlimited Authority*\*1191*to Redetermine Taxes?,* 29–NOV Am. Bankr.Inst. J. 12, 67 (2010) ("Recognizing the potential for abuse ... Congress added § 505(a)(2)(C), which eliminated the court's authority to redetermine 'the amount or legality of any amount arising in connection with an *ad valorem* tax on real or personal property of the estate, if the applicable period for contesting or redetermining that amount under any law (other than a bankruptcy law) *has expired.'* ") (quoting 11 U.S.C. § 505(a)(2)(C)).

Before Congress amended § 505 in 2005, a debtor was free to contest *ad valorem* tax claims that arose many years prior to the filing of a voluntary bankruptcy petition, but which had not been contested or adjudicated prepetition. By amending the statute to include § 505(a)(2)(C), Congress expressly intended to protect creditors by prohibiting a debtor from contesting *ad valorem* tax claims after the time for filing an action challenging the assessment of such taxes has expired under state law. *See e.g.,* Carl M. Jenks, *The Bankruptcy Abuse Prevention and Consumer Protection Act of 2005: Summary of Tax Provisions,* 79 Am. Bankr.L.J. 893, 896 (2005) ("Under the [BAPCPA], if the liability for an *ad valorem* tax has become fixed and the debtor's time to contest it outside of bankruptcy court has expired, the debtor may not contest the liability in bankruptcy.").

The 2005 amendment to the Bankruptcy Act that added § 505(a)(2)(C) has resulted in conflicting decisions from the bankruptcy courts that have been required to determine whether it is applicable if a petition for bankruptcy relief is filed *before* the time limit to challenge an *ad valorem* tax has expired. Here, the bankruptcy court concluded that § 505(a)(2)(C) was not applicable because the Debtor filed her petition in bankruptcy court prior to the date within which the debtor could have commenced an action under a nonbankruptcy proceeding. As noted above, the bankruptcy court in *In re Village at Oakwell Farms, Ltd.,* held that when a debtor fails to seek a redetermination of his or her tax liability prior to the expiration date for filing an action in a state proceeding, the debtor loses the right to seek a redetermination in a bankruptcy court under § 505(a)(2)(C). 428 B.R. at 380. We agree.

"It is a cardinal principle of statutory construction that a statute, ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant." *TRW Inc. v. Andrews,* 534 U.S. 19, 31, 122 S.Ct. 441, 151 L.Ed.2d 339 (2001)

(quoting *Duncan v. Walker,* 533 U.S. 167, 174, 121 S.Ct. 2120, 150 L.Ed.2d 251 (2001) (internal quotation marks omitted)). "It is our duty, 'to give effect, if possible, to every clause and word of a statute.' " *United States v. Menasche,* 348 U.S. 528, 539, 75 S.Ct. 513, 99 L.Ed. 615 (1955) (quoting *Montclair v. Ramsdell,* 107 U.S. 147, 152, 2 S.Ct. 391, 27 L.Ed. 431 (1883)). "General language of a statutory provision, although broad enough to include it, will not be held to apply to a matter specifically dealt with in another part of the same enactment. Specific terms prevail over the general in the same or another statute which otherwise might be controlling." *D. Ginsberg & Sons, Inc. v. Popkin,* 285 U.S. 204, 208, 52 S.Ct. 322, 76 L.Ed. 704 (1932) (internal citations omitted).

The intent of Congress in enacting § 505(a)(2)(C) was to prevent bankruptcy abuse by debtors and ensure that debtors pay the amount they owe as soon as possible. We are persuaded that in enacting § 505(a)(2)(C), Congress intended that the specific provisions of that statute must prevail over the more general provisions of § 108(a).*1192

## Conclusion

We conclude that the bankruptcy court erred in ruling that the Debtor's request for determination of her *ad valorem* tax liability was timely under the general time extension provision of § 108(a). The bankruptcy court's interpretation of the language in § 505(a)(2)(C) fails to give full effect to Congress's intent in passing the reforms in the BAPCPA, to curb abuses, protect creditors, and "ensure that debtors repay creditors the maximum they can afford." *In re Tennyson,* 611 F.3d at 879 (quotation omitted).

Accordingly, we REVERSE the judgment of the district court affirming the bankruptcy court's order holding that the Debtor's request for determination of her ad valorem tax liability was timely, and we REMAND this case to the district court with instructions to VACATE the bankruptcy court's order.





No. 07-12624 Non-Argument Calendar
United States Court of Appeals, Eleventh Circuit

# Brotherhood of Locomotive Engineers & Trainmen General Committee of Adjustment CSX Transportation Northern Lines v. CSX Transportation, Inc.

522 F.3d 1190 (11th Cir. 2008)
Decided Apr 4, 2008

No. 07-12624 Non-Argument Calendar.

1191 April 4, 2008. *1191

Richard Steven Edelman, O'Donnell, Schwartz Anderson, P.C., Washington, DC, for Plaintiff-Appellant.

Ronald Maurice Johnson, Michael S. McIntosh, Akin, Gump, Strauss, Hauer Feld, L.L.P., Washington, DC, for Defendant-Appellee.

Appeal from the United States District Court for the Middle District of Florida.

Before BIRCH, BLACK and MARCUS, Circuit Judges.

1192 *1192

BIRCH, Circuit Judge:

This appeal under the Railway Labor Act, 45 U.S.C. § 151, *et seq.* ("RLA"), concerns when an enforcement action accrues under the statute of limitations after an arbitration award and, alternatively, whether a request for interpretation of an arbitration award tolls the limitations period. Following an arbitration award, the union sought to enforce the award in district court. The district judge determined that the union's petition was outside the two-year, statutory limitations period and dismissed the enforcement action, which has presented first-impression issues for our circuit. We affirm.

## I. BACKGROUND

On November 19, 2002, T.R. Pitzen, employed by defendant-appellee, CSX Transportation, Inc. ("CSX"), claimed absence from work because of an off-duty neck injury. CSX did not question the legitimacy of Pitzen's claim. After nearly a three-week absence, Pitzen told a supervisor that, during the period when he supposedly was unable to operate trains, he had driven from Ohio to Panama City, Florida, participated in a karate tournament, and won the heavy-weight title at that tournament. Because his claimed injury absence was under false pretenses, CSX charged Pitzen with dishonesty and terminated him.

On behalf of Pitzen, plaintiff-appellant, Brotherhood of Locomotive Engineers and Trainmen General Committee of Adjustment CSX Transportation Northern Lines ("BLET"), challenged his dismissal and requested his reinstatement. Pursuant to the parties' collective bargaining agreement and a separate arbitration agreement that established Public Law Board 5959 1193 (the "Board"), the parties referred *1193 Pitzen's claim to the Board.[1] An arbitrator determined that CSX had the burden of proving that Pitzen had been dishonest regarding his absence because of his alleged injury and that it had failed to carry its burden. On June 2, 2004, the arbitrator sustained Pitzen's claim and ordered compliance within thirty days.


casetext
Part of Thomson Reuters

1  The RLA governs labor relations in the railroad industry and prescribes mandatory procedures for the resolution of disputes. Minor disputes arise under collective bargaining agreements involving employee grievances, which seek to enforce contractual rights or to resolve differing interpretations of an award. *Consolidated Rail Corp. v. Railway Labor Executives' Ass'n,* 491 U.S. 299, 302, 109 S.Ct. 2477, 2480, 105 L.Ed.2d 250 (1989); *Empresa Ecuatoriana de Aviacion, S.A. v. District Lodge No. 100,* 690 F.2d 838, 843 (11th Cir. 1982). Minor disputes include disputes over a carrier's right to discipline employees under the terms of a collective bargaining agreement. *Martin v. American Airlines, Inc.,* 390 F.3d 601, 607 (8th Cir. 2004). If the parties cannot resolve minor disputes, then either party may submit the dispute to final and binding arbitration. 45 U.S.C. § 153 First (i); *see Consolidated Rail Corp.,* 491 U.S. at 303, 109 S.Ct. at 2481; *Empresa Ecuatoriana de Aviacion,* 690 F.2d at 844. Such arbitration can occur before the National Railroad Adjustment Board ("NRAB"), a permanent arbitration board established by the RLA, 45 U.S.C. § 153 First. Alternatively, arbitration can occur before an arbitration board that the carrier and union create. 45 U.S.C. § 153 Second. These alternative boards are commonly referred to as Public Law Boards, which consist of representatives designated by the carrier and the union and a neutral arbitrator. 45 U.S.C. § 153 Second; *International Bhd. of Elec. Workers v. CSX Transp., Inc.,* 446 F.3d 714, 717 (7th Cir. 2006). BLET and CSX created Public Law Board No. 5959 to arbitrate specified labor disputes between them.

CSX reinstated Pitzen but did not pay him back wages for the period of his dismissal. On August 19, 2004, BLET sent a letter to CSX and demanded back pay for Pitzen. CSX responded on October 6, 2004, that the award did not require the payment of back wages. For more than a year, BLET did nothing. In November 2005, BLET sent two more letters to CSX demanding back pay for Pitzen. CSX responded by repeating its position that the award did not include back pay.

On February 9, 2006, BLET requested that the arbitrator clarify whether the award required payment of back wages. BLET had first acknowledged the potential need for such a clarification in its initial letter on August 19, 2004, but delayed making its request for an interpretation for another sixteen months. On April 7, 2006, the arbitrator clarified that, although the award did not provide for back wages expressly, the terms of the parties' collective bargaining agreement required them. Nonetheless, BLET waited almost four more months before filing its petition for enforcement with the district court on August 1, 2006. In lieu of an answer, CSX moved to dismiss under Federal Rule of Civil Procedure 12(b)(6), because the two-year statute of limitations barred BLET's petition to enforce the award.

On the facts pled in BLET's petition, the district judge concluded that the cause of action for enforcement accrued on July 3, 2004, and granted CSX's motion. The judge additionally decided that the Board had issued an interpretation of the award under 45 U.S.C. § 153 First (m), which did not toll the statute of limitations. Accordingly, the district judge determined that BLET filed its August 1, 2006, petition outside the two-year limitations period and dismissed the action. BLET has appealed that order.

## II. DISCUSSION

A. *Standards of Review*

Prevailing parties under Public Law Boards can enforce awards in federal district court. 45 U.S.C. § 153 First (p). In reviewing a motion to dismiss under Rule 12(b)(6), the standard of review "is ¹¹⁹⁴*1194 the same for the appellate court as it was for the trial court." *Stephens v. Department of Health*



*Human Servs.*, 901 F.2d 1571, 1573 (11th Cir. 1990). We review a district judge's order granting a motion under Rule 12(b)(6) *de novo. Spain v. Brown Williamson Tobacco Corp.*, 363 F.3d 1183, 1187 (11th Cir. 2003) (per curiam). We accept the allegations in the complaint as true and construe them in favor of the plaintiff. *Hill v. White,* 321 F.3d 1334, 1335 (11th Cir. 2003) (per curiam). A Rule 12(b)(6) dismissal "on statute of limitations grounds is appropriate only if it is `'"apparent from the face of the complaint"' that the claim is time-barred." *Tello v. Dean Witter Reynolds, Inc.*, 410 F.3d 1275, 1288 (11th Cir. 2005) (citations omitted).

We review *de novo* a district court's legal determination concerning the availability of equitable tolling for a statute of limitations. *Drew v. Department of Corrs.*, 297 F.3d 1278, 1283 (11th Cir. 2002). In contrast, the application of that law to the particular facts is reviewed for abuse of discretion. *Arce v. Garcia*, 434 F.3d 1254, 1260 (11th Cir. 2006). There is an abuse of discretion when a district judge bases his or her decision on factual findings that are clearly erroneous. *Id.*

B. *Accrual of Cause of Action*

There is no dispute that the two-year statute of limitations contained in 45 U.S.C. § 153 First (r) applies to BLET's action. This appeal concerns when BLET's enforcement cause of action under 45 U.S.C. § 153 First (p) accrued for the purpose of calculating the running of the statute of limitations. Because the award specifically states that CSX had to comply within thirty days, and the date of the award was June 2, 2004, the district judge concluded that BLET's enforcement cause of action accrued on July 3, 2004. Since BLET did not file its petition for enforcement until August 1, 2006, the judge dismissed BLET's claim as untimely.

The statute of limitations for RLA enforcement actions states that "[a]ll actions at law based upon the provisions of this section shall be begun *within two years from the time the cause of action*

*accrues* under the award of the division of the Adjustment Board, *and not after.*" 45 U.S.C. § 153 First (r) (emphasis added). To determine when an enforcement cause of action accrues, the statute provides:

> If a carrier does not comply with an order of a division of the Adjustment Board *within the time limit in such order*, the petitioner, or any person for whose benefit such order was made, may file in the District Court of the United States . . . a petition setting forth briefly the causes for which he claims relief, and the order of the division of the Adjustment Board in the premises. Such suit in the District Court of the United States shall proceed in all respects as other civil suits, except that on the trial of such suit the findings and order of the division of the Adjustment Board *shall be conclusive on the parties*
>
> . . . .

45 U.S.C. § 153 First (p) (emphasis added). The plain language of these provisions makes the carrier's failure to comply within the time limit established by the award the triggering event for an enforcement action and the running of the statute of limitations. BLET's interpretation, that "there is a cause of action for enforcement of an award, not when an award issues, or even when it becomes effective, but when the carrier refuses to comply with the award," Appellant's Br. at 10, disregards the subsequent clarifying statutory phrase that a carrier must comply "within the time limit in such order," 45 U.S.C. § 153 First (p).

The primary principle of statutory construction requires courts to give effect *1195 to the plain meaning of the words used "in their ordinary and usual sense." *Caminetti v. United States*, 242 U.S. 470, 485-86, 37 S.Ct. 192, 194, 61 L.Ed. 442 (1917). To the extent possible, the rules of statutory construction require courts to give meaning to every word and clause in a statute. *United States v. Menasche*, 348 U.S. 528, 538-39,

75 S.Ct. 513, 520, 99 L.Ed. 615 (1955); *TRW Inc. v. Andrews*, 534 U.S. 19, 31, 122 S.Ct. 441, 449, 151 L.Ed.2d 339 (2001). Additionally, courts must reject statutory interpretations that would render portions of a statute surplusage. *TRW*, 534 U.S. at 31, 122 S.Ct. at 449.

Consequently, the plain meaning of "within the time limit in such order" in § 153 First (p) is that a cause of action to enforce an award arises at the end of the time limit set forth in that award. By requiring a carrier to comply by a date certain, the RLA provides plaintiffs with a basis to determine whether they have a cause of action for enforcement. No compliance by the requisite date indicates that a potential plaintiff had time to acquire sufficient factual knowledge for reasonable inquiry to reveal the cause of action. *United States v. Kubrick*, 444 U.S. 111, 122-24, 100 S.Ct. 352, 359-60, 62 L.Ed.2d 259 (1979). In this case, BLET had reasonable basis to know that CSX was not going to pay Pitzen back wages when it did not do so by July 2, 2004, the date specified in the award for compliance. Consequently, BLET's cause of action accrued on the date following the deadline for compliance stated in the award, or July 3, 2004, as the district judge correctly determined.

Other circuits have interpreted § 153 First (p) literally and strictly as did the district judge in this case. *See Lekas v. United Airlines, Inc.*, 282 F.3d 296, 300 (4th Cir. 2002) (recognizing that "the failure to comply would have occurred *when payment was not made within that specified time*" (emphasis added)); *Transportation Commc'ns Int'l Union v. CSX Transp., Inc.*, 30 F.3d 903, 905 (7th Cir. 1994) ( *"TCIU"*) ("As a general rule, a cause of action accrues for purposes of subdivision (r) upon a carrier's non-compliance *at the time fixed for compliance in the award.*" (emphasis added)); *Joint Council Dining Car Employees Local 370, Hotel Restaurant Employees Int'l Alliance v. Delaware, L. W.R. Co.*, 157 F.2d 417, 420-21 (2d Cir. 1946) (concluding that the cause of action accrued the day after the date specified in the

award for compliance).[2] These consistent interpretations in other circuits not only are supported by the clear meaning of the statutory *1196 text but *1196 also are justified by policy considerations underlying statutes of limitations. With statutes of limitations, legislatures determine that "`the right to be free of stale claims in time comes to prevail over the right to prosecute them.'" *Kubrick*, 444 U.S. at 117, 100 S.Ct. at 357 (citation omitted). "Statutes of limitations are not arbitrary obstacles to the vindication of just claims, and therefore they should not be given a grudging application. They protect important social interests in certainty, accuracy, and repose." *Cada v. Baxter Healthcare Corp.*, 920 F.2d 446, 452-53 (7th Cir. 1990) (Posner, J.). Tying the accrual of an enforcement action to the specific time set forth in the award ensures that these interests are served and guarantees that both the potential plaintiff and the carrier know the earliest and latest date that an enforcement action can be instituted. *Railroad Yardmasters of N. Am. v. Indiana Harbor Belt R.R. Co.*, 166 F.2d 326, 329 (7th Cir. 1948).

---

2  The Sixth Circuit affirmed a district court's determination that

It is clear and unambiguous that the Congress intended that carriers and its employees, through their unions or otherwise, should be encouraged to avoid industrial strife by setting up special boards of adjustment to determine disputed claims arising from the interpretation of collective bargaining agreements then in effect between the carrier and the union; that such special boards' jurisdiction was to be limited to the jurisdiction conferred thereupon by agreement of the carrier and union; that compliance with the awards of these special boards should be enforced in United States district courts in the same manner and subject to the same proceedings for enforcement of compliance therewith as had earlier been provided for enforcement of compliance with awards of the National Railroad Adjustment Board; and that *the right of action to enforce such compliance should accrue on the date fixed by the special boards as ". . . the time limit . . ." for such compliance.*

Switchmen's Union of N. Am. v. Clinchfield R.R. Co., 310 F.Supp. 606, 610 (E.D.Tenn. 1969) (quoting 45 U.S.C. § 153 First (p)) (omissions in original) (emphasis added), aff'd, 427 F.2d 161 (6th Cir. 1970).

Significantly, this definite standard serves the policy considerations underlying the RLA. One of the stated objectives of the RLA is "to provide for the prompt and orderly settlement" of railway labor disputes. 45 U.S.C. § 151a(5). In enacting the RLA, "Congress endeavored to promote stability in labor-management relations in this important national industry by providing effective and efficient remedies for the resolution of railroad-employee disputes arising out of the interpretation of collective-bargaining agreements." *Union Pac. R.R. Co. v. Sheehan*, 439 U.S. 89, 94, 99 S.Ct. 399, 402, 58 L.Ed.2d 354 (1978) (per curiam). The specific limitations period established in this case by the district judge's interpretation of § 153 First (p) promotes efficiency and prevents labor disputes concerning this issue. *See id.* at 95, 99 S.Ct. at 403 (A determination than an employee "had not filed his appeal within the time requirements of the collective-bargaining agreement . . . is final and binding upon the parties and neither the District Court nor the Court of Appeals had authority to disturb it.").

BLET has not identified any authority that supports an accrual rule different from the district judge's application of § 153 First (p).[3] Accordingly, the district *1197 judge did not err in concluding that CSX failed to comply within the time period specified in the award. Because the award in this case expressly provided a time for compliance, the relevant authority supports the July 3, 2004, accrual date and substantiates the district judge's dismissal. Therefore, the district judge correctly determined that BLET's cause of action accrued when CSX refused to provide back pay by the date stated for compliance in the arbitrator's award. Because BLET waited more than two years after that date to file its petition, the district judge properly dismissed BLET's enforcement action as barred by the two-year statute of limitations.

[3] While BLET cites *Lekas*, it fails to note that the award in *Lekas* did not state a date certain for the carrier to comply. 282 F.3d at 299. It was the absence of a date certain that led the *Lekas* plaintiff to argue that a cause of action to enforce a RLA award accrues when a plaintiff has some other basis to discover the wrongful act that justifies the cause of action. The Fourth Circuit and all of the parties in *Lekas*

recognized that, if the adjustment board had required the carrier to comply " *within a specified time,* the failure to comply would have occurred when payment was not made within that specified time," and the cause of action would have accrued when the date for compliance had passed. *Id.* at 299-300 (emphasis added). *Lekas* is inapposite because the award at issue in this case did specify a time for compliance. BLET also cites the Seventh Circuit's *Railroad Yardmasters* decision for the proposition that there is no cause of action under § 153 First (p) "when an award is not clear, not sufficiently definite, or there is a dispute as to what is required." Appellant's Br. at 14. In *Railroad Yardmasters,* however, the adjustment board had not set a date certain in the challenged arbitration award. 166 F.2d at 328. Because § 153 First (p) confers jurisdiction upon the courts to enforce a RLA award "only on the contingency of non-compliance within the time limit provided in the order," the Seventh Circuit concluded "that an action for enforcement cannot be maintained upon an order which fixes no time limit for compliance." *Id.* at 329. That court explained that § 153 First (p) "requires that a time limit be fixed in the order" and that, where a fixed time appears, the cause of action for enforcement "would accrue upon *non-compliance at the time fixed." Id.* (emphasis added).

The Seventh Circuit in *Railroad Yardmasters* also affirmed the district judge's dismissal of the enforcement action because the award was not sufficiently definite to permit enforcement. 166 F.2d at 329-31. But this was an alternative basis for affirmance, separate and distinct from the argument that the plaintiff's claims were barred by the statute of limitations. *Id.* Therefore, it does not support BLET's contention that its cause of action for enforcement did not accrue until after the Board issued its interpretation of the award.

## C. *Effect of Request for Interpretation on Statute of Limitations*

BLET alternatively argues that, even if its cause of action accrued on July 3, 2007, the district judge still erred in dismissing the case because BLET's request for an interpretation from the Board as to whether CSX had to pay back wages tolled the running of the statute of limitations. Equitable tolling is a form of extraordinary relief that courts have extended "only sparingly." *Irwin v. Department of Veterans Affairs,* 498 U.S. 89, 96, 111 S.Ct. 453, 457, 112 L.Ed.2d 435 (1990). It is "'appropriate when a movant untimely files because of *extraordinary circumstances* that are both beyond his control and unavoidable even with diligence.'" *Arce,* 434 F.3d at 1261 (quoting *Sandvik v. United States,* 177 F.3d 1269, 1271 (11th Cir. 1999) (per curiam)); *see Outler v. United States,* 485 F.3d 1273, 1280 (11th Cir. 2007) (per curiam) ("Equitable tolling is only available if the petitioner establishes (1) extraordinary circumstances and (2) due diligence."). "The plaintiff bears the burden of showing that such extraordinary circumstances exist." *Arce,* 434 F.3d at 1261. The district judge explained that BLET "fails to allege any extraordinary circumstances beyond its control and unavoidable with diligence that prevented it from filing its action within the limitations period. Instead, BLET relies on the argument that the filing of a request for interpretation tolls the statute of limitations." R1-19 at 10.

Requests for interpretations are not uncommon in RLA arbitration proceedings. 45 U.S.C. § 153 First (m). Significantly, BLET could have sought an interpretation when CSX showed that it did not intend to pay Pitzen back wages by not doing so by July 2, 2004, the date of compliance specified in the award. Additionally, CSX clarified that it did not believe that the award required it to make a payment of back wages in the October 6, 2004, letter that it sent to BLET. Nonetheless, BLET waited until February 9, 2006, to request interpretation. Even when the arbitrator issued an

interpretation on April 7, 2006, BLET waited until August 1, 2006, to file its petition for enforcement. These delays show BLET's lack of diligence and such lack of diligence is inimical to a request for tolling. *Arce*, 434 F.3d at 1261, *Sandvik*, 177 F.3d at 1271; *Outler*, 485 F.3d at 1280.

"[F]or statute of limitations purposes[,] a plaintiff's ignorance of his legal rights and his ignorance of the fact of his injury or its cause should [not] receive identical treatment." *Kubrick*, 444 U.S. at 122, 100 S.Ct. at 359; *Lekas*, 282 F.3d at 300. The determinative fact is whether the plaintiff had knowledge of the harm incurred. BLET knew ¹¹⁹⁸when Pitzen did not receive *¹¹⁹⁸ back wages to which he was entitled within the time that the award established for compliance.

BLET could have pursued an interpretation while it sought to enforce the award. Enforcement and interpretation proceedings should proceed separately and simultaneously. *Great Northern Ry. Co. v. National R.R. Adjustment Bd., First Div*, 422 F.2d 1187, 1194 (7th Cir. 1970); *accord TCIU*, 30 F.3d at 907 n. 2. The Seventh Circuit explained "that the two procedures [enforcement and interpretation] should proceed independently of, and simultaneously with, each other." *Great Northern*, 422 F.2d at 1194. When these two actions proceed together, the § 153 First (m) proceedings will result in an interpretation of the award which the parties can make available to the court in the enforcement action, which "is precisely what the statute contemplates" by not dismissing the enforcement action despite the § 153 First (m) interpretation request. *Id.* "The fact that [the carrier] may have been seeking clarification from the Board to support its position does not amount to evidence that [the carrier] either concealed [plaintiff's] cause of action or caused [plaintiff] to miss a filing deadline," and, consequently, does not justify equitable tolling. *Lekas*, 282 F.3d at 301. Because BLET sought an award interpretation did not prevent it from simultaneously filing an enforcement action to

protect its rights. Therefore, BLET's request for interpretation did not justify equitable tolling, because it had not met its burden of showing that extraordinary circumstances existed. *Arce*, 434 F.3d at 1261.

To determine whether equitable tolling is appropriate, "[t]he basic question . . . is one `of legislative intent whether the right shall be enforceable . . . after the prescribed time.'" *Id.* (quoting *Burnett v. New York Cent. R.R. Co.*, 380 U.S. 424, 426, 85 S.Ct. 1050, 1053, 13 L.Ed.2d 941 (1965)) (second omission in original); *see Midstate Horticultural Co. v. Pennsylvania R.R. Co.*, 320 U.S. 356, 360, 64 S.Ct. 128, 130, 88 L.Ed. 96 (1943) ("It does not follow . . . that Congress did not intend the limitation [period] to be absolute."). Therefore, federal courts have refused to toll the statute-of-limitations period established by § 153 First (r).[4] The RLA "should be literally applied in the absence of a clear showing of a contrary or qualified intention of Congress." *Brotherhood of R.R. Trainmen v. Chicago River Ind. R.R. Co.*, 353 U.S. 30, 35, 77 S.Ct. 635, 637, 1 L.Ed.2d 622 (1957). Under a strict interpretation of § 153(r), the Second Circuit concluded:

[4] *See, e.g., TCIU*, 30 F.3d at 906 ("Subdivision (m) states unequivocally that a `copy of the awards shall be furnished to the respective parties to the controversy, *and the awards shall be final and binding upon both parties to the dispute.*' 45 U.S.C. § 153 First (m) (emphasis added). Clearly, Congress meant an award to be final and binding at this point."); *Gatlin v. Missouri Pac. R.R. Co.*, 631 F.2d 551, 555 (8th Cir. 1980) (recognizing that, because of "[t]he strict finality of Railway Labor Act Board decisions and the narrow scope of review given district courts[,]. . . . *Mo circumstances whatsoever exist for extension of the limitations period* and the decision of Public Law Board 596 must be deemed final. Appellants' action for review

casetext
Part of Thomson Reuters

of that decision as against [the railroad company] is time barred." (emphasis added)).

This is a part of the [RLA] setting up a specially constituted board to deal with the so-called minor disputes of the industry — grievances in the interpretation or application of employment agreements. As an integral part of this system, Congress gave the employees a special and favorable statutory remedy, to be exercised within two years "and not after," a period of enforced inaction for the employer, during which he cannot *1199 obtain even a declaration of his rights under the original agreement. We think, therefore, that *a court is not justified in finding any exception to, or extension of, this period.*

1199

*Joint Council*, 157 F.2d at 420 (quoting 45 U.S.C. § First 153(r)) (citation omitted) (emphasis added).

In the context of Adjustment Board awards, the former Fifth Circuit concluded "that while Congress did not foresee this extrastatutory mode of review, it was its intention that *all methods* of reviewing NRAB awards be barred unless `begun within two years from the time the cause of action accrues under the award . . ., and not after.'" *Gibson v. Missouri Pac. R.R. Co.*, 441 F.2d 784, 788 (5th Cir. 1971) (quoting 45 U.S.C. § 153(r) (emphasis added)). After reviewing the overall scheme of the RLA, the Seventh Circuit specifically determined that there was a policy in favor of the finality for arbitration awards and "decline[d] the Union's invitation to create an exception to finality where a request for interpretation is made during the limitations period" before a plaintiff files an enforcement action. *TCIU*, 30 F.3d at 907. Using this "highly persuasive" reasoning, the district judge properly concluded that "the two-year statute of limitations

found in U.S.C. § 153 First (r) is not tolled by a request for interpretation."[5] R1-19 at 11 (quoting *TCIU*, 30 F.3d at 907).

[5] Although BLET argues that the Sixth Circuit's decision in *Jones v. Seaboard System Railroad*, 783 F.2d 639 (6th Cir. 1986), where the plaintiff sought review of a RLA award under 45 U.S.C. § 153 First (q), establishes a basis for tolling its claims, *Jones* is inapposite. Unlike § 153 First (p), which provides for the enforcement of awards, paragraph (q) allows for limited review of RLA arbitration awards by district courts. The Sixth Circuit rejected the plaintiff's request and found that the plaintiff's claim accrued when the arbitrator issued an award affirming the employee's dismissal, and the plaintiff failed to seek review within the two-year limitations period established by § 153 First (r). *Id.* at 642-43. In making this determination, the Sixth Circuit explained in *dictum* that the only way the plaintiff could have escaped the statute of limitations was to have "filed a motion to reconsider within the two-year period, thereby tolling the time limitation." *Id.* at 643.

As the Seventh Circuit, has explained, the *Jones* dictum was incorrect. *TCIU*, 30 F.3d at 906 n. 1. That *dictum* was premised on seeking a motion for reconsideration of an Interstate Commerce Commission order; the Interstate Commerce Act permits parties to petition for reconsideration. *Interstate Commerce Comm'n v. Brotherhood of Locomotive Eng'rs*, 482 U.S. 270, 277-78, 107 S.Ct. 2360, 2365, 96 L.Ed.2d 222 (1987); *Jones*, 783 F.2d at 643. In contrast, the RLA does not provide for motions for reconsideration. *TCIU*, 30 F.3d at 906. Requests for interpretation under the RLA § 153 First (m), like the request in this case, are not apposite to motions for reconsideration in non-RLA cases. *Id.* at 906 n. 1. Unlike a motion for reconsideration, a request for interpretation

does not present the "possibility that the order complained of will be modified or changed in a way that will either render review . . . unnecessary or, on review, present . . . a decision and/or supporting rationale different than that reflected in the original order." *Id.* at 906 (citation omitted).

Section 153 First (m) "states unequivocally" that RLA arbitration awards are final when issued by the arbitrator. 45 U.S.C. § 153 First (m); *TCIU*, 30 F.3d at 906. Requests for interpretation pursuant to § 153 First (m) do not affect that finality. While subsection (m) provides arbitrators the power to interpret final awards, it does not give them the power to alter or modify them whatsoever. *See id.* (citing *United Trans. Union v. Soo Line R. Co.*, 457 F.2d 285, 287 (7th Cir. 1972)). Consequently, an interpretation request does not affect the enforceability of an award and does not hinder the pursuit of an enforcement action under § 153 First (p). BLET should have filed its enforcement action prior to or simultaneous with its request

1200*1200 for interpretation. Its delay in seeking an enforcement action barred BLET's action under the two-year statute of limitations and is fatal to its case.

## III. CONCLUSION

BLET has challenged the dismissal of its cause of action for enforcement of the arbitration award because of the expiration of the statute of limitations. Alternatively, BLET contends that its interpretation request tolled the running of the statute of limitations. As we have explained, in accord with the view of other circuits that have addressed these issues, an interpretation request does not toll the running of the statute of limitations, which had expired well before BLET filed its enforcement action. The dismissal of BLET's action by the district judge is AFFIRMED.

casetext
Part of Thomson Reuters

No. 12-15738

United States Court of Appeals, Eleventh Circuit.

# Arcia v. Fla. Sec'y of State

772 F.3d 1335 (11th Cir. 2014)

Decided Nov 17, 2014

No. 12–15738.

11-17-2014

Karla Vanessa ARCIA, Melande Antoine, et al., Plaintiffs–Appellants, v. FLORIDA SECRETARY OF STATE, Defendant–Appellee, Luis I. Garcia, et al., Intervenor Defendants.

Marc A. Goldman, Marina K. Jenkins, Lindsay Eyler Kaplan, Lorelie S. Masters, Kristen M. Rogers, Jenner & Block, LLP, Michelle Kanter Cohen, Catherine M. Flanagan, Project Vote, Katherine Culliton–Gonzalez, Penda Hair, Uzoma Nkwonta, Advancement Project, Ben Hovland, Fair Elections Legal Network, Washington, DC, Juan Cartagena, Jose Perez, LatinoJustice PRLDEF, New York, NY, John Louis De Leon, Chavez & De Leon, PA, Katherine Roberson–Young, Miami, FL, for Plaintiffs–Appellants. J. Andrew Atkinson, Ashley E. Davis, Florida Department of State, Tallahassee, FL, Michael Anthony Carvin, John M. Gore, Jones Day, Washington, DC, for Defendant–Appellee.

MARTIN, Circuit Judge

1338 *1338

Marc A. Goldman, Marina K. Jenkins, Lindsay Eyler Kaplan, Lorelie S. Masters, Kristen M. Rogers, Jenner & Block, LLP, Michelle Kanter Cohen, Catherine M. Flanagan, Project Vote, Katherine Culliton–Gonzalez, Penda Hair, Uzoma Nkwonta, Advancement Project, Ben Hovland, Fair Elections Legal Network, Washington, DC, Juan Cartagena, Jose Perez, LatinoJustice

PRLDEF, New York, NY, John Louis De Leon, Chavez & De Leon, PA, Katherine Roberson–Young, Miami, FL, for Plaintiffs–Appellants.

J. Andrew Atkinson, Ashley E. Davis, Florida Department of State, Tallahassee, FL, Michael Anthony Carvin, John M. Gore, Jones Day, Washington, DC, for Defendant–Appellee.

Appeal from the United States District Court for the Southern District of Florida. D.C. Docket No. 1:12–cv–22282–WJZ.

Before MARTIN, JORDAN and SUHRHEINRICH,[*] Circuit Judges.

> [*] Honorable Richard F. Suhrheinrich, United States Circuit Judge for the Sixth Circuit, sitting by designation.

## Opinion

MARTIN, Circuit Judge:

The panel vacates the opinion issued in this case on April 1, 2014. We reissue this opinion without the concurring opinion of Judge Jordan, and otherwise the opinion remains the same.

Section 8(c)(2)(A) of the National Voter Registration Act (the 90 Day Provision) requires states to "complete, not later than 90 days prior to the date of a primary or general election for Federal office, any program the purpose of which 1339 is to systematically *1339 remove the names of ineligible voters from the official lists of eligible voters." 42 U.S.C. § 1973gg–6(c)(2)(A). This provision became the center of a legal dispute in



2012, when a group of individual voters and organizations sued Florida Secretary of State Kenneth W. Detzner. These plaintiffs argued that Florida was violating the 90 Day Provision by conducting a program to systematically remove suspected non-citizens from the voter rolls within 90 days of a federal election. The District Court denied the plaintiffs' motions for a preliminary injunction and summary judgment, and entered judgment in favor of Secretary Detzner. The plaintiffs now appeal.

Because we conclude that Florida's program was an attempt to systematically remove names from the voter rolls in violation of the 90 Day Provision, we reverse and remand.

## I.   FACTS   AND   PROCEDURAL HISTORY

This case concerns Florida's efforts to remove the names of ineligible voters from the State's voter rolls prior to the 2012 primary and general elections. Concerned about people who are not citizens casting ballots in Florida elections, Secretary of State Detzner engaged in two separate programs to identify and remove non-citizens from the Florida voter rolls.

Secretary Detzner's first program began in advance of the primary election and used records from the Department of Highway Safety and Motor Vehicles (DHSMV). The Secretary started by compiling a list of registered voters who had previously presented the DHSMV with identification—such as green cards or foreign passports—suggesting that they may be non-citizens. After putting together this list, he sent a portion of it to the State Supervisor of Elections in each county, instructing them to (1) review the names on the list, (2) conduct additional research using "whatever other sources you have," and (3) initiate a notice and removal process. Secretary Detzner suspended the program at the end of April 2012. Records indicate, however, that suspected

non-citizens continued to be removed from the voter rolls during May and June, which was less than 90 days before the Florida primary election.

This first effort by Secretary Detzner to identify non-citizens was far from perfect. For example, Plaintiffs Karla V. Arcia and Melande Antoine were identified as non-citizen voters to be removed from the voter rolls. This, despite the fact that they were both United States citizens eligible to vote in the 2012 elections. Also, organizations like the Florida Immigration Coalition, Inc., the National Congress for Puerto Rican Rights, and 1199SEIU United Healthcare Workers East (1199SEIU) diverted resources from their regularly-conducted programs and activities to counteract the effects of the Secretary's program. These efforts included locating and assisting members who had been wrongly identified as non-citizens to ensure that they were able to vote.

Despite these shortcomings in his initial program, Secretary Detzner renewed his efforts to remove non-citizens from the voter rolls in advance of the 2012 general election. Rather than use the DHSMV records, this second program relied on the Department of Homeland Security's Systematic Alien Verification for Entitlements (SAVE) database. Secretary Detzner also announced that he would not wait until after the general election to implement his program. Even though there were less than 90 days before the general election, Secretary Detzner stated publicly that he planned to forward the names of registered *1340\*1340 voters identified as non-citizens in the SAVE database to State Supervisors.

This case began on June 19, 2012, when the plaintiffs first challenged Secretary Detzner's efforts to remove non-citizens prior to the Florida primary election. Among other things, the plaintiffs alleged that they were entitled to declaratory and injunctive relief because the Secretary's actions were barred by the 90 Day Provision. After Secretary Detzner announced that he would resume the removal of purported non-

citizens from the voter rolls using the SAVE database, the plaintiffs amended their complaint, arguing that the Secretary's program still violated the NVRA's 90 Day Provision because of the proximity to the general election. The plaintiffs sought a preliminary injunction and summary judgment.

The District Court found that the 90 Day Provision did not apply to the Secretary's efforts to remove non-citizens from the voter rolls and denied the plaintiffs' motions for an injunction and summary judgment. At the plaintiffs' request, the District Court also entered judgment as a matter of law in favor of Secretary Detzner. Plaintiffs now appeal this final judgment.[1]

> [1] The plaintiffs filed a motion to expedite this appeal, arguing that the Secretary's program risked disfranchising eligible voters incorrectly identified as non-citizens on the eve of the general election. Based on Secretary Detzner's assurances that no citizens would be mistakenly removed from the voter rolls before Election Day, this Court denied the plaintiffs' motion to expedite their appeal.

## II. JURISDICTIONAL ISSUES

Before reaching the merits, we must first determine whether we have Article III jurisdiction over the parties and issues presented here. In particular, we must decide (1) whether the plaintiffs have standing and (2) whether this case is moot because the 2012 elections have passed.

### A. STANDING

Secretary Detzner claims that neither the individual nor the organizational plaintiffs have standing because they did not suffer an "injury-in-fact." *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992). "We review issues of standing *de novo.* " *Hollywood Mobile Estates Ltd. v. Seminole Tribe of Fla.,* 641 F.3d 1259, 1264 (11th Cir.2011).

Standing is determined at the time the plaintiff's complaint is filed. *Focus on the Family v. Pinellas Suncoast Transit Auth.,* 344 F.3d 1263, 1275 (11th Cir.2003).

" 'Injury in fact' reflects the statutory requirement that a person be 'adversely affected' or 'aggrieved,' and it serves to distinguish a person with a direct stake in the outcome of a litigation— even though small—from a person with a mere interest in the problem." *United States v. Students Challenging Regulatory Agency Procedures,* 412 U.S. 669, 689 n. 14, 93 S.Ct. 2405, 2417 n. 14, 37 L.Ed.2d 254 (1973) (noting that "an identifiable trifle is enough"). An injury-in-fact involves "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *See Lujan,* 504 U.S. at 560, 112 S.Ct. at 2136 (quotation marks and internal citations omitted).

#### 1. Individual Plaintiffs

The individual plaintiffs, Ms. Arcia and Ms. Antoine, have standing because (1) they were directly injured by Secretary Detzner's first program before the 2012 primary election and (2) at the time they filed their complaint, they had 1341established *1341 a probable future injury allowing them to prospectively challenge Secretary Detzner's second program before the 2012 general election.

Ms. Arcia and Ms. Antoine had standing to challenge Secretary Detzner's first program before the 2012 primary election because they were directly injured by it when they were wrongly identified as non-citizens. Even though they were ultimately not prevented from voting, an injury like theirs is sufficient to confer standing. *See Common Cause/Ga. v. Billups,* 554 F.3d 1340, 1351–52 (11th Cir.2009) (finding that requirement to produce photo identification to vote was an injury sufficient to confer standing even though the right to vote was not "wholly denied"); *Charles H. Wesley Educ. Found., Inc. v. Cox,* 408 F.3d 1349, 1352 (11th Cir.2005) (finding sufficient

the injury of being unable to vote in home precinct because state government rejected voter's use of the federal registration form to change her address).

Ms. Arcia and Ms. Antoine also have standing to prospectively challenge the Secretary's second attempt to remove non-citizens from the voter rolls using the SAVE database. When the harm alleged is prospective, as it was here, a plaintiff can satisfy the injury-in-fact requirement by showing imminent harm. *Fla. State Conf. of the NAACP v. Browning,* 522 F.3d 1153, 1160–61 (11th Cir.2008). While the threatened future injury cannot be merely hypothetical or conjectural, probabilistic harm is enough. *Id.* at 1162–63. Because Ms. Arcia and Ms. Antoine were naturalized U.S. citizens from Nicaragua and Haiti respectively, there was a realistic probability that they would be misidentified due to unintentional mistakes in the Secretary's data-matching process. *See id.* at 1163–64 (distinguishing foreseeable injuries from those based on assumptions and conjecture). This being the case, Ms. Arcia and Ms. Antoine sufficiently established standing based on the potential errors that could occur when the Secretary attempted to confirm their immigration status in various state and federal databases in the hurried 90–day window before the election.

2. Organizational Plaintiffs

The organizational plaintiffs also have standing to challenge Secretary Detzner's program based on both a diversion-of-resources theory and an associational standing theory.

Under the diversion-of-resources theory, an organization has standing to sue when a defendant's illegal acts impair the organization's ability to engage in its own projects by forcing the organization to divert resources in response. *Havens Realty Corp. v. Coleman,* 455 U.S. 363, 379, 102 S.Ct. 1114, 1124, 71 L.Ed.2d 214 (1982) ("[C]oncrete and demonstrable injury to the organization's activities—with the consequent

drain on the organization's resources—constitutes far more than simply a setback to the organization's abstract social interests."). For example, our precedent provides that organizations can establish standing to challenge election laws by showing that they will have to divert personnel and time to educating potential voters on compliance with the laws and assisting voters who might be left off the registration rolls on Election Day. *See Browning,* 522 F.3d at 1165–66.

Here, all three of the organizational plaintiffs—the Florida Immigrant Coalition, Inc., the National Congress for Puerto Rican Rights, and 1199SEIU—submitted affidavits showing they have missions that include voter registration and education, or encouraging and safeguarding voter rights, and that they had diverted resources to address the Secretary's programs. A representative from 1199SEIU <sup>*1342</sup> also testified that after some of its members were identified as potential noncitizens before the primary election, the organization expended resources to locate and assist the members to ensure that they were able to vote.[2] This redirection of resources to counteract the Secretary's removal program is a concrete and demonstrable injury, not an "abstract social interest[ ]." *Havens Realty Corp.,* 455 U.S. at 379, 102 S.Ct. at 1124.

---

[2] This fact, together with Mr. Arcia and Ms. Antoine being included on the Secretary's list of purported non-citizens, distinguish this case from *Clapper v. Amnesty International USA,* ––– U.S. ––––, 133 S.Ct. 1138, 185 L.Ed.2d 264 (2013), in which the Court found the plaintiffs' theory of standing "relie[d] on a highly attenuated chain of possibilities." *Id.* at 1148.

---

The organizational plaintiffs also have standing to challenge Secretary Detzner's programs under an associational standing theory. An organizational plaintiff has standing to enforce the rights of its



Case 1:21-cv-23727-DPG  Document 244  Entered on FLSD Docket 10/11/2024  Page 101 of
107
Arcia v. Fla. Sec'y of State 107 F.3d 1335 (11th Cir. 2014)

members "when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Friends of the Earth, Inc. v. Laidlaw Envt'l Servs. (TOC), Inc.,* 528 U.S. 167, 181, 120 S.Ct. 693, 704, 145 L.Ed.2d 610 (2000). Based on our review of the affidavits provided on behalf of the organizational plaintiffs, we have concluded that the interests at stake in this case are germane to the purposes and goals of the organizations. Further, the declaratory and injunctive relief sought by the organizations does not require the individual participation of organizations' members. *Browning,* 522 F.3d at 1160. The only remaining issue is whether the members of the organizations themselves would have standing. We conclude that they do.

In order to sue on behalf of its members, organizational plaintiffs need not establish that all of their members are in danger of suffering an injury. Rather, the rule in this Circuit is that organizational plaintiffs need only establish that "at least one member faces a realistic danger" of suffering an injury. *Id.* at 1163. As in *Browning,* the organizational plaintiffs here argue that the process of matching voters across various databases creates a foreseeable risk of false positives and mismatches based on user errors, problems with the data-matching process, flaws in the underlying databases, and similarities in names and birthdates. *See id.* at 1163 (finding that "the injuries are foreseeable and the expected results of unconscious and largely unavoidable human errors in transcription"). The three organizational plaintiffs also represent a large number of people, like Ms. Arcia and Ms. Antoine, who face a realistic danger of being identified in the Secretary's removal programs because of their names or status as naturalized citizens. *See id.* (finding that large organizations like the NAACP had standing because there was a high probability that at least one of the members would be

mistakenly mismatched). On this record, the organizational plaintiffs have sufficiently established their standing to bring this action on behalf of their members.

B. MOOTNESS

Secretary Detzner next argues that the plaintiffs' claims are moot because the 2012 elections have passed. We retain jurisdiction to decide this case, however, because the exception to mootness for disputes "capable of repetition yet evading 1343 review" applies here.*1343 The "capable of repetition, yet evading review" exception to the mootness doctrine applies where (1) the challenged action is in its duration too short to be fully litigated prior to cessation or expiration, and (2) there is a reasonable expectation that the same complaining party will be subject to the same action again. *Davis v. FEC,* 554 U.S. 724, 735, 128 S.Ct. 2759, 2769–70, 171 L.Ed.2d 737 (2008) (quotation marks omitted) (rejecting mootness argument despite fact that election had passed). Both of these requirements are met here.

First, the plaintiffs are correct that Secretary Detzner's actions were too short in duration to be fully litigated prior to their cessation. In election cases, we have stated that there is often "not sufficient time between the filing of the complaint and the election to obtain judicial resolution of the controversy before the election." *Teper v. Miller,* 82 F.3d 989, 992 n. 1 (11th Cir.1996). Election cases also frequently present issues that will persist in future elections, and resolving these disputes can simplify future challenges. *See id.* Here, the plaintiffs could not challenge Secretary Detzner's program until it became clear that it would continue past the 90th day before an election, giving the plaintiffs just three months before the case became moot. Based on this record, we conclude that the Secretary's actions here were in their duration too short to be fully litigated prior to their cessation or expiration. *See Bourgeois v. Peters,* 387 F.3d 1303, 1309 (11th Cir.2004) ("[W]e conclude that one year is an

insufficient amount of time for a district court, circuit court of appeals, and Supreme Court to adjudicate the typical case.").

Second, there is a reasonable expectation that these plaintiffs will be subjected to Secretary Detzner's program again. The District Court's ruling was not limited to the 2012 elections or the specific program employed by the Secretary in 2012. Rather, it interpreted the 90 Day Provision generally to allow systematic removal programs based on citizenship during the last 90 days before an election. The Secretary has also not offered to refrain from similar programs within the 90–day window in the future. Thus, there is a reasonable expectation that the plaintiffs will be subject to the same action again.

For these reasons, we have jurisdiction over this case, even though the 2012 elections have passed.

## III. DISCUSSION

We now turn to the merits of this dispute. The primary issue here involves the statutory interpretation of the 90 Day Provision, which is codified at 42 U.S.C. § 1973gg–6(c)(2)(A). The 90 Day Provision requires that:

> A State shall complete, not later than 90 days prior to the date of a primary or general election for Federal office, any program the purpose of which is to systematically remove the names of ineligible voters from the official lists of eligible voters.

42 U.S.C. § 1973gg–6(c)(2)(A). The issue presented is whether "any program ... to systematically remove the names of ineligible voters" includes a program like the one initiated by Secretary Detzner to remove non-citizens from the voter rolls less than 90 days before the 2012 elections.

### A. PLAIN MEANING

"As in all cases involving statutory construction, our starting point must be the language employed by Congress, and we assume that the legislative purpose is expressed by the ordinary meaning of the words used." *Am. Tobacco Co. v. Patterson,* 456 U.S. 63, 68, 102 S.Ct. 1534, 1537, 71 L.Ed.2d 1344 748 (1982) (quotation marks *1344 and internal citations omitted). "Courts must assume that Congress intended the ordinary meaning of the words used, and absent a clearly expressed legislative intent to the contrary, that language is generally dispositive." *Gonzalez v. McNary,* 980 F.2d 1418, 1420 (11th Cir.1993) (quotation marks omitted). Because this is a case involving statutory construction, our first task is to determine whether Secretary Detzner's program is barred under the plain meaning of the 90 Day Provision. We believe that it is.

First, the purpose of Secretary Detzner's program was clearly to remove the names of "ineligible voters" from the Florida voter rolls. The National Voter Registration Act (NVRA) is premised on the assumption that citizenship is one of the requirements for eligibility to vote. *See, e.g.,* 42 U.S.C. §§ 1973gg–3(c)(2)(C)(i), 1973gg–5(a)(6) (A)(i)(I), 1973gg–7(b)(2)(A) (requiring certain voter registration forms to state or specify "each eligibility requirement (*including citizenship* )" (emphasis added)). Thus, Secretary Detzner's program to remove non-citizens was a program to remove "ineligible voters."

Second, Secretary Detzner does not deny that his program was an attempt to "systematically" remove ineligible voters from the voter rolls. Although the statute provides no definition for the word "systematically" or "systematic," we agree that Secretary Detzner's program was a "systematic" program under any meaning of the word. Secretary Detzner's program did not rely upon individualized information or investigation to determine which names from the voter registry to remove. Rather, the Secretary used a mass computerized data-matching process to compare the voter rolls with other state and federal



databases, followed by the mailing of notices. Certainly, it is telling that the database that Secretary Detzner used before the general election —SAVE—stands for *Systematic* Alien Verification for Entitlements.

Finally, the phrase "any program" suggests that the 90 Day Provision has a broad meaning. Both the Supreme Court and this Court have had occasion to consider the meaning of the word "any." In *United States v. Gonzales* , the Supreme Court noted that "[r]ead naturally, the word 'any' has an expansive meaning, that is 'one or some indiscriminately of whatever kind.' " 520 U.S. 1, 5, 117 S.Ct. 1032, 1035, 137 L.Ed.2d 132 (1997) (quoting Webster's Third New International Dictionary 97 (1976)). In the same way, this Court has held that when Congress does not add any language limiting the breadth of that word, "any" means all. *Merritt v. Dillard Paper Co.,* 120 F.3d 1181, 1186 (11th Cir.1997) ; *Lyes v. City of Riviera Beach,* 166 F.3d 1332, 1337 (11th Cir.1999) ; *United States v. Castro,* 837 F.2d 441, 445 (11th Cir.1988) (concluding that "any" meant "every" and "all"). "This long history of established meaning is important, because we readily presume that Congress knows the settled legal definition of the words it uses, and uses them in the settled sense." *Harris v. Garner,* 216 F.3d 970, 974 (11th Cir.2000). The fact that the provision now before us applies to "any program" strongly suggests that Congress intended the 90 Day Provision to encompass programs of any kind, including a program like Secretary Detzner's to remove non-citizens.

## B. STATUTORY CONTEXT AND PURPOSE

Thus, the plain meaning of the 90 Day Provision indicates that Secretary Detzner's actions fall under the category of "any program ... to systematically remove the names of ineligible voters." 42 U.S.C. § 1973gg–6(c)(2)(A). The 1345 language *1345 of the 90 Day Provision, however, is not the end of our inquiry. "In expounding a statute, we must not be guided by a single

sentence or member of a sentence, but look to the provisions of the whole law, and to its policy." *In re Colortex,* 19 F.3d 1371, 1375 (11th Cir.1994) (quotation marks omitted). Here, the statutory context and policy of the NVRA further buttresses our conclusion that the plain meaning of "any program ... to systematically remove the names of ineligible voters" was intended by Congress to include programs like Secretary Detzner's.

First, Congress expressly allowed for a number of exceptions to the 90 Day Provision, and an exception for removals of non-citizens is not one of them. Directly after the 90 Day Provision, the statute includes a limiting provision, which states:

> [The 90 Day Provision] shall not be construed to preclude—(i) the removal of names from official lists of voters on a basis described in paragraph (3)(A) or (B) or (4)(A) of subsection (a) of this section; or (ii) correction of registration records pursuant to this subchapter

42 U.S.C. § 1973gg–6(c)(2)(B). Thus the limiting provision creates an exception in the 90 Day Provision for "correction of registration records"[3] and also directs us to several of the exceptions in § 1973gg–6(a) (the General Removal Provision). The General Removal Provision, which governs the removal of voters *at any time,* states that the names of registrants may not be removed from the voter rolls except:

> [3]  The Secretary has not argued that his program constitutes a "correction" of registration records.

> (3)(A) at the request of the registrant; (B) as provided by State law, by reason of criminal conviction or mental incapacity ...

> (4)(A) the death of the registrant; or (B) a change in the residence of the registrant ...

*Arcia v. Fla. Sec'y of State* 772 F.3d 1335 (11th Cir. 2014)

*Id.* § 1973gg–6(a)(3)–(4). Reading these two provisions together, the NVRA expressly allows states to conduct three types of removals during the final 90 days before a federal election. They are removals (1) at the request of the registrant; (2) as provided by State law, by reason of criminal conviction or mental incapacity; and (3) upon death of the registrant. *See id.* § 1973gg–6(c)(2) (B) (citing *id.* § 1973gg–6(a)(3)–(4) ).

Noticeably absent from the list of exceptions to the 90 Day Provision is any exception for removal of non-citizens. "Where Congress explicitly enumerates certain exceptions to a general prohibition, additional exceptions are not to be implied, in the absence of evidence of a contrary legislative intent." *Andrus v. Glover Constr. Co.,* 446 U.S. 608, 616–617, 100 S.Ct. 1905, 1910, 64 L.Ed.2d 548 (1980) ; *see also United States v. Brockamp,* 519 U.S. 347, 352, 117 S.Ct. 849, 852, 136 L.Ed.2d 818 (1997) (observing that an "explicit listing of exceptions" indicates that "Congress did not intend courts to read other unmentioned, open-ended, 'equitable' exceptions into the statute"). The fact that Congress did not expressly include removals based on citizenship in its exhaustive list of exceptions to the 90 Day Provision is good evidence that such removals are 1346 prohibited.[4] *1346 Finally, the stated purposes of the National Voter Registration Act further support our reading of the 90 Day Provision. The NVRA states that its purposes are:

---

[4] Secretary Detzner suggests that the exception for removals "as provided by State law, by reason of criminal conviction or mental incapacity" could be read to authorize the removal of non-citizens from the voter rolls. Like the District Court, we reject this interpretation. An exception for any removal "as provided by State law" would render the 90 Day Provision completely superfluous. *See In re Griffith,* 206 F.3d 1389, 1393 (11th Cir.2000) ("[C]ourts should disfavor interpretations of statutes that render language

superfluous....") (quotation marks omitted).

--------

(1) to establish procedures that will increase the number of eligible citizens who register to vote in elections for Federal office;

(2) to make it possible for Federal, State, and local governments to implement this Act in a manner that enhances the participation of eligible citizens as voters in elections for Federal office;

(3) to protect the integrity of the electoral process; and

(4) to ensure that accurate and current voter registration rolls are maintained.

42 U.S.C. § 1973gg(b).

As *amici* points out, the 90 Day Provision is designed to carefully balance these four competing purposes in the NVRA. Brief of Current and Former Election Officials as *Amici Curiae,* 14–15. For example, by limiting its reach to programs that "systematically" remove voters from the voter rolls, the 90 Day Provision permits removals based on individualized information at any time. According to *amici,* individualized removals are safe to conduct at any time because this type of removal is usually based on individual correspondence or rigorous individualized inquiry, leading to a smaller chance for mistakes.

For programs that systematically remove voters, however, Congress decided to be more cautious. At most times during the election cycle, the benefits of systematic programs outweigh the costs because eligible voters who are incorrectly removed have enough time to rectify any errors. In the final days before an election, however, the calculus changes. Eligible voters removed days or weeks before Election Day will likely not be able to correct the State's errors in time to vote. This is why the 90 Day Provision strikes a careful



Arcia v. Fla. Sec'y of State   772 F.3d 1335 (11th Cir. 2014)

balance: It permits systematic removal programs at any time *except* for the 90 days before an election because that is when the risk of disfranchising eligible voters is the greatest.

C.         SECRETARY         DETZNER'S
INTERPRETATION

Secretary Detzner responds that interpreting the 90 Day Provision to prohibit systematic removals of non-citizens would create grave constitutional concerns. Because the 90 Day Provision and the General Removal Provision share many of the same exceptions, *see* 42 U.S.C. § 1973gg–6(c)(2)(B), Secretary Detzner believes that the statutory text of the NVRA provides us with only two options: either non-citizens may be excluded at any time, or not at all. The latter option, according to Secretary Detzner, would dilute the votes of citizens and trample on the rights of states to regulate the qualifications and functions of voters. *See Williams v. Rhodes,* 393 U.S. 23, 34, 89 S.Ct. 5, 12, 21 L.Ed.2d 24 (1968) ("[T]he State is left with broad powers to regulate voting, which may include laws relating to the qualifications and functions of electors.").

We reject Secretary Detzner's attempts to have us decide today whether both the General Removal Provision and the 90 Day Provision allow for removals of non-citizens. Certainly an interpretation of the General Removal Provision that prevents Florida from removing non-citizens would raise constitutional concerns regarding Congress's power to determine the qualifications of eligible voters in federal elections. *Cf. Arizona v. Inter Tribal Council*

1347*1347

*of Arizona, Inc.,* —— U.S. ——, 133 S.Ct. 2247, 2257, 186 L.Ed.2d 239 (2013) ("Arizona is correct that the Elections Clause empowers Congress to regulate *how* federal elections are held, but not *who* may vote in them."). We are not convinced, however, that the Secretary's perceived need for an equitable exception in the General Removal

Provision also requires us to find the same exception in the 90 Day Provision. None of the parties before us have argued that we would reach an unconstitutional result *in this case* if we found that the 90 Day Provision prohibits systematic removals of non-citizens. Constitutional concerns would only arise in a later case which squarely presents the question of whether the General Removal Provision bars removal of noncitizens altogether. And before we ever get that case, Congress could change the language of the General Removal Provision to assuage any constitutional concerns. With this in mind, we will confine our ruling to apply to the plain meaning of the 90 Day Provision and decline Secretary Detzner's invitation to go further.

Secretary Detzner next argues that in drafting the NVRA, Congress only contemplated the removal of people who were once entitled to vote, not the removal of people who never had eligibility (like non-citizens). In support of this distinction, Secretary Detzner argues that non-citizens are not technically "registrants," and removing them from the voter rolls is not really a "removal" because the non-citizens on the voter rolls were never supposed to be there from the start. He also observes that all the exceptions to the General Removal Provision relate to voters who *become* ineligible (like those who become felons or mentally incapacitated) rather than those voters who are ineligible at the time of their registration (like non-citizens).

At the outset, we are skeptical of Secretary Detzner's arguments about what Congress may or may not have contemplated when drafting the NVRA. Our job is to honor the broad statutory language in the 90 Day Provision, which unambiguously covers programs like Secretary Detzner's. *See Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 79, 118 S.Ct. 998, 1002, 140 L.Ed.2d 201 (1998) ("But statutory prohibitions often go beyond the principal evil to cover reasonably comparable evils, and it is ultimately the provisions of our laws rather than

the principal concerns of our legislators by which we are governed."); *Pa. Dep't of Corr. v. Yeskey,* 524 U.S. 206, 212, 118 S.Ct. 1952, 1956, 141 L.Ed.2d 215 (1998) ("[T]he fact that a statute can be applied in situations not expressly anticipated by Congress does not demonstrate ambiguity. It demonstrates breadth." (quotation marks omitted)). We are not allowed to engage in "purpose-driven statutory interpretation at the expense of specific provisions." *Myers v. TooJay's Mgmt. Corp.,* 640 F.3d 1278, 1286 (11th Cir.2011) (quotation marks omitted); *see id.* ("When presented with the plain text of a statute, we do not gaze at it blurry-eyed, attempting to see some hidden image formed by the broad purpose that lies behind the legislation.").

We also reject Secretary Detzner's suggestion that there is a categorical difference between (1) registrants who are ineligible to vote on account of their citizenship and (2) registrants who are ineligible to vote because of their criminal history or mental capacity. Registrants in any of those categories could be ineligible to vote at the time of their registration or they could lose their eligibility later. For example, while some voters lose their eligibility to vote after they register because of a criminal conviction or mental incapacity, other voters may have been ineligible for the same reasons at the time of their ¹³⁴⁸reasons at the time of their *1348 registration. In the same way, while Secretary Detzner is correct that a non-citizen registrant may have been ineligible to vote at the time that he registered, a citizen could also lose his citizenship after registering, thereby losing his eligibility to vote. *See* 8 U.S.C. § 1481(a)(5) (describing the procedure for a United States citizen to renounce his or her U.S. citizenship). Thus, we do not accept Secretary Detzner's argument that the NVRA distinguishes between the removals of registered voters who become ineligible to vote and registrants who were never eligible in the first place.

Finally, Secretary Detzner's limited interpretation of the 90 Day Provision would also require us to conclude—as the District Court did—that the 90 Day Provision only prohibits the removal of registrants who become ineligible to vote after moving to a different state. This is because the 90 Day Provision adopts all of the exceptions from the General Removal Provision except for the one allowing for removals based on a change in residence. *See* 42 U.S.C. § 1973gg–6(c)(2)(B). Such an interpretation, however, would functionally eviscerate the meaning of the phrase "any program" in the 90 Day Provision. *See United States v. Ballinger,* 395 F.3d 1218, 1236 (11th Cir.2005) (noting that it is "a cardinal principle of statutory construction" that "a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant") (quoting *TRW Inc. v. Andrews,* 534 U.S. 19, 31, 122 S.Ct. 441, 449, 151 L.Ed.2d 339 (2001) ). Surely when Congress wrote that the 90 Day Provision applied to "any program," it intended for the provision to apply to more than just programs aimed at voters who have moved. If Congress wanted such a limited result, it could have said so. *See CBS Inc. v. PrimeTime 24 Joint Venture,* 245 F.3d 1217, 1226 (11th Cir.2001) ("[W]here Congress knows how to say something but chooses not to, its silence is controlling." (quotation marks omitted)). As a result, we cannot accept Secretary Detzner's interpretation.

In closing, we emphasize that our interpretation of the 90 Day Provision does not in any way handcuff a state from using its resources to ensure that noncitizens are not listed in the voter rolls. The 90 Day Provision by its terms only applies to programs which "systematically" remove the names of ineligible voters. As a result, the 90 Day Provision would not bar a state from investigating potential non-citizens and removing them on the basis of individualized information, even within the 90–day window. All that the 90 Day Provision prohibits is a program whose purpose is to

"systematically remove the names of ineligible voters" from the voter rolls within the last 90 days before a federal election. 42 U.S.C. § 1973gg–6(c)(2)(A).

## IV. CONCLUSION

For these reasons, we reverse the District Court's grant of judgment as a matter of law to Secretary Detzner and remand with instructions to enter an order (1) declaring that Secretary Detzner's actions here were in violation of the 90 Day Provision of the NVRA; and (2) granting such further relief as the needs and interests of justice require.

## REVERSED AND REMANDED.

SUHRHEINRICH, Circuit Judge, dissenting:

I would affirm the judgment of the district court for the reasons set forth in the district court's opinion, *see Arcia v. Detzner,* 908 F.Supp.2d 1276 (S.D.Fla.2012), as well as the reasoning of *United States v.*

1349*1349

*Florida,* 870 F.Supp.2d 1346 (N.D.Fla.2012). I therefore respectfully dissent.

