UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 1:21-CV-23727-DPG

LIL' JOE RECORDS, INC.,

       Plaintiff,

v.

MARK ROSS, CHRISTOPHER WONG
WON, JR., RODERICK WONG WON,
LETERIUS RAY, ANISSA WONG WON
and LUTHER CAMPBELL,

       Defendants.

_____/

## PLAINTIFF'S MOTION FOR JUDGMENT
## AS MATTER OF LAW PURSUANT TO RULE 50

Plaintiff, Lil Joe Records, Inc. ("Lil Joe"), through undersigned counsel, submits its Motion for

Judgment as a Matter of Law pursuant to Rule 50(a) Fed. R. Civ. P., as matter of law, as follows:

**I.**    **Legal Standards Supporting Granting of this Motion for Judmgent as a Matter of
Law**

"Judgment as a matter of law is appropriate when a party presents no legally sufficient

evidentiary basis for a reasonable jury to find for them on a material element of his cause of action."

*Williams v. First Advantage LNS Screening Sols., Inc.*, 947 F.3d 735, 744 (11th Cir. 2020).

Circumstances precluding summary judgment do not necessarily preclude judgment as a matter of

law. *See, e.g., American Sav. Loan Assoc. of Florida v. Pembroke Lakes Regional Ctr. Assocs.,

Ltd.,* 908 F.2d 885, 888 n. 5 (11th Cir. 1990).

Under Rule 50, "[a] party's motion for judgment as a matter of law can be granted at the close

of evidence or, provided it's timely renewed, after the jury has returned its verdict . . . ." *Chaney v. City*,

483 F.3d 1221, 1227 (11th Cir. 2007). The Court can also consider the Rule 50 Motion and defer ruling

1

until the Jury returns its verdict. In amending the rules, the Advisory Committee has noted that "[o]ften it appears to the court or to the moving party that a motion for judgment as a matter of law made at the close of the evidence should be reserved for a post-verdict decision. This is so because a jury verdict for the moving party moots the issue and because a pre-verdict ruling gambles that a reversal may result in a new trial that might have been avoided. For these reasons, the court may often wisely decline to rule on a motion for judgment as a matter of law made at the close of the evidence, and it is not inappropriate for the moving party to suggest such a postponement of the ruling until after the verdict has been rendered." Fed.R.Civ.P. 50(a)(1),  Notes of Advisory Committee on Rules-1991.

Regardless of timing, "in deciding on a Rule 50 motion a district court's proper analysis is squarely and narrowly focused on the sufficiency of evidence." The question before the district court regarding a motion for judgment as a matter of law remains whether the evidence is "legally sufficient to find for the party on that issue." *Chaney v. City*, 483 F.3d 1221, 1227 (11th Cir. 2007). Here, the Defendants' evidence is woefully and legally insufficient.

## II.     Overview

This case, at its core, is about whether the defendants, members or survivors of members of 2 Live Crew, made a valid termination of a grant of sound recording copyrights to 5 albums when they sent notice of termination pursuant to 17 U.S.C. §203 (Ex. D59).

## III.     The Unrebutted Facts Presented at Trial

1.     The 4 members of *2 Live Crew:* Luther Campbell ("Campbell"), Christopher Wong Won, Mark Ross, and David Hobbs, transferred whatever sound recording copyright rights[1] they had to *2 Live Crew's* music (the "*2 Live Crew* Copyrights") to Luke Records, Inc. f/k/a Skyywalker Records, Inc. f/k/a Luke Skyywalker Records, Inc. ("Luke Records"). Campbell and Luke Records subsequently

---

[1] The transfer of composition copyrights are not at issue in this case.

2

filed bankruptcy where all of their sound recording copyright rights to *2 Live Crew's* music, including the *2 Live Crew* Copyrights, were transferred in bankruptcy and sold to Lil' Joe "free and clear of any and all liens, claims, encumbrances, charges, setoffs or recoupments of any kind", thereafter "no royalties, whether as artist, producer, writer, publisher, or in any other capacity, on any of the masters" are due to Luther Campbell. Exs. P4 (¶1A), P43 (Order Confirming the Joint Plan of Organization), P45 (1996 Assignment by Campbell and Luke Records) and P46 (recorded Luke Records' assignment). Defendants seek to terminate the transfer of the *2 Live Crew Sound Recording* Copyrights pursuant to 17 USC §203 (the "Termination Notice"; Ex. D59).

2.      Lil Joe acquired the 2 Live Crew *Sound Recording C*opyrights pursuant to a March 22, 1996 order of Judge Robert Mark, transferring the rights pursuant to and under the legal authority of 11 USC §363. (EX P43) ("Judge Mark's Order").

3.      Irrespective of whether the grant of rights to the 5 albums occurred in 1990 (according to the Defendants, Ex. D50) or 1991 (according to the Plaintiff, Exs. P1-3), the value of the copyrights were well known when the transfers occurred and significant sums had already been paid.A Five Million Dollar Advance by Atlantic Records had been given to Luke Records, Inc. for a distribution deal. All 5 albums had been hugely successful (RIAA Certified Gold Sales Of 500,000 copies for 2 Live Is What We Are and Move Somethin' or RIAA Certified Platinum Sales in excess of 1 Million copies for As Nasty As They Wanna Be And As Clean As They Wanna Be).

4.      The Termination Notice purports to terminate a transfer that allegedly occurred <u>only</u> pursuant to a contract entered into in 1990 which (according to Defendants) purports to memorialize an earlier oral agreement to transfer copyrights (Ex. D50, the "1990 Agreement").

5.      Plaintiff asserts the only  transfer of the sound recordings  copyrights  to Luke Records

occurred in 1991 pursuant to[2]:

- Exclusive Recording Agreement dated April 1991, between Luke Records, Inc. and Chris Wong Won; (Ex. P2)
- Exclusive Recording Agreement dated April 1991, between Luke Records, Inc. and Mark Ross and David Hobbs;  (Ex P3)
- Exclusive Recording Agreement dated February 1991, between Luke Records, Inc. and Luther Campbell. (Ex P1)

(collectively, the "1991 Agreements").

6.      The Termination Notice does not seek to terminate transfers made pursuant to the 1991

Agreements or the subsequent grants in 1993, 1996, 2001, and 2003, and are not mentioned in the

Termination Notice.

**<u>Reason No. 1: The Termination Notice is null and voide because it only purports to terminate any grant of rights under the 1990 Agreement, which agreement contains no grant of any sound recording copyrights.</u>**

Pursuant to 17 U.S.C. §203(a), termination can only be effected by serving a notice that meets

the  requirements found in 37 CFR § 201.10. Pertinent here, the Notice of Termination had to include:

- **Statement of Termination**: A *clear* statement that the termination is being exercised under the relevant section of the Copyright Act (e.g., 17 U.S.C. § 203).

- **Date of Execution of the Grant**: The *date* when the original grant or transfer of rights was executed.

- **Identification of the Grant**: A *brief statement reasonably identifying the grant* to which the notice of termination applies.

Notably, 37 CFR § 201.10(b)(2) requires that there be a "clear identification" of each of the above

required information. That includes the date of the execution of the grant being terminated and a brief

statement reasonably identifying the grant to which the notice of termination applies. 37 CFR §

201.10(b)(2)(iii), (v).

**A. The Termination Notice only identifies the 1990 Agreement and that 1990 Agreement contains no grant of sound recordings copyrights. As such, the Termination Notice is not effective to terminate the grant of copyrights here.**

_____

[2] The regulations under Section 203 mandate that the grant to be terminated must be  identified in the notice.

The evidence—and only evidence—is that (i) the Termination Notice that Defendants sent (Ex. D59),  refers to the 1990 Agreement only, and (ii) that this 1990 Agreement contains no grant of any sound recording copyrights. It is undated. And it merely refers to an earlier purported oral agreement to transfer copyright that as a matter of law cannot transfer a copyright and which is rebutted by the integration clause. Thus, the Termination Notice utterly fails to comply with 17 U.S.C. § 203 and 37 C.F.R. § 210, as it fails to identify the grant—any grant—to which the termination would apply and the date of that grant. Judgment as a matter of law on that ground is also correct.

Defendants also did not comply with the requirements to effectuate the Termination Notice here under 17 U.S.C. § 203 and 37 C.F.R. § 210 because they failed to identify the 1991 Agreements (or Campbell's 1995 grants; Ex. 45 and 46), the only contracts referring to the grant of the sound recordings at issue here, or any of the subsequent transfers. While Defendants point to the language "All other grants and transfers", that does not include the required date of the execution of the grant being terminated and a brief statement reasonably identifying the grant. 17 U.S.C. §203(a); 37 CFR § 201.10.

The Termination Notice's four corners claim the grant to be terminated is <u>only</u> pursuant to the undated "1990"  Agreement. The only evidence is that the grant of the 5 albums at issue was pursuant to the 1991 Agreements, which are not even mentioned in the Termination Notice.

The following legally sufficient and overwhelming evidence supports a finding as a matter of law that the 1990 Agreement contains no  grant of any rights to the sound recordings, and the only agreement transferring the sound recording copyright rights from *2 Live Crew*'s members to Luke Records was the 1991 Agreements:

- It is unrebutted and unrebuttable that the term of the 1990 Agreement is expressly January 1-December 31, 1987, but the only evidence is that none of the recordings at issue were made during that time frame. Not one.

- It is unrebutted and unrebuttable that the 1990 Agreement contains no grant of or transfer of any sound recording copyright rights – only name and likeness rights.
- As a matter of law (Section 204 of the Copyright Act), 2 Live Crew could not make an oral agreement (the terms of which neither Campbell nor Ross could not state) to transfer the copyrights.
- It is unrebutted and unrebuttable that Paragraph 16 of the 1990 Agreement expressly sets forth that no oral agreements are effective.
- It is unrebutted and unrebuttable that Allen Jacobi, the lawyer who prepared the 1991 Agreements, testified that he had no knowledge of a 1990 Agreement and there would be no reason to prepare the 1991 Agreements, if a 1990 Agreement existed.
- It is unrebutted and unrebuttable that Joe Weinberger, the in-house lawyer for Luke Records, testified that he was never aware of a 1990 Agreement, and that Luke Records used the 1991 Agreements to calculate and pay royalties.
- It is unrebutted and unrebuttable that both Chris Wong Won and his lawyer, Doug Stratton, sent letters to Luke Records threatening to sue for breach of the 1991 Agreements and did not mention a 1990 Agreement.
- It is unrebutted and unrebuttable that Luke Records and 2 Live Crew operated under the terms of the 1991 Agreements and made no reference to any 1990 Agreement.
- It is unrebutted and unrebuttable that Luther Campbell testified there was only one agreement and the 1990 agreement, which term ended before all of the albums at issue were recorded, does not transfer any sound recording copyrights.
- It is unrebutted and unrebuttable that a lawsuit was filed vs Luke Records in 1992 by David Hobbs and Mark Ross for breach of the 1991 Agreements, because no royalties were calculated and paid consistent with same and a settlement was reached and did not mention a 1990 agreement.

Neither Campbell nor Ross could provide any legally sufficient evidence that a grant of sound recording copyrights occurred in the 1990 Agreement that nowhere even references any sound recording copyrights. 2 Live Crew's claim that there was an oral agreement to transfer the copyrights prior to the 1990 agreement fails as matter of law and under the clear, irrebuttable terms of paragraph 16 of the 1990 Agreement, on which Defendants themselves rely, and under paragraph 27 of the 1991 Agreements. *Latimer v. Roaring Toyz, Inc*., 601 F.3d 1224, 1235 (11th Cir. 2010); *Francois v. Jack Ruch Quality Homes, Inc*., 2006 U.S. Dist. LEXIS 57062 *22 (C.D. Ill. Aug. 14, 2006) ("the Copyright Act invalidates any such transfer, sale or assignment of copyright ownership that is not in writing signed by the copyright owner. 17 U.S.C. § 204(a)."). Nor can a copyright be transferred retroactively

back to an oral agreement. *Davis v. Blige*, 505 F.3d 90 (2d Cir. 2007). "[A]ssignments ... are prospective ....", *id.* at 104, "a license or assignment in copyright can only act prospectively.", *id.* at 104. "There is little from a policy perspective to recommend a rule that allows retroactive licenses or assignments, and there are two strong reasons disfavoring them ...." *Id.* at 105-06.; *Spinelli v. Nat'l Football League*, 903 F.3d 185, 198 (2d Cir. 2018) (applied *Davis*'s holding to bar Associated Press from granting a retroactive license to the NFL).   Judgment as a matter of law is warranted on these grounds as well.

### B. The failure to identify (i) any grant of copyright and (ii) the 1991 Agreement, is no small defect and most certainly not harmless.

As a general rule, an error is harmless only if it "do[es] not materially affect the adequacy of the information required" under section 203. 37 CFR § 201.10(e)(1). It is unrebutted that the Termination Notice must describe the grant of a sound recording copyright to be terminated and doesn't mention in this Termination Notice <u>any grants in 1991, 1993, 1996, 2001</u> <u>and grants by the members of 2 Live Crew of the sound recording copyrights at issue</u>. Under 37 CFR § 201.10(e)(2), errors in identifying the date of the execution of the grant may not affect the validity of the notice if the errors were "made in good faith and without any intention to deceive, mislead, or conceal relevant information." Here, they weren't.

Here, the Termination Notice's failure to mention the 1991 Agreement was intentional, because those 1991 Agreements expressly set forth the "artist for hire" language <u>in 2 places</u> and the Termination Notice deceptively omits those 1991 Agreements. The Termination Notice further attempts to make it appear as though the transfers were made before the true value of the works was known when the overwhelming, irrebutable evidence is that they were known and paid significant sums at the time of the transfer.

Thus, if the date of execution specified in a notice of termination is not the actual date of

execution of the grant, that kind of error may be considered harmless "if it is as accurate as the terminating party is able to ascertain, and if the date is provided in good faith and without any intention to deceive, mislead, or conceal relevant information." *Compendium of U.S. Copyright Practices*, §2310.12 (3d ed. 2021) (citing 37 CFR § 201.10(e)(2)).  A harmless error would be, for example, a mistake on the date of execution.  But here, the date of execution is not the error.  Rather, the error is in the operative grant and omitted to mislead. "An error's 'materiality,' and hence its 'harmlessness,' is to be viewed through the prism of the information needed to adequately advance the purpose sought by the statutory termination provisions themselves." *Champlin v. Music Sales Corp.*, 604 F. Supp. 3d 224, 236 (S.D.N.Y. 2022). On the other, section 203 strives 'for the existing assignee to receive reasonable notice of what rights of theirs are being affected' in the artist's exercise of his or her termination right." *Champlin*, 604 F. Supp. 3d at 236 (quoting *Siegel*, 690 F. Supp. 2d at 1055–56). It is impossible to ascertain from the Notice which grant Defendants were attempting to terminate. This error was done to conceal the "work for hire" language expressly set forth in the 1991 Agreements, irrefutably that all Defendants know full well exists given they signed and sued upon them in prior litigation. And this error was material because it was flatly set forth to deceive to make it appear as though the transfers were made before the true value of the works was known when they squarely were known.

The Copyright Office has described the inquiry framed by these objectives as "attempt[ing] to avoid the imposition of costly or burdensome [termination] requirements" while, at the same time, "giving the grantee and the public a reasonable opportunity to identify the affected grant and work from the information given in the notice." Termination of Transfers and Licenses Covering Extended Renewal Term, 42 Fed. Reg. 45916, 45918 (Sept. 13, 1977). Here, the Termination Notice failed to even mention the 1991, 1993, 1996, 2001 and/or 2003 grant of rights.

**C. Even if the 203 Termination Notice was valid (respectfully, it is not), the irrebutable evidence is that there are, nevertheless, additional grants not mentioned at all in the**

**Termination Notice that are as a matter of law not terminated**

There is no mention in the Termination Notice of the Campbell's grants in **1996** (to Lil Joe), the Ross grants in **1993** (to Luke Records) or in **2001** (to Lil Joe) and the Wong Won grant in **2003**. Therefore, judgment as a matter of law is warranted because the Termination Notice does not (as a matter of law) affect these grants at all. See *Penguin Books v Steinbeck,* 537 F. 3d 193 (2[d] Cir.2008) (section 203 does not terminate grants replaced by subsequent grants).

**<u>Reason No. 1: The *2 Live Crew* Copyrights were "works made for hire," because 2 Live Crew were employees of Luke Records. Therefore the copyrights are not subject to termination under section 203.</u>**

As the Court knows well, it is firmly established that transfer of a copyright in a "work made for hire" is not subject to termination. 17 USC §203(a); *Ennio Morricone Music Inc. v Bixio Music Group Ltd.,* 936 F.3d 69, 73 (2nd Cir. 2019). "A 'work made for hire' is … a work prepared by an employee within the scope of his or her employment…." 17 USC §101.

This requirement to qualify a work as a 'work made for hire' is straightforward and easy to apply. *Ennio,* 936 F.3d at 73. A "work made for hire" includes "a work prepared by an employee within the scope of his or her employment." 17 U.S.C. § 101(1).

Here, there was extensive, overwhelming evidence (much being unrebutted) supporting Lil' Joe's claims that the three *2 Live Crew* members were each artists for hire, but certainly Campbell, as the CEO and owner of Luke Records, was an employee. The evidence is as follows:

1) The sound recording copyright registrations (Plaintiffs EX 27-32), and the copyright notices on the 5 albums (Defendants' EX D133, D57A) (designated by Campbell), filed over a decade before termination of the copyrights was in question, each show Luke Records was the owner of the copyrights, which was only accurate if the members were "artists for hire;"

2) Since these albums were released before any transfer (whether in 1990 pursuant to the 1990

Agreement or in 1991 pursuant to the 1991 Agreements), the copyright notice showing Luke Records' ownership could only be accurate if the members of *2 Live Crew* were "artists for hire";

3) The copyright registrations by Lil Joe show the sound recordings were acquired from Luke Records, and Luke Records could only be the owner with authority over those sound recordings if the members of 2 Live Crew were "artists for hire;

4) Each of the members of 2 Live Crew, Campbell, Wong Won, Ross and David Hobbs, expressly agreed in paragraphs 5(c) and 20(a) in the 1991 Agreements that the *2 Live Crew* Copyrights were works "made for hire";

5) If the 1990 Agreement is the operative agreement, each of the members of 2 Live Crew, Campbell, Wong Won, Ross and David Hobbs, expressly agreed in paragraph 2(d) that Luke Records owns the *2 Live Crew* Copyrights ("Company shall own all master recordsings embodying the performance of Artist made hereunder….") and that such ownershio "shall from the inception of their creation, be entirely and forever the property of the Company…", in other words, they were works "made for hire";

6) Both paragraph 16 of the 1990 Agreement and paragraph 27 of the 1991 Agreements contain an integration clause disclaiming any oral or other agreements;

7) Campbell, Christopher Wong Won and Mark Ross were paid salaries from which taxes were withheld (Exs. P39, 40, 41, 42) which Luke Records CFO and outside CPA testified is only done for employees, and participation by all the members of *2 Live Crew* in pension plans and receipt of workers compensation insurance and health insurance, which is only available to employees, was unrebutted.

8) Campbell's own documents filed under penalties of perjury in the Bankruptcy Court indicate he was an employee;

10

9) The testimony of Herman Moskowitz, the CPA for Luke Records, and Joe Weinberger, the tax attorney for Luke Records, was unrebutted that the members of 2 Live Crew were employees; and

9) Finally, the IRS audited Luke Records and after doing so, agreed with Luke Records' position that each of the members of 2 Live Crew were employees.

The Supreme Court in *Community for Creative Non-Violence v. Reid*, 490 U.S. 730, 751 (1989). identified thirteen non-exclusive factors to aid in this artist-for-hire inquiry. *Horror Inc. v Miller,* 15 F.4th 232 (2d Cir. 2021), expounded on the test. *Id.* at 243-44. These factors are not to be applied "in a mechanistic fashion" there is "no direction concerning how the factors were to be weighed." *Id.* at 248. Of *Reid's* thirteen factors, five "should be given more weight in the analysis, because they will usually be highly probative of the true nature of the employment relationship." *Horror,* 15 F.4th at 249. Those factors are: "(1) the hiring party's right to control the manner and means of creation; (2) the skill required [of the hired party]; (3) the provision of employee benefits; (4) the tax treatment of the hired party; and (5) whether the hiring party has the right to assign additional projects to the hired party."

The analysis, as set forth below, shows the overwhelming majority of the factors favor "employee" status of two of the three members issuing the termination notice—Mark Ross and Christopher Wong Won—and clearly show that the third member—Campbell—was an"employee"**:**

| Factor | Test | Evidence |
|--------|------|----------|
| *1 | Luke Records Right to Control | The 1991 Agreements and the 1990 Agreement specifically gives Luke Records complete control over the recording process. (¶¶ 4,5,6,8,9 of the 1991 Agreements, ¶4(a) of the 1990 Agreement). Based upon the unrebutted evidence, Luke Records controlled the entire production process. |
| *2 | The Skill Required | Both Luke Records and the members of 2 Live Crew were skillful in the recordings process. |

| 3 | Source of Instrumentalization and Tools | Based upon the unrebutted evidence, Luke Records paid for and provided the studio, picked the times when the studio would be used, and paid for all costs of production including the producers, instruments and tapes. Paragraph 5 of the 1990 Agreement and _ of the 1991 Agreements obligate Luke Records to pay all costs. Two of the albums at issue were recorded in studios owned by Luke Records. |
| --- | --- | --- |
| 4 | Location of Work | Based upon the unrebutted evidence, Luke Records selected and paid for the studios, or owned the studios. Paragraph 5 of the 1990 Agreement and _ of the 1991 Agreements obligate Luke Records to pay all costs. |
| 5 | Duration of Relationship | Based upon the unrebutted evidence, the parties worked together on an exclusive basis from 1986 until 1991. |
| *6 | Right to Assign Additional Projects | The 1991 Agreements (¶ 2(b)) specifically give Luke Records the right to assign additional projects. Based on the unrebutted evidence, Luke Records had the right to assign additional works |
| 7 | Extent of Discretion Over When and How Long Work | Based upon the unrebutted evidence, Luke Records controlled access to the studio and therefore when and how long work would occur. |
| 8 | Method of Payment | Based upon the unrebutted evidence, Luke Records paid them by check deducting payroll taxes. |
| 9 | 2 Live Crew's Role | The works were agreed to be works for hire which means the group members were employees. (¶¶ 5(c) & 20(a) of the 1991 Agreements and 2(d) of the 1990 Agreement). The group was deemed employees. (¶¶ 4a & 20a of the 1991 Agreements) |
| 10 | Whether the Work is Part of Luke Records' Regular Business | Based upon the unrebutted evidence, Luke Records was a record company. Hence its regular business was recordings. |
| 11 | Whether Luke Records is in Business | Based upon the unrebutted evidence, Luke Records was in business at the time of the recordings. |
| *12 | Provisions of Employee Benefits | Based upon the unrebutted evidence, each of the members of 2 Live Crew received benefits only |

| | | allowed to employees. |
|---|---|---|
| *13 | Tax Treatment | Based upon the unrebutted evidence, Luke Records treated the members as employees for payroll and tax purposes, which the IRS agreed to when it audited Luke Records. |

Four of the five factors show that Campbell most certainly was an employee and weigh heavily in support of a finding that Christopher Wong Won and Mark Ross were employees of Luke Records and therefore the *2 Live Crew* Copyrights were "works for hire." First factor - the right to control: The 1991 Agreements explicitly give Luke Records complete control and Luke Records CEO controlled the entire process. While individuals may have some artistic freedoms, the 1991 Agreements (at ¶4) and the 1990 Agreement (at ¶4) set forth that Luke Records will select the musical materials and the artists will record and re-record any material until Luke Records finds it satisfactory and Luke Records' decision is final. Moreover, the Supreme Court has cautioned that "the extent of control the hiring party exercises over the details of the product is not dispositive." *Reid,* 490 U.S. at 752. And "supervision need not be constant to establish an employee-employer relationship." *Robles v. RFJD Holding Co.*, No. 11-62069-CIV-ROSENBAUM/SELTZER, at *8 (S.D. Fla. June 3, 2013) (citing cases therein).

Second factor – the right to assign: The 1991 Agreements (¶ 2(b)) specifically give Luke Records the right to assign additional projects: "During each Contract Period hereunder, Company will have the following options ("Over-call Options") to increase the Recording Commitment for the Period . . . ."

Third and fourth factors – provision of employee benefits and tax treatment:  Campbell, Christopher Wong Won, and Mark Ross were also provided employee benefits and were treated as employees for tax purposes. These two factors in particular, "the parties' tax treatment of their relationship is, along with employee benefits, 'highly indicative' of whether a worker should be treated

as a conventional employee for copyright purposes." *Horror,* 15 F.4th at 253.

And while skill might be required, the same person, Campbell, is both the employer and the employee. Lil' Joe searched and could locate no authority holding the sole owner of a business to be an independent contractor, not an employee, just because he is a "skilled worker." (This proposition doesn't even make logical sense, as it would mean that a doctor or lawyer could never be an employee of his solely owned practice.). *Cf., JustMed, Inc. v. Byce*, 600 F.3d 1118 (9th Cir. 2010) (Byce, shareholder and director of company was an employee when he developed source code at issue); *Kev & Cooper Liab. Co. v. Gladwell Educ.*, Civil Action 22-2029 (SDW) (JRA), at *5 (D.N.J. Feb. 27, 2023) (rejecting argument that a work could not be fore hire where it was created by a co-owner of the company where other employees contributed to the work).

The remaining seven of the 13 factors analyzed in the chart above, held to be "less significant in the copyright context", *Horror,* 15 F.4th at 255, also favor Campbell's, Christopher Wong Won's and Mark Ross' status as an employee. Campbell performed numerous functions for Luke Records, as its CEO, beyond performing for *2 Live Crew*, including overseeing other acts, supporting the conclusion that Luke Records controlled Luther Campbell's works, could assign him additional projects and contemplated an indefinite relationship.  There can be little doubt that Luther Campbell and the other members of 2 Live Crew were an integral part of the record company's business. The unrebutted testimony was that Campbell was an employee of Luke Records was provided by Joe Weinberger (the in house lawyer for Luke Records), Herman Moskowitz (the CPA for Luke Records) and Allen Jacobi (the outside attorney for Luke Records). Campbell's naked and unsupported testimony that 2 Live Crew were not employees  is legally insufficient in the face of the very employee payroll checks that he signed, the copyright notices that he created, his own Banruptcy Court filings under penalties of perjury, his very participation in pension plans, health insurance, and workers

14

compensation insurance only available to employees. Campbell presented no legally sufficient evidence to controvert his own documents and filings.

Numerous cases support a finding that Campbell (as the CEO and owner of Luke Records) was acting within the scope of his employment. *See JustMed, Inc. v. Byce*, 600 F.3d 1118 (9th Cir. 2010) (holding Byce's work was a work made for hire; he was a shareholder and director of the corporation JustMed, Inc.; and the court concluded he was an employee of the corporation when he worked on the source code at issue, although Byce was not an employee for tax purposes); *E.E.O.C. v. Century Broad. Corp.,* No. 89 C 5842, 1990 WL 43286, at *3 (N.D.Ill. March 23, 1990) (broadcasting company "controlled" radio announcers because it dominated the manner in which the announcers performed their job: (1) it set rules about when news broadcasts would occur and how long they would be; (2) it exclusively controlled the marketing devices, such as contests; (3) it oversaw commercials and station identifications; and (4) it determined even when announcers could announce the time); *Sterpetti v. E-Brands Acquisition, LLC,* 2006 US Dist. LEXIS 21407 *20-22 (M.D. Fla. April 20, 2006)(an employee was an artist for hire who created a fresh pasta manual, within the scope of his employment even though there was no assignment nor contract; finding 3 elements must be present to show employee status if the work: a) is of the kind he is employed to perform; b) it occurs substantially with the authorized time and space limited; and c) it is activated at least in part by a purpose to serve the master.). Each of these three factors show that Campbell was acting within the scope of his employment with Luke Records. At a minimum, therefore, the legally sufficient evidence shows Campbell, incontrovertibly, and Mark Ross and Christopher Wong Won, overwhelmingly, were Luke Records employees so the *2 Live Crew* Copyrights are of works made for hire.  Judgment as a matter of law is correct on this ground because all 3 had to be independent contractors and just the evidence that 1 of the 3 members was an employee compels judgment as a matter of law.

15

**Reason No. 3: Section 203 does not apply since the value of the copyrights were known when the transfer occurred.**

By 1990 or 1991, the value of the copyrights was well known. The records were international hits and in 1990, the unrebutted evidence is that Luke Records received a distribution deal from Atlantic Records, with a $5 million advance. Since the value of the 2 Live Crew copyrights were known—in fact, well known—by 1990 or 1991, Section 203 protection is not warranted. *Waite v. UMG Recordings Inc.,* 2023 US Dist. LEXIS 14465 (4-5 (S.D. NY Jan. 27, 2023) (Section 203 implemented to protect artists who give up their copyrights *before* they know it is a hit); *Champlin v. Music Sales Corp.,* 604 F. Supp. 3d 224, 236 (S.D. NY 2022) ("the Act seeks to 'counterbalance the unequal bargaining position of artists seeking to reclaim their copyrights, resulting in part from the 'impossibility of determining a work's value until it has been exploited.'"") (quoting H.R. Rep. No. 94-1476, at 124 (1976)). Judgment as a Matter of Law is correct on these grounds.

**Reason No. 4: The Termination Notice cannot as a matter of 17 USC § 203(b)(5) affect the grant of rights to Lil Joe pursuant to bankruptcy law and the Bankruptcy Order of Judge Robert Mark.**

"Bankruptcy cases afford a separate vehicle by which copyrights can be transferred" by operation of law. *Nimmer on Copyright* § 19A.03[B] **attached.** "It is undisputed that the property of the debtor's estate includes the debtor's intellectual property, such as interest in patents, trademarks, and copyrights", legal and equitable, vested, unvested, or contingent, and regardless of whether there may be a transfer restriction. *Chesapeake Fiber Pkg. v. Sebro Packaging Corp.*, 143 B.R. 360 (D. Md. 1992) (citing *United States v. Inslaw Inc.*, 932 F.2d 1467, 1471 (D.C. Cir. 1991)); *Cardwell v Bankruptcy Estate of Joel Spivey (In re Douglas Asphalt Co.)*, 483 BR 560, 571 (Bankr. S.D. Ga. 2012); *Denadai v Preferred Capital Markets, Inc*., 272 B.R. 21, 28–30, 29 n 5 (D. Mass. 2001) (citing H.R. Rep. No. 95-595, at 175-76 (1977)); 11 U.S.C. § 101; 11 U.S.C. § 541. The grants of rights to Lil' Joe arose under Chapters 7 and 11 of federal bankruptcy law, and thus are not affected by at

termination right under subsection 203(b)(5)'s plain language. Section 203 expressly exempts rights arising under any other federal law from termination:

> Termination of a grant under this section affects only those rights covered by the grants that arise under this title, and in no way affects rights arising under any other federal, state or foreign law.

17 USC §203(b)(5). It is unrebutted that Lil Joe first obtained the rights to the 2 Live Crew sound recording copyrights pursuant to an order of bankruptcy by Judge Robert Mark, dated March 22, 1996 (Ex. P43), adopting the plan pursuant to 11 USC § 1229, and stating that Lil' Joe is a "good faith purchaser as that term is used in 11 U.S.C. § 363(m) and is entitled to all of the protection of good faith purchasers pursuant thereto." It is also unrebutted that Mark Ross's Bankruptcy Settlement Agreement and Agreed Nondischargeable Final Judgment (Ex. P8 & 11)**,** stating that he has "no rights" to the recordings.

"No rights" means "no rights". These bankrtupcy court transfers of copyrights are transfers by operation of federal law. *See Brooks v. Bates,* 781 F.Supp. 202, 205 (S.D.N.Y. 1991) (relying on Professor Melville B. Nimmer's copyright treatise to interpret "by operation of law" to mean transfers by bequest, bankruptcy, mortgage foreclosures, and the like. *Id.* at 205 (citing Melville B. Nimmer David Nimmer, 3 *Nimmer on Copyright* § 10.03[A] at 10-42); *see also* 3 *Nimmer on Copyright* § 10.03 at 22 **attached** ("It has already been noted that the Act's requirement for transfers to be memorialized in writing is inapplicable to those that arise "by operation of law."57 The statute leaves the contours of that exception undefined. Presumably, the intent is to refer to such matters as disposition by courts in bankruptcy, probate, and the like."); 3 *Nimmer on Copyright* **§** 10.4 at 3 **attached** ("The House Report states that Section 201(e) would not inhibit transfers of ownership pursuant to proceedings in bankruptcy and mortgage foreclosures, because in such cases the author, by his overt conduct in filing in bankruptcy,5 or hypothecating a copyright, has consented to such a transfer. Similarly, it may be

concluded that the transfer of rights from employee to employer in a for hire relationship is not precluded as this is based upon a rebuttable presumption of consent from the employee."); *Taylor Corp. v. Four Seasons Greetings, LLC*, 403 F.3d 958, 964 (8th Cir. 2005) (holding that a bankruptcy court order approving an asset purchase agreement transferring intellectual property rights constituted transfer by operation of law); *The Evolutionary Level Above Human, Inc. v. Havel*, 3:22-CV-395-MGG, at *18 (N.D. Ind. Feb. 27, 2024) (holding evidence presented by both parties established that works by the Heaven's Gate cult were transferred to the plaintiff in a copyright infringement lawsuit by operation of law in probate proceedings by the Public Administrator as part of a settlement agreement approved by the California court).

Moreover, Campbell and Ross lack standing to even pursue this asset. "Because a Chapter 7 debtor forfeits his prepetition assets to the estate, only the Chapter 7 trustee, not the debtor, has standing to pursue" that asset. *Russ v. Jackson County School Board*, 530 F.Supp. 3d 1074, 1082 (N.D. Fla. 2021) A bankruptcy 'trustee, as representative of the bankruptcy estate, is the only proper party in interest, and is the only party' who can pursue these interests. *Id.* Accordingly, here, it was the trustee of the Luke Bankruptcy, not Luther Campbell, who could elect to terminate the 2 Live Crew Sound Recording Copyrights. To ensure the Court is fully informed, per the Bankruptcy Code and Nimmer on Copyright and law cited therein, *Mills Music, Inc. v. Snyder*, 469 U.S. 153, 173 (1985), does not mean that either Luther Campbell or Mark Ross held on to an exercisable termination right after their bankruptcy as the individuals in *Mills Music* holding a termination right never entered bankruptcy and the holding was limited to whether a grantee was still entitled to the royalties from derivative works even after the original copyright holder exercised his renewal right, to which question the Supreme Court answered, yes.

Further, the bankruptcy court's final orders must be accorded preclusive effect. Where a court

of competent, which a bankruptcy court is, jurisdiction renders a prior final judgment on the merits, as did Judge Mark here, that order is to be given preclusive effect through res judicata. *See Wallis v. Justice Oaks II, Ltd.*, 898 F.2d 1544, 1550–52 (11th Cir. 1990); *CSX Transp., Inc. v. Bhd. of Maint. of Way Emps.*, 327 F.3d 1309, 1317 (11th Cir. 2003). These voluntary transfers by operation of law approved by their respective bankruptcy courts foreclose any challenge to Lil Joe's ownership of the sound recordings copyrights approved by the respective bankrtupcies. *See also* 11 U.S.C. § 363.

Copyrights are included in bankrtupcy transfers even if they are not listed on the asset schedule. *See Itofca, Inc. v. Megatrans Logistics, Inc.*, 322 F.3d 928, 932 (7th Cir. 2003). They do not have to be expressly negotiated between the debtor and creditor, but are transferred by operation of law in bankruptcy as 17 U.S.C. § 201 provides. *See* 3 *Nimmer on Copyright* §§ 10.03 ("The [Copyright] Act permit such transfers to be effectuated, in whole or in part, by means of conveyance or by operation of law.), 10.04 ("The House Report states that Section 201(e) would not inhibit transfers of ownership pursuant to proceedings in bankruptcy and mortgage foreclosures, because in such cases the author, by his overt conduct in filing in bankruptcy, or hypothecating a copyright, has consented to such a transfer."). "And in any event the order approving a bankruptcy sale is a judicial order and can be attacked collaterally only within the tight limits that Fed.R.Civ.P. 60(b) imposes on collateral attacks on civil judgments." *Futuresource LLC v. Reuters Ltd.*, 312 F.3d 281, 286 (7th Cir. 2002); *Pusser's (2001) Ltd. v. HMX, LLC*, No. 11 C 4659, at *10 (N.D. Ill. Mar. 28, 2012) (same). Thus, Lil Joe's rights as the owner of the Sound Recording Copyrights under 11 USC §363 are not subject to termination and cannot be affected by the Termination Notice. Judgment as a Matter of Law is correct on these grounds as well. Plaintiff also further incorporates, renews, and does not abandon the arguments it set forth in Plaintiff's Motion for Summary Judgment filings [ECF30, 31, 32, 32-1 through 32-6, 33, 47] and Motion for Reconsideration filings [ECF220, 220-1 through 220-5, 221].

## Conclusion

For any one of the 4 reasons listed above and because of the overwhelming, legally sufficient evidence presented in documents and testimony, the Termination Notice is not effective to terminate the grant of rights made in the 1991 Agreements or to terminate the subsequent grants.  Thus, Plaintiff Lil Joe Records, Inc., respectfully requests that the Court grant this Motion for Judgment as a Matter of Law and enter a final order granting Lil Joe Records request for declaratory relief that Lil Joe Records continues to own the sound recording copyrights that it acquired pursuant to the 1996 Order of Judge Robert Mark. Judgment on Lil Joe Records request for declaratory relief should be granted and Defendants' request for declaratory relief should be denied.

**WOLFE LAW MIAMI PA**
Counsel for Lil Joe Records Inc.
175 SW 7th Street, Suite 2410
Miami, Florida 33130
Phone: 305-384-7370

s/ Richard C. Wolfe_____
    Richard C. Wolfe, Esq.
    Florida Bar No.: 355607

    *And*

EASLEY APPELLATE PRACTICE PLLC
*Appellate Counsel for Plaintiff*
1200 Brickell Avenue, Ste. 1950
Miami, Florida  33131
T: (305) 444-1599; 800-216-6185
FLORIDA BAR DESIGNATED E-MAILS:
administration@easleyappellate.com
admin2@easleyappellate.com

 /s/ Dorothy F. Easley_____
DOROTHY F. EASLEY, MS, JD, BCS APPEALS
FLA. BAR NO. 0015891

## CERTIFICATE OF SERVICE

I hereby certify that on October 17, 2024, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record identified on the attached Service List in the manner specified, either via transmission of Notice of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notice of Electronic Filing.

Joel Rothman, Esq.
SRIP LAW PA
21301 Powerline Road, Ste 100
Boca Raton, Florida 33433
joel.rothman@sriplaw.com

Scott Burroughs, Esq.
Doniger/Burroughs
237 Water Street, First Floor
New York, NY 10038
scott@donigerlawfirm.com

/s/ Richard C. Wolfe
Richard C. Wolfe