# EXHIBIT A

# 5 Nimmer on Copyright § 19A.03

**Nimmer on Copyright**   >   **CHAPTER 19A Bankruptcy**

## Author

Peter S. Menell*

## § 19A.03 Copyrights In Bankruptcy Courts

Neither the current Copyright Act nor its predecessor 1909 Act at adoption mentioned the word "bankruptcy."[1] The various amendments to the current Act over the years followed suit. Nonetheless, a portion of the Digital Millennium Copyright Act addressed a wrinkle of this domain relating to actors, writers and directors losing residual payments after production companies go bankrupt.[2] The law included a direction to Comptroller General, in consultation with the Register of Copyrights, to prepare a study within two years evaluating the "impact of this section on the motion picture industry."[2.1] When that report duly issued, it revealed "no observable impact on the industry to date."[2.2] More specifically, 2% of owed residuals went unpaid during the previous three-year window, most of the noncompliance tracing back to low-budget films that do not generate much revenue anyway.[2.3]

In any event, the term "bankruptcy" is almost completely absent from the legislative history as well.[3] Likewise, Copyright Office regulations all but ignore it.[4]

---

*This chapter derives from a paper written by Peter S. Menell, Professor of Law and Executive Director, Berkeley Center for Law & Technology (Boalt Hall), for a presentation to the Federal Judicial Center's National Bankruptcy Judge Workshop in August 2004. Kenneth N. Klee and Howard J. Steinberg provided valuable comments on the chapter.

[1] But note a 1978 amendment that explicitly references Title 11. See § 10.04 supra.

[2] This aspect appeared in Title IV of the Digital Millennium Copyright Act. The Manager's Report explained the impetus behind that provision:

> The writers, screen actors, and directors guilds have expressed concern about their inability to obtain residual payments that are due to their members in situations where the producer of the motion picture fails to make these payments, for example where the producer/company no longer exists or is bankrupt. The guilds may be unable to seek recourse against the exclusive distributors, the transferees of rights in the motion picture, because those parties are not subject to the collective bargaining agreement or otherwise in privity with the guilds. Although the collective bargaining agreements generally require the production company to obtain assumption agreements from distributors that would effectively create such privity, some production companies apparently do not always do so.

Section-by-Section Analysis of H.R. 2281, Serial No. 6, 105th Cong., 2d Sess. 62 (1998). See § 12A.15[D] supra.

[2.1] 28 U.S.C. § 4001(h).

[2.2] Motion Pictures: Legislation Affecting Payments for Reuse Likely to Have Small Impact on Industry 5 (GAO Report Jan. 2001).

[2.3] "Of the more than $1.7 billion in residuals owed in the years 1996 through 1998 by the three guilds, we estimate that unpaid residuals accounted for, at most, $35.2 million." Id. at 4. "Although the legislation's impact on the overall motion picture industry may be small, certain individuals working on low-budget films, such as producers, union actors, writers, and directors, could experience substantial losses, according to industry representatives." Id. at 2.

[3] The one exception comes in the excerpt quoted in § 6A.03[C][2][b] supra.

Leah Hatikonstantinou

§ 19A.03 Copyrights in Bankruptcy Courts

It would be erroneous, however, to construe silence as insignificance. Because debtors often have an interest in copyrights, the full panoply of copyright issues can arise in bankruptcy courts. Moreover, because the debtor's interest can be on the plaintiff's or the defendant's side of the ledger, those issues can arise in a myriad of postures. Among the extant cases, implicated issues have ranged across the following:

- the effectiveness of an oral copyright license;[5]
- construction of the work for hire doctrine;[6]
- self-execution of the Berne Convention;[7]
  - the respective rights in computer software in the underlying work and a debugged derivative work;[8] and
- the scope of copyright protection for computer software.[9]

Most commonly, however, the issues arise in a few recurring postures, which are discussed below.

### [A] Adjudication of Infringement and Entitlements

The debtor in a bankruptcy case might have a copyright claim against a third party. In that instance, the bankruptcy court needs to hold a trial to determine the question of infringement.[10] Conversely, the debtor could be a copyright defendant—in which case the full panoply of copyright defenses apply.[11] Often implicated in the

---

[4] Here, the single exception arises in the context of the phonorecord compulsory license. See § 8.25[F] supra. The pertinent regulation states that

> in any case where, within three years before the phonorecord was relinquished from possession, the compulsory licensee has had final judgment entered against it for failure to pay royalties for the reproduction of copyrighted music on phonorecords, or within such period has been definitively found in any proceeding involving bankruptcy, insolvency, receivership, assignment for the benefit of creditors, or similar action, to have failed to pay such royalties, that compulsory licensee shall be considered to have "Permanently parted with possession" of a phonorecord made under the license at the time at which that licensee actually first parts with possession.

37 C.F.R. § 201.19(d).

[5] *In re Superior Toy & Mfg. Co., Inc., 183 B.R. 826, 833–834 (Bankr. N.D. Ill. 1995)* (Treatise cited as "the leading treatise on copyright law"). See § 10.03[A][7] supra.

[6] *In re Marvel Entm't Group, Inc., 254 B.R. 817, 832–834 (D. Del. 2000); In re Simplified Information Systems, Inc., 89 B.R. 538, 542–543 (Bankr. W.D. Pa. 1988) (Treatise cited).* See § 5.03 supra.

[7] *In re AEG Acquisition Corp., 127 B.R. 34, 42 (Bankr. C.D. Cal. 1991), aff'd, 161 B.R. 50, 52 (9th Cir. 1993).* See § 1.12[A] supra.

[8] *In re C Tek Software, Inc., 127 B.R. 501, 502, 506 (Bankr. D.N.H. 1991) (Treatise cited).* See § 3.04 supra. In that case, there was a security interest in the underlying source code. In order to foreclose on that material, the court ordered surrender of version 3.7.2B to the creditor, allowing retention of corrections through version 4.1.8. *Id. at 507.*

[9] *In re InSITE Servs. Corp., LLC, 287 B.R. 79, 90–91 (Bankr. S.D.N.Y. 2002).* See § 13.03[F] supra.

[10] See, e.g., *In re InSITE Servs. Corp., LLC, 287 B.R. 79, 90 (Bankr. S.D.N.Y. 2002).* In this case, one defendant claimed that the debtor was judicially estopped from pursuing its copyright claim, given an antecedent failure to list it among the Schedule of Assets filed with the court. *Id. at 91.* The court allowed the debtor to amend, noting that "it would be the Debtor's general creditors who would be harmed by summary dismissal of its complaints." *Id.* Another court found judicial estoppel in this posture. *Leventhal v. Schenberg, 917 F. Supp. 2d 837, 849 (N.D. Ill. 2013).* See § 13.07[C] supra.

[11] See, e.g., *In re Amica, Inc., 135 B.R. 534 (Bankr. N.D. Ill. 1992).* The claim in that case might have been not for infringement, but for contractual damages for use of the copyrighted program. See *id. at 538.* In any event, the debtor was able to establish fraudulent inducement, and thus was allowed to rescind the contract. *Id. at 550.*

latter context is whether, notwithstanding infringement, the policies underlying bankruptcy law should discharge liability and allow the debtor to start afresh.[12]

One case posed the question whether the right to a jury trial attaches in bankruptcy proceedings. In *Pearson Educ., Inc. v. Almgren*,[12.1] defendant impersonated a professor to obtain from publishers their instructors' manuals, which he turned around and sold to fellow students. Rather than serving him with a cease and desist letter, Pearson decided "to make an example of him" by filing suit for copyright infringement.[12.2] His $5,000 in gross profits soon dissipated, defendant was forced into bankruptcy.[12.3] After he perjured himself and was found culpable of willful infringement, Pearson and its fellow publishers wanted a jury to determine his appropriate level of statutory damages.[12.4] But the bankruptcy court struck that demand, and thereupon awarded the minimum amount,[12.5] which it deemed non-dischargeable in bankruptcy.[12.6]

The Eighth Circuit affirmed. The legal right to trial by jury gives way to equity in the context of bankruptcy proceedings.[12.7] The court also affirmed the discretionary denial of any attorneys' fees to the publishers.[12.8]

### [B] Transfer of Ownership

A previous chapter has explored the various ways in which copyrights can be transferred.[13] The common denominator in those scenarios is voluntary action by the copyright owner.

Bankruptcy cases afford a separate vehicle by which copyrights can be transferred. In this scenario, however, copyright owners, even in the event of involuntary bankruptcy, can be separated from rights over their works.[14]

Two cases presented to the Seventh Circuit in October 2002 illustrate the contours of this arena. In each, Judge Posner ruled that copyright exploitation must follow disposition by the pertinent bankruptcy court. In the first, company F entered into a contract to pay company B for continuously updated financial-markets data.[15] After B went bankrupt, company R bought some of B's assets—but not including the contractual rights with F, and R did not assume B's obligations.[16] F participated as a "party in interest," meaning that it had a right during the bankruptcy proceedings to raise and be heard on issues in the case.[17] Later, B's contractual rights with F

---

[12] See § 19A.03[D][1] infra.

[12.1] 685 F.3d 691 (8th Cir. 2012).

[12.2] *Id.* at 693.

[12.3] *Id.* at 693.

[12.4] See § 14.04[C] supra.

[12.5] On each of 19 counts it awarded the minimum of $750, for an aggregate of $14,250. 685 F.3d at 693. See § 14.04[B][1][a] supra.

[12.6] 685 F.3d at 693. See § 19A.03[D][1] infra.

[12.7] 685 F.3d at 694 ("a claim of debt or damages against the bankrupt is investigated by chancery means"). On intermediate appeal from the bankruptcy judge, the district court had held that the publishers "waived any right to a jury trial on copyright liability and damages by filing proofs of claim in the bankruptcy proceedings." *Id.* at 694.

[12.8] *Id.* at 696. See the discussion of this case in § 14.10[D][5][a][i] supra.

[13] See Chap. 10 supra.

[14] See § 10.04 supra.

[15] *FutureSource LLC v. Reuters Ltd.*, 312 F.3d 281, 283 (7th Cir. 2002).

[16] *Id.* at 283–84.

§ 19A.03 Copyrights In Bankruptcy Courts

passed to company M; despite M's assurances to the bankruptcy court that it would honor its obligations to F, it failed to do so.[18] F responded by suing R, arguing that it had a license from B "and that an intellectual-property license, like a tenancy in real estate, is not extinguished by the sale of the underlying property."[19]

The Seventh Circuit rejected that argument as nonsensical.[20] F wanted to benefit without paying anything to R, with which it had no contract, and also without paying M, from which it was receiving no services.[21] The court further rejected the analogy to real property, holding that the bankruptcy court's sale order extinguished all conflicting interests in the assets that R acquired.[22]

In the second case, ITOFCA sued MegaTrans for copyright infringement.[23] The latter responded that it had obtained the copyright in a previous bankruptcy sale; ITOFCA had participated in the bankruptcy proceedings and failed to object to the sale.[24] The Seventh Circuit accordingly rebuffed ITOFCA's claim. "When a bankruptcy court approves the sale of an asset of the debtor, a person who has notice of the sale cannot later void it on the ground that he is the asset's real owner."[25]

Other cases likewise align copyright ownership in accordance with the dictates of prior bankruptcy cases.[26] The party who claims to have acquired ownership through bankruptcy bears the burden of proving that the copyright was included in the bankruptcy court's disposition of assets.

In addition, a bankruptcy court may transfer a cause of action for copyright infringement. As has been canvassed above, the substantive law of copyright permits such assignment, if made explicit.[27] Accordingly, it has been held that a bankruptcy trustee has power to transfer a copyright claim.[28]

---

[17] *Id. at 284.*

[18] *Id.*

[19] *Id. at 285.*

[20] *Id. at 284.*

[21] *Id. at 285.*

[22] *Id. at 285.* In that context, F's lack of objection to the bankruptcy court, after having received notice, proved fatal. *Id.*

[23] *ITOFCA, Inc. v. MegaTrans Logistics, Inc., 322 F.3d 928 (7th Cir. 2003).*

[24] *Id. at 929.*

[25] *Id. at 930.* The situation was actually more complicated, given ambiguity in the bankruptcy court's order.

> It is true that [the purchaser] did not list a copyright among its assets on the asset schedule that it submitted to the bankruptcy court; true, too, that ordinarily persons who might have an interest in property being sold at a bankruptcy auction have a right to rely on the fact that the debtor's schedule of assets does not list the property in which they are interested. But it was apparent on the face of the bankruptcy judge's order that it was conveying the right to sell copies of the modified program—which is precisely the right that ITOFCA claims to have retained for itself. Its failure to object to the bankruptcy court's order is compelling evidence that its claim of right is an afterthought. It knew it had no basis for objecting to the sale order.

*Id. at 930–931.* A lengthy concurrence investigates the *res judicata* effects of the prior bankruptcy court determination. *Id. at 932–942* (Ripple, J., concurring) (Treatise cited). See § 12.07 supra.

[26] See, e.g., *AGV Prods., Inc. v. Metro-Goldwyn-Mayer, Inc., 115 F. Supp. 2d 378, 388–392 (S.D.N.Y. 2000)* (disposing of sequel rights in *The Terminator* pursuant to Orion bankruptcy plan); *Rosen v. E. Rosen Co., 818 A.2d 695, 698 (R.I. 2003)* (allowing receiver to engage in *nunc pro tunc* assignment of copyright).

[27] See § 12.02[C] supra.

### [C] Disposition of Copyrighted Goods

Of course, bankruptcy courts have the power to dispose of the debtor's physical assets. Given that ownership of material goods is distinct from ownership over the copyright,[29] that power extends to goods such as books and phonorecords. Thus, a California court ordered the sheriff to seize a film negative until liens in it had been worked out on appeal.[30]

Nonetheless, the courts are not blind to the consequences of their disposition of goods that could, if wrongfully distributed, infringe copyrights.[31] In In re *Audiofidelity Enterprises, Inc.*, for instance, the defendant in a copyright infringement suit entered into a consent judgment, and subsequently declared bankruptcy.[32] The plaintiffs from that earlier case participated as defendants in the later *Audiofidelity* bankruptcy hearing. The court accepted their assertion

> that should this Court authorize a sale in the context of a bankruptcy liquidation of the offending tapes and records, we would be putting back into the stream of commerce, into the hand of the public at large, the very offending tapes and records which [the earlier] order specifically and permanently enjoined the public from ever hearing.[33]

It thereupon ordered the subject inventory destroyed.[34]

In a later case, the debtor also had possession of infringing inventory,[35] consisting of some 2 million unlicensed compact discs.[36] Because the trustee believed it impossible to work out the appropriate licensing arrangements with the Harry Fox Agency (HFA) and considered the discs' continued storage a drain on the bankruptcy estate, he wished to abandon those materials. HFA at that point objected that such abandonment would constitute an infringing distribution of the copyrighted material, and maintained that the trustee was obligated to destroy the inventory.[37] The court concluded that "the trustee's abandonment of unsaleable inventory would not constitute a 'distribution' of unlicensed phonorecords within the meaning of the federal copyright law."[38] HFA continued to

---

[28] *Integrated Solutions, Inc. v. Service Support Specialties, Inc.*, 193 B.R. 722, 727 (D.N.J. 1996) (reaching opposite conclusion as to plaintiff's coordinate state law claims, given New Jersey public policy against assignment of tort claims).

[29] See § 10.09 supra.

[30] *LeFlore v. Glass Harp Prods., Inc.*, 57 Cal. App. 4th 824, 67 Cal. Rptr. 2d 340, 342 (1997). See § 19A.04[C][3][b] infra.

[31] See § 8.11[A] supra. The issue arose when songwriter Emmylou Harris sued for copyright infringement, based on exploitation of a master recording that her record company had sold in bankruptcy. See *Harris v. Emus Records Corp.*, 734 F.2d 1329, 1332 (9th Cir. 1984).

> Amicus Recording Industry of America argues that the purchase of master recordings at bankruptcy sales is a common practice of the recording industry. It urges that whether or not a copyright license is otherwise transferable, it does pass to the bankruptcy trustee under the provisions of the Bankruptcy Act.

*Id.* at 1334. The court disagreed, upholding judgment in plaintiff's favor. See § 19A.07[D][2][a] infra.

[32] 103 B.R. 544, 546 (Bankr. D.N.J. 1989).

[33] *Id.* at 547.

[34] *Id.* at 548 ("I realize this remedy is radical").

[35] *In re Pilz Compact Disc, Inc.*, 229 B.R. 630, 633 (E.D. Pa. 1999).

[36] *Id.* at 634. The warehouse containing the phonorecords was determined to hold about 25% public domain material, which the trustee sold without objection. *Id.* at 634.

[37] *Id.* at 636–37.

object that abandonment of the material to the debtor would allow the debtor to flout the copyright laws and asked the court to follow the *Audiofidelity* ruling of ordering destruction. But the court limited *Audiofidelity* to its facts, in which there had been a previous adjudication of copyright infringement.[39] In the end, it directed "the trustee to abandon the property to any entity other than the debtor."[40]

Yet another case consisted of a debtor who was in possession of various rehearsal tapes from famous groups.[41] The court found his possession of the tapes to be lawful, thus denying a conversion claim.[42] It allowed ownership of the tapes to remain with the debtor.[43] But to protect the common law copyright in these pre-1972 sound recordings,[44] the court entered a permanent injunction against "copying or distributing copies of the tapes in question."[45]

The most elaborate discussion of this issue occurs in In re *Valley Media, Inc.*[46] The debtor in that case was "the largest full-line supplier of entertainment software products (primarily CDs, DVDs, and VHS tapes) in the United States."[47] As of filing of the bankruptcy petition, it had inventory valued at $108 million,[48] including products on behalf of all the major record labels and hundreds of independents.[49] Vendors had placed product with the debtor under either a terms relationship based on purchase invoices, whereby the distributor purchased the inventory outright, or a consignment relationship, whereby title to the inventory remained with the vendor and the distributor did not pay for the goods until they were sold.[50] In any event, all the inventory was commingled,[51]

---

[38] *Id. at 640*.

[39] "The injunctive relief entered by the *Audiofidelity* bankruptcy court—to destroy the inventory—was simply an enforcement of the infringement judgment that could not be avoided." *Id. at 645*.

[40] *Id. at 644*. Other conditions also applied to the abandonment. See *id. at 645*.

[41] Sony Music Entertainment v. Clark Entertainment Group (In re Clark Entertainment Group), 183 B.R. 73, 75 (Bankr. D.N.J. 1995).

[42] *Id. at 76–78*.

[43] *Id. at 81*.

[44] *Id. at 79 (Treatise cited)*. See § 8C.03 supra.

[45] *Id. at 82*.

[46] 279 B.R. 105 (Bankr. D. Del. 2002).

[47] *Id. at 114*.

[48] *Id. at 118*.

[49] *Id. at 114*, *117* n.15.

[50] *Id. at 115*.

> The Consignment Vendors, made a number of representations and warranties in connection with the Distribution Agreements to ensure that DNA, as their distribution agent, would pass clear title to the Product when the consigned inventory was sold, including that such sale was also with permission from the third party copyright holders so that no copyright would be infringed. Specifically, the Consignment Vendors represented and warranted that they held "good, clear, and marketable title" to the Product, that the DNA Vendors had obtained all necessary rights and consents to allow Valley to distribute the Product such that Valley need not obtain third party authority to sell the Product and that the Products and their distribution would not violate the copyright of any third party.

*Id. at 119*.

the 15% consisting of consigned goods and the 85% consisting of terms goods.[52] The case arose on the debtor's motion to sell its inventory at auction, to which the consignment vendors objected,[53] contending (1) that they had superior rights under applicable state law and (2) that the auction would constitute a "first sale" in derogation of copyright law.[54]

On the first issue, the court engaged in a searching analysis of the Uniform Commercial Code as implemented under California law.[55] It held that denominating a relationship as a "consignment," by itself, "does not necessarily allow a consignor's ownership interests in the consigned goods to prevail over the claims of the consignee's creditors."[56] Rather, the consignors must perfect their interest by filing a UCC-1 financing statement, which they did not do under the operative facts.[57] Note that, in construing these provisions, the court was not concerned with the rights between the consignor-copyright owners and their consignee-distributor; instead, it was acting solely to benefit the consignee's third party creditors.[58] The court concluded that the debtor could sell the inventory under state law, as the debtor's interest therein was superior to the consignors'.[59]

Turning to the copyright question,[60] the court construed copyright law's first sale doctrine[61] to render liable a consignee or bailee who sells the subject goods, and by contrast to immunize an exclusive licensee who has been granted permission from the copyright owner to distribute those goods.[62] On consignment in this case were goods incorporating three distinct types of copyrights, those belonging to composers, to sound recording artists, and to record companies.[63] As to all three, the consignors warranted that they conveyed all necessary rights to the consignee-debtor so as to make the debtor an exclusive licensee; accordingly, the "entities purchasing from [the debtor] obtained title to lawfully made phonorecords and became 17 U.S.C. [§] 109(a) owners who could make subsequent sales without infringement."[64] Thus, after resolving one more nuance of

---

[51] *Id. at 116*.

[52] *Id. at 118*.

[53] *Id. at 111*.

[54] *Id. at 120–121*.

[55] *Id. at 121–133*.

[56] *Id. at 121*.

[57] *Id. at 123–124*. As an alternative, the consignors could prevail if they could "prove that the deliveree is generally known by his creditors to be substantially engaged in selling the goods of others." *Id. at 123*. The consignors failed to make that proof, as well. *Id. at 131–32*.

[58] *Id. at 125*. "Case law also suggests that the Consignment Vendors are not the creditors who should be protected under the applicable U.C.C. provisions and thus should be excluded from the calculation." *Id. at 132*.

[59] *Id. at 133*. "Therefore, I must conclude that the Objecting Vendors' [sic] may not obtain relief from the stay to recover the Contested Inventory. The Objecting Vendors will have a pre-petition unsecured claim against the estate for the invoice price of the Contested Inventory." *Id.* (citations and footnotes omitted).

[60] The parties raised a welter of points, not all of which the court needed to resolve. *Id. at 133–134*.

[61] *Id. at 134–135 (Treatise cited)*. See § 8.12[B][1] supra.

[62] *279 B.R. at 135*.

[63] *Id. at 136*.

[64] *Id. at 136*.

bankruptcy law,[65] the court allowed the auction to proceed[66] as to consignors still in a contractual relationship with debtor on the date it filed for bankruptcy.[67]

### [D] Limitations on Escaping Liability in Bankruptcy

The very essence of bankruptcy, of course, is to discharge debts.[68] Among those debts, in appropriate circumstances, might lie a judgment for copyright infringement, whether antecedent or prospective. The question therefore arises whether the defendant's judicious invocation of bankruptcy laws can defeat the plaintiff copyright owner's entitlement to damages.

#### [1] Discharge of Infringement Judgment.

Let us first imagine that an infringement case has proceeded through trial and appeal, resulting in a judgment against defendant in a fixed amount. To the extent that defendant later becomes bankrupt, a plan of reorganization may emerge whereby some or all of that debt could be extinguished.

But not always. Pursuant to the Bankruptcy Code, some debts are non-dischargeable,[69] notably those of individuals in Chapter 7 and Chapter 11 cases[70] that arise "for willful and malicious injury by the debtor ... to the property of another ... ."[71] Within the copyright sphere, the issue typically arises in ASCAP or BMI enforcement actions.[72] After judgment is rendered and the defendant files bankruptcy, the performing rights society will seek, in the enforcement action, to characterize the underlying offense as willful and malicious injury to property, thereby rendering the amounts due them non-dischargeable.[73]

---

[65] "The question before me is whether Valley's authority to sell the Contested Inventory still exists in bankruptcy under the executory, non-exclusive licenses in the Distribution Agreements." *Id. at 136–137*. As set forth below, the court answered that question in the affirmative. See § 19A.07[B][3] infra. It therefore concluded that

> the Debtor in Possession has the requisite authority to sell the Contested Inventory rather than mere authorized possession. The Auction Sale will qualify as a "first sale" where the owner of the copyrights or exclusive licensee of those Copyright Owners authorized another to sell the copies or phonorecords embodying the copyrighted work.

*Id. at 139* (footnote omitted).

[66] *Id. at 140* ("as long as the auction sale is to purchasers within the United States").

[67] Some vendors claimed that their licensing relationship with the debtor terminated before the bankruptcy petition. The court held that MCI successfully invoked the 15-day cure provision of its contract with debtor, and therefore ruled in its favor. *Id. at 143*. It likewise ruled in favor of one other consignor, but found the evidence equivocal as to a third. *Id. at 143–144*.

[68] "The general policy of bankruptcy law favors allowing the honest debtor to discharge debts and to make a fresh start free from the burden of past indebtedness." *In the Matter of Elms, 112 B.R. 148, 151 (Bankr. E.D. La. 1990)*. See § 19A.02 supra.

[69] *11 U.S.C. § 523*.

[70] See text accompanying § 19A.02[A][2] N. 30 supra. In the event of a Chapter 13 case, most of those same debts are dischargeable. See *11 U.S.C. § 1328*.

[71] *11 U.S.C. § 523(a)(6)*.

[72] See § 8.19 supra.

[73] One can trace the line through successive reported decisions in some instances. A good example is *Broadcast Music, Inc. v. Xanthas, Inc., 674 F. Supp. 553 (E.D. La. 1987)*, aff'd, *855 F.2d 233 (5th Cir. 1988)*, assessing $320,000 against the owner of unregistered jukeboxes. See § 8.17[B][3] supra. When the owner later declared bankruptcy, the court reviewed his status, to determine the debt non-dischargeable. *In the Matter of Elms, 112 B.R. 148 (Bankr. E.D. La. 1990)*.

§ 19A.03 Copyrights In Bankruptcy Courts

Some courts refuse to apply *res judicata*[74] when considering dischargeability under the Bankruptcy Code, particularly as to a default[75] judgment.[76] Under an older view that the bankruptcy standard requires "clear and convincing" evidence, of the "willful and malicious injury," an underlying civil judgment based on a "preponderance of the evidence" is inadequate to ever justify non-dischargeability, thus requiring a new trial.[77] But that heightened measurement has been discarded as the appropriate standard of proof for Bankruptcy Code dischargeability exceptions.[78] The recent trend is exemplified by a ruling in ASCAP's favor, providing little analysis beyond verifying that the underlying verdict was for willful infringement.[79] Thus, when one bankruptcy court held that something extra beyond willful copyright infringement must be demonstrated to prove malice,[80] the district court reversed.[81] Another court held a debt non-dischargeable only after such time as ASCAP has given unambiguous notification to the offending party about his commission of copyright infringement, and only as to the person actually notified, not his business partner or wife.[82]

In a different case against a husband and wife, the court ruled the former's willful infringement, as found by the jury in its special verdict, non-dischargeable;[83] simultaneously, however, it discharged the wife from that debt, given her lack of involvement in the infringement.[84] The court then had to confront the effect of non-dischargeable debt on the wife's community property.[85] It ruled her separate property beyond reach, but allowed the plaintiff to collect from the couple's post-petition community property.[86]

The law took a different direction in yet another case, in which a jury found a husband and wife culpable of willful copyright infringement. In subsequent proceedings, a bankruptcy court, on summary judgment, held that initial judgment nondischargeable as a "willful and malicious injury,"[86.1] based on the earlier jury's

---

[74] See, e.g., **In re Hibbs, 161 B.R. 259, 265 (C.D. Cal. 1993)**, aff'd mem., **122 F.3d 1071 (9th Cir. 1997)**. See § 12.07 supra.

[75] It should be added that, if the time to cure a default has not expired before the date of the filing of the bankruptcy, the time period for curing the default is extended to the later of the time period within which to cure the default or 60 days after the bankruptcy petition was filed. See 11 U.S.C. § 108(b).

[76] In re Watson, 117 B.R. 291, 293 (Bankr. W.D. Mo. 1990) (case brought by ASCAP); In re Walker, 477 B.R. 111, 118 (Bankr. E.D. Mo. 2012) (same).

[77] In re Watson, 117 B.R. 291, 296 (Bankr. W.D. Mo. 1990).

[78] See Grogan v. Garner, 498 U.S. 279, 111 S. Ec. 654, 112 L. Ed. 2d 755 (1991).

[79] See, e.g., Jubilee Communications Inc. v. Lynch, 16 U.S.P.Q.2d (BNA) 1971 (Bankr. W.D. Okla. 1990) (for willful violation of ASCAP's rights, defendant had to pay 4 awards of statutory damages at $10,000 apiece, which were held non-dischargeable); In the Matter of Elms, 112 B.R. 148 (Bankr. E.D. La. 1990).

[80] In re Pineau, 141 B.R. 522, 531 (Bankr. D. Me. 1992).

[81] In re Pineau, 149 B.R. 239, 245 (D. Me. 1993) ("Pineau's voluntary willingness to disregard ASCAP's rights by playing the songs without paying, warrants a finding of implied malice").

[82] In re Remick, 96 B.R. 935, 941–942 (Bankr. W.D. Mo. 1986).

[83] **Sophos v. Hibbs (In re Hibbs), 161 B.R. 259, 266–268 (C.D. Cal. 1993)**, aff'd mem., **122 F.3d 1071 (9th Cir. 1997)**. The verdict was for $200,000, onto which the court added $60,000 in post-judgment interest. ***Id.* at 266.**

[84] ***Id.* at 269.**

[85] See Chap. 6A supra.

[86] **161 B.R. at 269.**

[86.1] **11 U.S.C. § 523(a)(6).**

finding of willful infringement, as well as uncontroverted evidence that defendants knew of the copyright interest at stake; the Bankruptcy Appellate Panel affirmed.[86.2]

But the Ninth Circuit reversed, based on both willfulness and malice.[86.3] As to the former, it held that the term "willful" may have a meaning for copyright infringement cases different from the same term's usage in determining whether a debt is nondischargeable in bankruptcy.[86.4] In the former context, reckless disregard of the truth may render an infringer willful;[86.5] by contrast, "the Supreme Court has clearly held that injuries resulting from recklessness are not sufficient to be considered willful injuries under *§ 523(a)(6) of the Bankruptcy Code* and are therefore insufficient to merit an exemption to dischargeability."[86.6] Given the facts, the jury in the underlying copyright infringement case could have determined that the actual "bad actor" was the wife's brother, but that the husband and wife defendants acted recklessly in failing to supervise him, thereby rendering them culpable of "willful" infringement.[86.7]

Turning to the other prong, "malice" forms no element of copyright infringement, so the jury in the underlying case plainly made no finding with respect to whether defendants behaved maliciously.[86.8] When the matter proceeded into bankruptcy adjudications, the conclusion that the defendants acted with malice "rested entirely on its conclusion" that they acted willfully.[87] The Ninth Circuit remanded on that score as well, based on its requirement that there be "a separate analysis for each of the 'willful' and 'malicious' prongs."[88]

A subsequent decision by a bankruptcy court awarded $100,000 in statutory damages[89] against a copyright infringer of software.[90] The court determined the debt to be nondischargeable in bankruptcy,[91] as both willful and malicious.[92] The Eighth Circuit ruled to the same effect with respect to a debtor who stiff-armed

---

[86.2] *In re Albarran*, 347 B.R. 369 (B.A.P. 9th Cir. 2006).

[86.3] *In re Barboza*, 545 F.3d 702 (9th Cir. 2008).

[86.4] *Id. at 707*.

[86.5] See § 14.04[B][3][a] *supra*.

[86.6] *545 F.3d at 708*, citing *Kawaauhau v. Geiger, 523 U.S. 57, 60–61, 118 S. Ct. 974, 140 L. Ed. 2d 90 (1998)*.

[86.7] *545 F.3d at 709*. The court distinguished a prior case in which the bankruptcy judge, likewise on summary judgment, found that defendant "committed a willful injury within the meaning of § 523(a)(6) because he did not install certain measures to prevent the unauthorized copying of copyrighted material." *Id. at 710*, citing *In re Chin-Liang Chan, 325 B.R. 432, 448–449 (Bankr. N.D. Cal. 2005)*. In that earlier case, the evidence was uncontroverted and evidently did not leave room for the bankruptcy defense of copyright infringement willfulness via reckless supervision.

[86.8] See § 13D.02 *supra*.

[87] *545 F.3d at 712*.

[88] *Id. at 711*. Turning to substance, the opinion holds as follows:

> A "malicious" injury involves (1) a wrongful act, (2) done intentionally, (3) which necessarily causes injury, and (4) is done without just cause or excuse.

*Id. at 706*, quoting *In re Jercich, 238 F.3d 1202, 1209 (9th Cir. 2001)*.

[89] See § 14.04 *supra*.

[90] *In re Mann, 410 B.R. 43 (Bkrtcy. C.D. Cal. 2009)*. Note that the court separately awarded much more in trademark damages. *Id. at 50*.

[91] *Id. at 51*.

§ 19A.03 Copyrights In Bankruptcy Courts

ASCAP "an astounding 44 times."[92.1] It held his actions "malicious because he intended to harm"[92.2] the copyright owners by his failure to obtain a public performance license for the music performed at his saloon.[92.3]

In one unusual case, the debtor was not the infringer, but rather the erstwhile plaintiff in a failed copyright infringement action.[92.4] The bankruptcy court determined that her filing of a complaint was a willful action by which she intended the resulting injury occasioned by the defense of her meritless claim.[92.5] But, rather than showing malice, her initiation of a baseless claim reflected only recklessness.[92.6] As such, the frustrated defendant from the infringement case was unable to get around the discharge of plaintiff's debt in bankruptcy.[92.7]

In one case, plaintiff broadcasters of Chinese-language television obtained a judgment of $6.8 million in statutory damages[92.8] for defendant's sale of "TVpads" offering access to that programming.[92.9] That initial judgment included a finding of willful infringement.[92.10] After defendant declared bankruptcy, the question of dischargeability arose.[92.11] The debtor argued that "he was merely one of many sellers of TVpad devices,

---

[92] *Id.* at 47.

[92.1] *In re Walker*, 514 B.R. 585, 590 (B.A.P. 8th Cir. 2014).

[92.2] *Id.* at 591.

> At trial, the debtor admitted that he had some general knowledge of Federal copyright law and royalties. With this general knowledge, the debtor knew or should have known that the natural consequence of a failure to obtain a license is financial harm to the appellees. Considering the district court's finding and the debtor's admitted knowledge of Federal copyright law, we agree with the bankruptcy court and conclude that the debtor intended to bring about the loss that the appellees suffered.

*Id.*

[92.3] See § 8.19[B] supra.

[92.4] See *In re Pearman*, 432 B.R. 495, 500 (Bankr. D.N.J. 2010). Ms. Pearman allegedly wrote a poem to commemorate her grandparents' death, which she later discovered to be exploited by Kay Berry at gift shops called The Comfort Company. During discovery of Pearman's infringement claim, defendant Berry determined that portions of the poem in fact were composed when Pearman was a toddler. *Id.* at 497–99. Berry then sought its fees as prevailing party. See § 14.10 infra.

[92.5] 432 B.R. at 500.

[92.6] *Id.* at 502. "Ms. Pearman harbored a genuine, albeit mistaken, belief that she was the author of the Poem and had a right to copyright it. All of Ms. Pearman's actions follow a plausible progression from her mistaken belief that she wrote the Poem. Ms. Pearman's actions simply do not meet the 'heightened level of culpability' standard necessary to find malice." *Id.* at 501.

[92.7]

> Kay Berry is understandably frustrated that it was forced to incur costs defending a copyright infringement action that was not based in reality. Many judgment creditors are frustrated when validly incurred debts are discharged by a bankruptcy filing. Nonetheless, the standards for non-dischargeability require more than a showing that the debt was legitimately incurred or that the creditor is frustrated. Kay Berry has not sustained its burden; it has demonstrated that Ms. Pearman's actions were willful, but not that they were malicious....

*Id.* at 503.

[92.8] See § 14.04 supra.

[92.9] See *In re Bhalla*, 573 B.R. 265, 270 (Bankr. M.D. Fla. 2017).

[92.10] *Id.* at 274. Note that those proceedings took place in the Central District of California. *Id.*

which also included several big name retailers and internet distributors, such as Sears, Amazon, Ebay, and others."[92.12] The bankruptcy court concluded that defendant did more than merely selling electronic boxes; "he actively promoted use of the TVpad as a means of viewing Plaintiffs' protected content," including by use of a pseudonym to falsely claim the legality of the TVpads (and even after receipt of plaintiff's cease and desist letters.)[92.13] As such, it refused to allow discharge,[92.14] although it did exercise its discretion to cut the statutory damages by two-thirds.[92.15]

The Sixth Circuit reviewed the law in this arena to conclude that "a deep circuit split" divided courts that collapsed the two terms into a unitary test *versus* those that gave separate content to each.[92.16] Adopting the latter stance, it concluded that non-discharge requires proof both that the debtor acted *willfully*, meaning with "actual intent to cause injury, not merely a deliberate or intentional *act* that leads to injury," as well as being *malicious*, meaning "in conscious disregard of one's duties or without just cause or excuse."[92.17] Although the underlying copyright infringement case against the debtor in this case included a finding of willfulness, the circuit held open the possibility that "a debtor may act willfully, but not maliciously"[92.18]— which is exactly what the bankruptcy court below concluded.[92.19] The Sixth Circuit affirmed that holding, based on the thinness of the record in that initial infringement proceeding.[92.20]

### [2] Other Considerations.

---

[92.11] *Id. at 275*.

[92.12] *Id. at 275*.

[92.13] *Id. at 277–78*.

[92.14] *Id. at 283–84*.

> Debtor's actions to remove channel listings from the website, his use of a pseudonym, and his solicitation of advice from SEO as to how to reduce the appearance of his own involvement, demonstrate that Debtor was conscious at all times of the risks inherent to this business. Because the Debtor directed and facilitated others' infringement of Plaintiffs' copyrights and trademarks, the Court finds that his conduct was malicious, as well as willful ... .

*Id. at 279*.

[92.15] The initial award was "based on $15,000 for each of the 459 episodes of infringing content." *Id. at 281*. The bankruptcy court considered that amount excessive, and instead awarded $5,000 for each episode, totaling $2,295,000. *Id. at 282*.

[92.16] *In re Berge*, 953 F.3d 907, 914 (6th Cir. 2020).

[92.17] *Id. at 915* (emphasis original, internal quote omitted).

[92.18] *Id. at 916*.

[92.19] *Id. at 912*. Given an interim reversal by the district court, it actually reached that conclusion under two different standards. *Id. at 913*.

[92.20]

> At day's end, then, the finding that David was liable for willful copyright infringement ... does not support the application of issue preclusion in this proceeding. Nothing in those findings or the proceeding more broadly reflects resolution of the question of David's subjective intent to injure. As we cannot say with conviction that subjective intent was "actually litigated and decided previously," we cannot give the underlying judgment preclusive effect for purposes of discharging MarketGraphics's claim under § 523(a)(6).

*Id. at 921*.

Apart from the posture noted above of discharging prior judgments, the effects of bankruptcy on ongoing proceedings must also be considered. For instance, can a defendant, in anticipation of an adverse judgment, file bankruptcy and then invoke the "automatic stay" to prevent the jury from returning its verdict?[93] Although district court jurisdiction over copyright infringement claims is exclusive,[94] elsewhere the United States Code provides,

> Notwithstanding any Act of Congress that confers exclusive jurisdiction on a court or courts other than the district courts, the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11.[95]

The stage is thus set for a potential clash of regular district courts and their bankruptcy court adjuncts, and thus between an infringement action pending in a district court and another involving the same party in a bankruptcy court. Potentially resolving the tension here is yet another provision: "The district court shall, on timely motion of a party, so withdraw a proceeding if the court determines that resolution of the proceeding requires consideration of both title 11 and other laws of the United States regulating organizations or activities affecting interstate commence."[96] That language in turn raises the question whether the Copyright Act affects interstate commence.[97] Exactly how to apply that provision in the copyright context remains uncertain.[98]

Note that cases cited above stand for the proposition that a federal court's copyright jurisdiction is unaffected by the defendant's entry into bankruptcy.[99] The details of any potential tug-of-war between district courts adjudicating infringement actions and bankruptcy courts handling the affairs of the infringement defendant lie beyond the scope of this treatise—but must still be borne in mind by careful copyright practitioners.[100] It is to be noted that district courts may sever claims against bankrupt co-defendants,[101] in order to allow the balance of the proceedings to move forward.[102]

---

[93] See *§ 19A.02[A][1]* supra.

> According to the legislative history, the purpose of the automatic stay is to give the debtor a breathing spell from creditors, to stop all collection efforts, and to permit the debtor to attempt repayment or reorganization. Congress intended the scope of the stay to be broad. "All proceedings are stayed, including arbitration, license revocation, administrative, and judicial proceedings. Proceeding in this sense encompasses civil actions as well, and all proceedings even if they are not before governmental tribunals."

*In re Computer Communs., 824 F.2d 725, 729 (9th Cir. 1987).*

[94] *28 U.S.C. § 1338(a)*. See *§ 12.01[A][1]* supra.

[95] *28 U.S.C. § 1334(b)*.

[96] *28 U.S.C. § 157(d)*.

[97] See *§ 1.09[A][1][a]* supra.

[98] One court confronted the converse posture of jurisdiction by a debtor who was a copyright infringement *plaintiff*. See *In re Table Talk, Inc., 49 B.R. 485, 487 (Bankr. D. Mass. 1985)*. In terms of a case involving a copyright infringement *defendant* who files bankruptcy, it has been held that *28 U.S.C. § 157(d)* should be narrowly construed: "The fact that resolution of the matters in question calls merely for consideration or application of both bankruptcy law and other federal laws is plainly insufficient, in that mandatory withdrawal should only be made where substantial and material consideration of non-bankruptcy statutes is necessary in the case." *John Hine Studios v. Wasserman (In re Merryweather Importers), 179 B.R. 61, 62 (D. Md. 1995)*.

[99] See *§ 12.01[A][1]* N. 18 supra.

[100] See *BMI v. Game Operators Corp., 107 B.R. 326, 327–328 (D. Kan. 1989)* (automatic stay does not apply to "post-petition claims that could not have been commenced before the petition was filed.").

[101] The district court is powerless to adjudicate the rights of that bankrupt co-defendant on account of the automatic stay. See *§ 19A.02[A][1]* supra. Severance therefore allows it to continue to proceed against the non-bankrupt defendant(s) who remain.

In addition, care must be taken lest defendants squander or secret their assets to render any infringement judgment ultimately rendered uncollectible. In one case, in which a defendant who was sued for copyright infringement transferred to his sister five tracts of land worth $500,000,[103] the Fifth Circuit set aside that transaction under Texas' version of the Uniform Fraudulent Transfer Act.[104]

Nimmer on Copyright

Copyright 2024, Matthew Bender & Company, Inc., a member of the LexisNexis Group.

**End of Document**

---

[102] See *Broadcast Music, Inc. v. Northern Lights, Inc.*, 555 F. Supp. 2d 328, 332 (N.D.N.Y. 2008). This ruling applies only when the bankrupt fails to qualify as an indispensable party. *Id. at 332*. See § 12.03 supra. Under the facts presented, the court found the bankrupt not to be an indispensable party, despite its joint and several liability with the remaining defendants.

[103] *BMG Music v. Martinez*, 74 F.3d 87, 88 (5th Cir. 1996).

[104] *Id. at 89*. Looking through the opposite end of the telescope, one court acknowledged that "an exclusive copyright license *can* be the basis for a fraudulent transfer claim," but denied relief on the basis that "a trademark license *cannot* be the basis for a fraudulent transfer claim based on transferred rights, because no ownership rights are transferred under a trademark license." *In re KG Winddown, LLC*, 632 B.R. 448, 490 (S.D.N.Y. 2021) (emphases original).