UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 1:21-CV-23727-DPG

LIL' JOE RECORDS, INC.,

      Plaintiffs

v.

MARK ROSS, CHRISTOPHER WONG WON, JR.,
RODERICK WONG WON, LETERIUS RAY,
ANISSA WONG WON and LUTHER CAMPBELL,

      Defendants.

_____/

## RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW, ALTERNATIVELY, FOR NEW TRIAL WITH INCORPORATED MEMORANDUM OF LAW

Plaintiff, Lil' Joe Records, Inc. ("Lil' Joe"), hereby files this renewed Motion for Judgment as a Matter of Law and Alternative Motion for New Trial ("JMOL") under Fed. R. Civ. P. 50(b), 59(a), and 60(b), and S.D. Fla. Local Rule 7.1, and states as follows:

During the five-day jury trial on competing claims for declaratory relief about whether Defendants—three of the four members of the group *2 Live Crew* or their heirs—properly terminated a transfer of sound recording copyrights (the "Copyrights"), the jury was presented two questions of fact: 1) Were the members of *2 Live Crew* employees of Luke Records, Inc., f/k/a Skyywalker Records, Inc. f/k/a Luke Skyywalker Records, Inc ("Luke Records"), such that the subject works were "works for hire" and, thus, belonged to Luke Records; 2) If they weren't, then were the Copyrights transferred to Luke Records by a 1990 Recording Agreement ("1990 Agreement") [DE250-1], or by three Exclusive 1991 Recording Agreements [DE252-1, -2, -3] (the "1991 Agreements"). This matters because the only grant identified on Defendants' Notice of Termination is the 1990 Agreement and, as detailed below, the 1990 Agreement does not transfer the Copyrights as a matter of law. DE277 at 107-108; DE250-9.

The jury found that the group members were not employees and that the Copyrights were transferred under the 1990 Agreement. DE255. Lil' Joe challenges this determination because there is no such legally sufficient evidence to support that.

Lil' Joe also files this Motion because, in presenting its case and argument to the jury, Defendants featured various irrelevant, inflammatory, false, and just plain inappropriate matters to impassion and bias jury sympathy. Not a minute into Defendants' closing argument, Defendants' counsel set the stage for the crux of their argument: characterizing the case as "a tale of deceit and dishonesty that wouldn't be out of place in a Netflix movie" and arguing the group was "living the dream[] until in 1991 when they were unfortunate enough to cross paths with Mr. Weinberger. Mr. Weinberger infected the group, infected the label like a virus. He destroyed it from within." DE278 at T.56. Defendant's counsel continued, falsely and misleadingly accusing Mr. Weinberger of putting Mr. Campbell and Luke Records into bankruptcy only to take advantage of them by acquiring the Copyrights for "cents on the dollar" and coming out the "big winner" by making $10 million. DE278 at T.57, 67, 75–76. Defendants' counsel manufactured a fiction that Mr. Weinberger was responsible for lost documents, which the unrebutted testimony showed it was Luke Records that failed to turn over. DE278 at T.67–66. Then counsel accused Mr. Weinberger of using lawsuits as this one to bully people and appealed to community conscience directing the jury to stop him. DE278 at T.67, 95. This was a calculated, highly improper tactic to distract the jury from the actual evidence and the law and rule on impassioned sympathies because Defendants had somehow been taken advantage of, knowing full well that the evidence showed this was untrue.. The impermissible use of this evidence and argument merits a new trial.[1]

## A. LEGAL STANDARDS

"The authority and duty of a court to decide whether all elements of a claim have been proven does not end with the denial of a Rule 50(a) motion. If there is insufficient evidence for a jury reasonably to have found one of the elements of a claim to have been proven, the court has a duty to grant a proper Rule 50(b) motion." *Collado v. United Parcel Service, Co.*, 419 F.3d 1143, 1152 (11th Cir. 2005). When a Rule 50(a) motion for judgment as a matter of law ("JMOL") is denied, the movant may renew the motion under Rule 50(b), and may include an alternative request for a new trial under Rule 59.

A Rule 50(b) JMOL should be granted if "in viewing all the evidence and construing all

---

[1] By way of contrast, *2 Live Crew* was infamous for its raunchy, lewd content, which surrounded it with negative connotations and ill will. That had nothing to do with this case so Lil' Joe intentionally, without any need for Court direction, stayed clear of Defendants' actions.

inferences in the light most favorable to the nonmoving party, the court finds no reasonable juror could have reached the verdict returned." *Grimes v. Rott*, No. 20-10498, 2021 U.S. App. LEXIS 29113 *4 (11th Cir. Sept. 27, 2021) (citing *Ortega v. Schramm*, 922 F.2d 684, 694–95 (11th Cir. 1991)); *Chaney v. City*, 483 F.3d 1221, 1227 (11th Cir. 2007). Meaning, the Court must determine if the evidence was legally sufficient for the jury to find for a party on the issue in question, *McGinnis v. Am. Home Mortg. Servicing, Inc.*, 817 F.3d 1241, 1254 (11th Cir. 2016), "whether such sufficient conflicts exist in the evidence to necessitate submitting the matter to the jury[,] or whether the evidence is so weighted in favor of one side that one party must prevail as a matter of law", *Thosteson v. United States*, 331 F.3d 1294, 1298 (11th Cir. 2003). "The jury's findings should be excluded from the decision-making calculus on a Rule 50(b) motion, other than to ask whether there was sufficient evidence, as a legal matter, from which a reasonable jury could find for the party who prevailed at trial." *Chaney*, 483 F.3d at 1228. "The issue is not whether the evidence was sufficient for [the losing party] to have won, but whether the evidence was sufficient for it to have lost." *Rodriguez v. Farm Stores Grocery, Inc.*, 518 F.3d 1259, 1264 (11th Cir. 2008).

Alternatively, the Court may grant a new trial under Rule 59(a)(1)(A), which states a new trial motion is properly granted "for any reason for which a new trial has heretofore been granted in an action at law in federal court." The grounds for new trial are broad; the Court may order a new trial whenever it is required to prevent injustice. *Scott v. Dunnam*, No. 5:14-cv-5, 2016 U.S. Dist. LEXIS 49925 *9-10 (S.D. Ga. Apr. 13, 2016). The general grounds for a new trial include: that the verdict is against the weight of the evidence, or that for other reasons the trial was not fair, or substantial errors in admission or rejection of evidence or instructions to the jury, or an amalgamation thereof. *Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251 (1940). A new trial is warranted when "something occurred in the course of the trial which resulted or which may have resulted in the jury receiving a distorted, incorrect, or an incomplete view of the operative facts, or some undesirable element obtruded itself into the proceedings creating a condition whereby the giving of a just verdict was rendered difficult or impossible." *Deas v. PACCAR, Inc.*, 775 F.2d 1498, 1504 (11th Cir. 1985); *see also Weisgram v. Marley Co.*, 528 U.S. 440, 452n. (2000) (quoting *Duncan* with respect to grounds generally supporting relief in the form of a new trial); *see Rosenfield v. Wellington Leisure Prods.*, 827 F.2d 1493, 1497–98 (11th Cir. 1987) (great weight of the evidence); *Peat, Inc. v. Vanguard Rsch., Inc.*, 378 F.3d 1154,

1162 (11th Cir. 2004) (evidentiary error); *FIGA v. R.V.M.P. Corp.*, 874 F.2d 1528, 1532 (11th Cir. 1989) (reversing judgment and ordering new trial where evidentiary error might have affected case outcome) *Stuckey v. N. Propane Gas Co.*, 874 F.2d 1563, 1571 (11th Cir. 1989) (erroneous jury instructions); *McWhorter v. City of Birmingham*, 906 F.2d 674, 676–78 (11th Cir. 1990) (misconduct of trial counsel); *Deas v. PACCAR, Inc.*, 775 F.2d 1498, 1504 (11th Cir. 1985) (amalgamation of errors); *see also Ad-Vantage Tel. Directory Consultants, Inc. v. GTE Directories Corp.*, 37 F.3d 1460, 1465 (11th Cir. 1994).

Rulings on the admissibility of evidence may warrant a reversal when they "affected the substantial rights of the complaining party." *Murphy v. City of Flagler Beach,* 761 F.2d 622, 626 (11th Cir. 1985). ). "If the [jury] instructions do not accurately reflect the law and 'do not correctly instruct the jury so that [courts] are 'left with a substantial and ineradicable doubt as to whether the jury was properly guided in its deliberations," then '[courts] will reverse and order a new trial.'" *Simmons v. Bradshaw*, 879 F.3d 1157, 1162 (11th Cir. 2018) (citations omitted); *see also Stuckey v. Northern Propane Gas Co.*, 874 F.2d 1563, 1571 (11th Cir. 1989) (stating reversal appropriate where "instructions gave the jury 'a misleading impression or inadequate understanding of the law and the issues to be resolved.'").

When ruling on a Rule 59(a) motion for new trial, the Court must determine "if in his opinion, the verdict is against the clear [or great] weight of the evidence . . . or will result in a miscarriage of justice." *Ins. Co. of N.A. v. Valente*, 933 F.2d 921, 923 (11th Cir. 1991). "Granting motions for new trial touches on the trial court's traditional equity power to prevent injustice and the trial judge's duty to guard the integrity and fairness of the proceedings before him." *Sherrod v. Palm Beach County School Dist.*, 237 Fed. Appx. 423, 424 (11th Cir. 2007). A new trial is called for "when the court determines the trial was not fair.'" *Squillace v City of Parkland*, No. 2008-cv-60577, 2010 U.S. Dist. LEXIS 17660 *5 (S.D. Fla. March 1, 2010).

Rule 59(a) has a less stringent standard than Rule 50 in two significant ways: (1) a new trial under Rule 59(a) may be granted *even if* there is evidence supporting the jury's verdict, and the Court is free to *weigh* the evidence himself, and need not view it in the light most favorable to the verdict winner. *Ard v. Southwest Forest Industries*, 849 F.2d 517, 520 (11th Cir. 1988); *Williams*

*v. City of Valdosta*, 689 F.2d 964, 973 (11th Cir. 1982); *McGinnis v. Am. Home Mortg. Servicing, Inc.*, 817 F.3d 1241, 1254 (11th Cir. 2016). Consequently, the failure to meet the JMOL standard is not fatal to a motion for new trial. *Dudley v. Wal-Mart Stores, Inc.*, 166 F.3d 1317, 1320 n.3 (11th Cir. 1999).

Rule 60(b)(6) provides a catch-all, authorizing a court to grant relief from a judgment for "any other reason that justifies relief." Fed. R. Civ. P. 60(b)(6); *Booker v. Singletary,* 90 F.3d 440, 442 (11th Cir. 1996)("[W]hether to grant the requested relief is . . . a matter for the district court's sound discretion.").

While objected-to errors are reviewed for "substantial prejudicial effect", [*Brough v. Imperial Sterling Ltd.*, 297 F.3d 1172, 1179 (11th Cir. 2002) (citing *Piamba Cortes v. Am. Airlines, Inc.* 177 F.3d 1272, 1305 (11th Cir. 1999))], the unobjected-to errors may still warrant a new trial where the errors have "affected substantial rights," "which almost always requires that the error 'must have affected the outcome of the district court proceedings.'" *U.S. v. Rodriguez*, 398 F.3d 1291, 1299-300 (11th Cir. 2005) (quoting *Cotton,* 535 U.S. at 632). The Eleventh Circuit has described the standard for showing this "is the familiar reasonable probability of a different result formulation, which means a probability 'sufficient to undermine confidence in the outcome.'" *U.S. v. Rodriguez*, 398 F.3d 1291, 1299–300 (11th Cir. 2005) (quoting *United States v. Dominguez Benitez,* 542 U.S. 74 (2004)).

The Eleventh Circuit holds "that the "cumulative effect" of multiple errors may so prejudice a [party's] right to a fair trial that a new trial is required, even if the errors considered individually are nonreversible. *United States v. Pearson,*746 F.2d 787, 796 (11th Cir. 1984). "The court is afforded "wide discretion" in granting a new trial "where a combination of factors, which could have caused the jury to reach a possible erroneous verdict, [lead] the court to conclude that a new trial [i]s necessary." *Deas*, 775 F.2d at 1505; *Lord v. Univ. of Miami*, No. 13-22500-CIV-ALTONAGA, 2023 U.S. Dist. LEXIS 11242 * 29 (S.D. Fla. Jan. 23, 2023). In this case a myriad of factors, all tied together by Defendants' improper, inflammatory and, most significant, irrelevant closing calls for a new trial if judgment notwithstanding the verdict is not issued.

## B. THERE WAS NO EVIDENCE OR CONTRACT PRINCIPLE TO SUPPORT THE DETERMINATION THAT THE COPYRIGHTS WERE TRANSFERRED TO LUKE RECORDS BY THE 1990 AGREEMENT, THE TERMINATION NOTICE WAS NULL AND VOID, AND JMOL IS REQUIRED,

There is no legally sufficient evidence that the group members transferred the Copyrights under

the 1990 Agreement. Most compellingly, the 1990 Agreement's plain language contains no transfer of *any* sound recording copyrights. DE276 at 125;[2] DE204 (Mr. Ross' deposition transcript read at trial at T.46–47[3]). "[W]here the determination of the issues of a lawsuit depends upon the construction of a written instrument and the legal effect to be drawn therefrom, the question at issue is essentially one of law only…." *Barnes v. Diamond Aircraft Industries, Inc.*, 499 F. Supp. 2d 1311, 1315 (S.D. Fla. 2007) (applying Florida law); *Volusia County v Aberdeen at Ormond Beach, L.P.*, 760 So.2d 126, 131 (Fla. 2000). In interpreting contracts such as the 1990 Agreement, the Court looks to the plain meaning of the language. , *Repair Enters., Inc. v. Son Le Enters., Inc.*, No. 9:15-cv-81622, 2016 U.S. Dist. LEXIS 21282 * 7 (S.D. Fla. Feb. 18, 2016) (applying Florida law). In the absence of an ambiguity, the plain language controls because it is the best evidence of the parties' intent. *Id.* And "[w]here words of a contract are clear and definite, they must be understood according to their ordinary meaning." *Barnes*, 499 F.Supp.2d at 1317 (quoting *Institutional Supermarket Equip., Inc. v. C S Refrigeration, Inc.*, 609 So. 2d 66, 68 (Fla. Dist. Ct. App. 1992)).

The 1990 Agreement squarely omits the words "transfer", "assign", "grant" or any synonym and nowhere references the Copyrights:

> Company shall own all master recordings embodying the performance of Artist made hereunder and all derivatives of the same; and Company shall further own all of the performances of Artist embodied in said master recordings and derivatives thereof. Without limiting the generality of the forgoing, Company's said rights of ownership shall include the sole and exclusive right to manufacture, advertise, sell, lease, license or otherwise use, deal in or dispose of records embodying the performances of Artist to be recorded hereunder in all fields of use perpetually and throughout the world and upon terms and conditions as Company may approve; and the sole and exclusive right publicly to perform Artists performances embodied in recordings hereunder by means of radio broadcasting or otherwise and to license and authorize others to do so perpetually and throughout the world upon such terms and conditions as Company may approve. ***All master recordings recorded during the term here of and all derivatives manufactured therefrom, together with the performances embodied thereof shall from the inception of their creation, be entirely and forever the property of the Company***, or its designee free from any claims whatsoever by Artist or any person, firm or corporation deriving any rights or interests from Artist; and company shall have the right to assign and otherwise

---

[2] Q. Does this contain a grant of any sound recording?
  A. No. The only grant is for name and likeness.
[3] Q. Can you tell me where in this [1990] contract it makes any mention of any copyrights?
  …
  A.I mean I can't point it out, I can't point it out right now.

transfer such copyrights to any third party, free and clear of any claim by Artist or any person, firm or corporation, deriving any rights from Artist.

DE250-1 at 3–4, §2(d).[4] Since the 1990 Agreement has no words of transfer or grant of copyright, let alone these Copyrights, it is a legal impossibility that this contractual instrument could be the operative instrument transferring copyrights, and, as a matter of law, the Copyrights could not have been transferred by the 1990 Agreement. So, Lil' Joe is entitled to JMOL on this ground as well..

The *absence of any copyrights transfers* via the 1990 Agreement that Defendants claimed memorialized, but nowhere referred to a prior oral agreement was evidenced by Defendants' own testimony and conduct. Mark Ross's deposition, played for the jury, admitted the 1990 Agreement made no mention of copyrights. DE204 at 46–47 (Ross Depo. at  (*supra* n 3)). Further belaboring, even if the 1990 Agreement contained words of transfer or grant (it doesn't), the contractual instrument's plain language shows the Company, Luke Records, not the members, owned the Copyrights "from the inception of their creation" so, no different from the legal impossibility of selling the Brooklyn Bridge, there were no copyrights the members even owned to transfer in the 1990 Agreement. The jury's verdict completely missed that the members agreed Luke Records "shall own the master recordings" and that Luke Records has owned them "from the inception of their creation." It is a legal impossibility for the members of *2 Live Crew* to transfer to Luke Records something that Luke Records already owned "from the inception of their creation". Because the verdict and final judgment concluding otherwise is legally and factually erroneous and unsupportable, Lil Joe is entitled to a JMOL on this ground as well.

Further warranting JMOL, in the 1990 Agreement's "GRANT OF RIGHTS" section, it doesn't grant any rights to any sound recordings or Copyrights; it only allows for use the artists' name and likeness:

> Artist hereby grants to Company the sole and exclusive right during the initial term of this Agreement and all renewals and extensions of the same ***to use, publish and permit others to use and publish***, and licenses and authorize the ***use of Artists name***, including any professional ***name, likeness, signature and biographical data*** about Artist on and in connection with the manufacture, advertising, sale, lease and other exploitation in all fields of use throughout the world, of records, as the same are now known or hereafter devised or improve, including audiovisual devices, record products and other products and services of Company and Company's licensees, upon such terms and conditions as Company may approve.  However, ***the above mentioned grant of rights*** shall not include merchandising

---

[4] All emphasis is added unless otherwise noted.

rights and said right shall be nonexclusive after the term of this agreement and shall continue thereafter in perpetuity.

DE250-1 at 4. It contains is no "grant of rights" to *any music or copyright*, let alone these Copyrights.

As a further defect in the verdict and final judgment, the 1990 Agreement is bound by its integration clause that "[t]his agreement sets forth the entire agreement between the parties hereto with respect to the subject matter hereof…." DE250-1 at 22, §16. It makes no reference at all to prior oral agreements (and no evidence presented of prior oral agreements). *See infra.*

Because the 1990 Agreement contains no language transferring any copyright, let alone the Copyrights, it did not, and could not as matter of fact and law, have transferred the Copyrights. As the Court knows well, "[i]t is well settled that a court cannot rewrite the terms of a contract in an attempt to make otherwise valid contract terms more reasonable for a party or to fix an apparent improvident bargain." *Greene v. The Terminix Int'l Co. Ltd. P'ship*, 2022 U.S. Dist. LEXIS 107048 * 13 (S.D. Fla. June 15, 2022). The verdict and final judgment impermissibly do just that. JMOLshould be granted accordingly.

Beyond these explicit terms, additional evidence calls for this singular conclusion: The 1990 Agreement couldn't have transferred these Copyrights. First, while Defendants claimed the 1990 Agreement covered 1986 through 1990, its term was expressly **January 1 through December 31, 1987**. DE250-1 at 1. It is unrefuted and irrefutable that none of the Copyrights were made during that January 1-December 31, 1987, term. True, there was a mechanism to expand this term by "sending Artist a notice" [DE250-1 at 1, §1], but there was no record evidence of a sent notice and Defendants actually testified[5] they were unaware of any such notice. DE204 (Depo. at 48)[6], DE276 at 146–47.

Second, the Defendants own conduct showed that *they* operated under the 1991 Agreements as

---

[5] At trial, Mr. Campbell changed his deposition testimony that he could not recall if notice was given (like Mr. Ross testified) to proclaiming that verbal notice was given through the statement "let's go in the studio and do another record" was a verbal notice. DE277 at p.25. But to "send" a notice, it must be in a tangible form, *not oral*. *Barnes*, 499 F.Supp.2d at 1317 (words of a contract must be understood by their ordinary meaning). Further, Mr. Campbell testified Luke Records did not tell the members when to go into the studio to record, but they made that decision themselves. DE277 at pp 51 & 53–54. Defendants can't have it both ways.

[6] Q. Now, at any time did any of Luther's companies send you notice that they were extending the term?
   . . .
   THE WITNESS: I can't recall.

constituting the grant of the Copyrights, not the 1990 Agreement. When Christopher Wong Won and his counsel made demand on Luke Records for monies Mr. Wong Won believed he was owed, he demanded under the 1991 Agreements, not the 1990 Agreement. DE252-28, -29; DE276 at p.19. Mr. Wong Won's son testified he found his father's signed 1991 Agreement among his father's records. DE277 at 148. None of the Defendants testified they had the 1990 Agreement in their records. Likewise, Mark Ross and David Hobbs sued Luke Records under the 1991 Agreements, not the 1990 Agreement. DE276 at 19–20[7], 130[8].

Third, there's no evidence of the 1990 Agreement ever being used at Luke Records. Allen Jacobi, the lawyer who drafted the 1991 Agreements, testified Mr. Campbell directed him to prepare the 1991 Agreements. DE276 at 9. Before he started drafting "it took [Mr. Jacobi] a while to sort through what [Luke Records] had and what [Luke Records] didn't have and what [Luke Records] needed" and Mr. Jacobi was neither apprised of nor aware of the 1990 Agreement—thus, the reason the 1991 Agreement was needed. DE276 at 9–10, 16–19. Joe Weinberger, Luke Records' then-CFO, testified he, likewise, never knew of the 1990 Agreement when he worked at Luke Records. DE276 at 125. Not one sheet of paper was presented from the documents that Luke Records used to operate its business that referenced the 1990 Agreement. The only competent, legally sufficient evidence is that the 1990 Agreement was not used by Luke Records or Defendants and, by its very own language, doesn't even do what Defendants claim it did.

The 1991 Agreements, by contrast, expressly contain transfer language and references the Copyrights:

---

[7]   Q. And do you recall Christopher Wong Won claiming that the company breached the 1991 Agreements?
A. Yes.
Q. Do you recall that Mark Hobbs and -- I'm sorry, David Hobbs and Mark Ross also sued the company for breach of the 1991 Agreements?
A. I understand that, yes.
Q. Now, in your capacity as the attorney for Luke Records, did any of the members of 2 Live Crew ever claim that the company breached the 1990 Agreement, the one I just showed you was D-74 (sic)?
A. *No*, not to my knowledge.

[8] Q. In that case, at any time did Mr. Hobbs and/or Mr. Ross or their lawyer ever claim there was any contract other than the 1991 Agreement?
A. *Never*.
. . .
Q. So they only claimed the valid contract was the 1991contract. Correct?
A. Yes.

20. (a) ARTIST hereby **sell, transfers and assigns** to COMPANY irrevocably all right, title and interest in and to the masters embodying ARTISTS' performances the titles of which are listed on Schedule "A" annexed hereto and made a part hereof, from the inception of recordings thereof (hereinafter in this Paragraph 20 referred to as the "Masters"), in cluding, without limitation, the COMPANY'S (or its designee's) name as employer-for-hire such **copyrights** and all renewals and extensions thereof, perpetually and throughout the Territory.

(b) ARTIST will facilitate the **Masters** to COMPANY at its offices in Miami, Florida not later than simultaneously with the execution of this Agreement, unless said masters are already in the possession of COMPANY.

(c) The **Masters** will be deemed to have been recorded under this Agreement during the Initial Period of the Term of this Agreement.

DE252-1 at 17; DE252-2 at 17; DE 252-3 at 17. Even Mr. Campbell conceded the 1991 Agreements, not the 1990 Agreement, contained the transfer language. DE277 at 121,[9]

While Defendants proclaimed the 1991 Agreements were forward looking and do not cover the five albums at issue [DE277 at 185], the Court corrected their position as "contradicted by the testimony regarding whether or not the five Subject Albums were a part of Schedule A." DE277 at 185. It merits reminding the Court that Defendants' entire premise is that the 1990 Agreement could retroactively memorialize a proclaimed prior oral agreement to transfer that is nowhere referenced in the 1990 Agreement. Defendants' position was also overwhelmingly defeated by the 1991 Agreements' explicit terms stating the subject Masters "are listed on Schedule 'A.'" 1991 Agreements §20(a). Defendants' contrary argument defies the evidence, logic, and common sense. If the 1991 Agreements were truly forward looking, as Defendants proclaim, there'd have been no Masters to list on Schedule A as they wouldn't have existed. Mr. Campbell himself confirmed the "Masters" referred to in this part of the 1991 Agreements included those for the albums at issue when he agreed the masters for these albums subject of the Copyrights had already been recorded. DE277 at 45.[10] Moreover, Section 20(b) of the 1991 Agreements states: "ARTIST will facilitate the Masters to COMPANY. . .simultaneously with the execution of this Agreement, unless said masters are already in the possession of COMPANY." As a matter of law, facts, and common sense, works

---

[9]   A. [When testifying about the 1991 Agreements] It also says at the top that the artist will transfer and assign to the company all rights to the songs that are recorded.

[10]  Q. Let's scroll down and look at paragraph 20(c). Do you see that, "The masters will be deemed to have been recorded under this agreement during the initial period of the term of this agreement"?
   A. Yes, sir.
   Q. Now, at the time of signing this, the masters for the Subject Albums had already been recorded. Correct?
   A. Yes, sir.

can't be delivered "simultaneously" or already be in Luke Records' possession if the works were to be created in the future. Finally, section 20(c) says "The Masters will be deemed to have been recorded under this Agreement during the Initial Period of the Term of this Agreement", which makes no sense, and would be unnecessary, if the 1991 Agreement was only forward looking. This section 20(c) exists precisely because the 1991 Agreement is not only forward looking, but also expressly reaches back to the Copyrights. The 1991 Agreements' plain language defeated Defendants' claim. The erroneous jury verdict and final judgment are premised on matters of erroneous contract construction and misapplied law that warrant JMOL.

Further, Attorney Jacobi, the 1991 Agreements' drafter, explained repeatedly and consistently that the 1991 Agreements transferred to Luke Records *all* works *2 Live Crew* had "ever made," including works made before the 1991 Agreements. DE276 at 7, 10[11], 17[12], 22[13], 48[14], 61[15], 69[16], 73.[17]

---

[11] Q. What is this clause [20(a)]?
   A. This is the actual transfer of all rights from the individual to the company.
[12] Q. What do these three clauses [20(a), 20(b) and 20(c)] do?
   A. The same thing they did in the first contract.
   Q. What does that mean?
   A. That means that they transfer all right, title and interest to the company.
   Q. And you understand that the 1991 Agreement was for the Banned in the U.S.A. record. Correct?
   A. No, it was for all the previous records.
   Q. Even the ones that were recorded before the '91 agreement was signed?
   A. Absolutely.
[14] Q. Do you believe it's material or not?
   A. Not really, because it transfers everything they own regardless of Schedule A. Any rights
   that they had prior to 1991 are being transferred here. Schedule A just delineates them.
[15] Q. And it doesn't deal with any recording services before 1991. Correct?
   A. No, it does. It's all the recording services.
   Q. So, is it your testimony that they signed an exclusive recording agreement in 1991?
   A. That included every recording they ever made.
[16] Q. Mr. Jacobi, all three of the contracts, 1, 2 and 3, do they all have specific clauses transferring the
   old recordings, the five CDs at issue, to Luke Records?
   A. Yes.
[17] Q. Okay. Is paragraph 20(a) what is referred to as a Grant of Rights clause?
   A. Yes.
   Q. What Grant of Rights are made pursuant to paragraph 20(a)?
   . . .
   A. All right, title and interest.
   Q. Would that include the five albums that are at issue in this case?
   A. All right, title and interest, everything they owned music wise.
   Q. And paragraph 20(a) is in Exhibits P-1, P-2 and P-3?
   A. Yes.

Mr. Jacobi repeatedly and consistently testified that "Schedule A" to the 1991 Agreements identified all of *2 Live Crews* prior recordings as part of what the 1991 Agreements transferred. DE276 at pp 11[18], 12–13.[19] Mr. Campbell, by contrast, didn't recall whether there was a Schedule A to the 1991 Agreements. DE277 at 129.

"Judgment as a matter of law is appropriate when a party presents no legally sufficient evidentiary basis for a reasonable jury to find for them on a material element of his cause of action." *Williams v. First Advantage LNS Screening Sols., Inc.*, 947 F.3d 735, 744 (11th Cir. 2020); *Bannon v Geico General Ins. Co.,* No. 17-14184, 2107 U.S. Dist. LEXIS 135168 *5 (S.D. Fla. Aug. 21, 2017). Alternatively, it should be granted when "the evidence is so overwhelmingly in favor of the moving party that a reasonable jury could not arrive at a contrary verdict." *Seb S.A. v Sunbeam Corp.,* 148 Fed. Appx. 774, 786 (11th Cir. 2005). JMOL is entirely correct here because no competent, legally sufficient evidence was presented that identified the transfer of the Copyrights via the 1990 Agreement, the only transfer Defendants sought to terminate.  *See Squillace,* 2010 U.S. Dist. LEXIS 17660 at *3, 5, 10–14 (citing *Collado v. UPS,* 419 F.3d 1143, 1149 (11th Cir. 2005). In order to prevail on his claim, Squillace had to show that the City Commission enacted a policy. *Id.* at *6. Squillace presented evidence that the Mayor, City Manager and Environmental Resource Manager and Code Enforcement Officer were the policy makers, which the jury accepted. *Id.* at * 3, 10-12. Because that was insufficient as a matter of law, a judgment

---

[18] THE WITNESS: 20(a) references Schedule A and the Schedule A contains the prior recordings as part of this deal.

[19] Q. Mr. Jacobi, did you create Schedule A?
A. I did.
Q. What was Schedule A?
A. Schedule A was all of the prior records that had been recorded and released prior to this agreement.
MR. BURROUGHS: Same objections, Your Honor. Move to strike on best evidence rule. Hearsay. No foundation.
THE COURT: Overruled.
BY MR. WOLFE:
Q. What was on Schedule A?
A. The list of all the recordings that had been recorded previously to 1991.
Q. By including it on a Schedule A, what did that do?
A. It made it part of the contract.
MR. BURROUGHS: Objection, Your Honor. No foundation. Hearsay. Best evidence rule.
THE COURT: Overruled.
BY MR. WOLFE: Q. You can answer now.
A. It made it part of the contract.
Q. Were these five CDs included on the Schedule A that you prepared?
A. Absolutely.

as a matter of law was granted contrary to the jury's verdict. *Id.* at * 13-14.   The 1990 Agreement's plain language shows it didn't transfer any copyright whatsoever, let alone these Copyrights. There wasn't any contract-textual support for the jury to rely on to find the 1990 Agreement transferred the Copyrights.

  If the Court were to find there was some evidence that the 1990 Agreement transferred the Copyrights, the greater (and overwhelming) weight of the evidence is still in Lil' Joe's favor and the Court should order a new trial. "A judge should grant a motion for a new trial when 'the verdict is against the clear weight of the evidence or will result in a miscarriage of justice, even though there may be substantial evidence which would prevent the direction of a verdict.'" *Lipphardt v. Durango Steakhouse of Brandon, Inc.*, 267 F.3d 1183, 1186 (11th Cir. 2001) (quoting *Hewitt v. B.F. Goodrich Co.*, 732 F.2d 1554, 1556 (11th Cir. 1984) ("A judge should grant a motion for a new trial when 'the verdict is against the clear weight of the evidence or will result in a miscarriage of justice, even though there may be substantial evidence which would prevent the direction of a verdict.'")); *Ard v. Southwest Forest Industries*, 849 F.2d 517, 520 (11th Cir. 1988) (finding district court did not abuse its discretion in granting a new trial in favor of defendants after finding the verdict for plaintiff was against the great weight of the evidence where plaintiff's evidence was "so attenuated and weak" and much of defendant's evidence went undisputed).

  A new trial is warranted because Mr. Campbell's inconsistent testimony is overwhelmed by other uncontroverted evidence. *See Government Employees Ins. Co. v.* ., 724 F. Supp. 872, 880 (M.D. Ala. 1989) . Mr. Campbell conceded that his deposition testimony was very different than his trial testimony. DE277 at 87.[20] For example, he testified at trial who the lawyer was who prepared the 1990 Agreement, though at deposition he didn't even know. DE277 at 87–88. When pressed at trial to explain this, Mr. Campbell said he looked at documents, yet could never identify any document he looked at. DE277 at pp.88–90. He testified at deposition that he didn't know who prepared the 1991 Agreements, though at trial he acknowledged it was Mr. Jacobi. DE277 at p.91. At deposition he was specifically asked if he hired Allen Jacobi to prepare the 1991 Agreements and didn't recall that, DE277 at pp.132–33, in direct conflict with his trial testimony. He testified at deposition that he didn't know if the *2 Live*

---

[20]  Q. Let me ask you again; the testimony that you gave, under penalties of perjury, was very different two years ago than it was today. Correct?
  A: Yes.

*Crew* members had more than one contract with Luke Records, while at trial he newly claimed they had the 1990 Agreement and the 1991 Agreements. DE277 at pp.93–94. At deposition, he couldn't recall if notice was given to the members of *2 Live Crew* that Luke Records was exercising its option to extend the term of the 1990 Agreement (something Mark Ross also couldn't recall [DE204; DE276 at 46–47], and at trial he newly claimed that simply deciding to go into the studio and record music was a verbal notice. DE277 at pp.103–04. At deposition, he couldn't recall the terms of the alleged oral agreement reached by the members of *2 Live Crew* DE277 at p.115.[21] At deposition, he couldn't recall whether or not there was a Schedule A to the 1991 Agreements. DE277 at p.129. At deposition, he couldn't recall whether the bankruptcy court ordered him to deliver all contracts to Mr. Weinberger. DE277 at pp.129–30. Mr. Campbell's self-serving, groomed trial testimony was belied by his own earlier testimony and his own documents. The greater, if not overwhelming, weight of the evidence is that the 1990 Agreement did not transfer the Copyrights, so a new trial is warranted.

### C. DEFENDANTS POISONED THIS CASE WITH EVIDENTIARY INNUENDO AND ARGUMENT AIMED AT GARNERING JURY PASSIONS AND UNDESERVED SYMPATHY REQUIRING A NEW TRIAL.

As the Court knows, closing argument is an opportunity "to explain to the jury what it has to decide and what evidence is relevant to its decision." *Sysyn v. Jones*, No. 17-CV-61374-WILLIAMS, 2020 U.S. Dist. LEXIS 44442 *35 (S.D. Fla. Mar. 12, 2020) (citing *United States v. Iglesias*, 915 F.2d 1524, 1529 (11th Cir. 1990)). "The Courts have, therefore, condemned argument that is inflammatory or appeals to bias or prejudice." *Id.* at *35–36. If counsel's argument contains "grossly improper and inflammatory references" that are "wholly unjustified by anything in the record," new trial is warranted. *BankAtlantic v. Blythe Eastman Paine Webber, Inc.,* 955 F.2d 1467, 1474 (11th Cir. 1992). The Court must consider the allegedly improper argument in context, along with any objections raised and curative instruction, "to determine whether the remarks were 'such as to impair gravely the calm and dispassionate consideration of the case by the jury.'" *Allstate Ins. Co. v. James,* 845 F.2d 315, 318–19 (11th Cir. 1988).

"The standard for granting a new trial based on improper conduct by counsel, including improper closing argument, 'is whether the conduct was such as to impair gravely the calm and

---

Q. Do you recall that when I asked you in deposition what were the terms of the verbal agreement, you couldn't state any of them?
A. Yes, sir.
Q. Do you recall that I asked you where this verbal agreement was reached and you said, "I don't recall"?
A. Yes, sir.

dispassionate consideration of the case by the jury.'" *Neal v Toyota Motor Corp.,* 823 F.Supp. 939, 944 (N.D. Ga. 1993)(citing *Bankatlantic,* 955 F.2d at 1474)). The impact of improper sympathy arguments should be weighed both singularly and collectively. *See Lambert v Fulton County,* 253 F.3d 588, 596 (11th Cir. 2001); *Joseph v Publix Super Markets, Inc.,* 151 Fed. Appx. 760, 769 (11th Cir. 2005)("The cumulative effect of the erroneous admission … had a substantial prejudicial effect."). "If one cannot say, with fair assurance, that the judgment was not substantially swayed by the error, it is impossible to conclude that the substantive rights were not affected." *Ad-Vantage Tel. Directory Consultants, Inc. v. GTE Directories Corp*., 37 F.3d 1460, 1465 (11th Cir. 1994).

Instead of aiding the jury with the evidence, not a minute into closing argument, Defendants' counsel set the stage for a collage that together employed nearly every category of tactics that courts have previously held to be improper, highly prejudicial closing argument. Defendants misstated the evidence, referenced facts not in evidence, discussed matters not before the jury, and lobbed a barrage of personal attacks against Mr. Weinberger, telling the jury, right at the beginning of closing argument, this was "a tale of *deceit and dishonesty* that wouldn't be out of place in a Netflix movie" wherein Defendants were "living the dream, until in 1991 when they were unfortunate enough to cross paths with Mr. Weinberger. Mr. Weinberger *infected* the group, *infected* the label like a *virus*. He *destroyed* it from within." DE278 at p.56. Defendants' counsel persisted in this personal attack, telling the jury:

> He steered it into bankruptcy. [22] And who was the big winner? Mr. Weinberger. Mr. Weinberger bought up all the copyrights and built this entire empire where he's admitted he has made $10 million or more, and he did that even though he is supposed to be the group's trusted advisor. You heard that Mr. Campbell and the guys, they trusted him. He was a confidante. He was more than that. He was a friend. They watched football together, and they trusted this gentleman. And what did he do? He betrayed them. He steered the company into bankruptcy. He helped that bankruptcy take place—

DE278 at p.57. "He bought the rights for cents on the dollar." DE278 at T.57. These were the first words out of Defendants' counsel's mouth and the theme of the closing—nothing about the Copyrights, nothing about how they were transferred, and not a word about whether the group members were Luke Records employees. Only that Mr. Weinberger was a scoundrel who somehow swindled them. It is patently improper to advance the appearance before the jury as the oppressed "little guy" fighting against a bigger foe, making "send a message" arguments,. *Neal ,* 823 F.Supp. at

---

[22] Mr. Weinberger's testimony explained that the bankruptcy was caused by judgment entered in favor of Peter Jones. DE275 at T.47.

943. **Why** Mr. Campbell and Luke Records filed bankruptcy and **what** Lil Joe was able to make of his purchase of assets (for $3.3 million as the highest bidder, hardly "cents on the dollar") had no relevance, per the Court's prior rulings, to the questions the jury was instructed to answer. ??Further, Mr. Hobbs and Mr. Ross had already transferred their copyrights in settling the 1991-1993 litigation and the Ross Copyright transfer, recorded in 1999, needed to be an exhibit.?? Defendants' improper closing argument was engineered to impassion the jury that Defendants had been taken advantage of (in a bankruptcy court proceeding which *they'd* proposed and *they'd* never challenged, either before the bankruptcy court or on appeal-and diametrically contrary to Judge Mark's supervision and findings)²³ so the jury would take pity and give them the Copyrights regardless of the evidence and law.

It is inappropriate for counsel to employ inflammatory and untruthful remarks, incite antipathy, invoke sympathy from a jury, use facts not in evidence, and suggest to the jury they have the power to stop fictional abuses. *Allstate Ins. Co. v. James*, 845 F.2d 315, 319 (11th Cir. 1988) (improper closing argument where counsel "suggested to the jury that they were the 'somebody [who might] do something about this."); *Edwards v. Sears, Roebuck and Company*, 512 F.2d 276, 285 (5th Cir. 1975) (binding precedent in Eleventh Circuit, new trial required where "untrue 'admission,' injected into jury argument without any proper basis whatever, was grossly improper and clearly prejudicial. "Where placing material facts not in evidence before the jury in final argument substantially prejudices a party, reversal is required."(citations omitted)); *U.S.I. Properties Corp. v. M.D. Construction Co., Inc.*, 860 F.2d 1 (1st Cir. 1988) (using words like "corrupt," "conspirators," "lies," and "prevarications" to refer to witness testimony").

---

²³ If there was any basis for the contention that something untoward occurred during the bankruptcy, they should have, and would have. been raised in the bankruptcy proceedings. Not only was there no evidence of any truth to this argument, but, to the contrary, (i) the evidence is undisputed that plan of reorganization whereby the Copyrights were sold to Lil' Joe was proposed by Mr. Campbell and Luke Records [DE252-4], certainly they would not have sold for an amount they thought was unfair or if someone else would pay more, and (ii) the evidence is undisputed that Judge Mark found that "[t]he sale of the Debtors' assets to Joseph Weinberger and Lil' Joe Records, Inc. (together, 'Weinberger') pursuant to the terms of the Plan and the Letter of Intent is in the best interest of each of the Debtors' estates," "Weinberger is an independent third-party purchaser and the Letter of Intent was negotiated in good faith and at arms-length," and "Weinberger [is a] good faith purchaser[] as that term is used in 11 U.S.C. §363(m) and [is] entitled to all of the protection of a good faith purchaser pursuant thereto." DE252-20 at 2–3. The Eleventh Circuit has confirmed Judge Mark's findings that the Campbell/Luke Records plan "was proposed in good faith", was "in the best interest of each of the Debtors' estates", that Mr. Weinberger and Lil' Joe were "independent third-party purchasers [who] negotiated in good faith and at arms'-length.". *Thompkins v Lil' Joe Records, Inc.,* 476 F.3d 1294, 1301 (11th Cir. 2007). The Eleventh Circuit also recognized "the precedent of this circuit governing the preclusive effect of bankruptcy orders in subsequent litigation. *Id.* at 1302.

Defendants' injection of inappropriate matters began during the evidence phase and continued into closing argument. Mr. Campbell testified, over Plaintiff's vigorous objection, that "Mr. Weinberger went to three creditors and had these three creditors file an involuntary bankruptcy against me." DE277 at T.63. He further testified that "in that court proceeding the judge found Mr. Weinberger guilty of —." DE277 at T.63. After sending the jury out and a colloquy with counsel, the Court determined Mr. Campbell's comment about Mr. Weinberger's "guilt" was inappropriate and advised the jury, "I sustained the last objection so disregard the last part of the comment from the witness regarding what a bankruptcy judge found." DE277 at T.63-68. This was the sole caution to the jury in a sea of irrelevant, inflammatory comments. Belaboring, Judge Mark **never found** that Joe Weinberger had done *anything* wrong and the prejudice of defense counsel's misleading argument was palpable.

Undeterred, Defendants' counsel injected innuendo of more false evidence, asking questions to advance that Mr. Weinberger caused Luke Records/Mr. Campbell's bankruptcy. DE275 at T.[24], 88[25]. Upon his counsel's inquiry, and over Lil' Joe's objection, Mr. Campbell testified Mr. Weinberger used information from his position at Luke Records to take unfair advantage of him in the bankruptcy. DE277 at T.69. This non-evidence was later used to send the jury an improper send-a-message argument, telling them to rectify this fictional wrong, though the bankruptcy and Lil's Joe's bona fide acquisition no longer, per the Court's prior rulings, had relevancy to how the Copyrights were transferred many years earlier or whether the *2 Live Crew* members were Luke Records employees and there was no evidence that Mr. Weinberger did anything untoward in the bankruptcy (*supra* at n.23).

Defendants also elicited improper testimony that Lil' Joe made $10 million from the Copyrights while the Defendants got nothing. DE275 at T.89–90[26], 91–92[27]. It is axiomatic that "a jury

---

[24] Q.  Okay. Isn't it true that you participated or caused that bankruptcy to a degree?
A.  I didn't cause any bankruptcy.
Q.  Did you call creditors and tell them to file claims to push the label into bankruptcy?
A.  No.
[25] Q.  In fact, didn't you file legal documents in Mr. Cobble's name that helped push the label into bankruptcy?
A.  No.
[26] Q. How much have you made exploiting those copyrights?
MR. WOLFE: Objection. Relevance. 403.
THE COURT: Overruled.
THE WITNESS: I don't know the exact amount.
BY MR. BURROUGHS:

should not be advised about the wealth or poverty of the parties," *Shaps v. Provident Life & Accident Ins. Co.*, 244 F.3d 876, 886 (11th Cir. 2001), "nor should the financial status of one party be contrasted with the other's", *Brough v. Imperial Sterling Ltd.*, 297 F.3d 1172, 1179 (11th Cir. 2002). Defendants also elicited testimony (later emphasized in closing), without actual proof and completely irrelevant, that Lil' Joe bought the Copyrights for "cents on the dollar." DE275 at T.90–91[28]; DE276 at T.88[29].

---

Q. Give us your best estimate.
A. Maybe $10 million.
…
Q. Would it be at least $10 million?
A. I would think so.
Q. Would it be closer to $20 million?
A. I don't think so.

[27] Q. So, the tens of millions of dollars that you've made from Mr. Campbell and his label's copyrights -
A. I didn't make it. It was not a profit. There was a 10-year period of time where I had no salary.
Q. Okay. So, the millions of dollars that you made from the copyrights of 2 Live Crew --
A. They were revenues, just like when Luther Campbell had the copyrights he may have had over, like, 80, $90 million of revenue. He didn't have $90 million of profit.
Q. So, the millions of dollars that came into your company, Lil' Joe Records, from the sale of the 2 Live Crew music, did you share any of that money with the 2 Live Crew members?
MR. WOLFE: Objection. Relevance. 403.
THE COURT: Overruled.
THE WITNESS: They were paid whatever the contracts required them to be paid.

[28] Q. Isn't it true that you bragged after buying those copyrights that you had bought them for cents on the dollar?
MR. WOLFE: Objection. Relevance. 403.
THE COURT: Overruled. You may answer.
THE WITNESS: I had said something that was taken out of context by a writer at the newspaper that Luther Campbell worked for.
BY MR. BURROUGHS:
Q. And it was widely reported that you were claiming that you had bought out Mr. Campbell's copyrights and the label's copyrights for cents on the dollars. Correct?
A. That's not accurate as to what I told the reporter.
Q. But that was reported. Correct?
A. I believe so.
Q. Did you ever go to the publication and demand a retraction?
MR. WOLFE: Objection. Relevance.
THE COURT: Overruled.
THE WITNESS: I think my lawyer did.
BY MR. BURROUGHS: Q. Was it retracted?
A. The lawyer told me that I would have difficulty suing the newspaper.
Q. Isn't it a fact the newspaper had the records to show that you actually said that?
A. No.

[29] Q. Do you believe that you bought Mr. Campbell and the label's assets for cents on the dollar?
MR. WOLFE: Objection, Your Honor. Relevance.
THE COURT: Overruled. You may answer.

Defendants harped on this so much that they had to be told to move on. DE276 at T.88–89.[30] *All* calculated to plant the seed that Mr. Weinberger took wrongful advantage of Defendants that the jury should rectify, but none of which was an issue for the jury.

Defendants expended five pages of trial testimony improperly grilling Mr. Weinberger why he did not have Schedule 'A' to the 1991 Agreements despite knowing full well that he'd attempted to obtain them and Mr. Campbell withheld them to manufacture a false story. DE276 at T.111–15.  First, non-production in discovery is inadmissible and prejudicial. *See, e.g.*, *Bluestarexpo, Inc. v. Enis*, 21-20875-CIV-SCOLA/GOODMAN, at *32–33 (S.D. Fla. Nov. 9, 2022).  Second, it's undisputed that *Luke Records* —not Mr. Weinberger—was ordered by the bankruptcy court to "transport all original documents . . .  to a location selected by Weinberger and acceptable to [the liquidating trustee.]." DE252-20 at 7. The incontrovertible evidence and undisputed testimony is that Schedule A was never delivered to Mr. Weinberger. DE275 at T.98–99[31]; DE276 at T.111[32]. Mr. Weinberger explained the extraordinary efforts he undertook to get Luke Records and Mr. Campbell to comply with this bankruptcy court. DE275 at T.100-01[33]. No one disputed this, not even Mr. Campbell who was in

---

THE WITNESS: Well, in bankruptcy you don't pay top dollar for things. I assumed several million dollars of liabilities, and the cash that I outlaid was about a million dollars and there was, I think, claims that I had close to a half-million dollars that were wiped out.

[30] Q. But you feel that you got a very good deal. Right?
  MR. WOLFE: Objection. Asked and answered.
  THE COURT: Sustained. Let's move on.
  BY MR. BURROUGHS: Q. Did you tell other folks that you got a very good deal?
  MR. WOLFE: Objection. Asked and answered.
  THE COURT: Sustained.
  BY MR. BURROUGHS: Q. Earlier this week you testified that you believe you made about $10 million when you purchased Mr. Campbell's label's assets?
  MR. WOLFE: Objection. Asked and answered.
  THE COURT: Sustained.
  BY MR. BURROUGHS: Q. In fact, haven't you told others that you have made at least $15 million on just the purchase?
  MR. WOLFE: Objection. Relevance. Asked and answered.
  THE COURT: Counsel, let's move on to a different area, please.
[31] Q. But weren't you given all the records from the company?
  A. No
[32] Q. In fact, you have never had a copy of the Schedule A, this missing Schedule A in your records. Isn't that correct?
  A. I was never given it.
  [33] Q. Isn't it tax law that those documents must be maintained for at least seven years?
    A.  I was not given them.
    Q. You did not raise that issue at any time?

no position to do so because, while he couldn't even recall at deposition whether the bankruptcy court had ordered him to deliver Luke Records' documents to Mr. Weinberger [DE277 at T.129–30], he'd conceded at trial that he was not the person who delivered Luke Records documents to Lil Joe. DE275 at T.42 ("Actually, I didn't turn the boxes over, the comptroller of the company turned over all the boxes."). Still, Defendants continued with over five pages of trial testimony asking Mr. Weinberger why he didn't have a piece of paper that Luke Records had been court-ordered to deliver to him and didn't. DE276 at T.111-15. And this wasn't enough for Defendants, whose counsel in closing falsely misrepresented to the jury "that Mr. Weinberger has never even looked for them for thirty years until he got the notice that 2 Live Crew were recovering their copyrights." DE278 at T.91. Schedule A's non-production in discovery despite court orders was inadmissible. *Bluestarexpo*, at *38–39. Making Defendants' non-production a feature of Defendants' misleading closing "quasi-empty chair" argument was patently improper and inexcusable.

Defendants' counsel also argued outside the evidence that the audit about which Mr. Weinberger testified was "never mentioned in his deposition. They certainly didn't read you any testimony about that audit in the deposition. Never mentioned." DE278 at T.77. The audit was never mentioned in Mr. Weinberger's deposition because *Defendants'* counsel never asked about it! This was a calculated attack knowing Lil' Joe could cure what Defendants' counsel had misrepresented—it couldn't read the entire deposition transcript to show Defendants never asked Mr. Weinberger this question. Fed. R.Civ. P. 32. This prejudice was exacerbated by Defendants' improper objection to Lil Joe reading a part of Mr. Campbell's deposition as part of its presentation of evidence and cross-examination to sure this sly misrepresentation. Fed. R.Civ. P. 32(a)(3) ("An adverse party may use for any purpose the deposition of a party…."); DE277 at T.87.

Continuing their unrelenting assault on Mr. Weinberger, Defendants' counsel misleadingly argued during closing that none of the documents from the Luke Records tax audit that Mr. Weinberger testified about were introduced into evidence. DE278 at T.65. Just like Schedule A, this was the

---

A. We filed a motion in the bankruptcy court and Judge Mark ordered the U.S. Marshals to accompany Frank Terzo and George Tavares to get me whatever documents Campbell wouldn't give me, and then we left it like that.

Q. Okay.

A. I was trying to start my company up at the time. At the time, I didn't have the resources to continue fighting it. I had to try to keep the company going.

Q. Did you ever go to court and say, I am aware of this very important IRS file and it hasn't been turned over, Your Honor, force them to turn it over? Did you ever do anything to actually get your hands on that paper?

A. Yes, there were motions filed in the bankruptcy court.

proverbial pot calling the kettle black. It was Mr. Campbell's company, Luke Records, that was audited. DE275 at T.18-20. No one disputed this audit occurred. Mr. Campbell certainly didn't. Defendants never asked Luke Records' CPA, Herman Moskowitz, about it. The undisputed testimony is that Mr. Campbell and Luke Records were court-ordered to produce these records to Mr. Weinberger but did not to do so. *Supra* at 18. Despite that undisputed evidence that Mr. Campbell and Luke Records were the reason these documents were unavailable, Defendants' counsel advanced an untruthful, misleading argument of fiction, not in evidence, knowing full well there was an IRS audit, to cast blame and doubt on Mr. Weinberger, telling the jury:

> You didn't see a single document from this huge IRS audit that supposedly gives us, or gives them all this understanding of what happened in the '80s. There is no evidence of it. It's reconstructed self-serving testimony with no evidentiary underpinning, none at all.

DE278 at T.65. It's undisputed that Mr. Weinberger worked for Luke Records, was fired, and locked out. DE275 at T.88.Also undisputed, Mr. Campbell and Luke Records were court-ordered to turn over their records to Mr. Weinberger, and did not comply. *Supra* at 18.Lil' Joe couldn't "have walked in with boxes of it", as Defendants' counsel implied, because Luke Records refused to comply with court-ordered delivery of them to Lil' Joe. Despite this undisputed evidence, Defendants' counsel once again blamed Mr. Weinberger for their own flagrant noncompliance:

> Remember, he was a tax attorney, so he understands if you are an employee there is something like a W-2. If you're filing employee documents you have to have IRS forms, state tax forms. There is so much documentation that confirms someone is an employee. They could have walked in with boxes of it if this was true.

DE278 at T.65. Undeterred, Defendants' false statements continued, telling the jury:

> You can think about the evidence that you haven't seen, and to the extent that Mr. Weinberger's testimony is almost exclusively predicated on this so called IRS audit that he did after the fact, you can ask yourself, well, why were there no documents. Why were there no documents at all about this IRS audit or to support this argument that they were ever employees.

DE278 at T. 66. And the false statements continued, telling the jury:

> You did see the checks. You know, Mr. Wolfe was showing you those checks again. Each of those checks would have had W2 forms, IRS forms, corporate forms. They'd be reflected in a ledger, a P & L statement, a monthly statement. None of those documents exist. If they did, you would have seen them. They simply don't exist because this whole audit is a story.

DE278 at T.78.

All of this transpired before Defendants' counsel began to even address the questions to be considered in this case. DE278 at T.66 ("Now, stepping back a moment, you know, why are we here? Why have we spent the last couple of weeks together?"). Instead of addressing the questions this

case raises, Defendants' counsel continued with an onslaught of appeals for the jury to make things

right because Lil' Joe had made enough and was abusively litigious:

> We sent them this notice, said, hey, you made your tens of millions. You haven't shared any of
> it with us.
> . . .
> How, he received this letter, and like he did many times in the past with great success, he went
> to litigation. He filed a lawsuit. He sued us. He sued us saying, look, no, you guys do not have
> the 203 right. You cannot recover your copyright. I' going to keep them. I've had them for this
> whole time period for decades. I want to keep them. I am making money, and you can't take
> them back. That's what this lawsuit is about.

DE278 at T.67.

To ensure the jury became sufficiently inflamed, Defendants' counsel went back to his personal

attack on Mr. Weinberger and arguments outside the evidence:

> "[T]hings were really looking good for 2 Live Crew and the label, and at this point entered
> Attorney Mr. Weinberger. He joined the label as a trusted legal adviser. Four years later it was
> bankrupt.
>     Remember, when he came on the scene it was well after all the albums had been recorded
> and released. You heard that he was brought in entrusted by the guys to ensure that the legal
> side of the company was handled correctly and that Campbell and the guys relied heavily on
> his advice and counsel and that they were even friends, but that did not stop Mr. Weinberger
> from spotting an opportunity to exploit the guys and their situation.
>     You heard him testify that Mr. Campbell was his boss, Mr. Campbell was making choices.
> And you heard that he grew disenchanted, and he decided at one point he wanted to be the boss.
> He wanted to be the boss, and he saw an opportunity to make that happen, by steering this
> company into bankruptcy and --
>     MR. WOLFE: Objection, Your Honor. No evidence.
>     THE COURT: Overruled. Again, ladies and gentlemen, please rely on your own
> recollection of the evidence.
>     MR. BURROUGHS: And then using the information he had from the company in the
> bankruptcy to obtain all of the copyrights. He didn't go into the bankruptcy and try to help the
> label, help all the guys in the group. Quite the opposite. He went in there and took all the
> copyrights in this bankruptcy proceeding.
>     So, you can think about that, the label's lawyer, his trusted adviser, takes advantage of them
> by taking from them the thing most valuable to them, these creations that they made and then
> building a company on that, making tens of millions of dollars, bragging about what a great
> businessman he is.

DE278 at T.75–76.

Defendants' counsel then crowned closing argument with a plea to the jury that they help out

the little guys who'd been taken advantage of by the big, bad, and rich:

> [A]t the end of the day this is a case about people, about artists who trusted someone they
> shouldn't have, about someone who exploited those artists and bought their copyrights out of
> bankruptcy, made millions of dollars, over $10 million, and now because they are seeking to
> recover their copyrights as they are allowed to do under Section 203 of the Copyright Act, he is
> suing them again to block them.

> He mentioned so many lawsuits over the years and suing people and getting involved in lawsuits and even winning and that should stop today.

DE278 at p.93.

In his final words, Defendants' counsel asked the jury to not focus on the facts of this case , but to right what Defendants misrepresented to the jury as years of wrongs:

> "So, as this decades long saga comes to a close, you are going to be entrusted with rendering a verdict. We ask that you enter that verdict in favor of 2 Live Crew and their families."

DE278 at p.94.

Defendants' arguments impermissibly "impair[ed] gravely the calm and dispassionate consideration of the case by the jury.'" *Neal,* 823 F.Supp. at 944. Because "one cannot say, with fair assurance, that the judgment was not substantially swayed by the error, it is impossible to conclude that the substantive rights were not affected", a new trial is warrnted. *Ad-Vantage,* 37 F.3d at 1465. In *Ad-Vantage,* a new trial was warranted because, although the errors were few, "the evidence was highly prejudicial, no correcting instructions were given, and the inadmissible evidence was not only intentionally elicited but also emphasized in closing argument." *Id.* All of that occurred here and more. There were multiple instances of Defendants' erroneous presentations of evidence and arguments. This mischaracterized and injected evidence and arguments were intentionally elicited and emphasized in closing argument, were highly prejudicial, and no curative instructions were given. Like in *Ad-Vantage*, "one cannot say, with fair assurance, that the judgment was not substantially swayed by the error", so a new trial must be granted here.

Moreover, "[a] particularly indefensible tactic [is] the use of the closing arguments to bring before the jury damaging facts not in evidence and never established." *Edwards v. Sears, Roebuck and Co.*, 512 F.2d 276, 284 (5th Cir. 1975). "Where placing material facts not in evidence before the jury in final argument substantially prejudices a party, reversal is required." *Id.* "Counsel should not introduce extraneous matter before a jury or, by questions or remarks, endeavor to bring before it unrelated subjects and, where there is a reasonable probability that the verdict of a jury has been influenced by such conduct, it should be set aside." *Twachtman v. Connelly*, 106 F.2d 501, 508-09 (6th Cir. 1939). Here there is more than "a reasonable probability that the verdict of a jury has been influenced by such conduct, [so] it should be set aside."

"If the 'tactics' used during trial, taken together, 'tarnish the badge of evenhandedness and fairness that normally marks our system of justice,' then a new trial is warranted. ... This is especially the case when, as here, those 'tactics' are used during closing argument, which often leaves an

especially powerful impression on the jury." *Clapper v. American Realty Investors, Inc.*, 95 F.4th 309, 314 (5th Cir. 2024) (citation omitted).

> There is no doubt that these remarks, considered collectively, extend far beyond permissible hyperbole or "expressive language," and were designed to bias the jury against Clapper and his counsel. [These] improper statements pervaded closing argument. As noted above, they employed nearly every type of improper argument identified by our court, including … remarks about Clapper's wealth, a discussion of matters not in the record, insinuations that Clapper had lower moral standards …, and suggestions of Clapper's bad motives through counsels' opinion. These attacks "unquestionably tarnish[ed] the badge of evenhandedness and fairness that normally marks our system of justice."

*Id.* at 316 (citations omitted).

> In this case, repeated improper statements including … references to Clapper's wealth, matters not in the record, appeals to local bias, and suggestions of Clapper's bad motives, abandoned all "dignity, order, and decorum," which we have described as the "hallmarks of all court proceedings in our country."... These statements affected Clapper's "substantial rights" and warrant a new trial.

*Id.* at 317 (citation omitted). Replace "Clapper" with "Mr. Weinberger" and this is precisely what occurred here. Defendants' closing arguments have no relevance to the questions the jury was asked. Whether or not Mr. Weinberger caused Luke Records and Mr. Campbell's bankruptcies, whether or not the amount he paid for the Copyrights was sufficient (something Mr./ Campbell, Luke Records and Judge Mark were satisfied with, *supra* at 15-16, n.22-23), whether Lil' Joe earned two cents or a billion dollars from the Copyrights, are not of the slightest consequence to which agreement transferred the Copyrights. They could only have been  injected for one reason and one reason only—to inflame the jury into sending a message and stop the big, bad, overreaching Mr. Weinberger no matter what the evidence or law is. This the so-called "golden-rule" argument that requires reversal:

> A "golden-rule" argument invites jurors to "put themselves in the shoes of the plaintiff and do him as they would have him do unto them under similar circumstances." …. The risk is that such a statement asks jurors to "decide the case on the basis of sympathy rather than from an objective review of the evidence." …. An unremedied golden-rule argument will ordinarily result in reversal.

*Ermini v Scott,* 937 F.3d 1329, 1340 (11th Cir. 2019) (citations omitted). *Ermini* recognized that "golden-rule-ish statements" are less permissible when they have no connection to an element or factor genuinely at issue. 937 F.3d at 1341. Again, that is exactly what occurred here.

Lil Joe repeatedly objected that there was no evidence to support what Defendants' counsel was saying during closing. DE278 at T.57, 60, 76, 78, 81, 91. All of Lil' Joe's objections were

overruled and no curative instructions were given. *Id.* Even where curative instructions are given, the Supreme Court has recognized that "some occurrences at trial may be too clearly prejudicial for . . . a curative instruction to mitigate their effect." *Donnelly v. DeChristoforo*, 416 U.S. 637, 644 (1974); *see also O'Rear v. Fruehauf Corp.*, 554 F.2d 1304 (5th Cir. 1977); *McWhorter v. City of Birmingham*, 906 F.2d 674, 678 (11th Cir. 1990). Many courts use the "skunk in the jury box" metaphor. *Ewing v. Carnival Corp.*, 19-20264-CIV-GOODMAN, 2022 U.S. Dist. LEXIS 95911 *34 (S.D. Fla. May 27, 2022). That is, "you throw a skunk into the jury box and instruct the jurors not to smell it, but it doesn't do any good." *Id.* This concept is used when considering whether to grant a new trial because "the bench and bar are both aware that cautionary instructions are effective only up to a certain point.". *Id.* The improper arguments here were pervasive during trial and permeated the ***entire*** case, but especially closing argument, there was no curing it. Defendants repeated, continuous mantra-like reference to irrelevant matters and nonevidence and their appeal to the jury to make things right because Mr. Weinberger had made too much money from the Copyrights had a significant, unfairly prejudicial effect on Lil' Joe and warrant a new trial – it is the "skunk in the jury box" mandating a new trial.

**D.   AS DEFENDANTS FAILED TO PRESENT LEGALLY SUFFICIENT, COMPETENT EVIDENCE THAT THE 1990 AGREEMENT TRANSFERRED THESE COPYRIGHTS, WHICH TRANSFER IS THE ONLY ONE THEY ATTEMPTED TO TERMINATE, THE LACK OF INSTRUCTIONS ON THE RELEVANT LAW COUPLED WITH IMPROPER CLOSING ARGUMENT REQUIRE A NEW TRIAL.**

On the trial evidence presented, it was legal error to instruct the jury that the Copyrights could have been transferred orally and then later memorialized in writing when (1) the purported writing never mentioned any oral agreement, let alone the specifics of it, and actually featured an integration clause stating there were no other oral or written agreements (2) there was no evidence presented about the specifics of prior oral agreements, and (3) Defendants own conduct showed the 1991 Agreements were the operative instruments of transfer. *See* 17 U.S.C. § 204(a); *Davis v. Blige*, 505 F.3d 90 (2d Cir. 2007) (holding assignments of copyrights cannot operate retroactively); *Spinelli v. Nat'l Football League*, 903 F.3d 185, 198 (2d Cir. 2018) (applying *Blige*). No one testified to any oral agreement to transfer copyrights to Luke Records—*ever*.

Reliance on *Imperial Residential Design, Inc. v. Palms Development Group,* 70 F.3d 96 (11th Cir. 1994), to reject Lil' Joe's proposed jury instructions about these issues was error, where the parties in *Imperial* had joined forces against an infringer and entered a written transfer of rights agreement

while, here, the parties were adverse, they disputed the transfer, and there was no reference at all in the four corners of the 1990 Agreement to *any* prior oral agreement or *any* actual transfer of rights—i.e., it couldn't have been a "memorialization" because the 1990 Agreement didn't purport to memorialize any prior transfer and expressly disavowed any prior oral agreement in its integration clause. Further, in *Imperial*, the question was not whether the parties transferred rights in their written agreement, but whether they could use that written transfer confirming an earlier agreement to establish standing where it was executed after the infringing conduct had occurred. 70 F.3d at 98–99. The Eleventh Circuit stated it would not allow the infringer in that case to invoke the writing requirement of section 204(a) because the owner and the transferee had both joined as plaintiffs in the same lawsuit. 70 F.3d at 99. But this case relies on a very distinct and defective 1990 contractual device that transferred nothing, in an adversarial procedural posture of a bona fide purchaser of the Copyrights, and a Termination Notice that by law *must* specify the exact transfer it was terminating and didn't. Plaintiff's Proposed Instructions Nos. 12, 13, 14 [DE185 at 19–22] thatcorrectly explained the law should've been read to the jury: that a copyright transfer must be in writing, not proclaimed as transferred orally without evidence of its specifics, and can't be done retroactively, to avoid juror confusion exacerbated by Defendants' improper closing argument.

Reliance on *Imperial Group* was misplaced therefore, where noone testified to any oral agreement to transfer any copyright to Luke Records and the four corners of the 1990 Agreement made no reference to *any* prior oral agreement, which—lacking any such reference--couldn't have been a "memorialization" of anything and especially given its integration clause. Plaintiff's Proposed Instructions Nos. 12, 13, 14 [DE185 at 19–22] and the oral request to instruct the jury on the legal effect of an integration clause [DE236–37]—all correctly explaining the law—should have been read to the jury. *See* Eleventh Circuit Civil Pattern Jury Instr. 9.16; 17 U.S.C. §§ 101, 204(a); *Blige*, 505 F.3d 90; *Karlson v. Red Door Homes, LLC*, 611 F. App'x 566, 7 (11th Cir. 2015); *see also Barefoot Architect, Inc. v. Bunge*, 632 F.3d 822, 832-33 (3d Cir. 2011) (discussing *Imperial* and other similar cases, *nunc pro tunc* assignment itself cannot "both prove[] that an oral transfer occurred and g[i]ve legal effect to that otherwise unenforceable promise"; "[o]ther than the Memorandum of Transfer (which as we have said cannot stand on its own), none of the proffered evidence [or an oral agreement to transfer], such as it is, would permit a jury to conclude that an oral transfer took place on October 5, 1999, as the

Memorandum would have it and as Barefoot has argued. Summary judgment was therefore appropriate, and we will affirm the District Court.").

The law explains that, when Defendants presented their after-the-fact "note or memorandum" via the 1990 Agreement that they insisted reduced to writing an earlier oral transfer, they had to produce independent, extrinsic proof of "that crucial historical fact". Defendants presented nothing of that, and their own 1990 Agreement's integration clause disclaimed any such prior oral arguments. Lil' Joe's requested jury instructions on those points would have remedied the erroneous jury verdict and final judgment that misapprehended those facts and that law. *See Barefoot*, 632 F.3d at 832 (and multi-circuit law, including the Eleventh Circuit, discussed therein).

Further, because the 1991 Agreements' plain language shows that it transferred prior works by *2 Live Crew*, and the competent evidence showed the transfers included these Copyrights, as a matter of law, the Notice of Termination didn't terminate Lil' Joe's ownership of these Copyrights and JMOL should be granted.

Even if the Termination Notice were valid (it's not), the verdict and final judgment misapprehended that the irrebutable evidence is there are additional grants not mentioned ***at all*** in the Termination Notice that are ***not*** terminated as a matter of law. Defendants' Notice of Termination [DE250-9] nowhere mentions (1) Mr. Campbell's grants in 1996 to Lil' Joe [DE252-21, -22] or (2) Mr. Ross' grant in 2001 to Lil' Joe DE252-5. Therefore, JMOL is also warranted because the Termination Notice, itself, does not as a matter of law have any effect on these never-identified grants. *See Penguin Books v Steinbeck,* 537 F. 3d 193 (2d Cir.2008) (section 203 not terminate grants replaced by subsequent grants).

Judgment as a matter of law is also warranted because the only trial evidence was that the values of the copyrights were *already exploited and known* at the time of copyright transfer[34] and the 17 USC § 203 Notice of Termination rights are intended to extend to only authors who do not know the value of and have not exploited the copyrights at the time of transfer. *See also Acuti v. Authentic Brands Grp. LLC*, 33 F.4th 131 (2d Cir. 2022) (termination provisions were intended to protect authors from

---

[34] *See* DE276 at 119-20 (2024-10-11 TRL TSCRPT at Weinberger testimony re: $5 million and the copyright sound recordings had already been exploited in 1990); DE276 at 6-8 (2024-10-11TRL TSCRPT Jacobi testimony about $5 million paid by Atlantic Records); DE277 at 20 (2024-10-15 TRL SCRPT Campbell testimony Campbell and the band members had made millions on these albums even in 1990 and 1991.

unequal bargains due to impossibility of estimating a work's future value); *Waite v. UMG Recordings Inc.*, 2023 US Dist. LEXIS 14465 (4-5 (S.D. NY Jan. 27, 2023) (Section 203 implemented to protect artists who give up their copyrights before they know it is a hit); *Champlin v. Music Sales Corp.*, 604 F.Supp.3d 224 (S.D. N.Y. 2022) (highlighted objectives of section 203 to counterbalance unequal bargaining position of artists that arises from difficulty in determining a work's value until it has been exploited); *Everly v. Everly,* Case No. 3:17-cv-01440 (M.D. Tenn. Sep. 22, 2020) (referenced legislative history indicating Copyright Act revisions creating termination rights were intended to protect authors from unremunerative transfers). Thus, Section 203 does not apply here.

Lil' Joe respects the Court's prior rulings on this issue, but to ensure continued preservation, Lil' Joe renews all arguments previously raised that the Termination Notice cannot as a matter of 17 USC § 203(b)(5) affect the grant of rights to Lil' Joe pursuant to bankruptcy law and the Bankruptcy Order of Judge Robert Mark.

CONCLUSION

FOR THESE REASONS AND LEGAL AUTHORITIES SET FORTH HEREIN, Lil' Joe requests this Court grant judgment as a matter of law that the Copyrights were transferred by the 1991 Agreements, not the 1990 Agreement, so the Defendants' Termination Notice was ineffective, and enter judgment in favor of Lil' Joe, or, in the alternative, grant a new trial.

WOLFE LAW MIAMI PA
175 SW 7th Street, Suite 2410
Miami, Florida 33130
P: 305.384.7370
F: 305.384.7371
Email: rwolfe@wolfelawmiami.com

By:      /s/ Richard C. Wolfe
        Richard C. Wolfe, Esq.
        Florida Bar No.: 355607


            And
EASLEY APPELLATE PRACTICE PLLC
*Appellate Counsel for Plaintiff*
1200 Brickell Avenue, Ste. 1950
Miami, Florida 33131
T: (305) 444-1599; 800-216-6185
FLORIDA BAR DESIGNATED E-MAILS:
administration@easleyappellate.com
admin2@easleyappellate.com

|     |     |
| --- | --- |
| By: | /s/ Dorothy F. Easley |
|     | DOROTHY F. EASLEY, MS, JD, BCS APPEALS |
|     | FLA. BAR NO. 0015891 |

### CERTIFICATE OF SERVICE

I hereby certify that on November 27, 2024, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record identified on the attached Service List in the manner specified, either via transmission of Notice of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notice of Electronic Filing.

### SERVICE LIST

*Lil' Joe Records v. Mark Ross et al.*

CASE NO. 1:21-CV-23727-DPG

U.S. District Court, Southern District of Florida

RICHARD WOLFE, ESQ.
WOLFE LAW MIAMI, P.A.
Latitude One Building
175 SW 7th Street, Ste. 2410
Miami, Florida 33131
T: 305-384-7370
E: rwolfe@wolfelawmiami.com
*Counsel for Plaintiff*

DOROTHY F. EASLEY, MS, JD, BCS APPEALS
EASLEY APPELLATE PRACTICE PLLC
1200 Brickell Avenue, Ste. 1950
Miami, Florida 33131
T: (305) 444-1599; 800-216-6185
FLORIDA BAR DESIGNATED E-MAILS:
administration@easleyappellate.com
admin2@easleyappellate.com
Upload URL for secure e-service:
https://www.hightail.com/u/Easley-Appellate-Practice-PLLC
** *Appellate Counsel for Plaintiff*

JOEL B. ROTHMAN, ESQ.
SRIP LAW P.A.
21301 Powerline Road, Ste. 100
Boca Raton, Florida 33343
T: 561-404-4350
E: joel.rothman@sriplaw.com
*Counsel for Defendants*

SCOTT A. BURROUGHS, ESQ. (*pro hac vice*)
David Michael Stuart Jenkins, Esq., (*pro hac vice*)
DONIGER / BURROUGHS
247 Water Street, First Floor
New York, New York 10038
T: 310-590-1820
E: scott@donigerlawfirm.com
djenkins@donigerlawfirm.com
*Counsel for Defendants*

/s/ Richard C. Wolfe
Richard C. Wolfe